# EXHIBIT 5

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| | ) |
| Special Access Rates for Price Cap Local | ) |
| Exchange Carriers | ) WC Docket No. 05-25 |
| | ) |
| AT&T Corp. Petition for Rulemaking to | ) RM-10593 |
| Reform Regulation of Incumbent Local | ) |
| Exchange Carrier Rates for Interstate Special | ) |
| Access Services | ) |
| | ) |

**REPLY COMMENTS**
**OF**
**T-MOBILE USA, INC.**

Cheryl A. Tritt
Joan E. Neal
William C. Beckwith
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, N.W.
Suite 5500
Washington, D.C. 20006
(202) 887-1500
Counsel to T-Mobile USA, Inc.

Thomas J. Sugrue
   Vice President Government Affairs
Kathleen O'Brien Ham
   Managing Director, Federal Regulatory
   Affairs
James W. Hedlund
   Senior Corporate Counsel, Federal
   Regulatory Affairs
T-MOBILE USA, INC.
401 Ninth Street, N.W.
Suite 550
Washington, D.C.  20004
(202) 654-5900

July 29, 2005

# TABLE OF CONTENTS

**Page**

SUMMARY ................................................................................................................... ii

I.      INTRODUCTION ........................................................................................... 1

II.     THE COMMENTS SHOW THAT MUCH OF THE SPECIAL ACCESS
        MARKETPLACE IS NOT COMPETITIVE ..................................................... 4

        A.      The Record Demonstrates The Lack Of Special Access Competition ................ 4

        B.      The Commission and Others Properly Use ARMIS Data in
                Gauging The Lack of Special Access Competition ............................................ 7

        C.      ILEC Analyses of the Special Access Marketplace Are
                Fundamentally Flawed ...................................................................................... 9

III.    THE COMMISSION MUST REFORM ITS PRICING FLEXIBILITY
        RULES ........................................................................................................... 13

        A.      The Record Shows That MSAs Are Too Large For Granting
                Pricing Flexibility ............................................................................................ 13

        B.      The Comments Demonstrate That Pricing Flexibility Triggers
                Must Be Strengthened ...................................................................................... 15

IV.     THE LACK OF COMPETITION IN THE SPECIAL ACCESS MARKETPLACE
        REQUIRES THE COMMISSION TO MOVE RAPIDLY TO REFORM PRICE
        CAP REGULATION OF THESE SERVICES ................................................... 17

V.      THE COMMISSION SHOULD PROHIBIT EXCLUSIONARY TERMS,
        CONDITIONS AND PRACTICES IN THE PROVISION OF SPECIAL
        ACCESS ......................................................................................................... 21

VI.     CONCLUSION .............................................................................................. 22

ATTACHMENT A

## SUMMARY

The record in this proceeding shows that the Commission must strengthen its regulation of price cap ILECs' special access services because competition is not disciplining important parts of the special access marketplace. Competition will decrease further if the proposed Verizon-MCI and SBC-AT&T mergers are approved without adequate conditions. The initial comments establish the lack of competition for high-speed links between customer premises and ILEC central offices (channel terminations) and the high-speed interoffice transport links (channel mileage) that connect ILEC central offices.

For these special access services, customers like T-Mobile generally must rely on offerings available from a single provider - the local ILEC - in any given area of the United States. Under the Commission's current pricing flexibility and price cap rules for special access, T-Mobile has experienced substantial price increases where special access pricing flexibility is in effect. Other special access purchasers report experiences similar to T-Mobile's, describing their experiences of supra-competitive pricing and exclusionary practices by price cap ILECs. As an independent wireless carrier that operates in the highly competitive wireless market, T-Mobile does not lightly recommend increased regulation, but in markets in which there is no real competition and a single provider enjoys market power, regulation is fully justified and indeed necessary based on both policy and legal considerations. This is the situation in several key special access markets and Commission intervention in these markets is clearly called for.

When, as here, the facility in question is a key input that both the supplier and purchaser utilize in order to compete in a downstream retail market, the need for

regulatory intervention is even more acute. T-Mobile purchases supra-competitively priced special access services from ILECs in order to provide service to a wide range of customers, including millions of ordinary residential consumers. T-Mobile competes against the ILECs in two markets – first, we compete directly and intensely against the ILECs' wireless services and second, we increasingly compete against their wireline services in the emerging intermodal market. As the value leader in the wireless industry offering the most minutes at most key price points, T-Mobile tends to attract consumers who are extremely price sensitive. Supra-competitively priced critical inputs into T-Mobile's service (in this case, ILEC DS1 and DS3 special access services) have the effect of limiting T-Mobile's ability to compete against its suppliers' wireline and wireless offerings. Without adequate regulation of non-competitive special access services, ordinary residential consumers will experience less competition and higher prices for mobile services and limited, if any, competition from wireless carriers for their current wireline services.

Although some ILECs strive to show that there is competition for special access services, their analyses are flawed. As the attached Second Declaration of Dr. Simon Wilkie explains, the Commission can properly rely on the ARMIS data submitted by ILECs to the Commission for examining the special access marketplace. This data shows that the ILECs have market power in the special access markets. In contrast, the competitive analyses of some ILECs depend on unrealistic assumptions that conflict completely with the documented experiences of their customers.

The record shows further that because competition cannot discipline the marketplace for special access services, the Commission must tighten its regulation of

special access services to eliminate the supra-competitive pricing and the threat of exclusionary practices that pervade the special access marketplace today.  The Commission should emphatically deny the requests of some ILECs for more lenient pricing flexibility rules or the elimination of regulatory requirements for special access.

Instead, the Commission should adopt more stringent pricing flexibility rules. The record demonstrates that MSAs are far too large to be realistic geographic markets for special access pricing flexibility.  Nor, as commenters note, are the present triggers for pricing flexibility adequate proxies for competition. The Commission should consider adopting geographic market definitions and triggers for pricing flexibility based on its analysis of similar unbundled network elements in the *Triennial Review Remand Order*.

Due to the lack of competition in the special access marketplace, the Commission's price cap regime for these services will become increasingly important, and the Commission must move rapidly to reform that regime. The record supports the imposition of improved productivity (X) and growth (g) factors, more realistic service categories, and re-initialization of rates.  As commenters discuss, the Commission should prohibit exclusionary terms, conditions and practices in the provision of special access. Although some volume and term discounts are reasonable, other terms, conditions, and practices are anticompetitive and should be prohibited.

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Special Access Rates for Price Cap Local | ) |
| Exchange Carriers | ) |
| | )     WC Docket No.  05-25 |
| AT&T Corp. Petition for Rulemaking to | ) |
| Reform Regulation of Incumbent Local | )     RM-10593 |
| Exchange Carrier Rates for Interstate | ) |
| Special Access Services | ) |
| | ) |

**REPLY COMMENTS OF T-MOBILE USA, INC.**

## I.     INTRODUCTION.

T-Mobile USA, Inc. ("T-Mobile")[1] replies to initial comments filed in this

rulemaking[2] to emphasize that the Commission must strengthen its regulation of the

special access services provided by price cap incumbent local exchange carriers

("ILECs") because much of the special access marketplace is not competitive.  Wireless

carriers like T-Mobile and other innovative firms rely on special access services

purchased primarily from ILECs to knit together their networks.  However, as the

comments show, ILECs so dominate the supply of some types of special access service

---

[1]     As a national wireless provider, T-Mobile owns licenses covering 253 million
people in 46 of the top 50 U.S. markets.  T-Mobile currently serves more than 18.3
million customers in the United States.  Via its HotSpot service, T-Mobile also provides
Wi-Fi (802.11b) wireless broadband Internet access in about 5,700 convenient U.S.
locations, such as Starbucks coffee houses, Hyatt hotels, airports, and airline clubs,
making it the largest carrier-owned Wi-Fi network in the world.

[2]     *See Special Access Rates for Price Cap Local Exchange Carriers*, Order and
Notice of Proposed Rulemaking, 20 FCC Rcd 1994 (2005) (the "*Notice*").  Hereinafter,
all comments filed in this docket are short-cited.

that they can and do subject their customers to supra-competitive pricing and exclusionary terms, conditions and practices.

In particular, competition is essentially nonexistent for the links that T-Mobile purchases as channel terminations between its customer premises – its cellular base stations – and ILEC central offices. ILECs are essentially the sole source for these links. ILECs also are T-Mobile's primary providers of special access circuits for the interoffice transport links (channel mileage) that T-Mobile requires for backhaul. Although some ILECs attempt to show that competition exists in the special access marketplace, the experience of their customers and the strong economic evidence in the record show that such competition is sparse at best and centered on the highest-capacity special access services offered in the most urban areas of the United States.

The record also shows that the competitive picture for these services is unlikely to improve in the foreseeable future. The proposed Verizon-MCI and SBC-AT&T mergers now before the Commission will, if permitted to proceed, result in the two largest ILECs absorbing two of the largest independent providers of special access services.[3] Such increased consolidation will sharpen the competitive problems of the special access marketplace, to the detriment of those firms that rely on the ILECs' special access services. T-Mobile is especially concerned because T-Mobile is not only a large special

---

[3] T-Mobile has advocated that the Commission condition approval of the Verizon-MCI and SBC-AT&T mergers on improved regulation of those firms' special access services. Those conditions are essential because of the size and market power of the surviving firms. *See* T-Mobile Comments at 6, *citing* Response of T-Mobile, WC Docket No. 05-75, at 9-14 (filed May 24, 2005); Response of T-Mobile, WC Docket No. 05-65, at 7-11 (filed May 10, 2005). The Commission should look closely at the special access pricing data filed with the Commission and/or the Department of Justice in these two merger proceedings and consider that data in this proceeding as well.

access customer, but also a competitor of most of the ILECs. T-Mobile competes vigorously in the mobile wireless marketplace, where T-Mobile's competitors include national and regional wireless carriers that are affiliates of the same ILECs that supply T-Mobile with special access circuits.

With competition lacking in the special access marketplace and unlikely to improve, the Commission should reject immediately the arguments of some price cap ILECs that seek loosening or even removal of the Commission's special access regulations.[4] Rather the Commission must improve the two forms of special access regulation discussed in the *Notice*: the pricing flexibility rules[5] and price cap regulation as implemented in the CALLS plan.[6]

As the comments show, the geographic areas (Metropolitan Statistical Areas or "MSAs") to which pricing flexibility applies are simply too large to reflect the competitive conditions that would warrant such flexibility. Nor can the Commission consider the current pricing flexibility "triggers" to be reasonable predictors of

---

[4]      *See*, *e.g.*, BellSouth Comments at 46-48; SBC Comments at 58-62; Verizon Comments at 4, 33-34.

[5]      *See* 47 C.F.R. §§ 69.701 *et seq.*; *Access Charge Reform*, Fifth Report and Order and Further Notice of Proposed Rulemaking, 14 FCC Rcd 14221 (1999), *aff'd WorldCom v. FCC*, 238 F.3d 449 (D.C. Cir. 2001).

[6]      *See Access Charge Reform*, Sixth Report and Order in CC Docket Nos. 96-262 and 94-1, Report and Order in CC Docket No. 99-249, Eleventh Report and Order in CC Docket No. 96-45, 15 FCC Rcd 12962 (2000), *aff'd in part, rev'd in part, and remanded in part*, *Texas Office of Public Util. Counsel v. FCC*, 265 F.3d 313 (5th Cir. 2001), *cert. denied, Nat'l Ass'n of State Util. Consumer Advocates v. FCC*, 535 U.S. 986 (2002), *on remand, Access Charge Reform*, Order on Remand, 18 FCC Rcd 14976 (2003). *See also Cost Review Proceeding for Residential and Single-Line Business Subscriber Line Charge (SLC) Caps*, 17 FCC Rcd 10868 (2002), *aff'd, Nat'l Ass'n of State Util. Consumer Advocates v. FCC*, 372 F.3d 454 (D.C. Cir. 2004).

competition. The Commission should adopt more granular definitions of both the geographic areas to which pricing flexibility applies and the triggers for permitting such flexibility. It should require price cap ILECs to re-apply for pricing flexibility under these stricter definitions.

There also is strong support in the record for the Commission to reform its price caps regime for special access. The Commission's price cap regulation of special access services should account for both productivity growth as well as increases in scale economies for special access services, through mechanisms such as the X and g factors. The price cap rate structure should recognize that different types of special access service face different degrees of competition, and place such services in separate service categories within the special access basket to prevent anticompetitive price manipulation. Rates for special access services subject to price caps should be reinitialized based on forward-looking economic costs.

## II. THE COMMENTS SHOW THAT MUCH OF THE SPECIAL ACCESS MARKETPLACE IS NOT COMPETITIVE.

The record in this proceeding is replete with evidence of the lack of competition in the ILECs' provision of special access services. Although some price cap ILECs attempt to argue that competition exists throughout the marketplace, their market studies and analyses are fundamentally flawed in several respects. The Commission instead should give significant weight to the actual market experiences of the special access customers that have filed in this proceeding.

### A.    The Record Demonstrates The Lack Of Special Access Competition.

The initial comments filed in this proceeding convincingly document the lack of competition in the special access market. As T-Mobile discussed in its initial comments,

T-Mobile has very little choice of competitive suppliers for its critical special access links. For the DS1 base station-to-central office links that T-Mobile purchases as channel termination service, competition is almost non-existent.[7] As a result, T-Mobile purchases more than 96 percent of these links from the ILEC in that service area.[8] For interoffice transport links that T-Mobile purchases as channel mileage service, there is only slightly more competition, and T-Mobile still purchases approximately 94 percent of these links from the ILEC in that service area.[9]

Nor are T-Mobile's experiences unique. The record sets forth similar data and experiences from a wide range of special access customers regarding the paucity of viable special access competitors. For example, Broadwing Communications LLC and SAVVIS Communications Corporation ("Broadwing/Savvis") state that they have no viable alternatives to ILECs to purchase "last mile" connections and that the ILECs continue to have a near-monopoly on these services, making it extremely difficult to obtain these circuits from others.[10] Similarly, Nextel Communications, Inc. ("Nextel") documents the BOCs' market power for special access services, noting that non-incumbent LEC alternatives are available for less than 15 percent of all buildings, even in the most competitive markets.[11] The Ad Hoc Telecommunications Users Committee ("AHTUC") states that its members have had similar experiences, and that ILECs remain

---

[7]       *See* T-Mobile Comments at 7-8 and Attachment C, Sykes Declaration ¶ 5.

[8]       *See* T-Mobile Comments at 8 and Attachment C, Sykes Declaration ¶ 5.

[9]       *See* T-Mobile Comments at 8 and Attachment C, Sykes Declaration ¶ 6.

[10]      *See* Broadwing/SAVVIS Comments at 11, 15-18.

[11]      *See* Nextel Comments at 11-12.

the sole source of special access in 98 percent of business premises nationwide, even for the largest companies.[12]

Sprint also documents the difficulty of using alternative providers of special access services.[13] Specifically, despite its affirmative attempts to diversify its access suppliers, Sprint still relied upon the RBOCs for almost 95 percent of its DS1 circuits and 83 percent of its DS3 circuits at the end of 2004.[14] PAETEC Communications ("PAETEC") also describes the continued ILEC dominance of the special access market, stating that it is dependent upon ILECs for 95 percent of its special access lines in high-density markets.[15] In addition to these high levels of dependence upon the ILECs, Sprint also notes that the Regional Bell Operating Companies ("RBOCs") have made it administratively and financial difficult to migrate facilities to a competitor, by limiting the number of circuits that can be migrated at any one time and/or by assessing unreasonably high non-recurring charges for such migration.[16]

Moreover, a scarcity of competitive suppliers is not the only indication in the record of the dearth of competition in the special access marketplace. Price cap ILECs also have increased special access prices. T-Mobile has noted that in its experience, the

---

[12]     *See* AHTUC Comments at 14-15.

[13]     *See* Sprint Comments at 6-8.

[14]     *See* Sprint Comments at 7. Furthermore, Sprint notes that AT&T and MCI were Sprint's two largest non-ILEC special access providers, so the pending mergers could further impact what little competition does exist in this market. Sprint Comments at 7-8.

[15]     *See* PAETEC Comments at 5-6.

[16]     *See* Sprint Comments at 6-7.

special access prices of Qwest, Southwestern Bell, and Pacific Bell rose by approximately 62 percent, 27 percent and 15 percent, respectively, from 2002 to 2005.[17] Similarly, Time Warner Telecom has documented price increases of 19 percent from Qwest in 2004 alone.[18]

Price cap ILECs attempt to minimize the significance of these increases by, for example, claiming that price increases for certain special access services are necessary due to the workings of the competitive marketplace.[19]  But if markets were truly competitive, such rate increases would be unsustainable, as competitors (if any) would either lower the prices for their services or new entrants would undercut the tariffed rates.

Collectively, these experiences from a wide range of special access customers present strong evidence that the marketplace for special access services is not competitive.  Accordingly, as discussed below, the Commission must revise the regulatory structure that governs these services until true competition develops.

**B.    The Commission and Others Properly Use ARMIS Data in Gauging The Lack of Special Access Competition.**

In initial comments, T-Mobile and others explain that the huge increases in special access rates of return based on ARMIS data filed by the ILECs indicate a high degree of ILEC market power in the provision of special access.[20]  Some ILECs argue that ARMIS data is not a reliable basis for assessing rate levels or rates of return.  As Dr.

---

[17]    *See* T-Mobile Comments at 10 and Attachment C, Sykes Declaration ¶ 9.

[18]    *See* Time Warner Telecom Comments at 18.

[19]    *See, e.g.,* Verizon Comments at 22; BellSouth Comments at 15-16, 19.

[20]    *See, e.g.,* T-Mobile Comments at 10-11 and Attachment C, Wilkie Declaration at ¶ 20.

Simon Wilkie explains in his Second Declaration attached to these reply comments, the ILECs provide very little actual evidence of the alleged problems with this data. Moreover, the arguments they make are flawed in several respects.[21]

First, Dr. Wilkie notes that the ILECs self-report ARMIS data. As a result, any cost misallocations are largely attributable to the ILECs' own reporting actions.[22] The Commission therefore should not permit ILECs to claim that they are complying with the Commission's reporting requirements, and at the same time to claim that their self-reported data is incorrect or useless. Moreover, as other parties in this proceeding have noted, the ILECs regularly rely on ARMIS data in related contexts.[23] Although some of the ILECs have argued that ARMIS data overstate actual returns by including all DSL revenues but not all DSL costs, other evidence introduced earlier in this docket demonstrates that any such mismatch – to the extent it exists at all – would have only a negligible impact on the ILECs' special access rates of return.[24]

Dr. Wilkie further explains that even if there were arguably some minor flaws in the ARMIS accounting data, there have been steady and significant increases in the special access rates of return since the implementation of pricing flexibility.[25] These significant increases in the rates of return – during a time when the cost accounting rules

---

[21]    *See infra* Attachment A, Wilkie Second Declaration ¶ 5 (hereinafter "Wilkie Second Declaration").

[22]    *See* Wilkie Second Declaration ¶ 7.

[23]    *See* AHTUC Comments at 29-30.

[24]    *See* Reply Comments of AT&T, RM No. 10593 at 37 (filed Jan. 23, 2003) (citing Selwyn Declaration ¶ 67).

[25]    *See* Wilkie Second Declaration ¶ 8.

have remained constant – indicate market power regardless of any minor flaws in the structure of the data collection.  Finally, Dr. Wilkie notes that, if anything, the ARMIS data underestimates the ILECs' market power.[26]

The ARMIS data therefore provide clear indicia of overall costs and rates of return.   The Commission is correct in considering such data to assess the level of competition (or lack thereof) in the special access market.  The steadily increasing rates of return reflected in the ARMIS data provide a clear indication of market power that the Commission should remedy.

C.    **ILEC Analyses of the Special Access Marketplace Are Fundamentally Flawed.**

In their initial comments, price cap ILECs argue that the special access market is competitive. These arguments are fundamentally flawed.[27]  First, in their special access market share calculations,[28] these parties erroneously characterize unbundled network elements ("UNE") as sources of special access competition and broadly compare UNEs and special access services, especially with respect to wireless carriers like T-Mobile.[29] The Commission ruled in the *Triennial Review Remand Order* that wireless carriers like T-Mobile are not eligible to purchase UNEs at all "for the exclusive provision of mobile

---

[26]    *See* Wilkie Second Declaration ¶ 9.

[27]    *See* Wilkie Second Declaration ¶¶ 11-15.

[28]    *See* BellSouth Comments at 23-37; SBC Comments at 23-24.

[29]    *See, e.g., Unbundled Access to Network Elements*, Order on Remand, 20 FCC Rcd 2533,  2565-66 (2005) ("*Triennial Review Remand Order*") (noting the difficulties of comparing UNE and special access products).

dc-419650 v9

wireless services."[30]  Nor are UNEs available for the exclusive provision of long distance service.[31]  It makes no sense for the Commission to consider UNEs in evaluating the state of special access competition when wireless providers and long distance providers are ineligible to purchase them from ILECs.

More generally, the UNE rules changed materially in February 2005, and UNEs in many areas are in the process of being eliminated.  Even if there was once significant UNE-based competition in the supply of circuits to non-wireless providers and non-long distance providers, that element of competition is, at a minimum, declining rapidly.

Moreover, as Dr. Wilkie notes, the various ILEC studies asserting price decreases for special access described in the initial comments in this proceeding do not reflect the actual experience of their customers.[32]  As noted above, T-Mobile has experienced substantial special access price increases from Qwest, Southwestern Bell and Pacific Bell over the past three years.[33]  Similarly, Time Warner Telecom has documented a price increase of 19 percent from Qwest in 2004 alone.[34]  In addition, ILEC calculations relied upon to demonstrate price decreases, as Dr. Wilkie explains, are based upon weighted averages that create misleading results.[35]  Furthermore, regardless of any price increases

---

[30]    *See id*. at 2551-52.

[31]    *Id*.

[32]    *See* Wilkie Second Declaration ¶ 13, *citing* BellSouth Comments at 14-22; SBC Comments at 21-24; Verizon Comments at 5-7, 21-22; Iowa/Valor Comments at 10-11.

[33]    T-Mobile Comments at 10 (citing Declaration of Chris Sykes ¶ 9, attached thereto).

[34]    Time Warner Telecom Comments at 18.

[35]    *See* Wilkie Second Declaration ¶ 14.

dc-419650 v9

or decreases, current prices far exceed the rates that would exist in a competitive market.[36]

Moreover, Dr. Wilkie shows that ILEC arguments regarding the availability of discounts are misleading.[37]  Discounts, even seemingly substantial discounts, are available under certain terms and conditions (including some reasonable volume and term discounts, but also including unreasonable conditions such as the imposition of exclusivity requirements).  A review of ILEC tariffs indicates that when reasonable term and volume discounts are aggregated with unreasonable exclusivity commitment discounts in a tariff offering, customers can regularly obtain discounts from the ILECs of approximately 30 to 45 percent off of the "rack rates" for special access service.[38]  This does not necessarily mean, however, that the actual price paid by customers is decreasing or that it is a competitive rate.  To the contrary, to the extent that the underlying "rack

---

[36]      *See* Initial Declaration ¶¶ 18-21.

[37]      *See* Wilkie Second Declaration ¶ 15, *citing* BellSouth Comments at 15-19; Verizon Comments at 22.

[38]      For instance, SBC's tariff for special access in Illinois provides for combined term and volume discounts of up to 52.4 percent for DS3 service.  *See* Illinois Bell Telephone Company, Tariff Ill. C.C. No. 21, § 7.4.10 (eff. Dec. 10, 2003) (SBC Illinois DS3 special access optional payment plan discounts).  Verizon's tariff for special access in California offers five-year term rates for DS1 and DS3 service that are nearly 30 percent lower than those offered for one-year terms.  Similarly, SBC's California tariff provides for five-year term plans for DS1 and DS3 service that are 20 to 30 percent lower than comparable one-year plans.  Note that these California figures are term discounts only and do not include any additionally negotiated volume or other discounts.  *See* Verizon California, Inc., Schedule Cal. P.U.C. No. K-2, § IV.B.2. (eff. May 20, 2004); Pacific Bell Telephone Company, Schedule Cal. P.U.C. No. 175-T, § 7.5.8(C) (eff. Nov. 14, 2000).  In particular, the ILECs have claimed that some carriers get an additional 10 percent discount through policies such as SBC's "MVP" plan.  *See, e.g.*, Ex Parte Letter from Gary Phillips, SBC, filed in *AT&T Petition for Rulemaking*, WC Dkt. No. 04-313 (filed Nov. 12, 2004).

rate" to which the discount applies is supra-competitive, customer prices can still be increasing or can be at inefficiently high levels despite the presence of discounts.[39] If the special access market were truly competitive, the "rack rate" itself should be at cost.

ILECs also overstate the nature and extent of intermodal competition for special access services.[40] The record demonstrates that cable companies, fixed wireless providers and other providers are not viable competitive alternatives for special access service for a variety of reasons. Regarding cable companies, there is limited cable system infrastructure to the commercial buildings that require special access services, and the Commission itself has recognized that cable modem service has certain limitations that make it an imperfect substitute for DS1 loops.[41] Similarly, with regard to fixed wireless providers, the Commission has also recognized that fixed wireless services are not an adequate substitute for high-capacity wireline loops, which Dr. Wilkie also confirms.[42] The comments of customers in this proceeding confirm these conclusions.[43]

Dr. Wilkie's Initial Declaration explained that special access prices are well above actual and constructed competitive benchmarks, and that special access rates of return

---

[39]    *See also* Time Warner Telecom Comments at 2, 17-19.

[40]    *See* Wilkie Second Declaration ¶ 22 *citing* SBC Comments at 11, 16-20; Verizon Comments at 22-31; CenturyTel Comments at 6-8; Iowa/Valor Comments at 17-18.

[41]    *Triennial Review Remand Order*, at 2637-39.

[42]    *Triennial Review Remand Order*, at 2639 n.508; Wilkie Second Declaration ¶ 2.

[43]    *See*, *e.g.*, Nextel Comments at 10 (fixed wireless and cable circuits are not adequate substitutes for wireless providers that need service to remote and isolated cell sites).

provide further evidence of the supra-competitive nature of special access prices.[44]  To further examine the state of competition in significant portions of the special access market, Dr. Wilkie examined data obtained from Telegeography that sets forth the average prices obtained from competitive bids in certain MSAs.  This data shows significant price variations, which should not occur in a uniformly competitive market.  Not surprisingly, the price variations correlate to the level of competition in that particular market.  Furthermore, as Dr. Wilkie explains, the "Law of One Price," a fundamental economic principle which normally dictates that there can only be one, lowest price where firms are selling the same good in the same relevant market, does not apply in the case of special access.[45]  Rather, as T-Mobile's experience confirms, the difference between the ILEC special access price for a circuit can vary by as much as a factor of three depending upon whether competition exists in the relevant market.[46]

## III.    THE COMMISSION MUST REFORM ITS PRICING FLEXIBILITY RULES.

### A.    The Record Shows That MSAs Are Too Large For Granting Pricing Flexibility.

The Commission should tighten its pricing flexibility rules to better reflect the limited geographic areas and the lack of competition in special access markets.  Under the current rules, the metrics or "triggers" for granting pricing flexibility apply throughout entire MSAs, which are areas far too large to be the relevant geographic

---

[44]    Initial Declaration ¶¶ 10-21.

[45]    *See* Wilkie Second Declaration ¶¶ 24-26.

[46]    *See* Wilkie Second Declaration ¶¶ 23-26.

markets for determining special access competition.[47]  As Sprint notes, special access competition does not exist uniformly in all areas and rarely in a geographic area as large as an MSA.[48]  Even if the current pricing flexibility triggers accurately measure competition for a special access service in some portion of an MSA, the resulting pricing flexibility for that service will apply throughout the entire MSA, even in those areas in which little or no competition exists.

WilTel Communications LLC ("WilTel") observes that, in some cases,  ILECs have obtained pricing flexibility for entire MSAs based on satisfying the a trigger in a single wire center in the MSA, and then have limited competition even in that wire center by adopting anticompetitive discount plans.[49]  XO Communications, Inc. ("XO"), like T-Mobile in the initial comments, points out that the Commission rejected the use of MSAs in assessing competitive conditions for transport in the *Triennial Review Remand Order* and should do so here.[50]

The Commission therefore should limit the size of the geographic area eligible for pricing flexibility.  One approach would be to adopt the geographic analysis used in the *Triennial Review Remand Order* for transport and loops.[51]  The Commission would limit the area in which pricing flexibility might apply to a wire center for special access links

---

[47]      *See* Time Warner Telecom Comments at 7.

[48]      *See* Sprint Comments at 3, 9-10.

[49]      *See* WilTel Comments at 12.

[50]      *See* XO Comments at 11; T-Mobile Comments at 12-13.

[51]      *Triennial Review Remand Order* at 2619-20 (adopting a wire center approach for loop market analysis) and 2581-82 (adopting a route-by-route approach for transport market analysis).

between customer premises and a price cap ILEC's central office, and to the route between pairs of wire centers for special access interoffice transport. This would result in a more tailored, granular analysis that would better indicate the true state of competition in a market while minimizing the overbreadth problems posed by the rules' current use of MSAs.[52]

  **B.     The Comments Demonstrate That Pricing Flexibility Triggers Must Be Strengthened.**

The record shows that an additional weakness of the pricing flexibility rules is the present system of triggers. AT&T states that the present triggers were designed to be easy to administer and that that they have resulted in pricing flexibility even in areas where there has been little investment in alternative facilities that could provide competition to the ILECs' special access offerings.[53] Time Warner Telecom notes that the operation of the current triggers suggests competition where none exists.[54] The anticompetitive result is that the ILECs are exercising market power where they have received pricing flexibility.[55]

Moreover, Dr. Wilkie's Second Declaration shows that some price cap ILECs argue unrealistically that the current pricing flexibility triggers actually understate

---

[52]     *See*, *e.g.*, Nextel Comments at 22-24, WilTel Comments at 21-22. Another reasonable alternative would be to use a zone definition based upon line densities. *See Notice* at 2024.

[53]     *See* AT&T Comments at 3.

[54]     *See* Time Warner Telecom Comments at 4-6; AT&T Comments at 3.

[55]     *See* Time Warner Telecom Comments at 15-21.

competition.[56]  To the contrary, however, the converse problem exists for any proxy-type trigger, *i.e.*, that such a trigger also captures collocators that are not actual or potential competitors for special access service.[57]  For example, there are carriers that may be collocated in an ILEC central office to serve their own needs, but that do not provide (and have no intention of providing) any loop or transport services.[58]

Particularly for base station-to-central office links, the existence of multiple collocators simply does not result in special access competition, because as Dr. Wilkie has explained, these links have the economic characteristics of natural monopolies.[59]  In short, the larger problem with the triggers is that they overstate competition for important types of special access services.  Furthermore, as Dr. Wilkie states, the complementary nature of telecommunications network circuits within MSAs and the negative impact of this complementarity on competition has lead to market conditions that are inconsistent with economic efficiency and the goals of Congress and the FCC.[60]

---

[56]    *See, e.g.,* BellSouth Comments at 50-55; Verizon Comments at 35-37; Iowa/Valor Comments at 19-20; USTA Comments at 15-16.

[57]    *See* Wilkie Second Declaration ¶ 16.

[58]    In addition, as the Commission suggested in the *Notice*, collocated carriers may have ceased operating in particular markets altogether due to financial distress.  *See Notice* at 2030 (observing that numerous competitors have exited the market in whole or in part since 1999 and questioning whether, as a result, collocation continues to be an accurate proxy for irreversible competitive market entry).

[59]    *See* Wilkie Second Declaration ¶ 16, *citing* Initial Declaration ¶¶ 5-9 (explaining that base station-to-central office links have only one customer, carry low volumes of traffic and involve primarily sunk costs).

[60]    *See* Wilkie Second Declaration ¶¶ 17-21.

Because of these serious weaknesses in the existing rules, the Commission also should adopt more stringent triggers for price cap LECs before they can obtain pricing flexibility for more narrowly defined geographic markets.  One possibility for new triggers would be to adopt the *Triennial Review Remand Order* triggers for the UNEs that are functionally equivalent to special access services, *i.e.,* high-capacity loops and transport.[61]   The UNE triggers, which the Commission developed earlier this year after a detailed competitive analysis in the *Triennial Review Remand Order*, are much better predictors of the type of competitive pressures that will discipline interstate special access rates than the existing triggers, which date from 1999.  Further, the UNE triggers are more stringent than the current triggers for pricing flexibility, better ensuring against supra-competitive pricing of special access services and other abuses of market power.

T-Mobile and others support the Commission's tentative conclusion in the *Notice* that the Commission should apply any new pricing flexibility rules to all areas and services,  including those for which ILECs already have obtained pricing flexibility.[62] Failure to apply the new rules to all areas and services would give the ILECs free rein to continue to exercise market power in those MSAs where they have obtained pricing flexibility.[63]

---

[61]     *See* Nextel Comments at 22-24.  *See also Triennial Review Remand Order* at 2597-2604 (transport triggers) and 2629-2633 (loop triggers).

[62]     *See, e.g*., Nextel Comments at 17, 25-26; WilTel Comments at 20-24.

[63]     For services in areas now permitted pricing flexibility that will lose this status under the new rules, the Commission should set the rates for these services to be the same as the rates under the new rules for services that have never been eligible for pricing flexibility.

**IV.    THE LACK OF COMPETITION IN THE SPECIAL ACCESS
        MARKETPLACE REQUIRES THE COMMISSION TO MOVE RAPIDLY
        TO REFORM PRICE CAP REGULATION OF THESE SERVICES.**

When special access services in a geographic area are not eligible for pricing

flexibility under the rule changes proposed by T- Mobile, price cap regulation should

apply.  However, as the *Notice* and several of the commenters recognize, the current price

cap regime must be updated and revised to address the issues posed by special access

services that are not subject to competition.[64]

Some ILECs level a wide variety of criticisms at price cap regulation as applied to

special access.[65]  They attempt to cast doubt on the feasibility of determining productivity

growth and scale economies for special access services and translating those

determinations into productivity factors and g-factors.  They question the factual

predicates for such factors, arguing, for example, that there is no indication that any

productivity gains are attributed to special access services in particular.  They argue

against re-initializing rates for special access services subject to price caps.

While these arguments are not unexpected, they are beside the point.   The record

shows that competition does not exist in much of the special access marketplace. Price

cap regulation is the Commission's tool for controlling the prices of services over which

ILECs have market power, so that such prices are consistent with Title II of the

Communications Act.  Therefore, the Commission must revise price cap regulation as

---

[64]    *See*, *e.g.,* WilTel Comments at 16-19; Nextel Comments at 17; AHTUC
Comments at 26-27, 37-50.

[65]    *See*, *e.g.*, BellSouth Comments at 55-56; Qwest Comments at 5-18; SBC
Comments at 37-48; Verizon Comments at 39-44.

needed to prevent anticompetitive conduct by the ILECs as well as supra-competitive pricing.[66]

T-Mobile concludes that in revising the special access regulatory regime, the Commission must re-initialize rates for special access services that will be subject to price caps.  As described above, current special access prices are supra-competitive and have been increasing. As the Commission established in the *Triennial Review Remand Order* with respect to UNEs, those rates should be based on forward-looking economic costs.[67]  An improved price cap regime should also account for productivity growth and increases in scale economies for special access services, using appropriate X-factor and g-factor mechanisms.[68]  As the Commission noted, special access services "have significant economies of scale and scope."[69]  The price cap regime for special access should reflect such efficiencies.

A revised price cap rate structure should also place services facing different levels of competition into separate service categories within the special access basket to prevent any anticompetitive price manipulation. Although several categorizations are possible,[70] the Commission should consider one category for channel termination/channel mileage

---

[66]     *See* New Jersey Office of the Ratepayer Advocate Comments at 6-7.

[67]     *See* WilTel Comments at 17-18; Comptel/ALTS Comments at 21-30.

[68]     *See* AHTUC Comments at 43-48; Nextel Comments at 18-20; PAETEC Comments at 17-18.

[69]     *Notice* at 2004.

[70]     *See*, *e.g.*, Nextel Comments at 20-21.

(which face little or no competition) and a separate category for links between LEC wire centers and MSCs, and other services.

As discussed above, Dr. Wilkie's Second Declaration concludes that (1) existing special access prices are supracompetitive and (2) the MSA is an overbroad market for application of pricing flexibility rules.[71] Dr. Wilkie suggests an alternative general remedy, which is for the Commission to recalibrate special access rates by applying the commonly available 30 to 45 percent discount (described above) to existing rates.[72] This resulting price would be the tariffed, generally available "rack rate" for special access services, and this rate would apply subject only to reasonable terms and conditions (such as a one-year term commitment with a portability option).  For example, the ILECs should not be allowed to use their market power to impose exclusivity commitments on special access customers.  Carriers would then be free to negotiate any further flexible individual arrangements or discounts that they wish.  This approach would capture the consumer welfare benefits of competition in the current, noncompetitive special access marketplace.  Because the ILECs regularly provide such services at this price currently, this rate level can be presumed to cover ILEC costs as well as provide a profit.  This approach would also ensure that special access customers have access to efficient, market-calibrated prices without being forced to accept unduly onerous, anticompetitive conditions.

T-Mobile recognizes that it may take several months for the Commission to resolve the issues associated with revising the price cap regime for special access

---

[71]    *See* Wilkie Second Declaration ¶ 27, *citing* Initial Declaration ¶¶ 22-24.

[72]    *See* Wilkie Second Declaration ¶ 27.

services, especially in light of the unconstructive positions that some ILECs have taken in the initial comments. T-Mobile again urges the Commission to impose an interim 5.3 percent X-factor on special access services while this rulemaking is pending.[73] Other parties have advocated similar interim action, which is necessary to relieve special access customers of the supra-competitive prices that they are paying today under the Commission's current rules.[74]

## V.    THE COMMISSION SHOULD PROHIBIT EXCLUSIONARY TERMS, CONDITIONS AND PRACTICES IN THE PROVISION OF SPECIAL ACCESS.

T-Mobile agrees with some commenters that term and volume discounts for special access services may be both efficient and not unreasonably discriminatory.[75] However, the record also is replete with descriptions of a variety of anti-competitive and exclusionary terms, conditions, and practices by ILECs in providing special access services.[76] The Commission should bar price cap ILECs from all forms of anti-competitive and exclusionary behavior with respect to their special access services. Where competition is well established, such a bar need no longer apply, but the

---

[73]    *See* T-Mobile Comments at 21-24.

[74]    *See*, *e.g.*, Nextel Comments at 25-26; AT&T Comments at 6.

[75]    *See* WilTel Comments at 19; CompTel/ALTS Comments at 34.

[76]    Other commenters identify unreasonable exclusivity provisions imposed by the ILECs. *See*, *e.g.*, AT&T Comments at 6-8 (ILECs unreasonably condition volume discounts on customers' previous purchase levels); ATX/Bridgecom/Broadview Comments at 35-39 (describing region-wide commitments and "access service ratio" imposed by SBC); PAETEC Comments at 8-9 (describing how large termination fees prevent customers from using competitive alternatives); Sprint Comments at 6-7 (describing how the RBOCs have made it administratively and financially impossible to efficiently migrate existing special access facilities to alternative access vendors); WilTel Comments at 13-15, 19-20, 24-25 (describing ILEC near-exclusivity requirements enforced by penalties).

Commission should be cautious in relaxing this bar in order to protect against anticompetitive abuses.

## VI.    CONCLUSION.

The initial comments in this proceeding demonstrate that competition does not exist in much of the special access marketplace.  Because industry consolidation is eliminating two of the largest special access competitors, prospects are dim for any improvement in special access competition in the foreseeable future.  The Commission therefore should tighten the geographic areas to which any pricing flexibility would apply and adopt more stringent triggers for permitting pricing flexibility.  T-Mobile further urges the Commission to strengthen the price cap regime as applied to interstate special access services.

|  | Respectfully submitted, |
|---|---|

Cheryl A. Tritt
Joan E. Neal
William C. Beckwith
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, N.W.
Suite 5500
Washington, D.C. 20006
(202) 887-1500
Counsel to T-Mobile USA, Inc.

/s/ Thomas J. Sugrue
Thomas J. Sugrue
   Vice President Government Affairs

/s/ Kathleen O'Brien Ham
 Kathleen O'Brien Ham
   Managing Director,
      Federal Regulatory Affairs

/s/ James W. Hedlund
 James W. Hedlund
   Senior Corporate Counsel,
      Federal  Regulatory Affairs

T-MOBILE USA, INC.
401 Ninth Street, N.W.
Suite 550
Washington, D.C.  20004
(202) 654-5900

July 29, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2005, a copy of the foregoing **REPLY COMMENTS** was served by electronic mail, upon the following:

Daniel Gonzalez
Office of Chairman Martin
Federal Communications Commission
445 12th Street, SW
Washington, DC  20554
Email:  daniel.gonzalez@fcc.gov

Michelle Carey
Office of Chairman Martin
Federal Communications Commission
445 12th Street, SW
Washington, DC  20554
Email:  michelle.carey@fcc.gov

Lauren Belvin
Office of Commissioner Abernathy
Federal Communications Commission
445 12th Street, SW
Washington, DC  20554
Email:  lauren.belvin@fcc.gov

Jessica Rosenworcel
Office of Commissioner Copps
Federal Communications Commission
445 12th Street, SW
Washington, DC  20554
Email:  jessica.rosenworcel@fcc.gov

Scott Bergmann
Office of Commissioner Adelstein
Federal Communications Commission
445 12th Street, SW
Washington, DC  20554
Email:  scott.bergmann@fcc.gov

Tamara Preiss
Division Chief
Pricing Policy Division
Wireline Competition Bureau
Federal Communications Commission
445 12th Street, SW
Washington, DC  20554
Email:  tamara.preiss@fcc.gov

Margaret Dailey
Acting Deputy Division Chief
Pricing Policy Division
Wireline Competition Bureau
Federal Communications Commission
445 12th Street, SW
Washington, DC  20554
Email:  margaret.dailey@fcc.gov

Jeremy Marcus
Wireline Competition Bureau
Federal Communications Commission
445 12th Street, SW
Washington, DC  20554
Email:  Jeremy.marcus@fcc.gov

Thomas Navin
Wireline Competition Bureau
Federal Communications Commission
445 12th Street, SW
Washington, DC  20554
Email:  thomas.navin@fcc.gov

Best Copy and Printing, Inc.
Portals II
445 12th Street, SW
Room CY-B402
Washington, DC  20554

E-mail:  fcc@bcpiweb.com

/s/ Theresa L. Rollins
Theresa L. Rollins