## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 1:05CV02102 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| SBC Communications, Inc. and AT&T Corp., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 1:05CV02103 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| Verizon Communications Inc. and MCI, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF UNITED STATES' RESPONSE TO PUBLIC COMMENTS

Pursuant to the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) ("APPA" or "Tunney Act"), the United States hereby responds to the public comments received regarding the proposed Final Judgments in these cases. After careful consideration of the comments, the United States continues to believe that the proposed Final Judgments will provide an effective and appropriate remedy for the antitrust violations alleged in the Complaints. The United States will move the Court for entry of the proposed Final

Judgments after the public comments and this Response have been published in the *Federal Register*, pursuant to 15 U.S.C. § 16(d).

On October 27, 2005, the United States filed the Complaints in these matters alleging that the proposed acquisition of AT&T Corp. ("AT&T") by SBC Communications, Inc. ("SBC"), and the proposed acquisition of MCI, Inc. ("MCI") by Verizon Communications Inc. ("Verizon"), would violate Section 7 of the Clayton Act, 15 U.S.C. § 18.[1]  Simultaneously with the filing of the Complaints, the United States filed proposed Final Judgments[2] and Stipulations signed by plaintiff and defendants consenting to the entry of the respective proposed Final Judgments after compliance with the requirements of the Tunney Act.  Pursuant to those requirements, the United States filed Competitive Impact Statements ("CISs") in this Court on November 16, 2005; published the proposed Final Judgments and CISs in the *Federal Register* on December 15, 2005, see *United States v. SBC Communications Inc. and AT&T Corp.,* 70 Fed. Reg. 74,334, 2005 WL 3429685; *United States v. Verizon Communications Inc. and MCI, Inc.*, 70 Fed. Reg. 74,350, 2005 WL 3429686; and published summaries of the terms of the proposed Final

---

[1] Because these matters raised similar issues, including almost identical allegations of competitive harm and proposed relief, the United States filed an uncontested motion to consolidate them on November 1, 2005.  That motion was granted by the Court.  Because the Complaints, Competitive Impact Statements, and proposed Final Judgments in the two matters are virtually identical, the documents will be referred to collectively.  Moreover, because the comments received by the United States generally relate to both matters, this response will also refer to both, unless otherwise indicated.

[2] The United States filed amended proposed Final Judgments on November 28, 2005. The amendments added appropriate procedural recitals regarding the Court's public interest determination to both proposed Final Judgments and corrected an error in the SBC/AT&T proposed consent decree, conforming it to the parties' intent.  The SBC/AT&T Competitive Impact Statement reflects the correction to the proposed Final Judgments.  The corrected versions, not the original versions, were published in the *Federal Register*.  None of the public comments addressed this aspect of the proposed Final Judgment.

Judgments and CISs, together with directions for the submission of written comments relating to

the proposed Final Judgments, in *The Washington Post* for seven days beginning on December 8,

2005 and ending on December 14, 2005. The 60-day period for public comments ended on

February 13, 2006, and three comments were received as described below and attached hereto.

## I.    Background:  The United States' Investigation and Proposed Resolution

On January 30, 2005, SBC entered into an agreement to acquire AT&T.  On February 14,

2005, Verizon entered into an agreement to acquire MCI.  Over the following eight and a half

months, the United States Department of Justice ("Department") conducted an extensive,

detailed investigation into the competitive effects of the proposed transactions.  As part of this

investigation, the Department issued Second Requests to the merging parties, as well as more

than 60 Civil Investigative Demands to third parties.  In response, the Department received and

considered more than 25 million pages of material.  More than 200 interviews were conducted

with customers, competitors, and other individuals with knowledge of the industry.  Two

commenters here – COMPTEL and ACTel – represented carriers who had complaints about the

proposed transactions; the investigative staff carefully analyzed their allegations and

submissions, as well as the views and data presented by dozens of others.  While the Department

was reviewing these transactions, the Federal Communications Commission ("FCC"),[3] numerous

---

[3]  The FCC approved the proposed mergers in orders adopted on October 31, 2005, and released on November 17, 2005, including voluntary commitments of the parties as conditions. Memorandum Opinion and Order, *In the Matter of SBC Communications Inc. and AT&T Corp. Applications for Approval of Transfer of Control,* FCC WC Docket No. 05-65 (rel. Nov. 17, 2005), 2005 WL 3099626; Memorandum Opinion and Order, *In the Matter of Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control,* FCC WC Docket No. 05-75 (rel. Nov. 17, 2005), 2005 WL 3099625 (collectively "FCC Orders").

state public utility commissions, and several state Attorneys General conducted their own reviews. The third commenter, the Attorney General of the State of New York, was one of the reviewing state officials.

As part of the Department's investigation, it considered the potential competitive effects of these transactions on numerous products, customer groups, and geographic areas. For the vast majority of these, the Department concluded that the proposed mergers were unlikely to reduce competition. Indeed, the Department concluded that, viewed as a whole, the transactions were likely to create substantial efficiencies that could benefit consumers. For the most part, the mergers combined firms with complementary strengths, assets, and customer bases. Whereas SBC's and Verizon's strengths were in the "mass market" and small business segments, AT&T's and MCI's strengths were in serving large enterprises; whereas SBC and Verizon had very extensive local networks, AT&T and MCI had extensive national and international networks. In areas of significant overlap, with the exception of the markets alleged in the Complaints, there will remain, post-merger, sufficient competitive alternatives such that no anticompetitive effects are likely.

Because AT&T and MCI have among the most extensive local networks of any competitive local exchange carriers ("CLECs") in SBC's and Verizon's regions, the Department devoted substantial time and resources to analyzing those overlapping assets, and the products and markets they implicated to determine whether the merger would likely reduce competition.[4]

---

[4] Local networks typically are comprised principally of fiber-optic cable running throughout the metropolitan area. Fiber connecting aggregation points is often called "transport" fiber, and fiber running from a central office or node to an end-user building is often referred to as a loop or "last-mile connection." These local networks are typically used to provide services to large enterprise customers. As part of its investigation, the Department interviewed scores of

The Department sought extensive data from the merging firms as well as dozens of CLECs regarding their local networks, and the products provided over those networks.  In every metropolitan area of overlap, the Department found that there were multiple CLECs with local networks offering products and services very similar to the merging firms.  Indeed, in most of the overlapping metropolitan areas the acquired CLEC did not even have the most extensive local network in terms of number of buildings connected or miles of fiber-optic cable installed.  And even in the few cases where the acquired CLEC did have the most extensive local network, there were ample other firms that have extensive networks and that continue to grow those networks.

Nevertheless, the Department identified one limited competitive problem:  for hundreds of buildings, the transactions would combine the only two firms that owned or controlled a direct fiber-optic connection to the building, and for a subset of these buildings, entry (i.e., another carrier constructing its own fiber-optic connection) was not sufficiently likely to offset the potential anticompetitive effect.  These fiber-optic connections are used to provide Local Private Lines[5] to wholesale and retail customers and value-added telecommunications services that rely on Local Private Lines.  Accordingly, the Department filed Complaints alleging competitive

---

such customers, and received affidavits from dozens of others.  In general, customers had little competitive concern regarding the proposed mergers and, indeed, many believed they were likely to be beneficial.

[5] "A Local Private Line is a dedicated, point-to-point circuit offered over copper and/or fiber-optic transmission facilities that originates and terminates within a single metropolitan area and typically includes at least one local loop.  Local Private Lines are sold at both retail (to business customers) and wholesale (to other carriers).  [SBC and Verizon refer] to Local Private Line circuits as 'special access.'  Depending on how they are configured, Local Private Lines can be used to carry voice traffic, data, or a combination of the two.  Local Private Lines may be purchased as stand-alone products but are also an important input to value-added voice and data telecommunications services that are offered to business customers."  Complaints ¶¶ 13-14.

harm in this set of buildings and sought a remedy that would ensure that for each of the buildings

where there would otherwise be a reduction in competition, there would be, post-merger, another

carrier besides the merged firm with a direct fiber-optic connection to the building. In the

Department's judgment, a divestiture of fiber-optic capacity to the buildings of concern would

remedy this potential loss of competition.[6]

As explained more fully in the Complaints and CISs, the proposed transaction would

lessen competition substantially for (a) Local Private Lines and (b) voice and data

telecommunications services that rely on Local Private Lines in several hundred commercial

buildings. To restore competition, the proposed Final Judgments, if entered, would require a

divestiture of indefeasible rights of use ("IRUs")[7] for lateral connections[8] to the buildings in

question along with transport facilities[9] sufficient to enable the IRUs to be used by the purchaser

to provide telecommunications services. Entry of the proposed Final Judgments would terminate

---

[6] The modest nature of the competitive problem, as compared to the overall value of the mergers, is illustrated by the fact that in 2004, Local Private Lines offered by AT&T in SBC's territory accounted for less than 0.3 per cent of AT&T's total revenues. And, the revenues attributable to the buildings at issue in this case would be a fraction of that.

[7] "An IRU (or indefeasible right of use) is a long-term leasehold interest commonly used in the telecommunications industry that gives the holder the right to use specified strands of fiber in a telecommunications facility." CISs at 11.

[8] A "lateral connection" is the last segment of the fiber-optic cable to a building, running from the point of entry of the building to the splice point with fiber used to serve different buildings. CISs at 10.

[9] "Transport," as used in the industry, has no precise meaning but generally refers to fiber-optic capacity to carry data between aggregation points on a network. Often, it is used to refer to "interoffice transport," i.e., carriage of data between two central offices (switching facilities). In the proposed Final Judgments and CISs the term more broadly refers to facilities used to carry data from the splice point of the lateral connection to the purchaser's network. CISs at 9-11.

these actions, except that the Court would retain jurisdiction to construe, modify, or enforce the

provisions of the proposed Final Judgments and punish violations thereof.[10]

## II.     Legal Standard Governing the Court's Public Interest Determination

Upon publication of the public comments and this Response, the United States will have

fully complied with the Tunney Act.  It will then ask the Court to determine that entry of the

proposed Final Judgments would be "in the public interest," and to enter them.  15 U.S.C.

§ 16(e).  In making its public interest determination, the Court shall consider:

> (A)     the competitive impact of such judgment, including termination of alleged
> violations, provisions for enforcement and modification, duration or relief sought,
> anticipated effects of alternative remedies actually considered, whether its terms
> are ambiguous, and any other competitive considerations bearing upon the
> adequacy of such judgment that the court deems necessary to a determination of
> whether the consent judgment is in the public interest; and

> (B)     the impact of entry of such judgment upon competition in the relevant market or
> markets, upon the public generally and individuals alleging specific injury from

---

[10] The SBC/AT&T merger closed on December 18, 2005, and the Verizon/MCI merger closed on January 6, 2006.  In keeping with the United States' standard practice, neither the Stipulations nor the proposed Final Judgment prohibited closing the mergers.  *See* ABA Section of Antitrust Law, *Antitrust Law Developments* 387 (5th ed. 2002) (noting that "[t]he Federal Trade Commission (as well as the Department of Justice) generally will permit the underlying transaction to close during the notice and comment period").  Such a prohibition could interfere with many time-sensitive deals or prevent the realization of substantial efficiencies.  Here, the magnitude of the potential competitive harm from the mergers was relatively small, but delaying the closing of the transactions by the several months required for the Tunney Act public interest determination could have cost tens, if not hundreds, of millions of dollars in lost efficiencies from the transactions as a whole.  In consent decrees requiring divestitures, it is also standard practice to include "preservation of assets" clauses in the decree and stipulation to ensure that the assets to be divested remain competitively viable.  That practice was followed here.  Proposed Final Judgments § VIII; Stipulations § V.  In appropriate cases, particularly where a separate, distinct operating business is to be divested, "hold separate" provisions are also included.  In the Proposed Final Judgments at issue here, no "hold separate" provisions were necessary or appropriate, as the divested assets are not of a type that could meaningfully be "held separate."

> the violations set forth in the complaint including consideration of the public
> benefit, if any, to be derived from a determination of the issues at trial.

*Id.* § 16(e)(1). As the Court of Appeals has held, the Tunney Act permits a court to consider, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the proposed Final Judgment is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the proposed Final Judgment may positively harm third parties. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458-62 (D.C. Cir. 1995).

The Tunney Act is not intended to impose on a court procedures that would impair the utility of consent decrees in antitrust enforcement. Thus, the Act is not to "be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2)(2006). In conducting its public interest inquiry, "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney).[11] Rather:

> [a]bsent a showing of corrupt failure of the government to discharge its duty, the
> Court, in making its public interest finding, should . . . carefully consider the
> explanations of the government in the competitive impact statement and its
> responses to comments in order to determine whether those explanations are
> reasonable under the circumstances.

---

[11] The public interest determination can be made on the basis of the CISs and the United States' Response to Comments. The Tunney Act authorizes the court to use various procedures to gather additional information, 15 U.S.C. § 16(f), but a court need not invoke them unless it believes that the information already available is insufficient to resolve any critical issues that the public comments may have raised. *See* H.R. Rep. No. 93-1463, 93d Cong., 2d Sess. 8-9 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6535, 6538-39.

*United States v. Mid-America Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at ¶ 71,980, 1997 WL 4352, at *9 (W.D. Mo. 1977).

A court's task under the Tunney Act is to review the negotiated settlement of a dispute, not to devise a remedy for an adjudicated antitrust violation. Accordingly, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (quoting *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62.[12] Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[13]

The proper test of the proposed Final Judgment, therefore, is not whether it is certain to eliminate every anticompetitive effect of a particular merger or to assure absolutely undiminished competition in the future. Court approval of a consent judgment must be subject to a standard more flexible and less strict than the standard the court would apply were it devising a remedy

---

[12] *Cf. United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (recognizing it was not the court's duty to determine whether the proposed decree was the best settlement, because the parties, not the court, settle the dispute).

[13] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [Tunney Act] is limited to approving or disapproving the consent decree"); *Gillette*, 406 F. Supp. at 716 (noting that the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"); *see generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

after an adjudication of liability.  *Microsoft*, 56 F.3d at 1460-61 ("[W]hen a consent decree is

brought to a district judge, because it is a settlement, there are no *findings* that the defendant has

actually engaged in illegal practices.  It is therefore inappropriate for the judge to measure the

remedies in the decree as if they were fashioned after trial." (citation omitted)); *see also United*

*States v. AT&T Corp.*, 552 F. Supp. 131, 151 (D.D.C. 1982) ("[A] proposed decree must be

approved even if it falls short of the remedy the court would impose on its own, as long as it falls

within the range of acceptability or is 'within the reaches of public interest.'") (quoting *Gillette*,

406 F. Supp. at 716))), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *United*

*States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent

judgment even though the court might have imposed a greater remedy had the matter been

litigated).

      The Court must evaluate the adequacy of the proposed decree as a remedy for the antitrust

violations alleged in the Complaint, not for other supposed violations.  The Tunney Act does not

authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against

that case."  *Microsoft*, 56 F.3d at 1459.  Because the "court's authority to review the decree

depends entirely on the government's exercising its prosecutorial discretion by bringing a case in

the first place," it follows that "the court is only authorized to review the decree itself," and not

to "effectively redraft the complaint" to inquire into other matters that the United States did not

pursue.  *Id*. at 1459-60.  The United States is entitled to "due respect" concerning its "prediction

as to the effect of proposed remedies, its perception of the market structure, and its view of the

nature of the case."  *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C.

2003) (citing *Microsoft*, 56 F.3d at 1461).

In 2004, Congress amended provisions of the Tunney Act, but the amendments did not materially affect the scope or standard of review.  Where pre-amendment the Act provided a list of factors a court "may" consider in making its public interest determination, post-amendment the court "shall" consider the listed factors.  *Compare* 15 U.S.C. § 16(e)(2004) *with* 15 U.S.C. § 16(e)(1)(2006) (amended version).  Of course, even before the amendment courts were unlikely to choose to ignore factors that were on the list, and thus of clear congressional interest, merely because the statute used "may" rather than "shall."  The amendment also slightly modified the list of factors.  It added one new factor (whether the terms of the judgment are ambiguous, 15 U.S.C. § 16 (e)(1)(A), which the Court of Appeals had already made clear was appropriate to consider, *Microsoft*, 56 F.3d at 1461-62); modified a catch-all factor to limit its scope to *competitive* considerations;[14] and added "upon competition in the relevant market or markets" to the list of impacts to be considered, 15 U.S.C. § 16 (e)(1)(B), as one would expect in an antitrust case.  As for procedure, the amendment added the unambiguous directive that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene."  15 U.S.C. § 16 (e)(2).

In addition to amending the Tunney Act, Congress made findings.  In particular, it found that "it would misconstrue the meaning and Congressional intent in enacting the Tunney Act to limit the discretion of district courts to review antitrust consent judgments solely to determining

---

[14] The language was modified to read "any other *competitive* considerations bearing upon the adequacy of such judgment *that the court deems necessary to a determination of whether the consent judgment is in the public interest.*"  15 U.S.C. § 16 (e)(1)(A) (italics indicate new language).

whether entry of those consent judgments would make a 'mockery of the judicial function.'"[15]

That finding seems entirely correct. And, so far as we know, no court has *ever* construed the

Tunney Act to limit judicial review *solely* to whether the proposed judgment would make a

"mockery of the judicial function."[16] In any event, Congress in 2004 did not change the

applicable standard, but limited itself to a finding purporting to clarify its intent of 30 years ago –

a finding that is not inconsistent with the case law's interpretation of the Tunney Act.

The purpose of the Tunney Act, both before and after amendment, is clear: courts must

determine that a proposed decree is in the public interest before entering it, and must do so after

the public has had an opportunity to comment and the government has responded to any

comments. As part of that determination, a court should consider certain factors listed in the Act

relating to the competitive impact of the judgment and whether it adequately remedies the harm

alleged in the complaint. But the scope of a court's review is not unlimited: the Tunney Act

does not permit a court to redraft the complaint, examine possible competitive harm the United

---

[15] Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, § 221(a)(1)(B), 118 Stat. 661, 668 (2004).

[16] "[M]ockery of the judicial function" echoes *Microsoft*'s "[a] decree . . . is a judicial act, and therefore the district judge is not obliged to accept one that, on its face and even after government explanation, appears to make a *mockery of judicial power*." *Microsoft*, 56 F.3d at 1462 (emphasis added). The Court of Appeals was, of course, not limiting Tunney Act review solely to whether a decree makes a "mockery of judicial power." It explicitly stated that in a Tunney Act review, "the court can and should inquire . . . into the purpose, meaning, and efficacy of the decree. If the decree is ambiguous, or the district judge can foresee difficulties in implementation, we would expect the court to insist that these matters be attended to. And, certainly, if third parties contend that they would be positively injured by the decree, a district judge might well hesitate before assuming that the decree is appropriate." *Id.* at 1462. A comparison of the Tunney Act as amended, and the associated congressional findings, with *Microsoft* perhaps suggests why Senator Hatch, then Chairman of the Senate Judiciary Committee, said that "this amendment essentially codifies existing case law." 150 Cong. Rec. S3610, at S3613 (daily ed. Apr. 2, 2004).

States did not allege, or engage in a wide-ranging search for the relief that would *best* serve the public.

### III. Summary of Public Comments and Responses

During the 60-day public comment period, the United States received comments from COMPTEL, ACTel, and the New York State Attorney General.  Upon review, the United States believes that nothing in the comments warrants a change in the proposed Final Judgments or is sufficient to suggest that the proposed Final Judgments are not in the public interest.  These comments, in large measure, do not address whether the proposed remedy adequately redresses the competitive harm alleged in the Complaints, but rather whether the United States should have brought a different, much broader case.  The comments do include some concerns relating to whether the proposed Final Judgments adequately remedy the alleged harms.  The United States addresses these concerns below and explains how the remedy is appropriate.

A.     ACTel

1.     Summary of Comment

The Alliance for Competition in Telecommunications ("ACTel") is a group whose members include CLECs and interexchange carriers ("IXCs") that buy Local Private Lines at wholesale from the merging companies,[17] and compete against the merging companies for retail

---

[17] ACTel Comment at 3 (attached hereto as Attachment 1).  ACTel was formed in March 2005 by six competitive carriers "to challenge the Verizon/MCI and SBC/AT&T mergers" and was an active complainant in both the United States' and FCC's investigations of these transactions.  *Competitive Carriers Challenge Telecom Mergers* (Mar. 15, 2005), *available at* http://www.allianceforcompetition.com/newsroom/release/050315-1.php.

business customers.  On February 9, 2006, ACTel submitted a comment alleging that the proposed remedy "cannot succeed" and fails to meet the Tunney Act standard.  After some discussion of that standard,[18] and a description of ACTel's view of the wholesale markets for Local Private Lines, ACTel criticizes the proposed Final Judgments.  ACTel notes that whereas the Complaints allege harm to competition in the provision of Local Private Lines, the remedy is focused on the divestiture of (a) certain laterals to particular buildings, and (b) sufficient transport to connect those circuits to the network of the entity purchasing the divested lateral circuits.  ACTel identifies what it claims are three "deficiencies" in the remedy that will prevent it from being effective.

First, ACTel notes that the proposed Final Judgments do not cover all buildings for which the mergers will reduce the number of Local Private Line competitors from "2 to 1" (i.e., buildings where only the merging firms have last-mile connections).  Relying on data purchased from a third party, ACTel contends that the number of buildings for which the United States seeks relief is at least two orders of magnitude less than the number of buildings it believes present a 2-to-1 problem.  It thus contends that the "Government's remedy does not include all buildings that the Complaint purports to cover," suggests that the "Government needs to explain its methodology," and argues that "[i]f the Proposed Final Judgment does not address <u>all</u>

---

[18] ACTel states that the public interest determination here "will constitute the first significant application of the Tunney Act since Congress amended that statute in 2004."  ACTel Comment at 4.  However, since the effective date of the Tunney Act amendments – June 22, 2004 – at least 12 antitrust consent decrees have been reviewed by courts, found to be in the public interest, and entered.

situations in which AT&T is eliminated as the only facilities-based competitive alternative to SBC for loops, the court must withhold its approval of the settlements."[19]

Second, ACTel contends that the proposed Final Judgments are deficient because they address "only the part of the Local Private Line that connects to a building, not the part of the Private Line that connects to a carrier's network."  It argues that if the number of suppliers of the "transport" part of the network (the part of a circuit that interconnects carrier central offices) goes from two to one, customers of Local Private Lines will still be subject to competitive harm, and contends that the United States must look at transport on a "segment by segment" basis.  In short, ACTel contends that the proposed remedy is ineffective because customers will "still be subject to the '2 to 1' choke hold because the Government's remedy does not include transport (unless it is attendant to a divested loop for a building)."[20]

ACTel's third alleged deficiency is that the remedy addresses only 2-to-1 situations, whereas it believes there are "many 'anticompetitive effects' in Private Line situations beyond '2 to 1' loops."[21]  In particular, it argues that 4-to-3 and 3-to-2 situations also create a competitive problem here, and suggests that the United States has done "an about-face" and engaged in a "significant departure from established and documented procedures" by not alleging a competitive problem in those instances.[22]  Finally, ACTel argues that a purchaser of the divested assets, even if it is a "viable, ongoing telecommunications business" may not be an effective

---

[19] *Id.* at 12, 15.

[20] *Id.* at 21.

[21] *Id.*

[22] *Id.* at 23.

competitive substitute for AT&T and MCI at least in part because its network would not be as broad, or its customer base as "robust."[23]  ACTel concludes by suggesting alternate remedies to those contained in the proposed Final Judgments including divestiture of "all redundant loop and transport circuits," releasing customers from their current contracts, and prohibiting the merged firms from raising prices.[24]

        2.    <u>Response</u>

Tunney Act review principally addresses the adequacy of the remedy, not the adequacy of the complaint.[25]  Most of the issues ACTel raises, however, question the wisdom of the filed Complaints, and urge theories of competitive harm that the United States did not believe were supported by the evidence.  Additionally, in a number of instances in which ACTel claims to be challenging the adequacy of the remedy, ACTel construes the Complaints far too broadly.   For instance, ACTel misreads the Complaints as identifying a competitive problem in *all* 2-to-1

---

[23] *Id.* at 24.

[24] *Id.* at 25.

[25] *See, e.g., Microsoft*, 56 F.3d at 1459 ("Congress surely did not contemplate that the district judge would, by reformulating the issues, effectively redraft the complaint himself."); *id.* (stating that the district judge may not "reach beyond the complaint to evaluate claims that the government did *not* make"); *BNS,* 858 F.2d at 462-63 (The Tunney Act "does not authorize a district court to base its public interest determination on antitrust concerns in markets other than those alleged in the government's complaint.")  Nothing in the 2004 Tunney Act amendments could be viewed as suggesting that the reviewing court should look beyond the allegations in the complaint in determining whether the proposed decree is in the public interest.  Indeed, to do so could result in the court substituting its prosecutorial judgment for that of the United States. Were a court to reject a proposed decree on the grounds that it failed to address harm not alleged in the complaint, it would offer the United States what the Court of Appeals for the D.C. Circuit referred to as a "difficult, perhaps Hobson's choice":  it would have to either redraft the complaint and pursue a case it believed had no merit, or else drop its case and allow conduct it believed to be anticompetitive to go unremedied.  *Microsoft,* 56 F.3d at 1456.

buildings.  The allegations in the Complaints do not reach all such buildings, and therefore,

whether the remedy addresses them is not a proper subject for Tunney Act review.  In any event,

the United States believes the proposed remedy is adequate to redress the likely competitive harm

from the mergers.

a.    Transport

In its investigation, the United States examined the extent of AT&T's local networks in

SBC's territory, and MCI's local networks in Verizon's territory, which the acquired firms use to

provide Local Private Line and related services.  In order to analyze the competitive effects of the

mergers, the United States also examined the other CLEC networks in each metropolitan area of

overlap.  Using compulsory process, the United States obtained highly-confidential maps of

fiber-optic networks and information about "on-net buildings"[26] from more than two dozen

different CLECs.  The United States found that there were multiple CLECs with local networks

in every metropolitan area under consideration.  Those networks vary in their scope and reach,

but several in each metropolitan area reach the highest volume locations, especially central

offices with sizable demand.  Moreover, CLECs typically continue to add new locations to their

networks as demand warrants.[27]

Accordingly, the United States concluded that the mergers were unlikely to create a

"metropolitan area-wide" competitive problem, or a competitive problem in the vast majority of

---

[26] An "on-net" building is a building for which a carrier has built or acquired its own last-mile fiber-optic connection, connecting the building to its network.  Complaints ¶ 16.

[27] The FCC reached a similar conclusion.  *See, e.g.,* FCC Orders ¶ 45 ("In many MSAs, some competitors appear to have more extensive networks than [AT&T/MCI].  We conclude, therefore, that there are existing competitors with local fiber networks that reasonably could provide wholesale special access in MSAs where [AT&T/MCI] now operates local facilities.").

buildings in any given metropolitan area.[28]  Nevertheless, because there is considerable

differentiation in the buildings reached by different carriers networks, particularly for end-user

buildings, in a relatively small number of buildings the acquired company is the only alternative

to the RBOC[29] for a last-mile connection.   The competitive problem created by the mergers,

therefore, involves this set of buildings.

     As ACTel correctly points out, however, the relevant product that uses this connection or

loop is Local Private Lines service (or value-added services that rely on Local Private Line).

What the Complaints therefore allege is a likelihood of harm in the markets for Local Private

Lines, or services that rely on Local Private Lines, due to a reduction from two to one in the

number of providers of last-mile connections.  In other words, the market is Local Private Line,

but the merger-created bottleneck or competitive problem alleged in the Complaints is in the last-

mile connection.[30]  In general, there is no such bottleneck for transport, nor do the Complaints

allege a competitive problem specific to transport.  Thus, contrary to ACTel's contention, there is

no "inconsistency" between the Complaints and proposed Final Judgments in their treatment of

transport nor are the proposed Final Judgments deficient because they address "only the part of

---

     [28] Indeed, for the vast majority of buildings in a given metropolitan area the SBC or
Verizon is the only firm with a last-mile connection to the building.  Complaints ¶ 15.
Accordingly, the merger results in no loss of actual competitive options to that vast majority of
buildings.

     [29] The term "RBOC" refers to a regional Bell operating company, such as SBC or
Verizon.

     [30] Similarly, the proposed Final Judgments focus on divestiture of "laterals" and
"transport" rather than Local Private Lines because, as ACTel acknowledges, Local Private Line
is a product, not a specific asset.  Any divestiture needs to identify specific assets, rather than
"products," in order to avoid the very ambiguity that would cause concern under the Tunney Act.

the Local Private Line that connects to a building," not the transport part.[31]  It would be inappropriate to suggest that the remedy is inadequate because it does not address a competitive harm that the United States neither concluded was likely nor alleged in its Complaints.[32]

The divestiture remedy is focused on the assets that would be necessary to replace the competition lost in the buildings where harm was anticipated as a result of the mergers:  those assets are the laterals to the specific buildings that likely would be subject to anticompetitive effects.  As noted in the CIS, however, laterals are of little use if they are not connected to a network.  Therefore, the proposed Final Judgments also require the divestiture of IRUs for transport facilities sufficient to connect the divested laterals to locations mutually agreed upon by Defendants and the purchaser.  This will ensure that the purchaser can connect the laterals to its network facilities and provide both Local Private Lines and any other telecommunications services that rely on Local Private Lines that a customer in the building may desire.

---

[31] Indeed, contrary to ACTel's assertion (ACTel Comment at 16), the Complaints never even use the word "transport."

[32] ACTel argues "the Government must look at transport on a 'segment by segment' basis rather than via area-wide analysis."  Indeed, the United States effectively did just that.  Although the United States' investigation revealed that the vast majority of interoffice transport routes where AT&T or MCI is present would also have competitive alternatives post-merger, the United States, like ACTel, was concerned about any reduction of competitive options from two to one that could potentially result.  Because an interoffice transport circuit is essentially a circuit to a central office location, the United States chose to treat "central offices" as any other building and analyzed Local Private Line connections to them along with all other buildings connected to AT&T's and MCI's networks.  Ultimately, the United States identified only two SBC central offices and three Verizon central offices where AT&T or MCI, respectively, was the only connected CLEC and where entry was unlikely.  Consistent with the United States' approach to other 2-to-1 buildings where entry was unlikely, these five central offices are included in the proposed remedy and thus, to the extent that there is a competitive problem for the small number of transport routes from these central offices, the proposed Final Judgments will remedy it.

b.     Omitted 2-to-1 Buildings

ACTel complains that the proposed Final Judgments do not cover all 2-to-1 buildings. However, it incorrectly suggests that it is "impermissible by the express terms of the Complaint" for the United States to have excluded certain 2-to-1 buildings because the Complaints allege harm in *all* 2-to-1 buildings. Nowhere do the Complaints state that there would be competitive harm in all 2-to-1 buildings, nor would the facts support such an allegation. One reason is that for some of the 2-to-1 buildings entry would be likely in response to a post-merger price increase. Indeed, the Complaints specifically list some of the factors governing whether a CLEC will build fiber to a particular building and state that "entry may occur in response to a post-merger price increase in some of buildings where [AT&T or MCI] is the only connected CLEC."[33] Similarly, the CISs also discuss entry, and conclude that "[w]hile entry may occur in some buildings where [AT&T or MCI] is the only CLEC present in response to a post-merger price increase, the conditions for entry are unlikely to be met in the hundreds of buildings that are the subject of the Complaint[s]."[34] The Complaints did not allege, nor were intended to allege, harm in *all* 2-to-1 buildings; rather the "subject of the Complaint[s]" is the subset of buildings where harm was likely and that were identified in the proposed Final Judgments.

---

[33] Complaints ¶ 29. ACTel cites the Complaints on entry, quoting the language "entry is unlikely to eliminate the competitive harm that would likely result from the proposed merger." ACTel Comment at 15. That language recognizes that for the hundreds of buildings identified in the proposed Final Judgments entry is indeed unlikely, and a remedy is required. But ACTel omits the preceding language that acknowledges that for some of the 2-to-1 buildings, entry may well occur. *See* Complaints ¶ 29. For these buildings, a remedy is unnecessary.

[34] CISs at 8.

Ambiguity in the terms of a proposed judgment is a legitimate subject for consideration under the Tunney Act.  15 U.S.C. § 16(e)(1)(A).  ACTel contends that there is ambiguity "due to discrepancy between the number of buildings the Proposed Final Judgment identifies and what publicly available data suggests in terms of the number of '2 to 1' loop buildings affected by the mergers."[35]  This "discrepancy," however, is not an ambiguity in the terms of the proposed Final Judgments.  The proposed Final Judgments very clearly specify the buildings to be divested.  It is true that although the Complaints allege competitive harm in only a subset of 2-to-1 buildings, they do not specifically list the buildings in that subset.  However, the set of buildings as to which the United States believed there was sufficient evidence to support a conclusion of competitive harm, and which is the subject of its Complaints, is the set of buildings identified in the proposed Final Judgments filed simultaneously with the Complaints.  Thus, the question of whether the United States should have sought relief in additional 2-to-1 buildings goes not to the adequacy of the remedy, but rather to the United States' conclusions about where the mergers might cause competitive harm, and it is therefore not a proper subject for Tunney Act consideration.[36]

In any event, the United States believes that divestitures of laterals to the set of buildings identified in the proposed Final Judgments are sufficient to remedy any competitive harm that

---

[35]ACTel Comment at 12.

[36] Ultimately, the United States makes two kinds of judgments.  The first is whether and where a particular merger is likely to cause competitive harm; the second is whether a remedy is likely to be adequate to remedy the identified harm.  The first is not a proper subject for Tunney Act review, as it would require the Court to substitute its prosecutorial judgment for that of the United States; the second is indeed a proper subject for such review, as intended by Congress.  The United States' judgment as to which 2-to-1 buildings pose a competitive problem and therefore require a remedy is fundamentally a judgment of the first kind, not the second.

otherwise would be likely to result from the mergers. In order to identify buildings where the merging firms were the only carriers with a last-mile connection (i.e., 2-to-1 buildings),[37] the United States sought and received, via compulsory process, "on-net" building lists from AT&T, MCI, and over 30 other CLECs and compared those lists.[38] The United States then eliminated from the resulting list of 2-to-1 buildings those buildings where circumstances suggested that there was no competitive problem. For instance, because where there is no likely customer, there probably is no harm, the United States eliminated vacant buildings, buildings where a subsidiary of the merging firms was the only customer, and buildings with zero current demand for Local Private Line or related services.[39]

In addition, because entry is likely to occur in response to a price increase for some set of the 2-to-1 buildings, the United States considered the prospects for entry for each of the 2-to-1

---

[37] The United States' reasons for treating differently buildings where at least two carriers would have a last-mile connection post-merger, is discussed below. *See infra* section III.A.2.c.

[38] In its comment, ACTel suggests that the number of 2-to-1 buildings in each metropolitan area is in the thousands. Such numbers are absurdly high. For instance, ACTel's estimate that there are 6318 2-to-1 buildings in Los Angeles exceeds AT&T's *total* number of on-net buildings in that metropolitan area (much less 2-to-1 buildings) by more than twenty times. Contrary to ACTel's assertions that the number of 2-to-1 buildings in *each* metropolitan area is in the thousands, the United States found that the total number of 2-to-1 buildings in all the alleged metropolitan areas *combined* barely reached 1,000 for the Verizon and SBC regions respectively.

[39] Of course, it is hypothetically possible that a building in this category could have a competitive problem, for instance, if post-merger a new customer moved into a vacant building. However, Section 7 does not look to some hypothetical possibility of harm, but rather to a likelihood of harm. *See, e.g., New York v. Kraft General Foods, Inc.,* 926 F. Supp. 321, 358-59 (S.D.N.Y. 1995) ("Section 7 deals in 'probability,' not 'ephemeral possibilities.'") (quoting *United States v. Marine Bancorp., Inc.,* 418 U.S. 602, 622-623 (1974))); *Fruehauf Corp. v. F.T.C.,* 603 F.2d 345, 351 (2d Cir. 1979) ("[T]here must be 'the reasonable probability' of a substantial impairment of competition to render a merger illegal under § 7. A 'mere possibility' will not suffice.") (citations omitted).

buildings.  As noted in the Complaints, two of the most important factors in determining whether

entry is likely in a given building is the proximity of competitive fiber to that building, and the

capacity required by the building.[40]  The United States sought and received through compulsory

process the fiber maps of more than two dozen CLECs.  Using mapping software, the United

States compiled "master" electronic maps of each of the overlapping metropolitan areas.  For

each of the hundreds of buildings in question, the United States identified the distance to the

nearest competitive fiber and compared that with demand data for each of the buildings.  From

this, the United States was able to make judgments about the likelihood of entry in each building.

The buildings it chose to include in the proposed Final Judgments are those as to which the

United States believed it could show that entry was unlikely, and therefore that competitive harm

would be likely.  Accordingly, the divestitures required by the proposed Final Judgments reflect

the set of 2-to-1 buildings where competitive harm was likely, and should be adequate to remedy

the mergers' likely anticompetitive effects.

### c.    Anticompetitive Effects Beyond 2-to-1 Loops

ACTel alleges that the proposed remedy does not fix the "many 'anticompetitive effects'

in Private Line situations beyond '2 to 1' loops"[41] such as buildings where the number of

providers would go from four to three or three to two.  The Complaints, however, do not allege a

---

[40] Complaints ¶¶ 27-28.  The closer a building is to a competitor's fiber, the less it is likely to cost that competitor to install additional fiber to reach that building (since typically a major component of the cost of installing fiber is the cost of digging up city streets to lay new fiber-optic cable and that cost increases with distance).  The larger the demand for capacity in a building, the greater the expected revenues.  The decision of a carrier whether to enter a building often turns on the extent to which the expected revenue exceeds the construction cost.  *See also* CISs at 8.

[41] ACTel Comment at 21.

competitive problem as a result of reducing the number of competitors serving a building from four to three, or three to two.[42]  Indeed, ACTel acknowledges this, suggesting that the United States has done "an about-face" by not alleging a competitive problem in those instances in its Complaints.  Because the United States did not conclude that there was likely to be a competitive problem in 4-to-3 or 3-to-2 buildings, there is no reason to have included such buildings in the proposed remedy.

In many markets, a merger reducing the number of competitors from three to two or four to three is a competitive problem and the United States does not hesitate to bring such cases.  To conclude, however, that a merger is anticompetitive simply because the number of competitors is reduced from, e.g., three to two, is incorrect.  Many other considerations relating to market structure are also relevant.  Before coming to a judgment on the competitive effect of a merger, the United States evaluates whether coordinated or unilateral effects are likely,[43]  whether entry likely will occur, and whether a merger will generate efficiencies.[44]  Here, given the particular

---

[42] ACTel's comment incorrectly cites the Complaints.  It alleges that "according to the Complaint AT&T and MCI are the most significant competitors for SBC and Verizon," ACTel Comment at 21, and state that "AT&T and MCI are the most significant and effective competitors to the acquiring companies," *id.* at 23.  In both cases it cites to paragraph 17 of the Complaints.  Paragraph 17, however, makes no such allegations.  Instead, it makes the more limited allegations that AT&T and MCI are, respectively "among the leading CLECs" in the number of buildings connected to their networks, and that for hundreds of buildings, the merging firms are the only two carriers that own or control a direct building connection.

[43] United States Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines*, (rev. Apr. 8, 1997) § 2, *available at* http://www.usdoj.gov/atr/public/guidelines/hmg.htm.

[44] *Id.* §§ 3, 4.  Thus, ACTel's contention that the United States' decision to allege only a problem in certain 2-to-1 buildings is an "about-face" and represents a "significant departure from established and documented procedures" is without merit.  Merger analysis is a complex, fact-specific, case-by-case undertaking and one which cannot simply be resolved by looking only

structure of the marketplace, in looking at buildings where the number of competitors went from three to two or four to three, the United States was unable to conclude that the mergers would significantly increase the risks of coordinated interaction. Moreover, largely because the merging firms were not especially close substitutes, the evidence did not support a finding of likely unilateral anticompetitive effects in these buildings. Finally, the fact that at least two CLECs had added the buildings in question to their networks suggested that the characteristics of the buildings (e.g., location, capacity demand) made them susceptible to entry – significantly more so than the 2-to-1 buildings.[45] Thus, after almost nine months of analysis, and consideration of millions of pages of material and hundreds of interviews, the United States determined that the evidence did not support alleging a competitive problem in the 3-to-2 or 4-to-3 buildings in the SBC and Verizon territories; the likely competitive problem is limited to the provision of Local Private Line and related services in certain 2-to-1 buildings. That is the only competitive harm

---

at the change in concentration or the number of remaining competitors in a market. *See, e.g., id.* § 0 ("Because the specific standards set forth in the Guidelines must be applied to a broad range of possible factual circumstances, mechanical application of those standards may provide misleading answers to the economic questions raised under the antitrust laws."); *see also United States v. Continental Can Co.,* 378 U.S. 441, 458 (1964) ("Market shares are the primary indicia of market power but a judgment under § 7 is not to be made by any single qualitative or quantitative test. The merger must be viewed functionally in the context of the particular market involved, its structure, history and probable future.").

[45] In arguing that the mergers present competitive problems in Local Private Lines beyond the limited number of 2-to-1 situations alleged by the United States, ACTel relies heavily on information it and its members submitted to the Department and FCC. The Department devoted significant time to analyzing this data. But based on this analysis, as well its consideration of the large volumes of other information gathered during the course of the investigation, the Department could not draw the same conclusions as ACTel seeks to draw. Nor, apparently, could the FCC. *See, e.g.,* FCC Orders ¶ 46.

alleged in the Complaints, and the only harm that the proposed Final Judgments properly remedy.[46]

### d.    Divestiture Purchaser

ACTel does raise one point that goes directly to the adequacy of the proposed remedy. It argues that a purchaser of the divested assets, even if it is a "viable, ongoing telecommunications business," may not be an effective competitive substitute for AT&T and MCI at least, in part, because its network would not be as broad, nor its customer base as "robust."  It is, indeed, important for the success of the proposed remedy that the divestiture buyer be able to replace the competition that might otherwise be lost as a result of the merger.  For that reason, the proposed Final Judgments require that the purchaser, and terms of the purchase, be subject to the United States' approval.  As the CISs note, in scrutinizing the proposed purchaser(s), "the United States will be particularly focused on the purchaser's ability to be a viable competitor in offering Local Private Lines on both a retail and/or wholesale basis."  CISs at 9.

In each metropolitan area under consideration there are at least several CLECs with extensive networks, including, e.g.,  switches, fiber, dozens or hundreds of "on-net" locations. Those carriers are already effective competitors in the metropolitan area.  Where those carriers are not currently effective is the specific buildings where the acquired firm has fiber and they do not.  The proposed remedy, by providing another carrier with fiber-optic capacity to those buildings, will enable it to replace the competition that could be lost as a result of the merger.

---

[46] The FCC, which conducted its own in-depth analysis of the transactions, reached a consistent conclusion.  FCC Orders ¶ 40 ("We find that the terms of the consent decree should adequately remedy any likely anticompetitive effects in the provision of Type I wholesale special access services.").

Even if the purchaser's pre-existing network is not as extensive as the acquired firm's, as long as it has all the assets necessary to be able to reliably provide service to the buildings in question, there is little reason to believe that the purchaser would likely be a less aggressive, effective competitor for those buildings.  In short, the United States believes that there are potential purchasers who could effectively use the assets to compete, and intends to exercise its approval rights to approve only such purchasers.[47]

(e)    <u>Alternate Remedies</u>

Because the United States' proposed remedy adequately redresses the competitive harm alleged in its Complaints, there is no need to consider the remedies proposed by ACTel in its comment.  Moreover, some of its proposed remedies could raise difficult issues.[48]  That the proposed Final Judgments do not include ACTel's suggested remedies in no way suggests that they fail to fall within the reaches of the public interest.

B.    <u>COMPTEL</u>

1.    <u>Summary of Comment</u>

COMPTEL, a trade association of communications providers that compete against the merging firms and also purchase wholesale services from them, submitted a comment on

---

[47] This does not mean that only a carrier with an extensive pre-existing network could be acceptable as a purchaser.  Depending on the assets the carrier is purchasing from the merged firm in the particular metropolitan area, its plans to build or acquire other assets, its existing customer base, its business plan, etc., an established carrier without a pre-existing network in the metropolitan area in question might also be acceptable as a purchaser.

[48] For instance, their proposal that the merged firm divest all duplicative "loop and transport circuits" could cause significant customer disruptions as discussed further, *see infra* Sections III.B.2.b, III.B.2.c.i.

February 13, 2006, objecting to the proposed Final Judgments because, in its view, they "do not replace the competition lost from the elimination of AT&T and MCI as the two most significant competitors to SBC and Verizon."[49]  COMPTEL's comment begins by summarizing, and criticizing, the United States' Complaints.  In particular, it contends that the geographic market alleged by the United States is too narrow and "cannot plausibly be considered to be as small as an individual building."[50]  Moreover, it suggests that there are barriers to entry in addition to those alleged in the United States' Complaints, and that barriers to entry apply not just to buildings, but to entry into a metropolitan area as well.  COMPTEL suggests that a "post-merger price increase in the *metropolitan area* is just as much (actually more) of a danger than the threat of *building-specific* price increases" and contends that the proposed remedy would not prevent those increases.[51]

COMPTEL's comment also addresses the proposed remedy specifically, arguing that it is inconsistent with the United States' merger and remedy guidelines.  It suggests that a divestiture of laterals to only certain 2-to-1 buildings is inadequate and that, instead, the merged firms should be required to divest "all of the AT&T and MCI network assets that serve each metropolitan area."  Next, COMPTEL contends that the proposed remedy is faulty because it requires only the divestiture of currently unused fiber-optic strands to the buildings in question, and without a guaranteed customer or revenue stream, a proposed purchaser would be unwilling

---

[49] COMPTEL Comment at 2 (attached hereto as Attachment 2).  COMPTEL also filed a Motion to Intervene on February 8, 2006, raising essentially the same concerns regarding the proposed Final Judgments as are expressed in its comments.

[50] *Id.* at 8.

[51] *Id.* at 12.

to commit the capital to purchase the assets and install equipment needed to "light" the fiber-optic strands in questions and make them ready to use.  Third, COMPTEL argues that the form of the proposed divestitures – 10-year IRUs – is inadequate to resolve the competitive concerns.  Finally, COMPTEL suggests that the remedy is not "clear and enforceable" because some terms of the divestiture (pricing, splice points, and transport) are left to negotiation between the merged firms and divestiture buyers.

The final section of COMPTEL's comment complains that certain RBOC contracting practices are serving as a barrier to entry, and that the combined effect of the mergers and the contracting practices will be to enhance the risks of anticompetitive coordination between the two surviving firms.  COMPTEL suggests that the proposed remedy would compound this problem if AT&T (as the merged SBC/AT&T is now known) were to buy the divested assets from Verizon and vice versa.  COMPTEL argues in favor of an alternate remedy that would require the merged firms to divest all the acquired companies' "in-region assets" – including customers and employees – and would also eliminate certain contracting practices.

2.     Response

Like ACTel's comment, some of COMPTEL's comment criticizes the United States' Complaints rather than the adequacy of the remedy for the harm alleged in the Complaints.  In particular, COMPTEL criticizes the Complaints' geographic market definition as well as the decision not to include any allegations of "metropolitan-area-wide harm," harm due to coordinated interaction between the two merged firms, or harm due to RBOC contracting practices.  However, the proposed Final Judgments should not be viewed as inadequate because they fail to address competitive harm not alleged in the Complaints.  COMPTEL also raises

concerns that do go to whether the proposed remedy is sufficient to rectify the competitive harm alleged in the Complaints. However, the United States believes that the proposed remedy will adequately redress the alleged competitive harm and will do so in a manner that avoids disruptions or dislocations of the ultimate retail enterprise customers whose businesses depend on reliable telecommunications service.

a.  <u>Metropolitan Area Harm</u>

COMPTEL contends that the proper geographic market definition cannot be as small as an individual building. It suggests that the market is much broader, and that the harm the mergers cause is likely to be felt throughout the metropolitan area, rather than just in the specific buildings identified in the United States' papers. This concern is, primarily, a challenge to the United States' Complaints rather than the proposed remedy and, as previously noted, Tunney Act review properly addresses the proposed remedy, not the correctness of the Complaints' allegations of geographic market or competitive harm.

In any event, the market definition is correct, and markets can be as narrow as the individual building.[52] As COMPTEL notes, the United States defines markets primarily from the demand perspective, i.e., what options face the customer.[53] Customers for Local Private Lines can select only from the set of providers that offer service to the particular building those

---

[52] The FCC also concluded that the geographic market is the individual building. FCC Orders ¶ 28 (stating that "the relevant geographic market for wholesale special access services is a particular customer's location"). It also is worth noting that even the statement of Dr. Farrell, submitted on behalf of Global Crossing in the FCC's SBC/AT&T merger proceeding and attached to COMPTEL's comment as Exhibit E, recognizes that markets as narrow as individual buildings would be an appropriate way to analyze the geographic markets here. *See* Statement of Joseph Farrell ¶¶ 10-14 (Apr. 25, 2005).

[53] COMPTEL Comment at 10; *Horizontal Merger Guidelines* § 1.0.

customers need to connect. Although RBOC networks are typically ubiquitous and reach virtually every building in their franchised territories, CLECs, including AT&T and MCI, directly connect to only a small minority of buildings. Because the set of providers varies from building to building, and because a customer for a Local Private Line cannot substitute a circuit to a different building to supply the one it needs to connect, the relevant geographic market for Local Private Lines can indeed be the individual building.[54]

Regardless, however, of whether the appropriate geographic market here is as narrow as the individual building or as broad as the metropolitan area,[55] the competitive harm likely to result from the proposed merger is limited to a set of 2-to-1 buildings, and that is what the Complaints allege.[56] In the vast majority of buildings, the RBOC is the only firm owning a last-

---

[54] That a customer might need Local Private Lines to multiple locations does not in itself change this analysis. For instance, a customer's need for connections to three locations within a given metropolitan area does not necessarily mean the geographic market is the metropolitan area. The customer may simply be an active purchaser in three different markets. In fact, wholesale customers – such as those that constitute COMPTEL – often will purchase from multiple providers of Local Private Lines in a given metropolitan area, relying on the RBOC for the majority of their circuits, but purchasing from lower priced CLECs for the locations to which the CLECs can provide service. The fact that the wholesale customers may have "master service agreements" with carriers that cover a whole metropolitan area and specify the terms under which circuits are purchased does not change the fact that their competitive alternatives (and hence, prices) vary by building, and they may (and often do) choose to purchase circuits on a building-by-building basis.

[55] Because there are also some facts that suggest broader markets, the United States' Complaints acknowledge that the geographic market may be as broad as the metropolitan area. Nevertheless, if the market is as broad as the metropolitan area, then the market is highly geographically differentiated, with different carriers able to reach very different sets of locations and buildings within the area.

[56] *See, e.g.,* Complaints ¶ 25 (alleging that the merging parties "are the only two carriers that own or control a Local Private Line connection to many buildings in each region. The merger would, therefore, effectively eliminate competition for facilities-based Local Private Line service *to those buildings*") (emphasis added); *see also* CISs at 10 ("[T]here are numerous

mile connection, and the merger does not change this. For most of the small percentage of

buildings where AT&T or MCI is present as a competitive option, either another CLEC is also

present or circumstances are such that entry would be likely in response to a price increase.

Therefore, for these buildings also the evidence is insufficient to establish that the merger will

likely lead to competitive harm. Only in the set of 2-to-1 buildings for which the United States

sought a remedy did it conclude that the evidence was sufficient to show that the merger would

likely lead to competitive harm. COMPTEL's contention that the remedy is insufficient because

it does not address the concern that the mergers will lead to price increases throughout all the

buildings in a metropolitan area is therefore without merit: the evidence did not show that such

increases were likely,[57] the United States did not allege such increases, and therefore there was no

reason to seek relief to prevent such increases.

  b.  Divestiture of Specific Assets Versus an Operating Business

COMPTEL complains that the proposed remedy is inadequate to resolve the harm alleged

in the Complaints because it achieves the divestiture of only specific assets (laterals to certain 2-

to-1 buildings), rather than an entire operating business. It contends that this is in violation of the

---

buildings where [AT&T or MCI] is the only CLEC with a last-mile connection. It is the
decreased competition in the provision of these last-mile connections to buildings where [AT&T
or MCI] is the only CLEC that creates the harm alleged in the Complaint. . . . [D]ivesting these
last-mile connections will restore the lost facilities-based competition.").

  [57] As COMPTEL notes, often a particular carrier's default pricing for Local Private Lines
covers an entire metropolitan area. However, given that in each metropolitan area in question,
AT&T or MCI were each only one of multiple CLECs with local networks and typically
controlled no more than a small minority of CLEC on-net connections, the evidence did not show
that elimination of AT&T or MCI as an independent competitor would lead to "metropolitan
area-wide" anticompetitive price effects; the likely anticompetitive effect could be no broader
than certain individual buildings.

United States' remedy guidelines.[58]  COMPTEL's position, however, that an entire operating business needs to be divested here appears largely based on its erroneous assertion that the likely competitive harm extends beyond a limited set of 2-to-1 buildings.  To the extent that COMPTEL's argument is that an entire operating business needs to be divested in order to resolve the competitive harm in the specific 2-to-1 buildings identified in the United States' papers, that contention is meritless.

The purpose of any remedy is to avoid harm to competition that would otherwise be created by the merger.  Here, AT&T and MCI are being eliminated as independent competitors in the respective RBOC regions for Local Private Lines and value-added services that rely on Local Private Lines.  But the competitive problem is not a dearth of providers of these services in the specified metropolitan areas; indeed, each metropolitan area in question has several competitive providers of Local Private Lines and value-added services that rely on Local Private Lines.  The problem here is there are some buildings in each metropolitan area to which AT&T or MCI can offer fully facilities-based Local Private Line and related services but that to which no other CLEC can, or would be likely to, offer such services post-merger.  An effective remedy in this instance, therefore, does not necessitate creating an entirely new competitor offering Local Private Line and related services in each metropolitan area, but rather can be limited to a

---

[58] COMPTEL Comment at 14; *see* U.S. Dep't. of Justice, Antitrust Div., *Antitrust Division Policy Guide to Merger Remedies*, § I (Oct. 2004) ("*Remedy Guide*") *available at* http://www.usdoj.gov/atr/public/guidelines/205108.pdf. ("This Guide is a policy document, not a practice handbook. It is not a compendium of decree provisions, and it does not list or give 'best practices' or the particular language or provisions that should be included in any given decree."). Although the *Remedy Guide* is not binding, the proposed remedy here is entirely consistent with the *Remedy Guide*.  As the *Remedy Guide* notes, the fact that a provision was included in prior settlements does not make it necessarily appropriate for new ones; each matter must be evaluated on a case-by-case basis.  *Id.*

divestiture that would allow an existing carrier to provide fully facilities-based Local Private

Line and related services to the particular set of buildings in which the merger would otherwise

be likely to harm competition.[59]   Accordingly, a remedy that gives an already viable CLEC the

fiber-optic capacity to serve the buildings in question on acceptable terms resolves the

competitive harm.  A divestiture of an entire "operating business" is unnecessary.[60]  The only

question is whether the particular assets that the divestiture buyer must receive under the

proposed Final Judgments, and the terms by which those assets are conveyed, are sufficient to

allow the buyer to compete effectively in the buildings in question.  As discussed further below,

the United States believes that the proposed Final Judgments adequately resolve these issues.

      c.    <u>Concerns Regarding the Assets to Be Divested</u>

      COMPTEL contends that the divestiture of unused capacity to the buildings in question

in the form of ten-year IRUs is inadequate to resolve the competitive concerns alleged in the

---

[59] *See, e.g., Remedy Guide* § III.C.2 ("Divestiture of Less than an Existing Business Entity
Also May Be Considered When Certain of the Entity's Assets Are Already in the Possession of,
or Readily Obtainable in a Competitive Market by, the Potential Purchaser."). Here, essentially
all the assets necessary to compete in the problematic buildings are already in the hands of, or
readily obtainable by, numerous potential purchasers – except the fiber-optic connections to
those buildings.  For recent cases in which the United States has required divestiture of only
certain assets rather than an entire operating business, see *United States v. Cal Dive Int'l, Inc.,*
No. 1:05CV02041 (EGS) (D.D.C. Jan. 12, 2006) (order entering final judgment requiring
divestiture of two vessels and a saturation diving system), *available at* http://www.usdoj.gov/atr/
cases/f213100/213177.htm; *United States v. Cingular Wireless Corp.*, No. 1:04CV01850 (RBW)
(D.D.C. Mar. 14, 2005) (order entering final judgment requiring, in certain markets, divestiture
of wireless spectrum only), *available at* http://www.usdoj.gov/atr/ cases/f208000/208093.htm.

[60] Divestiture of an entire "operating business" or "business unit" is not only unnecessary
here, but also impractical.  Neither AT&T nor MCI have separate, easily severable "business
units" that operate the Local Private Line business in the metropolitan areas in question.  The
manner in which the respective corporations are organized would make it very difficult to
implement an effective divestiture of an entire "operating business" here.  Moreover, such a
divestiture could cause substantial customer disruption.  *See infra* Section III.B.2.c.i.

Complaints.  This raises several separate but related issues regarding the proposed remedy:  (a) whether it is sufficient to divest fiber-optic capacity (as opposed to also divesting customers); (b) whether it is sufficient to divest "unused" capacity, i.e., "unlit" fibers; (c) whether a divestiture in the form of an IRU, instead of ownership, is sufficient, and (d) whether ten years is a sufficiently long IRU term.  The United States considered each of these issues in its negotiation of the remedy.  Ultimately, the United States concluded that the provisions of the proposed Final Judgments are sufficient to redress the competitive harm.  Events since the filing of the proposed Final Judgments have helped confirm the United States' judgment, and should serve to reassure the Court as to the adequacy of the proposed remedy.

As a result of the proposed mergers, customers for Local Private Line and related services to certain buildings will lose their only alternative to SBC or Verizon.  The purpose of the divestiture remedy is to ensure that if and when those customers seek a provider for the relevant services, another competitive carrier will be able to supply them.  That purpose will be achieved if another carrier acquires sufficient AT&T or MCI assets to service the buildings in question.  However, another carrier will only purchase the divested assets if they present a viable business opportunity.  Therefore, the divestiture package must be one a carrier would be willing to buy.  COMPTEL's criticisms of the proposed divestiture properly address whether any buyer would be willing to purchase and operate the assets under the proposed terms (e.g., "unlit" fibers, without customers, on an IRU basis, for only ten years).

The United States believes that the proposed terms are adequate to secure a viable buyer for the assets.  Since the United States agreed to the divestiture terms, the divestiture process itself has helped to validate their adequacy.  Both AT&T and Verizon are well into the process of

auctioning the divestiture assets in question.[61]  Affidavits that both have filed with the United

States pursuant to pursuant to Section IV(B) of the Stipulations and Section IX of the proposed

Final Judgments indicate that there has been substantial interest in the divestiture assets:

multiple carriers have submitted proposals for some, or all, of the AT&T and MCI assets.  The

bids cover every metropolitan area identified in the proposed Final Judgments.  In the case of

AT&T (which began the divestiture process earlier than did Verizon), definitive agreements have

already been reached with three different well-established carriers that would cover divestiture of

all the assets in question.[62]  That several CLECs have bid to purchase and operate the assets, and

that AT&T has already been able to reach definitive agreements to divest all its required assets,

should help allay any concerns about whether the terms of the proposed divestiture are sufficient

to attract viable buyers.[63]

---

[61]  In order to secure a prompt remedy, the proposed Final Judgments require a divestiture within 120 days after the closing of the respective acquisitions, or within five (5) days after notice of the entry of final judgment by the Court, whichever is later.  Proposed Final Judgments § IV(A).

[62]  On February 20, 2006, AT&T entered into definitive agreements to divest the assets in Los Angeles and Chicago to one carrier, and the assets in Detroit, Hartford, Kansas City, Milwaukee, San Francisco, and St. Louis to another.  On February 21, 2006, AT&T entered into a definitive agreement to divest the San Diego, Dallas, and Indianapolis assets to a third carrier. The United States has not yet determined whether to approve these purchases, pursuant to Section IV(A) of the Stipulation and Section VI(C) of the proposed Final Judgment.

[63]  If the United States is wrong about whether the terms of the proposed divestiture are attractive enough to prompt a carrier to purchase the assets in any given metropolitan area, then after both the defendant(s) and trustee have failed to sell the assets, the trustee will file a report with the Court, the United States will make recommendations, and the Court "shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment."  Proposed Final Judgments § V.G.  Such orders could alter the terms of the divestitures, or the nature of the assets, in such a way as to make the divestiture viable.

(i)    Capacity Without Customers

As COMPTEL has noted, the United States often requires the divestiture of customers in antitrust remedies.[64]  Nevertheless, such a divestiture is not always necessary or appropriate. Here, because there are multiple providers of Local Private Line and related services in each metropolitan area, the set of divestiture assets could be relatively narrow:  a purchaser could serve the potentially problematic buildings simply by acquiring "last-mile" fiber-optic capacity connected to its local network.  Because fiber-optic capacity will be sold to an established CLEC, there is little concern that the purchaser would not be competitively viable without also receiving customer contracts.  A divestiture of customers would be necessary or appropriate in this case only if no adequate purchaser were willing to take on the assets in the absence of some sort of guaranteed revenue stream.  From its investigation, the United States concluded that purchasers would be willing to take on the assets, even without customers, on the assumption that they would be able to compete for, and win, customers over time in the buildings at issue.  The fact that multiple CLECs – including members of COMPTEL – submitted bids for these assets (and, in AT&T's case, have agreed to purchase the assets) helps confirm this.[65]

---

[64] *See, e.g., Remedy Guide* § III.B ("In markets where an installed base of customers is required in order to operate at an effective scale, the divested assets should either convey an installed base of customers to the purchaser or quickly enable the purchaser to obtain an installed customer base.").

[65] In this instance, a divestiture of customers might cause substantial disruption and complication – far more than in the ordinary antitrust settlement.  Among other things, shifting a portion of a customer's telecommunications service risks outages, something particularly worrisome given the extent to which many retail enterprises depend on reliable telecommunications service.  Had the United States sought to include a customer divestiture as part of the proposed remedies, it could well have run afoul of the Tunney Act's concern that the proposed remedy not adversely affect third parties.  15 U.S.C. § 16(e)(1)(B) (requiring court to consider the impact of entry of the judgment "upon the public generally"); *see also Microsoft,* 56

(ii) <u>Unused Capacity Versus "Lit" Fibers</u>

COMPTEL correctly notes that purchasers of the divested assets will receive unused capacity to the point of entry of each building, and, in order to begin serving customers, would have to invest some capital to gain building entrance and activate ("light") the fibers. COMPTEL's analogy to the cost of constructing entirely new "last-mile" connections, however, and its contention that these entrance and activation costs would prevent the remedy from being effective, are misplaced.

Although costs vary widely, the cost of gaining building entrance and activating fibers is typically a small fraction of the cost of constructing an entirely new "last-mile" connection – often an order of magnitude less.  Optronics equipment (equipment to light fiber) may not be cheap, but it still typically does not cost anywhere near as much as digging up city streets and laying new fiber.  Moreover, whereas most of the cost of a new "last-mile" connection is sunk (i.e., it cannot be recouped once committed), much of the cost of optronics equipment is not generally sunk because the carrier can remove the equipment and use it elsewhere if it is no longer needed in its original location.  Accordingly, the evidence gathered by the United States revealed that whereas carriers do not typically "build out" (i.e., build a new last-mile connection) to a customer without a relatively large guaranteed revenue commitment, they typically do light fiber and negotiate entrance to buildings connected to their network with unlit fiber if they are able to secure a customer of even modest capacity needs.

---

F.3d at 1462 (suggesting that Tunney Act analysis should consider whether "third parties . . . would be positively injured by the decree").

As COMPTEL suggests, for each building in question, the buyer of the divested assets may not negotiate a building entrance agreement or activate a fiber lateral until it has secured a customer in the building.  But that does not negate the effectiveness of the remedy.  The buyer of the divested assets can bid to supply Local Private Line and related services to the building in question, and if it prevails, negotiate building entrance and activate the fiber.  The CLECs who have bid for the assets in all likelihood plan to do exactly that.[66]  Customers for Local Private Line and related services will thereby have the benefits of competition, even if the divestiture purchaser ultimately does not win a customer contract, or "light" the fiber in their particular building.

### (iii) IRU Versus Ownership

COMPTEL characterizes the form of the divestiture as a "lease" and suggests that it will be ineffective because it is not full ownership.  Although COMPTEL is correct in that the remedy does not require transfer of full ownership, IRUs, which carry broader rights than typical leases, are commonly used in the industry and often viewed as almost indistinguishable from ownership.  In fact, many CLECs' metropolitan area networks – including some of those of pre-merger

---

[66] The United States also concluded that any attempt to divest "lit" capacity would have been unduly complicated and problematic.  For instance, splicing "lit" fibers out of the seller's network and into the buyer's would raise the prospect of customer outages.  On a similar note, if the proposed Final Judgments had required the merged firm to provide the purchasers with fiber into the building, as opposed to simply to it, the merged firm might have to negotiate entrance agreements with hundreds of landlords on behalf of a third party who might not need entrance agreements for all those buildings until some time in the future.  Perhaps more importantly, the divestiture buyer could well have ended up paying lease or entrance fees for countless buildings where it had no customers, greatly adding to the carrying costs of the fiber and making the divestiture assets much less attractive as a business proposition.  The better approach was to simply let the buyers negotiate their own building entrance agreements, on their own terms, and better suited to their specific needs, for each building if and when they need it (i.e., if and when they win a customer in that building).

AT&T – are constructed largely from IRU fiber rather than owned fiber. In its investigation, the United States did not uncover any significant evidence suggesting that conveying laterals in the form of IRUs would undermine the effectiveness of the remedy.

### (iv) Ten-Year Duration

COMPTEL complains that the required minimum term of the IRUs – ten years – is "relatively short" and will impair the effectiveness of the remedy. The United States disagrees. Retail agreements for Local Private Line and related services are virtually always much shorter than ten years; typically they are no more than two or three years. The fact that the IRUs are for ten years should not impair the ability of the divestiture purchaser to compete except, perhaps, near the end of the ten-year term. At that point, it is impossible to predict what the competitive landscape will look like, especially in the rapidly changing telecommunications industry. It is for that reason that the United States' consent decrees – including those proposed here – do not extend beyond ten years. The United States cannot, with confidence, predict whether the mergers would continue to cause anticompetitive harm beyond ten years in the future, as technological or other changes could substantially reshape the industry. Therefore, the remedy cannot be faulted for not extending beyond ten years.[67]

### (v)   Negotiable Terms

COMPTEL suggests that the remedy is not "clear and enforceable" because some terms of the divestiture (pricing, splice points, and transport) are left to negotiation between the merged

---

[67] It is also worth noting that fiber-optic cable does not last forever. The useful life of that fiber may be no more than 20 to 25 years. It is possible, if not likely, that much of the AT&T and MCI fiber at issue here may have been laid ten or more years ago. Thus, in many cases, in 10 years time, much of the divestiture fiber may be nearing the end of its useful life and there would be little purpose in requiring an IRU significantly longer than ten years.

firm and divestiture buyer.  In *any* divestiture, however, many of the terms need to be negotiated between the seller and buyer.  Indeed, the United States never specifies a purchase price in its settlements.  The requirements of the proposed Final Judgments here are "clear and enforceable": the merged firms must divest laterals to more than 700 specific addresses and sufficient transport to connect those laterals to the buyer's network.  The United States has no reason to believe that the negotiation of a commercial, arms-length agreement between the merged firms and divestiture buyers are likely to lead to any unusual problems.[68]  In fact, the evidence to date is otherwise:  AT&T has already submitted to the United States for approval definitive agreements for the divestitures required by the proposed Final Judgment with the terms fully resolved.  Of course, should there be any difficulties, the ultimate terms of the divestiture must be acceptable to the United States.[69]

            d.       Contracting Practices and Coordination

        COMPTEL complains at length that certain RBOC contracting practices are serving as a barrier to entry, and that, in its view, the combined effect of the mergers and the contracting practices will be to enhance the risks of anticompetitive coordination between the two surviving firms.  As part of its investigation the United States, of course, considered potential entry barriers in the markets in question (including RBOC contracting practices) as well as the possibility that the mergers could enhance the risks of collusion.  Whatever the entry barrier that may be posed

---

[68] Indeed, because of the relative simplicity of the remedy here, the agreements between the merged firms and divestiture buyers are likely to be much less complex and potentially problematic than many other divestitures, which typically can involve difficult issues regarding, e.g., transition agreements, intellectual property transfer, "splitting up" of customer contracts, arrangements for employees.

[69] Proposed Final Judgments § VI(C).

by RBOC contracting practices, the mergers do nothing to enhance them.  Nor have such contracts served to prevent multiple CLECs from building networks, entering markets, and selling significant volumes of, both wholesale and retail, Local Private Lines and related services. To the extent that AT&T and MCI were successful in selling Local Private Lines and related services to the buildings in question, the divestiture purchaser could be as well.

As for coordination, the United States was unable to conclude that the change in market structure brought on by the mergers was likely to lead to competitive harm due to an increased risk of coordination.[70]  The existence of numerous competitors (in addition to the merging firms) for both wholesale and large retail telecommunications customers tends to make collusion difficult.  In any event, the United States' Complaints did not make any allegations regarding RBOC contracting practices or anticompetitive coordination, and hence, COMPTEL's concerns are beyond the scope of the Complaints and have essentially nothing to do with whether the proposed remedy resolves the competitive harm alleged by the United States.[71]

---

[70] The FCC reached a similar conclusion.  FCC Orders ¶ 52 ("We also do not believe that the merger increases the likelihood of coordinated interaction."); *see also id.* ¶ 54.

[71] COMPTEL's sole basis for arguing that the contracting practices and coordination are relevant to the remedy is its allegation that if Verizon buys the divested AT&T assets, and vice versa, that may compound the competitive harm COMPTEL alleges.  Putting aside the questionable merit of these claims, as discussed above, the merging firms have already solicited and received bids for the assets in question as required under the proposed Final Judgments, and Verizon did not bid for the AT&T assets nor did AT&T bid for the MCI assets that Verizon is divesting.  Thus, COMPTEL's concern appears to be moot.

C.    New York Attorney General

1.    Summary of Comment

On February 13, 2006, the New York Attorney General ("NYAG") submitted a comment arguing that the proposed remedies are "unlikely to constrain the merged entities,"[72] in particular, because (a) they did not address the effect of the mergers on Internet access, and (b) they inadequately addressed the competitive concerns as to Local Private Lines.  With respect to the former, NYAG argues that the proposed Final Judgments are faulty because they do not require the merged firms to offer DSL on a stand-alone basis to consumers (i.e., without also requiring consumers to subscribe to telephone service), and because they do not require any relief related to Internet "backbones," the large, interconnecting fiber-optic networks that constitute the core of the Internet.  With respect to Local Private Lines, NYAG complains that the proposed remedies do not address the loss of competition from the potential elimination of AT&T's and MCI's re-sale of circuits owned by SBC and Verizon;[73] argues that the proposed divestitures are inadequate because they involve only a "handful of buildings" and, therefore, would not affect pricing throughout New York City or State, or constitute a viable network for a buyer;[74] and suggests that the remedy is "written in disappearing ink" because the assets to be divested can be modified at the purchaser's option and with the consent of the United States.[75]

---

[72] NYAG Comment at 4 (attached hereto as Attachment 3).

[73] *Id.* at 5.

[74] *Id.* at 6.

[75] *Id.* at 6-7.

2.     Response

a.     DSL, Internet Backbone, and Local Private Line Resale

Most of NYAG's comment[76] relates to issues well beyond the scope of the Complaints.

NYAG argues that the proposed Final Judgments should have required customer access to

unbundled DSL services.  It is not clear from the comment what merger-related harm NYAG

intends this to remedy, but, in any event, there appears to be no relationship between that

proposed restriction and the markets alleged in the United States' Complaints.[77]

---

[76] NYAG also filed comments with the New York Public Service Commission ("NYPSC") on April 29, 2005, as part of the Verizon/MCI merger proceedings before that body, raising essentially the same "naked DSL" and Internet backbone concerns it raises here.  The NYPSC approved the Verizon/MCI merger, with certain conditions, in a detailed 64-page order on November 22, 2005.  Order Asserting Jurisdiction and Approving Merger Subject to Conditions, *Joint Petition of Verizon Communications Inc. and MCI, Inc. For a Declaratory Ruling Disclaiming Jurisdiction Over or in the Alternative for Approval of Agreement and Plan of Merger*, New York Public Service Comm'n CASE 05-C-0237, (Nov. 22, 2005) ("NYPSC Order"), *available at* http://www3.dps.state.ny.us/pscweb/WebFileRoom.nsf/ ArticlesByCategory/135BB9AA905F47A7852570C0005155BD/$File/05c0237_11_22_05.pdf? OpenElement.

[77] DSL is primarily a "mass market" service, and the most frequently cited justification during the Department's and FCC's investigations for requiring the merged firms to offer "naked" or "unbundled" DSL as a remedy is the allegation the mergers would reduce competition for mass market telephone service.  If the merged firms were required to offer naked DSL, it would allegedly make it easier for standalone VoIP ("voice over internet protocol") providers like Vonage to compete against the merged firm.  The United States concluded that the evidence would not support a Section 7 case alleging competitive harm in the "mass market."  That conclusion was consistent with those reached by the New York Public Service Commission as well as the FCC.  *See* NYPSC Order at 29 ("We conclude that the merger will not likely result in anti-competitive effects for mass market customers."); FCC Orders at ¶¶ 81 (SBC/AT&T), 82 (Verizon/MCI) ("As discussed below, we find that [Verizon/SBC]'s acquisition of [MCI/AT&T] is not likely to result in anticompetitive effects for mass market services.").  Although neither the FCC nor the NYPSC identified a problem in "mass market," and therefore saw no need for a mandatory "naked DSL" remedy, they did accept the parties' voluntary commitments to provide "naked DSL" and included them as part of their orders.  FCC Orders, Apps. F, G (respectively); NYPSC Order at 61-62, 63.

Similarly, NYAG argues that the mergers could have anticompetitive effects in the Internet backbone market and argues that "[t]he Court should reject the Verizon-MCI merger unless and until Verizon provides the information needed to make an informed decision regarding the extent to which backbone concentration will increase as a result of the proposed merger with MCI." It goes on to suggest that the Court should consider "the appropriateness of divestiture of backbone assets" based on that information.[78] The United States investigated the effects of the mergers on the Internet backbone market, considering both the current traffic shares of the merging parties as well as potential increases in shares that might result from shifting SBC or Verizon retail customers onto the AT&T and MCI backbone. Ultimately, the United States concluded that competition in this market would not be harmed as the merged firms would continue to face several strong competitors. Therefore, it did not allege Internet backbone as a relevant product market, nor did it allege any harm in such a market.[79] Accordingly, relief directed to the Internet backbone market is unnecessary and NYAG's concerns about Internet backbone do not implicate whether the proposed Final Judgments are in the public interest.

NYAG's comment also includes a paragraph complaining that the mergers will adversely affect competition because they will eliminate "discounted 'last mile' wholesale leasing."

---

[78] NYAG Comment at 17. Essentially, NYAG asks the Court to conduct its own discovery and *de novo* antitrust investigation of the Internet backbone market, conduct a trial on whether the discovered facts prove liability, and then determine the appropriate remedy. This is, of course, not consistent with the Tunney Act.

[79] The FCC and the European Union also looked at the Internet backbone issue and determined that no relief was required. *See, e.g.,* FCC Orders ¶¶ 108 (SBC/AT&T), 109 (Verizon/MCI); Commission of the European Communities, Case No. COMP/M.3752 - Verizon/MCI, Art. 6(1)(b) Non-Opposition Decision, ¶ 45 (Oct. 7, 2005), *available at* <http://europa.eu.int/> comm/competition/mergers/cases/decisions/m3752_20051007_20310_en.pdf.

45

Although this concern does, at least, involve Local Private Lines, it raises an issue unrelated to anything alleged in the United States' Complaints. The United States investigated whether the mergers would have a significant adverse impact on competition in Local Private Lines by eliminating AT&T and MCI as independent resellers of ILEC circuits, but determined that the evidence did not support such a conclusion.[80] Accordingly, it did not allege this as competitive harm in its Complaints, nor would it be appropriate to seek any relief regarding resold circuits.[81]

b.    City or State-wide Pricing

NYAG briefly complains that the divestiture of only a "handful of buildings" is insufficient because it would not affect pricing throughout New York City or State. The United States did not allege, however, that the mergers would adversely affect prices throughout a whole city, state, or metropolitan area. As previously noted, there are multiple carriers with extensive networks in each metropolitan area under consideration,[82] and the evidence did not demonstrate a

---

[80] The United States' investigation determined that AT&T's and MCI's sales of resold circuits are relatively small and of limited competitive significance. Moreover, because numerous other CLECs have extensive fiber-optic networks in the metropolitan areas under consideration, as well as contracts with Verizon and SBC providing them with discounts similar to those of AT&T and MCI, other competitors could likely replace any competition that might be lost by the elimination of AT&T and MCI as independent resellers in SBC's and Verizon's territories respectively. The FCC reached a similar conclusion. FCC Orders ¶¶ 33, 43.

[81] The United States devoted significant time to investigating the issues discussed in NYAG's comments and concluded that the evidence did not support alleging competitive harm related to "mass market," Internet backbone, or resold Local Private Lines. NYAG has the statutory ability to investigate violations of state and federal antitrust laws, *see e.g.,* N.Y. GEN. BUS. LAW § 343 (McKinney 2006) (providing for pre-complaint discovery), and the standing to enforce them. If NYAG believed the evidence justified a broad antitrust case based on resold Local Private Lines, Internet backbone, DSL, or anything else, it could have brought that case. Here, it elected not to do so.

[82] For instance, in the New York metropolitan area – the focus of NYAG's concerns – the United States' investigation identified more than a dozen carriers besides Verizon and MCI with

likelihood of anticompetitive price effects covering all buildings in a metropolitan area. What the United States alleged was that the proposed mergers were likely to reduce competition to certain 2-to-1 buildings in each area, and the proposed remedy is directed at restoring competition to those buildings.[83]  NYAG notes that it is "hard to see how this remedy could have any significant positive effect on competition beyond the footprint of the handful of individual buildings identified."[84]  But that is the point:  the identified buildings are the only ones where competition was likely to be harmed, and they are, therefore, the only ones for which a remedy was required.  The proposed remedy should not be viewed as inadequate, or inconsistent with the public interest, simply because it fails to affect competition in locations where the evidence did not demonstrate an anticompetitive effect.

        (c)     <u>Scope of Divestiture</u>

        NYAG also argues that the divested buildings, at least in New York, "do not, themselves, form the critical mass needed to build a network. . . .  [A]ny would-be competitor who acquired the divested MCI facilities serving these scattered buildings would have neither the scope nor scale necessary to stand in MCI's competitive shoes."[85]  But the proposed Final Judgments did

---

significant fiber networks.  At least a half dozen of these had hundreds or thousands of route miles of fiber.  The United States identified well in excess of 4,000 CLEC "last-mile" building connections; less than 15 percent of these belonged to MCI.  These conclusions are consistent with those reached by the New York Public Service Commission in its analysis of the New York metropolitan area.  *See* NYPSC Order at 45 ("We conclude that on average there are approximately six alternative fiber networks within 1/10 of a mile of the MCI-lit buildings in New York, and that 75% of those buildings have two or more alternative carriers.").

[83] *See supra* note 56.

[84] NYAG Comment at 6.

[85] *Id.*

not contemplate that the purchaser would necessarily have no other assets beyond those being

divested.  As discussed in Section III.A.2.d, in every metropolitan area identified in the

Complaints (including New York) there are at least several CLECs with extensive networks,

including, e.g., switches, fiber, dozens or hundreds of "on-net" locations.  Those CLECs are

already effective competitors in many buildings in the metropolitan area, though not in the

buildings covered by the proposed Final Judgments where they lack a last-mile connection.  The

proposed remedy, by providing a carrier with fiber-optic capacity to those buildings, will enable

it to replace the competition that could potentially be lost as a result of the merger.  The purpose

of the United States having approval rights over the proposed buyer of the assets is to ensure that

the assets are acquired by a firm that can effectively compete to provide services to the buildings

in question.

(d)     <u>"Disappearing Ink"</u>

Finally, NYAG also raises one brief point regarding the assets to be divested:  it suggests

that the proposed remedy is "written in disappearing ink" because the assets to be divested can be

modified at the purchaser's option and with the consent of the United States.[86]  The proposed

divestitures in these matters involve a great many assets, including more than 700 lateral

---

[86] NYAG Comment at 7; *see* Proposed Final Judgments § II(D) ("With the approval of the United States, and in its sole discretion, and at the Acquirer's option, the Divestiture Assets may be modified to exclude assets and rights that are not necessary to meet the competitive aims of this Final Judgment.").  This provision is similar to ones used in other antitrust consent decrees that suggest that something less than the entire "divestiture assets" can be sold if the United States consents in writing.  *See, e.g., United States v. Marquee Holdings, Inc.*, No. 05 CV 10722, § IV(I) (KMW) (S.D.N.Y. filed Dec. 22, 2005) (proposed final judgment), *available at* http://www.usdoj.gov/atr/cases/f213800/213862.htm.; *United States v. UnitedHealth Group Incorporated*, No. 1:05CV02436, § IV(I) (RMU) (D.D.C. filed Dec. 20, 2005) (proposed final judgment), *available at* http://www.usdoj.gov/atr/cases/f213800/213817.htm.

connections to specific street addresses. Moreover, because 18 metropolitan areas are involved, there will almost certainly be several different purchasers. It is possible that as the divestiture sales proceed, it will be discovered that exclusions in the divestiture assets are desirable. For instance, if it turns out that, unbeknownst to the United States at the time of filing, one of the buildings in question is scheduled for demolition, it hardly makes sense to require a divestiture of a lateral to that building. In order to maintain flexibility to deal with such contingencies, and to avoid burdening the Court with requests for a decree modification every time such an occasion might arise, the United States included in the proposed Final Judgments a mechanism for minor exclusions from the divestiture assets.[87] To ensure that such exclusions are consistent with the purposes of the proposed Final Judgments, any exclusions must be at the purchaser's option, will require the consent of the United States, and are limited to assets and rights not necessary to meet the competitive aims of the Final Judgment.

## IV.    Conclusion

After careful consideration of these public comments, the United States remains of the view that the proposed Final Judgments provide an effective and appropriate remedy for the antitrust violation alleged in the Complaints and that their entry, therefore, would be in the public interest. Any settlement is a product of negotiation and compromise, and as courts have noted, the purpose of Tunney Act review is not for the court to engage in an "unrestricted evaluation of

---

[87] The Tunney Act condemns ambiguity in proposed Final Judgments. 15 U.S.C. § 16(e)(1)(A). It is for that reason that the proposed Final Judgments are extremely specific, identifying hundreds of individual building addresses. But that very specificity creates the need for some flexibility.

what relief would best serve the public"[88] or to determine the relief "that will best serve

society,"[89] it is simply to determine whether the proposed decree is within the reaches of the

public interest – "even if it falls short of the remedy the court would impose on its own."[90]

Under subsection (A) of 15 U.S.C. § 16(e)(1), the Court is instructed to consider a

number of factors relating to the competitive impact of the proposed Final Judgments.[91]  With

respect to the "termination of alleged violations," the Section 7 violation in each matter here is a

merger that would reduce competition in Local Private Line and related services to certain

buildings; by restoring competition to those buildings, the proposed remedy terminates the

violations.  With respect to "provisions for enforcement and modification," the proposed Final

Judgments contain the standard provisions that have been effective in numerous other cases

brought by the United States.  In particular, the proposed Final Judgments provide that the Court

retains jurisdiction over this action, and the parties may apply to the Court for any order

necessary or appropriate for the modification, interpretation, or enforcement of the Final

Judgment.  With respect to "duration of relief sought," the proposed divestitures are for a

minimum of ten years.  As discussed above, this period is adequate and appropriate given the

---

[88]  *BNS*, 858 F.2d at 462 (citing *Bechtel Corp.*, 648 F.2d at 666).

[89]  *Bechtel*, 648 F.2d at 666.

[90]  *AT&T*, 552 F. Supp. at 151.

[91]  The Court shall consider "the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest."  15 U.S.C. § 16(e)(1)(A).

rapidly changing nature of technology and the industry, as well as the useful life of the divestiture assets. With respect to "anticipated effects of alternative remedies actually considered," the alternative of injunctions blocking the proposed mergers would likely have prevented the firms in question from realizing literally billions of dollars in efficiencies. Such an extreme remedy is unwarranted given the relatively small magnitude of the competitive problem and the availability of a divestiture remedy that will completely resolve it. With respect to "whether its terms are ambiguous," no term in either proposed Final Judgment is ambiguous. Among other things, the assets to be divested are specified down to the individual building addresses. Finally, with respect to "any other competitive considerations bearing upon the adequacy of such judgment," none casts doubt upon the adequacy of the proposed Final Judgments.

Under subsection (B), the Court is to consider "the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial."[92] Because the buildings identified in the proposed Final Judgments are the only ones in which competition is likely to be lessened as a result of the mergers, the impact of entry of the proposed Final Judgments will be to restore any competition lost as a result of the merger in Local Private Lines and related services. Customers for Local Private Line and related services provided to the buildings in question – parties who might have otherwise suffered injury from the violations set forth in the Complaints – are likely to have competitive choice restored to them via the contemplated divestitures. Moreover, the relief is sufficiently limited so that the public will not

---

[92] 15 U.S.C. § 16(e)(1)(B).

suffer any adverse consequences from the proposed Final Judgments.[93]  No conceivable benefit

could arise from a determination of these issues at trial.  Based on the factors set forth in the

Tunney Act, the proposed Final Judgments are in the public interest.

      Pursuant to Section 16(d) of the Tunney Act, the United States is submitting the public

comments and its Response to the *Federal Register* for publication.  Our response is also being

provided to each of the commenters.  After the comments and the United States' Response to

Comments are published in the *Federal Register*, the United States will move this Court to enter

the proposed Final Judgments.

                        Respectfully submitted,


                        _____/s/_____

                        LAURY E. BOBBISH
                        Assistant Chief


                        _____/s/_____

                        LAWRENCE M. FRANKEL
                        (D.C. Bar No. 441532)
                        Trial Attorney

                        U.S. United States of Justice
                        Antitrust Division
                        Telecommunications and Media
                          Enforcement Section
                        1401 H Street, N.W., Suite 8000
                        Washington, DC 20530
                        Telephone: (202) 514-5621
                        Facsimile: (202) 514-6381

---

[93] Conversely, an injunction against the mergers, or a divestiture of customers as proposed by COMPTEL *would* likely have adverse impact on the public.