**PLAINTIFF UNITED STATES'S RESPONSE TO COMMENTS**

filed in
United States v. SBC Communications, Inc. and AT&T Corp.,
Civ. Action No. 1:05CV02102 (EGS) and
United States v. Verizon Communications and MCI, Inc.,
Civ. Action No. 1:05CV02103 (EGS)


**ATTACHMENT 2**

**Comments of COMPTEL**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

     Plaintiff,

     v.                             Civil Action No. 1:05CV02102 (EGS)

SBC Communications, Inc. and
AT&T CORP.,

     Defendants.


UNITED STATES OF AMERICA,

     Plaintiff,

     v.                             Civil Action No. 1:05CV02103(EGS)

Verizon Communications, Inc. and
MCI, Inc.,

     Defendants.


**COMMENTS OF COMPTEL**

     Pursuant to the Antitrust Procedures and Penalties Act (i.e., the "Tunney Act"),[1]

COMPTEL hereby files these comments explaining why the Proposed Amended Final

Judgments (PAFJs or PAFJ) resolving simultaneous Complaints filed by the United

States to prevent the acquisition of AT&T Corp. by SBC Communications Inc., and the

acquisition of MCI, Inc. by Verizon Communications, Inc. do not replace the

---

[1]     15 U.S.C. §16(b)-(e)

competition lost from the elimination of AT&T and MCI as the two most significant competitors to SBC and Verizon.[2]  Because the PAFJs do not address the harm alleged by the DOJ in the Complaints, entry of the PAFJs is not in the public interest.  Therefore, absent significant amendment of the PAFJs ,the Court will have no option but to reject the PAFJs as filed.  The DOJ has the ability to recognize the deficiencies in the PAFJs at this stage of the proceedings.  These comments are intended to elucidate the short-comings of the PAFJs and facilitate a more appropriate "divestiture."  COMPTEL's members are the primary remaining customers and competitors of the surviving entities of the respective mergers, and, therefore, have a strong interest in securing appropriate divestiture relief.

## I.    <u>INTRODUCTION</u>

The simultaneous acquisition of the nation's largest local competitors by the two largest incumbent providers should have initiated one of the nation's most extensive antitrust inquiries.  Instead, as COMPTEL explains below, the DOJ has failed to fully recognize the anticompetitive effects of the merger in the single product market for which it has chosen to bring suit – the market for dedicated intra-city transmission services, typically referred to as "Special Access" or "Local Private Line" – and has devised a remedy that directly conflicts with, and falls woefully short of, the basic tenants of its own Merger Remedy Guidelines and the mandates of Supreme Court precedent to restore competition to the level prior to the merger.

---

[2]    Although AT&T and SBC are now known as AT&T (while Verizon retained its name after its acquisition of MCI), we refer to each by their pre-merger names in these comments (unless otherwise indicated) to avoid confusion.

The Tunney Act governing this proceeding was adopted to ensure that the settlements of civil antitrust suits by the Department of Justice are in the public interest. Congress specifically amended the Tunney Act in 2004 to emphasize that it expected an independent judiciary to oversee proposed settlements to ensure that the needs of the American consumer were met.  Implementing Congress' unequivocal reaffirmation of the Tunney Act's requirement of independent judicial scrutiny is critical in the review of these simultaneous – and competitively interrelated – mergers that will reconcentrate the telecommunications market to a level unseen since the AT&T divesture just over twenty years ago.  By permitting these mergers to occur with minimal or no modifications to the PAFJs,  the DOJ is effectively reversing that historic divestiture.  As he implemented implemented the Tunney Act in that original AT&T case, Judge Greene admonished that:

> [i]t does not follow . . . that courts must unquestionably accept a proffered decree as long as it somehow, and however inadequately, deals with the antitrust and other public policy problems implicated in the lawsuit. To do so would be to revert to the "rubber stamp" role which was at the crux of the congressional concerns when the Tunney Act became law.

*U.S. v. American Telephone and Telegraph*, 552 F.Supp. 131, 151 (D.D.C. 1982), aff'd *sub nom.*, *Maryland v. U.S.*, 460 U. S. 1001 (1983).

In the comments that follow, COMPTEL explains that the proposed settlements of these mergers blindly ignore both the DOJ's Merger Guidelines and Merger Remedy Guidelines.  In order to demonstrate that the proposed settlements serve the public interest, the DOJ must present a clear and compelling explanation as to how its proposed remedies have any hope of restoring the competition that will be lost by these dominant firms each acquiring their largest competitive rivals.  The remedies crafted by the DOJ are not sufficient to restore competitive conditions the merger would remove; they do not

promote competition (but they do protect the largest, post-merger "competitors," SBC and Verizon); and they lack sufficient clarity and specificity to be enforceable. As currently crafted, the proposed consent decrees are not in the public interest.

## II.    SUMMARY OF COMPLAINT

Any conventional antitrust analysis begins by defining the relevant product and geographic markets. In its complaints here, however, the DOJ adopts a clear definition of only the product market, while dismissing the importance of correctly establishing the geographic market. As COMPTEL explains, the DOJ's failure to identify the relevant geographic market is one of the reasons that its proposed remedy cannot plausibly be expected to restore competition to pre-merger levels.

### A.    The Product Markets

The Government defines two product markets:  1) "Local Private Lines" (more commonly referred to as "special access"), and 2) the retail voice and data telecommunications services that rely on Local Private Lines. Complaint at ¶ 19. The DOJ describes "Local Private Lines" as dedicated, point-to-point circuits offered over copper and/or fiber optic transmission facilities (copper or fiber wires), and notes that the Bell monopolies use the term "special access" to refer to this product market. Complaint at ¶ 13.[3]

---

[3]    The term "special access" is a byproduct of the initial AT&T divestiture. The basic structure of the Modified Final Judgment (MFJ) implementing the AT&T divestiture was the structural separation of AT&T's intercity long distance operations from its local exchange operations. In order for AT&T and other long distance carriers to meet the specialized needs of very large business customers, they would need to lease local transmission facilities from the divested Bell Operating Companies (such as Verizon and SBC) to connect to large users. These connections were referred to as "special access" because they were used to connect specific, individual business customers to the long distance carrier's network and were designed to be used where the customer had large volumes of data and/or voice traffic.

For the first product market — Local Private Lines or Special Access[4] — the DOJ

provides some description of the competition foreclosed by the merger.  The Complaint

against SBC and AT&T, for example, notes that SBC dominates this market with $4.4

billion in sales in 2004, as compared to AT&T's local private line revenues (as one of

SBC's *largest* competitors) of $0.09 billion in the SBC region.  Complaint at ¶ 20.[5]  The

Complaint does not indicate what portion of SBC's $4.4 billion in sales are <u>to</u> AT&T –

indeed, the complaint does not even acknowledge that two of the largest purchasers of

special access are the acquired firms -- or whether any of these circuits are then combined

with AT&T's own facilities and resold to other carriers or business consumers.

However, it is certain that these sales are significant in size[6] and competitive

implication.[7]

---

[4]       As the DOJ notes, Verizon and SBC generally use the term "special access" to refer to Local Private Lines.  Complaint at ¶ 13.  This term is more commonly used by the industry because the principal use of such facilities is as a wholesale input to another carrier that provides retail service to the customer.  (While some business customers purchase Local Private Line services, the primary customers for Local Private Line are other carriers.  Complaint at ¶ 23.)  Because the term "special access" better captures the predominant use of such facilities, and because it is term more commonly used by the industry, COMPTEL will generally use the term in these comments in place of the DOJ's "Local Private Line" nomenclature.

[5]       Similar allegations are made against Verizon and MCI.

[6]       While we do not know with specificity the actual dollar volume of AT&T's purchases of SBC special access, we do know that they have a minimum commitment level of $765 million in special access purchases from SBC.  See AT&T ex parte at 5, filed with the Federal Communications Commission in RM-10593 November 9, 2004.  A copy of AT&T's submission is attached as Appendix A

[7]       COMPTEL explains later in these comments that the proposed merger creates a unique interrelationship between Verizon and SBC.  By acquiring the special access contracts of AT&T and MCI (the largest purchasers of special access), Verizon and SBC will become one of each other's largest competitors *and* customers.  Because both Verizon and SBC must rely heavily on inputs (i.e., special access) acquired from one another to compete with each other, both carriers have built-in supply mechanisms that monitor the competitive output of the other, providing a very real danger of coordinated pricing.  In addition, special access contracts have volume-discounted pricing schedules that discourage each firm from using competitive input suppliers even when they are available.  Notably, the DOJ's competitive analysis completely ignores the competitive symbiosis between SBC and Verizon that the mergers will create.

The Complaint further explains that one "element" of Local Private Line service is the so-called "loop" or "last mile" which is the portion of copper – more likely, fiber -- that provides the dedicated connection from one part of the network to the end-user's building.  Complaint at ¶ 12.  What is not explained in the Complaint is that there are other elements of special access service that must typically be purchased in order for the special access line to be commercially useful.  The other principal element of special access service is "transport."  Transport is the transmission component typically used to collect "loop" traffic at one point on the network and transport that traffic to another point on the carrier's network.[8]

The second product market that the Government alleges will be harmed as the result of this merger is the market for retail voice and data telecommunications services that rely on special access.  The DOJ provides no discussion as to the value of this market, or the relative market shares of the relevant firms within the territories served by SBC and Verizon.  This fundamental failure in analysis makes an appropriate Tunney Act public interest determination very difficult, if not impossible.  While the DOJ makes no effort at all to describe the size of this market, it is clearly substantial.[9]  Thus, restoring competition lost as the result of the elimination of such a significant competitor would

---

[8]     For example, a carrier might use a loop-transport-loop service connecting Georgetown University's Law School on Capitol Hill with its main campus in Georgetown (2 "end points" with transport in the middle).  Alternatively, a wireline carrier might provide only transport (i.e., no loops to a retail customer) between a cell site tower and a mobile telephone switching center.

[9]     For instance, AT&T earned $22.6 billion in business revenue in 2004.  The fact that approximately 1/3 of the nation's total access lines are in the territory served by SBC suggests that the value of retail voice and data communications that rely on private lines provided by AT&T are worth approximately $7 billion.   SBC's retail business revenues from voice and data communications are likely to be equally as large as AT&T's.  Commenters should not, however, have to estimate this information.  It needs to be provided by DOJ to permit an appropriate review of the PAFJs.  The Verizon/MCI PAFJ is equally deficient in providing necessary data to perform a meaningful competitive analysis.

likely demand a significant divestiture of a cognizable business unit.  It is not surprising that the DOJ chose not to provide any specifics on this product market, given the extremely limited value of the "divestitures" the decree proposes.

> **B.**     **The Geographic Market**

Despite its analytical significance, the DOJ fails to clearly identify the relevant geographic market for special access (and the retail services that rely upon it).  Rather, the DOJ merely notes that the relevant geographic markets for both product markets are "no broader than each metropolitan area and no more narrow than each individual building."  Complaint at ¶ 24.   Importantly, as COMPTEL explains below, the DOJ's analysis ignores the significance of regionwide contracting strategies in its analysis of geographic markets *entirely*, and has designed a building-specific remedy approach without offering any convincing explanation as to why a building-specific market definition is preferred to its metropolitan area alternative.

To begin, focusing "solely on demand substitution factors—i.e. possible consumer responses"[10]--within the reality of the special access/Local Private Line market, it is difficult to understand how the DOJ could define a geographic market as narrowly as an individual building.  As an initial matter, the only customers for whom this could be true would be customers whose demand was individually large enough to stimulate alternative entry,[11] but whose total demand was sufficiently concentrated in that

---

[10]      Merger Guidelines, Section 1.0.

[11]      AT&T has previously explained that it would need over 2,016 voice grade lines (which is the voice grade equivalent of a small fiber-system known as an OC-3 -- in an individual location in order to justify building facilities into that location.  AT&T Petition for Rulemaking To Reform Regulation of Incumbent Local Exchange Carrier Rates For Interstate Special Access Services,  Reply Declaration of Janusz A. Ordover & Robert D. Willig on Behalf of AT&T Corp. at ¶ 29, filed with the Federal Communications Commission in RM-10593 on January 23, 2003.

specific building for it to be willing to contract for service in that individual building alone.[12]  Yet, the DOJ has made no allegation that SBC (or Verizon) pre-merger, or post-merger, engage in building specific price discrimination. [13]  Nor is COMPTEL aware of *any* evidence that would support a geographic market definition that narrow and the Competitive Impact Statement filed with the PAFJs does not provide any such evidence. Indeed, in COMPTEL's experience, the fact that Verizon and SBC offer special access service on state or regionwide volume discount schedules suggests that it is more likely that the appropriate geographic market is actually *broader* than the metropolitan area alleged by the DOJ (and cannot plausibly be considered to be as small as an individual building).[14]  As explained by former DOJ and FCC chief economist Joseph Farrell:

> 15.    I understand that, today, SBC's pricing does not fully respond to such granular competitive conditions, building by building, and that SBC is content to price well above CAPs [Competitive Access Providers] where it does face CAP competition and offers substantial discounts in return for region-wide commitments to give SBC not simply a large amount of business but a large share of the carrier's business.

---

[12]    Most customers do not typically contract for special access-based services on a building-by-building basis.  Rather, as SBC has explained to the FCC, "the overwhelming majority of special access circuits are purchased by customers that bargain for substantial term, volume, and overlay discounts."  SBC Reply Comments at 26, filed with the Federal Communications Commission in *the Matter of Special Access Rates For Price-Cap Local Exchange Carriers,* WC Docket No. 05-25 on July 29, 2005 (internal citations omitted).  Moreover, [t]hese contract tariffs vary in their scope, covering a single MSA, multiple MSAs, or SBC's entire service territory."  SBC Comments at 53 n.176 filed with the Federal Communications Commission in *In the Matter of Special Access Rates For Price-Cap LECs,* WC Docket No. 05-25 on June 13, 2005.

[13]    Normally, the DOJ would only define geographic markets this narrowly if a "hypothetical monopolist" could identify and price differently to buyers in these buildings.  *See* Merger Guidelines, Section 1.22 "Geographic Market Definition in the Presence of Price Discrimination.

[14]    Although the correct geographic market definition is probably the entire SBC or Verizon region, for purposes of this filing, COMPTEL will adopt the largest geographic market asserted by the DOJ in its Complaint (the metropolitan area) when evaluating the adequacy of the DOJ's remedy.  Complaint at ¶ 24.

16. Such a pricing practice links special access pricing in different buildings, and--while it persists--argues for a region-wide market definition because (as I explain below) it can make region-wide concentration a more important determinant of competitive behavior and overall pricing than concentration and entry possibilities specific to a building or route.[15]

### C.    <u>Anticompetitive Effect</u>

In two brief paragraphs, the DOJ posits that the primary anticompetitive effects of the two largest local Bell monopolies acquiring their two largest competitors will be felt in those few buildings where the number of carriers serving the buildings with their own fiber or copper transmission facilities will decline from two to one. The DOJ explains that even though other competitors might still be able to resell private lines from SBC, these competitors would not be as effective at constraining the post-merger firm's prices to customers, because the merged firm will control the price of a critical input. Complaint at ¶ 25. According to the Complaint, this anticompetitive effect (reduced competition in a limited number of buildings) will not be limited to the market for "raw" special access service (unadorned transmission services), but will also distort prices in the market for "finished" telecommunications services (i.e., switched voice or managed data/Internet service) that use private lines as a critical input. Complaint at ¶ 26. As we discuss below, however, the PAFJs not only do not remedy this anticompetitive effect, but rather may actually exasperate it.

---

[15]    Statement of Joseph Farrell attached to the Opposition of Global Crossing filed with the Federal Communications Commission in *In the Matter of SBC/AT&T Merger*, WC Docket No.05-65 onApril 25, 2005. For the convenience of the DOJ, COMPTEL includes Professor Farrell's observations regarding the proper geographic market definition. A copy of the Statement is attached hereto as Appendix B.

The Merger Guidelines are primarily concerned with entry from the perspective of whether it is reasonable to expect that a post-merger, unilateral increase in price would be met with entry that is timely enough, reasonably likely, and on a sufficient scale to defeat the hypothetical price increase.  In the Complaints, the DOJ states that other carriers are unlikely to replicate AT&T's last mile connections into the few buildings for which the merged firm has consented to make unused capacity available.  The DOJ explains that carriers decide whether to build last mile facilities based on several factors:

a.   the proximity of the building to the CLEC's existing network interconnection points;
b.   the capacity required at the customer's location (and thus the revenue opportunity);
c.   the availability of capital;
d.   the existence of physical barriers, such as rivers and railbeds, between the CLEC's network and the customer's location; and
e.   the ease or difficulty of securing the necessary consent from building owners and municipal officials.

Complaint at ¶ 27.  COMPTEL does not disagree that the points listed above are barriers to entry; nor does COMPTEL disagree that entry — by either the last mile or transport facilities — would not be sufficient or sufficiently timely to defeat a post-merger increase in price.

However, COMPTEL must point out that the entry barriers the DOJ identifies are by no means exhaustive.  It is well recognized that dedicated, high-capacity telecommunications networks are characterized by substantial economies of scale and scope.[16]  Moreover, the "sunk" aspect of the high capital costs that are characteristic of competitive fiber deployment are additional entry barriers.[17]

---

[16]      In one of the early antitrust cases, this Court determined with respect to the local private line service offered by AT&T pre-divestiture, "that there are three reasons for defendants having achieved such clear economies of scale. First, as defendants' witnesses explained, higher levels of

Importantly, however, these and the other barriers the DOJ identifies are similar for all transmission facilities, regardless of whether they are "loops" or "transport;" and the inability of entry to defeat a post-merger price increase in the *metropolitan area* is just as much (actually more) of a danger than the threat of *building-specific* price increases. (As COMPTEL has explained, the DOJ has not offered any evidence that building-specific pricing by SBC and Verizon is the norm). Consequently, while the

---

demand allow efficient use of high-capacity facilities and technologies which provide transmission service at progressively lower unit costs. Second, the process by which the network is configured allows for the fullest utilization of these high-capacity, low-cost facilities. Finally, defendants supply the entire spectrum of communications services, and through the networking principle, demand for all those services is concentrated or pooled so that it can be transmitted and switched over the same facilities. This last phenomenon is referred to by economists as "economies of scope". Economies of scope exist when it is cheaper to produce two or more goods or services together than to produce each one separately. *Southern Pac. Communications Co. v. American Tel. & Tel. Co.*, 556 F. Supp. 825, 861-862 (D. D.C 1982). As noted above, with SBC's acquisition of AT&T, the pre-divestiture AT&T has been substantially reconstituted. Furthermore, the FCC has found that "Scale economies, particularly when combined with sunk costs and first-mover advantages . . . can pose a powerful barrier to entry. If entrants are likely to achieve substantially smaller levels of sales than the incumbent, then with scale economies their average costs will be higher than those of the incumbent, putting them at a potentially significant costs disadvantage to the incumbent. Profitable entry may not be possible if retail prices are close to the incumbent's average costs. The greater the extent and size of the scale economies throughout the range of likely demand, the higher the barrier they pose." *In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, Report and Order on Remand, 18 FCC Rcd. 16978 at ¶ 87 (2003), vacated in part (on other grounds), aff'd in part and remanded *sub nom. United States Telecom Association v. Federal Communications Commission*, 359 F.3d 554 (D.C. Cir. 2004), *cert. den. sub nom. AT&T Corporation v. United States Telecom Association*, 125 S.Ct. 316 (2004).

[17]     The existence of high, or proportionately high, sunk costs is generally recognized as a barrier to entry. *See, e.g.*, Larson, *An Economic Guide to Competitive Standards in Telecommunications Regulation*, 1 CommLaw Conspectus 31, 52 (January 2000) ("if entry requires the incurrence of capital costs, and a 'high' proportion of these are sunk costs for entrants, then entry barriers exist.") *c.f.*, Bolton, Brodley, and Riordan, *Predatory Pricing: Strategic Theory and Legal Policy*, 88 Geo. L.J. 2239, 2265 (August, 2000)("if challenged by new entry, the incumbent will rationally disregard such [sunk] costs in its pricing decisions rather than lose the business. The entrant . . . must now incur such costs, and therefore faces risk of underpricing by an incumbent with sunk costs. Thus, as a result, sunk costs may act as an entry barrier, giving the incumbent the ability to raise price above the competitive level.") The FCC has specifically found that "[s]unk costs, particularly when combined with scale economies, can pose a formidable barrier to entry." *In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, Report and Order on Remand, 18 FCC Rcd. 16978 at ¶ 88.

DOJ has recognized that the conditions for post-merger price increases are present, it has failed to fashion any reasonable remedy that would prevent such increases from occurring.

### III.    THE PROPOSED DIVESTITURES WILL NOT RESTORE COMPETITION

The formal policy guidance to the Antitrust Division regarding merger remedies is contained in the Antitrust Division Policy Guide to Merger Remedies ["Merger Remedy Guide"].[18]  In this policy statement, the Antitrust Division sets forth broad principles that it claims will guide its decisions to seek remedies to offset potential harms to competition resulting from mergers.  A controlling policy principle is that "restoring competition is the 'key to the whole question of antitrust remedy.'"[19]

Importantly, the goal of  restoring competition is not a policy choice made by the DOJ.  Rather, it follows from the guidance provided by the Supreme Court that "relief in an antitrust case must be effective to redress the violations and 'to restore competition' [and that] … [c]omplete divestiture is particularly appropriate where asset or stock acquisitions violate the antitrust laws."  *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972); *accord United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 331 (1961); *California v. American Stores Co.*, 495 U.S. 271, 280-81 (1980).

The DOJ has followed this policy and precedent time and time again in divestitures across various industries including telecommunications.  In previous

---

[18]     Antitrust Division Policy Guide to Merger Remedies, U.S. Department of Justice, Antitrust Division, October 2004.  Available at http://www.usdoj.gov/atr/public/guidelines/205108.htm

[19]     *Id.*, citing *United States v. E.I. du Pont de Nemours & Co., 366 U.S. 316, 326 (1961).*

telecommunications mergers in which the DOJ has negotiated remedies, the divested

assets included not just network infrastructure, but also customer contracts, business and

customer records and information, customer lists, accounts, leases, patents, licenses, and

operational support systems -- in essence complete operating businesses.  For example, in

*U.S. v. Cingular Wireless Corp. et al.*, DOJ required the divestiture of AT&T Wireless's

entire mobile wireless business in the identified geographic markets to prevent the

substantial lessening of competition for mobile wireless services.  *See U.S. v. Cingular*

*Wireless Corp. et al.*, No. 1:04CV01850, Proposed Final Judgment (D.D.C. November 3,

2004).  Similarly, in *U.S. v. WorldCom, Inc. and Intermedia Communications*, DOJ

required WorldCom to divest all Intermedia assets, except for the voting interest in

Digex, as an ongoing, viable business to prevent the substantial lessening of competition

in the market for Tier 1 Internet backbone services.  Again, the required divestiture

included customer contracts, operational support systems and each of the aforementioned

assets among a host of others. *U.S. v. WorldCom, Inc. and Intermedia Communications*,

No. 1:00CV02789, Proposed Final Judgment (D.D.C. November 17, 2000).  *See also*

*U.S. v. SBC Communications Inc. and Ameritech Corp.*,  No. 99-0715, Proposed Final

Judgment (D.D.C. March 23, 1999) (DOJ required divestiture of an entire business

including the assets listed above).   Most recently, only one year prior to the present

mergers being filed with the DOJ, the DOJ was perfectly willing to follow its own

counsel in the case of Qwest—another large incumbent local exchange carrier, but

substantially smaller than either SBC or Verizon—seeking to acquire Allegiance

Telecom in a bankruptcy proceeding.  There, the DOJ signed a consent decree with

Qwest that required Qwest to entirely divest itself of all of Allegiance's in-region business.[20]

A key question underlying the DOJ's approach here is simply "what happened?" Why is the guidance of its Merger and Remedy Guidelines – guidance to which the DOJ has consistently adhered in merger after merger, involving firms far smaller than those being combined here – no longer relevant to its analysis?[21]  As we explain below, the divestitures required under the proposed final judgments cannot plausibly restore the competition lost by the simultaneous acquisition of the nation's two largest *competitors* by the nation's two largest *incumbents*, much less do the divestitures even hint at addressing the heightened threat of coordinated pricing resulting from SBC and Verizon becoming each other's largest customer and competitor.

The DOJ's Merger Remedy Guide makes clear that the preferred course to restore competition is to divest sufficient assets to replace the competition lost by the merger, recognizing that such divestitures will likely require more than mere physical assets:

> Divestiture must contain at least the minimal set of assets necessary to ensure the efficient current and future production and distribution of the relevant product and thereby replace the competition lost through the merger.  The Division favors the divestiture of an existing business entity that has already demonstrated its ability to compete in the relevant market. An existing business entity should possess not only all the physical assets,

---

[20]    Ultimately, Qwest was out-bid in a bankruptcy auction by XO Communications and the consent decree was not filed.  The proposed consent decree is provided here as ==Appendix C== to illustrate a divestiture approach more consistent with the public interest than that to which the DOJ has acquiesced here.

[21]    COMPTEL is not so naïve as to believe that the massive size of the merged entities in these proceedings is necessarily unrelated to the Government's approach.  Mergers concentrate political capital in a manner comparable to their amalgamation of economic power – a fact Senator Tunney well recognized "[i]ncreasing concentration of economic power, such as occurred in the flood of conglomerate mergers, carries with it a very tangible threat of concentration of political power. Put simply, the bigger the company, the greater the leverage it has in Washington." 119 Cong. Rec. 3451 (Feb. 6, 1973).

but also the personnel, customer lists, information systems, intangible assets, and management infrastructure necessary for the efficient production and distribution of the relevant product.[22]

***

The goal of a divestiture is to ensure that the purchaser possesses both the means and the incentive to maintain the premerger competition in the market(s) of concern.[23]

Divestiture of an operating, on-going business redresses the antitrust violations and restores competition in the affected market.[24]   Significantly, the "divestitures" required by the consent decrees are not real divestitures at all (as the term is used to effect a "structural remedy" in the Merger Remedy Guide).  Rather, the proposed decrees call only for a ten-year lease of the defendant's unused fiber capacity – capacity that is dormant and cannot be made useful without substantial additional investment – and which only connects to buildings where the available revenue is already locked into long-term contracts with the defendants, most likely through a contract tying the service in the named building to the customer's requirements in other locations.   This temporary lease of the defendants' unused capacity to a carrier that has neither the scale nor scope of the defendants cannot restore the level of competition lost by the acquisition of AT&T and MCI.

A.     **A Building-Specific Remedy Is Insufficient**

To begin, although the DOJ was unable to define the relevant geographic market with precision – concluding only that it was no smaller than an individual building and no

---

[22]     Merger Remedy Guide at 12.

[23]     Merger Remedy Guide, at 9.

[24]     *Id*.

larger than a metropolitan area, the DOJ's "remedy" assumes that individual buildings are the appropriate measure. Moreover, the proposed final judgments only apply in those relatively few buildings where the merging parties control the only facilities serving the building (i.e., where because of the merger, the number of facility-paths to the building will go from 2-to-1). Notwithstanding the lack of any explanation of why only the "2:1" buildings are of concern (as opposed to circumstances where competitive choice collapses from 3:2 for instance), the DOJ's focus on a building-specific remedy assures higher prices to retail customers.

As noted earlier, COMPTEL is unaware of any market evidence that suggests that customers make purchasing decisions – or that carriers make pricing decisions – on a building-by-building basis. If customers do not make their decisions that way, and carriers do not price their services that discretely, there is no reasoned basis to conclude that the remedy can restore competition when the market has been incorrectly defined so narrowly.

In COMPTEL's experience, customers make their purchasing decisions for much broader areas that generally conform to the areas that the incumbents use to calculate volume discounts. Even if one assumes that a relatively (compared to our experience) narrow market definition of a single metropolitan area is appropriate, the only way to restore the competition lost by the mergers is to divest all of the AT&T and MCI network assets that serve each metropolitan area. Only if that were to occur, could the purchasing entrant be assured of the opportunity to offer customers service packages with a similar footprint as provided by the former competitors, AT&T and MCI.

Notably, AT&T and MCI were two of the largest purchasers of wholesale special access services in the territories served by SBC and Verizon and, as such, were able to take advantage of SBC's and Verizon's volume discount pricing strategies to achieve lower special access prices than other competitors. Because large end-user customers typically contract for retail service at multiple locations, AT&T and/or MCI were able to bid on such contracts using a blend of their own facilities and the heavily discounted special access facilities they leased from SBC and Verizon. Consequently, even if leasing the unused capacity that exists at some of the customer's locations to other entrants (a term called for by the proposed consent decrees) was able to replicate the *facilities*-based competition from AT&T and MCI (a proposition with which we disagree, for other reasons that we describe here), unless other entrants also enjoyed the same discounts achieved by AT&T and MCI for the special access circuits used to form the *complete* bid for all of the customer's locations, the level of competition in the metropolitan area would be harmed and prices would be expected to rise.

### B.    The Lease of Unused Capacity Does Not Restore Competition

Another remarkable feature about the proposed consent decrees is that they only require the defendants to lease the *unused* capacity they may have installed to a particular building – i.e., fiber strands that today lie dormant, that would require substantial additional investment to activate, and which quite possibly exceed the known demand in the building to which they are committed.

The DOJ correctly recognizes that "CLECs will typically build in to a particular building after they have secured a customer contract of sufficient size to justify the anticipated construction costs for that building." Complaint ¶ 28. In other words, the

most common arrangement is for facilities to be installed only after a customer has made a contractual commitment of sufficient duration and magnitude to justify the cost. Remarkably, although the DOJ recognizes this circumstance, it has proposed a remedy that effectively assumes the opposite.

In each of the buildings identified by the DOJ, there are only two networks available to customers (that of AT&T or MCI and that of the incumbent).  Following the DOJ's accurate observation that competitors generally do not deploy capital speculatively, it is likely that AT&T and MCI constructed their lateral connections only *after* obtaining a contract with the customer sufficient to recover the costs of construction.[25]  As such, it is unlikely that there is sufficient uncommitted demand in *any* of these buildings to justify a competitor incurring the cost to access the building to become a "third" option.

One obvious question is why should the DOJ presume that an entrant will precommit capital (to acquire a fiber-lease from the defendants) to serve these buildings without already having a customer under contract, when the DOJ recognizes more generally that an entrant would not otherwise take such a risk?  Moreover, the economic disincentive is even greater in these buildings because the entrant knows that the capital it would be committing would be to acquire capacity at levels that neither the incumbent (SBC and Verizon) nor the largest competitors (AT&T or MCI) were able to sell.  The DOJ's Merger Remedies Guide recognizes that "in markets where an installed base of

---

[25]    The FCC has found that large business customers "demand extensive services using multiple DS3s or OCn loops typically offered under long-term arrangements which guarantee a substantial revenue stream over the life of the contract."  *In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, Report and Order on Remand, 18 FCC Rcd. 16978 at ¶ 303 (2003).

customers is required in order to operate at an effective scale, the divested assets should either convey an installed base of customers to the purchaser or quickly enable the purchaser to obtain an installed customer base."[26]

Additionally, in its Merger Guidelines, among the factors the DOJ lists that are likely to "reduce sales opportunities" to a post-merger entrant is "any anticipated sales expansion by incumbents in reaction to entry, either generalized or targeted at customers approached by the entrant, that utilizes prior irreversible investments in excess production capacity."[27]  Here, while the "divestiture asset" is unused capacity, it is not even *all* the unused capacity the post-merger firm will possess; so it is hardly unthinkable that the merged firm would not be easily able to eliminate any sales opportunity for the prospective entrant (assuming such a sales opportunity could even exist on a building-specific basis)—especially given that the new entrant (even if it acquired the unused capacity for free) will still have to incur the costs of negotiating building access, laying fiber within the building, and lighting the fiber.  Yet, in this context, the DOJ has not required the defendants to divest a single customer – or even to waive the termination penalties associated with any contract that includes service in the identified buildings.[28]

**C.     A 10-year Lease is Not a Divestiture**

Above we emphasize the fact that CLECs are unlikely to install capacity to particular building until after the customer is locked into a contract suggests that the customer demand in the buildings where AT&T has installed fiber are unlikely to be

---

[26]     Merger Remedy Guide at 10

[27]     Merger Guidelines, Section 3.3.

[28]     So called "fresh look" requirements would at least permit the customers using the productive capacity that the DOJ is permitting the merged firms to retain to consider shifting their demand to the unused capacity that the DOJ would have the merged firms divest.

available to an entrant because of the customer's contractual commitments. A second implication is that an entrant is unlikely to want to lease dark fiber from the defendants (as assumed by the proposed consent decrees) precisely because the new entrant to the building will not have its own pre-committed customers.

Whether the entrant leases the unused capacity required to be divested by the proposed settlement -- or whether it constructs the facility new, the economic condition recognized by the DOJ remains the same. Entrants are unlikely to commit capital to serve an individual building unless a customer has already committed to cover the costs of that capital expansion. The fact that some dark fiber may have been obtained through the proposed "divestiture" does not substantially lessen this capital expenditure – there remain significant costs to access the customer and activate the fiber so that it is capable of providing services.

The DOJ appears unwilling to appreciate the comparability between capital expenditures incurred as construction costs and capital expenditures incurred as long-term leasehold acquisition costs. The fact is that competitors generally do not deploy capital on speculation. If they do not have a contract for a satisfactory level of demand at a particular location, then they typically will not spend capital to provide facilities to that location.

The risk to invested capital used to *activate* any leased fiber from the defendants is particularly acute. The DOJ's consent decrees only require a relatively short lease commitment of 10 years, without any renewal option. After the lease expires, the merged companies will once again control the assets supposed to be "divested," with the entrant that has leased these facilities having no clear option. In addition, without full transfer of

assets, prospective lessees will have no rights to access any building without first obtaining permission from the landlord or property manager of the building. This, again, makes the ability of the lessee to serve potential customers contingent on its ability to overcome an entry barrier that the DOJ has recognized and that the defendants have overcome.[29] It is remarkable that the DOJ would identify an entry barrier (like building access), and then propose a remedy to create new entry while leaving the prospective entrant to still negotiate that entry barrier.

### D.    The Remedy Is Not Clear and Enforceable

Among the broad, "guiding principles" in the Merger Remedy Guide is the notion that an antitrust remedy should be clear and enforceable. This is also a new requirement for the Court to analyze with respect to consent decrees under the Tunney Act—whether its terms are ambiguous, and therefore, whether it is enforceable. The present consent decree is so vague and ambiguous as to be virtually unenforceable.

As an initial matter, almost all—if not all—of the critical provisions of these consent decrees are subject to subsequent agreement among the parties. The elements of the divestiture leases that are subject to "agreement" between the parties—pricing, splice point access, and access to dark fiber transport—are among the most contentious issues in arbitrations held pursuant to the Telecommunications Act of 1996. History has shown

---

[29]    There is a related, yet somewhat technical, point that should also be considered. The merged firms almost certainly each have route diversity (*e.g.*, fiber coming in the front door and going out the back door). This is a valuable feature because it allows the carrier to protect its customer against service disruptions from fiber cuts (if the fiber coming into the building is cut, the carrier can simply "re-route" the customer's communications through the diverse fiber strand). However, there is nothing in the terms of the consent decrees that requires the post-merger firm to provide "diverse" fiber. Rather, the decree only requires a minimum of 8 strands to be divested. It appears that the post-merger firm could technically comply with the decree, while limiting the prospective purchaser's ability to win sales by only divesting fiber strands in the same sheath.

that competitive entrants are typically unsuccessful "negotiating" with the Bell companies, frequently having to resort to binding arbitration under the Telecommunications Act, 47 U.S.C. §252, even to implement basic interconnection and lease rights guaranteed by the statute and the FCC's rules implementing the statute.[30] The PAFJs do not divest independent operations that have the incentive and ability to be willing wholesalers to other competitive providers; rather, the decrees portend the same seeds for litigation that have plagued the Telecommunications Act of 1996 for a decade (and which ultimately produced these mergers in the first instance).

## IV.    THE PROPOSED REMEDY INCREASE THE LIKELIHOOD OF COORDINATED PRICING

### A.    ILEC Exclusionary Contracts Are a Barrier To Entry And Facilitate Collusion Between Post-Merger SBC and Post-Merger Verizon

COMPTEL has already shown that the DOJ has not adequately described all the barriers to entry in the Local Private Line market.  As we have noted, most private lines include a transport component as well as a loop component.[31]  Moreover, most private lines are purchased by carriers, which combine these private lines with intelligence and other network facilities and features to create finished services that are then sold to retail customers.  Thus, what little facilities competition that exists in the special access/Local Private Line market is provided by other carriers for other carriers.  The barriers that these entrants—who compete directly against SBC and Verizon—face are enormous.

---

[30]    *See* The Role of Incentives for Opening Monopoly Markets: Comparing GTE and RBOC Cooperation With Local Entrants (1999) (ILECs that do not cooperate with entrants attract less competitive entry) available at http://econpapers.repec.org/paper/wpawuwpio/9907004.htm.

[31]    Indeed, AT&T has explained that 40,000 of its local business customers require the lowest capacity private line service—DS1 service.  The vast majority of these customers—about 65%--are served via combinations of loops and transport.  See AT&T Presentation, CC Docket No. 01-338, October 7, 2002, at p. 10.

The DOJ only lists some of the "natural" economic barriers to entry. There are other, artificial barriers that have been erected by the Bell companies, including defendants SBC and Verizon.

The most notable features about the special access market are that: 1) the SBC and Verizon still maintain a monopoly over the market; even the competitive carriers with the largest networks must buy over 90% of their total special access circuits (Local Private Lines) from the incumbents; 2) in the most populous markets, SBC and Verizon are no longer price regulated by the FCC; and 3) almost all of the special access circuits sold by SBC and Verizon are sold under "optional pricing plans."[32]

These optional pricing contracts are relevant to this proceeding for three reasons: 1) they are important to understand in order to understand proper geographic market definition; 2) they are an ongoing barrier to facilities-based competitive entry into the Local Private Line/special access market because they severely foreclose access to customers and distort entry decisions; and 3) the continued existence of these contracts will make it even less likely that the proposed remedy will allow a new firm to take the place of AT&T—even if all of AT&T's in-region assets were divested.

The key feature of these optional pricing plans is that in order to get "discounts" on circuits for which they have no competitive alternative (the vast majority of their circuits) customers (like the pre-merger AT&T and MCI, and COMPTEL's members) must commit to purchasing the majority of their total circuit volumes from the Bell

---

[32]     These "optional pricing plans" are an essential feature of the special access market that needs to be understood in order to understand why entry of the proposed consent decrees is not in the public interest. To this end, COMPTEL has included with its comments a detailed analysis of SBC's optional pricing plan, prepared by former DOJ and FCC chief economist Joseph Farrell. Dr. Farrell's pricing plan analysis is included as Appendix D to these comments.

companies—including circuits for which a cheaper competitive alternative may be available. In other words, because only the incumbent can supply all of any customer's Local Private Line demand, the incumbent can condition the availability of discounts on certain circuits (the majority, for which no competitive alternative is available) on the customer's commitment to transfer the "competitively sensitive" portion of its demand to the incumbent.

In this respect, the optional pricing plans—which are pervasive—act to foreclose circuit demand from potential competitors of the incumbents for Local Private Line services.[33] This feature—contracts that foreclose sales opportunities to rivals—is yet another factor that the DOJ, in its Merger Guidelines, has identified as making post-merger entry less likely.[34] However, the DOJ has chosen not to eliminate this entry barrier for the prospective IRU purchaser.

Another feature of these contracts is that customers that cannot meet their volume commitments must pay high "termination" penalties. While customers do not like these contracts, they have little choice but to sign them.[35] Because, as noted previously, for the densest metro areas the FCC no longer regulates the Bells' special access rates, the Bells

---

[33]    See, e.g., "Quantity-Discount Contracts as a Barrier to Entry," T. Randolph Beard, PhD, George S. Ford, PhD, Lawrence J. Spiwak, Esq., Phoenix Center Policy Paper No. 20 (November 2004). Available at http://www.phoenix-center.org/ppapers.html

[34]    "Factors that reduce sales opportunities to entrants include . . . (b) the exclusion of an entrant from a portion of the market over the long term because of vertical integration or forward contracting by incumbents. . . ." Merger Guidelines, Section 3.3.

[35]    "Discount pricing plans offered by ILECs further reduce the ability of CLECs to compete and result in higher prices. Even where a CLEC may offer a competing special access service (at a substantial discount to the ILEC offering), WilTel may not use that CLEC in many cases because it can incur a lower incremental expense by committing additional services to an existing ILEC plan even though the overall unit cost from the ILEC may be higher." Declaration of Mark Chaney in support of the Comments of WilTel at ¶ 6 filed with the Federal Communications Commission in *In the Matter of Special Access Rates for Price Cap Local Exchange Carriers*, WC Docket No. 05-25 on June 13, 2005.

have used this pricing flexibility to raise their "month-to-month" or non-OPP prices for special access. The resulting effect is that customers—almost all of whom are retail competitors with the Bells (Local Private Lines/special access circuits are critical inputs to all wireline and wireless telecommunications services)—cannot afford to pay higher prices when their competitors (including the Bell affiliates) are purchasing at a "discount." The word "discount" is in quotations because the discounts are discounts off the month-to-month tariff price, so the Bell can still charge a monopoly profit maximizing price (through its OPP) by establishing a "supra-monopoly" price as the non-OPP alternative.

The most important thing to consider when trying to conceptualize how the optional pricing plans work, is that the incumbent—by exchanging "discounts" on products for which demand is inelastic (customers have no alternative) for commitments to not buy from competitors on products for which the customer could choose a competitor—gets to set the minimum scale of entry for his competitors. Thus the incumbent can pick demand over a large geographic region as the inelastic product (on which discounts are offered), or the incumbent could decide to "discount" lower capacity circuits (for which the incumbent's "first mover" status and scale/scope economies give it a tremendous advantage over new entrants) as the basis on which it will foreclose demand from rivals. Regardless, though, the end result is that the incumbent is able to raise the costs of its competitors by expanding the scale on which they would have to enter, or raising the size of the discount they would have to offer to make their customer

indifferent between buying from the incumbent, and/or by limiting its competitors ability to expand quickly (by foreclosing demand).[36]

Given that courts, as well, have recognized the potential for anticompetitive foreclosure effects in these so-called "bundled rebate" or "bundled discount" plans, the DOJ needs to determine what percentage of the wholesale (carrier) and retail markets for special access are foreclosed by the contracts at issue.  COMPTEL believes this number will be significant.[37]  The D.C. Circuit has held that exclusionary conduct by a monopolist is more likely to be anticompetitive than "ordinary" exclusionary conduct achieved through non-monopoly means (i.e., agreements among competitors).[38] Moreover, the Third Circuit has held that contracts almost identical to the Bell OPP's, when used by a monopoly, were anticompetitive and exclusionary in violation of the

---

[36]    See, *e.g.,* Declaration of Michael D. Pelcovits on Behalf of WorldCom (as MCI was formerly known) at 7 filed with the Federal Communications Commission in  *In the Matter of AT&T Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, RM-10593. ("Less than fully exclusive contracts can similarly be exclusionary where they tie up sufficient volume to prevent smaller competitors from achieving minimum viable scale.")  Pelcovits also uses the following example to explain the pricing disadvantage at which competitors that cannot match the incumbent's scale or scope are placed:  "Suppose the monopoly (pre-entry) price is $1.00 and the customer buys 100 units. Further suppose that a competitor is capable of providing 25 units at a price of 99 cents, thereby threatening to undercut the monopolist.   In response, the monopolist could offer the customer the choice of buying 75 units at $1.05 per unit, or buying all 100 units for 99 cents per unit.   As a result, the customer now faces a price from the monopolist for the 25 "in play" units of $20.25, or 81 cents per unit.   The competitor is unable to meet this price, and is excluded from the market." *Id*. at 7-8.

[37]    SBC notes that the "overwhelming majority" of its special access circuits are sold under term and volume contracts. See n. 11, supra.  Verizon has stated that 85% of its access sales were under some form of discount contract.  Verizon Comments at 22 filed with the Federal Communications Commission in  WC Docket No. 05-25 on  June 13, 2005.

[38]    *United States v. Microsoft Corp.,* 253 F.3d 34, 70 (D.C. Cir. 2001) (Microsoft's exclusionary contracts violated Section 2 (of the Sherman Act) "even though the contracts foreclose less than the 40-50% share usually required in order to establish a § 1 violation.")

antitrust laws.[39]  The Supreme Court has held that a market share over 65% is sufficient to establish a prima facie case of monopoly power.[40]  It is certainly the case that SBC and Verizon would be considered monopolies, pre-merger, in the special access market—regardless whether the market is defined as a building or metropolitan area.[41]  Thus, an inquiry into what proportion of special access services are sold under the contracts described above should be sufficient to have enough information to determine that as long as the defendants are allowed to use these contracts, the DOJ's proffered remedy has no legitimate hope of restoring competition lost through the mergers.

## B.  <u>The Proposed PAFJs Will Affirmatively Facilitate Collusion Between SBC and Verizon</u>

However, there is one remaining aspect to the contracts discussed above that independently compels the DOJ to reject the PAFJs and require a more complete divestiture.  The effect of the contracts, post-merger, will be to enhance the ability for the merged firms to engage in interdependent coordination.  Post-merger each firm is the other's largest in-region competitor and largest out-of-region supplier.  This new reality, in conjunction with the OPP contracts—which enforce input dependence on the dominant firm—leads naturally to increased coordination through the increased ability of each dominant firm to monitor each competitor for "cheating" and to thereby better facilitate

---

[39]     *LePage's Inc. v. 3 M*, 324 F.3d 141 (3d Cir. 2003)("The principal anticompetitive effect of bundled rebates as offered by [the defendant] is that when offered by a monopolist they may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer").

[40]     *American Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946).

[41]     Only 3 years ago, AT&T—the best-situated special access customer (with the largest competitive local network in any Bell region)—was dependent on the incumbents for 93% of its DS1-level transport and 65% of its DS3-level access.  See Reply Declaration of Janusz A. Ordover and Robert D. Willig on Behalf of AT&T Corp., In the Matter of AT&T Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services, FCC RM-10593, at ¶ 30.

coordination.  The Competitive Impact Statemetns do not address, let alone explain, howe coordinated effects will be prevented by the very limited relief proposed by the PAFJs.  Effectively, four very large competitors, two of whom (AT&T and MCI) had every incentive to seek to grow share and pursue entry have been reduced to two historic monopolies whose incentives are much more to protect existing monopolies than they are to aggressively compete.

## B.        The Proposed Settlements Should Be Evaluated Together

There is no question that the acquisitions of AT&T and MCI by SBC and Verizon, respectively, will substantially lessen competition in the provision and sale of "Local Private Lines" (also known as "special access") to the wholesale market, as well as voice and data services that rely on Local Private Lines, with the likely result that prices for the Lines and services using those Lines will increase "to levels above that which would prevail absent the merger(s). Complaints ¶¶1, 25, 33.  The Complaints conclude that,  absent relief, competition will be diminished and prices will rise in both the wholesale and retail local private line markets. Complaints ¶25.  Although the DOJ has asked the Court to review the proposed settlements together, it has ignored the important interrelationships between the mergers and the level of competition.  The Tunney Act Reform, however, does not allow this same luxury.  Rather, the DOJ is required to demonstrate that "the impact of entry of such judgment upon *competition in the relevant market or markets*. . . . "[42] resolves the anticompetitive effects identified in the Complaints.

---

[42]        15 U.S.C. § 16(e)(1)(B) (emphasis added).

The DOJ, in its Merger Guidelines, notes that a significant potential anticompetitive effect of mergers occurs when the mergers increase the ability of the remaining firms in the market to coordinate in ways that harm consumers. The DOJ notes that "[c]ertain market conditions that are conducive to reaching terms of coordination also may be conducive to detecting or punishing deviations from those terms." Merger Guidelines, Section 2.1.

COMPTEL submits that these conditions are fully satisfied in the case of the present mergers and the PAFJs do not remedy these conditions because they do not restore the competitive condition to pre-merger levels. The complaints recognize that AT&T and MCI are each among the largest competitors to both SBC and Verizon. Complaints at ¶ 8. The inescapable conclusion from this fact is that post-merger, both SBC and Verizon will be the largest competitor to the other. Significantly, however, each pre-merger carrier (i.e., AT&T and MCI) has explained to the FCC that it is bound by volume discount contracts to SBC and Verizon that effectively require that each purchase most of its special access services from its rival (SBC and Verizon) or be harmed by the loss of discounts based on regionwide commitments.[43]

What is even more important going forward is that the contracts do not just act to discourage the new "out-of-region" competitors from using *other competitive carriers*, but the contracts act as a disincentive for the post-merger out-of-region competitors to use their *own* networks. Thus, the contracts serve to cement the two post-merger firms' interdependence, and provide a ready-made excuse as to why they cannot/will not

---

[43]    See, generally, AT&T and MCI filings in FCC RM-10593 and WC Docket No. 05-25. Attachments 4 and 5 are representative of the pre-merger firms' concern over their dependence on SBC and Verizon special access—a dependence that was only magnified by the bundled rebate contracts.

compete aggressively on price in either wholesale input markets or in retail business or wireless markets.  Moreover, these commitment contracts for wholesale inputs constitute a perfect mechanism to detect and punish cheating in the retail market, as any significant increase in inputs purchased can indicate that the competitor is experiencing an increase in retail demand as the result of a decline in retail price.

Alternatively, the post-merger dominant firms have no less of an information advantage in wholesale markets.   Because the post-merger AT&T and Verizon have such a significant portion of wholesale demand under such contracts, they are also in a position to notice decreases in demand from other wholesale customers at old-AT&T or old-MCI "on-net" locations.   Reduced purchases by other wholesale market customers could easily and efficiently alert the post-merger incumbent to wholesale market cheating.

Once the dominant firm has detected wholesale or retail market cheating, it can then perfectly signal, through either price responses by its own CLEC in the other Bell's region, or through output restrictions—quality disruptions from its ILEC to the "maverick" CLEC.  Finally, these contracts ensure that the post-merger firms have a government-sanctioned defense to collusion.

Unlike the pre-merger AT&T and MCI, these post-merger companies will never complain about the unreasonable restrictions these contracts place on their ability to use competitive facilities—they perfectly know this is the intended effect of the contracts. Moreover, they also know that if they just stay "captive"—as is reasonable—then they can take any increase in private line rates as a signal/excuse to raise retail rates.  Since they can expect the same consideration where they are the input monopolist and

dominant retail firm, they have an incentive to provide the same consideration as an out-of-region competitor.  This is a significant risk of harm to the public interest, because most telecommunications services that the post-merger firms will sell in each other's ILEC regions (local, long distance, voice, data, and wireless) rely in large part on "Local Private Line" service as a critical input.

Finally, although it is pretty clear how the existing contracts enhance both firms' incentives and ability to coordinate post-merger, what may not be so clear is how the feckless remedy structure further enhances the ability of the post-merger firms to limit competition.  The "divestiture assets" are most likely to be interesting/valuable to a firm that already has a significant network in the divestiture market.  As the DOJ explains, "[p]urchasers that are already offering similar services in or near the metropolitan area are more likely to be viable competitors than other potential purchasers."  Competitive Impact Statement at p. 6 of 12.  Moreover, the government strongly prefers a single purchaser.  *Id.*  Finally, the terms of the "assets" themselves are fairly unique—10 yr leases for non-revenue-producing excess capacity; the "purchaser" would still have to undertake significant investment to use the assets by obtaining building access, laying additional inside wire/conduit, and then "lighting" the fiber; and, even after all that, the government is not requiring the defendants to let customers in the affected buildings out of their contracts so a purchaser could start earning revenue immediately.  Thus, because the "assets" are structured to be attractive to a purchaser who has a greater ability to

"warehouse" capacity than a "typical" competitor,[44] it seems most likely that AT&T and Verizon will be the natural high bidders for the excess capacity in each other's territory.

The further expansion of AT&T and Verizon's out-of-region presence in the other's in-region territory through the addition of excess capacity only increases the means for non-detectable signaling and closer coordination. For example, instead of cutting prices in Verizon's incumbent territory to signal disapproval of Verizon's pricing in AT&T's incumbent region, AT&T can just take steps that make it look like it is preparing to activate the excess capacity in the discreet out-of-region buildings. In fact, the parties may find it useful to signal entirely through discreet bids at the locations where DOJ seems to expect price discrimination.

---

[44]    "Because a single such connection may cost hundreds of thousands of dollars to build and light, CLECs will typically only build in to a particular building after they have secured a customer contract of sufficient size and length to justify the anticipated construction costs for that building." Competitive Impact Statement p. 5 of 12.

## **CONCLUSION**

COMPTEL has demonstrated that the PAFJs do not even begin to remedy, and may even exacerbate, the public interest harms caused by the elimination of the two largest competitive carriers by the two largest incumbent monopolies.  Accordingly, the Court will be required to reject the PAFJs, because they cannot satisfy the Tunney Act unless modified to: 1) include all of the acquired competitors' in-region assets as a whole business—with customers, employees, and assets; and 2) eliminate both post-merger firms' ability to offer "bundled rebate" style pricing to any customer, including their own long-distance and wireless affiliates.

Respecfully submitted,


Jonathan D. Lee
Mary C. Albert
COMPTEL
1900 M Street, NW
Suite 800
Washington, D.C.  20036-3508
(202) 296-6650

# Appendix A

## MVP & MIBS                          *Anti-Competitive Issues*

- Using these tariffs is not optional for AT&T in the future
- If AT&T does not use MVP, unit costs will go up in the near term - dramatically

- If there were alternatives…
- No customer would accept the anti-competitive terms of MVP or MIBS

## *MVP & MIBS*                             *Anti-Competitive Issues*

- **At that time the initial MVP tariffs, commitments based upon percent of previous spend were less of a concern – forecasts projected continued rapid growth in all service categories.**

- **Things have changed, and more change is possible through competition and new technology.**

  - *<u>Business Climate</u>*
    - **"Irrational Exuberance" to Optimization and Constrained Demand**
    - **Infinite Growth to Stranded Plant, Over-Capacity**
  - *<u>Supplier Alternatives</u>*
    - **Metro Facility CAPS to Cable, Wireless and Powerline**
    - **Geographically Limited Footprint to Ubiquitous Technology**
  - *<u>Technologies and Services</u>*
    - **TDM / Private Line / POTS to ATM / Packet / VOIP**
    - **Bulk Capacity to Bandwidth On Demand**
    - **Best in Class to Best Effort**
  - *<u>Customer Expectations</u>*
    - **Generic Reliability to Application-Specific Service Quality**
    - **Stability to Flexibility**

- **ILEC special service optional payment plans (like MIBS) cannot be allowed to require customers to "lock-in" current purchase levels.**
  - **Plan requirements must not "look back".**
  - **Plans must look forward.**



## *DS1 Unit Problem*

- SBC DS1 market share is in excess of 90%
- DS1 competition is limited - it is the last mile product
- Even where competitive carriers do operate, SBC DS1 unit cost are about 40% higher than competitors
- Given this market share and pricing , SBC will not voluntary reduce rates
- SBC may reduce prices to competitive levels if:
  - FCC action – re-regulation
  - Ensuring UNE DS1's are permitted as an economical replacement
  - Use of competitive and technological alternatives is possible
    - IP
    - Wireless
    - Packet
    - Broadband



## *MVP & MIBS*

- What Should a Competitive Plan Include?
    - Commitment Choice
    - Unit Costs that Reflect a Forward-Looking Competitive Market
    - Optimized Network Configuration
    - Next Generation Technology Savings Passed on to Customer

## *MVP Tariff*                    *Volume Independent Discounts*



- Current MVP tariff provides discounts for annual commitment levels as low as $10M.
- Commitment levels are established at 100% of the total expense at the beginning of the five year plan.
- Discounts increase from 9% in the first year to 14% in the fourth and fifth years.
- Discounts are independent of the committed expense volume.
  - Discounts afforded under this plan remain the same for large and small purchasers.
- AT&T's commitment level of $765M is over 75 times greater than the minimum.



## *MVP Tariff*                                    *Setting The MARC*



- MVP minimum expense commitments are set to encompass the entire existing expense stream to SBC. SBC refers to this as the 'Minimum Annual Revenue Commitment", known as the "MARC".
- This MARC renders SBC's embedded base "un-addressable" by alternative suppliers.
- SBC has indicated "roughly 65% of all special access revenues" are covered under the MVP tariff, demonstrating that the MVP discounts are critical price floor for the majority of wholesale special access

 **AT&T**          11/9/2004                    Page 6                              **Central Region LSAM**

## *MVP Tariff*                    *Managing The MARC*



- Customers who exceed their MVP commitments receive no discounts beyond the MARC.
- As markets grow, SBC forces their wholesale customers to increase their MARC to continue to receive discounts.
- Increases in the MARC render an even larger embedded base out of reach for competitors.
- Customers who fall below the MARC pay "True Up" charges to SBC.
- SBC insulates itself from market risk by requiring its wholesale customers to "keep SBC whole".

## *MVP Tariff*          *Anti-Competitive Issues*



- Although SBC positions the MVP as a "volume" discount program, discounts are independent of expense "volume" once $10M is achieved and depend solely on commitment of 100% of existing business.

- SBC's OPP contracts already provide a term commitment – the vast majority of AT&T's circuits are already covered by 5 year OPP commitments.

- SBC's MVP tariff freezes access competitors out of the current embedded base of customers, limiting their addressable market to new growth only.

The prospects for increased "true up" expenses places competing access suppliers at a competitive disadvantage once an MVP is in place, despite competitors' significantly lower unit costs for actual services.



## *MVP*                                    *Anti-Competitive Issues*

- Tariff requires 100% Commitment of current spend throughout life of Contract and beyond, no matter how large or small the commitment
  - Commitment can Increase but Cannot Decrease
  - Because no discount for excess spend, Customer must continually refresh commitment or effectively receive a lower discount
  - At end of commitment, Customer must continue at current level to retain 14% discount attained in Year 5 or forfeit discounts for 6 months and then start at 9% on new base
- Shortfall Penalties
  - Pay dollar for dollar on expenses below the Commitment
- Must Maintain an Access Service Ratio of 95%
  - Cannot Purchase More than 5% of Dedicated Access through UNE

## *MVP Tariff*                                    *Recasting the MARC*



**SBC Special Access Expense Trend**

*"True Up" Charges*

AT&T negotiated an increase in the MARC commitment on September 2001, to reflect the still burgeoning market conditions prior to the collapse of the telecom market.

At that time, commitments based upon percent of current spend were less of a concern – forecasts projected continued rapid growth in all service categories.

Things have changed, and more change through competition and new technology is possible --- IF

Future plans (like MIBS) cannot be allowed to lock in these levels. Plan requirements must not "look back". Plans must look forward.



## MIBS Tariff                    Setting MIBS equal to the MARC



SBC has proposed pricing MIBS to "Revenue Neutral" to SBC. Under this plan, the MIBs commitment would be set at the existing MVP MARC level. In the same manner as the MARC, the MIBS minimum expense commitments will encompass the entire existing expense stream to SBC, rendering the entire embedded base un-addressable by competing suppliers and technologies.

It should be noted that AT&T is already "below the MARC" – SBC's MIBS proposal eliminates any opportunity to re-cast the MARC to reflect current levels of actual service expense, and perpetuates the MARC commitments made in September 2001.



## *MIBS Project*                    ## *Current Rate Structure*



*AT&T's network expense can be significantly reduced by increasing utilization from current levels.*

*MIBS envisioned a "virtual" optimization benefit to AT&T by significantly discounting network components rolled into the "MNI" rate element*

**Significant improvements in AT&T's network utilization are stymied by expense commitment levels in place under the current MVP tariff.**

**SBC's decision to set MIBS pricing at levels equal to AT&T's current expense perpetuates SBC's relative unit cost disadvantage. Incremental unit cost improvements from "buying more MIBS" is insufficient to close a deepening unit cost gap**

**Under MIBS, AT&T has no meaningful opportunity to improve the utilization of the network elements it has paid for. SBC can, however, utilize any available capacity on under-utilized facilities to support other customers or their own retail products.**



## *MIBS*                                    *Anti-Competitive Issues*

- Customers Cannot Chose Commitment Levels
  - Requires Customer Commitments on Expense Levels Generated 3 Years Ago
  - SBC is Forcing a Higher Commitment than the Current Run Rate
  - Immediate Shortfall – only way to counteract is to move volumes from CLEC/CAP's and AT&T Network to SBC's Network

- Commitment Cannot Decrease
  - Adding Customers to AT&T's Base Automatically Increases the Bandwidth and Revenue Commitment Levels to SBC, thus Forcing a Higher Expense Commitment than the Current Run Rate
  - Adding Bandwidth increases the Bandwidth Minimum Revenue Commitment Level
  - Core Capacity can only go up
  - Commitment Increases are Non-Discretionary
  - MIBS Pricing is set to be "Revenue Neutral" to SBC.

## *MIBS*                    *Anti-Competitive Issues*

- Commitment periods are unrealistically long in time of rapid technology change and dramatic changes in end-user application requirements
  - Five or Seven Year Commitment Requirement
- Commitment Decrease Requires Market Exit and Subsequent Termination Penalties
- Because MIBS is Managed at the LATA Level, it Prohibits the use of Competitive Suppliers
  - MIBS Requires Commitments in all SBC LATA's where Customer has Presence
  - All eligible services in all LATA's must be purchased under MIBS
  - Cannot Purchase from Alternative Suppliers, even if Price Advantage
  - Lock-in Unit Cost that is 66% Higher than CLEC/CAP's
- MIBS is a Revenue Plan – it does not recognize Volume, Circuits, or Bandwidth
  - As Such, Network Efficiency by Replacing Legacy Services with Next Generation Services, which has a lower Unit Cost and Reduces Billing, does not Convey back to the Customer



## *MVP & MIBS*                                    *Anti-Competitive Issues*

If there were alternatives…

- No customer would accept the anti-competitive terms of MVP or MIBS

- **Things have changed, and more change is possible through competition and new technology.**

- **Future plans (like MIBS) cannot be allowed to lock in these levels.**
  - **Plan requirements must not "look back".**
  - **Plans must look forward.**

# Appendix B

## Statement of Joseph Farrell

### 25 April 2005

1.     I am Professor of Economics and Chair of the Competition Policy Center at the University of California, Berkeley, where I am also Affiliate Professor of Business.  In 1996-1997 I served as Chief Economist at the FCC.  In 2000-2001 I served as Deputy Assistant Attorney General and chief economist at the US Department of Justice Antitrust Division.  I am a Fellow of the Econometric Society and former President of the Industrial Organization Society.  From 2001 to 2004 I served on the Computer Science and Telecommunications Board of the National Academies of Science.  My curriculum vitae is attached as Appendix 1.

2.     I have been asked by counsel for Global Crossing to comment on likely competitive effects on special access of the proposed merger between SBC and AT&T.  Neither time nor data availability permits a full analysis, but in this declaration I identify some concerns that, in my view, the Commission and its staff should fully investigate.  In particular I offer a preliminary economic analysis of region-wide merger effects in the presence of percentage-of-requirements contracts such as I understand SBC uses in special access.

3.     Of most direct concern is the elimination of the horizontal competition between SBC and AT&T where both offer facilities-based special access to a building or other appropriately granular geographic market that is not so served by several other carriers.[1]  While the granular geographic market definition is the most obvious, it must be supplemented (not replaced) by a region-wide market definition and analysis capable of assessing the competitive effects of such a loss of competition in the presence of a loyalty or volume pricing program such as I understand that SBC offers, linking

---

[1] In their public interest statement, SBC and AT&T suggest that the markets where both offer special access are served by multiple others, but the specific facts they cite concern geographic areas far broader than buildings.  A full inquiry into appropriate granularity is evidently needed.

competition in different granular markets.  In addition, vertical concerns arise, especially given the Commission's pending special access rulemaking.  All of these concerns demand much more scrutiny in the light of adequate data, which the Commission is well positioned to demand and analyze, and important parts of which SBC and AT&T are likely to be uniquely positioned to provide.  The Commission's rulemaking does not substitute for competitive analysis of the proposed merger.

## Special Access Market

4.      Firms such as Global Crossing build facilities over which they offer business customers a range of telecommunications and data services.  In general however they do not build facilities all the way to customers' premises.  Rather, they procure last-mile connections, known as special access, from ILECs such as SBC and in some cases from competitive access providers (CAPs), including AT&T.

5.      In its region, SBC can offer special access to essentially all major business premises.  No CAP can offer access to a large percentage of such premises.  However, I understand that AT&T offers special access connections to substantially more buildings than can any other CAP.[2]

6.      I further understand that, whatever may be the case in consumer markets, intermodal (wireless or cable) alternatives are not generally regarded as viable alternatives to special access by Global Crossing and similarly situated firms, nor by their customers.

7.      Unbundled network elements do not generally offer a viable, independently priced, alternative way for Global Crossing or its customers to acquire the

---

[2] I also understand that AT&T is a major reseller of SBC special access.  While the role of resellers in competition is not straightforward, it certainly need not be null, especially when incumbents offer volume discounts, and the Commission should investigate the extent to which resellers collectively, and AT&T in particular, may constrain SBC's effective pricing in ways that promote competition and consumer welfare.

last-mile connection, because of the FCC's decision not to require unbundling of network elements unless used primarily for local competition.[3]

8.    I also understand that the Commission has treated special access as a market in itself.[4]

9.    These considerations suggest that special access is a relevant antitrust product market. More subtle issues arise in geographic market definition, as I discuss next.

## Geographic Market Definition

### Granular Analysis

10.    From the point of view of final demand-side substitution, the natural and correct market definition is likely to be extremely localized. A business located in a certain building and wishing to procure telecommunications services is unlikely to substitute special access to a *different* building in response to a small but significant and nontransitory increase in the price of special access services to its building. For a business with established premises, such substitution would involve costly relocation. Perhaps some businesses seeking new premises might seek out buildings to which special access is more competitively supplied, but it is unlikely that this effect would be strong enough to change the presumption that the correct geographic market based on demand-side substitution would be highly localized, as is the case with many telecommunications markets. For the same reason, the direct

---

[3] *Unbundled Access to Network Elements: Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, WC Docket 04-313, CC Docket 01-338, 2005 FCC LEXIS 912 at 64 (March 14, 2005).

[4] *See Special Access Rates for Price Cap Local Exchange Carriers; AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, 20 FCC Rcd 1994 (2005); *Performance Measurements and Standards for Interstate Special Access Services; Petition of U S West, Inc. For a Declaratory Ruling Preempting State Commission Proceedings to Regulate U S West's Provision of Federally Tariffed Interstate Services; Petition of Association for Local Telecommunications Services for Declaratory Ruling; Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended; 2000 Biennial Regulatory Review - Telecommunications Service Quality Reporting Requirements; AT&T Corp. Petition to Establish Performance Standards, Reporting Requirements, and Self-Executing Remedies Need to Ensure Compliance by ILECs with Their Statutory Obligations Regarding Special Access Services,* 16 FCC Rcd 20896 (2001); *Local Exchange Carriers' Rates, Terms and Conditions for Expanded Interconnection Through Physical Collocation for Special Access and Switched Transport,* 12 FCC Rcd 18730 (1997).

customers of special access (such as Global Crossing) do not find special access to different geographical points to be worthwhile substitutes, as they are trying to serve particular customers in particular locations.

11.    It is legitimate and often helpful to aggregate such highly granular markets when they face the same competitive conditions. But of course that condition can be affected by the pattern and structure of competitors' pricing and other competitive behavior.

12.    One natural form of competitive behavior would be for SBC and any CAPs who can provide special access to a particular building to compete, perhaps by bidding, on terms specific to that building.

13.    With that form of competition, the geographic market definition based on demand substitution by end users would be the correct framework in which to analyze the effects of a merger such as this one between SBC and a leading CAP.

14.    In that framework, one would identify geographic markets (buildings, for instance) in which SBC does not compete with AT&T, markets in which SBC faces competition only from AT&T, and markets in which SBC faces competition from AT&T and from one, two or more other CAPs. The analysis of competitive effects would then proceed separately for each of these classes of highly granular market.

## Regional Analysis

15.    I understand that, today, SBC's pricing does not fully respond to such granular competitive conditions, building by building, and that SBC is content to price well above CAPs where it does face CAP competition and offers substantial discounts in return for region-wide commitments to give SBC not simply a large amount of business but a large share of the carrier's business. Thus Global Crossing reports that:

> "Typically, SBC will structure volume commitments in terms of a percentage of the special access customer's embedded base of circuits, or its current annual spend. Special access customers must commit to spend at least 90% of their current spend in the

following year or maintain 90% of its embedded circuit base with SBC in order to be eligible for volume discounts,"[5]

and that, as a result, "SBC chooses not to meet its competitors' rates."[6]

16.    Such a pricing practice links special access pricing in different buildings, and—while it persists—argues for a region-wide market definition because (as I explain below) it can make region-wide concentration a more important determinant of competitive behavior and overall pricing than concentration and entry possibilities specific to a building or route.

17.    This does not mean that customers can substitute across routes, nor that only carriers who offer special access region-wide (which indeed would mean only SBC) are "in the market."  Rather, a region-wide geographic market definition is likely to be a sensible way of summarizing the competitive impact of CAP presence at multiple locations, as I describe in a simple formal model in the technical appendix below.  In that model I show how the price paid by special access customers on SBC monopoly routes (denoted $p$ in the model) depends on the percentage of routes that are SBC monopolies.  The aggregate share of CAPs, or more precisely the share of routes served by CAPs in aggregate (denoted $\theta$ in the model), turns out in that model to be a constraint on SBC's (discounted, i.e., effective) pricing $p$ even on monopoly routes, *if* SBC pursues a pricing strategy of the kind described.  It is in this sense that a region-wide geographic market definition is appropriate.

18.    I do not suggest that my simplified, incomplete formal model is the final or only answer.  Rather, it illustrates that when a dominant firm's pricing policies link competition across routes, a simple route-level competitive analysis, which inevitably misses such links, can readily yield wrong predictions for pricing, while a region-wide competitive analysis can help by incorporating analysis of such links.

---

[5] In the matter of SBC Communications Inc and AT&T Corp. Applications for Transfer of Control: Comments of Global Crossing, at 14 (April 25, 2005).
[6] *Id.* at 17.

**Using Both Approaches**

19.    The analysis above indicates that, to capture both the effects of limited
       potential for end-user substitution across addresses, and also the effects of
       pricing practices that link (perhaps quite widely separated) buildings,
       intelligent geographic market definition in this transaction involves using at
       least two definitions: one highly granular (perhaps as granular as individual
       office buildings), the other corresponding to the geographic scope of SBC's
       pricing practices, i.e., region-wide.[7]

20.    These are not alternative means of analysis.  As always, definitions should not
       pre-empt analysis; but an analysis that uses geographic market definition must
       consider both of these definitions or risk overlooking important effects.

21.    Because it is at least plausible (see below) that SBC's reported pricing
       practices are exclusionary, it presumably is comparably plausible that the
       Commission's separate inquiry into the special access market will constrain
       SBC's ability to sustain those practices.  If so, then the granular, perhaps even
       building-by-building geographic market definition would become relatively
       more appropriate.  On the other hand if SBC's pricing practices survive
       (whether or not because they are benign), the region-wide geographic market
       definition remains the natural way to capture potentially important
       competitive effects.  Thus a choice of one of these geographic market
       definitions would pre-judge the Commission's treatment of SBC's pricing
       policies.  (As I discuss below, none of this is to suggest that the pendency of
       the Commission's special access rule-making is a reason not to consider the
       effect of this proposed merger on the special access market.)  In this sense as
       well as the more substantive sense above, the two geographic market
       definitions must both be pursued at this stage, and are not alternatives in the
       sense that the Commission can simply choose one.

22.    SBC's pricing policies might also change as a result of changes in competitive
       conditions over time, or even as a result of a change in thinking by SBC's

---

[7] I understand that this may correspond to RBOC "footprints" such as Ameritech's, not (yet) reflecting
mergers into the current SBC.

management.  Thus, while it would certainly be wrong to analyze the merger only on a granular basis, as if SBC's actual current policies were off the radar screen, it would also be wrong to analyze the merger only on a region-wide basis, or as if those policies were certain to be permanent.

## Competitive Effects of SBC-AT&T Merger in Special Access

### Analysis with Granular Markets

23.   For many office buildings in-region, SBC is at present the only provider of special access.  The merger would nevertheless have a competitive effect in those granular markets if the merger eliminates an important potential of entry by AT&T; that is, if AT&T is an especially likely entrant.  AT&T is a large customer of special access and supplier of enterprise network services, and one likely mechanism through which entry into special access (that is, the construction of special access facilities) could occur is via the customer's enterprise network services provider deciding to build its own facilities to bypass SBC's special access charges.  It therefore is credible a priori that AT&T would be an especially likely entrant into granular special access markets that are currently monopolies.  Such a view would be reinforced if (a) the majority of non-ILEC construction of special access facilities is by an enterprise network services provider to its customer's premises, and (b) AT&T has a persistently high share of the enterprise network services market. Both of these conditions are consistent with my general understanding of the market, but the data required to examine them in detail is not publicly available; I urge the Commission and its staff to obtain this data and perform this analysis..

24.   For a substantial number of other buildings, I understand, AT&T and SBC are the only two alternative providers of special access.  For businesses in such a building, or for the telecommunications carriers (such as Global Crossing) who compete to serve them using special access, this is a merger from duopoly to monopoly, which should surely raise a very strong concern at the Commission.

25.     As usual, such concerns could be assuaged to some degree if entry were likely to be timely and sufficient to deter or repair any competitive problems. Given the large sunk costs involved, that it is unlikely to be the case, but Commission analysis of previous entry decisions by AT&T as well as by others could confirm this.

26.     There may be other buildings where SBC and AT&T both offer special access, and one other CAP (such as MCI) does so;[8] as to such buildings, this is a "three-to-two" merger, which should also raise significant concerns.[9]

27.     If the granular market accurately describes competition, then it should be possible for the Commission to quantify the likely effects of such changes. In particular, it would be possible (with suitable data from the parties) to study average special access prices with and without route-level competition.

28.     However, such a study will underestimate competitive effects—perhaps drastically so—if SBC pursues a geographically averaged pricing policy supported by discount plans that link competitive conditions across different routes. In the extreme, if SBC prices uniformly without regard to route-level competitive conditions, but its overall price level is sustained above the competitive level by its localized monopoly power in some routes, then such a cross-section study would miss the effect. Rather, in that case, one must analyze competitive conditions across as well as within granular markets to understand these effects and correctly predict the competitive consequences of a merger, as I discuss next.

## Analysis with Region-Wide Market

29.     Presumably SBC implements its discount plan in the expectation that it will affect customers' behavior. The effect is that a customer will (sometimes) pass up lower CAP prices in a particular building in order to meet its SBC volume commitment. That behavior, or the pricing plan that induces it, links

---

[8] There may well be other buildings where MCI provides the only competition to the ILEC, which will be important in analyzing a merger involving MCI.

[9] By stopping here, I do not mean to suggest that four-to-three mergers are unproblematic, but the basic point should be clear by now.

competitive conditions across the separate buildings or other highly granular (what would otherwise be) geographic markets. Customer behavior then cannot be properly understood, nor competitive conditions examined, on a purely granular basis.

30. In the technical appendix, I offer a simple preliminary model to help understand the role of CAP competition in constraining prices when the dominant ubiquitous firm, SBC, offers volume discounts large enough to be tempting, based on share commitments big enough to be constraining.

31. The model assumes that SBC's discounted price is constrained by special access customers' "break-out" option of instead buying from CAPs wherever they offer a better price, and paying SBC's undiscounted price where there are no CAPs (or where SBC offers a better price on a granular basis, although the model predicts, consistent with what I understand is the evidence, that this is not the pattern).

32. That break-out alternative is more appealing the higher is the gap between the percentage of buildings where there are CAPs and the percentage of business that a customer can give to CAPs without losing its SBC volume discount. As a result, the loss of a special access competitor through merger makes the break-out alternative less appealing (given SBC's volume threshold for discounts) and thus allows SBC to raise its discounted price without losing business.

33. In the model, one can (recognizing that it is very preliminary) calculate the likely competitive effect of the loss of a CAP such as AT&T. In the model, that effect is proportional to the change in the fraction of buildings that are served by one or more CAPs. That is, it is proportional to the fraction ($\Delta\theta$ in the model) of buildings served, pre-merger, by SBC and AT&T alone.

34. In this model, if one can assume that SBC's volume commitment requirement and its undiscounted price do not change with the merger, the overall average price effect from the merger is equal to that fraction $\Delta\theta$, times the difference between SBC's undiscounted price and the CAP price. This appears to be about as strong as, or arguably stronger than, the average competitive effect of

the merger-to-monopoly aspects of the merger would be in the granular mode of competition.

35.     Because the model predicts that a pricing policy like that attributed to SBC can create very strong competition among CAPs even at different locations, it may make entry incentives very weak even where SBC is charging prices well above cost.  If so, entry would be unlikely to repair or deter anticompetitive effects in a timely fashion.  Again, this is not an analysis ready for prime time: instead, it illustrates why further analysis is needed.

36.     Because the model is preliminary and incomplete, and the necessary data is not publicly available, I view it as illustrating an at least initially plausible region-wide mechanism through which the loss of a special access competitor causes a "unilateral effect" price increase by the dominant firm, given pricing policies broadly akin to SBC's.  This buttresses the argument that the Commission should carefully consider region-wide geographic markets as well as granular markets.

### Special Access Competition, Special Access Regulation, and Leverage

37.     Whatever its legal status, any suggestion that the Commission should ignore competitive concerns in special access because it has a pending rulemaking on the topic makes no sense from a general policy or economic viewpoint.  If the merger harms special access competition, no decision likely to be contemplated by the Commission in the rulemaking proceeding can restore such competition.

38.     To be sure, the Commission might find some policies to implement.  But most policies would be available with or without the competition lost by merger, so their availability does not change that fact that losing competition is harmful.

39.     Furthermore, if the rulemaking proceeding might (or might be thought apt to) involve price regulation of special access, that will create (or strengthen) incentives for leverage that the merger would simultaneously facilitate; such

regulation could even be prompted by the loss of special access competition due to the merger.[10]

40. With greater horizontal market power in special access, and with a much stronger position in enterprise network services following its acquisition of AT&T, SBC will in any event have increased incentives to raise special access prices to downstream enterprise network service providers (or generally special access customers) such as Global Crossing.

41. The effect of such a price increase, holding fixed the retail price charged by SBC's downstream affiliate, would in part be to shift business from independent downstream providers to SBC's downstream affiliate; this is more likely to happen, and the alternative outcome of the customers dropping out of the market is less likely to happen, if SBC's downstream affiliate is larger and more attractive to customers, as will be the case post-merger. Thus this component of the incentive will grow stronger with the merger.

42. Another part of the effect will be simply to raise market prices downstream; this is likely to be the primary effect if (as I understand) customers face significant portability or switching costs. This gives SBC more profits, the larger the market share of its downstream affiliate. Again, this indicates that the incentive for price increases to independent downstream firms will grow with the proposed merger. This incentive must be set against the potential elimination of double marginalization internally.

43. There may also be an incentive for non-price discrimination, especially if SBC fears that its special access pricing may be regulated, since that will create an incentive for regulatory bypass by taking rents at the enterprise network service level rather than at the special access level.[11]

---

[10] I am not suggesting (see my article cited below) that regulation of a bottleneck is the only condition that leads to incentives for leverage into an unregulated, competitive or potentially competitive complement. Rather, it is one well-established condition that predictably does so.

[11] For a recent discussion of a range of leverage incentives, and the link with regulation of a bottleneck, see Joseph Farrell and Philip Weiser, "Modularity, Vertical Integration, and Open Access Policies: Towards a Convergence of Antitrust and Regulation in the Internet Age," *Harvard Journal of Law and Technology* 17:1 (Fall 2003), 85-135.

44.     Increased incentives for leverage, in turn, will lead either to harm to competition in downstream markets such as enterprise network services, or to vertical regulation to try to stop such leverage, or quite possibly to both.

45.     Opinions can differ on the right degree of vertical restraint to impose on dominant firms with incentives for leverage, and I am not expressing a position here on whether special access prices should be regulated or whether vertical regulation such as non-discrimination should be imposed.

46.     For the reasons above, I conclude that (a) the proposed merger involves a loss of direct horizontal facilities-based competition in special access; (b) the geographic market definition and the competitive analysis involve consideration of SBC's pricing policies for special access, and this could well lead to a region-wide (or similar) geographic market definition being more informative than one based narrowly on consumer substitution; (c) there may well also be vertical issues, especially if the state of competition in special access is problematic; and (d) the Commission should vigorously investigate these concerns, including demanding the data with which to investigate them, and a general regulatory proceeding on special access cannot replace the investigation of merger-specific competitive effects.

# Technical Appendix: Pricing with Share-Contingent Discounts

Consider the following market structure. A dominant firm, S, offers service at all locations. It sets a price $p*$ and a discounted price $p$ that it gives to each customer who buys at least a fraction $1-\varepsilon$ of its volume from it.[12]

Rivals (CAPs) collectively offer service at a fraction $\theta < 1$ of all locations. They set a price $p_c$; I discuss the determination of $p_c$ below, but for simplicity I assume that it is the same for all CAPs.

Each customer needs to buy service at a number of locations, and I assume that service is available from CAPs (collectively) at a fraction $\theta$ of these locations. I assume that the dominant firm's volume condition for the discount, that the customer buy at least a fraction $1-\varepsilon$ of its volume from S, is binding, which means (assuming $p_c < p$) that $\varepsilon < \theta$.

Thus the customer has two buying strategies. First, it could buy from CAPs wherever they offer service, but must then pay S the undiscounted price $p*$ in the fraction $1-\theta$ of cases where there is no CAP. This "break-out" strategy leads to an average price paid of:

$$\theta p_c + (1-\theta) p *.$$

Alternatively, the customer can "manage to the discount" and limit its procurement from CAPs to a fraction $\varepsilon < \theta$ of locations, so that it pays the discounted price $p$ in the remaining cases. This leads to an average price paid of:

$$\varepsilon p_c + (1-\varepsilon) p.$$

In reality, different customers may make different choices, but for a simple model, consider limit pricing by S so that all customers choose the latter option. (There would

---

[12] As noted above, Global Crossing reports that SBC's volume commitment plans specify 90% of previous-year in-region special access spend. In order to meet such a commitment, assuming for simplicity that there is no growth, the customer would have to serve no more than a fraction $\varepsilon$ of customers via CAPs, where $\varepsilon$ is such that $(1-\varepsilon)p = [0.9][(1-\varepsilon)p + \varepsilon p_c]$; this yields $\varepsilon = [1 + 9 \frac{p_c}{p}]^{-1}$. If $p_c \approx \frac{1}{2} p$ then $\varepsilon \approx 0.15$.

be no point in the discount program if all customers chose the former option.)  At least given $\theta$ and $p*$, S presumably wants to maximize $p$, subject to keeping customers on the discount program, which implies:

$$p = \frac{(1-\theta)\, p* + (\theta-\varepsilon)\, p_c}{1-\varepsilon}$$

Note that since the customer is offered CAP service at $\theta$ locations but will not buy it at more than $\varepsilon$ of them, CAPs at different locations actually compete with one another. This is a possible reason why, I understand, a single CAP offering special access to a building otherwise served only by SBC will price well below SBC, not just below as would presumably be the case (adjusting for quality) without the volume pricing.

From the formula for $p$ one can derive the effects on the average price paid if a merger removes a CAP and $\theta$ thus falls, assuming that $p*$ and $\varepsilon$ remain unchanged:[13]

$$\Delta p = -(1-\varepsilon)^{-1} (p* - p_c)\Delta\theta$$

Perhaps more usefully, we can plug the formula for $p$ into the expression $\varepsilon p_c + (1-\varepsilon)p$ for the average price $\bar{p}$ actually paid, yielding $\bar{p} = (1-\theta)p* + \theta p_c$.  This is the same average price as would be paid if (a) there were no linkages among locations; (b) S priced at $p*$ at its monopoly locations; and (c) customers paid $p_c$ at locations with CAPs.  We then have $\Delta\bar{p} = (p* - p_c)[-\Delta\theta]$.

If (in the world with discount pricing) S expects that many customers will not break out and pay $p*$, but will instead manage to the discount and limit their purchases from CAPs so as to avoid $p*$ and pay $p$ instead, then $p*$ plays the role of a penalty inducement to manage to the discount scheme as well as a market price for break-out customers in monopoly buildings.  Thus it appears that S has an incentive to set $p*$ *above* the monopoly level $p^m$, roughly in proportion to the fraction of customers who manage to the discount rather than break out.  On the other hand, $p_c$ reflects artificial inter-location competition as described above, as well as any intra-location competition from the presence of multiple CAPs at a building, so $p_c$ will be decreasing in $(\theta-\varepsilon)/\theta$.

---

[13] One of the ways in which this model is preliminary and incomplete is that it does not model SBC's choice of those variables.

The net effect of the discount pricing program on the average price paid is thus not obvious from this preliminary analysis, but to the extent that $p* > p^m$ and/or that $p_c$ is below the average oligopoly price that would emerge under granular competition, the program apparently exacerbates the average competitive effect of a loss in $\theta$, i.e. the average competitive effect of a merger.

The model also seems to suggest that such a program may be exclusionary, in the sense of making entry even by an equally efficient CAP unprofitable even though the incumbent S prices well above cost. The gross return to entry is $p_c$ times the probability that a CAP will make a sale. In the simple model, that probability is $\varepsilon / \theta < 1$. That is, despite pricing well below the incumbent S, a CAP will sometimes (perhaps often) lose business to S. Although this is not a deep or complete analysis, I believe it is enough to establish that the possible anticompetitive effect of such a pricing plan is a question well worth investigating, and that competitive analysis of the proposed merger should not assume with certainty that these pricing practices will survive the Commission's policy response to such an investigation.

# Appendix C

# AGREEMENT

WHEREAS, Qwest Communications International, Inc., a Delaware corporation ("Qwest"), and Allegiance Telecom, Inc., a Delaware corporation ("Allegiance"), have entered into an Asset Purchase Agreement dated as of December 18, 2003 pursuant to which Qwest agreed to purchase substantially all of the property, assets, licenses, and rights that Allegiance uses to provide telecommunications services to business customers,

WHEREAS, Qwest intends to bid for the assets of Allegiance at the bankruptcy auction scheduled to be held on February 12 and 13, 2004, in the U.S. Bankruptcy Court for the Southern District of New York,

WHEREAS, the United States Department of Justice ("Department") has opened a preliminary inquiry into Qwest's proposed acquisition of Allegiance to investigate whether Qwest's acquisition of Allegiance's assets used to serve telecommunications customers in five Metropolitan Statistical Areas – Denver, Colorado; Minneapolis, Minnesota; Portland, Oregon; Phoenix, Arizona; and Seattle, Washington – located largely or wholly within Qwest's local exchange service franchise areas ("In-Region Assets") may tend substantially to lessen competition in any relevant market,

WHEREAS, the Department has identified no competitive concerns with Qwest's proposed acquisition of Allegiance in Metropolitan Statistical Areas located outside of Qwest's local exchange service franchise areas,

WHEREAS, Allegiance is in bankruptcy and a prolonged delay in resolving its status could be detrimental to Allegiance's customers, employees, and business, as well as to competition in the telecommunications business,

WHEREAS, Qwest and Allegiance desire that the closing of a potential transaction between Qwest and Allegiance not be unnecessarily delayed beyond April 8, 2004,

WHEREAS, Qwest and Allegiance desire to reach an agreement with the Department prior to the bankruptcy auction regarding the Department's antitrust investigation and the disposition of the In-Region Assets should the Department conclude that Qwest's acquisition of the In-Region Assets may tend substantially to lessen competition, and

WHEREAS, the Department believes that the undertakings of Qwest and Allegiance under the proposed Final Judgment would be sufficient to remedy any potential anticompetitive consequence of Qwest's acquisition of Allegiance,

NOW, THEREFORE, Qwest, Allegiance, and the Department agree that the following

provisions shall apply if the U.S. Bankruptcy Court for the Southern District of New York, pursuant to 11 U.S.C. § 363, approves an agreement by which Qwest acquires all, or substantially all, of the assets of Allegiance ("the Transaction"):

1. Qwest and Allegiance will not close the Transaction prior to April 8, 2004.

2. If at any time after April 1, 2004, the Department concludes that Qwest's acquisition of the In-Region Assets from Allegiance may tend substantially to lessen competition in any relevant market, and the Assistant Attorney General has authorized the filing of a complaint in federal district court alleging the same, Qwest and Allegiance agree not to contest that determination or any other allegations contained in the Department's complaint, provided that Qwest and Allegiance shall have been afforded a reasonable opportunity to meet with and be heard by the Deputy Assistant Attorney General or Assistant Attorney General within the Department responsible for this matter prior to such determination being made.

3. In the event that the Department determines that Qwest's acquisition of the in-region assets from Allegiance may tend substantially to lessen competition in any relevant market, Qwest and Allegiance hereby consent and agree, pursuant to the terms of the Stipulation attached hereto as Exhibit 1, to the entry of a Final Judgment, in the form attached hereto as Exhibit 2.

4. The Department will conduct its investigation of Qwest's proposed acquisition of Allegiance via Civil Investigative Demands ("CIDs") rather than Second Requests and will not oppose the closing of the Transaction on April 8, 2004, or any time thereafter.

5. Qwest and Allegiance will fully comply with CIDs for documents and interrogatories issued by the Department, will produce the requested information on a rolling basis, and will use their best efforts to complete production by March 5, 2004. Qwest and Allegiance will produce any individual issued a CID for oral testimony, and will use their best efforts to make any such individual available within 10 days after issuance of the CID.

6. The Department will use its best efforts to complete its investigation by the later of (a) April 8, 2004, or (b) 30 days after Qwest and Allegiance have both fully complied with CIDs for documents and interrogatories issued by the Department, but in the event that the Department has neither closed its investigation nor filed a complaint as of the date the Transaction is consummated, Qwest and Allegiance will abide by the Hold Separate provisions contained in Paragraphs V.A - V.L of the Stipulation, attached hereto as Exhibit 1, until such time as the Department notifies Qwest and Allegiance that it has decided not to challenge the proposed Transaction.

7. Until the Department completes its investigation, Qwest and Allegiance shall not,

2

without the Department's consent, sell, lease, assign, transfer, or otherwise dispose of any of the Divestiture Assets, as defined in Paragraph II.D of the Proposed Final Judgment attached hereto as Exhibit 2, except as in the ordinary course of business.

William Kolasky
Wilmer, Cutler & Pickering
Attorney for Qwest

Marimichael O. Skubel
Kirkland & Ellis LLP
Attorney for Allegiance

Lawrence M. Frankel
Attorney
Telecommunications & Media Section
Antitrust Division
United States Department of Justice

3

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| United States of America | ) | |
| | ) | Civil Action No. |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Filed: |
| | ) | |
| Qwest Communications | ) | |
| International Inc. and | ) | |
| Allegiance Telecom, Inc. | ) | |
| Defendants. | ) | |
| | ) | |

## HOLD SEPARATE STIPULATION AND ORDER

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

I.    DEFINITIONS

As used in this Hold Separate Stipulation and Order:

A.    "Acquirer" or "Acquirers" means the entity or entities to whom defendants divest the Divestiture Assets.

B.    "Qwest" means defendant Qwest Communications International Inc., a Delaware corporation with its headquarters in Denver, Colorado, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

C.    "Allegiance" means defendant Allegiance Telecom, Inc., a Delaware corporation with its headquarters in Dallas, Texas, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents,

and employees.

D.    "Divestiture Assets" means all assets, tangible and intangible, acquired by Qwest from Allegiance pursuant to 11 U.S.C. § 363, that are used by Allegiance to provide telecommunications services in the In-Region MSAs, except for Excluded Assets.  The term "Divestiture Assets" shall be construed broadly to accomplish the complete divestiture of assets to ensure that the divested assets are sufficient to operate a viable ongoing telecommunications business and includes, but is not limited to:

(1)    All switches, routers, transport, and associated collocation facilities located in the In-Region MSAs, and interconnection agreements used in connection with the provision of telecommunications services (telecommunications herein includes transmission using the IP protocol) to customers in the In-Region MSAs, and all interests, contracts and other associated rights in those facilities, that were acquired by Qwest from Allegiance pursuant to 11 U.S.C. § 363;

(2)    All contracts with customers to provide telecommunications services to locations within the In-Region MSAs, business and customer records and information, customer lists, credit records, deposits, accounts, and historic and current business plans associated with the provision of telecommunications services to customer locations in the In-Region MSAs or with marketing to potential customers in the In-Region MSAs;

(3)    All types of real property and personal property, equipment, inventory, office furniture, fixed assets and furnishings, supplies and materials located in the In-Region MSAs;

(4)    All licenses, permits and authorizations issued by the Federal Communications

2

Commission or any other federal, state or local regulatory body used in the provision of telecommunications services in the In-Region MSAs;

(5)    All intellectual property rights that are used to provide telecommunications services in the In-Region MSAs.  Intellectual property rights comprise all patents, licenses, sublicenses, trade secrets, know-how, computer software and related documentation, drawing, blueprints, design, technical and quality manuals, and other technical information defendants supply to their own employees, customers, suppliers, agents or licensees, or other intellectual property, including all intellectual property rights under third party licenses.  Intellectual property rights will be provided to the extent they are capable of being transferred to a purchaser either in their entirety, or through a license or sub-license;

(6)    All leases, contracts, agreements, and commitments with third parties used primarily in connection with the provision of telecommunications services in the In-Region MSAs; and

(7)    All transport facilities physically located in whole or in part within In-Region MSAs including all interests, contracts, and associated rights acquired by Qwest from Allegiance pursuant to 11 U.S.C. § 363.

E.    "Excluded Assets" means: (a) all Excluded Customer Contracts; (b) all transport facilities between MSAs outside of the In-Region MSAs; and (c) all Shared Systems.

F.    "Excluded Customer Contract" means any single contract with a customer (a) that covers telecommunication services provided to locations within, as well as outside, the In-Region MSAs, (b) for which the majority of the services are provided outside the In-Region MSAs (with

3

"majority" measured by an objective measure approved by the United States in its sole discretion), and (c) for which it would be impossible or impractical for Qwest and the Acquirer(s) to divide the revenues and responsibilities under the contract. The term also includes any business and customer records and information, customer lists, credit records, accounts, and historic and current business plans associated exclusively with provision of service via such contracts.

      G.    "In-Region MSAs" means the following Metropolitan Statistical Areas (MSAs): Denver, Colorado; Minneapolis, Minnesota; Phoenix, Arizona; Portland, Oregon; and Seattle, Washington.

      H.    "Shared Systems" means all operating and related systems acquired by Qwest from Allegiance pursuant to 11 U.S.C. § 363 that (a) are predominantly used in connection with the provision of telecommunications services to customers in markets outside of the In-Region MSAs, including, but not limited to, order entry, provisioning, billing, network monitoring, and other systems, and (b) are not capable of being divided between the divested and retained businesses.

      II.    <u>OBJECTIVES</u>

      The Final Judgment filed in this case is meant to ensure defendants' prompt divestiture of the Divestiture Assets for the purpose of remedying the effects that the United States alleges would otherwise result from Qwest's acquisition of the Divestiture Assets. This Hold Separate Stipulation and Order ensures, prior to such divestitures, that the Divestiture Assets remain economically viable and ongoing business concerns that will remain independent and uninfluenced by Qwest, and that competition is maintained during the pendency of the ordered

4

divestitures.

III.    JURISDICTION AND VENUE

The Court has jurisdiction over the subject matter of this action and over each of the parties hereto, and venue of this action is proper in the United States District Court for the District of Columbia.

IV.    COMPLIANCE WITH AND ENTRY OF FINAL JUDGMENT

A.    The parties stipulate that a Final Judgment in the form attached hereto as Exhibit A may be filed with and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act (15 U.S.C. § 16), and without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on defendants and by filing that notice with the Court.

B.    Defendants shall abide by and comply with the provisions of the proposed Final Judgment, pending the Judgment's entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the filing of this Stipulation with the Court, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an order of the Court.

C.    Defendants shall not consummate the transaction sought to be enjoined by the Complaint herein before the Court has signed this Hold Separate Stipulation and Order.

D.    This Stipulation shall apply with equal force and effect to any amended proposed

5

Final Judgment agreed upon in writing by the parties and submitted to the Court.

E.    In the event (1) the United States has withdrawn its consent, as provided in Section IV(A) above, or (2) the proposed Final Judgment is not entered pursuant to this Stipulation, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Stipulation, and the making of this Stipulation shall be without prejudice to any party in this or any other proceeding.

F.    Defendants represent that the divestitures ordered in the proposed Final Judgment can and will be made, and that defendants will later raise no claim of mistake, hardship or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

V.    <u>HOLD SEPARATE PROVISIONS</u>

Until the divestitures required by the Final Judgment have been accomplished:

A.    Defendants shall preserve, maintain, and continue to operate the Divestiture Assets as independent, ongoing, economically viable competitive businesses, with management, sales and operations of such assets held entirely separate, distinct and apart from those of Qwest's other operations.  Qwest shall not coordinate its marketing or terms of sale of any products or services with those sold under any of the Divestiture Assets.  Within ten (10) days after the entry of the Hold Separate Stipulation and Order, defendants will inform the United States of the steps defendants have taken to comply with this Hold Separate Stipulation and Order.

6

B.    Qwest shall take all steps necessary to ensure that (1) the Divestiture Assets will be maintained and operated as independent, ongoing, economically viable and active competitors in the telecommunications business; (2) management of the Divestiture Assets will not be influenced by Qwest (except to the extent necessary to carry out Qwest's obligations under this Order or as required by applicable law); and (3) the books, records, competitively sensitive sales, marketing and pricing information, and decision-making concerning production, distribution or sales of products or services by or under any of the Divestiture Assets will be kept separate and apart from Qwest's other operations.

C.    Defendants shall use all reasonable efforts to maintain and increase the sales and revenues of the services produced or sold by the Divestiture Assets, and shall maintain at current or previously approved levels for 2005, whichever are higher, all promotional, advertising, sales, technical assistance, marketing and merchandising support for the Divestiture Assets.

D.    Qwest shall provide sufficient working capital and lines and sources of credit to continue to maintain the Divestiture Assets as economically viable and competitive, ongoing businesses, consistent with the requirements of Sections V (A) and (B).

E.    Defendants shall take all steps necessary to ensure that the Divestiture Assets are fully maintained in operable condition at no less than its current capacity and sales, and shall maintain and adhere to normal repair and maintenance schedules for the Divestiture Assets.

F.    Defendants shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease, assign, transfer, pledge or otherwise dispose of any of the Divestiture Assets.

G.    Defendants shall maintain, in accordance with sound accounting principles,

7

separate, accurate and complete financial ledgers, books and records that report on a periodic

basis, such as the last business day of every month, consistent with past practices, the assets,

liabilities, expenses, revenues and income of the Divestiture Assets.

H.    Defendants shall take no action that would jeopardize, delay, or impede the sale of

the Divestiture Assets.

I.    Defendants' employees with primary responsibility for the operation of the

Divestiture Assets shall not be transferred or reassigned to other areas within the company except

for transfer bids initiated by employees pursuant to defendants' regular, established job posting

policy.  Defendants shall provide the United States with ten (10) calendar days notice of such

transfer.

J.    Defendants shall appoint a person or persons to oversee the Divestiture Assets,

subject to the approval of the United States, and who will be responsible for defendants'

compliance with this section.  This person shall have complete managerial responsibility for the

Divestiture Assets, subject to the provisions of this Final Judgment.  In the event such person is

unable to perform his duties, defendant shall appoint, subject to the approval of the United

States, a replacement within ten (10) working days.  Should defendant fail to appoint a

replacement acceptable to the United States within this time period, the United States shall

appoint a replacement.

K.    Unless informed otherwise by the person with managerial responsibility for the

Divestiture Assets, Qwest shall provide the Divestiture Assets at no cost with the following: (a)

any services provided via Shared Systems, and (b) transport over interexchange facilities

acquired by Qwest from Allegiance pursuant to 11 U.S.C. § 363 that are not included in the

Divestiture Assets.

L.    Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestitures pursuant to the Final Judgment to an Acquirer or Acquirers acceptable to the United States.

M.    This Hold Separate Stipulation and Order shall remain in effect until consummation of the divestitures required by the proposed Final Judgment or until further order of the Court.

Dated:

Respectfully submitted,
FOR PLAINTIFF
UNITED STATES OF AMERICA

FOR DEFENDANT
QWEST COMMUNICATIONS
INTERNATIONAL INC.

_____

Lawrence M. Frankel
D.C. Bar No. 441532
U.S. Department of Justice
Antitrust Division
1401 H Street NW, Suite 8000
Washington, DC 20530
(202) 514-4298

_____

William Kolasky
D.C. Bar No. 217539
Wilmer Cutler & Pickering
2445 M Street, NW
Washington, DC 20037
(202) 663-6357

FOR DEFENDANT
ALLEGIANCE TELECOM, INC.

_____

Marimichael O. Skubel
D.C. Bar No. 294934
Kirkland & Ellis LLP
655 Fifteenth Street NW
Washington, D.C. 20005
(202) 879-5034

9

<u>O R D E R</u>

IT IS SO ORDERED by the Court, this _____ day of  .

_____

United States District Judge

10

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| United States of America )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Qwest Communications )<br>International Inc., and )<br>Allegiance Telecom, Inc., )<br>)<br>Defendants. )<br>) | Civil Action No.<br><br>Filed: [*Date Filed*] |

### FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Complaint on April   , 2004,

WHEREAS, plaintiff and defendants, Qwest Communications International Inc. ("Qwest") and Allegiance Telecom, Inc. ("Allegiance"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

WHEREAS, defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by the defendants to assure that competition is not substantially lessened;

WHEREAS, plaintiff requires defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint; and

WHEREAS, defendants have represented to the United States that the divestitures required below can and will be made and that defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. **Jurisdiction**

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II. **Definitions**

As used in this Final Judgment:

A.     "Acquirer" or "Acquirers" means the entity or entities to whom defendants divest the Divestiture Assets.

B.     "Qwest" means defendant Qwest Communications International Inc., a Delaware corporation with its headquarters in Denver, Colorado, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and employees.

C.     "Allegiance" means defendant Allegiance Telecom, Inc., a Delaware corporation with its headquarters in Dallas, Texas, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their directors, officers, managers, agents,

2

and employees.

D.      "Divestiture Assets" means all assets, tangible and intangible, acquired by Qwest

from Allegiance pursuant to 11 U.S.C. § 363, that are used by Allegiance to provide

telecommunications services in the In-Region MSAs, except for Excluded Assets.  The term

"Divestiture Assets" shall be construed broadly to accomplish the complete divestiture of assets

to ensure that the divested assets are sufficient to operate a viable ongoing telecommunications

business and includes, but is not limited to:

(1)      All switches, routers, transport, and associated collocation facilities located in the

In-Region MSAs, and interconnection agreements used in connection with the provision

of telecommunications services  (telecommunications herein includes transmission using

the IP protocol) to customers in the In-Region MSAs, and all interests, contracts and

other associated rights in those facilities, that were acquired by Qwest from Allegiance

pursuant to 11 U.S.C. § 363;

(2)      All contracts with customers to provide telecommunications services to locations

within the In-Region MSAs, business and customer records and information, customer

lists, credit records, deposits, accounts, and historic and current business plans associated

with the provision of telecommunications services to customer locations in the In-Region

MSAs or with marketing to potential customers in the In-Region MSAs;

(3)      All types of real property and personal property, equipment, inventory, office

furniture, fixed assets and furnishings, supplies and materials located in the In-Region

MSAs;

(4)      All licenses, permits and authorizations issued by the Federal Communications

3

Commission or any other federal, state or local regulatory body used in the provision of telecommunications services in the In-Region MSAs;

(5)     All intellectual property rights that are used to provide telecommunications services in the In-Region MSAs.  Intellectual property rights comprise all patents, licenses, sublicenses, trade secrets, know-how, computer software and related documentation, drawing, blueprints, design, technical and quality manuals, and other technical information defendants supply to their own employees, customers, suppliers, agents or licensees, or other intellectual property, including all intellectual property rights under third party licenses.  Intellectual property rights will be provided to the extent they are capable of being transferred to a purchaser either in their entirety, or through a license or sub-license;

(6)     All leases, contracts, agreements, and commitments with third parties used primarily in connection with the provision of telecommunications services in the In-Region MSAs; and

(7)     All transport facilities physically located in whole or in part within In-Region MSAs including all interests, contracts, and associated rights acquired by Qwest from Allegiance pursuant to 11 U.S.C. § 363.

E.     "Excluded Assets" means: (a) all Excluded Customer Contracts; (b) all transport facilities between MSAs outside of the In-Region MSAs; and (c) all Shared Systems.

F.     "Excluded Customer Contract" means any single contract with a customer (a) that covers telecommunication services provided to locations within, as well as outside, the In-Region MSAs, (b) for which the majority of the services are provided outside the In-Region MSAs (with

4

"majority" measured by an objective measure approved by the United States in its sole discretion), and (c) for which it would be impossible or impractical for Qwest and the Acquirer(s) to divide the revenues and responsibilities under the contract. The term also includes any business and customer records and information, customer lists, credit records, accounts, and historic and current business plans associated exclusively with provision of service via such contracts.

      G.     "In-Region MSAs" means the following Metropolitan Statistical Areas (MSAs): Denver, Colorado; Minneapolis, Minnesota; Phoenix, Arizona; Portland, Oregon; and Seattle, Washington.

      H.     "Shared Systems" means all operating and related systems acquired by Qwest from Allegiance pursuant to 11 U.S.C. § 363 that (a) are predominantly used in connection with the provision of telecommunications services to customers in markets outside of the In-Region MSAs, including, but not limited to, order entry, provisioning, billing, network monitoring, and other systems, and (b) are not capable of being divided between the divested and retained businesses.

### III. Applicability

      A.     This Final Judgment applies to Qwest and Allegiance, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

      B.     Defendants shall require, as a condition of the sale or other disposition of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, that the purchaser of those assets agrees to be bound by the provisions of this Final Judgment,

5

provided, however, that defendants need not obtain such an agreement from the Acquirer(s).

## IV. Divestitures

A.     Defendants are ordered and directed, within 75 calendar days after the filing of the

Complaint in this matter, or five (5) days after notice of the entry of this Final Judgment by the

Court, whichever is later, to divest the Divestiture Assets in a manner consistent with this Final

Judgment to an acquirer acceptable to the United States in its sole discretion.  The United States,

in its sole discretion, may agree to an extension of this time period of up to three thirty-day

periods, not to exceed ninety (90) calendar days in total, and shall notify the Court in such

circumstances.  Defendants agree to use their best efforts to divest the Divestiture Assets as

expeditiously as possible.

B.     In accomplishing the divestiture ordered by this Final Judgment, defendants

promptly shall make known, by usual and customary means, the availability of the Divestiture

Assets.  Defendants shall inform any person making inquiry regarding a possible purchase of the

Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that

person with a copy of this Final Judgment.  Defendants shall offer to furnish to all prospective

Acquirers, subject to customary confidentiality assurances, all information and documents

relating to the Divestiture Assets customarily provided in a due diligence process except such

information or documents subject to the attorney-client or work-product privileges.  Defendants

shall make available such information to the United States at the same time that such information

is made available to any other person.

C.     Defendants shall provide the Acquirer(s) and the United States information

relating to the personnel involved in the production, operation, development and sale of the

Divestiture Assets to enable the Acquirer(s) to make offers of employment. Defendants will not interfere with any negotiations by the Acquirer(s) to employ any defendant employee whose primary responsibility is the production, operation, development and sale of the Divestiture Assets.

D.    Defendants shall permit prospective Acquirer(s) of the Divestiture Assets to have reasonable access to personnel and to make inspections of the physical facilities of the business to be divested; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

E.    Defendants shall warrant to all Acquirers of the Divestiture Assets that each asset will be operational on the date of sale.

F.    Defendants shall not take any action that will impede in any way the obtaining of necessary regulatory approvals, or operation or divestiture of the Divestiture Assets.

G.    Defendants shall warrant to the Acquirer(s) of the Divestiture Assets that there are no material defects in the environmental, zoning, licenses or other permits pertaining to the operation of each asset, and that following the sale of the Divestiture Assets, defendants will not undertake, directly or indirectly, any challenges to the environmental, zoning, licenses or other permits relating to the operation of the Divestiture Assets.

H.    Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV, or by trustee appointed pursuant to Section V, of this Final Judgment, shall include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by the Acquirer(s) as

7

part of a viable, ongoing telecommunications business. Divestiture of the Divestiture Assets may be made to one or more Acquirers, provided that in each instance it is demonstrated to the sole satisfaction of the United States that the Divestiture Assets will remain viable and the divestiture of such assets will remedy the competitive harm alleged in the Complaint. The divestitures, whether pursuant to Section IV or Section V of this Final Judgment,

(1) shall be made to an Acquirer (or Acquirers) that, in the United States's sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the business of telecommunications services; and

(2) shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer (or Acquirers) and defendants give defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

I.    Upon the Acquirer(s)'s request and upon commercially reasonable terms and conditions, Qwest will, for a reasonable transitional period following divestiture, provide Acquirer(s) with (a) any services provided via Shared Systems; and (b) any interexchange services or transport over interexchange facilities acquired by Qwest from Allegiance pursuant to 11 U.S.C. § 363 that are not included in the Divestiture Assets.

J.    To the extent leases, contracts, agreements, intellectual property rights, licenses or commitments with third parties that are acquired by Qwest from Allegiance pursuant to 11 U.S.C. § 363 and would otherwise be Divestiture Assets are not assignable or transferrable, or such contracts (except for customer contracts), agreements, rights, licenses or commitments cover more than one MSA, including at least one MSA that is not an In-Region MSA, then Qwest is not obligated to assign or transfer such contracts, agreements, rights, licenses or

commitments. In that event, or in the event that Qwest rejects any executory contract pursuant to

11 U.S.C. § 365 which the Acquirer deems necessary to operate a viable ongoing

telecommunications business in the In-Region MSAs, Qwest shall use its best efforts to obtain

for the Acquirer the equivalent of the services or other rights that would have been provided but

for said non-assignment, non-transfer, or rejection.

## V. Appointment of Trustee

A.    If defendants have not divested the Divestiture Assets within the time period

specified in Section IV(A), defendants shall notify the United States of that fact in writing. Upon

application of the United States, the Court shall appoint a trustee selected by the United States

and approved by the Court to effect the divestiture of the Divestiture Assets.

B.    After the appointment of a trustee becomes effective, only the trustee shall have

the right to sell the Divestiture Assets. The trustee shall have the power and authority to

accomplish the divestiture to an Acquirer[s] acceptable to the United States at such price and on

such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions

of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court

deems appropriate. Subject to Section V(D) of this Final Judgment, the trustee may hire at the

cost and expense of defendants any investment bankers, attorneys, or other agents, who shall be

solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the

divestiture.

C.    Defendants shall not object to a sale by the trustee on any ground other than the

trustee's malfeasance. Any such objections by defendants must be conveyed in writing to the

United States and the trustee within ten (10) calendar days after the trustee has provided the

9

notice required under Section VI.

D.    The trustee shall serve at the cost and expense of Qwest, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to Qwest and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E.    Defendants shall use their best efforts to assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

F.    After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall

10

include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G.    If the trustee has not accomplished such divestiture within six months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States who shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VI. Notice of Proposed Divestiture

A.    Within two (2) business days following execution of a definitive divestiture agreement, defendants or the trustee, whichever is then responsible for effecting the divestiture required herein, shall notify the United States of any proposed divestiture required by Section IV or V of this Final Judgment. If the trustee is responsible, it shall similarly notify defendants. The notice shall set forth the details of the proposed divestiture and list the name, address, and

11

telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B.    Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from defendants, the proposed Acquirer or Acquirers, any other third party, or the trustee if applicable additional information concerning the proposed divestiture, the proposed Acquirer or Acquirers, and any other potential Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.    Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from defendants, the proposed Acquirer or Acquirers, any third party, and the trustee, whichever is later, the United States shall provide written notice to defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to defendants' limited right to object to the sale under Section V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by defendants under Section V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

### VII. Financing

Defendants shall not finance all or any part of any purchase made pursuant to Section IV

or V of this Final Judgment.

## VIII. Hold Separate

Until the divestiture required by this Final Judgment has been accomplished defendants shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestiture ordered by this Court.

## IX. Affidavits

A.    Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture[s] has been completed under Section IV or V, defendants shall deliver to the United States an affidavit as to the fact and manner of its compliance with Section IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective purchasers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by defendants, including limitation on information, shall be made within fourteen (14) days of receipt of such affidavit.

B.    Within twenty (20) calendar days of the filing of the Complaint in this matter,

13

defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions defendants have taken and all steps defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment. Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.     Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestiture has been completed.

## X. Compliance Inspection

A.     For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants, be permitted:

(1)     access during defendants' office hours to inspect and copy, or at the United States's option, to require defendants provide copies of, all books, ledgers, accounts, records and documents in the possession, custody, or control of defendants, relating to any matters contained in this Final Judgment; and

(2)     to interview, either informally or on the record, defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without

14

restraint or interference by defendants.

    B.     Upon the written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, defendants shall submit written reports or interrogatory responses, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

    C.     No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

    D.     If at the time information or documents are furnished by defendants to the United States, defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI. No Reacquisition

    Defendants may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

## XII. Retention of Jurisdiction

    This Court retains jurisdiction to enable any party to this Final Judgment to apply to this

Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

### XIII.  Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

### XVI.  Public Interest Determination

Entry of this Final Judgment is in the public interest.

Date: _____

Court approval subject to procedures
of Antitrust Procedures and Penalties
Act, 15 U.S.C. § 16

_____

**United States District Judge**

16

# Appendix D

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Special Access Rates for Price Cap Local | ) | WC Docket No. 05-25 |
| Exchange Carriers | ) | |
| | ) | |
| AT&T Corp. Petition for Rulemaking to Reform | ) | |
| Regulation of Incumbent Local Exchange Carrier | ) | RM No. 10593 |
| Rates for Interstate Special Access Services | ) | |

**Reply Declaration of**
**Joseph Farrell**
**On Behalf of CompTel**

## I.      Qualifications

1.      I am Professor of Economics, Affiliate Professor of Business, and Chair of the Competition Policy Center at the University of California at Berkeley.  Among other non-university professional activities, I was Chief Economist at the FCC in 1996-1997, President of the Industrial Organization Society in 1996, Editor of the *Journal of Industrial Economics* in 1995-2000, Deputy Assistant Attorney General and chief economist at the Antitrust Division of the US Department of Justice in 2000-2001, and member of the National Academies of Science Computer Science and Telecommunications Board in 2001-2004. I am a Fellow of the Econometric Society and a member of the Editorial Board of the journal *Information Economics and Policy*.

## II.      Overview

2.      I begin by explaining why incumbent termination charges and certain kinds of optional volume or loyalty discounts are likely to exacerbate problems arising from well-known barriers to entry, especially when the inducement for customers to subscribe to these optional plans includes raising the price of the alternative,

e.g., setting excessive basic rates for month-to-month service.  I then discuss the use of price and cost information for assessing competition in this market, and comment in particular on the Declaration of Dr William Taylor.

### III.    Effects of ILEC Contracts on Competition

3.    Economic and structural barriers to competitive entry into the special access market are well known and well documented.  Ordover and Willig summarized several such barriers in a declaration submitted along with AT&T's petition that launched this proceeding.[1]  Special access services are characterized by economies of scale and sunk costs, as well as substantial incumbent first-mover advantages such as rights-of-way and building access.  As a result, competitive entry generally has been restricted to the highest capacity services provided in dense metropolitan areas.  Any further impediments to entry, such as the ILEC contract provisions I describe below, exacerbate these inherent economic and operational barriers.

4.    Among such incremental impediments to entry would be (a) excessive charges (typically payable by the customer) for terminating ILEC service, (b) commitments to purchase some minimum amount from the incumbent, with substantial penalties for non-compliance, and (c) any provisions such as volume or loyalty discounts under which a special access consumer pays the ILEC more for something else (such as service at another location) if it uses an entrant rather than ILEC special access in one location.  For many customers on a discount plan, the basic month-to-month tariff may be the next-most preferred alternative.  When the basic month-to-month plan specifies prices significantly above the competitive level, these discounted prices (and discounted prices in other plans) can also be above competitive levels.  Moreover, when a monopoly offers proportional or relative discounts off its undiscounted prices in order to induce customers to agree to exclusionary provisions, it has an incentive to set the undiscounted price above even the monopoly level (because, rather than simply

---

[1] In the Matter of AT&T Corp. Petition for Rulemaking To Reform Regulation Of Incumbent Local Exchange Carrier Rates For Interstate Special Access Services, RM No. 10593.  Declaration of Janusz A. Ordover and Robert D. Willig in support of AT&T's Petition, at ¶38-45.

deterring demand, an increase above the monopoly level steers customers into the discount plans and also brings the discount prices closer to the monopoly level).[2] Thus, even if they have other efficiency rationales, such pricing schemes put an additional wedge into the incentive for the customer to contract with a competitive carrier whose long-run cost is below the ILEC's price.[3] They thus weaken entry as a constraint on an incumbent's overall price level, whether or not they fall into standard antitrust categories such as predatory pricing or tying.

5.   ILECs have implemented such pricing schemes in their special access tariffs. SBC's "Managed Value Plan" ("MVP") Tariff is an example. The MVP is an umbrella plan. Customers purchasing a wide range of special access products can include several such purchases in the MVP, which provides discounts in addition to term and volume discounts contained in the underlying tariffs from which customers purchase the special access circuits that they include in the MVP. The MVP discounts increase each year (9% in the 1st year, 11% in the 2nd, 12% in the 3rd, 13% in the 4th, and 14% in the 5th year). Carriers must spend at least $10 million annually on SBC special access services to be eligible.[4] The MVP establishes a "Minimum Annual Revenue Commitment" (MARC) that the carrier must maintain with SBC for the five-year term. The MARC is established when the carrier joins the MVP by taking a carrier's previous three months' billing for qualified services (defined as virtually all SBC transport services) multiplied by four.

---

[2] The economics of price-setting once a subset of customers become entitled to a percentage discount off a list price are analyzed by Borenstein, Severin, 1996. "Settling for Coupons: Discount Contracts as Compensation and Punishment in Antitrust Lawsuits," *Journal of Law & Economics*, University of Chicago Press, vol. 39(2), pages 379-404. Professor Borenstein shows that such discounts do not lower prices overall but rather implement a transfer from non-discount customers to discount customers, with almost no effect on average price or on the seller's profit. Moreover, if entitlement to the discount is based on agreeing to exclusionary terms, such arrangements further harm consumers in the long run. In price flex areas, even basic tariffs are unregulated, and the rates in these tariffs can be, and have been, increased by the ILEC.

[3] The basic economics here were explored in the well-known article by Aghion, Philippe and Bolton, Patrick. "Contracts as a Barrier to Entry," *American Economic Review*, June 1987. 77(3), pp. 388-401. See also Joseph Farrell, "Deconstructing Chicago on Exclusive Dealing," *Antitrust Bulletin*, forthcoming, available at http://repositories.cdlib.org/iber/cpc/CPC05-053/. In particular, I explain there why discounts to customers in return for signing exclusive or exclusionary contracts may not make the customers better off.

[4] If the customer has a national footprint, it must meet the $10 million minimum in each SBC region.

<u>**Reply Declaration of Joseph Farrell**</u>

6.    Carriers receive the MVP discount on services purchased up to their MARC.  The discount does not apply to services purchased in excess of the MARC unless the MARC is increased.  The MARC can be increased (semi-annually, by a minimum of 5%), but cannot be decreased during the term of the MVP.

7.    The MVP requires carriers to purchase at least 95% of their SBC transport services from SBC's interstate tariff, restricting their purchases of UNEs to less than 5%.  (Recent tariff contract filings include a higher requirement of 98%)[5].

8.    If a carrier fails to meet the MARC, it must either continue the contract and pay a shortfall penalty equal to the difference between its MARC and the actual amount spent, or terminate its contract and pay a termination penalty.    For example, if the carrier terminates during year 3 of the plan, it pays 12.5% of the MARC for the remainder of year 3 and the remaining years of the agreement.  The customer is also billed for any nonrecurring charges that were waived under the MVP agreement.

9.    The termination penalty requires repayment of all MVP discounts received in the six months preceding the termination date plus a specified percentage of the MARC for the remainder of the term (10% if in year 1 or year 5, otherwise 12.5%).  The table below lays out the termination penalties for a carrier with a MARC of $20 million that terminates its agreement at the beginning of a year. The table assumes that a discount was earned in each of the previous 6 months.

| Year in which termination occurs: | Current MVP Discount Rate | Discount Earned in Previous 6 Months | % of Remaining Commitment Due | Remaining Commitment Due | Total Penalty | Penalty (In Months) |
|---|---|---|---|---|---|---|
| 1 | 9% | $0 | 10.0% | $10,000,000 | $10,000,000 | 6.0 |
| 2 | 11% | $900,000 | 12.5% | $10,000,000 | $10,900,000 | 6.5 |
| 3 | 12% | $1,100,000 | 12.5% | $7,500,000 | $8,600,000 | 5.2 |
| 4 | 13% | $1,200,000 | 12.5% | $5,000,000 | $6,200,000 | 3.7 |
| 5 | 14% | $1,300,000 | 10.0% | $2,000,000 | $3,300,000 | 2.0 |

10.    The Remaining Commitment Due is calculated as the MARC over the remaining years of the contract times the penalty rate (labeled "% of Remaining

---

[5] See e.g.  SWBT Tariff FCC No. 73, Section 41.31.

Commitment Due"). The total penalty is the sum of the Remaining Commitment Due and any discount earned in the previous 6 months. In the first two years of the contract, the penalty amounts to more than 50% of the annual MARC. In the last year, it falls to about 15% of the annual MARC. In addition to this penalty, the customer may incur termination penalties specified in the underlying tariff for the services included in the MVP. In some cases, these penalties amount to 40% of the monthly recurring rate over the remaining term of the tariff.[6]

11.     The MVP is structured in a way that can make it unprofitable for a competitor to win any modest portion of a customer's business, even if the incumbent's price exceeds the competitor's long-run cost. Essentially, it sets up an automatic and sometimes drastic price cut for any portion of the customer's business that the customer is considering switching to a competitor. For example, consider a customer that spends $20 million on special access services supplied by SBC. The customer can either 1) sign the MVP contract and purchase $20 million in special access services from SBC or 2) purchase 20% of its services from a CLEC and 80% from SBC. In scenario 1), the carrier receives an average 11.8% discount (ignoring discounting) from SBC over the length of the contract;[7] thus its total expenditure is $17.64 million per year. In scenario 2), the carrier would not be able to enter into an MVP agreement because the MARC is based on 100% of historical revenues. Thus, for the 80% of its special access requirements that it purchased from SBC, the customer would spend $16 million. The carrier would save money in this scenario only if the competitive carrier charged less than $1.64 million for the remaining 20% of the customer's demand, a discount of 59% off SBC's $4 million price before MVP discounts.

12.     Once an MVP agreement is signed, the marginal price of special access services for special access spending up to the MARC is zero, because a customer that misses the MARC is required to make up the shortfall by paying a penalty. The marginal price if the total spending is above the MARC is SBC's rate before the

---

[6] Southwestern Bell Telephone Company, Tariff F.C.C. No. 73, 2nd Revised Page 7-68.3.5.
[7] The 11.8% average discount is the arithmetic mean of the discounts of 9%, 11%, 12%, 13% and 14% offered in each of the five years of SBC's MVP.

<u>**Reply Declaration of Joseph Farrell**</u>

MVP discount is deducted (unless the MARC is increased).  Because the MARC cannot be decreased, a customer whose demand does not grow cannot switch to a competitive carrier for part or all of its special access spending without incurring significant penalties.

13.    A customer with increasing expenditures on special access may find it economical to use a competitor to serve its new demand.  Consider the example of a customer that entered into an MVP agreement with a MARC of $20 million.  Suppose that the customer established business in a new area, requiring special access services worth $10 million in that area.  The carrier could either include this new demand for special access service in its MARC, increasing the MARC by $10 million, and then receive the 11.8% average discount on this new commitment; or else it could go to a competitor that would only need to offer the 11.8% discount off SBC's pre-MVP prices to match the discount offered by the MVP plan.

14.    However, if this $10 million in new growth in the network occurs at the same time as a reduction of $2 million in the customer's original footprint, then the situation changes.  In this case, the first $2 million of the new growth would cost the customer nothing if it used SBC, since the customer had a commitment to spend $20 million on SBC's special access services.  If all the new business went to SBC, the MARC could be increased to $28 million and the discounted payment would be $24.696 million.  If the customer wanted to use a non-ILEC provider for the entire $10 million of new growth business, it would still have to maintain the $20 million MARC commitment and, with $18 million spent on special access purchased from SBC, it would not receive any MVP discount.  Thus, it would pay $20 million to SBC.  Using the non-ILEC provider would be lower cost only if its total price for the new growth was less than $4.7 million, a 53% discount off SBC's (pre-MVP) prices of $10 million.  In other words, the rival must beat a price that is less than half of the ILEC's pre-MVP price.

15.    Thus in some circumstances a customer switching a part of its business to a non-ILEC provider could lose not only the discount on the portion switched, but also the MVP discount on the portion that remained with the ILEC.  When the

**Reply Declaration of Joseph Farrell**

competitor cannot win the entire business (if, for example, it has loops to some but not to all of the customer's locations), it is effectively foreclosed from serving that customer.

16.  As a result, the MVP and similar pricing plans can have the effect of requiring a competitive carrier to beat a marginal price that is well below the average price that special access customers pay the ILEC.  That is, the ILEC can charge a price (11.8% below its pre-MVP price) that is well above a competitive carrier's cost, and the competitor will nevertheless find it unprofitable to enter on a small scale, because the customer is penalized on its inframarginal SBC business for giving marginal business to the competitor.[8]

17.  The effects of the MVP are magnified when the underlying tariffs for the special access services purchased by a customer contain similar discounts and penalties. To illustrate, consider Southwestern Bell Telephone Company's DS1 Term Payment Plan (DS1 TPP).[9]  The base payment in the TPP is circuit-specific—it requires commitments to specific circuits for the term of the contract.  But competing carriers often have a considerable amount of customer churn.  For such customers, SBC offers an option (the DS1 High Capacity Service Portability Commitment) that waives the specific circuit termination penalties described above, allowing customers to add and remove circuits without penalty.  Instead of circuit-specific commitments, the customer commits to a level of DS1 channel terminations.  The Portability Commitment lasts for three years.  The commitment level is 100% of the total DS1 channel terminations in service in the month preceding the start of the agreement.  This includes DS1s under term commitments and month-to-month arrangements.

---

[8] Like many exclusionary strategies, this can be defeated if entrants can realistically enter on a large scale and serve all (or a sufficient set of) customers.  Thus it is exclusionary only if that is unrealistic.  It is my understanding that after years of policymakers encouraging CLEC entry, CLECs still directly address only a very limited set of buildings.  See *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket No. 01-338, Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, 18 FCC Rcd. 16978, 17155, n.856 (2003).  ("Both competitive LECs and incumbent LECs report that approximately 30,000, *i.e.,* between 3% and 5% of the nation's commercial office buildings, are served by competitor-owned fiber loops.").

[9] Tariff F.C.C. No. 73, Section 7.2.

**Reply Declaration of Joseph Farrell**

18.    Each month, the total number of 2, 3, 5, and 7 year DS1 TPP Channel Terminations for the previous month will be calculated and measured against the commitment level.  If this total is less than 80% of the commitment level, then the customer is billed a shortfall penalty equal to the difference between 80% of the CL and the actual number purchased times the non-recurring charge.  If this total is more than 124% of the CL, then the customer is billed an adjustment factor equal to the difference between 124% of the CL and the actual number purchased times the non-recurring charge.[10]  The customer may increase its CL by submitting a written request, and is likely to do so given the "growth penalty" that applies if it does not promptly commit its unexpected demand growth to SBC.

19.    If the customer terminates the Portability Commitment or wants to decrease the CL prior to the end of the 3-year commitment, termination liabilities apply.  The termination liability is calculated as the decreased number of channel terminations multiplied by the prevailing month-to-month recurring rate multiplied by the number of months remaining in the portability commitment.

20.    To supply a portion of the services a customer has placed in the MVP umbrella, a competitor may have to reduce its rates to make up for payments such as the shortfall penalty and/or termination liability specified in the DS1 TPP.  These payments are in addition to the penalties in the MVP.  Together, the penalties in all the tariffs for services that a customer switches to a competitor are likely to be high enough to make the customer unprofitable for the competitor to win, even when the ILEC's overall level of prices for special access is above the competitor's long-run cost.  Again, these provisions, and others like them in the various term and volume discount plans offered by the ILECs artificially increase a customer's cost of switching, and raise competitors' costs of acquiring customers.

21.    It is a tempting fallacy to think that optional discount plans cannot be harmful simply because consumers select them voluntarily.  The claim that voluntary

---

[10] Because only 2, 3, 5, and 7-year commitments are counted when the shortfall penalty is calculated, the portability commitment penalizes carriers who have a large portion of their DS1 in month-to-month or 1-year commitments, thus providing incentive to enter into longer contracts.

discounts cannot harm consumers assumes that basic month-to-month rates are not affected, but in fact, once an ILEC has contracted with some of its customers for a percentage discount off the month-to-month tariff, it has an incentive to raise the latter above the level that it would have chosen otherwise.[11] In the longer term, exclusionary contracts can be expected to harm competition and customers, whether or not they decrease prices in the short run.

IV.    **Dr Taylor's Analysis Cannot Show that ILECs Lack Market Power**

22.    Dr William Taylor has submitted a report[12] arguing that price data show that Verizon lacks market power.  The basic syllogism is that average revenue per unit measures have fallen, hence prices have fallen, hence there is no market power. Unfortunately, each step of this syllogism is fallacious.  As a preliminary matter, I examine Dr. Taylor's claim that the average revenue per special access line has fallen over time.  Next, I examine the first part of his syllogism, that reductions in the average revenue per line imply that prices of special access products have fallen.  Finally, I analyze the second part of his syllogism, that reductions in price imply the absence of market power.

## 1.  Flaws in the Average Revenue per Line as a Measure of Price

23.    Dr. Taylor claims that "various measures of average revenue per circuit have fallen even as the demand for special access services has increased." [13] After describing six limitations[14] of his chosen price measure, the average revenue per line, he concludes: "Nevertheless, even with those caveats, the picture that emerges from the ARMIS average revenue per line data is quite clear: average revenue per line has decreased over the 1996-2004 period and decreased faster during the pricing flexibility period (2001-2004)." [15]   Dr. Taylor did not include sufficient information to verify his calculations.

---

[11] See Borenstein, *supra*.
[12] Declaration of William E. Taylor on Behalf of Verizon, In the Matter of Special Access Rates for Price Cap Local Exchange Carriers, WC Docket No. 05-25.  Henceforth, Taylor Declaration.
[13] Taylor Declaration, at ¶ 9.
[14] Taylor Declaration, at ¶ 15.
[15] Taylor Declaration at ¶ 16.

**Reply Declaration of Joseph Farrell**

24.     Dr. Taylor adjusted Special Access Revenue as reported in the ARMIS records to remove DSL revenues, using data he obtained from Verizon on its DSL revenues for 2002-2004.[16]  These DSL revenues are not part of the public record, and Dr. Taylor does not include the data he obtained from Verizon in his Declaration.  In addition, he removed DSL revenues for years prior to 2000 based on the observed growth of DSL revenues in the years for which he had data.  Without the underlying data, it was not possible to judge whether his calculations were correct or whether this extrapolation was reasonable.

25.     Dr. Taylor relied on the number of access lines reported in ARMIS 43-08, columns *fj* and *fk*.[17]  The ARMIS Report instructions require carriers to calculate the number of special access lines as follows:

> "The number of 64 kbps or equivalent digital special access lines terminated at the customer designated premises. … Where DS-3 or DS‑1 service is provided without individual 64 kbps circuit terminations, multiply the number of DS-3 terminations by 672 and the number of DS-1 terminations by 24 when calculating the value for this column."[18]

For DS1 and DS3 lines that are provided with individual 64 Kbps circuit terminations[19], the ARMIS data appear to provide a reasonable measure of capacity as represented by voice grade equivalent lines.  For DS1 and DS3 lines that are provided without individual circuit termination, the ARMIS data would appear to overestimate the line count since it assumes that the entire capacity is used, whether or not it is, in fact, used.  That is, a customer who needs only 12 DS0s worth of capacity, but who buys a DS1 because it is less costly than 12 DS0s, is assumed to purchase 24 DS0s if the ILEC is not asked to provide individual circuit terminations.  Accordingly, the average revenue per voice-grade equivalent is artificially reduced.

---

[16] Taylor Declaration at ¶ 18.
[17] Taylor Declaration at footnote 10.
[18] FCC Report 43-08.
[19] A 64 Kbps line is equivalent in capacity to a voice grade circuit.

<u>**Reply Declaration of Joseph Farrell**</u>

26.    I do not have the data to verify this downward bias in Dr. Taylor's estimate of the "price". Nor can I verify that this bias has not increased over time, contributing, at least in part, to Dr. Taylor's finding that the average revenue per line has fallen over time. Since data communications lines often do not need individual 64 Kbps terminations, and since data communications grew more rapidly than voice communications during the period at issue, there was likely an increase in the fraction of lines for which the ARMIS reporting requirements resulted in an overcount of special access lines. If so, the ARMIS line count would grow at a faster rate than would be warranted by the actual growth in demand for capacity. The calculated average revenue per ARMIS line would then decline more quickly than the average revenue per unit of capacity actually demanded.

27.    In sum, Dr. Taylor's conclusions regarding the decline of the average revenue per line over time cannot be verified with the data available to me. There are sound reasons for believing that at least a part of the reduction may be due to ARMIS reporting conventions but this portion of the reduction cannot be quantified with the available data.

28.    Much of Dr. Taylor's analysis focuses on "various measures of the average revenue per circuit".[20] Dr. Taylor asserts that this is a reasonable proxy for price: "Average revenue per voice-grade equivalent circuit is a reasonable measure of the price that customers actually pay for the special access service they receive."[21]

29.    To calculate the average revenue per voice-grade equivalent circuit, Dr. Taylor divides the total revenue obtained from the services in question by the number of special access lines obtained from ARMIS 43-08. As I have indicated earlier, the ARMIS reporting convention results in an overcount of the demand for capacity, especially for lines used for data communication.

30.    The following illustrative example demonstrates my earlier point that the ARMIS measure of special access lines overstates the appropriate measure of capacity, and, as a result, contributes to underestimating the price per unit capacity actually

---

[20] Taylor Declaration, at ¶ 9.
[21] Taylor Declaration, at footnote 7.

<u>**Reply Declaration of Joseph Farrell**</u>

paid by customers.  Suppose a DS1 is priced at $365 per month, and a DS3 is priced at $2,290 per month.[22]  These prices are assumed to remain constant in this example.  Therefore, the actual change in prices in this example is zero.

31.     Consider a consumer who initially purchases 6 DS1 circuits for a total charge of $2,190.  If the consumer uses all 144 voice-grade circuits in the 6 DS1s for voice traffic, the average revenue per used circuit would be $2,190/144 = $15.21.  Suppose the consumer's calling volume increases, and 168 voice-grade circuits are now needed to carry the new calling volume.  The consumer could order another DS1 for an additional $365, and use the additional 24 voice-grade circuits to carry the additional traffic.  Alternatively, the consumer could replace the 6 DS1s with a DS3, set up 168 channel terminations on the DS3 and obtain the same quality of service that he would have obtained on 7 DS1s.  The additional cost of the DS3 would be only $100 ($2,290 for the DS3 less $2,190 for the 6 DS1s already in place).  The DS3 would be less expensive than 7 DS1s, even though a large fraction of the DS3 was left idle.

32.     If the DS3 were provided with individual circuit terminations, the ARMIS record would reflect 168 special access lines, and the average revenue per unit would be $13.63 for a price reduction of 10.4%.  Thus this ARMIS record would show a relatively modest reduction in price even though no prices had been reduced.

33.     If the DS3 were provided without individual circuit terminations, the ARMIS record would reflect 672 terminations, and the average revenue per line would be $3.41 for a much larger apparent price reduction of 77.6%.

34.     But recall that the actual change in prices in this example is zero.  The change in prices as measured by the average revenue per ARMIS line is -10.4% when channel terminations are provided by the BOC.  The change in prices as measured by the average revenue per ARMIS line is -77.6% when channel terminations are not provided by the RBOC.  In this example, the average revenue per line falls regardless of the way in which ARMIS records the number of lines demanded by

---

[22] These are standalone monthly rates charged by SBC in California in July 2004, as reported in the Declaration of M. Joseph Stith, WC Docket No. 04-313, Attachment 1, page 13 of 20.

the customer, even though no prices have fallen.  In general, the change in average revenue per ARMIS line will understate the change in prices paid by consumers, and in times of growing demand, overstate the reduction (if any) in the prices paid by consumers.

35.    Dr. Taylor tries to correct for some of the limitations of average revenue per line by calculating separate average revenues for DS1 and DS3 lines.  Shifts from DS1 to DS3 circuits do not affect the average revenue per line for each category, removing one flaw in the average revenue measure.  Dr. Taylor found that: "DS-1 and DS-3 prices fell dramatically for Verizon East between 2000 and 2001; in fact, they fell at a much faster rate than would have been required by the price cap formula.  Possible explanations include a national recession and the telecommunications industry meltdown."[23]

36.    But DS-1 and DS-3 lines are not commodities supplied by price-takers with upward-sloping supply curves.  A recession or a telecommunications meltdown may lower demand but there is no clear reason to believe it raises demand elasticity or lowers the incremental cost of supplying such lines.  A more natural "composition effect" explanation of this price reduction is available.   Since DS1 lines are sold at different prices (with lower prices for longer term commitments and larger volumes purchased), a shift in demand from high price contracts to low price contracts can result in a reduction in average revenue per line even though no prices were reduced.  The same plausible explanation applies to DS3 lines.  Thus one cannot conclude that Dr. Taylor's partial disaggregation of all special access lines into DS1 and DS3 lines repairs the flawed average revenue measure.

37.    For reasons described above, when customers upgrade from multiple DS0s to a DS1 or from multiple DS3s to OCn services, the decrease in average revenue per access line will overestimate the price reduction, if any.

38.    The limitations of measures similar to the Average Revenue per Special Access Line are well known.  Indeed, in his published work on the long-distance market, Dr. Taylor pointed out several flaws with a related measure of price – the Average

---

[23] Taylor Declaration, at ¶ 29.

**Reply Declaration of Joseph Farrell**

Revenue per Minute (ARPM) for long-distance calls.  Dr. Taylor constructs a simple example with two products in which "ARPM declines despite the fact both of the component usage prices have increased."[24]  Dr. Taylor constructs other simple examples to illustrate deficiencies of average revenues as measures of price, and points out that "while AT&T's reported ARPM has declined, competition has not brought benefits of lower prices to low-volume users."[25]

39.     In his Declaration, Dr. Taylor states that "[t]he fact that prices fell much faster than GDPI-PI – X indicates that competitive forces have constrained LEC special access pricing, as anticipated by the Commission's pricing flexibility decision." [26] To reach this conclusion, Dr. Taylor compares changes in the Average Revenue per Line to the changes in the Price Cap Index (PCI).  This is not a useful comparison.  ILECs are required to compare an Average Price Index (API) to the PCI, and report this comparison to the FCC.  Table 1 below, based on data submitted by Verizon BNTR to the FCC, shows that for special access lines taken as a whole, the actual change in prices is almost exactly equal to the reduction required by the price cap plan, strongly suggesting that the price cap was a binding constraint on Verizon's special access prices, contrary to Dr Taylor's suggestion that competition has driven prices below the level required by price cap regulation.

| Table 1: API and PCI for Verizon (BNTR) | | | | |
|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 |
| Total Special Access PCI | 47.88 | 45.73 | 43.40 | 43.47 |
| Total Special Access API | 47.88 | 45.73 | 43.40 | 43.33 |
| *Source: Verizon TRP Filings* | | | | |

---

[24] William E. Taylor and J. Douglas Zona.  "An Analysis of the State Of Competition in Long-Distance Telephone Markets."  Journal of Regulatory Economics 11: 227-255 (1997).  Page 238.  Henceforth, Taylor and Zona.

[25] Taylor and Zona, page 240.

[26] Taylor Declaration, at ¶17.

Moreover, rates in pricing flexibility areas have increased,[27] suggesting that competitive carriers have not been able to discipline the incumbents' special access prices in areas that have been deemed competitive.

### 2. The Relationship between Trends in Prices and Market Power

40.  Dr. Taylor's Declaration largely focuses on attempting to show that prices for special access have fallen over time.  He infers that Verizon does not have market power.  For instance, in his Declaration he writes:

> "A careful analysis of that data does not show that Verizon has been able to exercise market power.  On the contrary, prices for individual DS1 and DS3 services, as well as average revenue per special access circuit have fallen steadily for special access circuits."  At 6.

> "Customers have benefited from additional competition and pricing flexibility as demonstrated by the continuing expansion of demand volumes accompanied by continuing falling prices."  At 4.

> "The NPRM entails a second analysis that entails assessing the level of and changes in the degree of competition in the marketplace, "short of conducting a burdensome market power analysis", against which the Commission warned in ¶72 of the NPRM.  Unfortunately, after that warning, the NPRM (¶72-111) immediately sets out precisely the information requirements and calculations that would be necessary to undertake a market power analysis for special access services.
> **Fortunately, however, the evidence from recent trends in quantities and prices of special access services makes such an analysis unnecessary, as the primary price and quantity data show no signs of the exercise of market power by incumbent providers. … Using a variety of data sources, I show that various measures of average**

---

[27] Evidence supporting this point can be found in: In the Matter of Special Access Rates for Price Cap Local Exchange Carriers, WC Docket No. 05-25.  Comments of CompTel/ALTS, Global Crossing North America, Inc., and NuVox Communications.  Pages 6-9.

<u>Reply Declaration of Joseph Farrell</u>

**revenue per circuit have fallen even as the demand for special access services has increased.**" At 8-9. (Emphasis added).

41.    But even if Dr. Taylor were correct that a decline in average revenue is a reasonable proxy for a decline in price, price reductions do not prove lack of market power. Even a monopoly will reduce price if marginal costs fall or if demand becomes more elastic. In addition a firm with decreasing, but still very substantial, market power will reduce prices for that reason.

42.    While there are pitfalls in using price-cost data to make inferences about the state of competition, it is clear that in any such endeavor it logically is the *relative levels* of price and cost, not the *rate of change* of price, that matter. Moreover, the Commission is concerned about whether prices are just and reasonable, not (only) with determining whether firms "lack market power."

43.    In his published work on competition in long distance markets, Dr. Taylor has argued that competitive prices will allow successful firms to recover their forward-looking incremental costs including an acceptable return on its investment.[28] He observed that the presence of high operating margins supports the conclusion that regulated competition has not produced substantial consumer benefits.[29] Dr. Taylor also recognizes that lower prices and increased demand can sometimes be mistakenly ascribed to competition.[30]

44.    In his Declaration in this Proceeding, Dr. Taylor himself recognizes the limitations of an analysis of trends in prices without information about costs. "Treating a small but significant nontransitory increase in price as an exercise of market power assumes the initial price is a competitive market price. Suppose 10 years of price cap regulation had constrained ILEC special access prices to lie below a competitive market level. In that case, a significant and sustained price increase when price cap regulation was removed would be welfare-increasing

---

[28] Taylor and Zona, Page 230.
[29] Taylor and Zona, page 229.
[30] Taylor and Zona, page 237.

**Reply Declaration of Joseph Farrell**

rather than an exercise in market power."[31]  Elsewhere in the Declaration, Dr
Taylor states: "In antitrust economics, this error – treating an increase from the
current price as an exercise in market power – is called the "Cellophane
fallacy"…"[32]   However, Dr. Taylor's analysis does not actually compare his
measure of the BOCs' special access prices to any benchmark of cost.

45.    Dr. Taylor's comparison of the average revenue per special access line to the
price reductions required under price caps provides no useful information on the
relationship of prices to costs.[33]   Under traditional price caps, the price cap
formula of inflation (or GDP-PI) less increases in productivity in the
telecommunications sector (or the X-factor) is intended to capture the expected
reduction in cost that would be achieved by  the regulated firm operating
efficiently.  As Dr. Taylor himself points out, actual price changes may vary
dramatically from the average change embodied in the price cap, so that
differences between prices (especially when they are misrepresented by the
average revenue per line) and the price cap in the short run may not contain useful
information on the state of competition, as indicated by the price-cost margin.[34]
In any event, the cap under the CALLS plan was never intended to represent
expected changes in cost, and a comparison of price changes to GDP-PI – X
during the CALLS period is not helpful in determining whether prices are
converging to the relevant costs.

46.    Dr. Taylor also suggests that problems of allocating common costs make direct
price-cost comparisons impossible.  This is correct if the costs of special access
are predominantly common costs as between special access and other services,
but not if a large fraction of the cost is the cost of customer-specific last-mile
infrastructure that the customer uses for special access.  Indeed, as I have argued
elsewhere,[35] a core principle of Telecommunications Act unbundling is that the
common-cost problem becomes much less severe if one is pricing network

---

[31] Taylor Declaration at 36.
[32] Taylor Declaration at footnote 21.
[33] See Figure 3, and the associated discussion.  Taylor Declaration, page 9.
[34] Taylor Declaration at 31.
[35] Joseph Farrell, "Creating Local Competition", *Federal Communications Law Journal* 49:1, November
1996, 201-215.

elements such as loops than if one is pricing services such as long-distance access. I understand that special access is essentially the full bundle of services of the loop or similar last-mile infrastructure (perhaps together with transport).

47.    The BOCs have not submitted estimates of the forward-looking economic costs of special access, focusing instead on limitations of available accounting costs in the ARMIS records.  However, forward-looking economic costs can be estimated using two reasonable approaches.  First, UNE rates for dedicated transport are often based on forward-looking economic costs calculated using an engineering-economics cost proxy model.  I understand that high capacity UNEs (DS1s and DS3s) and perhaps especially EELs are the functional equivalent of special access, so directly relevant UNE rates exist.  Second, the rates charged by a competitive provider of special access services are unlikely to be systematically below its forward-looking economic cost.  Thus UNE rates and CLEC special access charges may be useful benchmarks for comparing an ILEC's special access rates versus forward-looking long-run cost.

48.    The record in this proceeding includes a substantial amount of information on the relationship between UNE prices and special access prices, including:

> "In comparing special access vs. UNE prices, Worldcom found that DS1 UNE loops were about 18% less than comparable special access prices and DS3 UNE loops 28% less.  The fixed portion of transport under UNEs was about 10% less for DS1s and the fixed DS3 transport UNE prices were actually higher than special access.  On the other hand, major variances occurred on interoffice mileage (average DS1 UNE per mile charge was $1.52 vs. $13.72 for special access, and for DS3s it was $23.35 vs. $57.84)."[36]

> "In Atlanta, the mileage component of a 10-mile (UNE) EEL was $1.80, whereas BellSouth charged $180 in mileage in MTM special access prices or $80 under their discount plan.  Similar disparities are found in

---

[36] Henry G. Hultquist, Worldcom, Letter to Marlene H. Dortch, 10/29/02, FCC, Docket CC 96-98, 98-147, 01-338 (p. 7).

Sothwestern Bell and Ameritech (pp 21-22, 33-34).  Additionally, mileage costs were twice as high in price flex MSAs ($8/mile) than under price caps ($3.90/mile)."[37]

49.     A study by Mr. Joseph Stith of AT&T compares (a) special access rates in price cap areas to the corresponding rates in areas where the BOCs have been granted pricing flexibility, (b) price cap rates to the corresponding UNE rates, and (c) price flexibility rates to UNE rates.  He finds that "for a 10-mile circuit the Bells' tariffed rates are, on average, significantly above their rates for equivalent UNEs."[38]   Mr. Stith finds similar results for zero-mile circuits.

50.     In its Comments in this Proceeding, BellSouth submitted a study by RHK showing that ILEC prices substantially exceed either comparable UNE rates or competitors' rates.[39]   The study reports that BellSouth's average special access prices are $240, $1,356 and $5,077 for DS1, DS3 and OCN circuits.  The average prices for BellSouth's UNE transport element for DS1 and DS3 circuits are reported to be $141 and $623, or about half the corresponding special access prices.  The average prices charged by competitive carriers for DS1, DS3 and OCN circuits are reported to be $140, $700, and $3,300, respectively, or about half the corresponding Bell special access prices.  Since UNE prices are based on estimated forward-looking costs and since competitive carriers presumably seek at least to cover their forward-looking costs, the RHK study is consistent with the conclusion that BellSouth's special access prices considerably exceed forward-looking costs.

51.     The RHK study purports to show that BellSouth has a small revenue share for many categories of special access services, yet it reports that BellSouth's prices for these services are significantly higher than the prices charged by competing carriers, and also considerably higher than UNE rates.  The study does not explain why, in an apples-to-apples comparison, BellSouth is able to charge a substantial

---

[37] NuVox, Initial Comments, 10/4/04, WC 04-313, p. 22.
[38] Declaration of M. Joseph Stith, WC Docket No. 04-313, September 30, 2004.  At 17.
[39] Declaration of Stephanie Boyles, June 8, 2005.  WC Docket No. 05-25.

<u>**Reply Declaration of Joseph Farrell**</u>

premium over its competitors, and maintain prices in excess of UNE rates based on forward-looking costs.

52.    The evidence thus suggests that special access rates are often significantly above corresponding UNE rates.  The UNE rates are based on forward-looking cost, incorporating (unlike competitive carriers' pricing) ILEC-level economies of density.  ILECs' special access rates are also considerably higher than the rates charged by competitive carriers.

## Certification

I hereby certify, under penalty of perjury, that the statements and information contained in my declaration are correct and true to the best of my knowledge.

Joseph Farrell
29 July, 2005