**PLAINTIFF UNITED STATES'S RESPONSE TO COMMENTS**

filed in
United States v. SBC Communications, Inc. and AT&T Corp.,
Civ. Action No. 1:05CV02102 (EGS) and
United States v. Verizon Communications and MCI, Inc.,
Civ. Action No. 1:05CV02103 (EGS)

**ATTACHMENT 3**

**Comments of Elliot Spitzer. Attorney General, State of New York,
on the Proposed Final Judgments**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:05CV02102 |
| | ) | |
| v. | ) | Judge: Emmet G. Sullivan |
| | ) | |
| SBC COMMUNICATIONS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AT&T CORP. | ) | |
| | ) | |
| Defendants. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:05CV02103 |
| | ) | |
| v. | ) | Judge: Emmet G. Sullivan |
| | ) | |
| VERIZON COMMUNICATIONS INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MCI, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**COMMENTS OF ELIOT SPITZER,
ATTORNEY GENERAL, STATE OF NEW YORK,
ON THE PROPOSED FINAL JUDGMENTS**

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, Eliot Spitzer, the Attorney General of the State of New York, respectfully submits the following comments on the Proposed Final Judgments[1] ("PFJs") in the above referenced matters.

---

[1] Department of Justice, Antitrust Division, *United States v. SBC Communications Inc. and AT&T Corp.*; Competitive Impact Statement, Proposed Final Judgement, Complaint, Stipulation, 70

## I.   INTRODUCTION

The New York Attorney General ("AG") is charged with enforcing state and federal antitrust and consumer protection laws.   The AG advocates in administrative and judicial proceedings on behalf of New York State, consumers, and the public interest generally.   The AG has long advocated on behalf of competition in the telecommunications sector in both the national and state legal and regulatory arena.   The AG has participated actively in numerous New York Public Service Commission proceedings to support competition in New York State and has filed comments there as well as at the FCC on a broad range of telecommunications competition issues over the years, including comments with both agencies regarding the proposed Verizon-MCI merger.[2]

Through Verizon New York Inc., Verizon Communications Inc. ("Verizon") provides regulated and unregulated telecommunications services in New York, and is the dominant provider in multiple service markets from Maine to Virginia.   MCI Inc.'s ("MCI") subsidiaries provide telecommunications services on a regulated and unregulated basis in New York and, since before the breakup of AT&T in 1984, MCI has played a key competitive role in business, long distance and local service markets.

While SBC Communications, Inc. ("SBC") has had only a limited competitive presence in New York, it provides regulated and unregulated telecommunications services and is the dominant

---

Fed. Reg. 74334 (Dec. 15, 2005); Department of Justice, Antitrust Division, *United States  v. Verizon Communications Inc. and MCI, Inc.*; Competitive Impact Statement, Proposed Final Judgement, Complaint, Stipulation, 70 Fed. Reg. 74350 (Dec. 15, 2005).

[2] *See, e.g.*, http://www.oag.state.ny.us/ telecommunications/telecommunications.html.

provider in multiple service markets in 13 states.[3]    AT&T Corporation ("AT&T") provides

telecommunications services on a regulated and unregulated basis in New York and is the nation's

largest provider of enterprise services, while also establishing itself as a leading long distance and

local service competitor.

Together, MCI and AT&T maintain the most comprehensive local and long-haul facilities

which are required by major enterprise customers.  Since the Telecommunications Act of 1996,

AT&T and MCI have also established themselves as the most successful competitive local exchange

carriers ("CLECs") in New York and nation-wide.

Telecommunications are vital to New York's information-intensive economy, which is the

national and global center of the financial services and other major industries.  For over a generation,

increased competition in telecommunications has been the driving force behind fair prices, high

quality, innovative offerings and greater access to services.  As a result of New York City's

economic preeminence, increased competition for telecommunications services took hold here before

other parts of the state and country, and has been the most robust.  The Tunney Act process can play

an essential role in ensuring that strong competition continues in New York and nationwide.

While the U.S. Department of Justice ("DOJ") attempts to downplay the role of the Court

in reviewing the adequacy of the PFJs, Congress has made this Court the final arbiter of the propriety

of these mergers under the antitrust laws.  The Court must  "determine that the entry of such

judgment is in the public interest," and, if it cannot so find, it must reject the PFJ unless more

adequate provisions are made to protect the public interest.  15 U.S.C. § 16(e).  *See, e.g., United*

---

[3] Although SBC has chosen to adopt AT&T's name following its merger closing, we refer
to the two companies by their pre-merger identities to avoid ambiguity.

*States v. Microsoft Corp.,* 56 F.3d 1448, 1458 (D.C. Cir. 1995) ("Congress, in passing the Tunney Act, intended to prevent 'judicial rubber stamping' of the Justice Department's proposed consent decree[s]") (reversing district court's rejection of consent decree on other grounds).

Taken together, these mergers will change the face of the telecommunications industry. Post-merger these two companies will overwhelmingly dominate telecommunications markets andwill be in a position to inhibit competition, customer choice and innovation. The remedies contained in the PFJs are unlikely to constrain the merged entities.

There are two key areas of concern. First, the PFJs inadequately address local private lines, which are of major importance to business customers. Second, the PFJs ignore the effect of the mergers on Internet access. For the reasons discussed below, this Court should find that these mergers are not in the public interest and reject the PFJs.

## II.    LOCAL PRIVATE LINES

As DOJ acknowledges, the mergers will lessen competition substantially for Local Private Lines ("LPLs"), more commonly know as "special access" lines. LPLs are dedicated point-to-point circuits, that enable secure high-speed voice and data transfer typically used by businesses and other enterprises. LPLs are especially critical for inter-office communications in the financial services industry, a key component of New York's economy.

### A.    The Mergers Will Eliminate Facilities-Based Competition in the "Last Mile."

The most critical component of an LPL is the "last mile," *i.e.,* the last stretch of the connection from the carrier's network to the commercial building in which the customer is located. As incumbent local exchange carriers ("ILEC"), Verizon and SBC are often the only carriers with access to many buildings. CLECs must lease last-mile access from these incumbents if no other

4

provider has gained access to the customer's location, and if right-of-way excavation or building entry costs inhibit the CLEC from constructing a new last mile connection of its own.

MCI and AT&T have made the most significant inroads of all competitors to Verizon and SBC in gaining access to commercial buildings, by going through the time-consuming and costly process of laying their own competitive access lines. MCI and AT&T also lease last mile facilities from the ILECs to reach customers in buildings not reached by any CLEC. In many buildings in major commercial centers nationwide, MCI and AT&T have become key competitive carriers, who offer customers seeking LPL service a choice other than the incumbent ILEC. Entry into the retail special access market by CLECs other than MCI and AT&T, via laying their own last-mile connections, is negligible. This retail competition by MCI and AT&T will be eliminated by the mergers.

**B.    The Mergers Will Eliminate Discounted "Last Mile" Wholesale Leasing.**

The ILECs lease bundled long-haul and last-mile LPL facilities to CLECs at significant large-volume discounts, which only AT&T and MCI can take advantage of because of their scale and ability to make longer-term purchase commitments. Thus, MCI and AT&T have also been essential players providing competition in the wholesale market for last mile access. MCI and AT&T have acted as price constrainors on the ILECs. MCI and AT&T have also resold the incumbent ILECs' last mile access to other, smaller CLECs at discounted rates. Without this secondary wholesale market offered by AT&T and MCI, smaller CLECs will no longer have access to these discounted prices.

5

### C.    The Remedy Proposed By The PFJ for The "Last Mile" Is Inadequate.

In order to preserve some competition in the retail market for last mile access, the Verizon-MCI PFJ requires Verizon to divest a minuscule number of MCI-owned telecom facilities in individual buildings where MCI is the only telecom provider besides Verizon with last-mile connections in the building.  Likewise, SBC would have to divest certain AT&T assets according to a similar scheme.  These minimal divestitures will affect only a handful of buildings in major markets – a mere 17 in all of New York City, and only 38 buildings throughout all of New York State.  Although Verizon and MCI are competitors in many hundreds of buildings in New York State, DOJ has used an unduly narrow permissive screen, which results in only 38 buildings receiving limited divestitures to address adverse competitive effects of the mergers.

DOJ is missing the forest for the trees.  As a threshold matter, an individual building cannot plausibly be a geographic market for antitrust purposes.   Indeed, here, the buildings are simply scattered commercial locations amidst MCI's existing network in New York City and statewide. They do not, themselves, form the critical mass needed to build a network.  Nor are they network gateways or anchors that might have distinctive value.  In consequence, any would-be competitor who acquired the divested MCI facilities serving  these scattered buildings would have neither the scope nor scale necessary to stand in MCI's competitive shoes.  It is, therefore, hard to see how this remedy could have any significant positive effect on competition beyond the footprint of the handful of individual buildings identified – assuming that the divestitures can be accomplished at all.  Is the DOJ really prepared to inform the Court that the divestiture of access lines into these few buildings will have a competitive impact on pricing in general for LPL access in either New York City or the state generally?  If not, the proposed remedy is mere window dressing.

Moreover, under the PFJ, DOJ retains the right, in its sole discretion, to exclude assets and

6

rights.[4] Thus, even the 38 buildings in New York state could disappear from the Verizon-MCI PFJ divestiture list if DOJ concludes that any or all are not necessary to remedy the competitive harm. In other words, the remedy is written in disappearing ink. Either the divestitures are needed to remedy a likely antitrust violation or they are not. Surely the Court cannot be expected to decide that the public interest is served by a decree that has the potential for its divestiture remedies to vanish.

## III.    INTERNET ACCESS ISSUES

The two proposed mergers raise antitrust concerns relating to Internet services, concerns that are not sufficiently addressed by the PFJs.

The PFJs do not address whether Verizon and SBC should be required to permanently provide unbundled, stand-alone DSL service to all customers, nor do the PFJs prohibit discrimination in favor of Verizon's or SBC's own services in the use of their Internet backbone. The risks associated with these trends are real and will have serious adverse effects on competition and the public if unchecked.

These two transactions will result in the two combined companies controlling over fifty percent of the nation's Internet backbone.[5] Recent post-merger statements by the Chief Executive Officers of Verizon and SBC foreshadow the companies' plans to manage access to their Internet

---

[4] 70 Fed. Reg. at 74365 ("Lastly, with the approval of the United States, in its sole discretion, and at the purchaser's option, the Divestiture Assets may be modified to exclude assets and rights that are not necessary to meet the aims of this Final Judgement. This will allow for minor modifications of the Divestiture Assets to exclude assets that may not be necessary in order to remedy the competitive harm.")

[5] Nicholas Economides, *The Economics of the Internet Backbone*, NYU Law and Economics Working Papers, Paper 4, p. 377 (2004).

backbone more restrictively, by, for example, charging a premium for priority access.[6]

**A.    DSL**

**1.    Unbundled DSL**

Both Verizon and SBC offer consumers access to the Internet through broadband connections known as Digital Subscriber Lines ("DSL"). DSL service is a dedicated high speed digital connection to the Internet provided over the traditional copper telephone lines. Verizon and SBC offer DSL service to their in-region small business and residential customers over these standard wireline connections.[7]

DSL is necessary for customers to use telephone wires to access high speed data services as well as voice over Internet protocol ("VOIP") services. Typically, Verizon and SBC bundle DSL with their wireline voice services. This type of offering inhibits customers' ability to choose a competing provider for voice or data services.

For example, telephony using VOIP has the potential to be a major competitor to wireline telephone services. But stand-alone VOIP requires customers to secure broadband "last mile" access from another provider, typically via DSL. By only selling its DSL service bundled with its monopoly voice service, Verizon and SBC discourage their customers from choosing competitive VOIP providers. The Verizon customer cannot give up the Verizon voice service in favor of a competitive VOIP provider while keeping the customer's Verizon DSL broadband access. The negative effects

---

[6] *See, e.g.,* Arshad Mohammed, "SBC Head Ignites Access Debate," Wash. Post., Nov. 4, 2005 at D01.

[7] While other variations of DSL, used primarily by medium and larger business customers, do not share a telephone line with voice traffic, these comments focus on the residential and small business DSL market.

on competition are apparent, and indeed, may snuff out VOIP's competitive potential before it even takes off.

### 2.  Verizon Offers Stand-Alone DSL Only On A Limited Basis.

In March 2005, the FCC ordered Verizon and other carriers to allow their existing customers who subscribe to the carriers' voice and DSL service to port their phone numbers to a new voice carrier.[8]  In response, Verizon informed competing voice carriers that such customers should be advised that porting the number, and thus terminating their Verizon voice service, would cause their Verizon DSL service to be disconnected as the two services were inseparable.[9]  Subsequently, during the FCC and DOJ review of the Verizon-MCI merger, Verizon publicly expressed a willingness to allow its existing customers in the former Bell Atlantic service territories to maintain their Verizon DSL broadband service in the event that they discontinued Verizon's telephone service.[10]  However,

---

[8]  FCC Docket Number WC 03-251, BellSouth Emergency Request for Declaratory Ruling, FCC 05-78, Memorandum Opinion and Order and Notice of Inquiry, rel. March 25, 2005, 20 FCC Rcd 6830; 2005 FCC LEXIS 1817; 35 Comm. Reg. (P & F) 1063.

[9]  Verizon claimed that customer identification issues prevented it from offering wireline and DSL services independent of each other.  By contrast, Qwest Communications International Inc., the smallest regional Bell operating company ("RBOC"), has offered stand-alone DSL for quite some time.  *See* Yuki Noguchi, *Merger Critics Seek Telecom Regulation*, Wash. Post., April 20, 2005, at E5.  The inference is inescapable that Verizon is deliberately stalling so as to hinder competition from other VOIP providers.

[10]  Matt Richtel, *Some Verizon Customers to Get Stand-Alone D.S.L.*, N.Y. Times, April 19, 2005, at C7.  In conjunction with the April 18, 2005 announcement, in a notice to CLECs, Verizon explained that CLECs no longer had to alert customers that porting *would* result in disconnecting their DSL service.  Instead, Verizon said that CLECs should alert customers that DSL service *might* be disconnected, and that the customer should contact Verizon to determine how to handle the service.  There still seems to be some ambiguity whether every existing Verizon customer seeking stand-alone DSL will actually be able to do so.  Moreover, Verizon has not disclosed whether its stand-alone DSL will be priced at a premium or at a price comparable to that of the DSL component of the bundled product.

even this option is not available to new Verizon customers or those outside the former Bell Atlantic service territories who seek to subscribe to stand-alone DSL at the outset.[11] For these customers, the only way to obtain VOIP with Verizon DSL would be to subscribe initially to Verizon's voice telephony and DSL, to pay the required connection charges, and only thereafter to jettison the unwanted voice service. This constitutes a significant anticompetitive hurdle.

While retarding competitive entry by VOIP providers in this manner, Verizon has committed billions of dollars to expand its fiber-to-the-premises (FTTP) network. As this expansion is completed, it will allow Verizon to replace its DSL service with an array of high speed products to better compete with broadband and video services offered by cable providers. Thus far, however, FTTP is available only in limited areas.[12] While the roll-out of FTTP progresses, Verizon has little incentive to offer stand-alone DSL – particularly when refraining from doing so hinders VOIP providers from competing against Verizon's monopoly voice product.

Indeed, Verizon's own Annual Report indicates that offering DSL and other services on an unbundled basis is not likely to be a high priority for Verizon at all, as the bundles themselves give Verizon a competitive advantage over other service providers. Verizon's 2004 Annual Report highlights the company's "continuing initiatives to more effectively package and add more value to

---

[11]  *E.g.*, those customers formerly served by GTE before its acquisition by Bell Atlantic would not have the option of stand-alone DSL.

[12]  News Release, Verizon Communications, Inc., *Verizon Brings Blazing-Fast Computer Connections to 5 Long Island Communities*, (April 11, 2005) available at http://newscenter.verizon.com/proactive/newsroom/release.vtml?id=90318 ("Verizon customers in Massapequa, Wantagh, Franklin Square, Port Washington and Oyster Bay now can experience breathtaking high-speed Internet access as the company begins to offer its Verizon FiOS[sm] (FYE'-ose) Internet Service to homes here.").

our products and services. Innovative product bundles include local wireline services, long distance, wireless and DSL for consumer and business retail customers . . . . These efforts will also help counter the effects of competition and technology substitution that have resulted in access line losses in recent years."[13]

### 3.    The FCC Required That Verizon And SBC Offer Stand-Alone DSL.

The significance of the stand-alone DSL issue is demonstrated by the merger conditions ordered by the FCC and various state regulators. As part of the approval of the Verizon/MCI and SBC/AT&T transactions, the FCC required that the parties make stand-alone DSL available to customers in region without requiring the purchase of wireline telephone services for a period of two years.[14] While this condition recognized the competitive value of stand-alone DSL, the two year time frame moots its effect. The scheduled expiration of the requirements will not only cripple

---

[13] Verizon Communications Inc., 2004 Quarterly Report (for the period ending September 30, 2004), pp. 20-21 (2005). *See also* Verizon Communications Inc., 2003 Annual Report, Exhibit 13 (2004) (noting that decreases in certain revenue streams were "partially offset by increased demand for our DSL services"). Last year, Verizon noted that "[a]s of year-end 2003, approximately 48% of Verizon's residential customers have purchased local services in combination with either Verizon long distance or Verizon DSL, or both." Verizon Communications Inc., 2003 Annual Report, p. 6 (2004). By September 30, 2004, that number had increased to 53%. Verizon, 2004 Quarterly Report (for the period ending September 30, 2004), p. 26 (2005).

[14] FCC Docket No. 05-65, In the Matter of SBC Communications and AT&T Corp. Applications for Approval of Transfer and Control, FCC 05-185 Memorandum Opinion and Order, adopted October 31, 2005, rel. Nov. 17, 2005, 2005 FCC LEXIS 6385; 37 Comm. Reg. (P & F) 321; FCC WC Docket No. 05-75, In the Matter of Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control, FCC 05-184, Memorandum Opinion and Order, adopted Oct. 31, 2005, rel. Nov. 17, 2005, 2005 FCC LEXIS 6386; 37 Comm. Reg. (P & F) 416. The New York Public Service Commission also ordered Verizon to provide unbundled DSL, also for a period of two years. New York State Public Service Commission, *Order Asserting Jurisdiction and Approving Merger Subject to Conditions*, Case 05-C-0237, Joint Petition (issued November 22, 2005).

VOIP as a competitive voice telephone service; the mere *prospect* of such an event is likely to inhibit investment and growth by mass market VOIP providers.

The public interest should not depend on whether Verizon and SBC decide to offer stand-alone DSL of their own volition after the two-year requirement expires. Recognizing the advantage that Verizon and SBC derive from offering their DSL service only as a bundled product, DOJ should have considered whether Verizon and SBC are likely to eliminate DSL on a stand-alone basis as soon as the FCC's merger conditions expire. In approving the transactions, DOJ should have required customer access to unbundled services for longer than two years as a condition of its approval.

### B.    The Internet Backbone

#### 1.    The Mergers Will Increase Internet Backbone Concentration..

The combinations of Verizon with MCI and SBC with AT&T will dramatically increase concentration of Internet backbone facilities, and will enable Verizon and SBC to exert market power over competing Internet service providers ("ISPs") and content providers, to the detriment of consumers.[15] In recent statements, executives of both Verizon and SBC have stated that they intend to abandon the established practice of equal access for all Internet traffic by favoring their own services and charging premiums to competing ISPs for providing comparable service.[16] All other traffic would be subjected to lower grade service. This prospect could have significant

---

[15] The vast majority of Internet users in the United States access the Internet infrastructure through ISPs. While AOL is by far the largest ISP, many smaller ISPs exist, some of whom have customers only in limited regions. Nicholas Economides, *supra*, p. 375.

[16] *See e.g.,* Dionne Searcey and Amy Schatz, "Phone Companies Set Off Battle Over Internet Fees," Wall St. Journal, Jan. 6, 2006 at A1.

anticompetitive impacts on a number of Internet-based services, such as those that rely upon video streaming, and would alter the very nature of the Internet.

The Internet backbone comprises high speed hubs, to which customer data packets, including electronic mail and voice services, are sent by ISPs, and high speed circuits that connect the hubs to move data from one location to another. In most instances, the data is broken up into smaller packets to speed delivery. Because the data packets usually flow over multiple providers' backbones before reaching their final destinations, different providers' backbones must interconnect to deliver customer traffic.[17] Thus, the Internet backbone provides data transport and routing services, moving the data to the appropriate destinations with a minimum of loss and delay.

The primary Internet infrastructure in the U.S. has approximately ten major backbones – often referred to as "Tier 1 providers"– plus independent ISPs that use this backbone to provide services to customers.[18] One source identifies MCI and AT&T as two of the world's top five Internet backbones.[19] According to In Stat-MDR, a market research firm, "[a]t the end of 2000, 10 backbone providers generated 92 percent of all wholesale ISP revenues" in the U.S.[20] In Stat-MDR found that the three top providers in 2002 were MCI with 44% of the Internet backbone, Genuity with 12.5%,

---

[17] Nicholas Economides, *supra*, p. 375. For a more detailed understanding of the Internet backbone *see* Michael Kende, *The Digital Handshake: Connecting Internet Backbones*, FCC Office of Plans and Policy Working Paper No. 32 (September 2000) and Nicholas Economides, *supra*.

[18] Data about the Internet backbone are often incomplete or outdated or do not specifically identify whether the data are based on usage, revenue or some other measure. The merging parties were unable and/or unwilling to provide current data during the review of the transactions.

[19] Internet Backbone Lookup Page, http://www.cybercon.com/backbone.html. The others are Sprint, Qwest and Level 3.

[20] ISP-Planet Staff, *ISP Backbone Market Forecast: Flat Through 2002* at http://isp-planet.com/research/2002/backbone_020131.html.

and Sprint with 9.4%.[21]  Based on those numbers, these three providers alone comprise two-thirds of the Internet backbone market and yield an Herfindahl-Hirshfeld Index of 2180 without including the remaining smaller providers. This would be considered a highly concentrated market.

Tier 1 Internet backbone providers achieve interconnection of their backbones through what is known as "peering."  Through peering, Tier 1 providers agree to afford each other the ability to freely move data across networks without fees in mutually beneficial arrangements. Smaller backbone providers, on the other hand, are frequently considered free riders, as they generate too little traffic to be peering partners. Because Tier 1 providers generally do not consider no-fee peering with small providers to be sufficiently beneficial, smaller providers often enter into fee-based agreements – called "transit" arrangements – with Tier 1 providers.

These fee-based arrangements for interconnection are not necessarily problematic in a competitive market.  However, if only a few providers control backbone access, the resulting opportunity for these few to hinder the operations of smaller backbone competitors by refusing to interconnect with them, or by imposing onerous fees or conditions on interconnecting, has significant anticompetitive and public interest implications.  Those Tier 1 backbone providers would have both the ability and incentive to, for example, charge significantly higher fees, prioritize their own data packets, block certain ISP transmissions, or end their cooperative relationships with smaller backbones entirely.[22]

---

[21]  *Id.*

[22]  Kende, *supra*, pp. 18-23.

14

Consequently, regulatory action has been necessary to preserve competition when the Internet backbone was threatened by earlier corporate combinations and mergers. In 1998, when WorldCom, the owner of Internet backbone assets, proposed to acquire MCI, then the owner of UUNet backbone assets, the FCC required WorldCom to divest its backbone assets to Cable & Wireless.[23] Similarly, when the FCC considered the merger application of Bell Atlantic and GTE (which resulted in the formation of Verizon), the FCC weighed the public interest impact of the consolidation of the companies' Internet backbone holdings. Indeed, the FCC concluded that the merging parties had "not demonstrated any merger-specific benefits to the market for Internet backbone services."[24] Accordingly, approval of the GTE/Bell Atlantic merger was conditioned, in part, on GTE's divestiture of its Internet backbone.[25]

Taken together, the Verizon-MCI and SBC-AT&T mergers would significantly increase concentration in the Internet backbone market. Neither the FCC order nor the PFJ gave serious consideration to this critical issue, and to the effect of these mergers on the Internet backbone.

---

[23] CC Docket No. 97-211 - Application of WorldCom, Inc. and MCI Communications Corporation for Transfer of Control of MCI Communications Corporation to WorldCom, Inc., *Memorandum Opinion and Order*, FCC 98-225 (rel. Sept. 14, 1998).

[24] CC Docket No. 98-184 - In re Application of GTE Corporation, Transferor, and Bell Atlantic Corporation, Transferee For Consent to Transfer Control of Domestic and International Sections 214 and 310 Authorizations and Application to Transfer Control of a Submarine Cable Landing License, *Memorandum Opinion and Order*, released June 16, 2000, at ¶ 215.

[25] CC Docket 98-184, *supra*, at ¶ 215 (footnote omitted) ("Although we agree with the Applicants that the Internet backbone market is highly concentrated, we nonetheless conclude that the Bell Atlantic and GTE have presented insufficient evidence regarding how their proposed merger would alleviate such concentration and benefit consumers of long-haul data services.").

**2.    Verizon And MCI's Internet Backbones**[26]

MCI, by its own acknowledgment, owns "one of the most extensive Internet protocol backbones."[27] Recently, MCI reported that its backbone network "has been recognized for the fourth consecutive year. . . as the world's most connected Internet backbone playing a critical role in the movement of Internet traffic. Our expansive IP footprint, coupled with our direct interconnections, enables our customers to reach more destinations directly through our global Internet backbone than any other communications provider."[28]

MCI's extensive backbone thus represents an attractive, strategic asset. According to MCI's 2003 Annual Report, MCI occupies:

> a strategically important position within the communications market. . . due to the extremely rapid growth of Internet usage resulting from the increasing availability of high speed broadband access, the decreasing cost of all types of Internet access, the expanding volume of informative and entertaining content, the continued improvement in email and instant messaging, and the ever increasing number of personal computers, and other devices for accessing the Internet. Corporations and government entities have responded by developing additional applications to run over the Internet that allow communications and e-commerce transactions with customers, communications with employees and the transfer of data among offices and operating units.[29]

Although public information regarding Verizon's current Internet backbone ownership is incomplete, there can be no doubt that the opportunity to amass a dominant Internet backbone position is a driving force behind the company's decision to acquire MCI. As the companies stated in their Application to the FCC:

---

[26] We focus on the Verizon and MCI Internet backbone as Verizon is the major ILEC in New York State.

[27] MCI, Inc., 2003 Annual Report 2 (2004).

[28] MCI, Inc., 2004 Quarterly Report (for the period ending September 30, 2004) 33 (2004).

[29] MCI, Inc., 2003 Annual Report 15 (2004).

The Verizon/MCI combination of product offerings will provide a stronger, and geographically broader, converged solution for large enterprises. Verizon currently has strong IP-based offerings, but they have limited reach within its area footprint and Verizon is not a major provider of IP-based services. MCI's core strength is its global Internet backbone, which provides global IP connectivity today, and will be able to provide next-generation VoIP and other IP-based services worldwide tomorrow.[30]

But the consolidation of Verizon's assets with MCI's Internet backbone also holds significant risks of adverse consequences to competition and innovation. The issues related to consolidation of the Internet backbone were not raised by the parties in their Joint Petition, which fails to identify: (1) whether Verizon already controls a share of the Internet backbone, (2) the share of the Internet backbone held by MCI, and (3) the combined share of the Verizon/MCI assets. These risks were not addressed by DOJ in the Verizon-MCI PFJ, nor by the FCC in its approvals of the transactions. These omissions are striking.

The Court should reject the Verizon-MCI merger unless and until Verizon provides the information needed to make an informed decision regarding the extent to which backbone concentration will increase as a result of the proposed merger with MCI. Based on that information, together with further public comment evaluating it, the appropriateness of divestiture of backbone assets should be assessed.

### 3.    The Threat To Competition Is Concrete.

The consolidation of the Internet backbone as a result of the mergers is not an issue in the abstract. As the combined Verizon/MCI and SBC/AT&T move to offer more bundled product packages over their backbones – such as offering VOIP and video services – the increased need for bandwidth may strain their existing systems, encouraging Verizon and/or SBC to give priority to

---

[30] Application, p. 17 (citations omitted).

17

their own products. This prioritization would disadvantage consumers who use non-Verizon/SBC Internet service providers to access information and services that must travel accross the Verizon and SBC backbones.

The proposed combinations also would adversely impact other Internet backbone providers who lack the capacity to offer the same panoply of services. The more extensive offerings would drive traffic to Verizon and SBC and, moreover, increase the companies' market share.

Vital public policy, therefore, requires that Verizon's acquisition of MCI's Internet backbone, and SBC's acquisition of AT&T's backbone, when combined with their current Internet backbone holdings, not diminish either consumers' or competitors' equal and unfettered access to the Internet.

### 4.    The Mergers Risk Creating A Discriminatory Internet Class Structure.

There is a risk that, post-merger, Verizon and SBC will have Internet backbones that carry their own products in first class, while competitors ride in coach, pay more or never get to ride at all. A combined Verizon/MCI entity would be well positioned to create an Internet infrastructure that restricts access to the Internet backbone for countless businesses, institutions and individuals.[31]  At stake is nothing less than the ability of Internet access providers, such as Verizon and SBC, to limit or diminish consumers' access to Google, Vonage or any other content or service provider that does not pay its fees. The resulting Internet "class structure" would not only affect the ability of smaller competitors to participate in the marketplace of ideas and services, it risks drastically altering the

---

[31]  By way of example, there exists today a process known as "tagging," which allows a provider to use rule-based and policy-based filtering to limit the flow of data packets. If packets are "tagged," the network recognizes the class of service and priority assigned it for real-time delivery to ensure a high quality of service. Using tagging, Verizon could assign a higher transit priority – first class status – to data packets originating on its own system, while relating a lower priority – coach status – to the data packets from outside traffic that needs to access Verizon's Internet backbone.

character of the Internet. This would not only reverse the cultural and economic revolution that the Internet has inspired, but also would change the nature of the Internet, in which participants compete based on the quality of their content or services, not on their ability to pay fees to the backbone providers.

As demonstrated by recent Verizon and SBC statements, this danger is a likely near-term reality. Both SBC and Bell South have publicly advocated a two tiered Internet. SBC's public statements on the topic became more frequent after its acquisition of AT&T was approved.[32] SBC Chairman Edward E. Whitacre, Jr. is one of the most vocal proponents of a tiered system, stating that "Why should they be able to use my pipes? The Internet can't be free in that sense, because we and the cable companies have made an investment and for a Google or Yahoo or Vonage or anybody to expect to use these pipes free is nuts."[33] As an Amazon.com representative said after hearing Mr. Whitacre's comments, "What Mr. Whitacre's interview revealed was, I think he said two very distinct things. One is that the service providers have market power . . . and part two was, we intend to use it."[34]    Though Verizon waited to clear all regulatory hurdles to the merger with MCI before addressing the issue, its position is in line with that of SBC. Verizon Chairman Ivan Seidenberg recently stated that, "We have to make sure they don't sit on our network and chew our capacity."[35]

---

[32]  Declan McCullagh, "Playing favorites on the Net?", CNET News.com (Dec. 21, 2005) http://news.com.com/Playing+favorites+on+the+Net/2100-1028_3-6003281.html.

[33]  Arshad Mohammed, "SBC Head Ignites Access Debate," Wash. Post., Nov. 4, 2005 at D01.

[34]  McCullagh, supra note 31.

[35]  Dionne Searcey and Amy Schatz, "Phone Companies Set Off Battle Over Internet Fees," Wall. St. Journal, Jan. 6, 2006 at A1.

IV.    **THE PFJs UNDO THIRTY YEARS OF FEDERAL TELECOMMUNICATIONS COMPETITION POLICY.**

At least since DOJ commenced antitrust enforcement action against the national telephone monopoly, AT&T, over thirty years ago, resulting in the breakup of "Ma Bell" in 1984, the federal government has pursued a policy to encourage competition in all sectors of the rapidly changing telecommunications industry. The PFJs represent a significant step backwards, and will likely lead to a more monopolistic industry in the future.

MCI and AT&T have been the leading competitors to the regional Bell companies, Verizon and SBC, in the twenty years since the AT&T monopoly was broken up. However, as a result of these mergers, Verizon and SBC will become vertically integrated, dominant providers of local, long distance, wireless and Internet services to business and residential customers in large regions of the country. If these mergers proceed without stronger remedial protections, Verizon and SBC will be free to recreate within their regions the monopoly maintained by AT&T prior to 1984.[36] With the elimination of Verizon's and SBC's major competitors (MCI and AT&T), prices can be expected to rise, and telephone users, from large business customers to small businesses and residential customers, are likely to find fewer service choices. DOJ should have analyzed the national and regional impact of both mergers together and, at least, required divestiture substantial enough to create a realistic opportunity for industry participants to step into MCI's and AT&T's competitive shoes.

---

[36] Despite Verizon's and SBC's assertions that new technologies such as VOIP and cable telephony, as well as wireless providers pose significant competitive threats to the ILECs, it is premature to rely on such alternatives to substitute for the competition that MCI and AT&T have offered. These competitors do not play a significant role in business markets, having inadequate market share, reliability or security to handle sensitive data traffic. Thus, they cannot be relied upon to restrain Verizon or SBC from exercising market power after the merger.

Additionally, Verizon and SBC will each have a powerful incentive to refrain from competing in each other's territory and to focus on their respective regions. The two telecommunications mammoths will have more to gain by selling each other limited LPL access, than by engaging in rigorous competition by installing their own last-mile loops in each other's region. Even without coordination, there is a substantial risk that each will follow its own economic interests by not competing, as long as the other does the same. This kind of tacit collusion or mutual forebearance is highly anticompetitive, whether or not the parties actually agree to form a cartel. The PFJs do nothing to counter this substantial threat.

## V.    CONCLUSION

The Court should not give DOJ "a pass" in its review of these important mergers. The long term implications are too important for too many people and businesses in New York and, indeed, throughout the country. Nothing in the PFJs is likely to preserve effective competition at any level in the affected markets, or to prevent the harm to the public that will follow the reduction in competition. The proposed remedies are, at best, cosmetic. Based on the current state of affairs, the Court should reject the PFJs as insufficient and contrary to the public interest.

Dated: New York, New York
      February 13, 2006

Respectfully Submitted,

ELIOT SPITZER
  Attorney General of the
  State of New York

By:

      Jay L. Himes
      Chief, Antitrust Bureau

Mary Ellen Burns
Special Counsel, Public Advocacy Division

Jay L. Himes
Chief, Antitrust Bureau

Susanna Zwerling
Chief, Telecommunications & Energy Bureau

Peter D. Bernstein
Keith H. Gordon
Jeremy R. Kasha
Assistant Attorneys General
    *Of Counsel*

120 Broadway
New York, NY 10271
Tel No.: (212) 416-8262
Fax No.: (212) 416-6015

22