# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | Civil Action No. 1:05CV02102 (EGS) |
| | ) | |
| **SBC Communications, Inc. and** | ) | |
| **AT&T Corp.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | Civil Action No. 1:05CV02103 (EGS) |
| | ) | |
| **Verizon Communications, Inc. and** | ) | |
| **MCI, Inc.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**COMPTEL'S OPPOSITION TO THE DEPARTMENT OF JUSTICE'S MOTION FOR
ENTRY OF FINAL JUDGMENTS**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................2

I.      THE DOJ MISREPRESENTS THE APPROPRIATE SCOPE OF REVIEW .........2

        A.      The DOJ Wrongly Urges the Court to Reply on Incorrect Precedent ..............4

        B.      The Scope of the Court's Review is As Broad As Granted By Congress ........7

        C.      The Plain Language of the Statute Defines the Scope of the Court's
                Authority ..........................................................................................10

II.     THE DOJ PROVIDES NO INFORMATION THAT WOULD ALLOW
        THE COURT TO CONDUCT ITS PUBLIC INTEREST REVIEW UNDER
        THE TUNNEY ACT, AS AMENDED ..................................................................11

III.    THE DOJ'S "RESPONSE" DOES NOT RESPOND TO PUBLIC
        COMMENTS AND CONCERNS .............................................................................13

        A.      The DOJ Fails to Explain that It Intended to Omit Specific 2:1
                Buildings from Its Complaint ............................................................15

        B.      The DOJ Fails to Address COMPTEL's Comments ........................................16

                1.      Geographic Market Definition Is Central to the Court's Ability
                        to Evaluate the Adequacy of the Proposed Remedies ................................17

                2.      The DOJ Fails to Explain Why it Abandoned the Qwest/Allegiance
                        Divestiture Remedy It Was Willing to Impose Only One Year Prior
                        to the Announcement of the Present Mergers .............................................19

                3.      The DOJ Did Not Respond to COMPTEL's Concern that
                        the PAFJ's Would Facilitate Coordinated Behavior in Critical
                        Input Markets to the Detriment of COMPTEL Members ..........................19

        C.      The Mere Presence of a Purchasers Does Not Vindicate the
                DOJ's Remedy ..................................................................................20

CONCLUSION ....................................................................................................21

# TABLE OF AUTHORITIES

## FEDERAL CASES

Ayers v. Allain,
   893 F.2d 732 (5th Cir. 1990) .......................................................................5

Glidden Co. v. Zdanok,
   370 U.S. 530 (1962).......................................................................................5

Johnson v. United States,
   163 F. 30 (1st Cir. 1908).............................................................................5

Massachusetts School of Law v. U.S.,
   118 F.3d 776 (D.C. Cir. 1997)...................................................................5

Postmaster-General v. Early,
   25 U.S. 136 (1827).......................................................................................8

Red Lion Broad. Co. v. FCC,
   395 U.S. 367 (1969)......................................................................................3

Red Lion Broadcasting,
   355 U.S. at 380-81 .......................................................................................5

Stockdale v. Insurance Cos.,
   87 U.S. 323 (1874)........................................................................................7

Stone v. INS,
   514 U.S. 386 (1995)...........................................................................8, 9, 10

United States v. Central Contracting Co.,
   537 F. Supp. 571 (E.D. Va. 1982) ..........................................................13

United States v. Freeman,
   44 U.S. 556 (1845).......................................................................................6

United States v. Hutcheson,
   312 U.S. 219 (1941).....................................................................................6

United States v. Microsoft,
   56 F.3d 1448 (D.C. Cir. 1995) ...................................................................5

United States v. South B. R. Co.,
   333 U.S. 771 (1948)......................................................................................5

## MISCELLANEOUS

150 Cong. Rec. S3615 ........................................................................................7

150 Cong. Rec. S3617 ........................................................................................5

150 Cong. Rec. S3691 ........................................................................................4

38 Stat. L., 738 ..................................................................................................6

H. Rep. No. 669, 72d Congress, 1st Session, p. 3...........................................6

Merger Remedies Guide at 5 ............................................................................21

COMPTEL hereby respectfully files this Opposition to the Department of Justice's

Motion for Entry of Final Judgments, filed with the Court on April 5, 2006.

## INTRODUCTION

On April 5, 2006, the Department of Justice ("DOJ") filed its Motion for Entry of the

Final Judgments in the above captioned cases ("AT&T/Verizon cases").  This followed the filing

on March 21, 2006 of DOJ's Response to Public Comments ("Response to Comments") that

were filed during the statutory Tunney Act comment period.  Specifically, three commenters

(COMPTEL, ACTel, and the New York Attorney General) demonstrated that DOJ had thus far

failed to establish that the consent decrees it proposed would restore the competition it claims in

its Complaints will be lost as a result of the mergers.  The DOJ's Response to Comments and its

Motion for Entry fail to rebut the commenters' allegations that entry of the PAFJs is not in the

public interest.  DOJ has also failed to provide any information that would allow this Court to

make an independent assessment of whether entry of the PAFJs is in the public interest.  Thus,

this Court has no alternative but to reject the PAFJs, as presented.

That DOJ has failed to meet its burden of proof should come as no surprise.  The DOJ

has made no attempt, throughout this proceeding, to either provide sufficient information to

convince the Court that entry of the PAFJs is in the public interest, or to provide any information

at all that would allow the Court to make that determination independently—as Congress

requires the Court to do under the Tunney Act, as amended.  Indeed, not only does DOJ treat the

2004 Tunney Act Reform with a contemptuous disregard for the authority of Congress, but also

through its disregard of Congressional authority, is actively seeking to prevent the Court from

performing the independent evaluation that Congress requires before a determination can be made that entry of the consent decree restores competition and is in the public interest.

The DOJ seeks to prevent this Court from applying the independent scrutiny demanded by Congress in at least 3 ways:  1) the DOJ misrepresents the appropriate scope of review that Congress conferred on the courts in the Tunney Act Reform; 2) the DOJ provides no information at all that would allow the Court to conduct the analysis required by Congress; and 3) the DOJ does not address specific concerns raised by public commenters—rather, the DOJ relies on conclusory assertions and perfunctory dismissals of concerns as "outside the scope" of review that DOJ itself—and not Congress or this Court—has defined.  DOJ's disregard of its own burden of proof and the Court's review obligations is amplified by the perfunctory motion and memorandum just filed seeking entry of the final judgments.  While it is deplorable for one branch of government to mislead another on such an important issue as a public interest determination, it is disingenuous for the supposed custodian of the antitrust laws to disregard its fundamental obligations to the public by failing to properly advise the Court of the appropriate issues and standards necessary for the Court to conduct a thorough review of the decree.  Thus, the only option the DOJ has given this Court is to reject the PAFJs as contrary to the public interest.

## ARGUMENT

## I.     THE DOJ MISREPRESENTS THE APPROPRIATE SCOPE OF REVIEW

In Section II of the Response to Comments, the DOJ attempts to lay the groundwork for its contentions that its "non-response" is all that is required by the statute, and that this Court lacks the discretion to actually conduct an independent review as required under the Tunney Act Reform.  The Memorandum in support of entry does not cure this failure.  Every case on which

the DOJ relies to constrain the expanded discretion Congress gave the courts in 2004 is irrelevant at best, and intentionally misleading at worst. All of those cases limiting the review of the courts in a Tunney Act proceeding were effectively vacated by a subsequent clarification of the Tunney Act. There have been no published opinions interpreting the Tunney Act Reform since Congress re-wrote the statute in 2004.[1] Despite the plain intent of Congress that this Court undertake a thorough, independent review of whether the public interest is served by entry of the proposed consent decrees, the cases that DOJ cites would require the Court to not only ignore the plain language of the Tunney Act Reform, but hundreds of years of case law establishing the proper framework for statutory interpretation.

The amended Tunney Act presents effectively a matter of first impression for this Court to consider. It specifically prescribes the Court's authority to conduct a thorough public interest review in this case. The DOJ correctly sets forth the language of the statute—which *requires* the Court to independently consider several factors in conducting its public interest determination—but then goes on to erroneously assert that the statute "permits" a court to consider these specifically-enumerated factors. In urging the Court to look at case law that so misinterpreted the Tunney Act that Congress was compelled to pass new legislation to clarify its original intent, the DOJ seeks to mislead the Court into relying on case law specifically repudiated by Congress when it enacted the present iteration of the Tunney Act.

A critical purpose of the Tunney Act Reform adopted by Congress in 2004 was a change from "may" to "shall" with respect to an expanded list of factors that Congress expected courts

---

[1]     To the degree the Court would like more information on the scope of its authority, COMPTEL has provided the entire legislative history—in an unedited, "cut and paste" format—Exhibit A to this document. The entire legislative history is not long, and the Court might find it more edifying than DOJ's oft-cited, but misleading quote from Senator Hatch that the amendment merely codifies case law. While it would be hard to imagine a more pointless exercise for Congress than to overwhelmingly vote to amend a statute in order to codify the case law interpreting the statute, rules of statutory interpretation point to the opposite conclusion. See, *e.g.*, *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 380-81 (1969) ("Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction.").

to consider before determining that consent decrees satisfied the public interest standard.  As

Senator DeWine explained:

> Third, H.R. 1086 addresses a concern raised recently by a string of court opinions
> that appear to limit the depth of review required by the Tunney Act. In brief, the
> Tunney Act requires that prior to implementing an antitrust consent decree a court
> must review that decree to assure that it is in the public interest; historically, that
> requirement has been understood to require that the courts engage in more than
> merely "rubber-stamping" those decrees. A number of recent opinions have led
> some to question the depth of review required by the Tunney Act. This bill makes
> clear that the Tunney Act requires what it has always required, and that mere
> rubber-stamping is not acceptable.

150 Cong. Rec. S3691 (daily ed., April 12., 2004) (Statement of Sen. DeWine).

### A.    *The DOJ Wrongly Urges the Court to Rely on Incorrect Precedent*

As noted above, the DOJ consistently ignores the fact that Congress modified the Tunney

Act two years ago in order to insure that courts hold DOJ to its burden of proving that proposed

consent decrees are in the public interest.  Congress also requires the court to conduct its own

inquiry, with the assistance of public comments and the information that DOJ is supposed to file

along with its proposed decrees, to satisfy itself that the proposed consent decrees are in the

public interest.  For example, in its Opposition to COMPTEL's Motion to Intervene, or in the

Alternative to Participate as Amicus Curiae, the DOJ "note[s] that COMPTEL incorrectly claims

that Congress in 2004 'overruled' *United States v. Microsoft Corp*., 56 F.3d 1448 (D.C. Cir.

1995), or at least overruled 'limiting language' from the case."  DOJ Opposition at pp. 3-4, n.3.

COMPTEL did indeed make such a claim and it is DOJ that incorrectly argues for the continuing

validity of the standard of review espoused in *Microsoft*.  As Senator Kohl explained:

> First, section 221(a) of our bill contains Congressional Findings and
> Declarations of Purposes. These provisions clarify that we are determined to
> effectuate the original Congressional intent of the Tunney Act. In other words,
> after the enactment of this legislation, courts will once again independently
> review antitrust consent decrees to ensure that they are in the public interest. The
> Congressional Findings expressly state that for a court to limit its review of

antitrust consent decrees to the lesser standard of determining whether entry of the consent judgments would make a "mockery of the judicial function" misconstrues the meaning and intent in enacting the Tunney Act. The language quoted paraphrases the D.C. Circuit decisions in *Massachusetts School of Law v. U.S.*, 118 F.3d 776, 783 (D.C. Cir. 1997) and *United States v. Microsoft*, 56 F.3d 1448, 1462 (D.C. Cir. 1995). To the extent that these precedents are contrary to section 221(a) of our bill regarding the standard of review a court should apply in reviewing consent decrees under the Tunney Act, ***these decisions are overruled by this legislation***. While this legislation is not intended to require a trial de novo of the advisability of antitrust consent decrees or a lengthy and protracted review procedure, it is intended to assure that courts undertake meaningful review of antitrust consent decrees to assure that they are in the public interest and analytically sound.

150 Cong. Rec. S3617 (daily ed., April 12., 2004) (Statement of Sen. Kohl) (emphasis added).

Whether or not Congress can "overrule" decided cases (a proposition about which DOJ seems skeptical, even though it offers no citations to support its skepticism), it is well-settled that Congress can, through subsequent legislative action, clarify that courts have failed to give effect to the original intent of the statute, and prevent courts from applying cases misinterpreting the original statute in future actions.[2]  This is exactly what Congress has done with respect to the two cases specifically repudiated in the legislative history of the Tunney Act Reform.  Despite this Congressional action, the 1995 *Microsoft* case is the centerpiece of the legal framework the DOJ thrusts upon the Court.  Indeed, DOJ cites the *Microsoft* case no less than 13 times in its Response to Comments—many more times than any other case.

This is not the first time that Congress has "overruled" case law by passing subsequent amending legislation.  Congress has, in fact, done so with regard to the same general statute the

---

[2]     See, *e.g.*, *Glidden Co. v. Zdanok*, 370 U.S. 530 (1962) ("'Subsequent legislation which declares the intent of an earlier law . . .  is entitled to weight when it comes to the problem of construction.' Especially is this so when the Congress has been stimulated by decisions of this Court to investigate the historical materials involved and has drawn from them a contrary conclusion.") (internal citations omitted); *Red Lion Broadcasting*, 355 U.S. at 380-81; *Ayers v. Allain*, 893 F.2d 732, 755 (5th Cir. 1990).  *See also Johnson* v. *United States* 163 F. 30, 32 (1st Cir. 1908) ("The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. . . [and] it is not an adequate discharge of duty for the courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before."); *United States v. South B. R. Co.,* 333 U.S. 771, 774-775 (1948) ("when the questions are of statutory construction, not of constitutional import, Congress can rectify [the Court's] mistake . . . , or change its policy at any time").

Court is interpreting in this case—the Clayton Act. In *United States v. Hutcheson*, 312 U.S. 219

(1941), the Court was considering an amendment to the Clayton Act, in the form of the Norris-

LaGuardia Act (which, in response to case law to the contrary, specifically exempted certain

types of organized labor conduct from the application of the antitrust laws, including the Clayton

Act). Justice Frankfurter, writing for the Court, explained,

> The underlying aim of the Norris-LaGuardia Act was to restore the broad purpose
> which Congress thought it had formulated in the Clayton Act but which was
> frustrated, so Congress believed, by unduly restrictive judicial construction. This
> was authoritatively stated by the House Committee on the Judiciary. 'The purpose
> of the bill is to protect the rights of labor in the same manner the Congress
> intended when it enacted the Clayton Act, October 15, 1914 (38 Stat. L., 738),
> which act, by reason of its construction and application by the Federal courts, is
> ineffectual to accomplish the congressional intent.' H. Rep. No. 669, 72d
> Congress, 1st Session, p. 3. The Norris-LaGuardia Act was a disapproval of
> *Duplex Printing Press Co. v. Deering, supra*, and *Bedford Cut Stone Co.* v.
> *Journeymen Stone Cutters' Ass'n.*, 274 U.S. 37, as the authoritative interpretation
> of § 20 of the Clayton Act, for Congress now placed its own meaning upon that
> section. The Norris-LaGuardia Act reasserted the original purpose of the Clayton
> Act by infusing into it the immunized trade union activities as redefined by the
> later Act. In this light § 20 removes all such allowable conduct from the taint of
> being a "violation of any law of the United States," including the Sherman Law.
>
> *There is no profit in discussing those cases under the Clayton Act which were
> decided before the courts were furnished the light shed by the Norris-LaGuardia
> Act on the nature of the industrial conflict.*

*Hutcheson*, 312 U.S. at 235-36 (emphasis added).

As in *Hutcheson*, with the Norris-LaGuardia Act, Congress in 2004 clarified its original

intent in enacting the Tunney Act, and in doing so explained its reasoning for the unusual

legislative "clarification" as being judicial interpretations—specifically those relied upon by the

DOJ in trying to misleadingly convince this Court to accept artificial constraints on the scope of

its review—that Congress believed frustrated the original purpose of the Tunney Act. Moreover,

contrary to DOJ's unsupported insinuations, the rules of statutory construction followed by the

Court in *Hutcheson* are hardly unusual. *See, e.g., United States v. Freeman*, 44 U.S. 556, 565

6

(1845) ("The intention of the legislature, when discovered, must prevail, any rule of construction declared by previous acts to the contrary notwithstanding.") (internal citations omitted); *Stockdale v. Ins. Cos.*, 87 U.S. 323, 331 (1874) ("Both in principle and authority it may be taken to be established, that a legislative body may by statute declare the construction of previous statutes so as to bind the courts in reference to all transactions occurring after the passage of the law. . . .). Thus, in light of Congress's revealed intent, there is indeed "no profit" in relying on those cases which caused Congress to clarify the purpose of the Tunney Act. Instead, the Court should simply focus on interpreting the plain language of the Tunney Act Reform, which "will insure that the courts can undertake meaningful and measured scrutiny of antitrust settlements to insure that they are truly in the public interest . . . ." 150 Cong. Rec. S3610, 3617 (daily ed., April 12., 2004) (Statement of Sen. Kohl).

### B.  *The Scope of the Court's Review Is As Broad As Granted By Congress*

Congress has tasked this Court with the obligation and the authority to conduct an independent and impartial review of whether entry of the PAFJs is in the public interest.[3]  In contrast, DOJ clearly refuses to accept that Congress can, and has, changed the law in response to judicial decisions that Congress felt were beginning to look like "rubber stamps" and not independent public interest examinations.[4]  The DOJ cannot distract the Court from this task by imposing artificial limitations on the role Congress created for the Court through the Tunney Act Reform.

---

[3]     *See e.g.*, 150 Cong. Rec. S3610, 3615 (daily ed., April 12., 2004) (Statement of Sen. Leahy) ("As currently drafted, the court has discretion in making this public interest determination, and some have expressed concerns that this lack of guidance results in courts that are overly deferential to prosecutors' judgments. Thus, this bill intends to *explicitly restate the original and intended role of District courts in this process by mandating that the court make an independent judgment based on a series of enumerated factors.*") (emphasis added)

[4]     *See generally*, Exhibit A.  Every single lawmaker that comments on the Tunney Act Reform, including Senator Hatch, explains that the Tunney Act Reform was passed to eliminate "rubber stamping" of consent decrees by District Courts under the Tunney Act.

It is abundantly clear that the DOJ simply refuses to acknowledge that Congress has not granted DOJ the level of presumptive deference that it seeks to grant itself, and that Congress has required the Court to independently verify that the DOJ is, in fact, representing the public interest. The DOJ does, at least nominally, admit that the Tunney Act Reform provides a list of factors that the court "shall" consider (as opposed to the pre-amendment list of factors that a court "may" consider). However, despite the "lip service," the DOJ fails to truly acknowledge that the law was changed, and that "[t]he legislature may pass a declaratory act**,** which, though inoperative on the past, may act in [the] future." *Postmaster-Gen. v. Early,* 25 U.S. 136, 148-49 (1827).

Instead, the DOJ insists that "the amendments did not materially affect the scope or standard of review." DOJ Response to Comments at 11. Apparently, the DOJ believes that Congress intended the Tunney Reform Act to have no effect at all:

> Congress in 2004 did not change the applicable standard, but limited itself to a finding purporting to clarify its intent of 30 years ago—a finding that is not inconsistent with the case law's interpretation of the Tunney Act.

DOJ Response to Comments at 12. Such an interpretation, of course, is flatly contrary to ordinary principles of statutory construction. See, *Stone* v. *INS,* 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."). The DOJ continues to ignore the fact that the Tunney Act Reform *requires* the Court to consider certain factors before entering a proposed consent decree. For example, in determining whether a particular consent decree is in the public interest, the DOJ states that a court "*should* [rather than must] consider certain factors listed in the Act relating to the competitive impact of the judgment and whether it adequately remedies the harm alleged in the complaint." *Id*. (emphasis added).

In addition to its extensive reliance on the limiting language in one of the two cases that Congress specifically overruled in adopting the Tunney Act Reform,[5] the DOJ also tries to create a narrower standard of review by cobbling together an assortment of twenty to thirty year old cases from other district courts.  In so doing, the DOJ defines the entire framework under which it would have the Court review its "Response to Public Comments" in terms of what the Court may *not* do, or may *not* look at, in deciding whether entry of the PAFJs is in the public interest.[6]

The DOJ concludes, with no supporting legislative history, policy documents, case law or other citations, that "[t]he proper test of the proposed Final Judgment, therefore, is not whether it is certain to eliminate every anticompetitive effect of a particular merger or to assure absolutely undiminished competition in the future."  DOJ Response to Comments at 9.  The "proper test," which the DOJ articulates for the first time in its Response to Comments, seems to stand uncomfortably beside the Supreme Court's test, that "[t]he relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.' *Ford Motor Co. v. United States*, 405 U.S. 562, 573 (1972) (citing *United States v. Du Pont & Co*., 366 U.S. 316, 326 (1961)) (internal citations omitted).  Moreover, the Supreme Court explained that (even prior to the explicit mandate of the Tunney Act that the courts ensure the remedy is in the public interest) "[t]he District Court is clothed with 'large discretion' to fit the decree to the special needs of the

---

[5]    For example, immediately after listing the statutory obligations, the DOJ immediately tries to narrow the plain language of the statute—which *requires* the court to consider certain factors in conducting its public interest determination—by relying on the Congressionally-repudiated *Microsoft* case. ("As the Court of Appeals has held, the Tunney Act *permits* a court to consider. . . . ") DOJ Response to Comments at 8 (internal citations omitted, emphasis added).

[6]    "[A] court may not 'engage in an unrestricted evaluation of what relief would best serve the public.'" DOJ Response to Comments at 9 (citations omitted).  A court reviewing a consent decree is "not to devise a remedy for an adjudicated antitrust violation." *Id.*  "'[T]he court is only authorized to review the decree itself,' and not to 'effectively redraft the complaint' to inquire into other matters that the United States did not pursue." *Id* at 10 (citing Congressionally-overruled *Microsoft* case).  "[T]he Tunney Act does not permit a court to redraft the complaint, examine possible competitive harm the United States did not allege, or engage in a wide-ranging search for the relief that would *best* serve the public. *Id* at 12-13.

individual case." *Id.* (citing *United States v. Du Pont & Co.*, 353 U.S. 586 at 608 (1947)); *United States v. Crescent Amusement Co.*, 323 U.S. 173, 185 (1944).

Without producing any documentary evidence, economic testimony, or even a cogent theory of harm consistent with its own Merger Guidelines and how the proposed remedies address that harm, the DOJ's only hope of convincing the Court to enter the PAFJs depends on its ability to convince the court that because the decrees were the result of a negotiation between the DOJ and the Defendants, the decrees are beyond scrutiny, and that the law itself rightly insulates the DOJ from any unwanted scrutiny.  Nothing could be further from the truth.

**C.**     *The Plain Language of the Statute Defines the Scope of the Court's Authority*

As much as the DOJ wants to resist reality, the fact is that lawful Acts of Congress are the law of the land.  COMPTEL has shown that principles of statutory construction mandate giving full meaning to the words of Congress in restating the purpose of the Tunney Act, and that—contrary to the desires of the DOJ—there is "no profit" in rehashing case law that Congress has specifically repudiated.  Because there is no body of published opinions interpreting the reinvigorated Tunney Act Reform, the Court must rely on the plain language of the Act and the legislative history of the Act.   COMPTEL has provided the legislative history in Exhibit A, and for the edification of the Court, a red-lined version of the revised statute is provided below:

(e) Public interest determination

**(1)** Before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of such judgment is in the public interest. For the purpose of such determination, the court ~~may~~**shall** consider--

~~(1)~~**(A)** the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration ~~or~~**of** relief sought, anticipated effects of alternative remedies actually considered, **whether its terms are ambiguous,** and any other **competitive** considerations bearing upon the adequacy of such judgment~~:~~ **that the court deems necessary to a determination of whether the consent**

10

**judgment is in the public interest;  and**

~~(2)~~**(B)** the impact of entry of such judgment upon **competition in the relevant market or markets, upon** the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial**.**

**(2)  Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene**.

II.    **THE DOJ PROVIDES NO INFORMATION THAT WOULD ALLOW THE COURT TO CONDUCT ITS PUBLIC INTEREST REVIEW UNDER THE TUNNEY ACT, AS AMENDED**

The DOJ does not spend a lot of time discussing what it did right, or engaging in any analysis of how its theory of harm fits the facts of the case, or how the proposed remedies address that theory of harm.  It is revealing that while the DOJ claims to have "received and considered more than 25 million pages of material," DOJ Response to Comments at 3, over the course of its 8 month investigation (for a somewhat-unbelievable average of 3 million pages of documents "considered" per month), it has not produced any of these 25 million pages to help this Court conduct its independent public interest review.  Indeed, the DOJ has provided few facts, and no evidence, to support its contention that it has satisfied its burden to prove that the remedies it proposes restore the competition that it contends in its Complaints will be lost as the result of the present mergers.[7]

This failure alone—to produce any relevant documents or analysis that would help inform the public's comments or the Court's ultimate determination—provides grounds for the Court to reject the DOJ's attempt to enter the PAFJs.  It is similarly unavailing that, in the "more than 25 million pages of material" the DOJ "considered," and the "more than 200 interviews" that were conducted with "customers, competitors and other individuals with knowledge of the

---

[7]    As noted previously, the DOJ does not even concede that this is the standard it must meet in order to demonstrate that its remedies satisfy the public interest standard, its own Guidelines, and Supreme Court precedent.

industry," the DOJ considered no alternatives to the PAFJs, but "a full trial on the merits against Defendants." Competitive Impact Statements ("CIS") at Section VI.   The public, and this Court, are left to infer that the PAFJs simply materialized "out of thin air."

Given the breadth of the investigation the DOJ claims to have undertaken, the lack of any information presented, much less in a cogent, narrative, analytical format that explains what information the DOJ believed was relevant, and an explanation of the DOJ's analysis—within the Merger Guidelines and Remedy Guidelines frameworks—paints a less than flattering picture of how the DOJ arrived at the PAFJs which are being proffered here.  Verizon, in its Opposition to COMPTEL's Motion to Intervene, or in the Alternative to Participate as Amicus Curiae, complains that "CompTel does not argue 'that [the government's] resolution suggests malfeasance' or that there is 'reason to infer a sell-out by the Department [of Justice].'"  Verizon Opp'n at 4 (citation omitted).  After seeing the DOJ's response to public commenters, however, this is precisely the picture that is developing.  Not only has the DOJ failed to produce any evidence in support of its Complaints or proposed remedies, it has also failed to produce even the most elementary information that would confirm the integrity of the Complaints and the remedies.  If the DOJ is to be believed, the only conclusion that can be drawn from a reasoned analysis of the record in front of the Court is that, at some point in the "investigation," the Defendants told DOJ that they would be willing to part with some surplus fiber that was not necessary to serve any existing SBC, AT&T, Verizon, or MCI customers, if the DOJ would conclude the investigation.

Regardless of motivation or the possibility of political pressure, DOJ has failed to comply with the Tunney Act's informational requirements, which are necessary to allow this Court to

conduct its independent public interest review.[8]  In either case, the Court must reject the

Department's request to enter the PAFJs.  As one court has explained, when presented with a

similar—though less incredible—paucity of evidence from DOJ:

> The Act clearly does not require a full airing of Justice Department files but the
> Court cannot countenance plaintiff's claim that though Congress enacted sunshine
> legislation the courts may blandly (and blindly) accept government certification in
> case after case that no documents or materials, by themselves or in the aggregate,
> led to a determination by the government that it should enter into a consent
> decree.

*United States v. Cent. Contracting Co.*, 537 F. Supp. 571, 575 (E.D. Va. 1982).  The

DOJ's failure to provide this Court with anything close to the information required under

the Tunney Act is especially brazen, given the size of each of these mergers and that both

are under review at the same time, and given Congress's fresh mandate to the courts to

conduct a thorough, independent public interest review.  Thus, it is the DOJ itself,

through its intransigence, or indifference to the public interest, that compels this Court to

reject the PAFJs as presented.

## III.    THE DOJ'S "RESPONSE" DOES NOT RESPOND TO PUBLIC COMMENTS AND CONCERNS

The DOJ fails to address significant concerns raised by COMPTEL and other commenters.

The most frequent excuse the DOJ gives for ignoring the public comments is that the

commenters ask it to defend the integrity of its Complaints.  For example, the DOJ's response to

ACTel:

> Tunney Act review principally addresses the adequacy of the remedy, not the
> adequacy of the complaint.  Most of the issues ACTel raises, however, question
> the wisdom of the filed Complaints, and urge theories of competitive harm that
> the United States did not believe were supported by the evidence.

---

[8] The Court may recall that it was only in 1984 that this same DOJ asked the Court to break up the Bell system.
When a substantial part of that system is put back together -- as it now has been -- it is not unreasonable to expect
the DOJ to provide a full explanation of the changed competitive circumstances that would justify such an about-
face.

DOJ Response to Comments at 16 (internal citations and footnote omitted).  DOJ's response to

COMPTEL:  "[l]ike ACTel's comment, some of COMPTEL's comment criticizes the United

States' Complaints rather than the adequacy of the remedy for the harm alleged in the

Complaints."  DOJ Response to Comments at 30.  Likewise, DOJ's response to the New York

Attorney General ("NYAG"):  "[m]ost of NYAG's comment relates to issues well beyond the

scope of the Complaints."  DOJ Response to Comments at 46 (citations and footnote omitted).

This response misses the fundamental thrust of the comments that the Complaints allege a

substantial lessening of competition in a relevant market that is as narrow as a building and as

broad as a metropolitan area, without adequately providing a remedy that will restore

competition in such markets.  Compl. ¶ 24.

    Contrary to what the DOJ would have this Court believe, it is by no means unreasonable

for the public to ask the government to defend the integrity of its Complaints—especially when

the Government has offered not one shred of evidence to demonstrate that there is any consistent

factual, evidentiary, or analytical support for the allegations in the Complaints.  This does not

require a focus on what might have been alleged, but a clear explanation of what was alleged,

and how the relief proposed resolves the competitive problems alleged in the Complaints.

    The DOJ attempts to foreclose any scrutiny at all of its Complaints by simply asserting

that the Court cannot address the "correctness of the Complaints' allegations of geographic

market or competitive harm."  DOJ Response to Comments at 31.  This assertion is facially

wrong.  It is entirely appropriate for the Court, in conducting a public interest analysis of whether

the PAFJs restore the competition the DOJ alleges will be eliminated in its Complaints, to

inquire into the "correctness" of the Complaints' allegations of competitive harm.  Indeed, it

would seem impossible for the Court to satisfy itself that the proposed remedies cured the harms

alleged in the Complaints, if the Court had reason to question whether the harms alleged in the Complaints had evidentiary support in the first instance.

This question of evidentiary support seems especially relevant in the present case.  It is by no means a "stretch" to question whether—upon hearing that the parties were willing to sign a decree—the DOJ then drew their Complaints to correspond to the relief offered.  This question survives because neither the Complaints, nor the remedies, have any internal integrity.  In other words, neither document contains a cogent Merger Guidelines, or Merger Remedy Guidelines analysis. Moreover, commenter ACTel has exposed misleading inaccuracies in the Complaints that the DOJ quite obviously did not know about or explain in its original Complaints.  Further, the DOJ is obviously scrambling for an *ex post* justification for why its Complaints do not include all of the Defendants' 2-to-1 buildings.   It is also telling that the DOJ is completely unable and/or unwilling to defend the Complaints with evidence, or even a sworn declaration.

The DOJ's Response to Comments exposes some fairly significant flaws, like the ones mentioned above, in the reasoning behind its theory of harm and theory of relief.  COMPTEL will highlight a few of these inconsistencies to show the Court that entry of the PAFJs is not in the public interest.

**A.**     ***The DOJ Fails to Explain that It Intended to Omit Specific 2:1 Buildings from Its Complaint***

In response to ACTel's concern that the proposed decrees do not even cover all of the Defendants' 2-to-1 buildings, DOJ claims that

> [n]owhere do the Complaints state that there would be competitive harm in all 2-to-1 buildings, nor would the facts support such an allegation.  One reason is that for some of the 2-to-1 buildings entry would be likely in response to a post-merger price increase.

DOJ Response to Comments at 21, citing ¶ 29 of the Complaints. Those paragraphs state that while entry "may occur" in some 2-to-1 buildings, "entry is unlikely to eliminate the competitive harm that would likely result from the proposed merger." Complaints at ¶ 29. The reasonable construction of those paragraphs is that 2-to-1 buildings, in general, are likely to cause competitive concerns that are unlikely to be ameliorated by post-merger entry.

Moreover, while the DOJ equivocally allows that post-merger entry may occur in some of these buildings, it does not assert that it has some way of discerning which 2-to-1 buildings should be omitted from the decrees. Indeed, in neither the Complaints nor the CIS does the DOJ even imply that it has identified in advance a set of 2-to-1 buildings that will be so likely to attract timely entry, sufficient to defeat a post-merger price increase, that these buildings should be eliminated from the decrees. The DOJ now contends that it decided which buildings should be subject to divestiture by comparing multiple carriers' building lists, fiber maps, mapping software, and building demand to determine if there were 2-to-1 buildings where entry was likely, even post-merger. DOJ Response to Comments at 24.

**B.**     ***The DOJ Fails to Address COMPTEL's Comments***

The DOJ fails to address COMPTEL's comments in several significant ways: 1) the DOJ dismisses COMPTEL's questions about the proper geographic market definition left vague in the Complaints and unexplained in the CIS (this is a legitimate question with direct implications regarding the adequacy of the proposed remedy); 2) the DOJ fails to explain why it departed so substantially from the remedy it was ready to mandate in the Qwest/Allegiance Merger only one year prior to the announcement of the present mergers; 3) the DOJ fails to adequately address COMPTEL's concerns that the proposed remedies will harm its members by enhancing the potential for increased private line price coordination in the private line market for both post-

merger firms, and, finally; 4) the DOJ fails to adequately respond to COMPTEL's concerns that the leasehold interests offered as "divestiture assets" will be insufficient to replace the premerger competitive vigor of AT&T and MCI in the wholesale private line markets.

>   1.    Geographic Market Definition Is Central to the Court's Ability to Evaluate the Adequacy of the Proposed Remedies

In its comments, COMPTEL asks why buildings are geographic markets.  After all, there are plenty of restaurant buildings where a customer can only get Coke or Pepsi products, yet this does not mean that each building is a geographic market.  During the entire relevant period, Defendants SBC and Verizon were dominant common carriers with respect to local private line service and, as a result, were required to file tariffs for these services with the Federal Communications Commission.  Nonetheless, the DOJ has produced no tariff demonstrating that prices were set by Verizon or SBC on a building-specific basis.  Indeed, while alleging anticompetitive harm in markets as broad as an entire metropolitan area, the relief proposed is building-specific, with no explanation how competitors as large and active as AT&T and MCI can be replaced by "8 strands of fiber" in selected buildings.  One reason that the DOJ may not have alleged that these are markets where price discrimination is possible is that the DOJ would have had to answer some uncomfortable questions.  For example, the DOJ's recently-released "Commentary" on the Horizontal Merger Guidelines notes that when price discrimination becomes a consideration in whether to define a narrow geographic market,

> [t]he Agencies address the same basic issues for any form of discrimination: Would price discrimination, if feasible, permit a significantly greater exercise of market power?  Could competitors successfully identify the transactions to be discriminated against?  *Would customers or third parties be able to undermine substantially the discrimination through some form of arbitrage in which a product sold at lower prices to some customer groups is resold to customer groups intended by the firms to pay higher prices?*

U.S. DOJ/FTC Commentary on the Horizontal Merger Guidelines at 8 (emphasis added)

available at http://www.usdoj.gov/atr/public/guidelines/215247.htm.  This last question would be

especially uncomfortable for DOJ because it could produce no evidence of building-specific

price discrimination—even in Verizon and SBC buildings that pre-merger AT&T and MCI did

not serve with their own facilities.

As COMPTEL explained in its comments, and the DOJ ignores in its Response to

Comments,

> Notably, AT&T and MCI were two of the largest purchasers of wholesale special
> access services in the territory served by SBC and Verizon and, as such, were able
> to take advantage of SBC's and Verizon's volume discount pricing strategies to
> achieve lower special access prices than other competitors.  Because end-user
> customer's typically contract for retail service at multiple locations, AT&T and/or
> MCI would be able to bid on such contracts using a blend of their own facilities
> and the heavily discounted special access facilities they leased from SBC and
> Verizon.

COMPTEL Comments at 17.  Thus, COMPTEL explained, using the DOJ's own analytical

framework, why building-specific geographic markets was not supported by the evidence in this

case.  The DOJ's assertion that the Farrell Declaration, which COMPTEL submitted as Exhibit E

to its comments, supports the DOJ's view of building-specific markets is a gross

mischaracterization.  DOJ Response to Comments at 31, n. 52.  Professor Farrell says precisely

the opposite,[9] based on the Defendant's actual sales contracts, and the DOJ has not produced one

contract to support its contentions.

Similarly, the DOJ's assertion that AT&T private line revenues were *de minimis*,

compared with SBC's sales, is incredibly misleading.  As COMPTEL explained in its comments,

---

[9]     Professor Farrell actually states that, "SBC's pricing does not fully respond to such granular competitive
conditions, building by building . . . ."  Farrell Declaration at ¶ 15 (available at Attachment B to COMPTEL's public
interest comments) and "[SBC's special access contracts] link[] special access pricing in different buildings, and . . .
argues for a region-wide market definition because. . . it can make region-wide concentration a more import
determinant of competitive behavior and pricing than concentration and entry possibilities specific to buildings or
routes."  Farrell Declaration at ¶ 16.

and the DOJ ignored, AT&T was the largest purchaser of SBC special access, which it then resold to other carriers—thus defeating the ability of SBC to practice building-specific price discrimination.  If, post-merger, SBC/AT&T and Verizon/MCI are able to practice building-specific price discrimination, then the Complaints severely understate the competitive effect of pre-merger AT&T and MCI in the private line market and the PAFJs come nowhere close to restoring the competition lost by the elimination of AT&T and MCI from the market.

> 2.     The DOJ Fails to Explain Why It Abandoned the Qwest/Allegiance Divestiture Remedy It Was Willing to Impose Only One Year Prior to the Announcement of the Present Mergers

COMPTEL included with its Comments a consent decree signed by the DOJ only one year prior to these mergers being announced that would have required Qwest—the nation's smallest Bell Operating Company—to divest all of the in-region assets, customers, and employees of Allegiance, a much smaller competitor than either AT&T or MCI, as a condition of their merger.  The Qwest decree seemed very consistent with the DOJ's policy statements on merger remedies, and so COMPTEL merely asked, "what happened?"  The DOJ did not respond at all to COMPTEL's question about its departure from precedent that would seem to be so specifically on point.  The DOJ merely repeated passages from the Remedy Guidelines that they were not binding statements of policy, and that the real competitive harm in this instance—the 2-to-1 buildings (or at least some of them) were addressed in the decrees.

> 3.     The DOJ Did Not Respond to COMPTEL's Concern that the PAFJ's Would Facilitate Coordinated Behavior in Critical Input Markets to the Detriment of COMPTEL Members

In its comments, COMPTEL explained in thorough detail how the discount structure in both the SBC and Verizon special access contracts made each firm even more dependent on the other, post merger, and that this enhanced mutual interdependence created a tremendous

disincentive for either AT&T (in Verizon's ILEC region), or MCI (in SBC's ILEC region) to be an aggressive wholesaler of access services the way they were pre-merger.  The reason for this is that, since the DOJ is allowing the acquiring firms to retain all of the competitive carriers' assets "in-region" and each carrier has a significant dependence—through contracts that encourage the transfer of significant portions of demand (not just significant volumes) to the dominant incumbent local exchange carrier in exchange for somewhat higher discounts—on the other dominant incumbent, then each incumbent is in a better position to monitor the wholesale and retail pricing of the smaller rival in its region.  Consequently, decisions by the out of region firm to aggressively wholesale private line service to competitive carriers, could be met with similar price-cutting in that firm's dominant market, or the dominant firm supplier could simply raise rates to the affiliates (e.g., wireless affiliates) of the price-cutting maverick.  COMPTEL Comments at 27-33.

The DOJ fails completely to respond to this concern.  In note 71, the DOJ erroneously asserts that COMPTEL's sole basis for this concern depends on Verizon/MCI purchasing SBC/AT&T's "divested" facilities and vice versa.  Response to Comments at 44 n.71.  This is simply incorrect.  While COMPTEL did posit that such an outcome would further exacerbate post-merger coordination between SBC/AT&T and Verizon/MCI, this concern was never the "sole basis" for COMPTEL's concern, as the DOJ incorrectly notes.

### C.     *The Mere Presence of a Purchaser Does Not Vindicate the DOJ's Remedy*

The DOJ dismisses most of the concerns raised by public commenters about the ability of limited leases of unused fiber to replace the pre-merger competitive presence of AT&T and MCI—two companies with annual revenues well into the tens of billions of dollars—based on the fact that competitive carriers have shown an interest in leasing the facilities.  The DOJ knows

better than to assert that simply because some asset will clear the market at some price, that the asset will be enough to allow the purchaser to "replac[e] the competitive intensity lost as a result of the merger. . . ."  Merger Remedies Guide at 5.   The DOJ itself has cautioned that "at the right price, a purchaser may be willing to purchase these assets even if they are insufficient to produce competition at the premerger level."  *Id.* at 13.

## CONCLUSION

The DOJ has been openly contemptuous of the obligations that Congress has placed on it, and this Court through the 2004 Tunney Act Reform.  As a result, the DOJ has not even tried to satisfy its own obligations under the Tunney Act.  By refusing to provide documents or other materials on which it relied in creating its remedy, and by refusing to candidly discuss other alternatives to the proposed remedy that it may have also considered, the DOJ has given the Court no information on which to conduct a meaningful, independent Tunney Act Review.  The DOJ has also failed to respond to public concerns in any meaningful way.  As a result, the Court must reject the PAFJs as inconsistent with the public interest.

Dated: April 6, 2006

Respectfully submitted,

Kevin R. Sullivan (D.C. Bar No. 411718)
Peter M. Todaro (D.C. Bar. No. 455430)
King & Spalding LLP
1700 Pennsylvania Avenue N.W.,
Washington, D.C. 20006
(202) 737-0500
(202) 626-3737 (fax)

Jonathan D. Lee (D.C. Bar No. 435586)
Sr. Vice President, Regulatory Affairs
COMPTEL
1900 M Street N.W., Suite 800
Washington, D.C. 20036
(202) 296-6650
(202) 296-7585 (fax)

*Attorneys for Proposed Intervenor*
*COMPTEL*