# EXHIBIT A

*150 Cong Rec H 3654, ***

CONGRESSIONAL RECORD -- *HOUSE*

Wednesday, June 02, 2004

108th Congress, 2nd Session

150 Cong Rec H 3654

Subtitle B_**Tunney Act Reform**

SEC. 221. PUBLIC INTEREST DETERMINATION.

(a) Congressional Findings and Declaration of Purposes._

(1) Findings._Congress finds that_

(A) the purpose of the Tunney Act was to ensure that the entry of antitrust consent judgments is in the public interest; and

(B) it would misconstrue the meaning and Congressional intent in enacting the Tunney Act to limit the discretion of district courts to review antitrust consent judgments solely to determining whether entry of those consent judgments would make a "mockery of the judicial function".

(2) Purposes._The purpose of this section is to effectuate the original Congressional intent in enacting the Tunney Act and to ensure that United States settlements of civil antitrust suits are in the public interest.

(b) Public Interest Determination._Section 5 of the Clayton Act (15 U.S.C. 16) is amended_

(1) in subsection (d), by inserting at the end the following: "Upon application by the United States, the district court may, for good cause (based on a finding that the expense of publication in the Federal Register exceeds the public interest benefits to be gained from such publication), authorize an alternative method of public dissemination of the public comments received and the response to those comments.";

(2) in subsection (e)_

(A) in the matter before paragraph (1), by_

(i) striking "court may" and inserting "court shall"; and

(ii) inserting "(1)" before "Before"; and

(B) striking paragraphs (1) and (2) and inserting the following:

"(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

"(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

"(2) Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene."; and

(3) in subsection (g), by inserting "by any officer, director, employee, or agent of such defendant" before ", or other person".

**RELEVANT PARTS IN BOLD**

**Mr. SENSENBRENNER** . Mr. Speaker, I yield myself such time as I may consume.

Mr. Speaker, I rise in support of H.R. 1086, the Standards Development Organization Advancement Act of 2003. This legislation contains several important revisions to America's antitrust laws.

Pursuant to the general leave already granted, I will be placing into the Record a statement of legislative history that the gentleman from Michigan (Mr. Conyers) and I have agreed to, and I ask that it appear in the Record at the end of my statement.

Supplemental Legislative History for H.R. 1086, the "Standards Development Organization Advancement Act of 2003" as Enrolled by the House and Senate

When the House passed H.R. 1086, the "Standards Development Organization Advancement Act of 2003," it only contained provisions directed at including standards-development activities undertaken by certain standards development organizations (SDOs) within the treatment accorded certain joint ventures by the National Cooperative Research and Production Act "NCRPA." The Senate-passed version of H.R. 1086, which substantially incorporates the provisions of the House-passed version in its Title I, also contains an additional title, the "Antitrust Criminal Penalty Enhancement and Reform Act of 2003." The following legislative history is submitted on behalf of the House Committee on the Judiciary jointly by Chairman Sensenbrenner and Ranking Member Conyers:

Section-by-Section Analysis of H.R. 1086

title I_"standards development organization advancement act of 2003"

Section 101 contains the short title.

Section 102 sets forth the findings and purposes of the bill as they relate to standards development activities and standards development organizations (SDOs). The findings explain the purpose(s) behind the original enactment and subsequent

amendment of the National Cooperative Research and Production Act (NCRPA). The findings also discuss how passage of the National Technology Transfer and Advancement Act of 1995 (NTTAA) unintentionally heightened the vulnerability of SDOs to antitrust litigation. The findings also explain how SDOs generally do not stand to benefit from any antitrust violation that might occur during the voluntary consensus standards development process. Finally, this section finds that continuing to subject SDOs to potential treble damages liability under the antitrust laws could impede pro-competitive standards development activity.

Section 103 adds to the existing definitions contained in section 2 of the NCRPA: The term "standards development activity" is defined as "any action taken by a standards development organization for the purpose of developing, promulgating, revising, amending, reissuing, interpreting, or otherwise maintaining a voluntary consensus standard, or using such standard in conformity assessment activities, including actions relating to the intellectual property policies of the standards development organization." The definition of "standards development activity" excludes the following activities: exchanges of information, including competitively-sensitive information, among competitors relating to cost, sales, profitability, prices, marketing, or distribution of any product, process, or service that is not reasonably required in order to develop or promulgate a voluntary consensus standard or in order to use the standard in conformity assessment activities; agreements or other conduct that would allocate a market among competitors; and agreements or conspiracies that would set or restrain prices of any good or service.

The definition of "standards development activity" is broad enough to encompass any action taken by an SDO in "developing, promulgating, revising, amending. reissuing, interpreting or otherwise maintaining a voluntary consensus standard, or using such standard in conformity assessment activities, including actions relating to the intellectual property policies of the SDO." The "Standards Development Organization Advancement Act of 2003" is not intended to change or influence existing intellectually property policies currently utilized by various SDOs (including but not limited to, patent searches), nor to affect or influence new intellectual property policies that may be developed in the future. Such policies are vitally important to ensuring a level playing field among all users of a standard that incorporates patented technology. In addition, the legislation is not intended to change or alter the application of existing antitrust laws with respect to intellectual property. The legislation also seeks to encourage disclosure by intellectual property rights owners of relevant intellectual property rights and proposed licensing terms. It further encourages discussion among intellectual property rights owners and other interested standards participants regarding the terms under which relevant intellectual property rights would be made available for use in conjunction with the standard or proposed standard.

The term "standards development organization" is defined as "a domestic or international organization that plans, develops, establishes or coordinates voluntary consensus standards . . . in a manner consistent with Office Management and Budget (OMB) Circular Number A-119, as revised on February 10, 1998." The definition includes only the voluntary consensus standards body conducting the particular standards development activity, and does not include firms participating in the standards development activity.

The term "technical standard" is defined by reference to section 12(d)(4) of the NTTAA. The term "voluntary consensus standard" is defined with reference to revised

OMB Circular A-119.

Section 104 amends section 3 of the NCRPA to apply the rule of reason standard to SDOs with respect to covered standards development activities in which they are engaged.

Section 105 amends section 4 of the NCRPA to include properly structured standard-setting activity undertaken by SDOs as eligible for the protections set forth in that section, provided that such activities have been previously disclosed to the antitrust agencies in  **[*H3658]**
accordance with the requirements of the NCRPA, as amended.

Section 106 amends section 5 of the NCRPA to include SDOs, in their involvement in covered standards development activities, within the scope of the NCRPA scheme for awarding attorneys' fees to substantially prevailing parties.

Section 107 amends section 6 of the NCRPA to apply the same disclosure requirements to SDOs as a condition for obtaining the detrebling of damages. In order to obtain the detrebling, the required disclosures must occur not later than 90 days after either the date the SDO commences the standards development activity or the date H.R. 1086 is enacted, whichever is later.

Section 108 provides that the legislation shall not be construed to alter or modify the antitrust treatment of parties participating in a covered standards development activity, except for the SDO conducting the activity, nor of anyone engaged in standard-setting processes that are not within the scope of the legislation.

   title II_"antitrust criminal penalty enhancement and reform act of 2003"

   Subtitle A_Antitrust Enforcement Enhancements and Cooperation Incentives

Section 201 contains the short title.

Sections 211-214 strengthen the Antitrust Division's corporate criminal leniency program, by providing that an antitrust leniency applicant who cooperates satisfactorily with the Division in its criminal investigation and prosecution can also receive limited damages exposure in a related private civil action in exchange for satisfactorily cooperating with the private plaintiffs. As Senator Kohl, the co-sponsor of ◆ S. 1797 (which included the leniency provisions) stated, these provisions "will remove a significant disincentive to those who would be likely to seek criminal amnesty and should result in a substantial increase in the number of antitrust conspiracies being detected." (Statement of Senator Kohl (co-sponsor of S. 1797) upon introduction of the measure, 149 Cong. Rec. S13520 (daily ed. October 29, 2003)).

Section 211 states that sections 211-214 of the title shall sunset five years after the date of enactment, except with respect to "an applicant who has entered into an antitrust leniency agreement on or before" the sunset date.

Section 212, defines: "Antitrust Division" as "the United States Department of Justice Antitrust Division"; "antitrust leniency agreement" as "a leniency letter agreement, whether conditional or final, between a person and the Antitrust Division pursuant to the Corporate Leniency Policy of the Antitrust Division in effect on the date of

execution of the agreement; "antitrust leniency applicant" as "the person who has entered into the agreement" described above; "claimant" as a "person or class that has brought, or on whose behalf has been brought, a civil action alleging a violation of section 1 or 3 of the Sherman Act (Section 1 of the Sherman Act (15 U.S.C. 1) prohibits contracts or combinations in restraint of trade; section 3 (15 U.S.C. 3) applies 1 to the District of Columbia and to territories) or any similar State law," but specifically excludes plaintiffs who are states or subdivisions of states with respect to civil actions brought to recover damages sustained by the state or subdivision (i.e., civil actions not brought as parens patriae); "cooperating individual" as "a current or former director, officer, or employee of the antitrust leniency applicant who is covered by the agreement"; and "person" as the term is defined in subsection (a) of the first section of the Clayton Act (15 U.S.C. 12).

Section 213 states that conduct covered by a "currently effective antitrust leniency agreement" will subject an antitrust leniency applicant and its cooperating individuals, as defendants in a private or state enforcement antitrust action, to liability only for the actual portion of damages suffered by the claimant "attributable to the commerce done by the applicant in the goods or services affected by the violation" so long as the court in which the civil action is brought determines "that the applicant or cooperating individual . . . has provided satisfactory cooperation to the claimant. . . ." The section does not alter existing provisions of the antitrust laws with respect to recovery of costs, including reasonable attorneys' fees.

Satisfactory cooperation shall include "providing a full account to the claimant of all facts known to the applicant or cooperating individual . . . that are potentially relevant to the civil action" and "furnishing all documents or other items that are potentially relevant to the civil action . . . that are in the possession, custody, or control of the applicant or cooperating individual . . . wherever they are located." The section's use of the term "potentially relevant" is intended to preclude a parsimonious view of the facts or documents to which a claimant is entitled. Documents or other items in the applicant's possession, custody, or control must be produced even if they are otherwise arguably located outside the jurisdiction of the U.S. courts.

If the leniency applicant has applied for a leniency agreement "after a State, or subdivision of a State, has issued compulsory process in connection with an investigation of allegations of violations of either sections 1 or 3 of the Sherman Act or any similar State law based on conduct covered by the antitrust leniency agreement or after a civil action . . . has been filed," the court must consider the timeliness of the applicant's initial cooperation with the claimant. Thus, this section is not intended to allow antitrust defendants in a private lawsuit or state parens patriae investigation or enforcement action to apply to the Department of Justice at the last minute to avoid full treble-damage liability.

The court in which the civil action is brought is empowered to determine whether the necessary cooperation has occurred. The power of the court is the same whether the court is a state or federal court and whether the antitrust claims have been brought under state or federal laws. That cooperation includes providing full factual disclosure of all facts, documents, or other things that are relevant or potentially relevant. Because many leniency agreements may be with organizations rather than individuals, the section provides that any antitrust leniency applicant must use its "best efforts"to obtain and facilitate cooperation from individuals. Recognizing that there are discovery tools that plaintiffs can use in discovery of entities, this section is

intended to require cooperation of entities in such discovery. For example, under Fed. R. Civ. P. 30(b)(6), a corporation or another entity may be noticed or subpoenaed to provide a corporate representative to testify on its behalf. If the leniency applicant is an organization, individuals employed by the organization may also qualify for reduced private damages exposure if they cooperate to the court's satisfaction.

Section 214 clarifies that the subtitle does not affect the right of the Antitrust Division "to seek a stay or protective order in a civil action based on conduct covered by an antitrust leniency agreement," to prevent the leniency applicant's cooperation "from impairing or impeding" a Division investigation or prosecution. It also states that the subtitle does not create any right to challenge the decision of the Division concerning whether to grant a leniency agreement; nor does it affect the joint and several liability of any of the parties to civil antitrust actions covered by the subtitle other than the "antitrust leniency applicant and cooperating individuals. . . ." In combination with section 213, the rule of construction in this section preserving the application of joint and several liability as to all defendants other than the leniency applicant provides an additional incentive to corporations and individuals who have violated the antitrust laws to be the first to cooperate with the government and private litigants. While the antitrust leniency applicant who cooperates with civil plaintiffs will be liable only for single damages caused by its own unlawful conduct, the remaining defendants will be fully, jointly and severally liable for the treble damages the conspiracy caused, minus only the amount actually paid by the leniency applicant. This could have the effect of increasing the amount of damages the remaining defendants are ultimately required to pay.

Section 215 increases, for violations of sections 1-3 of the Sherman Act, statutory maximum monetary penalties from $350,000 to $1 million for individuals and business organizations other than corporations, and from $10 million to $100 million for corporations; and increases maximum jail sentences from three years to 10 years. These increases reflect Congress' belief that criminal antitrust violations are serious white collar crimes that should be punished in a manner commensurate with other felonies. This section will require the United States Sentencing Commission to revise the existing antitrust sentencing guidelines to increase terms of imprisonment for antitrust violations to reflect the new statutory maximum. No revision in the existing guidelines is called for with respect to fines, as the increases in the Sherman Act statutory maximum fines are intended to permit courts to impose fines for antitrust violations at current Guideline levels without the need to engage in damages litigation during the criminal sentencing process.

For example, Congress does not intend for the Commission to revisit the current presumption that twenty percent of the volume of commerce is an appropriate proxy for the pecuniary loss caused by a criminal antitrust conspiracy. This presumption is sufficiently precise to satisfy the interests of justice, and promotes efficient and predictable imposition of penalties for criminal antitrust violations. Comments to the guidelines provide that if the actual overcharge caused by cartel behavior can be shown to depart substantially from the presumed ten percent overcharge that underlies the twenty percent presumption, this should be considered by the court in setting the fine within the guideline fine range.

## Subtitle B_Tunney Act Reform

**Section 221 makes clear that Congress intends for the district court**

reviewing an antitrust consent decree to go beyond merely considering whether entry of the decree would "make a mockery of the judicial function," (this is currently the standard in the Court of Appeals for the D.C. Circuit) and that the purpose of this section is "to effectuate the original Congressional intent in enacting the Tunney Act. . . ."

The Public Interest Determination provision first amends the existing Tunney Act by allowing, for good cause shown, dissemination of public comments on proposed antitrust consent decrees and responses to them by an alternative to publication in the Federal Register; replaces "may" with "shall" in its directions to district courts reviewing consent decrees; adds to the factors that a reviewing court must consider, in determining whether the proposed decree is in the  [*H3659]
public interest, "whether its terms are ambiguous" and "the impact of entry of such judgment upon competition in the relevant market or markets"; clarifies that nothing in the section shall be construed as requiring the court to hold an evidentiary hearing or to permit anyone to intervene; and specifies that the written or oral communications made on behalf of a defendant, which the defendant is required to describe to the court under section 5(g) of the Clayton Act, include communications "by any officer, director, employee, or agent of such defendant, or other person."

Mr. Speaker, I reserve the balance of my time.

**Mr. SCOTT of Virginia** . Mr. Speaker, I yield myself such time as I may consume.


**Finally, Title II of the bill reforms the Tunney Act to strengthen the Act's requirements that courts review antitrust consent decrees in a meaningful manner, not simply as a rubber stamp to such decrees.**

H.R. 1086 is an important bill that modernizes and enhances enforcement of U.S. antitrust laws. I would like to commend the gentleman from Wisconsin (Chairman Sensenbrenner) and the gentleman from Michigan (Ranking Member Conyers) for their leadership and cooperative efforts on this bill, and I urge my colleagues to support it.

 **Mr. CONYERS** . Mr. Speaker, I rise in support of H.R. 1086, the standards Development Organization Advancement Act of 2003. This measure has enjoyed bipartisan support in the Judiciary Committee, the House, and the Senate. It provides important and significant improvements to our antitrust laws.

**Finally, Title II of the bill reforms the Tunney Act to strengthen the Act's requirement that courts review antitrust consent decrees in a meaningful manner, rather than simply "rubber-stamping" such decrees.**

H.R. 1086 is an important bill that modernizes and enhances the enforcement of U.S. antitrust laws. I'd like to thank the Chairman for his cooperative efforts on this bill and in writing the supplemental legislative history. We worked hard together on both and I'm very proud of the final product. I urge my colleagues to support this bill.

The SPEAKER pro tempore (Mr. Simpson). The question is on the motion offered by the gentleman from Wisconsin (Mr. Sensenbrenner) that the House suspend the rules and concur in the Senate amendment to the bill, H.R. 1086.

The question was taken; and (two-thirds having voted in favor thereof) the rules were suspended and the Senate amendment was concurred in.

A motion to reconsider was laid on the table.

**SUBJECT:** ANTITRUST & TRADE LAW (91%); LEGISLATION (90%); STANDARDS & MEASUREMENTS (90%); US FEDERAL
GOVERNMENT (79%); RESEARCH (79%); PUBLIC FINANCE (59%);

**LOAD-DATE:** June 3, 2004


*150 Cong Rec S 3607, *

CONGRESSIONAL RECORD -- *SENATE*

Friday, April 02, 2004

108th Congress, 2nd Session

150 Cong Rec S 3607

Subtitle B_**Tunney Act Reform**

SEC. 221. PUBLIC INTEREST DETERMINATION.

(a) Congressional Findings and Declaration of Purposes._

(1) Findings._Congress finds that_

(A) the purpose of the Tunney Act was to ensure that the entry of antitrust consent judgments is in the public interest; and

(B) it would misconstrue the meaning and Congressional intent in enacting the Tunney Act to limit the discretion of district courts to review antitrust consent judgments solely to determining whether entry of those consent judgments would make a "mockery of the judicial function".

(2) Purposes._The purpose of this section is to effectuate the original Congressional intent in enacting the Tunney Act and to ensure that United States settlements of civil antitrust suits are in the public interest.

(b) Public Interest Determination._Section 5 of the Clayton Act (15 U.S.C. 16) is amended_

(1) in subsection (d), by inserting at the end the following: "Upon application by the United States, the district court may, for good cause (based on a finding that the

expense of publication in the Federal Register exceeds the public interest benefits to be gained from such publication), authorize an alternative method of public dissemination of the public comments received and the response to those comments.";

(2) in subsection (e)_

(A) in the matter before paragraph (1), by_

(i) striking "court may" and inserting "court shall"; and

(ii) inserting "(1)" before "Before"; and

(B) striking paragraphs (1) and (2) and inserting the following:

"(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

"(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

"(2) Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene."; and

(3) in subsection (g), by inserting "by any officer, director, employee, or agent of such defendant" before ", or other person".

**SUBJECT:**  ANTITRUST & TRADE LAW (89%); STANDARDS & MEASUREMENTS (89%); LEGISLATION (79%); PUBLIC FINANCE (59%); US FEDERAL GOVERNMENT (59%); RESEARCH (59%);

**LOAD-DATE:** April 5, 2004


*150 Cong Rec S 3610, *

CONGRESSIONAL RECORD -- *SENATE*

Friday, April 02, 2004

108th Congress, 2nd Session

150 Cong Rec S 3610


Mr. HATCH . Mr. President, I rise today to support passage of H.R. 1086, the Standards Development Organization Advancement Act of 2003. This legislation,

along with provisions added to it during the Judiciary Committee markup and by the substitute amendment that I have offered along with Senators Leahy, DeWine, and Kohl, provides several important and significant improvements to our antitrust laws.

This legislation incorporates the limited antitrust protection for Standards Development Organizations that Senator Leahy and I introduced as ◆ S. 1799, and that Chairman Sensenbrenner introduced in the House as H.R. 1086. Under this provision, the civil liability for Standards Development Organizations or "SDOs" will be limited to single, rather than treble, damages for standards-setting activities about which they have informed the Department of Justice and Federal Trade Commission using a newly-created notification procedure.

The bill also increases the maximum criminal penalties for antitrust violations so that they are more in line with other comparable white collar crimes. I will note that this provision of the legislation is substantially the same as the one included in ◆ S. 1080, a Leahy-Hatch bill.

This legislation also provides increased incentives for participants in illegal cartels to blow the whistle on their co-conspirators and cooperate with the Justice Department's Antitrust Division in prosecuting the other members of these criminal antitrust conspiracies. This is accomplished by allowing the Justice Department, in appropriate circumstances, to limit a cooperating company's civil liability to actual, rather than treble, damages in return for the company's cooperation in both the resulting criminal case as well as any subsequent civil suit based on the same conduct.

**Finally, this substitute would amend the Tunney Act to end the problem of courts simply "rubber-stamping" antitrust settlements reached with the Justice Department. In my view, this amendment essentially codifies existing case law, while reemphasizing the original congressional intent that lead to passage of the Tunney Act. When this provision was added to H.R. 1086 in the Senate Judiciary Committee, I noted that, although I supported it in principal, I thought that continued modifications of the actual language might be necessary to respond to concerns that had been raised. I am pleased to be able to state that, largely through the efforts of Senator Kohl and his staff, a compromise on this language was reached that is supported_or at least not strongly objected to_by the parties involved.**

With that introduction, I will briefly discuss the four principal sections of the legislation.

**This legislation also amends the Tunney Act to end what some have seen as courts simply "rubber-stamping" antitrust settlements reached with the Justice Department without providing meaningful review. As I have stated, while I agree with the principle behind this proposal, I had significant concerns with the specific language that was reported out of the Judiciary Committee. After several months of discussions, I am happy to say that the current language appears to have answered most, if not all, of the principal concerns that were raised regarding the amendments to the Tunney Act.**

**Mr. LEAHY** . Mr. President, I am delighted that Senator Hatch, Senator Kohl, Senator DeWine, and I have been able to work together to develop a version of this

bill that can pass today as the Standards Development Organization Advancement Act. Technical standards help to promote safety, increase efficiency, and allow for interoperability in a variety of products Americans use every day. Despite the fact that they go largely unnoticed, we would be markedly less safe without airbags that deploy properly in serious automobile collisions, more vulnerable were there not technical standards for fire retardant materials in homes. And consumers would be less likely to make the purchases that drive our economy without the technical standards that ensure a light bulb will fit in its socket or allow DVDs to function properly regardless of the manufacturer.

**Finally, the Standards Development Organization Advancement Act makes some useful adjustments to the Tunney Act. That law provides that consent decrees in civil antitrust cases brought by the United States must be reviewed and approved by the District Court in which the case was brought. Under the Tunney Act, before entering a consent decree, the court must determine that "the entry of such judgment is in the public interest." In making this determination, the court may, but is not required to, consider a variety of enumerated factors. As currently drafted, the court has discretion in making this public interest determination, and some have expressed concerns that this lack of guidance results in courts that are overly deferential to prosecutors' judgments. Thus, this bill intends to explicitly restate the original and intended role of District courts in this process by mandating that the court make an independent judgment based on a series of enumerated factors. In addition, the legislation makes clear that this amendment to the Tunney Act will not change the law regarding whether a court may be required, in a particular instance, to permit intervention or to hold a hearing in a Tunney Act proceeding.**

**Mr. KOHL** . Mr. President, I rise today in strong support of the Antitrust Criminal Penalty Enhancement and Reform Act of 2003. It passed the Judiciary Committee unanimously in November 2003. Today, along with Senators Hatch, Leahy, and DeWine, we offer a substitute amendment to H.R. 1086. This legislation will enhance and improve the enforcement of our nation's antitrust laws in several important respects.

**In light of the importance of this legislation to the administration of our antitrust laws, as well as the infrequency with which we amend major provisions of the antitrust laws, it is essential to describe in detail the reasons we our advancing this bill. Our proposal will accomplish four important goals. First, our legislation will restore the ability of Federal courts to review the Justice Department's civil antitrust settlements to be sure that these settlements are good for competition and consumers. We will amend the Tunney Act, the law passed in 1974 in response to concerns that some of these settlements were motivated by inappropriate political pressure and failed to restore competition or protect consumers. Congress concluded then, and it is still true now, that judicial review will ensure that cases are settled in the public interest. Unfortunately, in recent years, many courts seem to have ignored this statute and do little more than "rubber stamp" antitrust settlements. This practice is contrary to the intent of the Tunney Act and effectively strips the courts of the ability to engage in meaningful review of antitrust settlements. Our bill will overturn this precedent and make clear that the courts have the authority to do this vital**

job.

Second, our legislation enhances criminal penalties for those who violate our antitrust laws. It will increase the maximum corporate penalty from $10 million to $100 million; it will increase the maximum individual fine from $350,000 to $1 million; and it will increase the maximum jail term for individuals who are convicted of criminal antitrust violations from 3 to 10 years. These changes will send the proper message that criminal antitrust violations, crimes such as price fixing and bid rigging, committed by business executives in a boardroom are serious offenses that steal from American consumers just as surely as does a street criminal with a gun.

Our legislation will give the Justice Department significant new tools under its antitrust leniency program. The leniency program helps the Government break up criminal cartels by encouraging wrongdoers to cooperate with the authorities. Our bill will give the Justice Department the ability to offer those applying for leniency the additional reward of only facing actual damages in antitrust civil suits, rather than treble damage liability. This will result in more antitrust wrongdoers coming forward to reveal antitrust conspiracies, and thus the detection and ending of more illegal cartels.

Finally, our bill incorporates a provision in the original House passed version of H.R. 1086. This provision limits the liability that standards setting organizations face under the antitrust laws to single damages in most circumstances. It will protect these important organizations from the threat of liability. However, it will not in any way limit the damages available to any company that is a member of such an organization for antitrust violations, nor limit damages should a standard setting organization engage in conduct that is a per se violation of antitrust law.

It is important to explain clearly and specifically why it is necessary to amend the Tunney Act and what we intend to accomplish with these changes. In recent years, courts have been reluctant to give meaningful review to antitrust consent decrees, and have been only willing to take action with respect to most egregious decrees that  [*S3616] make a "mockery" of the judicial function. Our bill will effectuate the legislative intent of the Tunney Act and restore the ability of courts to give real scrutiny to antitrust consent decree.

The Tunney Act was enacted in 1974 and provides that consent decrees in civil antitrust cases brought by the United States must be reviewed and approved by the district court in which the case was brought to determine if they are in the public interest. However, the text of the statute contains no standards governing how a court is to conduct this review. While the legislative history of the law is clear that it was meant to prevent "judicial rubber stamping" of consent decrees, the leading precedent of the D.C. Circuit Court of Appeals currently interprets the law in a manner which makes meaningful review of these consent decrees virtually impossible. Leading cases stand for the proposition that only consent decrees that "make a mockery of the judicial function" can be rejected by the district court. The changes in the Tunney Act incorporated in this legislation, as well as the statement of Congressional findings, will make clear that such an interpretation misconstrues the legislative intent of the statute.

The amendments to the Tunney Act found in our bill will restore the original intent of the Tunney Act, and make clear that courts should carefully review antitrust consent decrees to ensure that they are in the public interest. It will accomplish this by, No. 1, a clear statement of congressional findings and purposes expressly overruling the improper judicial standard of recent D.C. Circuit decisions; No. 2, by requiring, rather than permitting, judicial review of a list of enumerated factors to determine whether a consent decree is in the public interest; and No. 3, by enhancing the list of factors which the court now must review.

The Tunney Act was enacted in 1974 to end the practice of courts "rubber stamping" antitrust consent decrees, and to remove political influence from the Justice Department's decision as to whether to settle antitrust cases. There were several prominent decisions in the preceding years in which antitrust settlements by the Justice Department came under strong criticism as inadequate or motivated by illegitimate purposes, and which were not scrutinized by the courts. One of the leading early cases applying the Tunney Act noted that

the legislators found that consent decrees often failed to provide appropriate relief, either because of miscalculations by the Justice Department [citation omitted] or because of the "great influence and economic power" wielded by antitrust violators [citing S. Rep. No. 93-298, 93d Cong., 1st Sess. 5 (1973)]. The [legislative] history, indeed, contains references to a number of antitrust settlements deemed "blatantly inequitable and improper" on these bases [citing 119 Cong. Rec. 24598 (1973) (Remarks of Sen. Tunney)].

U.S. v. American Telephone and Telegraph, 552 F.Supp. 131, 148 (D.D.C. 1982), aff'd sub nom., Maryland v. U.S., 460 U. S. 1001 (1983).

While there were several notable cases which gave rise to the concern that the government was settling for inadequate remedies for antitrust violations, see U.S. v. AT&T, 552 F.Supp. at 148 n. 72; 119 Cong. Rec. 24598, Remarks of Sen. Tunney, the most prominent case was the Government's settlement in 1971 of an antitrust suit brought against ITT. Critics alleged that the Nixon administration had been influenced by campaign contributions to the Nixon reelection effort in 1972. The reasons for the settlement were not publicly disclosed, and the settlement was strongly criticized by consumer advocates. The settlement's critics attempted to have the settlement overturned by the district court, but the court rejected these efforts. "[T]here was no meaningful judicial scrutiny of the terms of the consent decree and no consideration of whether it was in the public interest." Anderson, supra, 65 Antitrust Law Journal at 8.

The legislative history of the original Tunney Act is clear that the purpose of the statute was to give courts the opportunity to engage in meaningful scrutiny of antitrust settlements, so as to deter and prevent settlements motivated either by corruption, undue corporate influence, or which were plainly inadequate. In introducing the bill, Senator Tunney highlighted his concern that antitrust settlements could result from the economicpower of the companies under scrutiny. He noted that "[i]ncreasing concentration of

economic power, such as occurred in the flood of conglomerate mergers, carries with it a very tangible threat of concentration of political power. Put simply, the bigger the company, the greater the leverage it has in Washington." 119 Cong. Rec. 3451, Feb. 6, 1973.

Senator Tunney also pointed with concern at the lack of scrutiny the courts were applying to antitrust settlements. He argued that "too often in the past district courts have viewed their rules [sic] as simply ministerial in nature_leaving to the Justice Department the role of determining the adequacy of the judgment from the public's view." Id. at 3542. Thus, his legislation was intended to substantially expand the role of the court in considering an antitrust consent decree. Senator Tunney described the criteria in the bill under which the courts to review the settlements, and stated that

The thrust of those criteria is to demand that the court consider both the narrow and the broad impacts of the decree. Thus, in addition to weighing the merits of the decree from the viewpoint of the relief obtained thereby and its adequacy, the court is directed to give consideration to the relative merits of other alternatives and specifically to the effect of the entry of the decree upon private parties aggrieved by the alleged violations and upon the enforcement of antitrust laws generally.

In a later floor debate on the legislation, Senator Tunney cited the testimony of Judge J. Skelley Wright of the U.S. Court of Appeals for the D.C. Circuit, who had testified at an earlier hearing of the Senate Antitrust and Monopoly Subcommittee expressing concern as to whether antitrust settlements "might shortchange the public interest." 119 Cong. Rec. 24597, July 18, 1973. Commenting on this testimony, Senator Tunney stated that "I think Judge Wright gets to the heart of the problem_it is the excessive secrecy with which many consent decrees have been fashioned, and the almost mechanistic manner in which some courts have been, in effect, willing to rubber stamp consent judgments." Id. at 24598 (emphasis added). The bill passed the Senate that day on a 92 to 8 vote.

The later House debate in which the bill was passed echoed Senator Tunney's concern. Congressman Seiberling of Ohio commented that, in considering antitrust consent decrees, "too often the courts have, in fact, simply rubber-stamped such agreements, and the public or competitors that might be affected have had an effective way to get their views before the court . . ." 120 Cong. Rec. 36341, Nov. 19, 1974. Similar sentiments were expressed by Congressman McClory, id., Congressman Jordan, id. at 36343, and Congressman Heinz, id. at 36341. Congressman Holtzman of New York commented that these procedures would "insure that our antitrust laws are not for sale." Id. at 36342.

The House and Senate Committee Reports on the legislation also echo the floor debate. The Report of the House Judiciary Committee states that

[o]ne of the abuses sought to be remedied by the bill has been called "judicial rubber stamping" by district courts of proposals submitted by the Justice Department. The bill resolves this area of dispute by requiring district court judges to determine that each proposed consent judgment is

in the public interest.

House Rep. No. 93-1463, 93rd Cong., 1st Sess. (1974), reprinted in 1974 U.S. Code Cong. & Admin. News 6535, 6538.

In one of the first cases to construe the statute, the Government's case to break up the AT&T phone monopoly, Judge Greene of the U.S. District Court for the District of Columbia reviewed, and then summarized, the legislative history of the Tunney Act. He concluded that:

To remedy these problems [that led to the passage of the Tunney Act], Congress imposed two major changes in the consent decree process. First, it reduced secrecy by ordering disclosure by the Justice Department of the rationale and the terms of proposed consent decrees and by mandating an opportunity for public comment. Second, it sought to eliminate "'judicial rubber stamping' of proposals submitted to the courts by the Department," by requiring an explicit judicial determination in every case that the proposed decree was in the public interest. It is clear that Congress wanted the courts to act as an independent check upon the terms of decrees negotiated by the Department of Justice. . . .

U.S. v. AT&T, 552 F. Supp. at 148-149 (emphasis added) (citations omitted).

This conclusion is supported by a recent law journal article co-authored by [*S3617] John J. Flynn, who was special counsel to the Senate Antitrust Subcommittee during the period when the Tunney Act was drafted and adopted. Professor Flynn writes that, in enacting the Tunney Act, Congress rejected the "notion that courts must give deference to the DOJ when determining if a consent decree is in the public interest. Instead, Congress wanted the courts to make an independent, objective, and active determination without deference to the DOJ." Flynn and Bush, The Misuse and Abuse of the Tunney Act: The Adverse Consequences of the "Microsoft Fallacies", 34 Loyola U. Chicago L. J. 749, 758 (2003).

The early case law that followed the adoption of the Tunney Act in 1974 imposed fairly stringent requirements on courts reviewing antitrust settlements reached by the Justice Department.

The leading early case is the district court's review of the Government's proposed settlement with AT&T in the massive antitrust case that broke up the telephone monopoly, U.S. v. AT&T, supra (D.D.C. 1983). Judge Greene of the U.S. District Court for the District of Columbia rejected an argument for a highly deferential review of the proposed consent decree. The court stated that

It does not follow . . . that courts must unquestionably accept a proffered decree as long as it somehow, and however inadequately, deals with the antitrust and other public policy problems implicated in the lawsuit. To do so would be to revert to the "rubber stamp" role which was at the crux of the congressional concerns when the Tunney Act became law.

U.S. v. AT&T, 552 F. Supp. at 151.

Instead the standard the court applied to determine if the public interest was served by the consent decree was rather exacting. The court stated it would only enter the proposed consent decree "if the decree meets the requirements for an antitrust remedy that is, if it effectively opens the relevant markets to competition and prevents the recurrence of anticompetitive activity, all without imposing undue and unnecessary burdens upon other aspects of the public interest." Id. at 153.

The more recent precedent under the Tunney Act have sharply retreated from Judge Green's opinion in AT&T to a much more deferential standard of review. It is this misinterpretation of the Tunney Act that our bill corrects. In describing the recent Tunney Act precedent, one commentator has called it a "retreat toward rubber stamping." Anderson, supra, 65 Antitrust Law Journal at 19. We agree. It is this overly deferential standard review which makes reform of the Tunney Act necessary so that the legislative intent can be effectuated and courts can provide an independent safeguard to prevent against improper or inadequate settlements. The changes we make to the Tunney Act today address these problems and correct the mistaken precedents.

The precedent continues to recognize that the Tunney Act is intended "to prevent "judicial rubber stamping' of the Justice Department's proposed consent decree," and for the court to "'make an independent determination as to whether or not entry of a proposed consent decree [was] in the public interest.'" U.S. v. Microsoft, 56 F.3d 1448, 1458 (D.C. Cir. 1995), quoting S. Rep. No. 298 at 5. Further, in reviewing the proposed consent decree, the court should inquire into "the purpose, meaning, and efficacy of the decree." Microsoft, 56 F.3d at 1463.

However, these same decisions improperly and strictly circumscribe the role of the trial court and give it little leeway to fail to approve an antitrust consent decree. The D.C. Circuit has stated that:

[T]he district judge is not obligated to accept [an antitrust consent decree] that, on its face and even after government explanation, appears to make a mockery of judicial power. Short of that eventuality, the Tunney Act cannot be interpreted as an authorization for a district judge to assume the role of Attorney General.

Id., 56 F.3d at 1462 (emphasis added). In other words, under this precedent, unless the proposed decree would "make a mockery of judicial power," the consent decree must be entered by the Court. In another portion of this opinion, in language much cited by lower courts, the D.C. Circuit held that the court should not insist that the consent decree is the one that will "best serve society," but only confirm that the resulting settlement is "within the reaches of the public interest." Id. at 1460, citations omitted; emphasis in original.

In a subsequent decision, the D.C. Circuit summarized a district court's review under the Tunney Act, as follows:

The district court must examine the decree in light of the violations charged

in the complaint and should withhold approval only if any of the terms appear ambiguous, if the enforcement mechanism is inadequate, if third parties will be positively injured, or if the decree otherwise makes "a mockery of judicial power."

Massachusetts School of Law v. U.S., 118 F.3d 776, 783 (D.C. Cir. 1997) (emphasis added) (quoting Microsoft, 56 F.3d at 1462). This is plainly quite a limited standard of review, which contains no admonition to review the likely effects of the consent decree on competition, and makes it very unlikely that a court would fail to enter almost any consent decree.

In the opinion of a leading academic commentator on the Tunney Act,

the court of appeals in Microsoft made a potentially serious mistake by formulating a rule that, so long as procedural niceties are followed, all antitrust consent decrees must be approved unless they are a "mockery." Once the real threat of meaningful scrutiny is eliminated, the benefits of deterrence and mediation would be destroyed and the Tunney Act would be nullified.

Anderson, supra, 65 Antitrust Law Journal at 38. Professor Flynn, who was involved in drafting the Tunney Act, agrees with this criticism of the D.C. Circuit's approach. Professor Flynn states that "from the language of the Tunney Act and its legislative history, this is precisely the sort of deferential standard the drafters of the Tunney Act did not want. . . . [T]he D.C. Circuit chose to ignore the legislative intent and cast judicial review of consent decrees back to the days when rubber-stamping was prevalent." Flynn and Bush, supra, 34 Loyola U. Chi. L. J. at 780-781.

As originally written, the Tunney Act serves two goals deterrence and mediation. The prospect of judicial scrutiny deters the Justice Department from heeding political pressure to enter into a "sweetheart" settlement. And real Tunney Act review also provides an opportunity for a judge to act as a mediator, obtaining modifications to deficient settlements. As Professor Anderson points out, "[i]f the government and antitrust defendants come to perceive that meaningful [judicial] scrutiny is not a real threat, the door will be wide open for attempts to swing sweetheart deals and for the public to lose confidence in antitrust enforcement by the government." 65 Antitrust Law Journal at 38.

In sum, as the Tunney Act is currently interpreted, it is difficult if not impossible for courts to exercise meaningful scrutiny of antitrust consent decrees. The "mockery" standard is contrary to the intent of the Tunney Act as found in the legislative history. Our legislation will correct this misinterpretation of the statute. Our legislation will insure that the courts can undertake meaningful and measured scrutiny of antitrustsettlements to insure that they are truly in the public interest, and to remind the courts of Congress' intention in passing the Tunney Act.

In an effort to explain how the revisions to the Tunney Act in H.R. 1086 correct the mistaken standard used by certain courts in applying the law, it is important to describe each of the specific provisions of section 221 of H.R. 1086. Today we have introduced, with Senators Hatch, Leahy, and DeWine,

a Managers' Amendment to H.R. 1086. These comments address H.R. 1086 as amended.

First, section 221(a) of our bill contains Congressional Findings and Declarations of Purposes. These provisions clarify that we are determined to effectuate the original Congressional intent of the Tunney Act. In other words, after the enactment of this legislation, courts will once again independently review antitrust consent decrees to ensure that they are in the public interest. The Congressional Findings expressly state that for a court to limit its review of antitrust consent decrees to the lesser standard of determining whether entry of the consent judgments would make a "mockery of the judicial function" misconstrues the meaning and intent in enacting the Tunney Act. The language quoted paraphrases the D.C. Circuit decisions in [*S3618]
Massachusetts School of Law v. U.S., 118 F.3d 776, 783 (D.C. Cir. 1997) and U.S. v. Microsoft, 56 F.3d 1448, 1462 (D.C. Cir. 1995). To the extent that these precedents are contrary to section 221(a) of our bill regarding the standard of review a court should apply in reviewing consent decrees under the Tunney Act, these decisions are overruled by this legislation. While this legislation is not intended to require a trial de novo of the advisability of antitrust consent decrees or a lengthy and protracted review procedure, it is intended to assure that courts undertake meaningful review of antitrust consent decrees to assure that they are in the public interest and analytically sound.

Section 221(b)(2)(A) of our bill amends the existing subsection of Section 5 of the Clayton Act (codified at 15 U.S.C. 16(e)) containing the requirement that courts review antitrust consent decrees to determine that these consent decrees are in the public interest. Our bill modifies the law by stating that, in making this determination, the court "shall" look at a number of enumerated factors bearing on the competitive impact of the settlement. The current statute merely states that the court "may" review these factors in making its determination. Requiring, rather than permitting, the court to examine these factors will strengthen the review that courts must undertake of consent decrees and will ensure that the court examines each of the factors listed therein. Requiring an examination of these factors is intended to preclude a court from engaging in "rubber stamping" of antitrust consent decrees, but instead to seriously and deliberately consider these factors in the course of determining whether the proposed decree is in the public interest.

Our bill, in section 221(b)(2)(B), also revises and enhances the factors which the court is now required to review in making its public interest determination. In addition to the factors enumerated under current law, the court must examine whether the terms of the proposed decree are ambiguous. While complete precision when dealing with future conduct may be impossible to achieve, an overly ambiguous decree is incapable of being enforced and is therefore ineffective. A mandate to review the impact of entry of the consent judgment upon "competition in the relevant market or markets" is also added by our bill. This will ensure that the Tunney Act review is properly focused on the likely competitive impact of the judgment, rather than extraneous factors irrelevant to the purposes of antitrust enforcement. Finally, this list is not intended to be exclusive, as the court is

directed to review any other competitive consideration "that the court deems necessary to a determination of whether the consent judgment is in the public interest."

Under the existing statute, the trial court is granted broad discretion as to how to conduct Tunney Act proceedings. Our amendments make no changes to these procedures. In deciding whether to approve the consent decree, the court may, but is not required to, hold a hearing on the proposed decree. Id. 16(f). In such a hearing, the court may take the testimony of Government officials or expert witnesses. The court may also take testimony from witnesses or other "interested persons or agencies" and examine documents relevant to the case. The court may also review the public comments filed during the sixty-day period pursuant to the Tunney Act. In addition, the court may appoint a special master or outside consultants as it deems appropriate. Finally, the court is granted the discretion to "take such other action in the public interest as the court may deem appropriate." Id. While the court may do any of the preceding, it is not required to follow any of these procedures.

Our amendments to section five of the Clayton Act add language stating that nothing in that section will be "construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." This language is not intended to make any changes to existing law, but merely to restate the current interpretation of the law. Under the statute, the court is not required to conduct an evidentiary hearing, but is permitted to do so or to take testimony if it wishes to do so. See 15 U.S.C. 16(f). This will remain the procedure, a court will be permitted, but not required, to conduct evidentiary hearings in making its Tunney Act determination. Additionally, the statute currently permits in 15 U.S.C. 16(f)(3) intervention by interested parties in the Tunney Act review proceeding. This will remain the procedure a court will be permitted, but not required, to allow parties to intervene.

Our amendments also make two other minor and technical changes to Tunney Act procedures. First, section 221(b)(1) of the bill permits the district court to authorize an alternative means of publication, rather than publication in the Federal Register, of the public comments received in response to the announcement of the proposed consent decree. A court may only authorize such alternative means of publication if it finds the expense of Federal Register publication exceeds the public interest benefits to be gained from such publication. This provision is intended to avoid unnecessary expense in publishing proposed consent decrees if alternate means are available, such as, for example, posting the proposed decrees electronically, which are sufficient to inform interested persons of the proposed consent decree.

The second technical amendment, found in section 221(b)(3) of our bill, amends the provision of the Tunney Act codified in 15 U.S.C. 16(g) which requires that defendants notify the court of all communications with the Government relevant to the consent decree, except for communications between the defendant's counsel of record and the Justice Department. Our bill adds language which clarifies the statute's language to make clear that only communications with the defendant, or any officer, director, employee,

**or agent of such defendant, or other person representing the defendant must be disclosed. The defendant is not required to disclose contacts with the Government concerning the settlement by persons not affiliated with, representing, or acting on behalf of the defendant, for example, competitors of the defendant. The defendant's obligation to disclose contacts by agents or persons representing the defendant, including outside lobbyists, is unaffected by this technical change.**

**In sum, our bill will mandate that courts engage in meaningful review of the Justice Department's antitrust consent decrees and not merely "rubber stamp" the decrees. It will make clear that it is a misinterpretation of the Tunney Act to limit a court's review to limit judicial review of these consent decrees to whether they make a mockery of judicial function, and therefore overrule recent D.C. Circuit decisions holding to the contrary. The bill is expressly intended to effectuate the legislative intent of the Tunney Act and ensure the ability of courts to effectively review consent decrees to ensure that they are in the public interest. It will require, rather than permit, a court to review a list of enumerated factors to determine whether a consent decree is in the public interest. By restoring a robust and meaningful standard of judicial review, our bill will ensure that the Justice Department's antitrust consent decrees are in the best interests of consumers and competition.**

**Mr. DeWine** . Mr. President, I rise today, along with Senator Hatch, Senator Leahy and Senator Kohl, as a sponsor of H.R. 1086, the Standards Development Organization Advancement Act of 2003. H.R. 1086 was passed unanimously by the Judiciary Committee in November 2003, and I am proud to say that H.R. 1086 encompasses many of the provisions of ◆ S. 1797, the Antitrust Criminal Penalty Enhancement and Reform Act of 2003, which Senator Kohl and I introduced in October 2003. H.R. 1086 is a comprehensive bill that will enhance and improve the enforcement of U.S. antitrust law in four key areas.

 **Third, H.R. 1086 addresses a concern raised recently by a string of court opinions that appear to limit the depth of review required by the Tunney Act. In brief, the Tunney Act requires that prior to implementing an antitrust consent decree a court must review that decree to assure that it is in the public interest; historically, that requirement has been understood to require that the courts engage in more than merely "rubber-stamping" those decrees. A number of recent opinions have led some to question the depth of review required by the Tunney Act. This bill makes clear that the Tunney Act requires what it has always required, and that mere rubber-stamping is not acceptable. In addition, H.R. 1086 makes a small number of minor modifications and revisions to ensure both that the Tunney Act accurately reflects its original intent and that it effectively functions in the modern legal and economic environment.**

 In all of these ways, H.R. 1086 modernizes and enhances the enforcement of U.S. antitrust laws, and I am proud to sponsor it.

Mr. McCONNELL. I ask unanimous consent that the Hatch-Leahy amendment at the desk be agreed to, the committee-reported substitute, as amended, be agreed to, the bill, as amended, be read a third time and passed, the motions to reconsider be

laid upon the table en bloc, and any statements relating to the bill be printed in the Record.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment (No. 3010) was agreed to.

(The amendment is printed in today's Record under "Text of Amendments.")

The committee amendment, in the nature of a substitute, as amended, was agreed to.

The bill (H.R. 1086), as amended, was read the third time and passed.

**SUBJECT:**  ANTITRUST & TRADE LAW (91%); LEGISLATION (90%); STANDARDS & MEASUREMENTS (90%); RESEARCH (79%); US FEDERAL GOVERNMENT (59%);

**LOAD-DATE:** April 5, 2004