# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>SBC Communications, Inc. and<br>AT&T Corp.,<br><br>　　　　　　　Defendants. | Civil Action No.: 1:05CV02102 (EGS) |
| United States of America,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>Verizon Communications Inc. and<br>MCI, Inc.,<br><br>　　　　　　　Defendants. | Civil Action No.: 1:05CV02103 (EGS) |

**REPLY OF THE UNITED STATES TO COMPTEL'S OPPOSITION TO THE UNITED STATES' MOTION FOR ENTRY OF THE FINAL JUDGMENTS**

The proposed Final Judgments in these matters fall within the reaches of the public interest, and nothing in COMPTEL's Opposition to the United States' Motion for Entry of the Final Judgments warrants a contrary conclusion. Accordingly, the Court should enter the proposed Final Judgments.

I.   **The United States Has Correctly Stated the Standard for Determining Whether the Proposed Final Judgments Fall Within the Reaches of the Public Interest**

As the United States explained in earlier filings, the Tunney Act, 15 U.S.C. § 16(e) (as amended), requires a court to find that entry of a proposed antitrust consent decree would be in the "public interest" before entering it, and, in making that determination, to consider specified factors relating to "the competitive impact of such judgment" and the "impact of entry of such judgment upon competition in the relevant market or markets." A court's statutory review is important, but nevertheless limited in scope by the Constitution and federal statute. In particular, the focus of the review is on "such judgment" – the one the United States proposes – not on some other proposal. And that judgment is evaluated in the context of the complaint filed by the United States – not some other hypothetical complaint.[1] The only question before this Court is whether the proposed decree adequately remedies the complaint's alleged competitive harm so as to fall within the reaches of the public interest. COMPTEL largely ignores the basic Constitutional principle of separation of powers. The United States, acting through the Department of Justice, has the sole power to decide whether to prosecute wrongful conduct.[2] The issue for the Court to review is limited to whether the proposed remedy is in the public interest, in light of the case the United States decided to bring.

---

[1] 15 U.S.C. § 16(e); *see United States v. Microsoft Corp.*, 56 F.3d 1448, 1460-62 (D.C. Cir. 1995); *United States v. BNS Inc.*, 858 F.2d 456, 462 (9th Cir. 1988); *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981); *United States v. AT&T Corp.*, 552 F. Supp. 131, 151 (D.D.C. 1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001. Contrary to COMPTEL's assertions, recent amendments to the Tunney Act do not detract from these precedents. *See infra* pp. 3-5.

[2] The executive branch "has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974).

Largely restating its earlier arguments, COMPTEL claims the United States misstated the standard for Tunney Act review and contends that the 2004 Tunney Act amendments "legislatively overruled" several of the cases the United States cited. As explained in the United States' Response to Public Comments,[3] the text of the 2004 amendments is less sweeping. The amendments modified the list of factors a court is to consider in making its public interest determination, and made judicial consideration of each factor mandatory rather than discretionary.[4] These changes neither suggest that the amendments altered the Tunney Act's fundamental purpose or standard, nor indicate that it would be appropriate for courts to investigate whether the United States should have alleged different harm in its complaint or engage in a wide-ranging search for the relief that would best suit the public.

These amendments neither overrule any cases nor conflict with the case law propositions on which the United States relied. COMPTEL relies not on the amendments themselves, but rather almost entirely on a single Congressional Record statement by one senator, Senator Kohl, in contending that Congress overruled certain decisions.[5] But even Senator Kohl's carefully worded statement does not support COMPTEL's contention. Senator Kohl said only that *"[t]o*

---

[3] Response to Public Comments at 7-13.

[4] The amendments also added a provision making it clear that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2).

[5] One of the other co-sponsors of the legislation, as adopted by the Senate, offers another theory of how to interpret it. Senator Hatch, then chairman of the Senate Committee on the Judiciary, reads the legislation's operative language as codifying the case law. 150 Cong. Rec. S3610, S3613 (daily ed. Apr. 2, 2004).

*the extent that these precedents* [*Microsoft* and *Massachusetts School of Law*[6]] *are contrary to section 221(a) of our bill regarding the standard of review a court should apply in reviewing consent decrees under the Tunney Act, these decisions are overruled by this legislation.*"[7] Section 221(a) contains a "finding" that "it would misconstrue the meaning and Congressional intent in enacting the Tunney Act to limit the discretion of district courts to review antitrust consent judgments solely to determining whether entry of those consent judgments would make a 'mockery of the judicial function.'"[8] However, "these precedents" are not contrary to Section 221(a): as the United States noted earlier,[9] neither *Microsoft* nor *Massachusetts School of Law* (nor any other case) construed the Tunney Act to limit judicial review solely to whether the proposed judgment would make a "mockery of the judicial function."[10] Thus, even if it were entirely correct that a conflict with a congressional finding regarding prior congressional intent would overrule a judicial decision, Senator Kohl's statement does not support the claim that the

---

[6] *Massachusetts School of Law v. United States,* 118 F.3d 776 (D.C. Cir. 1997).

[7] 150 Cong. Rec. S3610-02, S3618 (daily ed. Apr. 2, 2004) (statement of Sen. Kohl) (emphasis added).

[8] Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, § 221(a)(1)(B), 118 Stat. 661, 668 (2004).

[9] Response to Public Comments at 14 n.16.

[10] The Court of Appeals in *Microsoft* specifically stated that "the court can and should inquire . . . into the purpose, meaning, and efficacy of the decree. If the decree is ambiguous, or the district judge can foresee difficulties in implementation, we would expect the court to insist that these matters be attended to. And, certainly, if third parties contend that they would be positively injured by the decree, a district judge might well hesitate before assuming that the decree is appropriate." *Id.* at 1462; *see also Massachusetts Sch. of Law*, 118 F.3d at 783.

amendments "overruled" either *Microsoft* or *Massachusetts School of Law,* much less any other Tunney Act cases.[11]

In any event, both the text of the statute and the case law make clear a court's Tunney Act role: far from playing rubber-stamp, the court is to examine the effect of a proposed antitrust consent decree and determine whether that judgment addresses the harms alleged in the complaint and therefore falls within the reaches of the public interest based on the factors enumerated in the statute. The proposed Final Judgments in these matters meet this standard.

II.     **The Proposed Final Judgments Fall within the Reaches of the Public Interest**

The United States has filed the Competitive Impact Statements (CISs) and Response to Public Comments that the Tunney Act requires. These documents outline in detail the United States' competitive concerns with the mergers as well as how the proposed Final Judgments will adequately remedy those concerns. The Court can rely on these documents in concluding that the proposed Final Judgments are within the public interest.[12]

---

[11] COMPTEL also cites a statement by Senator DeWine that "this bill makes clear that *the Tunney Act requires what it has always required*, and that mere rubber-stamping is not acceptable." 150 Cong. Rec. S3610-02, S3618 (Apr. 2, 2004) (statement of Sen. DeWine) (emphasis added). The United States agrees. The body of case law helps explicate what the Tunney Act has always required, and neither it nor the United States suggests that courts should rubber-stamp proposed decrees.

[12] 15 U.S.C. § 16(e)(1)(A), (f)(4); *see United States v. Enova Corp.,* 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (stating that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone").

COMPTEL argues that "DOJ has failed to comply with the Tunney Act's informational requirements."[13] To the contrary, the United States filed the Competitive Impact Statements, public comments, and Response to Public Comments, as the statute requires.[14] In those documents, the U.S. described the alternatives to the proposed Final Judgments that it actually considered, as required.[15] The United States has not failed to disclose any "determinative documents," because no documents met the statutory standard.[16]

---

[13] COMPTEL's Proposed Opposition to the United States' Motion for Entry of the Final Judgments at 12 ("COMPTEL Opposition").

[14] 15 U.S.C. § 16(b), (d).

[15] 15 U.S.C. § 16(b)(6); *see Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1248 (D.C. Cir. 2004) (statute does not require "any discussion of an alternative not 'actually considered' by the Government"). Once the United States in its investigation concluded that the likely competitive problem was limited to certain 2-to-1 buildings, the only alternative to a trial on the merits it actually considered was a consent decree requiring the divestiture of fiber-optic capacity to the buildings, as that should fully remedy the problem.

[16] 15 U.S.C. § 16(b). COMPTEL argues to the contrary, relying on a district court case from another jurisdiction that defines such documents as "documents or materials [that] by themselves or in the aggregate, led to a determination by the government that it should enter into a consent decree." *United States v. Central Contracting Co.,* 537 F. Supp. 571, 575 (E.D. Va. 1982). However, this Circuit takes a different view, defining determinative documents much more narrowly, *Massachusetts Sch. of Law,* 118 F.3d at 784 ("The reference to what 'the United States considered *determinative*' . . . confines § 16(b) at the most to documents that are either 'smoking guns' or the exculpatory opposite.") (emphasis in original), and limiting *Central Contracting* to its unusual facts (including that the government in that case had not published the CIS or proposed consent decree as required by the Tunney Act), *Massachusetts v. Microsoft*, 373 F.3d at 1247, 1249. *See also United States v. Bleznak,* 153 F.3d 16, 20 (2d Cir. 1998) ("The range of materials that are 'determinative' under the Tunney Act is fairly narrow . . . . Indeed, were the law otherwise, 'determinative' would come to mean 'relevant.'"). As the United States stated in its CISs, there are no such determinative documents in these matters. *Cf. Massachusetts v. Microsoft,* 373 F.3d at 1249 (noting that "given the complexity of this case, which involved thousands of documents, it is not at all surprising that the Government considered no particular 'materials [or] documents' determinative") (alteration in original).

As discussed extensively in the CISs and Response to Public Comments, the United States conducted a detailed investigation of the competitive effects of the proposed mergers. It concluded that the evidence suggested a likelihood of competitive harm for Local Private Lines and related services provided to customers in certain buildings where each merger, respectively, would result in the merged firm being the only fully facilities-based provider of those services, i.e., 2-to-1 buildings where entry was unlikely. That was the only competitive harm that the United States concluded was likely as a result of the mergers. Accordingly, the United States sought a remedy from the merging parties that would replace the competitive alternative that would otherwise be lost in the buildings in question by providing another carrier with a fiber-optic connection to those buildings. After considerable negotiation the parties agreed on such a remedy, and the proposed Final Judgments incorporate that remedy.[17]

COMPTEL raises several specific topics as to which it contends that the United States' explanations are inadequate. However, its arguments are without merit.

**A.    The Proposed Remedy Addresses the Appropriate Set of 2-to-1 Buildings**

First, COMPTEL contends that the United States "Fails to Explain that It Intended to Omit Specific 2:1 Buildings from Its Complaint."[18] To the contrary, the Response to Public

---

[17] COMPTEL suggests that the remedy of this case was arrived at by the defendants proposing that they would "part with some surplus fiber" if the United States would conclude its investigation, and then the United States acceding to that request and drafting its Complaints to "correspond to the relief offered." COMPTEL Opposition at 12, 15. This simply is not correct. As is typically the case, the United States conducted a thorough investigation, reached conclusions about where competitive harm was likely, approached the parties about a possible remedy, and then negotiated proposed Final Judgments that would redress the potential competitive harm.

[18] COMPTEL Opposition at 15.

Comments specifically explains "[t]he Complaints did not allege, nor were intended to allege, harm in *all* 2-to-1 buildings."[19] Moreover, the Response to Public Comments explains the United States' rationale and methodology for identifying which 2-to-1 buildings presented a competitive problem and needed to be included in the remedy.[20] The proposed Final Judgments redress the harm in all of the buildings where a remedy was appropriate.[21]

---

[19] Response to Public Comments at 20.

[20] *Id.* at 20-23. COMPTEL suggests that the United States did not know that the remedy failed to cover all 2-to-1 buildings and "is obviously scrambling for an *ex post* justification for why its Complaints do not include all of the Defendants 2-to-1 buildings." COMPTEL Opposition at 15. This is incorrect. Not only was the issue of the number of 2-to-1 buildings – and which ones posed competitive problems – a major topic in the public FCC proceeding, but as discussed in the Response to Public Comments, the United States expended considerable time and effort during its investigation in gathering and analyzing data to determine which buildings were 2-to-1s, and which subset of these warranted a remedy. *See* Response to Public Comments at 22-23 (describing the United States' investigation and methodology and noting that the United States eliminated from the remedy vacant buildings, buildings where a subsidiary of the merging firms was the only customer, buildings with zero current demand for Local Private Line or related services, and buildings where entry was likely). Consequently, COMPTEL's contention that the United States "does not assert that it has some way of discerning which 2-to-1 building should be omitted from the decrees," COMPTEL Opposition at 16, is wrong.

[21] COMPTEL misconstrues the Complaints when it argues that "2-to-1 buildings, in general, are likely to cause competitive concerns that are unlikely to be ameliorated by post-merger entry." COMPTEL Opposition at 16. In quoting the Complaints, COMPTEL omits a critical part of the paragraph in question: "Although entry may occur in response to a post-merger price increase in some of the buildings where [MCI/AT&T] is the only connected CLEC, *the conditions for entry are unlikely to be met in hundreds of those buildings*. Thus, entry is unlikely to eliminate the competitive harm that would likely result from the proposed merger." Complaints ¶ 29 (emphasis added). What the Complaints allege, therefore, is that there are buildings where entry is likely and buildings where entry is not likely, and the merger is likely to result in harm to competition only as to the latter.

8

B.       **A Building-Specific Analysis Is Appropriate Here to Assess Competitive Harm**

Second, COMPTEL again challenges the Complaints' definition of relevant geographic market, arguing that the geographic market cannot be as narrow as an individual building. Even if challenging allegations contained in the United States' Complaints were an appropriate exercise under the Tunney Act,[22] as the United States already has explained the relevant geographic market here can be as narrow as an individual building. Markets are properly defined based on what options a customer faces. Because customers for Local Private Lines can select only from the set of providers that offer service to the particular building to which those customers need to connect, and the set of providers varies from building to building, it is appropriate to consider markets as small as an individual building. But regardless of whether the geographic market is as narrow as the individual building or as broad as the metropolitan area, the likely competitive harm here is limited to the set of 2-to-1 buildings for which the United States sought a remedy.[23] "Metro-area-wide harm" as a result of the mergers is unlikely due in

---

[22] COMPTEL complains that the United States "is completely unable and/or unwilling to defend the Complaints with evidence," and suggests that it is appropriate for the Court to explore "whether the harms alleged in the Complaints had evidentiary support in the first instance." COMPTEL Opposition at 15. Of course, the whole purpose of a consent decree – and of defendants agreeing not to contest liability – is to avoid the plaintiff having to prove the allegations in its complaint to the court with evidence, and the court having to try that case. The Tunney Act was not intended to undermine the efficacy of consent decrees by, in effect, requiring the plaintiff to prove its case, *see* Response to Public Comments at 8, and therefore the "public interest" inquiry is appropriately focused on the proposed consent decree itself and whether it remedies the harm alleged in the complaint.

[23] The FCC also concluded that it was appropriate to analyze the competitive effects in Local Private Lines (also known as special access) on a building-by-building basis, and that the remedy proposed here was appropriate. Memorandum Opinion and Order, *In the Matter of SBC Communications Inc. and AT&T Corp. Applications for Approval of Transfer of Control,* FCC WC Docket No. 05-65 (rel. Nov. 17, 2005), 2005 WL 3099626 ¶ 37; Memorandum Opinion and Order, *In the Matter of Verizon Communications Inc. and MCI, Inc. Applications for Approval of*

part to the number of other facilities-based providers of Local Private Lines and related services in each metropolitan area under consideration, and, absent a remedy, customers could plausibly expect to see their prices rise due to the mergers only in buildings where any competitive local exchange carrier ("CLEC") alternative would be eliminated as a result of the mergers.[24]

COMPTEL also suggests that a building-specific analysis is inappropriate because AT&T and/or MCI effectively constrain pricing throughout each metropolitan area by reselling RBOC circuits. But as the United States noted in its Response to Public Comments, its "investigation determined that AT&T's and MCI's sales of resold circuits are relatively small and of limited competitive significance. Moreover, because numerous other CLECs have extensive fiber-optic

---

*Transfer of Control,* FCC WC Docket No. 05-75 (rel. Nov. 17, 2005), 2005 WL 3099625 ¶ 37 (collectively "FCC Orders") ("[W]here [MCI/AT&T] is the only carrier besides [Verizon/SBC] that is directly connected to a particular building and where entry is unlikely, [MCI's/AT&T's] elimination as a competitor may lead to an increase in the price of Type I special access services to that building. Thus, absent appropriate remedial measures, like those imposed by the DOJ Consent Decree, the proposed merger is likely to have anticompetitive effects in buildings where [MCI/AT&T] is the only competitive LEC with a direct wireline connection and where entry appears unlikely.").

[24] COMPTEL's assertion that RBOCs charge metropolitan-area-wide prices does not warrant rejecting the proposed Final Judgments. Customers seeking Local Private Lines or related services in 2-to-1 buildings could still be harmed by the proposed mergers absent the proposed remedy in several ways, even though, as COMPTEL suggests, RBOCs charge metropolitan-area-wide prices and typically do not currently price discriminate to individual buildings for wholesale Local Private Lines. First, RBOC prices for Local Private Lines are generally substantially higher than CLEC prices (presumably because RBOCs face competition in only a small minority of buildings). Customers seeking service in 2-to-1 buildings post-merger would lose their only "low price" CLEC option, i.e., AT&T and MCI, and likely would be forced to pay the substantially higher "default" RBOC price. This theory of harm does not depend at all on building-specific pricing. Second, even though RBOCs do not currently typically price discriminate by building, they might well do so post-merger. Third, prices to large retail enterprises for value-added services that rely on Local Private Lines tend to be highly customized and individually negotiated; unremedied 2-to-1s for an important cost component could lead to higher prices to these customers absent the remedy in the proposed Final Judgments.

networks in the metropolitan areas under consideration, as well as contracts with Verizon and SBC providing them with discounts similar to those of AT&T and MCI, other competitors could likely replace any competition that might be lost by the elimination of AT&T and MCI as independent resellers in SBC's and Verizon's territories respectively."[25]  Therefore, the United States concluded that competitive harm was likely only in a specific set of 2-to-1 buildings.

**C.    The Contemplated Resolution in Qwest/Allegiance Is Irrelevant to this Proceeding**

Third, COMPTEL complains that the United States "Fails to Explain Why It Abandoned the Qwest/Allegiance Divestiture Remedy."[26]  Merger analysis is case-by-case and fact-specific, and remedies must be tailored to the particular competitive circumstances presented in each matter.  The CISs and Response to Public Comments here accordingly explained why the proposed Final Judgments are appropriate in *these* matters, not why a remedy contemplated in another matter with different parties, different markets, and a different competitive situation is inapplicable.  Qwest/Allegiance, moreover, is a particularly inappropriate comparison because in that instance the United States did not conduct a full investigation, did not conclude that competitive harm was likely in any relevant market, did not file a complaint, and did not seek to

---

[25] Response to Public Comments at 46 n.80; *see also* FCC Orders ¶¶ 33, 43 (reaching the same conclusion). COMPTEL argues that the United States' assertion that "AT&T private line revenues were *de minimis*, compared with SBC's sales is incredibly misleading" because it ignores the fact that AT&T purchases and resells SBC special access. COMPTEL Opposition at 18. Presumably, COMPTEL is referring to the United States' statement that: "[t]he modest nature of the competitive problem, as compared to the overall value of the mergers, is illustrated by the fact that in 2004, Local Private Lines offered by AT&T in SBC's territory accounted for less than 0.3 per cent of AT&T's total revenues." Response to Public Comments at 6 n.6. But, that 0.3 per cent represents *all* of AT&T's Local Private Line sales, *including* resold SBC circuits as well as AT&T owned circuits. The resold circuits represent a relatively small minority of the AT&T's total Local Private Line sales.

[26] COMPTEL Opposition at 19.

impose a remedy.[27] It is not clear what, if any, remedy the United States would have sought to impose had it conducted a full investigation in that matter. In contrast, in the matters currently before the Court, the United States did conduct a very full and thorough investigation and concluded that the mergers posed a likely competitive problem limited to several hundred 2-to-1 buildings. The proposed Final Judgments adequately remedy that problem, and therefore are in the public interest.

**D.   The Proposed Final Judgments Do Not Enhance the Risk of Coordinated Interaction**

Fourth, COMPTEL complains that the United States "did not respond" to COMPTEL's allegations that the proposed Final Judgments would facilitate coordinated interaction. This is incorrect.[28] Even under COMPTEL's theory, the *Final Judgments* could facilitate coordinated interaction only if the merged firms purchased each other's divested assets. But the merged firms

---

[27] As can be seen in the "Agreement" between the parties in Qwest/Allegiance and the Department of Justice, provided at Appendix C of COMPTEL's Comments, Qwest/Allegiance presented a very unusual situation. Qwest wanted to resolve any potential competitive problems prior to bidding for the Allegiance assets at a bankruptcy auction. The Department had yet to issue compulsory process or fully investigate whether there were, indeed, any such problems. Because the potential concerns were limited to five overlapping metropolitan areas, a divestiture of all of the acquired assets in those areas would address any conceivable competitive problems. Accordingly, the Department and the parties reached an agreement permitting the investigation to go forward, and providing that *if* the Department were to conclude that the proposed transaction were anticompetitive in any relevant market, Qwest would agree to divest all of the acquired overlapping assets. (Of course, had the investigation concluded that a divestiture of only a subset of those assets were necessary to restore competition, presumably Qwest would have agreed to a modification permitting it to divest less than it had agreed to prior to the investigation.) Because Qwest did not prevail in the bankruptcy auction, the agreement became moot and was never implemented. Importantly, the Department never conducted a full investigation, never reached a conclusion as to what markets (if any) would be adversely impacted by the proposed merger (the agreement does not identify a relevant market), and never had to consider the scope of an appropriate remedy – aside from concluding that a full divestiture of *all* overlapping assets would remedy any conceivable problem.

[28] *See* Response to Public Comments at 42.

did not even bid on each other's assets, so this is no longer a relevant concern.  COMPTEL's most recent submission makes clear that its concern is not that the *Final Judgments* will facilitate coordinated interaction, but that *the mergers* would facilitate coordinated interaction.  Although the United States considered these issues as part of its investigation, they go beyond anything alleged in the United States' Complaints and do not relate to whether the proposed Final Judgments adequately redress the identified harm.

In any event, the evidence does not support COMPTEL's allegations:  as previously noted, the United States "was unable to conclude that the change in market structure brought on by the mergers was likely to lead to competitive harm due to an increased risk of coordination."[29]  COMPTEL suggests that the combination of the mergers and the prevailing contracting structure will facilitate collusion in some relevant market by making the merged firms "more dependent" on each other and putting the merged firms in a "better position to monitor [each other's] wholesale and retail pricing."[30]  However, proving a Clayton Act Section 7 coordinated effects case requires more than theorizing about how a merger might lead to an enhanced ability to monitor and punish.  Here, there are practical problems to coordination that will remain after the mergers.  For example, in each metropolitan area in question, there are multiple other providers of retail and wholesale telecommunications services, including Local Private Lines.  Because any attempt of the merged firms to coordinate could well be undercut and undermined by these other

---

[29] *Id.* at 42; *see also* FCC Orders ¶ 52 ("We also do not believe that the merger increases the likelihood of coordinated interaction.").

[30] COMPTEL Opposition at 19-20.

carriers, it is unlikely that the mergers will significantly increase the risks of coordination.[31]  That the proposed Final Judgments do not address a competitive concern that was not alleged in the Complaints – because it was not supported by the evidence obtained during the investigations – is not a ground on which the Court should withhold approval.

E.  **The Interest of Several Sophisticated Telecommunications Carriers in Bidding for the Divestiture Assets Helps Confirm the Viability of the Proposed Divestiture**

Finally, COMPTEL briefly argues that "the mere presence of a purchaser does not vindicate the DOJ's Remedy."[32]  In itself, that is, of course, a true statement.[33]  However, COMPTEL's original Comment raised a number of objections to the proposed remedy on the ground that the proposed divestiture package might not be viable, e.g., because it did not include customer contracts, it was in the form of IRUs rather than full ownership, and the divestiture was "only" for ten years.  The United States responded to each of these points in detail, explaining why the form of the proposed divestiture should be adequate to attract carriers interested in acquiring the divestiture assets, and replace the competition that would otherwise be lost.  That not one, but several large, sophisticated telecommunications carriers have bid to acquire the divested assets (and, in three cases, have reached agreements to acquire the assets) helps confirm

---

[31] Other factors in this marketplace also tend to make coordination difficult, such as the high level of granularity – e.g., countless diverse products, customers, and building locations.

[32] COMPTEL Opposition at 20.

[33] A purchaser that did not have the intent or ability to compete in the markets for Local Private Lines would obviously not be appropriate as it would not replace the competition that would be lost as a result of the merger.  That is why the United States retains approval rights over the purchaser and purchase agreement – to ensure that the purchaser is one who can and will operate the assets in a competitive manner.  Proposed Final Judgments § IV.A; CISs at 9.

the soundness of the United States' judgment that the form of the proposed divestitures is adequate to attract viable buyers.

### III. Conclusion

The United States has provided a detailed explanation of the competitive harm identified in its Complaints, and how the proposed remedy redresses that harm. COMPTEL has had a more than ample opportunity to present its views, and the United States has twice addressed COMPTEL's concerns.

Based on its extensive investigation, the United States concluded that the mergers in question presented a relatively narrow competitive problem for Local Private Lines and related services in certain 2-to-1 buildings, and it negotiated a relatively simple, straightforward divestiture remedy to replace the competition that would otherwise be lost. The Court should conclude that the proposed Final Judgments fall within the reaches of the public interest and enter them to ensure that the needed divestitures are swiftly completed.

Respectfully submitted,

/s/
Laury E. Bobbish
Assistant Chief

/s/
Lawrence M. Frankel (D.C. Bar No. 441532)
Matthew C. Hammond
Trial Attorneys

Telecom & Media Section

Antitrust Division
U.S. Department of Justice
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530
(202) 514-5621
Attorneys for the United States