# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:05CV02102 (EGS) |
| SBC Communications, Inc. and AT&T Corp., | ) | |
| Defendants. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:05CV02103 (EGS) |
| Verizon Communications, Inc. and MCI, Inc., | ) | |
| Defendants. | ) | |

**AT&T INC.'S REPLY TO COMPTEL'S OPPOSITION
TO THE DEPARTMENT OF JUSTICE'S MOTION
FOR ENTRY OF FINAL JUDGMENTS**

COMPTEL's opposition arguments not only simply repeat their earlier comments, but are wrong on both the law and the facts. Their arguments should be rejected and the Final Judgment should be entered.

First, COMPTEL errs in urging this Court to abandon well-established precedent regarding the proper scope of review. While no party disagrees that this Court must make a public interest determination based on the statutory criteria, COMPTEL overreaches by arguing in effect that the 2004 Tunney Act amendments overturned virtually everything every court has ever said about the Tunney Act. The focal point of those amendments, as is clear from the

1

legislative history, was the "mockery" language used in some cases as one aspect of four separate standards for judging settlements. But, in this case, DOJ has not asked the Court to "rubber stamp" the settlements; rather it conducted an extensive investigation and has presented a reasoned analysis of market conditions in the Competitive Impact Statement ("CIS"), in its Response to Public Comments and now in its Reply to COMPTEL.

Second, COMPTEL seeks to have the Court rewrite the Government's complaint, and effectively compel DOJ to file an action that it has not filed and that it does not believe to have merit. But the reservation of prosecutorial discretion to the Executive Branch is a fundamental precept of both administrative and indeed constitutional law. Nothing in the Tunney Act as amended purports to make a court both judge and prosecutor.

Third, contrary to COMPTEL's specific complaints, DOJ has addressed all relevant issues raised by the public comments. In short, under the Tunney Act standards, the Court has a full record on which to render its decision in this matter.

I.  **THE 2004 TUNNEY ACT AMENDMENTS DID NOT REPUDIATE ALL PRIOR CASE LAW PRECEDENT.**

In 2004, Congress amended the Tunney Act to clarify its intent regarding judicial review of consent decrees. Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, § 221(a)(1)(B), 118 Stat. 661, 668 (2004). Under the Act as amended, this Court must examine a list of factors to determine whether the proposed consent decree is in the public interest. But, although the amendments add to the public interest review standard, COMPTEL is wrong to suggest that they require a wholesale abandonment of all precedent interpreting the Tunney Act. *See* COMPTEL Opp. to the Dep't. of Justice's Mot. for Entry of Final Judgments at 3, 9 (April 6, 2006) ("Opp."). Instead, established principles of statutory construction hold that, except where they are in conflict, the amended statute can and should be read in harmony with prior case law. *See, e.g., West v. Kerr-McGee Corp.*, 765 F.2d 526, 529-30 (5th Cir. 1985)

2

(statutory amendments overturned one principle rather than an entire body of insurance law precedent).

The legislative history makes crystal clear that the focal point of the 2004 amendments was a single issue. As the congressional findings stated, the amendments were intended to clarify that judicial review under the Tunney Act is not to be limited "solely to determining whether entry of [a] consent judgment[] would make a 'mockery of the judicial function.'" 150 Cong. Rec. S3609 (daily ed., April 12, 2004). This concern that courts not be a "rubber stamp" referred specifically to language in the *Microsoft* and *Massachusetts School of Law* decisions from the D.C. Circuit that courts are not required to approve settlements that would effect such a "mockery." Senator Kohl explained that the 2004 amendments overruled that language, but only "to the extent that these precedents are contrary to" the amendments. 150 Cong. Rec. S3617 (daily ed., April 12, 2004). In fact, they are not inconsistent because in neither case did the D.C. Circuit hold that courts should focus "solely" on that standard, but plainly used it only as a "catch-all" as the last of four separate tests.

Moreover, the legislative history reflects the endorsement of other language from the same cases concerning the scope of the court's review. Senator Kohl agreed with the D.C. Circuit's *Microsoft* decision that "in reviewing the proposed consent decree, the court should inquire into the 'purpose, meaning, and efficacy of the decree'". 150 Cong. Rec S3617 (quoting *Microsoft*, 56 F.3d at 1463)). This validation of prior precedent is consistent with Senator Hatch's statement that, while the amendments will ensure that courts do not "rubber stamp" consent decrees, they otherwise "essentially codified existing case law." 150 Cong. Rec. S3613

3

(daily ed. Apr. 2, 2004). Thus, both the legislative history here and basic principles of statutory construction dictate that prior law still has precedential value.[1]

Nevertheless, eager to throw out the baby with the bathwater, COMPTEL argues that judges now have the authority to "ask the government to defend the integrity of its Complaints." Opp. at 13-14. But such broadening of the court's role would interfere with the executive branch's prosecutorial discretion and would "impermissibly arrogate to [the courts] the President's role 'to take care that the laws be faithfully executed.'" *Microsoft*, 56 F.3d at 1457; *see also United States v. BNS*, 858 F.2d 456, 462-63 (9th Cir. 1988). That basic and unassailable legal principle is unaffected by the 2004 amendments, as explained above.[2]

In addition to its constitutional infirmities, broadening the role of the Court into that of prosecutor also would raise extreme practical difficulties. It potentially would require the court to conduct a de novo investigation of all the relevant facts and circumstances involved in assessing competitive conditions – an investigation that took over nine months. Congress plainly did not intend such a result, particularly where, as here, it took pains to re-emphasize that courts still do not need to conduct evidentiary hearings on proposed settlements. 15 U.S.C. § 16(e)(2); *see also* 150 Cong. Rec. S3618 (daily ed., Apr. 12, 2004) (statement of Sen. Kohl) (the

---

[1] COMPTEL effectively admits as much by positively citing *Massachusetts School of Law* five times in its previous intervention reply brief. *See* COMPTEL's Reply to Opp. to COMPTEL's Motion for Leave to Intervene, at 7, 8, 13, 14, and 16 (March 1, 2006).

[2] *See also Maryland v. United States*, 460 U.S. 1001, 1006 (1983) (Rehnquist, J. dissenting) ("The question whether to prosecute a lawsuit is a question of the execution of the laws, which is committed to the Executive by Art. II."); *Heckler v. Chaney*, 470 U.S. 821, 831 (1984) ("an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion. . . .This recognition of the existence of discretion is attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement"); *Marbury v. Madison*, 1 Cranch 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to inquire how the executive, or executive officers, perform duties in which they have discretion").

amendments are "not intended to require a trial de novo of the advisability of antitrust consent decrees or a lengthy and protracted review procedure").

Nonetheless, COMPTEL insists that, in addition to the Complaint, Proposed Final Judgment, and the Competitive Impact Statement which the Tunney Act requires, the DOJ should have produced documents obtained during its investigation of the mergers that "would confirm the integrity of the Complaints and the remedies." Opp. at 11-12. Nothing in the plain language of the Tunney Act as amended or its legislative history supports this alleged requirement. In fact, Congress considered but rejected an earlier version of the amendments that called for an explicit examination of the "substantial evidence and reasoned analysis" that supported an agency recommendation for a consent judgment. Antitrust Criminal Penalty Enhancement and Reform Act of 2003, S. 1797, 108th Cong. (2003). The fact that no such provision survived in the 2004 amendments further confirms that Congress did not intend to adopt additional documentary or evidentiary requirements.[3]

Indeed, the Tunney Act contains an extensive list of requirements in 15 U.S.C. Section 16(b), including the Competitive Impact Statement, that were specifically designed to provide courts with the information they need in order to make the public interest determination. *See, e.g., United States v. Microsoft*, 215 F. Supp.2d 1, 12-17 (D.D.C. 2002). The record here

---

[3] While COMPTEL cites a single district court case to support its request for documents (Opp. at 13 (citing *United States v. Central Contracting Co.*, 537 F. Supp. 571, 575 (E.D. Va. 1982)), it fails to note that the D.C. Circuit rejected the broad definition of "determinative document" under § 16(b) of the Tunney Act endorsed in that case. *MSL*, 118 F.3d at 784 ("a broad disclosure requirement would directly interfere with that ability [to negotiate settlements] . . . if [settlements] were sure to result in a discovery bonanza for private claimants."). *See also Hyperlaw, Inc. v. United States*, 159 F.3d 636, 1998 WL 388807, at *2-3 (D.C. Cir. 1998); *United States v. Microsoft*, 215 F. Supp.2d 1, 13 n.12 (D.D.C. 2002) (noting *MSL* conflict with *Central Contracting*); *United States v. Alex Brown & Sons, Inc.*, 169 F.R.D. 532, 542 (S.D.N.Y. 1996) (finding that recommendations prepared by outside consultants that influenced the government's settlement plans were more likely to be considered "determinative documents" because "Congress was more concerned with exposing external influences on the consent decree process").

contains not only all the statutory prerequisites, but additional comments and replies, so is more than sufficient for this Court to complete its review.

II. **COMPTEL FAILS TO RAISE ANY RELEVANT ISSUES THAT THE DOJ HAS NOT ALREADY ADDRESSED.**

In the latter half of its memorandum, COMPTEL repeats several of the arguments made in its Tunney Act comments and suggests that the DOJ failed to address them in its Response. But the record clearly shows otherwise. The DOJ has fully satisfied the requirements of the Tunney Act, addressed all relevant issues, and provided this Court with a full record upon which to render its decision.

A. **Building Analysis**: COMPTEL argues that the DOJ's failure to include all buildings in which the merger causes the number of competitors to decrease from 2 to 1 was an oversight rather than the result of a competitive assessment. Opp. at 15, 16. But both the Complaint and the CIS clearly explain that the remedy focuses only on that subset of such buildings where new entry by a competitor was unlikely. *See* CIS at 11 (entry would be likely for some 2 to 1 buildings, but "the expected customer demand and proximity of other CLEC fiber" to other 2 to 1 buildings suggested that "entry would not be timely, likely, or sufficient to eliminate the competitive harm" in those buildings) (emphasis added), Complaints ¶ 9-10. The DOJ explained its analysis yet again in even more detail in its Response to public comments. DOJ Response at 20-23. Thus, DOJ has formulated its Complaint and proposed relief based on a reasoned, factual assessment of how competition will be affected. In this regard, COMPTEL proffers no evidence that DOJ's market analysis is incorrect, while DOJ has provided the Court with precisely the sort of information necessary under the Tunney Act.

B. **Qwest/Allegiance**: COMPTEL next complains that the DOJ did not specifically address its point that DOJ was prepared to require more extensive divestitures of local assets in a proposed transaction between Qwest and Allegiance Telecom in 2004. Opp. at 19. While the

6

DOJ did not concentrate its comments specifically on the Qwest/Allegiance transaction, which earned only a short reference in COMPTEL's original comments (COMPTEL Comments at 13-14), the DOJ has explained why broader relief in this case was unjustified. DOJ Response at 33-34, 39 & n.66. In any event, the proposed relief in the Qwest/Allegiance deal is wholly distinguishable from the facts in this case, as it was only a *preliminary* position that the DOJ took *in advance* of a detailed antitrust investigation of a proposed transaction.[4] But Qwest did not win the auction, so neither the transaction nor the investigation ever occurred. In the instant case, of course, the DOJ took nine months to conduct a full investigation and then tailored the remedy to the violation alleged.

    C.    **Geographic Market**: COMPTEL claims that the DOJ has not provided sufficient support for its building specific market definition. But DOJ clearly explained its analysis as to why harm resulting from the merger would not be experienced on an area wide basis, but only a building basis. The acquired companies "were each only one of multiple CLECs with local networks [in each area] and typically controlled no more than a small minority of CLEC on-net connections, [so] the evidence did not show that elimination of AT&T or MCI as an independent competitor would lead to 'metropolitan area-wide' anticompetitive price effects." DOJ Response at 32 & n.57. Moreover, the economic expert whose comments COMPTEL attaches takes a two pronged approach to market definition, with one of those prongs being "individual office buildings." *See* COMPTEL Opp. at Exh. E, at ¶¶ 10-14, 19 (Apr. 25, 2005). Additionally, the FCC found "the relevant geographic market for wholesale special

---

[4] Because the transaction was connected to an expedited bankruptcy auction and "a prolonged delay in resolving its status could be detrimental to Allegiance's customers, employees, and business," App. C of COMPTEL's Comments at 1, Qwest only had two choices: "sell off overlapping assets right away in return for regulatory approval or let the agency conduct a much longer analysis." Ron Orol, *Qwest challenges SBC-AT&T tie-up*, Daily Deal (Apr. 27, 2005) (http://www.thedeal.com/NASApp/cs/CS?pagename=PENews&c=TDDArticle&cid=111453844 7291).

access services is a particular customer's location."[5] Again, DOJ has been responsive, the record is supportive, and COMPTEL has presented no contrary evidence.

**D.   "Coordinated Behavior:"** Finally, COMPTEL's allegations of coordinated behavior extend beyond the scope of the DOJ's Complaints and should not be a part of this inquiry. *See* DOJ Response at 42. Nevertheless, contrary to COMPTEL's assertions, the DOJ has addressed this issue substantively, explaining that such coordination is not likely because the "existence of numerous competitors (in addition to the merging firms) for both wholesale and large retail telecommunications customers tends to make collusion difficult." *Id.* Notably, the FCC reached the same conclusion. FCC Orders, supra n. 5, at ¶ 52.

## CONCLUSION

For the foregoing reasons, the Court should deny COMPTEL's Opposition to the Department of Justice's Motion for Entry of Final Judgments and should enter those judgments.

Respectfully submitted,

/s/ Wilma A. Lewis
Wilma A. Lewis (D.C. Bar No. 358637)
Wm. Randolph Smith (D.C. Bar No. 356402)
**CROWELL & MORING LLP**
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116

Counsel for Defendant AT&T Inc.

Dated:  April 18, 2006

---

[5]   *In the Matter of SBC Communications Inc. and AT&T Corp. Applications for Approval of Transfer of Control*, FCC WC Docket No. 05-65 (rel. Nov. 17, 2005), 2005 WL 3099626 ¶ 28; *In the Matter of Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control*, FCC WC Docket No. 05-75 (rel. Nov. 17, 2005), 2005 WL 3099625 ¶ 28.