**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br>v.<br><br>SBC Communications, Inc. and<br>AT&T Corp.,<br><br>                    Defendants,<br><br>The Alliance for Competition in<br>     Telecommunications<br>     3050 K Street, NW<br>     Fourth Floor<br>     Washington, DC  20007<br>     (202)342-8518<br><br>                    Applicant-*Amicus*. | Civil Action No.: 1:05CV02102 (EGS) |
| United States of America,<br><br>                    Plaintiff,<br>v.<br><br>Verizon Communications Inc. and<br>MCI, Inc.,<br><br>                    Defendants.<br><br>The Alliance for Competition in<br>     Telecommunications<br>     3050 K Street, NW<br>     Fourth Floor<br>     Washington, DC  20007<br>     (202)342-8518<br><br>                    Applicant-*Amicus*. | Civil Action No.: 1:05CV02103 (EGS) |

**DECLARATION OF DR. SIMON J. WILKIE SUBMITTED ON BEHALF OF THE
<u>ALLIANCE FOR COMPETITION IN COMMUNICATIONS</u>**

Pursuant to 28 U.S.C. § 1746, and the Rules of Civil Procedure of the United States District Court for the District of Columbia, I, Simon J. Wilkie, declare the following:

## I. INTRODUCTION

1.  My name is Simon J. Wilkie. I am Executive Director of the Center for Communications Law and Policy at the University of Southern California and former Chief Economist of the Federal Communications Commission ("FCC" or "Commission"). From 2002 to 2003, I served as Chief Economist at the Federal Communications Commission ("FCC"). In that capacity, I oversaw the economic analysis performed by the Commission staff and advised the Chairman and Commissioners on issues involving economic analysis. Major items before the FCC during my tenure included the EchoStar/DirecTV transaction, the Comcast/AT&T Broadband transaction, the Triennial Review of Unbundling Obligations, and the Biennial Review of Media Ownership rules.

2.  Previously, I was an Assistant Professor and Senior Research Associate in Economics at the California Institute of Technology. Prior to joining the faculty at the California Institute of Technology, I was a Member of Technical Staff at Bell Communications Research. I have also held the positions of Affiliated Scholar of the Milken Institute and Visiting Assistant Professor at Columbia University. Over the past fifteen years, my academic research has focused on the areas of mechanism design, regulation, and game theory. I specialize in analyses involving industrial organization, regulation, public finance, and the design of institutions, with particular applications to the economics of telecommunications and network industries. I have conducted economic research and prepared testimony on a variety of antitrust and regulatory issues in a number of industries, including the telecommunications industry. I have also consulted on matters involving mergers and acquisitions in the satellite and the cable industries,

and on issues related to local service and wireless competition. My research has appeared in a number of academic journals, including the *Review of Economic Studies, Journal of Economics and Management Strategy,* and the *Journal of Industrial Economics.* I received a Bachelor of Commerce degree (honors) in Economics from the University of New South Wales, Australia, and my M.A. and Ph.D. degrees in Economics are from the University of Rochester.

3. I have previously submitted two Declarations to the FCC on behalf of the Alliance for Competition in Communications ("ACTel"), in which I reviewed the competitive implications of the proposed acquisition of AT&T Corporation and its subsidiaries ("AT&T") to SBC Communications ("SBC")[1], and the proposed acquisition of MCI, Inc. ("MCI") by Verizon Communications, Inc. ("Verizon").[2] I also supervised the analysis that was submitted to the DOJ by various ACTel members with regard to the proposed acquisition and on several occasions discussed these analyses with DOJ lawyers and economists, including the expert retained by the DOJ, Professor Michael Katz.

4. I have been asked by counsel for ACTel to summarize briefly the results of the economic analysis that was provided to the DOJ regarding the competitive implications of these two proposed mergers. After being retained, I discovered that a number of companies maintained extensive files of actual bid receipt and purchase records, kept in the ordinary course of business. These records indicate the suppliers that had sold and offered for sale Local Private Line circuits for purchase (lease) by ACTel members, as well as the actual prices offered and at which transactions were made. Using these data sets provided by members of ACTel, I focused on the performance of those markets, e.g., how prices are affected by the number of facilities-

---

[1] Declaration of Simon Wilkie, *SBC Communications Inc. and AT&T Corp. Applications for Approval of Transfer of Control*, WC Dkt No. 05-65 (F.C.C. Apr. 26, 2005).

[2] Declaration of Simon Wilkie, *Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control*, WC Dkt No. 05-75 (F.C.C. May 6, 2005).

2

based and partially facilities-based suppliers of Local Private Line services and how the prices for Local Private Lines likely would be affected if AT&T and MCI are acquired.[3] These structural and performance studies of the likely competitive effects of the proposed mergers were quite extensive. I supervised a team of economists who collectively spent more than 3,000 hours performing the required studies. In particular with respect to the performance studies, we analyzed 22 different databases collected from four companies that purchase Local Private Lines.[4] These databases included more than 6,300 circuits, including DS1 and DS3 capacity circuits, both for local loop and interoffice transport.

     5.    Using these databases, I conducted a number of different econometric and statistical studies of the relationship between the number of facilities-based and partially facilities-based carriers and the observed prices for Local Private Line services. All of these statistical analyses are routinely used by economists to analyze pricing data and are certainly very familiar to Professor Katz. Generally speaking, as explained below, I found that (1) AT&T and MCI offered their circuits for sale (i.e., made bids) more than any other carriers except for SBC and Verizon. AT&T and MCI's bids included both their own facilities and those leased at advantageous prices from SBC and Verizon; (2) the larger the number of suppliers offering a particular circuit (up to four or in some cases five), the lower the price the purchasers paid; and (3) the presence of AT&T and MCI as bidders lowered the prices paid by other suppliers, including SBC. Based on these analyses, I was able to reach conclusions regarding the likely effect of the proposed mergers on prices in the relevant markets.

     6.    For example, using a sample of over 400 DS3 circuits in SBC's service area, in a

---

[3] Some suppliers of local access services use only their own network facilities, while others combine their facilities with facilities leased from the local Bell operating company.

[4] The identities of the four companies are not disclosed for confidentiality reasons.

regression model that included a single variable for the total number of available carriers, I found that the presence of AT&T as a supplier lowered SBC's annual transport rate (in a statistically significant manner) by more than $2,000 (approximately nine percent of SBC's undiscounted rate). Moreover, each additional carrier lowered SBC's annual transport rate (also in a statistically significant manner) by more than $1,300. This effect was observed not just when the number of carriers increased from one to two, but also when the total number of suppliers (including SBC and AT&T) increased from two to three, from three to four, and from four to five.

7. Similarly, in an analysis of over 600 DS1 and DS3 circuits in SBC's service area, I found that removing AT&T as a bidder would cause prices to increase by 13% to 25%, across all circuits. This price effect was more pronounced on circuits served by AT&T entirely with its own facilities. On those circuits, the effect of removing AT&T would be to increase prices by 51% to 74%. On circuits served by AT&T with a combination of its own facilities and those of SBC, the effect of removing AT&T would be to increase prices by 4% to 14%. Similar results were found in Verizon's service area with respect to the effect of removing MCI. In an analysis of over 400 DS1 circuits, removing MCI as a bidder would cause prices to increase by 10% to 14%, across all circuits. Again, the price effect was more pronounced on circuits served by MCI entirely with its own facilities, where the effect of removing MCI would be to increase prices by 38% to 50%. On circuits served by MCI with a combination of its own facilities and those of Verizon, the effect of removing MCI would be to increase prices by 1% to 5%.

8. These basic results were found in essentially all of the 22 databases I examined. AT&T and MCI offered their circuits to customers more than any other carriers except for SBC and Verizon. The presence of AT&T and MCI, both as facilities-based rivals and as partially

facilities-based rivals, caused statistically and economically significant reductions in observed prices. Moreover, prices were lower the greater the number of suppliers. A robust finding of this research is that increasing the number of suppliers from two to three, or from three to four, or in many instances from four to five, causes prices to fall.

9. The DOJ takes the position that in bidding situations involving the provision of Local Private Line circuits to buildings where the proposed mergers reduce the number of suppliers from three to two, or from four to three, do not raise antitrust concerns. The DOJ offered three reasons why the proposed mergers would not adversely affect competition in such bidding situations where the number of suppliers fell from three to two or from four to three.[5] None of these conclusions refute or even address the results of my empirical analysis. The DOJ's conclusions appear to be based on what might be called a rudimentary structural analysis – that yields predictions about how companies might behave given factors such as the potential entry of rival firms. Thus, the DOJ has performed an entirely structural merger analysis that by its very nature can only offer indirect inferences regarding the likely competitive effect of a proposed merger. In contrast, I performed extensive empirical studies of the performance of the relevant markets that directly evaluated the likely competitive effects of the proposed mergers.

10. The DOJ's indirect, structural approach clearly has led to an incorrect conclusion.[6] Prices for Local Private Lines are lower when three firms offer service than when

---

[5] First, "given the particular structure of the marketplace, in looking at buildings where the number of competitors went from three to two or four to three, the United States was unable to conclude that the mergers would significantly increase the risks of coordinated interaction." (DOJ, pp. 24-25) Second, "largely because the merging firms were not especially close substitutes, the evidence did not support a finding of likely unilateral anticompetitive effects in these buildings." (DOJ, p. 25) Third, "the fact that at least two CLECs had added the buildings in question to their networks suggested that the characteristics of the buildings (e.g., location, capacity demand) made them susceptible to entry – significantly more so than the 2-to-1 buildings." (DOJ, p. 25)

[6] In prior mergers, the Federal Trade Commission has used market-performance studies, rather than market-structure studies, to determine the competitive effects of proposed merges. See FTC v. Staples/Office Depot and FTC v. British Petroleum/ARCO.

two firms offer the same service, all other factors being held constant. Similarly, prices for Local Private Lines are lower when four firms offer service than when three firms offer the same service, again holding all other factors constant. This direct, market performance analysis answers the basic question raised in this proceeding: Will the DOJ's proposed remedy keep prices from rising? Since the proposed remedy ignores all 3-to-2 and 4-to-3 markets, the answer must be "no."

11. Finally, the DOJ's proposed remedy by its nature ignores the basic fact that competition in the relevant markets occurs between network firms. Such markets are characterized by complementarities (e.g., switches and transport lines), compatibility issues (e.g., digital versus analog signals), consumption externalities (e.g., the value of the network to one user increases with the total number of users), switching costs (e.g., changing carriers), and economies of scale (e.g., average costs fall as a network grows). In such markets, the DOJ's proposed piecemeal circuit divestitures ignores these effects and so cannot be expected to maintain the pre-merger level of competition between large rival networks. The predictable result is that a few circuits will change hands, the recipients will not have the networks in place to compete with the merged firms, and prices will rise.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: May 4, 2006

_____
Simon J. Wilkie