**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

―――――――――――――――――――――――

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | Civil Action No. |
| | ) | 1:05CV02102 (EGS) |
| **SBC Communications, Inc. and** | ) | |
| **AT&T Corp.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ―――――――――――――――― | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | Civil Action No. |
| | ) | 1:05CV02103 (EGS) |
| **Verizon Communications Inc. and** | ) | |
| **MCI, Inc.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ―――――――――――――――― | ) | |

**VERIZON'S REPLY IN SUPPORT OF THE UNITED STATES' MOTION FOR ENTRY
OF FINAL JUDGMENT AND IN OPPOSITION TO ACTEL'S MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF ACTEL'S MOTION FOR *AMICUS
CURIAE* AND INTERVENOR STATUS**

ACTel — a loose alliance of competitive communications providers that was organized

solely to oppose the Verizon/MCI and SBC/AT&T mergers — seeks to intervene in this Tunney

Act proceeding, or, in the alternative, to participate as amicus curiae, to "protect its interests" and

to "aid this Court."  ACTel Mem. at 5.[1]  Each of the companies that ACTel purports to represent,

―――――――――――――

[1] "ACTel Mem." refers to Memorandum of Points and Authorities in Support of ACTel's Motion
for *Amicus Curiae* and Intervenor Status, filed May 5, 2006.  "ACTel Supp. Mem." refers to
ACTel's Supplemental Memorandum in Opposition to the United States' Motion for Entry of
Judgments, filed May 16, 2006.

however, is also a member of the CompTel trade association.[2]  This Court has already permitted CompTel to participate as amicus.  ACTel fails to explain why its members need redundant representation to protect their interests or to assist the Court.  As the Department of Justice ("Department" or "DOJ") explains, ACTel's participation imposes additional burdens on the parties and the Court without countervailing benefit to appropriate judicial review.  *See* Response of the United States to ACTel's Motion for *Amicus Curiae* and Intervenor Status Pursuant to the Tunney Act at 2 (filed May 15, 2006).  The Court should deny ACTel's motion to participate in this proceeding.

In any event, ACTel's claims are misguided.  ACTel's principal argument is that the Department should have filed different claims.  But the Department has unreviewable discretion in deciding what complaint (if any) to bring.  The question in this Tunney Act proceeding is whether the proposed remedy meaningfully addresses the competitive concerns identified in the government's complaint, not whether the government should have pursued broader or different allegations of competitive harm arising from the Verizon/MCI merger.  (Point I, *infra*.)

Verizon disputed — and still disputes — that the merger caused *any* competitive harm. The government disagreed, and brought the claims it found to have been substantiated by its extensive investigation.  By requiring divestiture of MCI's fiber-optic facilities at more than 300 buildings, the Proposed Final Judgment preserves the facilities-based competition that, according to the complaint, the merger would otherwise threaten.  It thereby fully and directly remedies the

---

[2] ACTel does not list its members in its filings with this Court, and its website is no longer active.  According to a spokesman, however, ACTel's members are Cbeyond Communications, Eschelon Telecom, NuVox Communications, TDS Metrocom, and XO Communications.  *See* W. David Gardner, *New Roadblocks Face Verizon-MCI Merger*, TechWeb.com, *available at* http://www.techweb.com/wire/showArticle.jhtml?articleID=163100611.  Each of these companies is also a member of CompTel.  *See* CompTel, *Membership, Member Companies*, *available at* http://www.comptelascent.org/membership/member-companies.htm.

only competitive harm alleged in the complaint.  (Point II.A, *infra*.)  ACTel complains that MCI's facilities will be divested to smaller competitors lacking sufficient scope and scale to match the prices that MCI charged.  But this claim is not self-proving, and neither of ACTel's declarations provides the factual details or empirical support necessary to evaluate its merits. Moreover, one of ACTel's declarations — from an executive of a competing carrier who admits that his company is attempting to acquire MCI's assets to augment its already extensive network facilities — is proof that the proposed remedy *will* have its intended effect of preserving competition at the locations allegedly affected by the merger.  (Point II.B, *infra*.)

ACTel's other criticisms of the Proposed Final Judgment, though disguised as challenges to the remedy, amount in substance to an impermissible claim that the Department should have found additional forms of competitive harm.  (Point III.A, *infra*.)  In its effort to expand the scope of the Department's complaint, ACTel relies primarily on evidence that was carefully considered and properly rejected as unpersuasive by both the Department and the Federal Communications Commission ("FCC") following comprehensive investigations.  Even if it were within the compass of this proceeding for the Court to reexamine the Department's and the FCC's determinations — and it is not — ACTel provides no reason to doubt the soundness of their analysis.  (Point III.B, *infra*.)  The ACTel evidence also suffers from fatal flaws even beyond those identified by the Department and the FCC.  (Point III.C, *infra*.)

## I.      THIS COURT HAS NO AUTHORITY TO RE-WRITE THE DEPARTMENT'S COMPLAINT

The complaint that the Department of Justice filed with this Court is the product of a comprehensive investigation.  Based on that investigation, the Department also filed a Competitive Impact Statement with this Court that meets all the requirements of the Tunney Act. Under established precedent, the Department is therefore entitled to deference.  ACTel cannot

properly demand that this Court re-write the complaint or re-open the Department's investigation.

A.    **The Department of Justice Conducted a Comprehensive Investigation That Considered Every Facet of Verizon's and MCI's Businesses**

The Department spent seven months examining every aspect of Verizon's and MCI's businesses. In the course of that investigation, the Department collected tens of thousands of documents that it requested and that the parties produced. It issued dozens of interrogatory requests, which resulted in the production of extensive data regarding the parties' respective operations and services. And it held numerous meetings with the parties to review all of this information and to discuss various questions and concerns.

The Department also obtained extensive information from third parties, including ACTel's (and CompTel's) members. Among other things, the Department collected data regarding the locations where competing carriers had deployed fiber-optic facilities. The Department used these data to prepare a complex spreadsheet that enabled it to determine the extent of competitive alternatives in the areas where the parties operated such facilities. The Department also compared these data to other factors that might affect the ability of competitors to provide service, such as the demand for communications services at the relevant location. Because it is common for competing carriers to deploy fiber to locations where there are high levels of demand,[3] this analysis helped the Department determine the likelihood of additional competitive entry at the locations where MCI operated fiber.

_____

[3] *See* Competitive Impact Statement at 8 (filed Nov. 16, 2005) ("CIS") (explaining that CLECs will deploy fiber to a location "after they have secured a customer contract of sufficient size and length to justify the anticipated construction costs for that building"); Order on Remand, *Unbundled Access to Network Elements; Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 20 FCC Rcd 2533, ¶ 103 (2005) ("Wire centers that possess a high level of demand for telecommunications services are most likely to attract and support competing carrier transmission facilities that duplicate the incumbent LEC's network."),

The Department evaluated not only the merger's potential harms, but also its potential benefits. For example, the Department's interrogatory requests required the parties to identify and substantiate the cost savings and other efficiencies that would result from the merger, and the Department requested and received extensive white papers, presentations, and economic testimony on this subject. Verizon and MCI demonstrated that these cost savings and other efficiencies would total more than $7.3 billion (net present value), including approximately $3 billion in net cost savings and efficiencies from combining Verizon's and MCI's networks (such as transferring traffic from third party networks to MCI's network, avoiding redundant capital expenditures to build network facilities, and obtaining greater discounts on equipment purchases); more than $300 million in net cost savings and efficiencies from integrating Verizon's and MCI's Information Technology systems; nearly $3 billion in personnel expense savings; and approximately $1 billion in greater revenues that the combined companies would be able to earn by offering customers more comprehensive services and introducing new products more quickly.

The Department concluded based on its investigation that the merger would produce "exceptionally large merger-specific efficiencies" that "will likely benefit consumers." DOJ Press Release, *Justice Department Requires Divestitures in Verizon's Acquisition of MCI and SBC's Acquisition of AT&T* (Oct. 27, 2005), *available at* http://www.usdoj.gov/opa/pr/2005/October/05_at_571.html. The Department explained that MCI "sell[s] advanced retail products to enterprise customers and generally ha[s] relied on local exchange carriers, such as [Verizon], for customer access," whereas Verizon "similarly ha[s] relied on inter-exchange carriers [such as MCI] in selling advanced retail products to multi-

---

*petitions for review pending*, *Covad Communications Co., et al. v. FCC, et al.*, Nos. 05-1095 *et al.* (D.C. Cir. argued May 15, 2006).

region and out-of-region enterprises." U.S. Department of Justice & Federal Trade Commission, Commentary on the Horizontal Merger Guidelines at 58 (Mar. 2006), *available at* http://www.usdoj.gov/atr/public/guidelines/215247.pdf. "The merger allowed each of the firms to provide these products at a lower cost to the customers by making inputs and complementary products available at a lower cost." *Id.*[4]

Much of this evidence also was presented to the FCC, which is required to — and in this case did — find that the "potential public interest benefits of the proposed transfer outweigh the potential public interest harms." *See* Memorandum Opinion and Order, *Verizon Communications Inc. and MCI Inc., Applications for Approval of Transfer of Control*, 20 FCC Rcd 18433, ¶ 194 (2005) ("*Verizon/MCI Order*"). The Commission concluded that the "merger will enhance service to U.S. government customers and strengthen U.S. national security," *id.* ¶ 198; that "significant benefits are likely to result from the vertical integration of the largely complementary networks and facilities of Verizon and MCI," *id.* ¶ 203; that the merger "is likely to give rise to significant economies of scope and scale," *id.* ¶ 205; and that the merger also would produce substantial "cost . . . synergies," *id.* ¶ 208.

After careful investigation and analysis, the Department determined that the merger posed only a single competitive issue that required a remedy to protect the public interest.[5] That remedy — the divestiture of fiber laterals ("last-mile" connections) and associated transport at more than 300 buildings — addressed the core area of overlap between MCI's and Verizon's

---

[4] Wall Street analysts have recently observed that the integration of MCI into Verizon is "ahead of schedule" and that Verizon is "on track" to achieve the cost savings and other efficiencies it previously forecasted. Doug Colandrea *et al.*, Bear Stearns, *Verizon 1Q06 Earnings Review* at 4 (May 2, 2006); Jonathan Chaplin *et al.*, JP Morgan, *Verizon: Wireline Results Disappoint; Lowering Estimates* at 1 (May 2, 2006).

[5] Verizon disputed that conclusion, and demonstrated that there was *no* competitive issue that required a remedy to protect the public interest. To avoid protracted litigation, however, Verizon agreed to the proposed remedy.

local operations.  These buildings are located in eight metropolitan areas in Verizon's local

service territory (New York, Washington-Baltimore, Boston, Philadelphia, Richmond,

Providence, and Tampa) where MCI had the most extensive competitive operations.

The Department explained its findings in a Competitive Impact Statement ("CIS") that

meets all the requirements of the Tunney Act.  *See* 15 U.S.C. § 16(b).  The CIS sets forth "the

nature and purpose of the proceeding."  *Id.* § 16(b)(1); *see* CIS at 1-2.  It provides "a description

of the practices or events giving rise to the alleged violation of the antitrust laws," 15 U.S.C.

§ 16(b)(2), explaining the effect of the transaction on competition for Local Private Line service,

*see* CIS at 4-6.  It provides "an explanation of the proposal for a consent judgment" that

describes both the proposed divestiture remedy and "the anticipated effects on competition of

such relief."  15 U.S.C. § 16(b)(3); *see* CIS at 9-13.  The CIS explains that the Proposed Final

Judgment will "remedy the harm alleged in the Complaint" by "[d]ivesting the last-mile

connections to the hundreds of buildings in Verizon's territory" to a purchaser that can "begin

competing immediately for customers in these buildings and [that] will have the rights and cost

structure necessary to be effective."  *Id.* at 9, 11.  Finally, the CIS describes "the remedies

available to potential private plaintiffs damaged by the alleged violation in the event that such

proposal for the consent judgment is entered in such proceeding," 15 U.S.C. § 16(b)(4); *see* CIS

at 13; provides "a description of the procedures available for modification of such proposal," 15

U.S.C. § 16(b)(5); *see* CIS at 14; and contains "a description and evaluation of alternatives to

such proposal actually considered by the United States," 15 U.S.C. § 16(b)(6); *see* CIS at 15.

### B. Tunney Act Review Is Deferential; ACTel's Request To Reopen the Department's Investigation Must Be Rejected

ACTel does not assert, much less prove, that the Department failed to comply with any of

the specific requirements of the Tunney Act.  ACTel instead asserts that the Department "has not

supplied this Court with the affidavit of *any* economist, or for that matter anyone else, that would provide a factual predicate for any of the matters the Court must decide in reviewing the adequacy of the proposed decree." ACTel Mem. at 16. But the complaint and the CIS provide all the factual predicate this Court needs to approve the Proposed Final Judgment, and this Court owes the Department's findings deference under established precedent.

ACTel's claim that the Department failed to provide a sufficient factual predicate for this Court to approve the Proposed Final Judgment misapprehends the standards for Tunney Act review. The Tunney Act requires the Court to "determine that the entry of [a consent] judgment is in the public interest," taking into account "the competitive impact of such judgment" and "the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury *from the violations set forth in the complaint*." 15 U.S.C. § 16(e)(1) (emphasis added). Review is deferential in two independent respects.

First, the reviewing Court should not look behind the complaint and consider whether the Department might have pursued claims that are not raised in the complaint. The court is not permitted to "reach beyond the complaint to evaluate claims that the government did *not* make and to inquire as to why they were not made." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995). Rather, the Tunney Act's demands are satisfied if, "as measured by the Department's *complaint*, the decree . . . represents a material accomplishment." *Massachusetts Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 783 (D.C. Cir. 1997). "Such limited review is obviously appropriate for a consent decree entered into before a trial on the merits because the court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place." *Massachusetts v.*

*Microsoft Corp.*, 373 F.3d 1199, 1236-37 (D.C. Cir. 2004) (internal quotation omitted); *see also United States v. Microsoft*, 56 F.3d at 1459 (noting the "constitutional difficulties that inhere in" the Tunney Act).

Second, the court need not consider "whether the proffered decree is the best possible settlement that could have been obtained." *United States v. G. Heileman Brewing*, 563 F. Supp. 642, 647 (D. Del. 1983) (internal quotation marks omitted); *see also United States v. Western Elec. Co.*, 900 F.2d 283, 309 (D.C. Cir. 1990); *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981). "[T]he court's function is not to determine whether the resulting array of rights and liabilities 'is the one that will *best* serve society,' but only to confirm that the resulting settlement is 'within the *reaches* of the public interest.'" *Western Elec. Co.*, 900 F.2d at 309 (quoting *Bechtel*, 648 F.2d at 666) (internal quotation marks omitted).

Contrary to ACTel's claims, *see* ACTel Mem. at 15-16, recent amendments to the Tunney Act do not alter these principles. The amended statute makes consideration of certain factors mandatory ("the court shall consider") and emphasizes "competitive" considerations. *See* 15 U.S.C. § 16(e)(1); *see also* 150 Cong. Rec. S3610, S3617 (daily ed. Apr. 2, 2004) (statement of Sen. Kohl) (criticizing language in prior opinions suggesting that court should limit its review to "whether entry of the consent judgments would make a 'mockery of the judicial function'"). But nothing in the amendment states or even suggests — particularly in light of the "constitutional questions that would be raised" — that a district court may "subject the government's exercise of its prosecutorial discretion to non-deferential review." *Massachusetts Sch. of Law*, 118 F.3d at 783.

As explained above, the Department's complaint and CIS are the product of an extensive investigation and comply with all requirements of the Tunney Act. ACTel fails to show that

either submission is deficient in any respect, and it fails to provide any other basis for the Court

to re-open the Department's investigation.  ACTel instead accuses the Department of conducting

a "microanalysis of competition," borrowing a phrase that a journalist for The American Lawyer

once used to describe an unrelated decision.  ACTel Mem. at 14.  But that criticism is

inapplicable here.  ACTel assumes that, because the remedy the Department ultimately

demanded was relatively narrow, its investigation must have been narrow as well.  As described

above, however, the Department's investigation probed every aspect of the parties' respective

operations and services, thoroughly analyzed competition for those services, and drew pertinent

information from a wide variety of sources.  The Department was not required to demand — and

could not lawfully have demanded — remedies that were not warranted by the narrow (in the

Department's view) or no (Verizon's) harm caused by the merger; its decision to seek a

relatively modest, or even no remedy does not diminish the rigor and thoroughness of its

underlying investigation.

## II.    THE PROPOSED FINAL JUDGMENT FULLY AND EFFECTIVELY
ADDRESSES THE COMPETITIVE HARM ALLEGED IN THE COMPLAINT

During the course of the Department's investigation, Verizon and MCI demonstrated that

competition for Local Private Line services was intense and that the merger would not

substantially lessen competition for these services.  Verizon and MCI explained, for example,

that MCI's local fiber networks in Verizon's region were of minimal competitive significance,

both because they were narrow in scope and because they were used to compete for Verizon's

core Local Private Line customers to only a limited extent.  Verizon and MCI further showed

that, in the overwhelming majority of the locations where MCI had deployed fiber, many other

competitive fiber suppliers either were already serving those exact locations or had nearby fiber

facilities that could readily be extended there.  The relatively small number of exceptions were so

geographically dispersed and accounted for such a small percentage of overall capacity that they were not economically meaningful.  Verizon and MCI also demonstrated that the major customers of Local Private Line services — other carriers and large enterprises — are highly sophisticated and typically require service in multiple locations across the country (including places in which a combined Verizon/MCI will not have facilities).  It would therefore be impossible for Verizon to discriminate selectively in locations where MCI had overlapping fiber that was not subject to existing competition or that could not be readily duplicated.

Based on this showing, Verizon and MCI explained that there was no need for a remedy of any kind.  The Department reached a different conclusion, finding that the merger would reduce competition for Local Private Line services at certain locations.  While Verizon disagreed with that determination, there can be no serious dispute that the remedy obtained by the Department in the Proposed Final Judgment represents a complete fix to the limited competitive harm identified in the complaint.

> ### A.  The Proposed Remedy Satisfies the Standards of the Tunney Act Because It Alleviates Precisely the Competitive Harm That the Complaint Alleged

The complaint alleges that customers may lose the benefits of facilities-based competition in buildings where MCI was the sole facilities-based competitor to Verizon and where additional competitive entry is unlikely because of the high capital costs associated with construction of fiber-optic facilities.  As the Competitive Impact Statement explains, "Verizon and MCI are the only two firms that own or control a direct wireline connection" to several hundred commercial buildings in Verizon's service territory, and the merger "would reduce the number of carriers with an owned or controlled last-mile connection from two to one."  CIS at 7.  "The merger would, therefore, effectively eliminate competition for facilities-based Local

Private Line service to those buildings, and many retail and wholesale customers would no longer have MCI as a competitive alternative to Verizon." *Id.*

The Proposed Final Judgment directly addresses this concern by requiring divestiture of MCI's existing fiber-optic facilities at more than 300 buildings. As the Competitive Impact Statement explains, "divesting these last-mile connections will restore the lost facilities-based competition." *Id.* at 10. By ensuring that there is an effective fiber-based competitor other than Verizon at each of these buildings, the remedy prevents Verizon from attempting to "raise [the] price to retail and wholesale customers" at those locations, because the competitor can undercut Verizon's bid. Compl. ¶ 25.

The Proposed Final Judgment also takes steps to ensure that the divested assets will be acquired by an entity willing and able to use those assets to compete effectively. *See* CIS at 9 (the Divestiture Assets "must be divested in such a way as to satisfy the United States in its sole discretion that they will be used by the purchaser to compete effectively and remedy the harm alleged in the Complaint"). In addition to reserving the right to approve the purchaser, the Department required that the assets in each metropolitan area be divested to a single purchaser, thereby helping to ensure that the purchaser has sufficient scale to compete effectively. *See id.* at 10. The Department also required that the purchaser be given "adequate capacity to serve customers in a given location," sufficient "to serve current demand and allow for future growth and changes in the local service area." *Id.* Finally, to ensure that the divested assets could be connected to the purchaser's network, the Department required the divestiture of transport facilities "sufficient to connect the divested last-mile connections to locations mutually agreed upon by" the parties. *Id.* at 10-11.

These carefully crafted provisions provide an effective remedy that directly addresses the specific competitive harms that form the basis for the Department's complaint. Nothing more is required.

### B.     ACTel's Criticisms Are Unsubstantiated and Unwarranted

ACTel argues that the proposed remedy is inadequate because MCI's assets will be divested to smaller competitors that will not have sufficient scope and scale to match MCI's prices. *See* ACTel Mem. at 18-19; *see also* ACTel Supp. Mem. at 13-14. ACTel submits two declarations to support this claim — one by Randolph C. Nicklas, Vice President of Engineering, XO Communications, and the other by Joseph Gillan, an outside consultant. *See* ACTel Supp. Mem. Exhs. 1 & 14. Neither establishes that the proposed remedy is ineffective.

As an initial matter, the premise of ACTel's argument — that MCI charges prices lower than those of other smaller competitors — is empirically false. During the 2002-2004 period, MCI engaged in price-cutting of its Local Private Line rates, but those price cuts resulted from unique circumstances that no longer applied at the time of the merger. During that time, MCI's competitors sought to use the company's bankruptcy as a wedge to capture its customers. MCI responded to this one-time event by adopting a temporary pricing strategy designed to retain its customer base at all costs. Although MCI's defensive pricing practices during this time yielded significant price reductions, MCI was not a price leader but a follower, reducing its prices to meet the prices set by competitors that were themselves heading into bankruptcy. Having emerged from bankruptcy with its customer base largely intact, MCI steadily raised its special access prices to levels above those of its competitors, and was continuing to raise prices at the time of the merger.

Even if we accept for the sake of argument that MCI provided the level of competition that ACTel claims, ACTel fails to demonstrate that its members and other competitors will not be able to replace it. First, Mr. Nicklas's declaration unwittingly confirms that the proposed remedy will have precisely its intended effect of "restor[ing] the lost facilities-based competition." CIS at 10. Mr. Nicklas explains that XO has "submitted bids for certain 'indefeasible rights of use' for fiber laterals" and that it will use these laterals to "augment its network." Nicklas Decl. ¶¶ 4, 7. Mr. Nicklas acknowledges that XO's network is already extensive: it has deployed "over 7,000 route miles of its own fiber," and it operates "in 30 cities in 26 states using a combination of network assets it owns or controls and facilities or services leased from other parties." *Id.* ¶ 2. It is implausible for ACTel to claim that the proposed remedy is ineffective when its own members are seeking to avail themselves of the divested MCI assets to strengthen their competitive posture and thereby to further competition in the affected service areas.[6]

Second, ACTel claims that XO and other competitors are smaller than MCI and that smaller companies must necessarily charge prices higher than those of its larger competitors. *See* ACTel Mem. at 18-19; ACTel Supp. Mem. at 13-14; Gillan Decl. ¶¶ 9-14. The claim is misconceived. To start, Mr. Gillan offers no empirical evidence to support his assumption that smaller competitors necessarily charge prices higher than those of larger competitors. *See* Gillan Decl. ¶¶ 9-14. In fact, ACTel's supposed competitive concerns are premised squarely on the proposition that the opposite is true — that prior to the merger Verizon's prices were *higher* than those of MCI and other competitors, despite its much larger size, and that "the wholesale market

---

[6] Although Mr. Nicklas claims that "XO's prices to the wholesale market for local private lines are *often* necessarily higher than those charged by the old AT&T and MCI," *id.* ¶ 7 (emphasis added), he provides neither the details needed to evaluate the validity of such a claim — such as how often, and how much higher — nor any empirical support.

functioned effectively, producing low prices." ACTel Comments Regarding the Proposed

Consent Decrees at 5 (Heading). The FCC similarly rejected claims that MCI had "unique

advantages" by virtue of it size, explaining that "other competing carriers collectively" had more

extensive facilities than did MCI in the areas where MCI was competing. *Verizon/MCI Order*

¶¶ 42, 44; *see also id.* ¶ 47.

Moreover, although MCI was one of the largest competitors in Verizon's region, it was

not the largest. That distinction belongs to AT&T, which now dwarfs the former MCI and is

competing aggressively in Verizon's region. ACTel attempted to sidestep this fact in its

previous filings by arguing that Verizon and AT&T were likely to engage in "mutual

forbearance" from competing against each other. That argument was soundly rejected by

regulators. *See id.* ¶ 54 (explaining that, given that Verizon was spending billions to acquire

MCI's assets in AT&T's territory, "it is reasonable to expect Verizon to have strong incentives to

utilize fully its assets in SBC's territory"). ACTel does not try to resuscitate the argument here.

ACTel's rehashed arguments provide no basis for second-guessing the Department's

well-reasoned and amply documented conclusion that the proposed remedy fully addresses the

competitive harm identified in the complaint and therefore serves the public interest.

### III.    ACTEL'S CHALLENGES TO THE PROPOSED FINAL JUDGMENT EXCEED THE SCOPE OF THIS PROCEEDING, REPEAT CLAIMS THAT BOTH THE DEPARTMENT AND THE FCC REJECTED, AND PROVIDE NO BASIS FOR DENYING THE DEPARTMENT'S MOTION

ACTel does not take issue with the Department's core determination that the only

competitive harm that justified a remedy in this case involved Local Private Lines. *See* ACTel

Mem. at 17-18. ACTel's main criticism of the Proposed Final Judgment is that the remedy is

limited to those buildings where Verizon and MCI were the only two competitive suppliers of

Local Private Lines (so-called "two-to-one" buildings) and ignores many other locations where

ACTel claims the elimination of MCI would result in higher prices for Local Private Line services. ACTel's challenges fail for multiple reasons.

**A.**     ACTel argues that the Department should have identified additional areas of competitive harm beyond the two-to-one buildings, not that the proposed remedy fails to address the harm that the Department alleged in its complaint. As explained above, however, the Department decides whether and where there is competitive harm, and has unreviewable discretion in framing its complaint. This Court must determine whether the proposed remedy meaningfully addresses *that alleged harm* — and not other supposed harms hypothesized by competitors such as ACTel. The Proposed Final Judgment fully satisfies that standard, and this Court should reject ACTel's invitation to stray beyond the proper boundaries of this proceeding.

**B.**     In its attempt to recast the Department's complaint, ACTel relies on the same evidence that both the Department and the FCC fully considered and persuasively rejected. Even if it were open to this Court to review the Department's exercise of prosecutorial discretion — and it is not — nothing in ACTel's submission provides any basis for questioning the soundness of the Department's judgment.

ACTel's main argument — that the merger will result in competitive harm in locations beyond those identified in the complaint — rests on a summary of an analysis performed by economist Dr. Simon Wilkie. Dr. Wilkie purported to examine what would happen to prices for Local Private Line services if MCI were removed as a competitor. He based his study on "22 different databases collected from four companies that purchase Local Private Lines." ACTel Mem. Exh. 2 (Wilkie Declaration) ¶ 4. According to ACTel, this analysis "revealed that the greater the number of suppliers for (that is, the more bidders supplying) a given Local Private Line circuit, up to four or five suppliers, the lower the price the customer had to pay," that "MCI

and AT&T were the most frequent and most price-aggressive suppliers," and that their elimination as suppliers would "result in dramatic price increases for all types of Local Private Line circuits, going well beyond '2 to 1' loop situations."  ACTel Mem. at 20.

The Department rejected Dr. Wilkie's analysis.  There is no basis for the Court to second-guess that determination here.  As ACTel acknowledges, the Department "retained a widely recognized economist, Dr. Michael Katz, a former chief economist of the Antitrust Division, as well as the economic consulting firm of Charles River Associates, to assist in the investigation," and "Charles River Associates' personnel, as well as the Government attorneys and staff economists, received Dr. Wilkie's findings." *Id.*  Although ACTel alleges that that the Department "abruptly terminated" its investigation before it was complete, *id.*, it offers nothing but conjecture to support that allegation.  The fact is that the Department considered an enormous body of evidence, including economic testimony and other evidence contradicting Dr. Wilkie's claims.  On the basis of that complete record, the Department identified the specific competitive harm specified in the complaint.  There is no reason for the Court to credit ACTel's unsupported speculation that the Department rejected Dr. Wilkie's analysis on some basis other than its lack of merit.

Indeed, the Department was not alone in finding Dr. Wilkie's analysis unpersuasive.  The FCC likewise determined that his study was flawed.  The FCC first noted that, because ACTel failed to provide the "source data []or even the underlying methodologies used for the analyses," it was impossible to subject the study to critical "examination by opposing parties." *Verizon/MCI Order* ¶ 46.  Even so, the FCC found substantive flaws in the analysis that were discernible even from the limited description that ACTel did submit.

First, Dr. Wilkie's analysis "appear[s] to conflate Type I and Type II special access offerings"[7] — services that both the FCC and DOJ found to be in separate relevant product markets.  *Id.* ¶ 46; *see* CIS at 7 ("Although other competitors might resell Local Private Lines from Verizon [that is, provide Type II service], those competitors would not be as effective a competitive constraint because Verizon would control the price of the resold circuits").

Second, the FCC found that Dr. Wilkie's calculations of the likely price effects from the removal of MCI were skewed because he based his analysis on Verizon's "Special Access 'Rack' Rates" (standard tariff rates) and failed to take into account that competing carriers typically purchase Verizon's special access services at discounts of 35 to 40 percent off those rack rates.  *See Verizon/MCI Order* ¶ 43 n.114 (criticizing Dr. Wilkie's analysis for relying on the "simple tariff rate" to estimate special access prices).  This one correction by itself would have eliminated between two-thirds and four-fifths of the price differential that Dr. Wilkie purported to identify, rendering the results of his analysis largely meaningless.

ACTel now blames the FCC for ACTel's own failure to submit the underlying data on which it relied, claiming that the FCC "did not even seek access to the material."  ACTel Mem. at 20 n.21.  But if ACTel wanted the FCC to rely on its analysis, it could and should have provided the required data itself.  *See, e.g.*, 47 C.F.R. § 1.363 (detailing the underlying data to be submitted in support of statistical studies).  Verizon and MCI, moreover, specifically requested the underlying data used in Dr. Wilkie's analysis, but ACTel's counsel refused to provide it.  *See* Letter from Brad E. Mutschelknaus, Kelley Drye & Warren, to Sherry Ingram, Verizon (July 7, 2005) (attached hereto as Exhibit A) ("As you are aware, Verizon and MCI have no right of

---

[7] Type I special access services "are offered wholly over a carrier's own facilities," whereas Type II special access services are "offered using a combination of the carrier's own facilities . . . and the special access services of another carrier."  *Verizon/MCI Order* ¶ 26.

discovery in this proceeding, and neither Kelley Drye & Warren LLP or its clients in this matter

have any obligation to provide the requested information to you.  You should also be aware that

the information that you request is highly confidential, proprietary, and competitively

sensitive.").

     ACTel claims that it refused to submit the required data because the FCC's protective

order was inadequate.  *See* ACTel Supp. Mem. at 7.  It argues that the FCC could have reviewed

the data by examining, with ACTel's consent, the confidential responses that ACTel filed in

response to the Department's Civil Investigative Demand.  *See id.*  As the FCC explained,

however, ACTel not only failed to submit its source data, but also withheld the "underlying

methodologies used for the analyses," *Verizon/MCI Order* ¶ 46, and ACTel has offered no

justification for that refusal.  Moreover, as ACTel concedes, even if the FCC had reviewed Dr.

Wilkie's source data on file at the Department, it would not have been able to "incorporate[] [the

data] into the formal FCC record."  *See* ACTel Supp. Mem. Exh. 2 (Mutschelknaus Declaration)

¶ 6.  In those circumstances, the FCC could not have relied on the data in its order.  *See Center*

*for Auto Safety v. Federal Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992) (holding that an

agency "cannot . . . rely on [evidence] to provide the requisite evidentiary support during judicial

review" when that evidence was not "introduced . . . into the administrative record"); *Bethlehem*

*Steel Corp. v. EPA*, 638 F.2d 994, 1004 (7th Cir. 1980) (agency must create record adequate to

permit review); *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 643 (5th Cir. 1983) (agency is

responsible for independent verification of specifically challenged information obtained from

outside consultants); *see also International Union, UAW v. NLRB*, 459 F.2d 1329, 1336 (D.C.

Cir. 1972) ("[W]hen a party has relevant evidence within his control which he fails to produce,

that failure gives rise to an inference that the evidence is unfavorable to him.").[8]  Under the same

protective order that ACTel claims was inadequate, Verizon and MCI submitted enormous

volumes of competitively sensitive data into the record where it was subject to examination from

opposing parties, including ACTel.  ACTel elected to avoid this same level of scrutiny.

     **C.**     In addition to the reasons specifically identified by the FCC, Dr. Wilkie's analysis

was flawed in two additional respects that were developed in the record below.

     First, ACTel is wrong to claim that Dr. Wilkie's analysis was based "on what actually

happened in the market" and therefore should be given more weight than the Department's

"structural analysis."  ACTel Mem. at 24-25.  As Dr. Wilkie himself concedes, his analysis did

not measure *actual* competitive effects, but instead was purely a predictive model that was

designed to measure "the *likely* competitive effects" of removing MCI as a bidder.  Wilkie Decl.

¶ 9 (emphasis added).  As Dr. Wilkie notes in the preceding sentence, however, that is exactly

what the Department's analysis was designed to do as well.  *See id.* (DOJ's analysis designed to

provide "inferences regarding the likely competitive effect of a proposed merger").

     Dr. Wilkie analyzed historical pricing data, comparing prices offered in response to

requests for proposal ("RFPs") where MCI participated and where MCI did not participate.  *See*

*id.* ¶ 7.  Dr. Wilkie then assumed that the difference between the bid prices in these two

situations would be the price effect of removing MCI from the market.  But Dr. Wilkie failed

even to consider, let alone to account for, the ability of other carriers to enter the bidding process

---

[8] Although ACTel's outside lawyer claims that it is "relatively commonplace" for the FCC to request permission to review data filed with the Department in response to Civil Investigative Demands, *see* Mutschelknaus Decl. ¶ 6, he neglects to mention that the reason the FCC typically seeks to review such data is to inform its own decision of what data to request parties to produce for the FCC's record, not to rely on the data given to Department.  Because ACTel has maintained that it would have refused to submit its data to the FCC even on request, there was nothing for the FCC to gain by reviewing Dr. Wilkie's data on file at the Department.

if MCI were no longer in the market. With respect to the circuits in Verizon's region that Dr.

Wilkie studied, for example, there is no way to determine whether some or all the circuits were

located in very large commercial office buildings that one or more competitors might be willing

to serve once MCI's facilities are removed from the market. This omission is particularly critical

because of the possibility that MCI's presence may have been what deterred additional

competitive entry in the first instance. Dr. Wilkie also failed to consider that MCI's recent

historical pricing was not a good indicator of the prices it was likely to charge going forward,

because those prices were due in large part to a one-time defensive pricing strategy that MCI

adopted during its bankruptcy. *See supra* p. 13.

Second, despite ACTel's attempts to portray Dr. Wilkie's analysis as robust, the reality is

that it was based on a very small sample of bids. Dr. Wilkie did not even attempt to demonstrate

that this limited sample was statistically valid. In Verizon's region, for example, Dr. Wilkie's

analysis studied only 400 so-called DS1 circuits (which offer bandwidth equivalent to 1.54

megabits per second). *See* Wilkie Decl. ¶ 7. By comparison, Verizon sells to competing

carriers, as Local Private Lines, hundreds of thousands of DS1 circuits as well as tens of

thousands of much-higher-bandwidth DS3 and OCn circuits; prior to the merger, MCI likewise

sold to competing carriers as Local Private Lines tens of thousands of DS1 circuits, thousands of

DS3 circuits, and hundreds of OCn circuits; and other competitors similarly provide thousands of

high-capacity circuits as Local Private Lines. Dr. Wilkie based his analysis on less than one-

hundredth of one percent of competitive Local Private Line circuits sold in Verizon's region. A

study of such limited scope cannot be considered a reliable predictor of market behavior. For

these and many other reasons, Dr. Wilkie's work was unpersuasive to the Department and the

FCC. It should not be given any greater weight here.

**CONCLUSION**

ACTel's motion should be denied and the Department's motion for entry of the Final Judgment should be granted.

Respectfully submitted,


/s/ Mark C. Hansen_____

| | |
|---|---|
| John Thorne | Mark C. Hansen |
| David E. Wheeler | Mark L. Evans |
| Verizon Communications Inc. | Aaron M. Panner |
| 1515 N. Courthouse Road | Evan T. Leo |
| Arlington, Virginia 22201 | Kellogg, Huber, Hansen, Todd, |
| Telephone: (703) 351-3000 | Evans & Figel, P.L.L.C. |
| Facsimile: (703) 351-3670 | 1615 M Street, N.W., Suite 400 |
| | Washington, D.C. 20036-3209 |
| | Telephone (202) 326-7900 |
| | Facsimile (202) 326-7999 |

May 31, 2006