## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.:  1:05CV02102 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| SBC Communications, Inc. and | ) | |
| AT&T Corp., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 1:05CV02103 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| Verizon Communications Inc. and | ) | |
| MCI, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

### REPLY OF THE UNITED STATES TO ACTEL'S OPPOSITION TO THE UNITED STATES' MOTION FOR ENTRY OF THE FINAL JUDGMENTS

On April 5, 2006, the United States moved this Court to determine that entry of the proposed Final Judgments in these matters would be in the public interest and then to enter them. In an opposition to this motion filed on May 5, 2006, and a supplemental submission filed on May 16, 2006, ACTel contends that the Court should deny the government's motion.  As detailed in our prior filings and *infra*, the United States has satisfied the requirements of the Tunney Act, providing the Court with sufficient information to find that the settlements incorporated in the proposed Final Judgments are in the public interest.

The principal issue before this Court is whether the remedies negotiated and proposed by the United States and accepted by the defendants adequately address the harm identified in the Complaints, and are in the public interest. ACTel's filings raise no serious issues about the sufficiency or effectiveness of the proposed remedies to address the alleged harm. Rather, ACTel's arguments wander far from the appropriate focus of this proceeding. ACTel contends, in essence, that the United States should have brought a different, broader case, and that the 2004 Amendments to the Tunney Act ("2004 Amendments") allow the Court to substitute ACTel's view of the harm that should have been alleged for the view developed by the United States during its extensive investigation. The 2004 Amendments clarified certain aspects of the Tunney Act, but they do not permit such a result. Moreover, such a result would be untenable, as ACTel relies on limited factual support for its view. The United States considered a much wider evidentiary record – including hundreds of interviews (with customers, competitors, and consultants) and millions of pages of contemporaneous business documents from industry participants – in reaching its decision that the harm alleged in the Complaints was the only harm that was likely to result from the mergers.

Section I, *infra,* outlines in general terms the nature of the Court's Tunney Act review and the standard the Court is to apply under the amended statute. Section II explains why ACTel's arguments about the adequacy of the remedies proposed are meritless. Finally, Section III reviews each of the factors specified in the Tunney Act for the Court to consider, and shows how each supports entry of the proposed decrees.

I.     **The Court's Task Is To Determine Whether, Based on the Factors Enumerated in the Tunney Act, the Proposed Final Judgments Fall Within the Public Interest**

Before the Court may enter the proposed consent decrees here as the Court's final judgments, the Tunney Act requires it independently to determine, after considering at least a specified list of factors, that it would be in the public interest to enter them.[1]  The Court of Appeals has focused a district court's public interest inquiry on the relationship between the allegations in the government's complaint and the proposed remedy, viewed in light of the nature of settlements. It has explained that the proper standard for evaluating that relationship is whether the proposed decree is within the reaches of the public interest,[2] which in this case means that the decrees adequately prevent the competitive harm the United States has alleged to follow from the mergers at issue, without imposing undue harm in the process.[3]  Moreover, Congress intended that the Court reach this determination as expeditiously as possible,[4] and the Court of Appeals has made clear that due deference should be given to the government's predictions regarding the effect of its proposed remedies.[5]

In 2004, Congress amended the Tunney Act.  Congress changed the statutory list of factors a district court considers from optional to mandatory, so that courts may not ignore any of the items on the list.  But it did not change the standard the court is to apply in determining whether

---

[1] 15 U.S.C. § 16(e)(1).

[2] *United States v. Microsoft Corp.*, 56 F.3d 1448, 1459-62 (D.C. Cir. 1995).

[3] The public interest determination may also address certain related aspects of the effect of the decree's antitrust remedies.  *See infra* notes 25-27 and accompanying text.

[4] *See infra* note 23 and accompanying text.

[5] *Microsoft*, 56 F.3d at 1461.

entry of the decree would be in the public interest.  This Circuit's precedents accordingly remain authoritative on this issue.

### A.     The Tunney Act Requires the Court to Determine Whether It Is in the Public Interest to Enter the Proposed Settlement as a Judicial Decree

When the parties to an antitrust case come before the Court in a Tunney Act proceeding, they have already resolved their dispute reflected in the antitrust complaint.  The Court therefore does not face the typical task of adjudicating the merits of that dispute.  Rather, the Court's task is to determine whether to perform the judicial act of entering the proposed decree.[6]  In cases involving only private interests, the decision to enter settling parties' agreements as judgments requires little judicial attention.[7]  But in considering whether it should enter a consent decree affecting the public interest, "[t]he court has a larger role,"[8] most fundamentally because a court must avoid letting its decree become "an instrument of wrong" to the public.[9]

Well before the Tunney Act was enacted, courts recognized that approving an antitrust decree required a determination that the decree was equitable and in the public interest, and, in

---

[6] Because it results from a negotiated settlement, not from adjudication, the decree will not be "determined by the judge, who [following adjudication] may draft it, accept the draft proposed by the winning party, or adopt portions of draft language proposed by any of the parties," *Janus Films, Inc. v. Miller*, 801 F.2d 578, 582 (2d Cir. 1986), to achieve the result the Court views as appropriate, subject only to review on appeal.

[7] *See United States v. City of Miami*, 614 F.2d 1322, 1330 (5th Cir. 1980) ("In what can be termed 'ordinary litigation,' that is, lawsuits brought by one private party against another private party that will not affect the rights of any other persons, settlement of the dispute is solely in the hands of the parties . . . .  [T]he court need not and should not get involved."); *Janus Films*, 801 F.2d at 582 (asserting that the "court normally has only a limited role so long as the dispute affects only private interests").

[8] *Janus Films*, 801 F.2d at 582.

[9] *United States v. Swift & Co.*, 286 U.S. 106, 115 (1932); *cf. United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (analogizing public interest determination to decision on decree modification, where "a court should not reject an agreed-upon modification unless 'it has exceptional confidence that adverse antitrust consequences will result'") (citation omitted).

making this "public interest" determination, they considered whether the government had acted in

good faith, whether the settlement adequately and reasonably remedied the violations specifically

alleged in the complaint, and whether the consent decree unnecessarily impaired public policies

other than competition.[10]  This is the court's independent determination, but it is an independent

determination about the prosecutor's proposed remedy for the alleged violation, not an

independent determination of what remedy the court might have imposed after a trial for the

alleged violation, and certainly not a determination of what remedy might be appropriate for a

different violation that the government did not allege.  The focus on the violations alleged

recognizes the separate roles of judges and prosecutors in our constitutional system.[11]  The Tunney

Act embodies the pre-existing public interest standard:  "the court shall determine that the entry of

such judgment is in the public interest."[12]  As Judge Greene explained in *United States v. AT&T*

---

[10] *See, e.g.*, *United States v. Ling-Temco-Vought, Inc.*, 315 F. Supp. 1301, 1308-09 (W.D. Pa. 1970); *United States v. CIBA Corp.*, 50 F.R.D. 507, 513-14 (S.D.N.Y. 1970); *United States v. Carter Prods., Inc.*, 211 F. Supp. 144, 147-48 (S.D.N.Y. 1962).

[11] A focus on what is not alleged in the complaint would amount to a questionable focus on the executive branch's decision regarding what case to bring.  The Supreme Court long has recognized that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (citing, *inter alia*, *Confiscation Cases*, 74 U.S. (7 Wall.) 454 (1869)).  As the Court explained, "[t]his recognition of the existence of discretion is attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement."  *Id.*  It also is rooted in the Constitution: "[A]n agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict – a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'  U.S. Const., Art. II, § 3."  *Id.* at 832.

[12] 15 U.S.C. § 16(e)(1).  Prior to the 2004 Amendments, the quoted language appeared in 15 U.S.C. § 16(e).

("*AT&T*"), the Tunney Act "represents an endorsement of the line of cases in which courts examined proposed consent decrees to determine whether they were in the public interest."[13]

Although the Tunney Act does not define the term "public interest," the Court of Appeals for this Circuit has provided guidance as to its meaning, consistent with both historical practice and the Tunney Act's language and legislative history.  In *Microsoft*, the court properly focused the inquiry on the relationship between the allegations of the government's complaint and the proposed remedy.[14]  It took into account the respective roles of the executive and the judicial branches in these matters, the fact that settlement agreements and proposed decrees ordinarily arise before any judicial determination that the allegations of the complaint have been, or are likely to be, proved, and that such settlements may therefore reflect compromise and "underlying weakness in the government's case."[15]  In this light, the court recognized that a proper public interest test is flexible, and does not require a uniquely right remedy.  Thus, a district court is not "empowered to reject [the government's proposed remedies] merely because [it] believed other remedies were preferable";  the test, previously adopted by other courts, is whether the proposed settlement is "within the *reaches* of the public interest."[16]

---

[13] *United States v. AT&T*, 552 F. Supp. 131, 149 n.74 (D.D.C. 1982) ("*AT&T*"), *aff'd mem. sub nom. Maryland v. United States*, 460 U.S. 1001 (1983).

[14] *Microsoft*, 56 F.3d at 1459-62.  The court rested this focus on both statutory language and constitutional concerns.  *Id.* at 1459, 1462.

[15] *Id.* at 1461.  As the court explained, "It is . . . inappropriate for the judge to measure the remedies in the decree as if they were fashioned after trial."  *Id.*

[16] *Id.* at 1460 (emphasis in original) (internal quotation marks omitted).  ACTel contends that Senator Kohl has criticized the "reaches of the public interest" standard.  ACTel's Motion for Amicus Curiae and Intervenor Status Pursuant to the Tunney Act and in Opposition to the United States' Motion for Entry of the Final Judgments at 10 (May 4, 2006) ("ACTel Mem.").  However, the 2004 Amendments did not repeal it, and this circuit has not abandoned it.

This flexible standard, moreover, reflects the critical role that consent decrees play in public antitrust enforcement, a role the Tunney Act was intended to preserve.[17]  A consent decree is the product of negotiation.  The parties weigh the benefits of prompt and certain resolution of the case against the possibility that continued litigation might improve their respective positions.  Settlements potentially offer the public the benefits of more timely and certain relief, as well as significant savings in judicial and prosecutorial resources.[18]  But if courts refuse to enter any consent decree that does not match precisely the relief the court would have imposed in the absence of a settlement, "defendants would have no incentive to consent to judgment and this element of compromise would be destroyed.  The consent decree would thus as a practical matter be eliminated as an antitrust enforcement tool, despite Congress' directive that it be preserved."[19]

The court thus properly looks to whether the proposed decree adequately achieves the purposes of an antitrust remedy,[20] which in the context of these mergers is to prevent the competitive harm alleged to follow from the mergers.  In determining whether a proposed decree would adequately achieve those purposes, the court necessarily gives significant deference "to the

---

[17] *See* S. Rep. No. 93-298, 93d Cong., 1st Sess., at 5 (1973) ("[T]he consent decree is of crucial importance as an enforcement tool, since it permits the allocation of resources elsewhere."); 119 Cong. Rec. 24,600 (1973) (statement of Sen. Gurney) (The Tunney Act "is designed to enhance the value and effectiveness of the consent decree as a tool of public policy.").

[18] *See, e.g.*, *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971).

[19] *AT&T*, 552 F. Supp. at 151.

[20] In these cases, it does not matter for purposes of this Court's public interest determination that a consent decree should be evaluated as the outcome of negotiation, rather than as if it were the product of a government victory at trial.  The proposed decree here requires essentially the same relief that would have been requested had the United States prevailed at trial.  Nevertheless, the Court of Appeals has so held, *Microsoft*, 56 F.3d at 1460-61 & n.8, and the Tunney Act's legislative history recognizes the propriety of negotiated compromises.  H.R. Rep. No. 93-1463, 93d Cong., 2d Sess., at 12 (Congress intended that the statutory "public interest" concept encompass "compromises made for non-substantive reasons inherent in the process of settling cases through the consent decree procedure.).

government's predictions as to the effect of the proposed remedies," since neither remedy nor liability has been litigated;[21] the court is evaluating the relationship between the remedy and the public interest in light of the allegations.  The question is whether "the Department of Justice's explanations [are] reasonable under the circumstances."[22]

Although the Tunney Act allows district courts to employ diverse means of obtaining information that could inform its public interest determination, 15 U.S.C. § 16(f), only the Competitive Impact Statement and the government's Response to Public Comments are required. Other means lie within the Court's sound discretion, guided by the principle that "the trial judge will adduce the necessary information through the least complicated and least time-consuming means possible."[23]  The 2004 Amendments imposed no change in the discretionary nature of these proceedings.  Indeed, they specifically provide that "Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene."[24]

---

[21] *Microsoft*, 56 F.3d at 1461.

[22] *United States v. Western Electric Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) (internal quotations omitted) (citing with approval other courts' "understanding of the court-agency relation under the Tunney Act").

[23] S. Rep. No. 93-298, at 6; *accord* H.R. Rep. No. 93-1463, at 8.  Ordinarily, there is no need to rely on the optional techniques.  *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (asserting the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); Antitrust Procedures and Penalties Act:  Hearings on S. 782 Before the Subcommittee on Antitrust & Monopoly of the Senate Committee on the Judiciary, 93d Cong., 1st Sess. (Mar. 15, 1973), at 152-53 (testimony of Hon. J. Skelly Wright) ("[A]n experienced judge, who does have the facility of getting to the point and getting others to get to the point, can arrive at a public interest determination in most cases without using" additional tools.); S. Rep. No. 93-298, at 6 ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

[24] 15 U.S.C. § 16(e)(2).

Beyond the relationship between allegations and remedy, the court, which must "preside over the implementation of the decree,"[25] also properly gives attention to whether the proposed decree is ambiguous or otherwise likely to generate difficulties in implementation.  If it is, the court properly "insist[s] that these matters be attended to."[26]  And since a court seeks to do no harm, "if third parties contend that they would be positively injured by the decree, a district judge might well hesitate before assuming that the decree is appropriate."[27]

### B.     The 2004 Amendments Did Not Overrule This Circuit's Tunney Act Jurisprudence

ACTel argues that this Court can disregard this Circuit's binding Tunney Act precedent, alleging that an entire "line of District of Columbia Circuit authority" was "overruled by legislation," i.e., the 2004 Amendments.  This allegation has no basis in congressional action.  The 2004 Amendments made a small number of changes to the Tunney Act.[28]  Congress changed "the court may consider" to "the court shall consider" a list of factors.  This change ensures that a court does not ignore any of the list of factors, but it does not change the standard the court applies to determine whether entry of the judgment would be in the public interest after considering those

---

[25] *Microsoft*, 56 F.3d at 1461-62.

[26] *Id.* at 1462.  The 2004 Amendments added "whether [the proposed decree's] terms are ambiguous" to the list of factors for a court to consider.  *See* 15 U.S.C. § 16(e)(1)(A).

[27] *Microsoft*, 56 F.3d at 1462.

[28] COMPTEL's Memorandum conveniently shows those changes.  COMPTEL's Opposition to the United States' Motion for Entry of the Final Judgments at 8 (Apr. 6, 2006) ("COMPTEL Opp.").

factors.[29]  Congress did not change either the means or the data a court is to use in considering the factors.

The most critical point is that the standard of review set forth in this Circuit's precedents is entirely consistent with the revised language of the Tunney Act.  *Microsoft* does not conflict with the 2004 Amendments:  to the contrary, the decision contemplates that a court will consider essentially the same factors as in the current statute.  Moreover, as we have previously explained,[30] *Microsoft* is not contrary to the finding expressed in Section 221(a)[31] that accompanied the changes to the operative language of the statute.  Far from limiting a district court's discretion in the manner that the findings criticize, *Microsoft* adopted the flexible "reaches of the public interest standard" and did not limit district court discretion solely, or even in large measure, to "determining whether entry of those consent judgments would make a mockery of the judicial

---

[29] The 2004 Amendments also added "whether its terms are ambiguous," 15 U.S.C. § 16(e)(1)(A), a factor earlier emphasized by the Court of Appeals, *Microsoft,* 56 F.3d at 1462.  They limited "any other considerations bearing upon the adequacy" of the proposed judgment to "competitive" considerations, and further limited that to competitive considerations "the court deems necessary" to the public interest determination.  15 U.S.C. § 16(e)(1)(A).  They also added as a factor the impact of the proposed judgment on "competition in the relevant markets."  *Id.* § 16(e)(1)(B).

[30] *See supra* note 16; Resp. to Public Comments at 9-12; Reply of the United States to COMPTEL's Opposition to the United States' Motion for Entry of the Final Judgments at 3-5 (Apr. 17, 2006) ("United States' Reply to COMPTEL Opp.").

[31] (1) FINDINGS- Congress finds that--
    (A) the purpose of the Tunney Act was to ensure that the entry of antitrust consent judgments is in the public interest; and
    (B) it would misconstrue the meaning and Congressional intent in enacting the Tunney Act to limit the discretion of district courts to review antitrust consent judgments solely to determining whether entry of those consent judgments would make a "mockery of the judicial function".
 (2) PURPOSES- The purpose of this section is to effectuate the original Congressional intent in enacting the Tunney Act and to ensure that United States settlements of civil antitrust suits are in the public interest.
Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, tit. II, § 221(a), 118 Stat. 661, 668 (2004).

function."[32]   Thus, Congress plainly did not overrule the public interest standard addressed in this

Circuit's precedents.

    With no statutory language to support the asserted overturning of precedent, ACTel

professes to find support in what it contends "[r]epeatedly in the legislative history, Congress

made clear."[33]   Tellingly, every one of ACTel's citations to the legislative history is to one page of

the Congressional Record.[34]   ACTel relies entirely on a portion of one statement of one Senator to

establish what a reading of the amended Tunney Act itself does not reveal.[35]   But even according

to Senator Kohl,[36] the legislation only overruled *Microsoft* and *MSL* "[t]o the extent that these

precedents are contrary to section 221(a)"[37] which as discussed above they are not.

---

[32] *Massachusetts School of Law at Andover, Inc. v. United States*, 118 F.3d 776 (D.C. Cir. 1997) ("*MSL*"), relies largely on *Microsoft*. *See MSL*, 118 F.3d at 783 (citing *Microsoft* for the circuit's construction of the public interest inquiry).

[33] ACTel Mem. at 7.

[34] 150 Cong. Rec. S3617; *see* ACTel Mem. at 7, 8, 10, 16.

[35] Even if the Senator's words were consistent with ACTel's claims, another Senator, then Chairman of the Senate Committee on the Judiciary, expressed a different view. *See* 150 Cong Rec. S3613 (statement of Sen. Hatch) ("[T]his amendment essentially codifies existing case law[.]").

[36] 150 Cong. Rec. S3617-S3618.

[37] *Id.* at S3618.  Section 221(a) – a finding rather than a change to the operative language of the statute – does not provide conclusive evidence in determining the intent of Congress in 1974 when it enacted the Tunney Act.  "Subsequent legislation which declares the intent of an earlier law . . . *is not, of course, conclusive in determining what the previous Congress meant*."  *Glidden Co. v. Zdanok*, 370 U.S. 530, 541 (1962) (emphasis added) (internal quotation marks omitted).  COMPTEL, on which ACTel relies, ACTel Mem. at 3 n.6, quotes the same sentence from *Glidden*, but substitutes ellipses for the italicized words before noting that the later Congress' views are entitled to some weight.  COMPTEL Opp. at 5 n.2.  COMPTEL also presents two examples in which Congress had "'overruled' case law by passing subsequent amending legislation."  *Id.* at 5.  In both, however, Congress had acted not by expressing opinions, findings, or purposes, but rather by amending or adding operative statutory language.  *See id.* at 6-7 (discussing *United States v. Hutcheson*, 312 U.S. 219 (1941) (Section 20 of Norris-LaGuardia Act removes certain conduct from reach of Sherman Act and other statutes) and *Stockdale v. Ins. Cos.*, 87 U.S. 323, 331 (1874) (statutory language changes period during which particular tax is applicable)).  COMPTEL also quoted *United States v. Freeman*, 44 U.S. 556, 565 (1845), but the relevant passage, *see* COMPTEL Opp. at 7, means no more than that a court should find

**II. ____ACTel's Contention That the Proposed Final Judgments Are Not Within the Public Interest Is Without Merit**

ACTel's two court filings largely restate contentions to which the United States has previously responded. Its principal argument, relying mainly on an analysis of a limited set of data provided by four of its members, is that the proposed Final Judgments are not in the public interest because they fail to remedy competitive harm that the United States did not allege. Thus, ACTel contends that the United States should have brought a much more sweeping case, and therefore sought a much broader remedy. But the Court's public interest determination properly evaluates the remedy in light of the case the United States brought, not some hypothetical case that the United States concluded it should not bring. Even if ACTel's assertions were not beyond the appropriate scope of this proceeding, ACTel's description of the market structure here is flawed, and the empirical data it relies on is insufficient to support an allegation that the merger would result in harm beyond those buildings the United States identified. Reviewing a much broader array of information, including voluminous data and contemporaneous business documents from the merging parties and dozens of third parties, the United States determined that the only case that was warranted here is the one described in its Complaints. The proposed remedy adequately resolves the identified competitive problem.

**A.    ACTel's Claim that the Proposed Final Judgments Should Be Rejected Because They Fail to Remedy Unalleged Harm Is Without Merit**

ACTel's primary claim is that the proposed remedies dos not redress competitive harm that it contends will occur beyond 2-to-1 situations, such as in 4-to-3 and 3-to-2 "loop and transport

---

legislative intent in the words of the statute taken all together, and that where the words of the statute are doubtful or obscure, a court should rely on intent so found in construing the statute.

situations," and it relies on Dr. Wilkie's analysis of a limited data set as support for the claim.[38]

ACTel also argues that the United States "*accepted* ACTel's showing of injury, filed complaints

alleging that very injury, and proposed a remedy which the Government claims addresses the

injury alleged by ACTel."[39]  This certainly is not the case.

Although ACTel (and Dr. Wilkie) argue that the mergers are likely to create widespread

harm, affecting the vast majority of buildings to which AT&T or MCI have physical connections

in their respective merger partner's franchised territory, the totality of the evidence before the

United States did not suggest that such harm was likely, and thus the United States neither alleged

such harm in its Complaints nor attempted to remedy it.  Instead, the United States concluded that

competitive harm from the mergers would be likely only in a limited number of buildings where

the merger eliminated the only competitive alternative to the Regional Bell Operating Company

("RBOC") – i.e., certain 2-to-1 buildings.[40]  That is the only "injury" that the remedies seek, or

properly could seek, to eliminate.[41]  Thus, ACTel's repeated complaint that the remedies are

---

[38] ACTel Mem. at 24-25; *see also* ACTel's Supplemental Memorandum in Opposition to the United States' Motion for Entry of Final Judgments at 5 (May 16, 2006) ("ACTel Supp. Mem.").

[39] ACTel Supp. Mem. at 4 (emphasis in original).

[40] *See, e.g.,* Complaints ¶ 25 ("[The merging carriers] are the only two carriers that own or control a Local Private Line connection to many buildings in each region.  The merger would therefore effectively eliminate competition for facilities-based Local Private Line service to those buildings[.]").

[41] *See, e.g., United States v. Nat'l Lead Co.,* 332 U.S. 319, 351 (1947) (rejecting divestiture remedy in a case involving illegal horizontal agreements, where "[t]here is neither allegation in the complaint nor finding of fact by the District Court that the physical properties of either [defendant] have been acquired or used in a manner violative of the Sherman Act, except as such acquisition or use may have been incidental or related to the agreements above mentioned"); *United States v. Microsoft Corp.,* 253 F.3d 34, 105-07 (D.C. Cir. 2001) (asserting that relief "should be tailored to fit the wrong creating the occasion for the remedy"); *Yamaha Motor Co. v. FTC,* 657 F.2d 971, 984 (8th Cir. 1981) (finding that relief barring certain vertical restrictions "goes beyond any reasonable relationship to the violations found").

inadequate because "divesting a few circuits cannot possibly replace competition lost by the acquisition of the entire networks of AT&T and MCI,"[42] is misguided.  The purpose of the remedies is not to re-create AT&T's or MCI's network.  It is simply to replace the competition that would otherwise be lost as a result of the mergers in the one situation where the United States alleged there would be a significant anticompetitive impact – in certain 2-to-1 buildings.  As discussed below and elsewhere, by providing another carrier who is capable of being an effective competitor for Local Private Lines and related services with fiber-optic capacity to the buildings in question, the proposed Final Judgments achieve that goal.[43]

The Executive Branch is charged with responsibility for enforcing the antitrust laws, including Section 7 of the Clayton Act.  To do that, the Department of Justice ("Department") conducts extensive investigations, often using compulsory process, and carefully examines the totality of the evidence, which typically includes the internal business plans and competition-related documents of numerous companies.  Ultimately, in order to pursue an enforcement action, the Department must be convinced that competitive harm is likely (i.e., that the merger violates Section 7), based on evidence that would be sufficient to carry its burden of proof in court.[44]  By

---

[42] ACTel Supp. Mem. at 5 (emphasis omitted).

[43] *See infra* pp. 19-23.  *See also* Resp. to Public Comments at 20-27.

[44] ACTel's contention that the United States should "clearly state that '4 to 3' and '3 to 2' loop and transport situations identified in the customer data do not produce economic injury," ACTel Mem. at 26, clearly reflects a misunderstanding of the process and relevant standard.  ACTel would require the United States to assert, and perhaps prove, the non-existence of competitive injury ACTel believes likely to occur.  But the Court's public interest determination looks to whether the proposed decree adequately remedies the problems specified in the Complaints, not to the possible existence of unalleged harms.  In addition to the more fundamental flaws in ACTel's proposal, *see, e.g., supra* note 11, if the Tunney Act were interpreted to require the United States to disprove the existence of whatever competitive harm a third party chooses to allege, the practical difficulties and burdens of defending a decision not to sue on particular allegations would dramatically undermine the efficacy of consent decrees in resolving antitrust concerns.

14

itself, a single empirical study submitted by an interested party is rarely sufficient to meet that

burden. Rather, the Department must examine all the relevant evidence it gathers, decide whether

there is a plausible theory of harm, and determine whether there is sufficient admissible

documentary evidence, witness testimony, and expert opinion to support filing a case. In so doing,

it also needs to consider the evidence the merging parties will be able to put forth in their defense.

As ACTel notes, ACTel and its members presented certain data sets, and Dr. Wilkie's

analysis, to government investigators,[45] and contended that this evidence supports its allegations of

broader harm than the United States alleged in its Complaints. Analyses of raw data pertaining to

sales in markets that may be affected by a merger are valuable tools in the investigation of

proposed transactions, and the Department welcomes the submission of any analyses of such data.

However, such analyses often are based on limited data and may be produced by third parties with

an interest in the outcome of the results of the investigation, so the investigative staff carefully

reviews such submissions to test whether they are analytically sound and consistent with other

evidence obtained by the Department.

The Department reviewed raw databases produced by ACTel's members (in response to

compulsory process) as well as the analysis subsequently produced by Dr. Wilkie, and concluded

that Dr. Wilkie's analysis could not be given great weight for several reasons. For example, Dr.

Wilkie's analysis attempts to extrapolate market-wide effects from data sets that were quite limited

---

[45] Whereas ACTel presents only Dr. Wilkie's six-page conclusory declaration in this proceeding
(and concedes that it is "short, non-technical, and in summary form," ACTel Supp. Mem. at 11), the
Department, of course, obtained access to all of the underlying data pursuant to compulsory process and
thus was able to examine that data in detail.

in scope.  The data was from only four CLECs,[46] representing price requests for a relatively small

number of circuits.  In addition, simple and routine tests of the robustness of Dr. Wilkie's results

(for example, his attempt to tie the predicted price effects back to the number or identity of

bidders) often produced dramatically different results that did not support his conclusions.

Perhaps most importantly, the United States considered a large evidentiary record – including

millions of pages of documents, scores of interviews, network maps, lists of online buildings and

other information from the parties and numerous other industry participants – but did not find

significant reliable corroborating evidence[47] to support the claimed competitive problem in 4-to-3

or 3-to-2 situations.[48]

    Indeed, ACTel's contention that the anticompetitive impact of the mergers extends beyond

that alleged in the Complaints is premised on a distorted view of competition in the markets for

Local Private Lines – one that, among other things, greatly overstates the importance of AT&T and

---

[46] ACTel claims that "over 20 different bid databases" were presented, ACTel Mem. at 19, but the databases were from only four carriers and represented a tiny fraction of the marketplace.  There are dozens of carriers operating in SBC's and Verizon's franchised territories.

[47] ACTel appears to argue that an empirical study renders other forms of analysis irrelevant in a merger case.  *Id*. at 25.  Clearly robust empirical data can be useful in reaching conclusions about the effects of a merger, but empirical evidence is just one piece of the analysis and where, as here, there are significant limitations or weaknesses in the study, other forms of evidence and analysis become more important.

[48] Moreover, as discussed in the United States' Response to Public Comments at 24-25, a theory of competitive harm typically depends on an enhanced risk of either coordinated interaction or unilateral effects.  *See* U.S. Dep't Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 2 (rev. ed. 1997) ("*Merger Guidelines*").  (ACTel incorrectly describes "unilateral effects analysis" as "an econometric method of projecting market performance based on structural variables like market share."  ACTel Mem. at 25.  Actually, "unilateral effects" is one of two basic types of competitive harm theories, one in which "merging firms may find it profitable to alter their behavior unilaterally following the acquisition by elevating price and suppressing output."  *Merger Guidelines* § 2.2.  Econometric analysis is sometimes used in analyzing whether unilateral effects are likely, but so are other kinds of information – for instance, customer testimony or documentary evidence.)  In this matter, the United States did not believe that a theory asserting an enhanced risk of either unilateral effects or coordinated effects was plausible in 4-to-3 or 3-to-2 situations.  Resp. to Public Comments at 25.

MCI. In most customer buildings, the respective RBOC (SBC or Verizon) is the only available provider of Local Private Lines; only a small minority of buildings have any CLEC alternative at all. Because CLEC prices tend to be lower than RBOC prices, wholesale purchasers frequently prefer to buy from a CLEC, if one is available. In each metropolitan area identified in the Complaints, the acquired firm (AT&T or MCI) is only one of several CLECs offering Local Private Lines; typically, the acquired firm is a CLEC alternative for only a minority of the relatively few buildings with any CLEC alternative.[49] As a result, AT&T's and MCI's wholesale Local Private Line sales are relatively small.[50] In many of their respective on-net buildings, AT&T and MCI face competition from other CLECs. Sometimes AT&T or MCI offers the lowest wholesale Local Private Line price, but many times it does not. Perhaps most importantly and contrary to ACTel's assertions, the overall body of evidence suggests no correlation between the

---

[49] ACTel asserts that "[b]y far the largest networks competing against SBC and Verizon were those created, owned and operated by AT&T and MCI." ACTel Mem. at 17. Similarly, it argues that "MCI and AT&T were the largest, most price-competitive, and most pervasive suppliers of Local Private Lines to the wholesale market." ACTel Supp. Mem. at 12. These assertions are misleading at best, and, in many respects, incorrect. In most of the metropolitan areas in question, the acquired firm does not have the largest network, and even where it does, it would generally be an overstatement to say it has "by far the largest network." (It is important to remember that AT&T and Verizon are not merging with each other: even after the mergers in question, AT&T likely will remain a significant provider of Local Private Lines in Verizon's territory, and Verizon likely will be a significant provider of Local Private Lines in AT&T's territory.) Moreover, AT&T and MCI certainly were not "pervasive" – their wholesale Local Private Lines sales are only a small fraction as large as those of the RBOCs, and they have on-net only a tiny percentage of commercial buildings. The acquired firm is typically not significantly more "pervasive" than one or more other CLECs. Finally, the evidence did not suggest that AT&T or MCI were, over time, the most "price-competitive" CLEC providers of Local Private Lines. (Indeed, the record before the Department suggested that AT&T was often among the highest-priced CLECs for Local Private Lines.)

[50] In 2004, SBC had approximately $4.4 billion in special access sales, while AT&T had $90 million in Local Private Line sales in SBC's franchise territory. *See* Complaints ¶ 20. Similarly, in 2004 Verizon had approximately $3.5 billion in special access sales, while MCI had $198 million in Local Private Line sales in Verizon's franchise territory. *Id.*

price a carrier charges for a Local Private Line circuit and the "size and quality" of the rest of that supplier's network.[51]

ACTel now asks this Court to reject the proposed Final Judgments as not being in the public interest because the United States did not bring the kind of case ACTel wanted, the kind it contends was justified by its empirical study. The Court should reject this invitation. The focus of the Tunney Act public interest inquiry is on the proposed *judgment* as it relates to the specifically alleged harm, not the overall merits of the underlying mergers. Nor does the Act suggest that the Court should examine a case the United States did not bring and substitute its prosecutorial judgment for that of the Department of Justice.[52] The United States had sound reasons for filing the case it did, and the proposed Final Judgments remedy the harm in all the buildings identified in the United States' papers, i.e., all the buildings where the United States believed the mergers were likely to cause harm.[53]

---

[51] ACTel greatly overstates the impact of "network effects" in Local Private Line markets, and, in particular, misstates the impact with respect to pricing. ACTel argues that because AT&T and MCI were allegedly the "largest and most formidable" competitors to the RBOCs, it is "logical" that they could and did charge lower prices. ACTel Mem. at 18. The logic is faulty, and the evidence does not support the conclusion. Local Private Lines are largely a commodity product used to connect a particular building to a carrier's network. There is no reason to conclude that the larger the network, the lower the price charged for Local Private Lines, and, indeed, in its interviews with numerous CLECs as well as its review of large amounts of data and documents, the Department did not discover substantial evidence suggesting that prices for Local Private Lines correlate to network size. Indeed, the RBOCs – which have by far the largest networks – typically offer the highest prices.

[52] *See supra* notes 11, 41.

[53] ACTel claims that the United States is "required" under the Tunney Act to provide an economist's declaration in this proceeding. Transcript of Hearing at 53 (D.D.C. May 10, 2006); *cf.* ACTel Mem. at 26. This is inaccurate. The Tunney Act does not include such a requirement. Indeed, we believe that in the entire history of the Tunney Act and hundreds of decrees entered pursuant to it, the United States has provided such a declaration only in the two Tunney Act proceedings in *Microsoft* and in the proceedings before Judge Greene in the original *AT&T* case. Of course, the Court may request an economist's declaration if it needs one to inform its public interest determination, 15 U.S.C. § 16(f), but we believe there is no such need here, as this submission, together with the United States' other filings, adequately explain why entry of the proposed judgments would be in the public interest and why the

Although ACTel's principal complaint here is that the United States should have alleged harm in, and sought relief for, 4-to-3 and 3-to-2 buildings, ACTel also briefly argues that the proposed remedy will not be effective even in the 2-to-1 buildings covered by the proposed divestitures because "AT&T and MCI were the most aggressive and competitively priced sellers[,]" and the divestiture buyer "will not even be able to offer prices on the divested lines at the same low prices as AT&T and MCI charged . . . ."[54]  This is untrue.  As discussed above, based on the totality of the record before it, the United States did not find either (a) that AT&T or MCI offered more aggressive pricing for Local Private Lines than other CLECs on a sustained basis, nor (b) that the price a carrier chooses to charge for Local Private Lines depends on the size of its network.[55]  A purchaser who is a viable provider of Local Private Lines in the metropolitan areas in question should be able to use the divested assets to compete aggressively to provide service to the buildings in question, thereby adequately remedying the harm alleged in the Complaints, even if its network is not as large as those of AT&T or MCI.

### B.    The Proposed Remedy Addresses All the 2-to-1 Locations Where a Remedy Is Appropriate

In its initial comment, ACTel complained that the proposed Final Judgments did not require divestitures to all 2-to-1 buildings, claimed that the proposed Final Judgments should be rejected because not all 2-to-1 buildings were included in the remedy, and argued that the United

---

Wilkie material does not demonstrate the contrary.  Moreover, because the bulk of the documents and data the Department considered during its investigation was confidential business information, received pursuant to compulsory process and protected from disclosure by statute, there would be considerable practical difficulties in making that material part of the public record, or administrative burden in handling such information under seal.

[54] ACTel Supp. Mem. at 13.

[55] *See supra* note 51.

States should explain the methodology it used to determine which 2-to-1 buildings posed a competitive concern.[56]  In response, the United States explained that the mergers were unlikely to cause harm in certain 2-to-1 buildings in the metropolitan areas identified in the Complaints because they were, e.g., vacant, occupied only by the merged firm, or likely to attract entry in response to a price increase, and that therefore no remedy was necessary with regard to these buildings.  The United States also explained how it determined which buildings needed to be subject to the remedy using extensive data gathered via compulsory process in a building-by-building analysis.[57]

In its May 5 filing, ACTel does not criticize the substance of the United States' methodology, but instead complains that the United States' methodology "bears more than a striking resemblance to the analysis prepared by AT&T's economic expert," and suggests that the United States "decided to just take what the merging companies were offering."[58]  If the methodology is sound, it is irrelevant who devised it, but in any event, the United States' approach differs substantially from that suggested by AT&T's expert.[59]  Rather than "take what the merging

---

[56] Comments Regarding the Proposed Consent Decrees Submitted on Behalf of ACTel ("ACTel Comment") at 12-15.

[57] Resp. to Public Comments at 20-23.

[58] ACTel Mem. at 22.

[59] AT&T's expert argued that several broad categories of buildings would not be subject to competitive problems:  e.g., buildings with AT&T demand of greater than 2 DS-3s; buildings not subject to FCC unbundling requirements; buildings in SBC central office service areas that are served by other CLECs.  *See* Decl. of Dennis W. Carlton and Hal S. Sider (May 9, 2005), ¶¶ 15-48, Attach. to Joint Opposition of SBC Communications Inc. and AT&T Corp. to Petitions to Deny and Reply Comments (May 10, 2005), *In the Matter of Applications for Consent to Transfer of Control of Licenses and Section 214 Authorizations from AT&T Corp., Transferor, to SBC Communications Inc., Transferee,* FCC WC Docket No. 05-65.  The United States did not agree with these contentions.  Instead, as previously noted, it performed an building-by-building entry analysis of 2-to-1 buildings based on the demonstrated dedicated demand in each building combined with distance from competitive fiber, and also determined

companies were offering," the United States expended considerable time and resources

determining which buildings were likely to present a competitive problem, and then conducted

extensive negotiations with the merging parties to secure an adequate remedy.[60]  The number of

buildings included in the remedy is substantially greater than would have resulted had the United

States just adopted the analysis performed by AT&T's expert.

ACTel also complains that the United States has not adequately supported "its contention

that entry at some of the '2 to 1' sites would be so simple as to preclude the need for remedial

relief."[61]  Entry is a fundamental part of the competitive effects analysis of any merger.[62]  In order

for the United States to successfully prosecute a Section 7 case alleging harm in certain buildings,

it would need to be able to prove that potential anticompetitive effects, such as price increases,

would be unlikely to be deterred or counteracted by competitors building fiber to those buildings.

In every metropolitan area under consideration, multiple CLECs have local fiber networks and

---

that buildings with specific characteristics affecting demand (e.g., vacant buildings) did not require a
remedy.

[60] ACTel argues that because the Complaints and proposed Final Judgments in these matters
were filed on the same day, it somehow suggests that the remedy was not "seriously negotiated."  ACTel
Supp. Mem. at 7-8.  This is incorrect.  The Department's typical practice is to notify parties towards the
close of an investigation of its competitive concerns and, if possible, negotiate a remedy prior to filing a
complaint.  As a result, complaints and consent decrees are often filed on the same day and, indeed, in 11
out of the 12 antitrust consent decrees entered following the effective date of the 2004 Amendments to
the Tunney Act, the complaints and decrees were filed on the same day.  Similarly, ACTel suggests that
the appearance of some press stories speculating on the likely remedy prior to the filing of the
Complaints and proposed Final Judgments in these matters somehow casts doubt on the adequacy of the
proposed remedy.  *Id.* at 8.  This also is incorrect.  At the time of the press stories cited by ACTel, the
investigative staff was in negotiations with the merging firms and was also discussing the viability of
particular remedy concepts with third parties.  The Department, of course, has no control over what
others say to the press, and the fact that the nature of the Department's competitive concerns and the
likely remedy began appearing in press reports (with varying degrees of accuracy) in no way suggests
that the remedy was not the product of negotiations or that it is insufficient.

[61] ACTel Mem. at 22.

[62] *See Merger Guidelines* § 3.0.

continue to add new buildings to those networks as circumstances warrant. As previously noted, the best indicators of the likelihood of entry in a particular building are the capacity demand in that building (and thus the revenue opportunity) and the distance of that building from a carrier's fiber network (and thus the cost of extending that network to the building).[63] Based on the evidence it gathered regarding the combination of capacity demand and proximity that tend to be sufficient for profitable entry, combined with building-by-building demand and proximity data, the Department determined which buildings should be excluded from a remedy because entry was sufficiently likely, and which should be included because entry was unlikely. The Department accordingly concluded that there was a category of buildings where entry would be likely in response to a price increase, and thus where it would be unable to prove an anticompetitive effect as a result of the mergers.

In ACTel's initial comment, it also complained that the remedy was inadequate because it addressed only the bottleneck for "loop" circuits and not the bottleneck for "transport" circuits.[64] The United States responded that the Complaints did not allege a harm specific to transport circuits, and there generally is no bottleneck or competitive problem for transport circuits; nevertheless, for the tiny number of instances where the merger would decrease the number of providers to a central office from two to one and entry would be unlikely, the remedy addresses the problem because the United States treated central office locations as it treated any other AT&T or MCI on-net building.[65] ACTel now complains that: (a) the proposed remedy addresses many

---

[63] Complaints ¶ 27; Resp. to Public Comments at 23.

[64] ACTel Comment at 20-21.

[65] Resp. to Public Comments at 19 n.32.

fewer central offices than the "scores of wire centers" identified in information presented to the FCC as ones where AT&T was the only collocating CLEC, (b) the United States did not explain how it determined "which carriers were 'connected' to central offices"; and (c) the United States did not identify the specific central offices included in the remedy. These complaints go not to the adequacy of the remedy but to the United States' determination of which locations posed a competitive problem.

As previously noted, the United States obtained lists of on-net buildings (including central offices) from several dozen CLECs via compulsory process.[66] That is how it determined which carriers were connected to central offices. Moreover, as previously explained, certain 2-to-1 buildings, including central offices, could not be shown to pose a competitive problem for various reasons, including the fact that entry would be likely to occur in response to a price increase.[67] Central offices, not surprisingly, tend to have substantial amounts of traffic. Based on the demand and the proximity of competitive fiber (as identified through information gathered in response to compulsory process issued to third parties), the United States determined that for a significant number of central offices entry might well be likely in response to a price increase. That left a very tiny number of central offices where harm was likely, and those are included in the proposed remedy. Their specific identity is not material to the Court's public interest determination.[68]

_____

[66] Resp. to Public Comments at 22.

[67] *Id.* at 22-23. *See also supra* pp. 21-22.

[68] The United States' Response to Public Comments incorrectly stated in a footnote that the number of central offices included in the proposed remedies is five – two SBC and three Verizon. Resp. to Public Comments at 19 n.32. The three Verizon locations actually are wire centers (and thus locations to or from which "transport rates" would apply), but do not have switching facilities and thus by definition are not central offices (although "central office" and "wire center" are often used as synonyms). But since the relevant issue is whether the appropriate buildings were included – and the United States treated central offices and wire centers as any other building – the precise number of

**III.___The Proposed Final Judgments Are in the Public Interest and Should Be Entered by the Court**

The Tunney Act instructs the Court to consider certain factors in making its public interest determination:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from determination of the issues at trial.[69]

All these factors weigh in favor of entry of the proposed Final Judgments as being within the public interest.

**A.    The Proposed Final Judgments Terminate the Alleged Violations**

The competitive problem the United States alleged would result from these mergers is that for hundreds of buildings the number of carriers with a direct connection would be reduced from two to one, and entry is not sufficiently likely to deter anticompetitive price increases. The "last-mile connection" to commercial buildings tends to be a bottleneck, and the mergers would likely eliminate the only competitive alternative to the RBOC for hundreds of these buildings. Thus, the Complaints allege that the mergers violate Section 7 of the Clayton Act because they tend to result

---

central offices is not material. In any event, to avoid further controversy, the two SBC central offices included in the remedy are: 6407 NW Roanridge Rd., Kansas City, MO; and 1615 N Lake Ave., Pasadena, CA; and the three Verizon wire centers included are:  5 Clock Tower Pl., Maynard, MA; 27 Randolph St., Carteret, NJ; and 2240 Broadbirch Dr., Silver Spring, MD.

[69] 15 U.S.C. § 16(e)(1).

in a substantial lessening of competition for Local Private Lines and telecommunications services that rely on Local Private Lines in hundreds of buildings.[70]  A decree that remedies the alleged substantial lessening of competition effectively terminates the violation.

A sufficient remedy to the alleged competitive problem is to provide another competitive carrier with a last-mile connection to the buildings that it can effectively use to provide Local Private Line and related services.  Thus, the proposed Final Judgments require the merged firm to divest such connections to the hundreds of buildings requiring a remedy (listed in Appendix A to each proposed Final Judgment, respectively),[71] principally in the form of a long-term indefeasible right of use ("IRU").[72]  To ensure that the buyer can effectively use these lateral connections immediately, without substantial additional capital expenditure, the proposed Final Judgments require the merged firm to also divest sufficient transport capacity to connect the lateral connections to the purchasing carrier's network.[73]  Moreover, to ensure that the purchaser of the assets is one that can be a viable and effective competitor (e.g., with the requisite expertise, assets, financial strength), the United States maintains the right to approve the buyer, in its sole discretion.[74]  In addition, the United States retains approval over the terms of the divestiture agreement to ensure that they are compatible with the purposes of the proposed Final Judgments,

---

[70] Complaints ¶¶ 19-33; *see also* Competitive Impact Statements at 4-8 ("CISs"); Resp. to Public Comments at 20-23.

[71] Proposed Final Judgments § II(D) & Apps. A; *see also* CISs at 8-10.

[72] IRUs are commonly used by many service providers to compete for Local Private Line business, as demonstrated by the fact that AT&T's local networks are constructed, to a large extent, via fiber controlled through IRU.  Resp. to Public Comments at 39-40.

[73] Proposed Final Judgments § II(D); *see also* CISs at 10-11; Resp. to Public Comments at 19.

[74] Proposed Final Judgments §§ II(D), IV(A), (H); *see also* Resp. to Public Comments at 26-27, 41.

and that there are no provisions that would interfere with the buyer's ability to replace the competition that would otherwise be lost.[75]

A divestiture of fiber-optic capacity to the 2-to-1 buildings that pose a competitive problem to a purchaser that can effectively provide service to those buildings is adequate to remedy the violations alleged in the Complaints.[76]  That multiple competitive carriers have already bid for,[77] and reached agreements to acquire, the assets in question should help provide assurance that the divestiture package is viable, and that the competitive problem will indeed be remedied if the proposed Final Judgments are entered.

**B.    The Proposed Final Judgments Include Appropriate Provisions for Enforcement and Modification**

The proposed Final Judgments include standard provisions that have been effective in numerous past decrees to maintain the Court's jurisdiction and ensure compliance with the decrees

---

[75] *See infra* notes 94-95 and accompanying text.  In order to determine whether a divestiture buyer is likely to be an effective competitor in the market in question, the United States typically conducts a thorough inquiry into the proposed divestiture buyer and the terms of the divestiture agreement.  This review often involves interviewing, as well as requesting confidential financial and business information from, the buyer to assist the Department in determining whether the buyer has the management experience and financial ability to be able to compete with the divestiture assets, as well as a viable business plan.  *See* U.S. Dep't of Justice, *Antitrust Division Policy Guide to Merger Remedies* 30-33 (Oct. 2004).  That procedure is being followed here.

[76] *See* CISs at 9-12; Resp. to Public Comments at 20-23, 30-32, 50.

[77] ACTel submitted a declaration from an employee of XO Communications – a member of both ACTel and COMPTEL – stating that although it bid for the divestiture assets, the assets have "little market value" and "at best . . . offer a potentially cost-effective means to marginally augment the XO network in a short period of time."  Declaration of Randolph C. Nicklas, XO Communications (May 15, 2006), ¶ 6, Attach. to ACTel Supp. Mem., Ex. 1.  The issue is whether the assets are sufficient for a competitive carrier to be interested in purchasing them, and be able to use them quickly to compete for Local Private Line and related services in the 2-to-1 buildings in question.  XO bid for divestiture assets and concedes that the assets would potentially be a "cost-effective" way to augment their network "in a short period of time," thus suggesting that the divestitures will achieve their objectives.

as entered.[78]  The Court retains jurisdiction over the action for further orders necessary to carry

out, construe, modify, enforce, or punish violations of the proposed Final Judgments.[79]  To

preserve the Divestiture Assets until divested, the proposed Final Judgments in conjunction with

the Stipulations filed with the Court require the preservation of the Divestiture Assets and bar any

actions that would interfere with the divestitures.[80]  To ensure all necessary actions are being taken

to comply with the Final Judgments, the proposed Final Judgments require the defendants or

trustees, if appointed, to make regular submission of affidavits describing efforts to comply with

the Final Judgment.[81]  Finally, the United States may investigate any potential violations of the

Final Judgments, including gathering documents, interviewing employees on the record, and

requesting written submissions.[82]

### C.    The Duration of Relief Specified by the Proposed Final Judgments Is Sufficient to Protect Competition

The proposed Final Judgments expire 10 years from their date of entry.[83]  This period

coincides with the duration of the IRUs (or dark fiber services agreements) for the Divestiture

Assets.[84]  Ten years is significantly longer than the typical customer contract for Local Private

Lines and related services.  In a dynamically changing industry, a 10-year remedy is likely more

---

[78] *See* Resp. to Public Comments at 50-51.

[79] Proposed Final Judgments § XII; *see also* CISs at 15.

[80] Proposed Final Judgments § VIII; Stipulations § V(A)-(D).

[81] Proposed Final Judgments § IX.

[82] *Id.* § X(A)-(B).  Were the United States to discover violations of the Final Judgments, it could bring them to the attention to the Court, potentially by initiating contempt proceedings.

[83] *Id.* § XIII.

[84] *Id.* § II(D); *see also* Resp. to Public Comments at 40.

than sufficient to ensure that competition is replaced for the affected buildings.[85]  A longer decree

period would have imposed an additional burden upon the defendants without a commensurate

competitive benefit.[86]

### D.    The Anticipated Effects of Alternative Remedies Indicate the Desirability of the Proposed Final Judgments

During the investigation, a number of competitors – including members of ACTel and

COMPTEL – suggested certain remedies to the Department, and the investigative staff discussed

those remedies.[87]  However, once it became clear that the only likely competitive problem was

limited to certain buildings, it also became clear that a divestiture of fiber-optic capacity to those

buildings could adequately remedy the harm.  Thus, no remedy except for this sort of limited

divestiture was "actually considered" at the conclusion of the investigation except, as is always the

case, the alternative of an injunction completely barring the transactions.[88]  Enjoining the

transactions, however, would not have been warranted given the relatively small magnitude of the

harm that would result from the transactions compared to the billions of dollars in efficiencies that

---

[85] *See* Resp. to Public Comments at 40, 50-51.

[86] Excessively long decrees, particularly in rapidly changing industries, tend to become obsolete due to their failure to account for changing circumstances, and then require both judicial and prosecutorial resources to determine whether termination or modification is appropriate.  Over the past few decades, the Department has had to devote considerable resources to reviewing and seeking to modify old outmoded perpetual decrees.  As a matter of policy, 10 years is now the maximum decree length (as well as the standard decree length) sought by the Department.

[87] Some of the remedies suggested, such as a divestiture of all overlapping local assets including customer contracts, could have created considerable practical difficulties as well as the risk of significant customer disruption.  *See* Resp. to Public Comments at 37 n.65.

[88] *See* United States' Reply to COMPTEL Opp. at 6 n.15; CISs at 15.

would potentially be lost from such an injunction.[89]  The more narrowly focused remedy was clearly the more pro-competitive.

### E.     The Proposed Final Judgments Are Not Ambiguous

The proposed Final Judgments contain no significant ambiguities:  they are clear and specific regarding the assets to be divested, how the divestitures will occur, to whom the assets may be divested, the circumstances in which modifications can be made, and how the judgments can be enforced.[90]  The building laterals that must be divested are listed by street address in Appendix A to each Final Judgment, respectively; more than 700 addresses are identified in total.[91] For each building, the divestiture must include specifically defined "Lateral Connections," a specified number of fiber-optic strands, and sufficient transport.[92]  The proposed Final Judgments also specifically control other terms and aspects of the divestiture sales process including the timing of the divestitures, provisions for making the Divestiture Assets available to prospective buyers, necessary warranties that the defendants must make in relation to the Divestiture Assets, and a ban on reacquisition of the Divestiture Assets to avoid sham transactions.[93]

As is typically the case, some terms of the purchase agreement are left to negotiation by the purchasers and the defendants in a commercial arms-length agreement.  This arrangement allows the purchaser to address its specific needs; the undesirable alternative would be to force a one-size-

---

[89] *See* CISs at 15; Resp. to Public Comments at 51.

[90] *See* Proposed Final Judgments *passim*; Resp. to Public Comments at 51.

[91] Proposed Final Judgments App. A; *see also* Resp. to Public Comments at 21-22.

[92] Proposed Final Judgments §§ II(D), II(F); *see also* CISs at 9-11; Resp. to Public Comments at 19.

[93] Proposed Final Judgments §§ IV(A) - (D), (G), XI; *see also* CISs at 9, 12-13.

fits-all solution on the potential purchasers.  The purchasers' and defendants' exercise of this flexibility does not introduce any troubling ambiguity into the proposed Final Judgments, because the United States has approval rights over the terms of the sale to ensure that these are truly arms-length agreements that do not undermine the purposes of the Final Judgments.[94]  Similarly, the proposed Final Judgments allow for minor modifications to the Divestiture Assets, at the purchaser's option with the approval of the United States, to permit the exclusion of assets that are not necessary for the purchaser to use the assets to replace the lost competition.[95]  This also does not constitute an ambiguity that would make the proposed Final Judgments difficult to implement and therefore not in the public interest.

## F.     There Are No Other Competitive Considerations Bearing Upon the Adequacy of the Proposed Final Judgments or Upon the Court's Public Interest Determination

Congress provided for the Court to look at "any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest."[96]  After conducting an extensive investigation which included receiving and reviewing millions of pages of documents from the parties and dozens of third parties,[97] the United States does not believe there are any additional factors that

---

[94] Proposed Final Judgments §§ IV, IV(A); *see also* Resp. to Public Comments at 40-41.  The United States' discretion is not unbridled and must be applied consistent with the purposes of the Final Judgments to replace the lost competition, remedying the harm alleged in the Complaints.  Proposed Final Judgments §§ II(D), IV(A), (H); *see also* CISs at 9; Resp. to Public Comments at 26-27.

[95] Proposed Final Judgments § II(D); *see also* CISs at 12; Resp. to Public Comments at 48-49.

[96] 15 U.S.C. § 16(e)(1)(A).

[97] *See* Resp. to Public Comments at 3-7, 17-23, 25, 37, 44 n.77, 45-46.

would indicate that the proposed Final Judgments are inadequate or not in the public interest,[98] including those concerns specifically raised in the comments filed with the United States as part of the Tunney Act proceedings, or the subsequent COMPTEL and ACTel submissions.[99]  In particular, that the proposed Final Judgments do not remedy supposed harm that was not alleged in the Complaints has no bearing on the adequacy of the proposed Final Judgments in replacing the lost competition:  the proposed Final Judgments adequately remedy the only competitive harm alleged in the Complaints.

### G.    Entry of the Proposed Final Judgments Would Benefit Competition in the Relevant Markets

As discussed above, entry of the proposed Final Judgments will replace the competition that would otherwise be lost in the relevant markets (Local Private Lines and related services) in hundreds of buildings identified in the Final Judgments, while permitting the public to reap the benefits of efficiencies likely to result from the mergers.  Regardless of whether the relevant geographic market is defined as the metropolitan area or the individual building, the divestitures will redress the only competitive problem identified by the United States:  a loss of competition in certain 2-to-1 buildings.[100]  The divestitures will replace the acquired CLEC in those buildings

---

[98] *See* CISs *passim.*

[99] *See, e.g.,* Resp. to Public Comments at 21-23 (explaining inclusion of only 2-to-1 buildings where competition is likely to be substantially lessened), 30-32 (explaining that the remedy resolves the likely harm alleged in the Complaints regardless of the way the geographic market is defined), 32-34 (noting divestitures will be combined with an existing network so divestiture of on-going business unnecessary), 37 & n.65 (explaining complications from divesting customers).

[100]  *See* CISs at 10; Resp. to Public Comments at 20-23, 30-32, 46-47.

where competitive harm is likely, ensuring that customers in those buildings continue to have a competitive option other than the RBOC.[101]

**H.     Entry of the Proposed Final Judgments Will Likely Benefit the Public Generally**

The proposed Final Judgments correct the limited competitive problem for Local Private Line and related services for several hundred buildings alleged in the Complaints in a minimally intrusive manner.[102]  Because the proposed Final Judgments correct the problem, and do so in a way that does not interfere with the realization of substantial efficiencies (potentially in the billions of dollars) that these transactions likely will generate, the general public will benefit from their entry.

**I.     Entry of the Proposed Final Judgments Will Not Adversely Affect Individuals Alleging Specific Injury from the Violations Set Forth in the Complaints**

The divestitures required by the proposed Final Judgments will replace the lost competition alleged in the Complaints, preventing competitive harm to any individuals (including harm to COMPTEL's and ACTel's members in their capacity as customers) that would otherwise arise from the violations set forth in the Complaints.[103]  Entry of the proposed Final Judgments has no

---

[101]  Proposed Final Judgments at 1; *see also* CISs at 8-10; Resp. to Public Comments at 6-7, 19, 51.

[102]  A more intrusive remedy, such as one involving the divestiture of customer contracts, might have caused significant harm, particularly to large retail business customers.  Resp. to Public Comments at 37.

[103]  *See* Resp. to Public Comments at 51-52; *see also id.* at 16-23, 33-37.  *See also supra* Parts II.B, III.A.  That the remedy is not as extensive as COMPTEL or ACTel would like does not suggest that they are "adversely affected" by entry of the proposed Final Judgments.  *See, e.g., MSL*, 118 F.3d at 780 ("[I]f we may take the state of the world without the Department's lawsuit as the baseline, mere failure to secure better remedies for a third party . . . is not a qualifying impairment.  And indeed, our Tunney Act jurisprudence seems to make clear that that is the baseline for the Act's substantive purposes – the district court is not to reject an otherwise adequate remedy 'simply because a third party claims it could be better treated.'") (citation omitted).

preclusive effect on any action that any individual nevertheless claiming to be harmed by the defendants conduct may want to bring.[104]  Nor do the proposed Final Judgments or the sales of the Divestiture Assets as a practical matter limit the remedies that any individual harmed by the mergers could seek on its own, including broader divestitures.

**J.      Determination of the Issues at Trial Will Not Result in Any Significant Public Benefit**

Determination of the issues alleged in the Complaints at trial would provide no significant public benefit, but would serve only to delay the implementation of an effective remedy.  The case brought by the United States involves a loss of competition for Local Private Lines and related services in certain 2-to-1 buildings.  If this case were to proceed to trial, that is all the United States would attempt to prove.  Litigation would impose substantial costs and burdens on the United States, the parties, and the Court.  Even litigation of this limited case would involve considerable complexity, detailed evidence, and difficult confidentiality issues.  But more important, even if the United States were to be successful in proving liability, a remedy very much like that proposed to the Court here would adequately replace the competition that would otherwise be lost and alleviate the alleged harm.  Because an adequate remedy for the harm alleged is now before the Court, there is no significant benefit to adjudicated liability at trial.[105]

---

[104] *See* 15 U.S.C. § 16(a); *see also* CISs at 14.

[105] Although collateral estoppel and the *prima facie* evidence provision of the Clayton Act, 15 U.S.C. § 16(a), would allow subsequent antitrust plaintiffs to take advantage of judicial findings if the defendants were found liable after trial, any such "benefit" must be weighed against (a) the fact that because the remedy before the Court prevents the harm alleged in the Complaints, any damages claims that individuals might bring are unlikely to be viable, and (b) the possibility that the government would lose at trial, which, as a practical matter, would make private actions harder to bring successfully.

## IV.    Conclusion

Clearly, ACTel – an association of competitors to the merging firms – wishes the United States had brought a broader case and insisted on a broader remedy. That is not unusual: many firms in investigations of mergers concerning their direct competitors seek broad, sweeping relief[106] and produce information that they claim justifies seeking such relief.[107]  But as sometimes happens, the United States here concluded that the sum total of evidence did not support the complaining party's claims, and instead brought a narrow case seeking appropriately focused relief.  ACTel, not content with this decision, asks this Court to reject the proposed Final Judgments because they fail to redress harm that ACTel contends is likely to occur.

The purpose of a Tunney Act proceeding is for a court to examine the proposed remedy, and determine whether it is in the public interest based on the factors listed in the statute; it is not for a court to re-investigate the underlying merger at the behest of disappointed competitors, or put the Department of Justice on trial to justify its prosecutorial decision-making.  The United States

---

[106] Firms often complain about mergers involving their rivals, not merely because they seek a competitive advantage by imposing additional costs and difficulties on those competitors, but because they fear having to compete against a more efficient, effective competitor.  However, as case law has made clear, the antitrust laws protect competition, not competitors.  *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977); *Southern Pacific Communications Co. v. American Telephone & Telegraph Co.*, 556 F. Supp. 825, 920 (D.D.C. 1983); *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767 (1984) (stating that "an efficient firm may capture unsatisfied customers from an inefficient rival, whose own ability to compete may suffer as a result" but that this "is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster").

[107] Even though COMPTEL and ACTel both argue that the United States should have brought a broader case, and sought more sweeping relief, and even though there is substantial overlap between COMPTEL's and ACTel's membership, the arguments made by these two associations are fundamentally inconsistent.  Whereas COMPTEL argues that there is no evidence of "building-specific pricing" and hence, any harm must be "metro-area-wide" rather than building-specific, ACTel relies on building-specific data to suggest that the mergers may create competitive problems in 4-to-3 and 3-to-2 buildings.  This simply highlights the difficulty of a court seeking to investigate claims of harm raised by complaining competitors rather than focusing on whether the proposed remedy is adequate for the case filed by the United States.

has not only provided a detailed explanation of the competitive harm identified in its Complaints, and of how the proposed remedy redresses that harm, but also twice addressed in detail the concerns of two commenters.[108]  The Court should conclude that the proposed Final Judgments fall within the reaches of the public interest, and enter them to ensure that the necessary divestitures are swiftly completed.[109]

Respectfully submitted,

_____/s/_____
Laury E. Bobbish
Assistant Chief

_____/s/_____
Lawrence M. Frankel (D.C. Bar No. 441532)
Claude F. Scott, Jr. (D.C. Bar No. 414906)
Matthew C. Hammond
Trial Attorneys

Telecom and Media Enforcement Section
Antitrust Division
U.S. Department of Justice
1401 H Street, N.W., Suite 8000
Washington, D.C. 20530
(202) 514-5621
Attorneys for the United States

---

[108] CISs; Resp. to Public Comments; United States' Reply to COMPTEL Opp.

[109] AT&T has already entered into contracts with prominent, established CLECs to purchase all of the divestiture assets in question, and the United States, after investigating those buyers and the proposed contracts, has approved the divestitures to proceed once the Court enters the proposed Final Judgment.  Thus, as soon as the Court enters the proposed Final Judgment – but not until then – the competitive harm in the AT&T buildings in question can be remedied.