# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America,<br><br>　　　　　　Plaintiff,<br>v.<br><br>SBC Communications, Inc. and<br>AT&T Corp.,<br><br>　　　　　　Defendants,<br><br>The Alliance for Competition in<br>　　Telecommunications<br><br>　　　　　　and<br><br>COMPTEL,<br><br>　　　　　　*Amicus-Curiae.* | Civil Action No.: 1:05CV02102 (EGS) |
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br>v.<br><br>Verizon Communications Inc. and<br>MCI, Inc.,<br><br>　　　　　　Defendants,<br><br>The Alliance for Competition in<br>　　Telecommunications<br><br>　　　　　　and<br><br>COMPTEL,<br><br>　　　　　　*Amicus-Curiae.* | Civil Action No.: 1:05CV02103 (EGS) |

DC01/COHET/247897.1

## DECLARATION OF RICHARD D. PIERCE
## XO COMMUNICATIONS

Pursuant to 28 U.S.C. § 1746, and the Rules of Civil Procedure of the United States District Court for the District of Columbia, I, Richard D. Pierce declare the following:

1). My name is Richard D. Pierce. I am employed by XO Communications ("XO") as Senior Manager of OSP (Outside Plant) Planning and GIS (Geographic Information Systems) Analysis. My business address is 11111 Sunset Hills Road, Reston, Virginia 20190. I have been employed by XO since 1999 and have extensive experience in project management, engineering, planning, analysis, records management, and software development. In my current position at XO, my responsibilities include analyzing proposals for XO asset sales and leases and analyzing potential cost savings opportunities through the alternate leasing or building of outside plant networks. As an example of my work activities, I was part of the group that sold dark fiber strands on the XO network, and I managed the project researching, designing, testing, and implementing a new outside plant network management system.

2). XO is a facilities-based competitive local exchange carrier based in Reston, Virginia, providing a spectrum of services to business customers (mostly small and medium size enterprises). It operates using a combination of network assets it owns or controls and facilities or services leased from other providers.

3). XO submitted bids in Boston, MA, Tampa, FL, and Washington D.C. for certain "indefeasible rights of use" for fiber laterals ("lateral IRUs") that are the subject of the proposed Verizon/MCI amended final judgment in this case. I was part of the XO team that performed

DC01/COHET/247897.1                                    2

due diligence on these assets and determined their value, and I will be part of the team responsible for integrating and managing these assets should XO win the bids.

4). It is important to understand that XO does not consider the remedy in the proposed final judgment – access to lateral IRUs -- to be a true divestiture of assets in the three metropolitan areas bid. That is because XO would not obtain complete control of the facility in perpetuity. Rather, the remedy here is effectively only a 10 year lease of a mere 2 to 4 strands of dark fiber (fiber that has not been equipped to carry traffic) that are part of a larger bundle of strands in fiber cable on a route which MCI owned prior to the merger. The most common fiber bundles sizes typically range from 12 to 864 fiber strands. The remainder of the strands continue to be owned and controlled by Verizon/MCI and will continue to be used to serve their customers at the buildings listed in the proposed final judgment.

5). In general, the value of the lateral IRU divestitures is at best minimal. That is because even after obtaining them, XO would need to expend substantial amounts of time, effort, and resources to identify, market to, and acquire customers and connect the lateral IRU (with all associated equipment) to its network. This means that the facility is unlikely to generate positive cash flow until well into the ten year term, and the proposed final judgment does not provide for an extension of the term.

6). Let me explain two key aspects of our valuation calculation in greater detail. First, the lateral IRUs are bare facilities, without customers or traffic associated with them. That means that XO must first acquire customers and traffic, and it will take a very long time to make sales that will generate sufficient traffic to justify turning on the dark fiber facility. Second, the nodes (interconnection points) where XO would connect to these lateral IRUs in virtually every

instance are far from the XO network. Consequently, XO would have to construct the necessary transport and collocation facilities. This also is a lengthy and costly process, involving planning, acquisition of rights-of-way or rights-of-use and building permits, digging up roads, and the acquisition and placement of equipment. Moreover, XO would only undertake this activity once the customer signed an agreement, which would add further delay to the provision of any service.

7). To the best of my knowledge, the lateral IRUs that are proposed to be divested comprise only a small part of MCI's pre-merger metropolitan area network. Should XO win the bid for these select and isolated lateral IRUs it would in no way substitute for MCI's local competitive presence.

8). XO would look more favorably on the competitive value of the proposed divestiture if the following requirements were part of those included as a comprehensive remedy:

   (a)   Extend the current lateral IRU divestiture by requiring either the divestiture of dark fiber IRUs (4 fiber strands) or the equivalent "lit" fiber services (or a combination thereof) in all metropolitan area network assets of MCI that overlap with Verizon network facilities (virtually all of MCI's metropolitan area facilities) and according to typical industry arrangements where access to the fiber is made available at all buildings and existing access points (e.g., manholes, handholes, pull-boxes) containing an enclosure.

   (b)   Amend the term of the dark IRU lease or "lit" fiber services contract to ten years with at least a ten year renewal at the same rates, terms, and conditions;

(c) Within one year of entering into an agreement, require Verzion/MCI to connect the dark fiber IRUs or "lit" fiber services at their expense to at least one and preferably two technically feasible points of interconnection identified by the purchaser.

The competitive situation could be improved still further if the remedy addressed the issue of ensuring that the purchaser of the facilities could quickly acquire customers and their traffic. While these requirements will not replace the competition provided by MCI, I believe they will help enable competition from competitive local exchange carriers like XO.

I declare under penalty of perjury that the foregoing is true and correct

Executed on June 6, 2006.

Richard D. Pierce