### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| United States of America,<br><br>          Plaintiff,<br><br>     v.<br><br>SBC Communications, Inc. and<br>AT&T Corp.,<br><br>          Defendants,<br><br>The Alliance for Competition in<br>     Telecommunications<br><br>          and<br><br>COMPTEL,<br><br>          *Amicus-Curiae.* | Civil Action No.: 1:05CV02102 (EGS) |
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>Verizon Communications Inc. and<br>MCI, Inc.,<br><br>          Defendants,<br><br>The Alliance for Competition in<br>     Telecommunications<br><br>          and<br><br>COMPTEL,<br><br>          *Amicus-Curiae.* | Civil Action No.: 1:05CV02103 (EGS) |

## ACTel's MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR LEAVE TO FILE A RESPONSE TO ADDITIONAL BRIEFS FILED BY THE PARTIES

*Amicus Curiae,* The Alliance for Competition in Telecommunications ("ACTel"), hereby moves this Court for an Order granting it leave to file the attached eight pages in response to AT&T's, Verizon's and the United States Department of Justice's responses to ACTel's Reply Memorandum in Opposition to the Department of Justice's Motion for Entry of Final Judgments.

This Court's May 10, 2006 Minute Order contemplated no briefing beyond ACTel's Reply of June 7, 2006. However, Verizon, SBC and the United States Department of Justice (the "Parties") have each sought and received permission to file responses to ACTel's Reply. ACTel has acquiesced to each Parties' respective motion for an additional filing on the condition that the Parties not object to ACTel submitting this response. ACTel seeks to make this submission solely to make a record of factual inaccuracies raised for the first time in each of the Parties' Responses that ACTel has not previously addressed.

Pursuant to the requirements of Local Rule 7, ACTel has consulted with the other counsel in this litigation to determine whether they consent to granting ACTel leave to file a Response to the Parties' additional Responses to ACTel's Reply. Verizon and Comptel do not oppose. AT&T and the United States Department of Justice have stated that they will not consent.

Dated: June 23, 2006

Respectfully submitted,

_____/s/_____

Gary Reback (Bar No. 218594)
Carr & Ferrell LLP
2200 Geng Road
Palo Alto, CA 94303
650-812-3489 (phone)
650-812-3444 (facsimile)
greback@carrferrell.com

Thomas Cohen (Bar No. 269332)

Kelley Drye & Warren LLP
3050 K Street, NW, Suite 400
Washington, DC  20007
(202) 342-8400 (phone)
(202) 342-8451 (facsimile)
tcohen@kelleydrye.com


*Attorneys for the Alliance for
Competition in Telecommunications*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America,<br><br>      Plaintiff,<br>  v.<br><br>SBC Communications, Inc. and<br>AT&T Corp.,<br><br>      Defendants,<br><br>The Alliance for Competition in<br>   Telecommunications<br><br>     and<br><br>COMPTEL,<br><br>     *Amicus-Curiae.* | Civil Action No.: 1:05CV02102 (EGS) |
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br>  v.<br><br>Verizon Communications Inc. and<br>MCI, Inc.,<br><br>      Defendants,<br><br>The Alliance for Competition in<br>   Telecommunications<br><br>     and<br><br>COMPTEL,<br><br>    *Amicus-Curiae.* | Civil Action No.: 1:05CV02103 (EGS) |

**ACTel's MEMORANDUM IN RESPONSE TO
ADDITIONAL BRIEFS FILED BY THE PARTIES**

ACTel respectfully submits the following in response to the arguments made in the Responses of the Department of Justice, AT&T and Verizon.

Tunney Act

The ACTel Reply Memorandum focused on the fact that the amended Tunney Act now requires the Court to consider "competition in the relevant market." The Government responds that the Court must consider "the impact of entry of [the] judgment upon competition in the relevant market," which is certainly true, but the Government then asserts that this language means that the Court can only look at the impact of the judgment on the harm alleged. Government Response at 2. This is not what the amended statute says.

The statute says the Court must consider the effect of the judgment on the market not on the harm alleged. These mergers create harm (in the form of price increases) throughout the market for Local Private Lines (and elsewhere). The remedy in the Proposed Judgment should prevent all this harm, but it only addresses the harm in 2-to-1 buildings. The statute says the Court must consider the fact that the remedy does not even address the harm in the relevant market beyond 2-to-1 buildings. The competitive impact of entry of the Judgment is that the mergers will go forward with only the proposed remedy. The impact of the entry of the Judgment will not reverse the harm throughout the market caused by the mergers.

Evidence of Price Increases

The ACTel Reply next cited the Court to a myriad of evidence that prices for Local Private Lines would increase as a result of the mergers, notwithstanding the proposed remedy. This evidence includes a Merger Guidelines analysis, the Wilkie

1

empirical studies,[1] press reports, analyst evaluations and the like. The Government responds merely by denigrating ACTel's evidence – as "stock" analyst reports and newspaper articles.[2] Government Response at 5. But where is the Government's evidence? This Court has already reminded the Government that it bears the burden of convincing the Court. But through three rounds of briefing, the Government provides no declarations, no economic evaluation, no Merger Guidelines analysis and not a shred of evidence to convince this Court. Only ACTel has presented evidence to this Court, and the Government contents itself with taking "pot shots" at that evidence. The Government makes no attempt to put forward an affirmative case of its own, so the Court can make an independent evaluation.

As further support for its position, ACTel went on in its Reply to point out that although AT&T is constrained for a period of months by FCC order with respect to prices it can charge for certain Local Private Lines (some of those within the jurisdiction of the

---

[1] Beyond the claim that the Government could not find "significant reliable corroborating evidence" for the Wilkie results, the only so-called "flaws" in the analysis the Government identified were a small sample size and an inability by the Government to reproduce Dr. Wilkie's results from the samples. Government Reply at 15-16. As to the first point, the Wilkie studies included thousands of observations. But, more importantly, accuracy of predictions from a sample set is based on statistical measurements that consider sample size. Here, the relevant statistical tests showed the predictions to be highly accurate, fully allowing for the actual sample size. The Court will note that the Government does not challenge the reliability levels on which the conclusions are based.

As to the second point, the Government during its audit and evaluation never informed ACTel that it was having trouble replicating the results. ACTel's economists provided the Government with the data sets as well as computer programs to enable DoJ to run the data sets and evaluate them on the Government's own computers. Perhaps the Government's difficulty was merely the result of its own problems. In any event, ACTel's economists would have gladly helped the Government replicate the results from the data if the Government had bothered to ask.

[2] The Government Response cites to the "Risk" section of a 10-K filed by ACTel member XO in an attempt to suggest there was a widespread feeling that the mergers might produce lower prices. This statement, however, is directed toward industry pricing trends as whole. The relevant material for purposes of the effect of the mergers before the court is found at the beginning of the 10-K in a statement which the Government has not brought to the Court's attention: "Assuming that each of the announced transactions involving AT&T and MCI occur as planned, market power for U.S. telecommunications services will be further consolidated among the ILECs, and both business and residential consumer choice will be significantly reduced. While it is not certain what the effects of this industry consolidation will be, we believe that one possible result could be that prices for telecommunications services would stabilize due to reduced competition."

FCC), it has been busily raising prices elsewhere for Local Private Lines since the mergers were consummated. As support for this point, ACTel attached a series of price increase announcements for Local Private Lines released by AT&T since the mergers.

In response, AT&T argues that the price increases identified by ACTel apply "only to intra-state, retail services that are purchased by end users." AT&T Response at 3 (emphasis in the original). This statement is demonstrably false. The Government also argues that the price increase announcements do not pertain to wholesale Local Private Lines. Government Response at 6.

We are attaching to this memorandum the first page of previously submitted Exhibit H to ACTel's Reply memorandum – the first of the price increase announcements previously submitted. See May 5, 2006 letter resubmitted as Exhibit 1 to this Response. As the Court can readily observe, the notice states that it applies to "Resale" and the embedded spreadsheet with the actual price increases, the icon for which appears in the lower left hand corner, is labeled "DS1 CLEC Notice." Moreover, because the Notice is being sent to wholesalers (i.e., Competitive Local Exchange Carriers), the letter states (in the second sentence of the first paragraph) "the appropriate Resale discounts will be applied to the Retail rates." So, the announcement lists new retail prices from which set discounts are taken to establish new wholesale prices. The rates to resellers reflect a discount from retail prices that is available only to wholesalers. See 47 USC § 252 (d) (3).

Furthermore, the AT&T web site on which these price increase announcements are posted contains a statement that the postings are "for the convenience of our wholesale customers." Statement attached as Exhibit 2. How in the world AT&T can

3

claim these price increases apply "only" to retail services "purchased by end users" is simply unfathomable.[3]

And to make the point about post-merger price increases even clearer, we are attaching as Exhibit 3 a post-merger price increase announcement from AT&T that pertains to Local Private Lines that were sold by the old AT&T prior to the merger, rather that the old SBC. This establishes that the FCC price freeze order cited in AT&T's response is so narrow that it does not even apply to all interstate Local Private Lines. More importantly, these type of increases, on the cheaper old AT&T circuits, are the most troublesome from an antitrust perspective – the merged company is raising prices on what used to be cheaper competitive offerings.[4]

AT&T Statements

AT&T next argues that the statements by its CEO and CFO regarding "price stabilization" and "upside to pricing" relate to the enterprise market and not to the wholesale market. AT&T Response at 4. Frankly, we are astonished by this argument. The economic injury pled by the Complaint in this case is <u>not</u> limited to the wholesale market. On the contrary, the Complaint alleges that the relevant product market, Local Private Lines, "are sold at both retail (to business customers) and wholesale (to other

---

[3] In footnote 2 on page 3 of its Response, AT&T seems to admit that these services are for resale, but claims they are technically "special access" as that term is used by the FCC. AT&T then appears to argue that although the circuits covered by these price increases are clearly "Local Private Lines" sold at wholesale for resale, because they are in a particular pricing category called "special access," the price increases that apply to these Lines are not the type of injury to competition contemplated by the Complaint. There is simply no economic basis for distinguishing Local Private Lines sold by one tariff (or price list) as opposed to the same product sold through another tariff (or price list), and AT&T provides no argument or justification for such an economic distinction.

[4] The increases on Exhibit 3 are squarely within the product market alleged in the Complaint. Because they are old AT&T circuits, the "special access" nomenclature would not apply to them.

carriers)." Complaint at ¶ 13. The "Violations Alleged" in the Complaint include both of these. See Complaint at ¶¶ 30-33.

AT&T is simply incorrect in asserting that ACTel has only expressed concern about wholesale prices. AT&T Response at 3. In fact, ACTel commissioned a detailed study by a widely recognized survey sampling firm that established widespread concern by enterprise customers of post-merger price increases. This study was submitted to the DoJ by ACTel on October 7, 2005, and is attached as Exhibit 4.

AT&T's response denies that its executives discussed post-merger "price stabilization" in the wholesale market but candidly admits that these executives touted post-merger price stabilization in the retail market. We will certainly accept that admission – even characterizing the admissions as pertaining to "enterprise buying services," something the transcript does not say, Local Private Lines to enterprise customers are a key component of what is "stabilized."[5]

The Government, for its part, proposes to avoid all of this evidence of post-merger price increases by claiming that the products on which prices are rising do not correspond in every single respect to the products analyzed by Dr. Wilkie. Government Response at 6. In point of fact, all the price increase evidence bears upon Local Private Lines, the relevant product market. But the point really is not whether the Government finds sufficient "corroboration" from each individual piece of evidence. The issue is whether the Government can simply close its eyes to all of this evidence of post merger

---

[5] Actually, these admissions also cover the wholesale market. As AT&T explains in footnote 2 of its Response, both large enterprise customers and resellers buy off the same tariff at the same prices. Retail prices could not go up without wholesale prices also going up. The same is true of sales of Local Private Lines pursuant to the announcements attached by ACTel – the wholesale price is merely a discount (e.g. 15% or 20%) from the retail price.

price increases for Local Private Lines, going well beyond 2-to-1 buildings, the only

harm it even attempted to remedy.

AT&T is left with the argument that it also raised prices prior to the merger and

the Court should not take any special notice of the post-merger price increase

announcements. AT&T Response at p. 3. How AT&T can square its claim that it

routinely raised prices prior to the merger with its sworn testimony to the FCC that

wholesale prices were declining prior to the merger is difficult to understand. Even

Verizon's Response undercuts AT&T's position by pointing out that, unlike AT&T,

Verizon has not announced price increases "for services that are sold pursuant to

interstate or contract tariffs" since the mergers. Verizon Response at p. 2. Of course, the

AT&T admissions about "price stabilization" in the enterprise market would equally

apply to Verizon pricing; AT&T could not enjoy the benefits of "price stabilization"

unless Verizon also stopped discounting.[6]

Most assuredly, these price increases have occurred prior to the implementation of

the proposed remedy. But the price increases have occurred throughout the market – not

just in 2-to-1 buildings. The proposed remedy does not even purport to address all of the

places in which price increases have occurred. The Government takes issue with the

evidence submitted by ACTel, but continues to provide nothing of its own to carry its

burden and prove its position to the Court.

---

[6] In response to the admissions of AT&T and Verizon in sworn testimony, the best DoJ can offer is the testimony of an ACTel member not party to these proceedings to the effect that special access prices were rising prior to the mergers. DoJ takes the XO quotes out of context, without explaining that the comments about price increases relate only to situations in which competition does not exist. Specifically, the comments pertain to problems with the FCC's Pricing Flexibility regime, which has permitted deregulation where there is inadequate competition, thereby producing price increases. See http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6517632828 Neither AT&T nor Verizon dispute the accuracy of their own statements regarding price decreases, but the Government goes out of its way to make up conflicting testimony where none exists.

HHI Analysis

AT&T claims that HHI analysis is only "the starting point for analyzing the competitive impact of a merger." We agree. The "starting point" here is that many, many more buildings beyond those listed in the remedy are far above the HHI thresholds. None of the parties have provided the Court with any economic or factual evidence to rebut the presumption of economic injury that flows from these high HHIs. On this record, under the law of this Circuit, the HHIs would alone be sufficient to reject the mergers.

The Government, similarly, provides no evidence or economic analysis to rebut the presumptions of economic injury flowing from the high HHIs. It offers only an "explanation" unsupported by an expert. And the "explanation" it provides won't hold water – the Government provides no expert testimony to explain why entry will "cure" the anticompetitive effects of consolidation in a 3-to-2 building, but not in a "2-to-1" building. The Government is simply making up its explanation as it goes along.

Adequacy of Remedy

ACTel submitted with its Reply a declaration explaining that DoJ could have just as easily ordered the divestiture of unused strands throughout all the local exchanges to provide a more effective remedy, rather than just adopting a remedy for "2-to-1" buildings. The Government Response claims ACTel miscounted the number of fibers and the remedy really requires the divestiture of at least eight fiber strands, rather than four.

True, but so what? ACTel's point is that DoJ could have ordered divestiture of unused strands wherever there was an overlap of facilities, thereby producing a more

7

effective remedy (and a lot more competition) at little additional cost to the parties. The Government does not rebut this point in any respect.[7]

ACTel notes that the responses of the parties did not dispute, or otherwise characterize as inaccurate, the quote of the AT&T CEO that AT&T did not really "give back one thing" to the Government to gain consent for its merger. At least on that point, ACTel and the parties are in agreement.


Dated: June 23, 2006                                    Respectfully submitted,


                                                    _____/s/_____

                                                    Gary Reback (Bar No. 218594)
                                                    Carr & Ferrell LLP
                                                    2200 Geng Road
                                                    Palo Alto, CA  94303
                                                    650-812-3489 (phone)
                                                    650-812-3444 (facsimile)
                                                    greback@carrferrell.com


                                                    Thomas Cohen (Bar No. 269332)
                                                    Kelley Drye & Warren LLP
                                                    3050 K Street, NW, Suite 400
                                                    Washington, DC  20007
                                                    (202) 342-8400 (phone)
                                                    (202) 342-8451 (facsimile)
                                                    tcohen@kelleydrye.com

                                                    *Attorneys for the Alliance for
                                                    Competition in
                                                    Telecommunications*

---

[7] It is also important to note in regard to the inadequacy of the remedy that AT&T has stated in public filings that for a telecommunications provider to have a realistic chance of acquiring a multi-location customer, it must have "coverage" of 70-80% of that customer's telecommunications expenditures (demand). *See*, Affidavits of James S. Kahan accompany SBC Communications' filings in FCC CC Docket 98-141 (August 4, 1998 and November 16, 1998).
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=2127390009
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=2127390010
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6005544287
The remedy in the proposed Judgment – the divestiture of a limited number of 2:1 lateral connections – would not enable a purchaser to obtain anything close to the same "coverage" as the old AT&T or MCI had pre-merger.