# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:05CV02102 (EGS) |
| | ) | |
| SBC COMMUNICATIONS, INC. and AT&T CORP., | ) | |
| | ) | |
| Defendants. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:05CV02103 (EGS) |
| | ) | |
| VERIZON COMMUNICATIONS, INC. and MCI INC., | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY OF THE NEW JERSEY RATE COUNSEL TO THE UNITED STATES' SUBMISSION IN RESPONSE TO THE COURT'S MINUTE ORDER OF JULY 25, 2006

The New Jersey Division of Rate Counsel ("Rate Counsel") submits that the

Court should reject the proposed settlements now under review resulting from the

Complaints[1] filed by the Antitrust Division of the United States Department of Justice

---

[1] See Complaint, *United States v. Verizon Communications, Inc*., 1:05CV02102(EGS) and Complaint, *United States v. SBC Communications, Inc*., 1:05CV02103(EGS). These complaints relate to the merger of Verizon Communications, Inc with MCI, Inc. ("the Verizon merger") and the merger of SBC Communications, Inc., with AT&T Corp. ("the SBC merger").

("DOJ") related to the Verizon merger and the SBC merger.  This recommendation is based upon Rate Counsel's review of the DOJ's Submission in Response to the Court's Minute Order of July 25, 2006.   For the reasons set forth below, the materials supplied by the DOJ are simply inadequate to make the determinations required under the Tunney Act.  The materials provided do not shed sufficient light on Local Private Lines (special access) and the inadequate justification offered in the record underscores that the remedies proposed are much too narrow and fail to serve the public interest.   The remedies especially fail to protect mass market customers who want plain old telephone service, those mass market customers who make few toll and long distance calls, those customers who do not seek advanced services, and non-enterprise business customers.[2]

**EXCUTIVE SUMMARY**

As explained below, Rate Counsel urges the Court to reject the Final Judgment as not being in the public interest and to direct the parties to explore options for ensuring that customer choice and competition remain for mass market customers, specifically residential users of plain old telephone service and those residential customers who make few toll and long distance calls ("Target Customers").   Such options should include obtaining commitments from Verizon and SBC to compete out of region for Target Customers in other Regional Bell Operating Companies' in-region service areas or in the

---

[2]/      Mass market customers have been defined by the Federal Communications Commission as residential and small business customers that purchase standardized offerings of communications services. See *In the Matter of SBC Communications, Inc. and AT&T Corp. Application for Approval of Transfer of Control*, WC Docket No. 05-65, Memorandum Opinion and Order, FCC 05-183, (rel. November 17, 2005) (SBC Merger Order"). In particular, footnote 243 defines "mass market customers."  For purposes of this filing, the term "mass market" includes residential, small business and other non-enterprise business customers.

alternative, imposing divestiture of in-region competitive local exchange carrier ("CLEC") lines acquired in the two mergers.

Either option will ensure that the Target Customers have a choice of service providers. As demonstrated below, with the exiting of MCI, AT&T, and Sprint from the pursuit of mass market customers, there is only one true choice for the Target Customers within in-region areas served by Verizon and SBC.

**BACKGROUND**

The Verizon merger and the SBC merger were preceded by the issuance of the *TRRO* by the Federal Communications Commission ("FCC").[3]  The FCC applied a "reasonably efficient competitor" analysis whereby the FCC concluded that mass market local circuit switching was no longer needed to be provided at Total Element Long Run Incremental Cost ("TELRIC") under the Act.  Prior to the *TRRO*, CLECs, such at AT&T Corp. and MCI, Inc. used incumbent local exchange carrierlocal circuit switching in combination with incumbent local exchange carrier loops known as the unbundled network element platform("UNE-P") to serve mass market customers.  After the TRRO, CLECs now must obtain local circuit switching, shared transport (special access), and local loops (*i.e.*, "UNE-P") from local exchange carriers at commercially "negotiated" rates,[4] or deploy their own switches to use in combination with local exchange carriers'

---

[3]/      See Order on Remand, *In the Matter of Unbundled Access to Network Elements, Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, WC Docket No. 04-313 and CC Docket No. 01-338, FCC 04-290, (rel. February 4, 2005) ("*TRRO*"). Various appeals were filed and the Appeals were heard in the United States Court of Appeals for the District of Columbia.  See *Covad Communications v. FCC*, No. 05-1095, Slip Op. (June 16, 2006).  Rate Counsel filed a Petition for Hearing that is pending at this time.

[4]/      As the market becomes increasingly concentrated with each successive merger, the notion of CLECs' having any "negotiating" power with the incumbent local exchange carriers diminishes, further jeopardizing CLECs' ability to obtain access to unbundled switching at reasonable rates.

unbundled loops ("UNE-L"), or deploy their own local loops for the "last mile" to serve the mass market (*i.e.,* deploy their own facilities*)*.  Furthermore, in order to serve the mass market, CLECs may also rely on the incumbent carriers' shared transport (special access) to link incumbent carriers' switches to the CLEC' switching facilities.

Both AT&T and MCI announced prior to the issuance of the *TRRO* that they would no longer pursue the mass market.[5]  AT&T and MCI, along with Sprint, were the largest CLEC competitors competing with Verizon and SBC for mass market customers.[6]  Although both Verizon and SBC claim large line losses in-region to CLECs, the results of these two mergers for the mass market is increased concentration with ability to increase rates.  The FCC defined various relevant markets and performed competitive analysis in those markets.  In both mergers, the FCC defined the markets as wholesale special access, retail enterprise, mass market, internet backbone, and wholesale interexchange.  With respect to the mass market, for the SBC merger, the FCC found:

> Following Commission precedent, we begin our analysis by examining SBC's and AT&T's market share, supply and demand factors.  In general, the market share calculations indicate a high level of concentration in most franchise areas in SBC's states for all relevant services.  Within SBC's franchise areas, its median market share for local services increases from [ ] to  [ ] percent, with a post merger share range of [ ] percent to [ ] percent.  Similarly, within SBC's franchise areas, its median share of long distance service will increase from [ ] percent to [ ] percent, with a post-acquisition market share range from [ ] percent to [ ] percent.  Finally, within SBC's franchise areas, its median market share for bundled local and long distance services will increase from [ ] percent to [ ], with a

---

[5]/      See SBC Merger Order at ¶ 103 and footnotes therein; See also  .  See *In the Matter of Verizon Communications Inc. and MCI, Inc. Application for Approval of Transfer of Control*, WC Docket No. 05-75, Memorandum Opinion and Order, FCC 05-184, (rel. November 17, 2005) (Verizon Merger Order").  In particular, see Verizon Merger Order at ¶ 104 and footnotes therein.

[6]/      As the result of the Sprint-Nextel merger, Sprint-Nextel also announced that it would no longer pursue mass market through its CLEC operation.

post-acquisition market share range of [   ] percent to [   } percent. (footnotes omitted).[7]

With respect to the mass market, for the Verizon merger, the FCC found:

Following Commission precedent, we begin our analysis by examining Verizon's and MCI's market share, supply and demand factors.  In general, the market share calculations indicate a high level of concentration in most franchise areas in Verizon's states for all relevant services.  Within Verizon's franchise areas, its median market share for local services increases from [   ] to [   ] percent, with a post merger share range of [   ] percent to [   ] percent.  Similarly, within Verizon's franchise areas, its median share of long distance service will increase from [   ] percent to [   ] percent, with a post-acquisition market share range from [   ] percent to [   ] percent.  Finally, within Verizon's franchise areas, its median market share for bundled local and long distance services will increase from [   ] percent to [   ], with a post-acquisition market share range of [   ] percent to [   } percent. (footnotes omitted).[8]

These levels of concentration and the resultant mergers clearly raise concerns under the DOJ merger guidelines. In the New Jersey Verizon Merger proceeding, the HHI analysis performed by Rate Counsel's consultant shows a highly concentrated market.

**Rate Counsel's HHI Analysis**

The significantly increased market concentration ensuing from the mergers create significant and long-lasting anticompetitive consequences.  As part of its filings in the New Jersey Board's investigation of the impact of the Verizon merger on the public interest and on mass market consumers, the Rate Counsel conducted a Herfindahl Hirschman Index (HHI) analysis of several relevant markets.[9]  The HHI analysis, which

---

[7]/       See SBC Merger Order at ¶ 102.  Brackets indicate redacted proprietary information.

[8]/       See Verizon Merger Order at ¶ 103.  Brackets indicate redacted proprietary information.

[9]/       See redacted filings attached to Rate Counsel's Motion to Intervene docketed and entered on July 31, 2006 and filed on July 20, 2006.  Although the Rate Counsel did not conduct an HHI analysis in its review of the SBC merger, the results would likely be similar in magnitude to the results found by the Rate Counsel in its analysis of the Verizon merger.

is based on data provided by Verizon and MCI to the New Jersey Board and to the FCC, shows that the market concentration and re-monopolization by Verizon resulting from its acquisition of MCI further entrenched Verizon's market power and thus its ability to raise prices without consumer flight (*i.e.*, consumers will not have other options if Verizon raises prices or provides poor service quality). The post-merger increase in market concentration significantly exceeded the Merger Guidelines' threshold for concern.

Section 1.5.1 of the Merger Guidelines state, *inter alia,*,

In evaluating horizontal mergers, the Agency will consider both the post-merger market concentration and the increase in concentration resulting from the merger. Market concentration is a useful indicator of the likely potential competitive effect of a merger. The general standards for horizontal mergers are as follows:

... [parts a and b are omitted in this excerpt]

c) Post-Merger HHI Above 1800. The Agency regards markets in this region to be highly concentrated. Mergers producing an increase in the HHI of less than 50 points, even in highly concentrated markets post-merger, are unlikely to have adverse competitive consequences and ordinarily require no further analysis. Mergers producing an increase in the HHI of more than 50 points in highly concentrated markets post-merger potentially raise significant competitive concerns, depending on the factors set forth in Sections 2-5 of the Guidelines. *Where the post-merger HHI exceeds 1800, it will be presumed that mergers producing an increase in the HHI of more than 100 points are likely to create or enhance market power or facilitate its exercise.* The presumption may be overcome by a showing that factors set forth in Sections 2-5 of the Guidelines make it unlikely that the merger will create or enhance market power or facilitate its exercise, in light of market concentration and market shares.[10]

---

[10]/    Horizontal Merger Guidelines (emphasis added).

The HHI is a well-known measure of market share concentration, and is computed as the sum of the squares of each firm's market share.[11]  If a single firm serves an entire market, the HHI is 10,000 (the highest possible HHI), and if two firms each equally serve a market the HHI of that market is 5000.  The larger the HHI, the greater is the concentration.  Markets with HHI below 1000 are considered to be un-concentrated, those with an HHI between 1000 and 1800 to be moderately concentrated, and those with an HHI above 1800 to be highly concentrated.[12]

The following table reproduces the table that appears in the New Jersey Rate Counsel's initial brief, filed on October 14, 2005, with the New Jersey Board of Public Utilities in BPU Docket No. TM05030189, and subsequently submitted in this proceeding as one of several documents on a CD.[13]  The HHI analysis in the following table is based on the evidence submitted in the New Jersey Board's record.

The first column identifies the five New Jersey markets that the New Jersey Rate Counsel analyzed:  all switched access lines excluding enhanced extended loops ("EEL");[14] switched access lines including EELs; the total business services group; the "premium" business services group; and the mass market business services group.  The first two markets (that is, all switched access lines) differ only slightly and both are

---

[11]/      Horizontal Merger Guidelines, § 1.5; F.M. Scherer, Industrial Market Structure and Economic Performance, Rand McNally & Company, Chicago, 1970, 50-52.

[12]/      Horizontal Merger Guidelines, § 1.51.

[13]/      See redacted filings attached to Rate Counsel's Motion to Intervene docketed  and entered on July 31, 2006 and filed on July 20, 2006.

[14]/      An EEL is defined by the FCC as consisting of "a combination of an unbundled loop, multiplexing/concentrating equipment, and dedicated transport.  The EEL allows new entrants to serve customers without having to collocate in every central office in the incumbent's territory."  *In the Matter of Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, FCC CC Docket No. 96-98, *Third Report and Order and Fourth Further Notice of Proposed Rulemaking*, rel. November 5, 1999, at II. Executive Summary.

reasonable proxies for the mass market.[15]   The latter three markets correspond with segments of the non-enterprise business market, with the "BSG Premium" and the "BSG Mass Market" representing subsets of the "total BSG" market.[16]   The second column summarizes the pre-merger, market structure and shows a market concentration ranging between 5,049 and 6,425.  The third column shows the post-merger market concentration, ranging between 5,325 and 7,020.  The fourth column, which summarizes the increase in the HHI resulting from Verizon's acquisition of MCI, shows clearly that the increased post-merger concentration greatly exceeded the 100-point threshold of concern.  The merger increased market concentration in the switched access line market by *more than five times* the Merger Guidelines' threshold level of concern.[17]   The merger significantly increased market concentration, and, in the instance of all switched access lines, increased the HHI by more than 500.

The table is based on the information that Verizon provided in response to Rate Counsel and FCC discovery, and contains the data available in the FCC's proceeding. The FCC has stated, a "high market share does not necessarily confer market power, but it is generally a condition precedent to a finding of market power."[18]   Despite the clear

---

[15]/    Switched access lines, by definition, do not include any private or special access lines, but do include lines that serve residential and small business locations.

[16]/    These market definitions correspond with those used by Verizon in the merger proceeding.

[17]/    The underlying source data for this table has been designated as confidential and therefore are not provided in this filing.  If Verizon agrees to make the data available in this proceeding, the Rate Counsel is fully prepared to provide the work papers associated with the calculations summarized in this table.

[18]/    *In the Matter of Special Access Rates for Price Cap Local Exchange Carriers; AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, FCC WC Docket No. 05-25; RM-10593, *Order and Notice of Proposed Rulemaking*, Released January 31, 2005 ("Special Access NPRM"), at para. 103, citing U.S. Department of Justice and the Federal Trade Commission, Horizontal Merger Guidelines, issued April 2, 1992, revised April 8, 1997 ("Horizontal Merger Guidelines"), § 1.11

harm to the public interest and to local competition in the mass market evidenced by the Rate Counsel's HHI analysis and the Rate Counsel's other detailed market structure analysis submitted in the Verizon and the SBC merger proceedings,[19] the DOJ failed to explain or justify why the limited remedies proposed only apply to retail enterprise business customers.  DOJ offered no explanation as to why the limited remedies are adequate to control the market power of the merged entities for all markets affected either directly or indirectly by Private Line (special access).  See AT&T401007830 (Tab ll) at 7835 (breakdown of market), 7836 (raise prices), and 7839 (harvest customers); MCI-DOJQQ001024 (Tab 12) at 1024 (increase rates); VZ066004678 (Tab 10) at 4678—4680 (price premiums); VZ-0740117279 (Tab 10) at 7281, 7284 (6th bullet), 7294, 7299, 7300, 7353, and 7358 (services not under competitive threat).[20]  Furthermore, as is discussed in more detail below, the record shows an incomplete and myopic analysis with out discussion of the nuances associated Private Line (special access) including supracompetitive returns and the effect of such returns on competition in markets depending on such special access services.

| Market | Pre-Merger | Post-Merger | Change |
|---|---|---|---|
| Switched Access Lines - no EELs – New Jersey | 6,425 | 7,020 | 595 |

---

[19]/    See redacted filings attached to Rate Counsel's Motion to Intervene docketed and entered on July 31, 2006 and filed on July 20, 2006.

[20]/    Citations are to United States' Submission in Response to the Court's Minute Order of July 25, 2006 filed UNDER SEAL. Page numbers provided without discussion of specifics.

| Switched Access Lines – with EELs - New Jersey | 6,169 | 6,739 | 570 |
|---|---|---|---|
| BSG total | 5,779 | 6,075 | 296 |
| BSG - premium | 5,049 | 5,325 | 276 |
| BSG - mass market | 5,880 | 6,030 | 150 |

The extremely concentrated characteristic of Bell-dominated local markets, which the mergers indisputably exacerbated, demonstrates clearly that the DOJ has failed to answer the Court's essential question:

> Through the eyes of a layperson, the mergers, in and of themselves, appear to be against the public interest given the apparent loss in competition. In layperson's terms, why isn't that the case? [21]

Furthermore, as is demonstrated below, the DOJ's Private Line (special access) remedies are inadequate on their face and the DOJ's Private Line (special access) analyses has implications for the residential and non-enterprise business competition (mass market competition) which go unaddressed. In the instance of the mass market, however, it is the utter absence of *any* remedies that renders the DOJ's findings contrary to the public interest. The DOJ's failure to address the anticompetitive consequences of Verizon and SBC acquiring their archrivals – competitors that possessed a unique ability to serve the local market - renders its analysis incomplete and the proposed remedies insufficient based upon the record. The Rate Counsel urges the Court to find that the

---

[21]/    Court Order, July 7, 2006.

mergers, as modified by the DOJ's remedy, are contrary to the public interest and thwart the development of local competition.

**Special access market**

The Rate Counsel has repeatedly raised concerns in its filings with the FCC about the lack of competition in the special access market and about the harmful impact of the mergers on the special access market which directly affect competition for non-enterprise business markets and indirectly affect competition for residential markets to the extent special access is used for shared transport. Furthermore, the financial viability of any "reasonably efficient competitors" with business plans that contemplate first serving business customers and subsequently entering residential markets depends critically on adequate remedies that prevent anticompetitive behavior by the merged companies. In sufficient Private Line (special access) remedies jeopardize CLECs' overall financial health, which in turn diminished the prospect of any CLECs expanding their business to serve residential customers.

These concerns are germane to the Court's review of the mergers. Indeed, as discussed in more detail below, the CLECs' concerns with the special access market is broader than the retail enterprise market and affects non-enterprise business. The post-merger structure of the Private Line (special access) market undercuts the CLECs' ability to serve the residential and non-enterprise business markets. These concerns have been repeated in various CLECs' comments and reiterated in the current AT&T/BellSouth

merger proceeding at the FCC.[22]  The record shows that DOJ's remedies in the Verizon/MCI and AT&T/SBC mergers are inadequate.  The support provided in the DOJ's filing to the Court simply fails to show that a complete and thorough analysis of the Private Line (special access) market was conducted to ensure that the limited remedies adopted withstand Tunney Act review.

In the FCC merger review proceedings and in the FCC's still open proceeding examining special access regulatory regime, consumer advocates and competitors have raised questions with respect to anticompetitive behavior and the paucity of competition in the special access markets.  As stated in the Rate Counsel's reply comments in the FCC's Special Access proceeding last year:  "Compounding the above described issues with respect to the new unbundling regime is the Commission's review of the SBC/AT&T and Verizon/MCI merger applications.  As noted by Wiltel, with the consummation of the mergers, the two largest ILECs acquired the two largest CLEC and long-haul providers.[23]  Several commenters noted that the two largest non-RBOC providers of Special Access were AT&T and MCI and that previously, as uniquely

---

[22]/      See Global Crossing expressed concern regarding increasing concentration in the special access market, stating "[t]his concentration, combined with increasing pricing flexibility, raise serious concerns regard AT&T/BellSouth's pricing power and willingness to deal."; *In the Matter of AT&T Inc. and BellSouth Corporation Applications for Approval of Transfer of Control*, Federal Communications Commission WC Docket No. 06-74, Comments of Global Crossing North America, Inc., at 3-4. *See, also,* Mobile Satellite Ventures Subsidiary LLC, at 1;  See Paetec Communications, Inc. ("Paetec") asserted that it depends upon ILEC special access connections for 95% of its "last-mile connections to end-users."[22] Paetec asserted that the "competitive situation in the special access market" in AT&T's and Verizon's territory has "deteriorated substantially" since the mergers of SBC with AT&T and Verizon with MCI; *Id.,* Comments of Paetec Communications, Inc. ("Paetec"), at ii.  Time Warner also presented evidence of its reliance on the incumbent carriers.  *See* Declaration of Graham Taylor on behalf of Time Warner Telecom, Inc. ("Taylor Declaration"), at paras. 19-30.

[23]/      *In the Matter of Special Access Rates for Price Cap Local Exchange Carriers*; *AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, FCC WC Docket No. 05-25; RM-10593, Reply Comments of the New Jersey Division of the Ratepayer Advocate, July 29, 2005, at 17, citing Comments of Wiltel, at 5.

qualified CLECs, they provided the only real check on ILEC special access pricing.[24] The Rate Counsel highlighted commenters' concerns that "[t]he rules restraining ILEC monopoly pricing are woefully inadequate to deal with the potential for cross-subsidy and preferential dealing that these mergers portend."[25]

In the special access proceeding, commenters repeatedly warned the Commission that AT&T and MCI provided the only competitive pressure that the RBOCs faced in the special access market and that the mergers would nullify the benefits of such pressure.[26]

As was stated in the Rate Counsel's filing in the FCC's review of the merger between Verizon and MCI:

> Post-merger, MCI's incentives and obligations to shareholders would change dramatically. MCI's metamorphosis from a consumer of Bell services to a supplier of Bell services would strengthen considerably Verizon's regulatory position, to the harm of consumers. Furthermore, until the FCC resolves critical industry issues such as unifying the intercarrier compensation regime, addressing BOCs' exorbitant special access profits, and ensuring appropriate interaffiliate transactions, it would be unwise to allow the market to undergo further concentration, absent commitments aimed at curtailing abusive behavior by the merged entity. We urge the FCC to impose conditions to detect and to prevent (1) anti-competitive behavior and (2) extracting supra-competitive profits from consumers.[27]

The DOJ's after-the-fact support for the limited remedies do not even mention or analyze fully special access and in particular, the anti-competitive effects special access

---

[24]/     *Id.*, Sprint, at 7-8; Time Warner, at 19-20.

[25]/     *Id.*, Wiltel, at 5.

[26]/     *Id.* See, *e.g.*, Sprint, at 7-8; Qwest, at 3; Time Warner, at 19-20; Wiltel, at 5.

[27]/     See redacted filings attached to Rate Counsel's Motion to Intervene docketed and entered on July 31, 2006 and filed on July 20, 2006: *In the Matter of Verizon Communications Inc. and MCI, Inc., Applications for Approval of Transfer of Control, WC Docket No. 05-75,* Initial Comments of the New Jersey Division of the Ratepayer Advocate, Declaration of Susan M. Baldwin and Sarah M. Bosley, filed on May 9, 2005, para. 94.

has on markets that use or rely upon special access. The FCC released its *Special Access NPRM* (Order and Notice of Proposed Rulemaking) in WC Docket No. 05-25 on January 31, 2005, which addresses issues directly related to the mergers of SBC and AT&T and Verizon and MCI as well as the currently proposed AT&T/BellSouth merger.[28] The *Special Access NPRM* commenced a "broad examination of the regulatory framework to apply to price cap local exchange carriers' (LECs) interstate special access services"[29] given the expiration of the CALLS plan on June 30, 2005. The FCC has recognized that special access is a key input for competitive LECs, CMRS providers, business customers, and interexchange carriers (IXCs). Special access revenues have grown from 12.8 percent of Bell Operating Company interstate operating revenues in 1991 to 45.4 percent of interstate operating revenues in 2003.[30]

The Special Access proceeding also addresses a legacy AT&T petition for rulemaking asking the FCC to revoke pricing flexibility and re-examine the CALLS Plan claiming that predicted competitive entry in the special access market has not materialized and that BOC special access rates have increased or remained flat in every market where pricing flexibility has been granted.[31]

The Rate Counsel reasoned that:

The record regarding price increases where pricing flexibility has been granted is compelling and has been submitted time and again in several proceedings over the past several years. The Commission's request for

---

[28]/    *In the Matter of Special Access Rates for Price Cap Local Exchange Carriers*; *AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, FCC WC Docket No. 05-25; RM-10593, *Order and Notice of Proposed Rulemaking*, Released January 31, 2005 ("Special Access NPRM").

[29]/    *Id.*, at para. 1

[30]/    *Id.*, at para. 3.

[31]/    *Id.*, at para. 19.

more recent data to demonstrate that such price increases are "substantial and sustained" has been answered. The Ratepayer Advocate urges the Commission to seriously examine the evidence and to consider the ramifications to competition, and ultimately, to consumers if grants of pricing flexibility continue in markets that are not fully competitive.[32]

Indeed, the FCC itself noted in the *Special Access NPRM* that the BOCs have "earned special access accounting rates of return substantially in excess of the prescribed 11.25 rate of return that applies to rate of return LECs."[33] A declarant for a users group calculated that the BOCs, as a group, earned an average special access rate of return of 53.7% in 2004.[34] Most recently the National Association of State Utility Consumer Advocates, The New Jersey Division of Rate Counsel, and the Maine Office of the Public Advocate filed comments in the FCC's Jurisdictional Separations docket stating that "Despite the ILECs' claims about the competitiveness of the interstate market, the ARMIS reports . . . show the ILECs earning what can charitably be described as supracompetitive profits in the interstate jurisdiction, ranging as high as 58%."[35]

As discussed above, the complex issues associated with special access and its effect on multiple markets underscore the incomplete and limited analysis of Private Line

---

[32]/    *In the Matter of Special Access Rates for Price Cap Local Exchange Carriers*; *AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, FCC WC Docket No. 05-25; RM-10593, Reply Comments of the New Jersey Division of the Ratepayer Advocate, July 29, 2005, at 14, note omitted.

[33]/    S*pecial Access NPRM*, at para. 35.

[34]/    *In the Matter of Special Access Rates for Price Cap Local Exchange Carriers*; *AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, FCC WC Docket No. 05-25; RM-10593, Reply Comments of the New Jersey Division of the Ratepayer Advocate, July 29, 2005, at 29, citing Declaration of Susan M. Gately on behalf of the Ad Hoc Telecommunications Users Committee, at para. 9.

[35]/    *In the Matter of Jurisdictional Separations and Referral to the Federal-State Joint Board*, FCC CC Docket No. 80-286, Comments of the National Association of State Utility Consumer Advocates, the New Jersey Division of Rate Counsel, and the Maine Office of the Public Advocate, August 22, 2006, at 6.

(special access) by DOJ. Such analysis affects whether the proposed remedies are sufficient, adequate, and otherwise in the public interest.

The same finding of lack of choice that permeates and supports DOJ's conclusion that the merged entities can exercise market power for retail enterprise markets with respect to various identified buildings equally apply to non-enterprise business and residential, in particular Target Customers. To remedy such harms and related Clayton Act concerns, the Court should require that the DOJ and the merged entities address the resultant market power in the residential mass market and non-enterprise business market, and consider appropriate alternatives such as obtaining commitments from Verizon and SBC to compete out of region for Target Customers in other Regional Bell Operating Companies service areas or in the alternative, imposing divestiture of in-region CLEC lines acquired in the two mergers.

**THE TUNNEY ACT**

The Tunney Act requires the Court to review the DOJ's Proposed Amended Final Judgments and affirmatively find that: (1) the proposed consent decree(s) are in the public interest, and (2) the judgments proposed by DOJ to remedy the significant anticompetitive effects caused by these mergers are in the public interest.[36]

The 2004 amendments to Tunney Act made clear through the changes shown in boldface below that the Court must affirmatively find that certain public interest criteria are demonstrated by DOJ and the parties:

---

[36]/    See 15 U.S.C. § 16(e).

Section 16(e) entitled "**Public Interest Determination**" provides:

> **(1)** Before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of such judgment is in the public interest.  For the purpose of such determination, the court may **shall** consider—

> **(1)(A)** the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration or **of** relief sought, anticipated effects of alternative remedies actually considered, **whether its terms are ambiguous,** and any other **competitive** considerations bearing upon the adequacy of such judgment; **that the court deems necessary to a determination of whether the consent judgment is in the public interest; and**

> **(2)(B)** the impact of entry of such judgment upon **competition in the relevant market or markets, upon** the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial**.**

> **(2) Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene**.  Through these amendments to the Tunney Act, Congress put a greater burden on courts than existed before—when the specific elements of a public interest finding were permissive (the court had to find the consent decree was in the "public interest" but the statute left to the court's discretion whether the court would consider each suggested element of the public interest analysis). 15 U.S.C. § 16(e)(1980).

These changes underscore that the Court must now consider certain points, such as whether terms in the decree are ambiguous and the impact of the proposed judgment on competition in the relevant markets.[37]  The Court here must consider the effect of the decree on competition in the relevant markets, and then affirmatively find that entry of the decree is in the public interest. The Court is empowered to review any other

---

[37]/     15 U.S.C. § 16(e)(2004)

competitive consideration that the Court deems necessary to a determination of whether the Final Judgment is in the public interest.[38]

**THE DOJ FILING**

The DOJ would essentially ask the Court to accept as the sole basis for conducting its Tunney Act review, the after-the-fact Declaration of W. Robert Majure and the limited portions of the record below that are referenced therein. Rate Counsel suggests that an after-the-fact affidavit is insufficient to enable the Court to conduct its review. The Court must know the actual basis underlying the filing of the complaints with contemporaneous findings and determinations as to why the Complaints as filed satisfy the statutory requirements, i.e., that the mergers poise no anticompetitive harms to competition and to the public interest.

The Competitive Impact Statement filed in each respective merger simply addresses Local Private Lines. The DOJ concludes that:

> This loss of competition would result in customers facing higher prices for Local Private Lines and other telecommunications services that rely on Local Private Lines than they would absent the merger.[39]

The DOJ further concludes that:

> In the event of a small, but significant, nontransitory increase in price for either Local Private Lines or voice and data telecommunication services provided via Local Private Lines, insufficient customers would switch to switched circuits to render the increase unprofitable.[40]

---

[38]/    See Senator Kohl's explanation in the legislative history concerning Section 221(b)(2)(B) of the legislation; Congressional Record: April 2, 2004 (Senate) [page S3610-S3619] from the Congressional Record Online via GPO Access [wais.access.gpo.gov] [DOCID: cro2ap04-196].

[39]/    Each CIS at page 1 contains the identical conclusion and such conclusion is limited to Local Private Lines.

[40]/    *Id.* at 3.

Mr. Majure's declaration identifies at ¶ 2 his involvement and other DOJ personnel's involvement in the review of the mergers. Paragraph 2 provides, in pertinent part:

> I supervised the economists who worked with staff attorneys on the Division's investigations of SBC's proposed merger with AT&T and Verizon's proposed merger with MCI. I was involved in all aspects of their work including the development of potential economic theories of harm and the analysis of whether these theories were supported by the documents and data produced by the merging parties and competitive local exchange carriers ("CLECs"), as well as by information gathered from industry and public sources.

The DOJ concludes that unacceptable market power is present, if the mergers are consummated. However, the DOJ offer no information and guidance as to why the Complaints as filed are limited only to retail enterprise markets related to Local Private Lines. There is simply no discussion or analysis of other relevant markets that are affected by this merger and by the specific finding of market power in the Private Lines (special access) markets. In regard to the mass market, and the non-enterprise business market, the merged entities have the same ability to exercise market power and raise prices. Such action in these markets would be profitable. Rate Counsel submits there is no doubt that prices to consumers will rise from these mergers. In fact, the FCC acknowledges that AT&T's strategy is to "harvest" its mass market business by raising prices.[41]

This is the same harm that DOJ identifies with Local Private Lines and for which divestiture is directed, but DOJ offers no position as to competitive effects on the mass market or other relevant markets in seeking approval of the Final Judgment. Mr. Majure

---

[41]/ See *SBC Merger Order* at ¶ 103 and footnotes cited therein.

also asserts in his declaration that the focus of antitrust analysis of mergers is on when a proposed merger will likely lead to a loss of competition and as an economist, he looks at where and to what extent the companies compete, who else competes, how competition occurs and who else is likely to enter if conditions change.  Mr. Majure correctly concludes that "[i]n the present cases, the question is whether loss of AT&T or MCI is likely to affect competition for any particular product in a particular geographic area."[42] Rate Counsel notes that in the two complaints underlying each of the Final Judgments under review, such complaints identify Local Private Lines as "special access."[43]  As the result of DOJ's findings concerning special access, DOJ required divestiture of assets to preclude anti-competitive harms in violation of Section 7 of the Clayton Act.[44] Essentially, the Final Judgments under review are predicated upon the need to preserve choice and competition by ensuring that customers have competitive options other than the RBOC.[45]  They must have at least two providers.

In the Majure Declaration, there is no direct reference to "special access" but only to Local Private Lines.  As a result, there is no discussion of or comment upon the aspects of the market in special access and how market power in this market impacts and points to market power issues in other relevant markets, such as residential and non-enterprise business markets (the mass market).

---

[42]/     See Declaration of W. Robert Majure at ¶ 4 ("Majure Declaration").

[43]/     See DOJ's Complaint filed against Verizon and MCI ("Verizon Complaint") at ¶¶ 13, 15, 20, and 23 and  DOJ's Complaint filed against SBC and AT&T ("SBC Complaint") at ¶¶ 13, 15, 20, and 23.

[44]/     See United States' Submission in Response to the Court's Minute Order of July 25, 2006 at page 5; Verizon Complaint at ¶¶ 32 and 34; SBC Complaint at ¶¶ 32 and 34.

[45]/     Id. at page 18; Majure Declaration at ¶¶ 15-25.

It cannot seriously be disputed that Verizon and SBC have market power in Local Private Lines (special access). The growth in special access and the increased profits there are clearly documented. Rate Counsel along with National Association of State Utility Consumer Advocates and the State of Maine filed comments in response to the Further Notice of Proposed Rulemaking on the separation freeze that has been in place since 2000.[46] Those comments include an analysis of the growth in special access and the extraordinary returns earned from those special access services. Rate Counsel incorporates by reference the comments filed therein on August 22, 2006. The separation freeze has distorted the rates set for services at both the federal and state arena to the detriment of consumers with corresponding effects on the ability of Verizon and SBC to exercise market power across a broad range of relevant markets. In addressing appropriate remedies, the DOJ has no analysis or discussion of how the separations freeze affects its analysis of the Private Line (special access) market, affects the ability of CLECs to compete in Local Private Line markets or how the remedy proposed addresses the negative competitive effects of the separation freeze and its impact on competition. Similarly, there is no discussion or analysis of the supracompetitive returns that Verison and SBC are earning, and how the DOJ's limited remedies address the competitive harms arising therefrom.

Furthermore, the proposed remedy to overcome the violations of Section 7 of the Clayton Act is applied soley to retail enterprise buildings. The DOJ utterly fails to address or explain why protections to mass market customers in those markets are not

---

[46]/      See *In the Matter of Jurisdictional Separations and Referral to the Federal State Joint Board*, CC Docket No. 80-286 (released on May 16, 2006).

similarly appropriate and warranted.  Once the issue of special access is opened, there is no support offered as to why similar relief is not appropriate for the mass market.

Rate Counsel submits before any remedy can be imposed, a full and complete discussion of the Private Line (special access) market is essential.  Such analysis should address, at a minimum, special access and the markets it affects; and how regulatory conditions such as the separation freeze and the supracompetitive returns affect Private Line (special access) competition and rates.

Furthermore, the special access analysis under which the DOJ concludes that market power can be exercised in the retail enterprise market implicates and permeates the mass market.  The merged entities possess market power in the mass market.  Special access provides a vital transport function to CLECs affecting their ability to compete for mass market customers.  There are simply no viable competitors for Target Customers with the abandonment of the mass market due to the elimination of unbundled network element platform ("UNE-P") (elimination of local circuit switching at TELRIC rates).  The confluence of the elimination of UNE-P and the subsequent announced mergers leave Target Customers without choice and without a true option.  Appropriate remedies are necessary to eliminate the competitive harms to the mass market that result from the facts that major competitors no longer compete in the mass market and that the subsequent mergers further add to the market power of Verizon and SBC.  Non-enterprise customers are in the same position.  As a result, Rate Counsel asks that the Court declare that the Final Judgments are not in the public interest under the provisions of the Tunney Act, reject the Final Judgments, and direct the parties to consider alternatives, including having Verizon and SBC compete out of region, or in the alternative divest themselves of

the in-region CLECs lines acquired in the respective mergers, or such other appropriate

relief that the Court deems appropriate.    Rate Counsel provides e-mail links to various

referenced documents in Attachment A, hereto.


Respectfully submitted,

RONALD K. CHEN
PUBLIC ADVOCATE OF NEW JERSEY


By:  *Christopher J. White*
Christopher J. White, Esq.
Deputy Public Advocate
Division of the Rate Counsel
31 Clinton Street, 11th Floor
P.O. Box 46005
Newark, NJ 07101
973-648-7575 (Direct Line)
973-624-1047 (Fax)
D.C. Bar No.: 967919

Dated:  September 5, 2006

# ATTACHMENT A

**Document Links are as follows:**

*In the Matter of AT&T Inc. and BellSouth Corporation Applications for Approval of Transfer of Control, Federal Communications Commission* WC Docket No. 06-74: Reply Comments of the New Jersey Division of the Ratepayer Advocate, WC Docket No. 06-74, filed June 20, 2006.  This document is available from the FCC's website using the following URL:
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518360149


*In the Matter of Special Access Rates for Price Cap Local Exchange Carriers*; *AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, FCC WC Docket No. 05-25; RM-10593, Reply Comments of the New Jersey Division of the Ratepayer Advocate, July 29, 2005.  This document is available from the FCC's website using the following URL:
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518114158
Table 1 and Table 2 to the reply comments:
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518114160
Attachment to reply comments, Maine Supreme Judicial Court Decision:
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518114161


*In the Matter of Jurisdictional Separations and Referral to the Federal-State Joint Board*, FCC CC Docket No. 80-286, Comments of the National Association of State Utility Consumer Advocates, the New Jersey Division of Rate Counsel and the Maine Office of the Public Advocate, August 22, 2006..  This document is available from the FCC's website at the following URL:
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518439161


The filing also included the following documents:
Affidavit of Susan M. Baldwin
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518439162
Appendices to Affidavit of Susan M. Baldwin
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518439163
Declaration page to Affidavit of Susan M. Baldwin
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518439164

Affidavit of Robert Loube
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518439165
Appendix A to Affidavit of Robert Loube
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518439166
Appendix B to Affidavit of Robert Loube
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518439167
Appendix C to Affidavit of Robert Loube
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518439168
Appendix D to Affidavit of Robert Loube
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518439169
Declaration page to Affidavit of Robert Loube
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518439170
Attachment C to Affidavit of Robert Loube
http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi?native_or_pdf=pdf&id_document=6518439171


One could also retrieve the Separations Filing by going to the FCC's main search page for filed comments:
http://gullfoss2.fcc.gov/prod/ecfs/comsrch_v2.cgi

From there fill in the following search terms:
    1.  Proceeding – 80-286
    4.  Filed on behalf of – NASUCA

Choose the top record for the NASUCA filing dated 08/22/2006

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of September, 2006, I filed electronically with the Clerk, Reply of the New Jersey Rate Counsel to the United States' Submission in Response to the Court's Minute Order of July 25, 2006 and the following parties were mailed a copy by regular mail.


*Christopher J. White*
Christopher J. White
Deputy Public Advocate

# Service List

*Attorneys for Plaintiff, United States:*
**Jared A. Hughes**
**Lawrence M. Frankel**
**Matthew C. Hammond**
**David T. Blonder**
**James J. Schwartz**
**Claude F. Scott, Jr.**
Telecommunication and Media
Enforcement, Antitrust Division
U.S. Department of Justice
1401 H Street, N.W., Ste. 8000
Washington, D.C. 20530

*Attorneys for Defendant, Verizon
Communications Inc.:*
**Aaron Martin Panner**
**Joseph S. Hall**
**Mark C. Hansen**
Kellogg, Huber, Hansen, Todd, Evens &
Figel, PLLC
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

**David Earl Wheeler**
4445 Warren Street, N.W.
Washington, D.C. 20016-2439

**John Thorne**
1320 North Courthouse Road, 8th Floor
Arlington, VA 22201

*Attorneys for Defendant, SBC
Communications, Inc.:*
**William Randolph Smith**
**Michael L. Lazarus**
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

*Attorneys for Defendant, AT&T Corp.:*
**Wilma A. Lewis**
**William Randolph Smith**
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

*Attorneys for Movant, CompTel:*

**Kevin R. Sullivan**
King & Spalding LLP
1730 Pennsylvania Ave., N.W.
Washington, D.C. 2006

*Attorneys for Eliot Spitzer, Attorney
General of the State of New York:*

**Jay L. Himes**
Chief Antitrust Bureau
120 Broadway
New York, NY 10271

*Attorney for National Association of State
Utility Consumer Advocates:*

**David C. Bergmann**
Assistant Ohio Consumers' Counsel
Chairman, NASUCA Telecommunications
Committee
Office of the Ohio Consumers' Counsel
10 West Broad St., Suite 1800
Columbus, Ohio 43215

Charles T. Kimmett
Harris, Wiltshire & Grannis, LLP
1200 Eighteenth Street, NW
12 Floor
Washington, DC 20036-2506

*Attorney for Movant,  American Antitrust
Institute, Inc.:*

**Jonathan Laurence Rubin**
Jonathan L. Rubin, PA
1717 K Street, NW, Suite 600
Washington, DC 30036

*Attorneys for Movant, Alliance for
Competition in Telecommunications:*

**Gary L. Reback**
Carr & Ferrell LLP
2200 Geng Road
Palo Alto, CA 94303

National Association of State Utility
Consumer Advocates
8380 Colesville Road, Suite 101
Silver Spring, Maryland 20910

Kathleen F. O'Reilly
414 A Street, SE
Washington, DC 20003