IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
United States of America,               )
                                        )
            Plaintiff,                   )
                                        )
      v.                                 )      Civil Action No.: 1:05CV02102 (EGS)
                                        )
SBC Communications, Inc. and            )
AT&T Corp.,                             )
                                        )
            Defendants.                  )
_____)
                                        )
United States of America,               )
                                        )
            Plaintiff,                   )
                                        )
      v.                                 )      Civil Action No.: 1:05CV02103 (EGS)
                                        )
Verizon Communications Inc. and         )
MCI, Inc.,                              )
                                        )
            Defendants.                  )
_____)

## DECLARATION OF LEE L. SELWYN

submitted on behalf of the

## NATIONAL ASSOCIATION OF
## STATE UTILITY CONSUMER ADVOCATES
## (NASUCA)

September 5, 2006

REDACTED FOR PUBLIC INSPECTION



DECLARATION OF LEE L. SELWYN

EXECUTIVE SUMMARY

The two *Complaints* filed in this Court by the Department of Justice ("Department") allege that the mergers of SBC with AT&T and of Verizon with MCI will "substantially lessen competition" in the relevant product and geographic markets, which the Department defines as "the markets for: (a) Local Private Lines, and (b) voice and data telecommunications services that rely on Local Private Lines" covering geographic areas "no broader than each metropolitan area and no more narrow than each individual building." Having *defined* the "relevant product market" to include "voice and data telecommunications services that rely on Local Private Lines" and having *defined* the relevant geographic market as potentially embracing "each metropolitan area" where the relevant products are offered, the *Complaints* nevertheless limit their focus narrowly to Local Private Lines furnished to a handful of the least competitively desirable of all commercial buildings within each metropolitan area, and in so doing ignore altogether key components of the relevant product and geographic markets as the Department has itself defined them.

The purposes of an antitrust remedy in the context of these mergers is to maintain competition in the relevant product and geographic markets at pre-merger levels. However, the specific remedies being proposed by the Department in the Settlements incorporated in the *Proposed Final Judgments* ("*PFJs*") submitted in both cases give no effect to the most important of the competitive harms that the *Complaints* themselves allege. Moreover, even as to the specific markets that the *Complaints* do focus upon – Local Private Lines at a handful of individual commercial buildings – the specific remedies being proposed by the Department cannot reasonably be expected to replace the pre-merger competition to the incumbent RBOC that the acquired CLEC in those buildings had been providing.

The specific remedy being proposed by the Department is the divestiture of a portion of the spare, non-revenue-producing capacity at a handpicked subset of all "2-to-1 buildings" within the SBC and Verizon regions, respectively, where, according to the Department's own admission, "entry would be unlikely." No customers or revenues are involved in these divestitures. The Department explains that "it determined which buildings needed to be subject to the remedy using extensive data gathered via compulsory process in a *building-by-building analysis*."[1] However, given the nature of telecommunications, a "building-by-building analysis" – essentially a "five-foot view" of the market – is neither a reasonable nor an appropriate basis upon which to consider the competitive harms arising from these mergers. Telecommunications

---

1. Reply of the United States to ACTel's Opposition to the United States' Motion for Entry of the Final Judgments, at 20, emphasis supplied.

i



ECONOMICS AND TECHNOLOGY, INC.

is fundamentally a network-based business, and so the more extensive a carrier's own network, the greater the likelihood that the carrier will, in fact, have facilities available at both endpoints of any point-to-point connection that is requested by a prospective customer. The Department's approach ignores such network effects, assuming away the interdependence of the multiple locations that exists in a network context. It applies the same type of building-by-building remedy that might, perhaps, be appropriate for a merger of two coffee shop chains or two supermarket chains where interconnectedness is not a factor. The sole remedial measure to be imposed by the *PFJs* is the partial divestiture of a limited amount of non-revenue-producing spare dark fiber capacity at a handful of commercial locations where, by the Department's own "analysis," entry is least likely to occur. That remedy does nothing whatsoever to address or prevent even the narrow and specific competitive harms alleged in the *Complaints*, let alone the competitive harms that will emerge in the relevant markets of voice and data telecommunications services that rely on Local Private Lines.

The competitive *insignificance* of the specific "assets" that the Department is requiring AT&T and Verizon to divest is compellingly demonstrated by an analysis of the purchase and sale agreements entered into by AT&T and the several "acquirers" of the "divestiture assets" – the IRUs or "Service Agreements" covering the 383 building laterals in the eleven (11) MSAs in which AT&T had deployed fiber rings within the SBC footprint. In all, the proceeds of AT&T's "divestiture" of a portion of its capacity in these 383 buildings will yield all of BEGIN AT&T CONFIDENTIAL <<                         >>END AT&T CONFIDENTIAL of the $16-billion that SBC paid to acquire AT&T. The Department did not submit corresponding agreements between Verizon and the acquirers of its excess fiber strands if, indeed, Verizon has even found buyers for these "divestiture assets." Absent specific evidence to the contrary, I see little reason why the value of the Verizon divestiture assets as reflected in the prices would-be buyers would be willing to pay would be materially different from the price level that is reflected in the AT&T purchase and sale agreements.

The Department "explained that the mergers were unlikely to cause harm in certain 2-to-1 buildings in the metropolitan areas identified in the *Complaints* because they were ... likely to attract entry in response to a price increase ...,"[2] concluding on that basis that "no remedy was necessary with regard to these buildings." But it's easier to predict where entry is *unlikely* than where entry is likely, and the initial discussion in the Department's *Competitive Impact Statement* (reflecting the concerns identified in its *Complaints*) suggests that this is what the Department was attempting to do.[3] By contrast, what the *PFJs* do is to *assume* that entry is likely to occur *except* at those locations at which the Department's building-by-building analysis had determined that entry is unlikely to occur.

---

2. *Id.*

3. *See, Competitive Impact Statement*, at 6-8.

ii

REDACTED FOR PUBLIC INSPECTION


ECONOMICS AND TECHNOLOGY, INC.

The Department argues that these particular building-by-building divestitures will facilitate CLEC entry into buildings where entry might not otherwise occur.  But the Department's assessment of the economics of entry is woefully incomplete.  In order to utilize these "dark fiber" strands, a CLEC would need to invest substantial additional sums to purchase electronic components, and would have to attract *incremental demand* (i.e., demand in addition to the services that are currently being provided by AT&T to existing customers utilizing the "lit" fiber in those same buildings whose divestiture is not being required).

The Department's "building-by-building analysis" also ignores customers' requirements for single-source connectivity among multiple locations.  The integration of the AT&T and SBC – and MCI and Verizon – networks made possible by the mergers *enhances* the single-source connectivity that each post-merger entity can offer, further reducing the competitive value of isolated dark fiber strands in a handful of the least desirable buildings in each of the in-region MSAs.  If there were even a remote possibility that these assets in the hands of small CLECs would create a serious competitive challenge to the post-merger AT&T and Verizon – if those assets had any "going concern" value at all – the prices that these "divestiture assets" would realize in arm's length transactions with acquirers would have been far greater than the rummage sale prices at which these transactions were consummated.

Finally, the Department's "five-foot view" leaves entirely unaddressed the competitive harms to the market for *wholesale* local private line services furnished by AT&T (MCI) utilizing in-region special access services obtained from SBC (Verizon).  It also leaves unaddressed the effects of the mergers upon competition for *retail* voice and data services that rely upon local private lines, such as competitively-provided residential and business exchange service, wireless services provided by carriers not affiliated with AT&T or Verizon, Internet access, and Internet backbone network services.  AT&T and Verizon compete in all of these retail service markets, and their ability to control the essential local private line/special access input creates the potential for price squeezes, discrimination in the supply of essential inputs, and other anticompetitive practices.  Absent far more aggressive remedial measures than those to which the Department has agreed in its settlements with AT&T and Verizon, the two mergers will "substantially lessen competition" across a broad spectrum of telecommunications markets nationwide.  Accordingly, the *PFJs* are decidedly not in the public interest, and a consent order entering those judgments should not be signed by the Court.

REDACTED FOR PUBLIC INSPECTION



DECLARATION OF LEE L. SELWYN

TABLE OF CONTENTS

Executive Summary                                                                    i

Introduction                                                                         1

Scope of Analysis                                                                    2

The *Proposed Final Judgments* fail to address, let alone remedy, harms in the relevant markets
that result from the merger transactions that here produce a level of market concentration and
vertical integration not seen since prior to the 1984 break-up of the "old" AT&T.    3

The remedies set forth in the *Proposed Final Judgments* do not adequately address the
competitive harms identified by the Department of Justice in its *Complaints*.       10

    The *Proposed Final Judgments* fail to specify a remedy that addresses competitive
    harms with respect to the broad range of wholesale and retail services that depend on
    Local Private Lines.                                                         10

    The *Proposed Final Judgments* fail to provide for a remedy for competitive harms to
    retail special access competition as a result of the merger.                 12

    The *Proposed Final Judgments* fail to provide an effective remedy with respect to
    competitive harm associated with loss of large integrated carriers who benefitted from
    extensive "network externalities."                                           17

    The *Proposed Final Judgments'* remedies fail to recognize economies and competitive
    advantages associated with large, integrated operations of AT&T and MCI, vis-à-vis
    any of the remaining competitors who are being counted on to fill the gap left by their
    acquisition.                                                                 24

    The *Proposed Final Judgments* grossly overstate the role that competitive fiber
    distribution facility networks play in constraining post-merger AT&T and Verizon
    market power with respect to Local Private Lines/Special Access, and "last mile"
    connectivity in general.                                                     26

    The *Proposed Final Judgments'* remedies ignore the marketplace realities with respect
    to network services purchased by large business customers.                   31

REDACTED FOR PUBLIC INSPECTION


ECONOMICS AND
TECHNOLOGY, INC.

The *Proposed Final Judgments* include no remedies – and the *Complaints* completely ignored – the harms that result from the merger transactions in relevant secondary markets.    37

    The *Proposed Final Judgments'* remedies fail to address or deal with the significant competitive harms that the mergers will produce with respect to the "other telecommunications services that rely on Local Private Lines."    37

The *Proposed Final Judgments* fail to implement a structural framework that will ensure that competition is restored to pre-merger levels and is thus at odds with the guiding principles expressed in the Department of Justice's own *Policy Guide to Merger Remedies*.    41

    Even if focusing on last-mile facilities to 2-to-1 buildings were a defensible approach to addressing the anticompetitive harms identified in the *Complaints* – which it is not – there is absolutely no justification for the further limitation of the remedy to a small subset of all such buildings.    47

The below-bargain-basement prices that AT&T is to receive from its "sale" of the "divestiture assets" confirms their inconsequential competitive value and the failure of the Department to adhere to its own *Policy Guide to Merger Remedies*, which require it "to ensure that the purchaser possesses both the means and the incentive to maintain the level of pre-merger competition in the market(s) of concern."    52

    The Department appears to have ignored key AT&T documents that it had submitted to this Court, documents that confirm the utter worthlessness of the specific dark fiber assets that the Proposed Final Judgment would require AT&T to divest.    55

The *Complaints* take far too narrow a view of the serious and substantial anticompetitive harms that can be expected to arise from the mergers of SBC and AT&T and of Verizon and MCI, and the Proposed Final Judgments fail to eliminate or remedy those harms.    61

If the *Proposed Final Judgments* are entered, various and substantial competitive harms will emerge that were not remediated by the Federal Communications Commission in the conditions it imposed.    67

Conclusion    72

REDACTED FOR PUBLIC INSPECTION



*Declaration of Lee L. Selwyn / Table of Contents*

## Tables and Figures

### Tables

1   Sample SBC Special Access Prices at Various Capacity Levels    15

2   Network Externalities Grow Exponentially as the Number of On-Net Nodes Increases    20

3   Most CLEC enterprise customers are being served using special access, even on streets where CLEC-owned fiber has been deployed    28

4   Historic SBC (now AT&T) Realized Rates of Return on Special Access Services    37

5   AT&T Sale of "Divestiture Assets"    57

6   Effect of reclassification of AT&T CLEC residential lines in SBC region as ILEC lines together with the general decrease in CLEC activity in the residential sector    64

### Figures

1   Interconnection of local (ILEC) and long distance (IXC) carrier networks for provision of conventional long distance call.    9

2   SBC Map of Downtown San Francisco Financial District showing extensive use of SBC special access service at buildings located directly on CLEC fiber routes.    29

### Appendix

Glossary of Terms

### Attachments

1   Statement of Qualifications – Lee L. Selwyn

2   Declaration of Alan G. Benway, Robert G. Holleron, Jeffrey King, Michael E. Lesher, Michael C. Mullan and Maureen Swith ("Benway *et al*") on behalf of AT&T in FCC *Triennial Review Remand* proceeding, WC Docket No. 04-313, October 4, 2004.


ECONOMICS AND TECHNOLOGY, INC.

3    SBC Aug 18, 2004 *ex parte* submission in FCC WC Docket No. 01-338 containing maps of CLEC fiber routes in principal MSAs within SBC region.

4    Verizon *ex parte* submission in FCC *Triennial Review* proceeding, WC Docket No. 01-338, June 2004,  containing maps of CLEC fiber routes in principal MSAs within Verizon region.

5    Declaration of Anthony Fea and Anthony Giovannucci on behalf of AT&T in FCC *Triennial Review Remand* proceeding, WC Docket No. 04-313, October 4, 2004.

6    AT&T *Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, October 15, 2002, FCC RM Docket No. 10593.

7    AT&T Petition for a Writ of Mandamus

8    Ad Hoc Telecommunications Users Committee Brief in support of AT&T Mandamus Petition

9    Declaration of Lee L. Selwyn on behalf of AT&T filed in support of AT&T's *Petition for Rulemaking* regarding ILEC Special Access, filed January 23, 2003, in FCC RM No. 10593.

10   Declaration of Lee L. Selwyn on behalf of AT&T in FCC *Triennial Review Remand* proceeding, WC Docket No. 04-313, October 4, 2004

11   Reply Declaration of Lee L. Selwyn on behalf of AT&T in FCC *Triennial Review Remand* proceeding, WC Docket No. 04-313, October 19, 2004

12   *Competition in Access Markets: Reality or Illusion.  A Proposal for Regulating Uncertain Markets*, white paper prepared by Economics and Technology, Inc. for the Ad Hoc Telecommunications Users Committee, August 2004.

13   Declaration of Susan M. Gately on behalf of the Ad Hoc Telecommunications Users Committee filed June 20, 2006 in FCC WC Docket No. 06-74 (*AT&T/BellSouth Merger Application*), updating *Competition in Access Markets*

14   *Confronting Telecom Industry Consolidation: A Regulatory Agenda for Dealing with the Implosion of Competition*, prepared by Economics and Technology, Inc. for NASUCA, April 2005.

REDACTED FOR PUBLIC INSPECTION



*Declaration of Lee L. Selwyn  /  Table of Contents*

15    Reply Testimony of Lee L. Selwyn on behalf of the California Public Utilities Commission Office of Ratepayer Advocate (redacted), Cal. PUC Application No. 05-02-027 (SBC/AT&T merger), June 24, 2005.

16    Reply Testimony of Lee L. Selwyn on behalf of the California Public Utilities Commission Office of Ratepayer Advocate (redacted), Cal. PUC Application No. 05-04-020 (Verizon/MCI merger), August 15, 2005.

17    Public portion of SBC response to FCC Staff Data Request, item no. 4.

REDACTED FOR PUBLIC INSPECTION

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 1 of 74

1            DECLARATION OF LEE L. SELWYN

2

3    **Introduction**

4

5        1. *Experience in Telecommunications and Regulatory Policy*. My name is Lee L. Selwyn.  I

6    am President of Economics and Technology, Inc. ("ETI"), Two Center Plaza, Suite 400, Boston,

7    Massachusetts 02108.  ETI is a research and consulting firm specializing in telecommunications

8    economics, regulation and public policy.  I have been actively and continuously involved in the

9    field of telecommunications regulation and policy for approximately forty years.  I have testified

10   as an expert on a broad range of telecommunications regulatory and policy issues before the

11   FCC, approximately forty state regulatory agencies, the United States Congress, several state

12   legislative committees, and in federal and state court proceedings.  I have served as a consultant

13   to a number of regulatory agencies, including the FCC, across the United States, in Canada, and

14   in several other countries.  I have also served as a consultant to state utility consumer advocate

15   agencies in a number of states and to the National Association of State Utility Consumer

16   Advocates ("NASUCA").  I have appeared in regulatory and judicial proceedings on behalf of

17   competitive local exchange carriers including pre-merger AT&T and MCI.  I serve as economic

18   consultant to the Ad Hoc Telecommunications Users Committee, a group of approximately

19   twenty large corporate telecommunications enterprise customers.  I hold a Ph.D. in Management

20   from the Alfred P. Sloan School of Management at the Massachusetts Institute of Technology, a

21   Master of Science in Industrial Management from MIT, and a Bachelor of Arts with Honors in

22   Economics from Queens College of the City University of New York.  My full Statement of

23   Qualifications is annexed as Attachment 1 hereto.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 2 of 74

1    2. *Experience in Analysis of Telecommunications Mergers.* I have been involved on behalf

2    of consumer interests in all of the major RBOC mergers, including SBC/Pacific Telesis (1996-

3    97), Bell Atlantic/NYNEX (1996), SBC/SNET (1998), SBC/Ameritech (1998), and Bell

4    Atlantic/GTE (1998). Of specific relevance to the present Tunney Act proceeding, I appeared as

5    an expert for NASUCA member, the Office of Ratepayer Advocates of the California Public

6    Utilities Commission in both the SBC/AT&T and Verizon/MCI mergers. I co-authored (with

7    Helen E. Golding and Hillary A. Thompson) a report prepared for NASUCA, *Confronting*

8    *Telecom Industry Consolidation: A Regulatory Agenda for Dealing with the Implosion of*

9    *Competition*, that was submitted by NASUCA in both the SBC/AT&T and Verizon/MCI

10   proceedings. I also prepared a Declaration on behalf of Comptel that was submitted in the FCC

11   proceeding addressing the SBC/AT&T merger application, WC Docket No. 05-65. I recently

12   co-authored Comments filed by the Ad Hoc Telecommunications Users Committee in the

13   pending FCC proceeding addressing the proposed AT&T/BellSouth merger.

14

15   **Scope of analysis**
16

17   3. Within the framework of the Tunney Act, including the 2004 Amendments, I have been

18   asked by NASUCA to review the *Complaints* and *Proposed Final Judgments* ("*PFJs*") as filed

19   by the United States Department of Justice ("Department") in the above-captioned matters and to

20   review the materials proffered by the Department in support of the *PFJs*, including Declarations

21   and other documents. I have been asked to identify the impact of entry of such judgements

22   upon competition in the relevant markets, and to present my opinion as to whether the *PFJs*

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 3 of 74

1   adequately and reasonably remedy all of the competitive harms likely to arise from the two

2   merger transactions, including direct and indirect harms to residential customers.

3

4   **The *Proposed Final Judgments* fail to address, let alone remedy, harms in the relevant**
5   **markets that result from the merger transactions that here produce a level of market**
6   **concentration and vertical integration not seen since prior to the 1984 break-up of the**
7   **"old" AT&T.**
8

9       4.  As initially recognized in the *Complaints*, if the transactions are approved they would

10  respectively create the nation's largest and one of the largest providers of telecommunications

11  services.[4]  Nonetheless, those conditions and the extensive harms that result in relevant markets

12  from these merger transactions, are all but ignored and certainly go unaddressed in the remainder

13  of the Department's *Complaints,* including allegations, and in the *PFJs*.

14

15      5.  The 1984 break-up of the "old AT&T" – the "Bell System" – structurally separated the

16  monopoly providers of *local* telephone service – the "Bell Operating Companies" ("BOCs")[5] –

17  from the component of the "old AT&T" that had been providing long distance or "inter-

18  exchange" services.  Unlike local services, which were generally considered at that time to be

19  "natural monopolies" due to their extremely high fixed infrastructure costs, the downstream

20  interexchange market had been opened to competition during the 1970s by a series of FCC

---

4.  *Complaints*, at paras. 1.

5.  The consent decree created seven "Regional Bell Operating Companies" ("RBOCs") – NYNEX, Bell Atlantic, BellSouth, Ameritech, Southwestern Bell, U S West, and Pacific Telesis.  What is now AT&T Inc. consists of the original Southwestern Bell, Pacific Telesis, Ameritech, The Southern New England Telephone Company, AT&T and, subject to FCC approval, BellSouth.  What is now Verizon consists of NYNEX, Bell Atlantic, GTE, and MCI. U S West merged with Qwest, an interexchange carrier, in 2000.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 4 of 74

1    rulings that had eliminated most *legal* barriers to entry.[6]  A specific goal of the break-up of the

2    Bell System was to eliminate what had been formidable *economic* barriers to entry by

3    foreclosing the BOC incumbent local exchange carrier ("ILEC") entities' ability to leverage their

4    local service monopoly into the adjacent, and potentially competitive, long distance market.

5

6        6.  In order to provide service to end-user residential and business customers, interexchange

7    carriers ("IXCs") need to interconnect their long distance networks with the local exchange

8    networks of incumbent local carriers.  "Access services" – switched and special – were

9    introduced by the FCC following the 1984 break-up of AT&T as a means for providing IXCs

10   and other non-ILEC entities with the ILEC network services that were essential inputs to the

11   IXCs' operations.[7]  Wireless carriers – even those owned or controlled by ILECs – were initially

---

    6.  In its *Above 890* ruling, 27 FCC 359, 396 (1959), the FCC authorized the award of private microwave licenses directly to end users, but declined to require common carriers to interconnect with these private systems.  That policy was superseded by the Commission's *Specialized Common Carrier* ruling, when such interconnection between private and carrier networks was required.  *Specialized Common Carrier Services*, First Report and Order, 29 FCC 2nd 870, 940 (1971).  Recon. denied, 31 FCC 2nd 1106 (1971).  Aff'd sub nom. *Washington Utilities & Transportation Commission v. FCC*, 513 F. 2d 1142 (9th Cir. 1975).  In the mid-1970s, MCI introduced its "Execunet" service, offering for the first time an alternative to the Bell System's switched interexchange message telecommunications service (MTS).  The FCC initially determined that the Execunet service was not authorized under its *Specialized Carrier* ruling, but that finding was subsequently overturned by the D.C. Court of Appeals.  *MCI Telecommunications Corp. v. FCC*, 561 F. 2d. 365 (D.C. Cir., 1977) ("Execunet I") cert. denied 434 US 1040 (1978); mandate issued 580 F. 2d. 590 (D.C. Cir.) ("Execunet II"); cert. denied 439 US 980 (1978).

    7.  In the wake of the *Execunet* remand, the FCC established a rulemaking proceeding that would ultimately lead to the creation of "access charges" for interexchange services and "equal access" to local exchange networks for all interexchange carriers (IXCs).  See generally, *MTS and WATS Market Structure*, CC Docket No. 78-72,  *Notice of Inquiry and Proposed Rulemaking*, 67 FCC 2nd 757 (1978).  *Supplemental Order (Phase I)*, 94 FCC 2nd 852 (1983). *Phase I Order Modified on Reconsideration,* 97 FCC 2nd 682 (1983). *Phase I Order Modified on Further Reconsideration*, 97 FCC 2nd 834 (1984). *Phase I Orders Affirmed in Part, Remanded in Party sub nom. National Association of Regulatory Utility Commissioners v. FCC*, 737 F.2d 1095 (D.C. Cir. 1984). *Cert. denied*, 469 U.S. 1227 (1985). *Report and Order (Phase III)*, 100 FCC 2nd 860 (1985). *Phase I Order Modified on Second Further Reconsideration*, 101 FCC 2nd 1222 (1985). *Aff'd sub nom. American Telephone & Telegraph Co. v. FCC*, 832 F.2d 1285 (D.C. Cir. 1987).

REDACTED FOR PUBLIC INSPECTION



ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 5 of 74

1   required to operate as fully-separated subsidiaries,[8] and so also used switched and special access

2   services purchased from ILECs – including their own affiliates – under tariff on a

3   nondiscriminatory basis.

4

5       7. "Access services" come in two principal forms – "switched access" and "special access."

6   "Switched access" provides temporary connections between IXC networks and individual mass

7   market residential and business subscriber lines.  Interexchange carriers purchase switched

8   access services on a per-minute-of-use basis from the ILECs at each end of a long distance call,

9   and recover these costs through their retail long distance service prices (see Figure 1).  When the

10  volume of traffic to a specific customer location is sufficiently large, or when the nature of the

11  traffic is not suitable for transmission over the public switched telephone network ("PSTN"),

12  dedicated or leased facilities that do not involve call-by-call switching operations are more

13  efficient and/or more appropriate as a technical solution.  These services are known as "Local

14  Private Lines" or "Special Access," and are the sole area of competitive concern being addressed

15  in the Department of Justice *Complaints* and *PFJs* that are at issue in this proceeding.  Like

16  switched access, special access had historically been offered on a monopoly basis by BOCs and

17  other ILECs with little competitive challenge.  In the late 1980s, however, limited competition in

18  the special access market began to emerge in states where such entry was not legally barred, but

---

8.  The FCC's rules that required incumbent LECs to provide wireless services through a separate subsidiary were
sunset as of January 1, 2002, thus enabling the *de facto* integration of marketing, billing, and product offerings.  *In
the Matter of Amendment of the Commission's Rules to Establish Competitive Service Safeguards for Local
Exchange Carrier Provision of Commercial Mobile Radio Services; Implementation of Section 601(d) of the
Telecommunications Act of 1996,*WT 96-162, *Report and Order*, 12 FCC Rcd 15668 (1997), at 15724, para. 99; see
47 C.F.R. §  20.20(f).



Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 6 of 74

1    was typically confined to a very small number of specific buildings in central business districts

2    of major metropolitan areas.  In enacting the *Telecommunications Act of 1996*,[9] Congress sought

3    to facilitate this and various other forms of *local* entry by, among other things, prohibiting states

4    from barring such entry and by assuring entrants' the ability to interconnect their highly limited

5    networks with the ubiquitous networks owned and controlled by the BOCs and other ILECs.

6    Importantly, and notwithstanding Congress' efforts to eliminate both legal and economic barriers

7    to entry, just prior to the two mergers at issue here and nearly a decade following enactment of

8    the 1996 legislation, competitive providers of special access type services had deployed facilities

9    to approximately 30,000 individual commercial buildings, representing roughly 1% of the 3-

10    million commercial buildings nationwide.[10]  Post-mergers, the elimination of the AT&T-served

11    2-1 buildings within the SBC region and the elimination of the MCI-served 2-1 buildings within

12    the Verizon region, the number of buildings with competitive special access type facilities

13    decreased by roughly BEGIN AT&T CONFIDENTIAL <<    >> END AT&T

14    CONFIDENTIAL and BEGIN VERIZON CONFIDENTIAL <<  >> END VERIZON

---

9.  P. L. 104-104.

10.  *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carrier*, CC Docket No. 01-338; *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996,* CC Docket No. 96-98; *Deployment of Wireline Services Offering Advanced Telecommunications Capability,* CC Docket No. 98-147, *Report and Order and Order on Remand and Further Notice of Proposed Rulemaking,* 18 FCC Rcd 16978 (2003) ("*Triennial Review Order*") at paras. 311-327; *Unbundled Access to Network Elements; Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange CarriersIn the Matter of Unbundled Access to Network Elements; Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, WC Docket No. 04-313; CC Docket No. 01-338,* WC Docket No. 04-313; CC Docket No. 01-338, Ex Parte filing of Verizon (filed July 2, 2004) at Attachment 9.  In this filing, Verizon claims that there are 48,350 CLEC on-net buildings.  In my Declaration on behalf of AT&T in the FCC *Triennial Review Remand* proceeding, I corrected this figure, finding that there were approximately 28,450 CLEC on-net buildings.  See Attachment 10 at Table 1.



Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 7 of 74

1  CONFIDENTIAL, respectively, nationwide.[11]  Accordingly, the BOCs and other ILECs continue

2  to enjoy a *de facto* operative monopoly at all but a handful of business locations.

3

4      8.  Special access services are offered in a range of capacities – the quantity of digital data

5  that can be transmitted over the facility in a given interval of time.  Capacities are expressed in

6  terms of "bits per second" or "voice-grade equivalents," with a voice-grade channel having a

7  capacity of 64,000 bits per second (64 kpbs).  Very small business locations typically utilize

8  conventional business telephone exchange services that are technically identical to the type of

9  services that serve residential customers.  Mid-size and large business locations are commonly

10  served using special access type facilities with capacities ranging between 24 and 672 voice

11  channels (referred to as DS-1 or T-1 in the case of the 24-channel service, or DS-3 in the case of

12  the 672-channel service.  Very large business locations with high concentrations of telecom-

13  munications demand, or businesses that have large data communications needs (such as issuers

14  of credit cards, financial institutions, e-commerce businesses, e.g., Amazon and eBay, and the

15  like, will often require much larger capacities.  Standard capacities are offered up to

16  approximately 10-billion bits per second (10 Gbps), equivalent to roughly 129,000 voice

17  channels.  The FCC has determined that, in general, competition for special access type services

18  is economically feasible only at locations at which the capacity demand is at least 155-million

19  bits per second (155 mbps), roughly equivalent to 2,000 voice channels, and designated as the

---

11. *SBC Communications Inc. and AT&T Corp. Applications for Approval of Transfer of Control*, WC Docket
No. 05-65, *Memorandum Opinion and Order*, 21 FCC Rcd 18290 (2005) ("*FCC SBC/AT&T Merger Order*") at para
38; *Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control*, WC Docket No.
05-75, *Memorandum Opinion and Order*, 21 FCC Rcd 18433 (2005) ("*FCC Verizon/MCI Merger Order*") at para
38.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 8 of 74

1   "OC-3" level of service.[12]  The Department of Justice appears to agree that this is the minimum

2   level of demand at any single location that will produce sufficient revenue to justify the

3   investment in the facilities necessary to serve the building.[13]  Where the demand at any given

4   building is below the OC-3 level, the BOC monopoly remains solidly intact and

5   unchallengeable.[14]

6

7       9.  During the period in which BOCs were barred from long distance entry, they were made

8   to be entirely indifferent as to which IXC – and, for that matter, which fully-separated wireless

9   carrier – purchased access services from them, particularly because the significantly above-cost

10  access prices made those services quite profitable for the RBOC.  And even though access rates

11  were generally set well in excess of cost, the same excessive access prices were confronted by all

12  of the then-competing IXCs and wireless carriers, affording no one of them a competitive

13  advantage vis-a-vis the others.  But vertical integration changes all of that, eliminating the

---

12.  *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carrier*, CC Docket No. 01-338; *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-98; *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket No. 98-147, *Report and Order and Order on Remand and Further Notice of Proposed Rulemaking*, 18 FCC Rcd 16978 (2003) ("*Triennial Review Order*") at paras. 311-327; *Unbundled Access to Network Elements; Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange CarriersIn the Matter of Unbundled Access to Network Elements; Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, WC Docket No. 04-313; CC Docket No. 01-338*, WC Docket No. 04-313; CC Docket No. 01-338, *Order on Remand*, 20 FCC Rcd 2533 (2005) ("*TRR Order*") at paras. 149-181.

13.  *See*, Department of Justice *Complaints* at page 9.

14.  It is important to note that special access services are not used exclusively as inputs to services used by large business customers.  The residential and small business consumers that NASUCA members represent are also affected by the competitive market for special access services.  This is because as wholesale inputs, special access services are also key components of many telecommunications services used by residential and small business customers – including wireless services.

REDACTED FOR PUBLIC INSPECTION

ETI ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 9 of 74



**Figure 1.** Interconnection of local (ILEC) and long distance (IXC) carrier networks for provision of conventional switched long distance call. IXC purchases Switched Access service from ILECs at both the originating and terminating ends of the call, and recovers those outlays in the retail price it charges its customer for the long distance call.

1 RBOCs' "indifference" as to who purchased its access services or which IXC its local service

2 customers selected. Once allowed to compete with its access service customers for end-user

3 long distance business, the RBOCs' control of switched and special access charges was instantly

4 transformed into a formidable competitive weapon, affecting competitive activity across a broad

5 range of wholesale and retail, voice and data, wireline and wireless telecommunications services.

6 The Department's extraordinarily limited focus in its allegations is upon the handful of business

7 locations within the SBC and Verizon regions at which pre-merger AT&T Corp. or MCI had

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 10 of 74

1    been the sole competitive provider.  That focus only scratches the surface of the extensive

2    competitive harms that these mergers engender in numerous other relevant markets inherently

3    within the scope of the *Complaints*' initial paragraphs.

4

5    **The remedies set forth in the *Proposed Final Judgments* do not adequately address the**
6    **competitive harms identified by the Department of Justice in its *Complaints*.**

7

8        *The Proposed Final Judgments fail to specify a remedy that addresses competitive harms*
9        *with respect to the broad range of wholesale and retail services that depend on Local*
10       *Private Lines.*

11

12       10.  The *Complaints* limit the "relevant product markets" within which the potential for

13   competitive harms are being alleged to "the markets for: (a) Local Private Lines,[15] and (b) voice

14   and data telecommunications services that rely on Local Private Lines."[16]  The *Complaints* also

15   define "[t]he relevant geographic markets for both Local Private Lines, as well as voice and data

16   telecommunications services that rely on Local Private Lines, [as] no broader than each

---

15.  The use of the term "Local Private Lines" may be intended to avoid distinguishing between several similar services that involve dedicated local facilities.  A "private line" is a dedicated point-to-point circuit, with two defined end points, such as an alarm circuit or tie-line.  The industry uses the term "special access" to describe the "last-mile" facilities that connect a retail customer to an interexchange carrier or that interconnect multiple facilities of a wireline interexchange or wireless carrier, or that interconnect different carriers; the special access circuit is thus only an originating (or terminating) or interoffice segment of a larger network service.  Finally, dedicated local facilities used to access a competitive local exchange carrier (CLEC) may be provided either as special access or, in some cases, as "unbundled network elements" known as UNE dedicated loops.  To the extent that the Justice Department suggests that the facilities at issue here are isolated point-to-point circuits within the same metropolitan area (which, in fact, represent a minor fraction of all "Local Private Line/Special Access" type services), it completely obscures the competitive significance of dedicated last-mile facilities as part of competing telecommunications networks.

16.  *Complaints*, at paras. 19.

ETI ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 11 of 74

1    metropolitan area and no more narrow than each individual building."[17]  Yet, having identified

2    these two separate "relevant product markets" and having defined the relevant geographic

3    market as potentially embracing an entire metropolitan area, the *Complaints* then limit their

4    respective focus almost exclusively to only the "Local Private Lines" product market and to only

5    those situations where both AT&T and SBC *owned* facilities capable of furnishing Local Private

6    Line services to specific commercial buildings within the SBC region.  Having failed to develop

7    the second prong of the competitive harms identified in the *Complaints* – wholesale and retail

8    services that depend on Local Private Lines – the Justice Department then fails to ensure that the

9    *PFJ* includes effective remedies for the competitive harms it has identified.

10

11        11.  The competitive harms identified in the two *Complaints* are unduly narrow in their

12    scope, focusing almost entirely upon specific situations where, in the case of SBC/AT&T, pre-

13    merger AT&T is the only competitive service provider with so-called Local Private Line/Special

14    Access fiber optic facilities installed at commercial buildings within the 13 states in which SBC

15    operates as an incumbent local exchange carrier ("ILEC"), and in the case of Verizon/MCI,  pre-

16    merger MCI is the only competitive service provider with Local Private Line/Special Access

17    fiber optic facilities installed at commercial buildings within the areas in which Verizon operates

18    as an ILEC.  In fact, the scope of direct head-to-head competition between SBC and pre-merger

19    AT&T, or between Verizon and pre-merger MCI, is far more extensive than as outlined in the

20    Department's *Complaints*.  In both cases, the merger partners competed with each other for

21    residential/small business "mass market" services, for retail services furnished to large enterprise

---

17.  *Id.*, at paras. 24.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 12 of 74

1  customers, and for wholesale services furnished to other carriers.  Thus, even if the specific

2  remedies contemplated in the *PFJs* were sufficient to address the competitive harms specifically

3  identified in the two *Complaints* – which they are not – they still fall woefully short of

4  remedying the full range of competitive harms that the two mergers engender in the relevant

5  markets.

6

7  *The Proposed Final Judgments fail to provide for a remedy for competitive harms to retail*
8  *special access competition as a result of the merger.*
9

10  12.  The Department's *SBC/AT&T Complaint* alleges that:

11

12  SBC and AT&T are the only two carriers that own or control a Local Private Line
13  connection to many buildings in each region. The merger would, therefore, effectively
14  eliminate competition for facilities-based Local Private Line service to those buildings,
15  and many retail and wholesale customers would no longer have AT&T as a competitive
16  alternative to SBC.[18]

17

18  The *Complaint* then observes that:

19

20  Although other competitors might resell Local Private Lines from SBC, those
21  competitors would not be as effective a competitive constraint because SBC would
22  control the price of the resold circuits.

23

24  In making this observation, the Department appears to be suffering from a serious

25  misconception, i.e., that the *only* source of competition for Local Private Lines comes from

26  competing *facilities-based* providers and, on that basis, appears to have confined its *Complaint*,

---

18.  *SBC/AT&T Complaint*, at para. 25.

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 13 of 74

1    and *PFJ*, solely to situations in which AT&T is the only *facilities-based* competitor to SBC with

2    respect to Local Private Lines in specific buildings.

3

4         13.  Unaddressed in the *PFJs* are harms that result from the merger transactions in the

5    related relevant market of resale.  Pre-merger AT&T Corp. was a major reseller of special access

6    services obtained from SBC and other incumbent LECs *in addition* to its facilities-based Local

7    Private Line services.  In fact, as of January 2003, (pre-merger) AT&T Corp. was providing

8    retail services at the DS-1 or higher capacity levels to approximately 186,000 commercial

9    buildings across the US.  Of these, only about 6,700 buildings were being served using AT&T-

10   *owned* facilities, and another 3,300 locations were being served using facilities leased from other

11   CLECs.  Facilities-based competitive Local Private Line services were available at only about

12   10,000 locations, or roughly 5.7% of the 186,000 AT&T enterprise customer locations

13   nationwide.[19] The more recent data submitted by the Department as part of its August 7, 2006

14   evidence confirms that the preponderance of retail services that AT&T provides to enterprise

15   customers involve the use of Special Access obtained from ILECs rather than via AT&T-owned

16   "on-net" facilities.  According to the AT&T document,[20] BEGIN AT&T CONFIDENTIAL <<

17

18

19

---

19.  Reply Declaration of Lee L. Selwyn on behalf of AT&T Corp., *AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, Federal Communications Commission RM No. 10593, filed January 23, 2003, at para. 18.

20.  Bates no. ATT140024376.

REDACTED FOR PUBLIC INSPECTION

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 14 of 74

1

2

3

4                                          >> END AT&T CONFIDENTIAL

5    These figures demonstrate that pre-merger AT&T's activity in the Local Private Line market

6    involved facilities-based services furnished using AT&T-owned facilities or through the use of

7    facilities owned by other CLECs, but primarily as *resold special access services* acquired from

8    ILECs.  With respect to such resold special access services furnished to retail customers as well

9    as to other competitive carriers, pre-merger AT&T competed directly with SBC, most

10   particularly with respect to the DS-1 and DS-3 end of the Local Private Line market.  Although

11   the documentation submitted by the Department with respect to Verizon/MCI is not as detailed

12   as that furnished with respect to SBC/AT&T, it is likely that similar conditions applied with

13   respect to pre-merger Verizon and MCI.

14

15       14.  Numerous customers purchase Local Private Lines from resellers, *not* from facilities-

16   based carriers.  As the Department correctly observes, "Customers typically purchase Local

17   Private Lines in standard bandwidth increments such as DS 1 ("T1," 1.544 megabits per second),

18   DS3 (44.74 megabits per second), OC3 (155.52 megabits per second), and higher."[22]  Special

---

21.  The number of AT&T on-net buildings within the SBC region as identified in the Bates no. ATT140024376, BEGIN AT&T CONFIDENTIAL << >> END AT&T CONFIDENTIAL, differs significantly from the corresponding figure cited at para. 38 in the *unredacted* FCC Order in the SBC/AT&T Merger proceeding, WC Docket no. 05-65.  There, the figure given by the FCC, citing an AT&T *ex parte* submission, is BEGIN AT&T CONFIDENTIAL << >> END AT&T CONFIDENTIAL.

22.  *SBC/AT&T Complaint*, at para. 21.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 15 of 74

1   access prices vary less than proportionately with the capacity level, as demonstrated in the

2   following table:

3

| Table 1 | | | | | |
|---------|---|---|---|---|---|
| Sample SBC Special Access Prices at Various Capacity Levels | | | | | |
| Capacity (bandwidth) | Megabits per second (mbps) | Voice-grade equivalent | DS-1 equivalent | 10-mile Circuit Monthly Rate | Price per DS-1 equivalent (Note 1) |
| DS-1 (T1) | 1.5 | 24 | 1 | $495 | $495.00 |
| DS-3 | 44.7 | 672 | 28 | $5,811 | $415.04 |
| OC-3 | 155.5 | 2,016 | 84 | $9,600 | $228.57 |
| OC-12 | 622.1 | 8,064 | 336 | $18,100 | $107.74 |
| OC-48 | 2,488.3 | 32,256 | 1,344 | $35,875 | $53.39 |
| OC-192 | 9,953.3 | 129,024 | 5,376 | $100,125 | $37.25 |
| Source: Pacific Bell Tel. Co., Tariff F.C.C. No. 1, Access Service, Section 31, as of August 16, 2006. Note 1: Calculation based on conservative assumption of 50% utilization of DS-3 and higher capacity facilities. | | | | | |

19

20      15.  Retail end-user customers most commonly require service at the DS-1 or DS-3 levels at

21   any single location; in some cases, such as a large office building or a campus, OC-3 level

22   service may be required.  The larger channel capacities are typically provided to *carriers*, who

23   then subdivide them into lower-capacity channels for resale to individual retail customers.

24   Because the prices for these services vary less than proportionately with their respective

25   capacities, pre-merger AT&T and MCI were often able to offer subdivided channels at lower

26   prices than the equivalent capacity if purchased directly from the ILEC.  Consider the following

27   example.  From Table 1, we see that SBC's monthly price for a 10-mile DS-1 channel is $495,

ETI ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 16 of 74

1    and its price for a 10-mile DS-3 channel is $5,810.60, i.e., 11.74 times as much.  However, a DS-

2    3 represents 28 times the capacity of a DS-1, yet is offered at only 11.74 times the price of a DS-

3    1.  Suppose that AT&T is able to aggregate the demand from 20 customers each of whom

4    requires a DS-1 level of capacity over this same route, and serve them using a single DS-3.[23]  By

5    spreading the cost of a DS-3 ($5,810.60) over these 20 customers, AT&T is able to purchase the

6    equivalent of 20 DS-1 channels from SBC at an average price of only $290.53, some 41% *less*

7    than SBC's own retail price per DS-1.  AT&T could thus profitably resell DS-1s using a DS-3

8    special access service purchased from SBC at well below SBC's own retail DS-1 rate.  Indeed,

9    pre-merger AT&T and pre-merger MCI were doing just that.  In fact AT&T and MCI frequently

10    priced DS-1 access facilities to large business subscribers at prices substantially below the price

11    for a single DS-1 special access circuit out of the RBOC access tariffs.  Prices of $200 to $300

12    per month were not at all uncommon[24] – a price level substantially below the $495 per month 10-

13    mile circuit price found in SBC's special access tariff and reported in Table 1 above.

14

15        16.  The FCC expressly recognized the importance of this type of resale in its *Merger*

16    *Orders* with respect to both SBC/AT&T and Verizon/MCI.  Concerned that the former AT&T

---

23.  Even in instances in which only one customer at a location purchased one DS-1 from AT&T, it could still achieve significant economies by purchasing a DS-1 special access channel terminal (the connection between the customer premises and the ILEC serving wire center) and then combining that circuit (with circuits from other customers at other buildings in the same serving wire center area) at the ILEC serving wire center onto a higher-bandwidth circuit (e.g., DS-3) for the remainder of the circuit run to the AT&T POP.

24.  *See, e.g.*, Sprint Custom Network Service Arrangement CNSA No. 6926, available at http://www.sprint.com/business/support/ratesTandCschedules.html (accessed September 5, 2006) and MCI Special Customer Arrangement SCA Type 001 No. 4160, available at http://www.verizonbusiness.com/publications/service_guide/s_c_a/list.xml?skiprows=190 (accessed September 5, 2006), offering DS-1 access for $150.

ETI ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 17 of 74

1    and MCI units would simply fold their resold special access services into the parent companies'

2    retail rate schedule following the merger, the FCC has required that AT&T and Verizon each

3    agree to a freeze for a period of 30 months on the prices for SBC and Verizon ILEC tariffed

4    prices for DS-1, DS-3 and OC-n special access services, and on the prices paid by AT&T's

5    existing customers within the SBC region and by MCI's existing customers within Verizon's

6    region, for DS-1 and  DS-3 "wholesale metro private lines."[25]  Unfortunately, the FCC

7    requirement extends for only 30 months following the closing date for each transaction, after

8    which the acquired carriers may increase their rates without restriction.  The FCC offered no

9    basis for this choice of sunset date, such as an explicit finding that the market would have

10   become competitive on and after that point in time, and in fact there is no record support for any

11   such conclusion.  In any event, the Department's *Complaints* ignore this important source of

12   Local Private Line competition in its entirety.  If the *PFJs* are entered, harm in the resale

13   segment of the Local Private Line market will arise upon the expiration of that sunset date.

14

15       *The Proposed Final Judgments fail to provide an effective remedy with respect to*
16       *competitive harm associated with loss of large integrated carriers who benefitted from*
17       *extensive "network externalities."*
18

19       17.  The Department's failure to recognize the importance of the resale market reflects the

20   fundamental error of its expert, as graphically demonstrated in the August 7, 2006 submission to

21   this Court by the Department's Declarant W. Robert Majure, who opines that:

22

---

25.  *FCC SBC/AT&T Merger Order* at Appendix F; *FCC Verizon/MCI Merger Order* Appendix at G.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 18 of 74

1    If AT&T or MCI had some unique qualifications as a competitor in selling local private
2    lines, there might be concerns that no other CLEC would be as competitive as AT&T or
3    MCI.  However, I find no evidence suggesting a unique competitive role for either of
4    these firms in selling local private lines.  In fact, any supplier that can provide a
5    technically reliable point-to-point connection is a competitive option for purchasers
6    interested in accessing those two locations.[26]
7

8    Dr. Majure's conclusions are at odds with the facts.  Not only do AT&T and MCI possess

9    "unique qualifications as a competitor in selling local private lines," those qualifications are so

10   unique that no other non-RBOC competitor comes even remotely close.  There are several

11   sources of pre-merger AT&T's and MCI's unique competitive advantages.

12

13       18.  *Network externalities*.  In order for a carrier to "provide a technically reliable point-to-

14   point connection," the carrier must own or otherwise be able to obtain access to facilities *at both*

15   *endpoints*.  This means that the focus cannot be limited to *individual* end-point segments as the

16   Department has done.  Telecommunications is fundamentally a network-based business, and so

17   the more extensive a carrier's own network, the greater the likelihood that the carrier will, in

18   fact, have facilities available at both endpoints of any point-to-point connection that is requested

19   by a prospective customer.

20

21       19.  As is illustrated in the following diagrams, the number of potential point-to-point

22   connections that can be created on a network increases exponentially with the number of

23   individual "nodes" on the network.  For example, only one possible point-to-point connection

---

26.  Declaration of W. Robert Majure on behalf of the Department of Justice ("Majure Decl."), at para. 17.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 19 of 74



2 nodes, 1 point-to-point route



3 nodes, 3 point-to-point routes

4 nodes, 6 point-to-point routes



5 nodes, 10 point-to-point routes

1    can be created on a network serving only two nodes (A-B).  A network with three nodes can

2    support three different point-to-point connections (A-B, A-C and B-C); a network with four

3    nodes can support six different point-to-point connections (A-B, A-C, A-D, B-C, B-D and C-D),

4    and so on.  This relationship between the potential number of point-to-point connections (*C*) and

5    the number of locations served by the network (*n*) can be stated as:

6
7                                        $C = n(n-1) / 2$
8

 ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 20 of 74

1    Contrary to Dr. Majure's assessment, pre-merger AT&T and MCI each possessed what were

2    among the largest CLEC facilities-based fiber optic networks in terms of the quantity of nodes

3    (buildings) being served.  AT&T and MCI thus did in fact possess unique – and substantial –

4    qualifications as competitors in selling local private lines.

5

| Table 2 | |
| :---: | :---: |
| Network Externalities Grow Exponentially as the Number of On-Net Nodes Increases | |
| Number of On-net buildings ($n$) | Possible Point-to-Point Connections ($n(n-1)/2$) |
| 2 | 1 |
| 3 | 2 |
| 4 | 6 |
| 5 | 10 |
| 10 | 45 |
| 100 | 4,950 |
| 1,000 | 499,500 |
| 10,000 | 49,995,000 |

22    20.  Dr. Majure dismisses this widely understood and critically important property of

23    networks – referred to in the economics literature as "network externalities"[27] – by suggesting

24    that such competitive advantages arising from network extensiveness could be readily overcome

25    through the purchase of services from other carriers.  He notes that "AT&T and MCI purchased

26    local private lines from a laundry list of carriers, and other CLECs routinely purchase local

27.  *See, e.g.*, Michael L. Katz and Carl Shapiro, *Network Externalities, Competition, and Compatibility*, Antitrust and Competition Policy, A.N. Kleit (ed.), Camberley: Edward Elgar Publishing Ltd. (2005) .

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 21 of 74

1   private lines from each other."[28]  In fact, and as AT&T's own data confirm, the *vast majority* of

2   pre-merger AT&T local connections to commercial buildings were obtained through the

3   purchase of special access services from SBC and other ILECs, with only a small fraction

4   coming from other CLECs.

5

6       21.  For example, in testimony submitted by AT&T in the FCC's *Triennial Review Order*

7   *Remand* ("Triennial Review Remand"or "TRO Remand") proceeding, AT&T Declarants Alan

8   G. Benway, Robert G. Holleron, Jeffrey King, Michael E. Lesher, Michael C. Mullan and

9   Maureen Swith ("Benway *et al*") advised that:

10

11          ... with the exception of certain specific, high-demand locations or point-to-point routes,
12          competitive carriers ordinarily cannot realistically hope to achieve the per-unit cost of
13          the RBOCs' loops or transport. This can be achieved in only the minority of places for
14          which there is a very large demand for high-capacity transmission.

15

16          Even where it is potentially economic to build, the Commission has recognized that
17          competitive carriers often have trouble securing the necessary rights-of-way.  As first
18          movers, the incumbent telephone companies received rights-of-way from local
19          governments for underground cables and telephone poles and wires with only minimal
20          transaction costs, because persons in the neighborhood or municipality otherwise would
21          not receive any telecommunications services.  In contrast, local governments often do
22          not view local competition as beneficial and are not eager to have multiple telephone
23          carriers ripping up streets.  The situation is even worse when dealing with building
24          owners with regard to deployment of last mile loops.  Building owners understandably
25          welcomed the RBOC that promised to bring, for the first time, telecommunications
26          facilities to their properties, but often consider providing building access to competitive
27          carriers as unnecessary.  These situations are worsened by both governmental entities
28          and building owners that view the entry of a competitor as an opportunity to increase
29          revenues by charging unjustified, and sometimes, illegal fees to those seeking to build
30          competitive facilities.

_____

28.  Majure Decl., at footnote 20.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 22 of 74

1    Because of these entry barriers, AT&T and other competitive carriers have been able to
2    economically deploy fiber to only a small fraction of the total routes needed to serve
3    business customers, mostly those few routes that would justify the deployment of the
4    largest capacity ("OCn level") transmission facilities.  AT&T and other providers of
5    retail business services thus remain heavily dependent on RBOC-owned transport
6    facilities to fill-out their limited local network, especially for DSn-level services.[29]

7

8    22.  While Dr. Majure seems to be focusing upon the use of local private lines/special access

9    to provide point-to-point connections between buildings occupied by the same customer in the

10    same metropolitan area, the overwhelming use of these services is to provide "last mile" connec-

11    tivity to interexchange carrier networks.  Prior to the mergers, AT&T and MCI owned the largest

12    and second largest, respectively, facilities-based interexchange networks in the United States

13    and, in the case of AT&T in particular, owned international facilities to a vast array of countries

14    and continents worldwide.  In fact, AT&T's acquisition of TCG in 1998, and MCI's acquisition

15    of Metropolitan Fiber Systems (which owned UUNet) in 1996 and Brooks Fiber in 1998 were

16    made for the express purpose of providing these carriers with their own "last mile" connections

17    to the largest commercial customers *so as to minimize the need to purchase special access*

18    *services from ILECs*.[30]  Even so, both AT&T and MCI remained overwhelmingly dependent

19    upon special access services purchased from SBC, Verizon and other ILECs for the vast majority

20    of their last mile DS-1 and higher capacity connections to commercial customers.  In contrast,

21    and as AT&T Declarants Benway *et al* noted in their *TRO Remand* testimony,

29.  Declaration of Alan G. Benway, Robert G. Holleron, Jeffrey King, Michael E. Lesher, Michael C. Mullan and Maureen Swith ("Benway *et al*") on behalf of AT&T in FCC *Triennial Review Remand* proceeding, WC Docket No. 04-313, October 4, 2004, at paras. 27-29, citations omitted.  A copy of the Benway *et al* Declaration is provided herewith as Attachment 2.

30.  AT&T Corp. SEC Form 8-K dated January 8, 1998, at Exhibit 99.



Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 23 of 74

1    Moreover, the RBOCs are able to optimize their networks by carrying local and long
2    distance facilities over the same network, while the Commission's use restrictions have
3    hamstrung competitive carriers such as AT&T from obtaining similar economies of
4    scale (even when they have made significant capital investments to deploy local
5    facilities).[31]
6

7    Not only did the integration of interexchange and metropolitan area fiber networks benefit the

8    AT&T and MCI interexchange services, it also provided a ready market for the last mile and

9    metropolitan area connectivity that the AT&T and MCI metropolitan fiber networks offered.  In

10   other words, the network externalities arising from the integration of the AT&T and MCI long

11   distance and local networks made both networks more valuable, conferring unique competitive

12   advantages to both that were not available to non-integration local or long distance network

13   operators.  The integration of the AT&T and MCI local fiber and interexchange networks into

14   the local and interexchange networks of SBC and Verizon, respectively, serves to widen the

15   competitive gap between these highly integrated and (within their respective regions)

16   ubiquitously connected RBOC networks and the stand-alone limited connectivity local fiber

17   networks of their remaining non-integrated rivals.

18

19       23.  The "remedy" in the *PFJs* that is proposed to offset the competitive harms arising from

20   the two mergers – the divestiture of a limited amount of capacity at each of a limited number of

21   specific so-called "2-to-1 buildings" – ignores altogether these critically important network

---

31.  Benway *et al* Decl., at footnote 2.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 24 of 74

1  externalities and competitive benefits associated with the vertical integration of the local and

2  interexchange networks.[32]

3

4      *The Proposed Final Judgments' remedies fail to recognize economies and competitive*
5      *advantages associated with large, integrated operations of AT&T and MCI, vis-à-vis any of*
6      *the remaining competitors who are being counted on to fill the gap left by their acquisition.*
7

8      24.  Beyond the scope economies resulting from the significant externalities associated with

9  large and integrated networks, there are benefits of network integration that cannot be replicated

10  merely through divesting isolated last-mile facilities.  The BOCs themselves waged a vigorous

11  campaign to be released from legal requirements that prevented the integration of their local and

12  interexchange services (as had been required under Sec. 272(b)(1) of the 1996 Telecommuni-

13  cations Act)  – arguing that the segmentation of local and interexchange services created

14  significant inefficiencies and competitive disadvantages vis-a-vis rival carriers (such as the pre-

15  merger AT&T and the pre-merger MCI) that were able to operate their local and interexchange

16  networks on a fully integrated, end-to-end basis.  Verizon and other RBOCs urged the FCC to

17  eliminate these so-called "Operating, Installation and Maintenance" ("OI&M") restrictions,

18  which the FCC ultimately did in 2004.  In a May 19, 2003 *ex parte* filing made by Verizon in CC

19  Docket No. 96-149 in support of its *Petition for Forbearance from the Prohibition of Sharing*

20  *Operating, Installation and Maintenance Functions Under Section 53.203(a)(2) of the*

---

32.  The remedy being advocated by the Department of Justice might well be appropriate for a merger involving two retail store chains both of which had a presence in the same geographic markets.  While retail chains enjoy certain economies of scale and scope in areas such as purchasing, advertising and brand recognition, these are nowhere near as significant as the connectivity externalities associated with telecommunications networks.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 25 of 74

1  *Commissions Rules*,[33] Verizon made several specific representations to the Commission relative

2  to the operational importance of local/long distance network integration:

3
4  •    The OI&M restriction is the major factor in the additional costs caused by the 272
5       separate affiliate rules. The prohibition:
6       -    Prevents Verizon from offering one-stop customer interface for repair and
7            provisioning.
8       -    Imposes duplicative costs on Verizon's affiliates by requiring them to hire
9            additional personnel to do provisioning and maintenance work that could be done
10           more efficiently by sharing personnel with the BOC.
11      -    Requires the affiliate to develop and operate its own operating support systems
12           when the BOCs' OSSs could perform the same tasks with little modification.
13
14 •    The OI&M restriction puts Verizon at a significant disadvantage in competing with
15      carriers that are able to offer an integrated service platform using their local and long
16      distance facilities.
17
18 •    Many of Verizon's competitors provide their own transmission facilities directly to the
19      customer's location, seamlessly integrating "local" and "long distance" networks and
20      using a single work force to respond to installation and repair requests.
21
22 •    The OI&M rules result in handoffs of customer requests for service and repair that add
23      costs and difficulty in meeting large business customer expectations.
24

25 The types of operational difficulties and inefficiencies described by Verizon in support of its

26 *OI&M Forbearance Petition* not only exist but are compounded where much smaller carriers

27 with extremely limited on-net customer connectivity are required to obtain facilities from other

28 CLECs or to purchase special access services from SBC, Verizon and other ILECs.  This further

---

33.  *Petition of Verizon for Forbearance from the Prohibition of Sharing Operating, Installation and Maintenance Functions Under Section 53.203(a)(2) of the Commissions Rules*, CC Docket No. 96-149, *Ex Parte* Presentation of Verizon, filed May 9, 2003.

ETI ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 26 of 74

1    contradicts Dr. Majure's assessment that "AT&T or MCI have no unique qualifications as a

2    competitor in selling local private lines."

3

4    *The Proposed Final Judgments grossly overstate the role that competitive fiber distribution*
5    *facility networks play in constraining post-merger AT&T and Verizon market power with*
6    *respect to Local Private Lines/Special Access, and "last mile" connectivity in general.*
7

8        25.  Dr. Majure testifies that "multiple CLECs do business in each of the major cities within

9    SBC's and Verizon's service territory" and that these "CLECs' networks tend to cover the same

10   high density areas covered by AT&T and MCI, and they therefore overlap substantially with the

11   transport networks of AT&T and MCI."[34]  Dr. Majure describes the source he relied upon in

12   reaching this conclusion as "Tab 7, Overlapping CLEC Fiber Maps (overlays of the maps

13   provided to the Department by individual CLECs which illustrate the overlaps among their

14   transport networks)."[35]  Unfortunately, the specific maps upon which Dr. Majure – and

15   apparently the Department – relied are small-scale maps covering large areas ("Large Area

16   Maps").  These large area maps provide no detail whatsoever regarding specific street-by-street

17   routes or connected buildings.  But  in response to item 6(a) of the FCC Staff data request dated

18   April 18, 2005, SBC *had* provided the FCC with large-scale, highly detailed maps of the

19   principal MSAs within its region ("Detailed Maps").  Although SBC asserts confidentiality with

20   respect to the large area maps that it provided to the Department, it made no such claim with

21   respect to the far more detailed – and far more useful – maps that it had furnished to the FCC;

---

34.  Majure Decl., at para. 10.

35.  *Id.*, at footnote 9.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 27 of 74

1 accordingly, those detailed maps are in the public record.  The SBC detailed maps are provided

2 herewith as Attachment 3.  SBC had originally submitted these detailed maps in an *ex parte*

3 filing made on August 18, 2004 in the FCC's *Triennial Review* docket.  Verizon had also

4 provided a corresponding set of highly detailed maps showing CLEC routing and connected

5 buildings for the MSAs within its region in a June 2004 *ex parte* submission in the same FCC

6 *Triennial Review* docket, also on a non-confidential basis; I have reproduced the Verizon maps

7 in Attachment 4 to this Declaration.

8

9      26.  The detail street-level maps that SBC and Verizon had provided to the FCC identify the

10 source of connectivity to buildings in which *CLEC customers* are located.  The maps indicate

11 whether a building is served by CLEC-owned facilities or by Special Access services provided

12 by SBC or Verizon, as the case may be.  Not shown on the maps are the serving arrangements

13 associated with SBC or Verizon customers who, presumably, are in all cases served via SBC or

14 Verizon – and not CLEC – "last mile" facilities.  These maps – which do not appear to have been

15 reviewed or considered by the Department – demonstrate that even in the highest concentration

16 of business demand in the central business districts of the major MSAs, and even in buildings

17 located on streets with CLEC fiber, the vast majority of buildings are served via Special Access.

18 In order to make use of such fiber, a CLEC would need to construct a "lateral" connection

19 between the building and an access point on its fiber network.  The costs incident to such

20 construction are sufficiently high that unless there is sufficient revenue available from customers

21 located *in that building*, the CLEC will be unable to recover the cost of constructing the lateral

22 connection.  The SBC and Verizon maps compellingly demonstrate that even in areas with

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 28 of 74

1   substantial amounts of CLEC fiber "in the ground," most CLEC customers are still served using

2   special access services purchased from the ILEC.  CLECs thus remain extremely dependent

3   upon SBC and Verizon high capacity loops.  Figure 2 below reproduces SBC's map of the

4   downtown San Francisco financial district.  My analysis of the SBC map indicates that there are

5   roughly 436 instances where SBC special access services is being provided to CLEC customer

6   locations along streets where competitive fiber is in place.[36]  In fact, an analysis of those SBC

7   maps that separately identify CLEC "on-net" buildings and SBC special access buildings

8   underscores the pervasive use of SBC facilities even in markets that SBC itself considers the

9   most competitive.  Table 3 below presents the results of my analysis for several of the MSAs in

10  SBC's California footprint, which appear to be representative of all of the MSAs for which maps

11  have been provided:

12

| Table 3 | | | |
|---|---|---|---|
| Most CLEC enterprise customers are being served using special access, even on streets where CLEC-owned fiber has been deployed | | | |
| City | All locations | | SBC Special Access on streets with CLEC fiber |
| | SBC Spc. Access | CLEC  fiber | |
| San Francisco (city wide) | 1160 | 71 | 658 |
| San Francisco (financial dist.) | 719 | 68 | 436 |
| Oakland | 181 | 18 | 111 |
| San Jose | 95 | 24 | 63 |
| Dallas | 124 | 27 | 109 |

24

---

36. *SBC August 18, 2004 ex parte*, at Attachment A.

ETI ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 29 of 74



**Figure 2.** SBC map of Downtown San Francisco showing CLEC enterprise customers being served using Special Access and CLEC "lit" buildings.

REDACTED FOR PUBLIC INSPECTION

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 30 of 74

1    The maps provided by Verizon in its *TRO Remand* submission portray a similar condition –

2    extensive use by CLECs of Verizon special access services in downtown business centers where

3    CLEC fiber has been extensively deployed.

4

5         27.   The Department's belief that CLECs can easily utilize fiber that is already in place to

6    serve additional customers is belied by the two RBOCs' own submissions.  Contrary to Dr.

7    Majure's belief, the proximity of a customer to CLEC-owned fiber is not the controlling factor in

8    the CLEC's economic choice as between using its own already-in-place fiber facilities or

9    purchasing special access at above-cost prices from SBC.  As AT&T Declarants Anthony Fea

10   and Anthony Giovannucci explained in their TRO Remand Declaration, there are a number of

11   reasons why a CLEC may be forced to use RBOC facilities even if there is CLEC-owned fiber

12   nearby, including:

13
14   (1)   Connections to the fiber facility can only be made at a limited number of  "Network
15         Access Points" that have been established for this purpose, places where terminating
16         equipment and cross-connection facilities are in place.  There is a direct analogy to a
17         superhighway or mass transit system – even if you live right next to the highway or the
18         transit line, you can only access it at interchanges (in the case of the highway) or
19         stations (in the case of the transit line).
20
21   (2)   The costs of effecting such a connection are often substantial, and can only be justified
22         where revenues at the particular customer location will be sufficient.
23
24   (3)   Building owners are not obligated, as a legal matter, to allow CLECs to bring facilities
25         into their buildings, and where they do permit such entry may impose construction,
26         rental or other fees that will serve only to increase the entry barrier overall.
27

REDACTED FOR PUBLIC INSPECTION

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 31 of 74

1      (4)  Depending upon where the demarcation has been established, the BOC may own the
2            riser facilities within the building, whose use by a CLEC may potentially involve
3            makeready and recurring charges.[37]
4

5  It is critical that the Court not be misled by the kind of utterly superficial "geographic proximity"

6  theory that appears to lie at the core of the Department's *PFJs*.  The Department's presumption

7  that a CLEC presence in one building somehow facilitates its entry into other, nearby buildings

8  ignores altogether the economic costs and other considerations that are actually involved in

9  determinations as to the economic feasibility of providing service using CLEC-owned facilities.

10  This is precisely what AT&T and MCI had been telling the FCC prior to their decision to be

11  acquired by the RBOCs; their tune has since taken a full 180-degree turn.

12

13      *The Proposed Final Judgments' remedies ignore the marketplace realities with respect to*
14      *network services purchased by large business customers*
15

16      28.  The same kinds of operational difficulties that Verizon described in its *ex parte*

17  submission also explain why larger enterprise customers with networking requirements that

18  embrace many – sometimes thousands – of individual locations tend to select one carrier to take

19  end-to-end responsibility for the entire collection of voice and data services.  Networks with

20  limited on-net connectivity are no match for the network ubiquity of the post-merger AT&T and

21  Verizon, and present little or no serious competitive challenge to these companies.  *If there*

22  *exists no competitor whose network capabilities come anywhere close to those of AT&T or MCI,*

---

37.  Declaration of Anthony Fea and Anthony Giovannucci on behalf of AT&T in FCC *Triennial Review Remand* proceeding, WC Docket No. 04-313, October 4, 2004, at paras. 40-45.  A copy of the redacted Fea/Giovannucci Declaration is provided herewith as Attachment 5.



Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 32 of 74

1    *then the proposed remedy – divestiture of special access connections – cannot effectively restore*

2    *the competition lost by the elimination of AT&T and MCI as providers of network services to*

3    *large enterprise customers.*

4

5        29.  The enormous competitive disadvantages that confront carriers with small networks

6    might well be overcome if special access type connections to their customers could be obtained

7    from SBC, Verizon and other ILECs at cost-based rates.  However, this is certainly not the case.

8    In 1999, the FCC issued its *Special Access Pricing Flexibility Order*,[38] allowing ILECs in

9    numerous – and by now *most* – metropolitan areas to set their special access rates under a so-

10    called "pricing flexibility" regime, in which "marketplace forces" rather than price regulation

11    would be expected to constrain what might otherwise be excessive monopoly prices for these

12    services.  But as pre-merger AT&T itself noted in a *Petition* filed with the FCC in October 2002,

13    in each of the metropolitan areas that had become subject to "pricing flexibility," special access

14    prices were higher than in places where price regulation was still in effect, and that in many

15    cases the ILEC had raised its special access prices well above the price regulation level.  Pre-

16    merger AT&T continued to press this issue before the FCC and, when the FCC had failed to act

17    on its Petition, in November 2003, AT&T sought a writ of mandamus from the D. C. Circuit.

18    AT&T's *Petition* to the FCC and its *Petition for a Writ of Mandamus* are annexed hereto as

19    Attachments 6 and 7.  In its *Petition*, AT&T explained that:

---

38.  *Access Charge Reform, Price Cap Performance Review for Local Exchange Carriers, Interexchange Carrier Purchases of Switched Access Services Offered by Competitive Local Exchange Carriers, CCB/CPD File No. 98-63; Petition of U S West Communications, Inc. for Forbearance from Regulation as a Dominant Carrier in the Phoenix, Arizona MSA*, CC Docket No. 96-262, CC Docket No. 94-1 CC Docket No. 98-157, *Fifth Report and Order and Further Notice of Proposed Rulemaking*, FCC No. 99-206, 14 FCC Rcd 14221 (1999) ("*Pricing Flexibility Order*").

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 33 of 74

1      All of the transmission facilities used to provide special access services have strong
2      natural monopoly characteristics, and that is most starkly the case with the local loops
3      used to provide channel terminations to end user customers, which is the "most costly
4      and difficult" part of the incumbents' network for new entrants to replicate. See Verizon
5      Comm. v. FCC, 535 U.S. 467, 490-91 (2002). As the FCC has recently found, loop and
6      transport facilities exhibit economies of scale that give incumbents dramatically lower
7      unit costs over virtually all levels of demand (because, for example, trenching and other
8      "structure" costs are not capacity sensitive), and virtually all the necessary investment
9      must be "sunk" with little or no salvage value.  Further, even on routes where deploying
10    alternative facilities could be economically rational, competitive carriers often cannot
11    secure the necessary rights-of-way and building access (or face exorbitant demands
12    from municipalities and building owners to obtain that access that only heighten the
13    incumbent's cost advantage).  The FCC has found that deployment of alternative
14    facilities is thus generally limited to entrance facilities, to transport facilities on very
15    high density routes, and to very high capacity "OC-n" loops that are the equivalent of
16    thousands of individual telephone lines.
17
18    Special access is thus a classic "bottleneck" input. No matter how extensive or
19    sophisticated a carrier's network, it cannot deliver its services without the "last mile"
20    connection to the customer's building. And no matter how large the business or
21    government agency, it cannot obtain communications services unless it or its
22    communications services supplier first obtains special access. In the absence of rate
23    regulation or price-constraining competition between multiple facilities-based special
24    access providers, control of special access facilities conveys monopoly power.[39]

25

26      30.  I prepared several expert declarations on behalf of pre-merger AT&T dealing with

27   special access pricing issues.  The first of these, submitted in January of 2003, was in support of

28   its October 2002 Petition.  That Declaration is annexed hereto as Attachment 9.  In October 2004

29   I submitted an initial and a reply declaration on behalf of pre-merger AT&T in the FCC's

30   *Triennial Review Remand Proceeding* in which I showed that ILEC special access prices were

---

39.  *In Re AT&T Corp. et al.*, U.S. Court of Appeals for the District of Columbia Circuit, Case No. 03-1397, *Petition for a Writ of Mandamus* (filed Nov. 6, 2003) (hereinafter, AT&T *Petition for a Writ of Mandamus*), at 7. AT&T's co-petitioners included AT&T Wireless, The Comptel/Ascent Alliance, eCommerce and Telecommunications Users Group, and the Information Technology Association of America.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 34 of 74

1  continuing to escalate, and that the profit levels on these essentially unregulated services had in

2  some cases grown to as much as 68%.  These declarations are annexed hereto as Attachments 10

3  and 11.

4

5      31.  Enterprise customers typically do not purchase special access services directly from the

6  ILECs, but regularly made often substantial purchases from interexchange carriers (principally

7  from pre-merger AT&T and pre-merger MCI) of switched and dedicated, voice and data

8  interexchange network services *that incorporate special access services* that the interexchange

9  carrier would purchase from ILECs.  Enterprise customers are thus *indirect* purchasers of special

10  access and, as such, shared AT&T's concerns about the escalation in special access price levels

11  following "pricing flexibility."  One group of large enterprise customers, the Ad Hoc

12  Telecommunications Users Committee ("AdHoc"),[40] strongly supported AT&T's October 2002

---

40.  As described in a recent FCC pleading, the members of AdHoc are among the nation's largest and most sophisticated corporate buyers of telecommunications services.  AdHoc's members include eight "Fortune 100" companies, seventeen of the "Fortune 500."  Committee members come from a broad range of economic sectors (manufacturing, financial services, insurance, retail, package delivery, and information technology) and maintain thousands of corporate premises in every region of the country.  Their combined annual spend on communications services is between two and three billion dollars per year.  As substantial, geographically-diverse end users of telecommunications service nation-wide, AdHoc members are uniquely qualified to provide a credible, unbiased, and informed perspective on the state of competition in telecommunications markets.  AdHoc admits no carriers as members and accepts no carrier funding.  AdHoc members therefore have no commercial self-interest in imposing unnecessary regulatory constraints on incumbent service providers.  See, Reply Comments of the AdHoc Telecommunications Users Committee, filed August 8, 2006 *In the Matter of Petition of AT&T Inc. for Forbearance under 47 U.S.C. § 160(c) with Regard to Certain Dominant Carrier Regulations for In-Region, Interchange Services*, WC Docket No. 06-120.



Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 35 of 74

1   Petition and intervened in support of AT&T's *Petition for Writ of Mandamus* at the D.C.

2   Circuit.[41]

3

4       32.   The Ad Hoc Committee requested that our firm prepared a detailed analysis of special

5   access pricing and the state of competition in that market.   That report was released in August

6   2004 and is annexed hereto as Attachment 12.   It was submitted in a number of ongoing FCC

7   dockets addressing special access and other so-called "broadband" services and the recent FCC

8   merger proceedings.[42] The report, *Competition in Access Markets: Reality or Illusion.   A*

---

41.  *In Re AT&T Corp. et al. Petition for a Writ of Mandamus*, U. S. Court of Appeals for the District of Columbia Circuit, Case No. 03-1397, Brief of the Ad Hoc Telecommunications Users Committee, Intervenor, filed June 8, 2004; Reply Brief, filed August 18, 2004.

42.  See, e.g., Comments of Ad Hoc Telecommunications Users Committee ("AdHoc") (filed Jan. 22, 2002) at 2-3, filed in *Performance Standards Rulemaking*; Comments of AdHoc (filed Mar. 1, 2002) at 14-17, filed in *Review of Regulatory Requirements for Incumbent LEC Broadband Services; SBC Petition for Expedited Ruling That It Is Non-Dominant in its Provision of Advanced Services and for Forbearance From Dominant Carrier Regulation of These Services*, CC Docket No. 01-337, *Notice of Proposed Rulemaking*, 16 FCC Rcd 22745 (2001) ("*Broadband Regulation Rulemaking*"); Reply Comments of AdHoc (filed Jul. 1, 2002) at i, filed in *Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, CC Docket Nos. 02-33, 95-20, and 98-10, *Notice of Proposed Rulemaking*, 17 FCC Rcd 3019 (2002) ("*Wireline Broadband Internet Access Rulemaking*"); Comments of AdHoc (filed Dec. 2, 2002) at 5, filed in *AT&T Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, RM No. 10593 ("*ATT Special Access Rulemaking*"); Comments of AdHoc (filed Jun. 30, 2003) at 6, filed in *ILEC Separate Affiliate Dominant/Non-Dominant Rulemaking*; Reply Comments of AdHoc (filed Sept. 23, 2004) at 3-14, filed in *Petition of Qwest Corporation for Forbearance Pursuant to 47 U.S.C. § 160(c) in the Omaha Metropolitan Statistical Area*, WC Docket No. 04-223, *Memorandum Opinion and Order*, FCC No. 05-170 (rel. Dec. 2, 2005) ("*Qwest Omaha Forbearance Petition*");Reply Comments of AdHoc (filed May 10, 2005), filed in *SBC Communications Inc. and AT&T Corp. Application for Approval of Transfer of Control*, WC Docket No. 05-65 ("*SBC/ATT Merger Proceeding*"); Reply Comments of AdHoc (filed May 24, 2005) at 8-23, filed in *Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control,* WC Docket No. 05-75 ("*Verizon/MCI Merger Proceeding*"); Comments and Reply Comments of AdHoc (filed June 13, 2005 and July 29, 2005), filed in *Special Access Rates for Price Cap Local Exchange Carriers;ATT Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, WC Docket No. 05-25, RM No. 10593, *Order and Notice of Proposed Rulemaking*, 20 FCC Rcd 1994 (2005) ("*Special Access Rulemaking*"); Comments of AdHoc (filed Feb. 22, 2006), filed in *Qwest § 272 Forbearance Petition*; Letter from Colleen Boothby, Counsel for AdHoc, to Marlene Dortch, Secretary, FCC, WC Docket No. 04-440 (filed Mar. 16, 2006); Reply Comments of AdHoc (filed Jun. 20,

(continued...)


ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 36 of 74

1    *Proposal for Regulating Uncertain Markets* ("*Reality or Illusion*"), debunked the popular

2    illusion of readily available competitive alternatives  for local access facilities, particularly the

3    kinds of dedicated access facilities (a/k/a special access) that large enterprise customers utilize.

4    Through examination of both empirical evidence on the availability of access alternatives, and

5    examination of RBOC behavior in the marketplace, *Reality or Illusion* demonstrated that

6    competitive alternatives simply do not exist for the "last-mile" telecommunications services

7    enterprise customers must have to conduct business. These data have been updated and

8    submitted to the FCC in a Declaration filed by Susan M. Gately of my firm most recently filed in

9    FCC WC Docket No. 06-120[43], which is annexed hereto as Attachment 13.  As the latest data

10   indicates, the BOCs' overpricing of business broadband services continues apace, costing

11   American businesses $21.3 million *per day* in 2005.  At those prices, AT&T's (pre-merger SBC)

12   rate of return for the special access category (after depreciation and taxes) was a jaw-dropping

13   91.7% for 2005.   As Table 4 below (taken from Attachment 13)  demonstrates, the inflated

14   price levels are both significant and nontransitory, and getting worse.

15

---

42.  (...continued)
2006), filed in *AT&T Inc. and BellSouth Corp. Applications for Approval of Transfer of Control*,  WC Docket No.
06-74 ("*ATT/BellSouth Merger Proceeding*").

43.  Attachment B to the Reply Comments of the AdHoc Telecommunications Users Committee (filed August 8,
2006) in  response *Petition Of AT&T Inc. For Forbearance Under 47 U.S.C. § 160(c) With Regard To Certain
Dominant Carrier Regulations For In-Region, Interexchange Services*, WC Docket No. 06-120.


ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 37 of 74

| Table 4 | |
|---|---|
| Historic SBC (now AT&T) Realized Rates of Return on Special Access Services | |
| 1996 | 12.6% |
| 1997 | 16.0% |
| 1998 | 24.5% |
| 1999 | 39.6% |
| 2000 | 41.4% |
| 2001 | 61.3% |
| 2002 | 51.3% |
| 2003 | 63.2% |
| 2004 | 73.2% |
| 2005 | 91.7% |
| Source: Federal Communications Commission, ARMIS Report 43-04, Separations and Access Data Report: Table 1. | |

**The *Proposed Final Judgments* include no remedies – and the *Complaints* completely ignored – the harms that result from the merger transactions in relevant secondary markets.**

> *The Proposed Final Judgments' remedies fail to address or deal with the significant competitive harms that the mergers will produce with respect to the "other telecommunications services that rely on Local Private Lines."*

33.  While both *Complaints* correctly allege that the respective mergers will substantially

harm competition in the markets for "other telecommunications services that rely on Local

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 38 of 74

1   Private Lines,"[44] the *Complaints* fail to identify any specific services that would be so affected

2   beyond the general statement that "most large business customers do not find [switched] services

3   to be a viable or cost-effective substitute for voice and data telecommunications services

4   provided via Local Private Lines" and that "[i]n the event of a small, but significant,

5   nontransitory increase in price for either Local Private Lines or voice and data telecommuni-

6   cations services provided via Local Private Lines, insufficient customers would switch to

7   switched circuits to render the increase unprofitable."[45]

8

9       34.  In fact, many – perhaps even most – competitive telecommunications services rely, to

10  varying degrees, upon Local Private Lines/Special Access services purchased from RBOCs as

11  essential inputs.  Yet when these same types of retail telecommunications services are provided

12  by AT&T and Verizon themselves within their respective regions, such "purchases" of

13  comparable private line/special access type facilities that serve as inputs to their retail offerings

14  involve *intracorporate transfer payments* that amount to shifting monies from one corporate

15  pocket to another.  In some cases, the production of AT&T and Verizon retail services involves

16  no "purchase" of such inputs at all.  AT&T's and Verizon's ability to control the local private

17  line/special access market affords them the unique ability to create price squeeze situations for

18  rival firms and to engage in a variety of other discriminatory and anticompetitive practices.  As

19  such, AT&T's and Verizon's effective monopoly over local private lines/special access in all but

20  a handful of commercial buildings where a CLEC presence continues to exist, permits them to

---

44.  *Complaints*, at paras. 3, 32.

45.  *Id.*, at paras. 23.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 39 of 74

1   implement a "small [and perhaps not so small], but significant, nontransitory increase in price"

2   for Local Private Lines and special access.  In so doing, AT&T and Verizon are able to raise

3   prices across a broad spectrum of retail services provided to residential and small business

4   customers:

5

6   •   Competitive local exchange carriers ("CLECs") that provide service to residential and

7       business customers via unbundled loops ("UNE-Ls") obtained from AT&T and Verizon

8       frequently use special access-type services also obtained from AT&T and Verizon to

9       aggregate customer access lines from a number of ILEC wire centers and thereby to provide

10      transport for such services to the CLEC's switch.

11

12  •   Wireless carriers – and in particular those not affiliated with either AT&T or Verizon (such

13      as Sprint and T-Mobile) – use special access services leased from AT&T or Verizon to

14      interconnect their numerous transceiver sites (sometimes referred to as "cell sites") with

15      their central switching facilities.

16

17  •   Internet service providers ("ISPs") not affiliated with AT&T or Verizon regularly lease

18      special access services from AT&T and Verizon to provide DSL connectivity to residential

19      and commercial customers to whom they furnish high-speed Internet access.

20

21  •   Competing interexchange carriers not affiliated with AT&T or Verizon use special access

22      services purchased from AT&T or Verizon to create so-called "dedicated transport"

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 40 of 74

1    arrangements interconnecting individual ILEC wire centers and ILEC "access tandems"

2    with the IXC's point of presence (PoP).

3

4    •   Competing interexchange carriers that provide services to enterprise customers requiring

5    dedicated connectivity between the carriers' points of presence and its customers' premises

6    depend heavily upon special access type services, the vast majority of which are provided on

7    a monopoly basis by SBC or Verizon within their respective regions.

8

9    AT&T and Verizon compete in all of these voice and data services markets, either through their

10    ILEC entities or through one or more long distance, advanced services, wireless, or other

11    affiliates. Thus their ability to profitably implement and sustain a "small, but significant,

12    nontransitory increase in price" for Local Private Lines will operate to increase their rivals' costs

13    in each of these other market segments, enabling AT&T and Verizon to profitably implement

14    and sustain this "small, but significant, nontransitory increase in price" – and possibly a not-so-

15    small nontransitory increase in price for local residential and business exchange services, for

16    wireless services, for high-speed Internet access services, and for long distance services provided

17    to all market segments, from individual consumers to the largest enterprise customers. While

18    specifically and expressly including as part of the "relevant product market" these "other

19    telecommunications services that rely on Local Private Lines," the *Complaints* as well as the

20    *PFJs*' remedies sidestep these secondary effects altogether.[46]

---

46. Most of the retail services that depend upon AT&T and Verizon Local Private Lines/Special Access are either unregulated (e.g., wireless, Internet access) or have become largely deregulated as a direct result of various

(continued...)

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 41 of 74

1   **The *Proposed Final Judgments* fail to implement a structural framework that will ensure**
2   **that competition is restored to pre-merger levels and is thus at odds with the guiding**
3   **principles expressed in the Department of Justice's own *Policy Guide to Merger Remedies*.**
4

5        35.  The *PFJs* purport to implement a structural remedy that responds to the identified

6   competitive harms.  However, consistent with what is described above, the extremely limited

7   structural remedy that is proposed is wholly inadequate to preserve or restore competition to pre-

8   merger levels, because it leaves unaddressed key components of what made AT&T and MCI

9   unique competitors with respect to both "local private lines" and the vast array of voice and data

10  network telecommunications services that such facilities had been used to provide.

11

12       36.  Within the Department's own *Policy Guide to Merger Remedies* ("*Merger Remedies*

13  *Guide*"),[47] there are suggested approaches for ensuring the adequacy of remedies.  However,

14  with respect to the *PFJs*, the Department has largely ignored its own advice.

15

16  •   **"Remedies Must Be Based upon a Careful Application of Sound Legal and Economic**
17      **Principles to the Particular Facts of the Case at Hand."**  The assessment required to
18      fashion an effective remedy "will necessarily be fact-intensive. It will normally require
19      determining (a) what competitive harm the violation has caused or likely will cause and (b)
20      how the proposed relief will remedy that particular competitive harm.  Only after these
21      determinations are made can the Division decide whether the proposed remedy will
22      effectively redress the violation and, just as importantly, be no more intrusive on market
23      structure and conduct than necessary to cure the competitive harm.  Basing remedies on the

---

46. (...continued)
regulatory initiatives that have been undertaken by AT&T (and its predecessor SBC) and by Verizon.  There is thus
no "backstop" in place to limit or constrain retail price levels.  If by raising wholesale prices AT&T and Verizon can
increase the costs of all competing retail providers, retail prices will rise and the increased price levels will be
nontransitory and sustainable.

47.  United States Department of Justice, Antitrust Division, *Policy Guide to Merger Remedies*, October 2004.

REDACTED FOR PUBLIC INSPECTION

ETI ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 42 of 74

1   application of sound economic and legal analysis to the particular facts of each case avoids
2   merely copying past relief proposals or adopting relief proposals divorced from guiding
3   principles."[48]
4
5   •   "**Restoring Competition Is the Key to an Antitrust Remedy.**   Once the Division has
6   determined that the merger is anticompetitive, the Division will insist on a remedy that
7   resolves the competitive problem. Accepting remedies without analyzing whether they are
8   sufficient to redress the violation involved is a disservice to consumers. Although the
9   remedy should always be sufficient to redress the antitrust violation, the purpose of a
10  remedy is not to enhance pre-merger competition but to restore it. The Division will insist
11  upon relief sufficient to restore competitive conditions the merger would remove.  Restoring
12  competition is the "key to the whole question of an antitrust remedy," and restoring
13  competition "is the only appropriate goal with respect to crafting merger remedies."[49]
14

15  As has been discussed, the proposed remedy falls far short of providing a framework that is

16  conducive to restoring competition to pre-merger levels, because the approach it would take is

17  based upon a myopic view of the source of the identified competitive harm.   Moreover, even if

18  addressing the competitive harm from such a narrow perspective were defensible – which it is

19  not – a remedy that whittles down the divestiture assets to a minor subset of Defendants'

20  overlapping last mile facilities cannot be effective.

21
22  •   "**The Remedy Should Promote Competition, Not Competitors.**   Because the goal is
23  reestablishing competition – rather than determining outcomes or picking winners and losers
24  – decree provisions should promote competition generally rather than protect or favor
25  particular competitors."[50]
26
27  •   "**The Remedy Must Be Enforceable**.  A remedy is not effective if it cannot be enforced.
28  Remedial provisions that are too vague to be enforced or that could be construed when

---

48. *Id.*, at 3.

49. *Id.*, at 4.

50. *Id.*, at 5.

REDACTED FOR PUBLIC INSPECTION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 43 of 74

1    enforced in such a manner as to fall short of their intended purpose can render useless the
2    enforcement effort that went into investigating the transaction and obtaining the decree,
3    leaving the competitive harm unchecked..."[51]
4

5    The proposed remedy here certainly does not pick a particular competitor; in fact, the proposed

6    remedy gives no clue as to the identity of the replacement competitors.[52]   The real concern,

7    which is not remotely addressed by the *PFJs*, is that there exists no single competitor that has an

8    existing network, customer relationships, and access to capital to be able to fill the competitive

9    gap left by AT&T and MCI.  Leaving aside other concerns that this might raise (e.g., the

10   potential for collusive practices identified by Comptel),[53] the only two remaining industry

11   participants conceivably positioned to fill this role are Verizon and SBC, with respect to

12   divestiture assets outside of their incumbent LEC regions.   For years, Verizon and SBC have

13   proclaimed their desire to compete vigorously out-of-region, but have never fulfilled these

14   promises.   Now, in its Response to Public Comments, the Department discloses that neither of

15   these industry giants has even proposed to buy the available out-of-region divestiture assets.[54]

16

17       37.  The Department has certainly considered the capacity of a proposed divestee to offer a

18   substantive competitive challenge to the post-merger entity in its examination of other mergers.

---

51.  *Id.*, at 5-6.

52.  Documents submitted by the Department in its August 7, 2006 filing with this Court identify the proposed acquirers of the AT&T "divestiture assets."  However, no information regarding the identities of the acquirers of the Verizon "divestiture assets" has been provided.

53.  *Response to Public Comments*, at 30.

54.  *Id.* at 44 (fn. 71).

REDACTED FOR PUBLIC INSPECTION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 44 of 74

1   For example, when Microsoft proposed to acquire Intuit, the publisher of Quicken and other

2   personal financial software products, and divest its own personal software product, Microsoft

3   Money, to a competitor, the Department rejected the proposed arrangement specifically because

4   it deemed the proposed acquirer, Novell, incapable of deploying the divested assets in a manner

5   that would compensate for the lost competition.[55]  The Department rejected the Microsoft

6   proposal, and the Microsoft/Intuit merger never took place.  In the present case, the Department

7   has advised the Court that the two strongest competitors – Verizon in the case of AT&T and

8   AT&T in the case of Verizon – will not be acquiring each other's in-region fiber optic networks;

9   whoever the acquirers may be, they will certainly be no match for the two mega-RBOCs.

10  Instead, the Court is being asked to accept the parties' general (and unsupported) assurances as

11  to their existence *and* their ability to fill the competitive void left by the elimination of AT&T

12  Corp. and MCI as competitors to their respective RBOC parent.[56]  Under the *PFJs*, the

13  Department is entrusted with approving the selection of an acquiring company for the divestiture

14  assets.  But what if, as is likely to be the case, the only companies to step forward will be poor

15  substitutes for AT&T and MCI in terms of their ability to compete for Local Private Lines and,

16  more broadly, the services that depend on Local Private Lines?

17

---

55. *United States v. Microsoft Corporation and Intuit*, U.S. District Court, Northern District of California (San Francisco), No. 3:95-cv-01393-WHO, *Complaint for Injunctive Relief against Combination in Violation of Section 7 of the Clayton Act*, dated April 27, 1995.  The *Complaint* (at para. 32) alleges, among other things, that "[c]ompetition from Novell against Quicken will be at best a weak replacement for the lost competition from Microsoft.".

56. *Competitive Impact Statement*, at 9.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 45 of 74

1    38.  There is a genuine and legitimate basis for concern that the Department will simply

2    acquiesce in AT&T and Verizon's choice of "competitor," so as to salvage the *appearance* that

3    the *PFJs* are workable.  If the Department does not take this easy out and rejects most or all

4    potential acquirers as inadequate – what happens?  The entire matter is to be turned over to a

5    trustee, who must attempt to figure out a way to salvage the remedy.  This is hardly the "self-

6    enforcing" remedy contemplated by the *Merger Remedies Guide*.

7

8    39.  Moreover, in assessing the viability of potential CLEC acquirers of the divested AT&T

9    and MCI assets, the Department appears to have ignored the impact that the merger will have on

10   these other firms' own economic viability.  One of the proprietary AT&T documents submitted

11   to the Court by the Department, Bates no. ATT140024376, BEGIN AT&T CONFIDENTIAL <<

12

13

14                                                     >>END AT&T

15   CONFIDENTIAL.  Since SBC likely has facilities at all of the locations where pre-merger

16   AT&T had been purchasing special access services from other CLECs, it is reasonable to assume

17   that virtually all of those CLEC purchases will cease.  I have not seen the corresponding data for

18   MCI, but if it had been of a similar magnitude within the Verizon footprint, the elimination of

19   these revenues will clearly weaken those "other CLECs'" ability to remain viable and

20   competitive.

21

22   •  "**A Divestiture Must Include All Assets Necessary for the Purchaser To Be an Effective,**

23     **Long-Term Competitor. ...** The goal of a divestiture is to ensure that the purchaser

ETI ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 46 of 74

1  possesses both the means and the incentive to maintain the level of premerger competition
2  in the market(s) of concern."[57]
3
4  • "**Divestiture of an Existing Business Entity Is Preferred.** As stated above, any divestiture
5  must contain at least the minimal set of assets necessary to ensure the efficient current and
6  future production and distribution of the relevant product and thereby replace the
7  competition lost through the merger. The Division favors the divestiture of an existing
8  business entity that has already demonstrated its ability to compete in the relevant market.
9  An existing business entity should possess not only all the physical assets, but also the
10 personnel, customer lists, information systems, intangible assets, and management
11 infrastructure necessary for the efficient production and distribution of the relevant
12 product."[58]
13

14  For reasons set forth in more detail above, the proposed remedy (divestiture of selected facilities

15  to 2-to-1 buildings) falls far short of ensuring that the purchaser obtains a going business that

16  gives it the means and incentive to maintain the level of pre-merger competition.  Ownership of

17  the last-mile facilities targeted by the proposed remedy are only a *small piece* of the significant

18  factors that made AT&T and MCI effective competitors in the relevant product markets, as

19  identified in the *Complaint*.

20

21  40. The *PFJs* fail to recognize practical constraints that large enterprise customers face that

22  effectively serve as disincentives to switching providers.  In assessing the barriers faced by any

23  successor to AT&T and MCI – with or without the divestiture assets – it is important to

24  recognize that virtually all large enterprise customers have extensive networks and that the

25  services they purchase are subject to term and volume commitments.  Even if circumstances

---

57. *Merger Remedies Guide*, at 9.

58. *Id.*, at 12-15.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 47 of 74

1   permit the customer to switch providers at a particular location, diverting the associated revenues

2   could cause the customer to fall short of its "Minimum Annual Commitment" ("MAC") and/or

3   shift the customer into a less favorable volume pricing tier.

4

5      41.  Large enterprise customers have expressed very legitimate concerns about having their

6   contracts divested from the provider they selected (e.g., AT&T or MCI) to another provider.

7   However, the very fact that enterprise customers are unable to identify any competitor who they

8   would feel comfortable taking over the contracts associated with their large nationwide networks

9   is an eloquent reflection of the universe of potential acquirers for the divestiture assets.

10

11    *Even if focusing on last-mile facilities to 2-to-1 buildings were a defensible approach to*
12    *addressing the anticompetitive harms identified in the Complaint – which it is not – there is*
13    *absolutely no justification for the further limitation of the remedy to a small subset of all*
14    *such buildings.*
15

16      42.  The remedy only distributes selected, fragmented assets from the extensive networks

17   that AT&T and MCI had used to compete with SBC and Verizon, respectively.  In addition, as

18   described below, the actual assets subject to divestiture under the *PFJs* themselves constitute

19   only a fraction of the already very limited subset of all AT&T/MCI "last mile" assets.  The

20   Department would "include only those 2- 1 buildings where entry [by other CLECs] is unlikely"

21   in the buildings that are earmarked for partial divestiture.[59]  As to the remaining "2-to-1

22   buildings" for which no divestiture is being required, the Department projects that following the

23   mergers, another CLEC will enter those buildings and compete with AT&T or Verizon.

---

59.  Majure Decl., at para. 14.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 48 of 74

1   According to Dr. Majure, "[e]stimates of the revenue opportunity (based on the current traffic

2   being generated in the building adjusted for special circumstances) and the distance to the closest

3   CLEC fiber provide bases for identifying the subset of 2-1 buildings for which long-term harm

4   was not likely to be offset by entry."[60]

5

6       43.   The Department's explanation for such a limited scope of divestiture of last-mile

7   facilities is not plausible.  That void results in significant harm unremedied in the *PFJs*.  In its

8   *Response to Public Comments*, the Department has sought to defend its decision to agree to the

9   divestiture of less than all last-mile facilities at the "2-to-1 buildings."  The Department's

10  response is that the *Complaint* never stated that competition would be eliminated or substantially

11  lessened at each and every "2-to-1 building" (where the merger would eliminate the only

12  competitor to the ILEC); it only referred to the "hundreds of buildings" where additional CLEC

13  entry was unlikely to occur.[61]  As an initial matter, the entire set of 2-to-1 buildings in the SBC

14  and Verizon territories, respectively, could fairly be described as "hundreds" of buildings.  There

15  is nothing in the scope of the *Complaint*, as written, that would have kept the Department from

16  fashioning a remedy that included all or nearly all of such buildings.[62]

17

---

60. *Id.*

61. *Competitive Impact Statement*, at 8.

62. The *Competitive Impact Statement* filed in connection with the SBC-AT&T merger states, "As a result, there are numerous buildings where AT&T is the only CLEC with a last-mile connection.  It is the decreased competition in the provision of these last-mile facilities to buildings where AT&T is the only CLEC that creates the harm alleged in the Complaint." (CIS at 10)



Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 49 of 74

1      44.  The Department does allow for the possibility that entry by a new competitor – with the

2      construction of its own last-mile facilities – could reverse the elimination of the ILECS' only

3      competitor.  However, the section of the *Complaint* dealing with potential entry is appropriately

4      quite pessimistic about this possibility:  "Although other CLECs can, theoretically, build their

5      own fiber connection to each building in response to a price increase the merged firm, such entry

6      is a difficult, time-consuming, and expensive process."  The clear implication of the *Complaint*

7      was that while there might be grounds to omit some minor segment of the 2-to-1 buildings from

8      structural measures intended to preserve or replace competition, the vast majority of such cases

9      warranted direct intervention.  The inclusion of fewer than BEGIN AT&T CONFIDENTIAL

10     <<        >> END AT&T CONFIDENTIAL of the AT&T 2-to-1 buildings and BEGIN VERIZON

11     CONFIDENTIAL <<        >> END VERIZON CONFIDENTIAL of the Verizon 2-1 buildings is

12     in direct conflict with the competitive harm alleged in the *Complaints*.

13

14     45.  The Department states that it arrived at the list of 383 buildings, in the case of SBC, and

15     356 buildings, in the case of Verizon, by first eliminating buildings where no competition

16     seemed likely and then by applying "competitive screens" to identify buildings where there was

17     the possibility of new entry.  According to the Department, conditions that justified an assump-

18     tion that no competition seemed likely included (1) a building that was vacant or in which the

19     demand for local private line or related services was currently zero and (2) buildings in which a

20     subsidiary of the merging firms was the only customer.[63]  It is inconceivable, given the threshold

21     criteria for a CLEC's deployment of last-mile facilities to a building, that these criteria could

---

63.  Department of Justice's Response to Public Comments, at 23.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 50 of 74

1  account for more than a handful of the 2-to-1 buildings.  As to the competitive screens applied

2  by the Department (which are described in its *Response to Public Comments*), there are several

3  reasons why the approach used conflicts with the *Complaint* and fails to ensure that the presence

4  of the divestee in each building will offset the loss of AT&T/MCI as a competitor.

5

6      46.  Leaving aside their efficacy at screening for these two identified criteria (proximity and

7  revenue opportunity), the Department's competitive screens simply ignore several key factors

8  that the Department itself identifies as significant potential entry barriers.  In its *Complaint*, the

9  Department specifically identifies *five* (not two) factors that affect CLEC entry into individual

10  buildings:

11
12      (1)  Proximity to the CLEC's existing network interconnection points;
13
14      (2)  The revenue opportunity [measured by the capacity required at the customer's
15           location];
16
17      (3)  The availability of capital;
18
19      (4)  Physical barriers; and
20
21      (5)  Barriers associated with securing the consent of building owners and municipalities for
22           access and construction.
23

24  In addition, the *Complaints* refer separately to the impediment to entry associated with the extra-

25  ordinarily high cost of such construction – "*even if all of the above criteria  favor the construc-*

26  *tion in a particular case.*"  For this reason, the Department notes that CLECs will typically not

27  build facilities at a particular building without first having secured a sizable customer contract.

28  The details as to how these attributes applied specifically to each of the "2-to-1 buildings" in

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 51 of 74

1   determining whether any divestiture would be required are nowhere to be found in the

2   confidential documents submitted by the Department in support of Dr. Majure's Declaration –

3   Nonetheless, based upon whatever screens it actually utilized, "divestiture" is being required at

4   only BEGIN AT&T CONFIDENTIAL <<    >> END AT&T CONFIDENTIAL of the AT&T

5   "2-to-1 buildings" and BEGIN VERIZON CONFIDENTIAL <<    >> END VERIZON

6   CONFIDENTIAL of the Verizon "2-to-1 buildings."  This, of course, begs the question:  If

7   additional CLEC entry at the remaining "2-to-1 buildings" is sufficiently likely such that no

8   remedial measures are indicated, why hasn't such entry actually taken place in the *ten years*

9   since the 1996 legislation?  If anything, the various competitive harms identified in the

10  *Complaints* compel a remedy *broad* in scope, not narrow.  That is because those harms identified

11  are far more likely to be addressed by overinclusiveness (e.g., by requiring divestiture of *all* "2-

12  to-1 buildings") than by the underinclusiveness inherent in the Department's proposed remedy

13  (i.e., its divestiture of a portion of the unused, and non-revenue-producing capacity at a small

14  fraction of all "2-to-1" locations).  As a practical but relevant reminder in this context, it's easier

15  to predict where entry is *unlikely* than where entry is likely.  The *Competitive Impact Statement*

16  suggests that this is exactly what the Department was attempting to do (i.e., predict where entry

17  was unlikely)[64] but, in reality, the *Proposed Final Judgment* is doing precisely the opposite – i.e.,

18  *by not requiring any divestiture wherever the Department predicts that entry will occur*.

19

20       47.  Additionally, the very conditions that make the buildings where the partial divestiture of

21  unused capacity is being required the *least* likely to attract other CLEC entry going forward *also*

_____

64.  *See, Competitive Impact Statement*, at 6-8.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 52 of 74

1  *make the to-be-divested assets of minimal competitive value to a prospective acquirer*.  Since the

2  *PFJs* calls upon AT&T and Verizon to divest the greater of half of all dark fiber or eight strands

3  at any of the identified buildings, it is also likely that most, perhaps even all, of the divested

4  strands (which are to be provided in the form of a 10-year "indefeasible right of use" ("IRU")

5  rather than an outright sale) will have no current revenue stream associated with them.  For the

6  same reason that the building is being considered by the Department as not likely to attract entry

7  by another CLEC, the opportunity for the acquiring CLEC to gain any significant customers or

8  revenues going forward seems remote at best.

9

10  **The below-bargain-basement prices that AT&T is to receive from its "sale" of the**
11  **"divestiture assets" confirms their inconsequential competitive value and the failure of the**
12  **Department to adhere to its own *Policy Guide to Merger Remedies*, which require it "to**
13  **ensure that the purchaser possesses both the means and the incentive to maintain the level**
14  **of pre-merger competition in the market(s) of concern."**
15

16      48.   In short, what the Department is requiring that AT&T and Verizon divest consists of

17  the dregs of the scraps – i.e., a small number of spare dark fiber strands producing no current or

18  expected revenue at those buildings.  These buildings are so *unattractive* as prospects for new

19  business that the Department itself anticipates no competitive entry beyond the preexisting

20  AT&T or Verizon facilities.  To describe this settlement plan as even paying lip service to the

21  *Merger Remedies Guide* would be unduly charitable.

22

23      49.  Not only does the proposed remedy omit over BEGIN AT&T CONFIDENTIAL<<

24  >>END AT&T CONFIDENTIAL of the AT&T 2-to-1 buildings and BEGIN VERIZON

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 53 of 74

1    CONFIDENTIAL <<       >> END VERIZON CONFIDENTIAL of the MCI 2-to-1 buildings, it

2    limits the divestiture in several other key ways.  First, it requires divestiture of only a fraction of

3    the overlapping facilities being acquired by the Defendant.  Second, those facilities are generally

4    surplus (unused) circuits, for which there are no current and in all likelihood no currently

5    available customers.  Finally, the acquirer is not even offered the opportunity to purchase full

6    ownership rights in the divestiture assets, but only ten-year IRUs.  The Department responds

7    *seriatim* to criticisms of each of these carve-outs in its *Response to Public Comments*,[65] yet fails

8    to justify their combined impact.  Summing up all of the carve-outs, what is left is a proposal to

9    transfer a *portion* (a limited percentage of the capacity at affected buildings) of a  *fragment* of

10   total 2-to-1 buildings involving an *incomplete* set of business (facilities, but no network or

11   customers) for a *limited interval* (10 year leases) to a competitor *operating on a significantly*

12   *smaller scale* than either AT&T or MCI.

13

14       50.  The two identified divestiture-eligibility screens are themselves not reliable predictors

15   of likely entry.  The Department claims to have developed a selection method that can assess the

16   likelihood of entry.  Significantly, none of the specific parameters associated with each of the

17   "2-to-1 buildings" that were ostensibly evaluated in this screening process were included in any

18   of the documents submitted by the Department in its August 7, 2006 filing with this Court.

19   Consequently, we do not have the ability to examine the selection process to determine whether

20   the methodology described by the Department has been properly applied.

21

---

65.  See, Department of Justice's Response to Public Comments, at 21-42.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 54 of 74

1    51.  In any event, the selection method described by Dr. Majure appears better suited to

2    identify situations where entry is *least likely.*  The competitive "screens" described by Dr.

3    Majure are derived from only two of the five factors the Department identifies as relevant to

4    additional entry.  Thus, even where those two factors are satisfied, there are several additional

5    reasons why entry would not be viable.  The "screens" themselves are incomplete and leave

6    many questions unanswered.  Is the revenue estimate associated with the minimum demand

7    based upon the ILECs' excessive rates or the lower price the competitor will need to offer to

8    attract customers?  How long is the term commitment that is assumed?  Does the theoretical

9    CLEC have a network that supports the customer's end-to-end requirements?  Given the

10   uncertainty associated with these questions and its policy that favors structural solutions in

11   which a comprehensive business unit and its assets are divested, the Department could have

12   erred on the side of overinclusiveness in the selection of divestiture assets – but it has chosen

13   exactly the opposite tack.

14

15   52.  There is another practical consideration in evaluating the "value" of the buildings

16   divested. The buildings largely have no value to the purchasers unless and until they make

17   significant investments to install technology in those buildings. The Department appears to have

18   largely ignored the fact that the specific assets that it proposes that AT&T and Verizon divest

19   consist of *dark fiber* strands within the lateral fiber optic cable sheaths that had been constructed

20   (either by AT&T or Verizon or by another carrier that had leased the facilities as an IRU to

21   AT&T or Verizon) to each building.  "Dark fiber" is only one of the physical components of a

22   functioning connection to a building, but its use requires additional facilities, such as optronics

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 55 of 74

1  and multiplexing equipment, in order to "light" the fiber and enable it to carry telecommuni-

2  cations signals.  In order to put dark fiber into revenue-producing service, the acquirer of these

3  divestiture assets will need to purchase and install the required electronics.  In their *TRO*

4  *Remand* Declaration, AT&T Declarants Fea and Giovannucci put the cost of a pair of

5  multiplexers required for each lateral at approximately $47,000, or roughly 75% of their total

6  minimum cost estimate for a lateral connection of about $63,000.[66]  Thus, *even if the acquirer*

7  *has dark fiber strands into a particular building*, it will still confront a substantial capital

8  investment to "light" those strands, and will not make that investment unless there is sufficient

9  service demand to produce a stream of revenues sufficient to offset the capital cost.  And, as Dr.

10  Majure has conceded, the specific buildings that the Department is requiring be "divested" are

11  those that are the *least likely* to attract entry by another CLEC.[67]  Thus, for the very reason that

12  the Department has singled out these buildings for divestiture, the prospect of the acquirer

13  actually *competing* with AT&T or Verizon in these buildings must be viewed as minimal to

14  nonexistent.

15

16  *The Department appears to have ignored key AT&T documents that it had submitted to this*
17  *Court, documents that confirm the utter worthlessness of the specific dark fiber assets that*
18  *the Proposed Final Judgment would require AT&T to divest.*
19

20  53.  The competitive insignificance of the specific "assets" that the Department is requiring

21  AT&T and Verizon to divest is compellingly demonstrated by an analysis of the purchase and

---

66.  Fea/Giovannucci, at footnote 9.

67.  Majure Decl., at para. 13.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 56 of 74

1   sale agreements entered into by AT&T and the several "acquirers" of the "divestiture assets" –

2   the IRUs or "Service Agreements" covering the 383 building laterals across eleven (11) MSAs in

3   which AT&T had deployed fiber rings within the SBC footprint.  In Table 5 below, I have

4   summarized the specifics of each of these divestitures, showing for each market the identity of

5   the acquiring entity, the number of buildings involved, the total one-time IRU fee (or where the

6   divestiture consists of a "Service Agreement" in situations in which AT&T itself serves the

7   building via an IRU from another CLEC, the present value of the up-front and recurring

8   payments associated therewith), the number of strands included in the transaction, the average

9   price per building and the average price per strand.  In all, the proceeds of AT&T's "divestiture"

10  of a portion of its capacity in these 383 buildings will yield a total of BEGIN AT&T

11  CONFIDENTIAL <<                    >>END AT&T CONFIDENTIAL The Department did

12  not submit corresponding agreements between Verizon and the acquirers of its excess fiber

13  strands if, indeed, Verizon has even found buyers for these "divestiture assets."  Absent specific

14  evidence to the contrary, I see little reason why the value of the Verizon divestiture assets as

15  reflected in the prices would-be buyers would be willing to pay would be materially different

16  from the price level that AT&T anticipates receiving.

REDACTED FOR PUBLIC INSPECTION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 57 of 74

1    BEGIN AT&T CONFIDENTIAL<<

| Table 5 | | | | | |
|---------|---|---|---|---|---|
| AT&T Sale of "Divestiture Assets" | | | | | |
| MSA | Buildings | Strands | Total Price (Note 1) | Price per building | Price per strand |
| | | | | | |

Sources:  AT&T "Master Agreements" with Acquirers, Bates Nos. DOJ-AGREEMENTS-000001 through DOJ-AGREEMENTS-000755.

Note 1:  Total price is calculated as sum of up-front payments for IRUs to be purchased from AT&T, initial nonrecurring charges associated with purchase of "services" where AT&T currently serves the building via an IRU from another carrier, plus the present value (at a 12% annual percentage rate) of the recurring monthly charges for those "services."

36    >>END AT&T CONFIDENTIAL

REDACTED FOR PUBLIC INSPECTION

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 58 of 74

1      54. To put this total sale price in perspective, consider the following:

2

3  •  The cost of constructing a single lateral into a single building where proximate access to an

4      existing fiber ring is available is typically in the range of $65,000 to $250,000.[68]  On that

5      basis, the investment that would be required for *de novo* construction of laterals to the 383

6      AT&T buildings for which "divestiture" is being required would be somewhere between

7      $25-million and $95-million.

8

9  •  When AT&T purchased TCG in 1998 for $11.3-billion, TCG had "on-net" facilities

10      installed at 5,298 buildings; expressed on a per-building basis, AT&T paid roughly $2.13-

11      million *per on-net building* to acquire the TCG assets.[69]

12

13  •  BEGIN AT&T CONFIDENTIAL <<

14

15      >> END AT&T CONFIDENTIAL

---

68. *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carrier*, CC Docket No. 01-338; *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-98; *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket No. 98-147, Declaration of Edwin A. Fleming on behalf of WorldCom (MCI), filed April 4, 2002, at 3.

69. Teleport Communications Group, Inc., SEC Form 8-K filing dated July 23, 1998, at 4; AT&T Corp. SEC Form 10-Q report for second quarter 1998; AT&T Corp. SEC Form 8-K dated January 8, 1998, at Exhibit 99, page 1. Obviously, the acquisition of TCG by AT&T involved more than the laterals associated with TCG's 5,298 on-net buildings. TCG was also serving 11,248 *off-net* buildings utilizing ILEC special access or facilities leased from other carriers. However, the stark difference between the $2.13-million *per on-net building* that AT&T had paid to acquire TCG, and BEGIN AT&T CONFIDENTIAL <<     >> END AT&T CONFIDENTIAL that AT&T will be receiving from the acquirers for *all – not each – of the buildings it is being required by the Department of Justice to divest* further underscores the utter unimportance of the "divestiture assets" vis-a-vis the "going concern value" of the aggregate TCG enterprise.

ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 59 of 74

1 •   To describe the amounts paid by the three acquirer CLECs for the "divestiture assets" as fire

2     sale prices would be unduly charitable.  A better and more accurate characterization would

3     be *rummage sale prices*.

4

5 •   SBC's acquisition of AT&T was a $16-billion transaction.  The sum total of the assets to be

6     "divested" amounts to only BEGIN AT&T CONFIDENTIAL <<

7                                                          >> END AT&T CONFIDENTIAL of the

8     total acquisition cost.  It is ludicrous for the Department of Justice to suggest to this Court

9     that a "divestiture" of this level of insignificance could have a perceptible, let alone a

10    measurable, remedial effect in addressing the competitive harms that the Department has

11    identified in its *Complaint*, let alone the extensive additional harms about which the

12    Department's *Complaints* are entirely silent.

13

14 •  Level 3 Communications, Inc. has just recently completed its acquisition of Looking Glass

15    Networks, Inc. ("LGN"), a privately held facilities-based provider, for $152.9-million.[70]

16    LGN's network "includes approximately 2,000 route miles serving 14 major metro markets,

17    with lit fiber connectivity to 215 buildings, and dark fiber connectivity to 250 buildings."[71]

18    Expressed on a per-building basis, Level 3 paid approximately $329,000 per LNG building

---

70.  Level 3 Communications, Inc., Form 8-K, filed with the Securities and Exchange Commission, August 3, 2006, available at http://lvlt.client.shareholder.com/edgar.cfm.  The transaction consisted of 21.3-million shares of unregistered Level 3 stock (August 3, 2006 closing stock price = 3.64 per share; resulting in a $77.5 million stock value), $8.7-million in cash, and $66.7-million in debt repayment.

71.  Level 3 Communications, Inc., News Release, "Level 3 Completes Looking Glass Networks Acquisition," August 3, 2006, available at http://www.level3.com/press/7449.html.



ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 60 of 74

1    (including both lit and unlit buildings).  This acquisition appears to have been driven by the

2    "going concern" value of LGN and the enhancement of that value through integration into

3    the Level 3 network.  On a standalone basis, LGN is expected to generate $75- to $80-

4    million of annual revenues in 2006, representing a 25% increase over 2005 revenues.[72]

5

6    It is entirely reasonable to assume that the sales prices agreed to between AT&T and the

7    acquiring CLECs for these "divestiture assets" were set at arm's length and so reflect their true

8    marketplace value.  But even using the low-end estimate of the construction cost of a single

9    lateral to a single building – $63,000 – the cost that would be incurred by a CLEC to construct

10   the 383 building laterals that are involved in the "divestiture" would approach $25-million.  If

11   those assets had any "going concern" value, their aggregate "fair market value" should be well in

12   excess of their raw construction cost.  As such, the fact that AT&T's sale of these "divestiture

13   assets" realized only  BEGIN AT&T CONFIDENTIAL <<              >> END AT&T

14   CONFIDENTIAL with respect to construction cost alone, confirms beyond any dispute that

15   these "divestiture assets" are of no competitive consequence in the marketplace.  If there were

16   even a remote possibility that these assets would create a serious competitive challenge to the

17   post-merger AT&T, their arm's length value would have been far greater than the rummage sale

18   prices at which these transactions were consummated.

19

---

72.  Level 3 Communications, Inc., News Release, "Level 3 to Acquire Looking Glass Networks," June 5, 2006, available at http://www.level3.com/press/7264.html.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 61 of 74

1   **The *Complaints* take far too narrow a view of the serious and substantial anticompetitive**
2   **harms that can be expected to arise from the mergers of SBC and AT&T and of Verizon**
3   **and MCI, and the *Proposed Final Judgments* fail to eliminate or remedy those harms.**
4

5       55.  In the *Complaints* filed with this Court on October 27, 2005, the Department alleged,

6   generally, that the transactions will each "substantially lessen competition for (a) Local Private

7   Lines that connect hundreds of commercial buildings in SBC's (Verizon's) franchised territory

8   to a carrier's network or other local destination, and (b) other telecommunications services that

9   rely on Local Private Lines."  *SBC/AT&T Complaint*, at para. 1, *Verizon/MCI Complaint*, at para.

10  1.  Continuing their essentially parallel language, the two *Complaints* state that "SBC and AT&T

11  (Verizon and MCI) compete in the sale of wireline telecommunications services to retail and

12  wholesale customers in the United States."  *Ids.*, at paras. 2.

13

14      56.  The statement appearing at paragraph 2 in each of the *Complaints* dramatically

15  understates the matter.  Prior to their respective mergers, SBC and AT&T, and Verizon and

16  MCI, each competed with their respective merger partner across a broad spectrum of "wireline

17  telecommunications services" in retail and wholesale markets, most specifically, within their

18  respective wireline ILEC (BOC) operating areas.  Although the *Complaints* initially recognize

19  the breadth of pre-merger competition between the nation's two largest ILECs and its two largest

20  IXC/CLECs, as the *Complaints* develop, the focus quickly becomes increasingly (and unjusti-

21  fiably) narrow.   Whereas the Department appears to have started out more or less on the right

22  track, the ultimate thrust of the *Complaints* is narrowly and unjustifiably focused on the facilities

23  used by CLECs to serve business customers in individual buildings.

24      57.  Shortly after SBC and AT&T announced their merger intentions in early 2004 and

REDACTED FOR PUBLIC INSPECTION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 62 of 74

1   Verizon and MCI announced their intention to merge soon thereafter, the National Association

2   of State Consumer Advocates asked my firm to prepare a report addressing the potential compe-

3   titive harms arising from the mergers, particularly as these would affect mass market local and

4   long distance services used by residential customers.  The ETI report, *Confronting Telecom*

5   *Industry Consolidation: A Regulatory Agenda for Dealing with the Implosion of Competition*,

6   was released by NASUCA in April of 2005 and filed with the FCC, and is annexed hereto as

7   Attachment 14.  I was also asked by the Office of Ratepayer Advocates of the California Public

8   Utilities Commission ("ORA") to review the Joint Applications of SBC and AT&T Corp. and of

9   Verizon and MCI for California PUC approval of their respective proposed mergers, to review

10  the responsive comments filed by parties in the FCC proceedings considering the proposed

11  mergers, WC Docket Nos. 05-65 and 05-75, and based thereon, to present testimony to the

12  California PUC addressing the public interest standards set forth in the applicable sections of the

13  California Public Utilities Code.  Redacted copies of my prefiled testimony in both of the

14  California PUC proceedings is provided herewith as Attachments 15 and 16.

15

16      58.  Prior to their merger, AT&T was in fact SBC's single largest competitor in the

17  residential local exchange service market within the SBC 13-state operating area, and SBC was

18  AT&T's single largest competitor in the consumer and small business long distance market

19  within that same 13-state SBC home region.   Notably, AT&T was actively and aggressively

20  competing in the residential market up until the moment that it initiated merger discussions with

21  SBC.  As of June 30, 2004, three weeks before its highly-publicized decision to exit the

22  consumer market, AT&T was the single largest competitive provider of residential local



Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 63 of 74

1    telephone service nationwide.  AT&T had amassed a residential local service customer base of

2    4.677-million, representing an increase of 727,000 customers in just the first six months of

3    2004.[73]  In fact, over the twelve months between July 1, 2003 and June 30, 2004, AT&T had

4    *added* (net of disconnections) more than a million-and-a-half residential local service customers,

5    representing an increase of about 50% over its 2Q03 customer base of 3.13-million.[74]  Roughly

6    two million of the 4.677-million AT&T residential customers were in the 13-state SBC region.[75]

7

8         59.  Statistics recently issued by the FCC underscore the impact upon CLEC activity in the

9    residential market within the SBC footprint resulting from SBC's acquisition of AT&T.  The

10   FCC issues a semiannual report on the status of local telephone competition.  In the most recent

11   of these, which covers the time period through December 31, 2005, the FCC *reclassified* the

12   former (pre-merger) AT&T Corp. residential lines within the SBC region as ILEC lines.  A

13   comparison of the data for June 30, 2005 and December 31, 2005 underscores the combined

14   impact of eliminating AT&T as a competitor in the residential market within the SBC operating

15   area and the general decline in competitive activity in the residential market that was occurring

16   at that same time:

---

73. AT&T Press Release, July 22, 2004, "AT&T Announces Second Quarter 2004 Earnings, Company to Stop Investing in Traditional Consumer Services, Concentrate Efforts on Business Markets," at p. 6.

74. *Id.*

75. In the February 21, 2005 SBC/AT&T Merger Application, AT&T had stated that as of that date it was serving 4.2-million local service residential customers, of which 1.8-million were in the SBC region.  However, as of June 30, 2004, the total number of AT&T local service customers was 4.7-million.  By extrapolation, the in-region customer count as of June 30, 2004 was likely around 2.0-million, and the out-of-region quantity was thus roughly 2.7-million.



ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 64 of 74

| Table 6 | | | | |
|---|---|---|---|---|
| Effect of reclassification of AT&T CLEC residential lines in SBC region as ILEC lines together with the general decrease in CLEC activity in the residential sector | | | | |
|  | June 30, 2005 | December 31, 2005 | Change | |
| ILEC lines | 60,590,233 | 62,194,661 | + 1,604,428 | 3% |
| CLEC lines | 16,353,721 | 11,019,062 | − 5,334,659 | − 33% |
| Source: FCC, Industry Analysis and Technology Division, Wireline Competition Bureau, *Local Telephone Competition: Status as of June 30, 2005* (issued April 2006) *and as of December 31, 2005* (issued July 2006), at Table 9. | | | | |

Of course, the decrease in CLEC residential penetration of some 5.3-million lines is substantially

greater than the roughly 2-million former AT&T lines that had been reclassified as "ILEC lines"

in the FCC data – i.e., besides the reclassification of the former AT&T CLEC lines to ILEC

lines, another 3.3-million competitively-supplied access lines seem to have disappeared.[76]

    60.  In support of their contention that AT&T was no longer a competitor to SBC in the

residential market as a result of its "irreversible decision" to exit this segment, AT&T Corp.

Declarant John Polumbo, President of the AT&T Consumer business unit, explicitly attributed

the pre-merger AT&T Corp.'s action to withdraw from the residential market as a response to

the D.C. Circuit Court's ruling in *USTA II* eliminating ILECs' obligation to provide the so-called

Unbundled Network Element Platform ("UNE-P") to CLECs.  According to Mr. Polumbo,

---

    76.  The Verizon/MCI merger did not close until January, 2006; hence, as of the December 31, 2005 *Local Competition Report*, the MCI local service access lines retained their "CLEC lines" classification.


ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 65 of 74

1    In March of 2004,  ... the D.C. Circuit vacated the Commission's unbundling rules.
2    *USTA v. FCC, 359 F.3d 554 (D.C. Cir. 2004).*  Shortly thereafter, the Government
3    decided not to seek review of that decision in the Supreme Court, and AT&T
4    recognized that the availability of UNE-P at TELRIC [Total Element Long Run
5    Incremental Cost] pricing would likely be effectively eliminated.  AT&T had always
6    understood that UNE-P would not be available forever, but now it was clear that UNE-P
7    at TELRIC pricing would be phased out far more quickly than AT&T had previously
8    projected.

9

10    Thus, the economics of AT&T's mass market offerings were expected to change
11    radically for the worse in the very short term.  Indeed, AT&T's costs were set to
12    increase substantially even as new competitors (e.g., cable) were entering and as its
13    competitors' costs were declining.  Moreover, the decision simply underscored the
14    uncertainty inherent in any UNE-based approach to entering the local market.[77]

15

16    61.  Not only had AT&T and SBC been competing with one another in the residential local

17    and long distance markets, they also competed head-to-head in the enterprise business segment.

18    Prior to the merger, SBC had been competing both in-region and out-of-region for large business

19    accounts.  The FCC Staff's April 18, 2005 Initial Information and Document Request, item 4,

20    asked SBC to produce the following materials:

21

22    4.    According to page 91 of the Public Interest Statement, "[m]any business
23          telecommunications customers (and particularly large businesses) . . . employ rigorous
24          competitive bidding processes."  For situations since October 1, 2004 in which AT&T
25          or SBC has submitted a proposal to provide any service to a business customer and in
26          which AT&T or SBC is aware or believes that the other applicant also submitted a
27          proposal identify:
28          a.   The service(s) which was or were the subject of the proposal;
29          b.   The month the proposal was submitted;
30          c.   The class of customer as defined in response to specifications 1.a and 1.b;

---

77.  SBC/AT&T Merger Application, FCC WC Docket No. 05-65, "Description of the Transaction, Public Interest Showing, and Related Demonstrations," Declaration of John Polumbo filed February 21, 2005, at paras. 7-8.

ETI ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 66 of 74

1        d.   The revenues that would have been generated, separately within SBC's region and
2              outside SBC's region, under the proposal;
3        e.   Any other person which your company is aware or believes also submitted a
4              proposal;
5        f.   The location(s) in which the service was or is scheduled to be provided; and
6        g.   The person awarded the contract to provide the relevant service(s).
7

8    SBC's response, filed on May 9, 2005, covered the roughly seven months from October 1, 2004

9    through shortly before the filing date, consisted of several hundred pages identifying numerous

10   specific marketing efforts in which SBC had encountered AT&T and/or TCG as a direct

11   competitor – and in many cases the *only* competitor.  In some cases, SBC had lost the bid to

12   AT&T, and at other times SBC was the successful vendor.  AT&T Corp.'s absorption into SBC

13   eliminates this important source of direct head-to-head competition.  The substance of the SBC

14   response was designated as "confidential" by SBC and is subject to the *Protective Order* issued

15   by the FCC in that case.  SBC's narrative description of the document, which was provided as a

16   non-confidential response to the FCC Staff request item 4, is annexed hereto as Attachment 17.

17   The confidential document was included in the record in FCC WC Docket No. 05-65.[78]

18   Although I am unable to provide the Court with a copy of this document, I believe that it is

19   highly relevant to this Court's review of the Department's *Complaint* and *Proposed Final*

20   *Judgment* as it pertains to the SBC/AT&T merger.  As I have noted, the Department's *Complaint*

21   and *Proposed Final Judgment* in each of the mergers focuses narrowly upon the harm to

22   competition for "last mile" Local Private Line and Special Access connections to a small

23   minority of the hundreds of thousands of commercial buildings at which *retail* services are

---

78. *FCC SBC/AT&T Merger Order*, at para. 14.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 67 of 74

1  provided to enterprise customers for which SBC and AT&T, and Verizon and MCI, prior to their

2  respective mergers, were in direct competition *at the retail level* for a broad range of services.

3  SBC's confidential response to FCC Staff Request item 4 compellingly demonstrates the extent

4  of such direct *retail-level* competition, the loss of which is entirely unaddressed in the *Proposed*

5  *Final Judgment*.  The Department makes no reference to this document in any of its submissions

6  to this Court, nor does it address or discuss the extensive amount of retail-level competition that

7  had existed prior to the merger between each pair of merger partners and that has been

8  eliminated in its entirety by these two transactions.

9

10  **If the *Proposed Final Judgments* are entered, various and substantial competitive harms**
11  **will emerge that were not remediated by the Federal Communications Commission**
12  **("FCC") in the conditions it imposed.**
13

14     62.  Before the Department acquiesced to the ineffectual proposed remedies reflected in the

15  *PFJs*, the FCC undertook its review of the proposed mergers under the public interest standard

16  contained in the *Communications Act of 1934*, as amended.  Under this standard, the FCC

17  balances the potential competitive harms against the potential benefits of the merger.  The

18  *Orders* allowing both mergers to go forward identified some very serious likely competitive

19  impacts of these mergers, but relied heavily upon the remedies under the *PFJs* as providing a

20  mitigation for these harms.  Without the scant legal cover afforded by the Department's

21  acquiescence in these minimal and wholly inadequate competitive remedies, the FCC may well

22  have taken a different and likely more negative position with regard to the public interest

23  consequences of the mergers – in light of its findings regarding the likely negative competitive

24  impacts of the mergers on special access services and the many services that rely on them.

REDACTED FOR PUBLIC INSPECTION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 68 of 74

1    63.  The FCC orders approving both mergers included several specific "conditions," some of

2    which had been voluntarily offered by the applicants themselves in an attempt to blunt several of

3    the specific anticompetitive concerns that commenters had raised.  However, even with those

4    conditions imposed, various competitive harms will emerge if the PJFs are entered.  While

5    finding that there would likely be negative competitive impacts in the special access market

6    arising from the mergers, the FCC relies heavily upon the Department of Justice divestiture

7    conditions as set out in the *Proposed Final Judgments* to remedy those problems.[79]  In addition,

8    the FCC adopted several relatively modest "voluntary conditions" that had been offered by the

9    Applicants as conditions of its approval of the mergers – some relating to the special access

10   market, some to the pricing of unbundled network elements, and others to the offering of mass

11   market DSL and Internet peering arrangements.  Significantly, *all of these conditions are*

12   *temporary, and expire within 24 to 36 months following the date of approval*.  If the *PFJs* are

13   entered, the competitive harms they address will arise following that expiration.

14

15   64.  Of particular relevance to the special access market, the FCC required the following:[80]

16

17   •    A freeze for a period of 30-months on the prices for SBC incumbent LEC and Verizon
18        incumbent LEC tariffed prices for DS-1, DS-3 and OCn special access services;
19
20   •    A freeze for a period of 30-months on the prices paid by AT&T's existing  customers
21        within the SBC region, and by MCI's existing customers within Verizon's region, for
22        DS-1 and  DS-3 "wholesale metro private lines";
23

---

79.  *See, FCC Verizon-MCI Merger Order* at paras. 3, 24, 37, 40, 48-49, 219, and *FCC SBC-AT&T Merger Order* at paras. 3, 24, 37, 40, 48-49, 209.

80.  *FCC Verizon/MCI Merger Order*, Appendix G.

REDACTED FOR PUBLIC INSPECTION

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 69 of 74

1    •    Requirements aimed at prohibiting SBC and Verizon from discriminating in favor of
2         their wireline affiliates for a period of 30-months through:

4    a.   a prohibition on providing special access services to their wireline affiliates that are
5         not available to other similarly situated special access customers on the same terms
6         and conditions;

8    b.   a prohibition on discrimination in terms and conditions and grooming
9         requirements;

11   c.   a requirement to notify the FCC when offering special access contract tariffs to
12        their own affiliates and a requirement that any such special pricing be subscribed to
13        by a non-affiliated customer as well.

15   65. These "conditions" do nothing to correct the fundamental structural problems in the

16   market that are exacerbated by the mergers, nor ensure that the kinds of dynamic efficiency

17   gains that competitors like AT&T and MCI, prior to these mergers, had introduced into the

18   special access market will continue into the future.

20   66. Consider, for example, the matter of "peering" with other Internet Backbone Provider

21   ("IBP") networks. "Peering" is a commercial arrangement established between two network

22   service providers whereby each agrees to carry traffic originated on the other's network to a

23   point of termination on its network on a no-charge basis. Numerous peering arrangements have

24   been established across the nationwide and worldwide Internet on a purely voluntary basis,

25   without any regulatory mandate or prescription, and have been critical to the worldwide reach

26   that the Internet provides. These arrangements have been entirely *market-driven*, and have

27   developed precisely because no individual IBP possessed sufficient market power vis-a-vis other

28   IBPs to permit it to dictate peering conditions or to refuse to enter into peering agreements.

REDACTED FOR PUBLIC INSPECTION

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 70 of 74

1   Prior to the mergers, AT&T Corp. and MCI both operated extensive Internet backbone networks

2   and entered into voluntary peering arrangements with numerous other IBPs.  However, the

3   horizontal integration of the AT&T and MCI backbone networks with their respective merger

4   partner's base of end-user Internet service customers affords AT&T and Verizon a degree of

5   market power unmatched by any other *non-integrated* backbone network.  As a "merger condi-

6   tions," the FCC is requiring that AT&T and Verizon maintain *the same number* of peering

7   arrangements as had pre-dated the mergers (but not necessarily with the same peering partners),

8   but only for a period of 36 months.[81]  Read differently, the FCC is expressly authorizing AT&T

9   and Verizon to *discontinue* peering with other backbone network providers after the expiration

10  of that 36 month period.  There is no basis to expect that the competitive harms those conditions

11  were presumably intended to address will diminish, let alone disappear, due to the passage of

12  time.  By refusing to peer with competing backbone networks, AT&T and Verizon will be in a

13  position to force e-commerce websites (e.g., amazon.com, Google, eBay, online banking and

14  financial services websites, and retail businesses of all varieties) and content providers to

15  connect directly to the AT&T and Verizon backbones in order to access the AT&T and Verizon

16  end-user customers.  By linking their backbone networks with their retail end-user customer

17  base, AT&T and Verizon will be able to force competing non-integrated backbone networks out

18  of business altogether, and thereby to quickly come to dominate the Internet backbone network

19  market.  The FCC's "merger condition" relating to peering merely postpones this outcome for a

20  few years, but does not prevent it from ultimately happening.  And, of course, the sole remedial

21  measure in the *PFJs* – the partial divestiture of spare capacity at a handful of the least desirable

---

81.  *FCC SBC/AT&T Merger Order* at Appendix F;  *FCC Verizon/MCI Merger Order* at Appendix G.



Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 71 of 74

1   commercial locations at which pre-merger AT&T and MCI had fiber optic facilities – does

2   nothing whatsoever to address or prevent the consequences of elimination of peering.[82]

3

4      67.  And with respect to the extremely limited time frames during which its merger

5   conditions would remain in effect, the FCC orders make no findings or qualifiers as to the

6   anticipated condition of the market as of the designated sunset dates.  In fact, there is no basis to

7   expect that any of the competitive harms that the FCC's merger conditions were presumably

8   intended to address will diminish or disappear with the passage of time.  As such, and upon their

9   expiration, the *elimination* of these conditions offers the two mega-RBOCs unprecedented

10  opportunities to exercise market power and, ultimately, to remonopolize much of the US

11  telecommunications market.  Because the FCC has relied upon the *PFJs* and has failed to

---

82.  Evidence of significant RBOC market power with respect to consumer retail DSL service is already apparent. The August 22, 2006 *Wall Street Journal* (at page A2) reported recent price hikes by both Verizon and BellSouth:

> Last year, the government changed telecommunications rules so digital-subscriber-line, or DSL, subscribers would no longer have to pay into a federal fund that subsidizes phone services in rural areas and for low-income consumers. That promised to shave a dollar or two off a typical DSL Internet bill – $1.25 a month for Verizon's slower DSL service and $2.83 a month for its faster service.  Two companies, Verizon Communications Inc. and BellSouth Corp., won't be passing that savings on to consumers.  Verizon recently emailed subscribers announcing that it dropped the universal-service fee as of Aug. 14 and will impose a new "supplier surcharge" beginning Aug. 26. The new fee – $1.20 a month for slower-service customers and $2.70 a month for faster ones – is almost exactly what consumers would have saved with the government's change.  BellSouth yesterday said it also intends to continue charging Internet subscribers its $2.97 a month "regulatory cost recovery fee."

These new "surcharges" arose from no government mandate; they were nothing more than disguised price increases in the range of 8% to 12%.  Faced with mounting pressure from the FCC and others, on August 30, 2006 Verizon rescinded its "surcharge" plan; BellSouth had taken similar action the previous week.  But for the (albeit informal) pressure from regulators, Verizon and BellSouth clearly expected that they would have been able to implement and maintain these price increases without losing so much business as to make the price increases unprofitable.  FCC Commissioner Michael J. Copps, in a statement issued on August 30, 2006,  said, "Chalk one up for consumers. Getting this out in the open put an end to this charade of new surcharges.  This shows again the need for constant consumer and Commission vigilance."

REDACTED FOR PUBLIC INSPECTION

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 72 of 74

1    augment the protections for consumers against the adverse competitive consequences of these

2    mergers, it is all the more important that the *PFJs* be rejected and that the Department be

3    required to enforce its mandate under the antitrust laws.

4

5    **Conclusion**

6

7        68.   The extensive competitive harms that the SBC/AT&T and Verizon/MCI mergers

8    engender across a broad spectrum of telecommunications services within their respective regions

9    and nationwide are in no material sense addressed, let alone remedied, by the Department's

10   *Complaints* and *Proposed Final Judgments*.  But the concern obviously goes much deeper.  In

11   March of this year, the post-merger AT&T Inc. announced its intention to merge with BellSouth,

12   creating a horizontal and vertical combination of an even larger ILEC – this one covering 22

13   states and half of the total US local telephone market – and the largest US interexchange carrier

14   – one that is now considerably larger than the former AT&T Corp. had been at the time that it

15   was being acquired by SBC.  The vertical integration that had swallowed up SBC's then-largest

16   competitor within its 13-state operating area will similarly sweep aside BellSouth's single largest

17   competitor across its nine-state region.  The vertical integration that has already operated to

18   frustrate competitive activity and entry within the 13-state SBC footprint will now be extended

19   to embrace the nine additional states dominated by BellSouth.

20

21       69.   AT&T's public rationale justifying its merger with BellSouth and the even greater

22   integration than it had already achieved through the SBC/AT&T combination is the creation of

23   additional capital and operational efficiencies and other benefits.  For example, AT&T's Senior

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 73 of 74

1    Executive Vice President for Corporate Development, James S. Kahan. recently advised the FCC

2    that a key objective of the AT&T/BellSouth transaction is the integration of Cingular's wireless

3    operations into what would become the 22-state AT&T/SBC/BellSouth ILEC network.

4    According to Mr. Kahan:

5

6        17. Today, wireless networks use a significant amount of wireline network services to
7        connect their cell sites to their switches, wireless switches to each other, as well as to
8        the larger public switched network. However, today's wireline and wireless networks
9        have not been designed, engineered or operated on an integrated basis. But integration
10       of wireline and wireless networks not only creates capital and operational efficiencies,
11       but also allows for deployment of new integrated service offerings that will offer
12       significant benefits to mass market and business customers alike. Such integration will
13       thus be necessary for firms to remain competitive going forward.

14

15       18. The ability to achieve such wireline-wireless integration is one of the primary
16       motivations for AT&T's acquisition of BellSouth. ...[83]

17

18   Of course, extending this reasoning to its logical endpoint, there should be no competition in

19   telecommunications at all. Under AT&T's reasoning, the greatest efficiencies and product

20   benefits can only be achieved through total vertical and horizontal integration of all telecom

21   networks – wireline, wireless, local, long distance, voice, data, video, Internet, *everything* – and

22   the total eradication of all competitors. Under this reasoning, a single AT&T/SBC/BellSouth/

23   Cingular/Verizon/MCI/Verizon Wireless entity, by facilitating the creation of one nationwide

24   integrated wireline/wireless/voice/data/video network, would produce even greater public

25   benefits. In any industry characterized by high fixed costs, one can always make a case that

---

[83]. Declaration of James S. Kahan, Senior Executive Vice President – Corporate Development, AT&T Inc., filed March 29, 2006, in *Application of BellSouth Corporation, Transferor, and AT&T, Inc., Transferee, for Consent to Transfer Control of Licenses and Authorizations*, FCC WC Docket No. 06-74 ("Kahan FCC Declaration"), at paras. 17-18.



Declaration of Lee L. Selwyn
Civil Actions Nos. 1:05CV02102 (EGS)/1:05CV02103 (EGS)
September 5, 2006
Page 74 of 74

1     scale and scope create increased *static efficiencies* in the short-run.  But US telecommunications

2     policy has long since adopted the overarching view that the *dynamic gains* from widespread

3     competition will more than offset any short-run static losses that the economy might sustain.

4     And the US has realized enormous benefit from the competition that was made possible

5     following the break-up of the Bell System and in the immediate aftermath of the 1996 federal

6     legislation.  The Department's incredibly narrow focus upon a handful of commercial buildings

7     to the exclusion of virtually all other merger-driven consequences obscures these far more

8     important competitive harms that the current and future mergers create.

9

10       70.  The remedial measures in the *PFJs* are woefully inadequate to address the many

11    anticompetitive consequences of these two merger transactions.  As a result, it would not be in

12    the public interest to sign the consent order entering the *PFJs*.

13

14       I declare under the pains and penalties of perjury that the foregoing statements are true and

15    correct to the best of my knowledge, information and belief, and if called to testify thereon I am

16    prepared to do so.

_____
Lee L. Selwyn

REDACTED FOR PUBLIC INSPECTION

ECONOMICS AND
TECHNOLOGY, INC.

Appendix

GLOSSARY OF TERMS

| | |
|---|---|
| 2-to-1 buildings | A commercial building at which, following the merger, the number of carriers having facilities connected to the building will decrease from two to only one – i.e., prior to the SBC/AT&T merger, AT&T was the only competitive carrier with facilities connected to the building to compete with SBC within the SBC region or, in the case of the Verizon/MCI merger, MCI was the only competitive carrier with facilities connected to the building to compete with Verizon within the Verizon region |
| ARMIS | FCC Automated Reporting Management Information System |
| BOC | Bell Operating Company as defined at 47 U.S.C. §151 (35) |
| CLEC | Competitive Local Exchange Carrier |
| Dark fiber | Fiber optic cable facility with no electronic or optronic equipment associated with it – i.e., fiber facilities that require additional capital expenditures for such equipment in order for them to be usable to carry telecommunications signals. |
| DSL | Digital Subscriber Line |
| FCC | Federal Communications Commission |
| Facilities-based | Telecommunications services provided over facilities owned by the carrier providing the service, as distinct from "resale" services that involve the use by a carrier of telecommunications facilities leased from another (facilities-based) carrier |
| Fiber Optic cable | A sheath containing multiple fiber optic "strands" each one of which is capable of transporting large quantities of digital telecommunications signals. |
| Fiber Optic strand | An individual fiberglass thread that may be "lit" or "unlit" housed within a fiber optic cable |
| Fiber Ring | A metropolitan area fiber optic network constructed in the form of a circle or "ring" with a minimum of two alternate network paths to each node in the network, creating redundancy in the event of a failure of any individual network link. |
| Internet Backbone | A network of very high capacity long-haul facilities that carries traffic between retail Internet Service Providers |
| IBP | Internet Backbone Provider – the operator of an Internet Backbone network |

1



*Glossary*

| | |
|---|---|
| ISP | Internet Service Provider – the provider of retail Internet access to end users (residential end-users, e-commerce sites, content providers, etc.) |
| IRU | Indefeasible Right of Use – a long-term commercial leasehold interest that gives the holder the right to use specified strands of fiber in a telecommunications facility. |
| IXC | Interexchange Carrier |
| ILEC | Incumbent Local Exchange Carrier as defined at 47 U.S.C. §251(h) |
| Lateral | A fiber optic facility that connects an individual building to the carriers local fiber network or "fiber ring" |
| LEC | Local Exchange Carrier as defined at 47 U.S.C. §151 (44) |
| "Lit" fiber | Fiber optic facilities equipped with suitable electronic equipment, maing them suitable for the transmission of telecommunications signals |
| "Lit building" | A commercial building that has "lit fiber" connected to it. |
| Local Private Lines | A dedicated (non-switched) telecommunications service permanently connecting two points both of thwich are located within the same local service area |
| MSA | Metropolitan Statistical Area |
| "on-net" building | A customer premises that is served by facilities owned by the customer's retail carrier, rather than being leased by that carrier from another carrier. |
| Peering | A mutual commercial arrangement between two networks whereby exchange of traffic between the two networks takes place on a no-fee, or so-called "bill-and-keep" basis.  Under a peering arrangement, each network agrees to carry and terminate the traffic it receives from the other without either making any cash payment for such services to the other |
| PoP | Point of Presence – location at which an IXC interconnects with a LEC or ILEC. |
| PSTN | Public Switched Telephone Network |
| RBOC | Regional Bell Holding Company (e.g., SBC, Verizon, BellSouth, Qwest) |
| Special Access | Same as "Local Private Lines," but generally purchased by a telecommunications carrier to interconnect its Point of Presence with the premises of a specific end-user customer, or to interconnect two interexchange carrier points of presence. |

2

ECONOMICS AND
TECHNOLOGY, INC.

*Glossary*

| | |
|---|---|
| Switched Access | A temporary switched connecting between an end-user customer of a local exchange carrier and the point of presence of an interexchange carrier.  Switched access is used to provide temporary connections to the originator and recipient of ordinary long distance calls (see Figure 1 at page ** of the Declaration) |
| UNE | Unbundled Network Element |
| UNE-L | Unbundled "loop" – the physical wire connection between the local exchange carrier central office and the customer's premises |
| UNE-P | The Unbundled Network Element Platform, consisting of a UNE-L and an "port" on the local exchange carrier central office switch. |
| kbps | Thousand bits per second / kilobits per second |
| mbps | Million bits per second / megabits per second |
| Gbps | Billion bits per second / Gigabits per second |
| DS-0 | Voice-grade digital channel with bandwidth capacity of 64 kbps |
| DS-1 | Digital channel with bandwidth of 1.544 mbps, equivalent to 24 voice-grade DS-0 channels |
| DS-3 | Digital channel with bandwidth of 45 mbps, equivalent to 672 voice-grade DS-0 channels |
| DS-n | Generic reference to DS-1 or DS-3 |
| OC-3 | Digital channel with bandwidth of 155 mbps, equivalent to 2016 voice-grade DS-0 channels |
| OC-n | Generic reference to very high capacity digital bandwidths, which extend up to O-192, corresponding to approximately 10 Gbps, or about 129,000 voice-grade DS-0 channels. |

