**Attachment 2**

**Declaration of Alan G. Benway, Robert G. Holleron, Jeffrey King, Michael E. Lesher, Michael C. Mullan and Maureen Swith ("Benway _et al_") on behalf of AT&T in FCC _Triennial Review Remand_ proceeding WC Docket No. 04-313, October 4, 2004**



REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Unbundled Access to Network Elements | ) | WC Docket No. 04-313 |
| | ) | |
| Review of the Section 251 Unbundling | ) | CC Docket No. 01-338 |
| Obligations of Incumbent Local Exchange | ) | |
| Carriers | ) | |
| | ) | |

**DECLARATION OF ALAN G. BENWAY, ROBERT G. HOLLERON, JEFFREY KING,**
**MICHAEL E. LESHER, MICHAEL C. MULLAN, AND MAUREEN SWIFT**
**ON BEHALF OF AT&T CORP.**

## I.    QUALIFICATIONS.

### A.    Alan G. Benway

1.    My name is Alan G. Benway.  I am Product Director for Frame Relay and ATM services for AT&T.  In this position, I manage AT&T's domestic Frame Relay and ATM portfolios, including pricing strategy and features, and am accountable for the product portfolio's revenue, expense and customer satisfaction results.  I assumed my current responsibilities in February 2003.

2.    I joined AT&T in 1988.  Prior to my current position, I held a number of positions in product management, sales, engineering and operations.  My previous responsibilities include a number of efforts relating to AT&T's attempt to penetrate the local business services market with service offerings such as local Frame Relay,  ATM and Ethernet.  I hold a Bachelor of Science degree in Electrical Engineering and an M.B.A. in Marketing from Rutgers University.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313,  CC Docket No. 01-338

3.   I am one of the sponsors of the portion of the affidavit that demonstrates how AT&T is being subjected to price squeezes in Frame Relay markets.

### B.    Robert G. Holleron

4.   My name is Robert G. Holleron.   I am currently Group Manager of AT&T's Cost Support Center.   Prior to that, I have held a number of positions at AT&T involving the engineering of AT&T's network, and the development of models designed to determine the cost AT&T incurs in deploying and operating network facilities.   I joined AT&T in 1970 as a development engineer.   In 1976, I was assigned a sales position at New Jersey Bell.   In 1977, I shifted to the engineering department where I handled a number of engineering economic assignments.   In 1983, I shifted to AT&T's General Department, where I have been responsible for cost model development.

5.   I earned a B.S. in Electrical Engineering from Manhattan College in 1966.   I also earned an M.S. in Management from Trenton State College in 1988.

6.   I am the principal sponsor of the portion of the declaration discussing the analytical tools used to determine AT&T's connectivity costs. I also provided support to other affiants who used these tools to determine specific price squeeze examples.

### C.    Jeffrey King

7.   My name is Jeffrey A. King.   My business address is 1200 Peachtree Street, N.E., Atlanta, Georgia 30309.   I am employed by AT&T as a District Manager in the Local Services & Access Management organization.   I received a Bachelor of Arts degree in Business Administration with a concentration in Industrial Administration from the University of Kentucky in 1983.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

8.     I joined AT&T's Access Information Management organization in April 1986 and worked developing and testing the ordering and inventory Access Capacity Management System for electronically interfacing High Capacity access orders with incumbent local exchange carriers ("ILECs").   In December 1992, I joined the Access Management organization and managed customer/supplier relations on interstate access price issues, including access charge impacts and tariff terms and conditions analysis, with BellSouth and Sprint.   In addition, my responsibilities included cost study analysis.   I began supporting AT&T's efforts to enter the local services market with the implementation of the Telecommunications Act of 1996.  Since July 1998, my responsibilities have included analyzing ILEC costs and recommending all cost-based prices charged by ILECs.  My responsibilities also include managing access charges paid by AT&T to ILECs in the nine-state BellSouth territory.

9.     I am the principal sponsor of the portions of the declaration dealing with the special access Optional Payment Plans ("OPPs").

**D.     Michael E. Lesher**

10.    My name is Michael E. Lesher.  My business address is 900 Routes 202/206 North, Room 5C212F, Bedminster, NJ 07921.  I am employed by AT&T Corp. ("AT&T") as the Director of Access Product Management within AT&T's Business Services organization. My current duties include the development and lifecycle management of AT&T's point to point and ring access services, including responsibility for product costing and pricing, feature development, service implementation and process improvement.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

11.   I hold a B.S. degree in Accounting from Virginia Polytechnic Institute and State University, and an M.B.A. in Finance and Computer Science from Southern Methodist University.

12.   My AT&T career began with Southwestern Bell Telephone Company ("SWBT") in 1979, where I participated in settlement audits of independent telephone companies. At divestiture I transferred to AT&T Communications and from 1985 until 1991 had responsibility for regulatory accounting and access management issues in the Southwestern and South Central states serving territories. In 1992, I accepted a headquarters position responsible for leading a national team in pursuit of access charge reductions. I joined AT&T's Local Services Division in 1995 where I was responsible for enabling local market entry by ensuring that rates AT&T paid to incumbent local exchange companies for the use of their network were cost based. My job was further expanded in 2000 to include the national planning responsibilities for the Local Network Services organization. This position incorporated AT&T's local product and service requirements into the planning for leased connectivity for purposes of building and/or leasing the assets necessary to deliver upon these requirements. In 2003 I moved to my current position in the AT&T's product management organization.

13.   I am the principal sponsor of the portions of the declaration discussing AT&T's inability to offer certain local business services because of the price squeezes it faces, the ineffectiveness of special access regulation, and other areas not addressed by the other affiants.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

**E.    Michael C. Mullan**

14.    My name is Michael C. Mullan.  I am Group Manager in AT&T's Business Services –
Strategic Pricing Organization.  In this position, I am responsible for managing a team of
professionals that analyze and implement pricing strategies for all data network services,
including Frame Relay, ATM, private line, and ACCU-Ring services.

15.    I joined AT&T in 1995.  Prior to my current position, I held positions both in AT&T's
business services and consumer services organizations.   My previous responsibilities
included managing retail pricing for AT&T's business services for small and mid-sized
business customers and managing pricing strategies for consumer services in the
northeastern United States.  I also serviced as a Finance manager in AT&T's business
services CFO organization.

16.    I received a Bachelor of Arts degree in Economics from Bates College, and an MBA in
Finance from New York University.

17.    I am one of the sponsors of the portion of the affidavit that demonstrates how AT&T is
being subjected to prices squeezes in private line and Frame Relay markets.

**F.    Maureen Swift**

18.    I am employed by AT&T as a Director of Performance, Policy and Management in the
Local Services and Access Management group in AT&T's Network Services
organization.  In this position I am responsible for the oversight of both the special access
services and unbundled network elements purchased by AT&T from incumbent local
exchange carriers ("ILEC").  Additionally, I work closely with colleagues in the AT&T
Business Services unit to identify the needs and expectations of our customers who

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313,  CC Docket No. 01-338

purchase services that rely on inputs from other carriers.  I am a 1977 graduate of Nazareth College of Rochester, with a B.S. in Mathematics and Management Sciences. In 1985, I received an MBA (with concentration in Accounting and Operations) from the University of Rochester Simon School of Management.  From 1985 to 1992, I was employed by Rochester Telephone in Rochester, New York, in the area of separations and settlements.  In September 1992, I accepted the position of Manager of Business Development with ACC Corporation, a competitive long distance provider.  At ACC, I was also part of a team charged with developing a competitive local service product, and handled carrier relations with the incumbent local exchange carriers, including interconnection negotiations and performance issues.  Through a series of acquisitions, ACC became part of AT&T in July 1998.  I continued in a carrier relation's capacity until February 1999, when I was promoted to Division Manager for National Negotiations policy, where I was responsible for coordinating AT&T's policies for interconnection negotiations.  I assumed my present position in September 2000.

19.    I am the affiant that is the principal sponsor of the portion of the declaration discussing special access performance measures.

## II.    PURPOSE OF DECLARATION

20.    The purpose of our affidavit is to demonstrate that the local and long distance competition sought by the Telecommunications Act of 1996 ("1996 Act") cannot "flourish" (*United States Telecom Ass'n v. FCC*, 359 F.3d 554, 576 (D.C. Cir. 2004)) if competitive carriers are forced to serve business customers by purchasing "special

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

access" services from the regional Bell operating companies ("RBOCs"), rather than unbundled network elements ("UNEs") pursuant to section 251(c) of the 1996 Act.[1]

21.    Our declaration is divided into two basic parts. In Part III, we explain the many reasons why special access is inferior to UNEs. In particular, we explain why there is a substantial "risk" of anticompetitive "abuses" by the RBOCs if competitive carriers are remitted to special access services. In Part IV, we provide specific evidence of the ways in which the RBOCs have already used their artificial access cost advantage to foreclose AT&T from competing for local and long distance enterprise business.

## III.    SPECIAL ACCESS SERVICE IS SIMPLY NOT A SUBSTITUTE FOR COST-BASED UNBUNDLED NETWORK ELEMENTS.

22.    A fundamental requirement of a substantial and increasing amount of voice and data services provided to business customers is a high-capacity dedicated transmission facility to the customer's premises that allows the customer to originate and/or receive traffic. AT&T uses these facilities to offer services such as local voice, long distance voice, ATM, Frame Relay, private line, and other managed services. The cost of these dedicated facilities is a significant fraction of the overall costs of many retail services. In fact, as shown in more detail below, last-mile access is generally the largest single cost component of the business services that AT&T offers, accounting for a substantial majority of the costs of many types of voice and data services such as private line, ATM and Frame Relay services. *See also* UBS, *How Access Charges Determine Winners and*

---

[1] While the focus of this proceeding is on the availability of high capacity loops and transport as UNEs, the retention of such UNEs does not negate the need for reform for special access. As we describe below, these services are priced far above cost, include exclusionary terms that inhibit facilities-based competition, and are often provisioned upon terms that do not allow carriers to

(continued . . .)

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

*Losers in Telecom Services*, at 22 (April 2, 2004) ("In many instances, the special access circuits required to connect the end user to the IXC network represent the majority of the total cost of the circuit. That is more than 50% of the total cost of a Frame Relay drop or private line circuit is represented by the cost of the last mile that the IXCs must pay to the ILECs."); *id.* at 27 (estimating that special access costs represent 69% of MCI's business revenues derived from services provided over these facilities).

23.     These features of special access service make it essential for AT&T to obtain last-mile access upon reasonable terms and conditions. Quite obviously, where AT&T must pay more for access than the RBOC incurs, or obtains access at much lower quality, the RBOC will gain an artificial competitive advantage that will allow it to win customers even where AT&T is more efficient.

24.     Access rate stability is critical as well. Even when AT&T is leasing last-mile facilities to serve customers, it still incurs substantial fixed and sunk costs. For example, AT&T must invest in other network equipment used to provide the finished service (such as ATM switches) as well as incurring costs like custom network planning for the customer. Also, in many instances, AT&T will seek to serve customers through a combination of its own facilities and those it leases from the RBOC. Thus, AT&T requires not just access rates that allow it to enter on day one, but rates that will be sufficiently stable so that it can recover its fixed costs over a reasonable time period.

---

(. . . continued)
offer the quality of service demanded by retail customers.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

25.     AT&T not only requires stable access rates so that it can recover its fixed costs, but also because it is ordinarily provides service to enterprise customers under term contracts. These contracts typically require AT&T to provide service at a fixed price for a set term and do not allow AT&T to increase prices if its access costs should increase. Thus, if AT&T should suddenly incur substantially higher access costs, its service under the contract could become unprofitable.

26.     For a number of reasons, RBOC special access is markedly inferior to UNEs as a means of serving enterprise customers.

27.     *The RBOCs Have The Ability To Raise Prices For Special Access And Price-Squeeze Rivals.*     As the Commission correctly recognized, local transport networks exhibit substantial economies of both scale and scope. *Triennial Review Order* ¶¶ 302, 370-71. These scale and scope economies are compounded by the sunk character of the costs of building transmission facilities. *Id.* Thus, as Messrs. Fea and Giovannucci and D'Apolito and Stanley explain in their accompanying declarations, a competitive carrier must have significant traffic before it can even consider deploying transmission facilities in competition with an RBOC. In other words, with the exception of certain specific, high-demand locations or point-to-point routes, competitive carriers ordinarily cannot realistically hope to achieve the per-unit cost of the RBOCs' loops or transport. This can be achieved in only the minority of places for which there is a very large demand for high-capacity transmission.[2]

---

[2] Moreover, the RBOCs are able to optimize their networks by carrying local and long distance facilities over the same network, while the Commission's use restrictions have hamstrung competitive carriers such as AT&T from obtaining similar economies of scale (even when they

(continued . . .)

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

28.     Even where it is potentially economic to build, the Commission has recognized that competitive carriers often have trouble securing the necessary rights-of-way.    *See Triennial Review Order* ¶¶ 304-05, 371.   As first movers, the incumbent telephone companies received rights-of-way from local governments for underground cables and telephone poles and wires with only minimal transaction costs, because persons in the neighborhood or municipality otherwise would not receive *any* telecommunications services.   In contrast, local governments often do not view local competition as beneficial and are not eager to have multiple telephone carriers ripping up streets.   The situation is even worse when dealing with building owners with regard to deployment of last mile loops.   Building owners understandably welcomed the RBOC that promised to bring, for the first time, telecommunications facilities to their properties, but often consider providing building access to competitive carriers as unnecessary.   These situations are worsened by both governmental entities and building owners that view the entry of a competitor as an opportunity to increase revenues by charging unjustified, and sometimes, illegal fees to those seeking to build competitive facilities.

29.     Because of these entry barriers, AT&T and other competitive carriers have been able to economically deploy fiber to only a small fraction of the total routes needed to serve business customers, mostly those few routes that would justify the deployment of the largest capacity ("OCn level") transmission facilities.   AT&T and other providers of retail business services thus remain heavily dependent on RBOC-owned transport facilities to fill-out their limited local network, especially for DSn-level services.

---

(. . . continued)
have made significant capital investments to deploy local facilities).

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

30.   At the same time the RBOCs enjoy special access market power, there is not effective regulation of their special access rates. In its *Pricing Flexibility Order*, the Commission granted the RBOCs "pricing flexibility" so that they could lower special access rates to "meet competition." However, the Commission also freed the RBOCs to *raise* rates where they satisfied certain competitive "triggers." The Commission concluded that these triggers identified instances where existing alternatives and future entry would be sufficient to beat back any attempt by the RBOCs to raise prices above competitive levels.

31.   It is now clear that the triggers adopted by the Commission were misconceived. First, the Commission granted the MSA-wide deregulation of rates based on a showing that only a relatively small percentage of the relevant routes in the MSA had facilities-based competitive alternatives. Thus, these triggers permitted deregulation of a large geographic area – an entire MSA – although competitive collocation arrangements (and thus competitive alternatives) were limited to routes between a small number of few offices. Second, the triggers for the transport elements of special access were overbroad, because they authorized the deregulation of both loop and transport special access rate elements throughout the MSA even though the Commission's "fiber-based collocation" test generally indicated the presence of competitive facilities along only one piece-part of the transport route – entrance facilities. Third, the channel termination[3] trigger was even more flawed, because it permitted deregulation of channel termination rates based solely

---

[3]  Special access channel terminations provide the same functionality as high capacity loops.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313,  CC Docket No. 01-338

on the deployment of *transport* – a deployment that in no way implies that competitors have deployed their own loops. *Cf. Triennial Review Order* ¶ 371.

32.    Thus, the Commission granted the RBOCs pricing flexibility in markets where competitors lacked alternatives to the RBOCs' special access services.  And because of the high barriers to entry to the deployment of bypass facilities, exercise of market power by the RBOCs will not be disciplined by new entry.

33.    Unfortunately, AT&T knows all too well that in the wake of the *Pricing Flexibility Order*, the RBOCs have not only the incentive but also the ability to increase their special access rates whenever it suits their strategic interests to do so.  *See Triennial Review Order* ¶ 397 n.1235 (showing the extent to which the RBOCs have obtained pricing flexibility).  Shortly after receiving Phase II pricing flexibility, BellSouth and Verizon increased their rates for DS1 service throughout every Phase II MSA in their regions, even in the central business districts of large cities such as New York, Boston, and Atlanta.  *See* Reply Comments of AT&T, at 22 (filed in RM No. 10593, Jan. 23, 2003).  BellSouth also raised monthly rates for DS3 services in all of its Phase II MSAs throughout its region.  *Id.*  Qwest shortly thereafter followed suit, raising its rates for DS1 service in every Phase II MSA in its region.  *Id.*  The result is that the "pricing flexibility" rates that are generally available to competing carriers are now well-above the rates in MSAs still governed by the Commission's price cap regime.  *See generally* Stith Dec.

34.    In this regard, it is critical to understand that the very elimination of cost-based UNEs will necessarily *increase* the RBOCs' ability to raise special access rates.  Cost-based UNEs provide some constraint on the RBOCs' special access prices (albeit a limited one in light of use restrictions and other anticompetitive Bell practices that currently prevent

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

competitors form obtaining UNEs). Thus, any further diminishment in the right of carriers to obtain cost-based UNEs gives the RBOCs increased ability to raise special access prices.

35. Recent actions confirm this economic commonsense. In the wake of *USTA II*'s vacatur of the Commission's transport rules, the RBOCs have substantially increased their special access rates. For example, despite having imposed major price increases for its special access service over the last two years, on August 16, 2004, Qwest filed rate increases of between 9% and 94%, with an average rate increase of 27%, applicable to special access services subject to pricing flexibility.[4] Qwest sought these increases despite earning a 68% return on its special access services in 2003. Petition of AT&T Corp. at 2 (filed Transmittal No. 206, Aug. 23, 2004).

36. BellSouth entirely restructured its special access services in a way that will result in stiff price increases. On June 23, 2004, shortly after the *USTA II* decision and the collapse of the attempt to negotiate "commercial" access agreements, BellSouth entirely eliminated its TSP and PSIP tariff that provided for volume-based discounts for large special access purchasers. As a result, carriers that were not "grandfathered" under the prior plans before they were discontinued have no ability to obtain a volume-based discount in the entire BellSouth region.[5]

---

[4] Qwest Transmittal No. 206 (filed Aug. 16, 2004).

[5] This is not to suggest that carriers with existing contracts can effectively compete using special access. Rather, BellSouth's actions ensure that no other carriers, including new market entrants, will have access to these volume-based discounts, putting them at even more of a competitive disadvantage *vis-a-vis* other carriers that had chosen to participate prior to June 24, 2004.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

37.     These steep price increases have resulted in special access rates that are well-above the cost-based levels that would prevail in truly competitive markets In his accompanying affidavit, Mr. Stith compares RBOC special access rates with the rate set by the relevant state commission for the comparable UNE combinations under the Commission's economic cost standard. As he demonstrates, the RBOCs' special access rates, including the "discounted" OPPs touted by the RBOCs as viable alternatives to UNEs, are generally well above cost-based UNE rates. That means that, even when AT&T gets access at the lowest possible special access rate, the RBOC still enjoys a much lower cost for the same last-mile facilities that AT&T needs to provide retail services.

38.     It is also important to understand that the RBOC OPPs generally do not offer the same rate stability as UNEs. The RBOCs have no ability to unilaterally raise UNE rates; they are set by state commissions and can only be increased if the state commission agrees that the RBOC's economic cost has increased. UNE rates are generally fixed for a multi-year period, thus providing some rate stability. And, most importantly, UNE rates are set on the basis of economic cost, not RBOC monopoly power.

39.     On the other hand, the RBOC special access tariffs provide only limited rate stability, and condition that limited stability on acceptance of onerous exclusionary conditions. We understand that the RBOCs make no claim that competitive carriers can thrive when purchasing special access tariff at month-to-month rates. *See, e.g.*, July 2, 2004 Ex Parte Letter from Michael Glover to Marlene Dortch, Att. at 19 ("Verizon July 2 Ex Parte"). Instead, they point to the 40% "discounts" that are supposedly available under their various optional payment plans ("OPPs"). But even with regard to these term plans, AT&T cannot achieve the same level of rate stability as UNEs. That is because it is not

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313,  CC Docket No. 01-338

practically possible for AT&T to satisfy the conditions of those plans for all of its traffic. As a result, enough of AT&T's traffic is purchased at non-stabilized prices based directly on the month-to-month rate that AT&T's overall access expense is significantly higher than it would be if the OPP discounts were available for all of its traffic.[6]

40.    For example, to even approach the level of discount touted by the RBOCs for DS1s, AT&T must agree to commit its DS1 demand to the RBOC for terms as long as six years. Importantly, the reduced stable rates available under these plans often apply only to the demand that a carrier commits to the RBOC, and the carrier faces severe shortfall penalties to the extent it falls below that commitment.  *See, e.g.*, BellSouth Tariff FCC No. 1, § 2.4.8(B).  With the dramatic gains that the RBOCs are making in enterprise markets, AT&T (or any other competitive carrier) cannot reasonably commit its entire inventory of DS1s to the RBOC under these plans.  Rather, to prudently reflect AT&T's likely declining demand over the lengthy term of the plan, AT&T must maintain a substantial amount of DS1s outside of the rate stability term plan in order to ensure that it has "headroom" sufficient to avoid the severe shortfall penalties.  Thus, for those DS1s that are not committed under the term, AT&T must pay the month-to-month rates – rates that can be increased at any time by a Bell that has pricing flexibility.

41.    Similarly, to achieve the level of discounts touted by the RBOCs for DS3s, AT&T must commit individual circuits to the RBOC for terms up to eight years.  *See, e.g.*, BellSouth

---

[6] Monthly demand fluctuation prohibits a carrier from knowingly committing 100% of available inventory on a monthly basis.  Further, to the extent that demand is generally declining, a carrier cannot commit 100% of its available inventory without the risk of liability.  This is particularly problematic because the RBOCs do not allow a subscriber to decrease its commitment level during the term of any agreement.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313,  CC Docket No. 01-338

Tariff FCC No. 1, § 2.4.8(D).  It is simply not possible to match up perfectly AT&T's retail contracts with its wholesale purchases.  Customers will simply not agree to be bound to take service for the extended periods required by the Bells to achieve the maximum discount level.  Further, even where AT&T can get a customer to agree to a certain minimum revenue requirement, customers will not agree to purchase retail services on a circuit-specific basis – especially in light of the competition AT&T faces from the RBOCs that do not have to worry about these conditions.  Thus, as is typically the case, when a multi-location customer has shifts in its demand, AT&T will need to acquire more circuits at higher prices to serve new locations and have excess capacity in others.  With regard to the excess capacity, AT&T faces severe termination penalties.  And with regard to the new demand, AT&T can rationally satisfy that demand by purchasing access at some combination of month-to-month rates and much shorter term (and higher prices) rates stability plans.[7]  Thus, by virtue of the inflexibility of the rate stability plans, AT&T has no alternative but to meet its shifting demand by paying effectively higher DS3 rates to the RBOCs.  As a result, AT&T ends up having to purchase some DS3s at month-to-month rates.

42.    Finally, the level of discounts touted by the RBOCs are not achieved merely through acceptance of the above-discussed term conditions.  Rather, the RBOCs have put into effect "overlay" tariffs that offer additional, volume-based discounts beyond those just discussed.  As described below in greater detail, these tariffs contain additional

---

[7] If AT&T purchased the new circuits at the term of the original contract, it would risk having excess capacity should it lose that customer when the retail contract between AT&T and the customer expires.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

exclusionary terms that are designed to "lock-up" a subscriber's traffic and impede the ability of the subscriber to shift traffic to its own facilities or those of third-parties.

43.    In sum, because RBOC special access does not offer the same price stability as UNEs, the "risk" of using special access services is much greater than UNEs. *USTA II*, 359 F.3d at 577.    RBOCs have virtually no constraint on raising prices for carriers purchasing month-to-month special access rates.    And the RBOCs' "discounted" special access rates are structured in such a way that even a carrier purchasing special access under the OPPs will still need to purchase some special access service at month-to-month rates to reduce the substantial risk imposed by the term and penalty provisions contained in those tariffs.

44.    The RBOCs' ability to raise prices is particularly troubling because, as noted, special access costs constitute a significant fraction of the overall costs of the many retail services provided over special access facilities. This leaves AT&T and other competitors vulnerable to RBOC price squeezes.    Because the RBOCs obtain access to last-mile transmission facilities at economic cost while charging AT&T a much higher rate for access, they have the ability to set their retail rates for enterprise customers so low that AT&T cannot compete.    This can be the case even when AT&T can supply the other parts of the service at a cost equal to (or lower) than the RBOC can.    In addition, the RBOCs have the ability to foreclose competition for both local and long distance services, because both types of service are provided over the same last-mile transmission facilities.

45.    The highly tilted playing field faced by carriers forced to purchase special access is quantified in Exhibits 1–5.    In these exhibits, we compare the price that the RBOCs charge AT&T for a typical special access circuit versus how they price a similar circuit to

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

their own retail customers. We show that the special access rates paid by AT&T (which are among the lowest access rates available) are typically well in excess of what the RBOC charges its own retail customers. For example, as AT&T has already shown in prior filings, the access component of RBOC retail offerings are substantially lower than AT&T's wholesale special access rates.[8] Thus, even if AT&T can offer the other parts of the service at a cost equal to, or less than, what the RBOC incurs, this "spread" makes it impossible for AT&T to profitably offer many services. Worse yet, Exhibits 1-5 herein show that even the RBOCs' *total* retail price for these services is below what AT&T pays for special access.

46.  *The RBOCs Have The Ability To Lower The Quality Of Special Access.* The RBOCs also have every incentive to discriminate between their own retail customers and AT&T, by providing patently inferior quality special access than to which it provides itself. Quite obviously, this gives the RBOCs a major advantage when competing for retail enterprise business. Just as those retail customers prefer low prices, they also prefer high quality service. If AT&T cannot match the RBOCs' service quality, it is at an enormous competitive disadvantage, particularly for "mission critical" services needed by many enterprise customers.

47.  Unlike when it purchases UNEs, AT&T is not guaranteed any performance "parity" or other level of performance quality when it purchases special access services. Despite

---

[8] *See, e.g., Ex Parte* Letter from Frank Simone to Marlene Dortch, *Sunset of the BOC Separate Affiliate and Related Requirements*, WC Docket No. 02-112, CC Docket Nos. 00-175, 01-337, 02-33 (Aug. 9, 2004) (attaching analysis of SBC's tariffed frame relay offer). Other RBOCs similarly price the access portion of their retail services at much lower rates than competitors can obtain those access services on a wholesale basis.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

repeated requests from AT&T, other competitors and enterprise customers, the Commission has yet to adopt any performance standards for special access services.[9] And as monopolists, the RBOCs have no incentive to provide high quality wholesale service to rivals with whom they are competing in retail markets.

48.    AT&T knows this all too well.  As AT&T and other carriers have detailed in the Commission's pending Special Access Performance Measure Proceeding (CC Docket No. 01-321), firm order confirmations are often not provided on a timely basis, installation commitments are missed and the mean time to repair or restore problem or trouble circuits to normal operating levels are lengthy and often compromise customer service.  *See* Petition for Rulemaking at 18-19 (filed in CC Docket No. 01-321, Oct. 29, 2001); Comments of AT&T at 13-14 (filed in CC Docket No. 01-321, Jan. 22, 2002); Comments of Focal at 4 (filed DA 00-1141, June 23, 2000).  AT&T has supported these claims with hard data showing the poor (and in many cases, declining) service quality provided by the RBOCs.  Swift Dec., Att A (attached to Reply Comments of AT&T (filed in CC Docket No. 01-321, Feb. 12, 2002)) (attached hereto as Exhibit 6).  AT&T has also produced hard evidence showing that the RBOCs provide competitive carriers substantially worse performance than they provide their own retail affiliates.  Direct Testimony of Eileen Halloran, at 9-13 (filed in Mass. DTE Docket No. 01-34, Feb. 6,

---

[9] In the Commission's pending Special Access Performance Measure Proceeding (CC Docket 01-321), AT&T and other carriers are seeking benchmark performance standards designed to meet the demands of the enterprise customers served using those facilities, rather than the application of the "parity" standard set forth for UNEs under the Act.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

2002) (attached hereto as Exhibit 7).[10]  The level of special access performance has not

significantly changed since February of 2002.[11]

49.    State regulators that have examined RBOC special access performance have also found

that the RBOCs provide competitive carriers poor quality service.  The New York PSC

has determined that "Verizon's provision of Special Services is below the threshold of

acceptable quality."  Opinion and Order Modifying Special Services Guidelines for

Verizon New York Inc., Conforming Tariff, and Requiring Additional Performance

Reporting, NY PSC Case 00-C-2501, at 5 (June 15, 2001).  In response to a complaint

filed by AT&T against US WEST, the Colorado PUC found that "AT&T has experienced

regular, frequent, widespread, and ongoing delays in obtaining access."  The Colorado

PUC further found that this poor performance was discriminatory:  "US WEST has

provisioned DS1s and DS0s to AT&T on a wholesale basis after a longer interval than it

provided those same services to other wholesale customers."  And the Minnesota PUC

has held that there is considerable evidence "that the quality of US WEST's wholesale

access service" is discriminatory and has begun an investigation that Qwest has fought in

every forum that it could.  *See Qwest Corp. v. Scott*, 380 F.3d 367 (8th Cir. 2004).

---

[10]  As a result of Verizon's request to the New York Public Service Commission, AT&T no longer receives data regarding Verizon's performance for its own retail customers.

[11]  For example, an analysis of RBOC self-reported data shows that, for all RBOCs combined, DS1 on-time provisioning has remained relatively static (from 84.48% on time in February 2004 to 87.94% on time in August 2004), while maintenance performance has continued to decline (*e.g.*, the percentage outage repairs within three hours was 61.89% in February 2002 and 58.35% in August 2004, and the percentage of circuits that failed within one month was 14.78% in February 2002 and 22.30% in August of 2004).

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

50.    Most egregiously, the RBOCs appear to be using their poor performance as a systematic way of winning business customers.  As AT&T has described in the Special Access Performance Measures Proceeding, AT&T quite often must wait weeks or months to get a response for an order for special access service.  In many instances where AT&T's order has been delayed in this manner, it has learned from the customer that the RBOC approached it directly and offered to provide the necessary service, often in a shorter time.  Waldbaum Dec. ¶¶ 5-6 (attached to Reply Comments of AT&T (filed in CC Docket No. 01-321, Feb. 12, 2002)) (attached hereto as Exhibit 8).  Despite AT&T's best efforts, these anticompetitive practices continue to this day.

51.    In the past, the RBOCs have pointed to their willingness to include unilaterally some performance standards in their special access tariffs.  But given the lack of competition that they face, the RBOCs have little incentive to provide any meaningful performance measures.  With the exception of SBC, the RBOCs have refused to negotiate meaningful performance standards or provide meaningful remedies.  Comments of Time Warner and XO Communications at 47 (filed in CC Docket No. 01-321, Jan. 22, 2002).  As for SBC, while it agreed to include a discrete number of performance measures and penalties in its MVP tariff, it has failed to meet those requirements, particularly those relating to maintenance performance.    Thus, despite paying AT&T over **[PROPRIETARY BEGIN]**                                    **[PROPRIETARY END]**, the measures have had little effect in changing the status quo.[12]    In short, "the minimal

---

[12] SBC's MVP measures are deficient for the additional reason that the MVP is an exclusionary lock-up tariff.  Thus, SBC offers performance measures only to carriers that agree to restrict their purchase of special access from CLECs and to restrict their purchase of UNEs.

REDACTED FOR PUBLIC INSPECTION

Subject to Protective Order in WC Docket No. 04-313,  CC Docket No. 01-338

requirements in the tariffs "do little to remedy service quality problems" and 'are

insufficient to ensure that the ILECs will provide CLECs reasonable and

nondiscriminatory service." Comments of Time Warner and XO Communications at 47

(filed in CC Docket No. 01-321, Jan. 22, 2002).

52.    The RBOCs' poor special access performance stands in stark contrast to what is required

of them in provisioning UNEs.  The RBOCs were required to put performance measures

into place as a condition of § 271 relief that were designed to detect and prevent

discriminatory UNE provisioning.  Indeed, in all § 271 orders, the Commission ensured

that the application was subject to a performance measurement and enforcement plan.

And while AT&T has had some complaints with the precise terms of these state plans,

they generally require performance well above the level AT&T receives when it buys

special access from the RBOCs.  Equally important, those plans require the RBOCs to

provide information to allow competitive carriers to determine whether they are meeting

their non-discrimination obligations.

53.    *The RBOC OPPs Contain Poison Pills That Foreclose Competition.*  It is not just the

price and quality of special access that renders it inferior to UNEs.  The RBOCs have

also imposed a host of exclusionary conditions upon special access purchasers.  These

terms substantially increase the risks and costs that competitive carriers incur in

purchasing special access.

54.    In order to qualify for the lowest possible rate for RBOC special access services (which is

still well-above economic cost, *see generally* Stith Dec.), a competitive carrier must agree

to commit to the RBOC a sizeable percentage of its historic total traffic for a lengthy

term.  These conditions go beyond the conditions discussed above where a carrier can

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

agree to commit a certain level of service demand, or a particular circuit, in return for rate stability.    Instead, to achieve the discounts that the RBOCs say permit viable competition, a subscriber must also subscribe to an "overlay" OPP tariff that conditions the availability of the maximum discount on the subscriber's willingness to deal exclusively with the RBOC.  These conditions impose no costs or risks on an RBOC long distance affiliate, because any shortfall penalty is a right-pocket, left-pocket transaction and because the affiliate has no incentive or ability to shift its demand to competitive special access providers.

55.    The most vivid example of this "lock-up" provision is SBC's Managed Value Plan ("MVP").  The MVP's key terms condition the receipt of significant discounts for special access services upon the customer's entering a 5 year commitment to (i) maintain 95% of the recurring revenue it had with SBC at the time that it entered into the agreement and (ii) limit expenditures on UNE-priced replacements for special access services to no more than 5% of its total dedicated access spending.  *See* Ameritech FCC Tariff No. 2, § 19; Southwestern Bell Tel. Co. FCC Tariff No. 73, § 38; Pacific Bell Tel. Co. FCC Tariff No. 1, § 22.  Under the MVP, the minimum commitment level can be increased (but not decreased), and the discounts apply only to the committed revenue.  Failure to meet the minimum revenue commitment leads to loss of discounts unless the customer pays SBC the amount of the shortfall.  Exceeding the 5% cap on UNE purchases results in loss of discounts *and* termination, which triggers very severe penalties (that are clearly not cost-based given that the RBOCs special access prices are so far above economic cost).  At the same time, carriers get no credit toward the minimum contract requirements for those UNE purchases.  The other RBOCs' special access tariffs are similarly pernicious in this

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

regard.  *See, e.g.*, BellSouth Tariff FCC No. 1, § 2.4.8; Qwest Tariff FCC No. 1, § 7.1.3(C); Verizon FCC Tariff No. 14, § 5.16.14(A).

56.     To the extent that carriers must purchase special access to serve their business customers, they have little choice but to knuckle under to these lock-up terms, especially in those areas where the RBOCs have been increasing their special access rates (which, as noted above, are perversely in competitive markets).  Any other choice would be tantamount to economic suicide, because the discounts associated with the lock-up condition are substantial and cost based UNEs are generally not available.  A carrier foregoing the lock-up discount would thus not only be at an enormous competitive disadvantage *vis-a-vis* other carriers that obtained the lowest special access rates, but also the RBOC itself, which incurs the even lower economic cost of access.

57.     Moreover, these "overlay" discount plans undercut some of the (limited) benefits that are provided by the RBOCs' rate stability plans.  This occurs because the discounts that a subscriber earns under the overlay tariffs apply to the recurring billed rates, which are generally the lower, stabilized rates.  Thus, carriers are effectively penalized under the overlay discount plans for putting their circuits under rate stability plans.  At the same time, the severe shortfall/termination penalties under the overlay plans often outweighs the benefit of the rates under rate stability.  Thus, as a matter of economics, carriers will often forego those rate stability plans, opting instead to put more traffic under the overlay plans where the higher month-to-month rates will be counted towards their commitment requirements.

58.     These lock-up provisions make special access facially deficient as a substitute for UNEs. Competitive carriers cannot obtain the RBOCs' most-heavily "discounted" rates for a

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

particular circuit. To get the best price on any route, a subscriber must be willing to lock up virtually *all* of its traffic on *all* routes, thus forgoing the option to self-deploy, buy from alternative suppliers or purchase UNEs. Thus, even in those limited instances where one could imagine the possibility that a competitive carrier could successfully use special access to compete against the RBOC's retail offer, the competitor can only obtain it at a viable price by agreeing to *give up* its ability to purchase UNEs or exercise other options in the vast majority of instances in which special access is patently inadequate. Thus, RBOC special access service is not even *available* as a substitute to UNEs in any meaningful sense under the OPPs.

59.     Indeed, by its very terms, the manifest intended effect of the OPP lock-up provisions is to deter the very facilities-based special access competition that the Commission has sought to promote. A carrier that subscribes to a lock-up OPP must agree to provide the vast majority of its traffic over the RBOC's network. That means that even when competitive alternatives exist (possibly even on the carrier's own facilities), it generally cannot use them without risking the severe penalties triggered by failure to meet the minimum traffic levels that the OPPs require.[13] Indeed, since many carriers – but not RBOC long distance affiliates – are experiencing substantial declines in their retail services (due largely to fierce retail competition from the RBOCs themselves), they cannot send any (or any

---

[13] The competitive constraints imposed by the lock-up requirement arise when RBOCs' customers are forced to choose between keeping their service demand on the RBOCs' networks or diverting it to support their own facilities deployment or purchases from non-RBOC competitors. Where that choice arises, the shortfall liability provisions associated with the lock-up commitment ensure that the RBOC – rather than any rival – will serve the locked-up demand.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

significant amount of) incremental traffic over their own facilities, or those of alternative wholesale providers, and at the same time satisfy the terms of the lock-up provisions.

60.    Finally, as noted, because the OPPs also impose severe shortfall penalties on carriers that fail to meet the minimum traffic requirements, they facilitate the RBOCs' ability to price squeeze. The OPPs are analogous to "take or pay" contracts where the "take" amount is based on the subscriber's historical special access demand. Accordingly, a carrier that serves retail customers using special access under an OPP is subject to potentially enormous shortfall penalties if its retail volumes do not materialize, or if they drop over time. This fact gives the RBOCs a powerful incentive to target rivals that use special access, as it stands to gain *both* the customer's retail business and also keep its wholesale revenues, because the rival is required to "pay" for demand it does not "take."

61.    Again, the contrast with UNEs is stark. UNEs are available on a month-to-month basis at cost-based rates. If a carrier's retail service diminishes, it can reduce its purchase of UNEs without termination or shortfall penalties. And, of course, a carrier that buys UNEs need not agree to forego sending traffic to alternative providers or not to divert traffic to its own facilities.

## IV.    THE RBOCS HAVE SET WHOLESALE ACCESS AND RETAIL BUSINESS RATES AT LEVELS THAT FORECLOSE COMPETITION FOR AN ARRAY OF BUSINESS SERVICES.

62.    The Commission need not guess as to the potential "risks" of remitting carriers to above-cost special access services. The RBOCs are already directly foreclosing competition by price squeezing their rivals as a matter of fact.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

63.    Preliminarily, although AT&T has invested heavily in building a last mile local network, it still has only a fraction of its customers "on net." To reach the other customers it serves, AT&T must, for the most part, lease the facilities from the incumbent RBOC. In the majority of instances, AT&T has been forced to obtain this access as special access services rather than by leasing cost-based loop or loop-transport combinations (known as "EELs"). In addition to RBOC "no facilities" polices, the Commission's "use" and "commingling" restrictions have significantly precluded AT&T and other competitive carriers from using EELs to provide both long distance and local service. Competitive carriers' ability to purchase EELs has also been limited by above-discussed "lock-up" provisions in the RBOCs' special access tariffs that require them to purchase special access for the overwhelming majority of their traffic.

64.    The RBOCs have ruthlessly sought to exploit competitive carriers' dependence on special access services. In order to protect their monopoly local customer base, and to extend that domination to long distance services, the RBOCs adopted a mix of special access prices and retail prices that restrict AT&T's ability to compete for many local and long distance services provided to enterprise businesses. The result has been that the RBOCs have maintained their local monopolies. *See* IDC, *U.S. ATM Service Forecast and Analysis, 2001 – 2006* (June 2002) at 24 (RBOCs have 96.9% share of local ATM Services); *IDC, U.S. Frame Relay Services Forecast and Analysis, 2001-2006* (Apr. 2002) at 25 (RBOCs have 90.3% share of Frame Relay services); *Frost & Sullivan, U.S. Wholesale ATM and Frame Relay Markets* (2002) at 37 (RBOCs have 95.4% of combined local ATM/Frame Relay Services Markets); *see also* IDC, *U.S. Private Line Forecast and Analysis, 2002-2007* (Dec. 2003) at 7 (RBOCs have an approximately 60%

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

share of local private line market, which is *larger* than the long distance market). Indeed, as described below in subpart B, because of these tactics, AT&T has severely curtailed several local service offerings, even though it has a strong incentive to use its existing local network to offer them.

65.    These tactics have also allowed the RBOCs to achieve unprecedented inroads in long distance.  What is remarkable is how many customers they have won despite entering the market for business services in only the last few years.  If current conditions hold, this trend will only accelerate.  Enterprise customers typically purchase services under contracts that apply for multi-year terms.  Thus, the RBOCs have not yet been able to fully realize their maximum market share potential, because they have not been in the market long enough to have had an opportunity to compete for all of the customers. Likewise, they have not fully deployed the capabilities that allow them to compete for several customer segments (and, thus, have not had ability to price squeeze rivals).[14]  As they gain those capabilities, there is every reason to expect that they will increase the scope of the markets that they can foreclose through price squeezes.

66.    The RBOCs' financial disclosures tell the story well.  Verizon reported that its first quarter of 2004 "included nearly 500 Enterprise Advance sales to customers. Enterprise Advance is Verizon's initiative to connect *and extend its local networks and services to the national large-business market.*"[15]  Overall, Verizon touts having "closed" "over

---

[14] For example, we believe that not all of the RBOCs have yet added international service capabilities, and have not yet fully deployed nationwide sales forces or nationwide customer service capabilities.

[15] Verizon's Investor Quarterly, Q1 (April 27, 2004) at 4 (emphasis added).

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313,  CC Docket No. 01-338

2,000 opportunities . . . to date"; having "[o]ver 100 Fortune 500 customers"; having

""[o]ver 900 total unique customers"; and that it is "[t]argeting $250 million in new

revenue for 2004."[16]

67.    Similarly, SBC reported in the first quarter of 2004 that in the large-business market, it

"expects approximately $200 million in incremental revenues from its large business

initiative in 2004."[17]   SBC reported in the second quarter of 2004 that in the large-

business market segment SBC "respond[ed] to 57 percent more bid requests in the second

quarter of 2004 than in the year-earlier second quarter ... contracts won in this space

have increased 34 percent from the fourth quarter of 2003 [and t]he dollar value of

contracts won has increased as well,  up more than 30 percent versus  the second quarter

of 2003."[18]

68.    Most notable is the RBOCs' success rate in winning  contracts  for  which  they  bid.

Verizon trumpets the fact that it has won *over a third* (68/203) of enterprise segment

RFPs since the beginning of 2003 to which Verizon responded and where contracts were

awarded.   7/2/04 Verizon Ex Parte, Bruno Dec. ¶ 21.  And according to the Yankee

Group, "[c]ombined, AT&T, MCI and Sprint lost 33 contracts and gained only 17 – a net

lost of 16 contracts.  On the other side of the ledger, the RBOCs achieved a net gain of

10,  with  SBC  and  Qwest  leading  the  group  of  net  gains."    Yankee Group,

---

[16] Verizon, 2nd Quarter 2004 Earnings Conference Call, Doreen Toben, Chief Financial Officer, July 27, 2004, at  20 (available at http://investor.verizon.com/news/20040727/20040727.pdf).

[17] Investor briefing (available at http://www.sbc.com/Investor/Financial/Earning_Info/docs/1Q_04_IB_FINAL.pdf).

[18]  Investor  briefing    (July  22,  2004)  (available  at  http://www.sbc.com/gen/investor-relations?pid=2985).

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

*Communications Survey Confirms IXCs Lost Enterprise Market Share in 2003* (March 19, 2004), at 1. The predominant reason was *price. Id.* at 2-3.

69.     The remainder of our declaration provides concrete examples that demonstrate that the RBOCs' success in maintaining their local monopolies and penetrating the long distance market have been in large part a result of their exercise of price squeezes against their rivals. We document the RBOCs' price squeezes in the following manner. First, we compare the retail prices that the RBOCs currently charge for two of the most important business services – private line and Frame Relay – and compare them to the costs that an efficient carrier would incur to provide those services. Second, we discuss the several local services that AT&T has effectively ceased marketing altogether because of the strong economic advantages RBOCs have against rivals that must rely on their special access services.

70.     While the scope of services discussed in our declaration is quite broad, we emphasize that it represents only a fraction of the services currently subject to RBOC price squeezes. In many instances, the RBOCs do not make public their retail rates and, thus, there is no way for the Commission to determine whether an efficient carrier could match those rates while paying RBOC special access rates.[19] Nonetheless, it can still be shown from even the more limited universe of situations where the RBOCs have made their retail prices public, that the RBOCs are leveraging their access monopoly to prevent competition on the merits.

---

[19] As explained in the accompanying Declaration of Dr. Lee Selwyn, for this and other reasons, a regime in which the Commission must adjust its impairment determinations to reflect the availability of special access is simply not workable.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

71.     We also emphasize that the mere fact that an RBOC may not be undertaking a price squeeze today is quite irrelevant as to whether they could do so tomorrow. For the reasons discussed above, the RBOCs have the ability to raise special access rates. Thus, they can tomorrow increase rates in a way that eliminates the profit margins that AT&T earns on existing services. And, even where special access rates are stabilized by price caps, the RBOCs can simply lower retail prices. The ability is powerfully illustrated by the swiftness with which the RBOCs changed residential long distance prices from those that permitted competition to those that do not powerfully illustrates this ability. *See generally* Lieberman-Panerali Dec.

### A.     The RBOCs Have Undertaken A Series Of Price Squeezes In Key Business Services Markets.

72.     In *USTA II*, the court held that "risks of ILEC abuse" is a sufficient basis upon which to re-adopt the Commission's prior rule that disregards the availability of special access services in assessing impairment. *USTA II*, 359 F.3d at 577. In this section, we do much more than simply demonstrate that there are "risks" of anticompetitive activity if competitors are forced to use special access to compete with the RBOCs; we show that the RBOCs have *already* used their substantial cost advantages in providing access and actually imposed broad price squeezes against. Specifically, we compare the retail prices that the RBOCs have set for core business services to the costs that an efficient carrier would incur to provide those services. As we demonstrate below in subpart B below, even the most efficient carrier could not profitably match the RBOCs' prices to the extent it must pay prevailing special access prices. Before turning to the specific examples, we first explain how we conducted our analysis.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

We employed the same type of analysis used by AT&T's business finance organization

for AT&T's own business planning purposes. **[PROPRIETARY BEGIN]**

---

20

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313,  CC Docket No. 01-338

75.

21

**[PROPRIETARY END]**

76.     More fundamentally, AT&T's access cost analysis is conservative because the ability of

AT&T (or any other competitive carrier) to obtain special access discounts should be

irrelevant to a determination whether a competitive carrier is impaired by the lack of

access to the corresponding UNE on a specific route.   As discussed, OPP discounts are

only available when the subscriber makes term and volume commitments that impose

substantial risk on the subscriber (because of shortfall penalties in the OPPs).   To obtain

the full OPP discounts, subscriber must also agree to lock-up its traffic and forego lower

cost access services provided by third-parties.   In contrast, UNE purchasers can obtain

access to last-mile facilities without such onerous conditions.   As a result, in reflecting

---

21

(continued . . .)

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

the OPP discounts AT&T obtains but not correcting for the economic costs such conditions impose on AT&T, our analysis understates the true cost of purchasing RBOC special access services.

77.    Finally, the analysis presented below is conservative because we examine only the portion of AT&T's costs represented by special access. That is, we demonstrate that AT&T is subject to substantial price squeezes based on our comparison of the RBOCs' retail prices with AT&T's special access costs alone. We do not take into account the myriad other costs that are incurred in connection with AT&T's service offerings, such as network operating costs, billing, customer care, and customer acquisition costs. When these costs are factored in, the magnitude of the squeezes increases. Indeed, even where a comparison of the access costs and retail rates alone shows a small margin, the addition of AT&T's or any other efficient competitor's costs will tip the balance from a marginally profitable service to one that is not economically viable.

### 1.    Specific Price Squeeze Examples

78.    We now use this analytical process to provide evidence of specific price squeeze undertaken by the RBOCs. In each case, we explain the basic service configuration being addressed and the major components the service. In addition, we explain in detail how the RBOC retail prices were determined. We demonstrate below, for the services analyzed, that the RBOC's special access rates alone are above the relevant retail rate, making competition impossible with mathematical certainty. For those few instances in which the special access rates are below the retail price, we show that the addition of an

_____

(. . . continued)

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

efficient competitor's other internal costs would make it impossible to match the RBOC's retail prices if it is forced to pay existing special access rates.

### a)  Private Line Services

79.  Verizon's interstate private line offering starkly demonstrates the magnitude of price squeeze that BOCs are able to inflict on efficient competitors.  As discussed above, private line service provides a customer with dedicated connectivity between two points. Generally, there are three components to a private line service:  (i) the access circuit, which represents the connections between the customer premise and the customer's serving wire center at each end, (ii) the access transport component, which represents the connections between the customer's serving wire center at each end and the IXC's point of presence ("POP"); and (iii) the interstate channel component, which represents the mileage between the IXC's POPs.  Customers typically use private line service for data communications between locations.   AT&T almost always self-supplies the interstate channel component but, for T1- and T3-based private line services, most often needs to rely on the RBOC for the access components on one or both ends of the circuit.   The access component typically constitutes the majority of the overall costs of providing private line service.

80.  In order to show that Verizon's access prices do not permit meaningful competition, we proceeded as follows.  First, we obtained Verizon's retail prices for private line service from its published federal services guides.[22]  Then we compared that retail price to the

---

[22]    *See*   Federal   Rate   Schedule 3,   available   on   line   at https://retailgateway.bdi.gte.com:1490/viewdoccact.asp?system_id=2032163&lib=TMPI_PCDP _LIB+doc=87447&checkout=false&fileExt=.PDF+Frameset=Created.

REDACTED FOR PUBLIC INSPECTION

Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

special access costs that an efficient carrier incurs in providing its own private line service that relies on those Verizon's facilities on both ends of the circuit. Again, we stress this analysis is highly conservative because (i) the discounted special access rates AT&T buys from the Bells' OPPs are not a substitute for UNEs because they require AT&T to lock-up the lion's share of its traffic with the Bells to obtain those rates; (ii) AT&T, as the largest purchaser of special access, generally obtains steeper discounts than are available to the "typical" wholesale purchaser; and (iii) our cost estimates include only the special access component and not all of the other costs that an efficient carrier incurs in providing private line service.

81.     Exhibits 1 & 2 hereto demonstrate the results of the Verizon comparison for both DS1 and DS3 circuits. For both, the following assumptions were made. First, the circuit length for the access circuit component was assumed to be 6 miles on each end, which represents the average mileage between the serving wire center that serves the customer and the serving wire center that serves AT&T's POP for private line circuits in Verizon's territory. Second, because the discounts in Verizon's retail tariff range from 5%-35% depending on the customer's spending level and term commitment with Verizon,[23] AT&T conducted the analysis using both the 5% (see Exhibit 2) and the 35% discounts (see Exhibit 1).[24] Third, the cost for the interoffice channel component was priced out

---

[23]  *See* Verizon Federal Rate Schedule 3, 1st Revised Page 116.52.

[24]  The terms for the 5% discount are easily met. A customer who qualifies for a 5% discount must commit to a 1 year term and does not need to make a monthly revenue commitment. Customers that commit to a 5 year term and spend $250,000 a month or more qualify for the 35% discount. Analysis of AT&T's own customer base demonstrates that a significant number of customers would qualify for the 35% discount. Moreover, customers with significantly less monthly revenue commitments qualify for substantial discounts. For example, a customer that
(continued . . .)

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

using two different mileage assumptions based on the lengths that encompass the majority of circuits. Thus, the results were run both for a customer with 100 miles of interoffice facilities and for a customer with 300 miles of interoffice facilities because the majority of customers require transport facilities in this distance range.

82. The retail prices listed in Verizon's service guide for the components of these typical configurations were then compared with AT&T's costs for providing its own private line service. Exhibit 1 shows the results of AT&T's analysis for customers that qualify for the 35% discount. As Exhibit 1 shows, AT&T cannot possibly compete with Verizon's prices. **[PROPRIETARY BEGIN]**

**[PROPRIETARY END]**

---

(. . . continued)
spends only $50,000 a month would receive a 30% discount. *See* Federal Rate Schedule, 1st Revised Page 116.52. In any event, as the above analysis demonstrates, the pricing available to a retail customer that is entitled only to the lowest discount – 5% – would still place AT&T in a price squeeze.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

The results are even worse for DS3 private line service. Our comparisons between the prices in the Verizon service guide and efficient costs shows an even greater disparity between AT&T's access costs and Verizon's retail price. **[PROPRIETARY BEGIN]**

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**[PROPRIETARY END]**

84.    As Table 2 demonstrates below, a squeeze also exists where the customer is only eligible for the lowest discount available under Verizon's retail offer. The calculations supporting these results are provided in Exhibit 2. **[PROPRIETARY BEGIN]**

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313,  CC Docket No. 01-338

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**[PROPRIETARY END]**

85.   As the chart shows, Verizon's retail price for the T45 (T3) circuit is well below what it charges AT&T for wholesale access.  And while the retail price for Verizon's 100 mile circuit is slightly above its wholesale price, that razor-thin "margin" is insufficient to allow AT&T to recover the other costs incurred in providing long distance private line service.

86.   Thus, regardless of circuit length or level of retail discount, AT&T cannot compete with Verizon's private line offer where it must rely on Verizon's special access services. Moreover, for all of the reasons that explain why the AT&T's analysis understates the extent of the price squeeze, this analysis is extremely conservative.

### b)     Frame Relay Service

87.   The price squeezes resulting from the RBOCs' Frame Relay retail offerings also demonstrate that the availability of special access services is not a viable alternative to UNEs.  Frame Relay service is typically used for the high speed transmission of voice, data, video, and multimedia applications on a single network.  The service is comprised of a few basic components: access, permanent virtual circuits ("PVCs") and ports.  The access component is by far the most expensive of the three and is largely supplied to

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

AT&T by the BOCs. AT&T-self supplies the PVCs, which provide connectivity within the network between two customer ports, and the ports, which provide the connection between an access arrangement and a PVC.

88.    Because of the price squeeze opportunities that are present due to the RBOCs' special access advantage, AT&T has found it very difficult to compete with the RBOCs' Frame Relay services. As a practical matter, successfully competing with the RBOCs' local Frame Relay offer is next to impossible. Despite trying to compete with RBOCs' local Frame Relay service for over 6 years, AT&T has had extremely limited success penetrating the local Frame Relay market.

89.    In addition, as the RBOCs have gained section 271 authorizations, competing with RBOC Frame Relay offers that have an interLATA component (which AT&T refers to as a domestic Frame Relay service) is becoming increasingly difficult, and the RBOCs have been steadily gaining market share at the IXCs' expense.[25]  Indeed, a simple comparison between the price guide prices of SBC and Verizon with AT&T's access costs show that AT&T is subject to a substantial price squeeze in these regions.[26]

### (1)    SBC

90.    *T1 Access.* SBC's pricing for its domestic Frame Relay offer is set forth in a federal service guide.[27]  Since January 2004, SBC has been running a national promotion entitled

---

[25] For example, SBC's port share of the frame relay and ATM markets has almost doubled between 1999 and 2003.

[26] For the most part, the RBOCs' local and domestic Frame Relay offers are very similar; thus a comparison of those offers to AT&T's costs would yield similar results to those set forth here.

[27] SBC Long Distance Data Product Reference and Pricing Guidebook for Interstate Data Services and International Data Services (available at http://www.sbc.com/gen/public-
(continued . . .)

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

"Runaway Frame Promotion." All three components of SBC's Frame Relay service –
access, ports and PVCs – are priced separately in its service guide. We compared the
pricing for a representative customer with a representative T1 Frame Relay configuration
with AT&T's access costs to determine whether AT&T could meet the pricing available
under SBC's promotion. Specifically, we assumed that a typical customer would have a
data center (hub) connected to 80 remote locations via PVCs, which would require the
customer to order 80 128K Ports, 80 8K PVCs, 80 T1s, and an additional T1 access and
port for the hub location. In addition, AT&T assumed that the PVCs would have a 20%
local – 80% long haul weighting – a typical weighting for AT&T's customers.[28] Finally,
we assumed the customer agreed to a three year term, but purchased no other services
from SBC that might otherwise increase the volume discount to which the customer
would be entitled. We analyzed the overall price squeeze impact in the SBC region by
examining the average access cost across SBC's territory, and analyzed the specific
impact in the SWBT and Ameritech regions, where AT&T has lost significant frame
relay business.

**[PROPRIETARY BEGIN]**

---

(. . . continued)
affairs?pid=319).

[28] Local PVCs correspond to intraLATA service and long haul PVCs correspond to interLATA
service. SBC lists different prices depending upon whether the PVC is local or long haul. A
different weighting assigned to local versus long haul component of the PVC element is not
likely to have a significant effect on the results, since the cost of PVCs represent a small
percentage of the overall service costs.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313,  CC Docket No. 01-338

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

93.

**[PROPRIETARY END]**

94.    *T3 Access.* We also compared SBC's retail pricing for a representative configuration that

includes T3 Frame Relay and T3 access with a competitor's efficient costs to determine

whether AT&T could meet the pricing available under SBC's runaway frame promotion.

Although service configurations for such customers will necessarily depend on customer-

specific factors, a representative configuration would include two hub ports serving 100

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313,  CC Docket No. 01-338

remote locations.  This type of customer could be expected to order 100 128K ports with

access,  100  8K  PVCs,  and  two  additional  T3  access  circuits  and  ports  for  the  hub

locations.  AT&T assumed the same 20% local – 80% long haul weighting for the PVCs.

**[PROPRIETARY BEGIN]**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

**[PROPRIETARY END]**

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

## (2)     Verizon

97.     An analysis of Verizon's T3 based frame relay service also demonstrates the existence of a squeeze. Because Verizon's retail T3 pricing is so aggressive, the squeeze is likely to present itself when the customer requires higher speeds and relies heavily on T3 access. Thus, we assumed that a representative customer would have 10 remote sites with 4 megabit ports supported by T3 access, which are connected back to a hub site via 2 megabit PVCs. This is configuration is becoming more common as customer applications require more bandwidth. Finally, we assumed the customer agreed to a five year term. **[PROPRIETARY BEGIN]**




**[PROPRIETARY END]**

**B.     Services That AT&T Has Ceased To Offer Because Of RBOC Price Discrimination.**

98.     Since the 1996 Act was passed, AT&T has expended significant resources in its efforts to provide local voice and data services to business customers. AT&T has a strong incentive to offer such services. First, the RBOCs have traditionally been insulated from any competition and, as a result, have priced many of their services to businesses at monopoly levels. Thus, by offering competitive rates, AT&T has the opportunity to earn substantial revenues from business customers. Second, some of the network facilities it

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313,  CC Docket No. 01-338

uses to provide long-distance-only services can be more efficiently used to support bundled local/long distance offerings.  By increasing utilization of those facilities, AT&T can achieve a more favorable cost structure (and improve its ability to achieve the local/access synergies enjoyed by the RBOCs).    Third, business customers, like residential customers, are increasingly looking to obtain both local and long distance services from a single provider.    Thus, to the extent AT&T is unable to offer local services, its long distance customer base is at risk from RBOCs that can – and do – offer "one-stop shopping."

99.    In support of this effort, AT&T has invested heavily in building a local network capable of delivering the full suite of services that demanded by business customers demand. However, as explained above and elsewhere in this filing, it is simply not economically feasible for AT&T to deploy local facilities to every customer location it serves.  Instead, AT&T can economically deploy loop and transmission facilities only to serve the highest demand routes.    These same constraints likewise limit the ability of third parties to deploy alternative facilities and offer them at wholesale.  Thus, in order to obtain access to the vast majority of its customers, AT&T needs to lease high-capacity loop and transport transmission service from the RBOC.

100.    Although AT&T expected to obtain cost-based UNEs for this access, it has most often been relegated to special access services.    The RBOCs responded to AT&T's entry by using their access cost advantage to foreclose competition.    In doing so, the RBOCs adopted a mix of special access prices and retail prices that restrict  AT&T's ability to profitably offer several retail local services to business customers.  Despite the strong market incentive to offer these services, AT&T had no choice but to cease offering the

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

services because it could not earn a profit doing so. Thus, this is conclusive evidence that AT&T cannot compete for these retail services when remitted to special access services.

101.    For example, AT&T has largely discontinued providing local private line services where it relies upon leased access for the 'last mile' special access at both end of the circuit. The RBOCs dominate this market and in the wake of the 1996 Act, AT&T sought to enter this market and offer customers a choice. AT&T, however, has significantly scaled back those efforts due to the high cost of leased special access facilities. Indeed, AT&T learned the hard way that wherever it must use special access at both ends of the private line, there is simply no way for it to profitably offer this service. Thus, AT&T only offers local private line service to those situations where it is able to provision the service using primarily its own network facilities. As a result, AT&T's offer is limited either to those customers with the high level of demand needed to justify deployment of facilities, or the relatively small number of potential customers in locations that AT&T already serves at least on one end.[29]

102.    Even in circumstances where AT&T self-supplies at least one end of the circuit, AT&T's offer is no longer as competitive because of the needs to recover its special access costs for the remaining end of the circuit. During the past year, AT&T conducted a careful review and determined that its pricing for these services was well below its costs in light of the special access charges it was actually paying. AT&T thus was forced to raise

---

[29] These opportunities are further limited, because only a small percentage of AT&T's 'on-net' locations provide AT&T access to common space, which is needed to enable AT&T to serve all tenants in a particular location. *See* Fea-Giovannucci Dec., Part II.B.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

substantially the price of that service. Since that time, AT&T has sold virtually no new local private line customer contracts at these new rates.

103.    AT&T has also had to apply similar limitations on its local Ethernet products. These products are used to provide a point-to-point Ethernet private line connection between, for example, a customer's Local Area Networks ("LANs") within a metropolitan area. Again, the RBOCs dominate this market and AT&T would like to enter this market so it can offer customers a meaningful choice of suppliers. AT&T determined, however, that where it must rely on the RBOCs for high-priced special access as a product component, there was simply no way that it could profitably sustain a competitive offer. As a result, AT&T now primarily offers these services only in circumstances where it can self-provision the access – *i.e.*, to the limited subset of customers whose locations are already on AT&T's own local network.

REDACTED FOR PUBLIC INSPECTION
Subject to Protective Order in WC Docket No. 04-313,  CC Docket No. 01-338

## **VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct.


/s/ Alan G. Benway

Alan G. Benway

October 1, 2004.

CONFIDENTIAL INFORMATION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

## **VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct.


/s/ Robert G. Holleron

Robert G. Holleron

October 1, 2004

CONFIDENTIAL INFORMATION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

## **VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct.


/s/ Jeffrey King

Jeffrey King

October 1, 2004

CONFIDENTIAL INFORMATION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

## **VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct.


/s/ Michael E. Lesher

Michael E. Lesher

October 1, 2004

CONFIDENTIAL INFORMATION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct.


/s/ Michael C. Mullan

Michael C. Mullan

October 1, 2004

CONFIDENTIAL INFORMATION
Subject to Protective Order in WC Docket No. 04-313, CC Docket No. 01-338

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Maureen Swift

Maureen Swift

October 1, 2004