**Attachment 7**

**AT&T Petition for a Writ of Mandamus
in the United States Court of Appeals
for the District of Columbia Circuit
No. 03-1397
filed November 5, 2003**



IN THE
**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. _____

*In Re* **AT&T CORP., AT&T WIRELESS, THE COMPTEL/ASCENT
ALLIANCE, eCOMMERCE AND TELECOMMUNICATIONS
USERS GROUP, AND THE INFORMATION TECHNOLOGY
ASSOCIATION OF AMERICA,**

**Petitioners.**

————

**PETITION FOR A WRIT OF MANDAMUS**

————

Leonard J. Cali
Lawrence J. Lafaro
Judy Sello
AT&T CORP.
One AT&T Way
Bedminster, New Jersey 0792 1
(908) 532-1846

David W. Carpenter
SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

David L. Lawson
James P. Young
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

*Counsel for AT&T Corp.*

Douglas I. Brandon
Vice President-External Affairs
 AT&T Wireless Services, Inc.
1150 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 223-9222

Howard J. Symons
Michael H. Pryor
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo P.C.
701 Pennsylvania Avenue, NW
Suite 900
Washington, D.C.  20004
(202) 434-7300

*Counsel for AT&T Wireless*

Mark Uncapher
Senior Vice President & Counsel, Internet Commerce
& Communications Division, Information
Technology Association of America
1401 Wilson Boulevard, #1100
Arlington, VA 22209
703-284-5344

*Counsel for ITAA*

Brian R. Moir
Moir & Hardman
1015 18th Street NW, Suite 800
Washington, DC 20036-5204
(202) 331-9852

*Counsel for the eCommerce &
Telecommunications Users Group*

Jonathan D. Lee
The CompTel/ASCENT Alliance
1900 M Street, NW, Suite 800
Washington, D.C. 20036

*Counsel for the Comptel/ASCENT Alliance*

November 5, 2003

**CORPORATE DISCLOSURES PURSUANT TO RULE 26.1**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rules 15(c)(3), 26.1 and 28(a)(1)(A), petitioners respectfully submit these corporate disclosure statements.

AT&T Corp. ("AT&T") is a provider of telecommunications services.  AT&T has no parent company.  No publicly held company owns ten (10) percent or more of AT&T's stock.

AT&T Wireless Services, Inc. ("AWS"), is in the business of providing wireless telecommunications services and has no parent company.  NTT DoCoMo USA Inc. owns approximately seventeen percent of AWS's voting securities and is the only company that owns more than ten percent of the stock of AWS

The Comptel/ASCENT Aliance ("Comptel") is a national industry trade association representing the interests of the competitive telecommunications industry.  The association serves U.S. and international carriers and their suppliers who offer a variety of local, domestic, and international long distance, Internet, voice, data, and wireless services.  CompTel has no parent corporations, and no publicly held company has a  ten percent or greater ownership interest in CompTel.

The Information Technology Association of America ("ITAA") is the principal trade association of the nation's information technology industries.  ITAA is the principal trade association of the computer software and services industry.  ITAA has 500 member companies located throughout the United States ITAA's members provide the public with a wide variety of information products, software, and services.  ITAA does not have any parent company, subsidiary, or affiliate that has issued shares or debt securities to the public.

eCommerce and Telecommunications Users Group ("eTUG") represents the interests of commercial, educational, and governmental end users of electronic commerce, information

technologies, Internet, and telecommunications products and services. eTUG's objective is to facilitate, protect, and promote the mutual interests of end users with respect to public policy deliberations in order to achieve quality, cost-effective information and telecommunications systems. eTUG does not have any parent company, subsidiary, or affiliate that has issued shares or debt securities to the public.

**RELIEF REQUESTED**

Petitioners respectfully request the issuance of a writ of mandamus requiring that the Federal Communications Commission ("FCC"), within 45 days, (1) grant or at least rule upon the emergency requests that the FCC vacate its *Pricing Flexibility Order*,[1] (2) rule upon the emergency requests for other interim relief against the incumbent local exchange carriers' $5 billion in annual overcharges to special access customers, and (3) issue a notice of proposed rulemaking to address how the FCC's regulation of the incumbents' rates for special access services should be permanently reformed.

**ISSUE PRESENTED**

Whether a writ of mandamus should issue that requires the FCC to issue a rulemaking to reexamine rules that rest on predictions that have repeatedly been shown to be incorrect over the past four years and to rule on the emergency request for interim relief, pending the adoption of new rules, from rates that are grossly unjust and unreasonable and that are costing customers more than five billion dollars annually in excess charges?

**INTRODUCTION**

Petitioners are a coalition of business customers, interexchange carriers, wireless carriers, information service providers and other consumers of the "special access" services of the nation's largest incumbent local exchange carriers ("incumbents" or "ILECs"). These consumers seek mandamus against a gross violation by the FCC of its duty to revisit and revise rules that have been shown to rest on predictions that were wrong and to assure that rates for special access telecommunications services critical to the national economy are just and reasonable.

---

[1] Fifth Report and Order and Further Notice of Proposed Rulemaking, *Access Charge Reform*, 14 FCC Rcd. 14221, ¶¶ 9-10 (1999) ("*Pricing Flexibility Order*").

In particular, in its 1999 *Pricing Flexibility Order*, the FCC ended price cap regulation for special access services in metropolitan statistical areas ("MSAs") where the incumbent local exchange carriers ("ILECs") demonstrated that investments in some alternative transport facilities had been made in wire centers that accounted for specified percentages of special access revenues. The FCC understood that satisfaction of these triggers did not mean that there were alternatives to the ILECs' local "loop" connections to buildings anywhere in the MSA or that there even generally were alternative transport facilities. But the FCC "predicted" that where these "triggers" were satisfied, these alternative facilities would all be quickly constructed, that actual or potential competition would lead incumbents to *reduce* special access rates, and that market forces would enable the FCC to meet its statutory mandate of assuring the availability of this increasingly critical telecommunications service at "just and reasonable" rates.

The FCC's predictive judgments proved wrong. Why they were was wrong, and whether the FCC should have acknowledged that they were wrong long ago, are questions about which there can be debate. But that the predictions were wrong and that special access prices are wildly in excess of reasonable rates is now indisputable. Rather than reduce rates, incumbents have established special access rates in the MSAs where the services have been deregulated that are substantially higher than they would have been if those rates had remained subject to FCC price caps – while preserving market shares well above 90%. Contrary to the FCC's prediction, *no* alternative loop facilities serve the vast majority of commercial buildings in the MSAs in which the incumbents' rates have been deregulated. Using the incumbents' own data that has been filed with the FCC, the incumbents are now earning special access rates of return averaging about 40% in 2002 (and in several cases well over 50%) and obtaining revenues that are over $5 billion more annually than would have been allowed under the last rate of return that was prescribed by

the FCC (in 1990 when capital costs were much higher). Because excessive special access rates increase prices for many of the nation's goods and services, eliminating these overcharges will benefit the national economy as a whole, increasing the gross national product by some $11.6 billion in the first year alone.

This failure of the FCC's predictions became clear almost immediately after the *Pricing Flexibility Order* was issued. The undersigned petitioners and others have repeatedly asked the FCC to revisit the order, and the FCC has repeatedly refused to do so. Over a year ago, the undersigned petitioners again asked the FCC to address this extraordinarily significant issue. AT&T filed a formal petition asking that the FCC begin a rulemaking to address the failure of its earlier regulatory order. And because a rulemaking would not be completed overnight, AT&T also asked the FCC to use its statutory powers to order interim relief, pending the formulation of new rules. Otherwise, because new rules will operate prospectively, billions of dollars of overcharges would be paid by customers without hope of a remedy during the pendency of the rulemaking – with $10 billion in overcharges if the rulemaking took two years.

Over the past year, the petitioners (along with many others) have had numerous meetings with the Commission to urge immediate action on these pending requests, and indeed, petitioners have taken their concerns to the highest levels of the Commission. In these meetings, it has been made clear that the Commission does not intend to take any action in the foreseeable future. Without a writ of mandamus, therefore, petitioners and others harmed by the incumbents' excessive special access rates will continue to endure billions of dollars in annual overcharges, with no adequate remedy. Mandamus is clearly appropriate in such circumstances. *See*, *e.g.*, *TRAC* v. *FCC*, 750 F.2d 70, 79-81 (D.C. Cir. 1984).

The harm from the FCC's failure to rule is immense. Petitioners believe the FCC will need to grant interim relief if and when it acts, but even if the FCC were then somehow to deny relief, petitioners would have a final order to take to this court and to obtain relief here. But despite petitioners' entreaties, it now appears clear that without action from this Court, the FCC is content to allow the overcharges to continue, and to insulate itself from review by the simple expedient of doing nothing. Petitioners thus ask that mandamus be issued to require that the FCC expeditiously rule on the petition for interim relief and institute a rulemaking. This is truly a case where justice delayed is justice denied, with monumental adverse consequences for petitioners and the entire national economy.

## BACKGROUND

To place the issues in perspective, it is necessary to describe (1) the incumbents' special access facilities; (2) the FCC's prior regulation of special access services; (3) the FCC's *Pricing Flexibility Order*; (4) the FCC's subsequent grants of pricing flexibility; (5) the incumbents' response to those grants, and (6) AT&T's October 2002 Petition.

**1. The Incumbents' Special Access Services And Their Critical Importance.** The incumbents' local telephone networks are comprised of local loops, switches, and transport facilities. The local loops are wires that are buried underground in conduits or strung along telephone poles and that connect each home or business in an area to a building containing an "end office" switch that routes calls to their destinations either directly or through other switches. Transport facilities are high-capacity wires that connect end offices to one another, to "tandem" switches that aggregate traffic originating in multiple end offices, and to facilities owned by other carriers, such as wireless, data, and long distance carriers. To offer their services, these other carriers must purchase "access" services that use the incumbents' loop, transport, and in some cases switching facilities to connect end users to their networks.

Special access is a service that is routed over the incumbent's loop and transport facilities, but that is not switched by the incumbent's end office or tandem switches and that instead provides dedicated connections between two points. Such services are economic only when a customer has large volumes of voice or data traffic between the end points of the special access circuit. As petitioners' own diversity reflects, special access customers run the gamut from carriers and telecommunications and information service providers to all types of businesses in every segment of the economy. For example, special access is purchased (by end user customers or by interexchange carriers) to connect end user locations that generate large volumes of long distance traffic to an interexchange carrier's network. Similarly, special access is purchased by wireless carriers to connect their radio towers to their mobile switching centers and is purchased by interexchange carriers or wireless carries to connect their networks to particular tandem or end office switches on the incumbent's network. It is also purchased by Internet Service Providers, other information service providers, and end user customers to obtain dedicated connections between their nodes. Literally, hundreds of billions of dollars of commerce is conducted over special access services.

Indeed, the record before the FCC contained a macroeconomic study that calculated the effects that reduction of special access rates would have on the national economy. It showed that reducing special access from current levels to those that would produce the FCC's prescribed 11.25% rate of return would generate $11.6 billion in new economic activity and some 64,000 new jobs in the first year alone.[2]

---

[2] *See ex parte* Letter from Special Access Reform Coalition To FCC, dated June 12, 2003, attaching P. Rapport, L. Taylor, A. Menko, & T. Brand, *Macroeconomic Benefits from a Reduction in Special Access Prices* (June 2003).

Special access is comprised of three distinct types of facilities: (i) end user channel terminations (*i.e.,* local loops), which connect individual office buildings, mobile telephone tower sites, and other end user premises to an end office node; (ii) interoffice transport facilities, which carry the traffic between the end office and one or more other wire centers of the incumbent's network, and (iii) "entrance facilities," which carry traffic over a typically short distance between the closest wire center of the incumbent (the "serving wire center") and the network of the interexchange carrier, wireless carrier, or information service provider.[3]

All of the transmission facilities used to provide special access services have strong natural monopoly characteristics, and that is most starkly the case with the local loops used to provide channel terminations to end user customers, which is the "most costly and difficult" part of the incumbents' network for new entrants to replicate. *See Verizon Comm.* v. *FCC*, 535 U.S. 467, 490-91 (2002). As the FCC has recently found, loop and transport facilities exhibit economies of scale that give incumbents dramatically lower unit costs over virtually all levels of demand (because, for example, trenching and other "structure" costs are not capacity sensitive),[4] and virtually all the necessary investment must be "sunk" with little or no salvage value.[5] Further, even on routes where deploying alternative facilities could be economically rational, competitive carriers often cannot secure the necessary rights-of-way and building access (or face exorbitant demands from municipalities and building owners to obtain that access that only

---

[3] *Pricing Flexibility Order* ¶¶ 9-10; *see also WorldCom Inc.* v. *FCC*, 238 F.3d 449, 453 (D.C. Cir. 2001).

[4] *See, e.g.*, *Triennial Review Order*, FCC 03-36, CC Docket Nos. 01-338 *et al.,* ¶¶ 303, 370-71 (Aug. 21, 2003); AT&T Petition, Ordover-Willig Dec. ¶¶ 39-40.

[5] *See, e.g.*, *Triennial Review Order* ¶¶ 88, 303, 371, 386, 391; AT&T Petition, Ordover-Willig Dec. ¶¶ 41-43.

heighten the incumbent's cost advantage).[6]  The FCC has found that deployment of alternative facilities is thus generally limited to entrance facilities, to transport facilities on very high density routes, and to very high capacity "OC-n" loops that are the equivalent of thousands of individual telephone lines.[7]

Special access is thus a classic "bottleneck" input.  No matter how extensive or sophisticated a carrier's network, it cannot deliver its services without the "last mile" connection to the customer's building.  And no matter how large the business or government agency, it cannot obtain communications services unless it or its communications services supplier first obtains special access.  In the absence of rate regulation or price-constraining competition between multiple facilities-based special access providers, control of special access facilities conveys monopoly power.[8]

**2.  Regulation of the Incumbents' Special Access Services.**  The incumbents' interstate special access charges are governed by § 201 of the Communications Act, which requires that "[a]ll charges" for and in connection with interstate communications service "shall be just and reasonable" and that prohibits any charges that are "unjust or unreasonable."  47 U.S.C. § 201(b).  The FCC has a "duty to 'execute and enforce the provisions of' the Communications Act" to ensure that rates for special access and other interstate services are "just, fair, reasonable and nondiscriminatory."  *See, e.g., AT&T* v. *FCC,* 572 F.2d 17, 25 (2nd Cir. 1978).

---

[6] *See, e.g., Triennial Review Order* ¶¶ 305, 371; AT&T Petition, Ordover-Willig Dec. ¶¶ 44-45.

[7] *Triennial Review Order* ¶¶ 298, 367, 388.  A DS3 facility is the equivalent of 672 voice-grade lines.  The smallest OC-n capacity, OC-3, is the equivalent of 3 DS3s, or 2,016 lines.  *See id.* ¶ 202 & nn.631, 633-34.

[8] *See, e.g., Pricing Flexibility Order* ¶ 79 (access characterized by bottleneck facilities, "short-run monopoly power, low elasticity of demand, and high profits in the absence of regulatory or competitive constraints").

Initially, the FCC regulated the incumbents' special access services under a rate-of-return regime, in which the incumbents were allowed to charge rates to recover their cost of providing service plus a reasonable rate of return, which the FCC last set at 11.25% in 1990. *WorldCom Inc.* v. *FCC*, 238 F.3d 449, 453 (D.C. Cir. 2001). In 1990, based upon concerns that rate-of-return regulation did not provide appropriate incentives to reduce costs and operate efficiently, the FCC shifted to "price cap" regulation. *See* 47 C.F.R. § 61.41-.49; *see also Pricing Flexibility Order* ¶ 172. Under the price cap system, the FCC prescribes a maximum rate level for a set of services, and the incumbents' access rates are subject to streamlined review as long as the level of those rates are below the FCC-prescribed caps. The FCC divided the LECs' access services into four "baskets," and it "set separate price caps for each basket in order to limit a LEC's ability to cross subsidize among groups of services." *Nat'l Rural Telecom Ass'n* v. *FCC*, 988 F.2d 174, 181-82 (D.C. Cir. 1993). Special access services are confined to their own basket. 47 C.F.R. § 61.42(d)(5).

The FCC set the initial caps at the rate levels that had obtained under the rate-of-return regime. The caps were adjusted each year for inflation and for expected LEC improvements in productivity, in an effort to keep the caps in line with the LECs' costs. By 1995, however, it had become obvious that the FCC's selected productivity adjustment was too generous, and as a result the LECs' observed interstate rates of return were routinely well above the expected return of 11.25%. *See Bell Atlantic Tel. Cos.* v. *FCC*, 79 F.3d 1195, 1202 (D.C. Cir. 1996) (the FCC had expected returns above 12.25% to be "rare," but in fact they "had become routine"). Accordingly, the FCC adopted a new, higher productivity adjustment and it also reinitialized the caps to set them where they would have been if the FCC had adopted the higher productivity

adjustment from the beginning.  The LECs appealed the FCC's reinitialization of the caps, but this Court affirmed the FCC's order in full.  *See Bell Atlantic*, 79 F.3d at 1202-05.

The 1995 reinitialization of price caps proved to be only a temporary fix, however, and throughout the late 1990s, special access customers again urged the FCC to take action to reduce the incumbents' inflated access rates.[9]  At the same time, the incumbents, citing emerging competition on a few transport routes in the most urban areas and activity that they claimed portended substantial future competition, urged the FCC to grant them greater pricing flexibility for special access services.

**3.  *Pricing Flexibility Order*.**  The FCC had first raised the possibility of special access pricing flexibility in a notice of proposed rulemaking issued in 1995.  The FCC proposed to apply the same analysis that it had applied when it streamlined regulation of AT&T's services: *i.e.*, pricing flexibility would be awarded only after a determination that the services at issue were subject to actual price-constraining competition, as determined by thorough analyses of market share, demand responsiveness, supply responsiveness, and pricing behavior.[10]  The FCC noted that when it granted comparable pricing flexibility to AT&T, AT&T's competitors had ubiquitous, alternative long distance networks in place with excess capacity that could immediately absorb a substantial percentage of AT&T's traffic, and the FCC therefore proposed that "the relative supply capacities of the LECs' competitors should be an important factor to be

---

[9] *See, e.g.*, Access Charge Reform, CC Docket No. 96-262 et al., Comments of AT&T Corp. (Jan. 29, 1997); Request for Amendment of the Commission's Rules Regarding Access Charge Reform and Price Cap Performance Review for Local Exchange Carriers, Comments of AT&T Corp. (Jan. 30, 1998) & Reply Comments of AT&T Corp. (Feb. 17, 1998); Access Charge Reform, et al., CC Docket No. 96-262, et al., Comments of AT&T Corp. to Refresh the Record (Oct. 26, 1998); Petition of Ameritech for Forbearance from Dominant Carrier Regulation, CC Docket No. 99-65, AT&T Corp. Opposition & Exhibit A (Declaration of Janusz A. Ordover and Robert D. Willig) (March 31, 1999).

considered" when determining whether pricing flexibility is warranted.[11]   The FCC reiterated these tentative conclusions in its 1996 access reform notice of proposed rulemaking.  *See Notice of Proposed Rulemaking, Access Charge Reform, et al.*, 11 FCC Rcd. 21354, ¶¶ 149-50 (1996).

In 1999, however, the FCC abandoned these proposals and instead issued the *Pricing Flexibility Order*, which relied on new bright-line "triggers" that had been proposed by the incumbents in *ex parte* letters.[12]   Instead of an analysis of the actual competitive conditions in special access markets, the triggers focus on "collocation" – a competitor's placement of equipment at a price cap LEC's wire centers in order to interconnect with the LEC facilities at that wire center.  *See Pricing Flexibility Order* ¶ 81.   The FCC predicted that "operational collocations" would prove to be a reliable proxy for actual price-constraining competition, reasoning that any competitor that had placed equipment (and sunk investment) at a wire center would continue to rely upon the LEC's special access facilities only "on a transitional basis" and would rush "to extend its own facilities to reach its customers." *Id.* ¶ 104.

The FCC adopted one set of triggers for channel terminations and a different set that apply to dedicated transport and entrance facilities.  For both sets of triggers, relief is provided in two "phases."   If a price cap LEC meets the Phase I trigger in a metropolitan statistical area ("MSA"), it may offer contract tariffs and volume and term discounts for the applicable services throughout that MSA.  If a price cap ILEC meets the Phase II trigger, it is entirely free of rate structure and price cap rules for the given services throughout that MSA.  As noted below,

---

[10] *See* Second Further Notice of Proposed Rulemaking, *Price Cap Performance Review for Local Exchange Carriers,* 11 FCC Rcd. 858, ¶ 133 (1995).

[11] *See id.* ¶¶ 140-41.

[12] *See Pricing Flexibility Order* ¶¶ 115-17.

incumbents have obtained Phase II relief in over 150 MSAs – and for channel terminations as well as dedicated transport in over 75 MSAs.

To obtain Phase II relief for dedicated transport services, a price cap ILEC must show collocation in 50% of wire centers within the applicable MSA or in wire centers accounting for at least 65% of revenues for the services at issue.  *Id.* ¶¶ 148-49; *id.* ¶ 82.  Phase II relief is available for channel terminations upon a showing of collocation in 65% of wire centers within the applicable MSA or in wire centers accounting for at least 85% of revenues for the services in question.  *Id.* ¶ 50.

The applicant ILEC also must show that, for each wire center relied upon to meet the trigger, there is at least one competitor using a transport facility provided by a non-ILEC on a particular point-to-point transport route.  But satisfaction of the trigger says nothing about the existence of alternative transport on *other* routes.  Even more fundamentally, the FCC recognized that satisfaction of this collocation/transport trigger did not "measure competition for channel terminations."  *Id.* ¶ 104.  Instead, the FCC predicted that new market entrants would "extend" their facilities to include channel terminations that reach end users.  *Id.*

At the same time, the FCC acknowledged the "theoretical possibility" that granting across the board rate deregulation on an MSA-wide basis could enable LECs to engage in exploitative behavior.  *Pricing Flexibility Order* ¶ 83.  But the FCC predicted that this would not occur and that an incumbent's satisfaction of the Phase II triggers would signal that "almost all special access customers" in that MSA have "competitive alternatives."  *Id.* ¶ 142.  Thus, while the FCC believed that rates on certain routes might increase, the FCC predicted that the incumbents would generally use their new pricing freedom to reduce special access rates to

match the lower rates charged by CLECs and that overall rates would be lower than under price cap regulation. *Id.* ¶ 154.

This Court affirmed the *Pricing Flexibility Order* on the ground that it rested on predictions which were not unreasonable and to which the Court had to defer. Specifically, this Court deferred to the FCC's predictive judgment that the level of collocation could be an accurate "measure of competition in a given market and predictor of competitive constraints upon future LEC behavior." *WorldCom*, 238 F.3d at 459. The Court noted that "[t]he FCC readily admits that its decision to adopt the thresholds contained in the *Pricing Flexibility Order* was dependent, at least in part, on the agency's predictive forecasts," and held that the agency's "reasonable prediction deserves our deference, notwithstanding that there might also be another reasonable view." *Id.* (quotations omitted); *see also id.* at 462 ("the FCC made a predictive judgment that the amount of collocation required for each trigger will be sufficient to constrain anticompetitive practices by incumbent LECs").

The FCC had issued its *Pricing Flexibility Order* at the height of the boom in telecommunications that occurred in response to the Telecommunications Act of 1996 and the explosion of dot.coms in the late 1990s. During this era, start-up companies like Qwest, Global Crossing, XO, Adelphia, and Enron had announced plans to construct alternative networks and had raised hundreds of millions of dollars in capital. Almost immediately thereafter, the bubble burst; access to capital evaporated; and scores of firms that had announced ambitious plans to construct alternative transmission networks ceased operations or went into bankruptcy. *See, e.g.*, AT&T Reply Comments at 18-20.

**4. The Incumbents' Initial Requests For Pricing Flexibility**. Shortly after, issuance of the *Pricing Flexibility Order*, the incumbents filed requests to obtain Phase II pricing flexibility

for transport and channel terminations in metropolitan statistical areas that represent the largest markets and that collectively contain about half the nation's population.  In addition to questioning whether the collocation triggers had been satisfied,[13] AT&T and other carriers opposed the requests on the ground that the earlier prediction that the triggers are proxies for alternative facilities was incorrect in these MSAs, for there was no actual or potential competition that could constrain the incumbents' special access prices.[14]  For example, AT&T showed that, regardless of whether the triggers were met, AT&T and other purchasers of special access service remained almost entirely dependent upon the incumbents' special access, purchasing well over 90% of their needs from the incumbents, despite aggressive efforts to find other sources that would have been available if the FCC's predictions were accurate.[15]  However, the FCC refused to waive or reconsider its rules or otherwise even to consider this evidence.  It held that "an inquiry into the level of competition is not required" and that pricing flexibility would be granted whenever the mechanical triggers were met.[16]  Based on these truncated

---

[13] AT&T and others had argued that incumbents were relying on collocations that were not operational or that had been established by carriers that had gone bankrupt or ceased operations. But the FCC barred petitioners from supporting these claims.  In particular, the FCC barred any carrier from obtaining information about another carrier's facilities (which was deemed proprietary) on the ground that even defunct or financially distressed carriers would somehow respond and rebut the incumbents' claims.  *See, e.g.*, Memorandum Opinion and Order, *BellSouth Petition for Pricing Flexibility*, 15 FCC Rcd. 24588, ¶¶ 16-17 (2000).

[14] *See, e.g.*, Opposition of AT&T Corp., CCB/CPD No. 00-28, at 1-8 (Jan. 2, 2001) & Stock Dec. ¶¶ 3-5.

[15] *Id.*

[16] Memorandum Opinion and Order, *BellSouth Petition for Pricing Flexibility*, 16 FCC Rcd. 18174, ¶ 12 (2001).  *See also, e.g.*, Memorandum Opinion and Order, *Verizon Petition for Pricing Flexibility*, 18 FCC Rcd. 6237, ¶ 11 (2003); Memorandum Opinion and Order, *BellSouth Petition for Pricing Flexibility*, 16 FCC Rcd. ¶ 12 (2001); Memorandum Opinion and Order, *Petition of Ameritech et al. for Pricing Flexibility*, 16 FCC Rcd 5889 (2001); Memorandum Opinion and Order, *Verizon Petitions for Pricing Flexibility for Special Access and Dedicated Transport Services*, 16 FCC Rcd 5876, 5881 (2001); *BellSouth Pricing Flexibility Order*, 15

analyses, incumbents were granted complete Phase II pricing flexibility in nearly half of the country, and virtually all of the largest markets, by 2001.[17]

Ironically, at the same time the FCC was granting the incumbents pricing flexibility based on the triggers that were deemed proxies for competition, other regulators examined actual marketplace conditions and concluded that the incumbents retained "continued dominance" over special access services even in the areas of the country where competition was most developed.[18] For example, in 2001, the New York Public Service Commission ("NYPSC") analyzed a detailed record regarding deployment of special access facilities, including route miles of fiber, numbers of buildings passed and, most significantly, numbers of buildings actually connected to ILEC competitors. It concluded that "Verizon's combined market share data demonstrates its continued dominance in all geographic areas," even in Manhattan, the area with the most competitive activity of any in the nation.[19]  Far from showing that alternatives to Verizon's facilities had been deployed, the NYPSC's study found that "competitors rely on Verizon's

---

FCC Rcd 24588 (2000); *BellSouth Petition for Phase I Pricing Flexibility for Switched Access Services*, 16 FCC Rcd 5040, 5052 (2001).

[17] *See, e.g., BellSouth Petition for Pricing Flexibility*, 16 FCC Rcd. 86 (2000) (Phase II relief granted for 38 MSAs, including Monroe, LA and Wilmington, NC); *Verizon Petitions for Pricing Flexibility*, 16 FCC Rcd. 5876, nn.26, 28 (granting Phase II for relief for, *inter alia*, Parkersburg, WV, Binghamton, NY, Willamsport, PA, and Hagerstown, MD); *Petition of Ameritech Ill., et al.*, 16 FCC Rcd. 5889, nn.26-26 (2001) (granting Phase II relief for, *inter alia*, Rockford, IL, Kalamazoo, MI, Springfield, IL, Lubbock, TX and Topeka, KS); *Qwest Petition for Pricing Flexibility*, 17 FCC Rcd. 7363 (2002) (granting Phase II relief for, *inter alia*, Owensboro, KY, Burlington, NC, and Clarksville, TN-Hopkinsville, KY).

[18] Opinion and Order Modifying Special Services Guidelines for Verizon New York Inc., Conforming Tariff, and Requiring Additional Performance Reporting, 211 P.U.R.4th 190 (NYPSC 2001) ("NYPSC Special Access Order").

[19] The NYPSC found that in New York City, for example, "Verizon has 8,311 miles of fiber compared to a few hundred for most competing carriers; Verizon has 7,364 buildings on a fiber network compared to less than 1,000 for most competing carriers." *Id.* at 7. Further, Verizon's own data showed that "a maximum of 900 buildings [are] served by individual competitors' fiber

14

facilities," and that "Verizon represents a bottleneck to the development of a healthy, competitive market for Special [Access] Services." *Id.* at 9.[20]

Further, the FCC acknowledged the evidence of lack of competition in other contexts. Because there was no special access competition to discipline the incumbents, purchasers of the incumbents' special access services had repeatedly implored the FCC to adopt performance standards for the incumbents' provision of special access services, and they had documented the egregiously poor and discriminatory service that the lack of competition enabled the incumbents to provide.[21] The FCC recognized that this evidence was substantial, for it issued a notice of proposed rulemaking that sought comments on the customers' claims and on the performance standards that were proposed. *See* Notice of Proposed Rulemaking, *Performance Measures and Standards for Special Access Services*, 16 FCC Rcd. 20896 (2001). Further, the records in proceedings to implement the unbundling requirements of the Telecommunications Act of 1996 contained overwhelming evidence (that the FCC later accepted) that there generally were no competitive alternatives to incumbents' loops and transport due to their natural monopoly characteristics. But despite the findings of other regulators and the FCC's own

---

facilities," but New York City has "775,000 buildings in the entire city, over 220,000 of which are mixed use, commercial, industrial, or public institutions." *Id.* at 7-8.

[20] Further, the NYPSC concluded that Verizon "provides special [access] wholesale services in a discriminatory manner," that "delays" in provisioning "indicate Verizon's provision of Special [Access] Services is below the threshold of acceptable quality," and that "Verizon treats other carriers *less favorably* than its retail customers" (*id.* at 6) – behavior that is starkly inconsistent with a competitive market where customers have access to alternative suppliers. Consistent with these findings, other state commissions have also concluded that the incumbents' special access provisioning was inferior. MPUC Docket No. P-421/C-99-1183, *Complaint of AT&T Comm. Of the Midwest Inc. Regarding Access Services*, 2000 Minn. PUC Lexis 53, *34 (Aug. 15, 2000); CPUC Docket No. 99F-404T, *AT&T Comm. of the Mountain States, Inc.* v. *U S West Comm., Inc.,* Decision No. R00-128, at II.D, F, G (Feb. 7, 2000).

[21] *See Notice*, 16 FCC Red. 20896, ¶ 1 & n.3, ¶¶ 3-4 (citing letters and petitions filed on May 17, 2000; July 12, 2001; Aug. 6, 2001; Sept. 4, 2001; Oct. 30, 2001).

acknowledgement of the evidence of lack of competitive alternatives to incumbents' special access circuits, the FCC continued to treat the satisfaction of the triggers as proxies for actual competitive constraints on incumbents' pricing and to allow incumbents to provide special access service free of price cap or any other regulation

**5. The Incumbents' Response to Pricing Flexibility.**  The incumbents' response to the grants of pricing flexibility was also exactly the opposite of what the FCC predicted.  Rather than reduce overall rates in each MSA where they were granted Phase II pricing flexibility (*see Pricing Flexibility Order* ¶¶ 60, 154), the incumbents have established that are substantially higher than they would have been if those rates had remained subject to FCC price caps.[22] Verizon and Qwest, in fact, raised rates in every MSA in which they have received Phase II relief – including rates for services in the central business districts of large cities like New York and Boston where competition is most developed.  AT&T Reply Comments at 22.  As a result, the incumbents' rates in purportedly competitive areas where they have received Phase II pricing flexibility substantially exceed the rates in areas with rates governed by price caps:  for example, Verizon's month-to-month charges for DS3 channel termination rates where it has obtained relief exceed the rates in price-capped areas by more than 70 percent.  *Id*.

As a result of these price increases, the incumbents have earned unprecedented returns on their special access services.  In 2001, two years after the *Order* and the year after the first request for pricing flexibility was granted, the incumbents' rates of return for special access averaged over 38 percent – and one incumbent (the combined SBC companies) earned a 55 percent rate of return, nearly quintuple the 11.25 percent rate of return that the Commission had

---

[22] *Compare MCI WorldCom Inc.* v. *FCC*, Nos. 99-1395 *et al.*, Brief of Intervenors BellSouth, SBC, Verizon, and Qwest in Support of FCC, at 11 (filed August 4, 2000) (pledging that relief

found to be just and reasonable in 1990, when inflation and borrowing rates were much higher than in recent times.[23]  In 2002, the *average* rate of return approached an average of 40%.[24] These special access rates and returns provided the incumbents with revenues of more than $5 billion in excess of the 11.25% return found reasonable under price cap regulation.  AT&T Petition at 9.

Further, these price increases occurred while the incumbents' performance in filling special access orders was steadily deteriorating, and the price increases (and deterioration in service) did more than tax customers with excessive charges.  It also impeded competition in long distance markets that the largest incumbents (the BOCs) had been permitted to enter under § 271 of the Act.  Special access is essential to the provision of these services, and BOCs were (and are) using inflated special access rates to effect price squeezes that impeded this competition.  *See* AT&T Petition at 23-24.

**6. The October 2002 Petition.**  When the FCC had not taken any action to reform its rules by late 2002, AT&T filed a petition for rulemaking that asked the FCC (1) to institute a notice of proposed rulemaking to vacate its *Pricing Flexibility Order* and reform its access charge regulations and (2) to grant interim relief against the $5 billion in annual overcharges, pending adoption of new rules.

---

was necessary and would allow the incumbents to "reduce their rates in lower-cost areas") (emphasis added).

[23] *See* AT&T Petition at 8; AT&T Reply Comments at 37 & Selwyn Dec. ¶ 67.  These returns have consistently and significantly trended upward, reflecting increases in every year, for every incumbent, from 1996 though 2001.  *See* AT&T Petition at 9-10 & Friedlander Dec. ¶ 5 & Exh. 1; AT&T Reply Comments at 38 & n.108.

[24] *Ex Parte* Letter from Brian Moir, Counsel for E-Commerce and Telecommunications Users Group, to Marlene Dortch, FCC, at 4 (June 12, 2003).

This Petition demonstrated once again that the FCC's predictive judgment in the *Pricing Flexibility Order* was wrong, and that there was no basis for maintaining either these rules or the exemptions from price caps in those MSAs where triggers had been found to be met.

*First*, contrary to the FCC's prediction, the Petition showed that price-constraining competition between facilities-based special access providers does not exist in MSAs where the collocation triggers are met.[25]  It showed that alternatives to the incumbents' channel termination (local loops) facilities existed only in rare instances.  It further showed that, on the vast majority of routes where carriers or businesses need special access, there are also no alternatives to the incumbents' transport facilities.

For example, AT&T spends billions of dollars each year on special access, owns one of the largest non-ILEC networks of alternative special access facilities, and follows a policy of using its own or a competitive carrier's facilities wherever that is possible.  But AT&T is a captive customer of ILEC special access services with respect to more than *95 percent* of the nearly 200,000 commercial buildings it serves through special access.[26]  AT&T showed that the lack of competitive facilities is most acute with respect to the end-user channel terminations that connect to individual buildings.  With the limited exception of buildings served by the very highest capacity facilities ("OCn-level" circuits that carry traffic from thousands of lines),

---

[25] *See* AT&T Petition at 25-28 & Thomas Dec.  *See also* Comments of AT&T Wireless at 6 (RM No. 10593, Dec. 2, 2002) ("AWS has been unsuccessful in getting any of the BOCs to engage in serious contract negotiations in areas where the BOC has obtained pricing flexibility"); Comments of Cable & Wireless at 13 (RM No. 10593, Dec. 2, 2002) ("non-ILEC vendors" account for only 10% of Cable & Wireless' transport needs for 2002); Comments of Sprint at 3 (RM No. 10593, Dec. 2, 2002) (Sprint is forced to "rely upon the ILECs for approximately 93%" of its transport needs "despite aggressive attempts to self-supply and switch to CLEC-provided facilities wherever feasible"); WorldCom at 9 (RM No. 10593, Dec. 2, 2002) (reporting the existence of competitive LEC fiber to only 11% of buildings where WorldCom needs access).

[26] AT&T Reply Comments at 13-14 & Selwyn Dec. ¶¶ 9, 19-20 & Tables 6-8.

commercial buildings are generally never served by competing channel terminations.[27]   In particular, "DSn-level" facilities are used to serve the majority of businesses and constitute the majority of expenditures on special access services, but there are virtually no alternative channel termination facilities at those capacities.[28]   Facilities-based transport competition is somewhat more common, but even there, competitive facilities exist on only a small minority of routes, as the FCC has recently confirmed.[29]

*Second*, the Petition showed that the FCC's prediction that granting Phase II pricing flexibility would lead to lower rates was flatly wrong, for incumbents have not lowered but generally have raised prices in response to the relief that the FCC had afforded them, and rates in deregulated areas were routinely higher than they would have been under price caps.[30]   The Petition also showed incumbents now earn annual rates of return of up to 50 percent or more on their interstate special access services and that special access customers now pay the incumbents and other ILECs over $5 billion more than they would be charged under rates pegged to produce the target 11.25% rate of return that the FCC authorized in 1990 (when interest rates were much higher).   A study released in June 2003 demonstrated that such reductions in special access

---

[27] *See*, *e.g.,* AT&T Reply Comments at 13-14.

[28] *See* AT&T Reply Comments, Ordover-Willig Dec. ¶¶ 22-31.

[29] *See*, *e.g., Triennial Review Order* ¶¶ 378, 387, 391-92.  Wireless companies also depend upon special access to transport traffic between cell stations and their switches.  In order to meet consumer demand, wireless companies are increasingly locating cell stations in the outer suburbs and rural areas.  Further, wireless carriers, like long distance and broadband data providers, usually require only DSn-level transport, and there are generally *no* bypass facilities in these areas.  *Ex Parte Letter* from Doug Bonner to Marlene Dortch, at 1-2 (filed in CC Docket 01-338, Jan. 6, 2003) ("T-Mobile *Ex Parte*"); Comments of AT&T Wireless at 2-3 (RM No. 10593, Dec. 2, 2002).

[30] *See*, *e.g.,* AT&T Reply Comments, Selwyn Dec. ¶¶ 4-14.

pricing would add an annual $14.5 billion to the U.S. economy and create 132,000 jobs in the first two years alone.[31]

In light of this evidence, AT&T and other commenters requested that the FCC (1) on an interim basis, immediately reduce all special access charges for services currently subject to Phase II pricing flexibility to levels that would produce an 11.25% rate of return and impose a moratorium on consideration of further pricing flexibility applications, and (2) initiate a rulemaking to vacate the *Pricing Flexibility Order* and to further reform its rate regulation.

The incumbents' responses to the Petition did not deny the critical facts, and these are undisputed.  First, even though incumbents uniquely possess the relevant data, they put in no evidence regarding the routes where they face competition.  They did not even attempt to show that alternative transport, much less alternative loops, are generally available for special access customers in areas where the triggers were found satisfied.[32]  Second, the incumbents did not deny that they had established higher special access rates throughout MSAs where they had been afforded pricing flexibility than they charged in areas that were still under price caps.[33]  Finally,

---

[31] *See* P. Rappaport, L. Taylor, A. Menko, and T. Brand, "Macroeconomic Benefits from a Reduction in Special Access Prices," attached to Letter from Special Access Reform Coalition to FCC, RM Docket No. 10593, dated June 12, 2003.

[32] The incumbents' sole response was to produce an unsworn "fact report" that was authored by their lawyers, and that was meaningless.  Its "facts" consisted largely of pre-bubble press releases that hyped announcements in 2000 of planned network expansions, without any evidence that such expansions occurred and resulted in facilities that are adequate replacement for ILEC facilities.  *Compare* "Competition for Special Access Services," attached to Opposition of Verizon (Dec. 2, 2002), with AT&T Reply Comments at 16-19.  The incumbents also pointed to aggregated, and generalized, national data regarding fiber transmission deployment for long distance as well as local services.  But that fiber has been deployed for some purposes says nothing about the availability of alternative loops and transport on point-to-point "last mile" routes.

[33] Rather than deny rate increases, the incumbents noted only that the *Pricing Flexibility Order* (¶ 155) expressly acknowledged the possibility of some rate increases on some routes.  *See, e.g.,* Verizon Opposition at 25.  But as AT&T explained and as the incumbents did not dispute, the

incumbents were unable to rebut the overwhelming evidence that they earned excessive returns on special access services.[34]

In the face of these undisputed facts, industry participants repeatedly urged the FCC to act on the petition and provide relief from these unjust special access rates.[35]  Yet just as the FCC had refused to address the same claims in prior years, the FCC has taken no action or otherwise instituted proceedings to review its regulations governing rates for special access services.[36]

FCC predicted that rates would decline *overall*.  *See* AT&T Reply Comments at 30.  It was undisputed that they had not.

[34] The incumbents claimed that special access revenues have declined on a per line basis, but AT&T showed that the incumbents used average figures that concealed small per line rate declines from 1997 to 2000 that abruptly switched to per line rate increases in 2001, when the FCC began to grant Phase II deregulation.  AT&T Reply Comments at 27-29.  Further, AT&T explained that, because the per line costs the incumbents reported in 2001 are barely half the levels reported in 1997, even if rates had remained constant, they would be excessive in light of the fact that costs were declining 10 to 20 times faster.  *Id.* at 5, 29.

[35] *See, e.g.,* July 18, 2003 Letter from Brian Moir, Counsel to SPARC Coalition, to Marlene Dortch; May 1, 2003 Letter from SPARC Coalition to FCC Commissioners; June 12, 2003 Letter from SPARC Coalition to Marlene H. Dortch, FCC; ENTUA Feb. 7 *Ex Parte*.

[36] The FCC could have ameliorated the problem in its recent *Triennial Review Order*, FCC 03-36 (Aug. 21, 2003), where the FCC implemented § 251(c)(3)'s requirement that incumbent LECs provide requesting carriers access to network facilities at cost-based rates if those carriers would be "impaired" without such access.  The FCC there found that, with the exception of OC-n level loops and transport of more than ten DS3s of capacity, competitive carriers are impaired without access to incumbent facilities, and competing local exchange carriers may access these facilities at cost-based rates.  *See id.* ¶¶ 298-327 (loops), ¶¶ 370-93 (transport).  The FCC relied on marketplace and economic facts that showed that alternative loop and transport facilities have not been deployed and could not be expected to be economically or operationally deployed.  *Id.* ¶ 84.

Notably, the FCC rejected incumbents' claims that satisfaction of the *Pricing Flexibility Order*'s triggers has any relevance.  It observed that because its pricing flexibility rules require "only a single collocated competitor and the purchase of substantial amount of special access in a concentrated area [for deregulation of special access rates], this test *provides little indication that competitors have self-deployed alternative facilities, or are not impaired outside of a few highly concentrated wire centers*.  Additionally, the pricing flexibility trigger based on alternative transport collocation requires *no* consideration of the ubiquity of competitive transport facilities throughout the MSA."  *Id.* ¶ 397 (emphasis added).

However, while the FCC otherwise granted carriers the right to purchase high capacity loop and transport facilities at cost-based rates, it dramatically limited the ability of carriers to use these

**ARGUMENT**

The Administrative Procedure Act ("APA") directs federal agencies to conclude matters presented to them "within a reasonable time" (5 U.S.C. § 555(b)) and provides that federal courts shall "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). A writ of mandamus lies to implement these requirements. *See*, *e.g.*, *Radio-Television News Directors Ass'n* v. *FCC*, 229 F.3d 269 (D.C. Cir. 2000) (agency action unlawfully withheld); *Air Line Pilots Ass'n* v. *CAB*, 750 F.2d 81, 86 (D.C. Cir. 1984) (agency action unreasonably delayed). In the instant application, petitioners are complaining about agency action that is "unlawfully withheld" as well as action that has been "unreasonably delayed."

First, petitioners challenge agency action "unlawfully withheld." The terms of the Act and the decisions of this Court establish that the FCC is obligated to monitor marketplace conditions and to ensure the accuracy of the predictions that it made in its *Pricing Flexibility Order* to justify exempting dominant carriers from regulations designed to prevent them from charging supracompetitive rates. The FCC has failed to discharge its obligation to monitor MSAs where "triggers" are met and to determine whether sufficient facilities-based competition, in fact, exists to render rate regulation unnecessary. Here, the undisputed facts establish that the FCC's predictions have not come to pass and that the existing FCC rules produce "creamy returns" that are thus "unjust and unreasonable" under settled law. *Farmers Union Cent. Exchange Inc.* v. *FERC*, 734 F.2d 1286, 1502-03 (D.C. Cir. 1984). Whenever the FCC takes up

---

facilities to self-provide special access services to themselves and thereby avoid the incumbents' excessive special access charges. The FCC held that carriers could not use these "unbundled network elements" solely to bypass incumbent access services. *Triennial Review Order* ¶ 153. Instead, under the FCC's rules, a carrier can use high capacity loop and transport elements for its own special access needs only if it also provides local telephone services. *Id.* ¶¶ 591, 597. In addition, in determining what constitutes a "qualifying" local service, the FCC does not count local data services. *See id.* ¶¶ 603-11; 47 C.F.R. § 51.318.

this matter, it will thus be obligated (1) to vacate its pricing flexibility rules, thereby subjecting special access rates in Phase I and Phase II pricing flexibility MSA to the background "price cap" rules, and (2) to address whether regulations should otherwise be overhauled to assure that rates are just and reasonable. This Court can issue a writ of mandamus directing the FCC to do precisely that.

Second, at a minimum, this is a case in which agency action has been "unreasonably delayed." Over the past four years, the FCC has repeatedly failed to discharge its duty to assure that the "predictions" that underlie its *Pricing Flexibility* rules have been validated by actual marketplace experience and that its deregulatory order is not producing excessive rates in violation of § 201(b) of the Act. The dispositive facts warranting the requested relief are undisputed and indisputable. Moreover, the adverse consequences of the FCC's inaction are immense, for the existing rules are imposing an annual $5 billion tax on businesses that are at the heart of the national economy, reducing the gross national product by some $11.6 billion, and further threatening competition in long distance, wireless, and information service markets. Under the "rule of reason" that governs these matters (*see TRAC* v. *FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984)), the FCC's delay is plainly unreasonable and grounds for mandamus relief.

1. Section 201 of the Communications Act prohibits rates that are "unjust and unreasonable," and it imposes a duty on the FCC to ensure that special access and other rates are just and reasonable. *AT&T v. FCC,* 572 F.2d 17, 25 (2d Cir. 1978). It violates the Act for the FCC to permit incumbent LECs to earn excessive returns. *Illinois Bell Tel. Co.* v. *FCC*, 988 F.2d 1254, 1260 (D.C. Cir. 1993). It is a violation of those requirements for an agency to adopt

deregulatory measures that allow firms to earn "creamy returns" at the public's expense. *Farmers Union Cent. Exchange Inc.* v. *FERC*, 734 F.2d 1486, 1502-03 (D.C. Cir. 1984).[37]

The FCC's 1999 *Pricing Flexibility Order* deregulated the special access rates of incumbent LECs by ending price cap regulation in MSAs where certain "triggers" had been shown to be satisfied. The FCC did so based on highly tenuous "predictions" that the existence of collocations established (1) that there generally would be competition for special access facilities in the MSA and (2) that ending price cap regulation would generally result in lower rates in the MSAs where the triggers were found to be satisfied. In upholding the FCC's order, this Court concluded that the FCC's collocation triggers was "an admittedly imperfect measure of competition" but plausible enough initially to survive arbitrary and capricious review because of the deference due "the agency's predictive forecasts." *WorldCom*, 238 F.3d at 459.

It is well settled that when an agency adopts regulations based on such predictions, it is under a "correlative *duty* to evaluate its policies over time to ascertain whether they work – that is, whether they actually produce the benefits the Commission originally predicted they would." *Bechtel* v. *FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992) (emphasis supplied). As this Court has stated, it is "settled law that an agency may be forced to reexamine its approach if a significant factual predicate of a prior decision . . . has been removed." *Id.* Further, these principles have special force when agencies deregulate rates based on such predictive judgments. As this Court has stated, the FCC must then "vigilantly monitor the consequences of its rate regulation rules." *American Civil Liberties Union* v. *FCC*, 823 F.2d 1554, 1565 (D.C. Cir. 1987). And, "[i]f, in

---

[37] *See also Potomac Elec. Power Co.* v. *Public Utils. Comm'n of the District of Columbia*, 158 F.2d 521, 523 (D.C. Cir. 1947) (when a carrier's "returns have greatly exceeded a fair percentage of return upon a fair base, it follows as a matter of law that the rates charged . . . instead of being 'just and reasonable' as the law requires them to be, have been excessive") (internal quotation omitted).

light of actual market developments, the Commission determines that competition is not having the anticipated effect on access charges," the agency is required to "revisit the issue" and vacate any rule that is producing unreasonable charges.[38]

Here, there is not the slightest doubt that the FCC is under a duty to revisit its *Pricing Flexibility Order*. It is undisputed that the actual marketplace evidence – including the findings that the FCC has itself made in other contexts – establish that the predictions underlying the *Pricing Flexibility Order* have been proven false. First, contrary to the FCC's prediction, almost uniformly there are no competitive alternatives to incumbents' special access services in MSAs where the triggers have been satisfied. Second, and most fundamentally, the rate deregulation has not produced lower rates, but generally produced higher ones – with the result that there are higher special access charges in the purportedly "competitive" MSAs in which rates have been deregulated than in the MSAs that remain subject to price cap regulation.

Further, when the FCC revisits the issue, the result is "preordained." *Radio-Television News Directors Ass'n,* 229 F.3d at 272. In the face of the undisputed facts and the "creamy" returns that the FCC's *Pricing Flexibility Order* has produced, there can be no justification for retaining these rules, and the FCC will then be required to vacate them and to establish meaningful interim relief, pending the adoption of reformed access regulations. Because the FCC has "unlawfully withheld" relief that it is under a statutory duty to grant, the Court should issue a writ of mandamus that orders it.

---

[38] *Texas Office of Public Utility Counsel* v. *FCC*, 265 F.3d 313, 325 (5th Cir. 2001); *see also SWBT* v. *FCC*, 153 F.3d 523, 547 (8th Cir. 1998) (same); *CELLNET* v. *FCC*, 149 F.3d 429, 442 (6th Cir. 1998) ("[i]f the FCC's predictions about the level of competition do not materialize, then it will of course need to reconsider its [regulations] . . . in accordance with its continuing obligation to practice reasoned decision-making"); *AFL-CIO* v. *Brock*, 835 F.2d 912, 916-17 (D.C. Cir. 1987) ("courts recognize that agencies must respond to changed circumstances to carry out Congress' purposes").

2. At the very least, the FCC is guilty of "unreasonable delay," and a writ should issue that requires the FCC within 45 days to initiate proceedings to address petitioners' claims. In determining whether agency action has been unreasonably delayed, this Court applies a "rule of reason" that addresses the magnitude of the harms that the delay has caused, the extent to which the agency has violated a clear statutory duty, the extent to which decision of the matter would divert the agency from other matters, the complexity of the matter, and whether the agency acted in bad faith. *TRAC*, 750 F.2d at 79-80. These factors all support issuance of the writ.

*First*, the magnitude of the harm resulting from delay is immense. The special access rates annually impose over $5 billion in excessive charges on the price cap ILECs' customers. This Court has held that "[e]conomic harm is clearly an important consideration and will, in some cases, justify court intervention." *Cutler* v. *Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1987). The Court has thus ordered relief for unreasonable delays in rate proceedings where far lesser amounts were at issue. *See, e.g., Midwest Gas Users Association* v. *FERC*, 833 F.2d 341, 359-60 (D.C. Cir. 1987); *TRAC*, 750 F.2d at 80-81; *MCI Telecomms. Corp.* v. *FCC*, 627 F.2d 322, 345-46 (D.C. Cir. 1980); *Nader* v. *FCC*, 520 F.2d 182, 206-07 (D.C. Cir. 1975); *Potomac Electric Power Co.* v. *ICC*, 702 F.2d 1026, 1030, 1035 (D.C. Cir. 1983).

Further, the FCC's inaction is particularly harmful because excessive special access charges are tremendously damaging to consumers and competition, for as the FCC has explained, special access has a major impact on "the United States economy as a whole." *Special Access Interconnection Order*, 7 FCC Rcd. 7369, ¶ 18 (1992); *accord, Expanded Interconnection Order*, 7 FCC Rcd. 7740, ¶ 10 (1992). Whether businesses pay for special access directly or indirectly (through their purchases of retail voice and data services provided by carriers that purchase special access from the incumbents), monopoly overcharges must be

passed on to consumers in the form of higher prices for everything from groceries to cars and computers and from legal advice to brokers' commissions. And, as always, monopoly pricing means reduced output and an associated deadweight loss to society – products and services that would have been produced cannot be economically produced given the impact of special access on cost structures.[39] Supracompetitive special access rates also necessarily reduce investment by the carriers and other service providers that must rely on special access services,[40] and the record before the FCC contains a macroeconomic study that shows that reducing special access rates to levels producing an 11.25% rate of return would increase economic activity in the nation by $11.6 billion in the first year alone. *See supra* p. 5 n.2.

Supracompetitive special access rates also imperil competition in downstream markets because many communications services rely upon special access – *i.e.*, all wireless, broadband, and long distance services. The incumbents now compete in all of those downstream markets and their special access monopolies give them both the incentive and ability to raise their retail rivals' costs and impede competition on the merits.[41] As the FCC recognized in 1997, even before the incumbents had authority to offer each of these retail services on a nationwide basis, "absent appropriate regulation, an incumbent LEC and its interexchange affiliate could potentially implement a price squeeze once the incumbent LEC began offering in-region, interexchange toll services."[42] If competitive providers attempt to pass costs associated with

---

[39] *See*, *e.g.*, Robert Pindyck & Daniel Rubinfeld, Microeconomics, 351-52 (1989).

[40] AT&T Reply Comments, Ordover-Willig Dec. ¶ 6.

[41] *See*, *e.g.,* AT&T Reply Comments, Ordover-Willig Dec. ¶¶ 66-74.

[42] First Report and Order, *Access Charge Reform*, 12 FCC Rcd. 15982, ¶ 277 (1997) ("*Access Reform Order*") ("[t]he incumbent LEC could do this by raising the price of interstate access services to all interexchange carriers, which would cause competing in-region carriers to either raise their retail rates to maintain their profit margins or to attempt to maintain their market share by not raising their prices to reflect the increase in access charges, thereby reducing their profit

monopoly special access charges along to retail customers, they risk losing customers to an ILEC that does not pay those above-cost charges in any economically meaningful sense. If they do not pass along the monopoly charges, they face artificially excessive costs that threaten to outrun revenues both in the short and long runs.

*Second*, the FCC has been under a duty to monitor industry conditions and determine whether the predicates for its *Pricing Flexibility Order* were valid since the time of their adoption. Petitioners have been presenting the FCC with the facts that establish the error of its predictions throughout the past four years, and the FCC has taken no action in response to the petition for a rulemaking and for interim relief that was filed over a year ago.

*Third*, this issue is not one that requires the agency to divert itself from more important issues or expend undue resources. The FCC has often acknowledged as obvious that limiting monopoly returns in one of the industry's largest markets is one of the agency's highest priorities and a matter of paramount importance to consumers of telecommunications services, to carriers that rely upon those wholesale services, and to the entire nation's economy.[43] There is no issue

---

margins. If the competing in-region, interexchange providers raised their prices to recover the increased access charges, the incumbent LEC's interexchange affiliate could seek to expand its market share by not matching the price increase. The incumbent LEC affiliate could also set its in-region, interexchange prices at or below its access prices. Its competitors would then be faced with the choice of lowering their retail rates for interexchange services, thereby reducing their profit margins, or maintaining their retail rates at the higher price and risk losing market share").

[43] *See, e.g.,* Notice of Proposed Rulemaking, *Equal Access and Interconnection Obligations Pertaining to Commercial MobileRadio Service Providers*, 11 FCC Rcd. 5020, ¶ 12 (1996) (recognizing the incentives of "LEC[s] [to] extract monopoly rents for interconnection" and that "a LEC . . .could potentially restrict entry . . . by setting the interconnection rates prohibitively high"); *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd. 15499, ¶ 134 (1996) (recognizing that "[p]roperly set rate ceilings would prevent incumbent LECs from setting rates at levels so high as to prevent efficient competitive entry or to allow them to extract monopoly rents"); *Access Reform Order* ¶ 11 (recognizing that price caps are important "to replicate some of the efficiency incentives found in fully competitive markets" and that such restrictions are necessary "until actual competition makes price cap regulation unnecessary"); Memorandum Opinion and Order, *Verizon Petition for Pricing*

pending before the FCC where the financial and market structure stakes are higher and where the public interest benefits from regulatory reform would be more substantial and palpable. Nor would reexamination of special access regulation require undue agency resources. Parties from all relevant sectors of the industry have *already* compiled a voluminous record regarding the state of competition in access services, and the FCC has itself *concluded* that access competition does not exist and the conditions conducive to competition do not exist. *See, e.g., Triennial Review Order* ¶¶ 298-306, 386-89. The FCC should be required to initiate a proceeding that involves "crossing its t's" to implement its recent conclusions, and the proceeding promises enormous public benefits at minimal cost.

*Fourth*, this issue is not unduly complex. The immediate issue is simply whether evidence justifies the FCC's initiation and prompt completion of a review of its special access regulations. That issue depends upon whether competition exists in the provision of special access services as the FCC predicted it would when it fashioned its "triggers" to deregulation, and the FCC has already answered that question in the negative in the *Triennial Review* proceedings. The issue whether the pricing flexibility rules should be vacated pending the FCC's revision of its special access regulations is also straightforward. Evidence submitted in the *Triennial Review* proceeding, and the Commission's own conclusions there, indicate that no rational basis exists for the current rules. The price cap restrictions that apply in the absence of misguided pricing flexibility relief clearly provide more protection to consumers than unconstrained special access pricing, and the FCC can refine those restrictions through prompt

---

*Flexibility*, 18 FCC Rcd. 6237, ¶ 3 (2003) (recognizing a duty to ensure that "(1) price cap LECs do not use pricing flexibility to deter efficient entry or engage in exclusionary pricing behavior; and (2) price cap LECs do not increase rates to unreasonable levels for customers that lack competitive alternatives.").

execution of a rulemaking.  Finally, fashioning interim relief pending the completion of the rulemaking is a straightforward matter for an agency with expertise in ratemaking.[44]

*Finally*, bad faith agency action can support but is not required for issuance of the writ, *see TRAC*, 750 F.2d at 80.  Although petitioners have no evidence that the FCC's failure is the result of bad faith, petitioners can discern no legitimate reason for the agency's failure to act upon the substantial, and essentially undisputed, evidence that the price cap ILECs are abusing their market power by charging supracompetitive rates and earning exorbitant returns and damaging competition, contrary to the premises of the *Pricing Flexibility Order*.  If the FCC is reluctant to admit that its predictions turned out to be so wrong, that is perhaps understandable, but it is a wholly illegitimate basis for denying consumers, competitors, and the public relief that is critical to the national economy.  If the FCC's purpose is simply to protect ILEC revenue streams – and thus maintain implicit subsidies in violation of 47 U.S.C. § 254 – it should say so explicitly and justify that decision in an order subject to appellate review, rather than ignore its statutory duty when presented with evidence of patently unjust and unreasonable rates.

## CONCLUSION

The Court should issue a writ of mandamus directing the FCC within 45 days to: (1) release a notice of proposed rulemaking to vacate its pricing flexibility rules and adopt new rules to govern special access rates, and (2) rule on petitioners' request for interim relief seeking protection from more than $5 billion in *annual* overcharges pending the outcome of this rulemaking.  Petitioners also respectfully request that the Court direct the FCC to complete the rulemaking within nine months or submit a report to the Court explaining why it has not done so.

---

[44] *See* 47 U.S.C. § 154(i); *Lincoln Tel. & Tel. Co.* v. *FCC*, 659 F.2d 1092, 1107-08 (D.C. Cir. 1981); AT&T Reply Comments at 50 & n.152.

Respectfully submitted,

_____

Leonard J. Cali                     David W. Carpenter
Lawrence J. Lafaro                  SIDLEY AUSTIN BROWN & WOOD LLP
Judy Sello                          Bank One Plaza
AT&T CORP.                          10 South Dearborn Street
One AT&T Way                        Chicago, Illinois 60603
Bedminster, New Jersey 0792 1       (312) 853-7000
(908) 532-1846
                                    David L. Lawson
                                    James P. Young
                                    SIDLEY AUSTIN BROWN & WOOD LLP
                                    1501 K Street, N.W.
                                    Washington, D.C. 20005
                                    (202) 736-8000

*Attorneys for AT&T Corp.*

Douglas I. Brandon
Vice President-External Affairs
AT&T Wireless Services, Inc.
1150 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 223-9222

Howard J. Symons
Michael H. Pryor
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo P.C.
701 Pennsylvania Avenue, NW
Suite 900
Washington, D.C.  20004
(202) 434-7300

*Counsel for AT&T Wireless*

Mark Uncapher
Senior Vice President & Counsel, Internet Commerce
& Communications Division, Information
Technology Association of America
1401 Wilson Boulevard, #1100
Arlington, VA 22209
703-284-5344

*Counsel for ITAA*

Brian R. Moir
Moir & Hardman
1015 18th Street NW, Suite 800
Washington, DC 20036-5204
(202) 331-9852

*Counsel for the eCommerce &*
*Telecommunications Users Group*

Jonathan D. Lee
The CompTel/ASCENT Alliance
1900 M Street, NW, Suite 800
Washington, D.C. 20036
296-6650

*Counsel for the Comptel/ASCENT Alliance*

November 5, 2003