**Attachment 8**

**Brief of the
Ad Hoc Telecommunications Users Committee, Intervenor
in support of the
AT&T Petition for a Writ of Mandamus
in the United States Court of Appeals
for the District of Columbia Circuit
No. 03-1397
filed June 8, 2004**



INITIAL BRIEF

**No. 03-1397**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

*In Re* **AT&T CORP., AT&T WIRELESS, THE COMPTEL/ASCENT ALLIANCE,**
**eCOMMERCE AND TELECOMMUNICATIONS USERS GROUP, AND THE**
**INFORMATION TECHNOLOGY ASSOCIATION OF AMERICA,**

**Petitioners.**

————

**On Petition for a Writ of Mandamus Directing**
**Action by the Federal Communications Commission**

————

**Brief of the Ad Hoc Telecommunications Users Committee, Intervenor**

————

Colleen L. Boothby
Florence Kao
Levine, Blaszak, Block and Boothby, LLP
2001 L Street, NW, Suite 900
Washington, DC 20036

*Counsel for Ad Hoc Telecommunications*
*Users Committee*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned Intervenor certifies as follows:

**A.     Parties and Amici**

Petitioners, respondents, and intervenors in this case are:

Ad Hoc Telecommunications Users Committee
AT&T Corp.
BellSouth Corporation
CompTel/ASCENT Alliance
eCommerce and Telecommunications Users Group
Information Technology Association of America
Federal Communications Commission
Qwest Communications Commission
SBC Communications
Verizon

**B.     Rulings Under Review**

References to the rulings at issue appear in the Brief for Petitioners.

**C.     Related Cases**

There are no related cases.

**CORPORATE DISCLOSURE STATEMENT PURSUANT TO RULE 26.1**

The Ad Hoc Telecommunications Users Committee (the "Ad Hoc Committee") is an unincorporated, non-profit association of large business users of communications services that represents the interests of such customers in proceedings before the Federal Communications Commission (the "FCC") and the federal courts concerning the regulation of interstate telecommunications.  The Ad Hoc Committee is a "trade association," as defined in Circuit Rule 26.1(b).

# TABLE OF CONTENTS

JURISDICTION ........................................................................................................... 1

ISSUE PRESENTED ................................................................................................... 1

STATEMENT OF THE CASE ...................................................................................... 1

BACKGROUND .......................................................................................................... 3

ARGUMENT ............................................................................................................... 4

I.    Ad Hoc Members Are Uniquely Credible Barometers of the State of Competition in
Special Access Markets ............................................................................................. 4

II.    The FCC Has Repeatedly Ignored Evidence of the Widening Gap Between the
Assumptions and the Marketplace Realities Underlying the Commission's Pricing
Flexibility Rules ......................................................................................................... 6

III.    The FCC Must Abandon Its Failed Pricing Flexibility Experiment and Return to
Incentive Regulation .................................................................................................. 13

CONCLUSION ......................................................................................................... 15

i

# TABLE OF AUTHORITIES

## ADMINISTRATIVE CASES

*Access Charge Reform*, Fifth Report and Order and Further Notice of Proposed Rulemaking, 14 FCC Rcd 14221 (1999), *aff'd sub nom WorldCom, Inc. v. FCC,* 238 F. 3d 449 (D.C.Cir. 2001)…………………………………………………………………6

*Performance Measurements and Standards for Interstate Special Access Services*, CC Docket Nos. 01-321, 00-51, 98-147, 96-98, 98-141, 96-149, 00-229, Notice of Proposed Rulemaking, 16 FCC Rcd 20896 (2001)…………………………………………...............8

*Review of Regulatory Requirements for Incumbent LEC Broadband Services; SBC Petition for Expedited Ruling That It Is Non-Dominant in its Provision of Advanced Services and for Forbearance From Dominant Carrier Regulation of These Services,* CC Docket No. 01-337, Notice of Proposed Rulemaking, 16 FCC Rcd 22745 (2001)……………………………………………………………………………………….9

*Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, CC Docket Nos. 02-33, 95-20, and 98-10, Notice of Proposed Rulemaking, 17 FCC Rcd 3019 (2002)……………………………………………………………………………......11

*AT&T Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, RM No. 10593, DA 02-2913, rel. October 29, 2002…………………………………………………………………………11

*Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements*, WC Docket No. 02-112, and *2000 Biennial Regulatory Review Separate Affiliate Requirements of Section 64.1903 of the Commission's Rules*, CC Docket No. 00-175, Further Notice of Proposed Rulemaking, 18 FCC Rcd 10914 (2003)…………………...12

There are no authorities upon which we chiefly rely.

**GLOSSARY**

| | |
|---|---|
| BOC | Bell Operating Company |
| CLEC | Competitive Local Exchange Carrier |
| ILEC | Incumbent Local Exchange Carrier |
| IXC | Interexchange Carrier |
| MSA | Metropolitan Statistical Area |

## JURISDICTION

This Court has jurisdiction pursuant to the Hobbs Act, 28 U.S.C. § 2342, which authorizes judicial review of Federal Communications Commission action; the Administrative Procedure Act, 5 U.S.C. § 706, which authorizes courts to compel agency action that has been unlawfully withheld or unreasonably delayed; the All Writs Act, 28 U.S.C. § 1651, which authorizes this Court to issue all writs necessary or appropriate in aid of its jurisdiction; and Federal Rule of Appellate Procedure 21, which authorizes issuance of writs of mandamus.

## ISSUE PRESENTED

Whether a writ of mandamus should issue directing the FCC to initiate a proceeding to reexamine its special access pricing flexibility rules in light of the Commission's erroneous assumptions regarding the development of marketplace competition, upon which the rules were premised.

## STATEMENT OF THE CASE

Intervenor is an association of large customers of telecommunications services who, like most enterprise customers, depend heavily upon certain dedicated private line services known as "special access."  Special access services are provided almost exclusively by incumbent local exchange carriers ("ILECs").  Large end users buy special access directly from ILECs or indirectly through the long distance companies who purchase ILEC special access service for the "final mile" connection between an end user premises and the long distance company's interstate network.

1

In 1999, the Federal Communications Commission ("FCC") adopted special access pricing flexibility rules that freed the ILECs from so-called "incentive" or "price caps" regulation, which had previously limited the ILECs' ability to raise special access prices in any one year. The pricing flexibility rules allow ILECs to petition for elimination of all limits on their special access prices within individual geographic areas known as metropolitan statistical areas ("MSAs"). ILECs must demonstrate that a competitive local exchange carrier ("CLEC") has established a certain minimum presence in the MSA by interconnecting at a specified number of points to the ILEC's network. The petition will then be granted regardless of the CLEC's subsequent ability to provide service, attract customers, or even stay in business.

The FCC's adoption of the pricing flexibility rules was based on its belief that access service markets would become sufficiently competitive to discipline the ILECs' prices and practices once a CLEC met the minimum presence requirement (sometimes referred to as a "collocation trigger"). Ad Hoc has actively participated in a series of FCC rulemaking proceedings concerning the regulation of special access in which Ad Hoc and other parties repeatedly proffered evidence and analysis which establish that the FCC's predictions regarding special access competition have turned out to be wrong. Competition has *not* developed in MSAs for which flexible pricing has been authorized. Worse yet, the ILECs have invariably used their pricing flexibility to raise their prices – and their earnings – to record levels.

The FCC has refused to act on the information and evidence produced by Ad Hoc and other participants in the FCC's proceedings. The FCC has, in fact, completely ignored the information and associated requests for action based upon it. Accordingly,

this court should issue a writ of mandamus directing the FCC to respond to parties who have asked it to reexamine its pricing flexibility rules and the validity of the marketplace assumptions on which they were based.

## BACKGROUND

The members of the Ad Hoc Telecommunications Users Committee ("Ad Hoc" or "Committee") are among the nation's largest and most sophisticated corporate buyers of telecommunications services, including interstate special access services.  Currently, thirteen of the Committee's members are Fortune 500 companies; nine are Fortune 100 companies.  Committee members come from a broad range of industry sectors, including manufacturing, financial services, insurance, retail, package delivery, and information technology.  (Ad Hoc admits no carriers as members nor does it accept any funding from carriers.)

Large commercial enterprises like Ad Hoc's members rely heavily on the ILECs' interstate special access services for the dedicated, "final mile" connections that make up their private corporate networks, specialized data systems, and high-capacity transmission facilities at locations with heavy traffic volumes.[1]  Enterprise customers who purchase special access – both directly, as customers of ILECs, and indirectly, as customers of interexchange carriers ("IXCs") who must purchase ILEC special access to connect with customer premises –ultimately pay the price for FCC inaction on special access regulatory reform.

**SUMMARY OF ARGUMENT**

The FCC has repeatedly been presented with irrefutable (and unrebutted) evidence that its special access pricing flexibility rules are allowing ILECs to exploit unreasonably their virtual monopoly over special access services and charge excessive rates.  In proceeding after proceeding since the FCC adopted the pricing flexibility rules, Ad Hoc and other parties have submitted evidence demonstrating that competition has simply not developed in local exchange markets for the special access services upon which business customers depend.  The evidence also demonstrates that the ILECs have taken advantage of the lack of competition by raising their special access prices (and earnings) to record levels.  The court should therefore issue a writ of mandamus directing the FCC to respond to the evidence and arguments before it by initiating a proceeding to reexamine the special access pricing flexibility rules and the factual presumptions upon which they were premised.

**ARGUMENT**

I.      **Ad Hoc Members Are Uniquely Credible Barometers of the State of Competition in Special Access Markets**

As substantial, geographically-diverse end users of telecommunications service nation-wide, Ad Hoc members are uniquely qualified to provide unbiased but informed perspectives on the state of competition in the telecommunications marketplace.  Unlike competing carriers, Ad Hoc members have no commercial self-interest in imposing

---

[1]      Members have estimated that their collective annual spend on communications services

unnecessary constraints on the ILECs' pricing flexibility.  Indeed, as high-volume purchasers of telecommunications services, Ad Hoc members have historically been among the first beneficiaries of the FCC's de-regulatory efforts and expected the same to be true of any deregulatory regime for the ILECs' special access services.  As a consequence, Ad Hoc has consistently advocated de-regulation for the ILECs' special access services as soon as the market for those services becomes competitive.

Unfortunately, the special access market is not yet sufficiently competitive for market forces to discipline prices and service levels.  As a result, and as described below, Ad Hoc has repeatedly, and with increasing urgency, alerted the Commission to the lack of competition in the special access marketplace and filed supporting factual evidence and economic analyses in a variety of policy and rulemaking proceedings.

In its pleadings, Ad Hoc described the actual market experience of its members and the absence of competitive alternatives in the geographic markets where members sought to obtain special access services, despite members' active efforts to seek out competitive choices.  Ad Hoc urged the FCC to re-establish incentive regulation for the ILECs' special access services in order to protect customers from ILEC attempts to exploit their market power through excessive rates and commercially unreasonable terms and conditions.

Because the FCC has yet to take action in any of those proceedings, Ad Hoc supports the petitioners' effort to obtain a writ of mandamus from this court requiring the FCC to reexamine its special access pricing rules and provide interim rate relief pending

---

is approximately $ 2 billion.

the development of a new regulatory regime.

## II.    The FCC Has Repeatedly Ignored Evidence of the Widening Gap Between the Assumptions and the Marketplace Realities Underlying the Commission's Pricing Flexibility Rules

One of Ad Hoc's first principles for developing its substantive positions is that the FCC should rely on competition, not regulation, to set prices and carrier practices whenever possible.  But Ad Hoc is realistic about assessing the level of competition in the market and the prospects for competition to emerge.  In the absence of competition, Ad Hoc supports the use of regulation to ensure reasonable prices, open entry for potential competitors, and properly sized and targeted subsidy mechanisms.

Thus, despite Ad Hoc's preference for de-regulated telecommunications markets, Ad Hoc has repeatedly urged the Commission to re-visit its de-regulatory special access pricing flexibility rules because the competition upon which those rules were premised has simply failed to develop.

Ad Hoc first flagged the issue in 1998 as an active participant in the rulemaking docket that produced the pricing flexibility rules.[2]  Ad Hoc supported the concept of pricing flexibility for the ILECs, observing that "pricing flexibility serves the public interest generally because it holds the potential to send more accurate pricing signals to the market.  Moreover, consumers will benefit from expanded choices."[3]  But Ad Hoc's

---

[2]    *See Access Charge Reform*, Fifth Report and Order and Further Notice of Proposed Rulemaking, 14 FCC Rcd 14221 (1999), *aff'd sub nom WorldCom, Inc. v. FCC,* 238 F. 3d 449 (D.C.Cir. 2001) (*"Pricing Flexibility Rulemaking"*).

[3]    *Pricing Flexibility Rulemaking*, Comments of the Ad Hoc Telecommunications Users Committee (October 26, 1998) at ii (JA___).

6

support was contingent upon some linkage between pricing flexibility and "clear evidence of competitive conditions in relevant markets" [4] to protect customers with no competitive alternatives.   Ad Hoc adamantly opposed "basing the availability of pricing flexibility on *potential* competition rather than effective competition," [5] arguing that "regulatory relief should be timed to occur when markets are, in fact, competitive." [6]  Ad Hoc emphasized that "the short-term benefits associated with premature pricing flexibility do not justify the significant threat to the emergence of long-term, sustainable and effective competition that premature, excessive pricing flexibility would raise." [7]

Ad Hoc's comments catalogued the strong evidence that the special access market was not, in fact, competitive at the time of the rulemaking.  In particular, Ad Hoc pointed out that "the major ILECs' interstate earnings levels remain excessively high" in most Bell Operating Company regions, indicating that "market forces are offering no protection to access customers in those areas from gross overcharges by the dominant ILEC."[8]  Ad Hoc noted that "the slow emergence of local competition is not particularly surprising" given that it took twenty years for the long distance market to become sufficiently competitive to relax regulation of AT&T's prices.[9]  Viewed in that light, "[t]he Commission's hope that local competition could develop sufficiently in a few years to

---

[4]    *Id.* at 24, 27 (JA__).

[5]    *Id.* at ii (emphasis added) (JA__).

[6]    *Id.* at 26 (JA__).

[7]    *Pricing Flexibility Rulemaking*, Reply Comments of the Ad Hoc Telecommunications Users Committee (November 9, 1998) at ii (JA__).

[8]    *Id.* at 8-9 (JA__).

[9]    *Id.* at 10 (JA__).

constrain access prices has simply been too optimistic."[10]  Ad Hoc's core concern was that "CLEC competitive inroads to date are too limited in scope and scale to constrain the ILECs' pricing or provisioning behavior." [11]

Ad Hoc's concerns about the ILECs' pricing and provisioning behavior proved to be well-founded when, two years after the pricing flexibility rules were adopted, the Commission opened its *Performance Standards Rulemaking*.[12]  In that proceeding, the Commission is considering whether to adopt performance measurements and standards for the ILECs' provisioning[13] of special access service to ensure that the ILECs do not give their affiliated IXCs preferential treatment in the provisioning of special access.  Ad Hoc once again challenged the competitive assumptions underlying the pricing flexibility rules.

Ad Hoc's expert economic analysis of the ILECs' special access tariffs had produced the stunning revelation that the ILECs were using their pricing flexibility to *raise prices*, in the very areas that were supposedly the most competitive.  Based on the results of that analysis, Ad Hoc complained that "[r]ates are *higher* in markets where the Commission has granted ILECs [the most] pricing flexibility than in markets still subject to price cap regulation – an outcome that is exactly the opposite of what a competitive

---

[10]     *Id.*

[11]     *Id* at 2 (JA__).

[12]     *Performance Measurements and Standards for Interstate Special Access Services*, CC Docket Nos. 01-321, 00-51, 98-147, 96-98, 98-141, 96-149, 00-229, Notice of Proposed Rulemaking, 16 FCC Rcd 20896 (2001)(*"Performance Standards Rulemaking"*).

[13]     The term "provisioning" includes ordering, furnishing, maintaining, and repairing interstate special access circuits.

market would produce."[14]  Ad Hoc's analysis revealed "*no instance* of lower prices for generally available services in the MSAs to which Phase II pricing flexibility applies."[15] This evidence, coupled with the devastated financial state of competitive LECs after the 2000-2001 market downturn, led Ad Hoc to state bluntly that, "[w]hatever the wisdom of the Commission's reasoning in the summer of 1999,"[16] when it relied on the potential emergence of competition to adopt the pricing flexibility rules, "the fact is that competition has not emerged as predicted."[17]

The Commission has yet to act in the *Performance Standards Rulemaking.*

Ad Hoc again challenged the ILECs' supra-competitive special access rates and the lack of competitive alternatives in its comments on the FCC's *Broadband Regulation Rulemaking.*[18]  Ad Hoc pointed out (again) that the ILECs had used (and were continuing to use) their pricing flexibility to raise prices, reminding the Commission that no party, and no ILEC, in the *Performance Standards Rulemaking* had proffered a rebuttal of any kind to Ad Hoc's pricing analysis.

Ad Hoc also provided specific evidence of the market conditions encountered by

---

[14]     *Performance Standards Rulemaking*, Comments of the Ad Hoc Telecommunications Users Committee (January 22, 2002) at 2-3 (emphasis in original) (JA__).

[15]     *Id.* at 5 (emphasis added) (JA__).

[16]     *Performance Standards Rulemaking*, Reply Comments of Ad Hoc Telecommunications Users Committee (February 12, 2002) at 11 (JA__).

[17]     *Id.* at 13 (JA__).

[18]     *Review of Regulatory Requirements for Incumbent LEC Broadband Services; SBC Petition for Expedited Ruling That It Is Non-Dominant in its Provision of Advanced Services and for Forbearance From Dominant Carrier Regulation of These Services,* CC Docket No. 01-337, Notice of Proposed Rulemaking, 16 FCC Rcd 22745 (2001) ("*Broadband Regulation Rulemaking").*

Ad Hoc members.  Despite their buying power as large users, an Ad Hoc member survey of competitive conditions at over 30,000 locations revealed that viable competitive alternatives were frequently not available.  Contrary to the Commission's conviction in 1998 that competition was imminent, actual end users seeking actual service providers in real markets found few, if any, competitive alternatives to the ILECs' special access service [19] four years later.

In response to these market conditions, Ad Hoc urged the Commission to acknowledge the lack of competition for broadband special access services and to re-impose incentive regulation (*i.e.,* price caps) to protect end users:

> The ILECs have used the pricing flexibility granted to them under the existing rules to raise prices, confirming that significant countervailing competitive forces that could discipline market prices have simply failed to emerge….Accordingly, the Commission must not only continue regulation of the broadband business services market but it <u>must re-visit and re-tool its regulatory regime for that market</u> to reflect current competitive realities. <u>In particular, the Commission should re-impose its "price caps"/incentive regulation</u> to ensure just and reasonable prices in the [special access] services market.[20]

The Commission has yet to act in the *Broadband Regulation Rulemaking*.

Three months later, Ad Hoc raised the same issues in the FCC's *Broadband Wireline Internet Access Rulemaking*.[21]  Ad Hoc challenged as "fundamentally false"[22]

---

[19]     *See, generally, Broadband Regulation Rulemaking*, Comments of Ad Hoc Telecommunications Users Committee (March 1, 2002) at 14-17 (JA__).

[20]     *Id.* at i-ii (emphasis added; citations omitted) (JA__).

[21]     *Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, CC Docket Nos. 02-33, 95-20, and 98-10, Notice of Proposed Rulemaking, 17 FCC Rcd 3019 (2002) ("*Broadband Wireline Internet Access Rulemaking*").

[22]     *Broadband Wireline Internet Access Rulemaking*, Reply Comments of Ad Hoc Telecommunications Users Committee (July 1, 2002) at i (JA__).

the notion that competition has developed for "last mile" broadband connections to end users.  Ad Hoc characterized the ILECs' market power over special access broadband services as "extensive and pervasive" and complained once again about the ILECs' ability to "increase prices and earn supra-competitive profits for what purports to be a 'competitive' service."[23]

The Commission has yet to act in that proceeding.

Finally, Ad Hoc challenged the pricing flexibility rules in two recent FCC proceedings.  First, Ad Hoc filed December, 2002 comments in support of the AT&T petition for rulemaking that is the subject of the instant mandamus petition.[24]  Ad Hoc urged the FCC to grant AT&T's petition and begin a rulemaking to reform its pricing flexibility rules for special access.  After reviewing the arguments and evidence filed in the pleadings summarized above, Ad Hoc reminded the FCC that Ad Hoc members stand to benefit the most from the Commission's de-regulatory initiatives because of their buying power.[25]  And, as the biggest potential beneficiary of de-regulatory initiatives, Ad Hoc members have not been shy about demanding de-regulatory reform when market conditions justify it.[26]  But Ad Hoc was not demanding such reforms for the special access market because competitive conditions in that market did not justify such

---

[23]    *Id.* at 6 (JA__).

[24]    *AT&T Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, RM No. 10593, DA 02-2913, rel. October 29, 2002 ("*AT&T Petition for Rulemaking*").

[25]    *AT&T Petition for Rulemaking*, Comments of Ad Hoc Telecommunications Users Committee (December 2, 2002) at 5 (JA__).

[26]    *Id.*

reform. Rather, "[u]nder these market conditions, the FCC cannot continue to abandon the regulatory field and still ensure that the statutory objectives of the Communications Act are met."[27] Ad Hoc urged the Commission to "immediately begin a rulemaking to reform its regulation of price caps carriers' rates for interstate special access."[28]

Most recently, Ad Hoc filed comments in the FCC *BOC Separate Affiliate Rulemaking*.[29] In that docket, the FCC sought comment on whether Bell Operating Company ("BOC") long distance services should be regulated differently once the BOCs are no longer subject to the statutory requirement that they offer their long distance services through a separate subsidiary that must obtain access service on an arm's length, non-discriminatory basis from the ILEC side of the company. Because access markets are not competitive, Ad Hoc urged the FCC to adopt regulatory requirements that would protect enterprise customers and other access customers from "anti-competitive price increases or other ILEC attempts to leverage their local service market power in order to gain an anti-competitive advantage or fund anti-competitive practices in long distance markets."[30]

The Commission has yet to act in either of these two proceedings.

---

[27]    *Id.* at 2 (JA__).

[28]    *Id.* at 1 (JA__).

[29]    *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements*, WC Docket No. 02-112, and *2000 Biennial Regulatory Review Separate Affiliate Requirements of Section 64.1903 of the Commission's Rules*, CC Docket No. 00-175, Further Notice of Proposed Rulemaking, 18 FCC Rcd 10914 (2003) ("*Separate Affiliate Rulemaking*").

[30]    *Id.* at 6 (JA__).

### III.    The FCC Must Abandon Its Failed Pricing Flexibility Experiment and Return to Incentive Regulation

In its brief, AT&T has pointed out that the FCC cannot abdicate its duty to monitor and re-examine the predictions upon which it relied when it originally gave pricing flexibility to the ILECs.[31]  This duty stems not only from the deferential standard of judicial review discussed by AT&T but also from the FCC's more fundamental responsibility under Section 201 of the Act to protect customers from unjust and unreasonable rates, terms, and conditions.  By de-regulating the ILECs' special access prices and allowing them to exploit their considerable market power, and by refusing to re-visit those actions in the face of overwhelming evidence that the competitive assumptions underlying them were simply wrong, the FCC has failed to discharge its statutory responsibility.  By its inaction, the Commission has subjected enterprise customers to the excessive prices, unreasonable terms and conditions of service, inferior service quality, and technological torpor that results when competition is not present in an unregulated marketplace.  Given the long-standing and unrefuted evidence that competition has failed to develop in the market for special access services, the FCC's steadfast refusal to re-visit the special access pricing flexibility rules is inconsistent with the Act's requirements and damaging to end users and carriers alike.

The Commission's conviction in the original *Pricing Flexibility Rulemaking* that special access users no longer needed regulatory protection was unsustainable after

---

[31]     Brief of Petitioners at 28.

the ILECs responded to special access pricing flexibility with the price increases and record earnings described in the various pleadings filed with the FCC and with this court.  Pending the emergence of a competitive market, the FCC's pricing flexibility regime for special access can no longer be justified, whatever merit it may have had when it was adopted and competition seemed imminent.  That competition has not emerged and, based on the virtual tidal wave of service discontinuances and bankruptcies among CLECs in the past few years, is not likely to emerge soon.  In the face of evidence that special access markets were not competitive, the FCC should have re-examined its preference for weakening or eliminating its incentive regulation regime.

Given the Commission's failure to take action or respond in any way to the evidence before it, this court must intervene.

## CONCLUSION

For the foregoing reasons, the court should grant AT&T's petition for a writ of mandamus.

Respectfully submitted,

_____
Colleen L. Boothby
Florence Kao
Levine, Blaszak, Block and Boothby, LLP
2001 L Street, NW, Suite 900
Washington, DC 20036

*Counsel for Ad Hoc Telecommunications Users Committee*

**CERTIFICATE OF COMPLIANCE**
**PURSUANT TO FED. R. APP. P. 32(a)(7)(C)**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that the foregoing brief is proportionately spaced, has a typeface of at least 11 points in height, and contains 3,027 words (as measured by the word count of the word-processing system used to prepare this brief).

## CERTIFICATE OF SERVICE

I, Michaeleen Terrana, hereby certify that on this 8th day of June, 2004, I caused copies of the foregoing Initial Brief of the Ad Hoc Telecommunications Users Committee be served upon the following parties by first-class mail, postage prepaid.

_____
Michaeleen I. Terrana

| | |
|---|---|
| Leonard J. Cali<br>Lawrence J. Lafaro<br>Judy Sello<br>AT&T Corp.<br>One AT&T Way<br>Bedminster, NJ 07921 | David W. Carpenter<br>Sidley Austin Brown & Wood LLP<br>Bank One Plaza<br>10 South Dearborn Street<br>Chicago, IL 60603 |
| David L. Lawson<br>Joseph R. Guerra<br>James P. Young<br>Sidley Austin Brown & Wood LLP<br>1501 K Street, NW<br>Washington, DC 20005 | Mark Uncapher<br>Senior V.P. & Counsel<br>Internet Commerce Communications Division<br>Information Technology Association of America<br>1401 Wilson Boulevard, Suite 1100<br>Arlington, VA 22209 |
| Brian R. Moir<br>Moir & Hardman<br>1015 18th Street, NW, Suite 800<br>Washington, DC 20036 | Jonathan D. Lee<br>The CompTel/ASCENT Alliance<br>1900 M Street, NW, Suite 800<br>Washington, DC 20036 |
| John A. Rogovin<br>Federal Communications Commission<br>445 12th Street, SW<br>Washington, DC 20554 | Michael K. Kellogg<br>Geoffrey Klineberg<br>Kellogg Huber Hansen Todd & Evans<br>1615 M Street, NW, Suite 400<br>Washington, DC 20036 |
| Gary L. Phillips<br>SBC Communications Inc.<br>1401 I Street, NW, Suite 400<br>Washington, DC 20005 | James D. Ellis<br>SBC Communications<br>175 E. Houston<br>San Antonio, TX 78205 |

| Michael E. Glover<br>Verizon<br>1515 North Courthouse Road<br>Arlington, VA 22201 | Robert B. McKenna<br>Qwest Communications International, Inc.<br>607 14th Street, NW, Suite 950<br>Washington, DC 20005 |
|---|---|
| Charles R. Morgan<br>BellSouth Corporation<br>1155 Peachtree Street, Suite 1800<br>Atlanta, GA 30309 | |