**Attachment 11**

**Reply Declaration of Lee L. Selwyn on behalf of AT&T
in FCC *Triennial Review Remand* proceeding
WC Docket No. 04-313, filed October 19, 2004**



**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | |
| Unbundled Access to Network Elements | **WC Docket No. 04-313** |
| Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers | **CC Docket No. 01-338** |

Reply Declaration

of

**LEE L. SELWYN**

on behalf of

AT&T Corp.

October 19, 2004

REPLY DECLARATION OF LEE L. SELWYN

## EXECUTIVE SUMMARY

1.  Initial comments by parties in this proceeding confirm both the significant hurdles faced by CLECs in deploying their own facilities and the consistent efforts of the RBOCs to obscure the extent of their monopoly with regard to high capacity facilities.  The experience being reported by numerous CLECs in this proceeding is entirely consistent with the Commission's specific findings in the *Triennial Review Order ("TRO")* with regard to the necessity of capacity and location-specific granular analysis to determine CLEC impairment in serving enterprise customers.  The RBOCs nonetheless persist in presenting an industry overview that ignores the factors critical to determining the economic feasibility of CLEC deployment of competitive facilities and, by so doing, ask the Commission summarily to conclude that CLECs are not impaired in their ability to compete in the enterprise market without access to UNEs irrespective of the *facts* applicable to specific locations and routes.

2.  The RBOCs' primary evidence, the self-styled *UNE Fact Report*, contains gross misrepresentations based upon undocumented and unreliable data with respect to existing deployment of CLEC high capacity networks and, from that distorted perspective, makes unsupported claims about the feasibility of additional CLEC deployment.  The "facts" presented to support the RBOCs' claims do not take into account the critical capacity distinctions that frequently determine whether it is economically feasible for CLECs to deploy facilities at specific customer locations or on specific transport routes.  Despite broad claims with respect to competition for high-capacity facilities and services, the *UNE Fact Report* contains no data at all on the specific availability of competing CLEC facilities for either high capacity transport or high capacity loops at the DSn capacity levels at issue in this proceeding.  Only by failing to take account of  these critical capacity distinctions can the RBOCs posit the existence of MSA-wide and larger geographic markets.  Similarly, the RBOCs rely upon aggregations of claimed CLEC network capacity, obscuring critical data relating to locations and routes actually being served, and services and capacities actually being furnished.  When examined, the evidence of CLEC competitive networks cited in the *UNE Fact Report* includes route miles of fiber in London, ILEC-owned fiber, gas pipelines, and long haul fiber used to provide interexchange services, among numerous other errors.  In fact, this overly broad and factually unsubstantiated market view conflicts with the ILECs' own evidence that route-to-route competitive conditions vary widely within and across such geographies.

3.  Where the RBOCs do consider specific routes, their attempted extrapolation of this evidence to other, dissimilar circumstances, is equally invalid.  For example, the RBOCs seek nationwide



*Declaration of Lee L. Selwyn – Executive Summary*

findings of non-impairment based on evidence of fiber deployment in a scant handful of individual "lit" buildings in the densest urban centers. The examples on which the RBOCs rely show only that CLECs have deployed facilities to serve customers with very high capacity requirements in circumstances where the deployment generates revenues sufficient to economically support the large CLEC investments that are required. As the CLECs have plainly demonstrated, these conditions are unique to these high-revenue locations and cannot be assumed to exist over a broad geographic area. Moreover, as in earlier filings, the RBOCs' "evidence" of fiber deployment relies upon erroneous and in many cases entirely undocumented sources.

4. The RBOCs claim that the availability of "special access" fills any gaps remaining in CLEC network architecture. Characterizing the millions of commercial customer locations where CLECs have not deployed their own facilities as a "gap" in CLECs' networks is like describing the Pacific Ocean as a "gap" between San Francisco and Tokyo. Today, CLECs use special access facilities where they are forced to do so as a result of use or other restrictions. Dedicated loops and transport comprise a very substantial portion of CLECs' total costs (as compared, for example, with dedicated transport used by wireless carriers). Marketplace evidence shows that CLECs – large and small – that are being forced to use special access are consistently losing money, and are certainly not "flourishing." Persuasive evidence exists in both CLEC financial statements and sworn testimony that CLECs require UNEs for profitable operations. As discussed at length in my October 4, 2004 Declaration, forcing CLECs to rely upon special access arrangements allows the RBOCs to engage in cost/price squeezes– a circumstance now recognized by numerous investment analysts.

5. To bolster their arguments that special access represents a viable alternative to UNEs, the RBOCs contend that special access prices have decreased since the onset of pricing flexibility. This assertion is patently false. In fact, special access prices have increased (and the price/cost gap has widened) under pricing flexibility, confirming the persistence of the RBOC monopoly with respect to these essential services and facilities. The RBOCs' flawed analyses rely upon contrived and misleading calculations that (1) substitute "average revenue" for actual prices, (2) improperly take credit for mandatory special access rate decreases (in areas where the RBOCs have not obtained pricing flexibility) made pursuant to the Commission's price cap rules, and (3) ignore entirely the fact that during the period covered by the analysis there has been a significant shift in demand toward higher capacity OCn services, which have a lower price per voice grade equivalent channel than DSn services. Through these various manipulations, the RBOCs' "evidence" totally obscures the fact that the least competitive DSn services have been subject to the largest overall rate increases. In making their inflated claims about special access competition, the RBOCs also fail to acknowledge that the only way CLECs have stayed viable in many cases has been by taking advantage of RBOC "optional pricing plan" volume and term contracts for special access services – arrangements that may offer immediate financial benefits, but which operate to lock the RBOCs' CLEC rivals into long-term contractual arrangements that impose often severe financial penalties upon the CLEC either for deploying its own competing facilities or, where available, ordering UNEs to serve the affected locations.



*Declaration of Lee L. Selwyn – Executive Summary*

6. The Commission has determined the relevant geographic market for enterprise customers to be point-to-point in nature, and there is no evidentiary basis for altering this conclusion. The RBOCs, in their comments, diverge sharply from this *TRO* finding and grossly overstate the scope of the geographic market applicable to enterprise services. The RBOCs have made no serious attempt to justify their choice of an MSA as a geographic market, nor is their any plausible rationale for this approach. MSAs are established by the OMB "for statistical purposes," based upon criteria not related in any direct manner to the decisions underlying competitive telecommunications deployment. In this proceeding, AT&T and other CLECs have presented sworn testimony that competitive entry decisions are made on a location- and route-specific basis. The determination of a relevant geographic market for analyzing competition requires that customers confront "similar choices regarding a particular good or service" throughout that market. Clearly, where competitive deployment is being determined on a location- and route-specific basis, the geographic market cannot be defined in broader, unrelated terms.

7. CLECs have presented compelling evidence that they cannot rapidly increase their output or enter new areas in response to an RBOC price increase; low supply elasticity is a clear indicator of barriers to entry by competitors. The RBOCs' only attempt to counter this evidence involves pointing to a handful of locations currently "lit" by CLEC fiber and an even smaller number of point-to-point transport routes over which CLECs have deployed their own facilities. These are the only locations where, arguably, the RBOCs face any price discipline with respect to high-capacity facilities. Elsewhere, this competition and the resulting price discipline are completely lacking. Because nothing in the RBOC "evidence" undermines the Commission's previous determination that enterprise markets are point-to-point and because the facts bear out CLECs claims that competitive deployment is highly limited, the Commission's previous determination as to impairment with respect to enterprise loops and interoffice transport should repudiate both the RBOCs' highly biased account of special access competition and their bold attempt to redefine the geographic market for high capacity services.



TABLE OF CONTENTS

EXECUTIVE SUMMARY                                                                    i

INTRODUCTION                                                                          1

THE "UNE FACT REPORT"                                                                2

The RBOCs' "UNE Fact Report" grossly misrepresents the actual extent of CLEC loop/
transport self-deployment.                                                           2

Loops                                                                               14

Transport                                                                           20

CLEC USE OF SPECIAL ACCESS                                                          26

CLECs are not "flourishing" using special access to serve enterprise customers.     26

CLECs relying upon special access instead of UNEs are not profitable.            27

Persuasive evidence that UNEs are essential to the profitable operations for
CLECs                                                                            32

Like their smaller counterparts, even the largest CLECs are in no sense "flourishing" as a
result of their required purchases of special access services as the principal means for
obtaining access to RBOC hi-cap facilities.                                         36

Investment analysts see significant risk of a price squeeze if CLECs are forced to use
special access instead of UNEs when serving enterprise customers.                   39

CLECs' use of special access facilities occurs only when hurdles blocking the use of UNEs
that have been imposed by RBOCs cannot readily be overcome.                         41

SPECIAL ACCESS PRICE TRENDS                                                         47

The RBOCs' contention that special access prices have decreased since the onset of pricing
flexibility rests upon contrived and misleading "analyses" that substitute "average revenue"
for actual prices and misportray price decreases mandated by the Commission's price cap
rules as resulting from allegedly increased competition.                            47



Inclusion of annual price cap rate decreases for non-pricing flexibility services.  55

Use of "average revenue per voice grade equivalent" rather than actual prices.  61

Increased use of "optional pricing plan" volume and term contracts.  62

Verizon's "average revenue per VGE" analysis inappropriately aggregates the entire universe of special access services, and in so doing obscures the fact that the least competitive DS-n services have, in general, been subject to the largest overall rate increases.  64

Special access prices have increased – and the price/cost gap has widened – under pricing flexibility, confirming the persistence of the RBOC monopoly with respect to these essential services and facilities.  65

RBOC special access prices are not constrained by any of the "intermodal" alternatives that the RBOCs have identified.  75

SCOPE OF THE GEOGRAPHIC MARKET FOR ENTERPRISE SERVICES  83

The geographic market applicable to enterprise loops and transport facilities is point-to-point because, as the Commission has determined, competitive entry decisions are made on a location-specific and route-specific basis.  83

Enterprise customers do not confront "similar choices regarding a particular good or service" throughout an entire MSA – the standard previously adopted by the Commission as the basis for defining a geographic market area – and none of the evidence being advanced by the RBOCs proves otherwise.  83

As established by the OMB, the geography of MSAs make them inappropriate for defining markets.  90

CLEC supply elasticities are extremely low, such that CLECs are not able rapidly to expand the geographic scope of their facilities in response to RBOC price increases, thus imposing virtually no pricing discipline upon the RBOCs beyond the specific buildings that are currently "lit" or point-to-point transport routes over which CLEC facilities presently exist.  92

The Commission's Pricing Flexibility Order cannot support MSA-wide markets.  94

VERIFICATION  98


ECONOMICS AND TECHNOLOGY, INC.

*Declaration of Lee L. Selwyn – Table of Contents*

**Tables**

Table 1  Comparison of GDP-PI – 6.5% Annual Price Cap Rate Adjustment with Average Revenue per Special Access VGE per ARMIS 43-03                52

Table 2  Effect of GDP-PI – 6.5% Annual Price Cap Rate Adjustment upon SBC Average Revenue per Special Access DS-1                58

Table 3  Effect of GDP-PI – 6.5% Annual Price Cap Rate Adjustment upon RBOC Average Revenue per Special Access DS-1                60

**Figures**

Figure 1      Declining Annual Business Segment Revenue – Large CLECs                38

Figure 2      The Widening Special Access Price/Cost Gap – RBOC average                68

Figure 3      The Widening Special Access Price/Cost Gap – Verizon                69

Figure 4      The Widening Special Access Price/Cost Gap – SBC                70

Figure 5      The Widening Special Access Price/Cost Gap – BellSouth                71

Figure 6      The Widening Special Access Price/Cost Gap – Qwest                72

**Attachment**

1      Sources and Data Underlying Figures 2-6



# Before the
# FEDERAL COMMUNICATIONS COMMISSION
## Washington, DC 20554

| | |
|---|---|
| In the Matter of | |
| Unbundled Access to Network Elements | **WC Docket No. 04-313** |
| Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers | **CC Docket No. 01-338** |

REPLY DECLARATION OF LEE L. SELWYN

**INTRODUCTION**

1    8.  My name is Lee L. Selwyn; I am President of Economics and Technology, Inc. ("ETI"),

2    Two Center Plaza, Suite 400, Boston, Massachusetts 02108.  On October 4, 2004, I prepared and

3    submitted a Declaration in this matter on behalf of AT&T Corp.  I have been asked by AT&T to

4    respond to contentions being advanced by RBOCs that CLECs are "successfully" competing in

5    the enterprise market without access to UNEs and that they are "flourishing" using a special

6    access-based business model, that special access prices have been falling due to increased

7    competition, and that enterprise markets are geographically expansive – covering areas at least as

8    large as full MSAs – rather than point-to-point – i.e., location- or route-specific.  In this

9    declaration, I demonstrate that these various claims are without merit and are, in fact, precisely

10   opposite to "on the ground" reality.


ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 2 of 98

1          **THE "UNE FACT REPORT"**

2

3    **The RBOCs' "UNE Fact Report" grossly misrepresents the actual extent of CLEC loop/**
4    **transport self-deployment.**

5

6          9.   The RBOCs' *UNE Fact Report*, authored by attorneys Peter Huber and Evan Leo,[1] seeks

7    to portray extensive deployment of CLEC facilities in areas where, it contends, customer demand

8    is greatest.   CLECs, the *Report* argues, can serve and are serving a large number of enterprise

9    customers using their own facilities, fixed wireless services and cable television facilities, and

10   where none of these are available "competitors can readily use the ILEC's tariffed special-access

11   services to fill out any remaining gaps in their coverage."[2]   In fact, the *Report*'s own data,

12   together with sworn testimony by a number of CLEC executives and network engineers, paint an

13   entirely different picture.   Describing those portions of the overall enterprise market where

14   CLECs require the use of RBOC network facilities merely as "remaining gaps in their coverage"

15   would be like describing the Pacific Ocean as a "gap" between San Francisco and Tokyo.   In

16   fact, these "gaps" in CLECs' coverage to which Verizon refers constitute the vast, overwhelming

17   majority of all enterprise customer locations nationwide.

18

---

1. *UNE Fact Report 2004*, Peter W. Huber and Evan T. Leo, Prepared for and Submitted by BellSouth, SBC, Qwest and Verizon, October 4, 2004 ("*UNE Fact Report*").   Unless otherwise noted, all citations refer to Section III of this report.

2. *Id.*, at III-2.

ETI   ECONOMICS AND
      TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 3 of 98

1     10.  As was the case with the various *ex parte* submissions made by the RBOCs over the

2     summer, the *UNE Fact Report* fails to draw any distinctions among the various segments of the

3     overall enterprise market, distinctions that materially affect CLECs' ability to provide competing

4     services using either their own or other non-ILEC facilities.  Even taking the *Report*'s data on

5     CLEC facilities deployment at face value for purposes of discussion, CLECs have deployed

6     facilities at less than 31,669 enterprise customer locations, i.e., at *less than one percent of all*

7     *commercial buildings nationwide*.  And not even mentioned in the *Fact Report* is the *fact* that

8     virtually all of the customer sites at which CLEC facilities have been deployed involve services

9     at the OCn level.  Nowhere does the *Report* provide *any evidence* of CLEC loop facilities being

10    constructed at locations where the customer's requirement is at the DS-1 level – or even as much

11    as two DS-3s.  In the *TRO*, the Commission determined that CLECs *have not deployed their own*

12    *facilities to any measurable degree where the customer demand is less than three DS-3s.*[3]

13    Significantly, *no facts in the UNE Fact Report refute or, for that matter, even address this*

14    *critically important finding*.  Apparently, the RBOCs are hoping that by failing to distinguish

15    between the DSn and OCn segments, the Commission will simply *infer* from the highly limited

16    CLEC presence at the very high end of the enterprise market that the *entire enterprise market*

17    confronts precisely the same level of facilities-based competition.  And, indeed, such an

---

3.  *Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket No. 01-338; *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, CC Docket No. 96- 989; *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket No. 98-147, FCC No. 03-36, 18 FCC Rcd 16978 (2003) ("*Triennial Review Order*" or "*TRO*"), 18 FCC Rcd 17155, at para. 298.


ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 4 of 98

1  inference is just what the RBOCs would require, since there are decidedly no "facts" anywhere in

2  the *UNE Fact Report* that would actually and directly support such a conclusion.

3

4      11. The *UNE Fact Report* contains such gross misrepresentations and unreliable data with

5  respect to CLEC high capacity networks that it can only provide a highly distorted picture of

6  actual CLEC facilities deployment and business presence. First, with respect to competition for

7  high-capacity facilities and services, the *UNE Fact Report* contains no data at all on the specific

8  availability of competing CLEC facilities for either high capacity transport or high capacity

9  loops. Instead, the *Report* chooses to present "data" (discussed below) on "CLEC Networks"

10  followed by unsupported *assertions* that the existence of CLEC networks fully satisfies a

11  competing carrier's need for both high-capacity transport and high capacity loops.

12

13      12. This "evidence" of competitive fiber networks is a hodgepodge of quotes, misused

14  CLEC data, and generalizations that teach nothing about the actual state of competition for high

15  capacity services. For example, the *Report* begins its description of competitive networks by

16  citing the *TRO* as stating that the Commission had found that competitive fiber was available in

17  large and small markets throughout the country.[4] In fact, the Commission in the *TRO* made no

18  such finding. It devoted significant time and effort to delineate proper geographic and capacity

19  level product markets that identified specifically those limited instances where CLECs were not

20  impaired without access to UNEs. The *Report*'s statement obscures all these considered

21  distinctions, which are only identifiable through a close examination of the *Report*'s footnotes,

---

4. *UNE Fact Report*, at III-3

ET ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 5 of 98

1   where the *Report* cites several *TRO* findings to the effect that, in "some areas" and at some

2   capacity levels, CLECs have deployed their own fiber.  The *Fact Report*'s attempt to attribute an

3   overarching statement regarding the ubiquity of competitive fiber to these location- and capacity-

4   specific Commission statements is both disingenuous and misleading.

5

6        13.  Claims in the *UNE Fact Report* in many cases do nothing more than mirror claims

7   previously made separately by the individual RBOCs.  As I had noted in my October 4, 2004

8   Declaration (at paras. 34-49), Verizon makes similar statements, claiming that the Commission

9   has "found" that there was significant fiber deployment.  The information presented by the

10  RBOCs separately in their individual *ex parte* filings is substantially the same as the "facts"

11  being claimed in the *Fact Report* and to which I have already provided detailed responses in my

12  earlier testimony.  Verizon's attempts to rely upon information from the New Paradigm Research

13  Group's *CLEC Report* (a source also used extensively in the *UNE Fact Report*) and from various

14  CLEC marketing materials result in counts of CLEC facilities that are overstated by at least 40%.

15  Nothing in the *Fact Report* is immune to the same fundamental failings of Verizon's assertions:

16  *the Commission has identified several specific barriers to CLEC facility deployment and, on that*

17  *basis has found national impairment without access to UNEs for dark fiber, DS-1 loops, and for*

18  *less than three DS-3 loops provided at a specific location.*[5]  Trumped-up claims about the

19  number of CLEC fiber miles, or the number of lit buildings or the existence of fiber wholesalers,

20  do nothing to undermine, refute, or negate the Commission's earlier findings.

21

---

5.  *TRO*, 18 FCC Rcd 17164, 17170, 17173, at paras. 311, 320, 325.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 6 of 98

1    14.  Table 1 of the *UNE Fact Report* is substantially the same as Verizon's July 2, 2004 *ex*

2    *parte* Attachment 9, the data that I have previously discredited in my October 4, 2004 filing (at

3    paras. 35-46 and Table 1).  Interestingly, where Verizon's Table omitted the "Total Route Miles"

4    attributed to "other" carriers by New Paradigm Resources Group, the *UNE Fact Report* includes

5    this entry, accounting for over *half* (165,758) of all competitive route miles claimed in the

6    *Report.*  The *Fact Report* cites the NPRG *CLEC Report 2004*, chapter 4, at Table 16, as the

7    source for this "other carriers" figure, and claims that "CLECs not listed individually are: RCN,

8    PaeTec, Knology, Allegiance, Conversent, Everest, FDN, Sun West, Orlando Telephone."[6]  In

9    fact, the cited Table 16 of the *CLEC Report 2004* contains no such figure for "other," *leaving*

10    *more than half of the Fact Report's route miles of fiber assertion entirely undocumented and*

11    *unsupported*.

12

13    15.  The *UNE Fact Report* claims that "[w]ithin the large MSA, it has been equally easy to

14    target all the key wire centers, and all the key large points of traffic aggregation."[7]  Although the

15    *Fact Report* cites paragraph 298 of the *TRO* as support for this statement, in fact, the

16    Commission made no such finding.  The cite, specifically referring to record evidence on CLEC

17    ability to self-deploy enterprise market loops, indicates that precisely the opposite is true:

18
19          298.  The record contains a wealth of evidence to inform our enterprise
20          market loop analyses.  First, it reflects that competitive LECs have deployed
21          fiber that enables them to reach customers entirely over their own loop

---

6.  *UNE Fact Report*, at H-14.

7.  *Id.*, at III-8, citing *TRO*, at para 298.

ETI ECONOMICS AND
TECHNOLOGY, INC.

1        facilities. When competitive LECs self-deploy fiber they predominantly do so

2        at the OCn-level. In addition, the record shows that competitors have built

3        fiber loops to buildings that carry a significant portion of the competitive

4        traffic in certain MSAs. In contrast, the record contains little evidence of self-

5        deployment, or availability from alternative providers, for DS-1 loops. As for

6        DS-3 loops, evidence of self-deployment and wholesale availability is

7        somewhat greater than for DS-1s and is directly related to location-specific

8        criteria. Indeed, competitive LECs agree that at a three DS-3 loop capacity

9        level of demand, it is economically feasible to self-deploy, and record evidence

10      reveals that both AT&T and WorldCom have self-provisioned DS-3 circuits to

11      many customer locations.[8]

12

13 The Commission recognized that, far from being "equally easy to target all the key wire centers"

14 in large MSAs with respect to loops, based upon capacity and location specific criteria, CLECs

15 were often unable to self-provision loops, even with the evidence of OCn-level deployment.

16

17     16. Tables 7 and 8 of the *UNE Fact Report* purport to show "High-Capacity Service

18 offerings over Competitive Fiber" and that "CLECs Use Their Networks to Provide *Local*

19 *Services.*" Both of these tables, however, consist of nothing but marketing statements from

20 CLECs regarding service availability, and generally make no claims regarding the exclusive use

21 of the CLEC's own self-deployed fiber. In fact, as I noted in my initial Declaration (at para. 39),

22 CLECs often use the term "on-net" or otherwise characterize facilities as being on "their

23 network" when describing *either* owned or leased facilities. There is no reason to assume that

24 *any* of the carriers cited in Tables 7 or 8 are referring to services generally available to customers

25 served entirely and exclusively over the CLECs' own wholly owned facilities.

_____

8. *TRO*, at para. 298, footnotes omitted.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 8 of 98

1    17. State PUC staffs, in contrast with the wholesale claims of the *UNE Fact Report*, have

2    found that wholesale facilities are not generally available.  As the California Public Utilities

3    Commission Staff found in its Investigation Concerning Competitive Local Carriers'

4    Deployment of Facilities:

5

6        Staff thus concludes that no customer locations satisfy the wholesale loop
7        trigger within the SBC territory, and that no locations within the Verizon
8        territory satisfy the wholesale trigger.[9]

9

10    18. CLECs filing comments in this proceeding have confirmed the fact of severely limited

11    non-ILEC wholesale availability of loop facilities.  XO Communications director of Transport

12    Architecture explained that

13

14        Because of limited building presence from other CLECs, we rarely have been able
15        to purchase DS-1 and DS-3 loop facilities from other CLECs.  This is true of all of
16        our markets across the nation.  Indeed, we found that CLECs offer DS-1 and DS-3
17        loops on a wholesale basis to *fewer than 5 percent* of the buildings that XO
18        serves.[10]

19

---

9.  Staff of the California Public Utilities Commission, Administrative Law Judge Division, Telecommunications Division, *Staff Report on Investigation Concerning Competitive Local Exchange Carriers' Deployment of Facilities*, October 4, 2004 ("*California Staff Report*"), at 9-10.

10.  Declaration of Wil Tirado on Behalf of XO Communications, Inc., WC Docket 04-313, October 1, 2004 ("*Tirado (XO)*"), at para. 21, emphasis in original.

ETI **ECONOMICS AND TECHNOLOGY, INC.**

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 9 of 98

1    Similarly, Xspedius states that it "rarely would be able to purchase DS-1 loop facilities from

2    other CLECs. This is true of all of our markets across the nation."[11] Eschelon Declarant Kunde

3    explains that

4
5            If self-provisioning and acquiring high-capacity network elements from third-
6            party providers were realistic alternatives to ordering them from ILECs,
7            CLECs would have little reason to order them from ILECs. CLECs, such as
8            Eschelon, continue to require access to Qwest's unbundled high-capacity
9            loops, however, because self-provisioned and third-party provided high-
10           capacity loops are not available to serve the vast majority of our customers.
11           Relatively few of Eschelon's customers are located in big downtown office
12           buildings that may be 'lit' by competitive facilities.[12]

13

14           19. It is possible to contrast this sworn CLEC evidence with the assertions made in the *UNE*

15   *Fact Report* regarding the claimed availability of wholesale services. Table 9 in the *UNE Fact*

16   *Report* purports to provide a list of high-capacity wholesale services offered by competitive fiber

17   carriers. In every case, the sources for the carriers' "wholesale" offerings are statements made on

18   their respective websites or in the carriers' marketing materials. These sources lack specificity,

19   and provide no details as to the precise type, location or price of the services that the *Fact Report*

20   alleges are being offered. Without such specifics, it is not possible to verify the actual extent and

21   viability of these "wholesale offerings." Indeed, from the "facts" presented in Table 9, it is

---

11.  Declaration of James C. Falvey on Behalf of Xspedius Communications, LLC, WC
Docket 04-313, October 1, 2004 ("*Falvey (Xspedius)*"), at para 26.

12.  Declaration of David A. Kunde on Behalf of Eschelon Telecom, Inc., WC Docket 04-
313, October 1, 2004 ("*Kunde (Eschelon)*"), at para. 16. Similar statements are contained in the
Declarations of all CLEC Coalition witnesses (See fn. 44, *infra*.)

ETI ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 10 of 98

1  impossible to determine if all of the carriers listed provide wholesale services *to even one CLEC*.

2  In at least one case, a carrier cited by the *Report* as providing wholesale services – KMC – has

3  presented sworn testimony in this proceeding that it is not equipped to provide such services.[13]

4  Even where these carriers *do* provide limited wholesale services, the fiber networks owned and

5  operated by these CLECs (as I discuss below and in paragraphs 33-65 of my October 4, 2004

6  Declaration) are inadequate to establish the actual availability of competitive wholesale facilities

7  where required by CLECs.  For example, and as I reported at Table 2 of my October 4, 2004

8  Declaration, QSI Consulting, Inc. had examined ILEC claims as to the presence of trigger-

9  satisfying wholesale providers against specific evidence introduced in state *TRO* proceedings.

10  According to QSI, ILECs had *claimed* that dark fiber was available at 954 locations, whereas the

11  evidence put that figure at zero.  QSI also noted ILEC claims of DS-3 and DS-1 wholesale

12  availability at 719 and 724 locations, respectively, whereas its examination identified only 49

13  DS-3 and 36 DS-1 locations.  Finally, whereas the *Fact Report*'s Table 9 purports to identify

14  some 32 CLECs as providing wholesale services, QSI has advised me that in eighteen state

15  proceedings that it had reviewed, fully seventeen of the companies listed in the *UNE Fact

16  Report*'s Table 9 had not been specifically identified by the petitioning ILECs as satisfying any

17  wholesale triggers.[14]

18

---

13.  Declaration of Mike Duke on behalf of KMC Telecom Holdings, Inc., WC Docket 04-313, October 1, 2004 ("*Duke (KMC)*").

14.  The carriers not identified were Lightpath, Cavalier, TelCove, Comcast, SIGECOM, ChoiceOne, American Fiber Systems, City Signal, LightCore, Northeast Optic, OnFiber, ConEd Communications, PPL, El Paso, Lafayette, Southern Telecom, and AGL.



ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 11 of 98

1    20.  Claims advanced in the *UNE Fact Report* with respect to fixed wireless present

2    speculations as facts regarding the ability of fixed wireless operators to expand the geographic

3    scope of high-capacity networks.  As I noted in my October 4, 2004 declaration (at paragraphs

4    108-112), at present fixed wireless technology faces significant hurdles in attracting and serving

5    enterprise customers.  But now the *UNE Fact Report* notes that "[t]he fixed wireless industry was

6    not doing well at the time the *Order* was issued, but it has been dramatically revived since."[15]

7    The "dramatic revival" to which the *Fact Report* refers is the IEEE industry standard (802.16a),

8    which was recently finalized.  However, as the *Report* notes only in a footnote, "[i]nitial vendor

9    tests are scheduled for the third quarter of 2004, and certified equipment is expected in the

10   market by the first half of 2005."[16]  With the exception of WilTel, every carrier identified in

11   Table 15, "CLEC Use of Fixed Wireless to Extend Fiber Networks" is described as "checking

12   out," "looking at," "looking for," "working with," or "in trials" to use fixed wireless, with

13   statements couched in terms such as "could be a very meaningful breakthrough" "possibility."[17]

14   The new "WiMax" standard is still in its infancy and, as previous excitement over earlier

15   versions of fixed wireless service have shown, technologies rarely live up to their hype.  Indeed,

16   this is confirmed by testimony submitted by XO, which is, or more accurately intends to be, in

17   the fixed wireless business.  XO states that it has

18

---

15.  *UNE Fact Report*, at III-20.

16.  *Id.*, at III-20, fn. 52.

17.  *Id.*, at Table 15.



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 12 of 98

1    ... invested nearly $1 billion in acquiring LMDS spectrum at the 28, 31 and 39 GHz
2    frequencies, which in combination potentially covers 95 percent of the population
3    of the 30 largest U.S. cities.  We made this investment in the hope and expectation
4    that we eventually will be able to use fixed wireless technology as a local loop
5    substitute...  Despite our best efforts, the roll-out was a failure... The results of our
6    testing show that... at some indeterminate future point, wireless loops likely will be
7    able to function as substitute for more than 5 DS-1s or DS-3 local loops in some
8    situations.  However, it is very clear that widespread commercial deployment of
9    wireless local loops will not occur in the near future.  In addition, when it does
10    happen, the wireless local loops solution will only be useful in isolated situations
11    that are conductive to use of the technology.[18]
12

13    The Commission can hardly base a finding of non-impairment on a technology that even

14    substantial investors admit is not yet a viable commercial option, and indeed will never be

15    suitable for large portions of the enterprise market.

16

17        21.  In addition to the nonavailability of *wholesale* cable-based enterprise telecommuni-

18    cations services, there is also no indication that such services are being offered directly by cable

19    TV companies to retail enterprise customers.  As of the date of this Declaration, the only

20    business offerings mentioned on the Comcast, Time Warner Cable, Adelphia and Cablevision

21    websites are high-speed Internet access services.[19]  Cablevision's website indicates two business

_____

18.  *Tirado (XO)*, at paras. 23-35.

19.  Adelphia website, www.adelphia.com (accessed October 19, 2004); Comcast website,
business services, http://work.comcast.net/smallbusiness.asp (accessed October 19, 2004); Time
Warner Cable website,
http://www.rrbiz.com/RoadRunner/sec_tabs.asp?TRACKID=&CID=12&DID=16 (accessed
October 19, 2004); Cablevision website,
http://www.optimum.com/index.jhtml?pageType=business_home&referrer=http%3A//www.opti
mum.com/business (accessed October 19, 2004).

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 13 of 98

1   offerings – "Business Digital Cable" and "Business Internet" – but makes no mention of any

2   specific enterprise services such as frame relay, DSn, private line, digital PBX trunks, or other

3   such services.  Finally, while the Cox website does refer to such services, it specifically indicates

4   that they are provided over *fiber*, not over its cable television coaxial infrastructure.[20]

5

6       22.  Statements such as those cited above from XO belie the claims made in the *UNE Fact*

7   *Report* regarding the extent of fixed wireless use.  Table 13 claims that 40% of enterprise

8   businesses, 29% of mid-sized business, and 23% of small businesses report using fixed

9   wireless.[21]  However, the *Fact Report* provides no indication of the *extent* to which these

10  companies use fixed wireless – which use is, in all likelihood, extremely limited – or, for that

11  matter, what precisely would constitute "use" of "fixed wireless."  For example, does use of a

12  wireless local area network ("LAN") driven by a wireless router than can be purchased for less

13  than $100, constitute "use of fixed wireless?"  Is Starbucks counted as a "user" of fixed wireless

14  because it provides wireless "hot spots" in its stores that provide Internet access to Starbucks

15  customers, with the connection between the individual store and the host ISP being accomplished

16  using *wireline* facilities?  Indeed, the small number of providers cited, and the limited scope of

17  their service offerings (e.g. most of the fixed wireless providers cited in Table 14 provide service

---

20.  Cox carrier services website, http://www.coxbusiness.com/carrierservices_general.asp
(accessed October 19, 2004).

21.  *UNE Fact Report*, at Table 13.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 14 of 98

1   in one or two smaller cities), make it highly unlikely that 40% of large enterprise have adopted

2   fixed wireless in any significant way.[22]

3

4   *Loops*

5

6       23.  With respect to competition for high-capacity facilities and services, the *UNE Fact*

7   *Report* contains no data at all on the availability of competing CLEC facilities for either high

8   capacity transport or high capacity loops.  Instead, the *Report* chooses to present "data"

9   (discussed below) on "CLEC Networks" followed by unsupported *assertions* that the existence

10  of CLEC networks satisfies a competing carrier's need for both high-capacity transport and high

11  capacity loops.  By presenting only highly aggregated data that does not even recognize *any*

12  capacity-based distinctions, that does not differentiate between fiber deployed for customer

13  premises connections (loops) vs. transport, or in some cases that does not even distinguish

14  between "local" and "interexchange" fiber, the *UNE Fact Report* does not even address, let alone

15  contribute any "facts" to support, the kind of specific impairment analysis that the Commission

16  has determined to be necessary.

17

18      24.  Loop facilities represent a sunk cost to a CLEC that is unrecoverable through any other

19  means should the customer cease taking service from the CLEC.  Finally, the effect of the

20  RBOCs' first mover advantage with respect to preferential access to buildings, access to rights-

21  of-way, higher risk of new entrant failure, substantial sunk capacity, operational difficulties, and

────────────────

22.  *Id.*, at Table 14.

ECONOMICS AND
TECHNOLOGY, INC.

1   marketing and brand preferences, are all more pronounced with respect to specific local loop

2   routes than with transport facilities.

3

4       25.  That said, relying upon the *Fact Report*'s assertion that loops are subject to the same

5   type of "similar routes" assessment as applied by the Court to transport facilities, the *UNE Fact*

6   *Report* then purports to show that "competing carriers already terminate their fiber networks in

7   tens of thousands of buildings with many thousands more lying within easy reach."[23]  The *UNE*

8   *Fact Report*, however, fails to make a distinction between those buildings where CLECs "already

9   terminate their fiber networks" and those "lying within easy reach."  Of course, the authors offer

10  no specific definition or standard for their "within easy reach" assessment, but instead seek to

11  imply that where a potential customer is located within or nearby a building at which the CLEC

12  already has fiber in place, that customer can be served with minimal delay and at minimal cost.

13  Sworn testimony offered by various CLEC executives and network engineers, of course, have

14  put a lie to the *UNE Fact Report*'s undocumented speculations.[24]

15

---

23.  *Id.*, at III-31.

24.  See generally, *Tirado (XO)*; *Duke (KMC); Falveny (Xspedius)*; *Kunde (Eschelon)*;
Declaration of Rebecca H. Sommi on Behalf of Broadview Networks, Inc., WC Docket 04-313,
October 1, 2004 ("*Sommi (Broadview)*"); Declaration of Warren Brasselle on Behalf of Talk
America Inc., WC Docket 04-313, October 1, 2004 ("*Brasselle (Talk America)*"); Declaration of
Anthony Abate on Behalf of SNiP LiNK, LLC, WC Docket 04-313, October 1, 2004 ("*Abate
(SNiP LiNK*"); Declaration of Dan J. Wigger on Behalf of Advanced Telecom, Inc., WC Docket
04-313, October 1, 2004 ("*Wigger (Advanced)*").

ETI  ECONOMICS AND
TECHNOLOGY, INC.

1    26.  In my October 4, 2004 declaration, I provided an analysis of the various maps and tables

2    initially presented by the RBOCs in *ex parte* submissions in WC Docket 01-338.[25]  As I

3    explained, based upon the competitive fiber maps, CLECs often find it prohibitively expensive to

4    connect buildings to their networks, even where they have fiber "lying within easy reach" of the

5    specific location in question.  As it turns out, the *UNE Fact Report* contains many of the same

6    "route mile" and "on net" building errors as the tables presented by Verizon in its July 2, 2004 *ex*

7    *parte*.

8

9    27.  The *Report*'s figures for CLEC route miles of fiber and building connections present

10   out-of-context marketing and press material that rarely provides the information that is described

11   in the *Fact Report* document, and as such cannot be relied upon as "fact" to provide a reasonable

12   picture of CLEC network capabilities.  For example, Table 2, Section III of the *UNE Fact Report*

13   purports to show the facilities available from "Fiber Wholesalers" including the MSAs served,

14   network miles and buildings connected directly with competitive fiber.  An examination of the

15   source documentation cited as the basis for the preparation of this table, however, uncovers

16   numerous examples of misleading use of company statements.  For example:

17

18   •    AboveNet states that it has 1.4 million metro fiber miles, which provides no information

19        on actual route miles.  Also, AboveNet's 1.4 million metro fiber miles are in major US

20        markets as well as in London, England.  An inspection of network maps for AboveNet's

25.  *Selwyn October 4, 2004 Declaration*, at paras. 36-49.

ECONOMICS AND
TECHNOLOGY, INC.

1    US vs. London markets indicates that a very significant portion of this fiber is *not*

2    deployed in the US at all.[26]

3

4  •  LightCore is a wholly owned subsidiary of CenturyTel – an ILEC – and apparently

5    owns fiber facilities in CenturyTel's ILEC operating areas as well as areas in which the

6    company operates as a CLEC.[27]

7

8  •  NEESCom/Gridcom states that it "passes" 177 buildings, not that it has directly

9    connected the buildings to its network.[28]

10

11  •  Northeast Optic Network (NEON) indicates that, despite its metro fiber ring network, it

12    does not usually provide local loops.  NEON indicates that it:

13

14    can assist customers in three ways with the Local Loop:  We will source it, buy it,
15    and re-sell it to customers; Customers can source and buy it themselves and NEON
16    will connect them; NEON will work with building managers or other real estate
17    professionals to provide custom builds at specific, larger locations.  NEON will
18    consider providing Local Loop on an individual, case-by-case basis. Some of the

---

26.  AboveNet Website, AboveNet Products and Services Resources, IP and Fiber Maps,
http://www.above.net/products/maps.html (accessed October 15, 2004).

27.  CenturyTel Website, Company Profile, Service Areas,
http://www.centurytel.com/about/companyProfile/index.cfm (accessed October 15, 2004);
LightCore Website, Network Map, http://www.lightcore.net/network_nm.php (accessed October
15, 2004).

28.  NEES Metro Rings Website,
http://www.gridcom.com/neescom/prod_servc/metro/index.htm (accessed October 15, 2004).

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 18 of 98

1        criteria we assess include: how far is the customer's location off-network?; how
2        much capacity is required?; and what are the customer's needs?[29]
3

4    •    The NEON "Building List 2004" cited in Appendix H of the *UNE Fact Report* as a

5        basis for its figure of 177 NEON "lit" buildings actually contains a list of NEON

6        network facility locations, such as BOC Central Offices, and Common Carrier Access

7        points and Nodes, both "planned" and "existing"– *none of these buildings are end user*

8        *customer locations* and, as noted above, NEON states that it does not provide end-user

9        loop connectivity.[30]

10

11   •    The *UNE Fact Report* claims that OnFiber is providing service at 1,000 on-net

12       buildings.  However, OnFiber states that "the OnFiber network currently reaches or

13       passes almost 1,000 commercial buildings and Points of Presence (POPs)."[31]  "Passes"

14       does not ordinarily mean "connected," and it is not at all clear as to what "reaches"

15       means.  However, it would appear, at the very least, that the "facts" reported in the

16       "Fact Report" are less than accurate.

---

29. NEON Website, Frequently Asked Questions, http://www.neoninc.com/ (accessed October 15, 2004).

30. NEON Communications Building List 2004, http://www.neoninc.com/ (Link accessible from "Frequently Asked Questions" section of webpage, accessed October 15, 2004).  Note that this building list indicates 145 existing buildings and 37 planned buildings.

31. OnFiber Press Release, *OnFiber Achieves Triple Digit Revenue Growth for Second Consecutive Year*, February 9, 2004, Available at, http://www.onfiber.com/interior.asp?section=press&page=press_release&release=pr040209 (accessed October 25, 2004).

ETI ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 19 of 98

1    28. The speculation and assumptions behind the "Network Miles" figures included in Tables

2    1, 2 and 3 of the *UNE Fact Report* fail to properly isolate local fiber miles.  NEESCom/Gridcom,

3    a "Fiber Wholesaler," states that its route miles are a combination of local and regional miles,

4    consisting of both "regional backbone and expanding family of metro rings."[32]  Progress

5    Telecom, one of the utilities that the *UNE Fact Report* identifies as a wholesale provider of local

6    fiber, is cited as having 8,524 network miles.  In fact, this network consists significantly of long

7    haul fiber assets stretching from New York to Miami.[33] The UNE Fact Report indicates that AGL

8    Networks "installs more than 50,000 laterals and 750 miles of conduit per year."[34]  In fact, since

9    AGL only reports 235 route miles of fiber *altogether*, it seems rather unlikely that AGL

10   Networks installs anywhere near 750 fiber route miles annually.  AGL notes that "AGL

11   Resources" *not* "AGL Networks" installs these laterals and conduit miles.  AGL Resources is the

12   parent company of AGL Networks, but also the parent of Atlanta Gas Light, Chattanooga Gas,

13   Virginia Natural Gas, Georgia Natural Gas and Sequent Energy Management.[35]  Despite the

14   claims of the *UNE Fact Report*, it is reasonable to assume that the vast majority of laterals and

15   conduit laid by AGL does not include fiber, but rather is gas infrastructure.  Likewise, Con

---

32.  NEESCom Website, "The NEESCom Edge,"
http://www.gridcom.com/neescom/edge/index.htm (accessed October 15, 2004).

33.  Progress Telecom Network Map, Progress Telecom Website,
http://www.progresstelecom.com/pdf/Network%20Map.pdf (accessed October 15, 2004).

34.  *UNE Fact Report*, at Table 3.

35.  AGL Networks Website, Corporate Organization,
http://www.aglnetworks.com/content/company/agln_ourcom_cororg.html?onImage=0&onImage
=8 (accessed October 15, 2004).



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 20 of 98

1   Edison Communications and PPL Telcom note merely that their networks pass "within 2 city

2   blocks" or "within a half mile" of the business location figures cited.[36]  Finally, FPL FiberNet,

3   far from having a network that, "reaches '2.2 million business lines in the state' of Florida"

4   actually claims that its network, "crosses the service territories of the three major local telephone

5   companies in Florida, ultimately reaching 2.2 million business lines in the state" clearly *not*

6   implying that it is already connected to all 2.2 million business lines in Florida.[37]

7

8   ***Transport***

9

10      29.  The *UNE Fact Report* asserts that "competitive entrance facilities are available, at a

11   minimum, in every wire center where one or more competing carriers has collocated fiber-based

12   transmission equipment."[38]  The *Report*'s authors cite the *Pricing Flexibility Order* to

13   substantiate this claim, arguing that it holds that "fiber-based collocation provides strong

14   indication of competitive entrance facility deployment."[39]  But the *Report* conveniently ignores

---

36.  *UNE Fact Report,* at Table 3.

37.  *Id.*, at Table 3; Press Release, *FPL FiberNet, FPL FiberNet announces service availability in St. Petersburg metro*, September 24, 2001, available at: http://www.fplfibernet.com/news/contents/01126.shtml (accessed October 15, 2004).

38.  *Id.*, at III-27.

39.  *Id.*, at fn. 79, citing *Access Charge Reform,* CC Docket No. 96-262; *Price Cap Performance Review for Local Exchange Carriers*, CC Docket No. 94-1; *Interexchange Carrier Purchases of Switched Access Services Offered by Competitive Local Exchange Carriers*, CCB/CPD File No. 98-63; *Petition of U S West Communications, Inc. for Forbearance from Regulation as a Dominant Carrier in the Phoenix, Arizona MSA*, CC Docket No. 98-157; *Fifth*

(continued...)



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 21 of 98

1  the Commission's finding at para. 397 of the *TRO* that the mere existence of competitive

2  entrance facilities is not evidence of non-impairment with respect to unbundled transport.  There,

3  the Commission found that identification of only one fiber-based collocation arrangement in a

4  wire center was not sufficient for a finding of non-impairment.  The Commission required that,

5  based upon a simple headcount of collocation, BOCs were required to show competitive facilities

6  from three different CLECs.  As the Commission explained,

7

8        407.  We set the number of competitive facilities at three for several
9  reasons.  First, we want to be assured that the route can support "multiple,
10  competitive" transport networks.  Second, setting the trigger at three
11  competitive facilities allows for the possibility that some network owners may
12  not be interested in providing wholesale services, in contrast with the
13  wholesale availability trigger which counts only actual wholesalers.  Third, due
14  to the sunk nature of transmission facilities, facilities will remain on a route
15  even if a competitive transport provider exits the market.  Furthermore, we
16  note that where, through the application of this trigger, impairment for
17  unbundled transport at a particular capacity is no longer found, substantial
18  competitive transport facilities, and perhaps other capacities of UNE transport
19  will be available.  Therefore, if this trigger removes unbundled transport at a
20  particular capacity level, carriers will remain capable of serving end-user
21  customers in all areas. This will provide certainty for new market entrants.[40]
22

23  Far from attempting to ascertain the availability of wholesale transport or presenting data for

24  wire centers meeting the Commission's "three collocator" non-impairment test, the *Fact Report*

25  instead presents Table 4, which purports to show the "Percentage of Wire Centers and Access

---

39.  (...continued)
*Report and Order and Further Notice of Proposed Rulemaking,* FCC No. 99-206, 14 FCC Rcd
14221 (1999) ("*Pricing Flexibility Order*"), 14 FCC Rcd 14265, at para 81 (1999).

40.  *TRO*, 18 FCC Rcd 17231, footnotes omitted.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 22 of 98

1    Lines Served by One or More Fiber-Based CLEC Collocation Nodes." Far from confirming

2    non-impairment, this Table actually demonstrates that competitive transport is certainly not

3    available in a large number of RBOC wire centers. For example, only 13% of Verizon wire

4    centers in the 25 largest MSAs (presumably areas with the most competitive transport activity)

5    contain even *one* CLEC fiber-based collocation. The figures presented by other RBOCs are no

6    closer to meeting the Commission's standards, with SBC showing 15% of wire centers and

7    BellSouth showing 20% of wire centers containing one or more collocations.[41] Overall, the

8    *Report* claims that 16% of RBOC wire centers contain at least one fiber-based collocation. It is

9    reasonable to assume that the percentage of wire centers containing *three* fiber-based collocation

10    arrangements is significantly smaller, but of course this key metric is nowhere to be found in the

11    *UNE Fact Report*.[42]

12

13        30. The *UNE Fact Report* authors claim that

14

15        ... competing carriers have already obtained fiber-based collocation in 16
16        percent of Bell company wire centers, which contain 47 percent of total access
17        lines and 55 percent of total business lines. More than half of all BOC wire
18        centers with 5,000 or more *business* lines now have fiber-based collocation.
19        *See* Table 17. It is therefore reasonable to conclude that other wire centers that
20        meet this criterion could economically support competitive fiber as well.[43]

21

---

41. Data for Qwest contains only the seven largest MSA, resulting in a significantly lower number of total wire centers and higher percentage of collocation.

42. The source data provided in the *UNE Fact Report* is insufficient to make this determination.

43. *UNE Fact Report*, at III-28.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 23 of 98

1    No support whatsoever is advanced for this giant leap from what is to what might be.  Indeed,

2    sworn testimony by executives at a number of CLECs – individuals that unlike the authors of the

3    *UNE Fact Report* have had first-hand experience with the economic considerations and business

4    decisions associated with network construction – belie the *UNE Fact Report*'s "facts."[44]

5

6        31.  In fact, this RBOC claim is belied by the *UNE Fact Report*'s own Table 17.  There, the

7    *Report* indicates that only about 53% of wire centers meeting this "5000 business lines" criterion

8    (56% for Verizon, 40% for SBC and 70% for BellSouth) actually contain collocation by at least

9    one CLEC,[45] and as with Table 4, it is reasonable to assume that, if the *Report's* authors had

10   included wire centers with *three* competitive collocations, the percentage of wire centers with

11   viable competitive transport would be significantly smaller.

12

13       32.  It is also noteworthy that Table 17 of the *UNE Fact Report* (presenting "Fiber Based

14   Collocation in Wire Centers with 5,000 or More Business Lines") does not provide the

15   percentage of total business lines included in those wire centers with 5,000 or more business

16   lines.  In its Table 4, the *Report* contains not only the percentage of wire centers containing fiber-

17   based collocation, but also the percentage of business lines and access lines served by those wire

---

44.  See, generally*, Tirado (XO)*; *Falveny (Xspedius)*; *Kunde (Eschelon)*; *Sommi (Broadview)*; *Brasselle (Talk America)*; *Abate (SNiP LiNK)*; *Duke (KMC); Wigger (Advanced)*.

45.  Again, the data for Qwest contains only the seven largest MSAs, resulting in a significantly lower number of total wire centers and higher percentage of collocation.  Though not noted, it can be assumed that, as with Table 4, the *Report's* authors only included wire centers in the 25 largest MSAs.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 24 of 98

1    centers.  These figures (55% of all business lines and 47% of total lines) are repeated several

2    times in the *Report*'s text.[46]  Table 17, containing data based upon the *Report's* proposed

3    standard of wire centers with 5,000 or more business lines, contains no such corollary figures,

4    nor can such figures be extracted based upon the data provided.  Instead, Table 17 appears to

5    include only the percentage of wire centers with *both* more than 5,000 lines *and* CLEC fiber-

6    based collocation.[47]  This is not the relevant data the Commission needs to evaluate even under

7    the *Report's* proposed 5,000 line standard.  To evaluate impairment on the 5,000 business line

8    per wire center level, the Commission would require, at a minimum, a business case showing

9    that, for *all* wire centers with 5,000 or more business lines, competitive deployment by multiple

10   (i.e., at least three) CLECs is economic.  Given that, according to the *UNE Fact Report*, not even

11   one CLEC has chosen to collocate in nearly half of the wire centers the *Report* indicates are

12   addressable, the conclusion that such collocation is economically *possible* for *three* CLECs

13   cannot withstand scrutiny.

14

---

46.  *UNE Fact Report*, at III-7, III-29, III-31.

47.  The exact contents of Table 17 are unclear, since the column heading explains that it
contains the, "Percentage of Wire Centers with 5,000 or More Business Lines and Access Lines
Served by These Wire Centers with One ore More Fiber-Based CLEC Collocation Nodes," yet
the table contains only two columns, "# of Wire Centers" and "% of All WCs."  Though unclear,
I have assumed that the "# of Wire Centers" Column contains the number of wire centers with
5,000 or more business lines in the top 25 MSA (7 for Qwest) and the "% of All WCs" column
contains the percentage of all wire centers in the 25 MSA (7 for Qwest) with 5,000 or more lines
and CLEC Collocation Nodes.  The Table does not appear to contain any percentages based upon
access lines.



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 25 of 98

1    33.  Finally, as I discussed extensively at paras. 52-57 of my October 4, 2004 declaration, in

2    contrast to ILEC networks, the architecture of CLEC networks consist of interoffice transport

3    facilities used *solely* to *extend subscriber loops* from the RBOC wire center associated with the

4    customer's premises to a point on the CLEC's network where connectivity can be efficiently

5    achieved.[48]  As confirmed in the sworn testimony of a number of CLEC declarants, as well as in

6    the October 4, 2004 declaration of AT&T witnesses Fea and Giovannucci, CLEC networks do

7    not require or provide point-to-point connectivity between individual pairs of ILEC wire centers,

8    and as such no inference can be drawn that such transport using CLEC facilities is "possible"

9    merely because a particular CLEC – or multiple CLECs – happen to maintain collocations at the

10   wire centers in question.[49]  Other than reiterating this same unsupported speculation as to what

11   CLECs can "possibly" do with facilities in place, the *UNE Fact Report* itself offers no "facts"

12   that bear on this subject at all.

---

48.  *Selwyn October 4, 2004 Declaration*, at paras. 52-57.

49.  *Kunde (Eschelon)*, at para. 10; *Abate (SNiP LiNK)*, at paras. 11-12; *Tirado (XO)*, at para.
38.



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 26 of 98

1           **CLEC USE OF SPECIAL ACCESS**

2

3      **CLECs are not "flourishing" using special access to serve enterprise customers.**

4

5           34.  CLECs are frequently forced to use ILEC facilities obtained as special access services

6      rather than as UNEs to serve enterprise customers, because of use restrictions, "no facilities"

7      restrictions, special access constraints that require the purchaser to commit its traffic to special

8      access and refrain from buying UNEs to obtain discounts, or all-too-common RBOC refusals to

9      provision UNEs.  Thus, the use of special access rather than UNEs is rarely a matter of choice for

10     a CLEC.

11

12          35.  Other than various unsupported claims, no actual evidence has been introduced in this

13     proceeding showing that any CLECs are profitably using special access to serve enterprise

14     customers.  Verizon asserts that three particular carriers – Time Warner Telecom, US LEC, and

15     TelePacific – are "successfully" using special access which, according to Verizon, supports its

16     contention that UNEs are not necessary for successful CLEC operation.[50]  Verizon suggests that

17     these "poster children" have  achieved successful business models based upon use of special

18     access services.  However, contrary to the rosy picture Verizon seeks to portray, even these

19     poster children are neither profitable nor "typical" CLECs.

20

---

50.  *Verizon Comments*, at 61.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 27 of 98

1      36.  Verizon points to public statements of Time Warner Telecom and US LEC in which

2  each carrier had indicated that it was not reliant upon UNEs.  The conclusion that Verizon would

3  have the Commission draw is that special access facilities provide viable alternatives to UNEs.

4  Whatever purpose such statements on the part of these carriers may have served, they are not

5  sufficient, standing alone, to support Verizon's overarching contention.  For example, US LEC's

6  statement, apparently made in an attempt to assuage investor concerns arising out of the court

7  decision overturning the *TRO*, highlighted the fact that its provisioning methods were different

8  than most CLECs.  US LEC represented that it was "well positioned to address the uncertainty

9  around UNE services, *since unlike many of our competitors*, over 90% of our customer T-1s are

10  not UNE based."[51]  Verizon, however, offered no evidence that its three poster children were

11  actually profitable, let along "flourishing," under their claimed special access business model.  In

12  fact, none of these three carriers are profitable.

13

14  ***CLECs relying upon special access instead of UNEs are not profitable.***

15

16      37.  Time Warner Telecom ("TWTC") has lost money in each of the last three years.  Most

17  recently, the company reported net income of *negative* $89-million for 2003.[52]  To make matters

---

51.  US LEC Press Release, "US LEC Achieves $91.6 Million in Revenue and $12.9 Million in EBITDA," July 29, 2004.  Available at http://www.uslec.com/News.aspc?I=_Press Center&IFace=296, (accessed October 8, 2004) Emphasis supplied.

52.  Time Warner Telecom, 2003 10-K, filed with the Securities and Exchange Commission March 12, 2004.


ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 28 of 98

1    worse, TWTC has also experienced declining revenues for each of the past two years.[53]  The net

2    effect of all this has been a poor performing stock that has fallen by more than 50% over the past

3    twelve months.  Quite clearly, these metrics are not indicative of a healthy company.[54]  Time

4    Warner Telecom may be using a combination of its own facilities and special access, but it could

5    hardly be argued that the firm is "flourishing" by using that strategy.[55]

6

7       38.  Like Time Warner Telecom, it appears that US LECs' financial picture is less than

8    bright.  After eight years in operation, US LEC has turned a profit only once, and that was back

9    in fiscal year 1999.[56]  According to its most recent 10-K, US LEC has *lost money* in each of the

10   last four years.[57]  While US LEC's loss this past year (roughly $30-million) is less than its losses

11   in each of the prior three years, the company's balance sheet continues to degrade.  Since 2000,

---

53.  *Id.*

54.  The stock price has fallen from roughly $12 in October 2003 to roughly $5 as of October 2004.  See http://finance.yahoo.com/q/bc?s=TWTC&t=1y (accessed October 12, 2004).

55.  TimeWarner Telecom (TWTC), once an affiliate of Time Warner and its cable subsidiary, may also be  in a somewhat different position than other CLECs. While TWTC is now a separate company, Time Warner still owns 44% of the aggregate equity interest in TWTC and 71% of the aggregate voting interest.  Time Warner Inc., 2003 10-K, March 15, 2004, at 21. Indeed, TWTC still carries the "Time Warner" brand.  And although Time Warner Inc. maintains that its interest in TWTC *is not strategic*, TWTC *may* potentially have the opportunity to utilize Time Warner's cable facilities in a manner that is not available to other CLECs.  The fact that, even with that potential advantage, TWTC is operating in the red also speaks volumes about the viability of cable as an alternative to ILEC facilities.

56.  US LEC Corp., 2003 10-K filed with the Securities and Exchange Commission, March 23, 2004.

57.  *Id.*

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 29 of 98

1    total shareholder equity has plummeted from negative $22-million to negative $171-million.[58]

2    This poor performance led analyst Vik Grover of Heedham & Co. to value shares of US LEC at

3    $1.12 per share, far below its trading price of about $4.  According to the *Charlotte Business*

4    *Journal*, Grover contends that stiffening competition and too much debt and preferred stock

5    cloud US LEC's future.[59]

6

7        39.  Moreover, even though US LEC is at present primarily a special access-based provider,

8    statements in its most recent 10-Q report suggest that US LEC is well aware that UNEs offer

9    significant opportunities that special access does not, and that should UNEs continue to be

10   available in the future, its business plan would likely involve substitution of UNEs for special

11   access.[60]  In its most recent 10-Q report, US LEC stated that "while a decision by the FCC to

12   eliminate UNEs entirely or to permit significant price increases on those products would not, in

13   and of itself, have a material adverse impact on the Company, it would remove a significant

14   opportunity for future cost-savings."[61]  Loss of "a significant opportunity for future cost-savings"

---

58.  *Id*.

59.  *Analyst Sees Trouble Ahead at US LEC*, Charlotte Business Journal, July 23, 2004, available at http://charlotte.bizjournals.com/charlotte/stories/2004/07/26/story3.html?t=printable, (accessed October 11, 2004).

60.  US LECs  reliance on special access facilities rather than UNEs in the face of its acknowledgment that UNEs offer "significant savings" suggests that US LEC may be among the many CLECs that are using special access services rather than UNEs today because they must, not because they choose to.

61.  US LEC Corp., Second Quarter 10-Q filed with the Securities and Exchange Commission, August 11, 2004.


ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 30 of 98

1    by a company that has lost money for four straight years may be more of a material and adverse

2    impact than US LEC cares to admit.

3

4        40.  TelePacific, a west coast-based CLEC, is also highlighted by Verizon for its "exclusive"

5    reliance on special access facilities and its growth over the last 18-months.[62]  However, there is

6    no evidence that TelePacific is operating profitably using this business model, or that it intends

7    to continue to rely "exclusively" upon special access facilities to serve its current or future

8    customer base.  TelePacific is a privately owned company that does not publish financial reports.

9    TelePacific did however, issue a press release heralding the fact that it had achieved a positive

10   *EBITDA* (*E*arnings *B*efore *I*nterest, *T*axes, *D*epreciation, and *A*mortization) for the second quarter

11   of 2004.[63]  A positive *EBITDA*, while certainly better than a negative *EBITDA*, is certainly not

12   the same as a net positive profit, since it excludes interest, taxes, depreciation and amortization.

13   Presumably, if TelePacific were actually generating positive net income (not just positive

14   EBITDA), it certainly would have said so.[64]

15

---

62.  *Verizon Comments*, at 58.

63.  TelePacific Press Release, "TelePacific Communications Posts Positive EBITDA in Second Quarter of 2004," July 28, 2004, available at http://www.telepacific.com/aboutTelePacific/press/press.asp?id=2010 (accessed October 5, 2004).

64.  Note US LEC's press release referenced in footnote 51, *supra*, that it had achieved "$91.6 Million in revenue and $12.9 Million in EBITDA" in the 2nd Quarter of 2004.  That same press release also indicated a net loss to common stockholders of $12.3-million.


ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 31 of 98

1    41.    Additionally, part of TelePacific's apparent "success" appears to be the result of other

2    CLECs' misfortunes.  TelePacific appears to have picked up customers and assets at fire sale

3    prices from other CLECs that had gone bankrupt.  At least one such "purchase" was detailed in a

4    September, 2002 article in the *North Bay Business Journal*. The article details TelePacific's

5    expansion into the northern California region through purchase of  "ATG's equipment *and*

6    *customers* in San Rafael and Concord."[65]  The equipment was apparently worth $20-$25 million,

7    but TelePacific picked it up for $500,000.[66]  TelePacific's CEO, Dick Jalkut (former CEO of

8    NYNEX Telephone Companies), is quoted as saying that "TelePacific got such a sweet deal on

9    ATG's equipment and customers in San Rafael and Concord in the bankruptcy sale that it can

10   afford to compete aggressively with the providers already in those areas."[67]  As Mr. Jalkut went

11   on to boast, "the lucky strike extra was 1,100 subscribers with an annual run rate of $450,000 a

12   year."[68]  It may well be that TelePacific's ability to operate using (presumably) the same kinds of

13   special access facilities in the same market and with the same customers in which ATG went

14   bankrupt, is that TelePacific was able to do so without incurring much in the way of customer

15   acquisition costs (including steep special access NRCs) or switch costs.  In any event, the overall

---

65. Loralee Stephens, *TelePacific Dialing Up North Bay Customers*, North Bay Business
Journal, September 2, 2002, emphasis supplied.  Available at
http://www.telepacific.com/aboutTelePacific/press/featuredArticles/northBay.asp (accessed
October 5, 2004).

66. *Id.*

67. *Id.*

68. *Id.*



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 32 of 98

1   scale and geographic scope of TelePacific's operations are so minuscule when compared with

2   other CLECs that it can hardly be considered as "representative."

3

4   ***Persuasive evidence that UNEs are essential to the profitable operations for CLECs***

5

6       42.  With the apparent exception of those few CLECs highlighted above, most others have

7   stated, in many cases in sworn testimony before this Commission, that UNEs are essential to

8   their continued operation.  Facilities-based CLECs readily acknowledge that the greatest profit

9   margins are earned on services provided over their own facilities.  These same CLECs also

10  readily acknowledge that it is not always possible to reach customers over their own facilities.

11  For these instances, cost-based UNEs provide the only viable long-run opportunity for these

12  CLECs to compete with the ILECs for customers.  Special access services – services whose rates

13  are set at multiples of costs and in most cases are no longer rate regulated at all – are just plain

14  *too expensive* to use to provision local services.

15

16  ***XO:***  XO states that "special access pricing for DS-1 level service is much too high to be

17      used by CLECs such as XO to craft competitively-priced service offerings."[69]  According to

18  Laura D. Inniss, Vice President of XO's Telco Cost Management, "even under term and

---

69.  *Unbundled Network Elements*, WC Docket 04-313; *Review of the Section 251
Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket 01-338, Emergency
Petition For Expedited Determination that Competitive Local Exchange Carriers are Impaired
Without DS-1 UNE Loops, XO Communications, Inc., filed September 29, 2004 ("*Emergency
Petition of XO Communications*"), Exhibit 3, Declaration of Laura D. Inniss on behalf of XO
Communications at 12.

ETI  ECONOMICS AND
     TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 33 of 98

1    volume commitment plans, XO commonly must pay 20 percent to almost 75 percent more to

2    purchase connections to buildings as DS-1 special access versus DS-1 UNEs."[70]  This price

3    comparison was based upon special access prices under five-year term plans in Florida,

4    Texas, New York, Illinois, and Washington.  For a two-year OPP term, the price disparity

5    increases to somewhere between 75% and 147%.[71]

6

7    **Xpedius**: James C. Falvey, a Senior Vice President of Regulatory Affairs at Xspedius

8    indicates that "use of ILEC Special Access to provide local telecommunications is not

9    economic."[72]  He adds that "[w]ithout access to ILEC-provided DS-1 and DS-3 UNE loops

10   priced at TELRIC, our existing business would be severely harmed, and future sales against

11   the ILECs extremely difficult to pursue."[73]

12

13   **Advanced Telecom**:  Advanced Telecom describes itself as "a true facilities-based CLEC

14   that is committed to deploying its own facilities wherever such construction can be

15   economically justified,"[74] yet it has indicated that DS-1 and DS-3 UNE loop facilities are

16   critical to its ability to compete.  Its Vice President of Network Engineering and Operations,

---

70. *Id.*, Exhibit 3, Declaration of Laura D. Inniss on behalf of XO Communications, at 3.

71. *Id.*, Exhibit 3, Declaration of Laura D. Inniss on behalf of XO Communications, at Attachment 1.

72. *Falvey (Xspedius)*,  at 6.

73. *Id.*, at 7.

74. *Wigger (Advanced)*, at para. 5.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 34 of 98

1    Dan Wigger, testifies that "use of ILEC Special Access to provide local telecommunications

2    services is not economic"[75] and that "Advanced Telecom commonly must pay 200% to

3    300% more to purchase connections to buildings as DS-1 Special Access versus DS-1

4    UNEs.  Indeed, the difference is [in some instances] as high as 1,000%."[76]  Advanced

5    Telecom's "analysis shows that if [it was] required to replace DS-1 UNE loops with Special

6    Access services across the board, [its] operating margin would be completely wiped out."[77]

7

8    **Broadview Networks:**  Broadview Networks also indicates that special access services are

9    not a viable alternative to UNEs.  Rebecca Sommi, Vice President of Operations Support,

10   testified that "Broadview has built its network and based its competitive service offerings on

11   several cost factors, and the continued availability of UNEs is paramount."[78]  She also stated

12   that "[i]f ILECs are permitted to convert Broadview's network to special access, overall

13   transport and DS-1 loop costs would increase by approximately 225%."[79]

14

15   **KMC Telecom:**  KMC Telecom states that "KMC simply will not be able to provide

16   competitive telecommunications services to small and medium business customers in most

---

75. *Id.*, at para. 11.

76. *Id.*, at para. 50.

77. *Id.*, at para 51.

78. *Sommi (Broadview)*, at para. 15.

79. *Id.*, at para. 14.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 35 of 98

1  areas unless the FCC acts to insure that we are able to continue obtaining cost-based DS-1

2  UNE loops and EELs on an uninterrupted basis."[80]  According to KMC's Director of

3  Government Affairs, Mike Duke, "ILEC Special Access is not an economically feasible

4  alternative because Special Access rates are priced far above cost already and increasing

5  steadily."[81]

6

7  ***Talk America:***  Talk America also states that the use of special access services as a

8  replacement for cost-based UNEs would simply be too expensive to allow it to continue

9  operations.  "Talk America must pay a premium of 6,000% to 13,000% to purchase

10  interoffice transport as Special Access versus DS-1 and DS-3 UNE interoffice transport, and

11  the difference can be as high as $2,136 per DS-3."[82]  According to Warren Brasselle, Talk

12  America's Executive Vice President of Network Operations, "[i]f Talk America were

13  compelled to order all of its DS-3 transport as Special Access, our existing integrated voice

14  and data services offered to residential and small business customers would be rendered

15  uneconomic, and our ability to offer services to off net customers would end."[83]

16

---

80.  *Duke (KMC)*, at para 26.

81.  *Id.*, at para 26.

82.  *Brasselle (Talk America)*, at para. 12.  Additional pricing information is available in Attachment A to the Brasselle testimony.

83.  *Id.*, at para. 17.

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 36 of 98

1    43.  A direct comparison of special access rates to UNE rates adds credence to the CLECs

2    claims.  Even the Bells' very lowest tariffed rates, available only with potentially anticompetitive

3    conditions that lock up essentially all of the purchaser's demand and thus foreclose facilities

4    based competition even in the limited areas where it could otherwise be feasible, are significantly

5    above the rates for equivalent UNEs.  AT&T declarant Joseph Stith, in his October 4, 2004

6    declaration accompanying AT&T's initial comments, demonstrated that "for the DS-1 [optional

7    pricing plan] OPP rates – which represent the single largest expense for AT&T and the industry –

8    Ameritech's price cap rates are on average more than 150% higher than the UNE rates.

9    BellSouth's are 104% higher, Qwest's are 97% higher, and Verizon-North's are 83% higher.

10    Comparisons to Pricing Flexibility OPP rates are even more staggering, ranging from 129%

11    higher for Verizon to 171% higher for Ameritech."[84]

12

13    **Like their smaller counterparts, even the largest CLECs are in no sense "flourishing" as a**
14    **result of their required purchases of special access services as the principal means for**
15    **obtaining access to RBOC hi-cap facilities.**
16

17    44.  The financial situations of the larger CLECs confirm that even they are in no sense

18    "flourishing."  Annual Reports to Shareholders and 10-K reports filed with the SEC show that

19    AT&T, MCI, and Sprint FON Group[85] have each faced consistently declining enterprise segment

---

84.  Declaration of M. Joseph Stith on behalf of AT&T, WC Docket 04-313, October 4, 2004 ("*Stith (AT&T)*"), at 5.  See also *Declaration of M. Joseph Stith*, Attachment 1, at 1.

85.  Data for Sprint FON Group excludes Sprint PCS, which was at the time a separate tracking stock.  However, it *includes* data for the Sprint ILEC operations, which are generally not purchasers of RBOC special access services.



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 37 of 98

1    revenues over the past three years.  In 2001, AT&T realized $27.7-billion in business segment

2    revenue.[86]  In 2002, that number had decreased to $26.6-billion, and in 2003, business segment

3    revenues had dropped to only $25.0-billion – more than a 9% revenue decrease in just two years.

4    The outlook for 2004 is even worse – annualized results based upon quarterly reports put

5    AT&T's business segment revenues at just over $22.3-billion for the year, a 19.5% decrease

6    since 2001.[87]

7

8       45.  MCI and Sprint FON Group exhibit similar results, demonstrating that these CLECs are

9    anything but "flourishing."  Sprint's FON Group business segment revenues have declined from

10   $9.9-billion in 2001, to $8.9-billion in 2002, and to $8.0-billion in 2003.[88]  Annualized data for

11   2004 puts Sprint FON Group's business segment revenue at $7.5-billion,[89] representing a 24.2%

12   decrease in business segment revenue since 2001.  MCI's business segment revenue has

13   decreased from $21.0-billion in 2001, to $17.5-billion in 2002, and to $14.1-billion in 2003.[90]

14   Annualized results put MCI's 2004 business segment revenues at approximately $11.7-billion, a

---

86.  AT&T Corp., 2003 10K Report, March 15, 2004.

87.  AT&T Corp., Second Quarter 2004 10Q Report, August 4, 2004.

88.  Sprint Corp., 2003 10K Report, March 9, 2004.

89.  Sprint Corp., Second Quarter 2004 10Q Report, August 5, 2004

90.  MCI, Inc., 2003 10K Report filed with the US Securities and Exchange Commission, April 29, 2004.



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 38 of 98



**Figure 1.** Declining Annual Business Segment Revenue - Large CLECs (2004 data is annualized).

1    stunning 44% decrease since 2001.[91]  Figure 1 summarizes the declining revenues of these three

2    companies.

3

---

91.  MCI, Inc., Second Quarter 2004 10Q Report filed with the US Securities and Exchange Commission, August 9, 2004.

ETI ® ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 39 of 98

1    46.  Analysts also worry that large CLECs are withering, not "flourishing."  For example,

2    LeggMason, in a recent report, suggests that

3
4        [The Bells] have so severely weakened their primary competitors, AT&T (T) and MCI
5        (MCIP), that the current market caps of those companies, $12 billion and $5.3 billion,
6        respectively, are now but a small fraction of what they were.[92]

7

8    **Investment analysts see significant risk of a price squeeze if CLECs are forced to use**
9    **special access instead of UNEs when serving enterprise customers.**
10

11    47.  A recent analyst report confirms that CLEC price squeeze concerns are valid.

12    According to a UBS Warburg report on switched and special access costs,

13
14        ...the long distance carriers' reliance on Bell special access circuits gives the Bells a
15        substantial cost advantage that will increase over time.  This advantage enables the
16        Bells to underprice IXC competitors within their regions and should lead to rapid
17        market share gains among customers with traffic that is concentrated in a particular
18        Bell region.[93]
19

20    Preferential market economics such as these are a chief reason why the RBOCs tend to "play"

21    primarily in their own "backyard."  According to a CBS MarketWatch report, BellSouth has

22    unsurprisingly yet definitively stated that it finds it more profitable to target businesses in its own

23    territory, where it can hook customers directly in to the Company's network, due to the fact that

---

92.  Legg Mason, *After the Bell Trifecta: Telcos Stay on Offense, Eye New Policy Moves*,
September 15, 2004, at 1.  *See also*, CBS MarketWatch, *AT&T is seen going it alone*, October 9,
2004.

93.  UBS Investment Research, "Q-Series™: Paying to Play?" April 2, 2004 ("*UBS Access
Report*"), at 21.

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 40 of 98

1   profit margins are less attractive outside of its region.[94]  Of course, the reason that out-of-region

2   profits are "less attractive" is because the out-of-region ILEC would be forced to buy special

3   access circuits from the in-region ILEC at above-cost rates – just like any CLEC – rather than

4   simply using its own facilities.  This is, of course, the problem faced today by *all other non-ILEC*

5   *competitors*.

6

7        48. The UBS Access Report highlights the significance of special access services in an IXCs

8   cost structure, noting that

9
10          In many instances, the special access circuits required to connect the end user to the
11          IXC network represents the majority of the total cost of the circuit.  That is, more
12          than 50% of the total cost of a frame relay drop or private line circuit is represented
13          by the cost of the last mile that the IXCs must pay to the ILECs.[95]
14

15  The UBS report goes on to note that

16
17          The price of these corporate data services is falling at a faster rate than the price of
18          special access, suggesting that, over time, access is becoming a larger portion of the
19          overall spend and that *the Bells' cost advantage versus the IXCs will continue to*
20          *increase.*[96]
21

22  These assessments confirm that, under the current regulatory structure, the likelihood of a price

23  squeeze in this market is even greater on a going-forward basis than it is today.

---

94.  CBS MarketWatch, "AT&T Is Seen Going It Alone," October 9, 2004, at 2.

95.  *UBS Access Report*, at 22.

96.  *Id.*, emphasis added.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 41 of 98

1  **CLECs' use of special access facilities occurs only when hurdles blocking the use of UNEs**
2  **that have been imposed by RBOCs cannot readily be overcome.**
3

4      49.   CLECs' ability to use special access services in lieu of their own facilities or UNEs is

5   vastly overstated by Verizon.[97]  In an overly simplified and extremely misleading analysis

6   prepared by Verizon and included in the declaration of Verses, Lataille, Jordan and Reney,

7   "evidence" is provided purporting to show that the number of DS-1 UNEs in service today is

8   only a fraction of the number of DS-1 special access channel termination facilities in service.

9   From this data, Verizon asks the Commission to conclude that CLECs are using vastly more

10  special access than UNEs to provide service to subscribers.  Verizon is flat out wrong, and its

11  own evidence does not even begin to support that conclusion.

12

13      50.   Even *presuming* that all special access channel terminations that are connected at end

14  user locations *could* be re-ordered as UNEs (a hypothetical very far removed from today's

15  reality), Verizon's special access channel termination counts would be overstated by something

16  in the neighborhood of a factor of two, because Verizon includes *all* DS-1 special access channel

17  terminations, including those that do not go to end user locations.

18

---

97.  Declaration of Judy K. Verses, Ronald H. Lataille, Marion C. Jordan and Lynelle J.
Reney on behalf of Verizon, WC Docket 04-313, October 4, 2004 ("*Verses et al. (Verizon)*"),
Exhibit 10A.

ETi  ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 42 of 98

1    51.  Verizon includes special access  channel terminations that are provided to wireless

2    carriers who generally have not had access to UNEs.[98]  Among the many possible explanations

3    for the slow adoption of UNEs by wireless carriers, the *least* compelling would be that wireless

4    carriers had simply decided to forgo the opportunity to use lower priced UNEs.   AT&T

5    Wireless, Nextel, and T-Mobile have all asked the Commission to "clarify that CMRS providers

6    are entitled to purchase UNEs and convert existing special access facilities to UNEs without

7    termination liability."[99]  Indeed, the most likely reason that wireless carriers have not adopted

8    UNEs is that RBOCs have refused to provision UNEs in the wake of *USTA II*.

9

10    52.  As Verizon acknowledges, its channel termination count includes both channel

11    terminations provided to end user locations and entrance facilities connecting Verizon wire

12    centers to IXC POPs.[100]   These facilities are simply not relevant to any discussion of CLEC use

13    of DS-1 special access channel terminations in lieu of UNEs.

14

---

98.  *Verses et al. (Verizon)*, Exhibit 10A; *TRO*, at para. 140.

99.  *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange* Carriers, CC Docket No. 01-338; *Implementation of the Local Competition Provisions of The Telecommunications Act of 1996*, CC Docket No. 96-98; *Deployment of Wireline Services Offering Advanced Telecommunications Capacity*, CC Docket No. 98-147, Comments of AT&T Wireless, April 5, 2002, at 23; See also, Comments of Nextel Communications, Inc., April 4, 2002, at 2.

100.  See *Verses et al. (Verizon)*, at 21.

ETI ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 43 of 98

1    53.  Verizon's misleading analysis is particularly problematic not only because of the

2    unrealistic picture it paints, but also because it sidesteps the reasons why CLECs are using

3    special access facilities in place of UNEs, and diverts attention away from Verizon's affirmative

4    efforts to erect large hurdles designed to limit or prevent altogether CLECs ability to convert

5    special access lines to UNEs despite the desire of CLECs to do exactly that.

6

7    54.  In its recently filed *Emergency Petition*, XO stated that based upon its actual experience

8    in the market, the ILECs continue to engage in practices designed to prevent CLECs from

9    ordering UNEs and converting special access circuits to UNEs.[101]  XO stated that DS-1 loop

10    facilities are essential to its ability to serve many thousands of small and medium-sized business

11    customers, and that it needed those loops provided as UNEs."[102]  Contradicting the misleading

12    conclusions put forth by Verizon, XO also reported that "less than 25 percent of the DS-1 circuits

13    purchased by XO from the ILECs for use as local loops is special access; conversely, more than

14    75 percent of such loops are purchased as UNEs."[103]

15

16    55.  Xspedius Communications also provided evidence of the problems inherent in

17    converting preexisting special access circuits to UNEs.  Xspedius testified that "when requesting

---

101.  *Emergency Petition of XO Communications*, at 32.

102.  *Id.*, at 34.

103.  *Id*., Exhibit 3, Declaration of Laura D. Inniss on behalf of XO Communications, at 4.

ETI  ECONOMICS AND
     TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 44 of 98

1   conversion from Special Access to UNE/EEL, Xspedius has experienced endless negotiations

2   and foot dragging, delayed conversion requests, requirements for circuits to be disconnected and

3   reconnected, threats from the ILECs to impose exorbitant conversion charges, and overly long

4   provisioning intervals."[104]   Quantifying its use of special access versus UNEs, Xspedius

5   declarant Falvey testified that his company has "over 11,000 UNE T-1 loops and Enhanced

6   Extended Links/Loops ("EELs"), and close to an additional 5,000 Special Access T-1s in place

7   today."[105]   Indeed, Xspedius stated that "[o]f those Special Access T-1s, some are eligible for

8   conversions, some we tried to order as UNEs/EELs but were rejected by the ILECs, and many

9   are in markets like Tampa, Florida where "cost-based" UNE prices remain at the same level as

10   retail Special Access."[106]

11

12      56.  Broadview also provided evidence that in many of the cases where CLECs do use

13   special access, it is because the ILECs will not make UNE facilities available.  "[I]t is

14   Broadview's belief that CLECs do not order special access for their local interconnection

15   networks.  Broadview rarely orders special access, nor would any CLEC when UNEs can and

---

104.  *Falvey (Xspedius)*, at 16.  See generally the discussion at pages 15 - 17.

105.  *Id.*, at 5.

106.  *Id.*, at 5.



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 45 of 98

1   should be made available.  The primary reason that Broadview uses any special access is due to

2   the ILEC denying a UNE order because of "no facilities," or due to a regulatory restriction."[107]

3

4        57.  Countering Verizon's purported "evidence" of widespread use of special access in lieu

5   of UNEs, Advance Telecom stated that "only 5% of the DS-1 circuits purchased by Advanced

6   Telecom from the ILECs is Special Access."[108]  That evidence was mirrored by a statement by

7   Talk America that it did not use *any* DS-1 special access services to reach its customers.  "To the

8   extent that Talk America purchases DS-1 circuits from ILECs to serve end user customers, we do

9   so primarily through the use of UNEs, not Special Access.  We do not have a single T-1 on

10  Special Access that serves our end users.  Similarly, less than 10% of our DS-3 circuits have

11  been purchased as Special Access."[109]

12

13       58.  In view of the RBOCs' persistent and concerted efforts affirmatively to frustrate

14  CLECs' efforts to order UNEs or to replace otherwise qualifying special access circuits with

15  UNEs, it is to say the least particularly disingenuous of the RBOCs to hold out the CLECs'

16  largely forced use of special access as "evidence" that they are doing so "successfully."  This is

17  like the classic parable of the child who, having murdered both of his parents, then asks the court

---

107.  *Sommi (Broadview)*, at para. 15.

108.  *Wigger (Advanced Telecom)*, at para 52.

109.  *Brasselle (Talk America)*, at para. 15.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 46 of 98

1 for mercy because he is an orphan.  There are simply no credible "facts" or other credible

2 evidence that would support any finding that CLECs are competing "successfully," let alone

3 "flourishing," by their largely enforced use of special access in place of UNEs to serve enterprise

4 customers.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 47 of 98

1                    **SPECIAL ACCESS PRICE TRENDS**

2

3    **The RBOCs' contention that special access prices have decreased since the onset of pricing**
4    **flexibility rests upon contrived and misleading "analyses" that substitute "average**
5    **revenue" for actual prices and misportray price decreases mandated by the Commission's**
6    **price cap rules as resulting from allegedly increased competition.**

7

8        59.  Verizon and SBC have each introduced evidence purporting to support their claim that

9    RBOC prices for special access services have decreased since the onset of special access pricing

10   flexibility.  In fact, however, *prices* for RBOC special access services – and particularly for the

11   least competitive DS-n services – when compared on an "apples-to-apples" basis, have

12   *increased*, in some cases by high double-digit percentages since the pricing flexibility "triggers"

13   had been satisfied, as Mr. Stith documents in his Reply Declaration.  Even in those instances

14   where the nominal price has remained unchanged, it is still higher than the currently effective

15   price for the same service provided by the same RBOC in non-pricing flexibility areas in which

16   price cap rate adjustments are still required.

17

18       60.  Verizon and SBC do not, however, offer valid "apples-to-apples" comparisons, relying

19   instead upon broad averages and surrogates that *conceal*, rather than reflect, specific prices and

20   price movements over the time period under examination.  Dr. William E. Taylor, testifying for

21   Verizon, has presented a contrived "analysis" that purports to show that special access prices

ETI ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 48 of 98

1    have *decreased* under pricing flexibility.[110]  Significantly, however, Dr. Taylor does not look at

2    "prices" at all, focusing instead upon a surrogate – *average revenue per voice-grade equivalent*

3    *(DS0) channel*.  Changes in "average revenue per voice-grade equivalent ("VGE") channel"

4    result from numerous factors – most notably changes in the *mix* of services actually being

5    purchased – and is not a valid indicator of "price."[111]  SBC declarant Parley Casto testifies that

6    SBC's DS-1 special access rates have decreased by 11% since 2001, but conveniently ignores the

7    fact that most of that apparent price drop results from mandatory annual rate reductions required

8    by the Commission's price cap rules for services not subject to pricing flexibility.[112]  It is

9    noteworthy that neither Verizon nor SBC has offered any *direct* comparisons of specific price

10   movements over time, since had they done so the results would have put a lie to the RBOCs'

11   claims that prices have been falling.

12

---

110.  Declaration of William E. Taylor Regarding Special Access Pricing on Behalf of Verizon, WC Docket 04-313, October 4, 2004 ("*Taylor (Verizon)*").

111.  The Taylor testimony updates an earlier analysis by Kahn and Taylor submitted in the Commission's Special Access proceeding.  Dr. Kahn, however, in testimony presented before the US Court of Appeals, refuted the validity of exactly this type of fixed weight average as presenting misleading results.  See, Association of Oil Pipe Lines v. Federal Energy Regulatory Commisison and the United State of America, 281F.2d 239, 243;  350 U.S.App.D.C. 132, 136.

112.  Declaration of Parley C. Casto on Behalf of SBC Communications, Inc., WC Docket 04-313, October 4, 2004 ("*Casto (SBC)*").



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 49 of 98

1    61. Even if these claims of modest price drops in the range of 10% or so over a three- to

2    seven-year time frame were accurate – and they are decidedly *not* accurate – it still would do

3    nothing to undermine the key *facts* that

4

5    (1) RBOC special access prices are constrained by neither regulation (because of pricing

6        flexibility) nor by competition (because competing facilities rarely exist at the DS-n

7        capacities that are at issue in this proceeding), and can be increased selectively and

8        without limit at the whim of the RBOC as its own interests dictate;

9

10   (2) notwithstanding whatever price movements may have occurred over the past several

11       years, there is going forward a serious risk of competition-foreclosing price squeezes as

12       the RBOCs seek to exploit their rivals' near-total dependence upon RBOC special

13       access in providing DS-n services;

14

15   (3) as AT&T and others have demonstrated, the RBOCs are already using price/cost

16       squeezes to dominate enterprise service markets; and

17

18   (4) it is entirely infeasible for the Commission to evaluate – on a continuing basis as

19       RBOCs change their prices – the persistence of price/cost squeezes across hundreds of

20       markets, services and companies.


ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 50 of 98

1    62. The very same ARMIS data being relied upon by Dr. Taylor as the basis for his claimed

2    15% drop in average special access revenue per VGE over the 1996-2003 period also reveals that

3    special access *costs* have plummeted by 50% or more over that same time frame. Thus, even on

4    the basis of Dr. Taylor's "average revenue per DS-0" surrogate for price, the modest 15% "price"

5    drop that Taylor has calculated provides dispositive proof that RBOC prices are unconstrained by

6    competition: In competitive markets, prices follow costs, and no company could maintain (or

7    only slightly lower) its prices in the face of such dramatic decreases in cost – if competition were

8    actually present as the RBOCs contend, this huge price/cost gap would rapidly be competed

9    away.

10

11    63. The ARMIS data being relied upon by Dr. Taylor confirms the undeniable *fact* that,

12    whether viewed with respect to embedded or forward-looking economic cost, special access rates

13    are set at large multiples of cost. RBOC accounting data filed with the FCC reveal stunning rates

14    of return on special access for 2003, averaging 43.7% for the four regional Bell companies.[113]

15    The majority of RBOC special access services are now subject to "pricing flexibility."[114] For

16    these services, rates are no longer subject to annual price-cap rate reductions, and may be

17    increased without limit at the sole discretion of the RBOC. Even where pricing flexibility is not

18    in effect, no further price cap reductions have been required since July 2003. When viewed in

---

113. *Id.*, at 28.

114. *Pricing Flexibility Order*, 14 FCC Rcd 14221.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 51 of 98

1    this context, it is apparent that even if true, RBOC claims of cumulative 10% to 15% rate

2    decreases over the 1996-2003 time frame are entirely meaningless with respect to the issues

3    before the Commission in this proceeding, and must thus be afforded no importance whatsoever.

4

5        64.  Moreover, both Verizon and SBC have commingled price movements that were

6    *required* under the Commission's price cap rules with RBOC-initiated price changes made

7    following the onset of pricing flexibility.  In Verizon's case, and as shown in Table 1 below, had

8    the Commission's GDP-PI – 6.5% annual price cap rate adjustment rule been in effect for all

9    special access services and for all periods since 1996, the "average" price decrease over the

10   period would have been 28.5%, i.e., roughly *double* the 15.5% drop that Dr. Taylor had

11   calculated.

12

ET ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 52 of 98

| | | | | |
|---|---|---|---|---|
| Table 1 | | | | |
| Comparison of GDP-PI – 6.5% Annual Price Cap Rate Adjustment with Average Revenue per Special Access VGE per ARMIS 43-03 | | | | |
| Year | GDP-PI | ΔGDP-PI – 6.5% | Price cap index | Avg. revenue per VGE index |
| 1996 | 2.0 | -4.5 | 100.0 | 100.0 |
| 1997 | 1.9 | -4.6 | 95.5 | 104.4 |
| 1998 | 1.5 | -5.0 | 91.1 | 101.7 |
| 1999 | 1.1 | -.54 | 86.6 | 91.4 |
| 2000 | 1.6 | -4.9 | 81.9 | 90.5 |
| 2001 | 2.2 | -4.3 | 77.9 | 95.9 |
| 2002 | 2.4 | -4.1 | 74.5 | 86.3 |
| 2003 | 1.4 | -5.1 | 71.5 | 84.6 |

As this calculation demonstrates, and assuming that the average revenue per VGE is repre-
sentative of the "price" of special access as Dr. Taylor contends, under price caps the 2003
special access price index would have been 71.4 instead of the 84.5 calculated using Dr. Taylor's
formulation. On this basis, special access average revenues *as implemented by the RBOCs using
pricing flexibility and other pre-pricing flexibility adjustments* were roughly 18.35% *higher* than
they would have been through a straight application of the Commission's price cap formula over
the full 7-year period.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 53 of 98

1    65.  This outcome is hardly surprising.  Even in the "pricing flexibility" areas, the actual

2   extent of facilities-based competition for RBOC special access services is clearly not sufficient to

3   constrain RBOC pricing.  Indeed, in the *TRO*, the Commission recognized that mere satisfaction

4   of the pricing flexibility trigger was not indicative of the sufficiency of competition in any MSA:

5
6           ... The record indicates that incumbent LECs have qualified for special access
7           pricing flexibility in numerous MSAs throughout their regions, almost exclusively
8           by meeting the triggers based on special access revenues.  Because the revenue
9           trigger requires only a single collocated competitor and the purchase of substantial
10          amounts of special access in a concentrated area, this test provides little indication
11          that competitors have self-deployed alternative facilities, or are not impaired
12          outside of a few highly concentrated wire centers. Additionally, the pricing
13          flexibility trigger based on alternative transport-based collocation requires no
14          consideration of the ubiquity of the competitive transport facilities throughout an
15          MSA. The measure does not indicate that the competitive fiber facilities connect to
16          collocations in any other incumbent LEC central offices. The measure may only
17          indicate that numerous carriers have provisioned fiber from their switch to a single
18          collocation rather than indicating that transport has been provisioned to transport
19          traffic between incumbent LEC central offices. Therefore, we find that Commission
20          approval for special access pricing flexibility, finding that competing carriers have
21          made "irreversible sunk investments," is not sufficiently tailored to identify where
22          requesting carriers are not impaired without unbundled transport.[115]

23

24    66.  When examined on an apples-to-apples basis over the period since the onset of pricing

25   flexibility, special access prices have either increased or remained the same in nominal dollar

26   terms while corresponding prices in areas not eligible for pricing flexibility have decreased.

---

115.  *TRO*, at para. 397, footnotes omitted.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 54 of 98

1    This undeniable *fact* is obscured by the unrepresentative "average revenue" index that Dr. Taylor

2    has creatively elected to develop.

3

4       67.  There is, in reality, no inconsistency between an *apparent* decrease in "average revenue

5    per voice-grade equivalent (DS0) channel" and the persistent *increases* in price for the specific

6    DSn-level special access services at issue here.  There are at least three explanations for this

7    result, none of which is even mentioned by Dr. Taylor:

8

9    (1)  Inclusion of special access rate decreases resulting from annual price cap rate

10          adjustments for services not subject to pricing flexibility in the "average revenue"

11          figure;

12

13   (2)  Disproportionate increase in demand for very high capacity OCn services whose price,

14          when expressed on a per voice-grade equivalent ("VGE") basis, is substantially lower

15          than the per-VGE price for services purchased as DS-1s or DS-3s; and

16

17   (3)  Increased use of optional pricing plan ("OPP") contracts that impose substantial volume

18          and term commitments, coupled with large financial penalties, in exchange for

19          "discounts" off the prevailing month-to-month pricing.

20

ETI ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 55 of 98

1    As a result, the *apparent* decrease in *average* revenue per voice grade equivalent channel as

2    reported by Dr. Taylor is in no realistic sense indicative of any "price decreases," and to claim as

3    much is misleading and dishonest. The Commission should ignore and afford no weight or

4    credence whatsoever to Dr. Taylor's analysis.

5

6    ***Inclusion of annual price cap rate decreases for non-pricing flexibility services.***
7

8    68. In fact, taking into account required price cap reductions, Dr. Taylor's figures show that

9    rates subject to pricing flexibility to have *increased*. While Dr. Taylor's calculation of average

10   revenue per VGE, as reflected on his Figures 1 and 2, show pricing flexibility as commencing in

11   mid-2000, many RBOC MSAs had not been granted pricing flexibility until 2002, and even

12   today some MSAs – and *all* non-MSA areas – are still subject to price caps. Consequently, a

13   portion of the drop in average revenue per VGE that Dr. Taylor seeks to ascribe to the post-

14   pricing flexibility period were actually the result of *mandatory* annual price cap rate

15   reductions.[116] For these areas, prices have decreased by approximately 19.53% between mid-

16   2000 and those in effect as of this date.[117]

---

116. For example, SBC Declarant Parley C. Casto, at para. 16, footnote 2, admits that "[t]o be sure, some of SBC's Phase II special access rates in pricing flexibility areas are slightly higher than in those non-pricing flexibility areas. This results from rate reductions in non-flexible rate areas due to the annual price cap reductions dictated by the Federal rules which do not apply to pricing flexibility areas. ..."

117. The Price Cap index as show in Table 1 is 86.6 in 1999, 81.9 in 2000, and 67.8 in

(continued...)

ETI  ECONOMICS AND
     TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 56 of 98

1    69.  According to the ARMIS 43-03 reports upon which Dr. Taylor based his average

2    revenue per special access voice grade equivalent channel, average revenue per VGE had an

3    index value of 84.5 as of the end of 2003 (1996 = 100), implying a *total decrease* in nominal

4    dollars of 15.5% over the full 7-year period.  As I noted earlier, had the GDP-PI – 6.5% annual

5    price cap rate adjustment been operative for all special access services over the entire period, the

6    index value for 2003 would have been 71.5, indicating a cumulative 28.5% drop in average

7    revenue per VGE over the 1996-2003 period, all else being equal.

8

9    70.  Along the same lines, SBC declarant Casto claims that "SBC's average rates for DS-1s

10   purchased as special access dropped a total of 11% between 2001 and August 2004."[118]  As it

11   turns out, most of this decrease results from application of the Commission-mandated GDP-PI –

12   6.5% annual price cap adjustment to non-pricing flexibility special access services, which even

13   today account for some 50% of all SBC special access revenue.[119]  In fact, from January 2001

---

117.  (...continued)
2004.  The mid-2000 index value, as an average is (86.6+81.9)/2=84.25.  The percentage change
is calculated by subtracting the 2004 value from the mid-2000 value, and dividing by the mid-
2000 value.  (84.25-67.8)/84.25=19.53

118.  *Casto Declaration (SBC)*, at para. 8.

119.  Data is from Southwestern Bell, Nevada Bell, Pacific Bell, SNET, and Ameritech July
2004 Tariff Review Plan supporting documentation at page 4, column g, lines 5 and 6.  These
values for Total Special Access Revenues and Special Access Revenues for Non-Price Cap
Services were summed for 2003 and 2004 for total SBC values.  The numbers, as a ratio show
the percent of Special Access Revenues attributable to Non-Price Cap Services.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 57 of 98

1   through August 2004, the price cap index (PCI) decreased by 17.2% overall. As SBC obtained

2   pricing flexibility on an MSA-by-MSA basis during that period, the relative proportion of total

3   special access revenues subject to price cap adjustments decreased, from 100% in 2001 to 50% in

4   2004. In Table 2 below, I calculate the effective overall special access category rate reduction as

5   generated by the annual price cap index and the proportion of the category subject to price caps

6   during each year. Assuming that SBC made no changes in any special access rates in MSAs

7   subject to pricing flexibility over this period, the mandatory price cap rate adjustments would

8   have accounted for 6.45% out of the 11% average revenue decrease being referred to by Casto.

9

| Table 2 | | | | | | |
|---|---|---|---|---|---|---|
| Effect of GDP-PI – 6.5% Annual Price Cap Rate Adjustment upon SBC Average Revenue per Special Access DS-1 | | | | | | |
| Date | GDP-PI | ΔGDP-PI – 6.5% | Price cap index | % of SBC Special Access subject to price caps | Effective overall category rate reduction | Avg. DS-1 rate decrease claimed by Casto |
| Jan. 2001 | n/a | n/a | 100.0 | 100% | - | |
| July 2001 | 2.2 | -4.3 | 95.7 | 100% | 4.3% | |
| July 2002 | 2.4 | -4.1 | 91.8 | 78%* | 6.4% | |
| July 2003 | 1.4 | -5.1 | 87.1 | 56% | 7.2% | |
| July 2004 | n/a | n/a | 87.1 | 50% | 6.5% | – 11% |
| * estimate | | | | | | |

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 58 of 98

1    71.  SBC declarant Parley Casto also claims that "SBC has not as a general matter increased

2    special access rates in areas where it has obtained pricing flexibility."[120]  This claim is false, and

3    is at best seeking to substitute semantics for reality.  While it is apparently accurate that SBC has

4    not increased its schedule of month-to-month rates applicable for pricing flexibility areas, in

5    most cases the pre-pricing flexibility rates were lower, having been reduced one or more times by

6    application of the Commission's price cap rules.  In fact, Mr. Casto notes that prices for special

7    access services under pricing flexibility are higher than those in non-pricing flexibility (i.e., price

8    caps) areas, due to the X-Factor reductions in their price cap plan.[121]  What is not said, however,

9    is that when SBC was awarded pricing flexibility in a particular MSA, customers in that MSA

10    that had been purchasing special access at the preexisting price cap rates were immediately

11    subjected to the *higher* rates applicable under the pricing flexibility schedule.  Thus, the 'rate

12    schedule" may technically have remained unchanged, but the customers' bills were increased

13    because the higher pricing flexibility rates were substituted for the lower price cap rates.  From

14    the *customer's* standpoint, rates went up.

15

16    72.  Like SBC, a substantial portion of the other RBOCs' special access services are still not

17    subject to pricing flexibility, such that a large portion of the 15.5% average revenue decrease

18    proffered by Dr. Taylor is also attributable to mandatory price reductions rather than any

---

120.  *Casto Declaration (SBC)*, at para 16.

121.  *Id.*, at fn 2.

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 59 of 98

1    "voluntary" rate reductions that Dr. Taylor would ascribe to increased competition.  In Table 3

2    below, I have attempted to replicate the same type of analysis that I had done above for SBC for

3    the four RBOCs per Dr. Taylor's index calculation.   For purposes of this analysis, I have

4    assumed that the entire (100%) special access category was subject to price caps from 1996

5    forward until mid-2001.  By year-end 2001, the percentage of special access revenues subject to

6    price caps is assumed to have decreased to about 75%, and by the end of 2002 that had dropped

7    to about 50%.  Since the onset of pricing flexibility is conservatively assumed to have occurred

8    mid-year in 2001, I assume that for 2001 87.5% of special access revenues were still subject to

9    price caps, and that for 2002 62.5% were still subject to price caps.

ETI  ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 60 of 98

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Table 3 | | |
| | | | | Effect of GDP-PI – 6.5% Annual Price Cap Rate Adjustment upon RBOC Average Revenue per Special Access DS-1 | | |
| Year | GDP-PI | ΔGDP-PI – 6.5% | Price cap index | % of Special Access subject to price caps (assumed) | Effective overall category revenue index | Avg. VGE revenue index claimed by Taylor |
| 1996 | 2.0 | -4.5 | 100.0 | 100% | 100.0 | 100.0 |
| 1997 | 1.9 | -4.6 | 95.5 | 100% | 95.5 | 104.4 |
| 1998 | 1.5 | -5.0 | 91.1 | 100% | 91.1 | 101.7 |
| 1999 | 1.1 | -.54 | 86.6 | 100% | 86.6 | 91.4 |
| 2000 | 1.6 | -4.9 | 81.9 | 100% | 81.9 | 90.5 |
| 2001 | 2.2 | -4.3 | 77.9 | 100% | 77.9 | 95.9 |
| 2002 | 2.4 | -4.1 | 74.5 | 87.5% | 74.9 | 86.3 |
| 2003 | 1.4 | -5.1 | 71.5 | 62.5% | 73.0 | 84.6 |
| 2004 | 1.6 | -4.9 | 67.8 | 50% | 71.2 | n/a |

As this analysis demonstrates, price cap reductions *alone* (and assuming no change at all in pricing flexibility rates) would have produced an overall rate index of 71.2, *well below the 84.5 as calculated by Dr. Taylor*. Or, put differently, the only way that the *average* of price cap and pricing flexibility rates could have produced an index value of 84.5 is for the rates subject to pricing flexibility to have *increased*. Which is, of course, exactly what has happened.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 61 of 98

1    ***Use of "average revenue per voice grade equivalent" rather than actual prices.***
2

3    73. Dr. Taylor's comparison is cast in terms of "average revenue per voice grade

4    equivalent" ("VGE") special access service. However, that is distinctly *not* how special access

5    services are priced or sold. Special access services are denominated in terms of multiple pricing

6    dimensions and other service attributes including, among other things, bandwidth (capacity) and

7    distance. Bandwidths range from single voice-grade analog or digital (DS0) channels up through

8    an OC-192 "pipe," which is equivalent to 129,024 VGE channels. Because prices vary less than

9    proportionately with total bandwidth, when expressed on a VGE basis, the price per VGE

10   channel decreases as the total capacity of the "pipe" increases. For example, as I noted in my

11   October 4, 2004 declaration (at paragraph 24), an OC-12 facility, which is equivalent to 8,064

12   voice-grade (DS-0) channels or 336 DS-1s, is typically priced at only about 40 times the price of

13   a single DS-1. Thus, when purchased as part of an OC-12, the price of a single VGE channel is

14   only 12% of the per-channel price when purchased as part of a DS-1. In recent years, and when

15   viewed in terms of the entire special access universe, the demand for very high capacity OCn

16   services has been growing at a much faster rate than the demand for individual DS-1s or DS-3s,

17   driven in large part by the voracious capacity demands of the Internet and other high volume data

18   transmission applications. Thus, even if prices of specific services had remained unchanged, the

19   average "revenue per VGE channel" would fall, because successively larger percentages of

20   voice-grade equivalent channels are being purchased as part of very high capacity OCn services.


ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 62 of 98

1    74.  Along a similar line, it is also possible that the average distance of special access

2    services may also have decreased,[122] in which case (and, once again, holding all else equal), the

3    price per VGE would decrease simply because average distance per circuit has gone down, rather

4    than due to any change in any specific pricing element.  Dr. Taylor's analysis entirely ignores

5    this possibility.

6

7    ***Increased use of "optional pricing plan" volume and term contracts.***
8

9    75.  Since obtaining special access pricing flexibility in most MSAs, the RBOCs have been

10   increasing month-to-month prices while at the same time have offered discounts off those prices

11   in exchange for certain volume and term commitments on the part of the special access customer

12   (the IXC or CLEC) along with the acceptance of a potential obligation on the part of the

13   customer to incur a financial penalty if these commitments are not fully satisfied.  As AT&T

14   declarants Benway *et al* testified in their October 4, 2004 submission, the specific terms of such

15   OPP and similar contracts are often extremely onerous, and among other things require the

16   customer to forgo alternatives, in the minority of routes where such alternatives may exist, in

17   order to fulfill the committed volume.  This increased use of so-called OPPs with fixed volume

18   and term commitments in exchange for "discounts" off the RBOC month-to-month rates

---

122.  Comments of MCI, Inc., WC Docket No. 04-313, October 4, 2004, at 170-171.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 63 of 98

1   invalidates any attempt simplistically to track "average revenue" over time, because such a

2   comparison obscures major elements of the "price" that the RBOCs are actually demanding.[123]

3

4        76.  The "price" of a good or service consists of the total opportunity cost confronting the

5   purchaser, and as such consists of all elements of "value" given in exchange for it, which would

6   include both nominal cash payments as well as any non-cash restrictions, obligations,

7   commitments and risks that the purchaser is required to accept.  Comparing a month-to-month

8   price of $100 with an OPP price of $80 that requires a minimum purchase of $10-million over a

9   five-year period ascribes zero value to that commitment, to the potential for a financial penalty if

10  the commitment is ultimately not satisfied, or to the opportunity losses confronted by the

11  customer where, in order to satisfy the volume commitment, potentially lower-priced alternatives

12  may have to be forgone.

13

14  ***Verizon's "average revenue per VGE" analysis inappropriately aggregates the entire***
15  ***universe of special access services, and in so doing obscures the fact that the least***
16  ***competitive DS-n services have, in general, been subject to the largest overall rate***
17  ***increases.***
18

19       77.  With respect to the enterprise market, the focus of this proceeding is the extent to which

20  CLECs are impaired in their ability to serve enterprise customers without access to DS-n UNEs.

_____

123.  Declaration of Alan G. Benway, Robert G. Holleron, Jeffrey King, Michael E. Lesher,
Michael C. Mullan, and Maureen Swift on behalf of AT&T Corp., WC Docket 04-313, October
4, 2004 ("*Benway et al Declaration*"), at paras. 41-42, 54-61.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 64 of 98

1    In the *TRO*, the Commission determined that CLECs are *not impaired* and have competitive

2    alternatives (including self-deployment) for loops where the capacity demand at any one

3    customer location is three DS-3s or greater, or where the point-to-point transport requirement is

4    greater than twelve DS-3s.[124]   However, with respect to DS-n loops and transport facilities below

5    these thresholds, the Commission made national findings of impairment, subject to certain

6    exceptions based upon the presence of multiple retail or wholesale CLECs at a particular

7    customer location or over a particular point-to-point transport route.[125]   That notwithstanding, the

8    various "evidence" of self-deployment or of competitive availability that has been put forth by

9    the RBOCs in their various *ex parte* submissions during the summer and in their opening

10   comments and evidence submitted on October 4, 2004 treat all enterprise services as one market

11   and make no distinctions whatsoever among the various types and capacities of facilities that are

12   used to serve and are being demanded by enterprise customers.  To its credit, the price movement

13   evidence offered by SBC declarant Casto does at least purport to be confined to DS-1 services

14   purchased as individual DS-1 services.  In stark contrast, however, Verizon's evidence

15   agglomerates *all* special access services – including very high bandwidth OCn services – into

16   one category-wide average, thus obscuring all service-specific price movements and producing a

17   result that is entirely irrelevant and inapposite to any matters before the Commission in this

18   proceeding.

---

124.  *TRO*, 18 FCC Rcd 17173, 17200, at paras. 324, 359 .

125.  *Id.*, 18 FCC Rcd 17170, 17173, 17200, at paras. 320, 325, 359.


ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 65 of 98

1    ***Special access prices have increased – and the price/cost gap has widened – under pricing***
2    ***flexibility, confirming the persistence of the RBOC monopoly with respect to these***
3    ***essential services and facilities.***
4

5    78.  Dr. Taylor's one-dimensional "average revenue" analysis seeks to attribute the apparent

6    drop in the average revenue per VGE to increased "competition" rather than to fundamental

7    changes in the complexion of the special access universe.  He asserts that his results "support the

8    FCC's view that market forces in special access markets that meet its trigger conditions are

9    sufficient to constrain RBOC pricing and drive special access prices toward cost."[126]  This

10   patently baseless – and incorrect – "conclusion" is particularly noteworthy in that (a) Dr. Taylor

11   did not look at special access *prices* at all, but only at an arbitrary measure of unit revenue; (b)

12   Dr. Taylor did not confine his "analysis" to only those "special access markets that meet [the

13   Commission's] trigger conditions;" and (c) Dr. Taylor did not look at "costs" at all, and hence

14   has no basis for opining that special access prices are being driven toward cost – an "opinion," by

15   the way, that is demonstrably false.

16

17   79.  Special access prices are increasing.  Mr. Stith has provided an apples-to-apples

18   comparison of special access prices for each of the RBOCs' pre- and post-pricing flexibility, and

19   has demonstrated that, when prices for specific services and under the same terms and conditions

---

126.  *Taylor (Verizon)*, at para. 12.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 66 of 98

1    are compared, there is no question but that under pricing flexibility those prices have been

2    increasing.

3

4        80.  Separately, and in an effort to test Dr. Taylor's contention that special access prices are

5    being driven toward cost, I have compared his "average revenue per VGE" as derived from

6    ARMIS reports with several alternate indicia of "average cost per VGE" also derived from the

7    *very same* ARMIS reports that were used by Dr. Taylor.  Although, like Dr. Taylor's analysis,

8    this comparison does not account for the specific sources of either the revenue or the cost

9    changes over time, it nevertheless provides a useful basis for comparing revenues and costs,

10   since the specific components of the special access universe are the same for both the average

11   revenue and average cost as computed for each time period.

12

13       81.  Figure 1 reproduces the same "Nominal Special Access Revenue per Special Access

14   Voice Grade Equivalent" index for all RBOCs (per Taylor Figure 1), but includes three cost

15   indices for the same 1996-2003 period, Special Access Total Operating Expenses, Special

16   Access Total Plant in Service, and Special Access Net Investment.  Like Dr. Taylor, I set the

17   base value for all of these indices at 100 for 1996.  By 2003, average revenue per VGE had

18   dropped to an index value of 84.6 – it was this decrease upon which Dr. Taylor had based his

19   contention that special access prices had decreased under pricing flexibility.  However, as my

20   Figure 1 demonstrates, the corresponding indices for the three *cost* metrics had dropped by a far

ETI ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 67 of 98

1   greater amount over the same 1996-2003 time frame. Special Access Total Operating Expenses

2   per VGE had decreased to an index value of 44.9, Special Access Total Plant in Service per VGE

3   had decreased to an index value of 52.9, and Average Special Access Net Investment per VGE

4   had dropped to an index value of 36.5.

5

6       82. Figures 2-5 provide the component values for the corresponding revenue and cost

7   indices separately for Verizon, SBC, BellSouth and Qwest, respectively. While all but Qwest

8   have shown a decrease in average revenue per VGE over the 1996-2003 period (Qwest's actually

9   *increased by over 140%* to an index value of 240.7), in all four cases the revenue/cost gap has

10  swelled. For example, Dr. Taylor's average revenue per VGE index value for Verizon dropped

11  to 52.8 in 2003, but Verizon's special access average net investment had fallen by 71.3%, to an

12  index value of 28.7 over that same period. SBC's case is even more striking. Average revenue

13  per VGE remained almost unchanged over the period, with a 2003 index value of 97.8.

14  However, SBC's costs plummeted. In 2003, SBC's average special access net investment per

15  VGE had dropped by almost two-thirds, to an index value of 34.6. SBC's special access

ETI ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 68 of 98



**Figure 2.**  The Widening Special Access Price/Cost Gap – RBOC average.  (*See* Attachment 1 for data sources and data.)

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 69 of 98



**Figure 3.**  The Widening Special Access Price/Cost Gap – Verizon.  (*See* Attachment 1 for data sources and data.)

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 70 of 98



**Figure 4.** The Widening Special Access Price/Cost Gap – SBC. (*See* Attachment 1 for data sources and data.)

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 71 of 98



**Figure 5.** The Widening Special Access Price/Cost Gap – BellSouth. (*See* Attachment 1 for data sources and data.)

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 72 of 98



**Figure 6.**  The Widening Special Access Price/Cost Gap – Qwest.  (*See* Attachment 1 for data sources and data.)

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 73 of 98

1   operating expenses per VGE had been cut by more than half, to an index value of 46.7.  And

2   SBC's special access total plant in service had been almost halved, to an index value for 2003 of

3   54.9.

4

5       83.  Dr. Taylor's presentation of average BOC and Verizon-specific results also obscures the

6   extraordinary situation associated with Qwest.  As noted above, Qwest's revenue index jumped

7   to 240.7 from 1996 through 2003, whereas its special access operating expenses per VGE

8   actually fell, to an index value of 81.4.  Qwest's gross special access plant in service per VGE

9   remained almost unchanged through 2003 at an index value of 103.7, whereas its special access

10  average net investment per VGE actually fell by a third, to 65.4.

11

12      84.  Dr. Taylor remarks that "ARMIS special access revenue includes DSL revenues, but the

13  ARMIS special access lines do not include DSL lines" and so speculates that "the average

14  revenue per special access line [he] calculate[s] here *overstates* both the level and growth of

15  special access prices, as measured by average special access revenue per special access line."[127]

16  Significantly, Dr. Taylor did not offer any quantification of the magnitude of this "over-

17  statement," which cannot be determined from the ARMIS reports themselves.  However, at least

18  with respect to his own client – Verizon – this information could have been obtained and

19  provided, perhaps on a confidential basis, but Dr. Taylor and/or Verizon have apparently elected

---

127.  *Taylor (Verizon)*, at para. 18, emphasis in original.

ETI  ECONOMICS AND
     TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 74 of 98

1    to rely upon Dr. Taylor's speculation rather than any actual facts or data within their possession.

2    It is true that "ARMIS special access revenue includes DSL revenues," but it is far from certain

3    as to what percentage of DSL lines (and associated revenues) are actually booked to the special

4    access category in ARMIS.  Many DSL services are furnished via the DSL line-sharing UNE,

5    which is *not* included within the ARMIS special access category.  Moreover, since the line-

6    sharing UNE rate is typically substantially lower than the corresponding special access DSL

7    channel rate, it is likely that the majority of all DSL services are *not* being furnished as special

8    access.  Accordingly, the "overstatement" to which Dr. Taylor avers is probably quite small.

9

10    85.  On the other hand, none of the "average revenue per VGE" figures derived from

11    ARMIS either by Dr. Taylor or by myself include any of the special access rate increases that

12    became effective after December 31, 2003.  Qwest implemented two such increases in 2004.  In

13    its *Petition to Reject or Suspend* the second of the two filings, AT&T estimated an average rate

14    hike of 27% for that one increase alone.[128]  Holding all else equal, that one change alone would

15    have raised Qwest's average revenue per VGE index from 240 to 305 as of the present date.

16

17    86.  These persistent and escalating special access revenue/cost gaps, together with the

18    mushrooming RBOC rates of return on special access services, are consistent with pervasive

---

128.  *Qwest Corporation Transmittal No. 206*, Petition of AT&T Corp., August 28, 2004
("*AT&T Petition to Investigate Transmittal No. 206*"), at 2.

ET ECONOMICS AND
TECHNOLOGY, INC.

1    RBOC monopoly and market power with respect to special access services, and are certainly *not*

2    consistent with the RBOCs' fantasized portrayal of price constraining competition in MSAs

3    subject to pricing flexibility.  Even on the basis of Dr. Taylor's "average revenue per voice grade

4    equivalent," "prices" have dropped by only about 15% whereas costs have fallen by roughly

5    50%.  There is no realistic scenario under which these enormous profit levels could possibly be

6    sustained if competitors were truly nipping at the RBOCs' heels.

7

8    **RBOC special access prices are not being constrained by any of the "intermodal"**
9    **alternatives that the RBOCs have identified.**
10

11        87.  The new RBOC *UNE Fact Report* undertakes to minimize the extent of the RBOC

12    monopoly by adopting an overly expansive product market definition that embraces various *non-*

13    *wireline* telecommunications services that are portrayed as *intermodal* competitive alternatives to

14    ILEC wireline telephone services.  Leaving aside the myriad flaws in the *Fact Report* with

15    respect to actual subscribership to these alternative services, which I have discussed above, at

16    paras. 20-22, the RBOC analysis fails to show that these alternative forms of telecommunications

17    services are part of the same "relevant product market" as wireline access and exchange access

18    services.   This is of key importance.  If the facilities-based alternatives to which the *Fact Report*

19    points are not competitors in the same relevant product market with ILEC wireline services, then

20    their success (which the *UNE Fact Report* nonetheless seriously overstates) is not relevant to

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 76 of 98

1   whether CLECs are impaired in their ability to serve the enterprise market are without access to

2   particular UNEs.

3

4       88.  While the largely anecdotal evidence cited by the *UNE Fact Report* comes directly from

5   industry sources or industry analysts, the most relevant evidence that products are in the same

6   product market comes from the responses of actual consumers.  The court in *FTC v. Staples* set

7   forth this doctrine:

8
9           The general rule when determining a relevant product market is that "the outer
10          boundaries of a product market are determined by the reasonable interchangeability
11          of use [by consumers] or the cross-elasticity of demand between the product itself
12          and substitutes for it." Brown Shoe v. United States, 370 U.S. 294, 325, 8 L. Ed. 2d
13          510, 82 S. Ct. 1502 (1962); see also United States v. E.I. Du Pont de Nemours and
14          Co., 351 U.S. 377, 395, 100 L. Ed. 1264, 76 S. Ct. 994 (1956). *Interchangeability*
15          *of use and cross-elasticity of demand* look to the availability of substitute
16          commodities, i.e. whether there are other products offered to consumers which are
17          similar in character or use to the product or products in question, *as well as how far*
18          *buyers will go to substitute one commodity for another.*  E.I. Du Pont de Nemours,
19          351 U.S. at 393.  In other words, the general question is "whether two products can
20          be used for the same purpose, and if so, *whether and to what extent purchasers are*
21          *willing to substitute one for the other.*" Hayden Pub. Co. v. Cox Broadcasting
22          Corp., 730 F.2d 64, 70 n. 8 (2d Cir. 1984).[129]
23

24  The same concept is incorporated into the FTC/Department of Justice *Horizontal Merger*

25  *Guidelines*, which state:

26

---

    129.  Federal Trade Commission v. Staples, Inc. and Office Depot, Inc., 970 F. Supp. 1066,
1074 (D.D.C. 1997) (emphasis added).



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 77 of 98

1      A market is defined as a product or group of products and a geographic area in
2      which it is produced or sold such that a hypothetical profit-maximizing firm, not
3      subject to price regulation, that was the only present and future producer or seller of
4      those products in that area likely would impose at least a "small but significant and
5      nontransitory" increase in price, assuming the terms of sale of all other products are
6      held constant. A relevant market is a group of products and a geographic area that is
7      no bigger than necessary to satisfy this test. ... In determining whether a
8      hypothetical monopolist would be in a position to exercise market power, it is
9      necessary to evaluate the *likely demand responses of consumers* to a price
10     increase.[130]
11

12 Without significant cross-elasticity of demand, the fact that two or more suppliers offer products

13 or services that are, at some level, superficially similar does not establish that their two products

14 are in the same product market.  In fact, even where two suppliers offer *identical* items, if other

15 circumstances operate to impede substitution, the products will be considered to be in separate

16 product markets.[131]  As the *Horizontal Merger Guidelines* provide, "where a hypothetical

17 monopolist likely would discriminate in prices charged to different groups of buyers,

18 distinguished, for example, by their uses or locations, the Agency may delineate different

---

130.  Federal Trade Commission and U.S. Department of Justice, 1992 Horizontal Merger Guidelines [with April 8, 1997 revisions to Sec. 4].

131.  In *Staples v. Office Depot*, the Court recognized that office superstores and independent stationery stores often sold *identical* "consumable office supplies" ("A legal pad sold by Staples or Office Depot is 'functionally interchangeable' with a legal pad sold by Wal-Mart. A post-it note sold by Staples or Office Depot is 'functionally interchangeable' with a post-it note sold by Viking or Quill.") but nonetheless found that the office superstores sold these items in a separate product market from other types of stores, based on evidence of their pricing behavior.  *Staples*, *supra*, 970 F. Supp. 1066, 1074.

ETI ECONOMICS AND TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 78 of 98

1    relevant markets corresponding to each such buyer group."[132]  Along these same lines, Areeda

2    and Kaplow explain that "[e]ven physically and functionally identical items may be

3    differentiated if consumers, whether wisely or not, suppose them to be different."[133]

4

5        89.  In its portrayal of cable and fixed wireless as "intermodal" competitors for ILEC

6    wireline facilities, the *UNE Fact Report* gives no consideration to the extent to which such

7    services are viewed by enterprise customers as actual close substitutes for wireline services, nor

8    does it undertake to quantitatively examine the cross-elasticities among such services.  Instead,

9    the *Fact Report* identifies largely anecdotal indicia of limited substitution – isolated examples of

10   limited CLEC use of such facilities – and without any basis or evidence then summarily suggests

11   that such limited substitution as may exist under certain specific conditions provides a basis for

12   inference of absolute substitutability for all purposes.

13

14       90.  Substitutability among products or services (which can be expressed quantitatively in

15   terms of cross-elasticities) is at best a *relative* concept.  Two products or services may be

16   substitutable under certain conditions and for certain purposes, and yet be entirely non-

17   substitutable for other purposes.  Consider a simple example.  Automobiles and airplanes both

---

132.  *Horizontal Merger Guidelines*, at 1.0 Overview.

133.  Areeda, Phillip and Kaplow, Louis, *Antitrust Analysis:  Problems, Text, Cases, Fourth Edition*, Little, Brown and Company, 1988 at section 342 ("More about product market definition").

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 79 of 98

1    provide transportation between two points, and may be substitutes for one another in certain

2    cases.  For example, a trip from Washington to Philadelphia takes about three hours door-to-door

3    either by car or by plane, and people making such a trip might well see cars and planes as close

4    substitutes for this purpose.  However, airplanes are not particularly practical for very short

5    distances, such as 10 or 20 mile commutes, and cars may not be practical for short business trips

6    exceeding 300 or 400 miles.  The fact that consumers view these two alternative modes of travel

7    as close substitutes for trips of 150 to 300 miles provides no basis whatsoever for an inference

8    that cars and planes are close substitutes for all purposes.  Yet it is precisely this type of finesse –

9    from isolated anecdote to universal truth – that pervades the *Fact Report* and the RBOCs' claims.

10

11       91.  This same sleight-of-hand is pervasive throughout the *Fact Report* document and lies at

12    the core of the RBOCs' case.  Identify limited, anecdotal instances of CLEC or intermodal

13    competition, and then *assert* that if such competition is possible *somewhere*, then it must be

14    possible *everywhere*.  The RBOCs have made no attempt to quantitatively measure cross-

15    elasticities among the various services that they claim to fall within the same product market.

16    Quantitatively, the data being proffered by the RBOCs actually shows only limited intermodal

17    substitution with respect both to mass market and enterprise services.  If anything, such

18    "evidence" of limited substitution at the margin must be seen as affirmatively demonstrating that

19    enterprise customers *do not* view them as close substitutes.

20

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 80 of 98

1      92.   Examining intermodal alternatives from this perspective, it is clear that neither fixed

2   wireless nor cable can reasonably be considered to be part of the same relevant product market as

3   wireline DS-n services.  With respect specifically to the *enterprise* market, a number of CLECs

4   have submitted compelling evidence that the various intermodal alternatives to their use of

5   RBOC facilities are simply not viable beyond the most limited of marginal situations:

6

7      •   *Fixed wireless.*  Several CLEC declarants – including Wil Tirado for XO (a CLEC cited

8          as providing fixed wireless services by the *UNE Fact Report*), which, as I noted above,

9          is itself a holder of fixed wireless spectrum for which it had paid approximately $1-

10         billion to acquire – confirm that except in certain very limited situations fixed wireless

11         is not a viable substitute for RBOC wireline network facilities.  XO described its

12         attempt to roll-out fixed wireless as a "failure" and expects that widespread acceptance

13         will not occur in the near future, and, in fact, may never occur.[134]  David Kunde of

14         Eschelon Telecom noted that "Wireless loop facilities exist in only the most limited of

15         circumstances"[135] and Advanced Telecom notes that

16
17              ... [i]n our experience, fixed wireless is not an economic or technically
18              acceptable substitute for wireline UNE loop facilities... it is quite
19              evident that we remain years away from any sort of potential
20              widespread deployment, and that fixed wireless will never provide a

---

134.  See fn. 18, *supra.*

135.  *Kunde (Eschelon)*, at para. 18.



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 81 of 98

1    connectivity solution for most of our customer base.  Consequently,
2    the potential future deployment of wireless loop technology does not
3    currently reduce our essential need for cost-based wireline DS-1 loop
4    UNEs from the ILECs."[136]
5

6    •    Despite RBOC claims to the contrary, such as those presented in the *UNE Fact*

7    *Report*,[137] fixed wireless services represent only a minuscule share of the special access

8    market.  For example, in the case of large enterprise IP connections, Probe Group

9    reports that fixed wireless represents a mere 0.22% of total IP connections to large

10   enterprises.[138]  Probe estimates that by 2008, even given potential technological

11   innovations and developments, the use of fixed wireless services will grow only to

12   0.38% of total IP connections for large enterprises.[139]

13

14   •    *Cable.*  CLEC declarants Wigger,  Tirado and Kunde have confirmed my own

15   assessment (at paras. 113-115 of my October 4 declaration) that cable TV is also not a

16   viable alternative to RBOC network facilities for reaching enterprise customers.  CLECs

17   state that, to their knowledge, no cable television company has ever offered to provide

---

136.  *Wigger (Advanced Telecom)*, at paras. 25 &29.

137.  See para. 22, *supra*.

138.  Probe Group LLC, *U.S. Carriers Strategies and Markets*, June 2004,  at 5.

139.  *Id.*

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 82 of 98

1        DS-1 level loops to the CLEC.[140]  CLECs state that there are substantial geographic

2        differences between the build-out plans of most cable companies and CLEC needs, and

3        cable networks generally do not reach CLEC enterprise customers.[141]  Finally, even

4        where cable does exist, it rarely provides the capacity necessary to serve large numbers

5        of business customers with the required telecommunications and internet services at

6        DS-1 and higher speeds, since the design of the network commonly supports only

7        infrequent high-speed bursts to and from subscribers.[142]

8

9    93.  Indeed, not only are cable operators not offering *wholesale* DS-1 or DS-3 services using

10  their *coaxial cable* infrastructure, as I have noted earlier (at para. 21), they are not even offering

11  such services at retail to enterprise customers in their serving areas.  Cable and fixed wireless are

12  thus not "alternatives" to RBOC special access – and are clearly not in the same product market

13  no matter how broadly the product market may be defined – because functionally equivalent

14  enterprise services using these technologies for the most part do not even exist.

---

140.  *Id.*, at para. 30, *Tirado (XO)*, at para. 30.

141.  *Wiggers (Advanced Telecom)*, at para. 31; *Kunde (Eschelon)*, at para 18; *Tirado (XO)*, at para. 31.

142.  See, *Id.*, at paras. 30-32, *Tirado (XO Communications)*, at para. 32.

ECONOMICS AND
TECHNOLOGY, INC.

1      **SCOPE OF THE GEOGRAPHIC MARKET FOR ENTERPRISE SERVICES**

2

3      **The geographic market applicable to enterprise loops and transport facilities is point-to-**
4      **point because, as the Commission has determined, competitive entry decisions are made on**
5      **a location-specific and route-specific basis.**
6

7      *Enterprise customers do not confront "similar choices regarding a particular good or*
8      *service" throughout an entire MSA – the standard previously adopted by the Commission*
9      *as the basis for defining a geographic market area – and none of the evidence being*
10     *advanced by the RBOCs proves otherwise.*
11

12         94.  In the *TRO*, the Commission determined that separate *product markets* exists for DSn

13     and OCn loops and, similarly, determined that separate product markets were applicable for

14     interoffice transport routes at capacity levels of 12 DS-3s or less vs. those of greater capacity.

15     With respect to DSn loops and point-to-point transport capacity equivalent to twelve or fewer

16     DS-3s, the Commission determined that the relevant *geographic market* was *point-to-point*, and

17     on that basis established *route-specific triggers* which, where satisfied, would establish *non-*

18     *impairment* on a route-specific, point-to-point basis.[143]  In their declaration, Kahn and Tardiff

19     challenge that determination and argue that "the geographic scope of the relevant markets is at

20     least as large as a metropolitan statistical area (MSA)."[144]

---

143.  *TRO*, 18 FCC Rcd 17162, at para. 307.

144.  Declaration of Alfred E. Kahn and Timothy J. Tardiff Submitted in Support of the
Comments of the Verizon Telephone Companies, WC Docket 04-313, October 4, 2004
("*Kahn/Tardiff (Verizon)*"), at para. 14.

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 84 of 98

1    95.  Evidence submitted with the October 4, 2004 opening comments in this proceeding[145] –

2    including in particular evidence submitted by the RBOCs themselves[146] – confirms that CLECs

3    have self-deployed fiber optic facilities in only those areas of highest density within the principal

4    business districts of major metropolitan areas.  Even in those areas where CLECs have

5    constructed their own facilities, the vast majority of locations at which CLECs provide service to

6    enterprise customers still require the use of *ILEC* facilities to provide the "last mile" connection

7    to the customer, in large part because construction of fiber laterals and other facilities is simply

8    too costly relative to the potential revenues available at the vast majority of enterprise customer

9    locations.  While Kahn and Tardiff may claim that "competitors enter on an MSA basis,"[147] the

10    "facts on the ground" confirm the contrary.  AT&T witnesses Fea and Giovannucci have

11    explained that decisions as to self-provisioning are made on a case-by-case basis, and are only

12    justified where revenues available *at the specific location* are sufficient to offset the large cpital

---

145.  See, generally, CLEC comments cited at fn. 44, *supra*.

146.  *Competing Providers Are Successfully Providing High-Capacity Services to Customers Without Using Unbundled Elements*, *Ex Parte* Submission of Verizon Communications in CC Docket Nos. 01-338, 96-98, 98-147, filed July 2, 2004; *Lessons Learned in State TRO Proceedings*, *Ex Parte* Submission of BellSouth in CC Docket No. 01-338, filed August 18, 2004; *Ex Parte* Submission of Qwest in CC Docket Nos. 01-338, 96-98, and 98-147, filed August 19, 2004; *Ex Parte* Submission of SBC in CC Docket No. 01-138, 96-98, and 98-147, filed August 18, 2004.

147.  *Kahn/Tardiff (Verizon)*, at para. 15.



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 85 of 98

1    investment that is required to construct facilities to the building.[148]  Witnesses for other CLECs

2    have provided similar analysis and evidence.[149]  And, of course, in the *TRO*, the Commission

3    determined that CLEC self-provisioning of loop facilities was feasible only where revenues at

4    each specific customer location (building) were sufficient, and it established a minimum capacity

5    threshold of three DS-3s as a revenue surrogate.[150]  The Commission established certain triggers

6    that, if satisfied at a particular customer location or over a particular point-to-point interoffice

7    transport route, could serve as a basis for an *inference* of non-impairment at that location or over

8    that route, but otherwise determined at a national level that CLECs are impaired at locations

9    requiring less than three DS-3s or over interoffice routes requiring twelve or fewer DS-3s.  There

10   is no basis for, or evidence to support, Verizon's proposal that the MSA geography substitute for

11   those location- and route-specific triggers in trumping the *TRO*'s national impairment finding.

12

13   96.  The RBOCs' own geographic market evidence clearly undercuts the Kahn-Tardiff

14   rhetoric.  Each of the RBOCs has put forward a set of maps purporting to identify the locations

15   of CLEC customers and the method by which the CLEC is providing their service – either

16   through use of CLEC-owned facilities or RBOC special access.  None of the RBOCs have

---

148.  Declaration of Anthony Fea and Anthony Giovannucci on Behalf of AT&T Corp, WC Docket 04-313, October 4, 2004, and at paras 25-31.

149.  See, generally, CLEC comments cited at fn. 44, *supra.*

150.  *TRO*, 18 FCC Rcd 17170, 17172, at paras. 320, 324.



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 86 of 98

1    offered any evidence as to the type of customer or the nature of the service being provided, and

2    none have provided any information whatsoever as to the number and geographic locations of

3    customers that CLECs are *not* able profitably to serve, and which they are not presently serving.

4    The mere "availability" of special access and its possible use by a CLEC to serve a specific

5    customer at a specific location cannot and does not support the inference that Verizon and the

6    other RBOCs seek to draw – i.e., that *some* high-revenue customers in certain high-

7    concentration portions of an MSA are currently being served, then it follows that *all potential*

8    *customers at all capacity levels located anywhere within the MSA are capable of being profitably*

9    *served going forward.*

10

11        97.  The Commission has in the past rejected attempts by carriers to infer competition across

12    expansive geographic areas based upon the nominal presence of competition in limited portions

13    of such geography.  Two such Commission rulings – the *Comsat Reclassification Order*[151] and

14    the *Bell Atlantic/NYNEX Merger Memorandum and Order*[152] – are particularly instructive.  The

15    Commission has determined that a "relevant geographic market" area "aggregates into one

_____

151.  *Comsat Corporation Petition Pursuant to Section 10(c) of the Communications Act of 1934, as amended, for Forbearance from Dominant Carrier Regulation and for Reclassification as a Non-Dominant Carrier,* CC Docket No. 80-634,  *Order and Notice of Proposed Rulemaking,* FCC No. 98-78, 13 FCC Rcd 14083 (1998) ("*Comsat Reclassification Order*").

152.  *Applications of NYNEX Corporation, Tranferor, -and- Bell Atlantic Corporation, Transferee, For Consent to Transfer Control of NYNEX Corporation and Its Subsidiaries,* File No. NSD-L-96-10, *Memorandum Opinion and Order,* FCC No. 97-286, 12 FCC Rcd 19985 (1997) ("*Bell Atlantic/NYNEX Merger*").



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 87 of 98

1    market those consumers with similar choices regarding a particular good or service in the same

2    geographic area."[153]  If the relevant geographic market embraces "consumers with similar choices

3    regarding a particular good or service in the same geographic area," then *all customers* within the

4    specified geographic area must confront substantially equivalent "choices."

5

6        98.  Comsat had defined the relevant geographic market for international satellite services as

7    consisting of the entire world, and had sought to be reclassified as nondominant with respect to

8    the entirety of that geographic area.[154]  The Commission rejected Comsat's "whole world"

9    market definition, specifically concluding that there were still many locations (countries, in this

10   case) where Comsat confronted no competition at all:

11

12           28. Comsat provides switched voice and private line service to a large number
13           of point-to-point routes between the U.S. and foreign countries that can be grouped
14           into two separate and distinct geographic markets.  Many of these routes are served
15           by multiple cable and satellite carriers, in addition to Comsat, which provide
16           switched voice and private line service.  In addition to being served by multiple
17           carriers, these routes appear to exhibit low barriers to entry for Comsat's
18           competitors.  These routes are primarily between the U.S. and the countries of
19           Europe, the Americas, Asia and Australia.  *For the purposes of our analysis*, we
20           group these point-to-point routes exhibiting sufficiently similar competitive
21           characteristics into one geographic market referred to as the "thick route market."
22           The record also indicates that a second group of point-to-point routes also share
23           some common competitive characteristics. The 63 countries listed on Appendix A
24           to this Order are not linked to the U.S. by cable and, therefore, are served only by
25           satellite carriers.  In addition, generally Comsat is the only satellite carrier that

---

153. *Comsat Reclassification Order*, 13 FCC Rcd 14100, at para. 27.

154. *Id.*

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 88 of 98

1  provides switched voice and private line service to these countries from the U.S.
2  These markets are primarily developing nations located in Africa and Eastern
3  Europe as well as low density, remotely located island nations, such as Mauritius
4  and New Caledonia, that might not justify the cost of a cable connection.  In many
5  of these countries, legal barriers to entry exist for U.S. cable and satellite carriers.
6  Although the record offers little guidance on this point, *some of these countries,*
7  *however, may have low barriers to entry but insufficient demand may be the reason*
8  *Comsat is not encountering competition in these markets from U.S. satellite*
9  *carriers.*  Over time, we expect the number of these thin route countries to decrease
10  as they become linked to the U.S. by fiber-optic cable and lower their barriers to
11  entry.  *The record provides an insufficient basis for us to reasonably determine*
12  *when this will happen.*  Because these 63 countries exhibit sufficiently similar
13  competitive characteristics, for the purposes of our analysis, we group them into
14  one geographic market referred to as the "thin route market."[155]

15

16      99.  Similarly, in *Bell Atlantic/NYNEX*, the Commission concluded that it would treat a

17  geographic market as "an area in which *all customers in that area will likely face the same*

18  *competitive alternatives for a product*."[156]  And the Commission *excluded* medium and large

19  business and government customers from its limited finding in *Bell Atlantic/NYNEX*, with

20  respect to LATA 132, the New York Metro LATA *portion* of the considerably larger New York-

21  Northern New Jersey-Long Island, NY-NJ-PA MSA, that all *residential and small business*

22  *customers* faced similar competitive choices.[157]  Specifically limiting its finding to this one

23  segment only, the Commission determined that "any carrier that offers service in the New York

---

155.  *Id.*, at para. 28, emphasis supplied.

156.  *Bell Atlantic/NYNEX Merger*, 12 FCC Rcd 20017, at para. 54, emphasis supplied.

157.  *Id.*, 12 FCC Rcd 20016, at para. 53.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 89 of 98

1     Metropolitan Regional Calling Area offers that service to all customers in that area.  Thus, with

2     respect to mass market customers, each customer in the area can select service from the same

3     alternate providers."[158]  The Commission noted that the New York television and radio

4     advertising market encompass all of LATA 132.[159]  However, in the case of medium and large

5     business customers, the Commission concluded that ubiquitous offers are not the case and

6     advertising boundaries are irrelevant.  As the Commission found, "[i]n our experience, medium

7     sized business are targeted by specialized firms that do not necessarily seek to address the mass

8     market.  Larger business and governmental users, in contrast, are served under individual

9     contracts and marketed through direct sales contracts."[160]  The specific competitive conditions of

10    the enterprise market, as noted by the Commission, make it inappropriate for the same type of

11    "aggregation" of point-to-point markets the Commission chose to employ with regard to mass

12    market customers in the *Bell Atlantic/NYNEX Merger* to be extended to the medium and large

13    business/government enterprise markets.  Moreover, even where the Commission had found that

14    "all *residential and small business customers* faced similar competitive choices," that finding

15    was specifically confined to LATA 132 only.  The Commission has made no comparable finding

16    with respect to the entire New York-Northern New Jersey-Long Island, NY-NJ-PA MSA even

---

158. *Id.*, 12 FCC Rcd 20017, at para. 55.

159. *Id.*

160. *Id.*, 12 FCC Rcd 20016, at para. 53.



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 90 of 98

1    with respect to mass market services, and has made no such finding with respect to *any other*

2    *MSA* with respect to *any* services or categories of customers.

3

4       100. The RBOCs have not provided any analysis demonstrating that any of the MSAs that

5    they have identified represents a geographic area "in which all customers in that area will likely

6    face the same competitive alternatives for a product."  In fact, the evidence and analysis that the

7    RBOCs themselves have offered demonstrates precisely the contrary:  Within each and all of the

8    MSAs for which the RBOCs have provided detailed maps, "certain carriers may target particular

9    types of customers, provide specialized services or *control independent facilities in specific*

10   *geographic areas*" and, as such, limit the extent of competitive choices to specific locations and

11   specific routes, areas that in all cases constitute no more than a tiny fraction of the total

12   geographic area embraced within any of these MSAs.

13

14   ***As established by the OMB, the geography of MSAs make them inappropriate for defining***
15   ***markets.***
16

17      101.  The geographic areas encompassed with an MSA are in all cases defined in terms of

18   *political* boundaries – in most cases, county lines, except for the six New England States, where

19   municipal boundaries are utilized.  These delimiters have nothing at all to do with entry decisions

20   made by facilities-based CLECs.  MSAs are established and maintained by the federal Office of

21   Management and Budget ("OMB") for use by the US Census Bureau and other federal agencies



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 91 of 98

1    in collecting and reporting statistical data, i.e., to "provide nationally consistent definitions for

2    collecting, tabulating, and publishing Federal statistics for a set of geographic areas."[161]   The

3    RBOCs' suggestion that MSAs should be used by the Commission as the basis for defining the

4    relevant geographic market and, based thereon, for formulating and applying regulatory policy, is

5    directly at odds with the stated purpose of the "MSA" concept.   MSAs are intended to be used

6    *solely for statistical purposes*.   The OMB is clear and specific on this point, admonishing that

7    MSAs "should not be used to develop and implement Federal, state, and local nonstatistical

8    programs without consideration of the full effects of using these definitions for such

9    purposes."[162]   Nowhere in any of the RBOCs' factual submissions is there to be found any

10   discussion of "the full effects of using these definitions for [the] purposes" being advanced by

11   the RBOCs – i.e., as the geographic basis for a finding of non-impairment – or any other factual

12   support as to why areas defined by arbitrary political boundaries are an appropriate basis for

13   delineating areas within which all customers confront similar competitive choices.

14

15        102.   Even if effective, price-constraining competition were present in limited portions of the

16   MSA – which in any event is not the case – there would be no reasonable basis to infer non-

17   impairment throughout the remainder of the MSA where no such competition is present.   Most

---

161.  *Standards for Defining Metropolitan and Micropolitan Statistical Areas*, 65 Fed. Reg. 82228, December 27, 2000.

162.  *Id.*

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 92 of 98

1    MSAs are expansive areas – indeed, some are larger in total area than many states.  For many

2    MSAs, the areas of relatively high concentration represent only a small fraction of the overall

3    MSA geography.  And, as the various maps proffered by the RBOCs confirm, the presence of

4    non-RBOC fiber optic facilities is typically even more limited, usually to a relatively small

5    number of individual streets in the central business district, and in some cases to specific

6    concentrations of demand in a few suburban areas.

7

8        103.  Access line facilities are not fungible from one location to another:  The fact that a

9    CLEC might own facilities supporting a limited array of service offerings and serving a handful

10   of individual buildings on a particular street in a particular zip code does not make such CLEC-

11   owned facilities available ubiquitously throughout the entire MSA.

12

13   ***CLEC supply elasticities are extremely low, such that CLECs are not able rapidly to***
14   ***expand the geographic scope of their facilities in response to RBOC price increases, thus***
15   ***imposing virtually no pricing discipline upon the RBOCs beyond the specific buildings***
16   ***that are currently "lit" or point-to-point transport routes over which CLEC facilities***
17   ***presently exist.***
18

19       104.  *Supply elasticity* generally refers to the extent to which firms are able to expand or

20   contract their output in response to market price and other market conditions.  Generally, if firms

21   are able to rapidly adjust their supply – and particularly to increase it – in response to a price

22   change, this will tend to limit any one firm's ability to maintain supracompetitive prices, thereby



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 93 of 98

1    limiting or eliminating that firm's market power.  On the other hand, if competitors are not able

2    to expand supply when another firm in the market increases prices, the firm imposing the price

3    increase will have the ability to maintain excessive prices over an extended period of time, which

4    would demonstrate its market power.  In order for CLECs to rapidly expand their limited

5    facilities throughout an MSA, their *supply elasticity* would need to be relatively high.  The

6    RBOCs have offered no specific, quantitative evidence that this is the case and, in fact, AT&T

7    and several other CLECs *have introduced extensive evidence that the supply elasticity*

8    *confronting CLECs is extremely low.*[163]  The rate at which CLECs have been adding "lit"

9    buildings has slowed to little more than a trickle.  According to the *New Paradigm Research*

10   *Group CLEC Report 2004* relied upon by Verizon and Huber as a key source for this type of

11   data, CLECs added only 683 and 1,183 "lit" buildings in 2002 and 2003, respectively, increasing

12   their total 2003 building count by only about 7% over the two-year period.[164]  These "facts on the

13   ground" belie Kahn-Tardiff's entirely unsupported and demonstrably incorrect speculations that

14   "[f]acilities-based competitors can and do expand into nearby locations (and routes)."[165]

15

---

163.  See, generally, CLEC comments cited at footnote 44, *supra*.

164.  New Paradigm Resources Group, *CLEC Report 2003*, 17th Edition, at Table 18; New Paradigm Resources Group, *CLEC Report 2004*, 18th Edition, at Table 18.

165.  *Kahn-Tardiff (Verizon)*, at para. 15.



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 94 of 98

1    105.  If CLECs cannot rapidly respond (or in most cases cannot respond at all) to an RBOC

2    price increase by rapidly expanding their own facilities, which is the only condition (short of

3    regulation) that would be capable of constraining an RBOC price increase, the RBOCs possess

4    the ability, as an economic matter, to increase rates for any essential service they provide to

5    CLECs that is not otherwise subject to regulatory pricing constraints.  Special access service is

6    currently subject to pricing flexibility in nearly all of the MSAs identified in the RBOC *ex parte*

7    filings.  Special access prices may be increased in any or all of those areas without regulatory

8    limitation or approval.  As AT&T declarant M. Joseph Stith has shown, and notwithstanding the

9    purported MSA-wide "competition" for special access services that had formed the basis for that

10   pricing flexibility, special access prices in these purportedly "competitive" MSAs are in all cases

11   *higher* than comparable prices in areas still subject to price regulation, and RBOC rates of return

12   on special access have soared.

13

14   **The Commission's Pricing Flexibility Order cannot support MSA-wide markets.**
15

16   106.  The Commission came closest to adopting the MSA as the basis for relevant

17   geographic market definition in the *Special Access Pricing Flexibility Order.*[166]  There, the

---

166.  *Access Charge Reform,* CC Docket No. 96-262; *Price Cap Performance Review for Local Exchange Carriers*, CC Docket No. 94-1; *Interexchange Carrier Purchases of Switched Access Services Offered by Competitive Local Exchange Carriers*, CCB/CPD File No. 98-63; *Petition of U S West Communications, Inc. for Forbearance from Regulation as a Dominant Carrier in the Phoenix, Arizona MSA*, CC Docket No. 98-157; *Fifth Report and Order and*

(continued...)



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 95 of 98

1    Commission established minimum threshold criteria for granting price cap carriers pricing

2    flexibility for specific special access services based upon the instances of collocation and the

3    share of special access revenues on an MSA basis.  However, the Commission did not base its

4    decision to adopt the MSA as a relevant geographic market upon recognized economic or

5    antitrust standards.  At best, the MSA-level scope applicable to special access pricing flexibility

6    represented a middle-ground between alternative market definitions involving either larger or

7    smaller geographic reach.  For example, the Commission declined to define the market on a full-

8    state, ILEC study-area, or LATA basis, concluding that "competitive LECs generally do not

9    enter new markets on a state-wide basis."[167]  But the Commission also rejected CLEC proposals

10   to grant pricing flexibility at the wire center or central office level; while conceding that such an

11   approach "might produce a more finely-tuned picture of competitive conditions,"[168] it

12   nevertheless concluded that this level of granularity would impose additional expenses and

13   administrative burdens on ILECs in filing pricing flexibility petitions.[169]  In response to

---

166.  (...continued)
*Further Notice of Proposed Rulemaking,* FCC No. 99-206, 14 FCC Rcd 14221 (1999) ("*Pricing Flexibility Order*"), 14234-14235, para. 24-25.

167.  *Id.*, 14 FCC Rcd 14260, paras. 72-73.

168.  *Id.*, 14 FCC Rcd 14260,  para. 74.

169.  The Commission's emphasis upon administrative simplicity also extended to its decision to assess the presence of competitive entry in the RSAs for the purpose of granting ILECs pricing flexibility, by allowing ILEC's to file a single pricing flexibility petition for all the RSAs in a study area. *See, Id.*, at 14261, para. 76.



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 96 of 98

1    commentors who argued that competition may only exist in a small part of an MSA, the FCC

2    expressed its belief that the threshold triggers established for pricing flexibility were "sufficient

3    to ensure that competitors have made sufficient sunk investment within an MSA."[170]  Subsequent

4    events have shown that expectation to have been seriously in error.  RBOC special access prices

5    have clearly *not been constrained* by the minimal CLEC facilities-based presence at a few

6    buildings in the central business districts – even for special access services provided to *other*

7    locations within those same downtown areas, and RBOC earnings on special access have soared.

8    Even with the elevated RBOC prices, CLEC facilities investments have essentially ceased –

9    putting a lie to the oft-repeated RBOC canard that sought to attribute the lack of facilities-based

10   competition to what the Bells have claimed were regulatory mandated below-cost prices for

11   access to their networks.

12

13       107.  The ability of the RBOCs to raise special access prices after the grant of pricing

14   flexibility is a result of the RBOCs continuing market power with respect to these services.  As

15   the Commission noted in its *Pricing Flexibility Order*, "we will not require incumbent LECs to

16   demonstrate that they no longer possess market power in the provision of any access services to

17   receive pricing flexibility..."[171]  Likewise, the *TRO* noted the differences between the "impair"

18   standard and pricing flexibility triggers,

---

170.  *Id.*, 14 FCC Rcd 14260,  para. 74.

171.  *Id.*, 14 FCC Rcd 14271,  para. 90.



Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 97 of 98

1    ... because the special access revenue triggers require only a single collocated
2    competitor to purchase substantial amounts of special access in a concentrated
3    area, this test provides little, if any, indication that even that competitor has
4    been able to widely, if at all, self-deploy alternative loop facilities in that area.
5    Evidence of self-deployment of transport facilities is not necessarily evidence
6    of the economic ability of a competitive LEC to self-deploy loops. Moreover,
7    the presence of a single competitive LEC's collocated transport facility as a
8    trigger for purposes of protecting consumers from anticompetitive pricing, i.e.,
9    the purpose of our pricing flexibility rules, is not sufficient evidence that
10   facilities-based competitive entry into a market at the local loop level is
11   economically feasible. Under a special access pricing flexibility trigger, such
12   as suggested by incumbent LECs, DS-1 loops would no longer be unbundled in
13   many large geographic areas nationwide. This conclusion would clearly
14   contravene our unbundling mandate due to the pervasive competitive LEC
15   impairment at the DS-1 loop level resulting from an economic inability to
16   self-deploy and limited available wholesale alternatives.[172]
17
18   108. Clearly, the FCC's expectation that the threshold triggers established for pricing

19   flexibility would be "sufficient to ensure that competitors have made sufficient sunk investment

20   within an MSA" has not come to fruition either for the entirety of any MSA or even for the small

21   portion of certain MSAs in which CLECs have deployed fiber. The Commission's determination

22   in the *TRO* that the geographic scope of enterprise markets is "point-to-point" is fundamentally

23   sound, and certainly has not been undermined by any evidence or argument advanced by any of

24   the RBOCs' experts.

---

172. *TRO*, 18 FCC Rcd 17183, at para. 341.

ECONOMICS AND
TECHNOLOGY, INC.

Reply Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 19, 2004
Page 98 of 98

## VERIFICATION

The foregoing statements are true and correct to the best of my knowledge, information and

belief.

_____

LEE L. SELWYN

ECONOMICS AND
TECHNOLOGY, INC.

**Attachment 1**

**Sources and Data**

**Underlying Figures 2-6**

ECONOMICS AND
TECHNOLOGY, INC.

| Company | Row | Row Title | Y2003 Special Access ($) | Y2002 Special Access ($) | Y2001 Special Access ($) | Y2000 Special Access ($) | Y1999 Special Access ($) | Y1998 Special Access ($) | Y1997 Special Access ($) | Y1996 Special Access ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | All RBOCs | | | | |
| BellSouth Corporation | 5083 | Special Access Revenue | 2,148,397 | 2,009,816 | 1,834,931 | 1,229,413 | 918,699 | 763,742 | 615,446 | 518,221 |
| BellSouth Corporation | 1190 | Total Operating Expenses | 663,967 | 657,588 | 676,932 | 494,806 | 444,713 | 371,764 | 383,011 | 330,741 |
| BellSouth Corporation | 1690 | Total Plant In-Service | 4,088,228 | 4,009,316 | 4,005,925 | 3,338,531 | 2,442,156 | 2,121,781 | 1,905,471 | 1,582,945 |
| BellSouth Corporation | 1910 | Average Net Investment | 1,317,121 | 1,438,138 | 1,536,048 | 1,247,668 | 898,339 | 767,838 | 763,053 | 679,773 |
| BellSouth Corporation | 1915 | Net Return | 910,703 | 813,076 | 711,303 | 458,996 | 290,944 | 240,243 | 133,008 | 109,946 |
| Qwest Corporation | 5083 | Special Access Revenue | 1,872,907 | 1,640,238 | 1,512,740 | 1,210,030 | 909,305 | 708,150 | 551,544 | 423,327 |
| Qwest Corporation | 1190 | Total Operating Expenses | 542,166 | 555,883 | 558,249 | 519,208 | 435,654 | 363,889 | 382,167 | 362,447 |
| Qwest Corporation | 1690 | Total Plant In-Service | 3,484,737 | 3,481,366 | 3,460,928 | 2,949,322 | 2,462,580 | 2,061,448 | 1,991,951 | 1,828,132 |
| Qwest Corporation | 1910 | Average Net Investment | 1,036,068 | 1,198,747 | 1,416,675 | 1,183,572 | 944,811 | 815,296 | 856,845 | 862,193 |
| Qwest Corporation | 1915 | Net Return | 705,315 | 713,147 | 633,201 | 451,357 | 304,047 | 222,105 | 116,455 | 46,133 |
| SBC Communications | 5083 | Special Access Revenue | 5,077,207 | 4,254,654 | 4,294,276 | 3,405,513 | 2,481,339 | 1,951,929 | 1,531,096 | 1,219,371 |
| SBC Communications | 1190 | Total Operating Expenses | 1,690,493 | 1,537,557 | 1,350,369 | 1,465,291 | 1,057,370 | 1,071,780 | 994,553 | 851,214 |
| SBC Communications | 1690 | Total Plant In-Service | 9,227,656 | 9,114,449 | 8,022,241 | 7,623,212 | 5,716,826 | 5,199,595 | 4,434,578 | 3,947,674 |
| SBC Communications | 1910 | Average Net Investment | 2,580,329 | 3,175,416 | 3,045,731 | 2,890,702 | 2,213,592 | 2,147,399 | 1,904,567 | 1,753,989 |
| SBC Communications | 1915 | Net Return | 1,629,850 | 1,886,481 | 1,871,335 | 1,204,031 | 875,456 | 526,036 | 304,980 | 1,221,594 |
| Verizon Communications | 5083 | Special Access Revenue | 5,327,837 | 4,847,882 | 4,434,042 | 3,394,159 | 2,008,591 | 2,925,086 | 1,512,425 | 1,318,977 |
| Verizon Communications | 1190 | Total Operating Expenses | 1,183,390 | 2,047,888 | 2,326,042 | 2,394,114 | 2,050,539 | 1,597,186 | 1,516,139 | 1,182,649 |
| Verizon Communications | 1690 | Total Plant In-Service | 15,790,622 | 15,020,163 | 14,281,238 | 12,687,658 | 10,847,782 | 8,265,917 | 6,612,490 | 5,216,040 |
| Verizon Communications | 1910 | Average Net Investment | 5,277,602 | 5,648,340 | 5,759,217 | 5,116,407 | 4,383,827 | 3,419,049 | 2,848,609 | 2,404,909 |
| Verizon Communications | 1915 | Net Return | 1,238,891 | 1,359,867 | 1,286,600 | 780,691 | 436,293 | 291,291 | 62,810 | 92,987 |
| RBOC Totals | 5083 | Special Access Revenue | 14,426,348.00 | 12,794,328.00 | 12,010,389.00 | 9,342,895.00 | 7,017,904.00 | 5,449,907.00 | 4,322,311.00 | 3,479,896.00 |
| RBOC Totals | 1190 | Total Operating Expenses | 5,999,618.00 | 5,398,916.00 | 5,111,552.00 | 4,873,419.00 | 3,988,276.00 | 3,404,629.00 | 3,275,870.00 | 2,727,051.00 |
| RBOC Totals | 1690 | Total Plant In-Service | 32,591,243.00 | 31,625,294.00 | 29,770,332.00 | 26,598,723.00 | 21,469,344.00 | 17,648,741.00 | 14,944,490.00 | 12,574,791.00 |
| RBOC Totals | 1910 | Average Net Investment | 10,211,120.00 | 11,460,641.00 | 11,757,671.00 | 10,438,349.00 | 8,440,569.00 | 7,149,582.00 | 6,373,074.00 | 5,700,864.00 |
| RBOC Totals | 1915 | Net Return | 4,484,759.00 | 4,572,571.00 | 4,502,439.00 | 2,895,075.00 | 1,906,740.00 | 1,279,675.00 | 617,253.00 | 470,660.00 |
| RBOC Totals | | Special Access VGEs | 108,435,334 | 94,275,360 | 79,559,664 | 65,598,336 | 48,820,920 | 34,069,485 | 26,306,341 | 22,117,585 |
| RBOC per VGE | 5083 | Special Access Revenue | 0.13 | 0.14 | 0.15 | 0.14 | 0.14 | 0.16 | 0.16 | 0.16 |
| RBOC per VGE | 1190 | Total Operating Expenses | 0.06 | 0.06 | 0.06 | 0.07 | 0.08 | 0.10 | 0.12 | 0.12 |
| RBOC per VGE | 1690 | Total Plant In-Service | 0.30 | 0.34 | 0.37 | 0.41 | 0.44 | 0.52 | 0.57 | 0.57 |
| RBOC per VGE | 1910 | Average Net Investment | 0.09 | 0.12 | 0.15 | 0.16 | 0.17 | 0.21 | 0.24 | 0.26 |
| RBOC per VGE | 1915 | Net Return | 0.04 | 0.05 | 0.06 | 0.04 | 0.04 | 0.04 | 0.02 | 0.02 |
| Per VGE percentage changes | 5083 | Special Access Revenue | (0.02) | (0.10) | 0.06 | (0.01) | (0.10) | (0.03) | 0.04 | |
| Per VGE percentage changes | 1190 | Total Operating Expenses | (0.03) | (0.11) | (0.14) | (0.09) | (0.18) | (0.20) | 0.01 | |
| Per VGE percentage changes | 1690 | Total Plant In-Service | (0.10) | (0.10) | (0.08) | (0.08) | (0.15) | (0.09) | (0.00) | |
| Per VGE percentage changes | 1910 | Average Net Investment | (0.23) | (0.18) | (0.07) | (0.08) | (0.18) | (0.13) | (0.06) | |
| Per VGE percentage changes | 1915 | Net Return | (0.15) | (0.14) | 0.28 | 0.13 | 0.04 | 0.60 | 0.10 | |
| Indices | 5083 | Special Access Revenue | 84.56 | 86.26 | 95.95 | 90.52 | 91.36 | 101.67 | 104.43 | 100 |
| Indices | 1190 | Total Operating Expenses | 44.87 | 46.45 | 52.11 | 60.25 | 66.26 | 81.05 | 101.00 | 100 |
| Indices | 1690 | Total Plant In-Service | 52.86 | 59.00 | 65.82 | 71.32 | 77.35 | 91.11 | 99.92 | 100 |
| Indices | 1910 | Average Net Investment | 36.53 | 47.16 | 57.34 | 61.74 | 67.08 | 81.42 | 93.99 | 100 |
| Indices | 1915 | Net Return | 194.36 | 227.93 | 265.94 | 207.39 | 183.53 | 176.51 | 110.26 | 100 |
| TOTAL RBOC | | | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |

Note: Data underlying Figure 2.
Sources: Federal Communications Commission, ARMIS Report 43-01, Annual Summary Report: Table I, YE 1996-2003. Available at http://www.fcc.gov/wcb/eafs/ (accessed October 5, 2004);
Federal Communications Commission, ARMISR Report 43-03, Joint Cost Report: Table I, YE 1996-2003. Available at http://www.fcc.gov/wcb/eafs/ (accessed October 5, 2004).

| Company | Row | Row Title | Verizon Communications | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Y2003 Special ($) | Y2002 Special ($) | Y2001 Special ($) | Y2000 Special ($) | Y1999 Special ($) | Y1998 Special ($) | Y1997 Special ($) | Y1996 Special ($) |
| Verizon Communications | 5083 | Special Access Revenue | 5,327,837 | 4,889,620 | 4,368,442 | 3,497,939 | 2,708,561 | 2,026,086 | 1,624,225 | 1,318,977 |
| Verizon Communications | 1190 | Total Operating Expenses | 3,102,992 | 2,647,888 | 2,526,002 | 2,394,114 | 2,050,539 | 1,597,196 | 1,516,139 | 1,182,649 |
| Verizon Communications | 1690 | Total Plant In-Service | 15,790,622 | 15,020,163 | 14,281,238 | 12,687,658 | 10,847,782 | 8,265,917 | 6,612,490 | 5,216,040 |
| Verizon Communications | 1910 | Average Net Investment | 5,277,622 | 5,648,340 | 5,759,217 | 5,116,407 | 4,383,827 | 3,419,049 | 2,848,609 | 2,404,909 |
| Verizon Communications | 1915 | Net Return | 1,238,891 | 1,359,867 | 1,286,600 | 780,691 | 436,293 | 291,291 | 62,810 | 92,987 |
| | | Special Access VGEs | 34703115 | 26803797 | 24921686 | 19261037 | 11445395 | 7890191 | 5952898 | 4534619 |
| Per VGE calculations | 5083 | Special Access Revenue | 0.15352619 | 0.18242266 | 0.1752868 | 0.18160699 | 0.2366507 | 0.256785 | 0.272846 | 0.290868 |
| | 1190 | Total Operating Expenses | 0.08941537 | 0.09878779 | 0.1013576 | 0.12429829 | 0.1791584 | 0.202428 | 0.254689 | 0.260804 |
| | 1690 | Total Plant In-Service | 0.45502031 | 0.56037445 | 0.5730446 | 0.65872144 | 0.9477857 | 1.047619 | 1.110802 | 1.150271 |
| | 1910 | Average Net Investment | 0.15207862 | 0.2107291 | 0.2310926 | 0.26563507 | 0.383021 | 0.433329 | 0.478525 | 0.530344 |
| | 1915 | Net Return | 0.03569971 | 0.05073412 | 0.0516257 | 0.04053214 | 0.0381195 | 0.036918 | 0.010551 | 0.020506 |
| Per VGE percentage changes | 5083 | Special Access Revenue | -0.158404 | 0.04070978 | -0.0348016 | -0.2325948 | -0.078411 | -0.05886 | -0.06196 | -- |
| | 1190 | Total Operating Expenses | -0.0948743 | -0.0253537 | -0.1845617 | -0.3062102 | -0.114953 | -0.2052 | -0.02345 | -- |
| | 1690 | Total Plant In-Service | -0.1880067 | -0.0221103 | -0.1300653 | -0.3049891 | -0.095296 | -0.05688 | -0.03431 | -- |
| | 1910 | Average Net Investment | -0.2783217 | -0.0881183 | -0.1300374 | -0.3064739 | -0.116097 | -0.09445 | -0.09771 | -- |
| | 1915 | Net Return | -0.2963373 | -0.0172705 | 0.2736984 | 0.06329078 | 0.0325424 | 2.498962 | -0.48546 | -- |
| Indices | 5083 | Special Access Revenue | 52.7820254 | 62.7165803 | 60.263276 | 62.4361546 | 81.360089 | 88.28236 | 93.80399 | 100 |
| | 1190 | Total Operating Expenses | 34.2844456 | 37.8781034 | 38.863437 | 47.6595673 | 68.694534 | 77.61678 | 97.65523 | 100 |
| | 1690 | Total Plant In-Service | 39.5576668 | 48.7167397 | 49.818234 | 57.2666381 | 82.396745 | 91.07589 | 96.56872 | 100 |
| | 1910 | Average Net Investment | 28.6754559 | 39.7344007 | 43.574075 | 50.0872946 | 72.221213 | 81.70713 | 90.22909 | 100 |
| | 1915 | Net Return | 174.09376 | 247.410816 | 251.75882 | 197.659674 | 185.89428 | 180.0355 | 51.45397 | 100 |
| Verizon Communications | | | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |

Note: Data underlying Figure 3.
(accessed October 5, 2004);
Federal Communications Commission, ARMISR Report 43-03, Joint Cost Report: Table I, YE 1996-2003. Available at http://www.fcc.gov/wcb/eafs/ (accessed October 5, 2004).

**SBC Communications**

| Company | Row | Row Title | Y2003 Special ($) | Y2002 Special ($) | Y2001 Special ($) | Y2000 Special ($) | Y1999 Special ($) | Y1998 Special ($) | Y1997 Special ($) | Y1996 Special ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| SBC Communications | 5083 | Special Access Revenue | 5,077,207 | 4,254,654 | 4,294,276 | 3,405,513 | 2,481,339 | 1,951,929 | 1,531,096 | 1,219,371 |
| SBC Communications | 1190 | Total Operating Expenses | 1,690,493 | 1,537,557 | 1,350,369 | 1,465,291 | 1,057,370 | 1,071,780 | 994,553 | 851,214 |
| SBC Communications | 1690 | Total Plant In-Service | 9,227,656 | 9,114,449 | 8,022,241 | 7,623,212 | 5,716,826 | 5,199,595 | 4,434,578 | 3,947,674 |
| SBC Communications | 1910 | Average Net Investment | 2,580,329 | 3,175,416 | 3,045,731 | 2,890,702 | 2,213,592 | 2,147,399 | 1,904,567 | 1,753,989 |
| SBC Communications | 1915 | Net Return | 1,629,850 | 1,686,481 | 1,871,335 | 1,204,031 | 875,456 | 526,036 | 304,980 | 221,594 |
| | | Special Access VGEs | 45543054 | 41108058 | 31592086 | 27095927 | 21881920 | 14965298 | 11803472 | 10698098 |
| Per VGE calculations | 5083 | Special Access Revenue | 0.11148148 | 0.10349927 | 0.1359289 | 0.12568358 | 0.1133968 | 0.13043 | 0.129716 | 0.11398 |
| | 1190 | Total Operating Expenses | 0.03711857 | 0.03740281 | 0.0427439 | 0.05407791 | 0.0483216 | 0.071618 | 0.084259 | 0.079567 |
| | 1690 | Total Plant In-Service | 0.2026139 | 0.22171928 | 0.253932 | 0.28134162 | 0.261258 | 0.347443 | 0.375701 | 0.369007 |
| | 1910 | Average Net Investment | 0.05665692 | 0.07724559 | 0.096408 | 0.106684 | 0.1011608 | 0.143492 | 0.161357 | 0.163953 |
| | 1915 | Net Return | 0.03578702 | 0.04102556 | 0.0592343 | 0.04443587 | 0.0400082 | 0.03515 | 0.025838 | 0.020713 |
| Per VGE percentage changes | 5083 | Special Access Revenue | 0.07712333 | -0.2385776 | 0.0815164 | 0.10835237 | -0.130595 | 0.005509 | 0.138055 | -- |
| | 1190 | Total Operating Expenses | -0.0075995 | -0.1249556 | -0.2095866 | 0.11912426 | -0.325284 | -0.15003 | 0.058976 | -- |
| | 1690 | Total Plant In-Service | -0.0861692 | -0.1268556 | -0.0974248 | 0.07687287 | -0.248056 | -0.07521 | 0.018141 | -- |
| | 1910 | Average Net Investment | -0.2665352 | -0.198764 | -0.0963215 | 0.05459852 | -0.295007 | -0.11072 | -0.01584 | -- |
| | 1915 | Net Return | -0.1276897 | -0.307402 | 0.333029 | 0.11066927 | 0.1382006 | 0.360406 | 0.247413 | -- |
| Indices | 5083 | Special Access Revenue | 97.8077864 | 90.8046308 | 119.25658 | 110.267934 | 99.488157 | 114.4325 | 113.8055 | 100 |
| | 1190 | Total Operating Expenses | 46.6507941 | 47.0080329 | 53.720738 | 67.9653695 | 60.730852 | 90.00945 | 105.8976 | 100 |
| | 1690 | Total Plant In-Service | 54.9078624 | 60.0853713 | 68.814933 | 76.2428768 | 70.800258 | 94.15631 | 101.8141 | 100 |
| | 1910 | Average Net Investment | 34.55673 | 47.1143685 | 58.802115 | 65.0697317 | 61.700951 | 87.51995 | 98.41611 | 100 |
| | 1915 | Net Return | 172.772279 | 198.06287 | 285.97088 | 214.527134 | 193.15123 | 169.6988 | 124.7413 | 100 |
| SBC Communications | | | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |

Note: Data underlying Figure 4.

Sources: Federal Communications Commission, ARMIS Report 43-01, Annual Summary Report: Table I, YE 1996-2003. Available at http://www.fcc.gov/wcb/eafs/ (accessed October 5, 2004); Federal Communications Commission, ARMISR Report 43-03, Joint Cost Report: Table I, YE 1996-2003. Available at http://www.fcc.gov/wcb/eafs/ (accessed October 5, 2004).

| Company | Row | Row Title | Y2003 Special (s) | Y2002 Special (s) | Y2001 Special (s) | Y2000 Special (s) | Y1999 Special (s) | Y1998 Special (s) | Y1997 Special (s) | Y1996 Special (s) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **BellSouth Corporation** | | | | | | | | |
| BellSouth Corporation | 5083 | Special Access Revenue | 2,148,397 | 2,009,816 | 1,834,931 | 1,229,413 | 918,699 | 763,742 | 615,446 | 518,221 |
| BellSouth Corporation | 1190 | Total Operating Expenses | 663,967 | 657,588 | 676,932 | 494,806 | 444,713 | 371,764 | 383,011 | 330,741 |
| BellSouth Corporation | 1690 | Total Plant In-Service | 4,088,228 | 4,009,316 | 4,005,925 | 3,338,531 | 2,442,156 | 2,121,781 | 1,905,471 | 1,582,945 |
| BellSouth Corporation | 1910 | Average Net Investment | 1,317,121 | 1,438,138 | 1,536,048 | 1,247,668 | 898,339 | 767,838 | 763,053 | 679,773 |
| BellSouth Corporation | 1915 | Net Return | 910,703 | 813,076 | 711,303 | 458,996 | 290,944 | 240,243 | 133,008 | 109,946 |
| | | Special Access VGEs | 20,653,172 | 19,130,044 | 16,083,447 | 12,962,801 | 7,295,340 | 4,717,688 | 2,959,991 | 2,785,740 |
| Per VGE calculations | 5083 | Special Access Revenue | 0.10402262 | 0.10506071 | 0.1140882 | 0.09484162 | 0.1259296 | 0.161889 | 0.207922 | 0.186026 |
| | 1190 | Total Operating Expenses | 0.03214843 | 0.03437462 | 0.0420887 | 0.03817123 | 0.0609585 | 0.078802 | 0.129396 | 0.118726 |
| | 1690 | Total Plant In-Service | 0.19794674 | 0.20958216 | 0.2490713 | 0.25754704 | 0.3347556 | 0.44975 | 0.643742 | 0.568231 |
| | 1910 | Average Net Investment | 0.0637733 | 0.07517693 | 0.0955049 | 0.09624988 | 0.1231387 | 0.162757 | 0.257789 | 0.244019 |
| | 1915 | Net Return | 0.04409507 | 0.04250257 | 0.0442258 | 0.03540871 | 0.0398808 | 0.050924 | 0.044935 | 0.039467 |
| Per VGE percentage changes | 5083 | Special Access Revenue | -0.0098809 | -0.079127 | 0.2029336 | -0.2468678 | -0.222124 | -0.22139 | 0.1177 | -- |
| | 1190 | Total Operating Expenses | -0.0647627 | -0.1832822 | 0.10263 | -0.3738162 | -0.226436 | -0.391 | 0.089867 | -- |
| | 1690 | Total Plant In-Service | -0.0555173 | -0.1585455 | -0.0329095 | -0.2306416 | -0.255685 | -0.30135 | 0.132887 | -- |
| | 1910 | Average Net Investment | -0.1516905 | -0.2128474 | -0.00774 | -0.2183624 | -0.243421 | -0.36864 | 0.056431 | -- |
| | 1915 | Net Return | 0.03746829 | -0.038964 | 0.2490087 | -0.1121365 | -0.216855 | 0.133272 | 0.138541 | -- |
| Indices | 5083 | Special Access Revenue | 55.9182212 | 56.4762566 | 61.329042 | 50.9828981 | 67.694483 | 87.0248 | 111.77 | 100 |
| | 1190 | Total Operating Expenses | 27.0777315 | 28.9527923 | 35.450181 | 32.1505679 | 51.343661 | 66.37288 | 108.9867 | 100 |
| | 1690 | Total Plant In-Service | 34.8355845 | 36.8832407 | 43.832722 | 45.3243218 | 58.911844 | 79.14912 | 113.2887 | 100 |
| | 1910 | Average Net Investment | 26.1345834 | 30.8078409 | 39.138333 | 39.4436278 | 50.462805 | 66.69865 | 105.6431 | 100 |
| | 1915 | Net Return | 111.725203 | 107.690234 | 112.0564 | 89.7162667 | 101.04737 | 129.0276 | 113.3541 | 100 |
| BellSouth Corporation | | | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |

Note: Data underlying Figure 5.
(accessed October 5, 2004);
Federal Communications Commission, ARMIS/R Report 43-03, Joint Cost Report: Table I, YE 1996-2003.  Available at http://www.fcc.gov/wcb/eafs/ (accessed October 5, 2004).

| Company | Row | Row Title | Y2003 Special ($) | Y2002 Special ($) | Y2001 Special ($) | Y2000 Special ($) | Y1999 Special ($) | Y1998 Special ($) | Y1997 Special ($) | Y1996 Special ($) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Qwest Corporation | | | | |
| Qwest Corporation | 5083 | Special Access Revenue | 1,872,907 | 1,640,238 | 1,512,740 | 1,210,030 | 909,305 | 708,150 | 551,544 | 423,327 |
| Qwest Corporation | 1190 | Total Operating Expenses | 542,166 | 555,883 | 558,249 | 519,208 | 435,654 | 363,889 | 382,167 | 362,447 |
| Qwest Corporation | 1690 | Total Plant In-Service | 3,484,737 | 3,481,366 | 3,460,928 | 2,949,322 | 2,462,580 | 2,061,448 | 1,991,951 | 1,828,132 |
| Qwest Corporation | 1910 | Average Net Investment | 1,036,068 | 1,198,747 | 1,416,675 | 1,183,572 | 944,811 | 815,296 | 856,845 | 862,193 |
| Qwest Corporation | 1915 | Net Return | 705,315 | 713,147 | 633,201 | 451,357 | 304,047 | 222,105 | 116,455 | 46,133 |
| | | Special Access VGEs | 7535993 | 7233461 | 6962445 | 6278571 | 8198265 | 6496308 | 5589980 | 4099128 |
| Per VGE calculations | 5083 | Special Access Revenue | 0.24852823 | 0.22675701 | 0.2172714 | 0.19272379 | 0.1109143 | 0.109008 | 0.098667 | 0.103272 |
| | 1190 | Total Operating Expenses | 0.07194354 | 0.07684883 | 0.08018 | 0.08269525 | 0.0531398 | 0.056015 | 0.068366 | 0.088421 |
| | 1690 | Total Plant In-Service | 0.46241245 | 0.48128634 | 0.4970851 | 0.46974415 | 0.3003782 | 0.317326 | 0.356343 | 0.445981 |
| | 1910 | Average Net Investment | 0.13748261 | 0.16572247 | 0.2034738 | 0.18850977 | 0.1152452 | 0.125501 | 0.153282 | 0.210336 |
| | 1915 | Net Return | 0.09359284 | 0.09859001 | 0.0909452 | 0.07188849 | 0.0370867 | 0.034189 | 0.020833 | 0.011254 |
| Per VGE percentage changes | 5083 | Special Access Revenue | 0.09601122 | 0.04365801 | 0.1273718 | 0.73759157 | 0.0174872 | 0.104813 | -0.0446 | -- |
| | 1190 | Total Operating Expenses | -0.0638304 | -0.0415464 | -0.0304156 | 0.55618352 | -0.051325 | -0.18067 | -0.2268 | -- |
| | 1690 | Total Plant In-Service | -0.0392155 | -0.0317829 | 0.058204 | 0.5638424 | -0.053408 | -0.10949 | -0.20099 | -- |
| | 1910 | Average Net Investment | -0.1704045 | -0.185534 | 0.0793805 | 0.63572723 | -0.081722 | -0.18124 | -0.27125 | -- |
| | 1915 | Net Return | -0.0506864 | 0.08405945 | 0.2650871 | 0.93838751 | 0.0847435 | 0.641133 | 0.851091 | -- |
| Indices | 5083 | Special Access Revenue | 240.652976 | 219.571635 | 210.38658 | 186.616843 | 107.39972 | 105.5539 | 95.54004 | 100 |
| | 1190 | Total Operating Expenses | 81.3652125 | 86.9128955 | 90.680341 | 93.5249611 | 60.098928 | 63.35039 | 77.31965 | 100 |
| | 1690 | Total Plant In-Service | 103.684407 | 107.916405 | 111.45889 | 105.328351 | 67.352284 | 71.15242 | 79.90102 | 100 |
| | 1910 | Average Net Investment | 65.363419 | 78.7895058 | 96.737629 | 89.6232854 | 54.791094 | 59.6672 | 72.87507 | 100 |
| | 1915 | Net Return | 831.615195 | 876.01733 | 808.08975 | 638.762122 | 329.53273 | 303.7886 | 185.1091 | 100 |
| Qwest Corporation | | | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |

Note: Data underlying Figure 6.
(accessed October 5, 2004);
Federal Communications Commission, ARMISR Report 43-03, Joint Cost Report: Table I, YE 1996-2003. Available at http://www.fcc.gov/wcb/eafs/ (accessed October 5, 2004).

**Special Access Voice Grade Equivalents (VGEs)**

Special Access Lines (Non-Switched):

| Company | Y2003 | Y2002 | Y2001 | Y2000 | Y1999 | Y1998 | Y1997 | Y1996 |
|---|---|---|---|---|---|---|---|---|
| BellSouth Corporation | 255,194 | 295,227 | 333,934 | 294,669 | 154,715 | 101,650 | 59,651 | 74,524 |
| Qwest Corporation | 29,634 | 33,617 | 44,617 | 244,775 | 178,433 | 158,961 | 173,103 | 57,103 |
| SBC Communications | 415,042 | 375,135 | 321,519 | 333,094 | 332,164 | 512,579 | 531,038 | 999,640 |
| Verizon Communications | 184,984 | 226,621 | 298,468 | 344,950 | 349,303 | 369,539 | 373,636 | 236,221 |
| All RBOCs | 884,854 | 930,600 | 998,538 | 1,217,488 | 1,014,615 | 1,142,729 | 1,137,428 | 1,367,488 |

Special Access Lines (Non-Switched): Digital (fk)

| Company | Y2003 | Y2002 | Y2001 | Y2000 | Y1999 | Y1998 | Y1997 | Y1996 |
|---|---|---|---|---|---|---|---|---|
| BellSouth Corporation | 20,397,978 | 18,834,817 | 15,749,513 | 12,668,132 | 7,140,625 | 4,616,038 | 2,900,340 | 2,711,216 |
| Qwest Corporation | 7,506,359 | 7,199,844 | 6,917,828 | 6,033,796 | 8,019,832 | 6,337,347 | 5,416,877 | 4,042,025 |
| SBC Communications | 45,128,012 | 40,732,923 | 31,270,567 | 26,762,833 | 21,549,756 | 14,452,719 | 11,272,434 | 9,698,458 |
| Verizon Communications | 34,518,131 | 26,577,176 | 24,623,218 | 18,916,087 | 11,096,092 | 7,520,652 | 5,579,262 | 4,298,398 |
| All RBOCs | 107,550,480 | 93,344,760 | 78,561,126 | 64,380,848 | 47,806,305 | 32,926,756 | 25,168,913 | 20,750,097 |
| BellSouth Corporation | 20,653,172 | 19,130,044 | 16,083,447 | 12,962,801 | 7,295,340 | 4,717,688 | 2,959,991 | 2,785,740 |
| Qwest Corporation | 7,535,993 | 7,233,461 | 6,962,445 | 6,278,571 | 8,198,265 | 6,496,308 | 5,589,980 | 4,099,128 |
| SBC Communications | 44,543,054 | 41,108,058 | 31,592,086 | 27,095,927 | 21,881,920 | 14,965,298 | 11,803,472 | 10,698,098 |
| Verizon Communications | 34,703,115 | 26,803,797 | 24,921,686 | 19,261,037 | 11,445,395 | 7,890,191 | 5,952,898 | 4,534,619 |
| RBOC Total | 108,435,334 | 94,275,360 | 79,559,664 | 65,598,336 | 48,820,920 | 34,069,485 | 26,306,341 | 22,117,585 |

Note: Data underlying Figures 2-6.
Source: Federal Communications Commission, ARMIS Report 43-08, Operating Data Report: Table III, YE 1996-2003. Available at http://www.fcc.gov/wcb/eafs/ (accessed October 5, 2004).