**Attachment 10**

**Declaration of Lee L. Selwyn on behalf of AT&T
in FCC *Triennial Review Remand* proceeding
WC Docket No. 04-313, filed October 4, 2004**



**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | |
| Unbundled Access to Network Elements | **WC Docket No. 04-313** |
| Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers | **CC Docket No. 01-338** |

Declaration

of

**LEE L. SELWYN**

on behalf of

AT&T Corp.

October 4, 2004

DECLARATION OF LEE L. SELWYN

EXECUTIVE SUMMARY

1.  In the *Triennial Review Order ("TRO")*, the Commission specifically concluded that "[w]hen competitive LECs self-deploy fiber they predominantly do so at the OCn-level," that "the record contains little evidence of self-deployment, or availability from alternative providers, for DS1 loops," and "that at a three DS3 loop capacity level of demand, it is economically feasible to self-deploy." The Commission identified several *specific barriers* to CLEC facilities deployment, and on that basis found that, at a national level, CLECs would be impaired without access to UNEs for dark fiber, DS-1 loops, and for less than three DS-3 loops provided to the same customer location. Similarly, the Commission determined that self-provisioning of interoffice transport links could not be economically justified unless the CLEC's capacity requirement was greater than twelve DS-3s *over each specific point-to-point route*, and found that CLECs would be impaired without access to unbundled interoffice transport with respect to traffic requirements of twelve DS-3s or less or where there was less than two other CLECs offering wholesale interoffice transport over the specific point-to-point route. As subsequent empirical analyses by a number of state commissions have demonstrated those thresholds are if anything too low – it is often the case that CLECs cannot economically deploy facilities even at capacities far above the 3 and 12 DS3 thresholds that the Commission had established in the *TRO*.

2.  Rational analysis of high-cap loop and transport impairment requires recognition of some basic marketplace and economic realities. First, because the economics of self-provisioning are critically influenced by the circuit capacities involved and the potential revenues available for the service, the impairment analyses must be conducted separately for each of the principal market segments, disaggregated by circuit capacity. Second, because enterprise markets are *point-to-point*, aggregation should be permitted only to the extent that it can be demonstrated that the point-to-point markets in question reflect sufficiently similar competitive characteristics, including building access, rights-of-way and other key factors. Third, there must be a strict focus upon market dynamics and upon present and expected future market characteristics, rather than upon static "snapshots" of existing or past conditions. The Commission's *TRO* analysis largely – and laudably – conformed with these core principles in reaching its conclusions (I) that competitive self-deployment is uneconomic below certain DS-3 thresholds; (ii) that given obvious differences in relevant competitive conditions a route-by-route analysis is most appropriate, especially given the capacity limits on UNE availability; and (iii) that the availability of special access at rates that are constrained by neither competition nor regulation does not remove impairment. Verizon *et al* now urge the Commission to jettison that reasoned analysis in favor of new analyses that ignore each of these fundamental principles.



*Declaration of Lee L. Selwyn – Executive Summary*

3.  The RBOCs contend that CLECs are not impaired in their ability to compete in the enterprise market without access to UNEs. Through a series of *ex parte* submissions made in WC Docket No. 01-338, they undertake to demonstrate (a) that the deployment of fiber optic distribution and transport facilities by CLECs is so extensive that their need for access to RBOC network facilities is limited, and (b) that such RBOC facilities as CLECs may still require can be obtained by CLECs as "special access" services at rates that allow CLECs to compete effectively.  The RBOCs do not attempt to refute the fundamental economic reasons why CLECs cannot self-deploy.  In support of the first contention, the RBOCs provide various statistics and maps purporting to document existing CLEC fiber both nationally and in a number of the larger Metropolitan Statistical Areas ("MSAs") that fall within each of their respective footprints.  In support of the second claim, the RBOCs offer detailed, in some cases street-level maps purporting to identify specific building locations where, they claim, "competitors are successfully providing high-capacity services using special access purchased from incumbents."  A close examination of these contentions – and of the "evidence" proffered by the RBOCs in support thereof – reveals numerous factual errors, reliance upon erroneous and inconsistent undocumented data sources, and numerous exaggerations, overstatements, misinterpretations and mischaracterizations of the data being presented.

4.  In making these claims, the RBOCs attempt to draw impossible inferences from competitive transport deployment that *loop* bypass is economically feasible.  They ignore critical capacity distinctions and posit, without any factual basis, the existence of MSA-wide and larger geographic markets while ignoring altogether their own evidence that route-to-route competitive conditions vary widely within and across such geographies.  They seek nationwide findings of non-impairment on the basis of evidence of fiber deployment that is confined entirely to a handful of individual buildings located in the densest urban centers, and of impossible inferences drawn from the inapposite experiences of largely RBOC-controlled wireless carriers.  The RBOCs' "evidence" of fiber deployment also relies upon erroneous and in many cases entirely undocumented sources, misrepresenting resold ILEC services as CLEC-owned facilities and entrance facilities as interoffice transport facilities.  Finally, the RBOCs rely upon static market share-based analyses that simply ignore fundamental changes in market structure and industry dynamics that provide the RBOCs both with incentives and ability to execute crippling price-cost squeezes funded and abetted by the excessive prices they impose for special access and other RBOC monopoly services that confront no realistic competitive challenge.

5.  Perhaps the most important – and clearly fatal – of the numerous flaws in the RBOCs' studies is their failure to differentiate CLEC customers and self-deployed facilities *by capacity*.  Merely identifying routes or buildings served by competitive fiber without regard to capacity of the circuits is of no relevance to this proceeding.  No one contends that CLECS are impaired without access to OCn circuits.  Rather, the relevant question is the extent to which CLECs are impaired without access to DS-level circuits below the thresholds established in the *TRO*.  When considered in light of this relevant inquiry, the RBOC submissions actually *confirm* the extremely limited extent of competitive fiber deployment and the utter dependence of CLECs upon access to RBOC



*Declaration of Lee L. Selwyn – Executive Summary*

high-capacity network facilities for the vast majority of the enterprise customers that CLECs serve with DS-level circuits.

### *Loops*

6.   The RBOCs' information on CLEC fiber deployment at end user enterprise customer locations has been gleaned from a number of sources most of which are of highly questionable accuracy and reliability.  At a national level, Verizon claims that there are some 48,350 "lit" buildings – i.e., customer locations at which CLECs have deployed fiber.  Upon closer examination and after correcting those of Verizon's figures for which alternate documentation is available, a more accurate estimate is only about 28,000, i.e., slightly over half of Verizon's count.  In fact, the actual number is probably well below that (given, for example, that it is unclear that Verizon has not double-counted buildings served by more than one CLEC).  But whether the correct number of "lit" buildings is 48,000, 28,000 or less, that still leaves roughly *three million commercial premises nationwide* at which *no CLEC-owned facilities are available*, and where the only means by which a CLEC can provide service is through the use of ILEC-owned facilities.  The MSA- and street-level detail offered by Verizon and SBC serve to graphically confirm and demonstrate this point.  On its map of San Francisco, for example, SBC has identified approximately 1231 locations at which customers are being served by CLECs.  Of these, some 94.2% (1160 buildings) are being served using special access services purchased by the CLEC from SBC, and only 71 buildings – i.e., 5.8% – are locations at which SBC believes that "lit" CLEC-owned fiber is deployed.  Not shown on any of SBC's maps are any of the enterprise customer locations where the *retail* service is being provided by SBC itself.  Thus, the proportion of total enterprise customer locations where "lit" fiber is in place is, *at the very most*, 5.8%, *and is almost certainly considerably less than that*.

7.   More to the point, the RBOC data is completely undifferentiated by capacity level.  Even if evidence of competitive deployment of relevant facilities at only 5% of locations could justify a finding that self-deployment is economic in the 95% of locations where it has not taken place, the RBOCs' evidence does not identify self-deployment of *relevant* facilities – i.e., those below the 3 DS-3 threshold at which CLECs seek UNE access.  Rather, the best evidence of self-deployment of these relevant facilities comes from the state PUC impairment case records, as compiled by QSI Consulting, Inc., confirming both the *de minimis* use of CLEC fiber for DS-level services and the extraordinary exaggerations that have been put forward by the RBOCs.  Although the RBOCs all fail to provide any data regarding the capacity of the "lit" circuits provided by CLECs, the reality is that virtually all of those "lit" buildings are OC-level facilities.



*Declaration of Lee L. Selwyn – Executive Summary*

| QSI Analysis of Claimed vs. Actual CLEC Loop Facilities Buildings Satisfying FCC Triggers | | |
|---|---|---|
| **Trigger** | **ILEC claim** | **QSI finding** |
| Self-provisioning, DS-3 | 954 | 130 |
| Dark Fiber | 954 | 0 |
| Wholesale DS-3 | 719 | 49 |
| Wholesale DS-1 | 724 | 36 |
| Source: QSI Consulting, Inc., "Analysis of State Specific Loop and Transport Data, October, 2004, at 11-16. | | |

8. While the RBOCs all allude to the high concentration of enterprise customers in a relatively small number of wire centers located in the largest MSAs, they ignore the fact that the vast majority of those enterprise customers – even those located in areas of the greatest concentration of demand – fall well within the "less than three DS-3s" category. More generally, the RBOCs' "analyses" all fail to address the fact that "enterprise" customers fall into numerous separate market segments, ranging from relatively small, single-location firms with perhaps as few as a dozen employees, up to and including multibillion dollar, geographically dispersed entities with a total workforce numbering in the hundreds of thousands. Instead, they erroneously and simplistically treat all "enterprise" customers as falling within a single homogeneous market, both with respect to *location* and with respect to the specific services and service volumes being purchased.

9. The telecommunications requirements of the vast majority of individual *customers* and at the vast majority of individual customer locations is substantially less than three DS-3s – in fact, it is predominantly at the DS-1 level (1.544 Mbps) or less – a critically important market *fact* that none of the RBOCs' maps address or reveal. Verizon and Qwest do, however, acknowledge the preponderance of DS-1 level customers. Verizon concedes that "[t]he majority of the high capacity loops that are purchases [sic] as special access are DS-1s." Similarly, Qwest admits that 18,267, or 98.4%, of the special access circuits that CLECs have purchased from Qwest in the Denver MSA are DS-1s, and that only 296 are DS-3s. Qwest does not indicate how many, if any, of those 296 DS-3s involve installations of three or more DS-3s at the same customer location – the minimum service level at which the FCC had found CLEC deployment of fiber facilities to be economically feasible. For the segment of the enterprise market where the Commission had found little or no CLEC fiber deployment – i.e., below three DS-3s – CLEC dependence upon ILEC high-capacity network facilities is near-absolute. Indeed, there is no possibility that a self-provisioned DS-1 loop is likely to be economic.

10. The RBOCs ask the Commission to overlook the fact that the designation of "enterprise" embraces a broad range of customers with widely varying demand and geographic attributes, and to



treat all "enterprise" customers as constituting a single homogeneous market. In fact, these key customer attributes – size and location – are central to a CLEC's ability to profitably provide service without access to UNEs. In the *TRO* the Commission determined that CLEC self-provisioning of loop facilities was feasible only where revenues at each specific customer location (building) were sufficient, and established a minimum capacity threshold of three DS-3s as a revenue surrogate. But the actual cost of extending CLEC facilities to specific customer locations is itself heavily dependent upon the physical proximity of such location to other CLEC facilities. The three DS-3 threshold must thus be viewed as a minimally *necessary* condition for self-deployment, but certainly not as a *sufficient* condition because, where the physical distance between the customer and existing CLEC facilities is large, the minimum economic revenue (and capacity demand) threshold will be considerably higher.

### Transport

11. The RBOCs' transport story likewise fails to differentiate by capacity and also relies upon a complete mischaracterization of the relevant facilities and network architectures. CLECs do not maintain switching and other network facilities at each RBOC wire center. Instead, their networks are designed so as to concentrate these functions at one, or at most a small number, of locations within each market area in which they provide service. A CLEC thus must *extend* the subscriber loop facilities it obtains from the RBOC (whether as a UNE or as special access) to its network via interoffice transport facilities either deployed by the CLEC itself, obtained from other CLECs whose facilities are capable of providing connectivity over the required route, or from the RBOC. In the *TRO*, the Commission had determined that self-provisioning could not be economically justified unless the CLEC's capacity requirement was greater than twelve DS-3s over each specific point-to-point transport route, and found that CLECs would be impaired without access to unbundled interoffice transport with respect to traffic requirements of twelve DS-3s or less, or where there were less than two other CLECs offering wholesale interoffice transport over the specific point-to-point route.

12. The RBOCs now argue that CLECs always have alternatives to unbundled transport, and that as such they are not impaired if the availability of these facilities as UNEs is withdrawn. According to Verizon, "when competitive fiber is present in a given wire center, it almost always connects to the CLEC's own fiber network, or the fiber network of another competing provider, and can therefore be used to reach any other wire center that also is reached by those competitive networks." In making this claim, Verizon would have the Commission believe that *all* of the interoffice facilities owned by *all* of the CLECs serving a given MSA have been merged into a single, integrated network "cloud" such that connectivity to any one point within the "cloud" provides connectivity to every point within the "cloud." Verizon ignores that fact that CLEC interoffice networks are designed primarily, if not exclusively, for the limited purpose of *extending individual subscriber loops from the ILEC wire center at which they terminate to the CLEC's network hub and then to its service node or POP.* The anywhere-to-anywhere functionality being



portrayed by the RBOCs may precisely describe the PSTN, *but has nothing whatsoever to do with the fiber backbones that CLECs have constructed.* Functionally, CLEC networks are of the "hub and spoke" or "star" design, providing redundant point-to-point connectivity from each of the individual ILEC end offices where the CLEC has fiber-based collocations to the CLEC network hub. There is no requirement (nor economic justification) for interconnection *between or among* an individual competitor's fiber-based collocations, and there is certainly connectivity *between* all of the different CLECs' respective networks. Other than their fictitious and disingenuous mischaracterizations of the architecture, functionality, and connectivity of and among CLEC networks, the RBOCs have advanced no concrete evidence that would undermine the Commission's national finding of impairment on any point-to-point interoffice route with a transport requirement of twelve DS-3s or less. There is no scenario under which transport at the DS-1 level would ever be economic for a CLEC to self-provide.

### Use of "special access" as an alternative to UNEs

13. The second prong of the RBOCs' claim is that at all locations where CLECs are dependent upon ILEC high capacity facilities to reach specific enterprise customers, i.e., at the DS-level capacities at issue in this proceeding, those facilities are available to the CLEC as "special access" services. The RBOCs cite the *USTA II* Court direction that "the Commission's impairment analysis must consider the availability of tariffed ILEC special access services when determining whether would–be entrants are impaired," and on that basis ask the Commission to conclude that, since CLECs are *using* special access to serve customers *today*, it must follow that they are doing so "successfully" and thus are not "impaired" without access to UNEs. Importantly – and overlooked entirely by the RBOCs – is the fact that the Court's observation as to the ability of competition to "flourish" without access to UNEs is specifically confined to the *wireless* market where, unlike the situation for wireline services, special access costs represent a tiny fraction of wireless carriers' total operating costs. For CLECs, however, special access payments to the RBOCs may represent nearly half of all current operating expenses. The risk of competition-foreclosing price squeezes in the new market structure in which RBOCs are themselves competing aggressively for retail enterprise business is thus all too real.

14. For 2003, the four RBOCs reported an average rate of return on interstate special access services of 43.7%, with all but Verizon reporting earnings topping 60%. Qwest, which had reported special access earnings of 68.1% for 2003, has already implemented two separate – and substantial – rate hikes in 2004. The RBOCs clearly *are* "able drastically to hike [special access] rates," and have been repeatedly doing just that – and on multiple occasions. The evidence being advanced by the RBOCs as to the *existence* of CLEC customers being served via special access in no way establishes that CLECs are doing so "successfully" or that they will continue to be able profitably to serve enterprise customers in this manner. No inference can be drawn from the entirely *static* "snapshot" of *current* CLEC customers being portrayed by the RBOCs as to the state of CLEC market conditions going forward. Many current CLEC customers are subject to term contracts that



had been established prior to the RBOCs' receipt of Section 271 authority and prior to the multiple rounds of special access price increases. It is far from certain as to how many of these contracts will be renewed once these customers are "up for grabs" by the RBOCs, especially if CLECs are forced to increase their retail prices in response to the special access rate increases, further eliminating potential customers that could profitably be served if hicap UNE loop facilities were available to CLECs.

15. The Commission has previously observed that "forcing requesting carriers to rely on tariffed offerings would place too much control in the hands of the incumbent LECs, which could subsequently alter their tariffs and thereby engage in a vertical price squeeze." In fact, such price squeezes are precisely what is taking place in the market. Forcing CLECs to pay above-TELRIC prices for essential network elements impairs their ability profitably to serve customers that could be profitably served if the "last mile" facilities were available as UNEs at TELRIC rates. Special access services are not effectively regulated – indeed, they are generally priced well above economic cost and, since most special access rates are subject to "pricing flexibility," they may be – and are regularly being – increased, often by a substantial amount. The RBOCs can thus foreclose competition at any time through a classic "price squeeze." AT&T has demonstrated that there are local business services that it has ceased to offer in light of the special access prices that the RBOCs charge, and that for many other services such as private line service, ATM and Frame Relay, the RBOCs have set special access and retail prices at levels that do not allow AT&T or any other efficient carrier to compete for many customer segments. The *USTA II* court expressly recognized that relegating competitive carriers to special access would potentially subject those carriers to debilitating price squeezes and the burdens that this possibility imposed on the Commission could be sufficiently high that the administrative costs of accounting for special access in the impairment inquiry outweighed any benefit. This is clearly the case here. It is simply not administratively feasible for the Commission to adjust its impairment inquiry "on the fly" to account for whether the RBOCs are engaging in competition foreclosure. There are simply too many ways in which the RBOCs can price squeeze rivals. Indeed, the very possibility of such conduct on the part of the RBOCs will itself operate to impair competitors' ability to attract capital where the risk of anticompetitive responses by the RBOCs could be seen as foreclosing investors' ability to recover their investments in CLEC ventures.

### Conclusion

16. In the *TRO*, the Commission recognized the substantial variation confronting CLECs in the economics of serving enterprise customers at different capacity levels, and addressed those concerns by making national findings that CLECs are impaired without access to UNEs when providing service to customers at capacity levels below three DS-3s and for interoffice transport facilities at capacity levels at or below twelve DS-3s. The RBOCs' "evidence" fails to differentiate among the various capacity-based segments of the enterprise market, and thus fails to address – let alone challenge – these critically important *TRO* conclusions. Virtually all instances of CLEC fiber



*Declaration of Lee L. Selwyn – Executive Summary*

connections to customer premises is at the OCn level; even where CLEC fiber passes near or even directly in front of a building where the customer demand falls below that threshold, the costs of bringing the fiber into the building cannot be justified.  The RBOCs' claims as to non-impairment with respect to interoffice transport relies entirely on an utterly fanciful portrayal of ubiquitously interconnected but entirely fictitious CLEC fiber backbone networks.  Finally, the RBOCs' claims as to the suitability of special access as a substitute for UNE loop and transport facilities ignores the fact that special access services are, for the most part, not subject to any rate regulation, are priced well in excess of forward-looking economic cost, may be and are being increased at the whim of the RBOCs, and have created persistent price squeeze conditions that have forced CLECs to abandon large segments of the enterprise market.  None of the "evidence" proffered by the RBOCs undermines the Commission's original *TRO* determinations, and those impairment findings should be maintained in the permanent rules that the Commission adopts.



TABLE OF CONTENTS

EXECUTIVE SUMMARY                                                                                 i

INTRODUCTION                                                                                      1

OVERVIEW OF ECONOMIC IMPAIRMENT ANALYSIS REQUIREMENTS                                             3

   Fundamental principles of loop and transport impairment analysis                     3

   The extremely limited scope of the RBOC analyses                                       9

      Most of the relevant DSn-level loop and transport demand is *not* concentrated in a few very urban wire centers, and experience in those atypical highly urban areas could not support findings of non-impairment in other very different geographic areas.                                                                        10

      Aggregate data from the top 20 MSAs conceals critical point-to-point and location-specific conditions, and provides no basis for any generalized non-impairment conclusions that would be applicable for point-to-point and location-specific markets.                                                        12

      Under no realistic circumstances could CLECs be said to be "flourishing," and evidence of fiber deployed during the "telecom bubble" cannot be credited as evidence that such self-deployment is economic.                                 13

DSn LOOPS                                                                                         17

   The RBOC loop data                                                                    17

   The RBOCs' studies and data do not distinguish among the various segments of the enterprise market.                                                                     18

   RBOC claims of facilities-based CLEC loop competition are rooted in irrelevant, overstated and flawed CLEC data.                                                        21

      CLEC building counts are severely overstated.                                21

ix



The RBOCs' own evidence demonstrates CLECs' near-total dependence upon ILEC hicap loop facilities as the sole means of providing service to the vast majority of CLEC enterprise customers.    34

TRANSPORT    39

The RBOC "spider-web" maps of "possible" CLEC self-provisioned transport routes are entirely hypothetical and fictitious, identify no *actual* self-provisioned interoffice routes, and make no distinction as between routes with traffic requirements above or below the twelve DS-3 self-provisioning threshold adopted in the *TRO*.    39

The RBOCs have completely ignored the purposes for which CLECs have deployed fiber and the inability to obtain seamless transport over fiber deployed by different CLECs, and so their contrived evidence does not establish that competitors are not impaired without access to unbundled dedicated transport facilities.    40

RBOC "spider-web" maps and data portray entirely fictitious interoffice connectivity and clearly overstate the actual existence of CLEC fiber, even at undifferentiated capacity levels.    43

The existence of fiber-enabled equipment in an ILEC end office is not evidence that there is dedicated transport available from that end-office over a route that a particular CLEC may require.    49

The GeoTel data upon which the RBOCs' claims as to CLEC deployment are based is unsubstantiated and wrong.    50

Evidence of CLEC fiber-enabled equipment in an ILEC central office is not evidence that there is dedicated transport between that office and any other ILEC central office.    53

SPECIAL ACCESS AND RESULTING PRICE SQUEEZES    56

The requirement that CLECs utilize DS-1 and DS-3 loop and transport facilities priced as "Special Access" services subject to full pricing flexibility due to the nonavailability of these facilities as UNEs would afford the RBOCs both the incentive and the ability to impose a price squeeze upon rival carriers and in so doing impair CLECs' ability to profitably serve large segments of the enterprise market.    56

x



*Declaration of Lee L. Selwyn – Table of Contents*

Most special access rates are not currently regulated by the Commission, and may be – and are being – significantly increased by the RBOCs as it serves their own strategic ends.                                                                             60

Because both RBOC retail enterprise service rates and special access rates are essentially unregulated, the RBOCs have both the incentive and the ability to impose a price squeeze on rival CLECs.                                                        62

It is not administratively feasible for the Commission to adjust its impairment inquiry "on the fly" to account for whether the RBOCs are engaging in competition foreclosure.                                                                         67

The apparently successful use of high capacity special access facilities by wireless carriers provides no basis for the inference that CLECs can similarly "flourish" if forced to pay special access prices if their access to UNEs is foreclosed.        80

Cable and fixed wireless do not present a serious competitive challenge to the RBOC special access monopoly as a means for serving enterprise customers.                   87

CONCLUSION                                                                            94


**Tables**

Table 1     Analysis of Verizon Data regarding CLEC Fiber Networks                   30

Table 2     QSI Consulting, Inc., Analysis of Claimed vs. Actual CLEC loop facilities 34

Table 3     Most CLEC enterprise customers are being served using special access, even on streets where CLEC-owned fiber has been deployed                                35

**Figures**

Figure 1    Following 2001, the amount of capital available to CLECs for network investment and development has all but dried up.                                     14

Figure 2    88.9% of the total new CLEC investment that occurred since 1996 had been completed by the end of 2001                                                      15

Figure 3    SBC's map of the San Francisco financial district                        36



*Declaration of Lee L. Selwyn – Table of Contents*

Figure 4      Verizon's "Map C" for the New York MSA showing what Verizon
              claims to be the hypothetical existence of CLEC interoffice transport
              facilities.                                                                    45

Figure 5      Illustrative diagram of CLEC interoffice transport network functionality.
              No connectivity between or among ILEC wire centers is provided or
              required.                                                                      46

Figure 6      The only practical means by which one CLEC network could be used for
              node-to-hub EEL-type transport by a different CLEC is where both
              maintain network hubs in essentially the same place.                           47

Figure 7      The actual presence of CLEC point-to-point transport capacity is in
              reality to be found in only a handful of routes. (Illustrative)                48

**Attachments**

1    Statement of Qualifications

2    *Ex Parte* Submission of Pac-West Telecomm, Inc. in CC Docket No. 01-338, filed September
     7, 2004

3    CLEC Industry and Financial Statistics



**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of | |
| Unbundled Access to Network Elements | **WC Docket No. 04-313** |
| Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers | **CC Docket No. 01-338** |

DECLARATION OF LEE L. SELWYN

INTRODUCTION

1    Lee L. Selwyn, of lawful age, declares and says as follows:

2

3    17.  My name is Lee L. Selwyn; I am President of Economics and Technology, Inc. ("ETI"),

4    Two Center Plaza, Suite 400, Boston, Massachusetts 02108.  ETI is a research and consulting

5    firm specializing in telecommunications and public utility regulation and public policy.  I have

6    participated in numerous proceedings before the Federal Communications Commission ("FCC"

7    or "Commission") dating back to 1967 and have appeared as an expert witness in hundreds of

8    state proceedings before more than forty state public utility commissions.  My Statement of

9    Qualifications is annexed hereto as Attachment 1 and is made a part hereof.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 2 of 94

1    18. I have been asked by AT&T to respond to certain *ex parte* materials submitted by

2    Verizon, SBC, Qwest and BellSouth pertaining to interim and permanent unbundling

3    requirements arising from the March 2, 2004 ruling by the United States Court of Appeals for the

4    District of Columbia Circuit in *USTA v. FCC* ("*USTA II*") pertaining to the Commission's

5    *Triennial Review Order* ("*TRO*"), and to address certain other factual issues raised by the

6    Commission's August 20, 2004 *Order and Notice of Proposed Rulemaking* in the above-

7    captioned matter.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 3 of 94

1          OVERVIEW OF ECONOMIC IMPAIRMENT ANALYSIS REQUIREMENTS

2

3     **Fundamental principles of loop and transport impairment analysis**

4

5          19.  So-called "enterprise" customers generally consist of nonresidential (i.e., business,

6     institutional, government) telecommunications users having a requirement for multiple voice

7     access lines and/or for any of several varieties of data communications at a single premises.[1]  To

8     provide service to an enterprise customer, a CLEC requires a physical telecommunications path

9     between the CLEC's network and the customer's premises.  Such connectivity generally consists

10    of "last mile" facilities (usually referred to as a "subscriber loop") terminating at the designated

11    customer premises, and "transport" facilities linking the subscriber loop with the CLEC's

12    network facilities.  While some type of subscriber loop and transport facility is involved in

13    furnishing service to virtually any type of customer, the nature of the facilities involved in

14    serving individual customers varies across a broad range of capacities and technologies.  All of

15    these are encompassed within the scope of the "enterprise market," but that "market" is anything

16    but homogeneous, exhibiting enormous breadth both respect to *product* and *geography*.

---

    1.  In the *Triennial Review Order*, the Commission defined the enterprise market as "a
business customer market of typically medium to large businesses with a high demand for a
variety of sophisticated telecommunications services."  It added that "high capacity loops, DS1
to OCn, are generally provisioned to enterprise customers."  *Report and Order and Order on
Remand and Further Notice of Proposed Rulemaking, Review of the Section 251 Unbundling
Obligations of Incumbent Local Exchange Carriers*, CC Docket No. 01-338; *Implementation of
the Local Competition Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-
989; *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC
Docket No. 98-147, FCC No. 03-36, rel. Aug. 21, 2003 ("*Triennial Review Order*" or "*TRO*"), at
fn. 624.

ETI  ECONOMICS AND
     TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 4 of 94

1    20.  The nature and extent of competition in the "enterprise market" is also anything but

2    homogeneous, in large part because the economics of competitive entry vary widely across the

3    different geographic and product market segments.  Indeed, the Commission reached precisely

4    this conclusion in the *TRO*,[2] where it specifically identified distinctions as between the loop and

5    transport markets and, within each, identified only limited, specific situations in which the

6    development of facilities-based competition ("bypass") has been shown to be economically

7    feasible.  Subsequent empirical analyses by state PUCs and by others confirm the Commission's

8    *TRO* findings.  In advancing their "no impairment" claims, the RBOCs present little more than a

9    static "snapshot" of what they claim to be the facilities-based competition that is present in

10    certain limited product and geographic markets, and based upon such limited data, ask the

11    Commission to *infer*, from the presence of such limited facilities-based competition in limited

12    geographic areas at the very highest capacity ranges, that such competition exists or can be

13    presumed to exist ubiquitously across the entire enterprise market.

14

15    21.  Rational analysis of high-cap loop and transport impairment requires recognition of

16    some basic marketplace and economic realities:

17

18    (1)  *Disaggregation of impairment determinations by circuit capacity.*  The majority of the

19        costs of deploying loop or transport facilities are driven by the total *distance* involved,

20        and are largely unaffected by the transmission capacity of the facility being constructed.

---

2.  *Id.*, at paras. 201 and 202.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 5 of 94

1    Indeed, the only specific *capacity-sensitive* costs are those for the physical transmission

2    medium itself (such as fiber optic cable) and associated electronics.  It costs no more to

3    dig a trench, place new conduit or occupy existing conduit, or incur makeready and

4    recurring costs for pole attachments for a 48-strand fiber cable than for a 4-strand fiber

5    cable.  Thus, when expressed in terms of the cost per unit of transmission capacity, it is

6    far more expensive to construct loop or transport facilities where the capacity

7    requirement is small than where it is large, or where the distance to be traversed is long

8    rather than short.  ILECs confront similar economics of outside plant deployment, but

9    unlike CLECs, ILECs begin with an enormously larger customer base and considerably

10    shorter distances between their customers and their switches, and are thus far more

11    capable of spreading those fixed, non-capacity-sensitive costs across far greater capacity

12    builds than can a CLEC.  For these reasons, it is absolutely critical, as the Commission

13    has recognized, that analyses of self-deployment economics differentiate by capacity –

14    it is simply irrational to infer from OCn-level deployment that DSn-level deployment is

15    economically feasible.

16

17    (2)  *Recognition of point-to-point, route-specific markets, with aggregation only to the*

18    *extent that it can be demonstrated that the point-to-point markets in question reflect*

19    *sufficiently similar competitive characteristics, including building access, rights of way*

20    *and other key factors.*  The Commission has recognized, correctly, that CLEC

21    deployment of loop and transport facilities can only be practical where revenues are

22    adequate to provide for cost recovery.  However, while the minimum capacity levels



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 6 of 94

1    that the Commission has adopted may provide an indicia of this minimally necessary

2    condition, that indicia is not by itself sufficient to establish non-impairment.  CLEC

3    decisions with respect to deployment of loop and transport facilities are driven by

4    capacity demand (revenue) and engineering (cost) attributes unique to each such project.

5    While individual projects are subject to widely varying cost conditions arising from

6    location, building access, proximity to an existing network access point (i.e., a physical

7    location on the CLEC's fiber backbone where a connection can be accomplished), and

8    other construction-related considerations, these impediments are more readily and

9    consistently overcome where the overall capacity requirement (and hence revenue

10   expectation) is relatively high.  Even so, there are situations in which the impediment

11   cannot be overcome under any circumstances, such as those cases where (1) the

12   customer's location is too remote (or two ILEC offices are too far apart) and it is too

13   expensive to build a new facility for even a very high amount of demand; (2) a

14   competitor cannot get the municipal permissions necessary to construct a facility, (3) a

15   building owner refuses to permit the CLEC to deploy facilities within the building, or

16   (4) a customer declines to allow a competitor to transfer its traffic to competitive

17   facilities, unambiguously impairing the CLEC's ability to compete without access to the

18   ILEC's facilities.  There is no basis for inferring that deployment of CLEC-owned

19   facilities at a particular customer location is economically feasible or practical merely

20   due to the presence of CLEC-owned facilities "nearby."  Even the establishment of

21   minimum threshold conditions for a finding of non-impairment (e.g., three DS-3s) may

22   not be sufficient to assure that CLECs will be able to obtain UNE facilities where no



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 7 of 94

1    competitive alternative is possible.  In that regard, the three DS-3 threshold that the

2    Commission has established for a presumption of loop non-impairment actually *over-*

3    *predicts* the instances where alternatives to UNE loops would be available.  At best, the

4    three DS-3 threshold recognizes a minimum *necessary* condition for self-deployment,

5    although in no sense establishing the *sufficiency* of the threshold in assuring that non-

6    impairment actually exists.

7

8    (3)  *Strict focus upon market dynamics and upon present and expected future market*

9         *characteristics, rather than upon static "snapshots" of existing or past conditions*.  The

10        prevailing state of competitive facilities deployment and competitive presence reliant

11        upon special access – the only factual matters addressed in the various RBOC *ex parte*

12        filings – represent at best the *cumulative* effects of conditions that have existed in the

13        past, whose existence – given the fundamental changes in market structure and market

14        dynamics – do not support inferences as to the viability of such competition going

15        forward.  As an initial matter, much of the facilities deployment that has taken place

16        was undertaken by companies that have subsequently gone into bankruptcy or gone out

17        of business altogether.  The existence of such facilities provides no basis for *any*

18        inference as to the economic feasibility or business case merit of similar investments

19        going forward.  Indeed, in a rational market, those are the very type of *uneconomic*

20        *results* that should be discouraged, rather than seen as opportunities for additional

21        investment.  Second, the special access services that ILECs have furnished to

22        competitors were initially provided by the RBOC prior to the RBOC's recent entry into



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 8 of 94

1    the long distance market, at a time that the RBOC was not competing for the long

2    distance revenue that was available to the competitor to help defray the cost of the

3    special access service.  Going forward, RBOCs compete in all aspects of their wireline

4    competitors' business, and their ability to impose input costs on their competitors that

5    are significantly higher than their own costs – particularly their short-run marginal costs

6    – for comparable network functionality simply operates to increase competitors' costs

7    while facilitating *and financially supporting* the RBOCs' efforts to price-squeeze their

8    rivals.  Especially in light of the changed structural conditions in the long distance

9    market after RBOC entry, the existence of non-ILEC carriers competing via special

10   access provides no basis for an inference of non-impairment going forward.  Rather, the

11   analysis must assure that any facts upon which the proffered inferences are to be based

12   reflect the conditions in the specific market being analyzed, and that existing conditions

13   be used at most only to inform, but not to establish, assessments of future market

14   conditions.

15

16  The Commission's *TRO* analysis largely – and laudably – conformed with these core principles

17  in reaching its conclusions (I) that competitive self-deployment is uneconomic below certain

18  DS-3 thresholds; (ii) that given obvious differences in relevant competitive conditions a route-

19  by-route analysis is most appropriate, especially given the capacity limits on UNE availability;

20  and (iii) that the availability of special access at rates that are constrained by neither competition

21  nor regulation does not remove impairment.  Verizon *et al* now urge the Commission to jettison

22  that reasoned analysis in favor of new analyses that ignore each of these fundamental principles.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 9 of 94

1    **The extremely limited scope of the RBOC analyses.**
2

3        22.  The RBOCs' analyses are generally limited to the largest wire centers in the largest

4    Metropolitan Statistical Areas ("MSAs") in their respective footprints.  And as noted, even in

5    these limited geographic areas, the RBOCs make no distinction between OCn and DSn-level

6    loop or transport facilities.  From this extremely limited and highly aggregated data, the RBOCs

7    ask the Commission to *infer* the existence of CLEC alternatives across all enterprise market

8    segments – capacity levels and geographic location – notwithstanding the fact that such limited

9    CLEC facilities as do exist are confined almost entirely to the highest capacity services in

10   extremely confined areas of high business concentration.  The RBOCs' studies and data treat end

11   user locations and interoffice transport routes as presenting similar costs and provisioning

12   requirements, and conceal the critically important capacity- location- and route-specific

13   distinctions that the Commission identified and addressed in the *TRO*.

14

15       23.  In addition, the RBOCs present what can at best be described as entirely *static* evidence

16   as to the *current* state of competition in the enterprise market, thereby ignoring key regulatory

17   and capital market conditions that invalidate any inferences derived from existing conditions as

18   to the levels of competition that can be expected to exist going forward.  For these reasons, even

19   if the RBOCs' data were accurate in all respects, those data could not support the extraordinarily

20   broad conclusions that the RBOCs urge.

21

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 10 of 94

1    ***Most of the relevant DSn-level loop and transport demand is NOT concentrated in a few***
2    ***very urban wire centers, and experience in those atypical highly urban areas could not***
3    ***support findings of non-impairment in other very different geographic areas.***
4

5    24.  Verizon states that "more than *80 percent* of the demand for high-capacity special

6    access services in Verizon's region is concentrated in fewer than *8 percent* of its wire centers (or

7    532 out of 6,900 total)" and that "more than *three quarters* of the 532 wire centers where demand

8    is concentrated are located in only the 20 MSAs in Verizon's serving area with the largest

9    amount of high-capacity demand."[3]  Verizon appears to have based its measurement of "demand"

10   upon circuit capacity expressed as DS-0 or DS-1 equivalents, rather than, for example, in terms

11   of the *revenues* being derived from the "8 percent" of Verizon's wire centers.  Prices of high-

12   capacity services are not proportionate to circuit capacity.  For example, an OC-12 facility, which

13   is equivalent to 8,064 voice-grade (DS-0) channels or 336 DS-1s, yet carries a price that is

14   typically priced at only about 40 times that of a single DS-1.  Because the incidence of the

15   highest capacity services occurs disproportionately in the more densely populated areas, a

16   capacity-based measure exaggerates the actual extent to which *revenues* from the enterprise

17   market are distributed within and outside of the top-20 Verizon MSAs.  Moreover, only DSn-

18   level facilities are at issue in this proceeding, and weighting the data with the prevalence of OCn-

19   level service in the largest wire centers masks the marketplace reality that CLECs' need for DSn-

20   level facilities is not concentrated in a few wire centers, but is instead spread nationwide.  As an

--------

3.  *Competing Providers Are Successfully Providing High-Capacity Services to Customers Without Using Unbundled Elements*, *Ex Parte* Submission of Verizon Communications in CC Docket Nos. 01-338, 96-98, 98-147, filed July 2, 2004 ("*Verizon July 2, 2004 ex parte*"), at 6.

ETI  economics and
     technology, inc.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 11 of 94

1    example, AT&T Declarant Joseph Stith notes that some 36% – and not the 20% suggested by

2    Verizon – of AT&T's payments to Verizon for loop and transport services for the month of June

3    2004 were for DS-1 and DS-3 facilities located *outside of Verizon's top-20 MSAs*.[4]

4

5        25.  To the extent that Verizon is suggesting that CLEC competition is confined primarily to

6    the largest MSAs, its data would then also indicate that some 94.2%, i.e., about 6,500, of

7    Verizon's 6,900 wire centers are either not in the 20 largest MSAs at all, or are not among the

8    high-demand wire centers within those 20 largest MSAs.  Verizon claims that "in the MSAs that

9    it studied" it had "identified more than 480 wire centers in which two or more CLECs had likely

10   self-provisioned high-capacity transport"[5]  No information whatsoever is provided with respect

11   to the other MSAs and the non-MSA areas that Verizon did not study either with respect to the

12   extent to which CLECs have deployed fiber or the extent to which CLECs are currently

13   providing service using special access.  Hence, whatever policy conclusions may be spawned by

14   Verizon's evidence, those conclusions must necessarily be confined to the roughly 400 or so wire

15   centers in the 20 largest MSAs (i.e., three-quarters of the 532 largest Verizon wire centers across

16   its entire footprint) about which Verizon has provided evidence.  No inference can be drawn

17   from the conditions being claimed by Verizon as applicable to the very largest wire centers in the

18   very largest of its MSAs over to the remaining 6,500 wire centers in Verizon's national footprint.

19

---

4.  Declaration of M. Joseph Stith on behalf of AT&T Corp. ("*Stith Declaration*"), at para. 23.

5.  *Verizon July 2, 2004 ex parte*, Declaration of Judy K. Verses *et al*, at paras. 9, 11.

ETI ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 12 of 94

1      26.  Indeed, even the various maps that Verizon has introduced – which are limited to the 20

2    largest MSAs – indicate only minimal CLEC use of special access outside of the areas of highest

3    concentration.  There is no basis to infer from any of Verizon's evidence that, even if CLEC use

4    of special access in the high-density wire centers were mis)interpreted as suggesting no

5    impairment, there would be no basis to extend such an interpretation to the remainder of

6    Verizon's – and the other RBOCs' – service areas.

7

8        ***Aggregate data from the top 20 MSAs conceals critical point-to-point and location-***
9        ***specific conditions, and provides no basis for any generalized non-impairment***
10      ***conclusions that would be applicable for point-to-point and location-specific markets.***
11

12      27.  On close examination, the RBOCs' MSA maps actually provide very little relevant

13    information, and what information they do offer is undocumented, unverifiable, and wrong.

14    CLEC fiber routes identified on the maps are not differentiated as between loop and transport,

15    nor are specific CLEC networks separately specified.  Maps purporting to show locations of "lit"

16    buildings and of locations where the CLEC is presumed to be serving customers using RBOC

17    special access provide no information as to the type of service or the capacity level being

18    provided.  None of the RBOC maps identify or document any actual specific CLEC transport

19    routes, preferring instead to posit their existence from utterly baseless assumptions as to how

20    CLEC fiber networks are designed and operated.  What the RBOC maps do reveal is that CLECs

21    are dependent upon RBOC facilities at the vast majority of the CLECs' enterprise customer

22    locations – even at locations that are proximate to CLEC fiber.  But because the RBOCs fail to

23    identify and analyze the enterprise market segment-by-segment and route-by-route as the



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 13 of 94

1    Commission had done in the *Triennial Review* itself, they offer no explanations for the

2    conditions that their own maps reveal, preferring instead to make the leap to an assertion of non-

3    impairment in all cases.

4

5        28.   As I and other AT&T witnesses discuss, the proximity of a customer location to CLEC

6    fiber provides no basis to assume that such a customer can profitably be served using CLEC

7    facilities.  Similarly, the presence of CLEC fiber and associated equipment in a given pair of

8    RBOC wire centers – and not necessarily the same CLEC in both places – provides no basis for

9    the RBOCs' assumption that transport between those two wire centers entirely by means of

10   CLEC facilities is always "possible" as they contend.

11

12   ***Under no realistic circumstances could CLECs be said to be "flourishing," and evidence of***
13   ***fiber deployed during the "telecom bubble" cannot be credited as evidence that such self-***
14   ***deployment is economic.***
15

16       29.   The kind of static "snapshot" of the current state of fiber deployment being advanced

17   here by Verizon and the other RBOCs as a statistic from which the Commission can extrapolate

18   even greater deployment is fundamentally misguided.  At best, the competitive situation

19   described by Verizon and relied upon as a showing of "competitive" entry can be said to present

20   a *static* picture of cumulative CLEC fiber deployment that has taken place over the past eight

21   years.  The same NPRG *CLEC Report 2004* that Verizon has relied upon for its static analysis

22   details a more important aspect of the current state of CLEC activity – one that Verizon has

23   chosen to ignore altogether.  The vast majority of the CLEC network development to which



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 14 of 94

1    Verizon refers was constructed in the late 1990s through 2001, a time during which CLECs had

2    seemingly limitless access to capital.  But following 2001, the amount of capital available to

3    CLECs for network investment and development has all but dried up (see Figure 1).  Figure 2

4    presents this same data on a cumulative basis, indicating that 88.9% of the total new CLEC

5    investment that occurred since 1996 had been completed by the end of 2001.



**Figure 1.**  Following 2001, the amount of capital available to CLECs for network investment
and development has all but dried up.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 15 of 94



**Figure 2.** 88.9% of the total new CLEC investment that occurred since 1996 had been completed by the end of 2001.

1    30.  Today, of course, there is little or no new CLEC investment, and many CLECs are now

2    struggling to stay out of bankruptcy (see Table A3-2 in Attachment 3).  Indeed, very few CLECs

3    have increased their route miles of fiber or number of "on-net" buildings (see Table A3-3 and

4    Table A3-4 in Attachment 3), confirming the extremely low supply elasticity characteristic of

5    CLEC facilities, thus posing no serious competitive challenge to the incumbent RBOCs.

6

7    31.  Since the beginning of 2001, some 48 CLECs have sought bankruptcy protection under

8    Chapter 11 or have been shut down or liquidated.[6]  Of these, 26 were publicly-traded companies

_____

6.  New Paradigm Research Group ("NPRG"), *CLEC Report 2004.*  NPRG reports that 47
(continued...)

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 16 of 94

1    representing more than $65-billion in assets at the time of their bankruptcy filings (see Table

2    A3-5 in Attachment 3). While some of these companies have since come out of bankruptcy,

3    unused facilities and inflated investment valuations have resulted in a net economic loss of

4    roughly $50-billion (see Table A3-6 in Attachment 3). Investors are not likely to repeat their

5    mistakes anytime soon and, as such, the prospect of any major CLEC reentry after having been

6    price-squeezed out of the market seems remote at best.

7

8        32. Incredibly, the RBOCs are asking that all of this be ignored entirely, and that only a

9    current "snapshot" of superficial customer activity be dispositive of the "impairment" issue. But

10    a single snapshot obscures trends and other industry dynamics, conditions that clearly do not

11    support the RBOCs' "non-impairment" contentions. It is, however, these unmistakable trends

12    and industry dynamics that must drive the policymaking process, not the isolated portrays that

13    the RBOCs have advanced.

14

---

    6. (...continued)
CLECs have filed bankruptcy since January 2001 (see *CLEC Report 2004*, Chapter 2, at 1).
Since the time of the *Report*'s release, ATX/CoreComm has also filed for bankruptcy.

ETI ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 17 of 94

1                           DSn LOOPS

2

3   **The RBOC loop data**

4

5      33.  The RBOCs have proffered studies that purport to demonstrate what they seek to

6   describe as extensive deployment of fiber facilities by CLECs to serve end-user customers.

7   Generally, the RBOC material is of two types:

8

9   (1)  Maps and data depicting CLEC fiber optic facilities and "lit" end user buildings in the

10        largest MSAs within the RBOCs' respective footprints;[7] and

11

12  (2)  Aggregate data identifying the total number of buildings currently "lit" by CLEC-

13       owned facilities, separately for each of the largest CLECs.[8]

14

---

7.  *Competing Providers Are Successfully Providing High-Capacity Services to Customers Without Using Unbundled Elements*, *Ex Parte* Submission of Verizon Communications in CC Docket Nos. 01-338, 96-98, 98-147, filed July 2, 2004 ("*Verizon July 2, 2004 ex parte*"); *Lessons Learned in State TRO Proceedings*, *Ex Parte* Submission of BellSouth in CC Docket No. 01-338, filed August 18, 2004 ("*BellSouth August 18, 2004 ex parte*"); *Ex Parte* Submission of Qwest in CC Docket Nos. 01-338, 96-98, and 98-147, filed August 19, 2004 ("*Qwest August 19, 2004 ex parte*"); *Ex Parte* Submission of SBC in CC Docket No. 01-138, 96-98, and 98-147, filed August 18, 2004 ("*SBC August 18, 2004 ex parte*").

8.  *Id.*

ECONOMICS AND TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 18 of 94

1   **The RBOCs' studies and data do not distinguish among the various segments of the**
2   **enterprise market.**
3

4       34.  In their various *ex parte* filings, Verizon, SBC and Qwest have each provided detailed

5   maps of several major MSAs within each of their respective regions purporting to identify the

6   specific buildings at which CLECs are claimed to have deployed fiber loop facilities.  In none of

7   the cases being proffered by the RBOCs is there any indication as to the capacity level that is

8   being provided over these claimed CLEC-owned facilities.  Significantly, however, Verizon

9   concedes that "[t]he majority of the high capacity loops that are purchases [sic] as special access

10  are DS-1s."[9]  Similarly, Qwest admits that 18,267, or 98.4%, of the special access circuits

11  CLECs have purchased from Qwest in the Denver MSA are DS-1s, and that only 296 are DS-

12  3s.[10]  Qwest does not indicate how many, if any, of those 296 DS-3s involve installations of three

13  or more DS-3s at the same customer location – the minimum service level at which the FCC had

14  found CLEC deployment of fiber facilities to be economically feasible.  And according to

15  BellSouth, in Florida *alone* "approximately 40,000 DS1 lines ... [are being] purchased by CLECs

16  to serve end users."[11]  Hence,  the RBOC data actually supports and confirms the Commission's

17  overarching determination that CLECs are not deploying fiber where the customer demand is for

---

9.  *Verizon July 2, 2004 ex parte*, Attachment 1, Declaration of Judy K. Verses *et al*, at para.
48.

10.  *Qwest August 19, 2004 ex parte*, at 3.

11.  *BellSouth August 18, 2004 ex parte*, at 4.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 19 of 94

1   DS-1 service, and that "[w]hen competitive LECs self-deploy fiber they predominantly do so at

2   the OCn-level."

3

4       35.   Citing the Commission's *Triennial Review Order* ("*TRO*"), at paras. 370 and 398,

5   Verizon states that "[t]he Commission has previously acknowledged that competing providers

6   'have deployed significant amounts of fiber transport facilities to serve local markets.'"[12]  But

7   Verizon conveniently fails to mention that elsewhere in the *TRO*, at paras. 298-310, the

8   Commission specifically notes that, based upon record evidence, CLECs have predominately

9   deployed fiber *loop* facilities only in those customer locations where the capacity being

10  demanded is at the OCn level:

11

12          The record contains a wealth of evidence to inform our enterprise market loop
13          analyses.  ... When competitive LECs self-deploy fiber they predominantly do so at
14          the OCn-level. ...  In contrast, the record contains little evidence of self-deployment, or
15          availability from alternative providers, for DS1 loops.  As for DS3 loops, evidence of
16          self-deployment and wholesale availability is somewhat greater than for DS1s and is
17          directly related to location-specific criteria.  Indeed, competitive LECs agree that at a
18          three DS3 loop capacity level of demand, it is economically feasible to self-deploy,
19          and record evidence reveals that both AT&T and WorldCom have self-provisioned
20          DS3 circuits to many customer locations.[13]

21

22  The Commission identified several *specific barriers* to CLEC facilities deployment, and on that

23  basis found that, at a national level, CLECs would be impaired without access to UNEs for dark

24  fiber, DS-1 loops, and for less than three DS-3 loops provided to the same customer location:

───────────────────

12.  *Verizon July 2, 2004 ex parte*, at 9.

13.  *TRO*, 18 FCC Rcd 17156-17157, at para. 298.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 20 of 94

1        In conducting our impairment analysis, we give substantial weight to the cost of
2        constructing a loop facility in relation to the ability of the competitive carrier to
3        recover those costs over time, *i.e.*, where the traffic volume and associated revenue
4        potential from the loop facility allow a carrier to earn a return necessary to sustain its
5        operations at that location.  We do, however, consider other factors affecting
6        competitive LEC loop deployment, including access to public and private rights-of-
7        way and multiunit premises access, that incumbent LECs have not or do not similarly
8        face as a result of their first-mover advantage.  Altogether, these factors directly
9        influence the ability of competitive carriers to raise capital to deploy service to
10       customers using their own loop facilities in a timely manner. ...[14]
11

12 These and related findings and conclusions reached by the Commission in the *TRO* specifically

13 *and correctly* recognize the economic distinctions that must be made, not only among the

14 different product markets (i.e., mass market vs. enterprise market vs. wholesale market), but also

15 among enterprise customers with different capacity requirements and at different locations.  With

16 respect to customer location, the Commission specifically found that:

17
18        ... the extent of competitive deployment of high-capacity loop facilities can vary
19        tremendously by geographic area.  More specifically, the barriers to entry requesting
20        carriers face are most precisely identified *on each geographic route serving a*
21        *particular customer location*. ...[15]
22

23 While certainly voluminous, the RBOCs' evidence nowhere identifies the specific type of service

24 or capacity level being provided by the CLEC to its customers at each customer location.

25 Clearly, Verizon's attempt to lump all varieties of services, customer types, and geographic

26 locations into the same "soup" whose only commonality is that all involve some type of "high

---

14.  *Id.*, at para. 306.

15.  *Id.*, at para. 307, emphasis supplied.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 21 of 94

1   capacity"[16] last-mile connection to the customer's premises does not square with the Commis-

2   sion's detailed analyses and determinations to the contrary – an analysis to which neither Verizon

3   nor its sister RBOCs have advanced any credible rebuttal.

4

5   **RBOC claims of facilities-based CLEC loop competition are rooted in irrelevant,**
6   **overstated and flawed CLEC data.**

7

8       *CLEC building counts are severely overstated*

9

10      36.  Verizon and SBC both rely upon data obtained from GeoResults as the basis for their

11  information on CLEC fiber deployment.  Both indicate that GeoResults, in turn, obtained some

12  of its input data from the Telcordia Central On-Line Entry System ("CLONES") database,[17] and

13  have, apparently, taken as a given that the CLONES database is accurate.  It is not.

14

15      37.  However, as AT&T declarant Jeffrey D. Beemon explains, this data source contains

16  substantial amounts of out-of-date and obsolete records referring to equipment and locations that

17  are no longer in service, so reliance upon it as a basis for quantifying the extent of CLEC market

18  presence – and for identifying the specific locations at which CLECs have deployed facilities –

19  will necessarily produce vastly overstated results.  According to Mr. Beemon, AT&T had

---

16.  The term "high capacity" or "hicap" generally refers to digital services at the DS-1 (T-1) level or higher, supporting a data transmission rate of no less than 1.544 megabits per second, equivalent to 24 voice-grade DS-0 (64 kbps) digital channels.

17.  *Verizon July 2, 2004 ex parte*, at 13; *SBC August 18, 2004 ex parte*, at 3.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 22 of 94

1   652,036 CLLI codes in the CLONES database as of July 1, 2004, but "259,745 of these codes,

2   comprising approximately forty percent of the total number of AT&T's CLLI codes in the

3   CLONES database and spread across 131,309 building addresses, are no longer active."[18]  Mr.

4   Beemon indicated that he

5

6       believe[s] that other carriers' CLLI code and customer address information in the
7       CLONES database is also likely to contain significant inaccuracies.  While customer
8       locations inevitably change over time, carriers have relatively few incentives to engage
9       in the lengthy process of removing outdated information from the CLONES database
10      for the reasons described above.  I also understand from working with Telcordia on the
11      procedures to remove AT&T's outdated codes from the CLONES database that no
12      other carrier has undertaken a similar effort to remove large numbers of outdated
13      codes.[19]
14

15  Finally, Mr. Beemon also notes that "the information available to other users [of CLONES]

16  provides no information on the level of service serving the location (i.e., DS0, DS1, DS3, OC-3,

17  and above), or whether that service is provided via CLEC-owned fiber or via ILEC special access

18  services."[20]  It is apparent that none of the RBOC data that is based upon input from the

19  Telcordia database can be taken at face value.

20

---

18.  Declaration of Jeffrey D. Beemon on behalf of AT&T Corp. ("Beemon Declaration"), at
para. 6.

19.  *Id*., at para. 9.

20.  *Id.*, at para. 4.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 23 of 94

1    38.  In addition to overstating AT&T(and probably other carrier) data for the specific

2    markets reflected on its MSA maps, it appears that Verizon has also exaggerated the aggregate

3    counts of facilities of many other CLECs that it is provided.  Verizon claims that, within each of

4    the overly broad MSA market areas it has posited in its July 2, 2004 *ex parte* filing, "competing

5    providers have deployed [extensive fiber networks that] are capable of and being used to provide

6    high-capacity loops to buildings in which there is concentrated demand for high-capacity

7    services."[21]  Verizon then boldly asserts that "wherever there is demand for high-capacity

8    services, competing providers can and are serving customers without unbundled elements."[22]

9    Specifically, Verizon claims that CLECs serve some 48,350 buildings nationwide using their

10   own fiber.[23]  The figure represents an aggregation of data apparently obtained by Verizon largely

11   from several *secondary* sources.  This data differs from data provided by the CLECs themselves.

12   Whether the total number of buildings being served by CLEC-owned fiber is the 48,350 (as

---

21.  *Verizon July 2, 2004 ex parte*, at 12.

22.  *Id.*, at 1.  Careful parsing of this statement reveals the utter vacancy of Verizon's claims.
First, Verizon has not identified all locations "where[] there is demand for high-capacity
services," but only those specific locations that are putatively being served by CLECs without
use of UNEs.  Verizon has *not*, for example, provided any evidence that the nature of those
enterprise customers being served by CLECs without UNEs is comparable to that for Verizon's
own enterprise customers or for those CLEC customers being served *with UNEs* in terms of
lines, service mix, and overall revenue levels.  Had it done so, that data would have confirmed
that there are significant portions of the enterprise market that are not being served by CLECs
without the use of UNEs.  Similarly, Verizon's claim that "competing providers can and are
serving customers without unbundled elements" says only that CLECs are serving *some*
customers, but similarly teaches nothing about how much of the enterprise market *cannot
profitably be served* by CLECs without access to unbundled network elements.

23.  *Id.*, at Attachment 9.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 24 of 94

1   Verizon claims) or something less, even Verizon does not contend – nor could it – that

2   "*wherever* there is demand for high-capacity services," CLECs are capable of serving *all*

3   potential customers without UNEs.

4

5       39.  Verizon exaggerates the actual number of buildings being served by CLEC fiber by

6   misinterpreting the term "on-net" as used by CLECs in public statements and analyst reports.

7   Verizon apparently assumes that a CLECs uses the term "on-net" to refer specifically to

8   situations in which CLECs have deployed their own fiber optic facilities to specified customer

9   locations (buildings).  In fact, CLECs do not consistently use this characterization in that manner.

10  Rather, at least *some* CLECs use the term "on-net" to include all locations at which they are able

11  to provide service using *either* owned *or leased* facilities.  XO, for example, defines "on-net" in

12  its second quarter 2004 financial reports as "[b]uildings connected to our network by either XO-

13  owned or *controlled* cable or fixed wireless antenna."[24]   XO plainly states that it includes both

14  "owned" and "controlled" connections to its network under the "on-net" definition.  The extent

15  to which other CLECs also include "controlled" or leased connections is unclear.  Verizon has

16  also failed to distinguish between general "connectivity" and "on-net" connectivity – a subset of

17  total connections.  Total connections would include both "on-net" buildings as well as buildings

18  served by means of leased (e.g., special access) services between the building and the CLEC's

---

24.  XO Communications Condensed Consolidated Statement of Operations for the Second
Quarter, 2003, Operating Data Definitions, emphasis supplied.  Available at:
http://www.xo.com/about/investors/financials/xo2004q2_financialresults.pdf (accessed
September 30, 2004).

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 25 of 94

1  fiber ring or the CLEC's central office.  As a result, several of Verizon's results are either

2  undocumented or, in some cases, manifestly wrong:

3

4  *KMC*

5  Verizon claims that KMC has 15,600 on-net connections, basing this assessment upon a
6  KMC company press release.[25]  However, this press release states that there are "15,600
7  buildings connected to KMC's networks."[26]  Verizon has apparently assumed that all of
8  these are KMC-owned fiber connections.  KMC's website, however, provides more
9  detailed information, and notes that the company includes only "1,700 on-net buildings"
10  where it offers wholesale dedicated service connections.[27]

11

12  *McLeodUSA*

13  Verizon refers to McLeodUSA's 2001 10-K for its estimate of McLeod-owned on-net
14  buildings.  In that 10-K, McLeod reports that it is "connected to almost 1,500 buildings
15  along [its] network."[28]  However, McLeodUSA reported in the second quarter of 2004
16  that it provides service wholly over UNE-L, UNE-P/M and resale facilities.[29]
17  Therefore, McLeod could not own connections to 1,500 on-net buildings, since it does
18  not have any on-net connections at all.

___

25.  *Verizon July 2, 2004 ex parte*, Source Appendix, at 2, citing
http://www.kmctelecom.com/press/index.cfm?fuseaction=pressdetail&pressid=412.

26.  KMC Press Release, "KMC Telecom Successfully Completes Financial Restructuring,"
July 29, 2003, available at http://www.kmctelecom.com/press/index.cfm?fuseaction
=pressdetail&pressid=412 (accessed September 30, 2004).

27.  KMC Wholesale webpage, http://www.kmctelecom.com/Wholesale/ (accessed
September 30, 2004).

28.  McLeodUSA Inc., 2001 10K Report filed with the Securities & Exchange Commission,
April 12, 2002.

29.  McLeodUSA Release, "McLeodUSA Reports Second Quarter 2004 Results," July 28,
2004, at 2.



Declaration of Lee L. Selwyn
FCC WC Docket No. 04-313, CC Docket No. 01-338
October 4, 2004
Page 26 of 94

1    *TelCove*

2    Verizon relies upon a TelCove press release that describes "TelCove's embedded
3    network [as] connect[ing] well over 3,500 buildings,"[30] however, another TelCove
4    company brochure advertises "direct connectivity to over 2,500 on-net buildings."[31]
5

6    *IDT*

7    Verizon incorrectly reports that IDT Solutions has connections to 3,500 buildings. The
8    source to which Verizon refers for its information, IDT's website, states that IDT serves
9    only 1,800 on-net buildings in 22 cities.[32] In fact, the number of buildings actually
10   connected via IDT-owned fiber appears to be significantly less, perhaps none at all. As
11   Verizon itself recognized, IDT has ceased to provide service in 19 of those 22 cities.[33]
12   So if the 1,800 buildings were associated with the 22 cities, then in follows that the
13   number of buildings associated with the three cities (New York, Newark, and
14   Washington, DC) that IDT continues to serve must be less. IDT actually serves
15   however many buildings it does serve via fixed wireless (line-of-sight microwave), *not
16   fiber*.[34] Hence, the actual number of buildings at which IDT has deployed its own fiber

---

30. *Verizon July 2, 2004 ex parte*, Source Appendix, at 2, citing *TelCove Adds Next Generation of Metro Area and Intercity Ethernet Services to its Line of High-Speed Communication Services*, PR Newswire, January 29, 2004.

31. *TelCove: Advanced Secure Communications*, Telcove Company Brochure, at 2, available on Telcove's website at http://www.telcove.com/prroom/media.htm (accessed August 27, 2004).

32. *Verizon July 2, 2004 ex parte*, Source Appendix, at 2, citing http://www.idtsolutions.net/products/buscont/solutions.asp.

33. *Id.*, citing *Application of Winstar Communications, LLC for Authority to Discontinue Certain Services*, WC Docket No. 04-154, Section 63.71 Application, April 15, 2004, at 2.

34. IDT Solutions Press Release, "IDT Corporation Announces Reorganization of Winstar/IDT Solutions," May 12, 2004, available at http://www.idtsolutions.net/about/press/releases/1023.asp (accessed September 30, 2004). IDT had acquired the *fixed wireless* assets of Winstar, which had used line-of-sight microwave, not fiber, to provide connectivity to

(continued...)