**Attachment 15**

**Reply Testimony of Lee L. Selwyn on behalf of the
California Public Utilities Commission
Office of Ratepayer Advocates
(redacted)
Cal. PUC Application No. 05-02-027
(SBC/AT&T merger)
June 24, 2005**



# Before the
# PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Joint Application of SBC Communications Inc.  ("SBC") and AT&T Corp. ("AT&T") for Authorization to Transfer Control of AT&T Communications of California (U-5002), TCG Los Angeles, Inc.  (U-5462), TCG San Diego (U-5389) and TCG San Francisco (U-5454) to SBC, Which Will Occur Indirectly as a Result of AT&T's Merger with SBC, Tau Merger Sub Corporation | A.  05-02-027 |

Reply Testimony

of

## LEE L. SELWYN

on behalf of the

Office of Ratepayer Advocates

June 24, 2005

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

TABLE OF CONTENTS

EXECUTIVE SUMMARY                                                      vii

INTRODUCTION                                                            1

   Qualifications                                        1

   Assignment                                            3

OVERVIEW OF §854 REQUIREMENTS                                          4

If the Commission determines, as it should, that the proposed merger of SBC and AT&T is subject to §854 of the California Public Utilities Code, it must affirmatively find that the transaction will provide positive short-term and long-term benefits for California ratepayers and that the merger fully satisfies all of the public interest criteria set out in the statute.     4

The merger must provide short-term and long-term economic benefits to ratepayers     9

California Ratepayers are to receive "not less than 50 percent" of the total short-term and long-term forecasted economic benefits of the proposed merger where the Commission has ratemaking authority.     12

The "economic benefits" justifying the merger referred to at §854(b)(1) and the "economic benefits" that must be shared with ratepayers referred to at §854(b)(2) are, in virtually all respects, the same, and as such the Commission should adopt a consistent basis for assessing §854(b)(1) and §854(b)(2) "economic benefits to ratepayers."     16

§854(b)(3) requires the Commission to find that the merger will "not adversely affect competition," but in fact the merger will significantly increase SBC's market power and market concentration overall, and will result in decidedly less competition in the California telecommunications market.     19

REDACTED

ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                     LEE L.  SELWYN

THE FALLACY OF JOINT APPLICANTS' MERGER BENEFIT CLAIMS                    21

    Virtually all of the "benefits" identified by the Joint Applicants will inure to the post-
merger SBC and its shareholders, and the *de minimis* share to be allocated to California
ratepayers will not be sufficient to offset the substantial risks and harms that will
inevitably arise from the proposed transaction.                    21

    The merger will likely produce other economic harms to ratepayers, and those "negative
benefits" must be considered and offset against potential positive benefits in making the
required § 854(b)(1) finding.                    23

    The Joint Applicants' contention that the merger will promote innovation and R&D, and
that these improvements will be more rapidly flowed through to ratepayers, cannot be
squared with the overall increase in market concentration that will result if the two
companies are allowed to combine.                    25

    The merger is not likely to produce the increased out-of-region competition predicted by
the Joint Applicants, and it could result in decidedly less competition if post-merger
SBC and post-merger Verizon continue to follow their two-decades-long pattern of tacit
market allocation.                    33

    Having grossly exaggerated the various "soft" benefits they seek to attribute to the
merger in order to satisfy § 854(b)(1), the Joint Applicants then seek to affirmatively
*exclude* the vast majority of such "economic benefits" subject to the Commission's
ratemaking authority for purposes to the "not less than 50 percent" allocation to
ratepayers as required by § 854(b)(2).                    34

    Forecasts of positive economic benefits of the merger must be offset by a valid
economic assessment of the potential risks to both the merging parties and to California
ratepayers arising from the transaction.                    42

ECONOMIC BENEFITS FOR CALIFORNIA RATEPAYERS                    56

    The Joint Applicants propose to allocate no more than a *de minimis* fraction of
aggregate national merger synergies to California ratepayers                    56

    The total short-term and long-term forecasted economic benefits allocable to California
ratepayers where the Commission has ratemaking authority are more accurately
calculated to be in the range of $1.8-billion.                    57

**REDACTED**



EFFECT OF THE PROPOSED MERGER ON CALIFORNIA EMPLOYMENT AND
ECONOMY                                                                                64

    The proposed merger has the potential to eliminate thousands of California jobs and
    threaten continuation of benefits for current AT&T employees.                        64

    The merger could have a $15-billion adverse impact on the overall California economy.   65

HORIZONTAL COMPETITION ISSUES ARISING FROM THE PROPOSED MERGER        70

    Why is the merger of SBC and AT&T different from previous RBOC mergers?              70

    The proposed transaction is both a *horizontal* merger – in that SBC and AT&T currently
    compete with each other across a broad spectrum of service markets – and a *vertical*
    merger – in that each firm currently purchases services from, or produced by, the other
    to support its provision of downstream services.                                     72

    The proposed merger violates the specific market concentration provisions of the
    Department of Justice/Federal Trade Commission *Horizontal Merger Guidelines*.      81

        SBC and AT&T attempt to broaden the "relevant product and geographic market"
        for their wireline services, in order to create the appearance of lower market
        concentration, but the "intermodal" services they identify do not belong to the same
        "relevant product and geographic market," as these concepts are defined in the
        *Horizontal Merger Guidelines*.                                                  82

INTERMODAL COMPETITION AND MARKET CONCENTRATION                     102

    Consumer purchases of wireless, cable, and VoIP are not sufficient to prevent the post-
    merger SBC from imposing a "small but significant and nontransitory increase" in the
    price of its wireline services without losing so much business as to make the price
    increase unprofitable.                                                              102

    Where it occurs, wireless substitution is minimal at best                           104

    Use of a wireless phone as a "primary phone," or for long distance calling, is *not*
    "intermodal competition"                                                            111

    RBOC actions indicate that even wireline carriers perceive wireless service to be an
    integrated complement to, and distinctly not a substitute for, traditional wireline service  116



**REDACTED**

Cal. PUC A.05-02-027                    LEE L. SELWYN

Limited competition from cable providers at best produces a duopoly market outcome
for services that depend upon bottleneck "last mile" facilities                                    118

    Decreases in RBOC access lines are attributable to the decline of the second line
    market, rather than to consumer "substitution" of "intermodal" alternatives           122

VoIP services do not avoid the "last mile" bottleneck; moreover, they fall far short of
wireline services with respect to service quality and their ability to meet national
standards for emergency 911 service.                                                               123

Wi-Fi, Wi-Max, and other fixed wireless services do not serve as legitimate competitors
to DSL or cable modem services, especially at the residential and small business level.            135

The identifiable adverse impact upon competition from the merger must not be
subordinated to speculative claims as to future changes in market structure due to the
growth of putative intermodal alternatives                                                         137

VERTICAL INTEGRATION ISSUES ARISING FROM THE PROPOSED MERGER                                        139

Both SBC and AT&T currently purchase massive quantities of services in markets
currently served by the other as inputs to support their own activities in downstream
markets.                                                                                           139

The vertical integration of the SBC local access and AT&T interexchange network
infrastructures will diminish competition in wholesale markets and provide SBC with
the means to further extend its local service market power into adjacent and currently
competitive markets.                                                                              141

The *horizontal* concentration of retail long distance and enterprise services within the
SBC footprint, coupled with the *vertical* integration of SBC's local and AT&T's long
distance networks, when viewed together with the concurrent vertical merger of Verizon
and MCI, will eviscerate the demand for *wholesale* interexchange services.                       143

The vertical integration of AT&T and SBC will dramatically increase SBC's
*monopsony* power over its suppliers.                                                             147

Excessive special and switched access charges raise competitive problems even in the
absence of a merger, but an SBC/AT&T merger would make the problem far worse.                     152

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                            LEE L.  SELWYN

The vertical integration of AT&T's Tier 1 Internet backbone and SBC's "last mile" DSL facilities will reduce competition for wholesale Internet services and erect additional entry barriers for non-integrated Internet service providers.                156

IMPACTS ON COMPETITION FOR ENTERPRISE BUSINESS SERVICES                158

Without a solid foothold in the enterprise market, carriers attempting to compete with the giant SBC/AT&T have little chance of surviving as competitors for residential and small business services.                158

By eliminating AT&T as a competitor, SBC would be able to solidify its monopoly control of the wholesale (upstream) special access market, while simultaneous fortifying its ability and incentives to discriminate against downstream retail competitors.                161

Even though AT&T has been subject to precisely the same operational difficulties and competitive disadvantages (vis-à-vis the incumbent LEC) that SBC claims to be an impediment to its own competitive entry out of region, AT&T has still been successfully serving the very customers that SBC now claims it can serve only by merging with AT&T.                166

Predation and price squeezes between SBC's retail prices and its special access charges are currently occurring, and have the potential to become even more aggressive vis-à-vis other CLCs once AT&T has been absorbed into SBC.                180

Existing rules governing the allocation of ILEC costs as between "regulated" and "nonregulated" services are incapable of addressing the massive integration of network facilities and organizational resources that would result from the merger of SBC and AT&T.                183

The merger exacerbates the already tenuous competitive situation created by the sunset of Section 272.                187

The SBC/AT&T and Verizon/MCI mergers will result in *de facto* geographic market allocation as between the two mega-carriers, leaving each to largely remonopolize the enterprise market within its BOC operating footprint.                195

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

CONDITIONS FOR APPROVAL                                                           199

    If the Commission determines that the merger should be allowed to go forward, it
    should consider and adopt specific measures to mitigate the substantial economic and
    competitive harms that would otherwise result from the transaction.                199

        Assuring that the merger will produce benefits to ratepayers                  202

        Measures to offset the merger's adverse impact on competition                209

        Measures to limit potential ratepayer harms                                  223

        Elimination of harms to the California Economy                               235

DECLARATION                                                                        240


TABLES

Table 1  Pre- and Post-Merger Four-Firm Concentration Indices – Residential services,
        SBC California operating areas                                                50

Table 2  Pre- and Post-Merger Four-Firm Concentration Indices – Local and Long
        Distance Services, SBC California operating areas                              85

Table 3  Comparison of SBC and Verizon California Residential Rates                 99

Table 4  SBC Interstate Special Access Revenues and Rates of Return               171

Table 5  Most CLC enterprise customers are being served using special access even on
        streets where CLC-owned fiber has been deployed                             173

FIGURE

Figure 1     SBC map of Downtown San Francisco showing CLEC enterprise
            customers being served using Special Access and CLEC "lit"
            buildings.  Source: SBC *ex parte* letter dated August 18, 2004, CC
            Docket No. 01-338.                                                        174

REDACTED



Cal. PUC A.05-02-027                LEE L.  SELWYN

ATTACHMENTS

1    Statement of Qualifications, Lee L. Selwyn

2    Analysis of the Economic Impact of SBC/AT&T California Headcount Reductions

3    Excerpts from SBC Testimony and Other Statements Made in Regulatory Proceedings, both in California and at the FCC, Characterizing AT&T as a Competitor

4    Imputation Rule Proposed by AT&T, in WC Docket No. 02-112, June 2004

5    SBC Response to FCC Staff April 18, 2005 Initial Information and Document Request, Item 4

6    Summary of Proposed Conditions for Approval

7    A. 05-02-027 Discovery Responses referenced in testimony

8    WC Docket No. 05-25 FCC Staff Discovery Responses referenced in testimony

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L. SELWYN

## EXECUTIVE SUMMARY

The proposed merger of SBC and AT&T will have major, far-reaching, and decidedly negative impacts upon the California telecommunications market and the California economy:

- It will directly affect the manner in which both SBC California and AT&T provide service to California ratepayers.

- It will result in increased market concentration and less competition overall, leading to higher prices across a broad range of telecommunications services.

- It will likely increase SBC California's cost of capital

- It will result in large-scale job losses at both SBC and at AT&T producing a $15-billion negative impact for the California economy overall; and

- By raising competitive entry barriers, the merger will discourage entry and investment in the California telecommunications market.

These are exactly the kinds of concerns that led to the enactment of §854 of the California Public Utilities Code, and for this reason the Commission should determine that the proposed transaction is subject to §854 in all respects.

***Most of the "benefits" of the proposed merger will inure to SBC and AT&T; the merger will not provide positive short-term and long-term economic benefits for ratepayers***

§854(b) requires that the merger provide "short-term and long-term economic benefits to ratepayers" and that "not less than 50 percent" of such benefits be allocated to California ratepayers where the Commission has ratemaking authority. The Joint Applicants have sought to satisfy §854(b)(1) by enumerating a litany of purported "benefits," yet for purposes of §854(b)(2) they attribute less than two-tenths of one percent of the total $15-billion in "economic benefits" they have identified to their shareholders for "allocation" to California ratepayers. The Commission should reject this attempt at bifurcation, since the "economic benefits to ratepayers" justifying the merger referred to at §854(b)(1) and the "economic benefits" that must be shared with ratepayers referred to at §854(b)(2) are, in virtually all respects, the same.

**REDACTED**



Cal. PUC A.05-02-027                    LEE L.  SELWYN

Virtually all of the purported §854(b)(1) "benefits" identified by the Joint Applicants will inure to the post-merger SBC and its shareholders, and do not provide specific "benefits to ratepayers" as expressly required by the statute.  This lack of "ratepayer benefits" is underscored by the *de minimis* $27-million share that the Joint Applicants seemingly concede would be subject to allocation to California ratepayers assuming that the transaction is even subject to §854.  These "ratepayer benefits" purportedly identified by the Joint Applicants are clearly insufficient to offset the substantial risks and harms that will inevitably arise from the proposed transaction.

In fact – and as apparently conceded by the Joint Applicants themselves – virtually all of the benefits arising from the merger will inure to the combined companies' shareholders – and decidedly *not* to ratepayers:  The Joint Applicants' contention that the merger will promote innovation and R&D, and that these improvements will be more rapidly flowed through to ratepayers, cannot be squared with the overall increase in market concentration that will result, since it is *competition*, not scale of operations, that drives innovation.  The merger is not likely to produce the increased out-of-region competition predicted by the Joint Applicants, and it could result in decidedly less competition if post-merger SBC and post-merger Verizon continue to follow their two-decades-long pattern of tacit geographic market allocation.  Any forecasts of positive economic benefits of the merger must be offset by a valid economic assessment of the potential risks to both the merging parties, to California ratepayers, to SBC and AT&T employees, and to the California economy overall that will result from the transaction.

The Joint Applicants propose to allocate no more than a *de minimis* fraction of aggregate national merger synergies to California ratepayers, in this case, about $13-million.  However, based upon the "national" $15-billion estimate of merger synergies, the total short-term and long-term forecasted economic benefits properly allocable to California ratepayers where the Commission has ratemaking authority are more accurately calculated to be in the range of $2.057-billion.  If the merger is to be approved, the Commission will need to assure itself that "not less than 50 percent" of these aggregate "California benefits" will flow to California ratepayers in some identifiable manner.

***Unlike any of the prior RBOC mergers, the SBC/AT&T combination will increase market concentration within the same geographic areas as well as creating a vertically integrated mega-corporation that will have the opportunity and incentive to discriminate against non-integrated rivals both in upstream wholesale and in downstream retail markets.***

The proposed transaction differs from all previous RBOC mergers in that it is both a *horizontal* merger – in that SBC and AT&T currently compete with each other across a broad spectrum of service markets – and a *vertical* merger – in that each firm currently

REDACTED



purchases services from, or produced by, the other to support its provision of downstream services. For these reasons, the merger will have a material adverse impact upon competition in the California telecommunications market.

***Contrary to the Joint Applicants' repeated contentions, AT&T competes directly with SBC – and is in fact SBC's single largest competitor – across a broad range of retail consumer and enterprise services as well as in wholesale special access markets.***

While claiming to have "irreversibly exited" the consumer market, AT&T remains SBC's single largest competitor, with nearly 1.8-million access lines in the SBC region, many of which are in California. AT&T is a direct competitor of SBC in the enterprise business market. Even though AT&T has been subject to precisely the same operational difficulties and competitive disadvantages (vis-à-vis the incumbent LEC) that SBC claims to be an impediment to its own competitive entry out of region, AT&T has still been successfully serving the very customers that SBC now claims it can serve only by merging with AT&T. The SBC/AT&T and Verizon/MCI mergers will result in *de facto* geographic market allocation as between the two mega-carriers, leaving each to largely remonopolize the enterprise and consumer markets within each's respective operating footprint.

As a *horizontal* transaction, the proposed merger violates the specific market concentration provisions of the Department of Justice/Federal Trade Commission *Horizontal Merger Guidelines*. In a transparent attempt to overcome this critical hurdle, SBC and AT&T seek to broaden the "relevant product and geographic market" definition applicable to their wireline services by including a variety of so-called "intermodal" alternatives so as to create the *appearance* of lower market concentration in the specific product markets in which the two firms are direct competitors. However, the specific "intermodal" services they identify are not in the same "relevant product and geographic market" as these concepts are defined in the *Guidelines*. Specifically, consumers do not perceive wireless, cable, and VoIP as representing sufficiently close substitutes for basic wireline telephone services as to prevent the post-merger SBC from imposing a "small but significant and nontransitory increase" in the price of its wireline services without losing so much business as to make the price increase unprofitable – the specific standard for identifying "relevant product markets" set out in the *Guidelines*. The Joint Applicants support their "same product market" claim solely with subjective, anecdotal evidence and rhetoric describing what is at best entirely incidental substitution, but offer no rigorous, quantitative econometric analysis of relative prices and cross-price elasticities to *prove* their otherwise unsupported – and unsupportable – contentions. Where it occurs, wireless, cable, and VoIP substitution for wireline service is minimal at best, and certainly does not constrain wireline prices. The identifiable adverse impact upon competition from the merger must not be subordinated to speculative claims as

x



ECONOMICS AND TECHNOLOGY, INC.

to future changes in market structure purportedly attributable to the growth of putative intermodal alternatives.

***The merger will result in extensive vertical integration, creating the incentive and the opportunity for the combined company to discriminate against non-integrated rivals both with respect to upstream wholesale services as well as in downstream retail markets.***

Both SBC and AT&T currently purchase massive quantities of services in markets currently served by the other as inputs to support their own activities in downstream markets.  The vertical integration of the SBC local access and AT&T interexchange network infrastructures will diminish competition in wholesale markets and provide SBC with the means to further extend its local service market power into adjacent and currently competitive markets.  The *horizontal* concentration of retail long distance and enterprise services within the SBC footprint, coupled with the *vertical* integration of SBC's local and AT&T's long distance networks, when viewed together with the concurrent vertical merger of Verizon and MCI, will eviscerate the demand for *wholesale* interexchange services.  The currently excessive special and switched access charges raise competitive problems even in the absence of a merger, but an SBC/AT&T merger would make the problem far worse.

A similar outcome will arise with respect to Internet-related services.  When joined with AT&T, SBC will become both the largest provider of consumer high-speed Internet access services in California *and* a Tier 1 Internet backbone carrier.  This latter status will permit SBC to "peer" with other Tier 1 providers and exchange traffic without being required to make specific payments for bandwidth.  This cost-free access to the Internet backbone will provide SBC with a competitive cost advantage that none of its existing high-speed Internet access competitors can match.  The vertical integration of AT&T's Tier 1 Internet backbone and SBC's "last mile" DSL facilities will reduce competition for wholesale Internet services and erect additional entry barriers for non-integrated Internet service providers.

***The proposed merger will result in a loss of thousands of California jobs and will negatively impact the California economy by at least $15-billion.***

To achieve their "synergies," the Joint Applicants will be eliminating more than ten thousand jobs nationally across both companies.  As such, the proposed merger has the potential to eliminate thousands of high-paying California jobs and threaten continuation of benefits for current AT&T employees.  Taking both direct and indirect effects into account, the loss of these jobs translates into an adverse economic impact on the California economy, expressed in net present value terms, of not less than $15-billion.

REDACTED



Cal. PUC A.05-02-027                     LEE L.  SELWYN

***Although the proposed merger falls far short of satisfying the specific requirements set out at §854 of the California Public Utilities Code, at least some of its more egregious harms could be mitigated through the imposition by the Commission of specific merger conditions.***

The proposed merger fails to satisfy the explicit requirements at §854 and for that reason cannot be approved.  However, if the Commission nonetheless determines that the merger should be allowed to go forward, it should consider and adopt specific conditions to mitigate the substantial economic and competitive harms that would otherwise result from the transaction.  These measures would address each and all of the following specific areas of concern:

- Assure that the merger will produce benefits to ratepayers by earmarking a sufficient portion of the total short-term and long-term economic benefits to assure that California ratepayers receive not less than 50 percent thereof, where the Commission has ratemaking authority;
- Offset the merger's adverse impact on competition by assuring continued competitor access to the combined company's network at cost-based rates;
- Limit other potential ratepayer harms, such as potentially large price increases on services subject to significantly diminished competition;
- Eliminate harms to the California Economy by limiting the extent of headcount reductions in the State post-merger.

***On balance the proposed merger is not in the public interest, will result in decidedly less competition in the California telecommunications market, will fail to provide the required economic benefits to ratepayers, will cost jobs, and will have a large negative impact on the California economy overall, and should therefore not be allowed to go forward.***

Although the various conditions and mitigations outlined here will reduce the overall harm to ratepayers, to competition, to employees and to the California economy if the merger is allowed to go forward, on balance the merger is not in the public interest and does not satisfy the statutory thresholds for approval.  For all of these reasons, the Commission should not approve the SBC/AT&T Application, and should reject the proposed merger.



REDACTED

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1                                 INTRODUCTION

2

3   **Qualifications**

4

5   Q.  Please state your name, position and business address.

6

7   A.  My name is Lee L. Selwyn.  I am President of Economics and Technology, Inc. ("ETI"),

8       Two Center Plaza, Boston, Massachusetts 02108.  Economics and Technology, Inc. is a

9       research and consulting firm specializing in telecommunications economics, regulation,

10      management and public policy.

11

12  Q.  Please summarize your educational background and previous experience in the field of

13      telecommunications regulation and policy.

14

15  A.  I have prepared a Statement of Qualifications, which is attached hereto as Attachment 1.

16

17  Q.  Dr. Selwyn, have you previously testified before the California Public Utilities

18      Commission?

19

20  A.  Yes, I have appeared before this Commission on numerous occasions dating back to the

21      mid-1970s.  A summary of my participation in CPUC matters is included in my Statement

22      of Qualifications (Attachment 1).

23

1

ECONOMICS AND
TECHNOLOGY, INC.

REDACTED

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1  Q.  Please summarize your specific experience in proceedings involving mergers of Regional

2       Bell Operating Companies ("RBOCs") and other affiliate transactions involving RBOCs.

3

4  A.  I have participated and presented testimony in cases addressing each of the five previous

5       RBOC mergers.  I testified on behalf of the ORA in both the SBC/Pacific Telesis and the

6       Bell Atlantic/GTE merger dockets.  That testimony addressed, among other things, the effect

7       of the mergers on competition and on the surviving firms' market power, ratepayer impacts,

8       including the applicants' recovery of merger-related costs and the flow-through of merger

9       benefits to California ratepayers, and the conformance of the mergers with PU Code

10      §854(b).  In addition to these CPUC matters, my firm was engaged by a group of state

11      consumer advocate offices in 1998 to prepare an expert report for submission to the FCC

12      with respect to the BA/GTE merger.  In 1997 and 1998, I testified before the Maine Public

13      Service Commission on behalf of the State of Maine Office of Public Advocate with respect

14      to the NYNEX/Bell Atlantic merger.  In 1998, I presented testimony before the Connecticut

15      Department of Public Utility Control on behalf of the State of Connecticut Office of

16      Consumer Counsel to address the merger of the Southern New England Telephone Company

17      ("SNET") into SBC.  In 1999, I testified on behalf of the Attorney General of the State of

18      Illinois before the Illinois Commerce Commission regarding the merger of SBC and

19      Ameritech.

20

21      I have also participated in various proceedings addressing non-merger change of control

22      issues.  I testified on behalf of ORA's predecessor, the DRA, in the 1992-1993 proceeding

23      addressing the Pacific Telesis "spin-off" of its cellular and other wireless subsidiaries.  In

2

REDACTED

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                     LEE L.  SELWYN

1     2003, I was engaged by the Staff of the Washington State Utilities and Transportation

2     Commission to prepare a financial analysis and present public interest testimony addressing

3     Qwest's sale of its directory publishing business ("DEX") to a group of private investors.  I

4     have also been involved in numerous other cases addressing competition and market power

5     issues, including Section 271/272 and various competitive reclassification proceedings.

6

7     **Assignment**

8

9     Q.   On whose behalf is this testimony being offered, and what was your specific assignment in

10         this proceeding?

11

12    A.   ETI has been engaged by the Office of Ratepayer Advocates of the California Public

13         Utilities Commission ("ORA") to review the Joint Application of SBC Communications,

14         Inc. ("SBC") and AT&T Corp. ("AT&T") for California PUC approval of their proposed

15         merger, together with the accompanying public interest statement and supporting

16         declarations.  ETI has also been asked to review the responsive comments filed by parties in

17         the FCC proceeding considering the proposed merger, WC Docket No. 05-65.  Based upon

18         the foregoing, ETI has been asked to present testimony to the Commission and to offer an

19         opinion as to whether the proposed merger conforms to the requirements generally set forth

20         at §854 of the California Public Utilities Code.

21

22    Q.   Do you refer to specific SBC and/or AT&T responses to information and document requests

23         in this testimony?

3

REDACTED

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                      LEE L.  SELWYN

1    A.   Yes.  Attachment 7 hereto provides copies of all SBC/AT&T responses to discovery

2         requests in this proceeding to which I refer.  Attachment 8 provides copies of SBC/AT&T

3         responses to the FCC Staff's April 18, 2005 Initial Information and Document Request,

4         which have been made available by the Joint Applicants to ORA, and to which I refer in my

5         testimony.

4

REDACTED

ETI  ECONOMICS AND
     TECHNOLOGY, INC.

Cal. PUC A.05-02-027                LEE L.  SELWYN

1                        OVERVIEW OF §854 REQUIREMENTS

2

3    **If the Commission determines, as it should, that the proposed merger of SBC and AT&T is**
4    **subject to §854 of the California Public Utilities Code, it must affirmatively find that the**
5    **transaction will provide positive short-term and long-term benefits for California**
6    **ratepayers and that the merger fully satisfies all of the public interest criteria set out in the**
7    **statute.**

8

9    Q.  Dr.  Selwyn, are you generally familiar with §854 of the California Public Utilities Code?

10

11   A.  Yes.

12

13   Q.  I would like you to assume for the purpose of your testimony that the proposed merger of

14       SBC and AT&T is subject to §854(b) and §854(c) in all respects.  Assuming that to be the

15       case, what are the principal types of factual findings that the Commission is required to

16       make prior to approving the proposed merger?

17

18   A.  §854(b) requires that the Commission, prior to approving the merger, find that the proposed

19       transaction:

20

21       •   "Provides short-term and long-term economic benefits to ratepayers" (§ 854(b)(1));

22

23       •   "Equitably allocates, where the Commission has ratemaking authority, the total short-

24           term and long-term forecasted economic benefits ... of the proposed merger, acquisition

5

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    or control, between shareholders and ratepayers.  Ratepayers shall receive not less than

2    50 percent of those benefits" (§854(b)(2)); and that the merger

3

4    •    Will "[n]ot adversely affect competition" (§854(b)(3)).

5

6    §854(c) requires the Commission to consider each of eight separate criteria and make a

7    finding (based upon its analysis of these criteria) that, on balance, the merger is in the public

8    interest.  Under the eight subsections of §854(c), the Commission must consider whether the

9    proposed merger will:

10

11        (1)  Maintain or improve the financial condition of the resulting public utility doing

12             business in the state.

13

14        (2)  Maintain or improve the quality of service to public utility ratepayers in the

15             state.

16

17        (3)  Maintain or improve the quality of management of the resulting public utility

18             doing business in the state.

19

20        (4)  Be fair and reasonable to affected public utility employees, including both

21             union and nonunion employees.

22

23        (5)  Be fair and reasonable to the majority of all affected public utility shareholders.

6

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1       (6)  Be beneficial on an overall basis to state and local economies, and to the

2            communities in the area served by the resulting public utility.

3

4       (7)  Preserve the jurisdiction of the commission and the capacity of the commission

5            to effectively regulate and audit public utility operations in the state.

6

7       (8)  Provide mitigation measures to prevent significant adverse consequences

8            which may result.

9

10  Q.  Do you find Joint Applicants' Merger Application deficient with respect to one or more of

11      these criteria?

12

13  A.  Yes.   As my testimony will demonstrate, the Commission should be very concerned about

14      the merger's impact with respect to a number of these criteria, including (but not limited to)

15      the effect of the proposed merger on the Commission's ability to effectively regulate and

16      audit public utility operations of the post-merger entity in California and the Joint

17      Applicants' failure to propose any mitigation measure to prevent adverse impacts on

18      competition in the state.  Indeed, while I propose mitigation measures for the Commission's

19      consideration, it is questionable whether even those measures would be adequate to offset

20      the anticompetitive consequences of the merger or would provide as great a degree of

21      protection for California ratepayers as a decision to simply deny the merger.  In addition, as

22      I discuss below, the potential negative economic impact of this merger on the California

23      economy is likely to exceed $15-billion.  The Commission must consider this negative

7

REDACTED

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    economic impact in the context of the Applicants' minimal promises of California economic

2    benefits.

3

4    Q.   What options are available to the Commission in the event that it cannot make one or more

5         of these factual determinations based upon the merger application as presented by the Joint

6         Applicants?

7

8    A.   Generally, where the Commission cannot find that the proposed merger will affirmatively

9         satisfy one or more of the requirements of §854(b), it can either

10

11        •    Decline to approve the merger; or

12

13        •    Propose one or more specific mitigation measures that, if accepted by the Joint

14             Applicants, would fully satisfy all of the §854(b) requirements.

15

16   Q.   Has the second alternative of proposing one or more mitigation measures been used by the

17        Commission in any previous public utility mergers in California?

18

19   A.   Yes, on numerous occasions.   In approving the merger of Citizens and GTE, the

20        Commission imposed 44 separate (some multipart) conditions.[1]   The Commission also

---

1.  *In the Matter of the Joint Application of Citizens Telecommunications Company of California, Inc. (U-1024-C) and GTE California Incorporated  (U-1002-C) for Authority and Approval Under Pub. Util. Code Sections 851 and 854*, Decision No. 01-06-007, 210 P.U.R.4th

(continued...)

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1      imposed conditions in connection with both the SBC/PacTel[2] and BA/GTE mergers.[3]  These

2      conditions pertain to a broad range of concerns, including, but not limited to, affiliate

3      transactions, financial stability, and service quality.  These conditions are separate from, and

4      in addition to, the required sharing of benefits with ratepayers pursuant to §854(b)(2).

5

6      **The merger must provide short-term and long-term economic benefits to ratepayers**

7

8      Q.   Dr.  Selwyn, PU Code §854(b)(1) requires that the Commission find that the proposed

9           transaction "provides short-term and long-term economic benefits to ratepayers."  What

10          categories of "economic benefits" should the Commission be considering as satisfying this

11          requirement?

12

13     A.   I would note, as a threshold matter, that the statute specifies that the short-term and long-

14          term benefits arising from the merger be provided *to ratepayers*.  Thus, benefits from the

15          transaction inuring to SBC, AT&T, to their shareholders or to their affiliates, *do not qualify*

---

1.  (...continued)
189, 211-226 (Appendix B) (2001).

2.  *Re Pacific Telesis Group, Joint applicant: SBC Communications, Inc.*, Decision No. 97-03-067, 1997 Cal.PUC LEXIS 629, [*162], [*185-*187].

3.  *In the Matter of the Joint Application of GTE Corporation ("GTE") and Bell Atlantic Corporation ("Bell Atlantic") to Transfer Control of GTE's California Utility Subsidiaries to Bell Atlantic*, Decision No. 00-03-021, 2000 Cal. PUC LEXIS 211, 233 ("The proposed merger, with the adopted conditions, is in the public interest"), 268-274.

**REDACTED**

ETI  ECONOMICS AND
     TECHNOLOGY, INC.

1    as §854(b)(1) benefits to ratepayers except to the extent that the Commission determines that

2    a portion of such gains are to be shared with ratepayers, as required by §854(b)(2).

3

4  Q.  What types of "benefits" of the proposed merger might *not* accrue to ratepayers?

5

6  A.  There are several categories of "benefits" arising from the proposed merger that would not

7    qualify as §854(b)(1) benefits; indeed, there are categories of "benefits" that inure to the

8    Joint Applicants and their shareholders but that confer real and serious *harms* to ratepayers,

9    to employees, and to the California economy.

10

11    Obviously, synergy gains inuring to SBC ILECs other than SBC California, or to AT&T's

12    operations outside of California, would not qualify as §854(b)(1) benefits to *ratepayers*, as

13    well as those to be realized by other SBC or AT&T affiliates not subject to the CPUC's

14    ratemaking authority, such as Cingular.  With respect to those "benefits" arising within

15    California and where the Commission has ratemaking authority, ratepayers would realize

16    some portion of such benefits only

17

18    (a)  where the post-merger entity is specifically required (by order of the Commission) to

19        flow such benefits through to ratepayers in the form of rate reductions that might not

20        otherwise have taken place; or

21

22    (b)  where the post-merger SBC/AT&T entity is compelled by competitive marketplace

23        forces to make downward adjustments in its prices (for services for which the

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    Commission has ratemaking authority) to reflect cost decreases or other efficiency gains

2    arising from the merger.

3

4    So, for example, if the merger were to result in an increase in economies of scale for the

5    merged entity relative to that available to each company on a stand-alone basis, or were to

6    reduce the prices of capital equipment purchased by the merged entity relative to the supplier

7    prices that would available to SBC or AT&T standing alone, such gains would qualify as

8    § 854(b)(1) merger benefits if and only if some portion of those gains were flowed through

9    to *ratepayers* in some identifiable manner.  If the cost decreases or other efficiency gains are

10   retained by the merged entity, or are flowed to activities over which the Commission does

11   not have ratemaking authority (e.g., in other states or to affiliates that do not offer services to

12   "ratepayers" in California), no § 854(b)(1) benefits will have been produced by the merger.

13   In fact, it is entirely possible for SBC and AT&T to derive a net positive benefit from a

14   merger (e.g., higher revenues resulting from increased market power) that produces

15   decidedly *negative* impacts (e.g., higher rates) for ratepayers.  I discuss this in more detail

16   below.

17

18   Q.  When assessing the economic benefits to ratepayers, does it make sense to look only at the

19       upside impact of the merger for ratepayers and not the downside?

20

21   A.  Absolutely not.  As I discuss at length beginning at pages 21-55 and 64-69, the merger will

22       likely also produce economic harm to ratepayers in several important respects.  Those

23       "negative benefits" must be considered and offset against potential positive benefits in

11

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                LEE L.  SELWYN

1    making the required §854(b)(1) finding.   Moreover, forecasts of positive economic benefits

2    of the merger, such as those sponsored by the Joint Applicants, must be offset by a valid

3    economic assessment of the potential risks to both the merging parties and to California

4    ratepayers arising from the transaction.

5

**6    California Ratepayers are to receive "not less than 50 percent" of the total short-term and**
**7    long-term forecasted economic benefits of the proposed merger where the Commission has**
**8    ratemaking authority.**
9

10   Q.   § 854(b)(2) requires that prior to approving the merger, the Commission must find that the

11       proposed transaction "equitably allocates, where the Commission has ratemaking authority,

12       the total short-term and long-term forecasted economic benefits ... of the proposed merger,

13       acquisition or control, between shareholders and ratepayers.  Ratepayers shall receive not

14       less than 50 percent of those benefits."  Are the "economic benefits" referred to at

15       § 854(b)(2) the same as those mentioned at §854(b)(1)?

16

17   A.   Clearly, the "economic benefits to ratepayers" referred to at §854(b)(1) are not independent

18       of the "economic benefits to ratepayers" referred to at §854(b)(2) – the sole distinction being

19       that § 854(b)(2) limits the specific measurement of "not less than 50 percent" to the

20       economic benefits arising from those portions of the merged entity's activities "where the

21       Commission has ratemaking authority."

22

23   Q.   What are "short-term" vs. "long-term" economic benefits, as these terms are used in the

24       legislation?

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   A.  Generally, economists understand "short-term" to refer to a time period in which significant

2       portions of a firm's costs are fixed, whereas in the "long-term" all costs are presumed to be

3       variable.  Another way of distinguishing "short-term" from "long-term" in the context of a

4       merger is to think of "short-term" as referring to the transition period during which the

5       combined company is being reorganized and restructured so as to *implement* the merger,

6       activities that often entail considerable cost, whereas "long-term" would refer to the period

7       following the completion of these "merger implementation" efforts, when the *permanent*

8       synergy and other efficiency gains can be fully realized.  In past merger decisions, the CPUC

9       has attempted to distinguish between these two time frames on the basis of current vs.

10      anticipated future industry or market conditions.  For example, in the SBC/Telesis merger,

11      the Commission accepted the companies' argument that "long-term" referred to a time when

12      there would be sufficient competition in the California telecommunications marketplace

13      such that competitive marketplace forces would assure that the specific efficiency gains

14      arising from the merger would be provided to ratepayers.[4]  In the Bell Atlantic/GTE merger,

15      the companies offered a similar rationale based upon competition, and distinguished

16      between the two time frames by arguing that "short-term" meant two to three years, and that

17      "long-term" meant four years.[5]  Beyond four years was beyond long-term.

18

---

4.  *Re Pacific Telesis Group; Additional Applicants: SBC Communications Inc.; Pacific Bell,*  Application No. 96-40-038, *Decision No. 97-03-067,* 71 CPUC 2d 351, at 374-375 ("*SBC/Pacific Telesis Merger Order*").

5.  A.98-12-005, Bell Atlantic/GTE Merger Application, Supporting Report, Chapter 7, at 6.

REDACTED

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                      LEE L.  SELWYN

1    The correct view of "long-term" and of the "long-term economic benefits" must be that

2    which the Joint Applicants have themselves adopted for purposes of their own due diligence

3    and projections of merger-driven synergies.  These projections have been widely publicized

4    in Applicant's press conferences, SEC filings, and analyst briefings on the Merger, venues in

5    which SBC and/or AT&T, and their officers and directors personally, could face severe

6    punishment for knowingly making false statements.  A reasonable interpretation of "short-

7    term" for this purpose would be the period of time required to fully implement the merger

8    itself, which the Applicants here have identified as approximately three years.[6]  The statutory

9    requirement that ratepayers receive both short-term and long-term economic benefits implies

10   that (a) during the immediate post-closing implementation period, the net benefits to

11   ratepayers must exceed the up-front implementation costs, and (b) that for the long-term

12   ratepayers receive not less than 50 percent of the economic benefits for those aspects of the

13   post-merger SBC's activities that fall within the Commission's ratemaking authority.

14

15   Q.  But what if the competitive marketplace is capable of assuring that the ratepayer allocation

16       of long-term merger benefits will flow to ratepayers – is it still necessary for the Commis-

17       sion to view the long-term as extending indefinitely?

18

19   A.  Yes.  The Commission first needs to identify the total short-term and long-term economic

20       benefits of the merger that fall within the Commission's ratemaking authority.  It would then

_____

6.  SBC Response to TURN 1-8, SBC/AT&T - EYES ONLY Bates No. 0232. <<BEGIN
SBC/AT&T PROPRIETARY                                                       
                                                                 END SBC/AT&T
PROPRIETARY>>

14

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    need to formulate a process to assure that the statutory requirement that "not less than 50

2    percent" of those benefits are allocated to ratepayers will be satisfied, either through explicit

3    credits or through some other means.  If the Commission expects, as it has in the past, that

4    competitive marketplace forces will be sufficient to assure flow-through to ratepayers, it

5    nevertheless needs to establish a self-executing fall-back position to assure such flow-

6    through in the event that the expected competition fails to develop.

7

8    Q.  Is it reasonable for the Commission, at this time and at this stage of the development of

9       competition in the California telecommunications market, to assume that competitive

10      marketplace forces will assure that the requirements of § 854(b)(2) are satisfied?

11

12    A.  No.  The one consistent *fact* characteristic of the post-TA96 telecommunications industry is

13      that virtually none of the optimistic expectations as to the development of competition have

14      been fulfilled.  CLCs have gone bankrupt or otherwise exited the market in droves; billions

15      of dollars invested in new telecommunications ventures over the past decade have been lost;

16      and there is very little capital available to finance new telecom ventures going forward.

17      Indeed, this merger, together with the concurrent proposed merger of Verizon and MCI,

18      essentially brings to a close the nation's experiment with a competitive telecommunications

19      marketplace.  With SBC about to absorb its largest competitor and with Verizon about to

20      swallow up its second-largest rival, and given the demonstrated unwillingness of SBC and

21      Verizon to compete with each other, there is simply no realistic basis for the Commission to

22      expect – or, more importantly, for it to *assume* – that competitive marketplace forces will

23      assure that the explicit statutory requirement of § 854(b)(2) is satisfied.

15

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   Q.   Are there any potential "benefits to ratepayers" that would fall within the scope of

2        § 854(b)(1) where the Commission does *not* have ratemaking authority?

3

4   A.   Yes.  Benefits relating to *interstate* services furnished to SBC and AT&T California

5        ratepayers may be considered with respect to § 854(b)(1) even though they fall outside of the

6        scope of § 854(b)(2).  However, benefits inuring to the merged entity outside of California,

7        or to its shareholders or nonregulated affiliates, are not "benefits to ratepayers" and thus

8        cannot be included within either the § 854(b)(1) or § 854(b)(2) analysis.

9

10 **The "economic benefits" justifying the merger referred to at §854(b)(1) and the "economic**
11 **benefits" that must be shared with ratepayers referred to at §854(b)(2) are, in virtually all**
12 **respects, the same, and as such the Commission should adopt a consistent basis for**
13 **assessing §854(b)(1) and §854(b)(2) "economic benefits to ratepayers."**
14

15   Q.   Do you understand §854(b)(1) and §854(b)(2) to be referring to the same "total short-term

16        and long-term economic benefits to ratepayers"?

17

18   A.   Yes, except that the "allocation" requirements of such benefits at §854(b)(2) is limited to

19        those aspects of the combined company's operations "where the Commission has

20        ratemaking authority."  Thus, not less than 50 percent of whatever "short-term and long-term

21        economic benefits to ratepayers" that the Joint Applicants proffer as satisfying §854(b)(1)

22        must be allocated to ratepayers in those cases where the Commission has ratemaking

23        authority – i.e., with respect to *intrastate* wireline telecommunications services.

24

16

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                   LEE L.  SELWYN

1    Q.   Do the Joint Applicants appear to be treating the "economic benefits" applicable to those

2         two PU Code sections as referring to the same types of benefits?

3

4    A.   No.  In fact, the Joint Applicants present an extremely expansive, albeit largely unquantified,

5         assessment of §854(b)(1) "economic benefits" while simultaneously adopting an

6         extraordinarily narrow view of what qualifies as a "short-term and long-term economic

7         benefit" subject to § 854(b)(2).

8

9         In their initial and supplemental Applications and accompanying declarations, the Joint

10        Applicants attempt to portray a litany of fundamentally "soft" benefits, things like improved

11        service quality,[7] increased innovation, and claims that following the merger SBC will gain

12        the ability to compete out-of-region for enterprise customers, thereby contributing to a more

13        competitive telecommunications marketplace overall.

14

15   Q.   Why do you characterize these as "soft" benefits?

16

17   A.   Several reasons.  First, they are highly general in nature, and are certainly not linked

18        specifically to any identified or identifiable current deficiency in either SBC or AT&T.  For

19        example, the Joint Applicants claim that the merger will produce "improved service

---

7.  The Reply Testimony of Dale Piiru on behalf of ORA details the effect of the proposed
merger on service quality.

17

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                     LEE L.  SELWYN

1    quality."[8]  That improvement would constitute an "economic benefit" for California

2    ratepayers only to the extent that the *existing* service quality for services furnished by SBC

3    or AT&T in California today is less than satisfactory.  The Joint Applicants have not

4    contended that existing service quality is in any way unsatisfactory – certainly not

5    specifically with respect to services subject to the Commission's ratemaking authority – nor

6    have they provided any *specific* details as to how the merger will improve service quality *in*

7    *California* for *California ratepayers*.  Indeed, the Joint Applicants have offered no specific

8    quantification of the short-term and long-term economic benefits of the claimed service

9    quality improvements that they seek to ascribe to the proposed merger.

10

11   Similarly, as I discuss in more detail below, the Joint Applicants claim that the merger will

12   result in increased innovation,[9] but make no attempt to associate any specific and tangible

13   "economic benefit" with this claim.

14

15   Q.  Can the two different ways in which the Joint Applicants treat "economic benefits" be

16   reconciled?

17

18   A.  No.  The Joint Applicants treat the concept of "economic benefits" very expansively for

19   purposes of §854(b)(1) and very restrictively for purposes of §854(b)(2), when, plainly,

20   these two sections share a common definitional framework.  If the benefits are as limited as

---

8.  Joint Supplemental Application of SBC Communications, Inc. And AT&T Corp., Exhibit 3, Declaration of Christopher Rice ("*Rice Declaration*"), March 30, 2005, at para. 34.

9.  *Id.*

18

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                        LEE L.  SELWYN

1    the Joint Applicants contend under §854(b)(2), then there is no basis to approve the merger;

2    if the economic benefits are as broad as the Joint Applicants contend under §854(b)(1), then

3    they must be made to quantify each and every one of the "soft" benefits they claim in

4    support of the merger and to flow 50% of those benefits through to ratepayers.

5

6    **§854(b)(3) requires the Commission to find that the merger will "not adversely affect**
7    **competition," but in fact the merger will significantly increase SBC's market power and**
8    **market concentration overall, and will result in decidedly less competition in the California**
9    **telecommunications market.**
10

11   Q.  Dr. Selwyn, § 854(b)(3) requires the Commission to find that the proposed merger will

12       "[n]ot adversely affect competition" in the California telecommunications market.  What

13       type of analysis should the Commission pursue in addressing that concern?

14

15   A.  There are several specific means by which the merger may affect competition in the

16       California telecommunications market.  These can be summarized as follows:

17

18       •   Where SBC and AT&T compete with one another in the same relevant product market,

19           the merger would eliminate the competition between the two firms and in so doing

20           increase market concentration overall.  These "horizontal" effects would diminish

21           competition if the combination of the two firms produced a significant increase in

22           market power overall.  The US Department of Justice/Federal Trade Commission

23           *Horizontal Merger Guidelines* address this concern at §§ 1.1 through 1.5, and provide

24           specific tests to determine whether the net increase in market concentration arising from

25           the merger could enable the combined entity to implement a "small but significant and

REDACTED

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1      nontransitory" increase in price without losing so much demand as to make the price

2      increase unprofitable.[10]

3

4    •   Where the merger creates the potential – or an increased potential – for the combined

5       company to leverage its market power in one industry segment to monopolize an

6       adjacent but otherwise competitive segment.

7

8    •   Where *vertical integration* eliminates competing providers of wholesale services while

9       at the same time creating or expanding the potential for the combined firm to engage in

10      price squeezes vis-a-vis rival but non-vertically integrated providers.

11

12    The analysis of competitive impacts must thus address both *horizontal* and *vertical* effects

13    and, in fact, the proposed merger will almost certainly result in decreased competition across

14    a broad range of industry segments.   I address these impacts in detail beginning at page 70

15    of this testimony.

---

10.  U.S. Department of Justice and the Federal Trade Commission, *Horizontal Merger Guidelines*, ("*Horizontal Merger Guidelines*') available at: http://www.usdoj.gov/atr/public/guidelines/horiz_book/hmg1.html (accessed June 21, 2005).

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

1       THE FALLACY OF JOINT APPLICANTS' MERGER BENEFIT CLAIMS

2

3  **Virtually all of the "benefits" identified by the Joint Applicants will inure to the post-**
4  **merger SBC and its shareholders, and the *de minimis* share to be allocated to California**
5  **ratepayers will not be sufficient to offset the substantial risks and harms that will inevitably**
6  **arise from the proposed transaction.**

7

8  Q.  In the prior section, you suggested that benefits inuring to the Joint Applicants could not  be

9      assumed to translate into economic benefits for ratepayers and that, in fact, ratepayers might

10     be harmed by this merger; how might this happen?

11

12  A.  AT&T is SBC's single largest competitor for mass market local and long distance services

13     in California.  AT&T provides retail local exchange services to some <<BEGIN SBC/AT&T

14     PROPRIETARY            END SBC/AT&T PROPRIETARY>> residential basic customers

15     in SBC's California operating territory,[11] representing approximately <<BEGIN SBC/AT&T

16     PROPRIETARY        END SBC/AT&T PROPRIETARY>> of all CLC mass market

17     customers in the state.[12]  AT&T also provides (interLATA) long distance service to some

18        <<BEGIN SBC/AT&T PROPRIETARY              END SBC/AT&T

---

11.   AT&T Amended and Supplemental Response to TURN 1-1a.

12.  According to the FCC's December 2004 Local Competition Report (FCC Industry Analysis and Technology Division, *Local Telephone Competition: Status as of June 30, 2004*, Rel. December 2004, ("*Local Competition Report*"), at Table 8) California has 3,723,815 CLC end user lines.  Table 11 indicates that 70% of CLC's end under lines in California are provided to residential customers.  I have estimated, therefore, that there are 2,606,671 CLC residential access lines in California.

21

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    PROPRIETARY>> California residential subscribers,[13] and even competes with SBC for

2    *intraLATA* toll service, with some <<BEGIN SBC/AT&T PROPRIETARY ▒▒▒▒ END

3    SBC/AT&T PROPRIETARY>> residential customers choosing AT&T for their intraLATA

4    PIC.[14]  The merger will eliminate AT&T as a separate entity, and in so doing eliminate the

5    competition that presently exists between SBC and AT&T.  SBC's estimated share of the

6    retail local residential market within its operating territory would immediately jump from

7    <<BEGIN SBC/AT&T PROPRIETARY ▒▒▒▒ END AT&T/SBC PROPRIETARY>> to

8    <<BEGIN AT&T/SBC PROPRIETARY ▒▒▒▒ END SBC/AT&T PROPRIETARY>>.[15]  If,

9    as a result of that dramatic increase in market concentration, the post-merger SBC is able to

10   implement a significant and non-transitory increase in rates without losing so much business

11   as to make the rate increase unprofitable – the specific standard established in the US

12   Department of Justice/Federal Trade Commission *Horizontal Merger Guidelines*[16] – that

13   action would obviously produce a net benefit to the post-merger SBC in the form of

14   increased profits, but would clearly create a decidedly *negative* result for those ratepayers

15   who would be subjected to the price increase.

16

17

---

13.  AT&T Amended and Supplemental Response to TURN 1-1j.

14.  AT&T Amended and Supplemental Response to TURN 1-1i.

15.  SBC Response to TURN 1-4, "000329-000401 CONFIDENTIAL Consumer Market Share - Feb 2005.xls," Consumer Analytics & Research Customer and Product Share Report - Consumer (February 2005), sheet "Local-DA," Column L).

16.  *Horizontal Merger Guidelines.*

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   **The merger will likely produce other economic harms to ratepayers, and those "negative**
2   **benefits" must be considered and offset against potential positive benefits in making the**
3   **required § 854(b)(1) finding.**
4

5   Q.   Aside from the negative impacts on competition, how else might the merger result in

6        economic harm ("negative benefits") for ratepayers?

7

8   A.   The merger could lead to an overall increase in the rates consumers pay for services subject

9        to the Commission's ratemaking authority, even if in aggregate the merger produces positive

10       economic benefits to the two merging companies.  For example, following its acquisition of

11       Pacific Telesis Group, SBC began imposing an annual "royalty fee" on Pacific Bell (SBC

12       California) for SBC California's use of SBC trademarks.  In 2003, that royalty fee amounted

13       to $367-million.[17]  Were SBC to impose a similar type of fee upon AT&T's operations in

14       California, the costs booked to AT&T's California operations might well increase by more

15       than any "synergy" gain resulting from the merger, the net effect of which could materialize

16       in the form of higher rates for California ratepayers.

17

18       Also, if as the result of its acquisition of AT&T, SBC experienced a downgrade of its credit

19       rating, this would increase the cost of capital for SBC and its BOC ILEC subsidiaries, which

20       could well have a short- and long-term adverse economic impact on California ratepayers.

21

---

17.  *Report on the Results of Operations of Pacific Bell*, 2003, at Section C, 1.

23

REDACTED

ETI  ECONOMICS AND
      TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    Q.   Is this something that the Joint Applicants have anticipated?

2

3    A.   Apparently they have, as I discuss in detail later, SBC identified several "probable credit

4         impacts" that would result following its acquisition of AT&T.[18]  These projections are

5         contrary to the impression left by Mr. Horton in his Declaration dated February 21, 2005.

6         Mr. Horton stated,

7

8             the increased scale and diversification of the company should lower cost of
9             capital for AT&T... the scale of the combined firm, and its reduced capital
10            costs, will mean that the combined entity will be better equipped to make
11            network investments and to roll out innovative new services.[19]
12

13        Although Mr. Horton's statement regarding cost of capital is probably correct with respect to

14        AT&T, it does not and cannot be applied to the *combined firm*.

15

16   Q.   How might this adversely impact California ratepayers with respect to services subject to the

17        Commission's ratemaking authority?

18

19   A.   If the downgrading of SBC debt raised SBC's overall cost of capital, it could also affect

20        SBC California's cost of capital which, in turn, may ultimately translate into an increase in

21        SBC California rates.  For example, SBC California's intrastate rate base is currently

---

18.  See pages 46-48, *infra*.

19.  Joint Supplemental Application of SBC Communications, Inc. And AT&T Corp.,
Exhibit 2, Declaration of Thomas Horton ("*Horton Declaration*"), March 30, 2005, at paras. 15-
16.

24

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    approximately $7.89-billion.[20]  An increase of just 10 basis points in its overall cost of

2    capital would translate into a $7.89-million annual cost increase, which would exceed the

3    annual "California synergy" that the Joint Applicants have attributed to the merger.

4

5    **The Joint Applicants' contention that the merger will promote innovation and R&D, and**
6    **that these improvements will be more rapidly flowed through to ratepayers, cannot be**
7    **squared with the overall increase in market concentration that will result if the two**
8    **companies are allowed to combine.**
9

10   Q.  Are the Joint Applicants' claims with respect to increased innovation even credible?

11

12   A.  Hardly.  First, the claims being advanced in this area are extremely general and unspecific.

13       Basically, the Joint Applicants claim that their increased scale of operations will support

14       additional research and development ("R&D") spending, and that the results of such

15       expanded R&D would be made available to a more expansive market (particularly to smaller

16       businesses) by virtue of AT&T Labs' technology being made available to SBC.

17

18   Q.  Do these claims have merit?

19

20   A.  No, *because competition, and not scale of operations, is a far more potent driver of*

21       *innovation*.  Moreover, the time interval between basic R&D and the introduction of

22       products and services based upon into the marketplace will be significantly shorter where the

---

20.  *Report on the Results of Operations of Pacific Bell*, Year 2003, Chapter 15, page 15-4
("*Pacific Bell Intrastate Operating Report*").

25

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    firm confronts competition (which is presumably also engaged in similar R&D efforts) than

2    where the firm faces few or no rivals, in which case its incentives to bring new products to

3    market are significantly diminished.  Indeed, the very notion that merging two firms that

4    currently compete on a broad scale will *increase* their incentives to innovate and introduce

5    new services is highly counterintuitive.  There is an extensive amount of academic literature

6    addressing this very subject, and the persistent and overwhelming conclusion is the same –

7    competition drives innovation.[21]

8

9    Q.   Is there any specific, identifiable correlation between innovation and competition?

10

11   A.   Yes.  Certainly this rather obvious relationship has been demonstrated any number of times

12        right here in California.  The first serious personal computer – the Apple II – was created by

13        a couple of entrepreneurs in a garage in Cupertino.  Responding to this potential competitive

14        challenge to its (then-dominant) position in the computer industry, IBM entered the PC

15        market a few years later, but even its size and incumbency were no match for numerous

16        other start-ups that adopted the IBM PC architecture, soon making IBM a minor player in

17        the PC field.  Most of the major Internet-related innovations came from small start-up

18        ventures – many of which were also located in California – certainly not from large,

19        established firms.  Countless examples of such innovations can be cited – things like routers,

20        browsers, streaming audio and video, search engines, and the engines supporting electronic

---

21. *See, e.g.,* Wendy Carlin, *et al., A Minimum of Rivalry: Evidence from Transition Economies on the Importance of Competition for Innovation and Growth*, Contributions to Economic Analysis & Policy, Vol. 3, Number 1, 2004, Article 17.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    commerce.  Many of these innovations were ultimately adopted by the larger incumbents,

2    either via acquisition of the start-up firm or through imitation of the start-up's technology.

3    For example, the first major Internet browser, Netscape, was created by a start-up firm in

4    Ann Arbor, Michigan.  Microsoft then developed its own browser, Internet Explorer,

5    replicating most of the features of Netscape.  Lotus Development Corporation, a Cambridge,

6    Massachusetts start-up, introduced the first spreadsheet software for IBM PC computers,

7    Lotus 1-2-3.  Microsoft then imitated the Lotus product with its Excel spreadsheet software,

8    and IBM entered the spreadsheet software market by acquiring Lotus.

9

10   The telecommunications industry is similarly replete with examples of innovations

11   emanating from start-ups rather than from incumbents.  AT&T, for example, did not replace

12   its coaxial cable and microwave long lines network with digital fiber optic technology until

13   it was forced to do so by competing IXCs, such as Sprint (over whose network one could

14   hear a "pin drop").  ILECs generally did not deploy ADSL in the consumer market until

15   forced to do so by cable television providers' introduction of cable modem Internet access.

16   In fact, ILECs were generally slow to expand their local networks to accommodate large-

17   scale dial-up Internet access, ceding much of the market for ISP-bound dial-up traffic to

18   CLCs.  Indeed, even today, ILECs generally do not offer DSL services *except in connection*

19   *with Internet access* – for example, as substitutes for DS-1 or higher bandwidth data circuits

20   furnished to enterprise customers[22] – since the lower-priced DSL would effectively

---

22.  *See*, Federal Communications Commission, *Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services*, CC Docket No. 01-337, *Comments of the Ad Hoc Telecommunications Committee*, March 1, 2002, at 23-28.

27

**REDACTED**                                ECONOMICS AND
                                            TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1      cannibalize these other services and result in lower ILEC revenues overall.  Most recently,

2      VoIP services were introduced by start-ups such as Vonage and Packet8, only to be

3      subsequently adopted by SBC, AT&T, Comcast, and other large telecommunications and

4      cable providers.

5

6   Q.   You're not suggesting, are you, that AT&T should be viewed as a "start-up" firm that SBC

7      wants to acquire in order to gain access to its technology?

8

9   A.   No, of course not.  My point is that it does not follow that joining AT&T's and SBC's R&D

10      efforts will *necessarily* lead to increased innovation or, even if it did, to a more rapid

11      deployment of those developments into the end-user market.  SBC has referred to AT&T

12      Labs as the "crown jewel of telecom."[23]  Inasmuch as SBC is some five times the size of

13      AT&T (in terms of market capitalization),[24] the fact that the much smaller AT&T has

14      somehow been more innovative than the much larger SBC is itself a compelling

15      demonstration that SBC's *scale* has not been as effective a driver for R&D progress as has

16      AT&T's need to remain on the cutting edge in order to be competitive with SBC and its

17      sister RBOCs.

18

_____

23.  SBC/AT&T Special Analyst Meeting, February 1, 2005 ("*Special Analyst Meeting*"), at
slide 11, available at,
http://phx.corporate-ir.net/phoenix.zhtml?c=113088&p=irol-eventdetails&EventId=1009715
(accessed June 22, 2005).

24.  SBC's market capitalization (as of June 21, 2005) was $79-billion.  AT&T's market
capitalization as of the same date was $15.4-billion.

ECONOMICS AND
TECHNOLOGY, INC.

REDACTED

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1   Q.  But don't the Joint Applicants claim that they will be able to devote more resources – spend

2       more money – on research and development, and benefit from economies of scale in

3       research and development, following the merger?

4

5   A.  Yes.  That is their contention.  AT&T declarant Dr. Eslambolchi makes such an argument.

6       However, what drives innovation is creativity and necessity; massive corporations are

7       frequently slow to innovate because whatever gains they may achieve through large-scale

8       R&D efforts are often frustrated by organizational and institutional inertia typical of many

9       large corporations.  It's no surprise that some of the most important inventions of the 19th

10      and 20th centuries – the telephone, the electric light bulb, the airplane, and more recently,

11      the personal computer and some of the most important application layer developments on

12      the Internet (e.g., online auctions, online shopping, search engines, job-matching, streaming

13      audio and video, classified advertising services) came from small start-up firms and *not* from

14      the established incumbents in corresponding pre-Internet businesses (such as auction houses

15      like Sotheby's, department stores and catalog shopping firms like Sears,[25] bookstores like

16      Barnes & Noble, newspapers, and radio and TV broadcasters and networks).  These larger

---

25.  Significantly, Sears was an early entrant into the pre-Internet online service field with Prodigy, which began as a joint venture of Sears and IBM.  Despite its two powerful parents, Prodigy's technology and customer base was rapidly marginalized by start-ups such as America Online and by the Internet.  Sears and IBM dumped the company in 1996, and several years later, in 2001, it was purchased by SBC, but SBC no longer even uses the Prodigy brand name for its Internet services, and in fact does not appear to even offer high-speed (DSL-based) Internet service (now under the SBC Yahoo!  brand name) outside of its 13-state footprint.  *See* http://www.sbc.com/gen/general?pid=1080&cdvn=localize&prod-snip=dsl_res_order (accessed June 26, 2005).

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    firms ultimately jumped onto the Internet bandwagon, but were certainly *not* the initial

2    innovators.

3

4    As competitors across a broad range of services, SBC and AT&T confront strong incentives

5    to develop new products and to bring them to market quickly – AT&T moreso than SBC.

6    Once that rivalry is eliminated, those incentives will likewise diminish.  Hence, claims that

7    the merger will promote innovation are, at best, highly speculative, and are more likely,

8    simply wrong.

9

10   Finally, *ratepayers* derive benefit from product development and innovation only to the

11   extent that such new products and services are actually brought to market.  Any number of

12   studies have shown that firms that confront significant levels of competition are able to bring

13   new products/services to market far more quickly than firms with no or little competition.[26]

14

15   Q.  What specific claims do the Joint Applicants advance with respect to their ability to

16       introduce new services to mass market customers?

17

18   A.  The Joint Applicants provide testimony by Dr. Eslambolchi, who avers that "[i]n the absence

19       of this transaction, AT&T Labs' research and development efforts would continue to be

20       devoted largely to developing capabilities designed for services provided to large enterprise

---

26.  *See, e.g.,* Jeffrey B. Schmidt, *New Product Myopia*, Journal of Business and Industrial Marketing, Vol. 10, Number 1, 1995, at 31; B.J. Zirger and Janet L. Hartley, *The Effect of Acceleration Techniques on Product Development Times*, Transactions on Engineering Management, Vol. 43, Number 2, 1996.

30

ECONOMICS AND
TECHNOLOGY, INC.

REDACTED

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1     customers ... because AT&T has ceased actively marketing traditional local and long

2     distance services to small business and residential customers."[27]  He contends that "[t]he

3     combined entity would have the incentive to undertake the additional work necessary to take

4     the advancements AT&T has made, and will continue to make, with respect to enterprise

5     services and apply them to mass market offerings because of greater economies of scale and

6     the ability to cost-effectively market them."[28]

7

8     Significantly, the Joint Applicants do not offer the testimony of any *SBC* R&D or

9     technology executive to confirm Dr. Eslambolchi's speculations as to what the combined

10    company might or might not do with the AT&T technology that AT&T somehow did not

11    do, or was not able to do, on its own.  Assuming that there is actually mass market customer

12    demand for direct access to the various capabilities that he has identified,[29] one is led to

---

27.  Joint Application of SBC Communications, Inc. And AT&T Corp., Exhibit 3, Declaration of Hossein Eslambolchi ("*Eslambolchi Declaration*"), filed February 28, 2005, at para. 7.

28.  *Id.*, at para.  8.  Note that Dr. Eslambolchi does *not* state that AT&T Labs had actually been applying its R&D efforts to support mass market services prior to AT&T's decision to "cease[] actively marketing traditional local and long distance services to small business and residential customers."

29.  At least some of the enterprise-oriented services identified by Dr. Eslambolchi already benefit mass market customers through their adoption by the enterprise customers themselves. For example, he explains that IP-based Video innovations "include diagnostic tools that allow network operators to fine-tune their video delivery capabilities to produce higher quality and far more efficient transmission."  Eslambolchi declaration, at para. 10.  Mass market customers could well benefit from the improved IP-video content being offered to them by those "network operators" that are able to take advantage of these AT&T Labs capabilities, but it is unlikely that any mass market or small business customers will be purchasing these capabilities themselves

(continued...)

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    wonder as to why SBC, which serves more than 23-million mass market residential

2    customers across thirteen states,[30] has not itself pursued R&D in these same areas –

3    assuming of course that it has not, which is certainly the implication of Dr. Eslambolchi's

4    testimony.  One explanation for SBC's lack of interest in such development up to now

5    (assuming of course that SBC has not itself been pursuing these same R&D areas) may well

6    be the utter lack of competition for mass market services that SBC actually confronts.  After

7    swallowing up its largest mass market rival, SBC will confront *even less* mass market

8    competition, and would thus have *even less* interest in pursuing Dr. Eslambolchi's vision of

9    consumer focused innovation.[31]  Dr. Eslambolchi's testimony also begs the question as to

10   why AT&T, which up until last July had been investing billions of dollars to pursue mass

11   market customers, did not avail itself of the very same AT&T Labs' developments that Dr.

12   Eslambolchi now expects SBC to adopt and implement.  Clearly, none of Dr. Eslambolchi's

---

29.  (...continued)
directly from AT&T or from the post-merger SBC.

30.  FCC Report 43-08, the ARMIS Operating Data Report, Table III. Access Lines in Service by Customer, SBC Communications, 2004, residential Switched Access Lines– Lifeline and Residential Switched Access Lines – Non-Lifeline – Primary.

31.  I would call the Commission's attention to the proposed severance payments (so-called "golden parachutes") being earmarked for AT&T senior executives whose jobs are eliminated in the merger.  These are discussed in more detail in the Reply Testimony of Karin Hieta.  Dr. Eslambolchi is specifically included among these executives, and is to receive a severance package worth $4-million in the event that he leaves the post-merger SBC.  See, "Faces in the News," *Forbes.com*, March 14, 2005, available at http://www.forbes.com/facesinthenews/ 2005/03/14/0314autofacescan05.html (accessed June 21, 2005).  One would certainly expect that if SBC really considered the kind of R&D synergies being described by Dr. Eslambolchi to be important going forward, it would be looking for ways to assure his continued employment with the company, and not be providing him with such a generous exit incentive.

32

REDACTED

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    speculations come even remotely close to qualifying as § 854(b)(1) "economic benefits to

2    ratepayers."

3

4    **The merger is not likely to produce the increased out-of-region competition predicted by**
5    **the Joint Applicants, and it could result in decidedly less competition if post-merger SBC**
6    **and post-merger Verizon continue to follow their two-decades-long pattern of tacit**
7    **geographic market allocation.**

8

9    Q.   Another "benefit" being claimed by the Joint Applicants – and particularly by SBC – is the

10        combined firm's increased ability to compete more effectively in the *out-of-region* enterprise

11        market.  Does that qualify as a §854(b)(1) "economic benefit to ratepayers" in California?

12

13   A.   No, decidedly not.  As I will discuss at greater length below, it is not at all clear that the

14        merger will actually enhance SBC's ability to compete out-of-region rather than simply

15        transfer AT&T's existing enterprise customers over to SBC, in which event the merger will

16        result in *less competition overall*, not more.  In any event, even if the merger were to create

17        increased opportunities for the *combined firm* to compete outside of SBC's 13-state region –

18        opportunities that do not exist *for either SBC or AT&T today* – there is no obvious linkage

19        between SBC's ability to attract additional enterprise business outside of its thirteen-state

20        footprint (which also means outside of California) and any "short-term and long-term

21        economic benefit" to *California* ratepayers.[32]  And if the basis for these improved oppor

---

32.  Some might argue that if SBC does compete out-of-region and is able to increase the
size of its customer base overall, California ratepayers would benefit from the resulting scale
efficiencies.  Given SBC's current size, it's difficult to see how an incremental increase in the
number of customers would materially change the overall scale of its operations or reduce its

                                                                        (continued...)

33

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                     LEE L.  SELWYN

1    tunities for SBC in out-of-region enterprise markets stems from removing AT&T as a

2    competitor, then such a decrease in competition can hardly qualify as a short-term or long-

3    term economic benefit to California ratepayers – or to any ratepayers, for that matter.

4

5    **Having grossly exaggerated the various "soft" benefits they seek to attribute to the merger**
6    **in order to satisfy §854(b)(1), the Joint Applicants then seek to affirmatively *exclude* the**
7    **vast majority of such "economic benefits" subject to the Commission's ratemaking**
8    **authority for purposes to the "not less than 50 percent" allocation to ratepayers as required**
9    **by §854(b)(2).**
10

11   Q.   Has the Joint Applicants' "economic benefits" assessment included all of the services where

12        the Commission has ratemaking authority?

13

14   A.   The various "soft" benefits described in the Joint Application and supplemental Application

15        are being ascribed across a broad range of the merged entity's business activities, which

16        (presumably) embraces all of the SBC and AT&T California operations, including AT&T

17        California, Inc., TCG-Los Angeles, TCG-San Francisco, TCG-San Diego, SBC California

18        (i.e., Pacific Bell), SBC ASI, SBC Long Distance, Cingular Wireless, and perhaps other

19        components as well.  However, for purposes of §854(b)(2), the Joint Applicants present a

20        specific quantification of "California forecasted synergies" that are limited specifically to

21        *AT&T's* intrastate operations in California, developed as follows:

---

32.  (...continued)
average cost of providing service to customers *in California.*  Moreover, if that argument had any
merit, then from a public policy perspective *scale* would always take precedence over
*competition*, which would argue for a regulated natural monopoly market outcome rather than a
competitive market outcome as the central public policy goal.

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                              LEE L.  SELWYN

1    Based upon the revenue and expense data for the two holding companies, the Joint

2    Applicants developed a variable (or factor) to apply to the overall forecasted synergies to

3    project California forecasted  synergies.  In short, by taking *AT&T's estimated operating*

4    *expense for California* as a percentage of the combined company operating expense, the

5    Applicants have estimated a California operating expense factor.  This factor was multiplied

6    by the forecasted net expense synergies for the combined company for each of the first five

7    years post-closing, resulting in an estimate of the California-specific expense synergies for

8    each year.[33]

9

10   In other words, the Joint Applicants have taken a *portion* of AT&T's California expenses

11   that they have associated with AT&T's *intrastate* services (i.e., where the Commission has

12   ratemaking authority), and have calculated a ratio of those expenses to total companywide

13   combined SBC and AT&T expenses.  This process produced an estimate of the discounted

14   net present value (NPV) of "the forecasted short- and long-term forecasted economic

15   benefits of the transaction for California" of $27-million.[34]

16

17 Q.  How does this specific $27-million estimate compare with the NPV of total combined

18   companywide SBC and AT&T forecasted economic benefits of the merger?

19

---

33.  *Joint Supplemental Application*, March 30, 2005, at 13, emphasis supplied.

34.  *Id.*, at 13-14.

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   A.   SBC calculated two different synergy values.  The first, the so-called "PreSign" synergy

2        value, contemplated a merger closing date of June 2006.  The results of this model were

3        widely publicized to the investment community, and were included as the estimated value of

4        the proposed merger in the Joint Applicants' testimony presented before the FCC,[35] as well

5        as in a Form 8-K filing announcing its proposed acquisition of AT&T, made by SBC with

6        the Securities and Exchange Commission ("SEC") on January 31, 2005.[36]  A later version of

7        the Synergy Model (the "PostSign" run) assumed a closing date of December 2005 and

8        calculated <<BEGIN SBC/AT&T PROPRIETARY          END SBC/AT&T

9        PROPRIETARY>> in total synergies.  This synergy figure from the "PostSign" model run

10       was then used to calculate the $27-million California share of the net synergies.  To the best

11       of my knowledge, this PostSign synergy estimate has never been publicly disclosed or

12       submitted to the SEC as an update or revision to the original SBC Form 8-K.

13

14       The $27-million net synergies that the Joint Applicants ascribe to California thus represents

15       less than *two-tenths of one percent* of the aggregate <<BEGIN SBC/AT&T PROPRIETARY

16              END SBC/AT&T PROPRIETARY>> merger synergies being forecasted to

17       result from the transaction.  To put this in perspective, California accounts for approximately

18       31% of all SBC access lines, SBC California accounts for 28.6% of all SBC ILEC revenues

---

35.  *AT&T Corp. and SBC Communications Inc. Application Pursuant to Section 214 of the Communications Act of 1934 and Section 63.04 of the Commission's Rules for Consent to the Transfer of Control of AT&T Corp. to SBC Communications Inc.*, FCC Docket No. 05-65, Public Interest Statement of SBC Communications and AT&T, filed February 21, 2005, at 44.

36.  SBC Communications, Form 8-K dated January 31, 2005, at Exhibit 99.1, p. 4.

**REDACTED**                                    ETI ECONOMICS AND
                                                    TECHNOLOGY, INC.

Cal. PUC A.05-02-027                         LEE L.  SELWYN

1      and 24.2% of total SBC revenues.[37]  Approximately <<BEGIN SBC/AT&T

2      PROPRIETARY                    END SBC/AT&T PROPRIETARY>> of all AT&T local

3      service customers nationwide are located in SBC California serving area,[38] and AT&T

4      California, and the three TCG affiliates account for about <<BEGIN SBC/AT&T

5      PROPRIETARY        END SBC/AT&T PROPRIETARY>> of total AT&T corporate

6      revenues.[39]  Just considering these facts, the $27-million that the Joint Applicants proffer as

7      the NPV of "California synergies" cannot pass the "red face" test.

8

9  Q.   Does the process by which the Joint Applicants have come up with this $27-million

10      California synergies estimate satisfy the requirements of §854(b)(2)?

11

12  A.   No, clearly not.  Apparently the Joint Applicants have interpreted their obligations under

13      § 854(b)(2) as being limited to those portions of *AT&T* "where the Commission has

14      ratemaking authority" and, as such, do not include *any* short-term and long-term forecasted

---

37.  FCC Report 43-08, the ARMIS Operating Data Report, Table II. Switched Access Lines in Service, 2004 total switched access lines; Federal Communications Commission, ARMIS Report 43-01, Annual Summary Report, Table I, YE 2004, available at http://www.fcc.gov/wcb/eafs/ (accessed June 21, 2005);  SBC Communications Inc., 2004 10K Annual Report, March 11, 2005.

38.  AT&T has approximately 4.2-million residential local customers nationwide.  *AT&T Corp. and SBC Communications Inc. Application Pursuant to Section 214 of the Communications Act of 1934 and Section 63.04 of the Commission's Rules for Consent to the Transfer of Control of AT&T Corp. to SBC Communications Inc.*, FCC Docket 05-65, Merger of SBC Communications Inc. and AT&T Corp. Description of the Transaction, Public Interest Showing, and Related Demonstrations, filed February 21, 2005, at A-2.

39.  SBC Response to ORA 12-13, SBC/AT&T EYES ONLY Bates No. 01212; SBC Communications, Inc., 2004 10K Annual Report, March 11, 2005.

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                     LEE L.  SELWYN

1    economic benefits of the merger inuring to any SBC operations in California "where the

2    Commission has ratemaking authority."[40]  While I do not express a legal opinion as to the

3    Joint Applicants' legal argument, in my opinion the notion that synergies arising from a

4    merger of two companies, *both of which provide services subject to the Commission's*

5    *ratemaking authority,* should be limited solely to the "acquired" entity makes no sense as an

6    economic matter.

7

8  Q.  Please explain.

9

10 A.  First, when two companies such as SBC and AT&T agree to merge, typically one of the

11   merging corporations "acquires" the other as a wholly-owned subsidiary.  In the case of the

12   SBC/Telesis merger, SBC "acquired" PTG by exchanging SBC stock for PTG stock, and

13   SBC became the "surviving" corporation.  In the case of the Bell Atlantic/GTE merger, Bell

14   Atlantic "acquired" GTE and became the surviving corporation, although it then adopted the

15   Verizon name, such that *neither* the Bell Atlantic nor the GTE corporate identifies survived

16   the transaction.  In the case of the Qwest/US West merger, Qwest was the acquiring and

17   surviving company, even though Qwest was pre-merger a significantly smaller company

18   than US West.  Here, SBC is "acquiring" AT&T, but, although SBC will be the surviving

19   corporation, <<BEGIN SBC/AT&T PROPRIETARY

20                                                             END SBC/AT&T

---

40.  *Supplemental Application*, at 13.

38

REDACTED

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                     LEE L.  SELWYN

1  PROPRIETARY>>.[41]   Clearly, the choice of which entity does the acquiring and which is

2  the acquiree is ultimately an arbitrary one, one that is driven by a variety of legal, financial,

3  tax and perhaps even regulatory considerations that will have little or no impact upon the

4  manner in which the two firms are ultimately integrated organizationally and upon how

5  merger synergies and other merger-driven benefits are ultimately achieved and allocated.

6

7  All else being equal, if the pending merger were structured such that AT&T was acquiring

8  SBC, then the very same *legal* theory and factor calculation process being advanced by the

9  Joint Applicants with respect to their §854(b)(2) obligations would produce a significantly

10  larger estimate of the California forecasted economic synergies.

11

12  Second, the specific location within the combined company where synergies arise is entirely

13  within the combined company's control, and can be directed to specific areas of the merged

14  entity's operations.  There is no basis to expect or to assume that the distribution of

15  synergies will necessarily correspond with the distribution of expenses, revenues, capital

16  investments, or any other individual metric measured across the totality of the combined

17  companies.  For example, both SBC and AT&T maintain extensive information technology

18  (IT) operations that perform functions ranging from operations support systems (OSS),

19  customer records management, billing, payroll, inventory management, employee records,

20  and probably much more.  A major source of merger synergies arises through integration of

21  duplicate functions, but there is no set rule or principle that determines whether the AT&T

---

41.  SBC Response to TURN 1-8, SBC/AT&T - EYES ONLY Bates No. 0334.

ECONOMICS AND
TECHNOLOGY, INC.

REDACTED

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1   or the SBC IT operation for a particular function will survive or be absorbed into the

2   counterpart operation in the other company.  One outcome might mean a reduction in SBC

3   employment, whereas a different outcome could cut jobs at AT&T.  Also, there is no *a*

4   *priori* rule or principle that dictates where (geographically) such personnel reductions take

5   place.  The merged entity might, for example, cut jobs at AT&T in California and transfer

6   the function to SBC in Texas.

7

8   Additionally, all potential merger synergies are not achieved instantaneously upon closing of

9   the transaction; their implementation will involve both time and, typically, some up-front

10  cost.  The specific integration activities will necessarily be prioritized to suit the best

11  interests of the merged entity, but those are likely to differ, perhaps dramatically, from the

12  best interests of California ratepayers.  For example, given SBC's professed interest in

13  expanding the geographic scope of its enterprise services marketing, it is reasonable to

14  expect that post-merger SBC will give integration of the SBC and AT&T enterprise services

15  operations higher priority than, for example, integration of their respective local service

16  operations, which AT&T claims to be in the process of shutting down anyway, and which

17  the merged firm can continue to provide under either the AT&T or SBC California

18  organizations.

19

20  Q.   Do you believe that §854(b)(2) contemplates something more than the extremely narrow

21       definition of California merger synergies that the Joint Applicants have presented?

22

40

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

1   A.   Yes, and I think that any fair reading of the statute compels that conclusion.  §854 refers to

2        "the proposed transaction" and "the proposed merger;" it makes no reference to or distin-

3        guishes between the "acquiring" entity and the "acquired" entity.  As such, the statute must

4        be interpreted as embracing *all* effects of the transaction affecting California *ratepayers*

5        which, in this instance, necessarily includes both SBC-California and AT&T-California, as

6        well as all other SBC and AT&T affiliates providing services where the Commission has

7        ratemaking authority in California.

8

9   Q.   To the extent that both § 854(b)(1) and § 854(b)(2) require that the "short-term and long-

10       term economic benefits to ratepayers" be quantified, how precisely should this be done?

11

12  A.   For purposes of § 854(b)(1) and § 854(b)(2), "short-term and long-term economic benefits"

13       must be interpreted as requiring that the transaction provide "net positive benefits" to

14       ratepayers, i.e., that the potential gains *to ratepayers* from the transaction will exceed

15       potential risks, costs and other harms to be imposed upon ratepayers arising from the

16       merger.  In order for § 854(b)(1) to be satisfied, short-term *and* long-term economic benefits

17       must *each* provide positive net benefits to ratepayers.  In their filing, the Joint Applicants

18       have identified various benefits, many of which are speculative and not specifically

19       quantifiable as economic benefits *to ratepayers* and that therefore may not be included in the

20       § 854(b)(1) analysis.  A portion of the quantifiable synergy gains, such as cost savings,

21       increased productivity growth, and opportunities to generate additional revenues through

22       exploitation of complementary assets and other resources, may potentially qualify as

23       § 854(b)(1)economic benefits to ratepayers, provided of course that they can be shown to

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    flow to ratepayers in California.  However, the Joint Applicants have identified a number of

2    sources of risk arising from the transaction, none of which have been quantified by SBC or

3    AT&T.  If the identified benefits are not sufficient to overcome these economic cost

4    associated with such risks, § 854(b)(1) is not satisfied.

5

6    **Forecasts of positive economic benefits of the merger must be offset by a valid economic**
7    **assessment of the potential risks to both the merging parties and to California ratepayers**
8    **arising from the transaction.**
9

10   Q.   What do you mean by the "economic cost associated with such risks"?

11

12   A.   The existence of risks diminishes the potential value of a particular outcome to the extent

13        that such outcome may not be realized.  For example, suppose that I embark upon a business

14        venture that, according to my business plan, should produce profits in the first year of

15        $100,000 with a probability of 40%, of $50,000 with a probability of 20%, break-even (i.e.,

16        $0 profits) with a probability of 20%, or a loss of $50,000 with a probability of 20%.  It is

17        possible to calculated the *expected value* of these alternative outcomes by multiplying each's

18        respective value with the probability of its occurrence.  In this case, the expected value is

19        $40,000:

42

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

| | Outcome | Probability | Weighted value |
|---|---|---|---|
| 1 | | | |
| 2 | + $100,000 | 40% | + 40,000 |
| 3 | + $ 50,000 | 20% | + 10,000 |
| 4 | $      0 | 20% | 0 |
| 5 | − $50,000 | 20% | − 10,000 |
| 6 | Expected value | | $ 40,000 |

7

8  Q.  What specific risk factors have the Joint Applicants identified?

9

10  A.  A total of twelve separate sources of risk have been identified by the Joint Applicants, and

11      appear in the Application, the Supplemental Application, and in each of the declarations

12      submitted by the Joint Applicants.  According to the Joint Applicants:

13

14          Certain matters discussed in this statement, including the appendices attached,
15          are forward-looking statements that involve risks and uncertainties.  Forward-
16          looking statements include, without limitation, the information concerning
17          possible or assumed future revenues and results of operations of SBC and
18          AT&T, projected benefits of the proposed SBC/AT&T merger and possible or
19          assumed developments in the telecommunications industry.  Readers are
20          cautioned that the following important factors, in addition to those discussed in
21          this statement and elsewhere in the proxy statement/prospectus to be filed by
22          SBC with the Securities and Exchange Commission, and in the documents
23          incorporated by reference in such proxy statement/prospectus, could affect the
24          future results of SBC and AT&T or the prospects for the merger:

25

26      Several of the risk factors relate to timing of the transaction and to AT&T shareholder and

27      regulatory approval; several others relate to what might best be described as "exogenous"

28      conditions that could affect the financial success of the post-merger SBC but which would

43

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1     be expected to have similar effects upon the fortunes of the two companies even if they were

2     to remain independent; and one relates to the value of SBC shares to the extent these are

3     influenced by the (still uncertain) outcome of the Cingular/AT&T Wireless merger.

4     However, six of the twelve risk factors involve conditions incident to the present

5     SBC/AT&T merger:

6

7     (3)   the risks that the businesses of SBC and AT&T will not be integrated successfully;

8

9     (4)   the risks that the cost savings and any other synergies from the merger may not be fully

10          realized or may take longer to realize than expected;

11

12    (5)   disruption from the merger making it more difficult to maintain relationships with

13          customers, employees or suppliers;

14

15    (6)   competition and its effect on pricing, costs, spending, third-party relationships and

16          revenues;

17

18    (10)  the impact of new technologies; and

19

20    (12)  changes in the regulatory environment in which SBC and AT&T operate.

21

22   Q.   But aren't these "risk factors" basically "boiler plate" or "safe harbor" disclosures that the

23      Joint Applicants have included, probably on the advice of counsel?

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                LEE L.  SELWYN

1  A.  Yes, but that does not make them any less real or any less important.  The Joint Applicants'

2      caution that these "important factors ... could affect the future results of SBC and AT&T or

3      the prospects for the merger," and such cautions are at least as important for the required

4      § 854(b)(1) determination that the proposed transaction "[p]rovides short-term and long-

5      term economic benefits to ratepayers" as it is for shareholders of the two firms who may be

6      reviewing the Proxy Statement or other details of the transaction that SBC and/or AT&T

7      may disclose.  In the instant situation, the Joint Applicants have identified all of $27-million

8      in California synergy benefits, of which 50%, or about $13.5-million, would be provided, in

9      some unspecified manner, to California ratepayers.  Even a small failure on the part of the

10      post-merger entity to fully achieve all of its expected merger synergies – for example, if the

11      businesses of SBC and AT&T are not integrated successfully, or if the cost savings and any

12      other synergies from the merger are not fully realized or take longer to realize than expected,

13      or if disruptions from the merger make it more difficult for the combined company to

14      maintain relationships with customers, employees or suppliers – that $13.5-million total

15      "short-term and long-term economic benefit" of the merger could easily become a *negative*

16      number, in which case the requirements of § 854(b)(1) would not be satisfied.

17

18  Q.  Have the Joint Applicants undertaken to address the potential consequences of any of these

19      sources of risk?

20

21  A.  When asked for studies relating to the risk factors SBC enumerates in its legal disclosure,

22      SBC stated,

23

45

REDACTED

ETI  ECONOMICS AND
      TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1         Subject to their general and specific objections, Applicants respond that the
2         "Cautionary Language Concerning Forward-Looking Statements" found in the
3         Testimony of Anthony J. Giovannucci, and nearly all of Joint Applicants
4         testimony and filings in this proceeding, is intended to comply with federal
5         law, including Section 27A of the Securities Act of 1933 and/or Section 21E of
6         the Securities Act of 1934.  In addition, the cautionary statement is intended to
7         alert shareholders, potential investors and creditors (among others) that
8         statements regarding future anticipated or potential happenings or events (i.e.,
9         "forward-looking statements") necessarily involve risks and uncertainties
10        because it is impossible to predict what will happen in the future....[42]
11

12   It is exactly this statement, that it is "impossible to predict what will happen in the future"

13   that the Commission must consider.  Each risk factor enumerated by SBC as applying to

14   shareholders, potential investors and creditors also applies to the ratepayers of California

15   should this merger be approved.  Therefore the Commission should carefully consider the

16   risks and impacts associated with these risks when considering the proposed merger's

17   compliance with § 854(b)(1).

18

19   Q.  Have any specific sources of risk been omitted from the Joint Applicants' "boilerplate"

20       enumeration?

21

22   A.  Yes.  Specifically – and surprisingly – omitted from the Joint Applicants' enumeration of

23       potential risks are those relating to the potential effects of the merger on the credit rating of

24       the post-merger SBC and on its – and its ILEC affiliates' such as SBC California's – ability

25       to raise short-term and long-term capital in the financial markets.  As I have previously

26       mentioned, <<BEGIN SBC/AT&T PROPRIETARY

---

42.  SBC response to ORA 11-1.

REDACTED

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN



_____

43.  James S. Kahan Presentation to the 2004 Leadership Meeting, Bates No. SBCFCC000451986,  provided in response to SBC Supplemental Response to ORA 6-8.

44.  *Id.*, Bates No. SBCFCC000451986 - SBCFCC000451987.

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1           END SBC/AT&T

2      PROPRIETARY>>.

3

4   Q.   Are there any other factors that could work to undermine the potential benefits of the

5       merger?

6

7   A.   Yes.  Although I will address this in far more detail later in my testimony, when considering

8       whether § 854(b)(1) is satisfied, it is important to include in the analysis the conclusions

9       reached with respect to § 854(b)(3), which requires the Commission to find that the merger

10      "not adversely affects competition."  If, in fact, the merger does result in decreased

11      competition in the California telecommunications market overall – as well it might,

12      inasmuch as AT&T is SBC's largest competitor as well as SBC's largest wholesale

13      customer – this would potentially result in higher prices for SBC/AT&T services, which is

14      clearly *not* a "benefit to ratepayers."  And, by the way, it would not take very much in the

15      way of decreased competition arising from the merger to erase the $13.5-million 50% share

16      of the "California synergy benefits" that the Joint Applicants apparently concede would need

17      to be flowed through to ratepayers if the Commission determines that § 854(b)(2) applies to

18      this merger.

19

20      To put this $13.5-million in context, consider the following.  This "California synergy

21     benefit" is calculated based on a <<BEGIN SBC/AT&T PROPRIETARY     END

22      SBC/AT&T PROPRIETARY>>  share of the net present value of certain (but far less than

23      all) realized synergy gains from the merger for the two companies combined for the years

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                         LEE L.  SELWYN

1    2006 through 2010.  On an annual basis, that works out to about $3-million per year.  There

2    are about 12-million Pacific Bell *residential* customers in California.  If the Commission

3    were to, for example, spread that $3-million in annual synergy benefits equally among those

4    12-million residential customers, the "short-term and long-term economic benefits of the

5    merger" inuring to each customer would be approximately two cents per month.  Assuming

6    an average monthly intrastate phone bill of $37 (the national average local phone bill),[45] a

7    price increase of as little as *seven one-hundredths of one percent* would erase the entirety of

8    the § 854(b)(2) ratepayer share of the "economic benefits of the merger."  As I discuss in

9    more detail below, if the merger is approved, SBC's share of the California long distance

10   market would increase from about <<BEGIN SBC/AT&T PROPRIETARY        END

11   SBC/AT&T PROPRIETARY>>[46] to about <<BEGIN SBC/AT&T PROPRIETARY

12   END SBC/AT&T PROPRIETARY>>,[47]  and SBC's share of the California retail local

13   service market would increase from about <<BEGIN SBC/AT&T PROPRIETARY

14   END SBC/AT&T PROPRIETARY>>[48] to about <<BEGIN SBC/AT&T PROPRIETARY

---

45.  Industry Analysis and Technology Division, Federal Communications Commission, *Trends in Telephone Service,* data as of April 2005 ("*Trends in Telephone Service*") at Table 3.2.

46.  SBC Response to TURN 1-4, "000329-000401 CONFIDENTIAL Consumer Market Share - Feb 2005.xls," Consumer Analytics & Research Customer and Product Share Report - Consumer (February 2005), sheet "LD," Column L.  Considering SBC has only been in the California Long Distance market since December of 2002, this share is likely to continue to increase significantly.

47.  *Id.*

48.  SBC Response to TURN 1-4, "000329-000401 CONFIDENTIAL Consumer Market Share - Feb 2005.xls," Consumer Analytics & Research Customer and Product Share Report - Consumer (February 2005), sheet "Local-DA," Column L.

**REDACTED**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                     LEE L.  SELWYN

1         END SBC/AT&T PROPRIETARY>>.[49]   Both of these jumps in market

2    concentration would produce increases in the Herfendahl-Hirshfeld Index ("HHI") that

3    exceed the change permitted under the *Horizontal Merger Guidelines*.  The HHI is

4    calculated by summing the squares of the market shares of the (usually four) largest firms

5    competing in the same product market.  The maximum value of the HHI is thus 10,000 (i.e.,

6    the square of a 100% single-firm market share).  The *Guidelines* consider a market with an

7    HHI greater than 1800 to be "highly concentrated," and state that "[m]ergers producing an

8    increase in the HHI of more than 50 points in highly concentrated markets post-merger

9    potentially raise significant competitive concerns ..."[50]   Based upon these market shares, the

10    pre- and post-merger HHIs applicable to the California Long Distance and Local Services

11    Market within the SBC California operating areas can be calculated as follows:

12

---

49. *Id.*

50. *Horizontal Merger Guidelines*, at §1.5(c).

REDACTED

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

| Table 1 | | | | | | |
|---|---|---|---|---|---|---|
| Pre- and Post-Merger Four-Firm Concentration Indices<br>Residential services<br>SBC California operating areas | | | | | | |
| Product Market | SBC share | AT&T share | Pre-merger HHI | Post-merger HHI | Change | Exceed *Guidelines* threshold? |
| Residential Long Distance |  |  | 2849 | 6131 | 3282 | Yes |
| Residential Local |  |  | 6905 | 8860 | 1955 | Yes |
| Source:  SBC Response to TURN 1-4, Bates 00329-00401 Consumer Analytics & Research Customer and Product Share Report– Consumer (February 2005)<br>NOTE: Highlighted figures are SBC/AT&T PROPRIETARY | | | | | | |

These substantial increases in market concentration create the opportunity for post-merger SBC to implement a significant and non-transitory increase in price.  And even a price increase of as little as seven one-hundredths of one percent two-tenths of one percent, which is certainly well within the realm of possibility, would erase all of the ratepayer share of the $27-million in "short-term and long-term economic benefits to ratepayers" that the Joint Applicants concede fall within the Commission's ratemaking authority.

In summary, if the total "short-term and long-term economic benefits" that the Joint Applicants would confer upon California ratepayers is to be limited to no more than $13.5-million, there is almost no possibility that the *net* §854(b)(1) "short-term and long-term economic benefits to ratepayers" would be positive.  On that basis, the requirements of §854(b)(1) would not be satisfied, and the Commission may not approve the transaction.

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   Q.   Dr.  Selwyn, §854(b)(2) requires the Commission to find that the proposed transaction

2        "Equitably allocates, where the Commission has ratemaking authority, the total short-term

3        and long-term forecasted economic benefits ... of the proposed merger, acquisition or

4        control, between shareholders and ratepayers.  Ratepayers shall receive not less than 50

5        percent of those benefits."  Except for the specific requirement that §854(b)(2) "economic

6        benefits" are to be limited to "where the Commission has ratemaking authority," are there

7        other differences between the manner in which the Joint Applicants have portrayed the

8        benefits of the merger to their respective Boards of Directors, shareholders, securities

9        analysts, and potential investors and the manner in which they have calculated the

10       "California synergy benefits"?

11

12  A.   Indeed, yes.  The differences are significant – and entirely unexplained by the Joint

13       Applicants:

14

15       •    In the National Synergy Model, SBC calculates synergies through 2013 and includes as

16            a "terminal value" the Net Present Value (NPV) of future synergies extending beyond

17            2013 in perpetuity.  However, in the California Synergy Model, SBC truncates synergy

18            benefits after 2010, and does not include any terminal value in the terminal year 2010.

19

20       •    In the National Synergy Model, SBC offsets synergy gains with "merger implementa-

21            tion costs" that arise mostly in the first two or three years.  Since the national model

22            takes synergy gains out to perpetuity, this methodology is reasonable for management

23            decisionmaking purposes.  However, in the California Synergy Model, those same up-

52

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    front implementation costs were included, even though benefits were truncated after

2    2010.  As a result, California ratepayers would, in effect, be "charged" for the totality of

3    (the California share) of implementation costs, even though they would receive less than

4    five-years' worth of "benefits" and not the permanent (in perpetuity) benefits being

5    provided to Directors and Shareholders.

6

7    •    In the National Synergy Model, SBC has included revenue synergies and Capex

8         synergies, neither of which are included in the California Model.  There is nothing in

9         854(b)(2) that would allow the exclusion of these sources of "economic benefits" of the

10        merger.

11

12   •    The California Model considers only certain AT&T-California expenses, while

13        excluding SBC California (i.e., Pacific Bell) altogether.  §854(b)(2) limits the "at least

14        50% of the short-term and long-term economic benefits of the merger" to areas falling

15        within the Commission's ratemaking authority, but does *not* limit the ratepayer portion

16        to only the acquired entity (AT&T in this case).

17

18   In fact, and as I have explained, the "benefits" referred to at §854(b)(1) and §854(b)(2) are

19   essentially the same, except that §854(b)(2) makes specific reference to "where the

20   Commission has ratemaking authority" with respect to the *allocation* of benefits.  There is

21   nothing in §854(b)(2) that would allow the truncation of benefits after only five years and, in

22   fact, to do so would *expressly violate* §854(b)(2)'s requirement that "[r]atepayers shall

23   receive not less than 50 percent of those benefits."

53

ECONOMICS AND
TECHNOLOGY, INC.

REDACTED

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1      Moreover, as with §854(b)(1) "benefits," §854(b)(2) "benefits" also include more than just

2      the *acquired* entity, but also embrace any part of SBC or AT&T *where the Commission has*

3      *ratemaking authority*.  This would include services that have been detariffed or subject to

4      forbearance from regulation, because the Commission still retains its ratemaking authority.

5      No fair reading of §854(b) would conclude that the assessment of benefits is to be confined

6      only to the entity subject to the change of control, yet that is precisely what the Joint

7      Applicants have done in identifying the not less than 50 percent of total benefits (where the

8      Commission has ratemaking authority)  that are to be provided to ratepayers as required by

9      § 854(b)(2).  As noted earlier, the Joint Applicants' testimony describing the various "soft"

10     benefits of the merger specifically embraces all parts of the post-merger SBC/AT&T entity,

11     including AT&T Labs and the SBC BOCs.  Here, the Joint Applicants are attempting to use

12     a broad scope of benefits to satisfy §854(b)(1), and then apply an extremely limited scope of

13     benefits for purposes of §854(b)(2).

14

15  Q.  What explanation do the Joint Applicants advance for these stark differences between the

16     manner in which "economic benefits" are forecasted for purposes of satisfying §854(b)(1)

17     and for actually quantifying the "economic benefits" to be provided to California ratepayers

18     where the Commission has ratemaking authority under §854(b)(2)?

19

20  A.  Applicants claim that all parts of §854 are satisfied by the "soft" benefits they cite,

21     according to Applicants:

22
23         ... even if Section 854(b) were applied, substantial short- and long-term
24         benefits of the proposed change in control will be passed on to customers

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1        through increased choices for advanced product alternatives, greater innovation
2        and increased value to customers globally and in California.  The qualitative
3        benefits that are expected to flow from this merger in the competitive
4        marketplace fully satisfy the public interest standards set forth in Sections
5        854(b) and (c).[51]
6

7    Such a claim makes no sense in the context of the Applicant's $15-billion synergy estimate

8    presented to the financial community.

---

51. *Joint Supplemental Application*, at 14.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1         ECONOMIC BENEFITS FOR CALIFORNIA RATEPAYERS

2

3    **The Joint Applicants propose to allocate no more than a *de minimis* fraction of aggregate**
4    **national merger synergies to California ratepayers**
5

6    Q.   What is the forecasted short-term and long-term economic benefit being claimed by the Joint

7         Applicants, at least 50 percent of which is to be allocated to California ratepayers as called

8         for at §854(b)(2)?

9

10   A.   The Joint Applicants have put this figure at $27-million, which they claim represents the net

11        present value of "California synergies" associated with AT&T California services subject to

12        the Commission's ratemaking authority.

13

14   Q.   Do you consider this to be a reasonable estimate?

15

16   A.   No.  The Joint Applicants have advised the SEC, the financial community, and their

17        respective shareholders that the merger will produce aggregate synergies of some $15-billion

18        on a net present value basis.  The $27-million they concede as falling within the

19        Commission's ratemaking authority represents *less than two-tenths of one percent* of the

20        total merger synergies.  While interstate and nonregulated services may not fall within the

21        scope of §854(b)(2), there can be no question that the PUC has "ratemaking authority" over

22        far more than two-tenths of one percent of the Joint Applicants' total operations.

23

24   Q.   Have you attempted to estimate the correct §854(b)(2) California synergy amount?

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    A.   Yes.  I have identified several specific errors in the Joint Applicants' California Synergy

2         Model calculation, and have asked Ms. Hillary A. Thompson, a Consultant at ETI, to

3         attempt to correct them.  At my direction, Ms. Thompson has also prepared several alternate

4         calculations that reflect different theories as to how §854(b)(2) is to be applied.  The Joint

5         Applicants argue that the "long-term" should be limited to 2010; I disagree, and have asked

6         Ms. Thompson to modify the Joint Applicants' "California Synergy Model" to extend the

7         net present value calculation to perpetuity, as the Joint Applicants have themselves done in

8         making their own synergy forecasts for shareholders and the financial community.  I have

9         also asked Ms. Thompson to prepare an analysis that includes all of the Joint Applicants'

10        California operations subject to the Commission's ratemaking authority, embracing all

11        AT&T California and SBC California (Pacific Bell) intrastate services.

12

13   **The total short-term and long-term forecasted economic benefits allocable to California**
14   **ratepayers where the Commission has ratemaking authority are more accurately calculated**
15   **to be in the range of $1.8-billion.**
16

17   Q.   Dr. Selwyn, earlier you mentioned two different Joint Applicant calculations of the national

18        synergy benefits, differing by more than a billion dollars.  What is the source of the

19        difference between these two figures?

20

21   A.   As I noted, SBC ran two different version of the National Synergy Model, one entitled

22        "PostSign" and one "PreSign."  The PreSign Model calculates a net present value of national

23        synergies as <<BEGIN SBC/AT&T PROPRIETARY                END SBC/AT&T

24        PROPRIETARY>>, and the PostSign Model calculates a <<BEGIN SBC/AT&T

REDACTED

ETI  ECONOMICS AND
     TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1      PROPRIETARY                    END SBC/AT&T PROPRIETARY>> net present value.

2      The only difference between these two models appears to be the assumed "Transaction

3      Close" date.  The PreSign model anticipates closing on <<BEGIN SBC/AT&T

4      PROPRIETARY                    END SBC/AT&T PROPRIETARY>>, whereas the

5      PostSign model anticipates closing on <<BEGIN SBC/AT&T PROPRIETARY

6             END SBC/AT&T PROPRIETARY>>.  The differences in the net present value

7      synergy values they present are related entirely to the timing of the closing.  By assuming an

8      earlier start date on the PostSign model, SBC estimates an earlier combination of facilities

9      and resources and thus earlier realization of synergies.

10

11  Q.  Have you analyzed the National Synergy Model as produced by SBC?

12

13  A.  Yes.  However, other than gaining an understanding the general design, implementation, and

14      basic assumptions of the national synergy model, I have not undertaken a detailed analysis

15      of the National Synergy Model.  The Model contains numerous input files, each providing

16      their own calculations.  The results of these files provide inputs to one "master" file that

17      aggregates the information and performs the final calculations.  As I discuss later, and as

18      discussed fully in the Reply Testimony of Paul Phillips, not all of the necessary input files

19      have been provided by the Joint Applicants, and the relationships among some of the

20      component files were obscured by the lack of linking between files.  If the additional files

21      that have been requested by ORA in several motions and discovery questions are ultimately

22      provided, and with additional time to research and ascertain the relationship between all

23      input files, we may discover aspects of the National Synergy Model that require adjustment.

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    However, without access to this data, and given the limited time frame, I have assumed the

2    validity of the national synergy model's synergy calculations as the baseline from which the

3    intrastate California portion can be identified.

4

5    Q.    How do the Applicants calculate the California intrastate synergies relevant to §854?

6

7    A.    As I explained earlier, the Applicants' legal theory claims that §854 only applies to the

8          synergies associated with the acquired company, in this case AT&T.   According to the Joint

9          Applicants, if it applies at all (which they dispute), §854(b)(2) would apply only to AT&T's

10         California intrastate operations, which are performed by four AT&T subsidiaries, AT&T

11         Communications of California, Inc., TCG Los Angeles, TCG San Diego, and TCG San

12         Francisco.  Using adjusted operating expense data from each of these entities, the California

13         Synergy Model purports to calculate the ratio of adjusted AT&T intrastate California

14         operating expenses ("AT&T California Cash Opex") to the expenses of the entire pro forma

15         company ("Combined Company Cash Opex").  As calculated by SBC, the AT&T intrastate

16         percentage of operating expenses is <<BEGIN SBC/AT&T PROPRIETARY      END

17         SBC/AT&T PROPRIETARY>> ("California Opex Factor").

18

19   Q.    Do you agree with SBC's method for calculating the California Opex Factor for AT&T's

20         intrastate California operations?

21

22   A.    Although I strongly disagree that the §854(b)(2) benefits are to be confined solely to AT&T

23         intrastate California operations, I generally agree with the principles used by SBC in

REDACTED

ET  ECONOMICS AND
    TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    creating its California Opex Factor.  The fundamental principle behind SBC's California

2    Synergy Model appears to be that savings should follow expense proportionately.  This

3    means that the functions in the merged company with the highest operating expenses would

4    be allocated the highest synergies.  Although there are numerous other possible methods of

5    allocating synergies among operational entities and services (such as revenues or capital

6    expenditures), the use of operating expenses in this case makes logical sense.  Cost

7    reductions (consisting primarily of headcount reductions) provide 85% of the total company

8    synergies,[52] with only <<BEGIN SBC/AT&T PROPRIETARY            END

9    SBC/AT&T PROPRIETARY>> resulting from revenue synergies.  Allocating the total

10   California intrastate synergies based upon the ratio of the total California intrastate

11   operations expenses to the *pro forma* expenses is therefore logical.

12

13   Q.  Do you agree with the AT&T California Opex Factor as calculated by SBC?

14

15   A.  No.  In several cases SBC appears to have made errors in the selection of expenses relevant

16       to the calculation of the AT&T California Opex Factor.  These errors affect the assignment

17       of synergies to California ratepayers by understating the proportion of California expenses

18       relative to the Combined company expenses, in the following three ways:

19

20   •   Double counting of certain AT&T and SBC expenses in the Combined Company Cash

21       Opex calculation;

---

52. *Special Analyst Meeting*, at slide 13.

60

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    •    Exclusion of UNE-P expenses from the California Cash Opex figure calculation;

2

3    •    Exclusion of revenue and capital expenditure synergies from the California portion of

4         the synergy model.

5

6    These corrections should be adopted by the Commission regardless of the Commission's

7    decision on SBC's legal arguments regarding the appropriate short and long term benefits of

8    the merger, or the identity of the legal entity(ies) under §854(b)(2) that is required to share

9    merger savings.

10

11   Q.   What is the combined effect of all of these corrections?

12

13   A.   As Ms. Thompson explains, the combined effect of all of these corrections is to increase the

14        California synergy factor from <<BEGIN SBC/AT&T PROPRIETARY            END

15        SBC/AT&T PROPRIETARY>>, and increase the California synergy value to approximately

16        $74-million.

17

18   Q.   What is the effect of applying the same "in perpetuity" terminal value to the NPV

19        calculation that SBC had used as the basis for its $15-billion synergy estimate provided to its

20        shareholders, the financial community, and filed with the Securities and Exchange

21        Commission?

22

61

REDACTED

ET ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1  A.  As I have explained earlier, SBC's assertion that the "short and long term" synergies under

2      §854(b)(2) only extend through 2010 conflicts significantly with public statements to the

3      financial community.  SBC's National Synergy Model calculates the value of these

4      synergies in perpetuity.  I believe this is the correct long term synergy estimate for the

5      Commission to apply in California.  Ms. Thompson performed this calculation using the

6      same NPV calculation process that SBC had utilized in its National Synergy Model.  When

7      this was done, the original $27-million truncated (to 2010) SBC California synergy estimate

8      increased to $167-million.  When the three specific corrections that I had identified were

9      incorporated into the California synergy calculation, the result is a California net present

10     synergy value of $464-million.

11

12 Q.  Have you provided an alternative to the net present value in perpetuity in the event that the

13     Commission accepts SBC's proposed short-term and long-term time periods?

14

15 A.  Yes.  If the Commission accepts SBC's position that §854(b)(2) ratepayer benefits are to be

16     truncated beyond 2010, it should ratably allocate the up-front synergy costs-to-achieve

17     between the portion of benefits allocable to ratepayers and the portion beyond 2010 that are

18     to be flowed exclusively to the combined company's shareholders.  SBC calculates national

19     synergy benefits including those arising in 2011 through 2013 and beyond, using a post-

20     2013 "terminal value."  As is discussed in Ms. Thompson's testimony, these out-years

21     represent approximately 74% of the full national synergy benefit reported by SBC.  If the

22     Commission excludes these years' benefits from the §854(b)(2) California allocation, it

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1      should correspondingly exclude the same 74% of up-front costs-to-achieve from the

2      California synergy calculation.  Ms. Thompson provides the results of these adjustments.

3

4   Q.   What is the correct estimate of California merger synergies where the Commission has

5        ratemaking authority if, as you have testified, §854(b)(2) is to apply to both AT&T

6        California and SBC California intrastate California operations?

7

8   A.   Ms. Thompson has performed this calculation as well.  Including those synergies related to

9        SBC California, the total California synergy benefit (without my corrections) is $229-

10       million through 2010.  Including the full perpetuity long-run NPV analysis together with the

11       other adjustments that I have discussed, the net present value of the "short-term and long-

12       term economic benefits" subject to the §854(b)(2) "not less than 50 percent" allocation to

13       California ratepayers is $1.8-billion.

14

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                              LEE L.  SELWYN

1                          EFFECT OF THE PROPOSED MERGER
2                      ON CALIFORNIA EMPLOYMENT AND ECONOMY

3

4     **The proposed merger has the potential to eliminate thousands of California jobs and**
5     **threaten continuation of benefits for current AT&T employees.**
6

7     Q.   Dr. Selwyn, §854(c)(4) requires that the merger "be fair and reasonable to affected public

8          utility employees," and §854(c)(6) requires that the merger "be beneficial on an overall basis

9          to state and local economies, and to the communities in the area served by the resulting

10         public utility."  Does the proposed merger of SBC and AT&T raise concerns with respect to

11         these requirements?

12

13    A.   Indeed it does.  Fully 60% of the $15-billion in national synergy benefits is expected to arise

14         through "head count" (i.e., work force) reductions in both AT&T and in SBC.[53]  The two

15         companies have a combined national work force of <<BEGIN SBC/AT&T PROPRIETARY

16              END SBC/AT&T PROPRIETARY>>, of which <<BEGIN SBC/AT&T

17         PROPRIETARY        END SBC/AT&T PROPRIETARY>>, or about 26%, are based in

18         California.[54]  Overall, SBC expects to shed about <<BEGIN SBC/AT&T PROPRIETARY

19              END SBC/AT&T PROPRIETARY>> of the post-merger total work force, i.e., about

20         <<BEGIN SBC/AT&T PROPRIETARY        END SBC/AT&T PROPRIETARY>>

---

53.  *Special Analyst Meeting*, at slide 43.

54.  AT&T and SBC Responses to TURN 1-20;  SBC Response to TURN 1-8, SBC/AT&T -
EYES ONLY Bates No. 0231.

64

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    jobs.[55]  No state-specific headcount reductions have been provided, but assuming that the

2    reductions are spread uniformly across both firms and across all operating areas,[56]

3    California could expect to lose more than <<BEGIN SBC/AT&T PROPRIETARY

4    END SBC/AT&T PROPRIETARY>> jobs statewide.

5

6    In addition to the loss of more than <<BEGIN SBC/AT&T PROPRIETARY         END

7    SBC/AT&T PROPRIETARY>> jobs, existing AT&T employees or AT&T retirees may

8    experience a loss of benefits when taken over by SBC.  In the Joint Applicants' Plan of

9    Merger, SBC has committed to retain AT&T benefits for only one year following the close

10   of the merger.[57]  After this period, SBC may be under no requirement to continue to provide

11   quality benefits to AT&T employees or retirees.

12

13   **The merger could have a $15-billion adverse impact on the overall California economy.**
14

15   Q.  How do such employment reductions translate into an overall impact on the California

16       economy?

17

18   A.  There are both direct and indirect impacts.  Obviously, the elimination of jobs means that the

19       salaries associated with those jobs are no longer being paid – which is the direct economic

---

55.  SBC Response to TURN 1-8, SBC/AT&T - EYES ONLY Bates No. 0231.

56.  A conservative assumption, since more job losses are likely to occur in states where both SBC and AT&T have a significant operating presence, i.e. SBC's 13-state region.

57.  Joint Applications, at Exhibit 13.

**REDACTED**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    impact.  However, the economic effect is multiplicative.  When employees lose their jobs

2    and their incomes, they cut back their spending on goods and services produced by other

3    economic sectors – or leave the state altogether – which has a ripple effect throughout the

4    economy.  Economists refer to this as the "multiplier effect."

5

6    Q.    Has SBC previously conceded a direct and multiplier effect relationship between jobs and

7          the economy overall?

8

9    A.    Yes.  In the SBC/Telesis merger, SBC had offered specific "California Commitments"

10         whereby the merged companies agreed "to locate four major operating subsidiaries in

11         California" and "to create 1,000 new jobs in California at Telesis companies."[58]  SBC had

12         portrayed the economic impact of this 1,000-job creation commitment as "increas[ing] the

13         incomes of California residents by $50 million a year, plus an additional $100 million a year

14         in 'multiplier effects.'"[59]  In so doing, SBC was applying a 2:1 multiplier, which falls within

15         the range that economists generally accept.

16

---

58.  D.97-03-067, 71 CPUC 2d 351, 397-98.

59.  *Id.*, at 398.

66

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                LEE L.  SELWYN

1 Q. In this case, however, rather than *increasing* California jobs by 1,000, the result will be a

2   *loss* of more than <<BEGIN SBC/AT&T PROPRIETARY      END SBC/AT&T

3   PROPRIETARY>> jobs.  What is the economic impact of that "headcount reduction"?

4

5 A. Attachment 2 to this testimony provides a detailed analysis of the direct impact upon the

6   California economy resulting from the loss of more than <<BEGIN SBC/AT&T

7   PROPRIETARY      END SBC/AT&T PROPRIETARY>> jobs.  Obviously, the impact

8   of each eliminated position will depend upon the salary level that is avoided.  According to

9   data provided by the Joint Applicants, the cost per full-time equivalent employee ("FTE")

10   ranges from about <<BEGIN SBC/AT&T PROPRIETARY                END

11   SBC/AT&T PROPRIETARY>>.  Taken across all employment categories, I estimate the

12   average aggregate annual 2006 California salary loss at about $318-million.  Applying a

13   multiplier effect of 2.0 to capture indirect impacts, the aggregate annual economic impact on

14   the California economy attributable to the loss of <<BEGIN SBC/AT&T PROPRIETARY

15      END SBC/AT&T PROPRIETARY>> SBC and AT&T jobs would be approximately

16   $954-million.

17

18 Q. Can this be expressed in the same "net present value" terms as the Joint Applicants have

19   themselves done in their "National Synergy Model"?

20

21 A. Yes.  I have performed that calculation, the detail of which are also included in Attachment

22   2.  The NPV of the salary loss is calculated by assuming an annual <<BEGIN SBC/AT&T

23   PROPRIETARY   END SBC/AT&T PROPRIETARY>> salary increase and a <<BEGIN

67

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

1    SBC/AT&T PROPRIETARY [ ] END SBC/AT&T PROPRIETARY>> discount rate, and

2    is reduced by an estimate of the initial severance payments, which are assumed to be

3    <<BEGIN SBC/AT&T PROPRIETARY [ ] END SBC/AT&T PROPRIETARY>> of the

4    current annual salary.  I estimate the NPV of the salary loss to the California economy at

5    approximately $5.1-billion; after application of the 2.0 economic impact multiplier, the NPV

6    of the overall economic loss to the California economy is approximately $15.3-billion.

7

8    Q.   Are there other potential sources of economic harm to the California economy?

9

10   A.   Yes.  The increased market concentration and reduced level of competitive activity in the

11        California telecommunications market has the potential to result in significant and

12        nontransitory increases in prices both for residential and business services.  The combined

13        SBC and AT&T California annual intrastate revenues are currently in excess of $8-billion.[60]

14        Each one percent increase in post-merger SBC rates resulting from the increased market

15        concentration and reduced level of competition would produce a direct annual economic loss

16        of around $80-million, which translates into about $900-million in net present value terms.

17        And given the significant increase in market concentration overall, such post-merger rate

18        increases by SBC are extremely likely.  A study just released by Cal. Tech. professor and

19        former FCC Chief Economist Simon Wilkie estimates that the combined impacts of the

20        SBC/AT&T and Verizon/MCI merger will result in significant rate hikes for business

---

60.  AT&T intrastate operating revenues from pages 4 and 5 of California Synergy
Calculation, SBC intrastate operating revenues from Report on the Result of Operations of
Pacific Bell, year 2003, at Table 16-A.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   services that involve the use of special access type services.[61]  Prof. Wilkie examined

2   competitive price data for local loop and local transport services, and performed regression

3   analyses to estimate the effect of eliminating AT&T and MCI as competitive bidders.  He

4   reports that:

6   •  Winning bids are on average 50 percent to 60 percent lower that ILEC special access
7      charges;

9   •  The RBOC is almost never the lowest bidder;

11  •  AT&T and MCI are by far the most frequent bidders;

13  •  AT&T or MCI is the low price bidder most of the time; and

15  •  There is a significant difference between the winning price and the second-lowest price.

17  Prof. Wilkie reports that, based upon his initial regression analyses of the price data, once

18  AT&T and MCI no longer submit separate competitive bids, the wholesale price discount

19  from special access rates would decrease on average by over 15%.

---

61.  *AT&T Corp. and SBC Communications Inc. Application Pursuant to Section 214 of the Communications Act of 1934 and Section 63.04 of the Commission's Rules for Consent to the Transfer of Control of AT&T Corp. to SBC Communications Inc.* FCC Docket 05-65, Simon Wilkie June 15, 2005 ex parte, at 20-22.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1       HORIZONTAL COMPETITION ISSUES ARISING FROM THE PROPOSED MERGER

2

3       **Why is the merger of SBC and AT&T different from previous RBOC mergers?**

4

5   Q.   Dr. Selwyn, the proposed joining of SBC and AT&T is the sixth instance of a merger

6        involving at least one of the regional Bell operating companies.  In what way is this

7        particular transaction different from all previous RBOC mergers?

8

9   A.   Each of the five previous RBOC mergers – SBC/Pacific Telesis, Bell Atlantic/NYNEX,

10       SBC/SNET, SBC/Ameritech, and Bell Atlantic/GTE – involved *horizontal* combinations of

11       firms that, while maintaining near-monopoly control of their respective geographic service

12       areas, did not for the most part either compete with each other or engage in upstream or

13       downstream transactions with each other.  Their respective service areas were entirely non-

14       overlapping and, most importantly, they did not compete with each other to any measurable

15       degree outside of their own operating areas.  All of these transactions ultimately were

16       approved, reducing the number of major ILEC holding companies from eight to four.[62]

---

62. *SBC/Pacific Telesis Merger Order; Applications of NYNEX Corporation, Transferor, and Bell Atlantic Corporation, Transferee, For Consent to Transfer Control of NYNEX Cooperation and Its Subsidiaries,* NSD-L-96-10, *Memorandum Opinion and Order,* 12 FCC Rcd 19985 (1997)* ("*NYNEX/Bell Atlantic Merger Order*");  *Applications for Consent to the Transfer of Control of Licenses and Section 214 Authorizations from; Southern New England Telecommunications Corporation, Transferor To SBC Communications, Inc., Transferee,* CC Docket No. 98-25, *Memorandum Opinion and Order,* 13 FCC Rcd 21292 (1998) ("*SNET/SBC Merger Order*"); *Application of GTE Corporation, Transferor, and Bell Atlantic Corporation, Transferee; For Consent to Transfer Control of Domestic and International Sections 214 and 310 Authorizations and Application to Transfer Control of a Submarine Cable Landing License,* CC Docket No. 98-184, *Memorandum Opinion and Order,* 15 FCC Rcd 14032 (2000)
(continued...)

70

**REDACTED**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1    In every one of the five previous mergers involving SBC, Verizon, or their predecessors –

2    and this was certainly the case for the two mergers that specifically involved California

3    ILECs (SBC/Telesis and Bell Atlantic/GTE) – the respective applicants were quick to

4    emphasize that it was precisely because they did not compete and were unlikely to be

5    *potential* competitors that their proposed mergers would not diminish competition overall.[63]

6    There was, of course, a certain, perhaps distorted, logic to their argument:  If you start out

7    with two monopolies each of which serves non-overlapping geographic areas and join them

8    together, you end up with one geographically larger monopoly, and hence no diminution of

9    competition.  The HHI's – even though already very close to the maximum value of 10,000

10   for each of the merging parties, would not be materially increased by their combination, and

11   with no *increase* in the HHI, the merger would pass the *Horizontal Merger Guidelines*' test

12   applicable to "highly concentrated" markets – an increase of less than 50 points in the HHI.

---

62.  (...continued)
("*GTE/Bell Atlantic Merger Order*"); *Applications of Ameritech Corp., Transferor, and SBC Communications Inc., Transferee, For Consent to Transfer Control of Corporations Holding Commission Licenses and Lines Pursuant to Sections 214 and 310(d) of the Communications Act and Parts 5, 22, 24, 25, 63, 90, 95 and 101 of the Commission's Rules,* CC Docket No. 98-141, *Memorandum Opinion and Order,* 14 FCC Rcd 14712 (1999)("*Ameritech/SBC Merger Order*").

63.  See, e.g. *SBC/Pacific Merger Order*, 12 FCC Rcd 2634; Application of Ameritech Corporation and SBC Communications, Inc. for authority, pursuant to Part 24 of the Commission Rules, to Transfer Control of a License Controlled by Ameritech, CC Docket No. 98-141, *Description and Justification of Merger (Attachment to Application),* filed on July 24, 1998, at 57-59;  *GTE Corporation, transferor, and Bell Atlantic Corporation, transferee, for consent to transfer of control,* CC Docket No. 98-184, *Public Interest Statement (Exhibit A to Application),* filed October 2, 1998 ("*GTE/Bell Atlantic Application*"), at 24-28.  In the *NYNEX/Bell Atlantic Merger,* NYNEX and Bell Atlantic were seen as potential competitors in the New York metropolitan area (competitive plans were halted when merger talks began), but the Commission determined that the merger benefits, given the conditions offered by the applicants, outweighed this diminished competition ("*NYNEX/Bell Atlantic Merger Order*"), 12 FCC Rcd 20069.

71

REDACTED

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1     Here, however, AT&T and SBC compete directly for mass market and enterprise business

2     services, both local and long distance.

3

4     **The proposed transaction is both a *horizontal* merger – in that SBC and AT&T currently**
5     **compete with each other across a broad spectrum of service markets – and a *vertical***
6     **merger – in that each firm currently purchases services from, or produced by, the other to**
7     **support its provision of downstream services.**
8

9     Q.   What are the principal *horizontal* effects of the merger on competition in the California

10    telecommunications market?

11

12    A.   AT&T is SBC's single largest competitor for both local and long distance services in

13    California.   The competition between the two firms is broadly based, particularly at the

14    *retail* end of the market.  Both firms offer basic local exchange service to mass market

15    residential and small business customers.  Both offer intrastate and interstate long distance

16    services.  Both have introduced mass market Voice over Internet Protocol (VoIP) services.

17    Both are engaged in actively marketing local and long distance, voice and data services to

18    mid-sized and large enterprise customers.  Finally, SBC and AT&T also compete, albeit to a

19    far more limited extent, in the high-volume (OC-n) special access market within major

20    downtown central business districts, including specifically those in San Francisco, Oakland,

21    San Jose, Los Angeles, Irvine, San Diego and Sacramento.

22

23    Q.   What are the principal *vertical* aspects of the proposed merger?

24

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                      LEE L.  SELWYN

1   A.   Where SBC and AT&T are not engaged in horizontal competition with each other, they

2        control complementary *vertical* resources, the combination of which will enable them to

3        discriminate against or even exclude rivals altogether for retail-level competition.  SBC has

4        overwhelming dominance of the local exchange distribution ("last mile") and local

5        interoffice transport facilities, but currently obtains wholesale long distance services from

6        nonaffiliated interexchange carriers, primarily from WilTel.  AT&T has an extensive,

7        nationwide and worldwide long distance network, but up to now has been required to obtain

8        switched and special access services and unbundled network elements (UNEs) or their post-

9        *USTA II* equivalent from SBC in order to provide service to customers located within the

10       SBC California service areas and, for that matter, throughout the 13-state SBC region.  SBC

11       provides high-speed Internet access via its ADSL offering to more than 50% of California

12       high-speed Internet service customers, but is not a Tier 1 Internet backbone carrier, and thus

13       must purchase access to the Internet backbone from nonaffiliated providers.  AT&T, on the

14       other hand, is a Tier 1 Internet backbone provider but, because it has no mass market local

15       "last mile" facilities, is not a consequential player in the mass market high-speed Internet

16       service market.  *In fact, there is no existing firm that offers both retail high-speed Internet*

17       *access in the mass market* and *that is also a Tier 1 Internet backbone provider.*  The

18       marriage of SBC and AT&T will create such an entity for the first time (as will the merger

19       of Verizon and MCI), affording the post-merger SBC a formidable competitive advantage

20       throughout California and the rest of its 13-state operating area while giving it both the

21       incentive and the opportunity to engage and discriminatory treatment of nonaffiliated rivals

22       *both with respect to upstream backbone services and downstream retail services.*

23

73

REDACTED

ET ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   Q.   But throughout their Application and supporting declarations, the Joint Applicants

2        repeatedly contend that they do not compete with each other except on a very incidental

3        basis, and that as such the proposed merger will not result in diminished competition.  Is that

4        contention credible?

5

6   A.   No, far from it.  While this contention is being repeated by virtually every SBC and AT&T

7        declarant in this proceeding, *this frequent repetition does not make it so.*  SBC has long

8        recognized AT&T as a major competitor, if not also its number one rival.  Attachment 3

9        hereto provides extracts from and citations to SBC testimony made in regulatory

10       proceedings both here in California and at the FCC characterizing AT&T as a competitor.

11       The fact that AT&T may not have been entirely successful in its efforts to compete with

12       SBC – an outcome that in many instances was the result of regulatory and judicial initiatives

13       by SBC itself aimed at foreclosing AT&T access to SBC networks and "last mile" customer

14       facilities – does not alter the inescapable *fact* that both firms have been pursuing the same

15       customers in the same geographic areas for an extended period of time.

16

17  Q.   But doesn't AT&T now claim that it has "irreversibly" exited the consumer local and long

18       distance markets, and that as such it is not currently competing with SBC?

19

20  A.   That is AT&T's contention, but this claim does not comport with the "facts on the ground."

21       According to SBC declarants Dennis W. Carlton and Hal S. Sider, "consumer services

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    account for roughly 25% of AT&T's 2004 revenues."[64]  They go on to note that "[r]oughly

2    65 percent of AT&T's consumer services revenue is from 'stand alone' long distance (i.e.,

3    consumers that do not obtain local service from AT&T) while 35 percent of consumer

4    revenue is from subscribers that purchase a local/long distance bundle."[65]  AT&T has more

5    than four million local service customers,[66] nearly two million of which are located within

6    the SBC 13-state footprint,[67] and "approximately <<BEGIN SBC/AT&T PROPRIETARY

7          END SBC/AT&T PROPRIETARY>> UNE-P residential customers in California

8    [as of] July of 2004."[68]  Significantly, this remaining AT&T local service customer base is

9    larger than that of *any other CLC in California*; in fact, according to the Commission's most

10   recent study of local competition in California, *all CLCs combined – including AT&T – had*

---

64.  Joint Application, Exhibit 1, Declaration of Dennis W. Carlton and Hal S. Sider ("*Carlton-Sider Declaration*"), at para. 41.

65.  *Id.*

66.  AT&T has approximately 4.2-million residential local customers nationwide.  *AT&T Corp. and SBC Communications Inc. Application Pursuant to Section 214 of the Communications Act of 1934 and Section 63.04 of the Commission's Rules for Consent to the Transfer of Control of AT&T Corp. to SBC Communications Inc.*, FCC Docket 05-65, Merger of SBC Communications Inc. and AT&T Corp. Description of the Transaction, Public Interest Showing, and Related Demonstrations, filed February 21, 2005, at A-2.

67.  *Id.*

68.  AT&T Response to TURN 1-1a.  It is noteworthy that AT&T still asserts "confidentiality" to this and other data regarding its activities in the local service market.  If its decision to exit this market is as "irreversible" as AT&T now claims, its concern that other CLCs – companies that are no longer "competitors" of AT&T if AT&T's claim of having irreversibly exited this market is to be believed – would gain some unspecified competitive advantage from access to this market data is certainly curious, if it wholly inconsistent with its professed "irreversible" decision.

**REDACTED**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    *a total of less than 1 million residential customers as of 2003.*[69]  SBC declarants Carlton and

2    Sider have stated that AT&T is currently pursuing a strategy of  "'harvesting' the

3    [consumer] business" by raising prices so as to maximize revenues from those of its existing

4    mass market customers who remain with AT&T, with the intention of exiting this market

5    "over time."[70]

6

7    Given that 25% of AT&T's total 2004 revenues were coming from AT&T Consumer

8    Services ("ACS") and its intention to "harvest" the consumer revenues that it already had, I

9    for one was (at the time) rather surprised by the fanfare with which AT&T last July had

10   publicized its decision to withdraw from the consumer market.  Given that course of action –

11   i.e., cease providing service to new customers but continue to serve existing customers – one

12   would expect that the implementation of the decision to cease marketing service to new

13   customers to be undertaken with as little fanfare as possible *so as not to "spook" the existing*

14   *four million AT&T Consumer local service customers and twenty six-million long distance*

15   *customers* into thinking that AT&T was abandoning them.  Clearly, the decision to stop

16   providing service to new customers could have been done very *quietly* and without any

17   fanfare by AT&T, but that is decidedly *not* what AT&T actually did.  Instead, AT&T made a

18   very loud and very public announcement of its decision.  In June of 2004, AT&T announced

19   that it would cease providing service to new residential/small business customers in nine

_____

69.  *The Status of Telecommunications Competition in California*, California Public Utilities
Commission, Third Report for the Year 2003, in Compliance with Section 316.5 of the
California Public Utilities Code, submitted October 31, 2003, at Chart 3.1.a.

70.  *Carlton-Sider Declaration*, at paras. 41, 12.

76

REDACTED

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    states – including 3 in SBC territory – and that announcement was followed several weeks

2    later by the announcement that AT&T was withdrawing from the consumer market

3    altogether.  Within literally days of the AT&T announcement, several RBOCs ran full-page

4    advertisements in major daily newspapers alerting AT&T companies that "some phone

5    companies don't think you're worth it," and urging the AT&T customers to switch over to

6    the RBOC, where they still "think a lot about our residential customers."[71]

7

8    So why did AT&T adopt this seemingly counterproductive publicity strategy?  The answer

9    has now become abundantly clear:  When viewed in the context of the subsequent (January

10    31, 2005) announcement of its agreement to be acquired by SBC, the timing and the manner

11    in which AT&T heralded its decision to exit the consumer market appears to have been

12    driven by the prospect of such a merger as much or perhaps even more than the rationale

13    being articulated here by AT&T's declarants.

14

15    Q.  Please explain.

16

17    A.  At a superficial level, one might conclude that there was a six-month gap between the date at

18        which AT&T announced its decision to exit the consumer market (July 22, 2004) and the

19        date at which the merger with SBC was announced (January 31, 2005).  Upon closer

20        examination, however, the action actually appears to have been driven by the need to *portray*

21        AT&T as *not competing with* SBC in order for the merger to be approvable, rather than

---

71. *See e.g. The Boston Globe*, August 4, 2004 at A9; and the *New York Times*, August 4, 2004, at A5.

**REDACTED**

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   simply because AT&T had "concluded" that its ongoing consumer revenues could not be

2   maintained as a profitable business segment.

3

4   According to a Board of Director's presentation provided by AT&T in response to TURN 1-

5   8 and 1-9, AT&T had its initial dialogue with SBC on <<BEGIN SBC/AT&T

6   PROPRIETARY              END SBC/AT&T PROPRIETARY>>, i.e., *just*

7   <<BEGIN SBC/AT&T PROPRIETARY              END SBC/AT&T PROPRIETARY>>

8   *following the AT&T announcement that it was withdrawing from the consumer market.*[72]

9   But it appears that merger discussions may have actually commenced earlier than that:  An

10  SBC document indicates that SBC's initial "due diligence" analysis of the merger

11  commenced in <<BEGIN SBC/AT&T PROPRIETARY              END SBC/AT&T

12  PROPRIETARY>>, i.e., either concurrently with or perhaps even before the AT&T mass

13  market withdrawal announcement.[73]

14

15  By the time that it had announced its decision to withdraw from the consumer market,

16  AT&T had invested heavily in developing this line of business.  A significant portion of the

17  cost of serving new customers involves the up-front costs of customer acquisition

18  (advertising, marketing, sales, and sign-up incentives) as well as up-front costs of initiating

19  service (nonrecurring charges paid to ILECs as well as internal AT&T service connection

---

72.  *AT&T Presentation to the Board of Directors*, Bates ATCA4000179, provided in response to TURN 1-8 and 1-9.

73.  James S. Kahan, *Board of Directors Update*, January 30, 2005, Bates SBCFCC000419720.

78

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    costs).  Once the customer had been acquired and his or her service had been connected and

2    made operational, those "sunk" up-front outlays would have to be made up through ongoing

3    recurring charges.  Thus, once these up-front "sunk" costs had been incurred, the ongoing

4    forward-looking cost of *continuing to provide service to an existing customer* was

5    substantially less than the forward-looking cost of acquiring and providing service to a new

6    customer.  AT&T had obviously understood this, which explains why its decision was to

7    cease marketing service to new customers and was *not* to immediately cease *providing*

8    *service* to existing customers, since continuing to serve existing customers is profitable even

9    if continuing to market service to new customers would result in a loss.  In fact, AT&T

10   declarant Polumbo has, not surprisingly, reiterated AT&T's commitment to continue to

11   serve its existing mass market customers.

12

13   Q.   So what would explain AT&T's decision to widely publicize its decision to cease marketing

14        consumer services to new customers?

15

16   A.   AT&T's decision to announce its departure from consumer services with such fanfare

17        clearly threatened its $7.9-billion in consumer revenues and was at odds with its

18        "harvesting" strategy.  So either its actions were grossly inept or had some additional

19        undisclosed motive.  But it is simply not reasonable for AT&T to have placed its consumer

20        revenues in such jeopardy without some other business purpose in mind.  Given the

21        emphasis that both AT&T and SBC have placed upon AT&T's "announcement" as a key

22        rationale for the proposed merger, we now can appreciate the motivation behind what would

**REDACTED**

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                           LEE L.  SELWYN

1 otherwise seem to have been an inexplicable business decision.  What has now become all

2 too apparent is that AT&T's motive was its already-under-discussion merger with SBC.

3

4 Q. What importance should the Commission afford AT&T's claim that "the decision to exit the

5  mass market business is irreversible"?

6

7 A. Put simply, the Commission should not consider AT&T to have "irreversibly exited the

8  consumer market," but instead to have initiated an entirely transparent makeover solely for

9  the purpose of getting an SBC/AT&T merger past antitrust scrutiny.  Future historians of the

10  US telecommunications industry may come to view AT&T's seemingly suicidal business

11  strategy as having come from desperation resulting from a series of adverse regulatory and

12  judicial rulings.  Whatever its source, AT&T's professed "irreversible decision to withdraw"

13  from the consumer market must be afforded no weight in assessing the potential impact of

14  the proposed merger upon competition in the California telecommunications market as is

15  required by § 854(b)(3).  AT&T's decision to cease providing consumer services cannot be

16  de-linked from its decision to be acquired by SBC, and the elimination of AT&T as a viable

17  competitor in the consumer market must be seen as inextricably tied to the merger itself.

18

19  Indeed, acceptance of AT&T's position would set a dangerous precedent that would

20  undermine application of longstanding antitrust principles to future mergers.  If it appeared

21  that a prospective merger would result in market concentration exceeding that allowed by

22  the *Horizontal Merger Guidelines* (as I will discuss in detail below), one of the merger

23  partners would simply need to "announce" its intention to exit the market, so that the market

80

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    concentration could be characterized as "inevitable" (as AT&T and SBC seek to do here) –

2    providing convenient justification for the claim that the increase in market concentration

3    would occur regardless of the merger.

4

5    **The proposed merger violates the specific market concentration provisions of the**
6    **Department of Justice/Federal Trade Commission** *Horizontal Merger Guidelines*.
7

8    Q.    You have made several references to the *Horizontal Merger Guidelines* as issued by the

9          United States Department of Justice and the Federal Trade Commission.  Aren't these

10         agencies – and not the California PUC – the ones principally charged with assessing the

11         potential effect of the proposed merger upon competition?

12

13   A.    They have that responsibility, but certainly not to the *exclusion* of the California PUC or, for

14         that matter, the California Attorney General.  §854(b)(3) specifically directs the *Commission*

15         to find that the merger does not adversely affect competition.  Indeed, read in the context of

16         other portions of the PU Code, such as §709.2(c), it is clear that the Commission has an

17         *independent* responsibility to assure the continuation of a competitive telecommunications

18         market.

19

20   Q.    That said, is it reasonable for the Commission to utilize similar analysis techniques and

21         standards in assessing potential competitive impact as might also be used by the DoJ or the

22         FTC?

23

81

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   A.   Yes, because such techniques are rooted in valid economic theory and analysis.  The

2        *Horizontal Merger Guidelines*, in particular, focus heavily upon market definition and

3        market concentration.  These issues have been raised by the Joint Applicants in this

4        proceeding – contentions that the "relevant market" includes basic local and long distance

5        wireline services, wireless, VoIP, cable, and more.  By positing an overly expansive market

6        scope, the Joint Applicants hope to portray the effect of their merger as not resulting in

7        undue concentration in the "relevant market."  However, the *Guidelines* provide a very

8        explicit analytical framework for addressing these questions, and they should be closely

9        followed in assessing the Joint Applicants' largely unsupported and certainly unquantified

10       rhetoric.

11

12  Q.   What standard must be satisfied with respect to the effect of a merger upon market

13       concentration under the *Horizontal Merger Guidelines*?

14

15  A.   The *Horizontal Merger Guidelines* place particular emphasis upon the effect of a proposed

16       merger on *market concentration*.  A sufficiently large increase in market concentration,

17       according to the *Guidelines*, is "likely to create or enhance market power or facilitate its

18       exercise."[74]

19

20  Q.   How is market concentration measured, and what specific thresholds do the *Guidelines*

21       establish as indicative of competitive concerns?

---

74.  *Horizontal Merger Guidelines*, at §1.51.

82

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    A.    §1.5 of the *Merger Guidelines* provides the following specification as to the measurement

2          and potential anticompetitive effect of a merger-driven increase in market concentration:

3

4              Market concentration is a function of the number of firms in a market and their
5              respective market shares. As an aid to the interpretation of market data, the Agency
6              will use the Herfindahl-Hirschman Index ("HHI") of market concentration.  The
7              HHI is calculated by summing the squares of the individual market shares of all the
8              participants. ...
9

10             The Agency divides the spectrum of market concentration as measured by the HHI
11             into three regions that can be broadly characterized as unconcentrated (HHI below
12             1000), moderately concentrated (HHI between 1000 and 1800), and highly
13             concentrated (HHI above 1800).  Although the resulting regions provide a useful
14             framework for merger analysis, the numerical divisions suggest greater precision
15             than is possible with the available economic tools and information.  Other things
16             being equal, cases falling just above and just below a threshold present comparable
17             competitive issues.
18

19             In evaluating horizontal mergers, the Agency will consider both the post-merger
20             market concentration and the increase in concentration resulting from the merger.
21             Market concentration is a useful indicator of the likely potential competitive effect
22             of a merger.  The general standards for horizontal mergers are as follows:  a) Post-
23             Merger HHI Below 1000.  The Agency regards markets in this region to be
24             unconcentrated.  Mergers resulting in unconcentrated markets are unlikely to have
25             adverse competitive effects and ordinarily require no further analysis.  b) Post-
26             Merger HHI Between 1000 and 1800. The Agency regards markets in this region to
27             be moderately concentrated.  Mergers producing an increase in the HHI of less than
28             100 points in moderately concentrated markets post-merger are unlikely to have
29             adverse competitive consequences and ordinarily require no further analysis.
30             Mergers producing an increase in the HHI of more than 100 points in moderately
31             concentrated markets post-merger potentially raise significant competitive concerns
32             depending on the factors set forth in Sections 25 of the Guidelines.
33

34             c) Post-Merger HHI Above 1800.  The Agency regards markets in this region to be
35             highly concentrated.  Mergers producing an increase in the HHI of less than 50
36             points, even in highly concentrated markets post-merger, are unlikely to have
37             adverse competitive consequences and ordinarily require no further analysis.
38             Mergers producing an increase in the HHI of more than 50 points in highly
39             concentrated markets post-merger potentially raise significant competitive

83

REDACTED

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    concerns, depending on the factors set forth in Sections 25 of the Guidelines.
2    Where the post-merger HHI exceeds 1800, it will be presumed that mergers
3    producing an increase in the HHI of more than 100 points are likely to create or
4    enhance market power or facilitate its exercise.  The presumption may be overcome
5    by a showing that factors set forth in Sections 25 of the Guidelines make it unlikely
6    that the merger will create or enhance market power or facilitate its exercise, in
7    light of market concentration and market shares.[75]

8

9    Q.  In which of these categories do the various markets in which both SBC and AT&T

10       participate fall?

11

12   A.  Without question, the various product/service markets in which both merger partners operate

13       – basic local exchange service, long distance for residential and small business customers,

14       and all are "highly concentrated" as the term is defined by the *Guidelines*.  That is, all have

15       HHIs of at least 1800 within the SBC region prior to the merger, and would almost certainly

16       exhibit an increase in the HHI of at least 50 points as a result of the merger.

_____

75.  *Id.*, at §1.51.

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

| Table 2<br><br>Pre- and Post-Merger Four-Firm Concentration Indices<br>Local and Long Distance Services<br>SBC California operating areas | | | | | | |
|---|---|---|---|---|---|---|
| Product Market | SBC share | AT&T share | Per-merger HHI | Post-merger HHI | Change | Exceed *Guidelines* threshold? |
| Residence Long Dist. | | | 2849 | 6131 | 3282 | Yes |
| Residence Local | | | 6905 | 8860 | 1955 | Yes |
| Small Business Long Dist. | | | 2598 | 5421 | 2823 | Yes |
| Small Business Local | | | 6471 | 8304 | 1832 | Yes |
| Source: SBC Response to TURN 1-4, Bates 00329-00401 Consumer Analytics & Research Customer and Product Share Report– Consumer (February 2005) and Bates 000402-000461 Consumer Analytics & Research Customer and Product Share Report– Small Business (February 2005).  Used Local-DA figures for local.<br>NOTE: Highlighted figures are SBC/AT&T PROPRIETARY | | | | | | |

**SBC and AT&T attempt to broaden the "relevant product and geographic market" for their wireline services in order to create the appearance of lower market concentration, but the "intermodal" services they identify do not belong to the same "relevant product and geographic market" as these concepts are defined in the *Horizontal Merger Guidelines*.**

Q.  How do the Joint Applicants deal with the apparent violation of the *Merger Guidelines* that

     the proposed transaction would entail?

ECONOMICS AND
TECHNOLOGY, INC.

REDACTED

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    A.  The Joint Applicants advance several theories aimed at undermining the applicability of the

2        HHI analysis to the evaluation of the proposed merger, although they do not offer specific

3        HHI calculations reflecting these alternate views of the market.  Their arguments can be

4        summarized, generally, as follows:

5

6        •    Historic market shares (upon which the HHI calculations are based) are not relevant

7             because of the dynamic nature of the telecommunications market.

8

9        •    The "relevant product market" to be used in evaluating the effect of the merger upon

10            market concentration must include the various "intermodal" alternatives to traditional

11            SBC and AT&T wireline local and long distance services, such that under this

12            expansive definition of the "relevant product market," the respective SBC and AT&T

13            shares are sufficiently small so that the market cannot be considered as highly

14            concentrated.

15

16       While the *Merger Guidelines* do expressly recognize that "in some situations, market share

17       and market concentration data may either understate or overstate the likely future

18       competitive significance of a firm or firms in the market or the impact of a merger,"[76] the

19       largely rhetorical and anecdotal "evidence" being advanced by the Joint Applicants does not

20       *quantitatively* satisfy the required showings.

21

---

76.  *Id.*, at §1.52.

86

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    Q.   What process is specified in the *Guidelines* for the determination of the "relevant product

2         market" for purposes of a market concentration analysis?

3

4    A.   According to the *Horizontal Merger Guidelines,* a "relevant product market" consists of

5

6              a product or group of products such that a hypothetical profit-maximizing firm that
7              was the only present and future seller of those products ("monopolist") likely
8              would impose at least a "small but significant and nontransitory" increase in price.
9              That is, assuming that buyers likely would respond to an increase in price for a
10             tentatively identified product group only by shifting to other products, what would
11             happen?  If the alternatives were, in the aggregate, sufficiently attractive at their
12             existing terms of sale, an attempt to raise prices would result in a reduction of sales
13             large enough that the price increase would not prove profitable, and the tentatively
14             identified product group would prove to be too narrow.[77]

15

16        In other words, products (or services) are considered to fall within the same "relevant

17        product market" if consumers thereof consider them sufficiently close substitutes that a price

18        increase in one product would result in a sufficiently large shift in demand to the substitute

19        product as to make the price increase unprofitable.

20

21        The *Guidelines* suggest the following analytical process for making this assessment:

22

23             In considering the likely reaction of buyers to a price increase, the Agency will take
24             into account all relevant evidence, including, but not limited to, the following:

25

26             (1)  evidence that buyers have shifted or have considered shifting purchases
27                  between products in response to relative changes in price or other competitive
28                  variables;

29

---

77.  *Horizontal Merger Guidelines*, at §1.11.

**REDACTED**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

      (2)  evidence that sellers base business decisions on the prospect of buyer
substitution between products in response to relative changes in price or other
competitive variables;

      (3)  the influence of downstream competition faced by buyers in their output
markets; and

      (4)  the timing and costs of switching products.[78]

Q.  Have the Joint Applicants offered any evidence specifically addressing any of these four

points?

A.  No.

Q.  Do the Joint Applicants agree that the HHI analyses as specified in the *Guidelines* are

controlling in this case?

A.  No.  In fact, the Joint Applicants and their outside experts go to great lengths to dismiss the

importance and applicability of the *Horizontal Merger Guidelines* to this merger.  And, to

the extent that regulators and/or the Department of Justice may nevertheless seek to apply

the *Guidelines*' market concentration test – the HHI – to the instant situation, the Joint

Applicants have attempted to portray an overly expansive definition of the "relevant product

and geographic market," arguing that even after the merger the combined company will still

have only a small share of this (expansive) market.

---

78. *Id.*

88

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1  Q.  In arguing in support of their expansive market definition, do the Joint Applicants or their

2      outside experts adhere to the methodology specified in the *Merger Guidelines*?

3

4  A.  No.  In fact, SBC has explicitly stated, in response to four separate ORA interrogatories, that

5      "SBC has not performed any state specific studies using the methodology specified at §§ 1.1

6      through 1.3 of the DOJ/FTC *Horizontal Merger Guidelines*.[79]

7

8  Q.  So how do the Joint Applicants characterize the "relevant product market"?

9

10 A.  They offer highly subjective, anecdotal, and entirely superficial analyses of so-called

11     "intermodal" competition to the traditional SBC and AT&T *wireline* local and long distance

12     services.  They claim, for example, that consumers are replacing their traditional wireline

13     telephones with wireless, cable telephony, or Voice over Internet Protocol (VoIP) services.

14     To support this claim, they first cite various statistics on the growth in absolute demand for

15     these services and then point to a concurrent decrease in demand for basic wireline local

16     service and long distance calling.  The intended inference is that there is a nexus between

17     these two changes.

18

19 Q.  Are these contentions and inferences correct?

20

---

79.  SBC Supplemental Responses to ORA 6-13, 6-14, 6-15 and 6-16, dated May 26, 2005.

ECONOMICS AND
TECHNOLOGY, INC.

REDACTED

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    A.   No, they are not.  Neither SBC nor AT&T nor any of the outside experts offer any evidence

2         demonstrating a connection between growth in the use of wireless, VoIP, and cable

3         telephony services and the drop in access lines and wireline long distance usage.   Of even

4         greater importance, they have produced no evidence whatsoever demonstrating that the post-

5         merger SBC would be unable to impose at least a "small but significant and nontransitory"

6         increase in its prices because the putative intermodal alternatives were, in the aggregate,

7         sufficiently attractive at their existing terms of sale such that an attempt by SBC to raise

8         prices would result in a reduction of sales large enough that the price increase would not

9         prove profitable.  Although I will address the matter of "intermodal competition" at greater

10        length later in my testimony, several key conclusions are worth summarizing here:

11

12        •    While an extremely small number of consumers (in the range of 3% to 6%, depending

13             upon which "study" one believes) with certain specific demographic attributes may have

14             discontinued their wireline telephone service and rely upon wireless as their primary

15             access to the public switched network, the vast majority of consumers – in excess of

16             94% and perhaps as much as 97% – view wireless as *complementary* to, and not as a

17             substitute for, their wireline telephone.

18

19        •    Most of the drop in demand for wireline access lines is likely attributable to the

20             migration of consumers from dial-up to high-speed Internet access, and not to other

21             alternative voice services.  In 1990, long before anyone was even thinking about the

22             Internet as a mass market consumer medium, only about 4.118% of US households had

23             more than one access line.  In California, where the demand for first-generation online

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    services like Compuserve and Prodigy was beginning to develop, there were most likely

2    a maximum of 1-million SBC non-primary access lines.  By 2001, when dial-up access

3    demand for Internet service had reached its peak, some 24.41%, or 26.3-million, US

4    households had two or more access lines.  As of 2004, some 29-million households

5    nationally have subscribed for high-speed Internet access, either DSL (from the phone

6    company) or cable modem service (from the local cable television operator).  According

7    to the data provided by the Joint Applicants, total demand for wireline access lines has

8    decreased by 33-million since its 1999 peak, i.e., by *less* than the growth in demand for

9    high-speed Internet access.  The purportedly "lost" second line revenues have been

10   largely replaced, since 11.4-million customers have subscribed to DSL, and generally

11   pay the ILEC *more* for the DSL service than they did for the additional dial-tone access

12   line.  There is simply no evidence that the drop-off in demand for local wireline access

13   is due to wireless substitution; the vast majority is due to a technological shift to high-

14   speed Internet access.  And, incidentally, the latest figures would seem to indicate that

15   SBC's access line demand is actually on the rise.[80]

16

17   •    VoIP services are currently being used by approximately 1-million residential

18        consumers nationwide (statistics for California are not available). I am not aware of any

19        studies that have identified the number of VoIP customers that have *replaced* their basic

---

80.  According to SBC's "Supplementary Financial and Operating Data" worksheets for 4Q
2004 and 1Q 2005, demand for retail primary access lines has increased by 16,000 from 23.206-
million access lines to 23.222-million access lines.  Supplementary Financial and Operating Data
worksheets are available at http://www.sbc.com/gen/landing-pages?pid=5718 (accessed June 22,
2005).

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    wireline service entirely with VoIP, however, that number is likely very small.  For one

2    thing, in order to use VoIP, the consumer needs high-speed Internet access, either via

3    DSL or cable modem.  Most ILECs either do not offer so-called "naked DSL" (i.e.,

4    DSL independent of a customer's purchase of the ILEC's basic exchange service) or if

5    they do, there is a substantial additional charge.  Thus, virtually all of the <<BEGIN

6    SBC/AT&T PROPRIETARY            END SBC/AT&T PROPRIETARY>> of all

7    SBC-region California consumers that currently use DSL for internet access also have

8    dialtone service from SBC or another LEC, so those that also subscribe to VoIP are *not*

9    using it as a replacement for their primary phone service.[81]

10

11  •   Basic telephone services offered by cable television companies are a substitute for ILEC

12      wireline service, but the demand for cable telephony has stalled.  Nationally, it reached

13      about three million customers in December 2002 and has remained at roughly that same

14      level ever since.  Between that time and 2004, cable added only about 267,000 new

15      telephone subscribers.[82]  While some cable operators have recently announced that they

16      had abandoned their circuit-switched telephony offerings in favor of VoIP, the actual

17      number of cable VoIP customers remains extremely small.

18

---

81.  SBC Response to TURN 1-4, Bates 00329-00401 Consumer Analytics & Research
Customer and Product Share Report– Consumer (February 2005) and Bates 000402-000461.

82.  Industry Analysis and Technology Division, Federal Communications Commission,
*Local Telephone Competition, Status as of June 2004*, December 2004, at Table 5.

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1      •     In considering VoIP's potential, it is also important to recognize that the existing

2            demand for this service has come primarily from the "early adopters," those consumers

3            that will be among the first to experiment with new technologies and new gadgets.  One

4            study estimates the total "early adopter" demand at about 3% of the total consumer

5            market.[83]  VoIP still has numerous unsolved service problems, including access to E-

6            911 Public Safety Access Points (PSAPs) and voice transmission quality.  VoIP also

7            requires local power, and is thus subject to outage during a power failure.  It is

8            *premature* to extrapolate from the limited early adopter demand for VoIP to conclude

9            that this technology represents a serious competitive challenge to SBC or AT&T

10           wireline services.  And if, as and when it does, one can be almost certain that both

11           firms, whether merged or independent, will both be extremely active in providing VoIP

12           services over their existing networks and service provisioning infrastructures.  In fact,

13           both AT&T and SBC are already marketing VoIP services to consumers, and the

14           combined effects of SBC's wireline DSL dominance together with AT&T's Tier 1

15           Internet backbone status will assure that the combined company will be a formidable

16           VoIP powerhouse if VoIP ultimately becomes the "standard" for basic phone service.

17           SBC cannot be taken seriously in claiming that it faces competition from itself.

18

19   Q.   What standard should the Commission consider in determining whether any of these

20        intermodal services are part of the "relevant product market" in which the Joint Applicants

21        primarily operate?

---

83.  *TNS Consumer Market Share Special Studies Report 4Q04*, Presented to SBC March
2005, Bates SBCFCC000232757.

**REDACTED**

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1  A.  Intermodal services may be considered as falling within the same relevant product market as

2      wireline telephony if a sufficient portion of consumers view them as economic substitutes –

3      specifically (and as provided in the *Merger Guidelines*), where a "small but significant and

4      nontransitory increase in price" would cause a sufficiently large number of customers to

5      shift their demand to the alternative service so as to make the price increase unprofitable.

6      The anecdotes being advanced by SBC, AT&T and their outside experts, which deal with a

7      small number of customers (most likely atypical consumers), do not constitute the required

8      showing and must be afforded no weight in the Commission's analysis of the potential

9      competitive impact of the proposed merger.

10

11 Q.  What sort of quantitative data or studies could the Joint Applicants have provided, assuming

12     of course that their otherwise unsupported contention as to intermodal substitution were

13     valid to begin with?

14

15 A.  There are, in fact, quantitative tests for substitutability – specifically, the cross-elasticity of

16     demand between putatively substitute products or services.  If two products, A and B, are

17     substitutes worthy of being considered part of the same relevant product market, then a

18     change in the price of A will have a measurable effect upon the demand for B, and vice

19     versa.  Significantly, while a number of the Joint Applicants' outside economic experts have

20     provided extensive discussions of the putative intermodal competition that their clients

21     confront, *none have offered any quantitative evidence as to the actual cross-elasticity of*

22     *demand between their clients' wireline services and any of the intermodal alternatives they*

23     *present.*  In fact, SBC has stated that it "does not have any ... studies, presentations, analyses

94

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    or other documents ... related to 'price elasticity' between and among wireless, wireline, and

2    cable/VoIP telephone services."[84]

3

4  Q.  Does Dr. Aron address the issue of relevant product market in other recent testimony?

5

6  A.  Yes, she discusses it at some length in testimony submitted on behalf of Verizon in the

7    current URF OIR.[85]  Although she there advances the very same subjective, non-quantitative

8    assessment of putative "inter-modal" competition, she does attempt to rationalize her failure

9    to provide a precise, quantitative econometric assessment of substitutability.  According to

10   Dr. Aron:

11

12       In many cases, it is difficult or impossible to determine quantitatively ... how
13       responsive consumers are in their purchases of one product to a change in the price
14       of another.  As a result, an alternative approach to substitutability has been adopted
15       in antitrust case law, by which the critical determinant of whether two services are
16       in the same product market is to assess their "reasonable interchangeability of use."
17       This was the standard adopted by the Supreme Court in 1962 [citing *Brown Shoe*
18       *Co. v. United States*, 370 U.S. 294, 325 (1962)] and has generally been adopted by
19       courts since then.

20

21  Q.  Do you agree that *Brown Shoe* offers the "reasonable interchangeability of use" test as a

22    stand-alone "alternative approach" as Dr. Aron suggests?

---

84.  SBC response to ORA 13-9.

85.  *Order Instituting Rulemaking on the Commission's Own Motion to Assess and Revise the Regulation of Telecommunications Utilities*, Rulemaking 05-04-005, Declaration of Dr. Debra J. Aron Supporting Opening Comments of Verizon California, filed May 31, 2005, at para 44.

**REDACTED**                    ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    A.   No.  The cited text in *Brown Shoe* certainly does not read as Dr. Aron characterizes it.   The

2         Court's opinion states:

3
4              The outer boundaries of a product market are determined by the reasonable
5              interchangeability of use or the cross-elasticity of demand between the product
6              itself and substitutes for it.
7

8         Taken in context of the entire sentence, it is clear that these are not *alternative* approaches

9         but essentially different ways of expressing the *same* standard.

10

11   Q.   Does the Court in *Brown Shoe* say anything else that Dr. Aron's discussion overlooks?

12

13   A.   Yes.  Immediately after the text just quoted, the Court goes on to say:

14
15             However, within this broad market, well-defined submarkets may exist which, in
16             themselves constitute product markets for antitrust purposes.  The boundaries of
17             such a submarket may be determined by examining such practical indicia as
18             industry or public recognition of the submarket as a separate economic entity, the
19             product's peculiar characteristics and uses, unique production facilities, distinct
20             customers, distinct prices, sensitivity to price changes, and specialized vendors.
21             Because Section 7 of the Clayton Act prohibits any merger which may substantially
22             lessen competition 'in *any* line of commerce' (emphasis supplied), it is necessary to
23             examine the effects of a merger in each such economically significant submarket to
24             determine if there is a reasonable probability that the merger will substantially
25             lessen competition.  If such a probability is found to exist, the merger is proscribed.
26

27        This further explanation of the standard is key to applying it to the present circumstances.

28        Rather than supporting Dr. Aron's approach of looking at the merger impact in a very broad

29        context, the Court's guidance seems rather to be encouraging an analysis that looks to see

30        whether competition is lessened even within a discrete submarket.  Thus, despite their

96

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

1    limited substitutability, wireline and wireless services unambiguously satisfy the *Brown*

2    *Shoe* definition of separate submarkets, specifically, by virtue of their respective "industry or

3    public recognition of the submarket as a separate economic entity, the product's peculiar

4    characteristics and uses, unique production facilities, distinct customers, distinct prices,

5    sensitivity to price changes, and specialized vendors."

6

7    Q.   In her URF testimony, Dr. Aron suggests that where "it is difficult or impossible to

8         determine, quantitatively, through econometric analysis, survey evidence, or other

9         quantitative approach, how responsive customer are in their purchases of one product to the

10        change in the price of another," the "reasonable interchangeability of use" standard is

11        applicable.  Leaving aside the matter of whether *Brown Shoe* even authorizes this

12        "reasonable interchangeability of use" as an *alternative* to a rigorous cross-elasticity

13        analysis, is her apparent concession that no "econometric analysis, survey evidence, or other

14        quantitative approach" is even possible itself significant in assessing the actual extent to

15        which these putative "substitutes" are actually in the same product market as wireline

16        telephony?

17

18   A.   Indeed, yes.  Dr. Aron seems to be conceding that no data sufficient to support a rigorous

19        econometric analysis is available.  This would certainly *not* be the case if the various

20        intermodal services she posits as "substitutes" for wireline telephony were being seen by

21        consumers as substitutes.  Indeed, if her own clients, Verizon and SBC, were seriously

22        concerned about losing wireline sales to wireless, VoIP, cable, or other non-wireline

23        technologies, the responsiveness of customers "in their purchases of one product to the

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1     change in the price of another" would have been extensively studied and analyzed

2     quantitatively by Verizon and SBC themselves.  The fact that no such quantitative studies

3     have apparently been undertaken – or have not borne out Dr. Aron's qualitative assertions

4     and hence have not been disclosed – speaks volumes as to the dubious merit of her

5     conclusions.

6

7  Q.  Is there any quantitative evidence upon which the Commission can rely that would

8      affirmatively *refute* the anecdotal claims of substitutability being advanced by the Joint

9      Applicants and their outside experts?

10

11  A.  Yes.  In fact, one need look no further than the wireline local service market in the Los

12      Angeles metropolitan area.

13

14      The greater Los Angeles metropolitan area is divided between SBC California and Verizon

15      California (the former GTE-California).  Significantly, however, there is a large gap between

16      the SBC and Verizon price levels for the equivalent basic exchange service:

17

98

**REDACTED**

ET ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

| Table 3 | |
|---|---|
| Comparison of SBC and Verizon California Residential Rates | |
| ILEC | Monthly 1FR rate (incl.  FCC SLC) |
| SBC California | $ 15.11 |
| Verizon California | $ 23.75 |
| Price difference | $ 8.64 |
| Percent difference | 57.2% |

Verizon's rates are thus some 57.2% higher than SBC's, leading us to conclude that the SBC

and Verizon service areas are separate and distinct "relevant geographic markets" as defined

by the *Horizontal Merger Guidelines*.[86]  Importantly, however, the prices for the putative

"intermodal alternatives" identified by the Joint Applicants and their outside experts –

particularly wireless, cable telephony and VoIP – *are no higher in Verizon exchanges than*

---

86.  *Horizontal Merger Guidelines*, at §1.21.  The *Guidelines* define "the geographic market
to be a region such that a hypothetical monopolist that was the only present or future producer of
the relevant product at locations in that region would profitably impose at least a 'small but sig-
nificant and nontransitory' increase in price, holding constant the terms of sale for all products
produced elsewhere." That is, if the SBC and Verizon exchanges within the greater LA area were
in the same geographic market, then Verizon customers, faced with having to pay the extra $8.64
over the corresponding SBC price, would relocate their residences to SBC territory in sufficient
numbers so as to force Verizon to bring its prices into line with SBC's.  Verizon has thus been
able to sustain its "[not-so-]small but significant nontransitory" price differential relative to SBC
precisely because it is operating in a separate geographic market, since few if any consumers
would relocate their residence to an SBC exchange merely to save $8.64 per month on their
phone bill.

99

REDACTED

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1    *in SBC territory.*[87]  So even if SBC and Verizon do not compete with one another in their

2    respective – and separate – geographic markets, they would presumably each be competing

3    with the same wireless, cable and VoIP providers and with prices that are the same in both

4    ILEC service areas.  If wireless, cable telephony and VoIP were, as the Joint Applicants and

5    Dr. Aron contend, part of the same "relevant product market" as basic wireline telephone

6    service, Verizon would be unable to maintain its "[not-so-]small but [quite] significant [and

7    certainly] nontransitory" price differential relative to SBC.  The fact that Verizon is able to

8    maintain its $23.75 1FR price in the face of a $14.48 price being offered by Comcast

9    provides compelling proof that the vast majority of consumers do not see cable telephony as

10   falling in the same "relevant product market" as ILEC service, the "relevant product market"

11   that is applicable to this merger.

12

13   And in that regard, it is *essential* to recognize that the *Merger Guidelines* neither expect nor

14   call for *zero substitution* or zero cross-elasticity between two products in order for them to

15   be considered as falling in different product markets.  The *Guidelines'* test is whether

16   product B is a sufficiently close substitute for (hypothetically monopolized) product A that

17   the provider of A could not profitably implement a "small but sustainable and nontransitory"

18   increase in the price of A.  At best, Dr. Aron has shown that there is *non-zero* substitution, a

19   not-so-interesting and certainly not particularly surprising "fact" that has absolutely no

20   relevance to the definition of the "relevant product market" applicable to the competitive

---

87.  For example, Comcast, which provides telephone service in the greater Los Angeles
area in both SBC and Verizon service areas, charges the same $14.48 monthly rate (including the
SLC) irrespective of the underlying ILEC residential exchange service rate.

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                     LEE L.  SELWYN

1     impact analysis that the Commission is required by §854(b)(3) to perform in connection

2     with its review of the instant merger application.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1          INTERMODAL COMPETITION AND MARKET CONCENTRATION

2

3    **Consumer purchases of wireless, cable, and VoIP are not sufficient to prevent the post-**
4    **merger SBC from imposing a "small but significant and nontransitory increase" in the**
5    **price of its wireline services without losing so much business as to make the price increase**
6    **unprofitable.**
7

8    Q.   Dr.  Selwyn, we have been discussing the concept of "intermodal competition" in the

9         context of the *Horizontal Merger Guidelines'* specification for defining the "relevant

10        product market."  Have you analyzed the specific effect of the sources of such intermodal

11        competition being claimed by the Joint Applicants upon wireline local and long distance

12        services that would be provided by a post-merger SBC?

13

14   A.   Yes, I have.  None of the Joint Applicants' anecdotal evidence would support a finding,

15        consistent with the *Merger Guidelines* prescription, that any of the specific intermodal

16        services they or their outside experts identify are sufficiently close substitutes to SBC's

17        wireline services so as to prevent SBC from implementing a "small but significant and

18        nontransitory price increase" without losing so much business to these putative "intermodal"

19        alternatives as to make the price increase unprofitable.  When the effect of these intermodal

20        alternatives in constraining the continued market power of an incumbent telco is examined

21        in a comprehensive and analytical manner, it becomes evident that their relative importance

22        is minimal at best.  Moreover, given that SBC and its corporate affiliates are themselves

23        either the *source* of or a provider of essential inputs to at least *some* of the "intermodal"

24        services, characterizing these services as a competitive threat to SBC's traditional wireline

25        services is disingenuous.

102

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    Q.  Please explain.

2

3    A.  For example, Joint Applicants' declarant Dr.  Debra Aron cites an increase of 94-million

4        wireless subscribers since December 1999.[88]  This information is a bit misleading, because it

5        includes as individual "subscribers" each wireless phone in a "family plan" package (e.g., a

6        family plan customer with, say, four phones would be counted as four "subscribers"),

7        pricing plans that were first introduced only a few years ago.  As such, the increase in the

8        number of *households* with at least one wireless phone is far less dramatic.  Moreover, if

9        consumers truly viewed wireless as a close substitute for wireline, then the vast increase in

10       the number of wireless phones would be matched by a correspondingly large drop in the

11       number of *wireline* phones, but nothing even close to that has actually taken place.

12

13       To be sure, some very small amount of wireless substitution has been taking place *at the*

14       *margin*, but it is extremely limited, both with respect to residential, small business, and

15       enterprise services.  By subscribing to *both* wireline and wireless services, the vast,

16       overwhelming majority of consumers are *confirming* that they see wireline and wireless

17       service as *complements* to one another, and not as substitutes.  Indeed, it is the utter *lack* of

18       substitution of wireless for wireline by the vast majority (indeed, very close to all) of

19       households that provides compelling, essentially irrefutable evidence that wireless and

20       wireline are *not in the same relevant product market* and that *wireless is not an "intermodal*

21       *competitor" for traditional wireline telephone service.*

88.  Opening Testimony of Debra J. Aron, May 6, 2005 ("*Aron Testimony*"), at 21.

103

**REDACTED**

Cal. PUC A.05-02-027                     LEE L.  SELWYN

1    **Where it occurs, wireless substitution is minimal at best**

2

3    Q.   Are you suggesting that no one has substituted wireless service for wireline service?

4

5    A.   No, but as I have previously noted, *zero substitution* is not the standard being called for in

6         the *Merger Guidelines* as the basis for defining the relevant product market.  Of course there

7         has been *some*, albeit extremely limited, substitution of wireless for wireline, but certainly

8         not anywhere near enough to constrain wireline prices.  A recent paper presented at the

9         American Association of Public Opinion Research by Julian V. Luke *et al* of the Centers for

10        Disease Control and Prevention, National Center for Health Statistic presents an

11        independent, unbiased, view of the extent of wireless substitution, and its demographics.

12        Using data from the National Health Interview Survey, January-December 2003, the authors

13        determined that 3.1% of civilian non-institutionalized adults have only a wireless phone, and

14        3.7% of all households are wireless-only.

15

16        To be sure, some RBOCs have cited studies (conducted by or for them) that purport to show

17        somewhat higher, but typically still single-digit, substitution rates.[89]  However, even these

18        likely-exaggerated statistics still confirm that well in excess of 90% of all households do not

---

89.  *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements; 2000 Biennial Regulatory Review of the Separate Affiliate Requirements of Section 64.1903 of the Commission's Rules*, WC Docket No. 02-112 and CC Docket No. 00-175, Ex Parte Submission of Qwest Communications, filed October 28, 2003; *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements; 2000 Biennial Regulatory Review of the Separate Affiliate Requirements of Section 64.1903 of the Commission's Rules*, WC Docket No. 02-112 and CC Docket No. 00-175, Ex Parte Submission of Verizon Inc., filed October 15, 2003.

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    consider wireline and wireless to be substitutes, and hence not in the same relevant product

2    market.  In any event, whether the substitution rate is 3%, 5%, 10% or more, the *only*

3    applicable question – which *none* of these studies even *address* is whether the availability of

4    wireless as a substitute for wireline service is sufficient to constrain wireline prices.  The

5    Joint Applicants provide absolutely no evidence or data whatsoever to support the

6    conclusion that the availability of wireless services constrains prices for wireline service

7    today or would constrain them under post-merger conditions.  In fact, what little evidence

8    does exist on this subject (such as the sustained wireline price differential between SBC and

9    Verizon in the Los Angeles metropolitan area) compels the conclusion that wireless

10   substitution does not constrain wireline pricing to any measurable degree.  And, since the

11   *overwhelming majority* of consumers retain their wireline service even when they also have

12   one or more wireless phones in their household, the only reasonable conclusion is that the

13   overwhelming majority of consumers do not perceive the two services as "substitutes" and

14   that wireless service is *not* in the same "relevant product market" as wireline.

15

16   Q.  Dr. Aron cites a Deutsche Bank study purportedly showing that "wireless growth accounted

17        for 47% of ILEC primary line residential landline losses."  Are you familiar with the study

18        to which she refers?

19

20   A.  Yes.  However, it is particularly noteworthy that the Deutsche Bank study clearly

21        acknowledges the difficulties of assessing access line losses, and seeks to absolve itself of

22        any responsibility for accuracy in its calculation of intermodal substitution:

23

105

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

1    Where are RBOC lines going? *This is a question which is much easier to ask than*
2    *answer.*  Although in theory, line losses can only be attributed to three key
3    categories, the seasonal volatility of quarterly estimates and a *subjective guess* as to
4    what RBOC access lines would have looked like if there were no competitive
5    services (such as cable or wireless), as well as the overlap between traditional
6    wireline services and "new age" providers *makes any precise assessment extremely*
7    *difficult.  Having absolved ourselves of any responsibility for accuracy,* let us
8    proceed to try to quantify with as much granularity as possible the matrix of gains
9    and losses.[90]

10

11  Q.  What methodology does Deutsche Bank employ to calculate purported wireline losses to

12       wireless?

13

14  A.  The analysis begins by calculating the total of ILEC consumer primary lines for each quarter

15       starting in the fourth quarter of 2002 through the third quarter of 2004.  From this data, the

16       study calculates the net change in primary lines, which in this case represents quarter-by-

17       quarter ILEC line losses.  Deutsche Bank then generates what it calls the "Opportunity Loss"

18       or the likely demand for telecom services in the absence of other competitors, by adding the

19       total stock of new housing starts to the actual line losses.  From this total "opportunity loss,"

20       the study subtracts competition from UNE-P, Cable Telephony, and VoIP, and then simply

21       attributes the remaining net losses to wireless.

22

23  Q.  Is the new housing starts statistic the appropriate basis for calculating the "opportunity loss"

24       of lines lost?

---

90.  Deutsche Bank, *Crossing the Rubicon, Act II: Indian Summer wanes,* November 26,
2004, at 14 (emphasis supplied).

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    A.   No.  While Deutsche Bank certainly deserves credit for creativity, the use of new housing

2         starts is problematic for several reasons.  "New housing starts" is a gross additions statistic

3         that does not include housing units demolished.  Also, there is a considerable time lag

4         between a housing *start* and housing *occupancy*, yet it is *occupancy* that creates demand for

5         telephone service.  The housing starts statistic also gives no effect to vacancy rates, and its

6         use by Deutsche Bank implicitly assumes – quite incorrectly – that 100% of all housing

7         units are occupied immediately after the first shovel of dirt is removed from the site.  In fact,

8         new housing start data is often tabulated based upon applications for building permits[91] –

9         i.e., even earlier than that first shovelful of dirt – expanding the interval between housing

10        start and occupancy.  In short, each and all of the "assumptions" underlying the Deutsche

11        Bank "study" were inherently biased in the direction of overstatement – demolitions were

12        ignored, vacancies were ignored, time lags were ignored – and so the result was clearly at

13        the extreme end of the possible range of estimates.  That Dr. Aron felt compelled actually to

14        "rely" upon this patently contrived "study" underscores the utter vacancy of her core

15        contention.

16

17   Q.   Is there other evidence to confirm your view that Dr. Aron's assessment of wireless

18        substitution is exaggerated and overstated?

19

20   A.   Yes, and it would appear that Dr. Aron has ignored this more recent data, data that actually

21        undermines her contention.  A report in the June 2, 2005 *Wall Street Journal* notes that, in

---

91.  US Census Bureau, http://www.census.gov/const/www/newresconstdoc.html (accessed
June 21, 2005).

REDACTED

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    fact, "While the number of wireless-only households is increasing -- close to 6% of all U.S.

2    homes at the end of last year, according to Forrester Research Inc. -- the trend isn't

3    accelerating as quickly as many experts predicted. And some consumers are reconsidering

4    their decision to go wireless and are reconnecting to a landline."[92]   The *Journal* article goes

5    on to note that

6

7            When the Federal Communications Commission in November 2003 began
8            allowing customers to switch their home phone number to a cellphone, a huge shift
9            to wireless-only consumers was expected. About 820,000 people did make the
10           move through the end of last year, according to the FCC, but that was only a
11           fraction of what was predicted.[93]

12

13   Particularly noteworthy for purposes of the instant proceeding is the fact that "for the first

14   time in five years, the number of primary consumer landlines actually rose in the first

15   quarter at SBC Communications Inc."[94]  Moreover, the *Journal* reports that many consumers

16   who, responding to surveys, had said that they were planning to discontinue their wireline

17   phone did not follow through on that plan.  This could well explain some of the disparity

18   among the various "studies" purporting to address this issue.  But whichever of those studies

19   one chooses to believe, all confirm that somewhere in the mid- to high-90% range of US

20   consumers with wireless phones also have wireline phones – and do not consider wireless as

21   a "substitute" for wireline.

_____

92.  "Cutting the Phone Cord Isn't as Popular as Once Predicted," Christopher Rhoads, *The Wall Street Journal*, June 2, 2005, at p. B1.

93.  *Id.*

94.  *Id.*

**REDACTED**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    Q.  How would you measure the level of substitutability between two purported substitute

2         products such as wireless and wireline telephone service?

3

4    A.  A measurement of the cross-price elasticity between the two products would provide a

5         reasonable sense of their level of substitutability.

6

7    Q.  Would you please define the term "cross-price elasticity?"

8

9    A.  Cross-price elasticity is a measurement of the change in demand for a product given a

10        corresponding change in price for a substitute good.  This value can indicate whether two

11        products are complements or substitutes, and measures the sensitivity of consumers as to the

12        rate at which they consume these products given their corresponding prices.  The cross-price

13        elasticity for two related products is calculated as the percentage change in the quantity

14        demanded of product X, divided by the percentage change in price of product Y.  A positive

15        cross-price elasticity indicates that two products are substitutes, while a negative value

16        indicates the products are complements.  A resulting absolute value of more than 1.0 would

17        indicate a relatively high level of cross-elasticity, indicating a high level of substitution or

18        price sensitivity.  An absolute value of less than one indicates that consumers have a

19        relatively low level of cross-elasticity ("inelasticity") which would indicate that, even if two

20        products were substitutable for certain purposes, consumers would not be likely to substitute

21        one product for the other as a result of changes in price.

22

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L. SELWYN

1   Q.   To the best of your knowledge, has Dr. Aron calculated such a cross-price elasticity for

2        wireless and wireline services?

3

4   A.   No, it does not appear that Dr. Aron has conducted any such study of the relationship

5        between wireless and wireline service.[95]

6

7   Q.   Does the limited evidence of wireless substitution to which Dr. Aron has referred provide a

8        basis for concluding that wireless and wireline services fall within the same "relevant

9        product market"?

10

11  A.   No, because none of these studies address wireline/wireless cross-elasticities or show

12       whether wireless constrains wireline pricing.  Moreover, even if the claimed wireless

13       substitutes were validly included within the same product market as basic wireline telephone

14       service – which they are not – these services would "compete" with SBC only where SBC

15       was not itself also either a provider of wireless services or a provider of essential inputs to

16       nonaffiliated wireless carriers.

17

18       In fact, SBC is both.  SBC, BellSouth, and Verizon together control some 63% of the major

19       national wireless service providers, and may individually control a disproportionately larger

20       share within their respective wireline service footprints.  For example, SBC's wireless

21       affiliate, Cingular (which includes the recently-acquired AT&T wireless customer base), has

_____

95.  SBC response to ORA 13-9.

110

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

1    a <<BEGIN SBC/AT&T PROPRIETARY          END SBC/AT&T PROPRIETARY>>

2    share of the consumer wireless market within the SBC California serving area.[96]  All

3    wireless carriers make extensive use of ILEC special access services to interconnect their

4    transceiver sites with the wireless carrier's Mobile Telephone Switching Office ("MTSO");

5    thus, at least a portion of any wireline revenues "lost" to nonaffiliated wireless carriers will

6    also come back to SBC in the form of additional special access services required by the

7    wireless carrier to meet the additional demand.  Thus, even an actual "loss" of a wireline

8    customer to wireless – in the rare instances where that may occur – in most instances is *not a*

9    *loss* of the customer to SBC.

10

11    **Use of a wireless phone as a "primary phone," or for long distance calling, is *not***
12    **"intermodal competition."**
13

14    Q.    Dr. Aron cites several studies that purport to show that many wireless subscribers do have a

15    wireline phone, but use their wireless handset as their "primary" phone.  How are these

16    subscribers using their wireless phones as their "primary" phone?

17

18    A.    The most common application in which customers may use their wireless phones from home

19    is to originate long distance calls.  Most wireless rate plans include long distance calling at

20    no additional charge (as long as total usage stays within the block of time selected by the

21    customer) and, where the rate plan provides "free" night and weekend calling or "free" on-

22    net or "family" calling, or provides a block of time that significantly exceeds the customer's

---

96.  Customer Analytics and Research, Customer and Product Share Report– Consumer, February 2005, at "Wireless."  Bates 000329-000401.  Share is a sum of "SBC" and "AT&T."

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

1    typical needs, customers would perceive wireless-originated long distance as "free."  Not

2    surprisingly, consumers have shifted substantial portions of their long distance calling to

3    their wireless phones.  Despite that *usage substitution*, as noted, *very few customers have*

4    *actually disconnected their wireline service altogether*, and many still choose long distance

5    wireline calling plans that involve some fixed monthly charge.  In a recent investor briefing,

6    SBC cited the "high percentage of [its] long distance customers on plans with recurring

7    charges."  With "nearly 80% of consumers" on recurring charge plans (many on pricey

8    unlimited plans), SBC appears to be continuing to extract revenue from its long distance

9    customers, including those with wireless phones that, according to believers in intermodal

10   competition theory, constitute an easily accessible, cost-effective long distance substitute.

11   It's difficult to square Dr. Aron's contention that customers are "substituting" wireless for

12   wireline when placing toll calls, while some 80% still pay SBC a recurring monthly charge

13   for the ability to place discounted long distance calls from their primary wireline phone.

14

15   Q.  How is it that wireless carriers are able to offer seemingly "free" long distance service?

16

17   A.  Completely ignored in most analyses of usage substitution is the fact that wireless carriers'

18       ability to offer "free" long distance calling stems from certain pecuniary distortions created

19       by FCC regulations, and *not* from any production efficiency or technological advantage.   A

20       unique regulatory treatment allows wireless carriers to avoid paying access charges in many

21       cases where a wireline long distance carrier would incur these charges.  Because their access

22       charge burden is significantly lower than that confronting wireline carriers (and because they

112

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    charge for airtime usage), wireless providers often do not assess a discrete charge for long

2    distance calls.

3

4    Q.  Can you explain this in more detail?

5

6    A.  Wireline long distance carriers are required, pursuant to Part 69 of the FCC's rules,[97] to pay

7        access charges to local exchange carriers for the origination and termination of

8        interexchange calls carried by the IXC.[98]  Wireline ILECs, such as SBC, are required by Sec.

9        272(e)(3) of the 1996 Act to "impute" access charges into their retail long distance rates.

10       "Interexchange" calls are defined for this purpose as calls between exchanges not within the

11       same local calling area.  Local calling areas are ordinarily established in ILEC (or CLC)

12       tariffs and are subject to approval by the state commission.  However, in the case of *wireless*

13       carriers, the FCC has *preempted* the state commissions with respect to the definition and

14       scope of *wireless* local calling areas.[99]

15

16   Q.  What is the effect of the FCC's preemption of state commissions with respect to designating

17       wireless local calling areas?

18

_____

97.  47 CFR §69.105

98.  IXCs are required to pay access charges on *all* calls handed off to them, even if the two
endpoints of the call are physically located within the same ILEC local calling area.

99.  *Implementation of the Local Competition Provisions in the Telecommunications Act of
1996*, CC Docket No. 96-98, *First Report and Order*, 11 FCC Rcd 15499 (1996), at para 1036.

ECONOMICS AND
TECHNOLOGY, INC.

REDACTED

Cal. PUC A.05-02-027                LEE L. SELWYN

1  A.   The FCC has designated wireless local calling areas at the "Major Trading Area" (MTA)

2       level.  Unlike wireline local calling areas that typically involve distance of between 10 and

3       30 miles from the calling party's location, MTAs are large expanses of geography.

4       Nationwide, there are only 51 MTAs, many of which encompass entire states or even several

5       states.  Wireless calls are considered to be "local calls" when placed to points anywhere

6       withing the same MTA from which the call had originated.  Such "local calls" are

7       considered by the FCC to be Section 252(b)(5) local traffic, which is not subject to access

8       charges, irrespective of distance (which could be up to several hundred miles) or jurisdiction

9       (intrastate or interstate).

10

11      This federal preemption operates to expressly *exempt* wireless carriers from paying access

12      charges on any intra-MTA, wireless-originated call, even where the very same call would be

13      subject to access charges if placed from a wireline phone.  Those access charges – that

14      wireless carriers avoid – fall between about 1.1 cents per minute for interstate calls, to as

15      much as 1.8 cents a minute or higher for California intrastate calls.  It is difficult to square

16      the existence of this substantial FCC-imposed *intermodal* economic distortion with the

17      notion that consumer migration to "free" wireless long distance calling represents a *bona*

18      *fide* economically-based intermodal alternative.

19

20  Q.  Are there any wireline services where substantial wireless substitution has taken place?

21

22  A.  Interestingly, customers have substituted wireless calling for their use of payphones and

23      hotel-provided (outgoing) telephone services – two services where *locational monopolies*

114

ET ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    (by payphone owners and hotel operators) had resulted in excessive prices.  In both of these

2    markets, these locational monopolists lost significant business to wireless once customers

3    had an alternative way to place their calls from transient locations.

4

5    Q.   Has this type of wireless substitution been recognized in any of the "studies" cited by Dr.

6    Aron or by other Joint Applicant outside experts?

7

8    A.   Not specifically.  Indeed, by having ignored this real source of wireless substitution, those

9    "studies" likely *misattributed* at least some of the wireless long distance minutes as having

10    come from consumers' home phones rather than from demand that would have otherwise

11    been placed over payphones or from hotels.  As such, the "studies" have overstated the

12    actual extent of long distance substitution.

13

14   Q.   Are payphone and hotel telephone services part of the "relevant product market" applicable

15    to this merger?

16

17   A.   Perhaps at the wholesale level, but certainly not at the retail level.  Prices for calls from

18    hotels are set by the hotels themselves, and prices for payphone calls are set by the payphone

19    owner or operator service provider.  In fact, many ILECs have been divesting their payphone

20    business.

21

REDACTED

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                     LEE L.  SELWYN

1   Q.   Does the use of wireless phones in place of payphones or hotel phone services impose any

2        price constraints upon basic wireline local and long distance services offered by either SBC

3        or AT&T?

4

5   A.   No.  This is a separate and distinct market that, by definition, involves only calls originated

6        by customers away from their home or place of work.

7

8   **RBOC actions indicate that even wireline carriers perceive wireless service to be an**
9   **integrated complement to, and distinctly not a substitute for, traditional wireline service**.
10

11  Q.   You have previously asserted that wireless is not a substitute for wireline service.  Can you

12       provide any other specific evidence that suggests that wireless is not perceived to be a

13       substitute for wireline?

14

15  A.   Yes.  Even among those consumers who do rely upon wireless for most of their calling, the

16       continued demand for wireline phones for emergencies and for incoming calls is

17       demonstrated by a recent offering by Cingular Wireless and its RBOC owners, SBC and

18       BellSouth.  With its new "FastForward" service, Cingular customers whose local wireline

19       provider is either SBC or BellSouth can place their wireless phone in a special cradle, which

20       then signals Cingular to automatically forward all incoming cell phone calls to the

21       customer's wireline home phone.  Under this arrangement, which SBC and Cingular

22       describe as "integration" of wireless and wireline service, the customer does not incur a

23       charge for air time usage on the forwarded call.  BellSouth and SBC also permit their

24       bundled wireline and wireless customers to share one bucket of long distance minutes

116

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    between their wireless and wireline phone.  This application clearly demonstrates that

2    wireless and wireline service are being viewed as *complementary* services, rather than

3    substitutes.

4

5  Q.  What do you conclude from these combinations?

6

7  A.  Clearly, ILECs such as SBC are attempting to integrate wireless and wireline services, rather

8      than pit them against one another in competition.   SBC and BellSouth are not treating

9      Cingular as a "competitor" of their local exchange services at all.  In fact, they sell Cingular

10     wireless service through their own sales channels, and report that sales through such

11     channels represented 15% of gross Cingular customer additions in the second quarter of

12     2003.[100]

13

14     Far from positioning themselves as a substitute, such joint marketing programs are more

15     likely to stimulate additional demand for both wireline and wireless RBOC services.  The

16     fact that the RBOCs perceive a demand for these integrated service arrangements and

17     benefits of joint wireline/wireless marketing programs cannot be squared with their

18     otherwise unsupported contentions that wireless and wireline are substitutes.

19

---

100.  Cingular Wireless, SBC and BellSouth Joint Announcement, *Cingular Wireless, SBC Communications and BellSouth to Launch FastForward™ – Latest in a New Category of Services That Integrate Wireless and Wireline Communications*, September 9, 2003, available at http://www.sbc.com/Common/files/pdf/IB_fastforward.pdf (accessed May 26, 2005.)

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    Q.   Have the Applicants provided any hard evidence that quantifies the price-constraining effect

2         of "intermodal substitution?"

3

4    A.   No, they do not.  Dr. Aron speaks to the amount of access line loss currently faced by

5         SBC,[101] and cites several statistics about wireless usage rates,[102] but she never attempts to

6         quantify actual cross-elasticities.

7

8    **Limited competition from cable providers at best produces a duopoly market outcome for**
9    **services that depend upon bottleneck "last mile" facilities**
10

11   Q.   Please explain how, even when there is an intermodal alternative such as cable telephony

12        available to consumers, the presence of this alternative could fail to constrain the market

13        power of an incumbent monopoly provider.

14

15   A.   As I have previously noted, hard evidence "on the ground" in California confirms that

16        Verizon California has maintained its price level for basic flat-rate residence service even in

17        the face of cable telephony prices some $9 below Verizon's.  Clearly, very few of Verizon's

18        basic wireline service customers perceive cable telephony as a sufficiently close substitute

19        that Verizon is not being forced to cut its price level.  A key shortcoming of cable telephony

20        competition is that it is limited to the retail level.  One of the catalysts for the *1996 Act* was

21        the promise, or at least the potential, that monopoly cable operators and monopoly ILECs

---

101.  *Aron Testimony*, at 21.

102.  *Aron Testimony*, at 21-22.

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    would enter each other's business.  Cable providers had been flirting with telephony for a

2    number of years and, indeed, it was the prospect of cable bypassing the ILEC bottleneck and

3    serving as the second wire into the home that prompted AT&T's disastrous foray into cable

4    TV in 2000.  Current cable TV operators like Comcast, Time Warner, and RCN offer retail

5    local telephone service to their (primarily residential) cable subscribers, but do not, and are

6    not required to, make components of their networks available to CLCs on an unbundled or

7    even on a bundled resale basis.  Thus, while cable TV companies compete with the

8    incumbent LECs on a retail basis, they are not a source of *wholesale* competition for access

9    to facilities into the home.

10

11   Q.   But doesn't the presence of retail competition from cable providers serve to constrain ILEC

12        market power?

13

14   A.   Not really.  Cable telephony has been touted as having great competitive promise, but that

15        potential has been slow to develop.  As an initial matter, it is a costly undertaking to upgrade

16        cable systems from their traditional one-way analog video distribution capability to a

17        network architecture capable of supporting digital video and two-way services such as high-

18        speed Internet access and circuit switched voice telephony.  Nationally, cable passes

19        approximately 107-million homes,[103] but not all of these facilities are telephony-capable,

---

103. *Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming,* MB Docket No. 04-227, *Eleventh Annual Report*, rel. February 4, 2005.

119

**REDACTED**

ET ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1     thus making cable less ubiquitously available than wireline telephone service.  Of those 107-

2     million homes, 61% currently subscribe to cable TV service.[104]  However, by mid-2004,

3     cable systems were providing basic local telephone service to only about 3.34-million

4     customers nationwide.[105]  Thus, the 3.34-million cable telephony subscribers represent only

5     3.1% of all homes passed by cable, 5% of all cable TV subscribers, and a mere 1.85% of all

6     local telephone access lines.

7

8     Moreover, the rate at which cable companies have been adding new telephony customers has

9     clearly been slowing.  In the six months from January to June 2001, cable companies added

10    751,000 net additional telephony customers, while between January to June 2004, cable

11    companies added a meager 37,000 net telephony customers.[106]   Up to now, at least, the bulk

12    of the required investment has been directed at upgrades to support digital cable services and

13    Internet access, and it is not all clear that substantial additional investment in *circuit-*

14    *switched* telephony will occur.  Comcast, for example, has recently announced plans to

15    pursue a VoIP strategy[107] apparently in place of any further circuit-switched telephony roll-

16    out.  For residential and small business customers, cable telephony is the only remaining

17    vestige of facilities-based local competition to the ILECs.  Yet there is no indication that

---

104.  *Id.*

105.  Industry Analysis and Technology Division, Federal Communications Commission, *Local Telephone Competition, Status as of June 2004*, December 2004, at Table 5.

106.  *Id.*

107.  "Comcast Plans Major Rollout of Phone Services Over Cable," *The Wall Street Journal*, January 10, 2005, at B1.

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    cable telephony is in any material sense operating to constrain ILEC prices and market

2    power.

3

4    With other CLCs disabled from serving customers over ILEC loops (unless they incur

5    significant *uneconomic* switching investment) and with no obligation for cable companies to

6    provide CLCs with access to their local loops or switching facilities, what remains at best is

7    a cable/ILEC duopoly in the retail market.

8

9    Q.    What are the economic implications of a duopoly market outcome?

10

11   A.    Duopoly markets, where two firms carve up all of the demand between them, tend to behave

12         like monopolies, not like competitive markets, in that both firms charge prices above

13         marginal cost.[108]  In other words, if cable is the only actual competitor to the ILECs for basic

14         local telephone service, its presence is not likely to have any material effect in constraining

15         ILEC prices and market power over "last mile" facilities.

16

17   Q.    Are there other physical differences between cable telephony and wireline ILEC services

18         that make them less-than-perfect substitutes?

19

20   A.    Yes.  In most cases, cable telephony relies upon *locally-provided* power at the customer's

21         premises, and also relies upon *locally-provided* power for repeater sites between the cable

---

108.  W. Kip Viscusi, *et al*, *Economics of Regulation and Antitrust Second Edition*, MIT
Press, 1998, at 81.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                        LEE L. SELWYN

1    head-end and the customer's home.  As a result, a power failure may often mean that the

2    cable telephone service is out as well.  By contrast, the ILEC service is powered from the

3    central office, which is equipped with extensive power backup facilities.  In most cases,

4    ILEC phone service is not interrupted by an electric power failure, but that is not so with

5    cable telephony.

6

7    **Decreases in RBOC access lines are attributable to the decline of the second line market,**
8    **rather than to consumer "substitution" of "intermodal" alternatives**.
9

10   Q.   In Section III of her testimony, Dr. Aron attributes recent declines of RBOC access lines to

11        competition, especially from intermodal alternatives such as wireless and VoIP services.  Do

12        you agree with her contention that consumers are substituting wireless and VoIP service for

13        traditional wireline service?

14

15   A.   No, and in fact there is no evidence – certainly nothing advanced by Dr. Aron – that this is

16        taking place.  There is no question that the quantity of wireline basic exchange access lines

17        has been declining in recent years, but "intermodal competition" is not the only, or even the

18        primary source of this drop-off in demand for ILEC access lines.  One source may have been

19        the economic downturn that began in 2001.  The largest influence, however, is undoubtedly

20        the substantial *growth* in the demand for high speed Internet access via DSL and cable

21        modem services.  In the early 1990s – prior to the advent of mass market public access to the

22        Internet – only about 4.118% of all US households had more than one local telephone access

23        line.  However, beginning in the mid-1990s, the growing interest in dial-up Internet access

24        stimulated the demand for additional residential access lines; by 2000, some 26% of all US

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1     households had at least one additional wireline access line.[109]  DSL and cable modems

2     *replace* those additional dial-up access lines that had been installed principally for the

3     purpose of accessing the Internet.

4

5     Of course, the ILECs themselves provide a substantial share of these alternative (high-speed)

6     Internet access arrangements.  In California, <<BEGIN SBC/AT&T PROPRIETARY

7     END SBC/AT&T PROPRIETARY>> of high speed residential access lines in SBC's region

8     are provided by SBC.[110]  Once the transition from dial-up to high-speed Internet access has

9     been completed, the outlook for SBC with respect to their basic core residential local

10    telephone service is not one of continually declining demand.

11

12    **VoIP services do not avoid the "last mile" bottleneck; moreover, they fall far short of**
13    **wireline services with respect to service quality and their ability to meet national standards**
14    **for emergency 911 service.**
15

16    Q.   Dr. Aron also claims that SBC faces intermodal competition from providers of VoIP service.

17         At this stage of its development, can VoIP legitimately be included within the same relevant

18         product market as the wireline local and long distance services being furnished by SBC and

19         AT&T?

---

109.  The SEC 10K Annual Reports of all of the RBOCs note significant growth in "additional residential lines" during this period. SBC Communications, filed March 10, 2000; Bellsouth Corp., filed March 2, 2000; Qwest Corporation, filed March 3, 2000; Bell Atlantic Corp., filed March 30, 1999.

110.  *TNS Telecoms, Consumer Market Share, Quartely Summary Report 4Q04*, Presented to SBC, March 2005, Bates SBCFCC000232184.

**REDACTED**                                    ECONOMICS AND
                                                TECHNOLOGY, INC.

Cal. PUC A.05-02-027                LEE L.  SELWYN

1  A.  No.  In order to place the issue of VoIP in its proper context, it is useful first to review the

2      applicable portions of the *Horizontal Merger Guidelines* that address the relevance of new

3      technological substitutes:

4
5          1.521 Changing Market Conditions
6
7          Market concentration and market share data of necessity are based on historical
8          evidence.  However, recent or ongoing changes in the market may indicate that the
9          current market share of a particular firm either understates or overstates the firm's
10         future competitive significance.  For example, if a new technology that is important
11         to long-term competitive viability is available to other firms in the market, but is
12         not available to a particular firm, the Agency may conclude that the historical
13         market share of that firm overstates its future competitive significance.  *The Agency*
14         *will consider reasonably predictable effects of recent or ongoing changes in market*
15         *conditions in interpreting market concentration and market share data.*
16
17         1.522 Degree of Difference Between the Products and Locations in the Market and
18         Substitutes Outside the Market
19
20         All else equal, the magnitude of potential competitive harm from a merger is
21         greater if a hypothetical monopolist would raise price within the relevant market by
22         substantially more than a "small but significant and nontransitory" amount.  *This*
23         *may occur when the demand substitutes outside the relevant market, as a group,*
24         *are not close substitutes for the products and locations within the relevant market.*
25         There thus may be a wide gap in the chain of demand substitutes at the edge of the
26         product and geographic market.  Under such circumstances, more market power is
27         at stake in the relevant market than In a market in which a hypothetical monopolist
28         would raise price by exactly five percent.[111]
29

30     In considering the question as to whether VoIP can be considered part of the "relevant

31     product market" applicable to the competitive impact analysis of the SBC/AT&T merger,

32     the Commission would need to affirmatively find that

_____

111.  *Horizontal Merger Guidelines*, at §§1.521, 1.522.  Emphasis supplied.

**REDACTED**

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1      •      The recent or ongoing changes in market conditions attributable to the introduction of

2             VoIP are reasonably predictable;

3

4      •      VoIP is a "close substitute" for traditional wireline services; and

5

6      •      The availability of VoIP would prevent the post-merger SBC from raising prices of its

7             traditional wireline services by substantially more than a "small but significant and

8             nontransitory" amount.

9

10     Importantly, none of the "evidence" being advanced by the Joint Applicants or their outside

11     experts even addresses any of these specific questions.

12

13  Q.  Is the potential importance of VoIP as a "close substitute" for traditional wireline services

14     reasonably predictable?

15

16  A.  No, and in fact there is a considerable amount of uncertainty as whether VoIP will prove to

17     be a more efficient technology than circuit-switched telephony once the numerous pecuniary

18     distortions between VoIP and circuit-switched services are eliminated.  Interest in VoIP

19     services has been escalating dramatically over the past several years as the FCC and state

20     commissions grapple with unresolved regulatory concerns arising from VoIP providers'

21     efforts to integrate their services into the public switched telephone network.  To be sure,

22     some of the claims being made about VoIP are true – VoIP services do offer some

23     functionalities that are not presently available with traditional voice services, and VoIP

125

**REDACTED**

1    services are *currently* less expensive to purchase than traditional voice services – *provided*

2    *that the customer already subscribes to high-speed Internet access via DSL or cable modem*

3    *services.*[112]  However, much of the apparent price advantage available to VoIP providers vis-

4    a-vis wireline carriers stems from pecuniary factors, *all of which are in the process of being*

5    *eliminated.*  Specifically:

6

7    •    VoIP providers generally do not pay either intrastate or interstate switched access

8         charges on calls terminated to or originated from wireline ILEC and CLC customers.

9

10   •    VoIP providers do not contribute to federal or state universal service funding

11        mechanisms (although some do make nominal voluntary contributions).

12

13   •    VoIP providers do not currently provide access to E-911 emergency reporting services

14        that is equivalent to that being provided by ILECs and CLCs, and VoIP providers do not

15        currently contribute to the cost of maintaining Public Safety Access Points (PSAPs) or

16        other public service programs (such as dual-party relay services and CALEA), and may

17        not be collecting state sales taxes.

18

19   These costs are not insignificant.  Interexchange carriers such as AT&T are required to pay

20   as much as 1.8 cents per minute at both the originating and terminating end of each intrastate

21   long distance call they carry within California, and approximately 1.1 cents per minute for

---

112.  At current rates, the customer typically has to expend $30-$45 to get DSL or cable modem high-speed Internet access.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    each interstate long distance call.  VoIP providers typically gain access to the public

2    switched network via interconnections with CLCs that exchange traffic with ILECs under

3    local reciprocal compensation arrangements, typically involving payments of less than one-

4    tenth of one cent at the terminating end of a VoIP-originated call.

5

6    Customers of California LECs are required to pay $0.47 for the Federal Universal Service

7    Fee (and 10.02% more on any additional interstate services such as long distance) and are

8    required to pay 4.29% in California Universal Service surcharges, and a 0.3% surcharge for

9    California Relay Service.  Additionally these customers may face surcharges for E-911

10   access and CALEA.  Some VoIP providers impose a "regulatory fee" of $1.50 per month,

11   which they use to make voluntary contributions to certain (but not all) of these programs.

12   There is simply no way to predict how VoIP would fare vis-a-vis wireline services once

13   these distortions are removed, and certainly there is no basis whatsoever to extrapolate the

14   *potential* growth of VoIP services from the extremely limited early-adopter demand that

15   exists at this time.

16

17   Q.   Are there other differences between VoIP and traditional circuit-switched services that make

18        it impossible to predict the extent to which VoIP will receive widespread public acceptance

19        as a close substitute for wireline services?

20

21   A.   Yes.  VoIP does not provide a quality of service that is even close to that of traditional

22        circuit-switched wireline services.  While these qualitative differences can be overcome, the

23        cost of bringing VoIP up to circuit-switched quality standards is also not fully known or

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    predictable at this time.  VoIP's ongoing service quality deficiencies were highlighted in a

2    recent column in *PC Magazine* by *PC's* longtime technology columnist John Dvorak:

3
4        [I]f you're sitting on a real T1 line rather than a DSL connection, the quality [of a
5        VoIP call] is usually identical to the switched service.  That's because the T1 line is
6        a different level of service than flaky DSL. ... But the T1 is still the premium-level
7        service, and the only line that appears to work flawlessly with VoIP systems all the
8        time. ... [W]ith the current Internet slogging along under constant denial-of-service
9        attacks and overloaded with spurious e-mail transmissions, the idea that VoIP is
10       going to push aside land lines any time soon is wishful thinking.  And now
11       phonecos such as SBC are selling the VoIP equipment themselves, while indicating
12       that if you use a VoIP phone that hooks to the company's switched network you are
13       going to have to pay them – unless, of course, you use the company's VoIP
14       service.[113]
15

16   Most of the existing consumer VoIP traffic is being carried over the public Internet, which it

17   contends for capacity along with a myriad of other applications, some of which, like VoIP,

18   require large amounts of bandwidth and experience serious service quality problems when

19   individual packets are delayed or lost.  As presently configured, the public Internet could not

20   handle the volume of VoIP traffic that would develop if VoIP were ever to become a serious

21   *mainstream* competitor of circuit-switched telephony.

22

23   While start-up VoIP providers such as Vonage, Packet8, VoIP.net and Broadvox Direct have

24   all adopted business models involving the public Internet as their principal transport

25   medium, any large-scale roll-out of VoIP in the consumer market – or any roll-out of VoIP

26   in the enterprise market – will involve the use of dedicated IP networks and *not* the public

27   Internet.  Certainly this is the direction that AT&T, SBC, Comcast and others are pursuing.

---

113.  Dvorak, John, "The Problem with VoIP Phones," *PC Magazine*, January 24, 2005.

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                     LEE L.  SELWYN

1    Another technological solution is the use of premium arrangements whereby service

2    providers can purchase priority transmission of designated packets so as to minimize latency

3    problems (which produce "clipping" and other voice quality distortions).  Also, existing

4    consumer-level high-speed Internet access services – ADSL and cable modem – are

5    themselves subject to extreme variability in effective data transmission rates based upon

6    local traffic conditions.  VoIP quality can become seriously degraded if, for example, there

7    is a lot of demand contending for capacity on the same cable trunk along a given street.

8

9  Q.   But won't these problems ultimately be resolved?

10

11  A.   Yes, they probably will, but not without potentially substantial additional investment and

12    ongoing cost.  We cannot predict with any sort of certainty what these costs may be, or how

13    they would compare with the costs of traditional circuit-switched technology.  What we can

14    say with considerable certainty is that the existing quantity of consumer mass market VoIP

15    demand involving the use of consumer broadband access services and the public Internet is

16    not *scalable* were the aggregate demand for VoIP to increase to 10%, 20% or more of the

17    total voice telephony market.  For now, VoIP is to traditional circuit-switched telephony as

18    the Segway scooter is to the traditional automobile.  Both may be able to get you from point

19    A to point B (if the distance involved is fairly small), but (contrary to the early predictions of

20    its inventor), nobody seriously expects the Segway to replace the automobile any time soon,

21    and no one would seriously claim that the Segway and the automobile are in the same

22    product market.

23

129

REDACTED

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                        LEE L.  SELWYN

1    Q.   §1.521 of the *Merger Guidelines* state that "if a new technology that is important to long-

2         term competitive viability is available to other firms in the market, *but is not available to a*

3         *particular firm*, the Agency may conclude that the historical market share of that firm

4         overstates its future competitive significance."  Wouldn't this require that in order to be

5         considered in determining the post-merger SBC market share, VoIP technology would have

6         to *not be available* to the post-merger SBC?

7

8    A.   That is indeed correct, and this is an extremely important point.  VoIP technology clearly *is*

9         available to a post-merger SBC, and if VoIP actually becomes a serious factor in the voice

10        telephony market, the post-merger SBC will clearly be a major player, if not the dominant

11        mass market VoIP provider within its ILEC footprint.  SBC already provides <<BEGIN

12        SBC/AT&T PROPRIETARY            END SBC/AT&T PROPRIETARY>> of high-speed

13        Internet access in California,[114] and its position in the broadband access market will only be

14        strengthened through its vertical integration with the AT&T Tier 1 Internet backbone

15        network.  So even if at some point VoIP and circuit-switched services are in the same

16        relevant product market,  §1.521 of the *Merger Guidelines* would then require that SBC's

17        VoIP and circuit-switched shares be aggregated for purposes of calculating the post-merger

18        SBC's share of that product market and its HHI.  Either way, the presence of VoIP does not

19        materially reduce the post-merger SBC's share of the voice telephony product market or the

20        extremely high level of concentration that will result when the current AT&T and SBC

21        shares are combined.

--------

114.  See fn. 110, *supra.*

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    Q.    One of the specific qualitative factors differentiating VoIP from circuit-switched services

2          that you had mentioned earlier involves access to E-911 emergency reporting services.

3          However, Dr. Aron indicates that some VoIP services are "designed to offer E-911

4          connectivity."[115]  Doesn't that increase the substitutability of VoIP for traditional circuit-

5          switched basic telephone service?

6

7    A.    No, because at the present time at least, VoIP access to E-911, where it is provided, is

8          decidedly inferior to the level of access and security offered by traditional circuit-switched

9          services.  Dr.  Aron is correct, that some VoIP services, such as Vonage, offer consumers the

10         ability to dial 911 from their VoIP phone and be connected to a local PSAP.  However,

11         unlike traditional wireline service, where a call placed to 911 automatically connects the

12         caller to the correct PSAP serving the community in which the customer resides and

13         automatically provides the E-911 operator with information as to the caller's location,

14         Vonage currently routes 911 calls to the administrative number of a PSAP based upon user-

15         configured settings.  This administrative number does not connect directly to a 911 operator,

16         and does not provide the responding PSAP with customer location information.

17         Additionally, if the VoIP user fails to configure the E-911 settings, or configure them

18         incorrectly, a call placed to 911 may be routed to the wrong PSAP, or perhaps not be

19         connected at all.

20

21   Q.    What is the reason for this limitation on VoIP E-911 access?

---

115. *Aron Testimony*, at 33.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L. SELWYN

1   A.  The problem stems from the basic architecture of the Internet and the lack of any specific

2       relationship between a given IP address (which is assigned by the ISP to the Internet service

3       subscriber) and the VoIP telephone number, which is assigned by the VoIP service provider.

4       While in theory an ISP may (in many cases) be able to identify the physical location at

5       which a given IP address has been assigned, PSAPs use standard 10-digit North American

6       Numbering Plan (NANP) telephone numbers as the search key for their customer/location

7       databases, and there is no direct means (at least for the present) of associating a VoIP phone

8       number with a specific IP address or customer location.

9

10      Additionally, one of the unique features being offered by many VoIP providers is the ability

11      to have the service travel with the user from place to place (referred to as "nomadic"

12      service).  This is accomplished by taking the VoIP Telephone Adapter or VoIP-equipped

13      handset and simply plugging it in to any high-speed Internet access line, such as that which

14      is provided at many hotels.  Vonage offers a "virtual" VoIP phone service using the

15      customer's laptop computer, which may even access the Internet wirelessly where a Wi-Fi

16      "hot spot" is available.  In addition, many VoIP providers allow the customer to select a

17      phone number in an area code or location distant from where the service would ordinarily be

18      used, further complicating the ability of a PSAP to precisely locate the caller placing a 911

19      call.

20

21  Q.  How is the association between a VoIP phone number and the appropriate PSAP

22      established?

23

REDACTED

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                LEE L.  SELWYN

1    A.    Under the existing serving arrangement, the VoIP *customer* is responsible for informing the

2          VoIP service provider as to the customer's physical location.  Using that information, the

3          VoIP service provider determines the appropriate PSAP and enters the appropriate routing

4          data into its service platform such that a 911 call dialed by that customer will be delivered to

5          the appropriate PSAP.  This process of activating 911 service typically does not take place

6          immediately upon the receipt of the physical location information from the customer, and

7          can take as long as 48 hours to complete.  For this reason, up to now it is now been practical

8          for VoIP to offer 911 access to customers who move their VoIP service from place to place.

9

10         Just recently, the FCC issued an order requiring VoIP providers, within 120 days, to offer E-

11         911 service as a standard feature of interconnected VoIP service.  However, rather than

12         eliminate the difference between wireline and VoIP E-911, the FCC's action actually serves

13         to reinforce the substantial inferiority of VoIP E-911 access.  As a threshold matter, the very

14         fact that the FCC has seen fit to step in and regulate this issue is a clear indication that, at the

15         present time, VoIP E-911 service is not functionally equivalent to what customers have

16         come to expect from their wireline service.  Moreover, while on its face the FCC's order

17         might appear to address some of the safety concerns surrounding VoIP E-911 service, it

18         remains to be seen whether VoIP providers can or will be able to implement the

19         requirements of the order.  And even if they comply in all respects with the new

20         requirements, VoIP and wireline E-911 will be far from equivalent.  Specifically, under the

21         new regulations, VoIP *customers* still have the responsibility to identify their physical

22         location to the VoIP provider and to notify the VoIP provider when that physical location

23         changes.  If the customer does not provide accurate information, or fails to provide a new

133

ET ECONOMICS AND
TECHNOLOGY, INC.

REDACTED

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    location when the service is physically relocated, or fails to provide any location information

2    at all, access to the correct PSAP will not be provided.

3

4    Even assuming that customers take their responsibility seriously and are religious in

5    reporting locations and changes of locations to their VoIP provider, VoIP providers may still

6    not be able to create a workable solution that effectively duplicates the E-911 capabilities of

7    traditional wireline service, especially within the short time frame set forth by the FCC.

8    Two recent articles in the *Wall Street Journal* highlight the costs and difficulties associated

9    with implementing functional E-911 service for non-wireline phones in a timely manner.[116]

10   Given the hodge-podge of state and federal regulations, a serious lack of funding, and

11   technological challenges, it hardly seems surprising that of the nation's 6,000 E-911 call

12   centers, "only 41% of them can locate cell phones"[117] let alone Internet-based phones.  The

13   *Journal* continues, suggesting that "it would take $8-billion and at least four more years to

14   modernize the nation's 911 system for wireless calls.  And that doesn't include the costs of

15   updating the system to handle Internet phone services."  The fact that wireless E-911 is still

16   far from reliable is yet another reason why wireless – as well as VoIP – cannot be considered

17   as sufficiently close substitutes for traditional wireline services to bring them into the same

18   product market.

19

---

116. *No Signal, Cellphone Hangup: When You Dial 911, Can Help Find You?* The Wall
Street Journal, May 12, 2005, at page A1 ("*No Signal*"); *Tests Show Many Cellphone Calls to
911 Go Unlocated,* The Wall Street Journal, May 19, 2005, at page B1.

117. *Id.*

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                         LEE L.  SELWYN

1   **Wi-Fi, Wi-Max, and other fixed wireless services do not serve as legitimate competitors to**
2   **DSL or cable modem services, especially at the residential and small business level.**
3

4   Q.   In a discussion of Wi-Fi and Wi-Max technology, Dr. Aron suggests that these service can

5        substitute for a DSL or cable modem connection, or in the case of Wi-Max, a T-1 line.  Do

6        you agree that these and other fixed wireless alternatives are sufficiently close substitutes for

7        DSL and cable modem service to satisfy the *Merger Guidelines*' requirements for inclusion

8        in the same product market?

9

10  A.   No.  Today few residential (or business, for that matter) customers are served by wireless

11       Internet service providers, which face severe speed, range and reliability issues, among

12       others.[118]  Recently, the industry has made significant statements about the coming of

13       "WiMax," the next-generation of wireless data services that is supposed to bring increased

14       security, range, and reliability to fixed wireless services.  The development, however, is

15       being driven by large carriers for business customers, a very different focus than that of

16       Wireless Internet Service Providers (WISPs) that serve residential and small business users.

17       Issues for residential consumers, such as price, interoperability, and vendor availability are

18       unlikely to be addressed by this technology for several years.  As one analyst recently noted,

19       "In short, WiMAX will not likely be anything like a panacea for WISPs, especially in the

---

118.  For example, Verizon Wireless' "broadband" service operates at 500kbps, compared to
the 1-3 mbps speed of most cable modems and DSL.

135

**REDACTED**                                           ＥＣＯＮＯＭＩＣＳ ＡＮＤ
                                                        ＴＥＣＨＮＯＬＯＧＹ, ＩＮＣ.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1    short term, and it could easily be as late as mid-2006 before WiMAX systems truly suitable

2    for WISPs become available."[119]

3

4    Q.    What about initiatives by cities or towns – such as San Francisco – that have considered

5          installing municipal wireless broadband services that would be available to residents and

6          business at low or no cost?

7

8    A.    While its true that such plans have been floated, the RBOCs – *including SBC in particular* –

9          have moved to prevent this competition.  According to the *New York Times*:

10
11              Pushed by industry lobbyists, lawmakers in Kansas, Ohio, Texas, Indiana, Iowa,
12              Oregon, and other states have proposed legislation to restrict or prohibit local
13              governments from offering telecommunications services.  Nearly a dozen states
14              already enacted some restrictions.  Assuming that Verizon and other ILECs have
15              similar political power in other states, it appears that low-cost or free wireless data
16              services may be indefinitely postponed.[120]
17

18          Such activities are, of course, entirely consistent with other situations (e.g., with respect to

19          UNE-P) where the ILECs have worked to undermine competition at the same time that they

20          rely upon competitors' existence as support for their claim of eroding ILEC market power.

21

---

119.  Steve Stroh, "WISP Heresies," *ISP Plant*, December 24, 2004, available at
http://www.isp-planet.com/fixed_wireless/business/2004/stroh_heresies.html (accessed May 26,
2005).

120.  James Dao, "Philadelphia Hopes to Lead the Charge to Wireless Future," *The New
York Times*, February 17, 2005.

136

REDACTED

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   **The identifiable adverse impact upon competition from the merger must not be**
2   **subordinated to speculative claims as to future changes in market structure due to the**
3   **growth of putative intermodal alternatives**.
4
5   Q.   Is this the first time that claims of "intermodal" competition have been advanced by SBC?
6
7   A.   No.  In fact, SBC and the other RBOCs have certainly raised the "red flag" of intermodal
8        competition before.  In 2002 during the FCC's *Triennial Review* proceeding, the four
9        RBOCs filed the "UNE Fact Report" which details a panoply of purported intermodal
10       competition from cable and wireless providers.  The "Fact Report" presents many of the
11       same claims as Dr. Aron makes in her testimony here, including RBOC access line loss, and
12       the large jump in wireless subscribership levels.
13
14  Q.   After three years, what has come of those claims of widespread intermodal competition?
15
16  A.   Despite these claims of widespread technological substitution originally made three years
17       ago and repeated on numerous occasions since then, RBOC wireline services remain quite
18       robust and face very little competition at all.  As I noted above, net additions of cable
19       telephony customers have slowed dramatically over the past several years, and although
20       wireless subscribership continues to grow, there is no corresponding decrease in *primary*
21       wireline service access lines.  The claims of intermodal competition, both then and now,
22       wear thin with the evidence that clearly shows that, except for a few "early adopters,"
23       consumers in general are not substituting new technologies for basic wireline telephone
24       service.

137

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1  Q.  How will the landscape of intermodal competition change after the proposed merger of SBC

2       and AT&T?

3

4  A.  Regardless of the development of intermodal alternatives in the future, the post-merger SBC

5       will maintain a major presence as a retail provider of "intermodal" services such as wireless

6       and VoIP and as a wholesale provider of essential inputs to other providers of intermodal

7       services or to customers desiring to utilize intermodal services.  SBC's disingenuous claims

8       of facing intermodal competition will remain just as baseless – or become even more

9       ludicrous to the extent that the post-merger SBC is itself a major provider of these

10      "alternative" services.  For all of these reasons, the so-called intermodal competition

11      identified by the Joint Applicants is not properly included within the relevant product market

12      and, as such, must not be considered as diminishing the overwhelming market concentration

13      that will surely result if the SBC/AT&T merger is permitted to go forward.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    VERTICAL INTEGRATION ISSUES ARISING FROM THE PROPOSED MERGER

2

3    **Both SBC and AT&T currently purchase massive quantities of services in markets**
4    **currently served by the other as inputs to support their own activities in downstream**
5    **markets.**

6

7    Q.  Dr. Selwyn, you have discussed how the proposed SBC/AT&T merger differs from previous

8        RBOC mergers in its horizontal impacts.  Are there also vertical impacts of this merger that

9        were not seen in the earlier RBOC mergers?

10

11   A.  Yes.   In those previous mergers, the firms did not for the most part either compete with each

12       other or engage in upstream or downstream transactions with each other.  Their respective

13       service areas were entirely non-overlapping and, most importantly, they did not compete ith

14       each other to any measurable degree outside of their own operating areas.  The proposed

15       merger involves, for the first time, extensive *vertical* integration of what are currently

16       supplier-purchaser relationships.

17

18       The result of such integration will be to diminish competition in wholesale network services

19       and other supplier markets.  In addition to the extensive horizontal competition that

20       presently exists between SBC and AT&T, the two companies also engage in an extensive

21       range of *vertical* transactions both with each other and with other carriers involving both

22       upstream and downstream activities.  In order to provide both local and interexchange

23       services to customers located within the thirteen-state SBC local service footprint, AT&T

24       must purchase switched and special access services and unbundled network elements

139

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                        LEE L.  SELWYN

1     ("UNEs") from SBC; in fact, AT&T is SBC's *single largest customer* for these services.

2     Access charge payments to incumbent LECs may represent as much as 80% of the total

3     network costs of producing switched long distance service, and in the range of 50% of the

4     price of long distance services paid by enterprise customers (which primarily utilize special

5     access service).

6

7     Once joined with SBC, AT&T would no longer have to "pay" for switched and special

8     access services within the SBC operating areas, a benefit that no other carrier could possibly

9     match, given SBC's unassailable dominance over local exchange and access services within

10    its region, affording the merged entity a formidable competitive advantage vis-à-vis rival

11    carriers.  And following the merger, SBC's cash purchases of interexchange network

12    services from nonaffiliated wholesale IXCs (principally from WilTel) for downstream resale

13    to its end-user long distance customers would be replaced by non-cash transfers of similar

14    services provided over the AT&T network; again, a benefit no other carrier could match,

15    given SBC's near-monopoly in its local ILEC serving areas.  The very reasons why SBC

16    sees advantage in acquiring AT&T impose formidable competitive disadvantages and

17    barriers to rival carriers – including other RBOCs – virtually assuring that the "all distance"

18    US telecom industry will devolve into geographically-based regional monopolies.

19

140

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                        LEE L.  SELWYN

1  **The vertical integration of the SBC local access and AT&T interexchange network**
2  **infrastructures will diminish competition in wholesale markets and provide SBC with the**
3  **means to further extend its local service market power into adjacent and currently**
4  **competitive markets**.
5

6  Q.   What impact will the vertical integration of SBC and AT&T have on competition in the

7       affected upstream and downstream markets?

8

9  A.   The proposed SBC/AT&T merger raises serious concerns regarding both horizontal and

10      vertical concentration and anticompetitive effects, since the SBC ILECs possess dominant

11      market power over important upstream inputs that the merged SBC/AT&T and other

12      competitors will continue to need to produce downstream retail services.

13

14      With regard to horizontal analysis, SBC and AT&T compete directly with one another in a

15      number of important markets, including all three of the local market segments recently

16      identified by the FCC in its *Triennial Review Order*[121] and *Triennial Review Remand*

17      *Order*[122]: (1) mass market, consisting of residential services and very small business

18      services; (2) small enterprise market; and (3) large enterprise market.[123]  Competitive

---

121.  *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, CC Docket No. 01-338; *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-989; *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, CC Docket No. 98-147 (*TRR Proceeding*), *Report and Order on Remand*, 18 FCC Rcd 16978 ("*TRO*").

122.  *TRR Proceeding*, *Order On Remand*, 2005 FCC LEXIS 912 ("*TRRO*").

123.  *TRO*, at para. 124.

REDACTED

ET ECONOMICS AND
TECHNOLOGY, INC.

1    conditions must be analyzed in each of these three segments separately, and separately by

2    geographic area.[124]

3

4    The vertical market problems raised by this proposed merger, however, are potentially even

5    more serious.  Many competitive and putatively competitive telecommunications service

6    markets including those in which AT&T is a powerful competitor today are utterly

7    dependent upon obtaining access to or use of local distribution and interoffice transport

8    facilities that in the vast majority of cases within the SBC local region are owned and

9    controlled on a monopoly or near-monopoly basis by the SBC ILEC operating companies.[125]

10   When SBC or, if the merger is allowed to proceed, AT&T provides a competitive service

11   such as long distance or Internet access to an SBC ILEC local service customer either out of

12   a separate corporate affiliate or out of a separate business unit within the BOC itself, such

13   access is obtained as an internal corporate transaction, in which no cash changes hands and

14   which has no effect upon the parent company's "bottom line."  However, when unaffiliated

15   rivals provide the same type of competitive service, they are required to expend actual cash

16   money to obtain the required access services from SBC (just as SBC would have to pay the

---

124.  *See*, e.g., *TRO*, at para. 130; *Comsat Corporation Petition Pursuant to Section 10(c) of the Communications Act of 1934, as amended, for Forbearance from Dominant Carrier Regulation and for Reclassification as a Non-Dominant Carrier*, CC Docket No. 80-634,  *Order and Notice of Proposed Rulemaking*, FCC No. 98-78, 13 FCC Rcd 14083 (1998).  The Courts have recognized geographic markets in *United States Telecom Association v. FCC*, 290 F.3d at 422.

125.  In fact, and as the Commission has expressly recognized, even where the access is provided by a CLC, the CLC has the ability to exercise monopoly power with respect to "its own local service customers."  *AT&T Corp., Complainant, v. Business Telecom, Inc., Defendant*, EB-01-MD-001, *Sprint Communications Company, L.P., Complainant, v. Business Telecom, Inc., Defendant*, EB-01-MD-002, *Memorandum Opinion and Order*, 16 FCC Rcd 12312 (2001).

ECONOMICS AND TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    ILEC or CLC that provides the customer's local service if it sought to provide such

2    competitive services to a customer of another LEC either within its own thirteen state region

3    or outside of it).

4

5    **The *horizontal* concentration of retail long distance and enterprise services within the SBC**

6    **footprint, coupled with the *vertical* integration of SBC's local and AT&T's long distance**

7    **networks, when viewed together with the concurrent vertical merger of Verizon and MCI,**

8    **will eviscerate the demand for *wholesale* interexchange services.**

9

10   Q.   How do the Joint Applicants respond to concerns as to the consequences of vertical

11        integration?

12

13   A.   In contending that they do not compete with one another, the Joint Applicants describe their

14        respective firms as being "complementary," with each providing capabilities, resources and

15        market presence that the other does not presently possess.[126]  "Complementary" is, in the

16        context of the proposed merger, a euphemism for *vertical integration* on a massive scale.

17        The one key aspect of the SBC/AT&T merger that has no direct parallel in any of the

18        previous RBOC marriages is the *vertical integration* that will result when the two companies

19        combine, precisely because of these extensive complementarities.  AT&T is SBC's largest

20        single purchaser of services that AT&T requires to serve downstream mass market and

21        enterprise, local and long distance markets.  And, while SBC today makes few, if any,

22        purchases of services from AT&T, SBC does purchase massive quantities of interexchange

23        services from other carriers to support SBC's downstream retail long distance business, *most*

---

126.  *See, generally*, *Public Interest Statement*, February 21, 2005.

**REDACTED**

ETI   ECONOMICS AND
      TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    *or all of which can and likely will be provided by AT&T following the merger.*  The

2    consequences for competition *at both the retail and the wholesale levels* is all too clear:

3

4    •    AT&T will no longer need to "purchase" access services and UNEs for its downstream

5         services within the SBC footprint.  While some of these downstream services compete

6         directly with SBC's existing retail offerings and are thus likely to be discontinued, to

7         the extent that AT&T (or what is left of AT&T) continues to provide services within the

8         thirteen-state SBC region, it will have gained a formidable – perhaps insurmountable –

9         advantage over any non-SBC-affiliated rivals, which will have to keep paying "tribute"

10        to SBC for the privilege of doing business within SBC's turf.

11

12   •    At the same time, SBC will be eliminating external demand for access that could have

13        supported facilities-based entry by competitive access providers.  AT&T and MCI have

14        explained previously how the Bells were able to use vertical contracts to foreclose

15        business from facilities-based rivals and thereby exclude or limit entry.  Now they will

16        achieve permanent foreclosure through acquisition rather than through contracts.

17

18   •    SBC currently purchases interexchange network services for resale in its downstream

19        retail long distance business in a highly competitive wholesale market – indeed, SBC

20        would not have been able to pursue a *resale-only* long distance business model if the

21        interexchange market were as concentrated as the local market.  However, after the

22        merger, SBC will (presumably) cease making such third-party purchases, and instead

23        utilize the AT&T interexchange network to supply retail long distance services.

144

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L. SELWYN

1    Q.  How will the increase in overall market concentration arising from the *horizontal*

2         combination of SBC and AT&T affect competition in the *vertical* wholesale services

3         markets?

4

5    A.  The *horizontal* concentration of retail long distance and enterprise services within the SBC

6         footprint, coupled with the *vertical* integration of SBC's local and AT&T's long distance

7         networks, when viewed together with the concurrent vertical merger of Verizon and MCI,

8         will eviscerate the demand for *wholesale* interexchange services.  In their response to

9         protests of the Joint Applicants' filing, SBC and AT&T seek to dismiss the importance of

10        this issue by suggesting that WilTel, in particular, has taken contradictory positions relative

11        to the wholesale market, suggesting on the one hand that the merger "will remove SBC (and

12        Verizon) as a significant purchaser of wholesale services, and without those purchases, there

13        is not enough business to go around" and on the other hand, "that the transaction may harm

14        competition because, after closing, AT&T may no longer be willing to continue selling

15        wholesale long distance services to SBC's competitors."[127]  The Joint Applicants' response

16        ignores and seeks to misdirect the Commission's attention away from the *dynamic*

17        consequences of their vertical integration, offering instead an entirely *static* – and overly

18        simplistic – analysis.  Contrary to the SBC/AT&T claim, there is no inconsistency here, and

19        both concerns are real and important.

20

21    Q.  Please explain.

---

127.  *Joint Reply of SBC Communications, Inc. and AT&T Corp. to Protests*, Application
05-02-027, April 29, 2005, at 49.

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                LEE L.  SELWYN

1    A.  If both mergers are allowed, SBC and Verizon will each have achieved a retail market share

2        in the range of 80% or more in mass market in-region long distance services.  The two

3        RBOCs will collectively dominate the enterprise market and will likely carve up the

4        enterprise market along RBOC lines.  SBC and Verizon each have controlling interests in

5        the two largest wireless carriers, with combined national market shares of 63% and in-region

6        shares that are likely much greater.  Both will have achieved vertical integration with

7        national interexchange networks, and will have little or no need for any other carriers'

8        wholesale interexchange services either in-region or out-of-region.  As a result of this

9        diversion of wholesale demand away from independent wholesale carriers and over to the

10       then-integrated SBC/AT&T and Verizon/MCI networks, the remaining non-RBOC

11       wholesale demand will have been sufficiently diminished as to threaten the continued

12       survival of wholesale carriers.

13

14       As independent wholesale carriers exit the market, SBC and Verizon will then be the

15       primary sources for wholesale interexchange services.  However, having achieved a close-to-

16       80% share of retail long distance, SBC and Verizon will then be in a position to eradicate the

17       remaining retail service competition simply by refusing to make wholesale services available

18       to long distance resellers – a tactic that SBC has already employed with great success in

19       dismantling competition for *local* services.  The Joint Applicants claim that "it is not in

20       SBC's interest to abandon AT&T's wholesale business" thus rings hollow in view of the

21       well-documented history of SBC's steadfast resistance to providing wholesale *local* services

22       *even where it is required by statute and by FCC regulations to do so.*  Finally, the fact that

23       the FCC had, according to SBC, rejected similar arguments in the WorldCom/MCI merger is

146

**REDACTED**

1    inapposite to the present matter, since pre-merger the MCI WorldCom entities supplied only

2    a small fraction of the interexchange volume that AT&T now supplies, and post-merger

3    MCI WorldCom controlled only about 20% of the national long distance market, not even

4    close to the post-merger SBC/AT&T share of at least 80% of in-region mass market and

5    enterprise long distance services.

6

7    Q.   But hasn't SBC just entered into a deal with WilTel whereby SBC will continue to purchase

8         services from WilTel?

9

10   A.   Yes, but according to the press announcements, SBC's contractual commitment runs only

11        through 2007, i.e., for less than two years following the date SBC expects to close the

12        merger.  After that, it's a pretty safe bet that SBC will be using the AT&T network for

13        virtually all of its wholesale interexchange service needs.

14

15   **The vertical integration of AT&T and SBC will dramatically increase SBC's *monopsony***
16   **power over its suppliers.**

17

18   Q.   Are there other consequences of the vertical integration that would result from the merger?

19

20   A.   Yes.  As with the previous RBOC mergers, SBC and AT&T also tout, as an additional

21        merger "benefit," the merged entity's ability to obtain better prices from its suppliers, such

22        as equipment manufacturers and wholesale network services carriers, in effect, to gain

23        increased *monopsony power* with respect to such purchase transactions.  This result was not

24        only addressed in each of the previous RBOC merger situations, but was actually presented

147

REDACTED

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    by the applicants in each instance with a positive *spin*, i.e., as providing a positive benefit to

2    consumers and to the public interest.  Specifically, in each of the previous RBOC mergers,

3    the applicants identified as a "merger benefit" the increased purchasing power that the larger

4    firm would enjoy with respect to its purchases of plant and equipment.[128]  Significantly, SBC

5    advances similar expectations of "economies of scale in procurement and deployment" in

6    this case as well.[129]

7

8    Q.  But isn't this a valid benefit?

9

10   A.  To be sure, there are economies of scale in procurement of most any type of product or

11   service, but these do not typically increase indefinitely.  Ultimately, however, the ability of

12   successively larger firms to achieve lower prices from suppliers is more the result of the

13   large purchasers' *monopsony power* than of any scale economies.  Economics texts define

14   monopsony power as follows:

15

16   *Monopsony* refers to a market in which there is only one buyer.  An *oligopsony* is a
17   market with only a few buyers.  With one or only a few buyers, some buyers may
18   have *monopsony power*:  a buyer's ability to affect the price of a good.  Monopsony

---

128.  See, e.g. *Application of Ameritech Corporation and SBC Communications, Inc. for authority, pursuant to Part 24 of the Commission Rules, to Transfer Control of a License Controlled by Ameritech,* CC Docket No. 98-141, Exhibit 2 to Application, Affidavit of Martin A. Kaplan,  filed on July 24, 1998, at para. 20; *Application of Ameritech Corporation and SBC Communications, Inc. for authority, pursuant to Part 24 of the Commission Rules, to Transfer Control of a License Controlled by Ameritech*, CC Docket No. 98-141, Exhibit 2 to Application, Affidavit of Richard J. Gilbert and Robert G. Harris, filed on July 24, 1998 at para. 45.

129.  *Public Interest Statement*, at 33.

148

REDACTED

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   power enables the buyer to purchase the good for less than the price that would
2   prevail in a competitive market.[130]
3

4   If both the SBC/AT&T and Verizon/MCI mergers are allowed to go forward, the two largest

5   telecommunications firms will control some 58% of total US wireline revenues and 60% of

6   total US wireless revenues,[131] and will have the ability to dictate prices and equipment

7   design specifications to suppliers of equipment and network services.[132]  Additionally, to the

8   extent that these mergers have vertical as well as horizontal components, some existing

9   third-party suppliers may be forced out of the market altogether.

10

11  Consider, in particular, the wholesale network services that are purchased by SBC for

12  downstream resale to its retail mass market and enterprise customers.  Mr. Kahan states that

---

130.  Robert S. Pindyck & Daniel L. Rubinfeld, *Microeconomics 5th Edition*, Prentice Hall, 2001, at 352.

131.  This figure is likely extremely conservative because it includes intra-industry purchases of access services, UNEs and services for resale.  FCC Form 499-Q Filings, Detailed Revenues by Type of Carrier, 1st Quarter 2004–4th Quarter 2004 (all filers minus wireless service providers); Carrier revenue figures are from UBS Investment Research "Wireline Telecom Play Book," January 14, 2005.

132.  The consequences of this aspect of monopsony power is illustrated in a June 2, 2005 *Wall Street Journal* article, "Wireless Carriers' Veto Over How Phones Work Hampers Innovation" by Walter S. Mossberg:  "In the U.S., the wireless phone carriers have used their ownership of networks to sharply restrict what technologies can actually reach users. ... the U.S. carriers are exercising far too much control over the flow of new technologies into users' hands. In an ideal world, any tech company with a new cellphone, or with software to run on cellphones, should be able to sell it directly to users.  These customers would then separately buy plans from the cellphone companies allowing those devices to work on the networks. ... But that isn't how it works.  In most cases, manufacturers must get the network operators' approval to sell hardware that runs on their networks, and carriers don't allow downloading of software onto phones unless they supply it themselves."  June 2, 2005, at p. B1.

149

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L. SELWYN

1     "to attempt to address its limited geographic presence out of region, SBC has formed

2     strategic and commercial relationships to use third-party networks for transport and local

3     access in areas where we lacked our own network facilities.  The most significant of these

4     has been with Wiltel."[133]  WilTel is primarily a *wholesale* IXC, but WilTel also provides

5     wholesale services to other retail long distance carriers as well as services at retail to

6     enterprise customers.  As such, its relationship with SBC puts WilTel squarely in

7     competition with AT&T to the extent that SBC and AT&T *presently* compete for the same

8     retail mass market and enterprise customers.  In fact, although Mr. Kahan appears to

9     characterize SBC's use of the WilTel network as providing SBC with *out-of-region* network

10    facilities and services, the WilTel network provides extensive coverage *within* the SBC

11    footprint,[134] and it is my understanding that WilTel also provides extensive *in-region*

12    services and facilities to SBC and to its affiliates.

13

14    Mr. Kahan readily concedes that SBC's acquisition of AT&T will obviate its need to rely

15    upon third-party providers such as WilTel, and that SBC will gain significant competitive

16    advantage in serving large enterprise customers because, while today it "cannot guarantee its

17    ability to manage and control the networks over which the service is provided,"[135] it will

18    following its acquisition of AT&T be able to provide such guarantees and assurances to

19    large enterprise customers when it can integrate the AT&T network into its own.

---

133. Joint Application, Exhibit 2, Declaration of James S. Kahan ("*Kahan Declaration*"), at para. 25.

134. *See*, www.wiltel.com/map/ (accessed June 21, 2005).

135. *Kahan Declaration*, at para. 25.

150

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    In so doing, however, SBC will cut off wholesale carriers such as WilTel from the indirect

2    access to SBC's retail customers that such carriers currently obtain via their wholesale

3    services relationship with SBC.  Additionally, if Mr. Kahan's recitations as to SBC's alleged

4    difficulties in competing out-of-region are to be afforded any credence, then any wholesale-

5    only carriers would have absolutely no ability to compete in the *retail* mass or enterprise

6    markets with SBC or Verizon because the non-RBOC IXCs have no local service "footprint"

7    at all, and carriers such as WilTel that also provide retail services in the enterprise segment

8    will continue to suffer from the same difficulty that Mr. Kahan laments with respect to SBC

9    *sans* AT&T, i.e., that "Large business customers ... are often hesitant to award SBC major

10   contracts because it [SBC] cannot guarantee its ability to manage and control the networks

11   over which the service is provided."  Indeed, and as I discuss at greater length below, *it will*

12   *be impossible for competition to survive in a post-SBC/AT&T merger industry because SBC*

13   *has no obligation to assure that non-affiliated competitors are afforded precisely the same*

14   *level of access to the core SBC monopoly "last mile" local network infrastructure –*

15   *including local switching and interoffice transport – that AT&T will come to acquire*

16   *through the vertical integration of its and SBC's network.*

17

18  Q.  But don't the Joint Applicants contend that the merger will result in real efficiency gains

19       arising from the exploitation of synergies between the two firms?

20

21  A.  SBC claims that the merger will generate some $15-billion in synergy gains when expressed

22       in net present value (NPV) terms, a portion of which are attributed to efficiency and

23       productivity gains through elimination of duplicative functions between the two firms.  Of

151

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    course, some portion of these "cost savings" may well result from the elimination of

2    competition between SBC and AT&T.  But even if there are some actual *incremental*

3    efficiency gains arising from the merger, there is no assurance that any of these would be

4    flowed through to consumers – especially if the merger results in less competition overall.

5    From the standpoint of the overall California and US economies, the *dynamic losses* arising

6    from a decrease in competition at both the retail and wholesale levels would more than offset

7    any *static gains* inuring specifically and parochially to SBC.  Indeed, exerting monopsony

8    power to force down a supplier's price is *not* an efficiency gain for the economy overall

9    unless the supplier's *costs* are also reduced, nor are these welfare appropriations merger-

10   specific.  If these arrangements are so pro-competitive and efficiency-enhancing, then the

11   Bells could form buyers' coops, since none competes out-of-region anyway.  Moreover, to

12   the extent that the attempt to dictate such price reductions to suppliers forces them to curtail

13   new investment, expenditures on assuring service quality, or ultimately to cease providing

14   the wholesale service altogether, economic efficiency and the California and US economies

15   overall are decidedly *disserved*.

16

17   **Excessive special and switched access charges raise competitive problems even in the**
18   **absence of a merger, but an SBC/AT&T merger would make the problem far worse.**
19

20   Q.   How would the persistence of above-cost access charges affect the ability of rivals to

21        compete with SBC post-merger?

22

23   A.   SBC's prices for both special and switched access services are far in excess of forward-

24        looking economic cost.  When access charges were first introduced in 1984, they were based

152

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1      upon *embedded fully distributed cost*, but today even that standard has been abandoned, and

2      access charges now include substantial economic rents.  For example, according to SBC's

3      most recent ARMIS reporting for the year ended December 31, 2004, its realized rate of

4      return on its *embedded* investment in the interstate special access services category was

5      76.19%; that figure would be even higher if based upon forward-looking economic cost.

6      Switched access charges are also set well in excess of economic cost.  Interstate switched

7      access rates are around $0.0055 per minute, and intrastate switched access rates in SBC

8      territory may be as high as $0.02 to $0.03 per minute or higher.  Yet the *cost* to provide a

9      switched access connection, based upon cost studies conducted for purposes of setting local

10     intercarrier call termination rates, are in the range of $0.001 or less.[136]

11

12     The ability of SBC to force its rivals to pay a "tribute" to SBC for the privilege of competing

13     in SBC territory is exacerbated by its absorption of AT&T which, after the merger, will in

14     effect no longer be required to pay these excessive charges to SBC (since the nominal

15     payments would be, in effect, a pocket-to-pocket transaction among corporate affiliates with

16     no effect on the overall bottom line).

17

---

136.  As CompTel/ALTS note, SBC has recently introduced a "271 Local Switching Transport Offering" with a local usage charge that may be as low as $0.0007 (i.e., 7 one-hundredths of one cent) per minute, i.e., about 87% *below* the corresponding interstate switched access rate.  *See*, Federal Communications Commission, *Applications SBC Communications, Inc. and AT&T Corporation for Consent to Transfer of Control of Section 214 and 308 Licenses and Authorizations and Cable Landing License*, WC Docket No. 05-65, *Comptel/ALTS Petition to Deny*, April 25, 2005, at 53.

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

1    SBC thus enjoys a significant competitive advantage vis-à-vis any rival (including Verizon

2    or other RBOCs) within its ILEC operating territories in that SBC does not pay for access to

3    its own facilities, whereas any rival would have to pay cash *to SBC* in order to provide

4    service to an SBC local service subscriber.  Today, this problem is ameliorated, if at all, only

5    by the fact that SBC's long distance offerings (including all-distance services sold to

6    enterprise customers) are a "start-up" operation that commenced only within the last few

7    years following SBC's receipt of Section 271 long distance authority; but SBC's unfair

8    competitive advantage would be substantially compounded were it allowed to acquire

9    AT&T, the oldest and largest long distance carrier.

10

11   Q.   Was the matter of above-cost pricing of essential bottleneck services addressed in the

12        *Telecommunications Act of 1996*?

13

14   A.   The *1996 Act* anticipates the problem of RBOCs' unfair competitive advantages in

15        downstream markets due to their market power over upstream local connectivity services,

16        and includes provisions intended to address the vertical market power problem; but

17        unfortunately those provisions, while *necessary*, would not be *sufficient* to address the

18        problem if SBC were allowed to acquire AT&T (a prospect that was unanticipated and

19        seemed unthinkable when the 1996 Act was written and initially implemented).  For

20        example, Section 272(e)(3) of the 1996 Act, which remains in full force and effect even after

21        other portions of Section 272 sunset, requires that SBC *impute* into its own long distance

22        prices the same SBC access charges that would be paid by rival carriers.  In theory, then,

23        post-merger, SBC/AT&T should be indifferent as to whether it is providing long distance

154

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                LEE L.  SELWYN

1      service to an SBC ILEC customer or to a customer of a different LEC where actual cash

2      payments for access would be required.  The *fact* that, to date, SBC has chosen not to market

3      is long distances service to customers of other LECs underscores that while the imputation

4      requirement is necessary, it is not sufficient to prevent discrimination.  Even if an actual on-

5      the-books accounting transfer is recorded (e.g., as between the long distance affiliate and

6      that BOC from which the access service is obtained), this would be a left-pocket to right-

7      pocket transaction that has absolutely no effect whatsoever on the SBC parent company

8      bottom line.[137]  This is, of course, not the case where actual cash is paid to other LECs.

9

10     In the past, AT&T itself has expressed these same concerns.  In an *ex parte* filing made in

11     June 2004 in WC Docket No. 02-112, AT&T addressed the inability of existing imputation

12     rules to adequately prevent the RBOCs from subjecting rivals to a price squeeze by

13     simultaneously imposing high access charges while setting retail prices that fail to reflect

14     those same access charge levels.  AT&T proposed a specific, and detailed, set of imputation

15     rules that were intended to limit the RBOCs' ability and opportunity to impose these types

---

137.  This would not be the case if the SBC ILECs were subject to an effective form of regulation.  For example, under a rate of return or other earnings-based regulation, such as the original CC Docket 87-313 LEC price cap plan with earnings sharing, an accounting "payment" from the long distance affiliate or business unit to the BOC for access services would increase the BOC's earnings.  Under rate-of-return regulation, those increased earnings would offset the total BOC revenue requirement, driving down prices of other services and keeping earnings at the "authorized" level.  Under a price cap plan with sharing of excess earnings, a portion of the additional earnings generated by the accounting transfer would potentially have to be credited to the BOC's customers.  But under the current post-*CALLS* regulatory model, any increase in BOC earnings flow straight to the parent corporation's bottom line.  Hence, an "imputed" payment of access charges has the effect of reducing the long distance affiliate's earnings and correspondingly increasing the BOC's earnings by exactly the same amount, producing no net effect at the parent company level.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    of price squeezes on their rivals.[138]  A copy of AT&T's proposed Imputation Rule that was

2    included in its June 2004 *ex parte* submission is provided as Attachment 4 hereto.  It is

3    important to note, however, that these "remedies" were intended to work within the much

4    more competitive industry structure that existed one year ago.  It is unlikely that aggressive

5    regulation alone – in the absence of competitive pressure from AT&T and MCI – would be

6    effective at all if these mergers were approved.

7

8    **The vertical integration of AT&T's Tier 1 Internet backbone and SBC's "last mile" DSL**
9    **facilities will reduce competition for wholesale Internet services and erect additional entry**
10   **barriers for non-integrated Internet service providers.**
11

12   Q.   Does the vertical merger raise any competitive concerns for the market for Internet services?

13

14   A.   Indeed it does.  The SBC/AT&T merger also involves vertical integration relative to Internet

15        services at a level that no existing Internet service provider can achieve.  AT&T is a Tier 1

16        Internet backbone network service provider, which means that it is able to exchange traffic

17        with the other Tier 1 providers on a "peer-to-peer" basis without any cash payments.  Such

18        peering is available only to Tier 1 providers, of which SBC is currently not one.  SBC, on

19        the other hand, currently provides the plurality of high-speed Internet services to California

20        customers via its DSL offerings; AT&T is not even involved in the downstream retail

21        broadband services market (having sold that business to IBM several years ago).  Retail ISPs

---

138. *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements,* WC
Docket No. 02-112*, 2000 Biennial Regulatory Review Separate Affiliate Requirements of Section
64.1903 of the Commission's Rules*, CC Docket No. 00-175 ("*Non-Dominant Proceeding*"), Ex
Parte Declaration of Lee L. Selwyn and Covering Letter of AT&T, filed June 9, 2004.

ETI ECONOMICS AND TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1     – such as pre-merger SBC – must purchase Internet backbone capacity from Tier 1 providers

2     for cash.  After the merger, SBC will acquire the ability to access the Internet backbone on a

3     peer-to-peer basis, and will avoid a significant cost that *every other retail ISP is forced to*

4     *incur.*

5

6  Q.  How might this affect competition for downstream retail Internet services?

7

8  A.  Interestingly, one such impact has just materialized – even while the merger is still being

9     evaluated by regulators and the Department of Justice.  On June 1, 2005, SBC announced

10    that it was slashing the price of its high-speed ADSL Internet service to $14.95 per month, a

11    drop of 44% from the prior $27-per-month rate.  Other high-speed Internet service providers

12    charge as much as $45 a month for comparable service.

13

14  Q.  But isn't that price break good for consumers?

15

16  A.  In the short run, consumers will clearly save some money.  But what we're dealing with here

17    is a price war initiated by SBC and fueled by SBC's unique and considerable cost

18    advantages relative to its broadband rivals – principally cable companies.  Since most

19    subscriber loop costs are allocated to basic service (and not to DSL), and since SBC won't

20    have to pay for access to the Internet backbone, it can engage in such aggressive retail

21    pricing without necessarily losing money.  If rival carriers' forward-looking incremental

22    costs – which include the costs of upgrading cable for two-way high-speed Internet service

23    and for access to the Internet backbone (including all marketing and retailing costs) – are

157

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    greater than $14.95 per month, SBC's tactic will create a price squeeze that could potentially

2    force competitors out of the market altogether.  Were that to occur, allowing SBC to

3    monopolize the high-speed Internet service market, prices would inevitably rise, and

4    consumers would be decidedly worse off in the long run.  According to SBC

5    Communications CFO, the objective of the $14.95 DSL rate is to "pillage and plunder the

6    industry."[139]  Mr. Linder states that with this offer, SBC is, "trading [] some revenues during

7    that first year's life of the customer... and the opportunity going forward is having that

8    customer in the base, lower churn, ability to sell other services into that customer over

9    time."[140]  Mr. Linder admits that the $14.95 price is only profitable for SBC if SBC assumes

10   it will be able to raise the price– after it has taken market share.  "We generate positive cash

11   flow over the life of those [DSL promotional] customers at that price point... So over the life

12   of the customer with a discounted rate for a promotional period then moving to a standard

13   rate we will make money on those customers."[141]

_____

139.  SBC Communications at Lehman Brothers Worldwide Wireless and Wireline
Conference, June 1, 2005, transcript filed by SBC Communications pursuant to Rule 425 under
the Securities Act of 1993, at 7-8.

140.  *Id.*

141.  *Id.*

158

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

1         IMPACTS ON COMPETITION FOR ENTERPRISE BUSINESS SERVICES

2

3   **Without a solid foothold in the enterprise market, carriers attempting to compete with the**
4   **giant SBC/AT&T have little chance of surviving as competitors for residential and small**
5   **business services.**
6

7 Q.   There is considerable discussion in several of the Joint Applicants' declarations and in their

8      Application and Public Interest Statement about the importance of the merger to SBC's

9      ability to compete for the business of large national enterprise customers.  Should the

10     implications of the merger for competition in the large enterprise business segment be of

11     concern to ORA and to the Commission?

12

13 A.   Yes, it should.  First, it is a relevant consideration under §854(c)(6).  Second, even though

14     the specific constituency represented by ORA – and one that is of primary concern to the

15     Commission as well – the residential consumer market, obviously does not purchase the

16     high-capacity and high-volume services that are demanded by large business users,

17     consumers nevertheless have a major stake in assuring the continuation of a strong

18     competitive market in the large business segment, for several reasons.

19

20     •   Many of the so-called "enterprise" services are used to support a broad range of

21        *consumer* applications, such as Automated Teller Machines (ATMs), Internet access,

22        and a myriad of Internet applications ranging from banking to travel and online retail

23        purchases.  For example, the ability of a consumer to take an ATM card issued by a

24        California bank and get cash out of an ATM in Chicago or Cleveland, or in Copenhagen

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1      or Cairo – and in local currency, no less – is fueled by high-bandwidth and high-security

2      access and transport facilities that fall within the scope of the enterprise business service

3      market.  Competition in this segment has brought about dramatic reductions in the

4      prices of these services and has expanded their capacities and capabilities.

5

6    •   Consumer and enterprise services are furnished via an integrated network infrastructure,

7      often sharing the same physical cables, switches and other network components.

8      Competing non-RBOC carriers may not be capable of sustaining a business model that

9      is limited to less than all three segments (consumer, small business, and enterprise).  If

10     the post-merger SBC/AT&T is effective in blocking competition in the enterprise

11     market, rivals may be unable to achieve sufficient mass to compete in the consumer and

12     small business segments.

13

14   •   Enterprise services are often purchased as wholesale inputs for resale to consumers in

15     competitive retail markets.  If the market for enterprise services becomes so highly

16     concentrated following the merger that existing non-RBOC carriers are forced to exit

17     the market (or be absorbed into an RBOC), the availability of such wholesale services at

18     competitive prices could suffer, which would result in less competition at the retail end

19     of the consumer market as well.

20

21   Q.  Does SBC presently compete with AT&T in the large enterprise business sector?

22

160

REDACTED

Cal. PUC A.05-02-027                     LEE L.  SELWYN

1  A.  Indeed it does.  In fact, SBC has been competing both in-region and out-of-region for large

2      business accounts, according to data provided by SBC in response to the FCC Staff's April

3      18, 2005 Initial Information and Document Request, item 4.  SBC's full response to this

4      request is reproduced as Attachment 5 hereto.  This document identifies *hundreds* of specific

5      marketing efforts in which SBC had encountered AT&T and/or TCG as a direct competitor

6      – and in many cases the *only* competitor.  In some cases, SBC lost the bid to AT&T; but in

7      many other cases SBC was the successful vendor.  Once AT&T has been absorbed into

8      SBC, this type of direct head-to-head competition will cease.

9

10 **By eliminating AT&T as a competitor, SBC would be able to solidify its monopoly control**
11 **of the wholesale (upstream) special access market, while simultaneously fortifying its**
12 **ability and incentives to discriminate against downstream retail competitors.**
13

14 Q.  What types of advantages does SBC obtain by expanding its already substantial special

15      access market share?

16

17 A.  Let's begin by looking at conditions as they exist today.  SBC is the *only* source of special

18      access services to every customer location throughout the SBC footprint.  As such, SBC has

19      unique opportunities not available to other competitors.  A particularly relevant example is

20      provided by Dr. Joseph Farrell, former chief economist at the FCC, in a recent statement

21      attached to comments on the proposed merger filed at the FCC by Global Crossing.[142]

---

142.  Federal Communications Commission, *Applications SBC Communications, Inc. and AT&T Corporation for Consent to Transfer of Control of Section 214 and 308 Licenses and Authorizations and Cable Landing License*, WC Docket No. 05-65, *Comments of Global*

(continued...)

161

REDACTED

ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    There, Dr. Farrell describes the anticompetitive effects of an  SBC tariff that employs a

2    volume-based pricing scheme, in which discounts are applied based upon all of a wholesale

3    customer's purchases of SBC special access services.  In order to benefit from SBC's pricing

4    arrangement for special access, the wholesale customer is required to commit 90% of its

5    total special access demand to SBC, or to purchase 90% of its base period demand *from*

6    SBC.  As such, in order to meet the minimum volume threshold, special access customers

7    may be compelled to forgo purchasing special access services from a CLC or CAP

8    competitor – or perhaps even forgo self supply – even if its price or cost is below that of

9    SBC, if by making such a purchase the customer would then fall below the 90% SBC

10   contract demand threshold.  Thus, as long as SBC is able to maintain an absolute monopoly

11   over *some* (in fact, over *most*) of the special access market within its footprint, SBC can –

12   and does – leverage that monopoly to foreclose competition elsewhere even where it may

13   otherwise be economically viable.

14

15   Q.   Is AT&T a major competitor of SBC for the provision of enterprise services, including

16        special access?

17

18   A.   Absolutely.  Through its 1998 acquisition of Teleport Communications Group ("TCG"),

19        AT&T is now one of the largest, *if not the largest*, competitive provider of high-capacity last

20        mile digital subscriber facilities at the DS-1 level and above connecting to the premises of

---

142.  (...continued)
*Crossing North America, Attachment A, Statement of Joseph Farrell*, April 25, 2005 ("*Farrell Statement*").

ECONOMICS AND
TECHNOLOGY, INC.

REDACTED

Cal. PUC A.05-02-027                         LEE L.  SELWYN

1    enterprise customers within the SBC region.  As Dr. Simon Wilkie, testifying in the FCC

2    merger review for Cbeyond and several other CLCs. has noted, the  elimination of AT&T as

3    a competing provider of special access services will significantly reduce the extent of CLC

4    presence in many SBC enterprise markets.[143]  For example, absorption of AT&T into SBC

5    would reduce the number of CLC-served (enterprise customer) buildings in the Cleveland

6    MSA by 53.6%, from 3,039 to 1,409.[144]   In the Milwaukee MSA, the number of CLC-

7    served buildings would drop by 64%, from 3,292 to 1.186, with AT&T out of the picture.

8    Exhibit 6(a)(III) provided by AT&T in response to the FCC's data requests indicates that

9    there are approximately <<BEGIN SBC/AT&T PROPRIETARY ▨ END SBC/AT&T

10   PROPRIETARY>> AT&T-served buildings in San Francisco alone.

11

12   In a June 15, 2005 *ex parte* submission to the FCC, Prof. Wilkie provided pre- and post-

13   merger market share and HHI statistics for the SBC portion of the Los Angeles MSA.

14   There, SBC's capacity-based share of the enterprise loop market (T-1 or greater) is 87.2%,

15   yielding a pre-merger HHI of 7,677.  Adding AT&T's capacity-based 3.5% share to SBC's

16   increases post-merger the HHI to 8,279, i.e., a jump of 602.  Even in the enterprise market

17   segment where SBC's share (69.5%) is lowest – locations requiring at least an OC-3 level of

18   service – adding AT&T's 10.4% share raises the HHI from a pre-merger level of 5,345 to a

---

143.  Federal Communications Commission, *Applications SBC Communications, Inc. and AT&T Corporation for Consent to Transfer of Control of Section 214 and 308 Licenses and Authorizations and Cable Landing License*, WC Docket No. 05-65, Declaration of Simon Wilkie on behalf of Cbeyond *et al.*, April 25, 2005, at paras. 18-21, Tables 1 and 2.

144.  *Id.*, at Table 1.

ET ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                         LEE L.  SELWYN

1    post-merger 6,795 – i.e., a jump of 1,449.[145]  Significantly, SBC's Prof. Carlton, in his

2    Declaration for SBC, in citing the *New Paradigm Research Group CLEC Fact Report 2004*

3    as his data source, appears to have *included* buildings served by AT&T among those being

4    portrayed as "CLEC" locations.[146]

5

6   Q.   Hasn't AT&T previously claimed that it was "impaired" without access to SBC's DS-3

7        facilities?

8

9   A.   Only at lower levels of demand.  Although AT&T stated in its comments in the *TRR*

10       proceeding that it was not generally economical for AT&T to provide end user facilities-

11       based connections to its fiber optic networks where the end user's demand was at or *below*

12       *two DS-3s*, AT&T/TCG was and continues to be a significant provider of facilities-based

13       connectivity to larger end users and to other carriers whose demand was at or above three

14       DS-3s.  Elimination of AT&T as a competitor to SBC creates even greater concentration in

15       special access than exists at the present time and, as Prof. Farrell has demonstrated, will

16       enable SBC to apply an even larger price penalty where the (wholesale) special access

---

145.  Federal Communications Commission, *Applications SBC Communications, Inc. and AT&T Corporation for Consent to Transfer of Control of Section 214 and 308 Licenses and Authorizations and Cable Landing License*, WC Docket No. 05-65, Simon J. Wilkie, "Proposed Mergers of SBC/AT&T and VZ/MCI: Preliminary Analysis of Competitive Effects," *ex parte* submission by Cbeyond *et al.*, June 15, 2005, WC Docket Nos. 05-65, 05-75, at 14.

146.  *Carlton-Sider Declaration*, at para. 68.

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    customer fails to meet SBC's 90%-of-demand threshold than it is able to do today, with

2    AT&T in the market.[147]

3

4    Q.   How does this *horizontal* leveraging then provide SBC the opportunity to engage in vertical

5         discrimination favoring its own retail long distance affiliate over competitive providers?

6

7    A.   A recent BellSouth tariff – rejected after AT&T lodged a complaint with the FCC – went

8         one step further than the volume-based pricing arrangement just described.  This targeted

9         special access tariff (dubbed the "Transport Savings Plan" ("TSP"))[148] was similar to the

10        SBC plan discussed by Prof.  Farrell in that the customer had to commit a high percentage of

11        its total purchases to the ILEC in order to qualify for substantial discounts, but the plan

12        differed by virtue of also offering price breaks based on growth.  In this way, BellSouth was

13        able to offer higher discounts to its own affiliate (a provider that had started with virtually

14        zero base demand) than to well-established carriers (such as AT&T) that – while much

15        larger – were no longer growing.  In rejecting the BellSouth tariff, the FCC found that

16        BellSouth had designed the service to "favor BellSouth Long Distance and substantially

17        disfavor BellSouth Long Distance's larger competitors in a manner that appears to lack any

18        cost basis.  Section 272 'flatly' forbids such discrimination."[149]

19

---

147. *Farrell Statement*, at para. 15.

148. *AT&T Corp., Complainant, v. BellSouth Telecommunications, Inc., Defendant*, File
No. EB-04MD-010, FCC 04-278*, Memorandum Opinion and Order*, December 9, 2004.

149. *Id.*, at para. 29.

165

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   Q.  How does this bear upon SBC's opportunities and incentives for discrimination against

2       downstream suppliers?

3

4   A.  It illustrates that whenever an opportunity exists, SBC has strong incentives to tailor volume

5       discounts and specialized pricing plans for critical wholesale inputs to favor its own

6       affiliates over unaffiliated entities who offer competing retail services.   As I mentioned

7       earlier, in addition to being SBC's largest competitor for special access services, AT&T is

8       also SBC's largest customer in California for special and switched access services.   In 2004,

9       I've estimated that AT&T spent over 3-billion on access services throughout the SBC

10      region, likely making it the largest customer for these services by a fairly substantial margin.

11

12      Thus, rather than being diminished by its acquisition of AT&T, SBC's opportunities and

13      incentives will increase in scale and scope by being combined with its largest customer and

14      largest competitor.

15

16  **Even though AT&T has been subject to precisely the same operational difficulties and**
17  **competitive disadvantages (vis-à-vis the incumbent LEC) that SBC claims to be an**
18  **impediment to its own competitive entry out of region, AT&T has still been successfully**
19  **serving the very customers that SBC now claims it can serve only by merging with AT&T.**
20

21  Q.  Are you convinced by SBC's claim that it cannot compete on an out-of-region basis on its

22      own – that is, without joining forces with AT&T?

23

24  A.  No, and it is not even clear that the notion that SBC has not been competing for enterprise

25      business out-of-region is even correct as a factual matter.  According to Mr.  Kahan, SBC

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

1    was finding it difficult to compete except where it also controlled local network facilities as

2    an ILEC, yet its merger partner AT&T was successfully serving the very customers that

3    SBC now claims to have been unable to serve. This was the case, despite AT&T's being

4    subject to precisely the same operational difficulties and competitive disadvantages (vis-à-

5    vis the incumbent LEC) that SBC claims to be an impediment to its own competitive entry

6    out of region.  However, given the likelihood that these impediments will dramatically

7    increase *for other carriers attempting to compete within the SBC region* should SBC be

8    permitted to merge with AT&T, it is indeed hard to imagine how the surviving competitors

9    will overcome them.

10

11   Q.   What types of disadvantages are you referring to?

12

13   A.   The most substantial competitive/operational disadvantage consists of the need to purchase

14        special access services, a necessary input for serving enterprise customers, from the ILEC, at

15        considerably above-cost rates.   In both the *Triennial Review* and *Triennial Review Remand*

16        proceedings, AT&T provided extensive economic and operational testimony demonstrating

17        its extreme dependence upon ILEC facilities to furnish service to enterprise customers,

18        particularly those at the DS-1 level and smaller DS-3 purchases.  AT&T was also active in

19        seeking reversal of the FCC's "pricing flexibility" rules with respect to special access

20        services, based upon extensive experience indicating that special access rates were

21        consistently higher in areas where the RBOCs had received special access pricing flexibility

167

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                         LEE L.  SELWYN

1    than in areas still subject to price caps.[150]  These conclusions were echoed by the Ad Hoc

2    Telecommunications Users Committee, a group of large enterprise customers, who also

3    produced evidence showing that competition was not constraining RBOC special access

4    prices and thus pricing flexibility was simply resulting in higher rates.[151]

5

6    Q.   Exactly how excessive are SBC's and other RBOCs' prices for special access service?

7

8    A.   SBC has been able to set its DS-1/DS-3 special access prices at supracompetitive levels as a

9        result of the near-total dependence of virtually all IXCs and CLCs on these facilities in order

10       to serve enterprise customers.  These supracompetitive prices are much higher than the

11       corresponding UNE prices for the same elements, which are based upon forward looking

12       per-unit average costs and many multiples above the competitors' prices for the same

13       services where available, because competitors' prices are based upon economic cost.  As a

14       result of FCC restrictions on the use of UNEs for so-called "mixed" (i.e., local and long

15       distance traffic), and "available facilities" limitations on UNE-provisioning requirements,

16       IXCs and others are unable to purchase these facilities at competitive rates.[152]  In its most

---

150.  *AT&T Corp. Petition for Rulemaking To Reform Regulation Of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, Petition For Rulemaking, RM-10593, October 15, 2002 ("*AT&T Special Access Petition*").

151.  Lee L. Selwyn, Susan M. Gately and Helen E. Golding, *Competition in Access Markets: Reality or Illusion, A Proposal for Regulating Uncertain Markets,* Prepared for the Ad Hoc Telecommunications Users Committee by Economics and Technology, Inc., August 2004, at 18 (available at: www.econtech.com/accesswhitepaper.pdf), at 17.

152.  *See, e.g. TRRO*, at paras. 34-40, and 64.

168

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1    recent (end of year 2004) ARMIS 43-04 Report, SBC data indicate that the company

2    generated a 76.19% rate of return on its interstate special access services, up from 63.16%

3    for the previous year.  In fact, SBC's rate of return on special access has been growing

4    steadily, *as has its special access revenue.*

5

6    Q.   Haven't the RBOCs attacked the validity of rate of returns reported in ARMIS?

7

8    A.   Yes, but their arguments[153] are without merit.  The ARMIS financial results for SBC are

9    derived from accounting data compiled by SBC itself, presumably in accordance with the

10   Commission's rules, which SBC and the other RBOCs themselves had a major role in

11   developing.  Moreover, when it has suited its interests, SBC has relied upon ARMIS results

12   (for example, arguing for an increase in UNE rates where the costs reported in ARMIS

13   exceeded the Company's revenues).  While SBC challenges the use of ARMIS results when

14   these show *excessive* earnings (as in the case of special access), it relies upon ARMIS as the

15   definitive authority when the ARMIS results suggest an earnings deficiency or "below cost"

16   pricing.[154]

---

153.  *See, e.g., AT&T Corp. Petition for Rulemaking To Reform Regulation of Incumbent Local Exchange Carrier Rates For Interstate Special Access Services,* RM Docket No. 10593, *Opposition of SBC Communications,* December  2, 2002, at pp. 19-22; *Opposition of Verizon,* December 2, 2002, at pp. 21-23.

154.  For example, in May 2003 in Federal District Court in Chicago, Illinois, just five months after having challenged the use of ARMIS data for evaluating the reasonableness of special access prices in FCC RM-10593, SBC relied specifically upon ARMIS results to support its contention that UNE rates were not covering their costs.  According to SBC's expert witness:

(continued...)

169

REDACTED

ET ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1       In any event, whether or not ARMIS data includes minor cost misallocations at the margins

2       does not affect the overall integrity of *trends* in the data, *since those claimed misallocations*

3       *do not change from period to period.*  As Table 4 demonstrates, SBC's rate of return on

4       interstate special access has escalated from 39.55% in 1999 to an astounding 76.19% for

5       2004, while its interstate special access *revenues* also grew at double-digit year-over-year

6       rates, from $2.5-billion in 1999 to $4.5-billion in 2004.  Thus, even if the absolute rate of

7       return developed for the special access category using ARMIS data is off by some (at most a

8       very small) percentage, the trend in the data (escalating returns coupled with escalating

9       revenues) provides compelling evidence that SBC has the ability to increase prices to

10      supracompetitive levels without fear of attracting competitive entry or of losing so much

11      demand as to make the price increase unprofitable.

---

154.  (...continued)
SBC Illinois' average revenue per loop (for UNE-L) and revenue per line (for UNE-P)
per month is substantially below the costs that SBC Illinois recognizes on its books to
provide those UNEs.  I used the FCC's financial accounting information as reported in
its Automated Reporting Management Information System ("ARMIS") files to obtain
the historical cost data specifically for SBC Illinois.  These data are reported to the FCC
for purposes of tracking the interstate rate of return and are subject to a highly detailed
set of reporting guidelines.

*See,* Affidavit of Debra J. Aron on behalf of SBC in United States District Court for the Northern
District of Illinois, Eastern Division, Case No. 03-C3290, filed May 27, 2003.
Several months later, in December 2003, SBC was joined by USTA and other BOCs  in lauding
ARMIS as the source for the "actual" costs of UNEs in the response to the FCC's *TELRIC
NPRM.  See, e.g., Review of the Commission's Rules Regarding the Pricing of Unbundled
Network Elements and the Resale of Service by Incumbent Local Exchange Carriers*,  WC
Docket No. 03-173, *Opening Comments of SBC Communications, Exhibit A, "The Economics of
UNE Pricing," Debra J. Aron, PhD and William Rogerson, PhD,* December 16, 2003, pp. 28-32.
SBC has repeated this pattern several times over – alternatively attacking ARMIS data when it
shows something SBC doesn't like and then relying on ARMIS data in support of its desired
outcomes.

170

**REDACTED**                                           ECONOMICS AND
                                                       TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

| Table 4 | | |
| --- | --- | --- |
| SBC Interstate Special Access Revenues and Rates of Return | | |
| Year | Special Access Revenues ($billions) | Special Access ROR |
| 1999 | $2.48 | 39.55% |
| 2000 | 3.41 | 41.37% |
| 2001 | 4.37 | 61.53% |
| 2002 | 4.35 | 51.34% |
| 2003 | 4.43 | 63.16% |
| 2004 | 4.50 | 76.19% |
| Source: Federal Communications Commission, ARMIS Report 43-04, Access Report, YE 1999-2004.  Available at http://www.fcc.gov/wcb/eafs (accessed April 25, 2005).  Column O (Special Access) Row 8041 (Net Return) divided by Row 8040 (Average Net Investment). | | |

Q.  But didn't AT&T acquire its own facilities to serve these customers so that it could avoid

having to pay SBC and other RBOCs for special access at these exorbitant rates?

A.  For the most part, no.  AT&T estimated that (in 2002) of the approximately three million

commercial/business customer locations nationwide, it was providing service to

approximately 186,000 of these locations using some type of special access service or its

equivalent.[155]  Of these, only about 6,000 locations were being served directly using AT&T-

owned dedicated access facilities, another 3,700 were being served using dedicated access

---

155.  *Declaration of Kenneth Thomas on behalf of AT&T,* filed October 15, 2002 with the *AT&T Special Access Petition,* at 1.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1    facilities being leased from other CLCs, and the remaining 176,300 were being served by

2    ILEC special access services.[156]

3

4    Q.   Is there other evidence that demonstrates the extent of competitors' dependence upon SBC's

5         special access facilities, even where competitive fiber exists in the same area or even on the

6         same streets?

7

8    A.   Yes.  In an August 18, 2004 *Ex Parte* submission in CC Docket Nos. 01-138, 96-98, and 98-

9         147, SBC produced a set of extremely detailed maps of the central business districts of

10        approximately twenty major cities within its operating territory that confirm widespread use

11        of SBC special access services by CLCs *even on streets where competing fiber optic*

12        *facilities are portrayed as being in place.*  Figure 1 below reproduces SBC's map of the San

13        Francisco financial district, filed with its August 18, 2004 *ex parte*, in which more than 436

14        instances where SBC special access service is being provided to CLC customer locations

15        along streets where competitive fiber is in place.[157]  An analysis of those SBC maps that

16        separately identify CLC "on-net" buildings and SBC special access buildings underscores

17        the pervasive use of SBC facilities even in markets that SBC itself considers to be the most

18        competitive of all.  Table 5 below presents the results of my analysis for several of the

---

156.  *Id.*

157.  Federal Communications Commission, *Petition for Forbearance of the Verizon Telephone Companies Pursuant to 47 U.S.C. §160(c)*, WC Docket No. 01-338, SBC August 18, 2004 *ex parte* letter, at Attachment A.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    MSAs in SBC's footprint, which appear to be representative of all of the MSAs for which

2    maps have been provided.

3

| Table 5 | | | |
|---|---|---|---|
| Most CLC enterprise customers are being served using special access, even on streets where CLC-owned fiber has been deployed | | | |
| City | All locations | | SBC Spc. Access on streets with CLC fiber |
| | SBC Spc. Access | CLC  fiber | |
| San Francisco (city wide) | 1160 | 71 | 658 |
| San Francisco (financial dist.) | 719 | 68 | 436 |
| Oakland | 181 | 18 | 111 |
| San Jose | 95 | 24 | 63 |
| Dallas | 124 | 27 | 109 |
| Source: Analysis based upon SBC August 18, 2004 *Ex Parte* submission in CC Docket Nos. 01-138, 96-98, and 98-147 | | | |

173

REDACTED

ETI  ECONOMICS AND
TECHNOLOGY, INC.