Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    •    Connections to the fiber facility can only be made at a limited number of  "Network

2         Access Points" that have been established for this purpose, places where terminating

3         equipment and cross-connection facilities are in place.  Consider, by analogy, a

4         superhighway or mass transit system – even if you live right next to the highway or the

5         transit line, you can only access it at interchanges (in the case of the highway) or

6         stations (in the case of the transit line).

7

8    •    The costs of effecting such a connection are often substantial, and can only be justified

9         where revenues at the particular customer location will be sufficient.

10

11   •    Building owners are not obligated in many areas, as a legal matter, to allow CLCs to

12        bring facilities into their buildings, and where they do permit such entry may impose

13        construction, rental or other fees that will serve only to increase the entry barrier overall.

14

15   •    Depending upon where the demarcation has been established, the BOC may own the

16        riser facilities within the building, whose use by a CLC may potentially involve

17        makeready and recurring charges.

18

19        Given these complications, and given that much of the "CLEC owned" fiber cited by SBC in

20        these maps doubtless belongs to AT&T, once AT&T is no longer an independent provider,

_____

159.  (...continued)
behalf of AT&T Corp., filed October 4, 2004, at paras. 39-49.

**REDACTED**

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1      the capability of the remaining CLCs to build their own "facilities-based" last mile facilities

2      will sink even further.

3

4  Q.  You have just described the significant competitive hurdles faced by even a large and well-

5      established carrier (AT&T in this case) in attempting to compete with the ILEC within its

6      incumbent region.  Do you expect the surviving competitors to face even greater hurdles if

7      the proposed merger is approved?

8

9  A.  Yes, definitely.  SBC's excessive special access prices will significantly enhance its position

10     and opportunities in the retail enterprise services market, especially if SBC is permitted to

11     merge with AT&T.  In the *TRR Proceeding*, AT&T introduced extensive evidence that the

12     combined effect of the excessive SBC special access prices and SBC's retail prices with

13     which AT&T and other CLCs must compete subjects SBC's rivals to a formidable price

14     squeeze.  AT&T for one, claims to have ceased offering several local business services in

15     light of the special access prices that SBC and the other RBOCs charge.[160]  AT&T has also

16     shown that for many other services such as private line service and Frame Relay, the RBOCs

---

160.  AT&T first announced on June 23, 2004 that it was exiting the residential local and long-distance markets in seven states across the country (see AT&T News Release, "AT&T to Stop Competing in the Residential Local and Long-Distance Market in Seven States," June 23, 2004, available at http://www.att.com/news/item/0,1847,13121,00.html, accessed May 6, 2005). The following month, AT&T went on to announce that it was ceasing all investment in traditional consumer services (see AT&T News Release, "AT&T Announces Second-Quarter 2004 Earnings, Company to Stop Investing in Traditional Consumer Services; Concentrate Efforts on Business Markets," July 22, 2004 available at http://www.att.com/news/item/0,1847,13163,00.html, accessed May 6, 2005).

177

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    have set special access and retail prices at levels that do not allow AT&T or any other

2    efficient carrier to compete for many customer segments on a going-forward basis.[161]

3

4  Q.  In the event that both AT&T and MCI are merged into RBOCs (both of which operate in

5    California), what remaining competition will really exist for special access services?

6

7  A.  A significant portion of what little competition actually exists in the special access market –

8    competition that is limited mostly to the OCn segment – comes from AT&T and MCI

9    themselves.  For example, in their so-called *UNE Fact Report* submitted to the FCC in

10    October 2004 by SBC and its sister RBOCs, a total of 31,669 "Buildings Connected Directly

11    to CLEC's Fiber Network Using CLEC Fiber" were identified, *out of which 6,400* – i.e.,

12    about 20% of the total – were *attributed to AT&T.*[162]  The *UNE Fact Report* (while it fails to

13    enumerate the number of MCI "directly-connected" buildings) contends that MCI provides

14    last-mile facilities at all levels, as well as wholesale access.  Absorption of AT&T facilities

15    that are within the SBC region into the SBC network, and absorption of MCI facilities

16    within the Verizon region into Verizon will further reduce even the limited amount of

17    competition that exists in the high capacity facilities market.

18

---

161.  Federal Communications Commission, *TRR Proceeding*, WC Docket 04-313, Declaration of Alan G. Benway, Robert G. Holleron, Jeffrey King, Michael E. Lesher, Michael C. Mullan, and Maureen Swift on behalf of AT&T Corp., October 4, 2004.

162.  RBOC *UNE Fact Report 2004*, at III-4, Table 1.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1   Q.   Beyond the elimination of AT&T as the largest competitor of SBC for access services, what

2        additional harm will the merger do to competition for these services in California?

3

4   A.   The merger will fundamentally change the cost structure that this one very large (former)

5        competitor pays for access services.  In bringing AT&T's access capabilities (and

6        customers) into SBC's very large corporate umbrella,  SBC's ability to set its switched and

7        special access prices at excessive, supracompetitive levels will significantly enhance its

8        position and opportunities in the retail enterprise services market if, following the merger,

9        AT&T is no longer required to "pay" SBC for access services.

10

11  **Predation and price squeezes between SBC's retail prices and its special access charges are**
12  **currently occurring, and have the potential to become even more aggressive vis-à-vis other**
13  **CLCs once AT&T has been absorbed into SBC.**
14

15  Q.   How has SBC used its market power with respect to special access services to put its rivals

16       as a competitive disadvantage?

17

18  A.   Through its practice of shifting virtually all of its economic profit into the monopoly special

19       access services and away from the retail services that SBC offers to end-user enterprise

20       customers, SBC is able to maintain essentially the same aggregate earnings level whether or

21       not it, or a competitor, provides the end-user service.  But by overpricing special access,

22       SBC has been able to impose a classic price squeeze upon competitors, making their retail

179

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    offerings in the enterprise segment unprofitable.  This fact has been well documented by

2    AT&T and others before both the FCC and the Courts.[163]

3

4    Q.  What evidence of predation and price squeezes has AT&T itself put forward?

5

6    A.  In various FCC proceedings, AT&T has presented detailed analyses of the RBOCs' ability

7        to engage in a price squeeze, notwithstanding the existence of price cap regulation.  For

8        example, in the TRR proceeding, AT&T declarants Benway *et al*. explained:

9
10           [T]he special access rates paid by AT&T (which are among the lowest access rates
11           available) are typically well in excess of what the RBOC charges its own retail
12           customers.  For example, as AT&T has already shown in prior filings, the access
13           component of RBOC retail offerings are substantially lower than AT&T's
14           wholesale special access rates.  Thus, even if AT&T can offer the other parts of the
15           service at a cost equal to, or less than, what the RBOC incurs, this "spread" makes
16           it impossible for AT&T to profitably offer many services.  Worse yet, Exhibits 1-5
17           herein show that even the RBOCs' *total* retail price for these services is below what
18           AT&T pays for special access.[164]

19

20   Q.  What, if anything, has AT&T been able to do about this problem?

21

22   A.  Up to now, the *only* practical constraint on SBC's special access rate escalations has been

23       AT&T's persistence in challenging SBC's practices at the Commission and in the federal

---

163.  Federal Communications Commission, *AT&T Corp. Petition for Rulemaking To Reform Regulation Of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, Petition For Rulemaking, RM- 10593, October 15, 2002 ("*AT&T Special Access Petition*").

164.  *Benway et al. Declaration*, at para. 45.

REDACTED

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    courts, such as through its petition to end the ineffective special access flexibiilty rules,

2    which the FCC delayed dealing with, forcing AT&T to seek court intervention.  Even then,

3    when forced to move forward, the FCC dodged most of the issues raised and simply issued a

4    NPRM asking for current data (on issues for which AT&T's data was current at the time it

5    was filed).  With AT&T out of the picture as an advocate on special access pricing issues,

6    the prospect of further FCC action becomes even more uncertain.  There is a real concern

7    that SBC may have held back on even more aggressive price increases in the face of the

8    pending litigation, but that without the prospect of an AT&T challenge,  SBC move forward

9    to impose substantially higher rate levels as soon as the merger is closed.[165]

10

11   Q.   How does the proposed merger (along with that of Verizon and MCI) exacerbate this

12        situation?

13

14   A.   AT&T and MCI are the two largest providers of enterprise services to national customers,

15        and through years of experience and extensive networks have acquired significant market

16        share in the enterprise market.  It is this enterprise market share that SBC and Verizon covet,

17        and it is this combination of enterprise market share and special access monopoly that make

18        the proposed mergers a sure-fire recipe for rapid remonopolization of this segment.  If SBC

19        is able to obtain AT&T's *retail* market share and combine that with its *wholesale* access

---

165.  Despite its whopping 76.19% rate of return on special access, SBC's rates are not as high as those imposed by other RBOCs, affording SBC considerable "headroom" in raising rates while staying under the highest rates already in effect in other locations.  Once an RBOC has satisfied the "triggers" established in the Commission's special access pricing flexibility rules in any given MSA, it is subject to no constraints as to how high it can raise special access rates.

REDACTED

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1      monopoly, it will have the facilities, customer base, incentive *and the opportunity* to

2      discriminate against rivals and engage in predatory pricing on a massive scale.

3

4   Q.  What is likely to happen to the surviving competitors if SBC raises rates even further?

5

6   A.  Raising special access rates to levels that make competition unprofitable will enable

7      SBC/AT&T to force smaller competitors out of the market altogether.  Moreover, the

8      demonstrated ability of SBC to impose different prices for the same essential services to

9      different customers would enable SBC to be selective in its competition foreclosure efforts.

10     Where such competitors rely upon any kind of SBC access service or facility as in essential

11     input to that carrier's end-user service offering, SBC will be able to significantly undercut

12     that competitor's retail price – especially when it can exact a higher charge from the

13     competitor than from its own affiliate for the same service or facility.[166]  Through targeted

14     predatory pricing, SBC/AT&T will be able to make certain customers or products or

15     geographic markets unprofitable for rival firms.

---

166. CompTel/ALTS refers to SBC's "271 Local Switching Transport Offering" – SBC's replacement for the Sec. 251 UNE-Switching element that it is no longer required to provide – and its volume-based pricing structure that affords the largest CLCs (who can commit to purchase in excess of 750,000 switch ports from SBC) a discount of more than 50% per switch port and a 90% discount on usage charges relative to the charges applicable to CLCs committing to take less than 450,000 ports.  CompTel/ALTS notes that no cost justification has been offered by SBC for this enormous volume-based price spread, and also expresses the view that the *only* CLC that may qualify for the maximum discounts is AT&T, SBC's soon-to-be affiliate.  In fact, on its face, SBC's discounts could not possibly have a cost basis.  A CLC ordering 449,999 switch ports at $26 each would pay a total of $11,699,974 per month, whereas a larger CLC (e.g., AT&T) ordering 750,001 switch ports at $12 each would pay only $9,000,012, i.e., about 23% *less* for about 50% *more* service.

REDACTED

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                      LEE L.  SELWYN

1    **Existing rules governing the allocation of ILEC costs as between "regulated" and**
2    **"nonregulated" services are incapable of addressing the massive integration of network**
3    **facilities and organizational resources that would result from the merger of SBC and**
4    **AT&T.**
5

6    Q.   How is it that such predation and price squeezes are occurring when there are affiliate

7         transaction rules intended to address this type of problem?

8

9    A.   Simply put, there are some serious problems with the effectiveness of the current rules and

10       with the ability of regulators to police the types of conduct they are intended to address.

11

12       A number of parties filing comments at the FCC regarding the proposed merger have raised

13       serious concerns regarding the potential for cross-subsidization of competitive services by

14       SBC's monopoly services, and discriminatory treatment favoring SBC's (or its affiliates')

15       competitive services vis-à-vis those furnished by nonaffiliated rivals.[167]  Such acts are, of

16       course, expressly prohibited by the Commission's rules and by statute,[168] but the detection of

17       such conduct has become increasingly difficult and the extent of after-the-fact enforcement

18       has been largely ineffective, if for no other reason than the fact that it takes so long for

19       complaints of such anticompetitive conduct to be resolved that extensive damage can be

---

167.  Federal Communications Commission, *AT&T Corp. and SBC Communications Inc. Application Pursuant to Section 214 of the Communications Act of 1934 and Section 63.04 of the Commission's Rules for Consent to the Transfer of Control of AT&T Corp. to SBC Communications Inc.*, WC Docket 05-65, *Comments of Global Crossing North America, Inc.*, April 25, 2005; *Comments of ACN et al.*, at 34-45; *Comments of Cbeyond et al.*, at 10-16.

168.  47 U.S.C. § 254(k).

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   done to competition and to specific competitors even if, in the end, the complaints are held

2   to be valid.

3

4   Moreover, many of the existing regulatory mechanisms for detecting and preventing cross-

5   subsidization and discrimination were never designed to deal with a substantially

6   deregulated SBC/AT&T entity that would result from the proposed merger.  As an example,

7   nearly twenty years ago the FCC adopted 47 CFR §64.901 for the purpose of foreclosing

8   cross-subsidization of nonregulated services via cost misallocation.  However, as recognized

9   by the Commission in the *OI&M Order*, 47 CFR §64.901(c)) does *not* prevent cost

10  misallocation and cross-subsidization in the case of jointly owned facilities.[169]  Generally, 47

11  CFR §64.901 requires that the costs of jointly-used facilities be allocated between

12  competitive and monopoly services based upon *use*, and not upon cost causation.  Thus, the

13  decision to purchase a particular asset may be driven exclusively by the goal of providing a

14  competitive service, but if the asset, once having been acquired, is then used to provide both

15  competitive and monopoly services, its costs would then be allocated strictly in proportion to

16  such use.  Allocation of fixed plant as between monopoly and competitive services is

17  inherently arbitrary, and can be easily manipulated, even within the context of 47 CFR

18  §64.901(c)), to shift costs from the competitive services to monopoly services.[170]

---

169.  See fn. 171, *infra.*

170.  Consider the following example.  Suppose that the existing copper loop distribution plant is not capable of providing (competitive) video services (which is in fact the case).  So the RBOC embarks upon a massive capital spending program to entirely *replace* its copper plant with fiber to the home.  Once installed, the fiber will then be used to provide *both* conventional

(continued...)

184

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1    Q.   What kinds of concerns does this potential for manipulation lead to in the present merger

2         review?

3

4    A.   If the *effect* of ownership of joint facilities is to shift costs to regulated services and/or to

5         permit nonregulated services to use jointly-owned facilities without properly allocating costs

6         (which the Commission noted would be extremely difficult[171]), then the result is to create a

7         cross-subsidy of SBC's competitive operations by its regulated monopoly services.  And that

---

170.  (...continued)
monopoly voice telephone service *and* competitive video service.  Under the use-based
allocation requirement of 47 CFR §64.901, the cost of the jointly-used plant is to be assigned
based upon the highest use of the asset for each purpose over the coming three (3) year period.
If, during that period, only a small fraction of customers sign up for the BOC's video service, the
overwhelming majority of the costs of the fiber-to-the-home investment will be assigned to Plain
Old Telephone Service ("POTS"), *even though no portion of the capital investment was required
for POTS.*  47 CFR §64.901(c) was adopted at a time when the extent of an ILEC's
nonregulated activities was expected to be relatively small.  Indeed, even today, only a small
portion of the BOC's total costs are actually being classified as *nonregulated*.  For example,
according to the latest (end-of-year 2004) SBC ARMIS reporting, only 1% of total SBC plant in
service and 12% of total SBC operating expenses are classified as "nonregulated."  47 CFR
§64.901(c)) is simply not up to the task of dealing with the infusion of massive amounts of
nonregulated plant and expenses, which is exactly what will occur if SBC and AT&T are
permitted to merge.

171.  *Section 272(b)(1)'s "Operate Independently" Requirement for Section 272 Affiliates*,
WC Docket No. 03-228, *Petition of SBC for Forbearance from the Prohibition of Sharing
Operating, Installation, and Maintenance Functions under Sections 53.203(a)(2) and
53.203(a)(3) of the Commission's Rules and Modification of Operation, Installation, and
Maintenance Conditions Contained in the SBC/Ameritech Merger Order*, CC Docket Nos.
960149, 98-141, *Petition of BellSouth for Forbearance from the Prohibition of Sharing
Operating, Installation, and Maintenance Functions Under Section 53.203(a)(2)-(3) of the
Commission's Rules,* CC Docket No. 96-149*, Review of Regulatory Requirements for Incumbent
LEC Broadband Telecommunications Services*, CC Docket No. 01-337, *Report and Order* in WC
Docket No. 03-228, *Memorandum Opinion and Order* in CC Docket Nos. 96-149, 98-141, 01-
337, March 17, 2004 (*OI&M Order*).

REDACTED

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    is expressly and unambiguously prohibited in, although not foreclosed by, 47 CFR

2    §64.901(c)):  "A telecommunications carrier may not use services that are not competitive to

3    subsidize services subject to competition," notwithstanding the limitations of 47 CFR

4    §64.901's ability actually to detect such conduct.

5

6    Similarly, the ownership of essential local inputs like high-capacity digital access facilities

7    and collocation space by an *integrated* local/long distance enterprise provider such as the

8    combined SBC/AT&T entity would produce significant risks of discrimination.  The FCC,

9    in its *Non-Accounting Safeguards Order*, specifically cited the potential effect of joint

10   ownership on discriminatory access to facilities, saying:

11
12           Moreover, the ban on joint ownership of facilities should protect local exchange
13           competitors that request physical collocation by ensuring that a BOC's section 272
14           affiliate does not obtain preferential access to the limited available space in the
15           BOC's central office.[172]
16

17   As discussed earlier, the FCC recently found that competitors were impaired without access

18   to DS1 and DS3 facilities into customer premises at cost-based rates.[173]  SBC's proposal to

19   own the AT&T network and to provide these essential inputs *both* to itself *and* to its

20   competitors will specifically allow SBC preferential access to these and other competitively

21   essential facilities.

---

172.  *Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended*, CC Docket No. 96-149, *First Report and Order*, 11 FCC Rcd 21905(1996), 21983 (footnotes omitted).

173.  *TRR Proceeding*, *Order On Remand*, 2005 FCC LEXIS 912 ("*TRRO*").

REDACTED

ЄTЇ ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    **The merger exacerbates the already tenuous competitive situation created by the sunset of**
2    **Section 272.**
3

4    Q.   Could matters get worse before they get better with respect to opportunities for SBC (and

5         AT&T) to engage in anticompetitive cost misallocation?

6

7    A.   It appears likely that they could.  An SBC/AT&T merger, if combined with the "sunset" of

8         Section 272 on schedule, would substantially heighten the merged company's ability and

9         incentives to engage in cost misallocation, which would facilitate overpricing local services

10        to cross-subsidize retail long-distance services, to the detriment of competition and

11        consumers.

12

13        Presently, under the terms of the FCC's *OI&M Order*, although the RBOCs are permitted to

14        reintegrate their BOC and affiliate OI&M functions, they are still subject to the Section

15        272(b)(1) restriction on joint ownership of facilities.  Thus, at present, thets the BOC and its

16        affiliates are not permitted to collaborate on the purchase of equipment used by both entities.

17        In retaining this restriction, the FCC heeded comments from AT&T that showed the serious

18        risks of cost misallocation if the BOCs and their Section 272 affiliates were allowed to

19        jointly own network facilities.  AT&T pointed out that:

20
21             [I]f the BOCs were permitted to integrate their operations by jointly owning
22             switches, transmission and associated land and buildings, a massive and far larger
23             pool of joint and common costs would be created that would have to be allocated
24             through inherently arbitrary allocations.  As the Commission concluded in 1996,
25             "the costs of wired telephony networks and network premises are largely fixed and
26             largely shared among local, access, and other services," and thus sharing of these
27             network facilities among the BOC and its § 272 affiliates would dramatically

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   increase the magnitude of joint and common costs and thereby provide a
2   "significant opportunity for improper allocation of costs" that would impede
3   long-distance competition and harm ratepayers.*Non-Accounting Safeguards Order*
4   ¶ 159.[174]
5

6   In the *OI&M Order*, the Commission accepted this reasoning, and maintained its policy of

7   requiring that facilities used to provide competitive and noncompetitive services be

8   separately owned, noting:

9
10      The joint facilities ownership restriction was adopted concurrently with the OI&M
11      sharing prohibition to implement the "operate independently" requirement of
12      section 272(b)(1).  The joint facilities ownership restriction, codified in section
13      53.203(a)(1) of the Commission's rules, provides that "[a] section 272 affiliate and
14      the BOC of which it is an affiliate shall not jointly own transmission and switching
15      facilities or the land and buildings where those facilities are located."  In adopting
16      this restriction, the commission believed that joint ownership of facilities could
17      facilitate cost misallocation and discrimination.  Based on the record presented in
18      this proceeding, we continue to believe that, unlike the OI&M sharing prohibition,
19      the costs of maintaining separate ownership of facilities do not outweigh the
20      benefits the rule provides against cost misallocation and discrimination.  For
21      example, based on the record, we are persuaded that shared facilities would likely
22      create significant joint and common costs that would be inherently difficult to
23      allocate properly.[175]

---

174.  *Section 272(b)(1)'s "Operate Independently" Requirement for Section 272 Affiliates*,
WC Docket No. 03-228, Comments of AT&T Corp., at 17.

175.  Federal Communications Commission, *Section 272(b)(1)'s "Operate Independently"
Requirement for Section 272 Affiliates; Petition of SBC for Forbearance from the Prohibition of
Sharing Operating, Installation, and Maintenance Functions under Sections 53.203(a)(2) and
53.203(a)(3) of the Commission's Rules and Modification of Operating, Installation, and
Maintenance Conditions Contained in the SBC/Ameritech Merger Order; Petition of BellSouth
Corporation for Forbearance from the Prohibition of Sharing Operating, Installation, and
Maintenance Functions Under Section 53.203(a)(2)-(3) of the Commission's Rules; Review of
Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services*, WC
Docket No. 03-228; CC Docket Nos. 96-149, 98-141; CC Docket No. 96-149; CC Docket No.
(continued...)

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1    Q.    How do these concerns play out in the context of the proposed SBC/AT&T merger, after the

2          protections now afforded under Section 272, are sunset?

3

4    A.    The formidable competitive advantages that SBC/AT&T will gain from integrated facilities

5          cannot be overstated.  SBC's control of vast local facilities crucial to the provision of many

6          enterprise services will afford SBC substantial opportunities to discriminate against

7          competitors and engage in anticompetitive conduct if it is able to own and operate the

8          facilities on AT&T's network on an integrated basis.  Section 272 of the *1996 Act* requires

9          the RBOCs initially to operate their long distance services out of a separate affiliate that

10         transacts business with the BOC ILECs on an "arm's length" basis.  The initial idea of the

11         OI&M restriction, the joint ownership restriction, and the other safeguards of Section 272

12         was to mitigate the RBOCs' bottleneck advantages, in hopes of allowing CLCs to acquire a

13         base of customers and resources sufficient to allow them to neutralize the RBOCs'

14         bottleneck control of essential facilities.

15

16   Q.    What is the basis for your concern that the affiliate protections in Section 272 will be going

17         away?

18

19   A.    Sec. 272(f)(1) provides that the separate affiliate requirement is to sunset three years

20         following the RBOC's receipt of Section 271 in-region long distance entry in a given state,

---

175.  (...continued)
01-337, *Report and Order in WC Docket No. 03-228 Memorandum Opinion and Order in CC Docket Nos. 96-149, 98-141, 01-337,* 19 FCC Rcd. 5102 (2004) at para 32.

REDACTED

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    but may be extended by the Commission by rule or order.  Thus far, however, the

2    Commission has declined to order any such extension, and has allowed the safeguards of

3    Section 272 to sunset on schedule in all instances in which the three-year period has elapsed.

4    Despite the objections of state commissions and others, who contend that it is premature to

5    lift the separate affiliate safeguards provided by Section 272,[176] the FCC has not provided

6    any explanation or justification for its determination not to extend the separate affiliate

7    requirement beyond the sunset date.

8

9    Q.    Since SBC already has signicant incentives to favor its affiliates, what would the proposed

10          merger do to make matters worse?

11

12   A.    The mergers, when combined with the sunset of Section 272, will have a serious adverse

13          impact upon the *sustainability* of competition.  The timing of the sunsets with the dates at

14          which the approval process for the SBC/AT&T and Verizon/MCI mergers may be

15          completed may mean that at virtually the *exact same time* that SBC and Verizon acquire

16          control of their largest local and long distance competitors, they will no longer be subject to

17          any competitive safeguards with respect to the joint operation of their local and long

18          distance businesses.[177]  As AT&T itself has long argued, and as the Commission agreed in

---

176.  *See,* Federal Communications Commission, *Section 272(f)(1) Sunset of the BOC Separate Affiliated and Related Requirements*, WC Docket 02-112, *Memorandum Opinion and Order*, Concurring Statement of Commissioner Kevin J. Martin, December 23, 2002.

177.  Absent a change in Commission policy with respect to the sunset, the separate affiliate requirement will no longer exist in any SBC state by October 2006, just months after the merger,

(continued...)

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                LEE L.  SELWYN

1    the *OI&M Order*,[178] the use of integrated facilities for regulated local and competitive long

2    distance services raise significant competitive concerns.

3

4    The proposed mergers create a fundamental change in the conduct of the RBOCs' long

5    distance operations, and raise specific concerns with respect to §854(c)(7), which requires

6    the Commission to consider whether the proposed merger will "[p]reserve the jurisdiction of

7    the commission and the capacity of the commission to effectively regulate and audit public

8    utility operations in the state."  Whereas today both SBC and Verizon provide retail long

9    distance service by purchasing capacity from long distance wholesalers and reselling it to

10   their local service customers, the post-merger SBC will presumably seek to operate its own

---

177.  (...continued)
if approved, would likely be consummated, SBC received Section 271 Authority in the last of its states (Illinois, Indiana, Ohio and Wisconsin) in October 2003.  Assuming the Commission continues to allow Section 272 to sunset after three years, Section 272 restrictions will sunset in these states in October of 2006.  Although SBC is already permitted to integrate its long distance operations into its BOC operations in Texas and its four other Southwestern Bell states, its continues to operate them separately, pending resolution of whether and how a non-separated RBOC long distance operation will be regulated once the long distance and local operations were fully integrated (i.e., following the Sec. 272(f)(1)sunset).

178.  *Section 272(b)(1)'s "Operate Independently" Requirement for Section 272 Affiliates; Petition of SBC for Forbearance from the Prohibition of Sharing Operating, Installation, and Maintenance Functions under Sections 53.203(a)(2) and 53.203(a)(3) of the Commission's Rules and Modification of Operating, Installation, and Maintenance Conditions Contained in the SBC/Ameritech Merger Order; Petition of BellSouth Corporation for Forbearance from the Prohibition of Sharing Operating, Installation, and Maintenance Functions Under Section 53.203(a)(2)-(3) of the Commission's Rules; Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services*, WC Docket No. 03-228; CC Docket Nos. 96-149, 98-141; CC Docket No. 96-149; CC Docket No. 01-337, *Report and Order in WC Docket No. 03-228 Memorandum Opinion and Order in CC Dockets Nos. 96-149, 98-141, 01-337,* 19 FCC Rcd 5102 (2004), at para. 32.

191

ET ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                         LEE L.  SELWYN

1    (the former AT&T) long-haul facilities on an integrated basis with the BOCs' operations,

2    and to self-provide long distance service over the AT&T network.  This self-provisioning

3    would necessitate a heretofore unseen level of service and facility integration.  As a

4    purchaser of wholesale service from WilTel, SBC has paid WilTel for capacity on its

5    network, for which WilTel assumes responsibility for the OI&M functions associated with

6    its network.  This wholesale arrangement effectively limited the opportunities for SBC to

7    engage in anticompetitive conduct and cost shifting by significantly limiting the number of

8    services and facilities provided by the SBC BOC and needed by SBC Long Distance to

9    provide service.

10

11   These practical limitations of the RBOCs' provisioning of long distance service through

12   wholesale facilities have existed for each RBOC providing long distance service during all

13   periods covered under currently available Section 272 Biennial Audits.  However, none of

14   the biennial audits completed thus far have included auditing of any significant amount of

15   facilities-based long distance services provided by an RBOC affiliate,[179] primarily because

16   none of the RBOCs that have completed biennial audits provide facilities-based long

17   distance services in-region.  (SBC, Verizon and BellSouth provide in-region long distance

---

179. SBC, Verizon and BellSouth all provide long distance service through resale. Qwest, as a result of accounting irregularities, provided long distance service through a resale Section 272 affiliate until November 3, 2003, and did not, at that time, merge its resale affiliate into its facilities-based affiliate. The most recently filed Qwest Section 272 biennial audits cover the period from January 2, 2003 through January 1, 2004. As a result, there is less than 2 months worth of audited data regarding a start-up facilities based Qwest Section 272 affiliate. See, Federal Communications Commission, *Qwest Communications International, Inc. Section 272 Biennial Audit*, EB Docket No. 03-198, Ernst & Young, Report of Independent Accountants on Applying Agreed-Upon Procedures, filed June 10, 2004, at 8.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

1  entirely via resale of wholesale services purchased from other carriers.)  Despite this fact, the

2  opportunities for cost-shifting and discrimination from even the limited amount of joint

3  facilities and services has proven too much of a temptation for SBC.  As described by

4  AT&T, the Section 272 Audit in Texas showed "not merely discriminatory but also

5  deteriorating service quality"[180] with respect to services provided by the SBC BOC to non-

6  affiliates.

7

8  Q.  What will be the combined effect of removing the Section 272 requirements from SBC at the

9     same time it acquires significant long distance facilities?

10

11  A.  The effect will be to make cost misallocation, cross-subsidization, and discrimination

12     virtually undetectable.  Integrated operations such as those available to the post-merger,

13     post-sunset SBC will make it extremely difficult for state commissions and other regulatory

14     bodies to set rates and allocate costs.  Even with the structural separation requirement in

15     place, SBC is able to engage in cost shifting via joint marketing of local and long distance

16     services using BOC employees and other resources, and by furnishing various services to

17     both its BOC and long distance entities out of a separate "service company" that is able to

18     engage in *de facto* resource sharing for the benefit of both the BOC and long distance

19     entities.  As noted by the Pennsylvania Public Utility Commission during the New York

20     Sunset proceeding:

---

180.  Federal Communications Commission, *Implementation of the Telecommunications Act of 1996: Accounting Safeguards Under the Telecommunications Act of 1996*, CC Docket No. 96-150, Comments of AT&T Corp. on SBC's Section 272 Compliance Biennial Audit Report ("*AT&T Texas Audit Comments*") at 19.

193

ECONOMICS AND
TECHNOLOGY, INC.

REDACTED

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1

2      The separate accounting requirement of section 272 is consistent with the PA
3      PUC's interest in preserving their right to do an audit.  Audits can produce useful
4      information for policymakers such as the PUC.  With recent changes and reduction
5      in FCC accounting and reporting, the collapse of the affiliate into the incumbent
6      local exchange carrier perpetuates what appears to be a continual reduction in
7      available information, and, therefore, is not a preferred change.  The PA PUC
8      currently proscribes separate accounting for operations related to ILEC, CLC, IXC,
9      and CAP.  Maintaining this separation will be difficult if the FCC allows the
10     section 272 safeguards to collapse.  This separate accounting method assists the PA
11     PUC in its ability to design rates for the local exchange carrier segment, including
12     the unbundled network elements. The ability to readily identify costs and revenues
13     from the business segment is critical to ongoing rate review.[181]

14

15  Q.  What, if anything, has SBC and AT&T done to allay this type of concern?

16

17  A.  To date, SBC and AT&T have not divulged any details as to their plans regarding their

18      specific intended organization of AT&T assets within the combined post-merger entity.

19      However, the merged entity would emerge with *no regulatory oversight whatsoever* on its

20      ownership of vast AT&T and SBC facilities and its use of these facilities to provide

21      combined local and long distance services, making it almost impossible to detect and

22      prevent cost misallocation, cross-subsidization and discrimination favoring the merged

23      entity's competitive services at the expense of customers of monopoly local and access

24      services.

25

---

181.  Federal Communications Commission, *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements*, WC Docket No. 02-122, Comments of the Pennsylvania Public Utility Commission, July 22, 2002, at 4-5.

194

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1  **The SBC/AT&T and Verizon/MCI mergers will result in *de facto* geographic market**
2  **allocation as between the two mega-carriers, leaving each to largely remonopolize the**
3  **enterprise market within its BOC operating footprint.**
4

5  Q.  If SBC is not significantly more likely to compete out of region after acquiring AT&T than

6       before, what does that suggest as to the potential for continued competition between AT&T

7       (as part of SBC) and MCI (as part of Verizon)?

8

9  A.  SBC's Mr. Kahan has *conceded* that SBC has been unable to profitably serve enterprise

10      customers whose principal service requirements fall outside of the SBC BOC footprint.[182]

11      AT&T declarants Benway *et al* have indicated that AT&T confronts similar profitability

12      conditions where it is required to purchase special access from an RBOC.[183]  Neither SBC

13      nor AT&T offer any explanation or suggestion as to how their merger will alter this

14      condition *except where the service is being furnished within the SBC BOC footprint and*

15      *AT&T is, as a practical matter, relieved of the requirement to "pay" SBC for special access*

16      *at SBC's supracompetitive prices.*  Put differently, but accepting Mr. Kahan's "sweet spot"

17      explanation for SBC's focus on in-region enterprise customers, the merger will afford

18      SBC/AT&T a formidable – perhaps *insurmountable* – competitive advantage in serving both

19      SBC and AT&T enterprise customers within the SBC region, but will do little or nothing to

20      improve the *out-of-region* situation for SBC or AT&T.

_____

182. *Kahan Declaration*, at paras. 23-28.

183. *TRR Proceeding*, WC Docket 04-313, Declaration of Alan G. Benway, Robert G.
Holleron, Jeffrey King, Michael E. Lesher, Michael C. Mullan, and Maureen Swift on behalf of
AT&T Corp., October 4, 2004 ("*Benway et al Declaration*").

**REDACTED**

Cal. PUC A.05-02-027                    LEE L. SELWYN

1     Presumably, Verizon has encountered similar conditions in attempting to expand beyond its

2     legacy Bell Atlantic/NYNEX and GTE ILEC serving areas.  After its merger with MCI,

3     Verizon/MCI would enjoy precisely the same type of special access competitive advantage

4     within the Verizon "sweet spot" that SBC/AT&T will achieve within the SBC "sweet spot."

5     Verizon/MCI will have the same type of economic incentive to concentrate its efforts in the

6     Verizon region as SBC/AT&T will have for concentrating its efforts in the SBC region.  In

7     fact, MCI has already expressed publicly its recognition of this considerable access charge

8     advantage.  In a March 29, 2005 press release explaining its rejection of Qwest's revised $26

9     per share offer for the acquisition of MCI, MCI gave as one of its considerations for

10    accepting the lower-valued Verizon offer the superior "access economics" that would be

11    available to MCI by joining with Verizon.[184]  Verizon serves some 53.0-million switched

12    access lines, 21.6-million of which are in the Northeast, whereas Qwest serves only 13.4-

13    million switched access lines spread across fourteen western states.[185]

14

15    Thus, when considered together with the pending Verizon/MCI merger, the result of both

16    mergers will almost certainly be a *de facto* geographic market allocation of enterprise

17    customers as between post-merger SBC and post-merger Verizon.   At the same time, the

18    persistence of supracompetitive special access prices will operate to keep other competitors

_____

184.  MCI Press Release, *MCI Accepts Revised Proposal From Verizon*, March 29, 2005.

185.  ARMIS Report 43-08, Switched Access Lines in Service, 2004, accessed May 6, 2005.
"Northeast" is considered Connecticut, Maine, Massachusetts, New Hampshire, New Jersey,
New York, Rhode Island, Vermont.

**REDACTED**                                                    ECONOMICS AND
                                                                TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1      – including CLCs and the other two RBOCs (i.e., BellSouth and Qwest) – out of both the

2      SBC and the Verizon states.

3

4   Q.   Have others expressed similar concerns?

5

6   A    Yes.  In comments to the FCC, Cbeyond *et al.* suggest that the RBOCs have up to now

7      operated under at least a tacit agreement not to compete with one another, and that such an

8      outcome is even more likely in an industry dominated by two giant, yet roughly equal sized

9      firms.[186]  While I certainly do not disagree with Dr. Wilkie's analysis – one that is amply

10     supported by observed RBOC conduct over the past twenty-one years – I would note that for

11     the reasons that I have previously discussed *and from Mr. Kahan's own explanations*,

12     geographic market allocation is the most likely outcome of the combined SBC/AT&T and

13     Verizon/MCI mergers even in the absence of a deliberate policy on the part of each firm to

14     stay out of the other's territory.

15

16  Q.   Are there other ways in which the post-merger SBC and post-merger Verizon will reap

17     competitive benefits from concentrating on activities within their own (albeit expansive)

18     geographic areas?

19

---

186.  Federal Communications Commission, *SBC Communications Inc. and AT&T Corp. Applications for Approval of Transfer of Control*, WC Docket No. 05-65, *Petition to Deny of Cbeyond Communications, Conversent Communications, Eschelon Telecom, Nuvox Communications, Tds Metrocom, XO Communications and Xspedius Communications*, filed April 25, 2005, at 41-54.

REDACTED

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   A.   Yes.  Various types of reciprocal accommodations as between post-merger SBC and post-

2        merger Verizon are also a likely outcome, whose effect would be to exclude all smaller

3        rivals – including BellSouth and Qwest – from competing within the greater SBC/Verizon

4        footprint.  Qwest likely appreciates this, which may well explain its frenzied – and

5        ultimately unsuccessful – pursuit of MCI.  Such reciprocal arrangements can be easily

6        accomplished through the use of volume-based discounts for essential facilities, such as the

7        SBC "271 Switching Transport Offering" identified by CompTel/ALTS and the type of

8        special access pricing device described by Prof. Farrell.  With SBC and Verizon together

9        controlling the only two national interexchange carriers with significant presence in the

10       national enterprise customer market, tacit conduct that works to preserve and to allocate the

11       enterprise market between the two of them and to exclude all others is certainly an entirely

12       plausible outcome.

13

14       As long as special access charges remain at their present heights and create the kind of

15       economic barrier that, according to SBC's Mr. Kahan, has made SBC's attempt to compete

16       out-of-region unprofitable, the net result of the two mega-mergers will be to make

17       SBC/AT&T the *de facto* monopoly provider of enterprise services in the SBC states and to

18       make Verizon/MCI the *de facto* monopoly provider of enterprise services in the Verizon

19       footprint.  Competitors – including the other two RBOCs – will certainly confront even

20       greater barriers to entry within these fortress monopoly areas than those that SBC has

21       confronted when attempting to compete out of region.

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                         LEE L.  SELWYN

1                      CONDITIONS FOR APPROVAL

2

3    **If the Commission determines that the merger should be allowed to go forward, it should**
4    **consider and adopt specific measures to mitigate the substantial economic and competitive**
5    **harms that would otherwise result from the transaction.**

6

7    Q.   Dr. Selwyn, does the proposed merger of SBC and AT&T as presently structured satisfy the

8         specific requirements set out at §854(b) and (c) of the California Public Utilities Code?

9

10   A.   No, it does not.  The Joint Applicants have not shown that the merger will actually result in

11        any positive short-term and long-term economic benefits for ratepayers, certainly none that

12        would overcome the substantial risks and adverse effects upon competition in the California

13        telecommunications market that will surely arise if the transaction goes forward.  Indeed, the

14        specific quantification of the "total short-term and long-term forecasted economic benefits to

15        ratepayers" where the Commission has ratemaking authority that have been presented by the

16        Joint Applicants are so insignificant as to compel the conclusion that no net positive benefits

17        *to ratepayers* arising from the merger can be identified.  By joining SBC with its single

18        largest competitor in the California telecommunications market, the merger will increase

19        market concentration overall, and pave the way for the post-merger SBC to raise prices in

20        both the consumer and enterprise services markets.  The merger will result in a loss of at

21        least <<BEGIN SBC/AT&T PROPRIETARY        END SBC/AT&T PROPRIETARY>>

22        jobs in California, producing a total $15-billion net present value negative impact on the

23        California economy overall.  The facts of this case do not permit the Commission to make

**REDACTED**

ETI  ECONOMICS AND
      TECHNOLOGY, INC.

Cal. PUC A.05-02-027                LEE L.  SELWYN

1       the required §854 findings, and as such the proposed merger should not be allowed to go

2       forward.

3

4    Q.   §854(d) provides that "when reviewing a merger, acquisition or control proposal, the

5        commission shall consider reasonable options to the proposal recommended by other parties,

6        including no new merger, acquisition or control, to determine whether comparable short-

7        term and long-term economic savings can be achieved through other means while avoiding

8        the possible adverse consequences of the proposal."  In that regard, are there any measures

9        that, if accepted by the Joint Applicants as conditions for approval, could eliminate at least

10       some of the harms to ratepayers, to competition, and to the California economy that you

11       have identified as arising from the proposed merger?

12

13   A.   While I do not believe that the merger satisfies the statutory requirements for approval by

14       the Commission, in the event that the Commission determines otherwise there certainly are

15       measures that can be initiated that would offset at least some of the potential harms

16       associated with the transaction.  In the final analysis, however, I do not believe that it will be

17       possible to devise a set of conditions that would overcome all of these negative impacts.

18

19   Q.   What types of conditions or mitigation measures could the Commission consider to address

20       the specific harms and concerns that you have been discussing?

21

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   A.  For convenience, I have prepared a summary of the various merger conditions that I discuss

2       below, which is provided as Attachment 6 hereto.  Probably the best way to consider

3       potential mitigation measures is in the context of the specific requirements of §854.

4

5   •   *Benefits to ratepayers.*  §854(b)(1) requires that the Commission find that the merger

6       will provide short-term and long-term economic benefits to ratepayers.  As I have

7       explained, the Joint Applicants have not satisfied that burden because all of the

8       purported "benefits" are highly general and unspecific, and in any event have not been

9       shown to flow specifically to *ratepayers*, as required by the statute.  The §854(b)(1)

10      deficiency could, however, be overcome if the short-term and long-term forecasted

11      economic benefits to be allocated to *California* ratepayers where the Commission has

12      ratemaking authority are specific and are sufficient to overcome the risks to competition

13      and to the California economy.

14

15  •   *Harms to competition.*  §854(b)(3) requires the Commission to find that the merger will

16      "not adversely affect competition," but in fact the merger will significantly increase

17      SBC's market power and market concentration overall, and will result in decidedly less

18      competition in the California telecommunications market.  The various competitive

19      harms that will result when SBC's single largest competitor is taken out of the market

20      can be offset by the adoption of various regulatory measures that would assure

21      competitor access to SBC's network at cost-based rates *notwithstanding the putative*

22      *"non-impairment" findings with respect to certain unbundled network elements by the*

23      *D.C. Circuit Court of Appeals and the FCC.*

REDACTED

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    •    *Harm to California ratepayers.*  While the continued availability to the remaining

2         competitive carriers of all UNEs will perhaps help to make at least *some* level of

3         competition feasible, the departure of the two largest local service competitors from the

4         California market – AT&T and MCI – will surely result in less competition overall,

5         certainly in the immediate future.  Regulation will need to be adapted to recognize and

6         specifically address the return of the California telecommunications market to a near-

7         monopoly condition – these measures would also need to be coordinated and largely

8         replicated in the pending Verizon-MCI merger application as well.

9

10   •    *Harms to employment and to the California economy.*  The various adverse impacts

11        upon existing SBC and AT&T employees and the California economy overall resulting

12        from the loss of jobs and the shifting of SBC and/or AT&T activities that now take

13        place in California to other parts of the country can be addressed and minimized through

14        specific job- and employee benefits-retention commitments that would need to be

15        accepted by the Joint Applicants as conditions for approval.

16

17   **Assuring that the merger will produce benefits to ratepayers**
18

19   Q.   If as you have determined the merger will not satisfy the §854(b)(1) requirement that it

20        provide short-term and long-term economic benefits to ratepayers, what conditions would

21        need to be adopted so as to overcome this specific defect?

22

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                   LEE L.  SELWYN

1    A.    The Joint Applicants have advised their directors and shareholders that the "national synergy

2          benefits" arising from the merger, when expressed in terms of their net present value (NPV),

3          are forecast to be in the range of $15-billion.  Accepting for purposes of discussion the

4          accuracy of this forecast, virtually all of that $15-billion will flow to the combined

5          company's shareholders.  However, §854(b)(1) requires that merger benefits inure

6          specifically to *ratepayers*, and it is that specific showing that the Joint Applicants have

7          failed to make.  In fact, more than half of the "synergy gains" identified by SBC and AT&T

8          in their disclosures to shareholders and directors actually operate at cross-purposes with

9          specific requirements of §854.  For example, §854(c)(4) requires that the merger "be fair and

10         reasonable to affected public utility employees," and §854(c)(6) requires that the merger "be

11         beneficial on an overall basis to state and local economies, and to the communities in the

12         area served by the resulting public utility."  Yet fully 60% of the $15-billion in national

13         synergy benefits is expected to arise through "head count" (i.e., work force) reductions in

14         both AT&T and in SBC.  Although we do not have a specific figure for the job loss *in*

15         *California*, a straight extrapolation, based upon California's share of the post-merger

16         SBC/AT&T, would indicate potential job losses in this state of more than <<BEGIN

17         SBC/AT&T PROPRIETARY          END SBC/AT&T PROPRIETARY>> jobs,

18         representing $5.1-billion in payroll reductions when expressed on the same net present value

19         basis as was used to develop the total $15-billion estimate of synergy gains.  As I have

20         previously noted, a direct SBC payroll reduction of $5.1-billion has a multiplicative impact

21         upon the California economy overall, which I estimate (again in NPV terms) at roughly $15-

22         billion.  Clearly, one of the major challenges facing the Commission in this proceeding is the

23         need to balance the putative "economic benefit" of the headcount and other synergies

203

**REDACTED**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1       allocated to California by SBC of $27-million against the total $15-billion harm to the

2       California economy that those same job cuts will produce.

3

4   Q.  How might these and any other seemingly conflicting objectives be reconciled?

5

6   A.  According to the Joint Applicants, the net present value of the full extent of the "economic

7      savings"inuring to California is all of $27-million, or less than two tenths of one percent of

8      the more than $15-billion in "national" economic savings that the two companies forecast to

9      result from their proposed transaction.  Indeed, if SBC and AT&T persist in this patently

10     absurd claim while at the same time confronting the California economy with $15-billion in

11     negative impacts arising from their expected "head count" reductions, the Commission will

12     have no choice but to summarily reject the proposed transaction out-of-hand.  As a threshold

13     matter, therefore, it is critical for the Commission to demand that the Joint Applicants

14     provide a *legitimate* "allocation" of their aggregate national synergy benefits to California.

15     As I have discussed at length earlier in this testimony (at pages 56-63), starting with the

16     Joint Applicants' national synergy benefit figure and using their "National Synergy Model"

17     to support my analysis, I have estimated the total short-term and long-term economic

18     benefits properly allocable to California to be *at least* $1.8-billion, and probably more.[187]

19     This should be the baseline value against which all other "benefits" and "harms" arising

---

187.  As I noted in the discussion of the National Synergy Model above, the Joint Applicants have failed to produce all of the underlying electronic spreadsheets and data.  See, Reply Testimony of Paul Phillips.  Accordingly, I have only been able to provide an order-of-magnitude estimate of the California share of merger synergies, rather than a more precise forecast.

REDACTED

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    from the merger are evaluated, and against which proposed mitigation measures advanced

2    by other parties are considered, as the Commission is required by §854(d) to do.

3

4    If a sufficiently large allocation of §854(b)(2) economic benefits to *California ratepayers* is

5    adopted, this may overcome the absence of any affirmative demonstration by the Joint

6    Applicants of specific, quantifiable *ratepayer* benefits under §854(b)(1).  The Joint

7    Applicants' calculation of "forecasted short-term and long-term economic benefits" "where

8    the Commission has ratemaking authority" of only $27-million cannot possibly overcome

9    the §854(b)(1) evidentiary deficiency.  The Commission should find that the "forecasted

10   short-term and long-term economic benefits" "where the Commission has ratemaking

11   authority" to be at least $1.8-billion, and that in order to satisfy the requirement that

12   "ratepayers receive not less than 50 percent" of such benefits, at least $899-million in short-

13   term and long-term economic benefits must be provided to California ratepayers.

14

15   Q.   Does §854(b)(2) require that California ratepayers receive this share of benefits in the form

16        of cash refunds or Commission-mandated rate reductions?

17

18   A.   No, not necessarily.  It does require, however, that the aggregate short-term and long-term

19        *economic value* of all identified benefits provided to California ratepayers be not less than

20        50 percent of the total $1.8-billion California share, i.e., not less than $899-million.

21

22   Q.   How can ratepayers receive "not less than 50 percent of the total short-term and long-term

23        forecasted economic benefits" other than as cash payments or mandatory rate reductions?

REDACTED

ETi ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   A.   In principle, where positive synergy gains are to arise from the merger, ratepayers might

2        expect to receive the required share of such benefits ratably through the operation of

3        competitive marketplace forces, provided of course that the level of competition in the

4        market for those specific SBC/AT&T services where the Commission has ratemaking

5        authority is sufficient to force rates down to forward-looking long run economic cost – i.e.,

6        to assure that the efficiency gains arising from the merger are flowed through in the form of

7        lower prices for the (by then presumably competitive) services furnished by the post-merger

8        SBC.  In previous RBOC merger cases (SBC/Pacific Telesis and Bell Atlantic/GTE), the

9        Commission limited the *explicit* mandatory ratepayer share to identified synergies arising in

10       the early years of each merger, adopting the merging parties' position that by the end of that

11       initial period competitive marketplace forces would be sufficient to assure flow-through to

12       ratepayers.[188]

13

14  Q.   In hindsight, were those expectations realized?

15

16  A.   No, and in fact the level of competition – particularly for mass market consumer services –

17       is on the decline, and will erode even more rapidly if SBC is allowed to take AT&T out as

18       its largest competitor and if Verizon is concurrently allowed to take out MCI as its second

19       largest competitor.

20

21  Q.   But aren't SBC and Verizon – post-merger – going to be competing with each other?

---

188.  *SBC/Pacific Telesis Merger Order*; *NYNEX/Bell Atlantic Merger Order*.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   A.  While both SBC and Verizon are claiming that this will occur, more than twenty years of

2       history and any number of unfulfilled "commitments" can only lead to the conclusion that

3       such claims are offered solely for purposes of securing merger approval, after which they

4       will turn out to be as vacant as in all prior merger proceedings.  Post-merger competition

5       between the two mega-RBOCs would require that post-merger SBC and post-merger

6       Verizon actually compete aggressively with each other in the other's incumbent territory –

7       *something that has never happened in the more than twenty years since the RBOCs were*

8       *carved out of the predivestiture AT&T despite repeated promises and "commitments" by*

9       *both companies that they would compete out-of-region.*  Indeed, as I have noted, SBC's Mr.

10      Kahan *in his testimony in this case* now concedes the extreme difficulty of out-of-region

11      competition – particularly in the consumer services market:  *These difficulties are in no way*

12      *reduced or eliminated by SBC's proposed acquisition of AT&T.*  AT&T has *demonstrated* its

13      own inability to compete for consumer service business using the "last mile" facilities of

14      other RBOCs and other ILECs – *and now concedes that those difficulties, coupled with a*

15      *series of adverse regulatory and judicial rulings, have forced it to exit the consumer services*

16      *market altogether.*  Given this history, there is no reasonable basis for the Commission to

17      expect or to count on any consequential competition between post-merger SBC and post-

18      merger Verizon, and must dismiss any claims by either company to the contrary as simply

19      not credible and not borne out by identifiable facts or other evidence.

20

21  Q.  What about competition from other sources – won't that be sufficient to assure flow-through

22      of merger synergies by SBC?

23

207

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                     LEE L.  SELWYN

1    A.   No.  If the two largest CLCs (AT&T and MCI) and the two largest *facilities-based*

2         interexchange carriers (also AT&T and MCI) have concluded that they cannot compete with

3         the RBOCs, it would be nothing short of irrational for anyone to expect that smaller carriers

4         owning neither "last mile" nor interexchange facilities and having no consequential

5         embedded customer base would be successful in challenging an even stronger SBC than

6         AT&T and MCI ever had to confront.  And as I have discussed in considerable detail above,

7         none of the putative "intermodal" alternatives to basic wireline local exchange service fall

8         within the same "relevant product market" because none of these are sufficiently close

9         substitutes as to constrain wireline ILEC market power with respect to basic local wireline

10        service.

11

12   Q.   What is the alternative to outright refunds and/or rate decreases to assure that California

13        ratepayers receive the minimum $899-million ratepayer share of the California economic

14        benefits of the merger?

15

16   A.   One approach is for the Commission to consider the $899-million ratepayer share as a sort of

17        "currency" to be "spent" on an array of mitigation measures based upon each's value to

18        California ratepayers and to the California economy generally.  Requiring that such alternate

19        forms of "provid[ing] short-term and long-term forecasted economic benefits to ratepayers"

20        satisfy the requirement of §854(b)(2) be subject to specific quantification will help to assure

21        that the statutory goal is achieved.  A repetition of the "on faith" presumptions about the

22        putative growth of "competition" as the means for conferring such economic benefits upon

23        ratepayers – the approach used by the Commission in the SBC/Telesis and Bell

208

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    Atlantic/GTE mergers – are no longer valid in the face of dwindling competition and

2    escalating market concentration.

3

4    **Measures to offset the merger's adverse impact on competition**

5

6    Q.    Inasmuch as the SBC/AT&T and the concurrent Verizon/MCI mergers will remove the two

7          largest competitive carriers from both the California local and long distance markets, are

8          there measures that the Commission could adopt that would eliminate the loss of

9          competition that would result from the two mergers?

10

11   A.    There is no practical means for replacing AT&T as a formidable competitive presence in the

12         California local and long distance markets, and the very same regulatory conditions that led

13         AT&T to withdraw from active marketing of consumer services would surely work to

14         discourage others from attempting to fill the void left by AT&T's (and MCI's) departure.

15         Indeed, if the Commission has any hope of encouraging other competitive carriers to enter

16         and/or to expand their activities in the California consumer market, it will be necessary that

17         the specific regulatory conditions that led AT&T to exit the consumer market be reversed.

18

19         The FCC had relied upon the unbundling mandates in the 1996 Act, along with nominal

20         evidence of actual entry, when it let the RBOCs begin offering interLATA service in every

21         state – only to see the primary competitors falter as soon as the RBOCs were able to

22         leverage their market power and market dominance in local exchange services to quickly

23         overwhelm the largest CLC-IXCs – AT&T and MCI – forcing both to "throw in the towel"

209

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1      and join up with the very RBOCs that had been successful in shutting them out of the

2      market.  Subsequently, over the objections of state commissions,[189] the FCC began to

3      summarily permit the "separate affiliate" protections set out at Section 272 of the Act to

4      lapse, by operation of law[190] rather than following an affirmative examination of the need for

5      continuing these competitive safeguards as  necessary to meet their core objectives.  Almost

6      immediately thereafter, the FCC launched a rulemaking proceeding to consider whether the

7      time had come to end dominant carrier regulation of RBOC in-region, interstate and/or

8      international services because of "changes to the competitive landscape within the

9      interexchange market."[191]

10

11      The types of protections that were encompassed within Sections 271 and 272 of the Act

12      were not novel or untested approaches.  They evolved from decades of experience with

13      specific and well-documented opportunities for the abuse of market power by the incumbent

14      LECs and their long distance affiliates, and captured elements of the remedies that had

15      previously been implemented as a result of two major antitrust actions that the Justice

16      Department pursued against AT&T and the Bell System (which ended in 1956 and 1982,

17      respectively), as well as time-tested regulatory mechanisms used by the FCC and state PUCs

18      for preventing anticompetitive practices.  Yet these protections were cavalierly abandoned

---

189.  *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements*, WC 02-112, *Memorandum Opinion and Order*, 17 FCC Rcd 26869 (2002), at Copps/Adelstein dissent.

190.  *Id.* at paras. 14-15.

191.  *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements*, WC 02-112, *Further Notice of Proposed Rulemaking,* 18 FCC Rcd 10914 (2003).

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    by the FCC before there was time to ensure that a competitive industry had developed and

2    that such competition was sustainable and irreversible.

3

4    Now, in connection with their review of the mergers and industry conditions as they will

5    exist after these mergers, the Commission has the opportunity *and the responsibility* to

6    reinstate these critical pro-competitive safeguards.  Where permitted, the protections

7    afforded by Section 271 and 272 of the Act – and those set out at PU Code §709.2 – should

8    be revived.  Specifically:

9

10   •    The 47 U.S.C. §272(a) and Cal.  PU Code §709.2(c)(3) separate affiliate requirement

11        should be reinstated, and made applicable to all SBC long distance and other

12        competitive services.

13

14   •    The conduct requirements applicable to the separate affiliate and its relationship to

15        SBC's ILEC operations at 47 U.S.C. 272(b)(1) through (b)(5) and at Cal.  PU Code

16        §709.2(c)(1) and (c)(2) should be reinstated and strictly enforced.

17

18   •    An imputation rule applicable to all use of ILEC services by any SBC affiliate or

19        incorporated into any competitive services provided by SBC California should be

20        adopted and strictly enforced.

21

22   •    Measures necessary to assure, going forward following the merger, "that there is no

23        anticompetitive behavior by the local exchange telephone corporation, including unfair

211

**REDACTED**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1      use of subscriber information or unfair use of customer contacts generated by the local

2      exchange telephone corporation's provision of local exchange telephone service" per

3      Cal.  PU Code §709.2(c)(2), and "that there is no substantial possibility of harm to the

4      competitive intrastate interexchange telecommunications markets" per Cal.  PU Code

5      §709.2(c)(4), should be adopted and strictly enforced.

6

7  Q.   Didn't the Commission find, in authorizing SBC California's entry into the in-region long

8      distance market in California, that the requirements of PU Code §709.2(c) had been

9      satisfied?

10

11  A.   Yes, but AT&T's decision to exit the consumer market in California – and one of the

12      specific reasons given by AT&T for its decision[192] – suggest that the Commission's prior

13      finding should now be revisited.  In just over three years, SBC has amassed a long distance

14      market share in California of <<BEGIN SBC/AT&T PROPRIETARY        END

15      SBC/AT&T PROPRIETARY>>; together with AT&T's <<BEGIN SBC/AT&T

16      PROPRIETARY        END SBC/AT&T PROPRIETARY>> share, the combined

17      company will control fully <<BEGIN SBC/AT&T PROPRIETARY        END

18      SBC/AT&T PROPRIETARY>> of the California long distance market within the SBC

19      California operating areas.  It would stretch credulity to its outer limits for SBC to argue

20      that, in retrospect, its entry into long distance presented "no substantial possibility of harm to

21      the competitive intrastate interexchange telecommunications markets" or that, going forward

---

192.  *Polumbo Declaration*, at paras. 6-10.

212

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1      following its merger with AT&T, that situation would not become even more exacerbated.

2      If the merger is to be approved and unless the Commission is prepared to concede the

3      California consumer market for exchange and long distance service to SBC, it will need to

4      adopt, implement, and strictly enforce measures necessary to assure the continuation of

5      competition in this sector.

6

7   Q.   Suppose that AT&T was willing to divest its consumer local and long distance business as a

8      condition for approval of the merger.  Would that help to assure the survival of competition?

9

10  A.   Not by itself, but perhaps if divestiture is accompanied by all of the competitive conditions

11     and safeguards that I have outlined above *and* if a qualified purchaser of the to-be-divested

12     consumer operations can actually be found.  AT&T has stated that under existing regulatory

13     conditions it cannot successfully compete in the consumer market.  SBC's overwhelming

14     dominance of the local exchange market when coupled with its ability to jointly market and

15     to bundle local and long distance services has enabled it to capture <<BEGIN SBC/AT&T

16     PROPRIETARY       END SBC/AT&T PROPRIETARY>> of the consumer long

17     distance market in only three years.[193]  Any potential purchaser of the AT&T consumer

18     business in California would necessarily have to confront this reality going forward, and

---

193.  In my testimony, filed August 23, 2001, in R.93-04-003, I. 93-04-002, R. 95-04-043 and I. 95-04-044 (the 709.2 proceeding), I presented a simulation model for the purpose of predicting SBC's success in capturing long distance market share.  My model had predicted that after three years SBC would have captured at most 45.10% of the California long distance market.  Clearly, my prediction has been proven conservative by real world conditions.

REDACTED

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    recognize that it could not expect to retain the remaining AT&T stand-alone long distance

2    customers for very long.

3

4    With respect to *local* service, any purchaser of the AT&T customer base would confront

5    precisely the same problems with respect to the non-availability of UNE-P that led AT&T to

6    withdraw from this segment.  Indeed, one would have to assume that, acting prudently and

7    in its shareholders' best interests, AT&T had itself explored the possibility of selling its

8    consumer business rather than simply abandoning it.  The fact that AT&T chose to abandon

9    rather than sell-off its consumer segment certainly suggests a lack of interest on the part of

10   potential buyers, which is hardly surprising given that any buyer would obviously confront

11   the same regulatory conditions that drove AT&T from the consumer market.  Significantly,

12   the going business market value of AT&T's consumer business was almost certainly higher

13   the day before it announced its decision to exit this segment than at any time since, and is

14   almost certainly depressed in the wake of the announced mergers between SBC and AT&T

15   and between Verizon and MCI.  Even if the Commission were to require divestiture as a

16   condition for approval, there is no assurance of a viable purchaser, nor is there any assurance

17   that, even if one were found, the business could be operated successfully going forward.

18

19   Q.  Have divestiture proposals – where the merger partners both compete in the same market –

20       been rejected in the past as failing to provide a sufficient basis for allowing such a merger to

21       go forward?

22

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1  A.  Yes, in fact, in a strikingly similar case, the Department of Justice concluded that where the

2     business segment that was being proposed for divestiture did not have a realistic chance of

3     competing successfully with the merged entity following such divestiture, such a solution

4     was not sufficient to allow the merger to go forward.

5

6  Q.  To which case are you referring?

7

8  A.  In 1995, Microsoft had agreed to acquire the software firm Intuit, the publisher of a line of

9     personal finance ("PF")/Checkbook software (Quicken), TurboTax, and various other

10    financial software products.  In its filing in opposition to the proposed merger with the U.S.

11    District Court for the Northern District of California, the DoJ explained its position as

12    follows:

13

14        2.  The PF/Checkbook Software Market is highly concentrated, with Intuit's
15     "Quicken" product commanding a 1994 unit sales share of 69% and a total installed
16     base of more than seven million customers. Microsoft's PF/Checkbook product,
17     "Microsoft Money," was introduced in 1991, and the resulting competition led to
18     lower prices and increased innovation.  Microsoft is now the number two
19     competitor in the PF/Checkbook Software Market, with a 1994 unit sales market
20     share of about 22%, and an installed user base of about one million customers.
21     Absent the acquisition, Microsoft Money would likely continue to compete
22     successfully because (a) Microsoft already has devoted substantial resources to the
23     Money product, which it would increase even more substantially in the future, and
24     (b) the PF/Checkbook Software Market, for the reasons explained below, is
25     strategically important to Microsoft.
26
27        3.  The effects of this proposed acquisition could reach well beyond today's
28     PF/Checkbook Software Market. The acquisition threatens harm to consumers in
29     other important areas of commerce, especially the area of personal computer based
30     ("PC-based") home banking, which is a relatively tiny part of the PF/Checkbook
31     Software Market today.  Before the acquisition, Microsoft and Intuit had

215

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1    independent plans to compete in the field of electronic commerce, starting with
2    enhancement of their PF/Checkbook software products to enter the emerging home
3    banking marketplace.  Established PF/Checkbook software products provide an
4    important asset to develop home banking, in part because existing customers are
5    likely candidates for PC-based home banking. ...
6
7         5.  ... In an attempt to avoid an obvious antitrust challenge, Microsoft devised a
8    planned "fix," whereby it has agreed simultaneously to transfer part (but not all) of
9    Microsoft's Money business unit to a third party, Novell, Inc.  *The purported fix*
10   *would fail to remedy the anticompetitive effects of the proposed Intuit transaction.*
11   *Novell, with the assets it is supposed to receive from Microsoft, cannot be nearly as*
12   *effective a competitor with Money as Microsoft is and would be absent the*
13   *transaction.*[194]
14
15   In other words, the Department concluded that while *Microsoft* would be an effective

16   competitor with its *Money* product to Quicken in the PF/Checkbook software market, the

17   proposed divestee, Novell, would not be capable of competing with Microsoft/Intuit.  As the

18   Department explained in its competitive analysis:

19
20        32.  Actual and potential competition between Microsoft and Intuit, the two
21   strongest and most significant competitors in the PF/Checkbook Software Market,
22   will be eliminated.  Competition from Novell against Quicken will be at best a
23   weak replacement for the lost competition from Microsoft.  Microsoft, the strongest
24   competitor in the software industry, has the resources, ability and resolve to
25   challenge Intuit's leading market position (in both the OEM and retail channels),
26   while Novell does not.  Absent the acquisition, competition between Quicken and
27   Microsoft Money would increase.  Microsoft's reason for proposing the acquisition
28   of Intuit was its identification of the PF/Checkbook Software Market as
29   strategically important to Microsoft as a leading home PC application today, as a
30   front end for home banking tomorrow, and as a front end more generally for on-line
31   financial transactions in the more distant future.  ...

_____

194.  *U. S.  v.  Microsoft Corporation and Intuit, Inc.*, Complaint for Injunctive Relief
Against Combination in Violation of Section 7 of the Clayton Act, filed April 27, 1995 with the
United States District Court for the Northern District of California , emphasis supplied.
Subsequent to the filing of this Complaint, Microsoft and Intuit called off their proposed
transaction.

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

35.  Potential new competitors, if any, would find it even more daunting to compete against Quicken, the number one product in the market, if it were in Microsoft's hands.  Microsoft would retain many of the advantages that made Microsoft Money a powerful number two competitor against Quicken.  Instead of using those advantages to compete against Quicken, Microsoft would be able to use the combined advantages of both to dominate potential customers and strategic partners more thoroughly than Intuit could do with Quicken or Microsoft could do with Microsoft Money – especially if the two had to compete with each other.[195]

AT&T has been SBC's strongest competitor, and any potential purchaser/acquirer of AT&T's consumer business would not be capable of replacing AT&T as an effective competitive force in constraining SBC's market power.  The divestee would not have access to the AT&T brand, to the AT&T network, to AT&T Labs, or to most other AT&T assets and resources.  In the Microsoft/Intuit transaction, Microsoft controlled Windows, the dominant PC operating system, and even though it was in the number two position relative to Intuit in the PF/Checkbook software market, its dominance in the OS market made it a serious competitor.  The proposed divestee, Novell, had no leverage at all in mass market software, and had by 1995 been singularly unsuccessful in competing with Microsoft with word processing, spreadsheet and graphics software it had acquired from other companies.  If divestiture is to make a difference, the divestee must be a serious and capable player.  Given AT&T's difficulties, it is highly unlikely that a qualified purchaser of the AT&T consumer business could be found.

---

195. *Id.*

217

REDACTED

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   Q.   Assuming that a qualified purchaser/divestee of the AT&T consumer business was

2        identified, would divestiture standing alone be sufficient to overcome the potential

3        competitive harms that you have identified?

4

5   A.   No.  Divestiture would be a valid merger condition only if the purchaser/divestee had a

6        reasonable chance of competing successfully with SBC.  And to do that, *all* of the specific

7        regulatory impediments that operated to drive AT&T out of the consumer market would

8        need to be rescinded.  The purchaser/divestee would need to be able to obtain UNE-Ps at

9        TELRIC-based rates from SBC.  SBC would need to be precluded from pursuing the (now

10       former) AT&T stand-alone long distance customers that would be included in the

11       divestiture.  And the post-merger SBC would have to be expressly precluded and enjoined

12       from seeking to reimpose those regulatory changes subsequent to the closing of the merger

13       or the divestiture.  Finally, so as not to discourage entry and expansion by other competitors,

14       these same conditions would have to apply to all competing carriers, not just to the divestee.

15

16  Q.   Should these requirements remain in place indefinitely, or might there be a time when some

17       or all of them could be relaxed or rescinded?

18

19  A.   Never is a long time, and I am not suggesting that policies adopted here could not be

20       revisited if conditions change.  However, in order to be effective and to avoid confronting

21       would-be entrants and investors in competitive services with undue regulatory uncertainty, it

22       is critical that the competitive safeguards and unbundling requirements remain in place until

23       such time as *sufficient* competition becomes firmly established.  Many of the current policies

218

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    with respect to tests for sufficient competition apply highly theoretical standards rather than

2    empirical real-world analysis, and in nearly a decade following enactment of the 1996

3    federal legislation, these theoretical standards have been proven, time and again, to be

4    incapable of assuring competitive viability.  For example, Sec.  271(c)(1)(a) can be satisfied

5    by the existence of as few as *one* facilities-based carrier providing residence and business

6    services;[196] the FCC subsequently ruled that a competitive carrier providing services via

7    UNEs obtained from the Bell operating company and owning no facilities of its own would

8    also satisfy this requirement.[197]  The *USTA II* Court's finding of "non-impairment" with

9    respect to UNE-P and UNE-switching was also based upon similar *existential* evidence,

10    rather than upon evidence that competition had developed to the point where the

11    incumbent's market power was actually being constrained.

12

13    Going forward, the Commission should require that all competitive safeguards remain in full

14    force and effect until sufficient *facilities-based* competition has actually developed to the

15    point where SBC's market power as the incumbent LEC is diminished to the point where it

16    can no longer dictate prices or control essential facilities.  For example, the Commission

17    could require that prior to revisiting these competitive safeguards a minimum of 30% of the

18    consumer market is being served by *facilities-based* competitors (and not via UNEs), and

19    that such facilities-based services are available to at least 90% of SBC California

---

196.  47 U.S.C. §271(c)(1)(A)

197.  See, *Application of Ameritech Michigan Pursuant to Section 271 of the Communications Act of 1934, as amended, To Provide In-Region, InterLATA Services in Michigan*, CC Docket 97-137, *Memorandum Opinion and Order*, rel. August 19, 1997, at paras. 92-101.

219

**REDACTED**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    subscribers.  These parameters are suggestions, of course, but even with a facilities-based

2    share of 70%, SBC California's consumer segment HHI would still exceed 5000, well above

3    the 1800 level that the Department of Justice identifies as evidence of a "highly

4    concentrated" market.

5

6   Q.  Have the Joint Applicants addressed the possibility of divestiture of the AT&T consumer

7        business?

8

9   A.  <<BEGIN SBC/AT&T PROPRIETARY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

220

REDACTED

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN



END SBC/AT&T

PROPRIETARY>>

Q.  Are there other specific competitive safeguards and conditions that should be adopted if the

merger is to be allowed to go forward?

A.  Yes.  As I have discussed (at pages 139-157 above), the merger will create vertical

integration in both the Internet and enterprise business segments.  Integration of AT&T's

Tier 1 Internet backbone with SBC's consumer DSL customer base will serve to increase

---

198.  <<BEGIN SBC/AT&T PROPRIETARY

END SBC/AT&T PROPRIETARY>>.

221

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    barriers to competitive entry in the high-speed Internet access market relative to the already

2    significant barriers that presently exist.  SBC has exploited its exchange service market

3    dominance by capturing virtually all of the consumer DSL market, and has also been

4    successful in capturing more than 50% of the overall California high-speed Internet access

5    market.  Once vertically integrated with AT&T's Tier 1 backbone, SBC will acquire charge-

6    free access to other Tier 1 carriers, and will be in an even stronger competitive position.  Its

7    recent announcement of a $14.95 monthly rate for consumer ADSL suggests that SBC may

8    already be "jumping the gun" in recognition of the formidable competitive advantage it

9    expects to acquire.  If the merger is allowed to go forward, the combined company should be

10   subject to specific competitive safeguards to limit its potential market dominance in the

11   California Internet access market.  Specifically:

12

13   •    SBC should be required as a merger approval condition to offer DSL line sharing at

14        TELRIC-based UNE rates to competing providers of DSL services; and

15

16   •    SBC should as a merger approval condition be made to discontinue their practice of

17        requiring consumers to buy ILEC-provided local service as a condition of purchasing

18        ILEC DSL services ("naked DSL").

19

20   In the enterprise business market, SBC presently provides the vast majority of "last mile"

21   high-capacity (i.e., DS-1 and above) digital special access connections to business customers

22   located within its California service areas.  AT&T offers limited competition in a small

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    percentage of commercial buildings, but even that will largely evaporate following the

2    merger.

3

4    Q.  Is divestiture of AT&T's competing digital "last mile" facilities a possible solution?

5

6    A.  It's a possible solution, but like the idea of divesting the AT&T consumer business segment,

7        it is highly unlikely that a qualified buyer capable of providing the same level of competitive

8        strength as AT&T in the enterprise business market could be found.  Moreover, the potential

9        demand for CLC digital loop facilities will be substantially reduced following the two

10       mergers.  Up to now, AT&T and MCI have both had a practice of using CLC loop facilities

11       where available.  However, there would be no reason for SBC to maintain this same policy

12       after the merger, since it will have its own facilities in the same locations (within its 13-state

13       ILEC footprint).  So following the merger, not only will AT&T be eliminated as a *seller* of

14       last-mile facilities to enterprise customers, it will also be eliminated as a major *purchaser* of

15       such facilities from other CLCs.  That loss of business could well force other rival carriers to

16       exit the market, creating an even greater market share for SBC.

17

18   **Measures to limit potential ratepayer harms.**
19

20   Q.  Would it ever be possible for ratepayers to receive the required share of economic benefits in

21       the absence of both competition and specific, mandatory price reductions or refunds?

22

223

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    A.   In theory, if economic regulation were working as intended as a *replacement* for the

2         (nonexistent) competitive marketplace forces, the efficiency gains and cost savings arising

3         from the merger would be flowed through to ratepayers in the form of lower rates.  For

4         example, under the pre-NRF "rate of return regulation" ("RORR") regime, the reduced costs

5         would result in a lower overall revenue requirement, which would be captured and reflected

6         in lower rates in the next general rate case proceeding.  Under the NRF as it existed

7         beginning in 1990, these same types of efficiency gains would have been captured and

8         flowed through to ratepayers in the short-term through the "sharing" of excess earnings

9         requirement, and in the longer-term through an increase in the productivity offset or "X-

10        factor" that would have been determined in the next triennial review of the NRF.  However,

11        the X-factor was eliminated in 1995 and the sharing requirement was suspended in 1999, so

12        the NRF as it presently exists would not assure flow-through of merger savings, and thus

13        could not assure compliance with §854(b)(2).

14

15   Q.   You are not suggesting, are you, that the Commission revert to RORR or to the use of a

16        productivity factor as it had in the original NRF?

17

18   A.   I'm certainly not suggesting a reversion to rate of return regulation, but it may well be

19        necessary at this time for some of the *evolutionary* changes to the NRF that have occurred

20        over the past eight to ten years to be revisited in light of the failure of effective competition

21        to develop and the looming reconcentration of the California telecommunications market.

22

**REDACTED**

ETI  ECONOMICS AND
     TECHNOLOGY, INC.

Cal. PUC A.05-02-027                LEE L.  SELWYN

1    As originally envisioned, the adoption of an "alternative regulatory framework" that had

2    commenced in I.87-11-033 was not specifically premised upon the development of

3    competition.  In fact, it was not until 1994 that competitive local and intraLATA long

4    distance carriers were even certificated in California.[199]  Subsequent changes in the NRF –

5    like the elimination of the X-factor and the suspension of sharing, as well as the

6    reclassification of most services from Category 1 to Category 2 – were, however, premised

7    upon the development of competition as a *replacement* for economic regulation.

8

9    Q.  I assume that you are aware that the Commission is currently considering *further*

10       deregulatory measures in the current Unified Regulatory Framework ("URF") rulemaking,

11       R.05-04-005.[200]  Are you suggesting here that the Commission move in the opposite

12       direction in this proceeding?

13

14   A.  While I do not agree with many of the premises that have been advanced in the OIR

15       initiating the URF proceeding,[201] the two mega-mergers involving the two largest RBOCs

---

199.  *Alternative Regulatory Frameworks for Local Exchange Carriers and Related Matters*, Decision No. 94-09-065, *Interim Opinion*, September 15, 1994, 1994 Cal. PUC LEXIS 681 at 4.

200.  *Order Instituting Rulemaking on the Commission's Own Motion to Assess and Revise the Regulation of Telecommunications Utilities,* OIR 05-04-005, issued April 7, 2005.

201.  The OIR appears to be premised upon the notion that all telecommunications providers possess equal market power and accordingly should be subject to equal, or "unified," regulatory treatment.  The OIR appears to accept on faith the notion that services such as wireless, cable telephony, text messaging and VoIP are perfect substitutes for traditional wireline telephone service.  OIR at 2.  Since providers of such services are not subject to any form of price regulation or are not regulated at all, the OIR proposes that incumbent LECs be subject to

(continued...)

REDACTED

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                     LEE L.  SELWYN

1    and the two largest IXCs have the potential to effect a profound change in the competitive

2    landscape.  Obviously the Joint Applicants' perspective is quite opposite to that being

3    advanced here by myself as well as by most every other intervening party in the case.

4

5    One thing I would hope that most everyone would agree with is that there is considerable

6    uncertainty as to the ultimate structure of the post-merger telecom landscape, and it is

7    *critical* that the post-merger regulatory structure recognize and be capable of adapting to this

8    uncertainty.  If the form of regulation is premised upon the development of effective

9    competition but effective competition fails to develop – or worse, the small amount of

10   competition that still exists diminishes further – consumers face the risk of having to

11   confront an *unregulated monopoly* as the sole source of essential telecommunications

12   services.  On the other hand, if the current system of economic regulation is revised *on the*

13   *expectation that competition will not survive* and it actually grows and flourishes, then the

14   incumbents SBC and Verizon could be competitively harmed if they are subject to tight

15   regulation while their rivals are free to operate without any significant regulation at all.

16

---

201.  (...continued)
equivalent deregulatory treatment.  OIR, at A-2.  In so doing, the OIR fails to recognize the
longstanding distinction between "dominant" and "non-dominant" carriers, a distinction that is
made even more important if both of the currently pending mergers are approved.  The OIR
proposes to confer what would amount to *non-dominant* status upon post-merger SBC and post-
merger Verizon notwithstanding their 95%+ shares of the local service market, 80%+ shares of
the long distance market, cross-ownership controlling interests in the two largest wireless
carriers, and status as Tier 1 Internet backbone carriers.

226

ECONOMICS AND
TECHNOLOGY, INC.

REDACTED

Cal. PUC A.05-02-027                     LEE L.  SELWYN

1    Q.  Is there a unified regulatory solution that could operate to protect consumers, the incumbents

2         and competitors no matter what the ultimate market outcome?

3

4    A.  Yes, I believe that there is.  What is needed is some type of "self-executing" regulatory

5         scheme under which price – and perhaps even limited earnings – constraints would become

6         operative in the absence of effective competition while essentially "dropping out" if true

7         price-constraining competition actually materializes.  Under such an arrangement, the

8         Commission would be able to extricate itself from the seemingly endless debates as to how

9         much competition is actually present, which "intermodal" services constitute actual

10        competition for basic wireline services, and even from having to decide how much compe-

11        tition constitutes effective competition.  At the same time, however, it is essential that the

12        continuing dominant position of the post-merger SBC and Verizon be recognized.  SBC and

13        Verizon are the *only* service providers with ubiquitous facilities-based network infrastructure

14        throughout their respective operating areas.  There is no present realistic expectation that any

15        competing facilities-based carrier could expect to replicate the ILECs' ubiquity anytime

16        soon.  AT&T and MCI have each abandoned their efforts to compete with SBC and Verizon

17        for mass market services primarily if not solely due to the elimination of their access to

18        UNE-P and UNE switching.  Competition at the *retail* level is possible but only if access to

19        ILEC network resources *at the wholesale level* is assured.  That said, a regulatory system

20        capable of responding flexibly to the presence or absence of effective competition at the

21        retail level can be designed and implemented.

22

23   Q.  How would such a "self-executing" form of regulation work?

227

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   A.   Actually, many aspects of the original NRF, as configured in D.89-10-031, have the

2        potential to provide these "self-executing" features.  Consider, for example, the requirement

3        that ILECs subject to the NRF "share" excess earnings with ratepayers.  By de-linking rates

4        and costs, the NRF provided ILECs with the opportunity to increase their earnings above the

5        "authorized" level.  However, it is also possible that under such "incentive regulation"

6        systems excessive earnings could be accumulated not so much due to innovation and

7        efficiency on the part of the utility, but rather due to the failure of competition to develop, or

8        to the misspecification of the regulatory system itself.  For example, if the productivity

9        offset or X-factor was set too low – i.e., below the level of realistic productivity gains

10       achievable by incumbent LECs or by competing providers to the extent they are present –

11       the result would be excessive earnings simply because actual productivity gains (including

12       reductions in input prices) exceeded the level implied by the X-factor.  Similarly, to the

13       extent that the market was expected to become competitive, prices and earnings would also

14       be constrained to "competitive" levels by marketplace forces.  If competition failed to

15       develop as expected, no such market constraints would be present.

16

17       The "sharing" requirement under the NRF was essentially a back-stop protection against

18       misspecification of the X-factor and the failure of competition to constrain the incumbents'

19       prices.  Sharing became operative only where earnings had increased to in excess of 150

20       basis points above the "authorized" level, and were to be subject to 50/50 sharing with

21       ratepayers up to 500 basis points above the authorized level, at which point earnings would

22       be capped.

23

228

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   Q.  But isn't one of the consequences of a sharing requirement the elimination of incentives for

2       efficiency?

3

4   A.  That argument has been advanced – and is one of the reasons why the Commission in 1999

5       determined to temporarily suspend the sharing requirement – but in reality a sharing

6       requirement would have a similar effect upon innovation as a corporate income tax.  In

7       California, the marginal state and federal corporate tax rate is 43.84%, which means that *all*

8       *companies* are being required to "share" *43.84% of their earnings* with the state and federal

9       governments.  When NRF sharing was in effect, California ILECs were still financially far

10      better off having achieved "shareable" earnings than they would have been if earnings were

11      limited to the authorized rate of return.

12

13  Q.  How is sharing a self-executing regulatory mechanism going forward?

14

15  A.  The Joint Applicants have devoted a considerable portion of their evidence to claims as to

16      the high level of competitiveness of the California local and long distance markets.  If the

17      level of competition is as they have sought to portray it, there is no realistic possibility that

18      the combined company could expect to impose monopoly prices or to achieve excessive

19      monopoly earnings or economic rents.  A requirement to share excess earnings would

20      become operative only if excess, monopoly earnings materialize, and that would occur only

21      if effective competition fails to materialize.  If earnings are truly constrained by the intense

22      competition that the Joint Applicants describe, then a sharing requirement would not become

23      operative at all.  It is thus "self-executing" in that it only takes effect if the market fails to

REDACTED

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1    achieve a level of effective competition sufficient to constrain SBC's prices to competitive

2    levels.

3

4  Q.  Are there other features of the original NRF that exhibit similar "self-executing" effects?

5

6  A.  Yes.  The NRF specified three "categories" of ILEC services – monopoly (category 1),

7      subject to emerging competition (category 2), and fully competitive (category 3).  Services

8      in Category 1 were subject to the annual price cap rate adjustment and could be modified

9      only through an advice letter tariff filing subject to CPUC approval.  Category 2 services

10     were also subject to the price cap, but could be "flexibly priced" in the downward direction

11     only.  Fully competitive category 3 services were not subject to any pricing constraints.

12     Today, most ILEC retail services are classified as Category 2.  However, because the X-

13     factor was eliminated in 1995, SBC California has not been required to reflect any

14     productivity gains it had achieved with respect to such services for roughly ten years.  Thus,

15     although nominally "frozen," prices for most Category 2 services have actually remained

16     unchanged.  Conceptually, downward pricing flexibility is also a self-executing regulatory

17     device, in that it enforces a price ceiling where competition is not sufficient to impose one.

18     However, without the requirement to flow-through productivity/efficiency gains in what are

19     *de facto* monopoly services, SBC California has actually been enabled to increase rates

20     above the "competitive level" – i.e., above where prices would be if forced to long-run

21     economic cost by the operation of competitive marketplace forces.  Reinstatement of an

22     actual productivity factor together with downward pricing flexibility will create a self-

23     executing outcome:  If effective competition develops, prices will be forced down; if

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1  competition fails to develop, the regulatory constraints will become operative.  Also,

2  reinstatement of a productivity offset factor will help to ensure that the substantial synergy

3  gains in the form of increased efficiency that are being claimed by the Joint Applicants will

4  actually flow through to California ratepayers.  Simply maintaining the nearly decade-long

5  rate freeze will *guarantee* that the combined company will retain virtually all of the

6  economic benefits of the merger – which is expressly prohibited by §854(b)(2).

7

8 Q. What about essential services that are purchased by competing carriers as inputs to their own

9  retail offerings – what regulatory treatment is appropriate for these services?

10

11 A. Strict regulation of essential services is critical if competition at the retail level is to survive

12  in California.  Switched access charges need to be reduced to cost-based levels and

13  integrated into a unified intercarrier compensation regime with call termination charges set

14  at TELRIC-based rates.  Special access rates must also be reduced to forward-looking

15  economic cost, and where applicable integrated with TELRIC-based UNE rates.

16

17  It is particularly important that measures be adopted, implemented and enforced to prevent

18  the post-merger SBC/AT&T from deriving competitive benefit from vertical integration

19  where little or no competition is present in the upstream market.  Specifically, wherever a

20  monopoly service is incorporated into a putatively competitive retail offering, the full price

21  of the monopoly component(s) *that would be imposed upon a nonaffiliated competitor* must

22  be imputed into the retail price of the SBC/AT&T service.  That imputed price, together

23  with all costs of the value-added functions and services that comprise the retail offering,

231

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1    must establish a cost floor for the retail service.  Moreover, this imputation requirement must

2    be applied individually with respect to each retail service offering, and not across an

3    aggregation of all retail services.

4

5  Q.  Do you have any suggestions for a specific imputation requirement?

6

7  A.  Yes.  In June 2004, AT&T proposed a specific and detailed imputation rule to address

8    precisely this concern in an *ex parte* filing in the FCC's proceeding considering applying

9    non-dominant status to ILEC long distance services, WC Docket No.  02-112.  A copy of

10   AT&T's proposed imputation rule is provided herewith as Attachment 4 to this testimony.

11   These requirements were advanced and affirmatively supported *by AT&T* when it was

12   confronting ILEC and RBOC competition, and is even more applicable with AT&T and

13   MCI no longer in contention as competitors in the long distance and local service markets.

14

15  Q.  Does the proposed merger raise any other regulatory concerns that the Commission should

16   address as part of its consideration of this Application?

17

18  A.  Yes.  In many important respects, there is an even greater need for regulation of SBC today

19   than there was prior to the 1984 Bell System break-up.  Today, SBC is allowed to, and does,

20   operate in both monopoly and competitive markets *using the same network assets and pool*

21   *of human and other resources*.  Cost allocation requirements, where they even exist, are at

22   best subject to lengthy after-the-fact reviews and virtually no effective enforcement.  SBC

23   has enormous incentives to shift costs to its monopoly operations while shifting revenues to

232

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-02-027                        LEE L.  SELWYN

1    other  "below-the-line" business units and affiliates.  And the chances of being caught are

2    less than an ordinary taxpayer's chances of an IRS audit, and in proportion the penalties for

3    such cost shifting – if actually detected – are almost always far less severe.

4

5    Much of SBC's and the other RBOCs' conduct over the years was directed at

6    disadvantaging AT&T and MCI, and their existence as independent entities offered at least

7    some assurance that perhaps the most egregious RBOC conduct and deregulatory initiatives

8    would be brought to FCC and state PUC attention.  With AT&T and MCI merged into

9    RBOCs, the surviving group of much smaller competitive local and long distance carriers

10   cannot hope to match the economic, legal, and political resources of the RBOCs' and their

11   "bottomless pockets."[202]  Even before their mergers are approved and with less than 100%

12   assurance that they will ultimately be approved, both AT&T and MCI have scaled back their

13   regulatory involvement in matters adverse to Bell company interests.

14

15   A case in point can be found with respect to the ongoing FCC proceedings dealing with

16   interstate special access rates.  In October 2002, AT&T filed a Petition with the FCC seeking

17   substantial reductions in RBOC special access prices and asking that special access pricing

---

202.  Describing the RBOCs' ability to cross-subsidize their entry into  competitive
businesses with profits extracted from captive monopoly services, Judge Harold Greene
observed, "this is not so much because the Regional Companies have deep pockets, which they
do, but because their pockets are bottomless."  *United States v. Western Electric*,  Civil Action
No. 82-0192, 1989 U.S. Dist. LEXIS 18852, at *27

**REDACTED**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L.  SELWYN

1    flexibility, adopted by the FCC in 1999,[203] be rescinded.  AT&T pursued its Petition

2    aggressively, making repeated evidentiary filings with the FCC and ultimately seeking a

3    *Writ of Mandamus* from the D.C. Circuit Court compelling the FCC to act on its Petition.[204]

4    Worldcom made several filings in support of the AT&T Petition.[205]  Finally, on January 19,

5    2005, 12 days before the announcement of the SBC/AT&T merger plan, the FCC issued a

6    Notice of Proposed Rulemaking (NPRM) addressing most of the specific issues raised in the

7    AT&T Petition.  Initial Comments on the NPRM were filed on June 13, 2005.  Significantly,

8    *neither AT&T nor MCI filed comments on the special access rulemaking.*  But for the two

9    mergers, both AT&T and MCI would surely have been active and aggressive in opposing the

10   *de facto* non-dominant status that the URF OIR proposes to apply to SBC and Verizon.

11   With the shoe now on the other foot, AT&T's and MCI's utter silence is deafening.

12

---

203.  *Access Charge Reform,* CC Docket No. 96-262; *Price Cap Performance Review for Local Exchange Carriers*, CC Docket No. 94-1; *Interexchange Carrier Purchases of Switched Access Services Offered by Competitive Local Exchange Carriers*, CCB/CPD File No. 98-63; *Petition of U S West Communications, Inc. for Forbearance from Regulation as a Dominant Carrier in the Phoenix, Arizona MSA*, CC Docket No. 98-157; *Fifth Report and Order and Further Notice of Proposed Rulemaking,* FCC No. 99-206, 14 FCC Rcd 14221 (1999), 14 FCC Rcd 14265, at para 81 (1999).

204.  *Special Access Rates for Price Cap Local Exchange Carriers; AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, WC Docket No. 05-25 and WC RM-10593, *Order and Notice of Proposed Rulemaking*, Rel. January 31, 2005 at para. 21.

205.  *AT&T Corp. Petition for Rulemaking to Reform Regulation of Incumbent Local Exchange Carrier Rates for Interstate Special Access Services*, WC RM-10593, *Comments of Worldcom, Inc*. filed December 2, 2002; and *Reply Comments of Worldcom Inc*., filed January 23, 2003.

234

ETI ECONOMICS AND TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1  Q.  Please summarize your recommendations for conditions intended to minimize or prevent

2      harms to ratepayers arising from the merger.

3

4  A.  While the development of an effectively competitive market for consumer telecommuni-

5      cations services remains a key regulatory and public policy goal, the elimination of the two

6      largest competitors of SBC and Verizon in California cannot be lightly dismissed.  Unless

7      the retail-level competition for local and long distance services previously offered by AT&T

8      and MCI is replaced, the potential for significant price increases by the two principal

9      California RBOCs will be limited only by regulatory constraint.  Self-executing regulatory

10     measures that impose price and earnings ceilings while affording flexibility in the downward

11     direction will protect ratepayers while affording SBC and Verizon the flexibility that they

12     *legitimately* need to respond to such actual competition as may develop.  Continued

13     regulation of essential wholesale inputs to retail-level competitive services, including a

14     strictly enforced imputation regime, is critical to the development of competition, and must

15     be retained until such time as sufficient *and ubiquitously deployed* alternative *facilities-*

16     *based* competition capable of supporting services *in the same product market* as wireline

17     telephone service comes into existence.

18

19     **Elimination of harms to the California Economy**
20

21 Q.  You have identified potential harms to the California economy arising from the SBC/AT&T

22     merger in the range of $15-billion on a net present value basis.  What measures could be

23     imposed upon the combined company to minimize such negative impacts?

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                          LEE L. SELWYN

1    A.  The principal sources of harm to the California economy arising from the merger come in

2         the form of (a) the loss of more than <<BEGIN SBC/AT&T PROPRIETARY      END

3         SBC/AT&T PROPRIETARY>> SBC and AT&T California jobs, and (b) the potential

4         increase in price for telecommunications services used by large telecom- and information-

5         intensive California firms.

6

7         As I have noted above, in the SBC/Telesis merger, SBC had offered specific "California

8         Commitments" whereby the merged companies agreed "to locate four major operating

9         subsidiaries in California" and "to create 1,000 new jobs in California at Telesis

10       companies."[206]  According to the Commission, "Applicants argue that the jobs will increase

11       the incomes of California residents by $50 million a year, plus an additional $100 million a

12       year in 'multiplier effects.'"[207]

13

14    Q.  Have SBC or AT&T offered any comparable "California commitments" in connection with

15       the present application?

16

17    A.  No.  In fact, as I have discussed at pages 64-69 above, a key element of the "synergy

18       benefits" identified by the two companies to their respective Boards of Directors and

19       shareholders stems from massive job cuts.  No California-specific job loss figures are

20       provided, but if we assume that employment reductions are spread uniformly across the

---

206.  D.97-03-067, 71 CPUC 2d 351, 397-98.

207.  *Id.*, at 398.

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1   entire SBC 13-state region, and conservatively for many employment categories roughly

2   26% of those job cuts can be expected to occur in California.

3

4   Q.  Can the Commission address this potential adverse impact upon the California economy

5       through the imposition of merger commitments?

6

7   A.  Perhaps, but enforcement may be difficult or impossible.  Unlike the "commitments" made

8       to induce approval of the SBC/Telesis merger, the Joint Applicants have made no

9       commitments to maintain any specific headquarters operations for any subsidiaries or

10      affiliates in California, and have certainly not proposed to *increase* California employment.

11

12      Perhaps the best approach would be to require that the merged company limit California job

13      cuts to a specified maximum percentage of all job cuts.  For example, the Joint Applicants'

14      National Synergy Model is premised upon a total headcount reduction of <<BEGIN

15      SBC/AT&T PROPRIETARY          END SBC/AT&T PROPRIETARY>> jobs.  If

16      California job losses in most categories are in proportion to California's share of total post-

17      merger SBC operations, that would imply a cut of more than <<BEGIN SBC/AT&T

18      PROPRIETARY          END SBC/AT&T PROPRIETARY>> jobs with a potential

19      economic impact, expressed in net present value terms and including multiplier effects, of

20      approximately $15-billion.  Limiting California job cuts to, for example, 5% of total SBC

21      headcount reductions for all job categories, would save more than <<BEGIN SBC/AT&T

22      PROPRIETARY          END SBC/AT&T PROPRIETARY>> California jobs and bring the

23      negative impact upon the California economy down to only $3.1-billion.  Of course, even

**REDACTED**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                    LEE L.  SELWYN

1     that substantially smaller impact is still many multiples of the specific "short-term and long-

2     term economic benefit to [California] ratepayers" of only $27-million that the Joint

3     Applicants have thus far been willing to concede.

4

5    Q.  How could any such employment-related merger condition be enforced?

6

7    A.  Enforcement would be difficult, in part because so much of SBC's aggregate employment –

8     even employment within California – still falls well outside of the Commission's

9     jurisdiction.  In order to enforce any such commitment or condition, the Commission would

10    need to create new reporting requirements and a monitoring mechanism, and would need

11    some means of imposing penalties in the event that SBC fails to comply.  If the Commission

12    lacks the legal authority to impose such penalties, SBC would need to enter into an

13    enforceable voluntary commitment, and agree to be bound by it and to pay specified

14    penalties if its commitment is not fulfilled.

15

16    Q.  Could the Commission make the required §854(c)(4) and (c)(6) findings without some

17    means of enforcing specific employment commitments?

18

19    A.  No, I do not see how it could.  And it probably could not make the required §854(b)(2)

20    finding either based upon the Joint Applicants' forecast of only $27-million in California

21    synergies.  Assuming an average salary of $100,000, the NPV associated with each

22    California job I've estimated, including multiplier effects, is approximately $3.3-million.  A

23    loss of only 5 jobs would eradicate the "short-term and long-term economic benefits" to

238

**REDACTED**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-02-027                LEE L.  SELWYN

1    California ratepayers resulting from the merger.  The Joint Applicants could be eliminating

2    <<BEGIN SBC/AT&T PROPRIETARY          END SBC/AT&T PROPRIETARY>>

3    of times that number of jobs.

4

5    Although the various conditions and mitigations outlined here will reduce the overall harm

6    to ratepayers, to competition, to employees and to the California economy if the merger is

7    allowed to go forward, on balance the merger is not in the public interest and does not

8    satisfy the statutory thresholds for approval.  For all of these reasons, the Commission

9    should not approve the SBC/AT&T Application, and should reject the proposed merger.

10

11   Q.  Does this conclude your reply testimony at this time?

12

13   A.  Yes.  However, if additional information responsive to ORA or other party discovery is

14       forthcoming from SBC, I would ask for the opportunity to supplement this testimony to

15       reflect the effects, if any, of such additional data.

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED**

## DECLARATION

I declare under the pains and penalties of perjury that the statements contained in my Reply Testimony filed this date in A. 05-02-027 on behalf of the Office of Ratepayer Advocates are true and correct to the best of my knowledge, information and belief, and if called to testify under oath thereon I am prepared to do so.

June 24, 2005

_____
LEE L. SELWYN

240

ECONOMICS AND
TECHNOLOGY, INC.