**Attachment 16**

**Reply Testimony of Lee L. Selwyn on behalf of the
California Public Utilities Commission
Office of Ratepayer Advocates
(redacted)
Cal. PUC Application No. 05-04-020
(Verizon/MCI merger)
August 15, 2005**



# Before the
# PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

In the Matter of the Joint Application of Verizon
Communications Inc.  ("Verizon") and MCI, Inc.
("MCI") to Transfer Control of MCI's California
Utility Subsidiaries to Verizon, Which Will Occur
Indirectly as a Result of Verizon's Acquisition of
MCI

**A.  05-04-020**

Reply Testimony

of

# LEE L. SELWYN

on behalf of the

Office of Ratepayer Advocates

August 15, 2005

**REDACTED – PUBLIC VERSION**

LEE L.  SELWYN

TABLE OF CONTENTS

EXECUTIVE SUMMARY                                                              viii

INTRODUCTION                                                                      1

  Qualifications                                                                  1

  Assignment                                                                      3

OVERVIEW OF §854 REQUIREMENTS                                                     5

  If the Commission determines, as it should, that the proposed merger of Verizon and
  MCI is subject to §854 of the California Public Utilities Code, it must affirmatively find
  that the transaction will provide positive short-term and long-term benefits for California
  ratepayers and that the merger fully satisfies all of the public interest criteria set out in
  the statute.                                                                    5

  The merger must provide short-term and long-term economic benefits to ratepayers    9

  California Ratepayers are to receive "not less than 50 percent" of the total short-term and
  long-term forecasted economic benefits of the proposed merger where the Commission
  has ratemaking authority.                                                      12

  The "economic benefits" justifying the merger referred to at §854(b)(1) and the
  "economic benefits" that must be shared with ratepayers referred to at §854(b)(2) are, in
  virtually all respects, the same, and as such the Commission should adopt a consistent
  basis for assessing §854(b)(1) and §854(b)(2) "economic benefits to ratepayers."   16

  §854(b)(3) requires the Commission to find that the merger will "not adversely affect
  competition," but in fact the merger will significantly increase Verizon's market power
  and market concentration overall, and will result in decidedly less competition in the
  California telecommunications market.                                          19

REDACTED – PUBLIC VERSION



Cal. PUC A.05-04-020                     LEE L. SELWYN

THE FALLACY OF JOINT APPLICANTS' MERGER BENEFIT CLAIMS                21

    Virtually all of the "benefits" identified by the Joint Applicants will inure to the post-merger Verizon and its shareholders, and the *de minimis* share to be allocated to California ratepayers will not be sufficient to offset the substantial risks and harms that will inevitably arise from the proposed transaction.                21

    The merger will likely produce other economic harms to ratepayers, and those "negative benefits" must be considered and offset against potential positive benefits in making the required §854(b)(1) finding.                23

    The Joint Applicants' contention that the merger will promote innovation and R&D, and that these improvements will be more rapidly flowed through to ratepayers, cannot be squared with the overall increase in market concentration that will result if the two companies are allowed to combine.                25

    The merger is not likely to produce the increased out-of-region competition predicted by the Joint Applicants, and it could result in decidedly less competition if post-merger Verizon and post-merger SBC continue to follow their two-decades-long pattern of tacit market allocation.                31

    Having grossly exaggerated the various "soft" benefits they seek to attribute to the merger in order to satisfy § 854(b)(1), the Joint Applicants then seek to affirmatively *exclude* the vast majority of such "economic benefits" subject to the Commission's ratemaking authority for purposes to the "not less than 50 percent" allocation to ratepayers as required by § 854(b)(2).                33

    Forecasts of positive economic benefits of the merger must be offset by a valid economic assessment of the potential risks to both the merging parties and to California ratepayers arising from the transaction.                44

ECONOMIC BENEFITS FOR CALIFORNIA RATEPAYERS                56

    The Joint Applicants propose to allocate no more than a *de minimis* fraction of aggregate national merger synergies to California ratepayers                56

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

EFFECT OF THE PROPOSED MERGER ON CALIFORNIA EMPLOYMENT AND
ECONOMY                                                                                          60

    The proposed merger has the potential to eliminate hundreds of California jobs and
    threaten continuation of benefits for current MCI employees.                        60

    The merger could have an $807-million adverse impact on the overall California
    economy.                                                                           62

HORIZONTAL COMPETITION ISSUES ARISING FROM THE PROPOSED MERGER       67

    Why is the merger of Verizon and MCI different from previous RBOC mergers?        67

    The proposed transaction is both a *horizontal* merger – in that Verizon and MCI
    currently compete with each other across a broad spectrum of service markets – and a
    *vertical* merger – in that each firm currently purchases services from, or produced by,
    the other to support its provision of downstream services.                         69

    The proposed merger violates the specific market concentration provisions of the
    Department of Justice/Federal Trade Commission *Horizontal Merger Guidelines*.      84

    Verizon and MCI attempt to broaden the "relevant product and geographic market" for their
    wireline services, in order to create the appearance of lower market concentration, but the
    "intermodal" services they identify do not belong to the same "relevant product and
    geographic market," as these concepts are defined in the *Horizontal Merger Guidelines*.   88

INTERMODAL COMPETITION AND MARKET CONCENTRATION                      101

    Consumer purchases of wireless, cable, and VoIP are not sufficient to prevent the post-
    merger Verizon from imposing a "small but significant and nontransitory increase" in
    the price of its wireline services without losing so much business as to make the price
    increase unprofitable.                                                             101

    Where it occurs, wireless substitution is minimal at best                         104

    Use of a wireless phone as a "primary phone," or for long distance calling, is *not*
    "intermodal competition"                                                           111

    RBOC actions indicate that even wireline carriers perceive wireless service to be an
    integrated complement to, and distinctly not a substitute for, traditional wireline service   117

REDACTED – PUBLIC VERSION


ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L.  SELWYN

Limited competition from cable providers at best produces a duopoly market outcome
for services that depend upon bottleneck "last mile" facilities                               119

Decreases in ILEC access lines are attributable to the decline of the second line market,
rather than to consumer "substitution" of "intermodal" alternatives                           123

VoIP services do not avoid the "last mile" bottleneck; moreover, they fall far short of
wireline services with respect to service quality and their ability to meet national
standards for emergency 911 service.                                                          125

Wi-Fi, Wi-Max, and other fixed wireless services do not serve as legitimate competitors
to DSL or cable modem services, especially at the residential and small business level.      142

The identifiable adverse impact upon competition from the merger must not be
subordinated to speculative claims as to future changes in market structure due to the
growth of putative intermodal alternatives                                                   144

VERTICAL INTEGRATION ISSUES ARISING FROM THE PROPOSED MERGER                                  146

Both Verizon and MCI currently purchase massive quantities of services in markets
currently served by the other as inputs to support their own activities in downstream
markets.                                                                                      146

The vertical integration of the Verizon local access and MCI interexchange network
infrastructures will diminish competition in wholesale markets and provide Verizon with
the means to further extend its local service market power into adjacent and currently
competitive markets.                                                                         148

The *horizontal* concentration of retail long distance and enterprise services within the
Verizon footprint, coupled with the *vertical* integration of Verizon's local and MCI's
long distance networks, when viewed together with the concurrent vertical merger of
SBC and AT&T, will eviscerate the demand for *wholesale* interexchange services.             150

The vertical integration of MCI and Verizon will dramatically increase Verizon's
*monopsony* power over its suppliers.                                                         153

Excessive special and switched access charges raise competitive problems even in the
absence of a merger, but an Verizon/MCI merger would make the problem far worse.            158

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

The vertical integration of MCI's Tier 1 Internet backbone and Verizon's "last mile" DSL facilities will reduce competition for wholesale Internet services and erect additional entry barriers for non-integrated Internet service providers.          160

IMPACTS ON COMPETITION FOR ENTERPRISE BUSINESS SERVICES          163

Without a solid foothold in the enterprise market, carriers attempting to compete with the giant Verizon/MCI have little chance of surviving as competitors for residential and small business services.          163

By eliminating MCI as a competitor, Verizon would be able to solidify its monopoly control of the wholesale (upstream) special access market, while simultaneous fortifying its ability and incentives to discriminate against downstream retail competitors.          167

The merger of Verizon and MCI will produce an extensive array of competitive advantages for the combined entity that will operate to create potentially insurmountable barriers to entry and competition for rivals seeing to serve enterprise customers within the Verizon ILEC footprint.          172

Predation and price squeezes between Verizon's retail prices and its special access charges are currently occurring, and have the potential to become even more aggressive vis-à-vis other CLCs once MCI has been absorbed into Verizon.          183

Existing rules governing the allocation of ILEC costs as between "regulated" and "nonregulated" services are incapable of addressing the massive integration of network facilities and organizational resources that would result from the merger of Verizon and MCI.          186

The merger exacerbates the already tenuous competitive situation created by the sunset of Section 272.          191

The Verizon/MCI and SBC/AT&T mergers will result in *de facto* geographic market allocation as between the two mega-carriers, leaving each to largely remonopolize the enterprise market within its BOC operating footprint.          199

REDACTED – PUBLIC VERSION


ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

CONDITIONS FOR APPROVAL                                          204

    If the Commission determines that the merger should be allowed to go forward, it should consider and adopt specific measures to mitigate the substantial economic and competitive harms that would otherwise result from the transaction.                          204

        Assuring that the merger will produce benefits to ratepayers          207

        Measures to offset the merger's adverse impact on competition          213

        Measures to limit potential ratepayer harms          226

        Elimination of harms to the California Economy          238

DECLARATION                                          243


TABLES

Table  1      REDACTED                                          48

Table  2      Pre- and Post-Merger Four-Firm Concentration Indices – Residential Long Distance, Verizon California operating areas          51

Table  3      Comparison of Verizon and SBC California Residential Rates          97

Table  4      Comparison of Verizon Intermodal California Residential Unlimited Plans          100

Table  5      Verizon Interstate Special Access Revenues and Rates of Return          177


FIGURES

Figure 1      Verizon Long Distance Market Shares          79

Figures 2     Verizon LA Map          179

Figure 3      Verizon Riverside Map          180

REDACTED – PUBLIC VERSION

ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                LEE L.  SELWYN


ATTACHMENTS

1    Statement of Qualifications, Lee L. Selwyn

2    Verizon/MCI responses to Discovery Requests in this proceeding referenced in testimony

3    Verizon/MCI Responses to FCC Staff's Information and Documents Requests made available to the Joint Applicants to ORA in the "nmatrix" database referenced in testimony *(referred to in this filing)*

4    Details of calculations based upon the Applicants' claims regarding the net present value of the transaction.

5    Analysis of the Economic Impact of Verizon/MCI California Headcount Reductions

6    Summary of proposed merger conditions

7    AT&T's proposed imputation rule

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

## EXECUTIVE SUMMARY

The proposed merger of Verizon and MCI will have major, far-reaching, and decidedly negative impacts upon the California telecommunications market and the California economy:

•    It will directly affect the manner in which both Verizon California and MCI provide service to California ratepayers.

•    It will result in increased market concentration and less competition overall, leading to higher prices across a broad range of telecommunications services.

•    It will likely increase Verizon's cost of capital

•    It will result in large-scale job losses at both Verizon and at MCI producing a $807-million negative impact for the California economy overall; and

•    By raising competitive entry barriers, the merger will discourage entry and investment in the California telecommunications market.

These are exactly the kinds of concerns that led to the enactment of §854 of the California Public Utilities Code, and for this reason the Commission should determine that the proposed transaction is subject to §854 in all respects.

***Most of the "benefits" of the proposed merger will inure to Verizon and MCI; the merger will not provide positive short-term and long-term economic benefits for ratepayers***

§854(b) requires that the merger provide "short-term and long-term economic benefits to ratepayers" and that "not less than 50 percent" of such benefits be allocated to California ratepayers where the Commission has ratemaking authority.  The Joint Applicants have sought to satisfy §854(b)(1) by enumerating a litany of purported "benefits," yet for purposes of §854(b)(2) they attribute less than two-tenths of one percent of the total $7.3-billion in "economic benefits" they have identified to their shareholders for "allocation" to California ratepayers.  The Commission should reject this attempt at bifurcation, since the "economic benefits to ratepayers" justifying the merger referred to at §854(b)(1) and the "economic benefits" that must be shared with ratepayers referred to at §854(b)(2) are, in virtually all respects, the same.

Virtually all of the purported §854(b)(1) "benefits" identified by the Joint Applicants will inure to the post-merger Verizon and its shareholders, and do not provide specific "benefits

viii



Cal. PUC A.05-04-020                LEE L.  SELWYN

to ratepayers" as expressly required by the statute.  This lack of "ratepayer benefits" is underscored by the *de minimis* $6.6-million share that the Joint Applicants seemingly concede would be subject to allocation to California ratepayers assuming that the transaction is even subject to §854.  These "ratepayer benefits" purportedly identified by the Joint Applicants are clearly insufficient to offset the substantial risks and harms that will inevitably arise from the proposed transaction.

In fact – and as apparently conceded by the Joint Applicants themselves – virtually all of the benefits arising from the merger will inure to the combined companies' shareholders – and decidedly *not* to ratepayers:  The Joint Applicants' contention that the merger will promote innovation and R&D, and that these improvements will be more rapidly flowed through to ratepayers, cannot be squared with the overall increase in market concentration that will result, since it is *competition*, not scale of operations, that drives innovation.  The merger is not likely to produce the increased out-of-region competition predicted by the Joint Applicants, and it could result in decidedly less competition if post-merger Verizon and post-merger SBC continue to follow their two-decades-long pattern of tacit geographic market allocation.  Any forecasts of positive economic benefits of the merger must be offset by a valid economic assessment of the potential risks to both the merging parties, to California ratepayers, to Verizon and MCI employees, and to the California economy overall that will result from the transaction.

The Joint Applicants propose to allocate no more than a *de minimis* fraction of aggregate national merger synergies to California ratepayers, in this case, about $3-million.  However, based upon the "national" $7-billion estimate of merger synergies, the total short-term and long-term forecasted economic benefits properly allocable to California ratepayers where the Commission has ratemaking authority are more accurately calculated to be in the range of $206-million.  This California synergy estimate was developed by calculating a more appropriate California allocation factor than the less than one-tenth of one percent that has been advanced by the Joint Applicants.  This approach is conservative in that it does not examine California-specific synergy gains at a granular level, and excludes other Verizon affiliates that may offer services subject to the Commission's ratemaking authority.  If the merger is to be approved, the Commission will need to assure itself that "not less than 50 percent" of these aggregate "California benefits" will flow to California ratepayers in some identifiable manner.

The Joint Applicants have advised the SEC, the financial community, and their respective shareholders that the merger will produce aggregate synergies of some $7-billion on a net present value basis.  The $6.6-million they concede as falling within the Commission's ratemaking authority represents *less than one-tenth of one percent* of the total merger synergies.  In fact, if the total projected short term and long term benefits to California ratepayers with respect to services over which the Commission has ratemaking authority is as

ix

**REDACTED – PUBLIC VERSION**



Cal. PUC A.05-04-020                    LEE L.  SELWYN

trivial as the Joint Applicants claim and if the Commission nonetheless accepts that amount as satisfying §854(b)(2), the Commission would be entering into an enormous gamble on behalf of California ratepayers.  The immediate onset of merger implementation costs will exceed the immediate integration gains, such that net short-term benefits will be decidedly negative.  And the various long-term benefits being claimed by the Joint Applicants are dependent upon the interactions of many factors, the outcome of which is highly uncertain.  Even a small overestimate of the purported "long term benefits" by the Joint Applicants would erase the nominal $3.3-million they have earmarked for sharing with California ratepayers.  Even a small decrease in the level of competition – and the decrease will certainly not be small – could result in price increases by the post-merger Verizon that will exceed that $3.3-million.  This transaction is a bad gamble, because at best it will create insignificant benefits for ratepayers, and at worst it could result in significantly less competition, higher prices for essential telecommunications services, and a large negative impact for the California economy overall.  It makes no sense to place a bet where the risks are substantial and unknown, where the potential winnings are at best trivial, and where the potential losses are large and irreversible.

***Unlike any of the prior RBOC mergers, the Verizon/MCI combination will increase market concentration within the same geographic areas as well as creating a vertically integrated mega-corporation that will have the opportunity and incentive to discriminate against non-integrated rivals both in upstream wholesale and in downstream retail markets.***

The proposed transaction differs from all previous RBOC mergers in that it is both a *horizontal* merger – in that Verizon and MCI currently compete with each other across a broad spectrum of service markets – and a *vertical* merger – in that each firm currently purchases services from, or produced by, the other to support its provision of downstream services.  For these reasons, the merger will have a material adverse impact upon competition in the California telecommunications market.

***Contrary to the Joint Applicants' repeated contentions, MCI competes directly with Verizon – and is in fact Verizon's second largest competitor – across a broad range of retail consumer and enterprise services as well as in wholesale special access markets.***

While claiming to have irreversibly exited the consumer market, MCI remains one of Verizon's largest competitors, with millions of residential access lines, many of which are in California.  MCI is also a direct competitor of Verizon in the enterprise business market.  Even though MCI has been subject to precisely the same operational difficulties and competitive disadvantages (vis-à-vis the incumbent LEC) that Verizon claims to be an impediment to its own competitive entry out of region, MCI has still been successfully serving the very customers that Verizon now claims it can serve only by merging with MCI.  The Verizon/MCI and SBC/AT&T mergers will result in *de facto* geographic market

x



Cal. PUC A.05-04-020                    LEE L.  SELWYN

allocation as between the two mega-carriers, leaving each to largely remonopolize the
enterprise and consumer markets within each's respective operating footprint.

As a *horizontal* transaction, the proposed merger violates the specific market concentration
provisions of the Department of Justice/Federal Trade Commission *Horizontal Merger
Guidelines*.  In a transparent attempt to overcome this critical hurdle, Verizon and MCI seek
to broaden the "relevant product and geographic market" definition applicable to their
wireline services by including a variety of so-called "intermodal" alternatives so as to create
the *appearance* of lower market concentration in the specific product markets in which the
two firms are direct competitors.  However, the specific "intermodal" services they identify
are not in the same "relevant product and geographic market" as these concepts are defined
in the *Guidelines*.  Specifically, consumers do not perceive wireless, cable, and VoIP as
representing sufficiently close substitutes for basic wireline telephone services as to prevent
the post-merger Verizon from imposing a "small but significant and nontransitory increase"
in the price of its wireline services without losing so much business as to make the price
increase unprofitable – the specific standard for identifying "relevant product markets" set
out in the *Guidelines*.  The Joint Applicants support their "same product market" claim solely
with subjective, anecdotal evidence and rhetoric describing what is at best entirely incidental
substitution, but offer no rigorous, quantitative econometric analysis of relative prices and
cross-price elasticities to *prove* their otherwise unsupported – and unsupportable –
contentions.  Where it occurs, wireless, cable, and VoIP substitution for wireline service is
minimal at best, and certainly does not constrain wireline prices.  The identifiable adverse
impact upon competition from the merger must not be subordinated to speculative claims as
to future changes in market structure purportedly attributable to the growth of putative
intermodal alternatives.

***The merger will result in extensive vertical integration, creating the incentive and the
opportunity for the combined company to discriminate against non-integrated rivals both with
respect to upstream wholesale services as well as in downstream retail markets.***

Both Verizon and MCI currently purchase massive quantities of services in markets currently
served by the other as inputs to support their own activities in downstream markets.  The
vertical integration of the Verizon local access and MCI interexchange network infra-
structures will diminish competition in wholesale markets and provide Verizon with the
means to further extend its local service market power into adjacent and currently
competitive markets.  The *horizontal* concentration of retail long distance and enterprise
services within the Verizon footprint, coupled with the *vertical* integration of Verizon's local
and MCI's long distance networks, when viewed together with the concurrent vertical merger
of SBC and AT&T, will eviscerate the demand for *wholesale* interexchange services.  The
currently excessive special and switched access charges raise competitive problems even in
the absence of a merger, but a Verizon/MCI merger would make the problem far worse.

xi



Cal. PUC A.05-04-020                    LEE L.  SELWYN

A similar outcome will arise with respect to Internet-related services.  When joined with Verizon, MCI will become both the largest provider of consumer high-speed Internet access services in the Verizon California serving areas *and* a Tier 1 Internet backbone carrier.  This latter status will permit Verizon to "peer" with other Tier 1 providers and exchange traffic without being required to make specific payments for bandwidth.  This cost-free access to the Internet backbone will provide Verizon with a competitive cost advantage that none of its existing high-speed Internet access competitors can match.  The vertical integration of MCI's Tier 1 Internet backbone and Verizon's "last mile" DSL facilities will reduce competition for wholesale Internet services and erect additional entry barriers for non-integrated Internet service providers.

***The proposed merger will result in a loss of hundreds of California jobs and will negatively impact the California economy by at least $807-million.***

To achieve their "synergies," the Joint Applicants will be eliminating hundreds of jobs in California across both companies.  As such, the proposed merger has the potential to eliminate hundreds of high-paying California jobs and threaten continuation of benefits for current MCI employees.  Taking both direct and indirect effects into account, the loss of these jobs translates into an adverse economic impact on the California economy, expressed in net present value terms, of not less than $807-million.

***Although the proposed merger falls far short of satisfying the specific requirements set out at §854 of the California Public Utilities Code, at least some of its more egregious harms could be mitigated through the imposition by the Commission of specific merger conditions.***

The proposed merger fails to satisfy the explicit requirements at §854 and for that reason cannot be approved.  However, if the Commission nonetheless determines that the merger should be allowed to go forward, it should consider and adopt specific conditions to mitigate the substantial economic and competitive harms that would otherwise result from the transaction.  These measures would address each and all of the following specific areas of concern:

- Assure that the merger will produce benefits to ratepayers by earmarking a sufficient portion of the total short-term and long-term economic benefits so that California ratepayers receive not less than 50 percent thereof, where the Commission has ratemaking authority;
- Offset the merger's adverse impact on competition by assuring continued competitor access to the combined company's network at cost-based rates;
- Limit other potential ratepayer harms, such as potentially large price increases on services subject to significantly diminished competition;

xii

**REDACTED – PUBLIC VERSION**



Cal. PUC A.05-04-020                          LEE L.  SELWYN

- Eliminate harms to the California Economy by limiting the extent of headcount reductions in the State post-merger.

***On balance the proposed merger is not in the public interest, will result in decidedly less competition in the California telecommunications market, will fail to provide the required economic benefits to ratepayers, will cost jobs, and will have a large negative impact on the California economy overall, and should therefore not be allowed to go forward.***

Although the various conditions and mitigations outlined here will reduce the overall harm to ratepayers, to competition, to employees and to the California economy if the merger is allowed to go forward, on balance the merger is not in the public interest and does not satisfy the statutory thresholds for approval.  For all of these reasons, the Commission should not approve the Verizon/MCI Application, and should reject the proposed merger.

xiii

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

INTRODUCTION

**Qualifications**

5  Q.  Please state your name, position and business address.

7  A.  My name is Lee L. Selwyn.  I am President of Economics and Technology, Inc. ("ETI"),

8      Two Center Plaza, Boston, Massachusetts 02108.  Economics and Technology, Inc. is a

9      research and consulting firm specializing in telecommunications economics, regulation,

10     management and public policy.

12 Q.  Please summarize your educational background and previous experience in the field of

13     telecommunications regulation and policy.

15 A.  I have prepared a Statement of Qualifications, which is attached hereto as Attachment 1.

17 Q.  Dr. Selwyn, have you previously testified before the California Public Utilities Commission?

19 A.  Yes, I have appeared before this Commission on numerous occasions dating back to the mid-

20     1970s.  A summary of my participation in CPUC matters is included in my Statement of

21     Qualifications (Attachment 1).

1

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  Q.  Please summarize your specific experience in proceedings involving mergers of Regional

2       Bell Operating Companies ("RBOCs") and other affiliate transactions involving RBOCs.

3

4  A.  I have participated and presented testimony in cases addressing each of the five previous

5       RBOC mergers.  I testified on behalf of the ORA in both the SBC/Pacific Telesis and the

6       Bell Atlantic/GTE merger dockets.  That testimony addressed, among other things, the effect

7       of the mergers on competition and on the surviving firms' market power, ratepayer impacts,

8       including the applicants' recovery of merger-related costs and the flow-through of merger

9       benefits to California ratepayers, and the conformance of the mergers with PU Code §854(b).

10      In addition to these CPUC matters, my firm was engaged by a group of state consumer

11      advocate offices in 1998 to prepare an expert report for submission to the FCC with respect

12      to the BA/GTE merger.  In 1997 and 1998, I testified before the Maine Public Service

13      Commission on behalf of the State of Maine Office of Public Advocate with respect to the

14      NYNEX/Bell Atlantic merger.  In 1998, I presented testimony before the Connecticut

15      Department of Public Utility Control on behalf of the State of Connecticut Office of

16      Consumer Counsel to address the merger of the Southern New England Telephone Company

17      ("SNET") into SBC.  In 1999, I testified on behalf of the Attorney General of the State of

18      Illinois before the Illinois Commerce Commission regarding the merger of SBC and

19      Ameritech.  I have recently submitted Reply Testimony on behalf of ORA in the currently

20      pending Application of SBC to acquire AT&T, A.05-02-027.

21

22      I have also participated in various proceedings addressing non-merger change of control

23      issues.  I testified on behalf of ORA's predecessor, the DRA, in the 1992-1993 proceeding

2

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L. SELWYN

1   addressing the Pacific Telesis "spin-off" of its cellular and other wireless subsidiaries. In

2   2003, I was engaged by the Staff of the Washington State Utilities and Transportation

3   Commission to prepare a financial analysis and present public interest testimony addressing

4   Qwest's sale of its directory publishing business ("DEX") to a group of private investors. I

5   have also been involved in numerous other cases addressing competition and market power

6   issues, including Section 271/272 and various competitive reclassification proceedings.

7

8   **Assignment**
9

10  Q.  On whose behalf is this testimony being offered, and what was your specific assignment in

11      this proceeding?

12

13  A.  ETI has been engaged by the Office of Ratepayer Advocates of the California Public Utilities

14      Commission ("ORA") to review the Joint Application of Verizon Communications, Inc.

15      ("Verizon") and MCI Telecommunications Corp. ("MCI") for California PUC approval of

16      their proposed merger, together with the accompanying public interest statement and

17      supporting declarations. ETI has also been asked to review the responsive comments filed by

18      parties in the FCC proceeding considering the proposed merger, WC Docket No. 05-75.

19      Based upon the foregoing, ETI has been asked to present testimony to the Commission and to

20      offer an opinion as to whether the proposed merger conforms to the requirements generally

21      set forth at §854 of the California Public Utilities Code.

22

3

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  Q.  Do you refer to specific Verizon and/or MCI responses to information and document requests

2      in this testimony?

3

4  A.  Yes.  Attachment 2 hereto provides copies of all Verizon/MCI responses to discovery

5      requests in this proceeding to which I refer.  Attachment 3 provides copies of Verizon/MCI

6      responses to the FCC Staff's information and document request, which have been made

7      available by the Joint Applicants to ORA in the "nmatrix" database, and to which I refer in

8      my testimony.

4

ETI  ECONOMICS AND
     TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1                    OVERVIEW OF §854 REQUIREMENTS

2

3    **If the Commission determines, as it should, that the proposed merger of Verizon and MCI is**
4    **subject to §854 of the California Public Utilities Code, it must affirmatively find that the**
5    **transaction will provide positive short-term and long-term benefits for California**
6    **ratepayers and that the merger fully satisfies all of the public interest criteria set out in the**
7    **statute.**

8

9    Q.   Dr.  Selwyn, are you generally familiar with §854 of the California Public Utilities Code?

10

11   A.   Yes.

12

13   Q.   I would like you to assume for the purpose of your testimony that the proposed merger of

14        Verizon and MCI is subject to §854(b) and §854(c) in all respects.  Assuming that to be the

15        case, what are the principal types of factual findings that the Commission is required to make

16        prior to approving the proposed merger?

17

18   A.   §854(b) requires that the Commission, prior to approving the merger, find that the proposed

19        transaction:

20

21        •    "Provides short-term and long-term economic benefits to ratepayers" (§ 854(b)(1));

22

23        •    "Equitably allocates, where the Commission has ratemaking authority, the total short-

24             term and long-term forecasted economic benefits ... of the proposed merger, acquisition

5

REDACTED – PUBLIC VERSION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1       or control, between shareholders and ratepayers.  Ratepayers shall receive not less than

2       50 percent of those benefits" (§854(b)(2)); and that the merger

3

4       •     Will "[n]ot adversely affect competition" (§854(b)(3)).

5

6       §854(c) requires the Commission to consider each of eight separate criteria and make a

7       finding (based upon its analysis of these criteria) that, on balance, the merger is in the public

8       interest.  Under the eight subsections of §854(c), the Commission must consider whether the

9       proposed merger will:

10

11      (1)   Maintain or improve the financial condition of the resulting public utility doing

12            business in the state.

13

14      (2)   Maintain or improve the quality of service to public utility ratepayers in the

15            state.

16

17      (3)   Maintain or improve the quality of management of the resulting public utility

18            doing business in the state.

19

20      (4)   Be fair and reasonable to affected public utility employees, including both

21            union and nonunion employees.

22

23      (5)   Be fair and reasonable to the majority of all affected public utility shareholders.

6

ETI  ECONOMICS AND
     TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1        (6)   Be beneficial on an overall basis to state and local economies, and to the

2              communities in the area served by the resulting public utility.

3

4        (7)   Preserve the jurisdiction of the commission and the capacity of the commission

5              to effectively regulate and audit public utility operations in the state.

6

7        (8)   Provide mitigation measures to prevent significant adverse consequences which

8              may result.

9

10   Q.   Do you find Joint Applicants' Merger Application deficient with respect to one or more of

11        these criteria?

12

13   A.   Yes.   As my testimony will demonstrate, the Commission should be very concerned about

14        the merger's impact with respect to a number of these criteria, including (but not limited to)

15        the effect of the proposed merger on the Commission's ability to effectively regulate and

16        audit public utility operations of the post-merger Verizon entity in California and the Joint

17        Applicants' failure to propose any mitigation measure to prevent adverse impacts on

18        competition in the state.  Indeed, while I propose mitigation measures for the Commission's

19        consideration, it is questionable whether even those measures would be adequate to offset the

20        anticompetitive consequences of the merger or would provide as great a degree of protection

21        for California ratepayers as a decision to simply deny the merger.  In addition, as I discuss

22        below, the potential negative economic impact of this merger on the California economy is

23        likely to exceed $807-million.  The Commission must consider this negative economic

7

**ET** ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    impact in the context of the Joint Applicants' minimal promises of California economic

2    benefits.

3

4  Q.    What options are available to the Commission in the event that it cannot make one or more of

5        these factual determinations based upon the merger application as presented by the Joint

6        Applicants?

7

8  A.    Generally, where the Commission cannot find that the proposed merger will affirmatively

9        satisfy one or more of the requirements of §854(b), it can either

10

11       •    Decline to approve the merger; or

12

13       •    Propose one or more specific mitigation measures that, if accepted by the Joint

14            Applicants, would fully satisfy all of the §854(b) requirements.

15

16  Q.   Has the second alternative of proposing one or more mitigation measures been used by the

17        Commission in any previous public utility mergers in California?

18

19  A.   Yes, on numerous occasions.   In approving the merger of Citizens and GTE, the

20        Commission imposed 44 separate (some multipart) conditions.[1]   The Commission also

---

1.  *Joint Application of Citizens Telecommunications Company of California, Inc. (U-1024-C) and GTE California Incorporated  (U-1002-C) for Authority and Approval Under Pub. Util. Code Sections 851 and 854*, Decision No. 01-06-007, 210 P.U.R.4th 189, 211-226

(continued...)

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    imposed conditions in connection with both the SBC/PacTel[2] and BA/GTE mergers.[3]  These

2    conditions pertain to a broad range of concerns, including, but not limited to, affiliate

3    transactions, financial stability, and service quality.  These conditions are separate from, and

4    in addition to, the required sharing of benefits with ratepayers pursuant to §854(b)(2).

5

6    **The merger must provide short-term and long-term economic benefits to ratepayers**

7

8    Q.  Dr.  Selwyn, PU Code §854(b)(1) requires that the Commission find that the proposed

9        transaction "provides short-term and long-term economic benefits to ratepayers."  What

10      categories of "economic benefits" should the Commission be considering as satisfying this

11      requirement?

12

13    A.  I would note, as a threshold matter, that the statute specifies that the short-term and long-term

14      benefits arising from the merger be provided *to ratepayers*.  Thus, benefits from the

15      transaction inuring to Verizon, MCI, to their shareholders or to their affiliates *do not qualify*

---

1.  (...continued)
(Appendix B) (2001).

2.  *Re Pacific Telesis Group; Additional Applicants: SBC Communications Inc.; Pacific Bell*, *Application No. 96-40-038, Decision No. 97-03-067*, 71 CPUC 2d 351 ("*SBC/Pacific Telesis Merger Order*"), at 404, 410-411.

3.  *Joint Application of GTE Corporation ("GTE") and Bell Atlantic Corporation ("Bell Atlantic") to Transfer Control of GTE's California Utility Subsidiaries to Bell Atlantic*, Application No. 98-12-005, Decision No. 00-03-021, 2000 Cal. PUC LEXIS 211, 233 ("The proposed merger, with the adopted conditions, is in the public interest"), 268-274.

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    as §854(b)(1) benefits to ratepayers except to the extent that the Commission determines that

2    a portion of such gains are to be shared with ratepayers, as required by §854(b)(2).

3

4  Q.  What types of "benefits" of the proposed merger might *not* accrue to ratepayers?

5

6  A.  There are several categories of "benefits" arising from the proposed merger that would not

7    qualify as §854(b)(1) benefits; indeed, there are categories of "benefits" that inure to the

8    Joint Applicants and their shareholders but that confer real and serious *harms* to ratepayers,

9    to employees, and to the California economy.

10

11    Obviously, synergy gains inuring to Verizon ILECs other than Verizon California and

12    Verizon West Coast, or to MCI's operations outside of California, would not qualify as

13    §854(b)(1) benefits to *ratepayers*, as well as those to be realized by other Verizon or MCI

14    affiliates not subject to the CPUC's ratemaking authority, such as Verizon Wireless.  With

15    respect to those "benefits" arising within California and where the Commission has

16    ratemaking authority, ratepayers would realize some portion of such benefits only

17

18    (a)  where the post-merger entity is specifically required (by order of the Commission) to

19        flow such benefits through to ratepayers in the form of rate reductions that might not

20        otherwise have taken place; or

21

22    (b)  where the post-merger Verizon/MCI entity is compelled by competitive marketplace

23        forces to make downward adjustments in its prices (for services for which the

10

**REDACTED – PUBLIC VERSION**

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1       Commission has ratemaking authority) to reflect cost decreases or other efficiency gains

2       arising from the merger.

3

4       So, for example, if the merger were to result in an increase in economies of scale for the

5       merged entity relative to that available to each company on a stand-alone basis, or were to

6       reduce the prices of capital equipment purchased by the merged entity relative to the supplier

7       prices that would available to Verizon or MCI standing alone, such gains would qualify as

8       § 854(b)(1) merger benefits if and only if some portion of those gains were flowed through to

9       *ratepayers* in some identifiable manner.  If the cost decreases or other efficiency gains are

10      retained by the merged entity, or are flowed to activities over which the Commission does

11      not have ratemaking authority (e.g., in other states or to affiliates that do not offer services to

12      "ratepayers" in California), no § 854(b)(1) benefits will have been produced by the merger.

13      In fact, it is entirely possible for Verizon and MCI to derive a net positive benefit from a

14      merger (e.g., higher revenues resulting from increased market power) that produces

15      decidedly *negative* impacts (e.g., higher rates) for ratepayers.  I discuss this in more detail

16      below.

17

18  Q.  When assessing the economic benefits to ratepayers, does it make sense to look only at the

19      upside impact of the merger for ratepayers and not the downside?

20

21  A.  Absolutely not.  As I discuss at length beginning at pages 23  and 25, the merger will likely

22      also produce economic harm to ratepayers in several important respects.  Those "negative

23      benefits" must be considered and offset against potential positive benefits in making the

11

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L.  SELWYN

1    required §854(b)(1) finding.   Moreover, forecasts of positive economic benefits of the

2    merger, such as those sponsored by the Joint Applicants, must be offset by a valid economic

3    assessment of the potential risks to both the merging parties and to California ratepayers

4    arising from the transaction.

5

6    **California ratepayers are to receive "not less than 50 percent" of the total short-term and**
7    **long-term forecasted economic benefits of the proposed merger where the Commission has**
8    **ratemaking authority.**
9

10   Q.   § 854(b)(2) requires that prior to approving the merger, the Commission must find that the

11        proposed transaction "equitably allocates, where the Commission has ratemaking authority,

12        the total short-term and long-term forecasted economic benefits ... of the proposed merger,

13        acquisition or control, between shareholders and ratepayers.  Ratepayers shall receive not less

14        than 50 percent of those benefits."  Are the "economic benefits" referred to at § 854(b)(2) the

15        same as those mentioned at §854(b)(1)?

16

17   A.   Clearly, the "economic benefits to ratepayers" referred to at §854(b)(1) are not independent

18        of the "economic benefits to ratepayers" referred to at §854(b)(2) – the sole distinction being

19        that § 854(b)(2) limits the specific measurement of "not less than 50 percent" to the

20        economic benefits arising from those portions of the merged entity's activities "where the

21        Commission has ratemaking authority."

22

23   Q.   What are "short-term" vs. "long-term" economic benefits, as these terms are used in the

24        legislation?

12

ＥＴＩ ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L.  SELWYN

1  A.  Generally, economists understand "short-term" to refer to a time period in which significant

2      portions of a firm's costs are fixed, whereas in the "long-term" all costs are presumed to be

3      variable.  Another way of distinguishing "short-term" from "long-term" in the context of a

4      merger is to think of "short-term" as referring to the transition period during which the

5      combined company is being reorganized and restructured so as to *implement* the merger,

6      activities that often entail considerable cost, whereas "long-term" would refer to the period

7      following the completion of these "merger implementation" efforts, when the *permanent*

8      synergy and other efficiency gains can be fully realized.  In past merger decisions, the CPUC

9      has attempted to distinguish between these two time frames on the basis of current vs.

10     anticipated future industry or market conditions.  For example, the Bell Atlantic/GTE

11     merger, the companies offered a similar rationale based upon competition, and distinguished

12     between the two time frames by arguing that "short-term" meant two to three years, and that

13     "long-term" meant four years.[4]  Beyond four years was beyond long-term. In the SBC/Telesis

14     merger, the Commission accepted the companies' argument that "long-term" referred to a

15     time when there would be sufficient competition in the California telecommunications

16     marketplace such that competitive marketplace forces would assure that the specific

17     efficiency gains arising from the merger would be provided to ratepayers.[5]

18

---

4.  *Joint Application of GTE Corporation ("GTE") and Bell Atlantic Corporation ("Bell Atlantic") to Transfer Control of GTE's California Utility Subsidiaries to Bell Atlantic*, Application No. 98-12-005, *Bell Atlantic/GTE Merger Application*, Supporting Report, Chapter 7, at 6.

5.  *SBC/Pacific Telesis Merger Order*, at 374-375.

13

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    The correct view of "long-term" and of the "long-term economic benefits" must be that

2    which the Joint Applicants have themselves adopted for purposes of their own due diligence

3    and projections of merger-driven synergies.  These projections have been widely publicized

4    in Applicants' press conferences, SEC filings, and analyst briefings on the Merger, venues in

5    which Verizon and/or MCI, and their officers and directors personally, could face severe

6    punishment for knowingly making false statements.  A reasonable interpretation of "short-

7    term" for this purpose would be the period of time required to fully implement the merger

8    itself, which the Applicants here have identified as approximately three years.[6]  The statutory

9    requirement that ratepayers receive both short-term and long-term economic benefits implies

10   that (a) during the immediate post-closing implementation period, the net benefits to

11   ratepayers must exceed the up-front implementation costs, and (b) that for the long-term

12   ratepayers receive not less than 50 percent of the economic benefits for those aspects of the

13   post-merger Verizon's activities that fall within the Commission's ratemaking authority.

14

15   Q.  But what if the competitive marketplace is capable of assuring that the ratepayer allocation of

16       long-term merger benefits will flow to ratepayers – is it still necessary for the Commission to

17       view the long-term as extending indefinitely?

18

19   A.  Yes.  The Commission first needs to identify the total short-term and long-term economic

20       benefits of the merger that fall within the Commission's ratemaking authority.  It would then

---

6.  *Verizon/MCI investor Conference Call,* February 14, 2005, ( *"February 14, 2005 Investor Conference Call"*), slide exhibit at 28, available at: http://investor.verizon.com/news/20050214/, (accessed July 12, 2005).

14

ＥＴ ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  need to formulate a process to assure that the statutory requirement that "not less than 50

2  percent" of those benefits are allocated to ratepayers will be satisfied, either through explicit

3  credits or through some other means.  If the Commission expects, as it has in the past, that

4  competitive marketplace forces will be sufficient to assure flow-through to ratepayers, it

5  nevertheless needs to establish a self-executing fall-back position to assure such flow-

6  through in the event that the expected competition fails to develop.

7

8  Q.  Is it reasonable for the Commission, at this time and at this stage of the development of

9      competition in the California telecommunications market, to assume that competitive

10     marketplace forces will assure that the requirements of § 854(b)(2) are satisfied?

11

12 A.  No.  The one consistent *fact* characteristic of the post-TA96 telecommunications industry is

13     that virtually none of the optimistic expectations as to the development of competition have

14     been fulfilled.  CLCs have gone bankrupt or otherwise exited the market in droves; billions

15     of dollars invested in new telecommunications ventures over the past decade have been lost;

16     and there is very little capital available to finance new telecom ventures going forward.

17     Indeed, this merger, together with the concurrent proposed merger of SBC and AT&T,

18     essentially brings to a close the nation's experiment with a competitive telecommunications

19     marketplace.  With Verizon about to swallow up one of its largest rivals and with SBC about

20     to absorb its largest competitor, and given the demonstrated unwillingness of Verizon and

21     SBC to compete with each other, there is simply no realistic basis for the Commission to

22     expect – or, more importantly, for it to *assume* – that competitive marketplace forces will

23     assure that the explicit statutory requirement of § 854(b)(2) is satisfied.

15

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  Q.  Are there any potential "benefits to ratepayers" that would fall within the scope of

2     § 854(b)(1) where the Commission does *not* have ratemaking authority?

3

4  A.  Yes.  Benefits relating to *interstate* services furnished to Verizon California and MCI

5     ratepayers may be considered with respect to § 854(b)(1) even though they fall outside of the

6     scope of § 854(b)(2).  However, benefits inuring to the merged entity outside of California,

7     or to its shareholders or nonregulated affiliates, are not "benefits to ratepayers" and thus

8     cannot be included within either the § 854(b)(1) or § 854(b)(2) analysis.

9

10 **The "economic benefits" justifying the merger referred to at §854(b)(1) and the "economic**
11 **benefits" that must be shared with ratepayers referred to at §854(b)(2) are, in virtually all**
12 **respects, the same, and as such the Commission should adopt a consistent basis for assessing**
13 **§854(b)(1) and §854(b)(2) "economic benefits to ratepayers."**
14

15 Q.  Do you understand §854(b)(1) and §854(b)(2) to be referring to the same "total short-term

16    and long-term economic benefits to ratepayers"?

17

18 A.  Yes, except that the "allocation" requirements of such benefits at §854(b)(2) is limited to

19    those aspects of the combined company's operations "where the Commission has ratemaking

20    authority."  Thus, not less than 50 percent of whatever "short-term and long-term economic

21    benefits to ratepayers" that the Joint Applicants proffer as satisfying §854(b)(1) must be

22    allocated to ratepayers in those cases where the Commission has ratemaking authority – i.e.,

23    with respect to *intrastate* wireline telecommunications services.

24

16

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  Q.  Do the Joint Applicants appear to be treating the "economic benefits" applicable to those two

2      PU Code sections as referring to the same types of benefits?

3

4  A.  No.  In fact, the Joint Applicants present an extremely expansive, albeit largely unquantified,

5      assessment of §854(b)(1) "economic benefits" while simultaneously adopting an

6      extraordinarily narrow view of what qualifies as a "short-term and long-term economic

7      benefit" subject to § 854(b)(2).

8

9      In their Application and accompanying declarations, the Joint Applicants attempt to portray a

10     litany of fundamentally "soft" benefits, things like improved service quality,[7] increased

11     innovation, and claims that following the merger Verizon will gain the ability to compete

12     more effectively out-of-region for enterprise customers, thereby contributing to a more

13     competitive telecommunications marketplace overall.[8]

14

15 Q.  Why do you characterize these as "soft" benefits?

16

17 A.  Several reasons.  First, they are highly general in nature, and are certainly not linked

18     specifically to any identified or identifiable current deficiency in either Verizon or MCI.  For

19     example, the Joint Applicants claim that the merger will produce "improved service

---

7.  The Reply Testimony of Dale Piiru on behalf of ORA details the effect of the proposed merger on service quality.

8.  See, e.g. *Application*, at 22; *McCallion Declaration*, at paras. 6, 10, 16-22.

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

1    quality."[9]  That improvement would constitute an "economic benefit" for California

2    ratepayers only to the extent that the *existing* service quality for services furnished by

3    Verizon or MCI in California today is less than satisfactory.  The Joint Applicants have not

4    contended that existing service quality is in any way unsatisfactory – certainly not

5    specifically with respect to services subject to the Commission's ratemaking authority – nor

6    have they provided any *specific* details as to how the merger will improve service quality *in*

7    *California* for *California ratepayers*.  Indeed, the Joint Applicants have offered no specific

8    quantification of the short-term and long-term economic benefits of the claimed service

9    quality improvements that they seek to ascribe to the proposed merger.

10

11   Similarly, as I discuss in more detail below, the Joint Applicants claim that the merger will

12   result in increased innovation,[10] but make little attempt to associate any specific and tangible

13   "economic benefit" with this claim.

14

15   Q.  Can the two different ways in which the Joint Applicants treat "economic benefits" be

16        reconciled?

17

18   A.  No.  The Joint Applicants treat the concept of "economic benefits" very expansively for

19        purposes of §854(b)(1) and very restrictively for purposes of §854(b)(2), when, plainly, these

20        two sections share a common definitional framework.  If the benefits are as limited as the

---

9.  *McCallion Declaration*, at para. 47.

10. *Application*, at 33.

18

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                      LEE L.  SELWYN

1    Joint Applicants contend under §854(b)(2), then there is no basis to approve the merger; if

2    the economic benefits are as broad as the Joint Applicants contend under §854(b)(1), then

3    they must be made to quantify each and every one of the "soft" benefits they claim in support

4    of the merger and to flow 50% of those benefits through to ratepayers.

5

6    **§854(b)(3) requires the Commission to find that the merger will "not adversely affect**
7    **competition," but in fact the merger will significantly increase Verizon's market power and**
8    **market concentration overall, and will result in decidedly less competition in the California**
9    **telecommunications market.**
10

11   Q.   Dr. Selwyn, § 854(b)(3) requires the Commission to find that the proposed merger will "[n]ot

12        adversely affect competition" in the California telecommunications market.  What type of

13        analysis should the Commission pursue in addressing that concern?

14

15   A.   There are several specific means by which the merger may affect competition in the

16        California telecommunications market.  These can be summarized as follows:

17

18   •    Where Verizon and MCI compete with one another in the same relevant product market,

19        the merger would eliminate the competition between the two firms and in so doing

20        increase market concentration overall.  These "horizontal" effects would diminish

21        competition if the combination of the two firms produced a significant increase in

22        market power overall.  The US Department of Justice/Federal Trade Commission

23        *Horizontal Merger Guidelines* address this concern at §§ 1.1 through 1.5, and provide

24        specific tests to test whether the net increase in market concentration arising from the

25        merger raises concerns that the combined entity will be able to implement a "small but

19

**REDACTED – PUBLIC VERSION**

ET ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    significant and nontransitory" increase in price without losing so much demand as to

2    make the price increase unprofitable.[11]

3

4    •    Where the merger creates the potential – or an increased potential – for the combined

5         company to leverage its market power in one industry segment to monopolize an

6         adjacent but otherwise competitive segment.

7

8    •    Where *vertical integration* eliminates competing providers of wholesale services while

9         at the same time creating or expanding the potential for the combined firm to engage in

10        price squeezes vis-a-vis rival but non-vertically integrated providers.

11

12   The analysis of competitive impacts must thus address both *horizontal* and *vertical* effects

13   and, in fact, the proposed merger will almost certainly result in decreased competition across

14   a broad range of industry segments.   I address these impacts in detail beginning at page 67 of

15   this testimony.

---

11.  U.S. Department of Justice and the Federal Trade Commission, *Horizontal Merger Guidelines*, ("*Horizontal Merger Guidelines*') available at: http://www.usdoj.gov/atr/public/guidelines/horiz_book/hmg1.html (accessed July 12, 2005).

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1          THE FALLACY OF JOINT APPLICANTS' MERGER BENEFIT CLAIMS

2

3    **Virtually all of the "benefits" identified by the Joint Applicants will inure to the post-**
4    **merger Verizon and its shareholders, and the *de minimis* share to be allocated to California**
5    **ratepayers will not be sufficient to offset the substantial risks and harms that will inevitably**
6    **arise from the proposed transaction.**

7

8    Q.   In the prior section, you suggested that benefits inuring to the Joint Applicants could not  be

9         assumed to translate into economic benefits for ratepayers and that, in fact, ratepayers might

10        be harmed by this merger; how might this happen?

11

12   A.   MCI is one of Verizon's largest competitors for mass market local and long distance services

13        in California.  MCI provided (as of January, 2005) retail local exchange services to some

14        <<BEGIN VZ/MCI PROPRIETARY          END VZ/MCI PROPRIETARY>> residential

15        local customers in Verizon's California operating territory, and <<BEGIN VZ/MCI

16        PROPRIETARY          END VZ/MCI PROPRIETARY>> statewide.[12]  These statewide

17        subscribers represent approximately <<BEGIN VZ/MCI PROPRIETARY          END

18        VZ/MCI PROPRIETARY>> of all CLC mass market customers.[13]

---

12.  *Hallbach Declaration*, at 18.

13.  According to the FCC's July 2005 Local Competition Report (FCC Industry Analysis and Technology Division, *Local Telephone Competition: Status as of December 31, 2004*, Rel. July 2005, ("*Local Competition Report*"), at Table 8) California has 3,905,815 CLC end user lines.  Table 11 indicates that 67% of CLC's end under lines in California are provided to residential customers.  I have estimated, therefore, that there are 2,616,896 CLC residential access lines in California.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    MCI also provides (interLATA) long distance service to some <<BEGIN VZ/MCI

2    PROPRIETARY ▨ END VZ/MCI PROPRIETARY>> California residential

3    subscribers,[14] and even competes with Verizon for *intraLATA* toll service.  The merger will

4    eliminate MCI as a separate entity, and in so doing eliminate the competition that presently

5    exists between Verizon and MCI.  If, as a result of the increase in market concentration, the

6    post-merger Verizon is able to implement a significant and non-transitory increase in rates

7    without losing so much business as to make the rate increase unprofitable – the specific

8    guideline established in the US Department of Justice/Federal Trade Commission *Horizontal*

9    *Merger Guidelines*[15] – that action would obviously produce a net benefit to the post-merger

10   Verizon in the form of increased profits, but would clearly create a decidedly *negative* result

11   for those ratepayers who would be subjected to the price increase.

12

13

14

15

16

---

14.  Hallbach Declaration, at para 18 (figure is the sum of stand alone long distance and integrated local/long distance subscribers in SBC and Verizon's California regions).

15.  *Horizontal Merger Guidelines.*

22

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  **The merger will likely produce other economic harms to ratepayers, and those "negative**
2  **benefits" must be considered and offset against potential positive benefits in making the**
3  **required § 854(b)(1) finding.**
4

5  Q.   Aside from the negative impacts on competition, how else might the merger result in

6        economic harm ("negative benefits") for ratepayers?

7

8  A.   The merger could lead to an overall increase in the rates consumers pay for services subject

9        to the Commission's ratemaking authority, even if in aggregate the merger produces positive

10       economic benefits to the two merging companies.  For example, following its acquisition of

11       Pacific Telesis Group, SBC began imposing an annual "royalty fee" on Pacific Bell (SBC

12       California) for SBC California's use of SBC trademarks.  In 2003, that royalty fee amounted

13       to $367-million.[16]  Were Verizon to impose a similar type of fee upon MCI's operations in

14       California, the costs booked to MCI's California operations might well increase by more than

15       any "synergy" gain resulting from the merger, the net effect of which could materialize in the

16       form of higher rates for California ratepayers.

17

18       Also, if as the result of its acquisition of MCI, Verizon experienced a downgrade of its credit

19       rating, this would increase the cost of capital for Verizon and its BOC ILEC subsidiaries,

20       which could well have a short- and long-term adverse economic impact on California

21       ratepayers.

22

---

16.  *Report on the Results of Operations of Pacific Bell*, 2003, at Section C, 1.

23

**REDACTED – PUBLIC VERSION**

ETI  ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1  Q.  Is this something that the Joint Applicants have anticipated?

2

3  A.  Apparently they have, though they do not appear to have discussed it in their application, or

4      at any length in their Board of Directors meetings.  As I discuss in detail later,  Verizon

5      identified several probable credit impacts that would result following its acquisition of

6      MCI.[17]  These projections are contrary to the impression left by Ms. Hallbach in her

7      Declaration dated April 21, 2005.  Ms. Hallbach stated,

8          The combined company will be in a strong financial position to invest in the existing IP
9          network at a lower cost of capital than MCI could obtain on its own.  This increased
10         investment will enable the new company to increase network capacity, extend network
11         reach, and add new capabilities to the network.[18]
12

13     Although Ms. Hallbach's statement regarding cost of capital is probably correct with respect

14     to MCI, it does not and cannot be applied to the *combined firm*.

15

16  Q.  How might this adversely impact California ratepayers with respect to services subject to the

17      Commission's ratemaking authority?

18

19  A.  If the downgrading of Verizon credit rating raised Verizon's overall cost of capital, it could

20      also affect Verizon California's cost of capital which, in turn, may ultimately translate into

21      an increase in Verizon California rates.  For example, Verizon California's intrastate rate

---

17. See page 48, *infra*.

18. *Hallbach Declaration*, at para. 61.

24

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED – PUBLIC VERSION**

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1   base is currently approximately $2.4-billion.[19]  An increase of just 10 basis points in its

2   overall cost of capital would translate into a $2.4-million annual cost increase, which would

3   exceed the annual "California synergy" that the Joint Applicants have attributed to the

4   merger.

5

6   **The Joint Applicants' contention that the merger will promote innovation and R&D, and**
7   **that these improvements will be more rapidly flowed through to ratepayers, cannot be**
8   **squared with the overall increase in market concentration that will result if the two**
9   **companies are allowed to combine.**
10

11  Q.  Are the Joint Applicants' claims with respect to increased innovation even credible?

12

13  A.  Hardly.  First, the claims being advanced in this area are extremely general and unspecific.

14      As noted by Dr. Rubinfeld, "Because the two companies have not had the opportunity to

15      produce any joint business plans, any predictions regarding innovation must be considered

16      tentative."[20]  However, he goes on to claim that the merger will "regardless" allow Verizon

17      and MCI to more quickly offer innovative services to a larger customer base than they would

18      be able to separately.[21]

19

20  Q.  Do these claims have merit?

21

_____

19. *Report on the Results of Operations of Verizon California*, Year 2004, W/P 2-1.

20. *Rubinfeld Declaration*, at 84-85.

21. *Id.*

25

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  A.  No, *because competition, and not scale of operations, is a far more potent driver of*

2      *innovation*.  Moreover, the time interval between basic R&D and the introduction of products

3      and services based upon into the marketplace will be significantly shorter where the firm

4      confronts competition (which is presumably also engaged in similar R&D efforts) than where

5      the firm faces few or no rivals, in which case its incentives to bring new products to market

6      are significantly diminished.  Indeed, the very notion that merging two firms that currently

7      compete on a broad scale will *increase* their incentives to innovate and introduce new

8      services is highly counterintuitive.  There is an extensive amount of academic literature

9      addressing this very subject, and the persistent and overwhelming conclusion is the same –

10     competition drives innovation.[22]

11

12 Q.  Is there any specific, identifiable correlation between innovation and competition?

13

14 A.  Yes.  Certainly this rather obvious relationship has been demonstrated any number of times

15     right here in California.  The first serious personal computer – the Apple II – was created by

16     a couple of entrepreneurs in a garage in Cupertino.  Responding to this potential competitive

17     challenge to its (then-dominant) position in the computer industry, IBM entered the PC

18     market a few years later, but even its size and incumbency were no match for numerous other

19     start-ups that adopted the IBM PC architecture, soon making IBM a minor player in the PC

20     field.  Most of the major Internet-related innovations came from small start-up ventures –

_____

22.  *See, e.g.,* Wendy Carlin, *et al., A Minimum of Rivalry: Evidence from Transition Economies on the Importance of Competition for Innovation and Growth*, Contributions to Economic Analysis & Policy, Vol. 3, Number 1, 2004, Article 17.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1    many of which were also located in California – certainly not from large, established firms.

2    Countless examples of such innovations can be cited – things like routers, browsers,

3    streaming audio and video, search engines, and the engines supporting electronic commerce.

4    Many of these innovations were ultimately adopted by the larger incumbents, either via

5    acquisition of the start-up firm or through imitation of the start-up's technology.  For

6    example, the first major Internet browser, Netscape, was created by a start-up firm in Ann

7    Arbor, Michigan.  Microsoft then developed its own browser, Internet Explorer, replicating

8    most of the features of Netscape.  Lotus Development Corporation, a Cambridge,

9    Massachusetts start-up, introduced the first spreadsheet software for IBM PC computers,

10   Lotus 1-2-3.  Microsoft then imitated the Lotus product with its Excel spreadsheet software,

11   and IBM entered the spreadsheet software market by acquiring Lotus.

12

13   The telecommunications industry is similarly replete with examples of innovations

14   emanating from start-ups rather than from incumbents.  AT&T, for example, did not replace

15   its coaxial cable and microwave long lines network with digital fiber optic technology until it

16   was forced to do so by competing IXCs, such as Sprint (over whose network one could hear a

17   "pin drop").  ILECs generally did not deploy ADSL in the consumer market until forced to

18   do so by cable television providers' introduction of cable modem Internet access.  In fact,

19   ILECs were generally slow to expand their local networks to accommodate large-scale dial-

20   up Internet access, ceding much of the market for ISP-bound dial-up traffic to CLCs.  Indeed,

21   even today, ILECs generally do not offer DSL services *except in connection with Internet*

22   *access* – for example, as substitutes for DS-1 or higher bandwidth data circuits furnished to

27

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L.  SELWYN

1    enterprise customers[23] – since the lower-priced DSL would effectively cannibalize these

2    other services and result in lower ILEC revenues overall.  Most recently, VoIP services were

3    introduced by start-ups such as Vonage and Packet8, only to be subsequently adopted by

4    Verizon, MCI, Comcast, and other large telecommunications and cable providers.

5

6    Q.   You're not suggesting, are you, that MCI should be viewed as a "start-up" firm that Verizon

7         wants to acquire in order to gain access to its technology?

8

9    A.   No, of course not.  My point is that it does not follow that joining MCI's and Verizon's R&D

10        efforts will *necessarily* lead to increased innovation or, even if it did, to a more rapid

11        deployment of those developments into the end-user market.  Inasmuch as Verizon is some

12        eleven times the size of MCI (in terms of market capitalization),[24] the fact that the much

13        smaller MCI has somehow been more innovative than the much larger Verizon is itself a

14        compelling demonstration that Verizon's *scale* has not been as effective a driver for R&D

15        progress as has MCI's need to remain on the cutting edge in order to be competitive with

16        Verizon and its sister RBOCs.

17

---

23.  *See*, Federal Communications Commission, *Review of Regulatory Requirements for Incumbent LEC Broadband Telecommunications Services*, CC Docket No. 01-337, *Comments of the Ad Hoc Telecommunications Committee*, March 1, 2002, at 23-28.

24.  Verizon's market capitalization (as of July 28, 2005) was $95.7-billion.  MCI's market capitalization as of the same date was $8.3-billion.

28

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                              LEE L.  SELWYN

1  Q.  But don't the Joint Applicants claim that they will be able to devote more resources – spend

2       more money – on research and development, and benefit from economies of scale in research

3       and development, following the merger?

4

5  A.  Yes.  That is their contention.  However, what drives innovation is creativity and necessity;

6       massive corporations are frequently slow to innovate because whatever gains they may

7       achieve through large-scale R&D efforts are often frustrated by organizational and

8       institutional inertia typical of many large corporations.  It's no surprise that some of the most

9       important inventions of the 19th and 20th centuries – the telephone, the electric light bulb,

10      the airplane, and more recently, the personal computer and some of the most important

11      application layer developments on the Internet (e.g., online auctions, online shopping, search

12      engines, job-matching, streaming audio and video, classified advertising services) came from

13      small start-up firms and *not* from the established incumbents in corresponding pre-Internet

14      businesses (such as auction houses like Sotheby's, department stores and catalog shopping

15      firms like Sears,[25] bookstores like Barnes & Noble, newspapers, and radio and TV

16      broadcasters and networks).  These larger firms ultimately jumped onto the Internet

17      bandwagon, but were certainly *not* the initial innovators.

---

25.  Significantly, Sears was an early entrant into the pre-Internet online service field with Prodigy, which began as a joint venture of Sears and IBM.  Despite its two powerful parents, Prodigy's technology and customer base was rapidly marginalized by start-ups such as America Online and by the Internet.  Sears and IBM dumped the company in 1996, and several years later, in 2001, it was purchased by SBC, but SBC no longer even uses the Prodigy brand name for its Internet services, and in fact does not appear to even offer high-speed (DSL-based) Internet service (now under the SBC Yahoo!  brand name) outside of its 13-state footprint.  *See* http://www.sbc.com/gen/general?pid=1080&cdvn=localize&prod-snip=dsl_res_order (accessed June 26, 2005).

29

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    As competitors across a broad range of services, Verizon and MCI confront strong incentives

2    to develop new products and to bring them to market quickly, even where that requires

3    additional capital investment.  Once that rivalry is eliminated, those incentives will likewise

4    diminish.  Hence, claims that the merger will promote innovation and speed-to-market are, at

5    best, highly speculative, and are more likely, simply wrong.

6

7    Finally, *ratepayers* derive benefit from product development and innovation only to the

8    extent that such new products and services are actually brought to market quickly.  Any

9    number of studies have shown that firms that confront significant levels of competition are

10   able to bring new products/services to market far more quickly than firms with no or little

11   competition.[26]

12

---

26.  *See, e.g.,* Jeffrey B. Schmidt, *New Product Myopia*, Journal of Business and Industrial Marketing, Vol. 10, Number 1, 1995, at 31; B.J. Zirger and Janet L. Hartley, *The Effect of Acceleration Techniques on Product Development Times*, Transactions on Engineering Management, Vol. 43, Number 2, 1996.

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

1  **The merger is not likely to produce the increased out-of-region competition predicted by the**
2  **Joint Applicants, and it could result in decidedly less competition if post-merger Verizon**
3  **and post-merger SBC continue to follow their two-decades-long pattern of tacit geographic**
4  **market allocation.**
5

6  Q.  Another "benefit" being claimed by the Joint Applicants is the combined firm's increased

7      ability to compete more effectively in the *out-of-region* enterprise market.  Does that qualify

8      as a §854(b)(1) "economic benefit to ratepayers" in California?

9

10 A.  No, decidedly not.  As I will discuss at greater length below, it is not at all clear that the

11     merger will actually enhance Verizon's ability to compete out-of-region rather than simply

12     transfer MCI's existing enterprise customers over to Verizon, in which event the merger will

13     result in *less competition overall*, not more.  In any event, even if the merger were to create

14     increased opportunities for the *combined firm* to compete outside of Verizon's region –

15     opportunities that do not exist *for either Verizon or MCI today* – there is no obvious linkage

16     between Verizon's ability to attract additional enterprise business outside of its footprint

17     (most of which is outside of California) and any "short-term and long-term economic

18     benefit" to *California* ratepayers.[27]  And if the basis for these improved opportunities for

19     Verizon in out-of-region enterprise markets stems from removing MCI as a competitor, then

---

27.  Some might argue that if Verizon does compete out-of-region and is able to increase the size of its customer base overall, California ratepayers would benefit from the resulting scale efficiencies.  Given Verizon's current size, it's difficult to see how an incremental increase in the number of customers would materially change the overall scale of its operations or reduce its average cost of providing service to customers *in California*.  Moreover, if that argument had any merit, then from a public policy perspective *scale* would always take precedence over *competition*, which would argue for a regulated natural monopoly market outcome rather than a competitive market outcome as the central public policy goal.

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1     such a decrease in competition can hardly qualify as a short-term or long-term economic

2     benefit to California ratepayers – or to any ratepayers, for that matter.

3

4  Q.  But haven't the wireless affiliates of SBC and Verizon been competing directly with each

5     other out-of-region and, if so, doesn't that refute your contention that the RBOCs do not

6     compete against each other?

7

8  A.  The RBOCs' various wireless affiliates do compete with one another, but that does not alter

9     the fact that the RBOCs have never competed and are unlikely to compete against each other

10    in any *wireline* sector.  RBOC-affiliated wireless carriers currently serve about 60% of

11    wireless customers nationwide.  The remaining share are being served by non-RBOC

12    carriers, such as Sprint-Nextel, T-Mobile, Alltel, Centennial, and others.  Up until its

13    absorption into Cingular, AT&T Wireless also competed against RBOC-affiliated wireless

14    carriers.  With five or six carriers serving most major markets, it would have made no sense

15    for Verizon or SBC to voluntarily forbear from competing out-of-region, since that would

16    have resulted in their simply ceding customers to non-RBOC rivals.  This is clearly not the

17    case in a market that is a duopoly or at most a tight oligopoly.  SBC and Verizon each have a

18    virtual monopoly over special access within their respective footprints, and can dictate the

19    terms of entry into the enterprise market to any other competitor.  If Verizon and SBC tacitly

20    agree to concentrate on enterprise customers whose primary demand is within their

21    respective footprints, they can exclude rival carriers and maintain prices at supracompetitive

22    levels indefinitely.  There is no parallel in the wireless sector, because there the RBOCs have

23    no ability to dictate terms of entry for rival wireless carriers.

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                        LEE L.  SELWYN

1    **Having grossly exaggerated the various "soft" benefits they seek to attribute to the merger**
2    **in order to satisfy §854(b)(1), the Joint Applicants then seek to affirmatively *exclude* the**
3    **vast majority of such "economic benefits" subject to the Commission's ratemaking**
4    **authority for purposes to the "not less than 50 percent" allocation to ratepayers as required**
5    **by §854(b)(2).**
6

7    Q.   Has the Joint Applicants' "economic benefits" assessment included all of the services where

8        the Commission has ratemaking authority?

9

10   A.   No.  The various "soft" benefits described in the Joint Application and supplemental

11       Application are being ascribed across a broad range of the merged entity's business activities,

12       which (presumably) embraces all of the Verizon and MCI California operations including

13       Verizon California, Verizon West Coast, Verizon Long Distance, Verizon Avenue

14       Corporation, Verizon Select Services, Inc., Verizon Wireless, and all of the various MCI

15       subsidiaries that operate in the state.  However, for purposes of §854(b)(2), the Joint

16       Applicants present a specific quantification of "California forecasted synergies" that are

17       limited solely and specifically to the California intrastate operations of Verizon's ILEC

18       operating affiliate, Verizon California.

19

20   Q.   What rationale do the Joint Applicants offer for their position that §854(b)(2) economic

21       benefits are to be confined solely to synergy gains arising within Verizon California?

22

23   A.   According to Joint Applicants' witness Timothy J. McCallion, President – Pacific Region, of

24       Verizon Corporate Services Group Inc., "Verizon Long Distance, Verizon Avenue

25       Corporation, Verizon Select Services, Inc., as well as all of MCI's operating subsidiaries, are

33

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1    exempted from Section 854(b) because they are engaged in competitive businesses as to

2    which the Commission does not exercise the same type of ratemaking authority as it does

3    with respect to incumbent local exchange carriers."[28]  Mr. McCallion goes on to opine that

4    Verizon West Coast – which like Verizon California is also an incumbent local exchange

5    carrier – "is also exempted from Section 854(b) because it does not have gross annual

6    revenues exceed five hundred million dollars."[29]

7

8   Q.   Do you agree with what seem to be these legal opinions being advanced by Mr. McCallion?

9

10  A.   While I am not an attorney and do not offer a legal opinion, on its face the basis for Mr.

11       McCallion's belief that all of the Verizon and MCI entities other than Verizon California are

12       "exempted from Section 854(b)" seems to stem from a misleading misreading of the

13       statutory language "where the Commission has ratemaking authority" to instead be stating

14       "where the Commission exercises the same type of ratemaking authority as it does with

15       respect to incumbent local exchange carriers."  Of course, that is decidedly *not* what

16       §854(b)(2) says.  In fact, the Commission *has* ratemaking authority over most intrastate

17       telecommunications services, although it does not presently regulate rates for many

18       putatively "competitive" services.  The Commission does not have ratemaking authority with

19       respect to wireless (CMRS) services,[30] such as those furnished by Verizon Wireless, so

---

28.  *McCallion Declaration*, at 15-16.

29.  *Id*., at 16.

30.  47 U.S.C. §332(c)(3)(A).

34

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1   economic benefits of the merger arising within Verizon Wireless are not subject to

2   §854(b)(2).  However, the Commission clearly "has ratemaking authority" over the

3   California intrastate services offered by Verizon Long Distance, Verizon Avenue

4   Corporation, and Verizon Select Services, Inc., and any other Verizon and MCI affiliates that

5   provide California intrastate services, and as such the synergy gains arising within each and

6   all of these entities – insofar as their intrastate operations are concerned – fall squarely and

7   unambiguously within the scope of §854(b)(2).

8

9   Q.   What about Verizon West Coast – is Mr. McCallion correct that it is "exempted from Section

10       854(b) because it does not have gross annual revenues exceeding five hundred million

11       dollars"?

12

13  A.   I will leave it to learned counsel to debate that question.  However, I would make several

14       observations that are relevant to such a debate.  First, it seems highly unlikely – if not

15       unthinkable – that in enacting §854 the California Assembly would have intended large

16       utilities to escape the application of the statute merely by splitting themselves up into

17       multiple subsidiaries or by maintaining multiple separate corporate entities following a

18       merger or acquisition.  Mr. McCallion, for example, states that his position is "President –

19       Pacific Region," which would certainly suggest that his responsibility extend to Verizon

20       entities other than Verizon California, Inc.  Mr. McCallion's employer – Verizon Corporate

21       Service Group Inc. – provides various corporate service functions to both Verizon California,

22       Inc. and to Verizon West Coast.  These putatively separate "companies" have 100% common

35

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                           LEE L.  SELWYN

1    ownership and at least some common management.  Thus, as a *policy* matter, I see no basis

2    for walling off Verizon West Coast from inclusion within the scope of §854(b)(2).

3

4  Q.  How does Verizon's position on the scope of §854(b)(2) compare with that being advanced

5    by SBC and AT&T in A.05-02-027 – the SBC/AT&T Merger Application?

6

7  A.  Interestingly, the two pairs of Joint Applicants have advanced exactly opposite positions on

8    this issue.  While both SBC/AT&T and Verizon/MCI argue that §854(b) does not apply in

9    the first place, their positions as to §854(b)(2) – assuming that §854(b) does apply – are

10    directly at odds with each other.  As I have noted, Verizon/MCI take the position that *only*

11    Verizon's ILEC operations within Verizon California, Inc. may be considered for allocation

12    of economic benefits to ratepayers, and that the other Verizon and MCI entities, which

13    provide only *competitive* services over which the Commission does not *exercise* ratemaking

14    authority, are "exempted" from §854(b)(2).  SBC/AT&T, in stark contrast, take the position

15    that *only* the various AT&T entities that provide intrastate services within California are

16    subject to §854(b)(2), making no mention of the issue of whether the services being

17    furnished by AT&T in California are "competitive" or whether or not the Commission

18    currently "exercises" ratemaking authority, but that SBC California (Pacific Bell) is *not*

19    subject to §854(b)(2) because it is not specifically involved in the merger transaction – i.e.,

20    AT&T is being acquired by the SBC parent company, not by SBC California (Pacific Bell),

21    so there is no "change of control" affecting SBC California (Pacific Bell).

22

36

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    SBC/AT&T thus appear to concede that if §854(b) applies to their transaction, then the

2    Commission does have ratemaking authority over AT&T's California operations; in contrast,

3    Verizon/MCI appear to concede that if §854(b) applies to their transaction, the Commission

4    has ratemaking authority with respect to Verizon California, Inc., but that because it does not

5    "exercise" ratemaking authority with respect to MCI or the other Verizon entities, they are all

6    "exempted" from §854(b)(2).  Clearly, both cannot be correct.

7

8  Q.  What is the "correct" answer as to the scope of §854(b)(2)?

9

10  A.  The "correct" answer lies in those areas in which both sets of Joint Applicants' positions are

11     compatible.  SBC/AT&T are correct when they recognize that the Commission has

12     ratemaking authority over AT&T, even though the Commission may not at present exercise

13     that authority either to set or to approve AT&T's rates.  Similarly, Verizon/MCI are correct

14     that the ILEC entities *are* included within the scope of §854(b)(2) *even though the ILEC*

15     *entity is itself not an actual "party" to the merger transaction*.  And for that same reason,

16     Verizon's attempt to wall off its smaller ILEC affiliate from inclusion within §854(b)(2)

17     clearly puts form over substance.  The "correct" application of §854(b)(2) must be with

18     respect to *all aspects of the post-merger entity's operations over which the Commission has*

19     *ratemaking authority irrespective of the nominal "structure" of the parent company and its*

20     *various regulated and nonregulated affiliates*.  In that context, *all* of the Verizon and MCI

21     activities over which the Commission has ratemaking authority – whether or not such

22     authority is actually being exercised – fall within the scope and applicability of §854(b)(2).

23

37

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                      LEE L.  SELWYN

1  Q.  What process have Verizon/MCI used to calculate what they claim to be the "economic

2      benefits" of the merger that fall within the scope of §854(b)(2)?

3

4  A.  The full explanation for how Verizon allocates synergies resulting from the merger is

5      contained in the Declaration of Stephen Smith on behalf of Verizon.[31]  In short, Verizon

6      distributed synergies between Verizon and MCI first by considering "only those synergies

7      that will flow to Verizon and exclud[ing] those synergies that will flow to MCI."[32]  Verizon

8      categorizes the synergies as revenue (retained customers and additional services),

9      information technology (IT), network, and other (international and headcount).  These

10     categories are then evaluated as which entity (MCI or Verizon) will accrue the synergy.  For

11     synergies Verizon attributes in whole or part to Verizon operations, Mr. Smith allocates the

12     synergy benefits.  These "Verizon" synergy benefits are then allocated to Verizon California

13     based upon the ratio of revenue for Verizon California small and medium business and

14     enterprise customer markets and Verizon nationwide revenues for these customer markets,

15     Verizon's cost allocations used in the "ordinary course of business," circuit counts, and

16     accounting wage allocation data.  This is further allocated to exclude interstate, unregulated,

17     non-Verizon California, and Category II services.  This process produced an estimate of the

18     discounted net present value (NPV) of the forecasted short- and long-term forecasted

19     economic benefits of the transaction for California of $6.6-million.[33]

_____

31. See, generally, *Smith Declaration.*

32. Id., at para 21.

33. *Id.*, at 17, *Smith Supplemental* at 1 (revised figure to $6.6-million).

38

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  Q.  How does this specific $6.6-million estimate compare with the NPV of total combined

2      companywide Verizon and MCI forecasted economic benefits of the merger?

3

4  A.  Verizon witness Stephen E. Smith states that Verizon had "estimated that the transaction

5      would generate $7-billion of present value arising from new revenues and expense and

6      capital savings, net of costs to achieve those benefits and net of related taxes."[34]  This $7-

7      billion figure was widely publicized to the investment community, and was included as the

8      estimated value of the proposed merger in the Joint Applicants' testimony presented before

9      the FCC,[35] as well as in a Form 8-K filing announcing its proposed acquisition of MCI,  made

10     by Verizon with the Securities and Exchange Commission ("SEC") on February 14, 2005.[36]

11     This $7-billion total synergy figure then formed the basis for Mr. Smith's calculation of the

12     $6.6-million California share of the net synergies.

13

14     The $6.6-million net synergies that the Joint Applicants ascribe to California thus represents

15     less than *one-tenth of one percent* of the aggregate $7-billion in total merger synergies being

16     forecasted to result from the transaction.  To put this in perspective, California accounts for

17     approximately 8% of all Verizon switched access lines, Verizon California accounts for 8%

---

34.  *Smith Declaration*, at para. 8.  The synergy benefit has been revised to $7.3-billion (which I generally round to $7-billion).

35.  *Verizon Communications, Inc. and MCI, Inc. Applications for Approval of Transfer of Control*, FCC Docket No. WC Docket No. 05-75, *Application,* April 21, 2005 ("*Application*").

36.  Verizon Communications, Form 8-K dated February 14, 2005, at Exhibit 2.

REDACTED – PUBLIC VERSION

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    of all Verizon ILEC revenues and 4% of total Verizon revenues.[37]  Approximately <<BEGIN

2    VZ/MCI PROPRIETARY              END VZ/MCI PROPRIETARY>> of all MCI

3    residential local service customers nationwide are located in the Verizon California serving

4    area,[38] and the various MCI affiliates operating in California account for about <<BEGIN

5    VZ/MCI PROPRIETARY     END VZ/MCI PROPRIETARY>> of total MCI corporate

6    revenues.[39]  Just considering these facts, the $6.6-million – or only approximately one-tenth

7    of one percent of the synergy total– that the Joint Applicants proffer as the NPV of

8    "California synergies" cannot pass the "red face" test.

9

10   Q.  Does the process by which the Joint Applicants have come up with this $6.6-million

11       California synergies estimate satisfy the requirements of §854(b)(2)?

12

13   A.  No, clearly not.  Apparently the Joint Applicants have interpreted their obligations under

14       § 854(b)(2) as being limited to those portions of Verizon subject to the type of price

15       regulation that the CPUC exercises with respect to ILECs, and, as such, do not include *any*

16       short-term and long-term forecasted economic benefits of the merger inuring to MCI or to

17       any other Verizon operations in California where, they contend, the Commission does not

---

37.  FCC Report 43-08, the ARMIS Operating Data Report, Table II. Switched Access Lines
in Service, 2004 total switched access lines; Federal Communications Commission, ARMIS
Report 43-01, Annual Summary Report, Table I, 2004 total operating revenues, available at
http://www.fcc.gov/wcb/eafs/ (accessed July 18, 2005);  Verizon Communications Inc., 2004
10K Annual Report, January 27, 2005.

38.  *Hallbach Declaration*, at 16-18.

39.  *Hallbach Declaration*, at 5, MCI, 2004 Annual Report, dated February 25, 2005.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1    exercise this type of ratemaking authority.[40]  While I do not express a legal opinion as to the

2    Joint Applicants' legal theory, in my opinion the notion that synergies arising from a merger

3    of two companies, *both of which provide services subject to the Commission's ratemaking*

4    *authority,* should be limited solely to the entity over which the Commission currently

5    *exercises* ratemaking authority  makes no sense as an economic matter.

6

7    Q.  Please explain.

8

9    A.  First, when two companies such as Verizon and MCI agree to merge, typically one of the

10       merging corporations "acquires" the other as a wholly-owned subsidiary.  In the case of the

11       SBC/Telesis merger, SBC "acquired" PTG by exchanging SBC stock for PTG stock, and

12       SBC became the "surviving" corporation.  In the case of the Bell Atlantic/GTE merger, Bell

13       Atlantic "acquired" GTE and became the surviving corporation, although it then adopted the

14       Verizon name, such that *neither* the Bell Atlantic nor the GTE corporate identifies survived

15       the transaction.  In the case of the Qwest/US West merger, Qwest was the acquiring and

16       surviving company, even though Qwest was pre-merger a significantly smaller company than

17       US West.  Clearly, the choice of which entity does the acquiring and which is the acquiree is

18       ultimately an arbitrary one, one that is driven by a variety of legal, financial, tax and perhaps

19       even regulatory considerations that will have little or no impact upon the manner in which

---

40.  *Smith Declaration*, at fn. 3 and para. 35.  It should be noted that, even if SBC's legal
theory regarding ILEC regulation is correct, there is no justification for excluding Category II
services from the California synergies.

41

ETI  ECONOMICS AND
     TECHNOLOGY, INC.

Cal. PUC A.05-04-020                      LEE L.  SELWYN

1    the two firms are ultimately integrated organizationally and upon how merger synergies and

2    other merger-driven benefits are ultimately achieved and allocated.

3

4    Second, the specific location within the combined company where synergies arise is entirely

5    within the combined company's control, and can be directed to specific areas of the merged

6    entity's operations.  For example, both Verizon and MCI maintain extensive information

7    technology (IT) operations that perform functions ranging from operations support systems

8    (OSS), customer records management, billing, payroll, inventory management, employee

9    records, and probably much more.  A major source of merger synergies arises through

10   integration of duplicate functions, but there is no set rule or principle that determines whether

11   the MCI or the Verizon IT operation for a particular function will survive or be absorbed into

12   the counterpart operation in the other company.  One outcome might mean a reduction in

13   Verizon employment, whereas a different outcome could cut jobs at MCI.  Also, there is no *a

14   priori* rule or principle that dictates where (geographically) such personnel reductions take

15   place.  The merged entity might, for example, cut jobs at MCI in California and transfer the

16   function to Verizon in Maryland.

17

18   Additionally, all potential merger synergies are not achieved instantaneously upon closing of

19   the transaction; their implementation will involve both time and, typically, some up-front

20   cost.  The specific integration activities will necessarily be prioritized to suit the best interests

21   of the merged entity, but those are likely to differ, perhaps dramatically, from the best

22   interests of California ratepayers.  For example, given Verizon's professed interest in

23   expanding the geographic scope of its enterprise services marketing, it is reasonable to expect

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    that post-merger Verizon will give integration of the Verizon and MCI enterprise services

2    operations higher priority than, for example, integration of their respective local service

3    operations, which MCI claims to be in the process of shutting down anyway, and which the

4    merged firm can continue to provide under either the MCI or Verizon California

5    organizations.

6

7    Q.  Do you believe that §854(b)(2) contemplates something more than the extremely narrow

8        definition of California merger synergies that the Joint Applicants have presented?

9

10   A.  Yes, and I think that any fair reading of the statute compels that conclusion.  §854 refers to

11       "the proposed transaction" and "the proposed merger;" it makes no reference to or distin-

12       guishes between the "acquiring" entity and the "acquired" entity and, as I have previously

13       noted, the basis for allocation of economic benefits is bounded by those activities where the

14       Commission *has* ratemaking authority and not, as the Joint Applicants have creatively

15       claimed, where the Commission *exercises a certain type of* ratemaking authority.  As such,

16       the statute must be interpreted as embracing *all* effects of the transaction affecting California

17       *ratepayers* which, in this instance, necessarily includes both Verizon California, Inc. and all

18       other Verizon and MCI entities and affiliates that provide intrastate services where the

19       Commission *has* ratemaking authority in California, whether or not such authority is actively

20       being *exercised* by the Commission at this time.

21

22   Q.  To the extent that both § 854(b)(1) and § 854(b)(2) require that the "short-term and long-term

23       economic benefits to ratepayers" be quantified, how precisely should this be done?

43

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1   A.   For purposes of § 854(b)(1) and § 854(b)(2), "short-term and long-term economic benefits"

2        must be interpreted as requiring that the transaction provide "net positive benefits" to

3        ratepayers, i.e., that the potential gains *to ratepayers* from the transaction will exceed

4        potential risks, costs and other harms to be imposed upon ratepayers arising from the merger.

5        In order for § 854(b)(1) to be satisfied, short-term *and* long-term economic benefits must

6        *each* provide positive net benefits to ratepayers.  In their filing, the Joint Applicants have

7        identified various benefits, many of which are speculative and not specifically quantifiable as

8        economic benefits *to ratepayers* and that therefore may not be included in the § 854(b)(1)

9        analysis.  A portion of the quantifiable synergy gains, such as cost savings, increased

10       productivity growth, and opportunities to generate additional revenues through exploitation

11       of complementary assets and other resources, may potentially qualify as

12       § 854(b)(1)economic benefits to ratepayers, provided of course that they can be shown to

13       flow to ratepayers in California.  However, the Joint Applicants have identified a number of

14       sources of risk arising from the transaction, none of which have been quantified by Verizon

15       or MCI.  If the identified benefits are not sufficient to overcome these economic costs

16       associated with such risks, § 854(b)(1) is not satisfied.

17

18  **Forecasts of positive economic benefits of the merger must be offset by a valid economic**
19  **assessment of the potential risks to both the merging parties and to California ratepayers**
20  **arising from the transaction.**

21

22  Q.   What do you mean by the "economic cost associated with such risks"?

23

44

ETI   ECONOMICS AND
         TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  A.  The existence of risks diminishes the potential value of a particular outcome to the extent that

2      such outcome may not be realized.  For example, suppose that I embark upon a business

3      venture that, according to my business plan, should produce profits in the first year of

4      $100,000 with a probability of 40%, of $50,000 with a probability of 20%, break-even (i.e.,

5      $0 profits) with a probability of 20%, or a loss of $50,000 with a probability of 20%.  It is

6      possible to calculated the *expected value* of these alternative outcomes by multiplying each's

7      respective value with the probability of its occurrence.  In this case, the expected value is

8      $40,000:

9

| Outcome | Probability | Weighted value |
|---|---|---|
| + $100,000 | 40% | + 40,000 |
| + $ 50,000 | 20% | + 10,000 |
| $       0 | 20% | 0 |
| − $50,000 | 20% | − 10,000 |
| Expected value | | $ 40,000 |

10

11

12

13

14

15

16  Q.  What specific risk factors have the Joint Applicants identified?

17

18  A.  A total of twelve separate sources of risk have been identified by Verizon in investor

19      briefings and filings with the SEC.  According to Verizon:

20

21          The following important factors could affect future results and could cause

22          those results to differ materially from those expressed in the forward-looking

23          statements:

24

45

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    Several of the risk factors relate to timing of the transaction and to MCI shareholder and

2    regulatory approval; several others relate to what might best be described as "exogenous"

3    conditions that could affect the financial success of the post-merger Verizon but which would

4    be expected to have similar effects upon the fortunes of the two companies even if they were

5    to remain independent; and one relates to the ability of Verizon Wireless to continue to

6    obtain sufficient spectrum.  However, six of the twelve risk factors involve conditions

7    incident to the present Verizon/MCI merger:

8

9    (1)   technology substitution;

10

11   (2)   an adverse change in the ratings afforded our debt securities by nationally accredited

12         ratings organizations;

13

14   (3)   the effects of competition in our markets;

15

16   (4)   the timing, scope and financial impacts of our deployment of fiber-to-the-premises

17         broadband technology;

18

19   (5)   a significant change in the timing of, or the imposition of any government conditions to,

20         the closing of our business combination transaction with MCI, Inc;

21

22   (6)   and the extent and timing of our ability to obtain revenue enhancements and cost

23         savings following the MCI transaction.

46

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  Q.  But aren't these "risk factors" basically "boiler plate" or "safe harbor" disclosures that the

2       Joint Applicants have included, probably on the advice of counsel?

3

4  A.  Yes, but that does not make them any less real or any less important.  Such cautions are at

5       least as important for the required § 854(b)(1) determination that the proposed transaction

6       "[p]rovides short-term and long-term economic benefits to ratepayers" as it is for

7       shareholders of the two firms who may be reviewing the Safe Harbor Statement or other

8       details of the transaction that Verizon and/or MCI may disclose.  In the instant situation, the

9       Joint Applicants have identified all of $6.6-million in California synergy benefits, of which

10      50%, or about $3.3-million, would be provided, in some unspecified manner, to California

11      ratepayers.  Even a small failure on the part of the post-merger entity to fully achieve all of

12      its expected merger synergies – for example, if the businesses of Verizon and MCI are not

13      integrated successfully, or if the cost savings and any other synergies from the merger are not

14      fully realized or take longer to realize than expected, or if disruptions from the merger make

15      it more difficult for the combined company to maintain relationships with customers,

16      employees or suppliers – that $3.3-million total "short-term and long-term economic benefit"

17      of the merger could easily become a *negative* number, in which case the requirements of

18      § 854(b)(1) would not be satisfied.

19

20  Q.  Have any specific sources of risk been omitted from the Joint Applicants' "boilerplate"

21      enumeration?

22

47

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  A.  Yes.  Specifically – and surprisingly – omitted from the Joint Applicants' enumeration of

2      potential risks are those relating to the potential effects of the merger on the credit rating of

3      the post-merger Verizon and on its – and its ILEC affiliates' such as Verizon California's –

4      ability to raise short-term and long-term capital in the financial markets.  As I have

5      previously mentioned, <<BEGIN VZ/MCI PROPRIETARY

| Table 1 | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

         END VZ/MCI PROPRIETARY>>.

---

41. Pro-Forma Consolidated Results, VZCA 00484469.  Note that, though the years on the
source table refer to 2004-2008, the data underlying this table comes from VZCA 00484467,
which is labeled for years 2006-2010.

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1  Q.  Are there any other factors that could work to undermine the potential benefits of the

2       merger?

3

4  A.  Yes.  Although I will address this in far more detail later in my testimony, when considering

5       whether § 854(b)(1) is satisfied, it is important to include in the analysis the conclusions

6       reached with respect to § 854(b)(3), which requires the Commission to find that the merger

7       "not adversely affects competition."  If, in fact, the merger does result in decreased

8       competition in the California telecommunications market overall – as well it might, inasmuch

9       as MCI is one of Verizon's largest competitors as well as one of Verizon's largest wholesale

10      customers – this would potentially result in higher prices for Verizon/MCI services, which is

11      clearly *not* a "benefit to ratepayers."  And, by the way, it would not take very much in the

12      way of decreased competition arising from the merger to erase the $3.3-million 50% share of

13      the "California synergy benefits" that the Joint Applicants apparently concede would need to

14      be flowed through to ratepayers if the Commission determines that § 854(b)(2) applies to this

15      merger.

16

17      To put this $3.3-million in context, consider the following.  This "California synergy benefit"

18      is calculated based on an allocation of the net present value of certain (but far less than all) of

19      the $7-billion synergy gains expected to arise from the merger for the two companies

20      combined.  On an annual basis for the four years during which, according to the Joint

21      Applicants, §854(b)(2) "economic benefits" would be flowed to California ratepayers, that

22      works out to about $825,000 per year.  There are about 2.6-million Verizon California

23      *residential* customers (primary lines) in California.  If the Commission were to, for example,

49

ECONOMICS AND
TECHNOLOGY, INC.

1    spread that $825,000 in annual synergy benefits equally among those 2.6-million residential

2    customers, the "short-term and long-term economic benefits of the merger" inuring to each

3    customer would be approximately three cents ($0.03) per month.  Assuming an average

4    monthly intrastate phone bill of $37 (the national average local phone bill),[42] a price increase

5    of as little as *one tenth of one percent* would erase the entirety of the § 854(b)(2) ratepayer

6    share of the "economic benefits of the merger."  As I discuss in more detail below, if the

7    merger is approved, Verizon's share of the residential long distance market within its ILEC

8    footprint would increase from about <<BEGIN VZ/MCI PROPRIETARY       END

9    VZ/MCI PROPRIETARY>>[43] to about <<BEGIN VZ/MCI PROPRIETARY       END

10   VZ/MCI PROPRIETARY>>.[44]  The jump in market concentration that would result from this

11   change increases the Herfendahl-Hirshfeld Index ("HHI") of the long distance market.  That

12   increase exceeds the change that the *Horizontal Merger Guidelines* state raises concerns.

13   The HHI is calculated by summing the squares of the market shares of the (usually four)

14   largest firms competing in the same product market.  The maximum value of the HHI is thus

15   10,000 (i.e., the square of a 100% single-firm market share).  The *Guidelines* consider a

16   market with an HHI greater than 1800 to be "highly concentrated," and state that "[m]ergers

---

42.  Industry Analysis and Technology Division, Federal Communications Commission, *Trends in Telephone Service,* data as of April 2005 ("*Trends in Telephone Service*") at Table 3.2.

43.  Verizon Marketing Research, *3Q04 Consumer Market Share: Report on Long Distance*, January 2005,VZCA 00395590 (*Long Distance Market Share Report*), according to VZCA 00395592, data for California is in line with the Verizon West estimates.  Since this data is nearly a year old, the Verizon long distance share is likely to be larger now.  In addition, these numbers may be conservative, since it is unclear if MCI's long distance market share as reported here includes bundled local/long distance customers.

44.  *Id.*

50

**REDACTED – PUBLIC VERSION**


ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    producing an increase in the HHI of more than 50 points in highly concentrated markets post-

2    merger potentially raise significant competitive concerns ...”[45]  Based upon these market

3    shares, the pre- and post-merger HHIs applicable to the California Long Distance and Local

4    Services Market within the Verizon California operating areas can be calculated as follows:

5

| Table 2 | | | | | | |
|---------|---|---|---|---|---|---|
| Pre- and Post-Merger Four-Firm Concentration Indices<br>Residential Long Distance<br>Verizon California operating areas | | | | | | |
| Product Market | Verizon share | MCI share | Pre-merger HHI | Post-merger HHI | Change | Exceed *Guidelines* threshold? |
| Residential Long Distance | | | 3450 | 4786 | 1336 | Yes |
| Source: *Long Distance Market Share Report*<br>NOTE: Highlighted figures are VZ/MCI PROPRIETARY | | | | | | |

19

20    These substantial increases in market concentration create the opportunity for post-merger

21    Verizon to implement a significant and non-transitory increase in price.  And even a price

22    increase of as little as one-tenth of one percent, which is certainly well within the realm of

23    possibility, would erase virtually all of the ratepayer share of the $6.6-million in “short-term

24    and long-term economic benefits to ratepayers” that the Joint Applicants concede fall within

25    the Commission’s ratemaking authority.

26

---

45.  *Horizontal Merger Guidelines*, at §1.5(c).

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1     In summary, if the total "short-term and long-term economic benefits" that the Joint

2     Applicants would confer upon California ratepayers is to be limited to no more than $3.3-

3     million, there is almost no possibility that the *net* §854(b)(1) "short-term and long-term

4     economic benefits to ratepayers" would be positive.  On that basis, the requirements of

5     §854(b)(1) would not be satisfied, and the Commission may not approve the transaction.

6

7  Q.  Dr.  Selwyn, §854(b)(2) requires the Commission to find that the proposed transaction

8     "Equitably allocates, where the Commission has ratemaking authority, the total short-term

9     and long-term forecasted economic benefits ... of the proposed merger, acquisition or control,

10    between shareholders and ratepayers.  Ratepayers shall receive not less than 50 percent of

11    those benefits."  Except for the specific requirement that §854(b)(2) "economic benefits" are

12    to be limited to "where the Commission has ratemaking authority," are there other

13    differences between the manner in which the Joint Applicants have portrayed the benefits of

14    the merger to their respective Boards of Directors, shareholders, securities analysts, and

15    potential investors and the manner in which they have calculated the "California synergy

16    benefits"?

17

18 A.  Indeed, yes.  The differences are significant – and entirely unexplained by the Joint

19    Applicants:

20

21    •    In the National Synergy Model, Verizon calculates synergies including a "terminal

22         value" the Net Present Value (NPV) of future synergies extending in perpetuity.

52

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1       However, in the California Synergy Model, Verizon truncates synergy benefits after

2       2009, and does not include any terminal value in the terminal year 2009.

3

4       •   In the National Synergy Model, Verizon offsets synergy gains with "merger implemen-

5          tation costs" that arise mostly in the first two or three years.  Since the national model

6          takes synergy gains out to perpetuity, this methodology is reasonable for management

7          decisionmaking purposes.  However, in the California Synergy Model, those same up-

8          front implementation costs were included, even though benefits were truncated after

9          2009.  As a result, California ratepayers would, in effect, be "charged" for the totality of

10        (the California share) of implementation costs, even though they would receive less than

11        five-years' worth of "benefits" and not the permanent (in perpetuity) benefits being

12        provided to Directors and Shareholders.

13

14       •   The California Model considers only certain Verizon California synergies, while

15         excluding MCI California operations altogether.  §854(b)(2) limits the "at least 50% of

16         the short-term and long-term economic benefits of the merger" to areas falling within the

17         Commission's ratemaking authority, but does *not* limit the ratepayer portion to only

18         Verizon California.

19

20      In fact, and as I have explained, the "benefits" referred to at §854(b)(1) and §854(b)(2) are

21      essentially the same, except that §854(b)(2) makes specific reference to "where the

22      Commission has ratemaking authority" with respect to the *allocation* of benefits.  I see

23      nothing in §854(b)(2) that would allow the truncation of benefits after only four years and, in

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1   fact, to do so would *expressly violate* §854(b)(2)'s requirement that "[r]atepayers shall

2   receive not less than 50 percent of those benefits."

3

4   Moreover, as with §854(b)(1) "benefits," §854(b)(2) "benefits" also include more than just

5   the ILEC entity where the Commission *exercises* ratemaking authority, but also embrace any

6   part of Verizon or MCI where the Commission *has* ratemaking authority.  This would

7   include services that have been detariffed or subject to forbearance from regulation, because

8   the Commission still retains its ratemaking authority.  No fair reading of §854(b) would

9   conclude that the assessment of benefits is to be confined only to the entity whose rates are

10  currently regulated by the Commission, yet that is precisely what the Joint Applicants have

11  done in identifying the not less than 50 percent of total benefits (where the Commission has

12  ratemaking authority)  that are to be provided to ratepayers as required by § 854(b)(2).  As

13  noted earlier, the Joint Applicants' testimony describing the various "soft" benefits of the

14  merger specifically embraces all parts of the post-merger Verizon/MCI entity, including MCI

15  and the various Verizon affiliates.  Here, the Joint Applicants are attempting to use a broad

16  scope of benefits to satisfy §854(b)(1), and then apply an extremely limited scope of benefits

17  for purposes of §854(b)(2).

18

19  Q.  What explanation do the Joint Applicants advance for these stark differences between the

20      manner in which "economic benefits" are forecasted for purposes of satisfying §854(b)(1)

21      and for actually quantifying the "economic benefits" to be provided to California ratepayers

22      where the Commission has ratemaking authority under §854(b)(2)?

23

54

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1   A.   Applicants claim that all parts of §854 are satisfied by the "soft" benefits they cite:

2
3           While revenue synergies from these new offerings will accrue to MCI and
4           Verizon, the businesses purchasing these new services will also benefit from
5           access to new communications functionalities that will improve worker
6           productivity. Although the amount of consumer benefit cannot be quantified
7           with certainty, it clearly exists; otherwise businesses would not purchase these
8           new services.[46]
9

10      Such a claim makes no sense in the context of the Applicant's $7-billion synergy estimate

11      presented to the financial community.  The benefit a business or consumer realizes from

12      increased communication functionality – if any – is directly related to the amount that a

13      company is willing to pay for these new services and functionalities.  Such increased

14      revenues are reflected in the Verizon/MCI revenue synergy calculations.  In any event, the

15      various "soft" benefits of the type described by the Joint Applicants are, at best, highly

16      speculative and certainly cannot qualify as the type of "economic benefits" called for by the

17      statute.  Indeed, some or even most of the purported "benefits" (things like improved service

18      quality and increased functionality) may be even more likely to arise in the absence of the

19      transaction through the continued operation of a more competitive marketplace.  Reliance

20      upon such "soft" benefits and claims subjects California ratepayers to considerable risk.  If

21      these speculations do not ultimately materialize, the negative aspects of the proposed

22      transaction – the decrease in competition and the loss of California jobs, among others – will

23      overwhelm whatever nominal gains for ratepayers that the transaction might eventually

24      produce.

_____

46. *McCallion Declaration*, at para. 40.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1                    ECONOMIC BENEFITS FOR CALIFORNIA RATEPAYERS

2

3    **The Joint Applicants propose to allocate no more than a *de minimis* fraction of aggregate**
4    **national merger synergies to California ratepayers**
5

6    Q.   What is the forecasted short-term and long-term economic benefit being claimed by the Joint

7         Applicants, at least 50 percent of which is to be allocated to California ratepayers as called

8         for at §854(b)(2)?

9

10   A.   The Joint Applicants have put this figure at $6.6-million, which they claim represents the net

11        present value of "California synergies" associated with Verizon California, Inc. services

12        subject to the Commission's ratemaking authority.

13

14   Q.   Do you consider this to be a reasonable estimate?

15

16   A.   No.  The Joint Applicants have advised the SEC, the financial community, and their

17        respective shareholders that the merger will produce aggregate synergies of some $7-billion

18        on a net present value basis.  The $6.6-million they concede as falling within the

19        Commission's ratemaking authority represents *less than one-tenth of one percent* of the total

20        merger synergies.  While interstate and nonregulated services may not fall within the scope

21        of §854(b)(2), there can be no question that the PUC has "ratemaking authority" over far

22        more than one-tenth of one percent of the Joint Applicants' total operations.

23

56

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    In fact, if the total projected short term and long term benefits to California ratepayers with

2    respect to services over which the Commission has ratemaking authority is as trivial as the

3    Joint Applicants claim and if the Commission nonetheless accepts that amount as satisfying

4    §854(b)(2), the Commission would be entering into an enormous gamble on behalf of

5    California ratepayers.  The immediate onset of merger implementation costs will exceed the

6    immediate integration gains, such that net short-term benefits will be decidedly negative.

7    And the various long-term benefits being claimed by the Joint Applicants are dependent upon

8    the interactions of many factors, the outcome of which is highly uncertain.  Even a small

9    overestimate of the purported "long term benefits" by the Joint Applicants would erase the

10   nominal $3.3-million they have earmarked for sharing with California ratepayers.  Even a

11   small decrease in the level of competition – and the decrease will certainly not be small –

12   could result in price increases by the post-merger Verizon that will exceed that $3.3-million.

13   This transaction is a bad gamble, because at best it will create insignificant benefits for

14   ratepayers, and at worst it could result in significantly less competition, higher prices for

15   essential telecommunications services, and a large negative impact for the California

16   economy overall.  It makes no sense to place a bet where the risks are substantial and

17   unknown, where the potential winnings are at best trivial, and where the potential losses are

18   large and irreversible.

19

20   Q.   Have you attempted to estimate the correct §854(b)(2) California synergy amount?

21

22   A.   Yes, I have done so by developing a more appropriate California allocation factor than the

23   less than one-tenth of one percent that has been advanced by the Joint Applicants.  I believe

57

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    that this approach is conservative in that it does not examine California-specific synergy

2    gains at a granular level and excludes other Verizon affiliates that may be offering services

3    subject to the Commission's ratemaking authority.  However, based upon the Applicant's

4    own estimates of national aggregate merger savings, I estimate the total California intrastate

5    merger synergies to be at least $206-million.

6

7  Q.  How did you arrive at this $206-million estimate?

8

9  A.  Using the Applicant's claims regarding the net present value of the transaction, I separated

10    out the Verizon California and MCI California intrastate portions, based upon proportional

11    revenue and expense data.  The details of these calculations are shown in Attachment 4.

12    Whether using Verizon intrastate California revenues or expenses, or MCI intrastate

13    California revenues, each indicated that California intrastate operations fall between the

14    narrow 2.7-3.0% range of total company revenues or expenses.  This data strongly suggests

15    that California intrastate operations will account for approximately 2.8% of the pro forma

16    merged company.  The revenue and expense synergies that will be realized by the California

17    portion of this combined company are therefore approximately 2.8% of the total revenue and

18    expense synergies that will ensure, or 2.8% of $7.3-billion, equaling $206-million.

19

20  Q.  This is significantly more than is calculated by Verizon and presented in the Testimony of

21    Mr. Smith.  Isn't it a little excessive?

22

58

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1   A.   Absolutely not.  In fact, I strongly urge the Commission to reject this merger precisely

2        because even my estimate, some 34 times the Verizon calculation of synergy benefits, can

3        not outweigh the harms that will occur as a result of the merger.

4

5   Q.   Please Explain.

6

7   A.   If a sufficiently large allocation of §854(b)(2) economic benefits to *California ratepayers* is

8        adopted, this may overcome the absence of any affirmative demonstration by the Joint

9        Applicants of specific, quantifiable *ratepayer* benefits under §854(b)(1).  The Joint

10       Applicants' calculation of "forecasted short-term and long-term economic benefits" "where

11       the Commission has ratemaking authority" of only $6.6-million cannot possibly overcome

12       the §854(b)(1) evidentiary deficiency.  Indeed, my estimate of $206-million cannot overcome

13       the harms, as I discuss in the following section, to the California economy that will result

14       from the proposed merger.  Unless the Commission can find that the merger will result in

15       benefits to ratepayers and the California economy of *at least $807-million*, the Commission

16       can not find that the proposal is consistent with §854.

59

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1                      EFFECT OF THE PROPOSED MERGER
2                   ON CALIFORNIA EMPLOYMENT AND ECONOMY

3

4    **The proposed merger has the potential to eliminate hundreds of California jobs and**
5    **threaten continuation of benefits for current MCI employees.**
6

7    Q.   Dr. Selwyn, §854(c)(4) requires that the merger "be fair and reasonable to affected public

8         utility employees," and §854(c)(6) requires that the merger "be beneficial on an overall basis

9         to state and local economies, and to the communities in the area served by the resulting

10        public utility."  Does the proposed merger of Verizon and MCI raise concerns with respect to

11        these requirements?

12

13   A.   Indeed it does.  According to public statements made by Verizon, 80%-85% of the $7-billion

14        in national synergy benefits is expected to arise through expense reductions, and it appears

15        that nearly half of this will be "head count" (i.e., work force) reductions in both MCI and in

16        Verizon.[47]  According to public sources and Verizon, the two companies have a combined

17        national work force of approximately 250,000, of which 20,682, or about 8%, are based in

18        California.[48]  Overall, Verizon expects to shed about 3% of the post-merger total work force,

---

47.  *February 14, 2005 Investor Conference Call*, slide exhibit at 25, available at:
http://investor.verizon.com/news/20050214/ ; transcript at 6, available at:
http://investor.verizon.com/sec/, (accessed July 12, 2005).

48.  *Id.*; Yahoo!Finance website for Verizon and MCI, http://finance.yahoo.com/q/pr?s=VZ,
http://finance.yahoo.com/q/pr?s=MCIP, (accessed July 19, 2005);  and Verizon Response to
TURN Data Request 1-19, May 15, 2005.

60

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

i.e., about 7,000 jobs.[49] <<BEGIN VZ/MCI PROPRIETARY

2                                                                      END

3      VZ/MCI PROPRIETARY>>[50] This calculation, since it appears to have been performed in

4      conjunction with estimating Verizon's proposed §854(b) economic benefits, does not include

5      any California allocation of MCI jobs eliminated statewide, and only includes certain job

6      functions for Verizon California employees associated with "intrastate" services.

7

8   Q.  Have you estimated the total number of jobs lost in California from both MCI and Verizon,

9       for all services?

10

11  A.  I have.  This calculation more accurately shows the effect of the merger on California

12      employment than the calculation Verizon did for the purposes of allocating synergies.

13      Approximately 6% of the 40,000 total MCI jobs are in California.[51]  To estimate the total

14      number of MCI jobs eliminated in California, therefore, I have taken 6% of the headcount

15      reductions Verizon identifies for MCI.  This results in an estimated <<BEGIN VZ/MCI

16      PROPRIETARY      END VZ/MCI PROPRIETARY>> lost California MCI jobs.  I then

17      applied Verizon's California factor used in its California synergy calculation to all estimated

18      Verizon California headcount reductions, for a total Verizon statewide California headcount

19      reduction of <<BEGIN VZ/MCI PROPRIETARY            END VZ/MCI

---

49.  *February 14, 2005 Investor Conference Call*, transcript at 6, available at:
http://investor.verizon.com/sec/, (accessed July 12, 2005).

50.  *CAHeads*, VZCA 00008264.

51.  MCI response to TURN 1-19 indicates 2,467 employees in California.

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    PROPRIETARY>> Thus, I have estimated the total loss of California jobs as a direct result

2    of the Verizon/MCI merger to be <<BEGIN VZ/MCI PROPRIETARY ▮▮▮ . END VZ/MCI

3    PROPRIETARY>>

4

5    **The merger could have an $807-million adverse impact on the overall California economy.**

6

7    Q.   How do such employment reductions translate into an overall impact on the California

8         economy?

9

10   A.   There are both direct and indirect impacts.  Obviously, the elimination of jobs means that the

11        salaries associated with those jobs are no longer being paid – which is the direct economic

12        impact.  However, the economic effect is multiplicative.  When employees lose their jobs and

13        their incomes, they cut back their spending on goods and services produced by other

14        economic sectors – or leave the state altogether – which has a ripple effect throughout the

15        economy.  Economists refer to this as the "multiplier effect."

16

17   Q.   Have the use of a multiplier previously been used with respect to the economic impact of a

18        California merger?

19

20   A.   Yes.  In the SBC/Telesis merger, SBC had offered specific "California Commitments"

21        whereby the merged companies agreed "to locate four major operating subsidiaries in

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    California" and "to create 1,000 new jobs in California at Telesis companies." [52]  SBC had

2    portrayed the economic impact of this 1,000-job creation commitment as "increas[ing] the

3    incomes of California residents by $50 million a year, plus an additional $100 million a year

4    in 'multiplier effects.'" [53]  In so doing, SBC was applying a 2:1 multiplier, which falls within

5    the range that economists generally accept.

6

7  Q.   In this case, however, rather than *increasing* California jobs by 1,000, the result will be a *loss*

8       of <<BEGIN VZ/MCI PROPRIETARY          END VZ/MCI PROPRIETARY>> jobs.  What

9       is the economic impact of that "headcount reduction"?

10

11 A.   Attachment 5 to this testimony provides a detailed analysis of the direct impact upon the

12      California economy resulting from the loss of <<BEGIN VZ/MCI PROPRIETARY

13      END VZ/MCI PROPRIETARY>> jobs.  Obviously, the impact of each eliminated position

14      will depend upon the salary level that is avoided.  Using an average salary rate from the two

15      job categories used by Verizon to calculate California synergies, I have estimated an average

16      yearly salary of approximately <<BEGIN VZ/MCI PROPRIETARY          END VZ/MCI

17      PROPRIETARY>>.  This is very conservative, since it leaves out salaries related to

18      traditionally higher paid positions such as executives or lawyers.  Taken across all

19      employment categories, I estimate the average aggregate annual California salary loss at

20      about $31-million.  Applying a multiplier effect of 2.0 to capture indirect impacts, the

---

52.  D.97-03-067, 71 CPUC 2d 351, 397-98.

53.  *Id.*, at 398.

63

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    aggregate annual economic impact on the California economy attributable to the loss of

2    <<BEGIN VZ/MCI PROPRIETARY           END VZ/MCI PROPRIETARY>> Verizon and

3    MCI jobs would be approximately $92-million.

4

5    Q.   Can this be expressed in the same "net present value" terms as the Joint Applicants have

6         themselves done in their "National Synergy Model"?

7

8    A.   Yes.  I have performed that calculation, the detail of which are also included in Attachment

9         5.  The NPV of the salary loss is calculated by assuming a <<BEGIN VZ/MCI

10        PROPRIETARY          END VZ/MCI PROPRIETARY>> discount rate, and is reduced by

11        an estimate of the initial severance payments, which are assumed (by Verizon) to be

12        <<BEGIN VZ/MCI PROPRIETARY          END VZ/MCI PROPRIETARY>> of the current

13        annual salary.  I estimate the NPV of the salary loss to the California economy at

14        approximately $269-million; after application of the 2.0 economic impact multiplier, the

15        NPV of the overall economic loss to the California economy is approximately $807-million.

16

17   Q.   Are there other potential sources of economic harm to the California economy?

18

19   A.   Yes.  The increased market concentration and reduced level of competitive activity in the

20        California telecommunications market has the potential to result in significant and

21        nontransitory increases in prices both for residential and business services.  The combined

22        Verizon and MCI California annual intrastate revenues are currently in excess of $2.6-

REDACTED – PUBLIC VERSION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                      LEE L.  SELWYN

1    billion.[54]  Each one percent increase in post-merger Verizon rates resulting from the

2    increased market concentration and reduced level of competition would produce a direct

3    annual economic loss of around $26-million, which translates into about $248-million in net

4    present value terms.  And given the significant increase in market concentration overall, such

5    post-merger rate increases by Verizon are extremely likely.  A study just released by Cal.

6    Tech. professor and former FCC Chief Economist Simon Wilkie estimates that the combined

7    impacts of the Verizon/MCI and SBC/AT&T mergers will result in significant rate hikes for

8    business services that involve the use of special access type services.[55]  Prof. Wilkie

9    examined competitive price data for local loop and local transport services, and performed

10   regression analyses to estimate the effect of eliminating MCI and AT&T as competitive

11   bidders.  He reports that:

13   •    Winning bids are on average 50 percent to 60 percent lower that ILEC special access
14        charges;

16   •    The RBOC is almost never the lowest bidder;

18   •    AT&T and MCI are by far the most frequent bidders;

20   •    AT&T or MCI is the low price bidder most of the time; and

22   •    There is a significant difference between the winning price and the second-lowest price.

---

54.  MCI intrastate operating revenues from *Hallbach Declaration*, at para. 10, Verizon intrastate operating revenues from *Report on the Result of Operations of Verizon California*, 2004, at W/P 2-1.

55.  *AT&T Corp. and SBC Communications Inc. Application Pursuant to Section 214 of the Communications Act of 1934 and Section 63.04 of the Commission's Rules for Consent to the Transfer of Control of AT&T Corp. to SBC Communications Inc.* FCC Docket 05-65, Simon Wilkie June 15, 2005 ex parte, at 20-22.

65

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1       Prof. Wilkie reports that, based upon his initial regression analyses of the price data,

2       once MCI and AT&T no longer submit separate competitive bids, the wholesale price

3       discount from special access rates would decrease on average by over 15%.  However,

4       even if discounts did not decrease so drastically, even a minor increase in a business'

5       cost of voice and data communication would cost the California economy significantly

6       more than the Joint Applicant's claimed California benefits.

REDACTED – PUBLIC VERSION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1       HORIZONTAL COMPETITION ISSUES ARISING FROM THE PROPOSED MERGER

2

3    **Why is the merger of Verizon and MCI different from previous RBOC mergers?**
4

5    Q.   Dr. Selwyn, the proposed joining of Verizon and MCI is the seventh instance of a merger

6         involving at least one of the regional Bell operating companies.  In what way is this

7         particular transaction different from all of the other RBOC mergers that have gone into

8         effect?

9

10   A.   Each of the five previous RBOC mergers – SBC/Pacific Telesis, Bell Atlantic/NYNEX,

11        SBC/SNET, SBC/Ameritech, and Bell Atlantic/GTE – involved *horizontal* combinations of

12        firms that, while maintaining near-monopoly control of their respective geographic service

13        areas, did not for the most part either compete with each other or engage in upstream or

14        downstream transactions with each other.  Their respective service areas were entirely non-

15        overlapping and, most importantly, they did not compete with each other to any measurable

16        degree outside of their own operating areas.  All of these transactions ultimately were

17        approved, reducing the number of major ILEC holding companies from eight to four. [56]

---

56.  *SBC/Pacific Telesis Merger Order; Applications of NYNEX Corporation, Transferor, and Bell Atlantic Corporation, Transferee, For Consent to Transfer Control of NYNEX Cooperation and Its Subsidiaries,* NSD-L-96-10, *Memorandum Opinion and Order,* 12 FCC Rcd 19985 *(1997)* ("*NYNEX/Bell Atlantic Merger Order*");  *Applications for Consent to the Transfer of Control of Licenses and Section 214 Authorizations from; Southern New England Telecommunications Corporation, Transferor To SBC Communications, Inc., Transferee,* CC Docket No. 98-25, *Memorandum Opinion and Order*, 13 FCC Rcd 21292 (1998) ("*SNET/SBC Merger Order*"); Application of GTE Corporation, Transferor, and Bell Atlantic Corporation, Transferee; For Consent to Transfer Control of Domestic and International Sections 214 and*

(continued...)

67

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1      In every one of the five previous mergers involving SBC, Verizon, or their predecessors –

2      and this was certainly the case for the two mergers that specifically involved California

3      ILECs (Verizon/Telesis and Bell Atlantic/GTE) – the respective applicants were quick to

4      emphasize that it was precisely because they did not compete and were unlikely to be

5      *potential* competitors that their proposed mergers would not diminish competition overall.[57]

6      There was, of course, a certain, perhaps distorted, logic to their argument:  If you start out

7      with two monopolies each of which serves non-overlapping geographic areas and join them

8      together, you end up with one geographically larger monopoly, and hence no diminution of

9      competition.  The HHI's – even though already very close to the maximum value of 10,000

10     for each of the merging parties, would not be materially increased by their combination, and

---

56.  (...continued)
*310 Authorizations and Application to Transfer Control of a Submarine Cable Landing License*, CC Docket No. 98-184, *Memorandum Opinion and Order*, 15 FCC Rcd 14032 (2000) ("*GTE/Bell Atlantic Merger Order*"); *Applications of Ameritech Corp., Transferor, and SBC Communications Inc., Transferee, For Consent to Transfer Control of Corporations Holding Commission Licenses and Lines Pursuant to Sections 214 and 310(d) of the Communications Act and Parts 5, 22, 24, 25, 63, 90, 95 and 101 of the Commission's Rules,* CC Docket No. 98-141, *Memorandum Opinion and Order*, 14 FCC Rcd 14712 (1999)("*Ameritech/SBC Merger Order*").

57.  See, e.g. *SBC/Pacific Merger Order*, 12 FCC Rcd 2634; Application of Ameritech Corporation and SBC Communications, Inc. for authority, pursuant to Part 24 of the Commission Rules, to Transfer Control of a License Controlled by Ameritech, CC Docket No. 98-141, *Description and Justification of Merger (Attachment to Application)*, filed on July 24, 1998, at 57-59;  *GTE Corporation, transferor, and Bell Atlantic Corporation, transferee, for consent to transfer of control,* CC Docket No. 98-184, *Public Interest Statement (Exhibit A to Application)*, filed October 2, 1998 ("*GTE/Bell Atlantic Application*"), at 24-28.  In the *NYNEX/Bell Atlantic Merger,* NYNEX and Bell Atlantic were seen as potential competitors in the New York metropolitan area (competitive plans were halted when merger talks began), but the Commission determined that the merger benefits, given the conditions offered by the applicants, outweighed this diminished competition ("*NYNEX/Bell Atlantic Merger Order*"), 12 FCC Rcd 20069.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                LEE L.  SELWYN

1    with no *increase* in the HHI, the merger would pass the *Horizontal Merger Guidelines*' test

2    applicable to "highly concentrated" markets – an increase of less than 50 points in the HHI.

3    Here, however, MCI and Verizon compete directly for mass market and enterprise business

4    services, both local and long distance.

5

6    **The proposed transaction is both a *horizontal* merger – in that Verizon and MCI currently**
7    **compete with each other across a broad spectrum of service markets – and a *vertical* merger**
8    **– in that each firm currently purchases services from, or produced by, the other to support**
9    **its provision of downstream services.**
10

11  Q.  What are the principal *horizontal* effects of the merger on competition in the California

12     telecommunications market?

13

14  A.  MCI is Verizon's second largest competitor for both local and long distance services in

15     California.   The competition between the two firms is broadly based, particularly at the

16     *retail* end of the market.  Both firms offer basic local exchange service to mass market

17     residential and small business customers.  Both offer intrastate and interstate long distance

18     services.  Both have introduced mass market Voice over Internet Protocol (VoIP) services.

19     Both are engaged in actively marketing local and long distance, voice and data services to

20     mid-sized and large enterprise customers.  Finally, Verizon and MCI also compete, albeit to a

21     far more limited extent, in the high-volume (OC-n) special access market within major

22     downtown central business districts, including specifically those in Los Angeles, San

23     Bernardino, and San Diego.

24

25  Q.  What are the principal *vertical* aspects of the proposed merger?

69

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                  LEE L.  SELWYN

1   A.   Where Verizon and MCI are not engaged in horizontal competition with each other, they

2        control complementary *vertical* resources, the combination of which will enable them to

3        discriminate against or even exclude rivals altogether for retail-level competition.  Verizon

4        has overwhelming dominance of the local exchange distribution ("last mile") and local

5        interoffice transport facilities within its operating areas, but currently obtains wholesale long

6        distance services from nonaffiliated interexchange carriers.  MCI has an extensive,

7        nationwide and worldwide long distance network, but up to now has been required to obtain

8        switched and special access services and unbundled network elements (UNEs) or their post-

9        *USTA II* equivalent from Verizon in order to provide service to customers located within the

10      Verizon California service areas and, for that matter, throughout the remainder of the

11      Verizon region – the legacy Bell Atlantic (including NYNEX) areas in the Northeast, and the

12      various GTE operating areas across the South, Southwest, Midwest, and west coast areas.

13      Verizon provides high-speed Internet access via its ADSL offering to more than <<BEGIN

14      VZ/MCI PROPRIETARY      END VZ/MCI PROPRIETARY>> of high-speed Internet

15      service customers within its California operating areas,[58] but is not a Tier 1 Internet backbone

16      carrier, and thus must purchase access to the Internet backbone from nonaffiliated providers.

17      MCI, on the other hand, is a Tier 1 Internet backbone provider but, because it has no mass

18      market local "last mile" facilities, is not a consequential player in the mass market high-

19      speed Internet service market.  *In fact, there is no existing firm that offers both retail high-*

20      *speed Internet access in the mass market* and *that is also a Tier 1 Internet backbone*

21      *provider*.  The marriage of Verizon and MCI will create such an entity for the first time (as

---

58.  *Agenda, Today's Discussion,* at 20, VZCA00402098.

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                           LEE L.  SELWYN

1    will the merger of SBC and AT&T), affording the post-merger Verizon a formidable

2    competitive advantage throughout its California service areas and in the rest of its region

3    while giving it both the incentive and the opportunity to engage in discriminatory treatment

4    of nonaffiliated rivals *both with respect to upstream backbone services and downstream*

5    *retail services.*

6

7   Q.   But throughout their Application and supporting declarations, the Joint Applicants repeatedly

8        contend that they do not compete with each other except on a very incidental basis, and that

9        as such the proposed merger will not result in diminished competition.  Is that contention

10       credible?

11

12  A.   No, far from it.  While this contention is being repeated by virtually every Verizon and MCI

13       declarant in this proceeding, *this frequent repetition does not make it so.*  Verizon has long

14       recognized MCI as a major competitor, if not also one of its most formidable rivals.  The fact

15       that MCI may not have been entirely successful in its efforts to compete with Verizon – an

16       outcome that in many instances was the result of regulatory and judicial initiatives by

17       Verizon itself aimed at foreclosing MCI access to Verizon networks and "last mile" customer

18       facilities – does not alter the inescapable *fact* that both firms have been pursuing the same

19       customers in the same geographic areas for an extended period of time.

20

21  Q.   Have the Joint Applicants offered any formal economic or econometric analysis

22       demonstrating that the merger of Verizon and MCI will not have adverse competitive

23       consequences?

71

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  A.  No, and the utter lack of any such formal analysis is particularly noteworthy in view of the

2       extensive qualifications of the Joint Applicants' declarant Daniel L. Rubinfeld in economics,

3       econometrics, and antitrust.

4

5  Q.  When you speak of "formal" analyses, to what specifically are you referring?

6

7  A.  There are several, *none of which are being offered by the Joint Applicants or by any of their*

8       *experts*.  One of the most basic quantitative measures of the effects of a merger on

9       competition is the Herfindahl-Hirschman Index ("HHI") of market concentration.  I will

10      discuss the HHI in more detail later in this testimony.

11

12      Prof. Rubinfeld undertakes to portray the California telecommunications market as intensely

13      competitive by including within the "market" so-called "inter-modal" alternatives to

14      conventional wireline telephone services, things like wireless, Voice over Internet Protocol

15      ("VoIP"), cable telephony, and broadband.  As I shall discuss in more detail below, there are

16      formal analytical methods for identifying the "relevant product market" applicable to the

17      assessment of the competitive impact of the merger of two firms.  These are spelled out in

18      considerable detail in the Department of Justice/Federal Trade Commission *Horizontal*

19      *Merger Guidelines*.  Given Prof. Rubinfeld's prior affiliation with the Department of Justice

20      and with its Antitrust Division in particular, he is undoubtedly quite familiar with this

21      document and with its analytical prescriptions.  Indeed, Prof. Rubinfeld has explained in a

22      previous FCC filing, "The Herfindahl-Hirschman Index (HHI) represents a standard antitrust

72

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                        LEE L.  SELWYN

1    tool used to assess the measure of concentration in any market."[59]  Dr. Rubinfeld chooses,

2    however, to bypass this "standard antitrust tool" in favor of rhetorical characterizations of

3    wireless, VoIP, broadband and cable services as being putative "substitutes" for wireline

4    telephony, relying upon various third-party "forecasts" of demand growth and employing

5    trendy buzz-words like "convergence" and "industry dynamics."  He offers bold assertions

6    like "wireless service is a competitive alternative to wireline service for most customers"[60]

7    without quantitatively measuring the actual cross-elasticities associated with this putative

8    "competitive alternative."

9

10   Q.   What significance should the Commission ascribe to this lack of formal quantitative

11        analysis?

12

13   A.   Prof. Rubinfeld has previously noted the importance of formal analytical methods such as the

14        HHI.  His failure to employ such methods here is no simple accident or oversight:  Had he

15        employed the analytical framework outlined in the *Horizontal Merger Guidelines* or that he

16        himself had employed elsewhere, there is little doubt that his – and the Joint Applicants' –

17        claims as to the importance of "inter-modal competition" could not have been supported.

---

59.  *See,* Federal Communications Commission, *Applications for Consent to the Transfer of Control of Licenses MediaOne Group, Inc., Transferor, To AT&T Corp., Transferee*, CS Docket No. 99-251, *Declaration of Daniel L. Rubinfeld and J. Gregory Sidak on behalf of Bell Atlantic and GTE*, August 23, 1999.

60.  *Rubinfeld Declaration,* at para. 116.

73

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  Q.  Prof. Rubinfeld also claims that the merger of Verizon and MCI will have "no

2      anticompetitive effects because of few overlaps."[61]  Does he offer any formal analysis to

3      support this contention?

4

5  A.  No, and in fact he does not even follow his own prescription as to how the potential for

6      competition should be examined.

7

8  Q.  Please explain.

9

10 A.  In advancing his argument that Verizon and MCI confront extensive competition from other

11     providers and other services, Prof. Rubinfeld places a great deal of emphasis upon forecasts

12     and projections of *future* competitive growth.  He explains that:

13
14         To correctly assess the competitive effects of the transaction it is important to
15         employ a forward-looking view of competition (as is the standard practice when
16         analyzing antitrust issues in dynamic industries).  In industries characterized by
17         rapid technological change, such as the communications industry, the competitive
18         significance of particular suppliers may be understated when looking at historical
19         data and other information relating to both customers and competitors. [62]
20

21     Significantly, however, when it comes to providing an assessment of the specific competitive

22     impact of the merger of the two companies, Prof. Rubinfeld confines himself to *what is*, and

23     does not speak of *what would be* in the event that the merger is not allowed to go forward.

---

61.  *Id.*, at para. 157 (caption).

62.  *Id.*, at para. 111.

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED – PUBLIC VERSION**

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    Prof. Rubinfeld's discussion of the lack of overlaps between Verizon and MCI, at paras. 158-

2    166 of his declaration, is written in the present or past tense, and thus describes only the

3    present status of the two companies' activities and facilities.  For example:

5    There *is* little overlap of Verizon's and MCI's facilities, and where such overlaps
6    exist, there arc other competitors providing service in those areas. The same holds
7    true with respect to overlap of services. Whereas MCI *has* a large base of enterprise
8    customers throughout the nation and the world, Verizon *serves* only a small part of
9    the enterprise segment and does so primarily within its region.  Whereas Verizon
10   *has* a base of residential and small business customers within its region, MCI *has*
11   *been* experiencing a continuing decline in its consumer business, and cannot
12   reasonably be expected to be a significant competitor in the residential and small
13   business segment.  Moreover, as stated previously, there are and are likely to
14   continue to be a substantial number of competitors  in both the enterprise and
15   residential/small business segments.[63]

17   Prof. Rubinfeld would apparently have the Commission believe that without the merger

18   Verizon would simply roll over and play dead when it comes to competing in the specific

19   lines of business in which MCI is presently engaged (and which Verizon purported is not).

20   For example, Prof. Rubinfeld notes that "[w]hile Verizon competes to serve the enterprise

21   segment to some extent, it has not made significant inroads there.  Because it was a relatively

22   late entrant, Verizon has lagged in the provision of enterprise services."[64]  It would seem that

23   Prof. Rubinfeld is a master of the understatement.  According to Verizon's *Fourth Quarter*

24   *2004 Investor Quarterly*, "Enterprise revenues totaled approximately *$6 billion in 2004,*

25   *increasing 4.9 percent in the fourth quarter 2004 and 1.9 percent in the full year, compared*

---

63.  *Id.,* at para. 158, emphasis supplied.

64.  *Id.,* at para. 134.

75

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L. SELWYN

1    *with the same period in 2003*.[65]  MCI reported 2004 Enterprise revenues at $4.8-billion – i.e.,

2    *actually about 20% less than Verizon*.[66]  MCI Commercial and Enterprise revenues total

3    <<BEGIN VZ/MCI PROPRIETARY            END VZ/MCI PROPRIETARY>>

4    meaning that after only a few years in the nationwide enterprise and commercial market,

5    Verizon has nearly <<BEGIN VZ/MCI PROPRIETARY        END VZ/MCI

6    PROPRIETARY>> of the business revenues of MCI.[67]  If all MCI enterprise (small and large

7    business), consumer, and SkyTel revenues are in the analysis, revenue from all MCI services

8    is only 57% larger than Verizon's current stand-alone *enterprise* revenues.  Verizon itself, in

9    its analysis of MCI's long term strategies in May of 2004, noted <<BEGIN VZ/MCI

10   PROPRIETARY

11                                    END VZ/MCI PROPRIETARY>>

12

13   These figures are not surprising in light of the successes Verizon has seen in gaining

14   enterprise market share since it received long distance authority throughout its local region.

15   Verizon's "Enterprise Advance" service, designed to meet the needs of national business

---

65.  Verizon Communications, *Fourth Quarter 2004 Investor Quarterly*, at 4, emphasis supplied.

66.  MCI Inc., *2004 Annual Report*, April 20, 2005, at 7 (note that MCI defined enterprise services only as "large global" corporate and government entities).

67.  MCI Commercial and Enterprise revenues from *Verizon, Project Eli Finance,* September 23, 2004, at 12, VZCA 00000824.

68.  *Verizon Anticipated Long-Term Strategies of AT&T, Sprint, and MCI*, May 3, 2004, at 11, VZCA 00260346.

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

1   customers with many locations,[69] has seen significant growth.  According to an internal

2   Verizon report, the Enterprise Advance successes have included:

3

4   •    <<BEGIN VZ/MCI PROPRIETARY



15   END VZ/MCI PROPRIETARY>>[70]

16

17   $6-billion in 2004 enterprise revenues – and Verizon is just getting started.  At least with

18   respect to its legacy Bell Atlantic jurisdictions in the Northeast, Verizon could not be a

19   serious player in the enterprise segment prior to its receipt of Sec. 271 in-region authority.

20   Of course, in California Verizon was under no line-of-business restriction with respect to

21   long distance, and could certainly have been – and likely was – pursuing and serving

22   enterprise customers for some time.  Verizon had obtained Sec. 271 authority in all of its

23   (former Bell Atlantic) states by March of 2003, and so has been qualified as a full-fledged

24   competitor in the enterprise segment for more than two years.  Verizon has been immensely

---

69.  *See*, Verizon Website, *Verizon Enterprise Solutions Group*, available at:
http://www22.verizon.com/enterprisesolutions/Includes/SiteUtilities/JCMSSkeleton.jsp?filePath
=/Anonymous/Default/ProductDetail/CorpNetwork/EnterpriseAdvanced.html, (accessed August
3, 2005).

70.  *Verizon Domestic Telecom: State of the Business*, at 3, VZCA 00079352.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    successful in amassing market share in the *consumer* long distance segment over the short

2    time that it has been allowed to offer in-region service (see Figure 1: Verizon Long Distance

3    Market Shares), and as of the third quarter of 2004 enjoyed a <<BEGIN VZ/MCI

4    PROPRIETARY          END VZ/MCI PROPRIETARY>> share of the consumer long

5    distance market within its California ILEC operating areas.[71]  The percentage has doubtless

6    increased since that time.  Verizon predicts that it will have an <<BEGIN VZ/MCI

7    PROPRIETARY          END VZ/MCI PROPRIETARY>> share of long distance customers

8    by 2013.[72]  Indeed, it is precisely this rapid acquisition of consumer long distance share by

9    both Verizon and SBC that has helped to drive AT&T and MCI out of that segment

10   altogether.  There is no basis for concluding – and indeed Prof. Rubinfeld offers none – that

11   absent the merger Verizon would not be as aggressive a competitor for enterprise business as

12   it has been for consumer business.

13

---

71.  See fn. 43, supra.

72.  *Retail Markets Long-Term strategy: Financial Model Overview*, March 31, 2004, at 75,
VZCA 00455170.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN



**Figure 1**.  Verizon Long Distance Market Share Growth by state since receiving Section 271 in-region long distance authority

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L.  SELWYN

1  Q.  Is it reasonable to expect that, absent its merger with MCI, Verizon would expand its

2      activities in the enterprise segment and compete directly and aggressively with MCI both

3      here in California and nationally throughout the Verizon region?

4

5  A.  Yes, of course.  Verizon's analysis of the implications of the MCI merger with the enterprise

6      services group indicated that it expected the merger would effect <<BEGIN VZ/MCI

7      PROPRIETARY                                          END VZ/MCI

8      PROPRIETARY>> certainly not that it would not engage in organic growth. [73]  Verizon

9      characterized the implications of this merger as <<BEGIN VZ/MCI PROPRIETARY

10                                     END VZ/MCI PROPRIETARY>>   Verizon has had

11     region-wide long distance authority for a little more than two years, which is not nearly

12     enough time for its position in the large enterprise segment to become established.  Unlike

13     mass market customers, most large enterprise customers enter into term contracts with their

14     carriers, typically covering two- and three-year terms.  Even when their current contract is up

15     for renewal or renegotiation, the process is often lengthy and methodical.  RFPs are

16     developed and issues, responsive proposals are received and evaluated, and following

17     selection of one or more providers contract negotiations themselves may involve

18     considerable time and effort.  It would be entirely unreasonable – as Dr. Rubinfeld seems to

19     have done – to look at Verizon's current, still nascent position in the enterprise segment and

20     to assume that absent its merger with MCI that condition would remain immutable.  If it is

---

73. *ESG CLC Update, Ed McGuinness,* September 23, 2004, at 16, VZCA 00000448.

74. *Id.*

80

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1    not allowed to absorb MCI, Verizon will pursue a "Plan B" of some sort.  It may try to

2    recruit sales and account managers from MCI and AT&T.  It may significantly expand its

3    marketing efforts.  It may offer aggressive pricing and packaging to lure customers away

4    from MCI and AT&T.  While we may not know with precision exactly what Verizon's "Plan

5    B" might be, it is absolutely certain that there would be a "Plan B" and that it would be

6    pursued aggressively.  The real winner in such circumstances would be the enterprise

7    customer – who would be confronted with *more* competitive choices and almost certainly

8    with lower prices.  Yet Verizon's Prof. Rubinfeld seems to have assumed that there is no

9    "Plan B" and that without the merger the Verizon enterprise segment would simply go away.

10   Such an assumption is absurd.

11

12   Q.   But doesn't MCI now claim that it is experiencing a "continuing and irreversible decline of

13        its consumer business " to the point where it is now "substantially reducing its marketing

14        efforts to consumers, and refocusing its emphasis on the large enterprise segment."[75]?

15

16   A.   That is MCI's contention, but this claim does not comport with the "facts on the ground."

17        Consumer services account for roughly <<BEGIN VZ/MCI PROPRIETARY      END

18        VZ/MCI PROPRIETARY>> of MCI's January, 2005 revenues."[76]  Roughly <<BEGIN

19        VZ/MCI PROPRIETARY     END VZ/MCI PROPRIETARY>> percent of MCI's consumer

---

75.  *Hallbach Declaration*, at para. 34, *Rubinfeld Decl*aration, at para. 11.

76.  *Hallbach Declaration*, at para. 34; MCI News Release, "MCI Announces First Quarter 2005 Result," May 5, 2005,  available at http://global.mci.com/about/investor_relations/news/, To estimate January 2005 total MCI revenues, quarterly revenues were divided by 3.

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED – PUBLIC VERSION**

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    services revenue is from 'stand alone' long distance (i.e., consumers that do not obtain local

2    service from MCI) while <<BEGIN VZ/MCI PROPRIETARY        END VZ/MCI

3    PROPRIETARY>> of consumer revenue is from subscribers that purchase a local/long

4    distance bundle.[77]  MCI has more than <<BEGIN VZ/MCI PROPRIETARY        END

5    VZ/MCI PROPRIETARY>> million local service customers,[78] and approximately <<BEGIN

6    VZ/MCI PROPRIETARY        END VZ/MCI PROPRIETARY>> residential customers

7    in California as of January 2005.[79]  In its April 2004 "Line Loss Strategy Session" Verizon

8    indicated that the <<BEGIN VZ/MCI PROPRIETARY        END VZ/MCI

9    PROPRIETARY>> in California consumer line losses in March 2004 were attributable to

10   <<BEGIN VZ/MCI PROPRIETARY        END VZ/MCI PROPRIETARY>>

11   Significantly, this remaining MCI local service customer base is one of the largest in

12   California; in fact, according to the Commission's most recent study of local competition in

13   California, *all CLCs combined – including MCI – had a total of less than 1 million*

14   *residential customers as of 2003.*[81]

---

77.  *Id.*

78.  *Id.*

79.  *Id.* It is noteworthy that MCI still asserts "confidentiality" to this and other data regarding its activities in the local service market.  If its decision to exit this market is as "irreversible" as MCI now claims, its concern that other CLCs – companies that are no longer "competitors" of MCI if MCI's claim of having irreversibly exited this market is to be believed – would gain some unspecified competitive advantage from access to this market data is certainly curious, if it wholly inconsistent with its professed "irreversible" decision.

80.  *Verizon Line Loss Strategy Session Materials,* April 2004, VZCA 00275443.

81.  *The Status of Telecommunications Competition in California*, California Public Utilities

(continued...)

82

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  Q.   What importance should the Commission afford the Joint Applicants' claim that the decline

2       of its consumer business is irreversible?

3

4  A.   This contention is particularly curious when considered in the context of how we got to

5       where we are in terms of the competitiveness of the consumer telecommunications market,

6       because to the extent that this assessment is correct, it is Verizon – and its sister RBOCs –

7       that are directly responsible for this result.

8

9  Q.   Please explain.

10

11 A.   The 1984 break-up of the Bell System – and in particular the structural separation of entities

12      providing local and long distance services – was intended to prevent the monopoly local

13      carriers – the BOCs – from using their control of the local market to foreclose competition in

14      the adjacent long distance market.  The *Telecommunications Act of 1996* provided a means

15      by which the BOCs could reenter the in-region long distance market by satisfying certain

16      network access and unbundling requirements – set out at 47 U.S.C. §271(c)(2)(B) – thereby

17      facilitating CLC entry into the *local* market.  Had this process worked as intended, CLCs

18      would have amassed a base of *local* customers – through the use of BOC facilities – that

19      would constrain BOC exercise of market power in both the local and long distance segments.

20      By the time the last of the BOC §271 applications was approved (in 2003), most of the

_____

81.  (...continued)
Commission, Third Report for the Year 2003, in Compliance with Section 316.5 of the
California Public Utilities Code, submitted October 31, 2003, at Chart 3.1.a.

**REDACTED – PUBLIC VERSION**

ETI  ECONOMICS AND
TECHNOLOGY, INC.

1    service ordering and provisioning problems had been worked out, and competing carriers

2    were succeeding in acquiring retail customers and in providing both local and long distance

3    services to them.  At about the same time, Verizon, SBC and the other RBOCs initiated an

4    aggressive, and ultimately successful, campaign to extricate themselves from the very

5    unbundling requirements that they had been required to – and had putatively *agreed* to –

6    satisfy as a condition for in-region long distance entry.  They argued to both the FCC and the

7    courts that the fact that CLCs were successful in serving customers and in competing with

8    the BOCs *proved* that the CLCs were no longer "impaired" in their ability to compete

9    without access to the UNE platform (UNE-P) and UNE switching.  The decisions by both

10    AT&T and MCI to exit or to curtail their activities in the consumer segment was driven

11    directly and specifically by the withdrawal of UNE-P.  Ironically, the "irreversible" decline

12    in the consumer segment that MCI now portrays provides a compelling demonstration that

13    MCI *is* "impaired" in its ability to compete with Verizon (and other ILECs) without access to

14    UNE-P.  Consumer demand for telecommunications is not in the decline – indeed, consumers

15    are spending more on all varieties of telecommunications services today than ever before.

16    MCI has been squeezed out of the market by Verizon and the other RBOCs and their

17    successes in the regulatory arena – and that is certainly not the same as claiming that MCI

18    simply does not compete with Verizon.

19

20    **The proposed merger violates the specific market concentration provisions of the**
21    **Department of Justice/Federal Trade Commission *Horizontal Merger Guidelines*.**
22

23    Q.   You have made several references to the *Horizontal Merger Guidelines* as issued by the

24        United States Department of Justice and the Federal Trade Commission.  Aren't these

84

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                      LEE L.  SELWYN

1    agencies – and not the California PUC – the ones principally charged with assessing the

2    potential effect of the proposed merger upon competition?

3

4  A.  They have that responsibility, but certainly not to the *exclusion* of the California PUC.

5    §854(b)(3) specifically directs the *Commission* to find that the merger does not adversely

6    affect competition.  Indeed, read in the context of other portions of the PU Code, such as

7    §709.2(c), it is clear that the Commission has an *independent* responsibility to assure the

8    continuation of a competitive telecommunications market.

9

10  Q.  That said, is it reasonable for the Commission to utilize similar analysis techniques and

11    standards in assessing potential competitive impact as might also be used by the DoJ or the

12    FTC?

13

14  A.  Yes, because such techniques are rooted in valid economic theory and analysis.  The

15    *Horizontal Merger Guidelines*, in particular, focus heavily upon market definition and

16    market concentration.  These issues have been raised by the Joint Applicants in this

17    proceeding – contentions that the "relevant market" includes basic local and long distance

18    wireline services, wireless, VoIP, cable, and more.  By positing an overly expansive market

19    scope, the Joint Applicants hope to portray the effect of their merger as not resulting in undue

20    concentration in the "relevant market."  However, the *Guidelines* provide a very explicit

21    analytical framework for addressing these questions, and they should be closely followed in

22    assessing the Joint Applicants' largely unsupported and certainly unquantified rhetoric.

23

85

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  Q.   What standard must be satisfied with respect to the effect of a merger upon market

2        concentration under the *Horizontal Merger Guidelines*?

3

4  A.   First, it is important to recognize that the *Horizontal Merger Guidelines* are not cast in stone,

5        but rather provide a framework with which to understand the effects of a merger.  These

6        guidelines place particular emphasis upon the effect of a proposed merger on *market*

7        *concentration*.  A sufficiently large increase in market concentration, according to the

8        *Guidelines*, is "likely to create or enhance market power or facilitate its exercise."[82]

9

10 Q.   How is market concentration measured, and what specific thresholds do the *Guidelines*

11       establish as indicative of competitive concerns?

12

13 A.   §1.5 of the *Merger Guidelines* provides the following specification as to the measurement

14       and potential anticompetitive effect of a merger-driven increase in market concentration:

15
16            Market concentration is a function of the number of firms in a market and their
17            respective market shares. As an aid to the interpretation of market data, the Agency
18            will use the Herfindahl-Hirschman Index ("HHI") of market concentration.  The
19            HHI is calculated by summing the squares of the individual market shares of all the
20            participants. ...
21
22            The Agency divides the spectrum of market concentration as measured by the HHI
23            into three regions that can be broadly characterized as unconcentrated (HHI below
24            1000), moderately concentrated (HHI between 1000 and 1800), and highly
25            concentrated (HHI above 1800).  Although the resulting regions provide a useful
26            framework for merger analysis, the numerical divisions suggest greater precision
27            than is possible with the available economic tools and information.  Other things

---

82.  *Horizontal Merger Guidelines*, at §1.51.

86

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1     being equal, cases falling just above and just below a threshold present comparable
2     competitive issues.
3
4     In evaluating horizontal mergers, the Agency will consider both the post-merger
5     market concentration and the increase in concentration resulting from the merger.
6     Market concentration is a useful indicator of the likely potential competitive effect
7     of a merger.  The general standards for horizontal mergers are as follows:  a) Post-
8     Merger HHI Below 1000.  The Agency regards markets in this region to be
9     unconcentrated.  Mergers resulting in unconcentrated markets are unlikely to have
10    adverse competitive effects and ordinarily require no further analysis.  b) Post-
11    Merger HHI Between 1000 and 1800. The Agency regards markets in this region to
12    be moderately concentrated.  Mergers producing an increase in the HHI of less than
13    100 points in moderately concentrated markets post-merger are unlikely to have
14    adverse competitive consequences and ordinarily require no further analysis.
15    Mergers producing an increase in the HHI of more than 100 points in moderately
16    concentrated markets post-merger potentially raise significant competitive concerns
17    depending on the factors set forth in Sections 25 of the Guidelines.
18
19    c) Post-Merger HHI Above 1800.  The Agency regards markets in this region to be
20    highly concentrated.  Mergers producing an increase in the HHI of less than 50
21    points, even in highly concentrated markets post-merger, are unlikely to have
22    adverse competitive consequences and ordinarily require no further analysis.
23    Mergers producing an increase in the HHI of more than 50 points in highly
24    concentrated markets post-merger potentially raise significant competitive concerns,
25    depending on the factors set forth in Sections 25 of the Guidelines. Where the post-
26    merger HHI exceeds 1800, it will be presumed that mergers producing an increase
27    in the HHI of more than 100 points are likely to create or enhance market power or
28    facilitate its exercise.  The presumption may be overcome by a showing that factors
29    set forth in Sections 25 of the Guidelines make it unlikely that the merger will create
30    or enhance market power or facilitate its exercise, in light of market concentration
31    and market shares.[83]

32

33  Q.   In which of these categories do the various markets in which both Verizon and MCI

34       participate fall?

35

_____

      83.  *Id*., at §1.51.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                              LEE L.  SELWYN

1    A.   Without question, the various product/service markets in which both merger partners operate

2         – basic local exchange service, long distance for residential and small business customers and

3         enterprise customers – all are "highly concentrated" as the term is defined by the *Guidelines*.

4         That is, all have HHIs of at least 1800 within the Verizon region prior to the merger.  As I

5         presented in Table 2 earlier, the merger presents significant risks to the long distance market

6         in California, given the substantial increase in Verizon's HHI post-merger.

7

8    **Verizon and MCI attempt to broaden the "relevant product and geographic market" for**
9    **their wireline services in order to create the appearance of lower market concentration, but**
10   **the "intermodal" services they identify do not belong to the same "relevant product and**
11   **geographic market" as these concepts are defined in the *Horizontal Merger Guidelines*.**
12

13   Q.   How do the Joint Applicants deal with the apparent violation of the *Merger Guidelines* that

14        the proposed transaction would entail?

15

16   A.   Through their outside expert, Prof. Rubinfeld, the Joint Applicants advance several theories

17        aimed at undermining the applicability of the HHI analysis to the evaluation of the proposed

18        merger, although they do not offer specific HHI calculations reflecting these alternate views

19        of the market.  Their arguments can be summarized, generally, as follows:

20

21        •    Historic market shares (upon which the HHI calculations are based) are not relevant

22             because of the dynamic nature of the telecommunications market.

23

24        •    The "relevant product market" to be used in evaluating the effect of the merger upon

25             market concentration must include the various "intermodal" alternatives to traditional

88

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1      Verizon and MCI wireline local and long distance services, such that under this

2      expansive definition of the "relevant product market," the respective Verizon and MCI

3      shares are sufficiently small so that the market cannot be considered as highly

4      concentrated.

5

6   While the *Merger Guidelines* do expressly recognize that "in some situations, market share

7   and market concentration data may either understate or overstate the likely future

8   competitive significance of a firm or firms in the market or the impact of a merger," [84] the

9   largely rhetorical and anecdotal "evidence" being advanced by the Joint Applicants does not

10  *quantitatively* satisfy the required showings.

11

12  Q.  What process is specified in the *Guidelines* for the determination of the "relevant product

13      market" for purposes of a market concentration analysis?

14

15  A.  According to the *Horizontal Merger Guidelines,* a "relevant product market" consists of

16

17      a product or group of products such that a hypothetical profit-maximizing firm that

18      was the only present and future seller of those products ("monopolist") likely would

19      impose at least a "small but significant and nontransitory" increase in price.  That is,

20      assuming that buyers likely would respond to an increase in price for a tentatively

21      identified product group only by shifting to other products, what would happen?  If

22      the alternatives were, in the aggregate, sufficiently attractive at their existing terms

23      of sale, an attempt to raise prices would result in a reduction of sales large enough

---

84.  *Id.*, at §1.52.

89

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L.  SELWYN

1    that the price increase would not prove profitable, and the tentatively identified
2    product group would prove to be too narrow.[85]
3

4  In other words, products (or services) are considered to fall within the same "relevant product

5  market" if consumers thereof consider them sufficiently close substitutes that a price increase

6  in one product would result in a sufficiently large shift in demand to the substitute product as

7  to make the price increase unprofitable.

8

9  The *Guidelines* suggest the following analytical process for making this assessment:

10
11    In considering the likely reaction of buyers to a price increase, the Agency will take
12    into account all relevant evidence, including, but not limited to, the following:
13
14    (1)  evidence that buyers have shifted or have considered shifting purchases
15         between products in response to relative changes in price or other competitive
16         variables;
17
18    (2)  evidence that sellers base business decisions on the prospect of buyer
19         substitution between products in response to relative changes in price or other
20         competitive variables;
21
22    (3)  the influence of downstream competition faced by buyers in their output
23         markets; and
24
25    (4)  the timing and costs of switching products.[86]

26

27  Q.  Have the Joint Applicants offered any evidence specifically addressing any of these four

28      points?

---

85.  *Horizontal Merger Guidelines*, at §1.11.

86.  *Id.*

90

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  A.  No.

2

3  Q.  Do the Joint Applicants agree that the HHI analyses as specified in the *Guidelines* are

4       controlling in this case?

5

6  A.  No.  As I mentioned earlier, despite Dr. Rubinfeld's previous use of such quantitative

7       measures, neither Joint Applicants nor their outside experts mention the *Horizontal Merger*

8       *Guidelines* or concede their relevance to this merger.  And, to the extent that regulators

9       and/or the Department of Justice may nevertheless seek to apply the *Guidelines*' market

10      concentration test – the HHI – to the instant situation, the Joint Applicants have attempted to

11      portray an overly expansive definition of the "relevant product and geographic market,"

12      arguing that even after the merger the combined company will still have only a small share of

13      this (expansive) market.

14

15  Q.  So how do the Joint Applicants characterize the "relevant product market"?

16

17  A.  They offer highly subjective, anecdotal, and entirely superficial analyses of so-called

18      "intermodal" competition to the traditional Verizon and MCI *wireline* local and long distance

19      services.  They claim, for example, that consumers are replacing their traditional wireline

20      telephones with wireless, cable telephony, or Voice over Internet Protocol (VoIP) services.

21      To support this claim, they first cite various statistics on the growth in absolute demand for

22      these services and then point to a concurrent decrease in demand for basic wireline local

91

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    service and long distance calling.  The intended inference is that there is a nexus between

2    these two changes.

3

4  Q.   Are these contentions and inferences correct?

5

6  A.   No, they are not.  Neither Verizon nor MCI nor any of the outside experts offer any evidence

7       demonstrating a connection between growth in the use of wireless, VoIP, and cable telephony

8       services and the drop in access lines and wireline long distance usage.   Of even greater

9       importance, they have produced no evidence whatsoever demonstrating that the post-merger

10      Verizon would be unable to impose at least a "small but significant and nontransitory"

11      increase in its prices because the putative intermodal alternatives were, in the aggregate,

12      sufficiently attractive at their existing terms of sale such that an attempt by Verizon to raise

13      prices would result in a reduction of sales large enough that the price increase would not

14      prove profitable.  Although I will address the matter of "intermodal competition" at greater

15      length later in my testimony, several key conclusions are worth summarizing here:

16

17      •     While an extremely small number of consumers (in the range of 3% to 6%, depending

18            upon which "study" one believes) with certain specific demographic attributes may have

19            discontinued their wireline telephone service and rely upon wireless as their primary

20            access to the public switched network, the vast majority of consumers – in excess of

21            94% and perhaps as much as 97% – view wireless as *complementary* to, and not as a

22            substitute for, their wireline telephone.

23

92

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    •    Most of the drop in demand for wireline access lines is likely attributable to the

2         migration of consumers from dial-up to high-speed Internet access, and not to other

3         alternative voice services.  According to Verizon, <<BEGIN VZ/MCI PROPRIETARY

4                                                                         END VZ/MCI

5         PROPRIETARY >> In 1990, long before anyone was even thinking about the Internet as

6         a mass market consumer medium, only about 4.2% of US households had more than one

7         access line.  By 2001, when dial-up access demand for Internet service had reached its

8         peak, some 24.41%, or 26.3-million, US households had two or more access lines.  As of

9         2004, some 29-million households nationally have subscribed for high-speed Internet

10        access, either DSL (from the phone company) or cable modem service (from the local

11        cable television operator).  According to Verizon's own studies, <<BEGIN VZ/MCI

12        PROPRIETARY

13

14

15                          END VZ/MCI PROPRIETARY>>  The purportedly "lost" second line

16        revenues have been largely replaced by DSl customers and generally pay the ILEC *more*

17        for the DSL service than they did for the additional dial-tone access line.  There is

18        simply no evidence that the drop-off in demand for local wireline access is due to

---

87.  *Competition and Technology Substitution of Access Lines, 2005 B Assumptions Review 5-3-2004, Prepared by Ronita Matias, Economics and Competitive Market Analysis,* at 18, VZCA 00384477.

88.  *Id.,* at 13, VZCA 00384472.

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    wireless substitution; the vast majority is due to a technological shift to high-speed

2    Internet access.

3

4    •    VoIP services are currently being used by approximately 1-million residential consumers

5         nationwide (statistics for California are not available). I am not aware of any studies that

6         have identified the number of VoIP customers that have *replaced* their basic wireline

7         service entirely with VoIP, however, that number is likely very small.  For one thing, in

8         order to use VoIP, the consumer needs high-speed Internet access, either via DSL or

9         cable modem.  Most ILECs either do not offer so-called "naked DSL" (i.e., DSL

10        independent of a customer's purchase of the ILEC's basic exchange service) or if they

11        do, there is a substantial additional charge.  Thus, virtually all of the 4.1-million Verizon

12        consumers that currently use DSL for internet access also have dialtone service from

13        Verizon or another LEC, so those that also subscribe to VoIP are *not* using it as a

14        replacement for their primary phone service.[89]

15

16    •    In considering VoIP's potential, it is also important to recognize that the existing

17        demand for this service has come primarily from the "early adopters," those consumers

18        that will be among the first to experiment with new technologies and new gadgets.  Of

19        course, the percentage of consumers that represent early adopters is typically small, in

20        the low, single digit range.  VoIP still has numerous unsolved service problems,

21        including access to E-911 Public Safety Access Points (PSAPs) and voice transmission

---

89.  Verizon Communications, *Second Quarter 2005 Investor Quarterly*,  at 1.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

1    quality.  VoIP also requires local power, and is thus subject to outage during a power

2    failure.  It is *premature* to extrapolate from the limited early adopter demand for VoIP to

3    conclude that this technology represents a serious competitive challenge to Verizon or

4    MCI wireline services.  And if, as and when it does, one can be almost certain that both

5    firms, whether merged or independent, will both be extremely active in providing VoIP

6    services over their existing networks and service provisioning infrastructures.  In fact,

7    both MCI and Verizon are already marketing VoIP services to consumers, and the

8    combined effects of Verizon's wireline DSL dominance together with MCI's Tier 1

9    Internet backbone status will assure that the combined company will be a formidable

10   VoIP powerhouse if VoIP ultimately becomes the "standard" for basic phone service.

11   Verizon cannot be taken seriously in claiming that it faces competition from itself.

12

13  Q.  What standard should the Commission consider in determining whether any of these

14      intermodal services are part of the "relevant product market" in which the Joint Applicants

15      primarily operate?

16

17  A.  Intermodal services may be considered as falling within the same relevant product market as

18      wireline telephony if a sufficient portion of consumers view them as economic substitutes –

19      specifically (and as provided in the *Merger Guidelines*), where a "small but significant and

20      nontransitory increase in price" would cause a sufficiently large number of customers to shift

21      their demand to the alternative service so as to make the price increase unprofitable.   The

22      anecdotes being advanced by Verizon, MCI and their outside experts, which deal with a

23      small number of customers (most likely atypical consumers), do not constitute the required

95

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    showing and must be afforded no weight in the Commission's analysis of the potential

2    competitive impact of the proposed merger.

3

4    Q.    What sort of quantitative data or studies could the Joint Applicants have provided, assuming

5          of course that their otherwise unsupported contention as to intermodal substitution were valid

6          to begin with?

7

8    A.    There are, in fact, quantitative tests for substitutability – specifically, the cross-elasticity of

9          demand between putatively substitute products or services.  If two products, A and B, are

10         substitutes worthy of being considered part of the same relevant product market, then a

11         change in the price of A will have a measurable effect upon the demand for B, and vice

12         versa.  Significantly, while a number of the Joint Applicants' outside economic experts have

13         provided extensive discussions of the putative intermodal competition that their clients

14         confront, *none have offered any quantitative evidence as to the actual cross-elasticity of*

15         *demand between their clients' wireline services and any of the intermodal alternatives they*

16         *present*.

17

18   Q.    Is there any quantitative evidence upon which the Commission can rely that would

19         affirmatively *refute* the anecdotal claims of substitutability being advanced by the Joint

20         Applicants and their outside experts?

21

22   A.    Yes.  In fact, one need look no further than the wireline local service market in the Los

23         Angeles metropolitan area.

96

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                     LEE L. SELWYN

1    The greater Los Angeles metropolitan area is divided between SBC California and Verizon

2    California (the former GTE-California).  Significantly, however, there is a large gap between

3    the SBC and Verizon price levels for the equivalent basic exchange service:

4

|  Table 3 | |
| --- | --- |
| Comparison of Verizon and SBC California Residential Rates | |
| ILEC | Monthly 1FR rate (incl.  FCC SLC) |
| SBC California | $ 15.11 |
| Verizon California | $ 23.75 |
| Price difference | $ 8.64 |
| Percent difference | 57.2% |

15

16    Verizon's rates are thus some 57.2% higher than SBC's, leading us to conclude that the

17    Verizon and SBC service areas are separate and distinct "relevant geographic markets" as

18    defined by the *Horizontal Merger Guidelines*.[90]  Importantly, however, the prices for the

---

90. *Horizontal Merger Guidelines*, at §1.21.  The *Guidelines* define "the geographic market to be a region such that a hypothetical monopolist that was the only present or future producer of the relevant product at locations in that region would profitably impose at least a 'small but significant and nontransitory' increase in price, holding constant the terms of sale for all products produced elsewhere." That is, if the SBC and Verizon exchanges within the greater LA area were in the same geographic market, then Verizon customers, faced with having to pay the extra $8.64 over the corresponding SBC price, would relocate their residences to SBC territory in sufficient numbers so as to force Verizon to bring its prices into line with SBC's.  Verizon has thus been able to sustain its "[not-so-]small but significant nontransitory" price differential relative to SBC precisely because it is operating in a separate geographic market, since few if

(continued...)

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1 putative "intermodal alternatives" identified by the Joint Applicants and their outside experts

2 – particularly wireless, cable telephony and VoIP – *are no higher in Verizon exchanges than*

3 *in SBC territory*.[91]  So even if Verizon and SBC do not compete with one another in their

4 respective – and separate – geographic markets, they would presumably each be competing

5 with the same "inter-modal" wireless, cable and VoIP providers and with prices that are the

6 same in both ILEC service areas.  If wireless, cable telephony and VoIP were, as the Joint

7 Applicants and Prof. Rubinfeld contend, part of the same "relevant product market" as basic

8 wireline telephone service, Verizon would be unable to maintain its "[not-so-]small but

9 [quite] significant [and certainly] nontransitory" price differential relative to SBC.  The fact

10 that Verizon is able to maintain its $23.75 1FR price in the face of a $14.48 price being

11 offered by Comcast provides compelling proof that the vast majority of consumers do not see

12 cable telephony as falling in the same "relevant product market" as ILEC service, the

13 "relevant product market" that is applicable to this merger.

14

15 And in that regard, it is *essential* to recognize that the *Merger Guidelines* neither expect nor

16 call for *zero substitution* or zero cross-elasticity between two products in order for them to be

17 raise competitive concerns.  The *Guidelines*' test is whether product B is a sufficiently close

18 substitute for (hypothetically monopolized) product A that the provider of A could not

---

90.  (...continued)
any consumers would relocate their residence to an SBC exchange merely to save $8.64 per month on their phone bill.

91.  For example, Comcast, which provides telephone service in the greater Los Angeles area in both SBC and Verizon service areas, charges the same $14.48 monthly rate (including the SLC) irrespective of the underlying ILEC residential exchange service rate.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1    profitably implement a "small but sustainable and nontransitory" increase in the price of A.

2    At best, Prof. Rubinfeld has shown that there is *non-zero* substitution, a not-so-interesting

3    and certainly not particularly surprising "fact" that has absolutely no relevance to the

4    definition of the "relevant product market" applicable to the competitive impact analysis that

5    the Commission is required by §854(b)(3) to perform in connection with its review of the

6    instant merger application.

7

8    Q.   Are there other examples of this kind of pricing behavior by Verizon in California?

9

10   Q.   Yes.  Despite Verizon's claims that it faces significant competitive pressure from cable and

11        intermodal providers, it has not lowered its prices or improved its service offerings to answer

12        this competition.  For example, Table 4 below provides the details of several "unlimited"

13        plans offered in San Diego or Los Angeles areas.  In all but one case, Verizon's

14        "competitive" offer is both more expensive and includes fewer features than purported

15        intermodal competitors– despite the virtually *zero* marginal cost to Verizon of providing

16        these additional features.  In the case of VoIP Broadvoice with Cox cable modem, for $5.00

17        more than Verizon's Unlimited offer, customers get unlimited calling to the United States

18        and 20 other countries as well as cable modem service.

19

20   In each competitive offer by a cable company or intermodal alternative, the included features of

21   the plan as well as the price make it clearly a better option than Verizon's unlimited bundle– if

22   consumers truly do see these services as substitutes.  Under the DOJ's *Guidelines*, Verizon's

99

ETI ECONOMICS AND
TECHNOLOGY, INC.

1 ability to sustain a price level significantly above (for lesser service), that of intermodal

2 alternatives indicates a strong likelihood that these products are not in the same market.

| Table 4 | | | |
|---|---|---|---|
| Comparison of Verizon Intermodal California Residential Unlimited Plans | | | |
| Company | Monthly Rate | Includes Voice Mail | Vertical Features Included |
| Verizon California | $ 54.95 | No | 3 |
| Cox | $ 48.89 | No | 15 |
| Comcast | $ 48.95 | No | 5 |
| VoIP Broadvoice (With Cox Cable Modem) | $59.90 | Yes | 24 |
| Wireless (T-Mobile) | $ 39.99 | Yes | 4 |
| Sources: Verizon website, http://www22.verizon.com/ForYourHome/sas/sas_LocalPlans.aspx Cox website, http://www.cox.com/sandiego/highspeedinternet/pricing.asp and http://www.cox.com/sandiego/telephone/connection_nationwide.asp (For cable modem prices, it was assume that the customer took cable television service); Comcast website (http://www.comcast.com) and Comcast Phone of California Schedule P.U.C.  No.1, Sheet No. 114-T, 3rd Revised, effective December 25, 2004; T-Mobile Website, http://www.t-mobile.com/plans/?tab=national (Since Verizon uses 350 minutes to benchmark long distance savings with its unlimited plan, I have used the T-Mobile plan including 600 anytime minutes and unlimited nights and weekends.) | | | |

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1          INTERMODAL COMPETITION AND MARKET CONCENTRATION

2

3    **Consumer purchases of wireless, cable, and VoIP are not sufficient to prevent the post-**
4    **merger Verizon from imposing a "small but significant and nontransitory increase" in the**
5    **price of its wireline services without losing so much business as to make the price increase**
6    **unprofitable.**
7

8    Q.   Dr.  Selwyn, we have been discussing the concept of "intermodal competition" in the context

9         of the *Horizontal Merger Guidelines'* specification for defining the "relevant product

10        market."  Have you analyzed the specific effect of the sources of such intermodal

11        competition being claimed by the Joint Applicants upon wireline local and long distance

12        services that would be provided by a post-merger Verizon?

13

14   A.   Yes, I have.  None of the Joint Applicants' anecdotal evidence would support a finding,

15        consistent with the *Merger Guidelines* prescription, that any of the specific intermodal

16        services they or their outside experts identify are sufficiently close substitutes to Verizon's

17        wireline services so as to prevent Verizon from implementing a "small but significant and

18        nontransitory price increase" without losing so much business to these putative "intermodal"

19        alternatives as to make the price increase unprofitable.  When the effect of these intermodal

20        alternatives in constraining the continued market power of an incumbent telco is examined in

21        a comprehensive and analytical manner, it becomes evident that their relative importance is

22        minimal at best.  Moreover, given that Verizon and its corporate affiliates are themselves

23        either the *source* of or a provider of essential inputs to at least *some* of the "intermodal"

24        services, characterizing these services as a competitive threat to Verizon's traditional

25        wireline services is disingenuous.

101

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                        LEE L.  SELWYN

1  Q.  Please explain.

2

3  A.  At best, the "evidence" being offered by Prof. Rubinfeld and other Joint Applicant declarants

4      demonstrates the presence of *some*, albeit minimal, substitution of wireless, VoIP or cable

5      telephony for traditional wireline services.  But that it not the relevant standard.  What

6      matters – and the only thing that matters if these "inter-modal" alternatives are to be included

7      within the same "relevant product market" as wireline telephony – is that their existence and

8      availability is sufficient to prevent a post-merger Verizon from implementing a "small but

9      significant and nontransitory price increase" without losing so much business to these

10     putative "intermodal" alternatives as to make the price increase unprofitable.  For example,

11     Joint Applicants' declarant Prof. Rubinfeld cites an increase of 94-million wireless

12     subscribers since December 1999.[92]  This information is a bit misleading, because it includes

13     as individual "subscribers" each wireless phone in a "family plan" package (e.g., a family

14     plan customer with, say, four phones would be counted as four "subscribers"), pricing plans

15     that were first introduced only a few years ago.  As such, the increase in the number of

16     *households* with at least one wireless phone is far less dramatic.  Moreover, if consumers

17     truly viewed wireless as a close substitute for wireline, then the vast increase in the number

18     of wireless phones would be matched by a correspondingly large drop in the number of

19     *wireline* phones, but nothing even close to that has actually taken place.  Indeed, Prof.

20     Rubinfeld concedes that "[b]etween December 2001 and December 2004 Verizon's retail

21     lines in service fell by <<BEGIN VERIZON PROPRIETARY    END VERIZON

---

92.  *Rubinfeld Declaration*, at para. 46.

ETI ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED – PUBLIC VERSION**

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    PROPRIETARY>> percent."[93]  However, recent data from Verizon's 1st Quarter 2005

2    Earnings Conference Call indicate that if consumer broadband (i.e. DSL) lines are added to

3    residential access lines there is *zero* quarterly change in access lines.  That is, the gain in

4    DSL lines cancels out the *entire* residential access line loss – including loss from additional

5    Verizon lines and any purported intermodal competition.[94]

6

7    To be sure, some very small amount of wireless and other intermodal substitution has been

8    taking place *at the margin*, but it is extremely limited, both with respect to residential, small

9    business, and enterprise services.  By subscribing to *both* wireline and wireless or other

10   purported intermodal services such as cable modem or DSL, the vast, overwhelming majority

11   of consumers are *confirming* that they see wireline and these other services as *complements*

12   to one another, and not as substitutes.  Indeed, this complementary status is best illustrated by

13   irrefutable fact that the vast majority (indeed, very close to all) of households that have a

14   wireless telephone also have a wireline phone.  Thus, wireless and wireline are *not in the*

15   *same relevant product market* and that *wireless is not an "intermodal competitor" for*

16   *traditional wireline telephone service.*

17

---

93. *Id.*, at para. 24.

94. Verizon Communications, *First Quarter 2005 Earnings Conference Call*, April 27, 2005, slide exhibit at 23, available at: http://investor.verizon.com/news/20050427/ (accessed August 12, 2005).

103

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  **Where it occurs, wireless substitution is minimal at best**

2

3  Q.   Are you suggesting that no one has substituted wireless service for wireline service?

4

5  A.   No, but as I have previously noted, *zero substitution* is not the standard being called for in the

6        *Merger Guidelines* as the basis for defining the relevant product market.  Of course there has

7        been *some*, albeit extremely limited, substitution of wireless for wireline, but certainly not

8        anywhere near enough to constrain wireline prices.  A recent paper presented at the

9        American Association of Public Opinion Research by Julian V. Luke *et al* of the Centers for

10       Disease Control and Prevention, National Center for Health Statistic presents an independent,

11       unbiased, view of the extent of wireless substitution, and its demographics.  Using data from

12       the National Health Interview Survey, January-December 2003, the authors determined that

13       3.1% of civilian non-institutionalized adults have only a wireless phone, and 3.7% of all

14       households are wireless-only.

15

16       To be sure, some RBOCs have cited studies (often conducted by or for them) that purport to

17       show somewhat higher, but typically still single-digit, substitution rates.[95]  However, even

18       these likely-exaggerated statistics still confirm that well in excess of 90% of all households

---

95.  Federal Communications Commission, *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements; 2000 Biennial Regulatory Review of the Separate Affiliate Requirements of Section 64.1903 of the Commission's Rules*, WC Docket No. 02-112 and CC Docket No. 00-175, *Ex Parte Submission of Qwest Communications*, filed October 28, 2003; Federal Communications Commission, *Section 272(f)(1) Sunset of the BOC Separate Affiliate and Related Requirements; 2000 Biennial Regulatory Review of the Separate Affiliate Requirements of Section 64.1903 of the Commission's Rules*, WC Docket No. 02-112 and CC Docket No. 00-175, *Ex Parte Submission of SBC*, filed October 15, 2003.

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    do not consider wireline and wireless to be substitutes, and hence not in the same relevant

2    product market.  In any event, whether the substitution rate is 3%, 5%, 10% or more, the *only*

3    applicable question – which *none* of these studies even *address* is whether the availability of

4    wireless as a substitute for wireline service is sufficient to constrain wireline prices.  The

5    Joint Applicants provide absolutely no evidence or data whatsoever to support the conclusion

6    that the availability of wireless services constrains prices for wireline service today or would

7    constrain them under post-merger conditions.  In fact, what little evidence does exist on this

8    subject (such as the sustained wireline price differential between Verizon and SBC within the

9    Los Angeles metropolitan area) compels precisely the opposite conclusion – *that wireless*

10    *substitution does not constrain wireline pricing to any measurable degree*.  And, since the

11    *overwhelming majority* of consumers retain their wireline service even when they also have

12    one or even multiple wireless phones in their household, the only reasonable conclusion is

13    that the overwhelming majority of consumers do not perceive the two services as

14    "substitutes" and that wireless service is *not* in the same "relevant product market" as

15    wireline.

16

17  Q.  Prof. Rubinfeld cites three "econometric studies demonstrate that wireless services are

18    important economic alternatives for fixed lines and usage that are exerting price pressure on

19    traditional wireline service."[96]  Are you familiar with these studies?

20

---

96. *Rubinfeld Declaration*, at para. 52.

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1   A.  Yes.  The first, a study by Rodini, Ward, and Woroch, presents evidence that mobile services

2       are an economic alternatives to *second* fixed lines.  This study does not address whether

3       wireless presents an economic alternative for *primary* lines, nor if it exerts price pressure on

4       traditional wireline service.  Even as it relates to secondary lines, the number of customers

5       substituting wireless for wireline is necessarily severely limited.  As I discussed earlier,

6       Verizon evidence indicates that the overwhelming majority of second lines are used for dial-

7       up internet service– a function for which a wireless phone can not yet be considered a

8       substitute.

9

10      The second study, by Horváth and Maldoom, Professor Rubinfeld characterizes as

11      illustrating that "using a mobile phone significantly depresses the use of fixed lines."[97]  What

12      Professor Rubinfeld fails to note is that this study is entirely based upon *British* fixed and

13      wireless data, and is funded by British Telecom.[98]  There are important differences between

14      the British and US wireline and wireless telephone systems, not the least of which is that

15      most areas do not have local flat-rate calling, and wireless plans are generally called-party-

16      pays.  Additionally, while the British study did show some substitution in terms of minutes,

17      the authors note that they were unable to quantify any effects of primary line "access"

18      substitution– actual "cutting the cord."[99]

---

97.  *Id.,* at fn. 41.

98.  Horváth, Réka and Dan Maldoom, "Fixed-mobile substitution: a simultaneous equation model with qualitative and limited dependent variables," DotEcon DP No. 02/02, August 2002, available at: http://www.dotecon.com/publications/dp0202.pdf, (accessed August 9, 2005).

99.  Id, at 6.

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1  The final study cited by Professor Rubinfeld, by Australians Madden and Cobie-Neal,

2  "examines the substitution effect between fixed-line and mobile telephony while controlling

3  for the consumption externality associated with telephone networks." [100]  According to

4  Professor Rubinfeld's description, the authors "also show a substantial fixed-mobile

5  substitution effect."  Prof. Rubinfeld fails to note that this study shows a substantial

6  substitution effect across a dataset comprised of 58 countries from 1995-2000. [101]  Included in

7  this dataset are nations across every income range, including 10 low income, 11 lower-

8  middle, 9 upper-middle and 28 high income nations across Africa, Asia, Europe, the Middle

9  East and the Western Hemisphere.  Of course, the pricing, service quality and viability of

10  both wireline and wireless services vary widely between these 58 countries, there being little

11  or no similarity between the economic, social or market situation for telecommunications

12  between Pakistan, Indonesia, or Tunisia (for example) and the United States generally or

13  California specifically.  For example, in many developing countries it is not unusual for

14  thieves to steal copper telephone wires to sell for scrap, or for a customer to have to pay

15  numerous bribes to have a telephone installed and maintained. [102]  Professor Rubinstein's

---

100.  Madden, Gary and Coble-Neal, Grant, "Economic determinants of global mobile telephony growth," Information Economics and Policy 16 (2004) 519-534, abstract.

101.  *Id.*, at 522.

102.  *See, e.g.* Medina, Martin, "Informal Recycling and Collection of Solid Wastes in Developing Countries: Issues and Opportunities" *United Nations University*, July, 1997, at 6, http://www.gdrc.org/uem/waste/swm-ias.pdf, (accessed July 9, 2005); Sametband, Ricardo, "Argentina's New Wireless Problem," *Wired News*, November 20, 2002, http://wired-vig.wired.com/news/technology/0,1282,56365,00.html, (accessed July 9, 2005); Ranjit, Dev Raj, "Cross talk over 'poor person's' mobile," *Asia Times Online*, October 6, 1999, available at: http://www.atimes.com/ind-pak/AJ06Df01.html, (accessed July 9, 2005).

(continued...)

**REDACTED – PUBLIC VERSION**


ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1    attempt to imply that this study is relevant to the substitutability of wireless for wireline

2    services in California is irresponsible and seriously misleading.

3

4  Q.  Is there other evidence to confirm your view that Prof. Rubinfeld's assessment of wireless

5    substitution is exaggerated and overstated?

6

7  A.  Yes, and it would appear that Prof. Rubinfeld has ignored this more recent data, data that

8    actually undermines his contention.  A report in the June 2, 2005 *Wall Street Journal* notes

9    that, in fact, "While the number of wireless-only households is increasing – close to 6% of all

10   U.S. homes at the end of last year, according to Forrester Research Inc. – the trend isn't

11   accelerating as quickly as many experts predicted.  And some consumers are reconsidering

12   their decision to go wireless and are reconnecting to a landline."[103]  The *Journal* article goes

13   on to note that

14
15       When the Federal Communications Commission in November 2003 began allowing
16       customers to switch their home phone number to a cellphone, a huge shift to
17       wireless-only consumers was expected. About 820,000 people did make the move
18       through the end of last year, according to the FCC, but that was only a fraction of
19       what was predicted.[104]
20

---

102.  (...continued)

103.  "Cutting the Phone Cord Isn't as Popular as Once Predicted," Christopher Rhoads, *The Wall Street Journal*, June 2, 2005, at p. B1.

104.  *Id.*

108

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    Particularly noteworthy is the fact that "for the first time in five years, the number of primary

2    consumer landlines actually rose in the first quarter at SBC Communications Inc."[105]

3    Moreover, the *Journal* reports that many consumers who, responding to surveys, had said

4    that they were planning to discontinue their wireline phone did not follow through on that

5    plan.  This could well explain some of the disparity among the various "studies" purporting

6    to address this issue.  But whichever of those studies one chooses to believe, all confirm that

7    somewhere in the mid- to high-90% range of US consumers with wireless phones also have

8    wireline phones – and do not consider wireless as a "substitute" for wireline.

9

10   Q.   How would you measure the level of substitutability between two purported substitute

11        products such as wireless and wireline telephone service?

12

13   A.   A measurement of the cross-price elasticity between the two products would provide a

14        reasonable sense of their level of substitutability.

15

16   Q.   Would you please define the term "cross-price elasticity?"

17

18   A.   Cross-price elasticity is a measure of the change in demand for a product given a

19        corresponding change in price for a different good.  This value can indicate whether two

20        products are complements or substitutes, and measures the sensitivity of consumers as to the

21        rate at which they consume these products given their corresponding prices.  The cross-price

---

105.  *Id.*

109

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1    elasticity for two related products is calculated as the percentage change in the quantity

2    demanded of product X, divided by the percentage change in price of product Y.  A positive

3    cross-price elasticity indicates that two products are substitutes, while a negative value

4    indicates the products are complements.  A resulting absolute value of more than 1.0 would

5    indicate a relatively high level of cross-elasticity, indicating a high level of substitution or

6    price sensitivity.  An absolute value of less than one indicates that consumers have a

7    relatively low level of cross-elasticity ("inelasticity") which would indicate that, even if two

8    products were substitutable for certain purposes, consumers would not be likely to substitute

9    one product for the other as a result of changes in price.

10

11  Q.   To the best of your knowledge, has Prof. Rubinfeld calculated such a cross-price elasticity

12       for wireless and wireline services?

13

14  A.   No, it does not appear that he has conducted any such study of the relationship between

15       wireless and wireline service – certainly he has not offered any such formal quantitative

16       analysis in his testimony.

17

18  Q.   Does the limited evidence of wireless substitution to which Prof. Rubinfeld has referred

19       provide a basis for concluding that wireless and wireline services fall within the same

20       "relevant product market"?

21

22  A.   No, because none of these studies address US wireline/wireless cross-elasticities or show

23       whether wireless constrains wireline pricing.  Moreover, even if the claimed wireless

110

ETI ECONOMICS AND
TECHNOLOGY, INC.

1    substitutes were validly included within the same product market as basic wireline telephone

2    service – which they are not – these services would "compete" with Verizon only where

3    Verizon was not itself also either a provider of wireless services or a provider of essential

4    inputs to nonaffiliated wireless carriers.

5

6    In fact, Verizon is both.  Verizon, BellSouth, and SBC together control some 63% of the

7    major national wireless service providers, and may individually control a disproportionately

8    larger share within their respective wireline service footprints, in part as a result of

9    "bundling" wireless with wireline.  All wireless carriers make extensive use of ILEC special

10   access services to interconnect their transceiver sites with the wireless carrier's Mobile

11   Telephone Switching Office ("MTSO"); thus, at least a portion of any wireline revenues

12   "lost" to nonaffiliated wireless carriers will also come back to Verizon in the form of

13   additional special access services required by the wireless carrier to meet the additional

14   demand.  Thus, even an actual "loss" of a wireline customer to wireless – in the rare

15   instances where that may occur – in most instances is *not a loss* of the customer to Verizon.

16

17   **Use of a wireless phone as a "primary phone," or for long distance calling, is *not***
18   **"intermodal competition."**

19

20   Q.   Prof. Rubinfeld cites several studies that purport to show that many wireless subscribers do

21        have a wireline phone, but use their wireless handset as their "primary" phone. [106]  How are

22        these subscribers using their wireless phones as their "primary" phone?

_____

106.  *Rubinfeld Declaration*, at para. 54.

111

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1   A.   The most common application in which customers may use their wireless phones from home

2        is to originate long distance calls.  Most wireless rate plans include long distance calling at

3        no additional charge (as long as total usage stays within the block of time selected by the

4        customer) and, where the rate plan provides "free" night and weekend calling or "free" on-

5        net or "family" calling, or provides a block of time that significantly exceeds the customer's

6        typical needs, customers would perceive wireless-originated long distance as "free."  Not

7        surprisingly, consumers have shifted substantial portions of their long distance calling to

8        their wireless phones.  Despite that *usage substitution*, as noted, *very few customers have*

9        *actually disconnected their wireline service altogether*, and many still choose long distance

10       wireline calling plans that involve some fixed monthly charge.  In a July 26, 2005 investor

11       briefing, Verizon noted that as of the end of the second quarter 2005, some 60% of all

12       consumer lines were subscribing to bundles and key services,[107] and also reported year-over-

13       year growth in long distance of 8.8%.[108]  It's difficult to square Prof. Rubinfeld's contention

14       that customers are "substituting" wireless for wireline when placing toll calls, when so many

15       continue to purchase long distance bundles and utilize Verizon Long Distance calling

16       services from their wireline phones.

17

18  Q.   How is it that wireless carriers are able to offer seemingly "free" long distance service?

19

---

107.  Verizon Communications, *Second Quarter 2005 Earnings Conference Call*, July 26, 2005, transcript at 6, available at http://investor.verizon.com/news/20050726/.

108.  Verizon Communications, *Second Quarter 2004 Investor Quarterly*, at 13.

112

**REDACTED – PUBLIC VERSION**

ET  ECONOMICS AND
    TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  A.  Completely ignored in most analyses of usage substitution – and certainly overlooked by

2      Prof. Rubinfeld – is the fact that wireless carriers' ability to offer "free" long distance calling

3      stems from certain pecuniary distortions created by FCC regulations, and *not* from any

4      production efficiency or technological advantage.   A unique regulatory treatment allows

5      wireless carriers to avoid paying access charges in many cases where a wireline long distance

6      carrier would incur these charges.  Because their access charge burden is significantly lower

7      than that confronting wireline carriers (and because they charge for airtime usage), wireless

8      providers often do not assess a discrete charge for long distance calls.

9

10 Q.  Can you explain this in more detail?

11

12 A.  Wireline long distance carriers are required, pursuant to Part 69 of the FCC's rules,[109] to pay

13     access charges to local exchange carriers for the origination and termination of interexchange

14     calls carried by the IXC.[110]  Wireline ILECs, such as Verizon, are required by Sec. 272(e)(3)

15     of the 1996 Act to "impute" access charges into their retail long distance rates.

16     "Interexchange" calls are defined for this purpose as calls between exchanges not within the

17     same local calling area.  Local calling areas are ordinarily established in ILEC (or CLC)

18     tariffs and are subject to approval by the state commission.  However, in the case of *wireless*

---

109.  47 CFR §69.105

110.  IXCs are required to pay access charges on *all* calls handed off to them, even if the
two endpoints of the call are physically located within the same ILEC local calling area.



**REDACTED – PUBLIC VERSION**

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    carriers, the FCC has *preempted* the state commissions with respect to the definition and

2    scope of *wireless* local calling areas.[111]

3

4  Q.  What is the effect of the FCC's preemption of state commissions with respect to designating

5      wireless local calling areas?

6

7  A.  The FCC has designated wireless local calling areas at the "Major Trading Area" (MTA)

8      level.  Unlike wireline local calling areas that typically involve distance of between 10 and

9      30 miles from the calling party's location, MTAs are large expanses of geography.

10     Nationwide, there are only 51 MTAs, many of which encompass entire states or even several

11     states.  Wireless calls are considered to be "local calls" when placed to points anywhere

12     withing the same MTA from which the call had originated.  Such "local calls" are considered

13     by the FCC to be Section 252(b)(5) local traffic, which is not subject to access charges,

14     irrespective of distance (which could be up to several hundred miles) or jurisdiction

15     (intrastate or interstate).

16

17     This federal preemption operates to expressly *exempt* wireless carriers from paying access

18     charges on any intra-MTA, wireless-originated call, even where the very same call would be

19     subject to access charges if placed from a wireline phone.  Those access charges – that

20     wireless carriers avoid – fall between about 1.1 cents per minute for interstate calls, to as

---

111.  Federal Communications Commission, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, CC Docket No. 96-98, *First Report and Order*, 11 FCC Rcd 15499 (1996), at para 1036.

ECONOMICS AND
TECHNOLOGY, INC.

**REDACTED – PUBLIC VERSION**

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1    much as 1.8 cents a minute or higher for California intrastate calls.  In fact, the effect of this

2    *intra-MTA* access charge exemption can be seen in the chart presented as Figure 3 in Prof.

3    Rubinfeld's declaration.  On its face, the chart would seem to imply an absolute decrease in

4    wireline switched access minutes, which (according to this chart) had peaked at about 560-

5    billion in 2000 but had dropped to less than 440-billion by 2003.  Yet according to Prof.

6    Rubinfeld's Figure 7, "the trend in wireless minutes of use has exceeded the growth of

7    wireless subscribers ..."[112]  But wireless-originated long distance calls still mostly terminate

8    at *wireline* phones, so why are wireline switched access minutes decreasing?  One key

9    explanation for the *apparent* decrease is that while *intra-MTA wireline long distance calls*

10   are subject to switched access charges, *intra-MTA wireless long distance calls are not*.

11   Hence, Prof. Rubinfeld's data actually shows the effects of a *reclassification* of switched

12   access minutes to 47 U.S.C. §252(b)(5) local intercarrier traffic.  It is difficult to square the

13   existence of this substantial FCC-imposed *intermodal* economic distortion with the notion

14   that consumer migration to "free" wireless long distance calling represents a *bona fide*

15   economically-based intermodal alternative.

16

17   Q.  Are there any wireline services where substantial wireless substitution has taken place?

18

19   A.  Interestingly, customers have substituted wireless calling for their use of payphones and

20   hotel-provided (outgoing) telephone services – two services where *locational monopolies* (by

21   payphone owners and hotel operators) had resulted in excessive prices.  In both of these

---

112.  *Rubinfeld Declaration*, at para. 49.

REDACTED – PUBLIC VERSION

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                   LEE L.  SELWYN

1    markets, these locational monopolists lost significant business to wireless once customers

2    had an alternative way to place their calls from transient locations.

3

4    Q.   Has this type of wireless substitution been recognized in any of the "studies" cited by Prof.

5         Rubinfeld or by other Joint Applicant outside experts?

6

7    A.   Not specifically.  Indeed, by having ignored this real source of wireless substitution, those

8         "studies" have likely *misattributed* at least some of the wireless long distance minutes as

9         having come from consumers' home phones rather than from demand that would have

10        otherwise been placed over payphones or from hotels.  As such, the "studies" have overstated

11        the actual extent of long distance substitution.

12

13   Q.   Are payphone and hotel telephone services part of the "relevant product market" applicable

14        to this merger?

15

16   A.   Perhaps at the wholesale level, but certainly not at the retail level.  Prices for calls from

17        hotels are set by the hotels themselves, and prices for payphone calls are set by the payphone

18        owner or operator service provider.  In fact, many ILECs have been divesting their payphone

19        business.

20

21   Q.   Does the use of wireless phones in place of payphones or hotel phone services impose any

22        price constraints upon basic wireline local and long distance services offered by either

23        Verizon or MCI?

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  A.  No.  This is a separate and distinct market that, by definition, involves only calls originated

2       by customers away from their home or place of work.

3

4  **RBOC actions indicate that even wireline carriers perceive wireless service to be an**
5  **integrated complement to, and distinctly not a substitute for, traditional wireline service**.
6

7  Q.  You have previously asserted that wireless is not a substitute for wireline service.  Can you

8       provide any other specific evidence that suggests that wireless is not perceived to be a

9       substitute for wireline?

10

11 A.  Yes.  Even among those consumers who do rely upon wireless for most of their calling, the

12      continued demand for wireline phones for emergencies and for incoming calls is

13      demonstrated by a recent offering by Cingular Wireless and its RBOC owners, SBC and

14      BellSouth.  With its new "FastForward" service, Cingular customers whose local wireline

15      provider is either SBC or BellSouth can place their wireless phone in a special cradle, which

16      then signals Cingular to automatically forward all incoming cell phone calls to the

17      customer's wireline home phone.  Under this arrangement, which SBC and Cingular describe

18      as "integration" of wireless and wireline service, the customer does not incur a charge for air

19      time usage on the forwarded call.  BellSouth and SBC also permit their bundled wireline and

20      wireless customers to share one bucket of long distance minutes between their wireless and

21      wireline phone.  Verizon promotes its "Verizon Plus" stores, where "customers can purchase

117

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    telephone equipment, wired and wireless services or pay home phone and Verizon Wireless

2    bills."[113]

3

4    Q.   What do you conclude from these combinations?

5

6    A.   Clearly, ILECs such as Verizon are attempting to integrate wireless and wireline services,

7         rather than pit them against one another in competition.   Verizon ILECs are not treating

8         Verizon Wireless as a "competitor" of their local exchange services at all.  In fact, they sell

9         Verizon Wireless services through their own sales channels.

10

11        Far from positioning themselves as a substitute, such joint marketing programs are more

12        likely to stimulate additional demand for both wireline and wireless RBOC services.  The

13        fact that the RBOCs perceive a demand for these integrated service arrangements and

14        benefits of joint wireline/wireless marketing programs cannot be squared with their otherwise

15        unsupported contentions that wireless and wireline are substitutes.

16

17   Q.   Have the Joint Applicants provided any hard evidence that quantifies the price-constraining

18        effect of "intermodal substitution?"

19

---

113.  Verizon News Release, "Verizon Invites Texas, Florida Customers to Cut the Cable
and Integrate Calling, Internet and DIRECTV Programming," March 29, 2004, available at
http://newscenter.verizon.com/proactive/newsroom/release.vtml?id=84353 (accessed August 12,
2005).

118

**REDACTED – PUBLIC VERSION**

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                       LEE L.  SELWYN

1   A.   No, they have not.  I've previously discussed Prof. Rubinfeld's purported "economic

2        studies," and beyond these woefully inappropriate studies, Prof. Rubinfeld never attempts to

3        quantify actual cross-elasticities.

4

5   **Limited competition from cable providers at best produces a duopoly market outcome for**
6   **services that depend upon bottleneck "last mile" facilities**
7

8   Q.   Please explain how, even when there is an intermodal alternative such as cable telephony

9        available to consumers, the presence of this alternative could fail to constrain the market

10       power of an incumbent monopoly provider.

11

12  A.   As I have previously noted, hard evidence "on the ground" in California confirms that

13       Verizon California has maintained its price level for basic flat-rate residence service even in

14       the face of cable telephony prices some $9 below Verizon's basic local residential rate.

15       Clearly, very few of Verizon's basic wireline service customers perceive cable telephony as a

16       sufficiently close substitute that Verizon is not being forced to cut its price level.  A key

17       shortcoming of cable telephony competition is that it is limited to the retail level.  One of the

18       catalysts for the *1996 Act* was the promise, or at least the potential, that monopoly cable

19       operators and monopoly ILECs would enter each other's business.  Cable providers had been

20       flirting with telephony for a number of years and, indeed, it was the prospect of cable

21       bypassing the ILEC bottleneck and serving as the second wire into the home that prompted

22       AT&T's disastrous foray into cable TV in 2000.  Current cable TV operators like Comcast,

23       Time Warner, and RCN offer retail local telephone service to their (primarily residential)

24       cable subscribers, but do not, and are not required to, make components of their networks

119

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1    available to CLCs on an unbundled or even on a bundled resale basis.  Thus, while cable TV

2    companies compete with the incumbent LECs on a retail basis, they are not a source of

3    *wholesale* competition for access to facilities into the home.

4

5    Q.    But doesn't the presence of retail competition from cable providers serve to constrain ILEC

6          market power?

7

8    A.    Not really.  Cable telephony has been touted as having great competitive promise, but that

9          potential has been slow to develop.  As an initial matter, it is a costly undertaking to upgrade

10         cable systems from their traditional one-way analog video distribution capability to a

11         network architecture capable of supporting digital video and two-way services such as high-

12         speed Internet access and circuit switched voice telephony.  Nationally, cable passes

13         approximately 107-million homes,[114] but not all of these facilities are telephony-capable, thus

14         making cable less ubiquitously available than wireline telephone service.  Of those 107-

15         million homes passed, only about 61% currently subscribe to cable TV service.[115]  However,

16         by year end 2004, cable systems were providing basic local telephone service to only about

17         3.71-million customers nationwide.[116]  Thus, the 3.71-million cable telephony subscribers

---

114.  Federal Communications Commission, *Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming,* MB Docket No. 04-227, *Eleventh Annual Report*, rel. February 4, 2005.

115.  *Id.*

116.  *Local Telephone Competition Report,* at Table 5.

REDACTED – PUBLIC VERSION

ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                          LEE L.  SELWYN

1    represent only 3.5% of all homes passed by cable, 5.7% of all cable TV subscribers, and

2    approximately 2% of all local telephone access lines.

3

4    Up to now, at least, the bulk of the required investment has been directed at upgrades to

5    support digital cable services and cable modem high-speed Internet access, and it is not all

6    clear that substantial additional investment in *circuit-switched* telephony will occur.

7    Comcast, for example, has recently announced plans to pursue a VoIP strategy[117] apparently

8    in place of any further circuit-switched telephony roll-out.  For residential and small business

9    customers, cable telephony is the only remaining vestige of facilities-based local competition

10   to the ILECs.  Yet there is no indication that cable telephony is in any material sense

11   operating to constrain ILEC prices and market power.

12

13   With other CLCs disabled from serving customers over ILEC loops (unless they incur

14   significant *uneconomic* switching investment) and with no obligation for cable companies to

15   provide CLCs with access to their local loops or switching facilities, what remains at best is a

16   cable/ILEC duopoly in the retail market.  In fact, a recent report by McKinsey & Company

17   for Verizon addressing "Perspectives on Consumer VoIP" refers to Comcast as a <<BEGIN

18   VERIZON PROPRIETARY                                                                END

19   VERIZON PROPRIETARY>>[118]

---

117.  "Comcast Plans Major Rollout of Phone Services Over Cable," *The Wall Street Journal*, January 10, 2005, at B1.

118.  McKinsey & Company, *Perspectives on Consumer VoIP: Discussion Document,* October 2004, VZCA00390803.

**REDACTED – PUBLIC VERSION**                ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  Q.  What are the economic implications of a duopoly market outcome?

2

3  A.  Duopoly markets, where two firms carve up all of the demand between them, tend to behave

4       like monopolies, not like competitive markets, in that both firms charge prices above

5       marginal cost.[119]  In other words, if cable is the only actual competitor to the ILECs for basic

6       local telephone service, its presence is not likely to have any material effect in constraining

7       ILEC prices and market power over "last mile" facilities.

8

9  Q.  Are there other physical differences between cable telephony and wireline ILEC services that

10      make them less-than-perfect substitutes?

11

12 A.  Yes.  In most cases, cable telephony relies upon *locally-provided* power at the customer's

13      premises, and also relies upon *locally-provided* power for repeater sites between the cable

14      head-end and the customer's home.  As a result, a power failure may often mean that the

15      cable telephone service is out as well.  By contrast, the ILEC service is powered from the

16      central office, which is equipped with extensive power backup facilities.  In most cases,

17      ILEC phone service is not interrupted by an electric power failure, but that is not so with

18      cable telephony.

19

---

119.  W. Kip Viscusi, *et al*, *Economics of Regulation and Antitrust Second Edition*, MIT Press, 1998, at 81.

122

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                         LEE L.  SELWYN

1  **Decreases in ILEC access lines are attributable to the decline of the second line market,**
2  **rather than to consumer "substitution" of "intermodal" alternatives**.
3

4  Q.  Prof. Rubinfeld seeks to attribute recent declines of RBOC access lines to competition,

5        especially from intermodal alternatives such as wireless and VoIP services.  Do you agree

6        with his contention that consumers are substituting wireless and VoIP service for traditional

7        wireline service?

8

9  A.  No, and in fact there is no evidence – certainly nothing advanced by Prof. Rubinfeld – that

10      this is taking place.  There is no question that the quantity of wireline basic exchange access

11      lines has been declining in recent years, but "intermodal competition" is not the only, or even

12      the primary source of this drop-off in demand for ILEC access lines.  One source may have

13      been the economic downturn that began in 2001.  The largest influence, however, is

14      undoubtedly the substantial *growth* in the demand for high speed Internet access via DSL and

15      cable modem services.  In the early 1990s – prior to the advent of mass market public access

16      to the Internet – only about 4.1% of all US households had more than one local telephone

17      access line.  However, beginning in the mid-1990s, the growing interest in dial-up Internet

18      access stimulated the demand for additional residential access lines; by 2000, some 26% of

123

ETI ECONOMICS AND TECHNOLOGY, INC.

Cal. PUC A.05-04-020                              LEE L.  SELWYN

1  all US households had at least one additional wireline access line.[120]  DSL and cable modems

2  *replace* those additional dial-up access lines that had been installed principally for the

3  purpose of accessing the Internet.[121]

4

5  Of course, the ILECs themselves provide a substantial share of these alternative (high-speed)

6  Internet access arrangements.  In California, <<BEGIN VZ/MCI PROPRIETARY  END

7  VZ/MCI PROPRIETARY>> of high speed residential access lines (as of the fourth quarter

8  2003) in Verizon's region are provided by Verizon.[122]  As Verizon notes, <<BEGIN VZ/MCI

9  PROPRIETARY

10      END VZ/MCI PROPRIETARY>> Once the transition from dial-up to high-

11  speed Internet access has been completed, the outlook for Verizon with respect to its basic

12  core residential local telephone service is not one of continually declining demand.

13

---

120.  The SEC 10K Annual Reports of all of the RBOCs note significant growth in "additional residential lines" during this period. Verizon Communications, 1999 Annual 10K Report, filed March 10, 2000; Bellsouth Corp., 1999 Annual 10K Report, filed March 2, 2000; Qwest Corporation, 1999 Annual 10K Report, filed March 3, 2000; Bell Atlantic Corp., 1998 Annual 10K Report, filed March 30, 1999.

121.  In fact, DSL, and even the higher-priced cable modem services, may actually be less expensive for the consumer than continued use of dial-up.  Verizon California's monthly charge for flat-rate residential exchange service – including the interstate SLC – is $23.75 for customers in the greater Los Angeles area.  Add to that the $10 to $24 monthly subscription rate for dial-up Internet service from ISPs such as AOL or Earthlink and you have a total price for the second dial-up access line plus Internet access in the range of $35 to $50.  Verizon California's regular monthly rate for DSL, which *includes* Internet service, is only $37.95.

122.  *Agenda, Today's Discussion,* at 20, VZCA00402098.

**REDACTED – PUBLIC VERSION**

ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                    LEE L.  SELWYN

1  **VoIP services do not avoid the "last mile" bottleneck; moreover, they fall far short of**
2  **wireline services with respect to service quality and their ability to meet national standards**
3  **for emergency 911 service.**
4

5  Q.  Prof. Rubinfeld also claims that Verizon faces intermodal competition from providers of

6       VoIP service.  At this stage of its development, can VoIP legitimately be included within the

7       same relevant product market as the wireline local and long distance services being furnished

8       by Verizon and MCI?

9

10 A.  No.  In order to place the issue of VoIP in its proper context, it is useful first to review the

11      applicable portions of the *Horizontal Merger Guidelines* that address the relevance of new

12      technological substitutes:

13
14       1.521 Changing Market Conditions
15
16       Market concentration and market share data of necessity are based on historical
17       evidence.  However, recent or ongoing changes in the market may indicate that the
18       current market share of a particular firm either understates or overstates the firm's
19       future competitive significance.  For example, if a new technology that is important
20       to long-term competitive viability is available to other firms in the market, but is not
21       available to a particular firm, the Agency may conclude that the historical market
22       share of that firm overstates its future competitive significance.  *The Agency will*
23       *consider reasonably predictable effects of recent or ongoing changes in market*
24       *conditions in interpreting market concentration and market share data.*
25
26       1.522 Degree of Difference Between the Products and Locations in the Market and
27       Substitutes Outside the Market
28
29       All else equal, the magnitude of potential competitive harm from a merger is greater
30       if a hypothetical monopolist would raise price within the relevant market by
31       substantially more than a "small but significant and nontransitory" amount.  *This*
32       *may occur when the demand substitutes outside the relevant market, as a group, are*
33       *not close substitutes for the products and locations within the relevant market.*
34       There thus may be a wide gap in the chain of demand substitutes at the edge of the

125

ETI ECONOMICS AND
TECHNOLOGY, INC.

Cal. PUC A.05-04-020                        LEE L.  SELWYN

1      product and geographic market.  Under such circumstances, more market power is
2      at stake in the relevant market than In a market in which a hypothetical monopolist
3      would raise price by exactly five percent.[123]
4

5   In considering the question as to whether VoIP can be considered part of the "relevant

6   product market" applicable to the competitive impact analysis of the Verizon/MCI merger,

7   the Commission would need to affirmatively find that

8

9   •   The recent or ongoing changes in market conditions attributable to the introduction of

10      VoIP are reasonably predictable;

11

12   •   VoIP is a "close substitute" for traditional wireline services; and

13

14   •   The availability of VoIP would prevent the post-merger Verizon from raising prices of

15      its traditional wireline services by substantially more than a "small but significant and

16      nontransitory" amount.

17

18   Importantly, none of the "evidence" being advanced by the Joint Applicants or their outside

19   experts even addresses any of these specific questions.

20

21 Q.  Is the potential importance of VoIP as a "close substitute" for traditional wireline services

22   reasonably predictable?

23

---

123. *Horizontal Merger Guidelines*, at §§1.521, 1.522.  Emphasis supplied.

126

REDACTED – PUBLIC VERSION

ECONOMICS AND
TECHNOLOGY, INC.