

**Joan Marsh**
Director
Federal Government Affairs

Suite 1000
1120 20th Street NW
Washington DC 20036
202 457 3120
FAX 202 457 3110

November 30, 2004

Ms. Marlene Dortch
Secretary
Federal Communications Commission
445 12th Street, SW, Room TWB-204
Washington, DC 20554

    Re:    Notice of Written Ex Parte Communications, <u>In the Matter of Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers</u>, CC Docket Nos. 04-313 and 01-338

Dear Ms. Dortch:

    Enclosed for filing is an AT&T white paper entitled "Record Evidence That Satisifies USTA II on Contested Points." In accordance with Commission rules, I am filing one electronic copy of this notice and request that you place it in the record of the above-referenced proceedings.

                                                    Sincerely,

                                                     Joan Marsh

cc:    Austin Schlick; Jeremy Miller; Russ Hanser; Ian Dillner

**RECORD EVIDENCE THAT SATISFIES *USTA II* ON CONTESTED POINTS**

This white paper summarizes the record evidence that satisfies the standards of *USTA II* on two contested points relating to enterprise loops and dedicated transport. It demonstrates that the Commission should: (1) reject ILEC claims that the presence of one or two fiber providers in a building eliminates loop impairment and find that the presence of at least two wholesale providers with full building access is necessary to eliminate such impairment, and (2) dismiss any separate claims based on the purported availability of cable-based service.

I.  **THE EXISTENCE OF ONE OR TWO FIBER BASED PROVIDERS IN A BUILDING DOES NOT ELIMINATE LOOP IMPAIRMENT AND THE COMMISSION SHOULD REQUIRE THE PRESENCE OF AT LEAST TWO WHOLESALE PROVIDERS WITH FULL BUILDING ACCESS BEFORE ANY DE-LISTING.**

AT&T has demonstrated that competitive carriers are impaired in providing loops below 3 DS3s of capacity and that this impairment cannot be eliminated unless there are, at the very least, two certified wholesale providers of service that have access to the entire building. ILECs have countered that the presence of one CLEC with fiber to a building is sufficient to satisfy the Act. This contention is baseless and ignores that record evidence and the standards of *USTA II*. The ILECs' claims ultimately reduce to a contention that a duopoly is sufficient to satisfy the goals of the Act, which is a claim that is foreclosed by the Supreme Court and Commission precedents.

1. First, the fact that one CLEC has constructed fiber to a building can establish only that one CLEC has sufficient demand in the building to cover the huge fixed costs of extending fiber to that building. Another CLEC cannot economically extend fiber to the building unless it has committed capacity above the 2 DS3 threshold and other CLECs are thus clearly impaired under the standards of *USTA II*. As the record evidence shows, the determination of economic impairment is carrier- and capacity-specific. "Each business case must be based on the specific, *committed* revenues made by the individual customer under each individual contract proposal," not on other factors, such as the mere existence of other competitors.[1] This is especially true

---

[1] AT&T, D'Apolito-Stanley Dec. ¶ 11; *see also* AT&T, Fea-Giovannucci Dec. ¶ 32 ("For any given carrier, whether deployment is economic depends entirely on how much *traffic* that *specific* carrier has on the point-to-point route in question, how close together the two points are (i.e., how much new outside plant is required) and what alternatives exist to construction on that route. The fact that *another* carrier has built a facility to a given LSO or to a given customer location has nothing whatsoever to do with whether AT&T can economically build a transmission facility between the same two points"); AT&T at 39 ("While one competitor may find it economically feasible to construct a lateral from its metro fiber to a particular location – because of its unique circumstances with regard to committed traffic and a short distance of the customer location from its fiber network – that does not mean that any other carrier whose nearest pre-designed access points is farther away could deploy loops to that same location at the
(continued . . .)

when such other competitors have deployed an OCn facility while the specific carrier only has commitments to provide DS1s or a few DS3s of capacity.

The ILECs also suggest that the existence of one CLEC (or two CLECs) with fiber in the building establishes that this fiber will be used to provide service at wholesale to any CLEC who wants to serve other customers in that building. That is wrong for two reasons. CLECs can only provide wholesale service comparable to the ILEC where they have the right to access an entire building, and the record establishes that CLECs' rights are typically limited to particular floors in a building.[2] For this reason, even those few CLECs that purport to be wholesalers end up being unable to provide service and cancel orders for wholesale loops approximately half the time.[3] In addition, a purchasing carrier must be able to gain access to the competitive loop at its point of termination, which is also rare without having to build a link to the wholesaler or to establish a collocation and cross-connects in an ILEC office.[4] Establishing such cross-connects is extremely expensive and the ILEC application process is so time-consuming that carriers cannot realistically rely on upon it.[5]

Further, even where CLECs have fiber in a building and access rights to the entire building, there are substantial economic barriers to the provision of wholesale services. For

---

(. . . continued)
same capacity level").

[2] *See, e.g.*, AT&T, Fea-Giovannucci Dec. ¶ 44.

[3] *Id.* ¶ 80 n.24 ("what appears to be happening is that a CLEC will indicate that a building is "on-net" when in fact it has only a fiber-to-the-floor arrangement. Thus, when the CLEC accepts the order, it does not actually have facilities in place to serve that customer. After accepting the order, the CLEC will attempt to extend its facilities beyond the fiber-to-the-floor arrangement to serve the AT&T customer, but approximately half of the time such an extension proves to be infeasible, and the CLEC then turns around and cancels AT&T's order").

[4] *See* 11/10/04 AT&T Ex Parte at 3 ("AT&T does *not* wholesale UNE-like facilities that enable another carrier to access a customer loop at an AT&T network location – as required by the definition of a 'loop.' A loop is a functionality that only provides connections between a customer premise and an ILEC serving office, and is *not* an entire end-to-end service. . . . Virtually all AT&T private line services sold to competitive carriers require the use of *leased ILEC facilities* and thus do not meet the requirement that a wholesaler must provide service over its own network facilities . . . ."); 11/8/04 ALTS Ex Parte at 2, 6 (competitive wholesalers typically use UNEs as an integral part of their wholesale offers). The only exceptions are carriers that require *so much capacity* that they are willing to pay for a CLEC to construct a new *dedicated entrance facility* between the CLEC network location to the other carrier's location. This is *not* "wholesaling" of DS1 or DS3 loop capacity at all, and it certainly is not a "widely available" offer, as is required for wholesaling. 11/10/04 AT&T Ex Parte at 3; *Triennial Review Order* ¶ 414.

[5] AT&T, Fea-Giovannucci Dec. ¶ 22 ("Furthermore, the theoretical ability to deliver such wholesale service is reliant on cage-to-cage cross-connects in ILEC central offices and operational support on the part of the incumbent which are presently unproved"); *id.* ¶ 17 n.5.

2

some CLECs, wholesaling is flatly impossible because of their network configurations.[6] And even for those CLECs for whom wholesaling is theoretically possible, the provision of wholesale services requires that the CLEC enter a different line of business, incur additional fixed investments in multiplexing equipment and OSS systems, and invest in marketing, customer support, and product development.[7] Few CLECs could rationally make these additional investments because the "lock-in" provisions of the ILECs' special access tariffs have foreclosed most of the available "market."[8] These are the reasons that the record shows that the market for competitive wholesaling is virtually nonexistent.[9]

In short, the Commission cannot assume that wholesale service will be made available in buildings having one, two, or even greater numbers of fiber-based service providers.

2. The ILECs also argue that the goals of the Act are met if there is one CLEC with fiber to the building and that CLEC is offering service at wholesale to all customers in the building. But this is a claim that the Act's pro-competitive objectives are met by the existence of duopolies. This is baseless. Both the Commission and the courts have repeatedly held that duopoly is not a sufficient basis to ensure effective competition, and that a larger number of competitors is necessary to demonstrate that a market is even minimally "competitive."

The Supreme Court has squarely rejected any claim that the Commission is required to be satisfied with the existence of a duopoly. In *Verizon Tel. Cos. v. FCC*, 535 U.S. 467, 510 n. 27 (2002), the Supreme Court stated that the Commission is authorized to adopt rules that will allow entry not only by larger competitive carriers like AT&T and MCI, but also by "hundreds of smaller entrants." There is nothing in *USTA I* or *USTA II* that is remotely to the contrary, particularly where, as here, the issue is whether competitive carriers are to receive access to

---

[6] Loop-Transport Coalition at 108 ("Mr. Duke [of KMC] testifies that it is operationally impossible for KMC to provide wholesale loop services to other competitive LECs. . . . KMC's loops connect directly to the KMC backbone, and not to incumbent LEC central offices, as most retail carriers would require. . . . [E]ven for a CLEC that is as facilities-focused as KMC, economic and operational considerations make self-provisioning – and wholesaling – loops [not viable]").

[7] *See, e.g.,* Loop-Transport Coalition, Duke (KMC) Dec. ¶¶ 21-25 (KMC did not plan to provide wholesale loop services when it constructed its network, and as a result, the KMC network is not sized and configured to do so. KMC has also not deployed the back office systems that would be required for such a wholesale business mode); *see also* AT&T, Fea-Giovannucci Dec. ¶ 22.

[8] *See, e.g.*, AT&T, Fea-Giovannucci Dec. ¶¶ 50-54; AT&T 11/12/04 Ex Parte "Bell OPP Tariffs Both Impede Facilities-Based Competition and Increase the Risk of Providing Local and Long Distance Services>".

[9] XO, Tirado Dec. ¶ 21 (CLECs offer wholesale loops to less than 5% of the buildings XO seeks to serve); Loop-Transport Coalition at 106 ("Wholesale loop alternatives are almost non-existent. The only exception in ATI's service area is in the city of Takoma, Washington, where a competitive fiber provider offers DS1 access to a limited number of buildings that are on its network.").

3

existing ILEC loop and transport facilities. And the Supreme Court's and Commission precedents establish that duopolies presumptively violate antitrust standards and cannot meet the objects of an Act that is designed to foster competition in ways that go beyond antitrust requirements. *See Verizon Commun. Inc.* v. *Law Offices of Curtis V. Trinko*, 124 S. Ct. 872, 880-82 (2004).

In the *Echostar-DirecTV Merger Order*, the Commission held that "existing antitrust doctrine suggests that a merger to duopoly . . . faces *a strong presumption of illegality.*"[10] Duopolies "inevitably result in less innovation and fewer benefits to consumers" which "is the antithesis of what the public interest demands."[11] Duopoly "competition" is problematic not just because the firm with the larger market share may exercise market power, but because *both* participants are likely to have the incentive and ability to maintain prices above competitive levels rather than to compete ruthlessly with each other, as they would need to do in a market with multiple firms.[12]

Commission precedent is fully consistent with decisions that robust competition is unlikely to occur in the absence of at least *four* competitors to an incumbent. In the *AT&T Non-dominance Order*, the Commission declared AT&T non-dominant only upon an undisputed showing that "MCI and Sprint alone can absorb overnight as much as fifteen percent of AT&T's total 1993 switched capacity at no incremental capacity cost," and that "within 90 days, MCI, Sprint, and LDDS/WilTel, using their existing equipment, could absorb almost one-third of AT&T's total switched capacity."[13] The Commission further noted that some resellers had grown "to become regional or even national facilities-based competitors (such as ALC/Allnet and WorldCom, formerly LDDS/WilTel)."[14] Moreover, in the *Media Ownership Order*, the Commission held that "both economic theory and empirical studies" indicate that "*five* or more relatively equally sized firms" are necessary to achieve a "level of market performance comparable to a fragmented, structurally competitive market."[15]

The courts agree. "Where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding."[16] As the Supreme Court has explained,

---

[10] 17 FCC Rcd. 20559, ¶ 103 (2002) (emphasis added).

[11] *Id.* (separate statement of Chairman Powell).

[12] Department of Justice, *Horizontal Merger Guidelines* § 2.

[13] 11 FCC Rcd. 3271, ¶ 59 (1995).

[14] *Id.* ¶ 61; *see also* AT&T Reply at 36-37. Ironically, the Bell companies argued that AT&T should not be declared nondominant, in part because, in their view, MCI and Sprint were the only other facilities-based carriers "worth serious consideration," and that these two national facilities-based competitors, notwithstanding their substantial excess capacity, were insufficient to guarantee competition in the long distance market. *Id.* ¶ 52.

[15] 18 FCC Rcd. 13620, ¶ 289 & n.612 (2003) (emphasis added; citing economic literature).

[16] *FTC* v. *PPG Indus. Inc.*, 798 F.2d 1500, 1503 (D.C. Cir. 1986). *See also FTC* v. *University Health, Inc.*, 938 F.2d 1206, 1218 n.24 (11th Cir. 1991) ("Significant market concentration makes

(continued . . .)

"firms in a concentrated market" can "in effect *share* monopoly power . . . by recognizing their shared economic interests and their interdependence with respect to price and output decisions."[17]

For these reasons, there must be a minimum of two fiber-based providers in a building before the Commission can even consider removing UNE access to loops to serve that building – and even two providers cannot eliminate impairment unless they are both offering service at wholesale to all customers in the building. Correlatively, any "trigger" that eliminates UNEs for loops or transport based on the existence of wholesale alternatives must recognize that *multiple* wholesalers are required to ameliorate impairment. If there is only one wholesaler, then the "market" is simply a duopoly, with all of the competitive impediments identified above. For precisely these reasons, the Commission previously and expressly found that the presence of *at least two* wholesalers is necessary to overcome the "umbrella pricing" that occurs when only one wholesaler competes with the ILEC.[18] And in order to avoid arguments about whether a competitor is (or is not) a wholesaler, any wholesaling trigger must likewise be based on CLEC self-certification.[19]

## II.  CABLE-BASED SERVICE TO ENTERPRISE CUSTOMERS IS *DE MINIMIS*.

The evidence shows that cable competition for enterprise services is *de minimis*. *First*, cable facilities generally do not reach enterprise businesses.[20] Cable networks are designed to

---

(. . . continued)
it easier for firms in the market to collude, expressly or tacitly."); *United States* v. *Ivaco, Inc.* 704 F. Supp. 1409, 1428 n.18 (W.D. Mich. 1989) ("with only two firms in the market, the firms would be able to police cheating, or non-collusive pricing by their competitor").

[17] *Brooke Group Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) (emphasis added). *See also FTC* v. *Heinz*, 246 F.3d 708, 725 (D.C. Cir. 2001) ("The creation of a durable duopoly affords both the opportunity and incentive for *both* firms to coordinate to increase prices."); *PPG Indus.*, 628 F. Supp. at 885 n.9 ("The relative lack of competitors eases coordination of actions, explicitly or implicitly, among the remaining few to approximate the performance of a monopolist").

[18] *Triennial Review Order* ¶ 413 & n.1275 (citing Carlton & Perloff, *Modern Industrial Organization* at 111 (3d ed.)) ("We choose two competitive wholesale providers as the appropriate trigger because it ensures the suitability of 'multiple, competitive supply' and will provide an incentive for new transport facilities deployment while allowing competitive pressures from the wholesalers to control pricing and terms. . . [W]e find that two wholesale providers, in addition to the incumbent LEC, should provide competitive pressures on pricing and terms and avoid "umbrella pricing" while providing incentives to deploy. . . . We find that the risk of umbrella pricing is high when only one wholesale competitor enters the market in competition with the incumbent LEC, but is substantially reduced when two or more competitors provide wholesale transport in competition with the market leader, the incumbent LEC.").

[19] AT&T at 64.

[20] *See* Yankee Group, *Cable and DSL Battle for Broadband Dominance* (February 2004), at 4-5

(continued . . .)

5

reach residential end-users, not business locations. With few exceptions, cable infrastructures generally do not "pass" business locations and thus cannot readily serve the vast majority of office buildings and other business sites.[21]

*Second*, cable facilities generally are not capable of supporting enterprise services. Cable networks do not have the same degree of back-up electrical power as typical wireline networks, and the "shared platform" nature of cable modem service raises data security and transmission performance issues that are particularly important to business customers, who routinely transmit highly sensitive or mission-critical financial and commercial data.[22] Cable rarely contains the necessary capacity to serve large numbers of business customers with the required telecommunications and internet services at DS-1 and higher speeds, since the design of the network commonly supports only infrequent high-speed bursts to and from subscribers.[23]

*Third*, largely because of the limitations identified above, cable companies do not – and generally cannot – offer wholesale access to CLECs.[24]

*Fourth*, the evidence shows that "[r]esidential and small business subscribers, not surprisingly, account for over 96 percent of the reported high-speed lines delivered over cable systems."[25] Cable providers reported supplying fewer than 16,000 coaxial cable connections to medium and large businesses nationwide at the time the Commission reached its conclusions in the *Triennial Review Order*, and report less than 30,000 such connections today.[26] Given that

---

(. . . continued)
("We projected cable modem would surpass DSL in this [the small business] segment by year-end 2003. However, cable modem penetration *dropped precipitously* in the small business market, or businesses with between 20 and 99 people. Cable operators also achieved limited success in the remote office market, reaching only 4.2 percent of the market in 2003") (emphasis added). As the Yankee Group now recognizes, "*DSL operators dominate* the U.S. [small business] broadband and enterprise remote-office broadband market." *Id.* at 4 (emphasis added). The Yankee Group further acknowledges that its earlier predictions failed to account for the reluctance of business to purchase cable modem services because they are viewed as less secure and because cable does not offer "symmetrical" services. *Id.* at 5.

[21] AT&T, Selwyn Dec. ¶ 113.

[22] *Id.* ¶¶ 114-15.

[23] *See* Loop-Transport Coalition, Wigger Dec. ¶ 30-32, Tirado Dec. ¶ 32.

[24] *See id.*, Wigger Dec. ¶ 30, Tirado Dec. ¶ 30 (no cable television company has ever offered to provide DS-1 level loops); *id.*, Wigger Dec. ¶ 31, Kunde Dec. ¶ 18, Tirado Dec. ¶ 31 (there are substantial geographic differences between the build-out plans of most cable companies and competitors' specific needs, and cable networks generally do not reach competitive carriers' customers).

[25] *Third Section 706 Report*, 17 FCC Rcd 2844, ¶ 45 (2002).

[26] AT&T, Selwyn Dec. ¶ 115 (citing *Triennial Review Order* ¶ 41; Industry Analysis and
(continued . . .)

there are roughly three million commercial buildings in the United States, cable connections represent less than one percent of potentially addressable business locations.

*Finally*, as Cbeyond explains in a recent *ex parte*, cable companies' hybrid fiber coaxial services clearly do not compete with high capacity (DS1 and DS3) fiber services. For example, the technical limitations on such services, including the fact that cable is an asymmetric service that significantly limits the amount of data that may be sent from a customer location, are so severe that only small businesses with the most unsophisticated needs could use such services.[27] Moreover, Cbeyond has ported very few numbers to or from these cable "competitors."[28] In addition, the hybrid cable service is priced far below Cbeyond's "5-line DS1 'base package,' ordered by 88% of its customers," which simply confirms that the cable service is not even in the same product market with high capacity DS1 service.[29]

---

(. . . continued)
Technology Division, Wireline Competition Bureau, *High Speed Services for Internet Access: Status as of June 30, 2002*, (2002)). As Dr. Selwyn notes, the most recent Commission staff report reveals that for the period ended December 31, 2003, five million high speed coaxial cable connections serving new residence and small business cable customers were added, but that only approximately 3,400 new coaxial cable connections were added that served large business subscribers, with the total number of connections to high speed cable connections to large business users still less than 30,000 in total. *See id.* (citing Industry Analysis and Technology Division, Wireline Competition Bureau, *High Speed Services for Internet Access: Status as of December 31, 2003* (2004); Industry Analysis and Technology Division, Wireline Competition Bureau, *High Speed Services for Internet Access: Status as of December 31, 2002* (2003)).

[27] 11/19/04 Cbeyond Ex Parte at 3-4.

[28] *Id.* at 4.

[29] *Id.* at 4-5.