**Attachment 1**

**REDACTED FOR PUBLIC INSPECTION**

*REDACTED – FOR PUBLIC INSPECTION*

**DECLARATION OF ANTHONY FEA, ANTHONY GIOVANNUCCI,
BOB HANDAL, MICHAEL LESHER AND C. MICHAEL PFAU**

**AT&T Corp.**

> **In connection with the proposed transaction, SBC intends to file a registration statement, including a proxy statement of AT&T Corp., and other materials with the Securities and Exchange Commission (the "SEC").  Investors are urged to read the registration statement and other materials when they are available because they contain important information.**  Investors will be able to obtain free copies of the registration statement and proxy statement, when they become available, as well as other filings containing information about SBC and AT&T Corp., without charge, at the SEC's Internet site (www.sec.gov).  These documents may also be obtained for free from SBC's Investor Relations web site (www.sbc.com/investor_relations) or by directing a request to SBC Communications Inc., Stockholder Services, 175 E. Houston, San Antonio, Texas 78205.  Free copies of AT&T Corp.'s filings may be accessed and downloaded for free at the AT&T Relations Web Site (www.att.com/ir/sec) or by directing a request to AT&T Corp., Investor Relations, One AT&T Way, Bedminster, New Jersey 07921.
>
> SBC, AT&T Corp. and their respective directors and executive officers and other members of management and employees may be deemed to be participants in the solicitation of proxies from AT&T shareholders in respect of the proposed transaction.  Information regarding SBC's directors and executive officers is available in SBC's proxy statement for its 2004 annual meeting of stockholders, dated March 11, 2004, and information regarding AT&T Corp.'s directors and executive officers is available in AT&T Corp.'s proxy statement for its 2004 annual meeting of shareholders, dated March 25, 2004.  Additional information regarding the interests of such potential participants will be included in the registration and proxy statement and the other relevant documents filed with the SEC when they become available.
>
> Certain matters discussed in this statement, including the appendices attached, are forward-looking statements that involve risks and uncertainties.  Forward-looking statements include, without limitation, the information concerning possible or assumed future revenues and results of operations of SBC and AT&T, projected benefits of the proposed SBC/AT&T merger and possible or assumed developments in the telecommunications industry.  Readers are cautioned that the following important factors, in addition to those discussed in this statement and elsewhere in the proxy statement/prospectus to be filed by SBC with the Securities and Exchange Commission, and in the documents incorporated by reference in such proxy statement/prospectus, could affect the future results of SBC and AT&T or the prospects for the merger: (1) the ability to obtain governmental approvals of the merger on the proposed terms and schedule; (2) the failure of AT&T shareholders to approve the merger; (3) the risks that the businesses of SBC and AT&T will not be integrated successfully; (4) the risks that the cost savings and any other synergies from the merger may not be fully realized or may take longer to realize than expected; (5) disruption from the merger making it more difficult to maintain relationships with customers, employees or suppliers; (6) competition and its effect on pricing,

*REDACTED – FOR PUBLIC INSPECTION*

costs, spending, third-party relationships and revenues; (7) the risk that Cingular Wireless LLC could fail to achieve, in the amount and within the timeframe expected, the synergies and other benefits expected from its acquisition of AT&T Wireless; (8) final outcomes of various state and federal regulatory proceedings and changes in existing state, federal or foreign laws and regulations and/or enactment of additional regulatory laws and regulations; (9) risks inherent in international operations, including exposure to fluctuations in foreign currency exchange rates and political risk; (10) the impact of new technologies; (11) changes in general economic and market conditions; and (12) changes in the regulatory environment in which SBC and AT&T operate.

The cites to webpages in this document are for information only and are not intended to be active links or to incorporate herein any information on the websites, except the specific information for which the webpages have been cited.

*REDACTED – FOR PUBLIC INSPECTION*

**DECLARATION OF ANTHONY FEA, ANTHONY GIOVANNUCCI,
BOB HANDAL, MICHAEL LESHER AND C. MICHAEL PFAU**

**AT&T Corp.**

1.     My name is Anthony Fea.  My business address is 200 Laurel Ave Middletown, New

Jersey.  I am a Director responsible for the Program and Project Management of AT&T's

Local Network Services ("LNS") organization, the group within AT&T Corp. that

provides local service to AT&T Business customers.  I am currently responsible for LNS'

national integrated Program and Project Management activities.  Integrated Program and

Project Management planning activities includes Program and Project Management

activities for the Switch, Transport, Node, Digital Cross-Connect Systems and Outside

Plant technologies used in AT&T's local networks, as well as interexchange carrier

("IXC") collocations and network optimization.  As part of my job, I am also responsible

for supporting the current and future years' capital budgets, along with current year

capital management responsibilities.  I am a graduate of Stevens Institute of Technology,

with a B.S. in Electrical Engineering.  Since obtaining my degree, I have worked at a

number of telecommunications firms including Bell Atlantic (now Verizon), Telcordia

Technologies (BellCore), and most recently TCG and AT&T.

2.     My name is Anthony J. Giovannucci.  My business address is 207-209 F Street, South

Boston, Massachusetts. I am a Director for AT&T's Engineering organization,

specifically overseeing AT&T's Media Engineering organization which is responsible for

national planning and deploying AT&T's transmission media (fiber and microwave), for

both Local and Long Distance applications.  In my current position I am responsible for a

number of key areas of Outside Plant activity, including the development of an Outside

Plant ("OSP") Plan of Record for capital deployment, negotiation and completion of

*REDACTED – FOR PUBLIC INSPECTION*

agreements controlling rights-of-way, building rights-of-entry, franchises and joint facility builds as well as the evaluation of distressed assets for their potential acquisition and incorporation into AT&T's network footprint. Prior to my employment by AT&T, I performed OSP Engineering on a contract basis at various regional Bell companies (New England Telephone and BellSouth) between 1987 and 1993. From 1993 to 1998, I worked at TCG which was acquired by AT&T in 1998. Along with Mr. Fea, I am the principal sponsor of the testimony describing the engineering, operation and location of AT&T's local networks.

3.  My name is Bob Handal. My business address is One AT&T Way Bedminster, NJ 07921. I am a Director responsible for Alternate Supply within the Local Services and Access Management ("LSAM") organization that is responsible for access procurement. Specifically, the Alternate Supply team manages relationships with suppliers other than incumbent local exchange carriers ("LECs") to procure access services. As part of my job, I am responsible for developing relationships with suppliers that can offer alternatives to the special access services offered by incumbent LECs. I am responsible for the execution of supplier agreements, the associated budgets, and unit cost reduction targets. I have worked at AT&T in a variety of positions since I graduated from the University of Vermont in 1989. I have been in my current assignment since January of 2003. I am the principal sponsor of the portions of the testimony pertaining to AT&T's purchase of dedicated access from competitive carriers.

4.  My name is Michael E. Lesher. My business address is One AT&T Way, Room 5C212F, Bedminster, NJ 07921. I am employed by AT&T Corp. ("AT&T") as the Director of

*REDACTED – FOR PUBLIC INSPECTION*

Access Product Management within AT&T's Business Services organization. My current duties include the development and lifecycle management of AT&T's point-to-point and ring access services, including responsibility for product costing and pricing, feature development, service implementation and process improvement of both local and private line services. Prior to this, I have held a number of positions at AT&T with responsibility for AT&T's local network and services. I hold a B.S. degree in Accounting from Virginia Polytechnic Institute and State University, and an M.B.A. in Finance and Computer Science from Southern Methodist University. I am the principal sponsor of the testimony pertaining to AT&T's supply of local private line services.

5.    My name is C. Michael Pfau. My business address is One AT&T Way, Room 3A158, Bedminster, New Jersey 07921. I have a Bachelors of Science degree in Mechanical Engineering and a Master of Business Administration. I have a Professional Engineering license from the state of Pennsylvania. I am employed by AT&T Corp. ("AT&T"), and I serve as Director - Public Policy Analysis, Network Engineering & Technologies. My responsibilities include developing public policy as it relates to interconnection with incumbent ILECs and the use of unbundled network elements that they are obligated to provide under the Telecommunications Act of 1996 ("the Act") and the Commission's rules implementing the Act. In that capacity I am required to understand the operational needs of the various business units so that their interests are reflected in the policy positions taken by AT&T. I also help those units understand how provisions of the Act and the Commission's rules affect their business plans. I support the other affiants in this testimony regarding the presentation of the data that AT&T retains regarding the scope of

*REDACTED – FOR PUBLIC INSPECTION*

its local network and the availability of alternative access arrangements from other competitive carriers.

6.    The purpose of our current declaration is to provide additional factual background regarding AT&T's deployment of loop and transport facilities, and the extent to which it both purchases alternatives to incumbent LEC special access services from other competitive carriers and provides such alternatives to other carriers.  Specifically, we will describe (1) AT&T's local network architecture, particularly the limited scope of AT&T's local network facilities in SBC's service territory; (2) why, as a matter of basic network engineering, AT&T's dedicated building access facilities are not "unique"; (3) the limited extent to which AT&T provides wholesale local private line services that can be viewed as an alternative to incumbent LEC special access service; and (4) the extent to which AT&T's purchases of dedicated access alternatives from competitive carriers are widely dispersed among numerous carriers.  Each point is discussed in turn below.

**AT&T'S LOCAL NETWORK IN SBC'S SERVICE TERRITORIES IS QUITE LIMITED**

7.    Although opponents of the AT&T-SBC merger characterize AT&T's local network as extensive, it is in fact quite limited.  AT&T's local network employs the "spoke/hub" basic architecture used by most competitive local carriers.  This means that when AT&T enters a local market, it typically does so first by deploying a metropolitan fiber facility (metro fiber), generally in the "downtown" area of the market, that connects strategic network locations such as local switches, nodes and AT&T's local points of presence ("POPs").  As is the case for other competitive local carriers, AT&T does not have direct access to individual customer locations in a large majority of instances, so, in the majority of cases, AT&T must lease loop (and often transport facilities) from the

4

*REDACTED – FOR PUBLIC INSPECTION*

incumbent LEC. These facilities are accessed only at the incumbent LEC wire center. To connect its network to that of the incumbent and pick up the traffic from the loop and transport facilities that it is leasing, AT&T will collocate in an incumbent local serving office ("LSO") and extend a fiber lateral from its metro fiber to that facility. Such "facilities-based" collocations connect directly to the AT&T network and serve as a point where the demand generated by AT&T customers at that particular wire center is placed on AT&T's network.

8.    AT&T can also use its facilities-based collocation as a point where it accesses traffic served by other incumbent LSOs that are not directly connected to AT&T's local fiber network. AT&T leases ILEC transport to connect the LSOs in which it has established a facilities-based collocation to the LSOs where it does not have a facilities-based collocation. In connection with this activity, AT&T will sometimes deploy "non-facilities-based" collocations. Non-facilities-based collocations do not involve the deployment of local metro fiber but generally are instances in which AT&T has deployed multiplexing equipment that allows more efficient utilization of incumbent LEC special access services that are used to bring traffic to AT&T's fiber-based collocations. As such, non-facilities-based collocations are not part of AT&T's local fiber network.[1]

9.    In a minority of instances, AT&T is able to economically justify extending its local network to individual buildings that generally share three characteristics in common: (1)

---

[1] In addition, AT&T has deployed a limited number "rifle shot" collocations, which are also not associated with AT&T's metro fiber deployment but instead are used in connection with AT&T's long distance services and its "digital link" service. When providing its digital link service, AT&T uses long distance 4ESS switches to provide a limited functionality local voice

(continued . . .)

*REDACTED – FOR PUBLIC INSPECTION*

there is an AT&T customer willing to place substantial business directly onto the AT&T network; (2) the building is located in close proximity to its metro fiber; and (3) if spare conduit does not already exist, it is practically feasible to engage in new construction to connect the building to AT&T's metro fiber. When these conditions are met, and the business case demonstrates that the investment is prudent to undertake, AT&T extends a fiber lateral from a "splice point" (a pre-deployed physical point of connection to the metro fiber) from its metro fiber to the building. Typically, such splice points are established about every [REDACTED] along the metro fiber route.

10.     In the past, particularly prior to AT&T's acquisition of TCG in 1998, TCG deployed fiber extensions to buildings "on spec" in the hopes that it would ultimately win business to fill up that capacity. AT&T, however, discontinued that practice several years ago. Because of capital constraints, AT&T deploys fiber laterals only when it has a firm customer commitment to purchase service that independently justifies the construction. This is true with respect to both retail and wholesale service.

11.     AT&T has deployed local metro fiber networks in only 61 markets nationwide. The network includes metro fiber and associated dedicated fiber lateral connections to about [REDACTED] buildings where there is an active commercial presence in the building – a tiny faction of the buildings where AT&T serves retail and wholesale customers through the use of dedicated local loop facilities.

---

(. . . continued)

service to business customers that also use AT&T long distance service.

*REDACTED – FOR PUBLIC INSPECTION*

12.     In SBC's region, AT&T has deployed metro fiber facilities in only 19 metropolitan areas.[2]  Like other competitive carriers in SBC's region, AT&T's metro fiber serves only the most urban portions of those markets where demand is most highly concentrated.  As a result, AT&T has facilities-based collocations in only about [REDACTED] of SBC's central offices.[3]

13.     The substantial majority of AT&T's facilities-based collocations are in wire centers that are located in the areas of each local market where demand is most highly concentrated.  Specifically, AT&T has [REDACTED]  facilities-based collocations associated with its metro fiber in SBC territory.  Most [REDACTED]  of those collocations are in an SBC office that satisfies the "triggers" the Commission established for de-listing both DS1 and DS3 transport, and an additional [REDACTED]  are in offices that satisfy the "triggers" the Commission established for de-listing DS3 transport.[4]  Thus, nearly [REDACTED] of AT&T's fiber-based collocations are in locations where the Commission has held that there are multiple competitors present or substantial potential revenues that would permit collocation by multiple competitors, or both.[5]

---

[2] The metropolitan areas are Austin, Chicago, Cleveland, Columbus, Dallas, Detroit, Dayton, Hartford, Houston, Indianapolis, Kansas City, Los Angeles, Milwaukee, Reno, St. Louis, Sacramento, San Antonio, San Diego, and San Francisco.  AT&T has also deployed local facilities in Cincinnati, but that area is outside of SBC's incumbent territories in Ohio.

[3] In addition, AT&T has [REDACTED] so-called "rifle shot" collocations, which as noted, are not associated with AT&T's metro fiber deployment but instead are used in connection with AT&T's long distance services and its "digital link" service.

[4] This calculation, and related calculations below, were conducted by comparing the locations of AT&T's facilities-based collocations with the list of "Tier 1" and "Tier 2" wire centers provided to the Commission by SBC.

[5] For the remaining minority of locations – which represent about [REDACTED] of SBC's

(continued . . .)

*REDACTED – FOR PUBLIC INSPECTION*

14. AT&T has extended its network to [REDACTED] buildings in SBC's region that also have active commercial customers of AT&T.[6] This is a tiny fraction of the hundreds of thousands of commercial buildings in SBC's service region that we understand are served with dedicated facilities.[7]

15. AT&T is only one of many competitive carriers that operate in SBC's states. In 2004, AT&T purchased special access alternatives from [REDACTED] different suppliers in SBC states that in virtually all instances provide AT&T dedicated building access using their own network facilities. These carriers include: [REDACTED].

16. Because of the breadth and scope of competitors in SBC's region, AT&T reaches only a small fraction of the total buildings served by other competitive carriers. In addition to keeping detailed data regarding the building locations served by AT&T's local network, AT&T has also developed a database regarding the buildings served by competitive carriers. The underlying data were provided to AT&T by competitive carriers seeking to provide AT&T with special access services to the buildings that they serve. These data are typically updated monthly or quarterly by the competitive carriers.

---

(. . . continued)
switch locations – there still may be multiple collocators.

[6] Such locations are hereinafter referred to as "commercial buildings." AT&T's network also connects to non-commercial buildings, such as incumbent LSOs, for purposes of interconnecting with other networks. Such "network locations" typically do not house retail or wholesale customers. Thus, they are not locations for which competitive carriers would seek to purchase local private line service from AT&T.

[7] In this regard, we are not aware of any building served by AT&T that is not also served by SBC.

17.     Because AT&T uses the data for its own commercial purposes, it has a strong interest in ensuring that they are accurate as possible. AT&T generally seeks to eliminate a building from its "on net" list if AT&T learns that the building is not, in fact, currently served by competitive fiber. AT&T also eliminates from the database competitive carriers that do not satisfy AT&T's quality standards. As such, AT&T's data do not include the entirety of available competitive special access supply because the data do not reflect carriers that do not actively market special access services to AT&T, nor do they include carriers from which AT&T does not purchase special access services.[8] For example, AT&T's data do not include buildings served by Sprint.

18.     As noted, AT&T has [REDACTED] commercial buildings "on net" in the SBC service areas. Competitive carriers serve many times that number. According to AT&T's competitive building inventory, [REDACTED] different competitive carriers have lit fiber connections to [REDACTED] buildings in the SBC service territories – a tiny fraction of commercial buildings in SBC's service territories.[9] In addition, AT&T's competitive inventory shows that competitive carriers have "unlit" fiber connections to

---

[8] AT&T's data includes more than "lit" buildings. AT&T identifies a building with flags noting whether the building is currently lit by a competitive carrier, could be lit by deploying terminal equipment, or is a building that a competitive carrier would be willing to put on net under appropriate conditions. Unless otherwise specified, we refer only to currently lit buildings and, as such, are thus taking a conservative view of a list that already understates competitive deployment. AT&T also does not know whether any of the buildings listed are pure non-commercial locations where AT&T (or any other retail provider) is unlikely to have customers. AT&T believes most of the building locations are locations with at least some commercial customers, for it would be pointless for competitive carriers to provide AT&T with "on net" buildings where AT&T (or any other carrier) would never expect to have a customer.

[9] AT&T estimates that these [REDACTED] connections serve approximately [REDACTED] unique buildings.

[REDACTED] buildings in SBC service territories. Thus, CLECs in aggregate have [REDACTED] direct fiber building connections.

19. In a substantial number of instances, these competitive carriers serve the same buildings as AT&T. In SBC's service territories, [REDACTED] of AT&T's "on net" buildings are also served by "lit" CLEC fiber and [REDACTED] are also served by "unlit" CLEC fiber.

20. Relying on information supplied by GeoTel, Cbeyond claims that the "loss" of AT&T as an independent competitor would result in a substantial reduction in the number of buildings directly served by competitive fiber facilities. Cebyond, however, limited its analysis to two markets: Cbeyond claims that AT&T serves 53% of unique buildings in Cleveland (Cbeyond at 26 & Wilkie Dec. ¶ 18) and 64% of unique buildings in the Milwaukee, Wisconsin MSA. (Cbeyond at 26 & Wilkie Dec. ¶ 20). AT&T's detailed data regarding the location of its network and the buildings served by competitive carriers – data AT&T relies upon for its own commercial purposes – demonstrate that these claims are overblown. AT&T's local network in these metro areas reaches only a small fraction of the buildings served either by SBC or other competitive carriers.

21. *Cleveland.* As is the case nationally, AT&T's local network in Cleveland is limited. AT&T has only [REDACTED] commercial buildings on net in Cleveland, and [REDACTED] of those locations also served by competitive carriers. On the other hand, competitive carriers serve [REDACTED] additional unique buildings that are not directly served by AT&T's network as well as [REDACTED] buildings that are served by AT&T.

AT&T's building inventory also shows that competitive carriers have deployed unlit fiber to another [REDACTED] buildings in Cleveland.

22.    As is the case generally, most of the buildings AT&T serves in Cleveland are "high demand" locations that generate at least one DS3 equivalent of retail demand and are candidates for competitive deployment by other carriers if AT&T's current customer(s) wished to switch providers.[10]  Of the [REDACTED] AT&T buildings not served by either lit or unlit competitive facilities, all but [REDACTED] have 1 DS3 equivalent or more of demand.

23.    AT&T's metro fiber in Cleveland is concentrated in dense urban areas. AT&T has [REDACTED] fiber-based collocations in the Cleveland MSA.  [REDACTED] are in Tier 1 wire centers and [REDACTED] are in Tier 2 wire centers.   AT&T's [REDACTED] collocations represent only [REDACTED] percent of SBC's switches in the Cleveland area.

24.    *Milwaukee.*  The statistics for the Milwaukee, Wisconsin MSA are similar.  Competitive carriers in Milwaukee serve [REDACTED] unique buildings with lit fiber and have deployed unlit fiber to another [REDACTED] buildings; AT&T has only [REDACTED] commercial buildings "on net."  Of these [REDACTED] buildings, competitive carriers

---

[10] Although a single DS3 of demand is not always sufficient to support bypass deployment, this threshold is a useful proxy for considering whether competitive deployment is possible in light of the Commission's nationwide non-impairment findings in the *TR Remand Order* (¶ 117), which limited competitive carriers to one DS3 loop per location and the Commission's further decision (*id.* ¶ 146) to eliminate access to DS3 (and DS1) loops altogether in high demand areas where many AT&T buildings are located.  The Commission also limited requesting carriers to 10 DS1s per location. *Id.* ¶ 128.

have deployed lit fiber to [REDACTED] of them.  Moreover, of those [REDACTED] AT&T buildings not served by active competitive fiber, [REDACTED] have more than one DS3 of demand.

25.    AT&T's local metro fiber in Milwaukee is largely built out to the same wire centers as other competitive carriers in that market.  AT&T has only [REDACTED] fiber-based collocations in the Milwaukee MSA.  In contrast, there are 36 SBC switch locations in the Milwaukee area. [REDACTED] of AT&T's fiber-based collocations are in Tier 1 MSAs that satisfy both the Commission's "triggers" for DS1 and DS3 transport.

## AT&T's DEDICATED BUILDINGS ACCESS FACILITIES ARE NOT "UNIQUE"

26.    We understand that a particular concern raised by commenters in this proceeding is the fact that AT&T has deployed last-mile fiber laterals to individual commercial buildings in SBC's service areas and that, as a result, competition must be analyzed on a route-by-route basis.  *See* Broadwing at 22-23; Cbeyond at 25-30; CompTel at 16; Global Crossing at 11-13 & Farrell Dec. ¶¶ 23-28.  In particular, we understand that they claim that even to the extent there is generally competition throughout an MSA, the loss of AT&T with respect to particular buildings is competitively significant.  The evidence, however, shows that the fact that AT&T is the only carrier currently serving a building does not mean that other carriers could not economically deploy to that building too.

27.    As described above, AT&T's network is only connected to a small fraction of the total buildings served by competitive carriers, and in many cases, competitive carriers serve the same buildings as AT&T.  Even with respect to the small number of AT&T's fiber laterals where there currently is no other competitor in the building, these buildings are

potentially addressable by competitors that have demonstrated their ability to deploy fiber to many times more buildings than AT&T. AT&T today in most instances builds fiber laterals only where the customer has demand sufficient to support at least OC3-level service. The Commission has found, however, that competitive carriers are not "impaired" with respect to OCn-level loop facilities because the revenue opportunities associated are sufficient to overcome the economic barriers to deploying local loops. *Triennial Review Order* ¶ 316 ("Services offered over OCn loops produce revenue levels which can justify the high cost of loop construction, providing the opportunity for competitive LECs to offset the fixed and sunk costs associated with loop construction."). Indeed, in the *TR Remand Order* (¶¶ 177-85), the Commission made a national finding of non-impairment that limits requesting carriers to leasing only a single DS3 loop facility and further limited DS1 and DS3 loops in many "high demand" locations where AT&T has deployed its own fiber laterals. *See supra* note 10.

28.     This is confirmed by the data on the extent to which AT&T's self-supplies or leases access to OCn facilities from competitive carriers as opposed to incumbent LECs in SBC's region. At the OC-3 level, AT&T self-provided about [REDACTED] of the circuits it uses in support of its service offerings and leases about [REDACTED] of those circuits from competitive carriers. At the OC-12 level, AT&T self-supplies about [REDACTED] of the circuits it uses in support of its service offerings and leases about [REDACTED] of those circuits from competitive carriers. Finally, AT&T self-supplies [REDACTED] of its OC-48 level circuits. These data thus show that self-supply is generally feasible at the OCn-level and that there is substantial supply of competitive OCn-level special access services.

*REDACTED – FOR PUBLIC INSPECTION*

29.     The fact that AT&T was able to deploy a fiber lateral to serve a customer in a particular location generally means that one (or more) customers in the location has OCn-level (or near OCn-level) of demand sufficient to support competitive deployment of facilities. Indeed, the very fact that AT&T was able to construct facilities to a particular building to serve a particular customer is evidence that the customer is willing to purchase services from a facilities-based competitor and that another carrier could also economically construct facilities to that same customer provided that it has a reasonably proximate metro fiber. Thus, when AT&T's contract with that customer expires and the customer's business is again "up for grabs," other carriers have a comparable ability to deploy their own facilities and win the customer that AT&T had when it initially won the customer's business.

30.     The evidence suggests that the majority of buildings served only by AT&T could also be economically served by other competitive carriers. There are [REDACTED] commercial buildings in SBC's territories that are served only by AT&T. Over [REDACTED] of those buildings have at least 1 DS3 equivalent of demand.

31.     Nor does AT&T have any special ability to build to additional buildings. Foremost, as shown above, the balance of the competitive carrier industry addresses many times the number of buildings in SBC's territory that AT&T reaches. While there may be some instances in which AT&T has the "closest" network, AT&T's fiber facilities are typically located in the dense urban areas that are also typically served by numerous other competitive carriers. Indeed, AT&T has examined the opportunities that exist in buildings within a mile of its network where it is currently leasing special access service

14

to serve retail customers.  As such, this analysis identified buildings where AT&T might be said to have an advantage because of the proximity of its network.  Compared to the thousands of buildings that AT&T currently reaches using leased dedicated access facilities, only [REDACTED] could potentially satisfy AT&T's business case for construction designed to achieve access cost savings – *i.e.,* where the savings from access cost reduction would by itself support deployment.  Further, only [REDACTED] of those buildings have one DS3 or less of demand and are candidates for a potential build because of their close proximity to AT&T's metro fiber.[11]  But even with respect to these few "near net" buildings that AT&T estimates that it could potentially serve with its own fiber despite their relatively "low" demand, other competitive carriers may be as close, or closer, to these buildings and thus be in an equal or better position to build their own facilities.

32.    In the minority of cases where AT&T has deployed loops and currently serves retail service below the levels deemed to establish "impairment" by the Commission, even those situations do not necessarily indicate unique circumstances in which other parties would be unable to serve similarly situated (or even the same) customers.  Foremost, the service provided to a customer and a building at any particular time is simply a snapshot that represents current conditions.  Customers routinely add and disconnect demand as needs change, businesses relocate and/or contracts expire and are put out for bid.  The fact that it was economically justified to place a customer location on AT&T's network in

---

[11] [REDACTED].

*REDACTED – FOR PUBLIC INSPECTION*

the past is not altered by subsequent changes in the customer's needs and/or shifts in its serving carrier.

33.    Thus, locations that appear as "low volume" today are a natural outcome of competitive forces at work.  Because demand typically does not "disappear" from a location, it remains available to support future deployment by another competitive carrier.  Indeed, in many locations where AT&T currently serves a "low volume" customer, it is because it has lost some of that customer's business to another competitive carrier after AT&T's initial customer contract expired.  Such instances are evidence of the feasibility of multiple competitive deployment to a building.

34.    And even in the small number of instances in which AT&T (or its predecessors) deployed facilities when its customers in the building had "low" demand, it usually did so under conditions that would typically permit other carriers to do the same.  For example, multi-location customers will sometimes not award a contract unless a carrier agrees to place all of their locations "on net."  In such cases, the total revenues from the contract were sufficient to allow AT&T to economically deploy facilities to some low demand locations.  Other carriers in similar circumstances would be able to extend their network to such low volume locations.  In other instances, a low demand retail customers may be in a building where AT&T has also established a network location, such as a point-of-interconnection with another carrier or a network node.[12]  There are also buildings where AT&T is able to "hub" multiple buildings on a "campus" to a central point of aggregation

---

[12]  Such network locations independently justify the deployment of fiber by AT&T.  Other competitive carriers likewise have the same ability to deploy fiber to serve "low" capacity

(continued . . .)

*REDACTED – FOR PUBLIC INSPECTION*

– a build that other carriers could feasibly undertake in similar circumstances.[13]  Finally, other carriers, like AT&T are able to serve a "low demand" building via a fixed wireless loop in the situations that permit such deployment.[14]

## AT&T IS NOT A SIGNIFICANT PROVIDER OF WHOLESALE LOCAL PRIVATE LINE SERVICES

35.  Merger opponents also greatly overstate the role of AT&T as a supplier of alternatives to incumbent LEC special access services.  AT&T's local network is different from that of many other competitive carriers in one important respect.  It was primarily designed and deployed to service AT&T's own retail customers, not to support wholesale "special access" alternatives to other carriers.

36.  As a result of AT&T's retail focus, AT&T sells less than [REDACTED] a year in wholesale local private line services in SBC's region.  To put this figure in perspective, AT&T expects to generate over [REDACTED] in revenue from its local and long distance private line services.

---

(. . . continued)
customers that are located in buildings that house their network locations.

[13]  In those circumstances, some of the individual buildings might have less than 2DS3 equivalents of demand, but because of their proximity to other served buildings and the unique opportunity to use another commercial location as a network hub to aggregate traffic onto a fiber connection service becomes economically feasible.  Again, because of the aggregate revenue opportunity presented in such circumstances, other competitive carriers would have the same economic ability to self deploy such facilities.

[14]  Because fixed wireless "loops" do not require the same investment as wireline fiber loops, AT&T is able economically to provide lower capacity services using fixed wireless connections than with fiber loops.  However, AT&T's experience is that about [REDACTED] of commercial buildings can be served with fixed wireless loops because of "line of sight" limitations on the technology, inability to get access to building rooftops, and gaps in AT&T's spectrum ownership.

37.     Indeed, AT&T cannot be considered a key supplier of private line services to the competitive carriers who have opposed this merger.  Specifically, 25 competitive carriers assert have alleged that the combination of SBC's and AT&T's local network facilities raises competitive concerns.[15]  But [REDACTED] of these carriers do not purchase any local private line service at all from AT&T in SBC's region.  Overall, AT&T supplies only about [REDACTED] local private line circuits to these 25 carriers that generate about [REDACTED] a month in revenues – which averages to only [REDACTED] per each of these competitive carrier.[16]  And [REDACTED] of these revenues are for OCn-level service where for which the Commission has held that there are relatively low barriers to competitive supply.

38.     This conclusion is not called into question by merger opponents' economic testimony that AT&T is a "key" bidder on private line services and in some circumstances offers the lowest price of rival competitive suppliers.  *See* Cbeyond, Wilkie Dec. ¶¶ 22-27.  Quite obviously, if AT&T had the substantial competitive cost advantage suggested by Professor Wilkie, AT&T would have more than a miniscule share of the dedicated access "market" in SBC's territory.  But more fundamentally, AT&T's ability to offer "low" private line rates depends heavily on the relative location of the buildings to be served in relation to AT&T's network.  For locations that are already on AT&T's network (or in very close proximity to access points to AT&T's metro fiber such that AT&T can deploy

---

[15] These carriers are ACN, ATX, , Broadwing, Bullseye, Cavalier, Cbeyond, Cimco, Conversent, Cox, CTS, Eschelon, Gillette, Global Crossing, Granite, Lightship, Lightyear, NuVox, Pac-West, RCN, Savvis, TDS, Tele-Pacific, US LEC, Xspedius, and XO.

[16] These figures are based on AT&T's 2005 local private line sales.

a fiber lateral at a relatively low cost), AT&T may have the ability to supply the private line service at a "low" rate. And while AT&T's network is occasionally the closest to the location in question, the data discussed above show that this occurs very rarely, and that many other competitive carriers usually have a comparable (or superior) ability to serve those locations.

39.     Finally, AT&T is not a "reseller" of special access services, as some merger opponents have claimed. AT&T does not purchase special access services from SBC (or any ILEC for that matter) and then resell them to other CLECs. Thus, AT&T is not using resale as a means to engage in arbitrage and put pressure on SBC's special access prices.

40.     The reason why AT&T does not engage in such pure resale is simple: such a practice is unlikely to generate any profits. Even where AT&T obtains from other incumbent LECs "volume-based" discounts that are greater than those earned by most other special access purchasers – and we understand that SBC does not offer such discounts – the spread between the discounts AT&T obtains and other carriers obtain is small. The transaction costs of engaging in the resale business would wipe out any margins AT&T might hope to earn.

41.     AT&T does use SBC special access services as an input to many of its local and long distance service offerings, including, in some instances, AT&T's local private line services that are purchased at wholesale by other carriers. AT&T refers to services for which it leases a portion of the local network from another carrier as "Type II" service. With only a literal handful of exceptions, however, AT&T provides Type II local private line services only where AT&T has self-supplied the transport portion of the service and

one of the tails of the service. Thus, most of the private line circuits AT&T sells are "Type I" services provided over AT&T's own facilities and only a minority of are provided over special access leased from SBC.

42.     Further, the vast majority of AT&T's Type II sales are to existing customers. AT&T sells very little Type II private line service to new customers because of the inherent disadvantage in selling the service in competition with carriers able to supply the service entirely over their own facilities.

43.     In all events, AT&T's sales of Type II local private line service are not significant. AT&T currently provides less than [REDACTED] a year in wholesale local private line services in SBC's territory. Of that amount, only [REDACTED] is associated with Type II services for which  AT&T leases a portion of the circuit from SBC. And, as explained, the majority of these revenues are associated with AT&T's own local facilities because most of the circuit is provided over AT&T's network.

## AT&T IS NOT A "MAKE OR BREAK" PURCHASER OF SPECIAL ACCESS SERVICES

44.     We next address the concern raised by some merger opponents that the loss of AT&T as a purchaser of access services from competitive carriers threatens the viability of these carriers. *See* CompTel at 19. The facts belie this claim. According to the Commission, the overall special access market is over $14 billion a year. *See* Statistics on Common Carriers, Table 2.8  (Oct. 12, 2004) (reporting that the RBOCs by themselves had over $14 billion in special access revenues in 2003). Not only are these services purchased by other major IXCs such as MCI, Sprint, Qwest, Global Crossing and Level 3, but also by wireless carriers, system integrators and any retail provider of bandwidth intensive

20

telecommunications or data applications. And these other purchasers represent the majority of special access purchases nationwide. In fact, AT&T's nationwide special access expenditures on special access (from both incumbent and competitive carriers) amount to about [REDACTED] a year.

45. Nationwide, AT&T spends only [REDACTED] on alternative access services provided by competitive carriers, and within SBC's region, AT&T spends only about [REDACTED] annually with competitive carriers. In stark contrast, AT&T purchases over [REDACTED] a year in special access from SBC.

46. AT&T's purchases are also spread among a wide variety of carriers. In 2004, AT&T purchased special access services from over [REDACTED] different competitive carriers nationwide. Over [REDACTED] of these carriers do not provide special access service at all in the SBC region and thus are unaffected by the merger. And with regard to the remainder that sell special access alternatives in SBC's region, [REDACTED].

47. The following table lists AT&T's 10 largest competitive special access suppliers in SBC's region for the calendar year 2004, and shows the relative percentage of AT&T's purchases from those carriers in SBC's region versus AT&T's special access purchases nationwide.[17] [REDACTED]

---

[17] AT&T's other competitive special access suppliers in the SBC region provided AT&T with less than [REDACTED] in special access service in SBC's region. Providers not among the top ten accounted for less than [REDACTED] of AT&T's in-region purchases from competitive carriers.

*REDACTED – FOR PUBLIC INSPECTION*

## VERIFICATION

**I declare under penalty of perjury that the foregoing is true and correct.**

**DATE**                                                     **/s/ Anthony Fea**
**May 9, 2005**                                      **Anthony Fea**

*REDACTED – FOR PUBLIC INSPECTION*

**VERIFICATION**


**I declare under penalty of perjury that the foregoing is true and correct.**


| **DATE** | _____/s/ Anthony Giovannucci_____ |
|----------|-------------------------------------------|
| **May 9, 2005** | **Anthony Giovannucci** |

*REDACTED – FOR PUBLIC INSPECTION*

**VERIFICATION**

**I declare under penalty of perjury that the foregoing is true and correct.**

**DATE**                                                      /s/
**May 9, 2005**                                         **Bob Handal**

*REDACTED – FOR PUBLIC INSPECTION*

**VERIFICATION**

**I declare under penalty of perjury that the foregoing is true and correct.**

**DATE**                                    _____/s/_____
**May 9, 2005**                                    **Michael Lesher**

*REDACTED – FOR PUBLIC INSPECTION*

## VERIFICATION

**I declare under penalty of perjury that the foregoing is true and correct.**


**DATE**                                                            _____/s/_____

**May 9, 2005**                                                    **C. Michael Pfau**