**Attachment 2**

**REDACTED FOR PUBLIC INSPECTION**

# ATTACHMENT 9

# REPLY DECLARATION OF JONATHAN P. POWELL, PETER H. REYNOLDS, AND EDWIN A. FLEMING

REDACTED – FOR PUBLIC INSPECTION

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Verizon Communications Inc. and | ) | |
| MCI, Inc. | ) | WC Docket No. 05-75 |
| Applications for Approval of | ) | |
| Transfer of Control | ) | |

**REPLY DECLARATION OF JONATHAN P. POWELL, PETER H. REYNOLDS, AND EDWIN A. FLEMING**

1.  My name is Jonathan P. Powell.  I am Director, Wholesale Pricing – Data for MCI.  My responsibilities include the competitive positioning and pricing of MCI's wholesale Metro Private Line service.  My business address is 6929 North Lakewood, Tulsa, Oklahoma.

2.  My name is Peter H. Reynolds.  I am Director, National Carrier Management and Initiatives for MCI.  My responsibilities include managing MCI's relationships with CLECs and other access vendors.  My business address is 22001 Loudoun County Parkway, Ashburn, Virginia.

3.  My name is Edwin A. Fleming. I am Senior Manager of Strategic Business Planning for MCI. My responsibilities include evaluating and managing building additions to MCI's local network.  My business address is 2655 Warrenville Road, Downers Grove, Illinois.

**REDACTED – FOR PUBLIC INSPECTION**

4.      The purpose of this declaration is to (1) explain that any volume discount that MCI

may obtain for Verizon special access services plays little or no role in MCI's Metro

Private Line pricing; and (2) discuss the large number of competitive alternatives to

MCI's wholesale Metro Private Line service.

I.      **MCI's Limited Use of Verizon Special Access Services**

5.      As was discussed in the Declaration of Jonathan P. Powell and Stephen M. Owens

(Powell/Owens Declaration), MCI has constructed local fiber networks in several

cities in Verizon's territory.  Those local fiber networks extend to approximately

[**BEGIN PROPRIETARY      END PROPRIETARY**] "on-net" buildings in

Verizon's territory,[1] a figure that includes [**BEGIN PROPRIETARY       END

PROPRIETARY**] fiber-based collocations in Verizon central offices.   Most of these

on-net buildings – approximately [**BEGIN PROPRIETARY         END

PROPRIETARY**] – are in the Verizon-East region.

6.      In order to reach off-net customer locations, MCI obtains high-capacity circuits from

other CLECs or, more commonly, from Verizon's special access tariffs.  MCI

purchases most of those special access circuits pursuant to one of Verizon's term

plans.  The rates that MCI pays Verizon for those special access circuits are the same

rates that MCI pays in those areas in which MCI does not have local facilities.  More

generally, Verizon's rates do not vary by MSA or wire center; they vary only

---

[1] This figure includes both fiber-served buildings and a limited number of buildings served over
copper facilities.  It also includes some buildings that have MCI fiber but are not currently active
i.e., have no transmission electronics.

**REDACTED – FOR PUBLIC INSPECTION**

according to tariff filing entity, state, or, in the case of some services, one of three pricing zones in a state.

7.      MCI uses its local fiber networks both (1) to provide MCI retail customers with access to MCI's long-haul voice, data, and Internet services; and (2) to provide retail and wholesale "Metro Private Line" services.  Depending on the application, MCI's Metro Private Line service is equivalent to either the incumbent LECs' special access service or local private line service.  Metro Private Line circuits are dedicated intraLATA high-capacity circuits that connect carrier hotels, incumbent LEC central offices, IXC POPs, wireless POPs, ISP POPs, office buildings, and other end user buildings.  MCI's wholesale Metro Private Line customers include IXCs, CLECs, wireless carriers, and ISPs.

8.      MCI classifies Metro Private Line circuits into four different categories, depending on the mix of MCI facilities and third-party facilities that MCI uses to provision the Metro Private Line circuit.  A Type I circuit is provisioned entirely "on-net," i.e., it connects two on-net buildings using only MCI fiber.  The other three types of Metro Private Line circuits – Type II, Type III, and Type IV – are provisioned, to varying degrees, using special access circuits obtained from another local carrier – usually, but not exclusively, the incumbent LEC.

9.      A Type II circuit connects an on-net building to an off-net building.  Most of the circuit is provisioned using MCI's local fiber, but a small piece is provisioned using the facilities of another local carrier – typically, an incumbent LEC special access

**REDACTED – FOR PUBLIC INSPECTION**

"channel termination" that extends MCI's network to the off-net building.  A Type III circuit uses two incumbent LEC channel terminations, to reach an off-net building at each end of the circuit, and MCI fiber in the "middle."   A Type IV circuit uses no MCI facilities; it is simple resale of an incumbent LEC special access circuit.

10.    Although Metro Private Line Type II, Type III, and Type IV circuits use incumbent LEC special access services, and although MCI is a large purchaser of incumbent LEC special access services, any volume discounts that MCI may receive on its special access purchases are not a significant factor in the pricing of Metro Private Line services.

11.    Notably, more than [**BEGIN PROPRIETARY    END PROPRIETARY**] percent of MCI's wholesale Metro Private Line revenue is derived from circuits that are entirely on-net and do not use incumbent LEC special access at all, i.e., Type I circuits.  Consequently, any special access volume discount that MCI may receive plays no role in MCI's pricing of a substantial majority of its Metro Private Line services.

12.    Most of the remainder of MCI's wholesale Metro Private Line revenue is derived from Type II circuits, which generally use only a single channel termination.  Less than 2 percent of MCI's wholesale Metro Private Line revenue is derived from Type

**REDACTED – FOR PUBLIC INSPECTION**

III circuits.  And MCI does not currently offer Type IV circuits, i.e., MCI does not

currently engage in the simple resale of incumbent LEC special access services.[2]

13.    Little or none of the differential between the price that a wholesale customer would

pay for an MCI Type II circuit and the incumbent LEC's price for an equivalent

circuit is attributable to any special access volume discount that MCI may receive.

Generally, the only special access component of a Type II circuit is a single channel

termination.  In most cases, the incumbent LECs' channel termination prices are

largely independent of volume.  For example, MCI obtains channel terminations

under [**BEGIN PROPRIETARY**

**END PROPRIETARY**]

14.    Because the incumbent LECs' special access rates are largely independent of volume,

the price that MCI pays for the special access service used in a Type II circuit –

typically, only a single channel termination -- is much the same as the price that a

---

[2] The only Type IV circuits currently provided by MCI consist of a handful of "grandfathered"
Type IV circuits.

**REDACTED – FOR PUBLIC INSPECTION**

Metro Private Line customer would pay if it purchased the channel termination, for the same term, directly from the incumbent LEC.  And even in those instances in which MCI may obtain some modest additional volume discount, that additional discount is largely offset by MCI's internal costs, including the cost of submitting the order for the channel termination to the incumbent LEC.  Any differential between the MCI Metro Private Line price for a Type II circuit and the incumbent LEC's price for an equivalent circuit is thus almost exclusively attributable to the on-net part of the circuit, not to any volume discount that MCI may receive for the special access part of the circuit.

## II.  Competition for MCI's Wholesale Metro Private Line Service

15.    MCI's wholesale Metro Private Line business represents only a small fraction of MCI's total revenue.  In the Verizon-East region, for example, MCI's wholesale Metro Private Line revenue is only approximately [**BEGIN PROPRIETARY**

  **END PROPRIETARY**] per year.

16.    In each of the areas in which MCI provides wholesale Metro Private Line services in the Verizon territory, it faces competition from several other CLECs.  As was discussed in the Powell/Owens Declaration, other CLECs have pursued much the same market entry strategy as MCI, constructing their fiber networks on high-density routes in the downtown core or in suburban areas with high business concentration.  Depending on the city, service providers competing with MCI's Metro Private Line service in the Verizon region include CLECs such as AT&T, Time Warner, XO, and

**REDACTED – FOR PUBLIC INSPECTION**

TelCove; new fiber wholesalers such as AboveNet, FiberNet, and OnFiber, and utilities such as Progress Telecom, ConEd Communications, and PPL Telecom.

17.     In some cases, MCI is also a customer of these CLECs and fiber providers.  MCI has entered into agreements to purchase dedicated circuits from several CLECs in the Verizon region, including [**BEGIN PROPRIETARY**

   **END PROPRIETARY**].   MCI has also obtained dark fiber from utilities and other fiber wholesalers, including [**BEGIN PROPRIETARY**

                     **END PROPRIETARY**].

18.     MCI maintains a database of buildings that have been "lit" by MCI or one of the CLECs with which MCI has an agreement to purchase dedicated access services. In Albany, NY, MCI's database shows [**BEGIN PROPRIETARY        END PROPRIETARY**] lit buildings.  MCI is the sole CLEC in no more than [**BEGIN PROPRIETARY     END PROPRIETARY**] of those buildings.  Similarly, in Baltimore, MD, MCI is the sole CLEC in no more than [**BEGIN PROPRIETARY   END PROPRIETARY**] of the [**BEGIN PROPRIETARY        END PROPRIETARY**] lit buildings in MCI's database; in Pittsburgh, PA, MCI is the sole CLEC in no more than [**BEGIN PROPRIETARY     END PROPRIETARY**] of the [**BEGIN PROPRIETARY        END PROPRIETARY**] lit buildings in MCI's database; in Philadelphia, PA, MCI is the sole CLEC in no more than [**BEGIN PROPRIETARY     END PROPRIETARY**] of the [**BEGIN PROPRIETARY**

REDACTED – FOR PUBLIC INSPECTION

**END PROPRIETARY**] lit buildings in MCI's database; in New York, NY, MCI is the sole CLEC in no more than [**BEGIN PROPRIETARY        END PROPRIETARY**] of the [**BEGIN PROPRIETARY        END PROPRIETARY**] lit buildings in MCI's database; and in Washington, DC, MCI is the sole CLEC in no more than [**BEGIN PROPRIETARY        END PROPRIETARY**] of the [**BEGIN PROPRIETARY        END PROPRIETARY**] lit buildings in MCI's database.

19.    The CLECs and fiber wholesalers that have networks in the Verizon region are well-positioned to compete for MCI's Metro Private Line revenue.  First, CLECs are already present in a substantial fraction of MCI's on-net buildings.  For example, the lit building lists provided to MCI by the CLECs with which MCI has agreements to purchase dedicated access services show that those CLECs alone have a presence in at least [**BEGIN PROPRIETARY        END PROPRIETARY**] of MCI's approximately [**BEGIN PROPRIETARY        END PROPRIETARY**] on-net buildings in the Verizon-East region.

20.    It should be stressed that this figure understates the extent to which CLECs are present in MCI lit buildings in Verizon-East territory.  MCI only has information about the buildings that have been lit by the CLECs with which MCI has an agreement to purchase dedicated access services. MCI does not know which MCI on-net buildings have also been lit by the other CLECs that have networks in Verizon-East territory. Other CLECs that are known to have lit buildings in the Verizon-East region, and thus may be present in MCI on-net buildings, include [**BEGIN**

REDACTED – FOR PUBLIC INSPECTION

**PROPRIETARY**

**END PROPRIETARY**].  Cavalier, for example, advertises high-bandwidth "metro transport" services that rely on Cavalier's "dense footprint in 215 Verizon central offices."[3]

21.     Furthermore, MCI's wholesale Metro Private Line demand is concentrated in the subset of buildings that are most likely to be served by multiple CLECs or fiber providers.  Specifically, MCI's Metro Private Line wholesale business has been focused on the provision of high-capacity circuits between "carrier" buildings such as IXC POPs, wireless POPs, ISP POPs, carrier hotels, and incumbent LEC central offices. For example, the Metro Private Line circuits that MCI sells to wholesale customers at the 60 Hudson Street and 111 8th Avenue carrier hotels in New York are typically OC-n level circuits. Because those carrier hotels and other carrier buildings are very high traffic locations, they are also the locations in which MCI faces the most competition for its wholesale business.  For example, MCI faces competition at the 60 Hudson Street carrier hotel from at least AT&T, Time Warner, Level 3, and XO.

22.     Finally, most MCI on-net buildings – including those that to date have been lit only by MCI – are readily addressable by multiple CLECs or fiber providers.  As is shown in Attachment 1, which relies on data previously presented in Exhibit 12B of the Lew/Lataille Declaration, 80 percent of MCI's on-net buildings are concentrated in

---

[3] http://www.cavtel.com/wholesale/index.shtml

**REDACTED – FOR PUBLIC INSPECTION**

only 111 of the [**BEGIN PROPRIETARY       END PROPRIETARY**] Verizon wire centers that have MCI on-net buildings.  Attachment 1 also shows that all but 10 of those 111 Verizon wire centers have three or more competitive fiber providers, and that those 111 wire centers have an average of 10 competitive fiber provider networks.

23.    Any of the multiple CLECs and fiber wholesalers that have constructed networks in the Verizon wire centers in which MCI on-net buildings are concentrated could readily extend their networks to an MCI on-net building.

24.    *Verizon Central Offices*  As is discussed above, some of MCI's on-net buildings are Verizon central offices.  In determining which Verizon central offices to bring on-net, MCI targeted those central offices that had the highest levels of demand and, consequently, provided sufficient revenue to warrant the cost of facilities construction.  Because the MCI fiber-based collocations are in such high-demand central offices, and because MCI was able to "prove in" the fiber-based collocations, it is apparent that other CLECs could also extend their networks to those central offices (if they have not done so already).

25.    Of the [**BEGIN PROPRIETARY       END PROPRIETARY**] Verizon central offices in which MCI's local network has a fiber-based collocation, [**BEGIN PROPRIETARY       END PROPRIETARY**] or 74 percent, have been designated by Verizon as either Tier 1 or Tier 2 central offices under the transport impairment tests that the FCC adopted in the *Triennial Review Remand Order* (see Attachment 2).

REDACTED – FOR PUBLIC INSPECTION

And, in many applications, Metro Private Line circuits that terminate in Verizon wire centers are equivalent to entrance facilities, for which the FCC has made a finding of non-impairment.

26. *End User Buildings* CLECs and other fiber providers could also readily extend their networks to office buildings, corporate campuses, and other MCI on-net end user buildings. The fact that MCI has lit a building shows that there are no building access issues and that the building is a communications-intensive location that generates sufficient revenue to justify the cost of facilities construction.

27. MCI generally does not even consider a building for a "building add" unless there is customer demand of a DS3 or more, and adds a building only if the available revenue is sufficient to recover the cost of construction within the payback period specified by MCI's corporate guidelines.  A sample consisting of the most recent 20 approved building adds in Verizon-East territory for which "day one" circuit counts were specified in the proposal showed that all but two had initial circuit demand of a DS3 equivalent or more, and demand in the two buildings whose initial circuit demand was below the DS3 level was projected to ultimately increase above that level.[4]

28. Furthermore, a review of current circuit data for the on-net buildings with MCI local fiber in Verizon territory showed that a significant majority have current demand at

---

[4] The "day one" circuit count does not necessarily indicate the ultimate traffic level in a building. The two buildings with day one circuit counts below the DS3 level were approved because the revenue guaranteed by the customer justified the cost of construction. It is likely that, in order to meet their revenue commitments, the customers in these buildings would have to subsequently increase their circuit demand above the day one level.

**REDACTED – FOR PUBLIC INSPECTION**

the OCn or near-OCn level. Specifically, [**BEGIN PROPRIETARY      END PROPRIETARY**] percent of those buildings have current demand of two or more DS3 equivalents.[5]  And [**BEGIN PROPRIETARY      END PROPRIETARY**] percent have current demand of one or more DS3 equivalent.[6]

29.    In every city, MCI's on-net buildings exhibit high levels of circuit demand.  In Albany, NY, for example, [**BEGIN PROPRIETARY      END PROPRIETARY**] percent of MCI's on-net buildings have current circuit demand of 2 DS3 equivalents or more; in Baltimore, MD, [**BEGIN PROPRIETARY      END PROPRIETARY**] percent of MCI's on-net buildings have current circuit demand of 2 DS3 equivalents or more; in New York, NY, [**BEGIN PROPRIETARY      END PROPRIETARY**] percent of MCI's on-net buildings have current circuit demand of 2 DS3 equivalents or more; in Philadelphia, PA, [**BEGIN PROPRIETARY      END PROPRIETARY**] percent of MCI's on-net buildings have current circuit demand of 2 DS3 equivalents or more; in Pittsburgh, PA, [**BEGIN PROPRIETARY      END PROPRIETARY**] percent of MCI's on-net buildings have current circuit demand of 2 DS3 equivalents or more; and in Washington, DC, [**BEGIN PROPRIETARY END PROPRIETARY**] percent of MCI's on-net buildings have current circuit

---

[5] This analysis includes both Verizon-East and Verizon-West buildings.  MCI on-net buildings that are Verizon wire centers were excluded from this analysis.

[6] Current demand below the DS3 level typically signifies that a customer whose traffic justified the facilities construction has relocated or switched to a different carrier.  Included in those buildings with current demand below the DS3 level are buildings that have MCI fiber but are not currently active, i.e., MCI has no customers in the building and has removed the transmission electronics.

**REDACTED – FOR PUBLIC INSPECTION**

demand of 2 DS3 equivalents or more.  Overall, in those six cities, [**BEGIN PROPRIETARY    END PROPRIETARY**] percent of MCI's on-net buildings have current circuit demand of 2 DS3 equivalents or more.

30.    Because MCI's on-net buildings are high-demand locations, and because MCI has no material cost advantage in constructing outside plant, obtaining building access, or preparing the "POP space" in the building, the fact that MCI was able to "prove in" the extension of its network to a building shows that other CLECs could do the same.

31.    At least 80 percent of MCI's on-net buildings are either in wire centers that meet the "triggers" that the FCC established for de-listing unbundled DS3 loops, or have sufficient demand to justify the use of OC-n circuits, which are not available as unbundled network elements. Specifically, 51 percent of MCI's on-net buildings are in wire centers that meet the DS3 impairment test adopted in the *Triennial Review Remand Order,* and an additional 29 percent of MCI's on-net buildings have current circuit demand at the OC-n or near OC-n level, i.e., two or more DS3 equivalents.

**REDACTED – FOR PUBLIC INSPECTION**

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on May 20, 2005

_Jonathan P. Powell_
Jonathan P. Powell

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on May 20, 2005

Peter H. Reynolds

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on May 20, 2005

_____
Edwin A. Fleming

REPLY DECLARATION OF JONATHAN P. POWELL,
PETER H. REYNOLDS, AND EDWIN A. FLEMING

EXHIBIT 1

REDACTED – FOR PUBLIC INSPECTION

REDACTED – FOR PUBLIC INSPECTION

# REPLY DECLARATION OF JONATHAN P. POWELL, PETER H. REYNOLDS, AND EDWIN A. FLEMING

## EXHIBIT 2

REDACTED – FOR PUBLIC INSPECTION

REDACTED – FOR PUBLIC INSPECTION