**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America,<br><br>                 Plaintiff,<br>    v.<br><br>SBC Communications, Inc. and<br>AT&T Corp.,<br><br>                 Defendants,<br><br>The Alliance for Competition in<br>    Telecommunications<br><br>                 and<br><br>COMPTEL,<br><br>              *Amicus-Curiae*. | Civil Action No.: 1:05CV02102 (EGS) |
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br>    v.<br><br>Verizon Communications Inc. and<br>MCI, Inc.,<br><br>               Defendants,<br><br>The Alliance for Competition in<br>    Telecommunications<br><br>               and<br><br>COMPTEL,<br><br>    *Amicus-Curiae*. | Civil Action No.: 1:05CV02103 (EGS) |

**ACTEL'S REDACTED SURREPLY TO THE
UNITED STATES' REPLY SUBMISSION IN RESPONSE TO THE
COURT'S MINUTE ORDER OF JULY 25, 2006**

**TABLE OF CONTENTS**

**Page**

I. THE GOVERNMENT IGNORES TRADITIONAL MERGER ENFORCEMENT
   CRITERIA .................................................................................................................. 2
   A. Market Concentration ...................................................................................... 2
   B. Post-merger Pricing ......................................................................................... 4

II. THE GOVERNMENT IMPORTS NEW AND UNPRECEDENTED CRITERIA
    THAT WILL UNDERMINE MERGER ENFORCEMENT ............................................. 7
    A. Factual Misrepresentations ............................................................................. 8
    B. Legal errors ................................................................................................... 10

In its zeal to secure judicial blessing for what at best is an embarrassing lapse in merger enforcement, the Government is leading this Court to clear error. The Government's Reply asks the Court to simply ignore the traditional antitrust criteria by which mergers have been evaluated for decades – (1) affect on post-merger price and (2) market concentration – and instead impose new, far more stringent criteria for a successful challenge to an anti-competitive merger. The Government wants this Court to take an unwise and unprecedented step and to make new law. The Government can prevail in this case only if this Court is willing to take such a step.

In its Reply brief, for the first time in this case, the Government provides an explanation as to why the harm flowing from the mergers is confined to 2-to-1 buildings, rather than 3-to-2 or 4-to-3 buildings. The Government claims that to successfully challenge the effects of these mergers in 4-to-3 and 3-to-2 markets, it must show that the acquired company (a) has "*unique* competitive characteristics," and (b) regularly sells at the *lowest* prices in the market. The Government's position is now a matter of public record and will be cited by those attempting to dissuade this or a successor Administration from challenging a merger. Should a court countenance this approach, merger enforcement will be radically altered and irrevocably damaged. Few, if any mergers could possibly be enjoined under such standards.

The Government cites no legal authority for its new criteria. There is none. In fact, such criteria are contrary to existing law and find no support in economics. The Government has publicly argued against such criteria in the last contested merger case that it tried, <u>United States</u> <u>v. Oracle Corp.</u> It would be bad policy to adopt such ill-conceived requirements under any circumstances. It is far worst to radically change

1

existing law merely so that the Government can avoid the embarrassment of its own sloth.

This case can not be cast merely as a disagreement among reasonable economists – whatever the merits of the disagreements between the Government's economists and those of some other amici over the proper definition of "relevant market." The legal standard the Government now advocates for merger review represents a vast sea change in antitrust enforcement.

## I.

### THE GOVERNMENT IGNORES TRADITIONAL MERGER ENFORCEMENT CRITERIA

**A.    Market Concentration**

The principal issue in merger review is whether the merged companies will be able to raise prices after the merger. There is no dispute on this point. There are a number of analytical tools that enable courts to evaluate this issue, foremost among which is a concentration analysis, such as an HHI. An HHI calculation is not some ministerial step that can be avoided without consequence. It should give the Court pause that the Government moved the entry of its Proposed Final Judgment without informing the Court that the HHIs for the deals far exceeded those deemed acceptable by the case law in this circuit. High HHIs are one important indication of post-merger price increases.

The Court's "pause" should turn to outright concern when amici pointed out, as they have here, that HHIs have been calculated in well-nigh every conceivable way, and all reveal concentration levels far in excess of what is acceptable. The Government responds by claiming that HHIs "would add nothing useful" to its explanation of harm,

2

pointing out that in the 2-to-1 situations challenged by the Government, HHIs exceed acceptable thresholds. But the point is that the same HHI methodology that shows excessive concentration in 2-to-1 situations also shows that 3-to-2 and 4-to-3 mergers far exceed acceptable levels. To claim the HHI analysis "adds nothing usseful" is wrong: HHI analysis plainly shows unremedied harm that will lead to post-merger price increases, as have already occurred.

The Department of Justice periodically publishes a report entitled "Merger Challenges Data." The most recent such report, from the period 1999 – 2003 is attached as Exhibit 1. It is a very short document that shows what will happen if the Department's new criteria are adopted. In the document, the Department reports and categorizes the mergers it has challenged *solely* by HHI because, in the words of the report, "the market share and concentration levels at which the Agencies have challenged mergers are significant."

Table 3 in the report lists markets in the dairy industry in which mergers were challenged. The dairy industry is clearly a commodities industry (which is what the Government's economist says the LPL markets are). There were 182 total markets in which mergers were challenged in the dairy industry. The telecommunications industry is reported in Table 6. Mergers were challenged in 214 different markets. The Court will note that many if not most challenged markets manifested post-merger HHI statistics far lower than the 4-to-3 and 3-to-2 markets in this case.

More importantly, the statistics show the Government has frequently challenged mergers in 4-to-3 and 3-to-2 markets. Is the Department telling this Court that in each such challenged market, the acquired company was "unique"? That is the rule the

3

Government wants this Court to apply in this case. As we explain in greater detail below, the Department's newly enunciated approach, under which market concentration is ignored and "uniqueness" is required, will dramatically alter antitrust enforcement. A "uniqueness" criteria means that few if any mergers can be challenged effectively in the future.

**B.      Post-merger Pricing**

In a traditional merger review, particularly with high HHIs, the Government would make some attempt to provide an analysis of post-merger pricing, as well as an explanation of how the remedy will preclude anti-competitive price increases. But the Government's lawyers and economists continue to refuse to make any predictive statements about the price effects of these mergers. Price increases are the key issue in antitrust enforcement. The Government tries to frame the issue before this Court as whether some other supplier can "step into the shoes" of AT&T and MCI at specific building locations. Majure Reply Decl. at ¶ 19. That is not the issue in a merger review. It is not even clear what "step into the shoes" of AT&T means. The issue is whether prices will go up as a result of the merger. Neither the Government's economists nor its lawyers claim that the proposed remedy will prevent post-merger price increases, even in 2-to-1 buildings.

ACTel, on the other hand, submitted many sources of evidence showing that market prices for Local Private Lines have increased since the mergers, and that the merging companies have themselves announced price increases for Local Private Lines in geographic markets not controlled by the FCC order precluding such price increases. The Government simply dismisses without further analysis all the evidence of increased prices – industry reports, press statements, and even the "on the record" statements of top

4

executives from the merging companies – as "misleading" and "taken out of context." Reply brief at p. 107. ACTel also submitted actual copies of post-merger price increase announcements, but the Government claimed these price increases were not "symptomatic of 'dramatic' across the board price increases," id., and therefore simply ignored them.

Finally, ACTel submitted to this Court a number of analyses of projected price increases based on the business records of customers of the merging companies, but the Government found fault with all of these.[1] The Government claims that the data from the CID submissions of the various companies was not actually reliable business record data. The Government knows this criticism to be false. The data was not prepared for this or any other litigation. It was compiled from responses to formal RFPs ("requests for proposal") and from actual Masters Service Agreements. The prices are those actually offered by suppliers in the real world and what purchasers in the real world would pay under executed contracts for the circuits that are analyzed.

The Government also claims that the statistical analyses in the summaries, all of which show that the mergers will result in significant price increases in 4-to-3 and 3-to-2, as well as 2-to-1 situations, are "unreliable." Specifically, the Government claims the analyses all exhibit a "fundamental flaw" in that they ignore the "possibility of endogeneity," which is a fancy way of saying that something other than the variable

---

[1] The Government's Reply brief makes it seem that companies responding to the Government's CIDs submitted their summaries to the Government but withheld their data until compelled to provide it. Reply brief at p. 31. This suggestion is both inaccurate and offensive. The Government knows full well that each summary and its respective data sets were submitted in response to the Government CIDs at precisely the same time and in precisely the same submissions. The Government also knows that only a portion of one of the data sets was even examined by Government economists before it shut down the entire merger review process and cleared the acquisitions. Based on this knowledge, we have every reason to presume that the analysis the Government now submits to this Court was performed only after this Tunney Act challenge arose and not during the earlier period when the Government was supposed to be conducting a thorough investigation to protect the public interest.

being tested is affecting the result. Majure Reply Decl. Attachment at p. 3. This is hogwash, and the Government knows it. **[REDACTED]**[2]

Finally, the Government's economist claims that a couple of CID responses were deliberately withheld from this Court because the results were inconsistent with ACTel's argument. Majure Reply Decl. Attachment at p. 4. **[REDACTED]**[3]

We do not expect this Court, in the conduct of a Tunney Act proceeding, to evaluate every complicated economic issue and determine which side is correct with regard to each criticism of pricing analysis. But we do believe that when traditional concentration measurements (HHIs) show significant problems and when conventional statistical analysis of business record data, statements of the merged companies' top executives, and publicly announced pricing changes all point to post-merger price increases, the Government has to do more than "nitpick" amici's submissions to satisfy Tunney Act obligations. The Government must provide this Court with an analysis of post-merger pricing. The Government could have done a more thorough investigation of pricing data, if it had been serious about evaluating these mergers. It could have actively tried to prepare a legal case to challenge the mergers, instead of making after-the-fact excuses for giving powerful companies a free pass.

In order to satisfy Tunney Act requirements, the Government must now clearly state that its proposed remedy will preclude post-merger price increases, and it must cogently explain, in a defensible analysis, why the remedy would work in this fashion

---

[2] The Government's economist not only ignores the control variables clearly indicated in the analyses, but he also introduces his own flawed control variable, market characteristics at the LATA level, which he claims produce different results from those reported in the CID submissions. But different LATAs have different numbers of competitors, so the control used by the Government's economist actually masks the true relationship between the number of bidders and the winning bid. No wonder the Government claims to have gotten different results.

[3] **[REDACTED]**

and produce the predicted results. In this case, the Government's economist will not even state that the remedy precludes post-merger price increases. He does not discuss post-merger prices at all. Instead he devises a set of wholly unprecedented merger challenge criteria, which, if adopted by this Court, would gut merger enforcement.

## II.

### THE GOVERNMENT IMPORTS NEW AND UNPRECEDENTED CRITERIA THAT WILL UNDERMINE MERGER ENFORCEMENT

Market concentration statistics and pricing information unmistakably point to unremedied anticompetitive effects throughout the relevant LPL market, extending far beyond 2-to-1 buildings. Heretofore in this case, the Government has simply refused to address unremedied harm in 4-to-3 and 3-to-2 situations, claiming that those mergers are outside the scope of the Complaint. The Government has now abandoned that position. In its Reply brief, for the first time, the Government purports to offer a justification of sorts for its decision to seek relief only in 2-to-1 buildings. According to the Government's economist, "the evidence did not suggest a significant loss of competition as a result of the mergers," in any building that, post-merger, had a least two suppliers (however limited the suppliers' rights). Majure Reply Decl. at ¶ 23.

The rationale for this conclusion is set out in both the Government's Reply brief and its economist's declaration. The Government has finally joined issue on the most important question in this case – whether the failure to address competitive injury in 4-to-3 and 3-to-2 buildings dooms the proposed remedy under the public interest test. The Government's explanation for its conduct invents evidentiary support where there is none. It invokes economic theories that are far beyond dubious in their application to this case. And it asks the Court to approve merger review criteria that are truly

7

unprecedented and that would, if adopted by this Court, severely restrict Government merger enforcement.

In order to explain just how a far afield the Government's new antitrust theories will take this Court, it is necessary for us to set out in a bit of detail what the Government is contending, and to expose the evidentiary and economic fallacies in the Government's story. This, of necessity, involves some economic analysis. We ask the Court's patience given the importance of this issue to the case.

Basically, the Government's economist and brief writers argue that (1) Local Private Lines are a commodity, meaning that customers buy the lowest priced offering regardless of any other factor; and (2) suppliers have no significant capacity constraints; and, therefore, (3) two suppliers produce prices just as low as three or more suppliers. Given this conclusion, according to the Government, if the acquisitions of AT&T and MCI result in just two suppliers to a building, the mergers can not be challenged under the law unless amici (or someone) can show that (4) AT&T and MCI have "*unique* competitive capabilities" or (5) are always (or at least most often) low price leaders.

### A.    Factual Misrepresentations

The Government's factual assertions are contradicted by the very record the Government has submitted to the Court. The Government's Reply brief (at p. 33) and its economist's declaration (at ¶ 24) simply assert that Local Private Lines are commodity products without any citation to the record. The record presented by the Government is to the contrary. Price is certainly an important factor to LPL customers, but it is not the only factor, nor even the most important factor. **[REDACTED]**[4] This is exactly what

---

[4] **[REDACTED]**

8

the amici have been saying from the beginning of this case, and specifically disproves the Government's unsupported assertions that Local Private Lines are commodities. In point of fact, customers look to network coverage, service, support and a variety of other criteria in addition to price.[5]

Nor does the Government provide support for its assertion that suppliers to a building can easily expand capacity to cover whatever is lost by the elimination of AT&T and MCI. Government Reply brief at 33. The Government's only supporting citation for this point, the brief of amicus Sprint, can be read, at best, to say that the cost of additional wiring is less than the cost of securing rights of way. In any case, there are many examples in the bidding data submitted by ACTel numbers of AT&T circuits that are capacity-constrained and therefore unavailable for wholesale market.

But the greater fallacy in this portion of the Government's argument is the continued assumption that if a CLEC is connected to any floor of a building, it can and will expand to other floors previously serviced by AT&T and MCI. Again, the record submitted to the Court by the Government is to the contrary. **[REDACTED]** The Government simply assumes this constraint away. Indeed, at one point in its Reply brief, the Government asserts that securing consents from building owners is only a small cost, but the Government does not provide any citation to the record at all. See, p. 14, n. 41. ACTel, on the other hand, has previously provided a number of authorities that explain the extent of this constraint.

---

[5] In all of the material submitted by the Government, we can find only one document (from MCI) that supports the Government's theory. See United States August 7 brief on p. 9.

9

Similarly, there is no indication in the record before the Court that the CLECs already connected to a building provide service to the wholesale market at all. The Government just ignores this point in its analysis of harm.[6]

**B.      Legal errors**

At bottom, the record indicates that neither of the Government's first two assumptions are correct. Local Private Lines are not commodities. CLECs already connected to a building can not costlessly (or at a trivial cost) expand to service customers of the old AT&T and MCI.

More fundamentally, it is economically incorrect and unprecedented in the case law for the Government to claim that two suppliers (even if they are supplying commodities and are not at all capacity-constrained) will produce the same low prices as three or more suppliers. The Government economist now makes this claim, see Majure Reply Decl. ¶ 25 n. 36, based upon a set of economic relationships known as the "Bertrand model," which the Government's economist asserts "has been studied extensively by economists." The Government's economist cites a leading industrial organization textbook for this proposition, but neglects to point out that the same text characterizes the Bertrand model as a "paradox" because the model assumes that the two competing firms make no profit at all.[7] The author goes on to explain that if the Bertrand model were a valid predictor of real world behavior, no firms would ever enter a duopoly market.

---

[6] The Government disingenuously treats these issues only in the context of divested assets. Companies that purchase the divested assets will likely provide wholesale access, if the Government requires it. But the CLECs already connected to a building may or may not – and the Government's entire analysis of harm assumes that they will, without any record support.

[7] J. Tirole (1988) *The Theory of Industrial Organization*, MIT Press, p. 210-211 and p. 211, n. 1.

Other leading texts also explain that the Bertrand model is purely hypothetical and not intended to predict behavior in markets like those before this Court. The Cabral text, for example, labels the Bertrand model as "not very realistic."[8] Perhaps the most compelling criticism of the Bertrand model comes from Mr. Majure's recently named boss, Dennis Carlton, the new chief economist of the Antitrust Division. Carlton's text says that the Bertrand model is "counterintuitive." Carlton goes on to explain that the model would apply, at best, to situations in which competitors come together to compete in only one session (such as a one-day trade fair) and it would not apply in situations in which competitors compete with each other day after day.[9]

We do not expect the Court to become an economic expert on the Bertrand model in order to decide this case. We merely want the Court to see just how far fetched the Government's arguments are in this case. The Government is grasping at straws. The Bertrand model is a "not very realistic," "counterintuitive" "paradox." It was created as an academic exercise for the purpose of study. It is based in a broad set of unrealistic assumptions that are foreign to the real world competition. It has no application to this case. The Court would subject itself to harsh criticism (if not outright ridicule) if it permitted the Government to rely on a Bertrand model. The suggestion that two competitors produce the same low prices as three or more competitors is "counterintuitive" and "not very realistic."[10]

---

[8] Cabral (2000), *Introduction to Industrial Organization*, MIT Press, p. 104.

[9] Carlton and J. Perloff (1994), *Modern Industrial Organization*, 2nd edition, pp. 347, 331.

[10] The section of the Merger Guidelines cited by the Government (2.22) undermines rather than supports its argument. That section says that when merging firms have a combined share of at least 35% (all 3-to-2 buildings meet that test), they may find it profitable to raise price ... ." There is a limited exception to this rule where customers of the merged companies would be able to find "economical alternative sources of supply." The Government simply assumes such sources of supply exist here because, according to the Government, capacity is easy to add. **[REDACTED]**

11

Having concluded that two competing suppliers produce the same low prices as three or more competitors, the Government goes on to claim that it cannot successfully challenge the mergers unless AT&T and MCI can be proven to have "unique advantages." Majure Decl. ¶ 27. On page after page of its brief, the Government faults amici for failing to prove that AT&T and MCI are "uniquely capable competitors" that have "uniquely" large and "uniquely" extensive networks. Reply brief at pp. 26, 28, 29.

"Uniqueness" has never been a merger evaluation criterion. It is not found in the Merger Guidelines. We know of no case that has imposed the "uniqueness" requirement now advanced by the Government. Such a requirement is antithetical to established practice. Heretofore, the Government has challenged mergers when they produce excessive concentration and the likelihood of price increases. This frequently occurs when two large companies merge, notwithstanding the fact that neither is "unique."

If the Government had to prove that the acquired company in a merger were "unique," few if any merger challenges would be successful. The merger statistics attached to this brief show many examples of Government challenges to mergers in commodity markets with four or five competing suppliers. The "uniqueness" standard that the Government now asks this Court to enforce would end all such merger enforcement.

Similarly flawed is the Government's contention that it can challenge the mergers only if AT&T and MCI were consistently the lowest priced suppliers, Majure Reply Decl. ¶ 28, the elimination of which would cause a "disproportionate effect." Reply brief at 31. This argument is also contrary to existing law and practice. In the recently contested PeopleSoft merger, the Government itself rejected this argument when it was

12

made by the other side, and instead took the position that the elimination of a competitor will harm price competition, whether that competitor has absolutely the lowest prices or not.

### [REDACTED][11]

In sum, the approach for which the Government now just seeks judicial approval is without precedent in either law or economics. It is also very bad public policy. To cover what is clearly an unfortunate enforcement decision, the Government is advocating a new set of standards that would eviscerate merger enforcement altogether. Absent the application of unprecedented new criteria, it is clear that the harm the Government identified in 2-to-1 markets is also present in 3-to-2 and 4-to-3 markets. This harm is unremedied by the consent decree and, therefore, the public interest standard has not been satisfied.

Dated September 28, 2006.

                                                 Respectfully submitted,

                                                      /s/

                                                Gary Reback (Bar No. 218594)
                                                Carr & Ferrell LLP
                                                2200 Geng Road
                                                Palo Alto, CA  94303

---

[11] There are a myriad of other flaws in the Government's reasoning. The Government continues to assert, for example, that all building tenants would have a choice of two facilities-based providers after the mergers. This, again, is just plain wrong. The Government counts a CLEC with limited rights to a single floor of a building as a supplier to a tenant on a different floor, when the CLEC has no right to serve the tenant at all. The documents the Government supplied the Court demonstrate this fact, which the Government continues to ignore.

The Government also contends that it would be "impractical" to consider all of the entry criteria it pled in the Complaint. But the Government made no effort, of which we are aware, to even gather information on key issues such as building access, **[REDACTED]**. Having pled each building as a separate market, it is incumbent upon the Government under the Merger Guidelines to do a thorough entry analysis.

**[REDACTED]**

650-812-3489 (phone)
650-812-3444 (facsimile)
greback@carrferrell.com

Thomas Cohen (Bar No. 269332)
Kelley Drye & Warren, LLP
3050 K Street, N.W., Suite 400
Washington, D.C. 20005
(202) 342-8400 (phone)
(202) 342-8451 (facsimile)
tcohen@kelleydrye.com

*Attorneys for the Alliance for Competition in Telecommunications*

14