**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Civil Action No.: 1:05CV02102 (EGS) |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| SBC Communications, Inc. and ) | |
| AT&T Corp., ) | |
| ) | |
| Defendants, ) | |
| ) | |
| The Alliance for Competition in ) | |
| Telecommunications ) | |
| ) | |
| and ) | |
| ) | |
| COMPTEL, ) | |
| ) | |
| *Amicus-Curiae*. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | Civil Action No.: 1:05CV02103 (EGS) |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| Verizon Communications Inc. and ) | |
| MCI, Inc., ) | |
| ) | |
| Defendants, ) | |
| ) | |
| The Alliance for Competition in ) | |
| Telecommunications ) | |
| ) | |
| and ) | |
| ) | |
| COMPTEL, ) | |
| ) | |
| *Amicus-Curiae*. ) | |

**ACTel's REDACTED RESPONSE TO THE UNITED STATES' REPLY
TO ALLEGATIONS MADE BY AMICI AT NOVEMBER 30, 2006 HEARING**

*Amicus Curiae*, the Alliance for Competition in Telecommunications ("ACTel"), hereby files this response to the United States' Reply to Allegations Made by Amici at November 30, 2006 Hearing, filed December 14, 2006.

On November 30, counsel for amici presented to the Court CID documents from the Justice Department's own submission that belie assertions made by the Justice Department in its declarations and briefs. At the conclusion of the presentation, the Court inquired whether the Justice Department wished to respond to amici's argument that the factual record on which the Justice Department claims to rely contradicts, rather than supports, the Justice Department's position.

The Justice Department filed its Reply on December 13, 2006. The Justice Department's Reply fails to even address the principal arguments made by amici, and those arguments remain unrebutted by the Justice Department. The few rebuttal points the Justice Department does offer are undermined by a plethora of conflicting documents in the materials the Justice Department previously submitted to the Court, additional examples of which are attached to this brief.

# I

### The Appropriate Legal Standards for the Court's Review Are Not at Issue.

The legal standards that govern the Court's review are not contested. At the November 30 hearing, amici's counsel reiterated that under controlling Supreme Court authority, *Ford Motor Co. v. United States*,[1] the proposed remedy must be "effective to redress the violations and to restore competition." Unless the proposed remedy is

---

[1] 405 U. S. 562, 573 (1972).

"effective," the Justice Department has failed to carry its burden under the Tunney Act. The Justice Department voiced no objection to this standard, either at the hearing or in its subsequent written Reply.

Nor has the Justice Department contested the appropriate legal standards for the Court's review of the explanations and arguments on which the Justice Department purports to rely. The Court now has before it a factual record that contains the "materials" of "substance," including both documents and declarations, which the Justice Department claims support the allegations of the Complaints and the consent decrees.[2] The Justice Department's explanations and arguments must be measured against this record.

At the November 30 hearing, counsel for amici argued that under Supreme Court precedent, the Justice Department's argument must make "practical sense," "economic sense," be "tied to the facts of the case," and "rest on a reasonable foundation."[3] Both the Justice Department's arguments and its expert opinions must be "supported by sufficient facts to validate [them] in the eyes of the law."[4] Conversely, the Court cannot rely on an antitrust argument and opinion when "indisputable record facts contradict" or otherwise render them "unreasonable."[5]

These are the standards the Supreme Court requires every antitrust plaintiff to meet before its argument and expert opinion are permitted into the record at all. As amici's counsel argued on November 30, if the Justice Department cannot even meet the

---

[2] This is what the Court ordered the Justice Department to produce. *See* Tr. of July 25, 2006 at p. 19.

[3] These standards come from Matsushita Elec. Indus. Co. *v.* Zenith Radio Corp., 475 U. S. 574, 587, 597 (1986) and Daubert *v.* Merrell Dow Pharmaceuticals, Inc., 509 U. S. 579, 591, 597 (1993).

[4] Brooke Group Ltd. *v.* Brown & Williamson Tobacco Corp., 509 U. S. 209, 242 (1993).

[5] *Id.*

standard to get its explanations into the record, it has no business asking the Court to defer to those explanations. The Justice Department's December 13 Reply does not contest either these legal authorities or their applicability to this proceeding.

## II

## The Documents Submitted by the Justice Department Contradict the Justice Department's Claim that the Remedy Will Be Effective for "2-to-1" Buildings.

Amici's counsel began on November 30 by addressing the effect of the merger and the proposed remedy on so-called "2-to-1" buildings. The Justice Department concedes this issue is squarely within the four corners of the relevant market pled in the Complaint.

### A.  The remedy does not prevent price increases.

Amici's counsel first pointed to the Justice Department's description of anticompetitive effects flowing from the mergers in "2-to-1" buildings. In its first submission to the Court, the Justice Department claimed that the mergers cause competitive injury in "2-to-1" situations because "the merged firms would no longer face competition … in these buildings" making the mergers "likely to result in higher prices." Majure Dec. ¶ 13. But, the Justice Department has not even asserted that its proposed remedy will prevent these "likely" price increases in "2-to-1" buildings. Nor has the Justice Department provided record support for such a position.

Although directly challenged on these points in the November 30 hearing, the Justice Department's December 13 Reply offers no response to amici's argument. The divestitures proposed by the Justice Department do not remedy the higher prices that the Justice Department itself predicts.

**B. The remedy does not provide two customer choices.**

Instead of directly addressing and attempting to remedy the injury – "higher prices" – that its own economist identified, the Justice Department sets a far more modest goal for its proposed remedy. Specifically, the Justice Department claims that after the application of the remedy, "[a]ll customers … will have a choice of two facilities-based providers, just as they did before the merger."[6] On its face, this assertion is legally insufficient to remedy the harm – "higher prices" – that the Justice Department identifies as flowing from the mergers. Beyond that, the record presented to the Court conclusively demonstrates that the proposed remedy will not, in fact, provide two choices to customers after the mergers.

Although the Justice Department claimed its remedy would leave all "customers" with two Local Private Line choices, the documents presented to the Court revealed that the Justice Department did not even begin its analysis by identifying all "customers" that had only two choices prior to the merger. Instead, the Justice Department began its remedy analysis by counting "buildings" rather than customers, and limited its focus to "buildings where [CLECs] have lateral connections." Justice Department Submission, August 7, 2006 at 8.

But CLECs frequently have rights only to individual floors of particular buildings, are not connected to the other floors, and have no rights from the landlord to get connected to those floors. AT&T has made this point publicly[7] and amici's counsel presented to the Court examples in the record of CLEC interrogatory responses showing just how limited CLEC connection rights are. **[REDACTED]**

---

[6] United States Submission, August 7, 2006, at p. 9; Majure Dec., ¶ 16.

[7] *See* AT&T White Paper, attached as Exhibit 1 to ACTel's July 25, 2006 Response, at p. 2.

The record contains a myriad of other examples. We have provided citations in the margin to various CLEC CID responses, all produced by the Justice Department to the Court, **[REDACTED]**, in which the responding CLEC provides the Justice Department with precise floor information.[8]

The Justice Department simply assumed away this constraint, despite the fact that it is clearly and unequivocally set out in the documents that the Justice Department claims to have relied upon. Contrary to the CLEC's CID responses, the Justice Department assumed that a CLEC connected to any portion of a building has the rights to service customers in the entire building. As a result, the Justice Department started with a list of about **[REDACTED]** "2-to-1" buildings, but there remain a vast number of customers, in an indeterminately vast number of buildings, that will have only one supplier after the merger. The Justice Department counted these customers as located in "3 to 2" buildings. The Justice Department's remedy never considered these customers at all because the Justice Department assumed, contrary to fact, that a small CLEC with limited rights to serve a very small portion of the customer's building could serve the entire building.

The Justice Department's Reply of December 13 does not contest amici's characterization of the Justice Department's flawed methodology. Rather, the Justice Department continues to insist that amici are trying to define the relevant market as *floors* of a building, rather than as individual buildings, as the Complaint specifies. This is simply untrue. The Justice Department contends that each building is a market. Amici are simply pointing out the obvious – if the Justice Department's remedy intends to provide "all customers" in the relevant markets that had two choices prior to the merger

---

[8] *See, e.g.,* **[REDACTED]**.

with two choices after the merger, as the Justice Department has repeatedly claimed, its methodology needs to count, as "3 to 2" buildings, only buildings where CLECs have rights to the *entire* building, or at least *most* of it, rather than to just a small fraction of the building, with no rights whatsoever to expand to the other floors.

The Justice Department also claims that its deeply flawed methodology cannot possibly be construed as a "major deficiency in the proposed remedy" because amici did not raise the floor connection issue in public comments filed with the United States last February.[9]  It is certainly true that amici did not raise this issue last February.  Amici at that point had no way of knowing how the Justice Department was making its calculations.  It was only when the Justice Department was forced by Court order to provide the CLEC CID responses that the Justice Department's approach became visible.  Prior to the Justice Department's document production, no one could reasonably have assumed that the Justice Department would ask for information in its CID, receive that information from CLECs, and then assume the responses away and take a position in public directly contrary to what its own investigation showed.[10]

**C.  The remedy is based on a flawed entry analysis.**

Ignoring what are likely many thousands of buildings in which most customers have only a single supplier post merger, the Justice Department's methodology counted only about **[REDACTED]** "2-to-1" buildings.  But the Justice Department did not even

---

[9] United States Reply, December 13, 2006, at n. 29.

[10] In its Reply, the Justice Department also points the Court to prior submissions in which the Justice Department characterized the likelihood of CLEC entry into "2-to-1" buildings, but these citations are irrelevant to the floor rights assumption the Justice Department has made.  Similarly irrelevant is the point made by the New York Attorney General's consultant that does not mention landlord permission issues at all.  *See* United States Reply, December 13, 2006, at 9 (*quoting* Nicholas Economides).  Of course CLECs hope to win other tenants in a building they serve – but that does not mean they will be able to reach them.  The Justice Department itself regards "building owner consent" as an entry barrier.

propose a remedy for all of these buildings. At the November 30 argument, amici's counsel pointed the Court to calculations in the record showing that the proposed remedy applies to only about **[REDACTED]** of these buildings – about 700 in all.[11] The public remains largely unaware of just how small a percentage of the affected buildings the remedy addresses. The Justice Department did not contest in Court, nor in its written Reply, amici's calculations or assertions. The Justice Department therefore claims that entry is "not unlikely" at the **[REDACTED]** "2-to-1" buildings that it has admittedly identified but does not attempt to remedy.

The Justice Department has steadfastly refused, both in Court and in its Reply, to identify the likely CLEC entrant for each such building, despite the fact that it must have identified those CLECs if the Justice Department performed the analysis it claimed to have performed. This, by itself, is a violation of the Merger Guidelines. There is no way to tell if entry is "likely" without knowing the identity of the entrant.

Furthermore, the materials provided to the Court by the Justice Department are not sufficient to permit the calculations the Justice Department says it made in reducing the number of "2-to-1" buildings from more than **[REDACTED]** to about 700. For example, the Justice Department claimed in its submission to the Court that the "proximity of a building to a [CLEC's] network connection points" is among the factors "that are most likely to impact entry decisions." United States Submission of August 7, 2006 at p. 6. Yet the Justice Department did not produce the locations of CLEC access

---

[11] Amici's counsel provided the Court with the appropriate figures from the declaration of the New York Attorney General's economic consultant. Virtually identical calculations were made by the other economists in the case. Attached as Exhibit A is the portion of the declaration of NASUCA's expert to the same effect.

points to the Court, despite the fact that its CID gathered this material.[12] And the Justice Department claims to have calculated the distance from each building to accessible CLEC fiber, Majure Dec. at ¶ 14, but the maps produced to the Court do not provide this information.

Amici's counsel directly challenged the Justice Department at the November 30 hearing on these points, arguing that either the Justice Department made up the analysis it claimed to have conducted, or the Justice Department has an analysis, including the identity of each likely entrant, but is declining to produce that analysis to the Court despite the Court's direct order, undoubtedly because the analysis (if it exists at all) is so deeply flawed that it cannot withstand the light of day.

At the conclusion of the argument on November 30, the Court reminded the Justice Department's counsel that production had been ordered "for the bottom line materials that would enable me to do what I am supposed to do." Transcript at 108. Nevertheless, the Justice Department's Reply merely recites what has previously been produced – without providing any identification of entrants, any lists of network entry points, any distance measurements, or calculations of any kind that the Court can review, even for accuracy. *See* Justice Department's Reply of December 13, 2006 at p. 5, n. 15.

On November 30, amici's counsel concluded the section of oral argument on "2-to-1" buildings by explaining in detail why the buildings at which the Justice Department

---

[12] A footnote in the Justice Department's Reply Submission of September 19, 2006, indicates that the Justice Department may not have measured from the network access points at all, but instead simply assumed, contrary to fact, that each CLEC's network is accessible at the closest point to a "2-to-1" building. That is, even though the text of the Justice Department's August 7, 2006, submission stated (at page 6) that the Justice Department's "investigation identified … the proximity of a building to a competitive local exchange carrier's ('CLEC') network connection points," a footnote in a declaration to the September filing stated that the Justice Department "only accounted for the cost to construct a connection to the network at its closest point." *See* Majure Reply Dec. at n. 27.

assumes entry is "not unlikely" are among the least likely of all buildings to attract new entry. The Justice Department contests not a single one of the factual claims made by amici's counsel. Rather, the Justice Department contends that entry need not be shown "with certainty," but only that sufficient entry be "likely" under the Merger Guidelines. The Justice Department's statement, as far as it goes, is certainly correct, but in no way diminishes the force of amici's argument.

Amici's characterization of the record, not contested by the Justice Department, is this: The Justice Department is asking this Court to assume entry is "likely" in hundreds of buildings that have the lowest demand for new suppliers, and in which all customers are captured by existing contracts. Each such building has at least three unremedied impediments to entry (unavailability of capital, physical barriers and landlord/municipality consents) that are specifically identified in the Complaint at ¶ 27 but are not addressed in the remedy *at all*. The Justice Department is asking the Court to assume that entry is "likely" in the next two years (the Merger Guidelines requirement) at each of these unremedied "2-to-1" buildings, despite the fact that there has not been entry by small CLECs at a single one of these buildings for the last ten years. And the Justice Department has failed to provide the Court any analysis that might support this implausible conclusion – and it now appears that there is no such analysis.[13]

---

[13] The proposed remedy is also deficient because it does not meet the Merger Guidelines requirements for another reason, as well. The Justice Department did not contest in Court or in its Reply that the Merger Guidelines require entry to "return market prices to their premerger levels." The Justice Department does not claim that its proposed remedy will produce this result, even where applied.

### III

### The Record Contradicts the Justice Department's Position on Entry Beyond "2-to-1" Buildings.

**A. The Justice Department's position is contrary to settled law.**

The remedy's failure to address any merger-related injury beyond that in "2 to-1" buildings has been a major issue in this proceeding. The Justice Department has proffered an explanation as to why a remedy is necessary in "2-to-1" situations, but not in other Local Private Line situations clearly covered by the Relevant Market and Violations Alleged sections of the Complaint, such as "4-to-3" buildings and "3-to-2" buildings. Amici argued on November 30 that the reasons proffered by the Justice Department for its failure to address "4-to-3" and "3-to-2" situations are contrary to law, unsupported by the facts, and make no economic sense. In effect, the Justice Department is asking the Court to hold that mergers to duopoly are in the public interest.

In order to explain just how far from conventional antitrust analysis the Justice Department is attempting to lead this Court, amici's counsel displayed in open court the District of Columbia Circuit's statement regarding mergers to duopoly ("3-to-2" mergers):

> As far as we can determine, no court has ever approved a merger to duopoly under similar circumstances [high barriers to entry].[14]

---

[14] FTC *v.* H. J. Heinz Co., 246 F. 3d 708, 717 (D. C. Cir. 2001). In its December 13 Reply (at 6 n. 17), the Justice Department cited two cases as "examples of challenges where the Justice Department alleged the mergers were 3-to-2 in markets with high entry barriers which were rejected by the courts for failures of proof." In those two cases the courts rejected the Justice Department's position after determining that the Justice Department's product market definition was "overly narrow." *United States v. Sungard Data Systems, Inc.*, 172 F. Supp. 2d 172, 193 (D.D.C. 2001); *see also United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1108 (N.D. Cal. 2004) ("plaintiffs have not proved that the product market they allege … exists as a separate and distinct line of commerce.) Those cases, therefore, do not support the conclusion that a merger to duopoly is permissible. And they have no bearing on these merger proceedings because, there is no dispute that "local private lines" are a distinct product market.

The Justice Department's written Reply does not contest the applicability nor the accuracy of the cited authority. The Justice Department simply ignores that authority and instead asserts that it followed the "unilateral effects" analysis of the Merger Guidelines in declining to extend its remedy to "3-to-2" and "4-to-3" situations. *See* Justice Department Reply at pp. 5-6.[15]

**B. The Justice Department's position is contrary to the record.**

The Justice Department's entire unilateral effects argument is based on its claim, renewed in its written Reply, that Local Private Lines are "commodities," by which the Justice Department means that 'customers perceive no substantial difference between the various Local Private Line options," and "competition for these customers generally comes down to price." Majure Reply Dec. at ¶ 24.

In commodity markets, according to the Justice Department, a single competitor is sufficient to preclude price increases by the merged companies, unless the competitor is capacity constrained. *See* United States Reply Submission of September 19, 2006 at 33. The Justice Department therefore argued that because Local Private Lines are commodities, and each customer, post-merger, would have a choice of two suppliers,

---

[15] If the Justice Department had followed its usual approach as set forth in the Merger Guidelines, it undoubtedly would have required more extensive divestitures, as in the merger of Alltel and Midwest Wireless and the proposed acquisition of Allegiance Telecom by Qwest Communications. As COMPTEL stated in its filing of September 14, 2006, in Alltel/Midwest the Justice Department required the divestiture of all of Alltel's wireless business, including spectrum and customers, in 28 counties where their service overlapped, even though other wireless companies served those areas. Similarly, when Qwest sought to buy Allegiance, it proposed to divest all of Allegiance's assets in Qwest's region and the Justice Department entered into an agreement with Qwest that would have required those divestitures. The Justice Department seeks to distinguish that case primarily because it entered into its agreement with Qwest without conducting a full investigation. December 13 Reply at 7-8. But Qwest did not propose, and the Justice Department did not accept, a divestiture proposal that plainly exceeded what would be required under the applicable standards. Rather, they entered into that agreement because the remedy followed from a straightforward application of the applicable merger standards.

AT&T and MCI must bring something "unique" to the market, or price at the absolutely lowest level, before the acquisitions harm competition. *Id.* at 25-32.

But Local Private Lines do not manifest the commodity characteristics that the Justice Department claims. The record before the Court thoroughly discredits these assertions. It is difficult to fathom why the Justice Department would make claims so clearly contradicted by its own documents. The record demonstrates that price competition was quite fierce before the mergers, but that Local Private Line products were differentiated by supplier, and customers highly valued product attributes in addition to low price.

At the November 30 hearing, counsel for amici presented an example of a document that makes these points – a **[REDACTED]** document showing that wholesale customers value the "coverage" of the seller's network as a buying criteria more than the price the seller charges.[16] The Justice Department's Reply attempts to explain away this document, as if it were the only piece of evidence demonstrating that both customers and that competitors perceive substantial differences among products and services, and customers value other buying criteria beyond and ahead of price. The record is full of other examples.

An additional **[REDACTED]** document, for example, states:

**[REDACTED]**.[17]

The **[REDACTED]** document goes on to explain that **[REDACTED]**. This is directly contrary to what the Justice Department and its expert assert.

---

[16] Transcript of Nov. 30, 2006, at p. 91.

[17] **[REDACTED]**

There are many more examples of perceived product differentiation. Documents in virtually every CLEC's submission make precisely the same point. **[REDACTED]**

Another CLEC, **[REDACTED]**, submitted to the Justice Department (and the Justice Department submitted to this Court) its marketing plan, including the following prominently displayed customer testimonial from **[REDACTED]**:

**[REDACTED]**[18]
**[REDACTED]**.

**[REDACTED]**.[19] **[REDACTED]**[20] All of these are in the Court's record, submitted by the Justice Department.

Even AT&T's CID submission directly contradicts the Justice Department's claims. **[REDACTED]**:

**[REDACTED]**[21]

Indeed, among the thousands (if not hundreds of thousands) of documents on which the Justice Department purports to rely, it has cited to only a single **[REDACTED]** document[22] suggesting that "**[REDACTED]**." Assuming that this document actually relates to Local Private Lines (as opposed to the broader category of "wholesale data services"), **[REDACTED]** market perception undoubtedly deviated from the marketing perception and approaches of all other suppliers because **[REDACTED]** was the low price leader, and differentiated its product based on price, rather than on the other factors used by its competitors. The **[REDACTED]** documents make this point

---

[18] **[REDACTED]**
[19] **[REDACTED]**
[20] **[REDACTED]**
[21] **[REDACTED]**
[22] Justice Department Reply of December 13, 2006, at 11.

most clearly, **[REDACTED]**[23]  The documents of the other CLECs indicate a far different approach.  In short, the record produced by the Justice Department shows that customers perceive enormous differences among suppliers and products, and that suppliers sell and market their Local Private Line products based on these differences.  Price is important, but it is only one among many buying criteria, and not even necessarily the most important in every case.

Local Private Lines are simply not "commodities."  Therefore, there is no basis in fact, law or economics for arguing, as the Justice Department does, that harm occurs only when there is a merger to monopoly ("2-to-1") in a Local Private Line market, but not in a "3-to-2" or "4-to-3" situation.  And, even if, contrary to the record, Local Private Lines were commodities, the proposed remedy does not provide each customer with two choices after the mergers (as explained above), so the merged companies would be free to raise prices in all such situations.

### C.  The Justice Department invented new legal requirements.

The Justice Department's arguments that (1) it has to prove that the acquired company's product is "unique" before it can challenge the merger, and (2) MCI and AT&T were not the "low price leaders" are relevant only if Local Private Lines are commodities.  Since the record is to the contrary, the Justice Department's "uniqueness" and pricing arguments are beside the point.

Nevertheless, in the interest of completeness, we point out that ACTel's initial response to the Justice Department's submission included compilations of actual CLEC bidding records, so that the Court can itself observe the frequency with which AT&T and

---

[23] **[REDACTED]**

MCI won competitive bids. But the main point, wholly unrebutted by the Justice Department, is that the acquired company in a merger need not be the low price leader before the merger creates competitive injury in the form of higher prices. As we have previously explained, if AT&T, for example, offered its product at lower prices than SBC, some other competitive supplier would have to bid an even lower price, so the elimination of AT&T (or MCI) creates competitive injury, whether that company was the low price leader or not.[24]

## IV

### Additional Evidence Demonstrates the Remedy Is Not in the Public Interest.

At the conclusion of amici's November 30 presentation, counsel pointed to the AT&T/BellSouth merger, which the Justice Department cleared, notwithstanding unremedied "2-to-1" buildings, as evidence that the Justice Department, itself, regards its remedy as nothing more than a public figleaf. The Justice Department's written Reply did not contest amici's characterization of the BellSouth acquisition.

The Justice Department did claim, however, that an **[REDACTED]** document presented by amici was not sufficient to show that the intent of the merger was to retard price competition. The words of the document are certainly clear enough, but the Justice Department claims that the document predated the mergers before the Court and does not specifically mention those mergers by name. These distinctions are mere makeweights. The Justice Department does not and cannot deny amici's point – that **[REDACTED]**

---

[24] As to "uniqueness," neither the word nor the concept appear in any of the Merger Guideline sections cited by the Justice Department. Nor does the Justice Department cite any case law to support its position. Apparently lost on the Justice Department is the difference between a "differentiated" product and a "unique" one. There is no requirement of "uniqueness" in antitrust law.

looked to mergers as the antidote for price competition. Moreover, in the documents submitted by the Justice Department, there are additional examples of the same motivation by others of the merging companies. **[REDACTED]** documents, for example, **[REDACTED]**[25] And amici have pointed to numerous examples of public statements by the merging companies about how prices have "stabilized" or increased since the acquisitions. Both the goal and the result of the mergers are unambiguous: higher prices.

## Conclusion

The Court should bring these proceedings to an end. The Court ordered the Justice Department to produce the materials of substance on which it relied and the Justice Department made a submission in response to the Court's order. But the record produced by the Justice Department exposed the misstatements, contradictions and distortions of the Justice Department's claims. The Justice Department has nothing more to provide. Although given every opportunity by the Court to make both written and oral replies to amici's arguments, it has neither produced nor cited to anything more in the documentary record that would support any of its positions. The Justice Department has not demonstrated that its remedy is in the public interest, even under the most deferential standard. In fact, these proceedings have shown just the opposite – that neither the mergers nor the remedy meets the public interest test.

December 21, 2006                               Respectfully submitted,

                                                _____/s/_____

                                                Gary Reback (Bar No. 218594)
                                                Carr & Ferrell LLP

---

[25] **[REDACTED]**

2200 Geng Road
Palo Alto, CA  94303
650-812-3489 (phone
650-812-3444 (facsimile)
greback@carrferrell.com

Thomas Cohen (Bar No. 269332)
Kelley Drye & Warren LLP
3050 K Street, N.W., Suite 400
Washington, DC 20007
202-342-8400 (phone)
202-342-8451 (facsimile)
tcohen@kelleydrye.com

*Attorneys for the Alliance for
Competition in Telecommunications*

Jonathan D. Lee (Bar No. 435586)
General Counsel
COMPTEL
900 17th Street N.W., Suite 400
Washington, DC 20006
202-296-6650 (phone)
202-296-7585 (facsimile)
jlee@comptel.org

*Attorney for COMPTEL*

Kathleen F. O'Reilly (Bar No. 056390)
Counsel to NASUCA
414 "A" Street, SE
Washington, D.C. 20003
202-543-5068 (phone)
202-546-8395 (facsimile)
kforeilly@igc.org

David C. Bergmann
Chair, NASUCA Telecommunications
Committee
Assistant Consumers' Counsel
Office of the Ohio Consumers' Counsel
10 West Broad Street, Suite 1800
Columbus, OH 43215
614-466-8574 (phone)
614-466-9475 (facsimile)
bergmann@occ.state.oh.us

*Attorneys for NASUCA*

Christopher J. White (Bar No. 967919)
Deputy Public Advocate
Division of the Rate Counsel
31 Clinton Street, 11th Floor
P.O. Box 46005
Newark, NJ 07101
973-648-7575 (phone)
973-624-1047

*Counsel for the New Jersey Division
of Rate Counsel*

Christopher J. Wright (Bar No. 367384)
Timothy J. Simeone (Bar No. 453700)
Harris, Wiltshire & Grannis LLP
1200 Eighteenth Street N.W., 12th Floor
Washington, DC  20036
202-730-1300 (phone)

*Counsel for Sprint Nextel Corporation*