**JOINT STATEMENT OF
CHAIRMAN KEVIN J. MARTIN AND
COMMISSIONER DEBORAH TAYLOR TATE**

Re:  *AT&T Inc. and BellSouth Corporation Application for Transfer of Control*, WC Docket No. 06-74


The telecommunications market continues to be a dynamic one.  New technologies and services are continuing to transform every aspect of our lives.  The merged AT&T/BellSouth (AT&T) promises to offer consumers a wider array of IP-enabled services, including voice, data, wireless, and video services.  In particular, the merger will enable the combined company to accelerate its deployment of broadband and IPTV in the BellSouth region.   The merger also will enhance national security by creating a stronger and more efficient U.S. supplier of critical communications capabilities.  Further, the merger will allow the combined entity to expand its global reach and be better positioned to provide the broad range of communications services that enterprise customers demand.  As a result, today the Commission finds that this merger will further many of its broadband, competition, and public safety priorities and finds that the merger, on balance, will serve the public interest.

In particular, this merger promises to result in greater competition in the broadband and video markets.  Broadband deployment to all Americans remains one of the highest objectives for us at the Commission.  This deployment is critical to our nation's competitiveness in the global economy and to our national security.  All consumers should expect to benefit from this technology.  The merging parties recognize this and continue to deploy high bandwidth broadband to consumers.  This merger will enable the combined entity to build upon the progress the companies have individually made in the deployment of broadband technologies in the combined territory.

The merging parties are also engaged in plans to deploy IPTV service throughout their territories to compete with other video providers, like cable and satellite.  By enhancing the ability of new entrants to provide video services, we are advancing our goal of universal affordable broadband access for Americans, as well as our goal of increased video competition.  Greater competition in the market for the delivery for multichannel video programming is a primary and long-standing goal of federal communications policy. Consumers across the country will reap the benefits of this new competition – and sooner as a result of this merger.  The addition of new entrants in the video marketplace holds prices down and improves service.  The additional competition, as well as the nature of IPTV, will also improve the availability and control of content that American consumers demand.  Moreover, the delivery of quality video services that demand a quality broadband infrastructure will only further encourage the deployment of broadband networks into yet unserved or underserved areas.

Although we believe that this transaction offers significant benefits to consumers, we have reservations about some of the voluntary commitments offered by the merger applicants. Like the review by the Department of Justice, nineteen states, and three foreign countries, the order we adopt today does not find there to be any public interest harms resulting from the merger. Unlike the Department of Justice and these other entities, however, we nevertheless impose a number of conditions on the merging parties.

Some of the conditions will certainly provide additional consumer benefits. We find the imposition of some of the conditions, however, to be unnecessary. And, some of the conditions impose burdens that have nothing to do with the transaction, are discriminatory, and run contrary to Commission policy and precedent.

To be sure, we are pleased that some of these conditions should accelerate the deployment of broadband facilities and adoption of broadband service throughout the 22-state region of the merged company. For example, the applicants have committed to offer high-speed broadband services to all consumers in the combined territory by the end of 2007. They have also committed to providing new retail broadband customers a $10 a month broadband Internet access service throughout the combined region and they have committed to provide a stand-alone broadband service – one that doesn't require the purchase of other bundled services – at $19.95 per month. While we would not impose these requirements as regulations, we are pleased that these conditions will further encourage the deployment and adoption of broadband by consumers. As such, these are certainly consumer-friendly concessions and are additional public benefits of the transaction.

Other conditions, however, are unnecessary and may actually deter broadband infrastructure investment. The conditions regarding net-neutrality have very little to do with the merger at hand and very well may cause greater problems than the speculative problems they seek to address. These conditions are simply not warranted by current market conditions and may deter facilities investment. Accordingly, it gives us pause to approve last-minute remedies to address the ill-defined problem net neutrality proponents seek to resolve.

Importantly, however, while the Democrat Commissioners may have extracted concessions from AT&T, they in no way bind future Commission action. Specifically, a minority of Commissioners cannot alter Commission precedent or bind future Commission decisions, policies, actions, or rules. Thus, to the extent that AT&T has, as a business matter, determined to take certain actions, they are allowed to do so. There are certain conditions, however, that are not self-effectuating or cannot be accomplished by AT&T alone. To the extent Commission action is required to effectuate these conditions as a policy going forward, we specifically do not support those aspects of the conditions and will oppose such policies going forward.

For example, today's order does not mean that the Commision has adopted an additional net neutrality principle. We continue to believe such a requirement is not necessary and may impede infrastructure deployment. Thus, although AT&T may make a voluntary

business decision, it cannot dictate or bind government policy.  Nor does this order.  Similarly, this order does not bind the Commission to reregulate prices or reestablish price controls.  Specifically, with regard to special access condition #6, AT&T is required to file an amended tariff which reduces its wholesale special access prices for DS1, DS3, and Ethernet services to some but not all companies.  Unlike the commitment to offer broadband services to consumers for $19.95 a month, this condition provides no consumer benefit and is aimed at large enterprise customers and some competing carriers.  And, AT&T will not be giving theses discounts to all customers equally.  Specifically, the merged entity will lower the prices for some carriers but not for others.  Carriers such as Verizon and Qwest do not qualify for these discounted rates unless they also lower their rates in their respective regions.  In effect, therefore, the Democrat Commissioners want to price regulate not only AT&T but also Verizon and Qwest.  Accordingly, not only are the conditions unnecessary as there is no finding of public interest harm, but the conditions attempt to impose requirements on companies that are not even parties to the merger.  As such, this condition imposes burdens on carriers that are not even parties to the transaction.  This condition surely imposes burdens that have nothing to do with the transaction.

Moreover, unlike other voluntary business commitments, this condition requires future Commission approval.  Such approval would contravene established Commission policy and precedent and we would object.  In short, we object to effectuating a change in Commission policy by a voluntary commitment by one company.

First, the reimposition of rate regulation in the special access market is inconsistent with the Commission's general policies of deregulating prices in competitive markets.  Second, such a condition is explicitly inconsistent with Section 202(a) of the Communications Act of 1934, as amended, that prevents discrimination in, among other things, charges, practices, or services and finds it unlawful to give any undue or unreasonable preferences or advantages.  *See* 47 U.S.C. § 202(a) (prohibiting unreasonable discrimination in charges or services for like communication services directly or indirectly); *Maislin Industries, U.S., Inc. v. Primary Steel, Inc*., 497 U.S. 116, 130-31 (1990) (invalidating order allowing a carrier to charge a tariffed, regulated rate to certain customers and not others); *MCI v. CompTel*, 842 F. 2d. 1296, 1304 (1988) (stating that the Commission is required by statute to ensure that special access tariffs "conform to the dictates of section 202(a).  If certain prices are discriminatory, it is not enough to point to the fact that they were computed in accordance with dissimilar methodologies.  The FCC has no choice but to see that the terms of section 202(a) are observed, even if that entails some modification of the methodologies used to derive the proposed charges.").  Carriers that are denied the discounts would be subject to a competitive disadvantage in the marketplace.

As such, even when AT&T attempts to fulfill its merger commitment by filing its tariffs, the Commission is not bound to approve these tariffs.  Indeed, consistent with the Commission's prior policies and precedent, we would oppose such discriminatory practices and would encourage such tariffs to be rejected.

Finally, in addition to the fact that this condition appears aimed to give certain competing carriers an advantage over others, we note that there is no requirement that the benefits of the discounted special access rates are passed through to customers.

AT&T's proposed commitments turn the clock backward to rate regulations of a decade past. While the company has voluntarily agreed to these conditions, the Commission is required by law to recognize competition and will continue to use other tools and legal avenues to continue down the deregulatory path envisioned by Congress and adopted by the Commission.